## 23-2553

IN THE

# United States Court of Appeals

### FOR THE THIRD CIRCUIT



UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

*On Appeal from the United States District Court
for the Eastern of District of Pennsylvania
The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK*

## JOINT APPENDIX
## VOLUME XLII OF XLV
### Pages Appx19501 to Appx20000
### (Filed Under Seal)

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*

## **Table of Contents**

**Page**

### **Volume III**
### **(Filed Under Seal)**

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
    (Doc. 250) ................................................................... Appx181

Statement of Material Facts by Defendant in Support of
    Its First Dispositive Motion, dated October 25, 2019
    (Doc. 281-3) ............................................................. Appx185

Statement of Material Facts by Defendant in Support of
    Its Fourth Dispositive Motion, dated October 25, 2019
    (Doc. 287-3) ............................................................. Appx247

Statement of Material Facts by Relators,
    dated October 25, 2019 (Doc. 294) ........................... Appx295

Declaration of Gary Reilly, for Relators,
    in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

    Exhibit 1 to Reilly Declaration -
    Expert Report of Eugene Shapiro, M.D.,
    dated March 13, 2018. ........................................... Appx438

    Exhibit 2 to Reilly Declaration -
    Expert Report of Dr. Robert Malone, M.D.,
    dated March 13, 2018 ........................................... Appx460
    *(Cont'd in Vol IV)*

### **Volume IV**
### **(Filed Under Seal)**

    Exhibit 3 to Reilly Declaration -
    Expert Report of David A. Kessler, M.D.,
    dated March 14, 2018, with Schedules
    and Appendices ..................................................... Appx551
    *(Cont'd in Vol V)*

**Table of Contents**
**(Continued)**

**Page**

**Volume V**
**(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ...................................................... Appx1483
*(Cont'd in Vol VI)*

**Volume VI**
**(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 .............................................................. Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018 ...................................................... Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017 .......................................................... Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018 ........................................................ Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016 ........................................................ Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 .............................................................. Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 .............................................................. Appx1945

**Table of Contents**
**(Continued)**

**Page**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ........................... Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 ............................................................. Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
*(Cont'd in Vol VII)*

**Volume VII**
**(Filed Under Seal)**

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 ........................................................ Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ........................................................ Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 ........................................................ Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) ................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ...................................... Appx2232

**Table of Contents**
**(Continued)**

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ............................................................ Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ....................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ................................................................ Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ................................................................ Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018 ... Appx2476
**(Cont'd in Vol VIII)**

**Volume VIII**
**(Filed Under Seal)**

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ................................................................ Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) ........................................................... Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ............................................................ Appx2538

**Table of Contents**
**(Continued)**

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................. Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ....................................................... Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 ........................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ...................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) ................................................... Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

**Table of Contents**
**(Continued)**

**Page**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ....................... Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ..................................................... Appx2938
*(Cont'd in Vol IX)*

**Volume IX**
**(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 ......................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 .................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 ....................................................... Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

**Page**

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) ......................................................... Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) ................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 ............................................................... Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) ................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) ................................................... Appx3552

**Table of Contents**
**(Continued)**

**Page**

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

**Table of Contents**
**(Continued)**

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ..................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 .............................................................. Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ..................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ....................................................... Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ..................................................... Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

**Table of Contents**
**(Continued)**

**Page**

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ...................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ...................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) ...................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................. Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ...................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ......................................................... Appx3910

**Table of Contents**
**(Continued)**

**Page**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ...................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ...................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ........................ Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) .................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as"CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) ........................................................ Appx3991
*(Cont'd in Vol XI)*

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

**Table of Contents**
**(Continued)**

**Page**

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ...................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ...................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ....................................................... Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ....................................................... Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ....................................................... Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ...................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ...................... Appx4091

**Table of Contents**
**(Continued)**

**Page**

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) .................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) ........................................................ Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) .................................................. Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) ........................................................ Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) ........................................................ Appx4227

**Table of Contents**
(Continued)

Page

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ...................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ...................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ...................................................... Appx4467

**Table of Contents**
**(Continued)**

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) .................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) .................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 .................................................................. Appx4497
*(Cont'd in Vol XII)*

**Volume XII**
**(Filed Under Seal)**

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016 ..................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) .................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) ................................................... Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

**Table of Contents**
**(Continued)**

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ...................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 ........................................................... Appx4879
*(Cont'd in Vol XIII)*

**Volume XIII**
**(Filed Under Seal)**

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ...................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ........................................................ Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) ........................................................... Appx5103

**Table of Contents**
**(Continued)**

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) ......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) .................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ...................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ............... Appx5158

**Table of Contents**
**(Continued)**

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ............... Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ...................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

**Table of Contents**
**(Continued)**

**Page**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ................................................ Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) ...................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) .......................................... Appx5466
***(Cont'd in Vol XIV)***

**Volume XIV**
**(Filed Under Seal)**

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) ...................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

**Table of Contents**
**(Continued)**

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................ Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ..................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ....................................................... Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ..................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ........................................................... Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ....................................................... Appx5868

**Table of Contents**
**(Continued)**

**Page**

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ...................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ...................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ...................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ...................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ...................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ...................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ...................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ...................................................... Appx5892

**Table of Contents**
**(Continued)**

**Page**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 ......................................................... Appx5896
*(Cont'd in Vol XV)*

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 ........................................................... Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ......................................................... Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) .................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................. Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) ............................................... Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

**Table of Contents**
**(Continued)**

**Page**

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) ..................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) .................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

**Table of Contents**
**(Continued)**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) ..................................................... Appx6493
*(Cont'd in Vol XVI)*

**Volume XVI**
**(Filed Under Seal)**

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) ..................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

**Table of Contents**
(Continued)

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ....................... Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 ............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ..................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ....................................................... Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ....................................................... Appx6645

**Table of Contents**
**(Continued)**

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ...................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017 ........................................................ Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ...................................................... Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ...................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ...................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 ........................................................ Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ...................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ...................... Appx6830

**Table of Contents**
**(Continued)**

**Page**

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ......................... Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) ..................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ....................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ......................... Appx7000
*(Cont'd in Vol XVII)*

**Volume XVII**
**(Filed Under Seal)**

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ........................ Appx7010

**Table of Contents**
**(Continued)**

**Page**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ....................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ................ Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) .......................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ..................................... Appx7169

**Table of Contents**
**(Continued)**

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ............................................................ Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ............................................................ Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ............................................................ Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ............................................................ Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ............................................................ Appx7202

**Table of Contents**
(Continued)

**Page**

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) ............................................................................ Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ........................................................ Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ........................... Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ........................................................ Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 ............................................................. Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 ........................................................ Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 .............................................................. Appx7403
*(Cont'd in Vol XVIII)*

**Table of Contents**
**(Continued)**

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 .............................................................. Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ....................... Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ...................................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) ..................................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 ................................................................. Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................ Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................ Appx7609

**Table of Contents**
(Continued)

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014)  ................................................................ Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 .......................................................... Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 .................................................................. Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008  ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) .................................................. Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................ Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

**Table of Contents**
**(Continued)**

**Page**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC ..................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC ..................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................. Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................. Appx7987
*(Cont'd in Vol XIX)*

**Volume XIX**
**(Filed Under Seal)**

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC ..................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC ..................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC ..................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC ..................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC ..................................... Appx8127

**Table of Contents**
(Continued)

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC ..................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ...................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ...................................................... Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 ................................................ Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 .......................................................... Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) ......................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) ......................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) ......................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) ......................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ........................................................ Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ........................................................ Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ........................................................ Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ........................................................ Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ........................................................ Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ........................................................ Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ........................................................ Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ........................................................ Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ........................................................ Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ........................................................ Appx8395

**Table of Contents**
**(Continued)**

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) ......................................................... Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) ......................................................... Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) ......................................................... Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) ......................................................... Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 ............................................................. Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) ................................................... Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) ..................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) ..................................................... Appx8478
*(Cont'd in Vol XX)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) ..................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) ................................................... Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) ..................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) ..................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) ..................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) ................................................... Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) ..................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) ..................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) ................................................... Appx8718

**Table of Contents**
**(Continued)**

**Page**

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ..................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ..................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ..................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ..................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ..................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ..................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ................................................... Appx8996
*(Cont'd in Vol XXI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) ................................................. Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) ..................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) ..................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) ..................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) ................................................. Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) ..................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) ..................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

**Table of Contents**
**(Continued)**

**Page**

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 .................................................................. Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

## **Table of Contents**
### **(Continued)**

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ...................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ..................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ....................................................... Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ..................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ......................................................... Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ......................................................... Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ..................................................... Appx9420

**Table of Contents**
**(Continued)**

**Page**

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) ..................................................... Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ............................................. Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) .......................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 ...................................... Appx9448
*(Cont'd in Vol XXII)*

**Volume XXII**
**(Filed Under Seal)**

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ............................................. Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 .......................................... Appx9621

Declaration of Lisa C. Dykstra in Support of
Defendant's Motions for Summary Judgment,
executed October 25, 2019 (Doc. 295) .................... Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

**Table of Contents**
(Continued)

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 ................................................................ Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) .......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ........................................................ Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 .......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 ............................................................... Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 .................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................. Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) ..................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) .................................................... Appx9805
*(Cont'd in Vol XXIII)*

**Table of Contents**
**(Continued)**

**Volume XXIII**
**(Filed Under Seal)**

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D. .................................................. Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) .................................................. Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016 .......................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) .................................................. Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ............... Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) .................................................. Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107) ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
**(Continued)**

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) ..................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................ Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) ................................................. Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) .................................................. Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) .................................................. Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

**Table of Contents**
**(Continued)**

**Page**

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ....................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

**Table of Contents**
**(Continued)**

**Page**

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 .................................................... Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ............................................ Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ................................ Appx10319

**Table of Contents**
**(Continued)**

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ....................................................... Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet ................................................................ Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 .................................................................. Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) ................................................... Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) ................................................... Appx10497
*(Cont'd in Vol XXIV)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ............................................... Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) ................................................... Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) .................................................. Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) .................................................. Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) .................................................. Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) ................................................... Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) ................................................... Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) ................................................... Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) ................................................... Appx10789

**Table of Contents**
**(Continued)**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ............................................... Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) ................................................... Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) .................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) .................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) .................................................... Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) .................................................... Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) .................................................... Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) .................................................... Appx10988
*(Cont'd in Vol XXV)*

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 ............................................................. Appx11017

**Table of Contents**
**(Continued)**

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ........................................ Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ................................................. Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 ...................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................. Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 ............................................. Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ....... Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 .................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ............................ Appx11086

**Table of Contents**
**(Continued)**

**Page**

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 .............................................................. Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 ...............................................................Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967  .........................................................Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) .............Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) .......Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017  .......................................................Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ...........................Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil.  ..................................................Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 ...............................................................Appx11194

**Table of Contents**
(Continued)

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 .................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 .......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................. Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 .............................. Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 ........................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ........................................................... Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 ................................................................. Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

**Table of Contents**
(Continued)

**Page**

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al.*, *Viral Infections*,
(7th Edition, Chapter 180) .................................................... Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................. Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ......................... Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................. Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) ................................................. Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ...................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ................................................................ Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers .................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

**Table of Contents**
**(Continued)**

**Page**

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ............................................................ Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ........................................................ Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ............................... Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ............................... Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ........................................................ Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label ................................................... Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ............................... Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) ................................................... Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) ..................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................. Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) ..................................................... Appx11713

**Table of Contents**
**(Continued)**

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) .................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) .................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) .................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) .................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) .................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) .................................................... Appx11764

**Table of Contents**
**(Continued)**

**Page**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) ..................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) ..................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
*(Cont'd in Vol XXVII)*

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) ..................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) ..................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ....................................................... Appx12248

**Table of Contents**
(Continued)

Page

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855)  ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................... Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) ................................................... Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

**Page**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................ Appx12294
*(Cont'd in Vol XXVIII)*

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................. Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) ............................................. Appx12506
*(Cont'd in Vols XXIX, XXX, and XXXI)*

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) .................................................... Appx14066

**Table of Contents**
**(Continued)**

**Page**

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ............................................... Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
*(Cont'd in Vol XXXII)*

**Volume XXXII**
**(Filed Under Seal)**

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) .................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) .................................................... Appx14537

**Table of Contents**
**(Continued)**

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) ..................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................ Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) .................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................. Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) ................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
(Continued)

**Page**

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................ Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ....................................................... Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) .................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ....................................................... Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) .................................................... Appx14988

**Table of Contents**
**(Continued)**

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) .............................................. Appx14997
***(Cont'd in Vol XXXIII)***

**Volume XXXIII**
**(Filed Under Seal)**

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) ............... Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................. Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) ................................................... Appx15389

**Table of Contents**
**(Continued)**

**Page**

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin .................................................................. Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) .................................................. Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) .................................................. Appx15494
*(Cont'd in Vol XXXIV)*

**Volume XXXIV**
**(Filed Under Seal)**

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ........................................................... Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ...................................................... Appx15556

**Table of Contents**
**(Continued)**

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) ................................................................. Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 .................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 ........................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ....................................................... Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) ........................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ....................... Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members .................................................. Appx15738

**Table of Contents**
(Continued)

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 .............................................. Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ........................ Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) ............................................. Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) .................................. Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ........................ Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ...................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies ................................................... Appx15794

**Table of Contents**
**(Continued)**

**Page**

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) ................... Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ........................................................ Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) ................................................... Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) ................................................... Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) ..................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) ..................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) ................................................... Appx15897

**Table of Contents**
**(Continued)**

Exhibit 228 to Dykstra Declaration -
M-M-R®II Label (October 2003)
(MRK-KRA00757092-5) ...................................................... Appx15901

Exhibit 229 to Dykstra Declaration -
M-M-R®II Label (September 2002)
(MRK-KRA00757096-9) ...................................................... Appx15906

Exhibit 230 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757104-7) ...................................................... Appx15911

Exhibit 231 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757108-11) ...................................................... Appx15916

Exhibit 232 to Dykstra Declaration -
M-M-R®II Label (April 19999)
(MRK-KRA01449029-40) ...................................................... Appx15921

Exhibit 233 to Dykstra Declaration -
M-M-R®II Label (February 2014)
(MRK-KRA01449226-36) ...................................................... Appx15934

Exhibit 234 to Dykstra Declaration -
M-M-R®II Label (June 2014)
(MRK-KRA01449243-53) ...................................................... Appx15946

Exhibit 235 to Dykstra Declaration -
M-M-R®II Label (October 2015)
(MRK-KRA01449260-70) ...................................................... Appx15958

Exhibit 236 to Dykstra Declaration -
M-M-R®II Label (February 2000)
(MRK-KRA01449271-5) ...................................................... Appx15970

Exhibit 237 to Dykstra Declaration -
M-M-R®II Label (March 2010)
(MRK-KRA01449276-83) ...................................................... Appx15976

**Table of Contents**
**(Continued)**

Page

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) .................................................. Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) .................................................. Appx15994
*(Cont'd in Vol XXXV)*

**Volume XXXV**
**(Filed Under Seal)**

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................. Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) .................................................... Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ......................................... Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ......................................... Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website .................................... Appx16173

**Table of Contents**
**(Continued)**

**Page**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) ........................................ Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................ Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 ........................................ Appx16342

Defendant Merck's Response to Relators' Statement of
Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

**Volume XXXVI**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra, for Merck, in Support of
Response to Relators' Statement of Material Facts,
executed November 26, 2019 (Doc. 299) ............................. Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ....................................... Appx16521

**Table of Contents**
**(Continued)**

**Page**

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851  .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 .......................................................................... Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004  ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017  ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil.  .................................................... Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................... Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ....................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) ................................................. Appx16569

**Table of Contents**
**(Continued)**

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) .................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................. Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ................................................. Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ........................................ Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 ................................................................... Appx16820

**Table of Contents**
**(Continued)**

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 ........................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) .................................................... Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ............................................................. Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 ............................................................ Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) .................................................... Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
*(Cont'd in Vol XXXVII)*

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) ........................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

**Table of Contents**
**(Continued)**

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 .................................................. Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................. Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................. Appx17425
*(Cont'd in Vol XXXVIII)*

**Volume XXXVIII**
**(Filed Under Seal)**

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ................................................. Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

**Table of Contents**
**(Continued)**

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
***(Cont'd in Vol XXXIX)***

**Volume XXXIX**
**(Filed Under Seal)**

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" ........................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" .............................................................. Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................. Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" .................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................. Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases" ................................................... Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

**Table of Contents**
**(Continued)**

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................ Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 ................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ...................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

**Table of Contents**
**(Continued)**

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high
vaccination era," by Marshall, Helen and Plotkin, Stanley,
*Lancet Infectious Diseases*, (2019) 19:118-119 ................... Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and
rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current
Opinion in Virology*, (2019) 34:110-116 ............................... Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin,
Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*,
(2013) 32(10):1156-1157 ..................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough)
Publications ......................................................................... Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and
Resources ............................................................................ Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ...................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland,
dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed
May 30, 2019 ...................................................................... Appx18428

**Table of Contents**
**(Continued)**

**Page**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 ................................................ Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
*(Cont'd in Vol XL)*

**Volume XL**
**(Filed Under Seal)**

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

**Table of Contents**
**(Continued)**

**Page**

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ............................................................ Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 ................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ................................................ Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 .................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ........................................................... Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) ................................................................ Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) ................................................................ Appx18646

**Table of Contents**
(Continued)

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) .................................................................. Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) ......................................................... Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH .................................................. Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ........................................................... Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 .......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 .......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ........................................................... Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ........................................................... Appx18747

**Table of Contents**
**(Continued)**

**Page**

Relators' Responses to Merck's Statements of Material Facts in
Support of Its First and Fourth Summary Judgment Motions
and Their Corresponding Additional Statement of Material
Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
Merck's Four Motions for Summary Judgment,
executed November 26, 2019 (Doc. 300) ............................ Appx18984

   Exhibit 361 to Reilly Declaration -
   Deposition Testimony of Amy Keegan,
   taken April 27, 2017 ............................................................. Appx18996
   *(Cont'd in XLI)*

**Volume XLI**
**(Filed Under Seal)**

   Exhibit 362 to Reilly Declaration -
   Memorandum titled "Delay of Filing for Optimized
   GOS/HAS-free Diluent for M-M-R®II" with Attachment,
   dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

   Exhibit 363 to Reilly Declaration -
   The Current Manufacturing Target Titer for the Mumps
   Component of Measles, Mumps, and Rubella Virus Vaccine
   Live M-M-R®II (MRK-CHA00576983-93) ....................... Appx19077

   Exhibit 364 to Reilly Declaration -
   Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
   M.D., dated December 10, 1998, with Attachment
   (MRK-CHA00756233-55) ................................................... Appx19089

   Exhibit 365 to Reilly Declaration -
   Excerpts from Clinical and Regulatory Review Committee
   Critical Activities, issued August 15, 2001
   (MRK-CHA01724860-25029) ............................................. Appx19113

**Table of Contents**
**(Continued)**

**Page**

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) ............................................... Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) .............................................. Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) .................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) .................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) .................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................. Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ................ Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) ................................................... Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) .............................................. Appx19202

**Table of Contents**
(Continued)

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 ........................................................ Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) .................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) .............................. Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 ........................................................ Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ............................................................ Appx19455

**Table of Contents**
(Continued)

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) ................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) .................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) .................................................. Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) .................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ...................................... Appx19498
*(Cont'd in Vol LXII)*

**Table of Contents**
**(Continued)**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) ................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................. Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018 ...................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

**Table of Contents**
(Continued)

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) ..................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ........................................ Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 .................................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 ....................................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ................................................................ Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
**(Continued)**

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) ..................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................. Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) .................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ......................................................... Appx19788

**Table of Contents**
**(Continued)**

**Page**

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) .................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) .................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) .................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) .................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) .................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) .................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

**Page**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
***(Cont'd in Vol XLIII)***

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................. Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) ................................................. Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ............................................................ Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................... Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

**Table of Contents**
(Continued)

**Page**

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................. Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) .................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) .................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................. Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) ................................................... Appx20176

**Table of Contents**
(Continued)

Page

Exhibit 442 to Reilly Declaration -
Deposition Testimony of  Thomas McGuire, Ph.D.,
taken July 2, 2018 ............................................................... Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009................................... Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 ............................................... Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ........................................................ Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) ............................................................... Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 ............................................................... Appx20360

**Table of Contents**
**(Continued)**

**Page**

Defendant Merck's Response to Relators' Additional Statement of
    Material Facts in Connection with Defendant's First and Fourth
    Summary Judgment Motions, dated December 20, 2019
    (Doc. 311) ............................................................................. Appx20427

Defendant Merck's Response to Relators' Additional Statement of
    Material Facts in Connection with Defendant's First and Fourth
    Summary Judgment Motions, dated December 20, 2019
    (Doc. 314) ............................................................................. Appx20486
    *(Cont'd in Vol XLIV)*

**Volume XLIV**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra in Support of Defendant's
    Replies and Response to Motions for Summary Judgment,
    executed December 20, 2019 (Doc. 315) .............................. Appx20545

    Exhibit 330 to Dykstra Declaration -
    Excerpts from the Deposition Testimony of Amy Keegan,
    taken February 9, 2018 ........................................................ Appx20552

    Exhibit 331 to Dykstra Declaration -
    Email from Paul Lanzetta to Thomas Romanus
    and John Comonitski, dated August 19, 2011
    (MRK-KRA00955764-955765) .......................................... Appx20555

    Exhibit 332 to Dykstra Declaration -
    Excerpts from Deposition Testimony of Cynthia Morrisey,
    taken July 27, 2017 ............................................................. Appx20558

    Exhibit 333 to Dykstra Declaration -
    Table of Contents for Information Submitted with Merck's
    BLA for the replacement of Human Serum Albumin with
    Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

    Exhibit 334 to Dykstra Declaration -
    FDA's Draft Guidance for Industry Stability Testing of
    Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

**Table of Contents**
**(Continued)**

**Page**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) ......................................................... Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............ Appx21035

**Table of Contents**
**(Continued)**

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31) ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) .................................................................... Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) .................................................................... Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) .................................................................... Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ............................................ Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) ........................................ Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009) ............................................................ Appx21120

**Table of Contents**
(Continued)

                                                                    **Page**

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 ................... Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................. Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) ........................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) ............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................ Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) ................................................................... Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 ......................................................... Appx21192

**<u>Table of Contents</u>**
**(Continued)**

**<u>Page</u>**

Defendant's Response to the United States' Statement of
    Interest in Response to the Parties' Summary Judgment
    Briefing, dated January 18, 2021 (Doc. 323)...................... Appx21194

Defendant Merck's Reply to Relators' Response Regarding
    the United States' Statement of Interest (Doc. 328) .......... Appx21206

# M-M-R®<sub>II</sub>

Presentation Agenda

- **Agenda:**

  » **Background**

  » **Mumps End Expiry Clinical Trial : current status**

  » Statistical evaluation for study success

  » Impact of mumps end expiry study outcome
    » Regulatory compliance
    » Filing in Japan

  » Short-term options under evaluation

  » Decision requested

CONFIDENTIAL

MRK-CHA00025831_00003

3

**Appx19501**

MRK-CHA0002583l

# Mumps End Expiry Study (#007): Background

- In 1996, CBER noted that the minimum release spec for mumps equals minimum claimed potency (i.e. no allowance for stability losses over claimed shelf-life)

- Merck committed to a clinical study to evaluate lower end expiry potencies.

- In 1999, CBER specified that the mumps minimum release potency be set at 5.0 log $TCID_{50}$/dose to support an end expiry claim of 4.3 log $TCID_{50}$/dose.

- The release potency recommended by CBER neglected to include all elements, including variability, associated with post-release potency losses

4

MRK-CHA00025831_00004

CONFIDENTIAL

# Mumps End Expiry Study (#007): Background

- Multiple regulatory interactions ensued, which led to Merck commitment to:

  » (1) design a stability study with lots manufactured to the new mumps target and

  » (2) set permanent release specifications with the data obtained from that study.

- Recent calculations show that the current manufacturing target of 5.2 log $TCID_{50}$/dose and associated release potency of 5.0 log $TCID_{50}$/dose can support an end of expiry claim of 4.0 log $TCID_{50}$/dose (at 24 months dating), the intermediate dose used in the mumps end-expiry trial – **but not an end expiry of 4.3 log $TCID_{50}$/dose.**

MRK-CHA00025831_00005

CONFIDENTIAL

# Mumps End Expiry:
## Clinical Study (#007)

- Objective:

  Comparison of the immunogenicity of M-M-R®$_{II}$ at potencies (3.7 & 4.0 log TCID$_{50}$) below claimed end expiry (4.3 log TCID$_{50}$) to M-M-R®$_{II}$ with a standard release potency (4.9 log TCID$_{50}$)

- Vaccination Group/ Number of Subjects

  » M-M-R®$_{II}$ (mumps potency 4.9 log TCID$_{50}$) - 590

  » M-M-R®$_{II}$ (mumps potency 4.0 log TCID$_{50}$) - 590

  » M-M-R®$_{II}$ (mumps potency 3.7 log TCID$_{50}$) - 590

- Blood samples at Day 1 and 42 (+ 1yr persistence)

- Enrollment complete. FPI: Feb99; LPO (day 42): Sept00

CONFIDENTIAL

MRK-CHA00025831_00006

7

# Mumps End Expiry Study (#007): Issues

- AIGENT Assay (PRN)

» New functional antibody assay developed at the request of CBER

» CBER Inspection of serology laboratory resulted in concerns over GMP issues (i.e. data handling, spreadsheet validation, etc.) in August 2001

» Invalid samples identified for retesting – sample storage exceeds 1 year time limit specified by SOP; issue communicated to CBER

» CBER requested that a retest analysis be performed on subset of samples in April 2002 (to compare original and retest results)

Case 2:23-2553    Document 36-12    Page: 104    Date Filed: 12/06/2023

Appx19505

# Mumps End Expiry Study (#007): Issues

- AIGENT Assay (PRN) - Cont'd

  » GMP issues resolved May 2002

  » Samples retested in June –August 2002

  » Change in immunogenicity identified with post retest samples in August 2002

MRK-CHA00025831_00008

CONFIDENTIAL

# Mumps End-Expiry Trial: Timeline



**February 1999**: First Patient In (FPI)

**August 2000**: Start of Measles ELISA testing
(Thawing of first specimen and Storage at 4°C)

**September 2000**: Last Patient Out (LPO)

**December 2000**: Start of Mumps PRN testing

**August 2001**: - End of Mumps PRN testing (Primary testing period)
- CBER inspection – resolution in May 2002

**June-August 2002** : Retest of Invalid assays by PRN (Second testing period)

MRK-CHA00025831_00009

CONFIDENTIAL

MRK-CHA00025831

# Mumps End Expiry Study (#007): Status

- CBER Communication

  » Background Document to CBER - September 20

  » Obtain concurrence on invalidating test results from 2002 and testing of available frozen retains from this subset

10

MRK-CHA00025831_00010

CONFIDENTIAL

11

# M-M-R®<sub>II</sub>
## Presentation Agenda

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » **Statistical evaluation for study success**

  » Impact of mumps end expiry study outcome
     » Regulatory compliance
     » Filing in Japan

  » Short-term options under evaluation

  » Decision requested

CONFIDENTIAL

MRK-CHA00025831_00011

Appx19509

MRK-CHA0002583

# Criteria for Acceptable Mumps End Expiry Dose

- Primary endpoint based on a mumps neutralization assay

- End expiry dose must be similar (non-inferior) to the release dose

  » 5 percentage point non-inferiority margin

  » One-sided alpha of 0.05

- End expiry dose must have an acceptable antibody response

  » Lower bound of the 95% two-sided confidence interval >90%.

MRK-CHA00025831_00012

CONFIDENTIAL

MRK-CHA0002583l

# M-M-R®II Protocol 007: Mumps End Expiry

Interim Summary of the Percent of Subjects Who Develop Neutralizing Antibodies to Mumps† and Median Titers 6 Weeks Postvaccination and Associated 95% Confidence Intervals in Initially Seronegative Subjects‡

| | Treatment Group | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ~4.9 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 186) | | | ≤4.0 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 196) | | | ≤3.7 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 183) | | |
| Parameter | n | Observed Response | 95% CI | n | Observed Response | 95% CI | n | Observed Response | 95% CI |
| SCR | 168 | 94.6% (159/168) | (90.1%, 97.5%) | 175 | 93.1% (163/175) | (88.3%, 96.4%) | 167 | 88.0% (147/167) | (82.1%, 92.5%) |
| Median Titer | 168 | 2048.0 | (1591.3, 2635.8) | 175 | 2048.0 | (1571.5, 2668.9) | 167 | 2048.0 | (1474.5, 2844.5) |

† ≥4-fold rise in antibody titer, i.e., 1:16 to 1:64 where 1:16 is assigned to titers below 1:32, the limit of detection.

‡ Regardless of protocol violations or day ranges.

†† Percentage of subjects with 6-week titer >4096

N = Number of subjects vaccinated in each treatment group.

n = Number of initially seronegative subjects in each treatment group with postvaccination serology.

CI = Confidence Interval.

CONFIDENTIAL

MRK-CHA00025831_00013

# Interim Analysis Conclusions

- The responses for all three groups were lower than the expected 95%.

- The 3.7 End Expiry potency had a very low chance of meeting the success criteria for the study.

- Given these results, the probability of meeting the acceptability criterion for the 4.0 End Expiry potency was estimated to be approximately 70%.

14

MRK-CHA00025831_00014

CONFIDENTIAL

**Appx19512**

# Decreased Power for Primary Hypotheses

- Loss of ~300 paired samples due to testing outside of assay SOP 1-year window.

- Higher pre-positive rate (14%) than originally anticipated (5%).

- Anticipate only 430 subjects per group, instead of 502 per group.

- Potentially lower response rate in the Release group (94.6%) than originally anticipated (95%).

CONFIDENTIAL

Appx19513

MRK-CHA0002583I

# Overall (Blinded) Seroconversion Rate Estimates

| Timepoint | Overall SCR |
|---|---|
| Interim Analysis (modified SOP) | 92.0% (469/510) |
| Interim Analysis (original SOP) | 93.0% (409/440) |
| Complete Data (excluding ~300 paired samples tested outside the assay SOP 1-year window) | 91.9% (1208/1315) |

MRK-CHA00025831_00016

CONFIDENTIAL

Appx19514

# Required SCR for Success

- Assuming 430 subjects per group and a 95% SCR in the Release group, the observed SCR in the 4.0 Expiry group must be:

  » Acceptability: ≥93.3%
  » Similarity (non-inferiority): ≥ 93.0%

- Note: Observed 93.1% SCR in the interim analysis for the 4.0 Expiry group.

18

# Power to Rule Out a Difference of 5.0 Percentage Points and to Meet a Lower Bound of 90% with 430 Evaluable Subjects Per Group

| Expected True Rate in Control Group | True Decrease Between Control and Mumps Expiry Group | | | |
|---|---|---|---|---|
| | 0.0 Percentage Points | 1.0 Percentage Points | 2.0 Percentage Points | |
| 96% | 97.1% | 83.6% | 51.9% | |
| 95% | 92.5%[1] | 67.5% | 30.9% | |
| 94% | 77.0% | 41.4% | 13.5% | |
| 93% | 48.5% | 18.4% | 4.4% | |
| 92% | 22.0% | 6.1% | 1.1% | |

[1] Based on 502 evaluable subjects in the original protocol, the power was 96.1%.

CONFIDENTIAL

MRK-CHA00025831_00018

**Appx19516**

# M-M-R®$_{II}$
## Presentation Agenda

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » Statistical evaluation for study success

  » **Impact of mumps end expiry study outcome**
    » **Regulatory compliance**
    » **Filing in Japan**

  » Short-term options under evaluation

  » Decision requested

MRK-CHA00025831_00019

CONFIDENTIAL

**Appx19517**

# Mumps End Expiry Study (#007): Regulatory Implications

- Recent calculations using the new stability monitoring model show that the current manufacturing target of 5.2 log $TCID_{50}$/dose and associated release potency of 5.0 log $TCID_{50}$/dose supports an end of expiry claim of 4.0 log $TCID_{50}$/dose (at 24 months dating), the intermediate dose used in the mumps end-expiry trial – **but not an end expiry of 4.3 log $TCID_{50}$/dose at 24 month.**

- Estimated* shelf-life with 4.3 log $TCID_{50}$ is **<12 months, a potentially non-marketable shelf life**

\* Calculations are under review and evaluation

CONFIDENTIAL

MRK-CHA000025831_00020

# Mumps End Expiry Study (#007): Regulatory Implications

- Current Label claims:

|  | mumps end expiry | shelf-life |
|---|---|---|
| » US: | 4.3 log $TCID_{50}$/dose | 24 month |
| » EU & ROW | 3.7/4.3 log $TCID_{50}$/dose * | 24/18 month* |

*local agency requirements

CONFIDENTIAL

MRK-CHA00025831_00021

# JNDA for M-M-R®<sub>II</sub>:
## Status

- Program Objective:  Expand the M-M-R®<sub>II</sub> market into Japan to increase vaccine revenues (~$8MM annually by 2009).

Target

JNDA Final review        (Aug – Sept 02)                    Oct 02

Critical path:
Resolution of mumps end expiry

Filing of JNDA (End Sept 02)                                Dec 02

Review (15-24 month) - Approval                            2Q02 - 4Q04

CONFIDENTIAL

MRK-CHA00025831_00022

# JNDA for M-M-R®$_{II}$:

## Status

- Minimum claimed mumps potency for Japan:

  » Current US label claim specifies mumps potency at end of 24 month shelf-life is equal or above 4.3 log $TCID_{50}$

  » Recent stability estimate does not support label claim

  » Options:

    – Delay file until evaluation of options for short-term fixes are complete
      - Feasibility of future change unclear
      - Delay filing for Kaketsuken creates marketing competitive disadvantage

    – File with minimum mumps potency of 4.3 log $TCID_{50}$ and 12 month shelf-life
      - Feasibility of future change unclear
      - Competitive disadvantage
      - Inconsistent with M-M-R®$_{II}$ label in the US or ROW

    – Delay file until mumps end expiry data analysis is complete and provide in file for Japanese agency review

CONFIDENTIAL

MRK-CHA00025831_00023

**Appx19521**

# M-M-R®$_{II}$

## Presentation Agenda

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » Statistical evaluation for study success

  » Impact of mumps end expiry study outcome
    » Regulatory compliance
    » Filing in Japan

  » **Short-term options under evaluation**

  » Decision requested

CONFIDENTIAL

MRK-CHA00025831_00024

24

**Appx19522**

25

# Options under evaluation for short-term fixes

- The team is evaluating the following options:

  » Maintaining 4.3 log TCID50/dose expiry potency specification
    – reduction in maximum allowed TOR in manufacturing
    – increase overfill of mumps

  » Attempt to negotiate regulatory agency acceptance of the clinical data supporting 4.0 log TCID50
    – Change label to reflect lower than 96% protection

  » Repeat Mumps End Expiry Study

- The team will report to CRRC upon conclusion of evaluation and determination of feasible options

CONFIDENTIAL

MRK-CHA00025831_00025

# Options under evaluation for short-term fixes

- ## Maintaining 4.3 log TCID50/dose expiry potency specification:

  Using new stability monitoring model, current estimate for shelf-life is < 12 month

  » Issue:
    – Label compliance

  » Evaluation underway to define conditions to achieve a shelf-life of 18 months if possible such as reduction of TOR or time post reconstitution, etc.

  » Increase overfill level of mumps
    – Mumps bulk vaccine manufacturing capacity limitations
    – Lack of adequate safety data to support increased titer overfill
    – Implementation of a maximum release specification requirement which may result in an increase in rejection of M-M-R®$_{II}$ lots

CONFIDENTIAL

MRK-CHA00025831_00026

# Options under evaluation for short-term fixes

- **<u>Change label to reflect lower than 96% protection</u>**

  » Issues include:

    – If study fails, this would require negotiating with CBER to relax the criteria of success

    – Relaxing the criteria for success would lower the bar for the competition and facilitate entry into the U.S. market

CONFIDENTIAL

# Options under evaluation for short-term fixes

## **Repeat Mumps End Expiry Study:**

» Issues include:

- Technical feasibility of generating clinical supplies and conducting study

- Time to completion (at least 3 years – short term fixes are still required)

- No assurance that we would succeed the second time

- Completing the study and filing would potentially consume the same timeframe required to correct the stability problem by accelerating the new stabilizer program.

CONFIDENTIAL

MRK-CHA00025831_00028

Appx19526

MRK-CHA0002583l

# Options under evaluation for short-term fixes

- **Increase overfill level of mumps:**

  » Issues include:

  – Lack of adequate safety data to support increased titer overfill

  – Mumps bulk vaccine manufacturing capacity limitations

  – Implementation of a maximum release specification requirement which may result in an increase in rejection of M-M-R®$_{II}$ lots

MRK-CHA00025831_00029

CONFIDENTIAL

# M-M-R®II

## CRRC - Oct. 08, 2002

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » Statistical evaluation for study success

  » Impact of mumps end expiry study outcome
    » Regulatory compliance
    » Filing in Japan

  » Options under evaluation for short-term fixes

  » **Decision requested**

MRK-CHA00025831_00030

CONFIDENTIAL

# Decisions Requested

- Accelerate the new stabilizer program for M-M-R®II in order to improve the stability and the tolerability of the vaccine.

- If program is initiated in 1Q03:
  » timing of file without clinical trial / cross referencing clinical data to ProQuad refrigerated study would be 3-4Q05
  » timing of file with clinical trial would be 1-2Q06

CONFIDENTIAL

MRK-CHA00025831_00031

# New Stabilizer for M-M-R®$_{II}$:

- **Program Objective:** To change from the use of the current stabilizer to a urea-containing stabilizer

- The new stabilizer will provide an opportunity to:

  » Improve the product stability profile (for both mumps and measles)

  » Comply with minimum potency requirements through product expiry

  » Improve adherence to EU thermal stability test requirements

  » Address perceived product tolerability issue

- Program was presented at Vaccine T-PAC Aug02 and awaiting decision at MRL Interface Meeting on program prioritization with other in-line products

CONFIDENTIAL

MRK-CHA00025831_00032

32

**Appx19530**

33

CONFIDENTIAL

# Back-ups

MRK-CHA00025831_00033

# Options under evaluation
# for short-term fixes

- ## Maintaining 4.3 log TCID50/dose expiry potency specification:

  » Impact on marketing*:

  - 18 month Scenario - assuming a loss of 15% in market share in international markets (Europe and ROW) projects to a revenue impact of $212 million for the LROP period.

  - 12 month scenario - assuming a loss of 35% in market share in international markets (Europe and ROW) projects to a revenue impact of $496 million through the LROP time frame.

*based on calculations using baseline LROP 2003 to 2011

MRK-CHA00025831_00034

CONFIDENTIAL

34

11/26/2019
Declaration of G. Reilly
EXHIBIT 391

Appx19533

Alison L. Fisher, Ph. D.
Associate Director
Worldwide Regulatory Affairs
Vaccines/Biologics

Merck & Co., Inc.
P.O. Box 4, BLB-22
West Point PA 19486-0004
Tel 484 344 3761
Fax 484 344 2952
Email:alison_fisher@merck.com

June 30, 2004



**MERCK**

Research Laboratories

William M. Egan, M.D.
Office of Vaccines Research and Review (HFM-400)
c/o Food and Drug Administration
Center for Biologics Evaluation and Research
Document Control Center (HFM-99)
Woodmont Office Center, Suite 200N
1401 Rockville Pike
Rockville, MD 20852-1448

### M-M-R®II
### (Measles, Mumps, and Rubella Virus Vaccine Live)
### STN 101069

### SUPPLEMENTAL BIOLOGICS LICENSE APPLICATION

Dear Dr. Egan:

Pursuant to Section 351 of the Public Health Services Act and in accordance with 21CFR 601.12, we submit for your approval, a Supplemental Biologics License Application for Measles, Mumps, and Rubella Virus Vaccine Live (STN 101069 M-M-R®II).

M-M-R®II is currently manufactured using pooled human derived serum albumin (HSA) as a viral growth media, in the bulk manufacturing process and as a component of the bulk diluents at the formation of the final product. To address ongoing safety and sourcing concerns related to human blood-derived products, Merck & Co. plans to substitute rHA for HSA in the bulk manufacturing process of M-M-R®II. rHA is a recombinant protein produced in yeast [Recombumin™ 20% (rHA) and is manufactured by Delta Biotechnology Ltd.]; this product is structurally and analytically comparable to the unmodified monomeric population of HSA. Experimental data have confirmed that the substitution of rHA for HSA in the viral growth media results in satisfactory vaccine virus growth and product characteristics. Thus, rHA and HSA, which are essentially similar, are considered functionally comparable for the production of viral bulks.

This Manufacturing Supplemental Biologics License Application also provides experimental evidence that substitution of rHA for HSA results in a final product that remains identical to M-M-R®II with HSA except for the use of rHA in the bulk manufacturing culture medium instead of HSA, and removal of HSA and inclusion of rHA in the bulk diluent. In addition, the results of bioequivalence clinical trial 009 ( A Comparison of the Safety, Tolerability, and Immunogenicity of M-M-R®II Manufactured



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00137854
MRK-CHA00137854

**Appx19534**

William M. Egan, M.D.
M-M-R®II (Measles, Mumps, and Rubella Virus Vaccine Live)
SUPPLEMENTAL BIOLOGICS LICENSE APPLICATION
Page 2

with Recombinant Human Albumin (rHA) Versus M-M-R®II Manufactured with Pooled-Donor Human Serum Albumin (HSA) in Healthy Children 12 to 18 Months of Age) conducted under BB-IND 10076 provides safety, tolerability and immunogenicity data to support this claim.

FDA form 2567, a summary of revisions to the circular, and a revised Package Circular are also provided. A SAS transport file containing statistical data sets supporting safety, tolerability, and immunogenicity data for the Clinical Study Reports has been included. Case Report Tabulations and relevant Case Report Forms are provided as SAS transport files in an electronic format (compact disc, CD).

The information contained on CD has an approximate size of < 100 MB. We have taken precautions to insure that any software on the CD is free of computer viruses (Norton Anti-Virus 7.51, Symantec Corp., 2000) and we authorize the use of anti virus software, as appropriate.

In accordance with the Prescription Drug User Fee Act of 1992 (PDUFA) and reauthorized in the Food and Drug Administration Modernization Act of 1997 (FDAMA) and the Prescription Drug User Fee Amendments of 2002 (PDUFA III), as indicated in the attached form 3397, no user fee is required for the supplement as it contains only bioequivalence data.

We consider the information included in this submission to be a confidential matter, and request that the Food and Drug Administration not make its content, or any future communications in regard to it, public without first obtaining the written permission of Merck & Co., Inc.

Should you have any comments or questions regarding the technical electronic linking aspects of this submission please contact Mr. Michael Fallen at (484) 344-7041; please address regulatory questions directly to me at (484) 344-3761, or in my absence, to Dr. Manal Morsy, (484) 344-3785.

Sincerely yours,

Alison Fisher, PhD.
Associate Director
Worldwide Regulatory Affairs
Vaccines and Biologics

Attachments

Federal Express

Q:\FRANKLIN\VACCINES\WINTERBOTTOM\Letters\Cover Letter MMRIIsBLA

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00137855
MRK-CHA00137855

Measles, Mumps, and Rubella Virus Vaccine - Live – Replacement of human serum albumin with
recombinant albumin                                                                                              1
3 Quality
3.2.P.8.3 Drug Product – M-M-R™II with rHA

## TABLE OF CONTENTS

|  | | Page |
|---|---|---|
| List of Tables | | 3 |
| List of Figures | | 6 |
| List of References | | 10 |
| 8.3 | Stability Data | 11 |
| 8.3.1 | Types of Studies and Batches Tested | 11 |
| 8.3.2 | General Study Methodology | 11 |
| 8.3.3 | Test Conditions for Filled Container | 13 |
| 8.3.3.1 | Normal Test Conditions | 13 |
| 8.3.3.1.1 | Storage at −20 °C (−25 to −15 °C) | 13 |
| 8.3.3.1.2 | Storage at 5 °C (2–8 °C) | 13 |
| 8.3.3.1.3 | Reconstitution and Storage at 5 °C (2–8 °C) | 15 |
| 8.3.3.1.4 | Storage at 25 °C (23–27 °C) | 15 |
| 8.3.4 | Assay Procedures and Validation | 16 |
| 8.3.4.1 | Characteristics Studied | 16 |
| 8.3.4.2 | Assay Procedures | 16 |
| 8.3.4.3 | Assay Validation | 17 |
| 8.3.5 | Results of Stability Tests on the Filled Container | 17 |
| 8.3.5.1 | Measles Infectivity Titrations | 17 |
| 8.3.5.1.1 | Storage at −20 °C (−25 to −15 °C) | 17 |
| 8.3.5.1.2 | Storage at 5 °C (2–8 °C) | 28 |
| 8.3.5.1.3 | Storage at 2–8 °C Following Reconstitution | 41 |
| 8.3.5.1.4 | Storage at 25 °C (23–27 °C) | 43 |
| 8.3.5.1.5 | Conclusions on Measles Stability | 47 |
| 8.3.5.2 | Mumps Infectivity Titrations | 47 |
| 8.3.5.2.1 | Storage at −20 °C (−25 to −15 °C) | 47 |
| 8.3.5.2.2 | Storage at 5 °C (2–8 °C) | 58 |
| 8.3.5.2.3 | Storage at 5 °C (2–8 °C) Following Reconstitution | 71 |
| 8.3.5.2.4 | Storage at 25 °C (23–27 °C) | 73 |
| 8.3.5.2.5 | Conclusions on Mumps Stability | 77 |
| 8.3.5.3 | Rubella Infectivity Titrations | 77 |
| 8.3.5.3.1 | Storage at −20 °C (−25 to −15 °C) | 77 |
| 8.3.5.3.2 | Storage at 5 °C (2–8 °C) | 87 |
| 8.3.5.3.3 | Storage at 5 °C (2–8 °C) Following Reconstitution | 100 |
| 8.3.5.3.4 | Storage at 25 °C (23–27 °C) | 101 |
| 8.3.5.3.5 | Conclusions on Rubella Stability | 105 |
| 8.3.5.4 | Summary of All Stability Tests | 105 |
| 8.3.5.4.1 | Tests on −20 °C Samples | 105 |
| 8.3.5.4.2 | Tests on 5 °C (2–8 °C) Samples | 110 |
| 8.3.5.4.3 | Tests on 25 °C (23–27 °C) Samples | 119 |
| 8.3.6 | Derivation of Potency Specifications | 121 |

P.8.3 Stability



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00138585
MRK-CHA00138585

Appx19536

Measles, Mumps, and Rubella Virus Vaccine - Live – Replacement of human serum albumin with
recombinant albumin                                                                2
3 Quality
3.2.P.8.3 Drug Product – M-M-R™II with rHA

| | | |
|---|---|---|
| 8.3.6.1 | Basis for the Label Claim (Minimum Potency at End-Expiry) | 121 |
| 8.3.6.2 | Rationale for Maximum Potencies at Release | 121 |
| 8.3.6.3 | Basis for Minimum Release Potency Specifications | 121 |
| 8.3.6.3.1 | Minimum Release Potency Limit for Measles | 122 |
| 8.3.6.3.2 | Minimum Release Potency Limit for Mumps | 123 |
| 8.3.6.3.3 | Minimum Release Potency Limit for Rubella | 124 |

P.8.3 Stability



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00138586
MRK-CHA00138586

Appx19537

Measles, Mumps, and Rubella Virus Vaccine - Live – Replacement of human serum albumin with 123
recombinant albumin
3 Quality
3.2.P.8.3 Drug Product – M-M-R™II with rHA

#### 8.3.6.3.2    Minimum Release Potency Limit for Mumps

The loss estimates and standard errors for mumps potency were used to determine the minimum post-lyophilization release specification limit needed to ensure, with 95% probability, that the minimum expiry potency of $4.1 \log \mathrm{TCID}_{50}/\mathrm{dose}$, following reconstitution and up to 8 hours at 2–8 °C, would be met. These variables are summarized in [Table 3.2.P.8.3-mmr; 35].

**[Table 3.2.P.8.3-mmr; 35]  Calculation of Mumps Overall Stability Profile Using the Comprehensive Statistical Release Model**

| Storage | Loss Rate ($\log \mathrm{TCID}_{50}/$ unit time) | Standard Error (SE) ($\log \mathrm{TCID}_{50}$) | Duration |
|---|---|---|---|
| Storage at 23–27 °C (Sealing/Inspection/Packaging) | 0.10163/40 hours | 0.04244 | 40 hours |
| Storage at ≤ –20 °C | –0.01493/year | 0.01325 | 1 year[a] |
| Storage at 2–8 °C | 0.54338/24 months | 0.02671 | 24 months |
| Storage at 2–8 °C following Reconstitution | 0.05272/8 hours | 0.01411 | 8 hours |
| Release Potency Assay (1x12) Variability (Std. Deviation) | N/A | 0.060 | N/A |

N/A:  Not applicable.

[a] A transfer study is in progress to extend storage at ≤ –20 °C to 18 months.

The release potency required to guarantee minimum mumps potency at expiry of $\geq 4.1 \log \mathrm{TCID}_{50}/\mathrm{dose}$ is calculated utilizing the total loss (0.6828) and the total variability (square root of the total variance, $\sqrt{0.00645}$). Using the one-sided 95% critical value from a standard normal distribution (1.65) the minimum release potency needed to ensure a 95% probability of exceeding the expiry potency is:

**Minimum Release Potency = Minimum Expiry + total loss + $(1.65 \, x \, \sqrt{TotalVariance}$ )**
$$= 4.1 \log \mathrm{TCID}_{50}/\mathrm{dose} + 0.6828 + (1.65 \, x \, 0.0803)$$
$$= 4.92 \log \mathrm{TCID}_{50}/\mathrm{dose}$$

Since release potency determinations are reported to 0.1 log, the minimum release estimate is conservatively rounded up to provide the proposed minimum release specification of $5.0 \log \mathrm{TCID}_{50}/\mathrm{dose}$. Therefore, the minimum release potency for mumps of $5.0 \log \mathrm{TCID}_{50}/\mathrm{dose}$ ensures, with 95% confidence, that the vaccine will meet or exceed the end-expiry dose at the end of the 24 month shelf-life.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00138707
MRK-CHA00138707

11/26/2019
Declaration of G. Reilly
EXHIBIT 392

Appx19539



Restricted
**R** ⊕ **Confidential**
*limited access*

## *Regulatory Liaison FDA Conversation Record*

| To: | Drs. Keith Chirgwin and Ercem Atillasoy |
|---|---|
| | |
| Vaccine/Project: | M-M-R™II / rHA |
| | |
| Date of Conversation(s): | May 27, 2005 |
| | |
| FDA Contact: | Ms. Daryll Miller, Regulatory Health Project Manager, CBER |
| | Captain Gale Heavner, Director Regulatory, CBER |

**Merck Participant**: Dr. Alison Fisher

**CBER Participant conversation 1**: Ms. Daryll Miller
**CBER Participant Conversation 2**: Captain Gale Heavner

**Executive Summary**

Conversation 1: Ms. Daryll Miller called to apprise me that we need to revise the label for MMR ™II /rHA. The revised label should state that the Mumps End Expiry potency is 20,000 $TCID_{50}$ (4.3 $log_{10}$ $TCID_{50}$). Ms. Miller stated that we need to send this label as an amendment to the sBLA and explain in the cover letter that the label revision is needed because the Mumps End Expiry sBLA has not been approved and may not be approved until early September 05.

I asked Ms. Miller if she had any update on the Mumps End Expiry sBLA. She mentioned that Ms. Luba Vujcic is in charge of reviewing that file, that Captain Heavner is the project manager, and that the responses that were submitted in April have not yet been reviewed based on the workload at CBER with other Merck filings.

Conversation 2: I left a phone message with Captain Gale Heavner to apprise her of the above conversation (conversation 1) with Daryll Miller. Captain Heavner returned my call several hours later. In that conversation (conversation 2), I asked Capt. Heavner if she could update me on the status of the Mumps End Expiry file. She confirmed what Ms. Miller said; that the team is very busy reviewing other Merck files. I mentioned that as the Mumps End Expiry and rHA files are linked, it would certainly be helpful to resolve the issues with the Mumps End Expiry file. I offered to drive to the FDA to meet with the reviewers to walk them through our Mumps End Expiry responses and also offered to bring hard copies of all the correspondence that has taken place between Merck and the agency, since 1996 to help CBER reviewers navigate through the events that formed the basis for the Mumps End Expiry file. She said that this could be very helpful and that she would get back to me with an update.

MRK-KRA00793082
Appx19540

**Post-Meeting Note/Actions:**

We will assess the timing of resubmitting the revisions....(consider waiting until the mumps end expiry file is approved) so that two label updates do not need to be submitted to CBER. If this is the case, notify CBER of this plan and that we will not send revised labeling until we understand the status of the Mumps End Expiry file.

The alternative is to work with the labeling group to revise M-M-R™II /rHA label, to include a Mumps End Expiry potency of 4.3 ($\log_{10}$ TCID$_{50}$), and send the revised label down to CBER as an amendment to the rHA file.

2

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 393

Alison L. Fisher, Ph. D.
Associate Director
Worldwide Regulatory Affairs
Vaccines/Biologics

Merck & Co., Inc.
P.O. Box 4, BLB-22
West Point PA 19486-0004
Tel 484 344 3761
Fax 484 344 2962
Email:alison_fisher@merck.com

July 13, 2005

Norman Baylor, PhD.
Office of Vaccines Research & Review (HFM-400)
Food & Drug Administration
Center for Biologics Evaluation and Research
Document Control Center (HFM-99)
Woodmont Office Center, Suite 200N
1401 Rockville Pike
Rockville, Maryland 20852-1448



Dear Dr. Baylor:

### M-M-R®II
### (Measles, Mumps, and Rubella Virus Vaccine, Live)
### STN 101069/5068

### Amendment to Supplemental Biological Licensing Application – June 30, 2004

We consider the information included in this submission to be a confidential matter, and we request that the Food & Drug Administration not make its contents, or any other future communications in regard to it, public without first obtaining the written permission of Merck & Co., Inc.

This amendment to the supplement contains revised mumps end expiry potency text in Module 1, Label (Attachment 1), in Module 3, Quality, 3.2.P Drug Product Section (Attachment 2) and in Module 2.3, Quality Overall Summary, 2.3.P Drug Product Section (Attachment 3).

In these sections, the mumps end expiry potency has changed from 4.1 log $TCID_{50}$ to 4.3 log $TCID_{50}$ (12, 500 $TCID_{50}$ to 20, 000 $TCID_{50}$ or 12, 500 $CCID_{50}$ to 20, 000 $CCID_{50}$) because the Mumps End Expiry File (STN: BL 10176/5061) has not been approved. Also, any reference to STN: BL 10176/5061 in these sections has been removed for the same reason.

In Attachment 2, please note updates to 3.2.P.8.3 Drug Product section, page 123. The loss rate and standard error for storage at 2-8 $^{\circ}$C were updated using additional stability data from mumps containing vaccines manufactured with either HSA or rHA. The minimum mumps release potency was recalculated with the updated measurements, together with a change of assignment of loss rate at -20 $^{\circ}$C. An estimated increase in potency at -20 $^{\circ}$C was originally used in the calculation. This was changed to 0 (zero) in order to eliminate the artificial deflation of the minimum release potency by a predicted increase of potency at -20 $^{\circ}$C over time.

**CONFIDENTIAL**

MRK-KRA00141789
MRK-CHA00141789

Appx19543

Norman Baylor, Ph.D.
M-M-R®ᵢᵢ (Measles, Mumps, and Rubella Virus Vaccine, Live) STN 101069/5068
Amendment to Supplemental Biological Licensing Application – June 30, 2004
Page 2

If you have any questions concerning this submission, please contact me at 484-344-3761 or in my absence, Ken Surowitz, Ph.D., at 484-344-2122.

Sincerely yours,

Alison L. Fisher, Ph.D.
Associate Director
Worldwide Regulatory Affairs
Biologics/Vaccines

Attachment

Q: Fisher\MMRII letters\ Supplement to rHA submission

CONFIDENTIAL

Form Approved: OMB No. 0910-0338
Expiration Date: August 31, 2006
See OMB Statement on page 2.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

# APPLICATION TO MARKET A NEW DRUG, BIOLOGIC, OR AN ANTIBIOTIC DRUG FOR HUMAN USE

*(Title 21, Code of Federal Regulations, Parts 314 & 601)*

**FOR FDA USE ONLY**

APPLICATION NUMBER

## APPLICANT INFORMATION

| NAME OF APPLICANT | DATE OF SUBMISSION |
|---|---|
| Merck & Co., Inc. | July 13, 2005 |

| TELEPHONE NO. (include Area Code) | FACSIMILE (FAX) Number (include Area Code) |
|---|---|
| (484) 344-3761 | (484) 344-2962 |

| APPLICANT ADDRESS (Number, Street, City, State, Country, ZIP Code or Mail Code, and U.S. License number if previously issued): | AUTHORIZED U.S. AGENT NAME & ADDRESS (Number, Street, City, State, ZIP Code, telephone & FAX number) IF APPLICABLE |
|---|---|
| Sumneytown Pike<br>P.O. Box 4, BLB-22<br>West Point, PA 19486-0004 | |

## PRODUCT DESCRIPTION

NEW DRUG OR ANTIBIOTIC APPLICATION NUMBER, OR BIOLOGICS LICENSE APPLICATION NUMBER (If previously issued)   STN# 101069

| ESTABLISHED NAME (e.g., Proper name, USP/USAN name) | PROPRIETARY NAME (trade name) IF ANY |
|---|---|
| Measles, Mumps and Rubella Virus Vaccine Live | M-M-R® II |

| CHEMICAL/BIOCHEMICAL/BLOOD PRODUCT NAME (if any) | CODE NAME (If any) V205C |
|---|---|

| DOSAGE FORM: Injection | STRENGTHS:<br>Measles/1,000 TCID (50) per 0.5 mL Dose<br>Mumps/20,000 TCID (50) per 0.5 mL Dose<br>Rubella/1,000 TCID (50) per 0.5 mL Dose | ROUTE OF ADMINISTRATION:<br>S.C. |
|---|---|---|

(PROPOSED) INDICATION(S) FOR USE:

MMR® II is indicated for simultaneous vaccination against measles, mumps and rubella in persons 15 months of age or older.

## APPLICATION INFORMATION

APPLICATION TYPE
*(check one)*   ☐ NEW DRUG APPLICATION (21 CFR 314.50)     ☐ ABBREVIATED NEW DRUG APPLICATION (ANDA, 21 CFR 314.94)
☒ BIOLOGICS LICENSE APPLICATION (21 CFR Part 601)

IF AN NDA, IDENTIFY THE APPROPRIATE TYPE     ☐ 505 (b)(1)     ☐ 505 (b)(2)

IF AN ANDA, OR 505(b)(2), IDENTIFY THE REFERENCE LISTED DRUG PRODUCT THAT IS THE BASIS FOR THE SUBMISSION
Name of Drug                                    Holder of Approved Application

TYPE OF SUBMISSION (check one)   ☐ ORIGINAL APPLICATION   ☐ AMENDMENT TO A PENDING APPLICATION         ☐ RESUBMISSION
☐ PRESUBMISSION         ☐ ANNUAL REPORT       ☐ ESTABLISHMENT DESCRIPTION SUPPLEMENT       ☐ EFFICACY SUPPLEMENT
☒ LABELING SUPPLEMENT   ☐ CHEMISTRY MANUFACTURING AND CONTROLS SUPPLEMENT         ☐ OTHER

IF A SUBMISSION OF PARTIAL APPLICATION, PROVIDE LETTER DATE OF AGREEMENT TO PARTIAL SUBMISSION:

| IF A SUPPLEMENT, IDENTIFY THE APPROPRIATE CATEGORY | ☐ CBE | ☐ CBE-30 | ☐ Prior Approval (PA) |
|---|---|---|---|

REASON FOR SUBMISSION

| PROPOSED MARKETING STATUS (check one) | ☒ PRESCRIPTION PRODUCT (Rx) | ☐ OVER THE COUNTER PRODUCT (OTC) |
|---|---|---|

| NUMBER OF VOLUMES SUBMITTED    / | THIS APPLICATION IS | ☒ PAPER   ☐ PAPER AND ELECTRONIC   ☐ ELECTRONIC |
|---|---|---|

**ESTABLISHMENT INFORMATION (Full establishment information should be provided in the body of the Application.)**
Provide locations of all manufacturing, packaging and control sites for drug substance and drug product (continuation sheets may be used if necessary). Include name, address, contact, telephone number, registration number (CFN), DMF number, and manufacturing steps and/or type of testing (e.g. Final dosage form, Stability testing) conducted at the site. Please indicate whether the site is ready for inspection or, if not, when it will be ready.

Cross References (list related License Applications, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, and DMFs referenced in the current application)

FORM FDA 356h (9/02)

Page 1 of 1

**CONFIDENTIAL**

MRK-KRA00141791
MRK-CHA00141791

Appx19545

| | |
|---|---|
| This application contains the following items: *(Check all that apply)* | |
| 1. Index | |
| 2. Labeling *(check one)*  ☐ Draft Labeling     ☐ Final Printed Labeling | |
| 3. Summary (21 CFR 314.50 (c)) | |
| 4. Chemistry section | |
|   A. Chemistry, manufacturing, and controls information (e.g., 21 CFR.50.(d)(1); 21 CFR 601.2) | |
|   B. Samples (21 CIFIR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request) | |
|   C. Methods validation package (e.g., 21 CFR.50(e)(2)(i); 21 CFR 601.2) | |
| 5. Nonclinical pharmacology and toxicology section (e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2) | |
| 6. Human pharmacokinetics and bioavailability section (e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2) | |
| 7. Clinical Microbiology (e.g., 21 CFR 314.50(d)(4)) | |
| 8. Clinical data section (e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2) | |
| 9. Safety update report (e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2) | |
| 10. Statistical section (e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2) | |
| 11. Case report tabulations (e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2) | |
| 12. Case report forms (e.g., 21 CFR 314.50 (f)(2); 21 CFR 601-2) | |
| 13. Patent information on any patent which claims the drug (21 U.S.C. 355(b) or (c)) | |
| 14. A patent certification with respect to any patent which claims the drug (21 U.S.C. 355 (b)(2) or 0)(2)(A)) | |
| 15. Establishment description (21 CFR Part 600, if applicable) | |
| 16. Debarment certification (FD&C Act 306 (k)(1)) | |
| 17. Field copy certification (21 CFR 314.50 (k)(3)) | |
| 18. User Fee Cover Sheet (Form FDA 3397) | |
| 19. Financial Information (21 CFR Part 54) | |
| 20. OTHER (Specify) | |

**CERTIFICATION**

I agree to update this application with new safety information about the product that may reasonably affect the statement of contra i nd ications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following:

  1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
  2. Biological establishment standards in 21 CFR Part 600.
  3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
  4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
  5. Regulations on making changes in application in FD&C Act Section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
  6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
  7. Local, state and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.
The data and information in this submission have been reviewed and, to the best of my knowledge are certified to be true and accurate.

**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| SIGNATURE OF RESPONSIBLE OFFICIAL OR AGENT | TYPED NAME AND TITLE | DATE |
|---|---|---|
| *Alison L. Fisher* | Alison L. Fisher, Ph.D.<br>Associate Director<br>Worldwide Reg. Affairs/Vaccines Biologics | July 13, 2005 |

| ADDRESS *(Street, City, State, and ZIP Code)* | Telephone Number |
|---|---|
| Sumneytown Pike, P.O. Box 4, BLB-22<br>West Point, PA 19486-0004 | (484) 344-3761 |

**Public reporting burden for this collection of information** is estimated to average 24 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

| | | |
|---|---|---|
| Department of Health and Human Services<br>Food and Drug Administration<br>CDER, HFD-99<br>1401 Rockville Pike<br>Rockville, MD 20852-1448 | Food and Drug Administration<br>CDER (HFD-94)<br>12229 Wilkins Avenue<br>Rockville, MD 20852 | An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. |

FORM FDA 356h (9/02)          PSC Media Arts: (301) 443-1090  EF

CONFIDENTIAL

MRK-KRA00141792
MRK-CHA00141792

Appx19546

Measles, Mumps, and Rubella Virus Vaccine - Live -- Replacement of human serum albumin with          121
recombinant albumin
3 Quality
3.2.P.8.3 Drug Product – M-M-R™II with rHA

### 8.3.6        Derivation of Potency Specifications

The potency specifications for M-M-R™II with rHA filled container product were derived from a comprehensive statistical release model that is based on the M-M-R™II with HSA product stability profile. This model includes parameters such as potency loss at room temperature during sealing, inspection, and packaging operations, storage at $-20\ °C$ and storage of the product for 8 hours following reconstitution immediately prior to use. Also included in this model are maximum potencies at release that are based on clinical experience with commercially released lots of M-M-R™II with HSA product and minimum potencies at release that have been calculated as described below using stability data from single dose M-M-R™II with HSA lots manufactured between January 1995 and June 2001. Expiry limits are based on historical expiry potencies assigned to the measles, mumps, and rubella virus components of M-M-R™II with HSA.

### 8.3.6.1      Basis for the Label Claim (Minimum Potency at End-Expiry)

Historically, end-expiry specifications for measles, mumps, and rubella ($\geq1000$, $\geq20\ 000$, and $\geq1000\ TCID_{50}$/dose, respectively), were based on historical expiry potencies assigned to the virus components of M-M-R™II with HSA. These potency values translate to log scale values of $\geq3.0$, $\geq4.3$, and $\geq3.0\ \log TCID_{50}$/dose. End-expiry specification for measles, mumps, and rubella for M-M-R™II with rHA will also be defined as $\geq1000$, $\geq20\ 000$, and $\geq1000\ TCID_{50}$/dose, respectively, translating to log scale potency values of $\geq3.0$, $\geq4.3$, and $\geq3.0\ \log TCID_{50}$/dose.

### 8.3.6.2      Rationale for Maximum Potencies at Release

The maximum potency specifications at release for measles, mumps, and rubella are defined as the maximum potency, calibrated to the reference standards, of each of the viruses that was released in commercial lots of M-M-R™II with HSA during the period of September 30, 1999 through December 1, 2001. The maximum release potencies correspond to 4.2 log $TCID_{50}$/dose for measles, 5.5 log $TCID_{50}$/dose for mumps, and 4.1 log $TCID_{50}$/dose for rubella. As such, the maximum potencies for release of measles, mumps, and rubella are defined as $\leq4.2$ log $TCID_{50}$/dose, $\leq5.5$ log $TCID_{50}$/dose, and $\leq4.1$ log $TCID_{50}$/dose, respectively.

### 8.3.6.3      Basis for Minimum Release Potency Specifications

The cumulative data through 18 months from stability studies performed on filled container production lots manufactured with rHA indicate this product to be satisfactorily stable for at least 18 months from the date of transfer to $2–8\ °C$. The comprehensive statistical release model for measles, mumps, and rubella supports a 24-month expiry based on the proposed minimum release potencies described in [Sec. 3.2.P.8.3.6.3.1-mmr], [Sec. 3.2.P.8.3.6.3.2-mmr], and [Sec. 3.2.P.8.3.6.3.3-mmr]. The 24-month shelf-life claimed includes potency losses occurring at room temperature during sealing, inspection, and packaging, $-20\ °C$

P.8.3 Stability



CONFIDENTIAL

MRK-KRA00141883
MRK-CHA00141883

**Appx19547**

Measles, Mumps, and Rubella Virus Vaccine - Live – Replacement of human serum albumin with    122
recombinant albumin
3 Quality
3.2.P.8.3 Drug Product – M-M-R™II with rHA

storage before packaging, loss during 2–8 °C storage after packaging for up to 24 months, and up to 8 hours at 2–8 °C following reconstitution immediately prior to use.



REDACTED - OTHER MERCK PRODUCTS

P.8.3 Stability



CONFIDENTIAL

Measles, Mumps, and Rubella Virus Vaccine - Live – Replacement of human serum albumin with recombinant albumin
3 Quality
3.2.P.8.3 Drug Product – M-M-R™II with rHA

123

#### 8.3.6.3.2    Minimum Release Potency Limit for Mumps

The loss estimates and standard errors for mumps potency were used to determine the minimum post-lyophilization release specification limit needed to ensure, with 95% probability, that the minimum expiry potency of 4.3 log $TCID_{50}$/dose, following reconstitution and up to 8 hours at 2–8 °C, would be met. These variables are summarized in [Table 3.2.P.8.3-mmr; 35].

[Table 3.2.P.8.3-mmr; 35]    Calculation of Mumps Overall Stability Profile Using the Comprehensive Statistical Release Model

| Storage | Loss Rate (log $TCID_{50}$/ unit time) | Standard Error (SE) (log $TCID_{50}$) | Duration |
|---|---|---|---|
| Storage at 23–27 °C (Sealing/Inspection/Packaging) | 0.10163/40 hours | 0.04244 | 40 hours |
| Storage at ≤ –20 °C | 0/year[a] | 0.01325 | 1 year[b] |
| Storage at 2–8 °C | 0.4397/24 months | 0.01788 | 24 months |
| Storage at 2–8 °C following Reconstitution | 0.05272/8 hours | 0.01411 | 8 hours |
| Release Potency Assay (1x12) Variability (Std. Deviation) | N/A | 0.060 | N/A |

N/A:  Not applicable.

[a] Predicted increase in potency over time set equal to 0-loss.

[b] A transfer study is in progress to extend storage at ≤ –20 °C to 18 months.

The release potency required to guarantee minimum mumps potency at expiry of ≥4.3 log $TCID_{50}$/dose is calculated utilizing the total loss (0.5491) and the total variability (square root of the total variance, $\sqrt{0.0060996}$ ). Using the one-sided 95% critical value from a standard normal distribution (1.65) the minimum release potency needed to ensure a 95% probability of exceeding the expiry potency is:

$$\text{Minimum Release Potency} = \text{Minimum Expiry} + \text{total loss} + (1.65 \times \sqrt{TotalVariance})$$
$$= 4.3 \text{ log } TCID_{50}/\text{dose} + 0.5941 + (1.65 \times 0.0781)$$
$$= 5.02 \text{ log } TCID_{50}/\text{dose}$$

The minimum release potency for mumps of 5.0 log $TCID_{50}$/dose ensures, with 95% confidence, that the vaccine will meet or exceed the end-expiry dose at the end of the 24 month shelf-life.

P.8.3 Stability

Restricted Confidential Limited

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 394

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 1

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

     UNITED STATES OF AMERICA  : CIVIL ACTION
3    ex rel., STEPHEN A.       : NO. 10-04374(CDJ)
     KRAHLING and JOAN A.      :
4    WLOCHOWSKI,               :
          Plaintiffs,          :
5                              :
          vs.                  :
6                              :
     MERCK & CO., INC.,        :
7         Defendant.           :
     _____ : Master File No.
8    IN RE:  MERCK MUMPS       : 12-03555(CDJ)
     VACCINE ANTITRUST         :
9    LITIGATION                :
                               :
10   THIS DOCUMENT RELATES TO: :
     ALL ACTIONS               :
11                    -  -  -
12              December 5, 2018
13     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14                    -  -  -
15          Videotaped deposition of DIPTI
16   GULATI, PhD, taken at the offices of Spector
17   Roseman & Kodroff, PC, 1818 Market Street,
18   Suite 2500, Philadelphia, Pennsylvania 19103,
19   beginning at 8:46 a.m., before LINDA
20   ROSSI-RIOS, a Federally Approved RPR, CCR and
21   Notary Public.
22
23
24

Appx19551

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 2

1 A P P E A R A N C E S :
2
3 On behalf of the Private Plaintiffs
4     SPECTOR ROSEMAN & KODROFF, P C
      BY: JOHN A  MACORETTA, ESQUIRE
5         and
      DIANA J  ZINSER, ESQUIRE
6     1818 Market Street
      Suite 2500
7     Philadelphia, PA  19103
      215 496 0300
8     jmacoretta@srkw-law com
      dzinser@srkw-law com
9
10
   On behalf of the Relators
11
      KELLER GROVER LLP
12    BY:  JEFFREY F  KELLER, ESQUIRE
      (Via telephone)
13    1965 Market Street
      San Francisco, CA  94103
14    415 543 1305
      jfkeller@kellergrover com
15
16
   On behalf of the Defendant, Merck & Co ,
17 Inc
18    MORGAN LEWIS & BOCKIUS LLP
      BY:  MARGARET ERIN RODGERS SCHMIDT, ESQUIRE
19       MELINA R  DIMATTIO, ESQUIRE
           and
20       LISA C  DYKSTRA, ESQUIRE
      1701 Market Street
21    Philadelphia, PA  19103
      215-963-5000
22    margaret rodgers-schmidt@morganlewis com
      melina dimattio@morganlewis com
23    ldykstra@morganlewis com
24

Page 3

1 A P P E A R A N C E S (cont'd.):
2
3 On behalf of the Defendant, Merck & Co ,
   Inc.
4
      VENABLE LLP
5     BY:  MICHAELA F  ROBERTS, ESQUIRE
      750 East Pratt Street
6     Suite 900
      Baltimore, MD  21202
7     410-244-7400
      mfroberts@venable.com
8
9
   A L S O  P R E S E N T :
10
11
      TIMOTHY HOWARD, ESQUIRE
12    Merck in-house counsel
13    R. ADAM LAZAROFF, CLVS
14
              - - -
15
16
17
18
19
20
21
22
23
24

Page 4

1           I N D E X
2
   WITNESS              PAGE
3
   DIPTI GULATI, PhD
4
     By Mr  Macoretta      11
5
6
7       E X H I B I T S
7
   MARKED      DESCRIPTION      PAGE
8
   Gulati-1    Report of Dipti     12
9               Gulati, MS, D PHIL
10 Gulati-2    LinkedIn page       25
11 Gulati-3    5/12/99 Memo,       91
               00094960
12
   Gulati-4    MMRII Protocol 007 -   103
13             Mumps End Expiry
               Study,
14             01649759 - 01649780
15 Gulati-5    5/3/02 Email,       128
               00498385 - 00498387
16
   Gulati-6    2/3/00 Memo,        137
17             00095144 & 00095145
18 Gulati-7    2/27/01 Memo,       168
               00500697 & 0050069
19
   Gulati-8    3/13/01 Memo,       190
20             00024453 & 00024454
21 Gulati-9    3/13/01 Email,      191
               00562218 & 00562219
22
23
24

Page 5

1       E X H I B I T S (cont'd )
2 Gulati-10   ORRC Clinical and   223
               Regulatory Review
3             Committee Agenda
               10/8/02,
4             00780210 - 00780265
5 Gulati-11   1/25/02 Email,      235
               00024008 - 00024010
6
   Gulati-12   7/13/05 Letter,     244
7             00141789 - 00141906
8 Gulati-13   6/30/06 Memo,       250
               01894917 & 01894918
9
   Gulati-14   Supplemental Biologics  279
10            License Application,
               00137854, 00137855,
11            00138585, 00138586 &
               00138707
12
   Gulati-15   3/29/04 Internal Merck  301
13            stability calculation,
               00722649 & 00722650
14
   Gulati-16   11/4/04 Memo,       311
15            00722667 & 00722668
16 Gulati-17   Warning Letter,     328
               00209399 - 00209409
17
   Gulati-18   Supplemental Expert   340
18            Report of Philip B
               Stark, Ph D
19
   Gulati-19   Chart               352
20
   Gulati-20   Biological Product    357
21            Deviation Report,
               00754233 - 00754238
22
   Gulati-21   10/17/02 Memo,      387
23            01649892 & 01649893
24

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

| | Page 6 |
|---|---|
| 1 | E X H I B I T S (cont'd.) |
| 2 | Gulati-22    10/31/02 Email,    400 |
| | 00094134 & 00094135 |
| 3 | |
| | Gulati-23    2/26/01 Email,    423 |
| 4 | 00549510 - 00549535 |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 7

1    DEPOSITION SUPPORT INDEX
2
3    DIRECTION TO WITNESS NOT TO ANSWER
4    Page  Line
5    44    9
6
7
8
REQUEST FOR PRODUCTION OF DOCUMENTS
9
Page  Line
10
(None)
11
12
13
14
15    STIPULATIONS
16    Page  Line
17    (None)
18
19
20
QUESTIONS MARKED
21
Page  Line
22
(None)
23
24

Page 8

1                - - -
2        VIDEOGRAPHER:  Good morning.
3    We're now going on the video record at
4    8:46 on December 5, 2018.
5        Please note that the microphones
6    are sensitive and may pick up
7    whispering and private conversations
8    and cellular interference.  Please
9    turn off all cell phones or place them
10   away from the microphones as they can
11   interfere with the deposition audio.
12   Audio and video recording will
13   continue to take place unless all
14   parties agree to go off the video
15   record.
16       This is media unit one of the
17   video recorded deposition of Dipti
18   Gulati in the matter of the United
19   States of Merck ex rel. versus Merck &
20   Co., Incorporated and In Re: Merck
21   Mumps Vaccine Antitrust Litigation,
22   filed in the United States District
23   Court for the Eastern District of
24   Pennsylvania, Master File Number

Page 9

1    12-3555(CDJ).
2        This deposition is being held
3    at Spector Roseman & Kodroff PC,
4    located at 1818 Market Street,
5    Suite 2500, Philadelphia, PA 19103.
6        My name is R. Adam Lazaroff,
7    CLVS, from the firm Veritext Legal
8    Solutions, and I am the videographer.
9        The court reporter today is
10   Linda Rossi Rios, also from the firm
11   of Veritext.
12       I am not related to any party
13   in this action nor am I financially
14   interested in the outcome.
15       Counsel and all parties in the
16   room and anyone attending remotely
17   will now state their appearances and
18   affiliations for the record.
19       If there are any objections to
20   the proceeding, please state them at
21   the time of your appearance beginning
22   with the noticing attorney.
23       MR. MACORETTA:  Good morning.
24   My name is John Macoretta from Spector

3 (Pages 6 - 9)

Appx19553

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 10

1　Roseman & Kodroff.  I'm here for the
2　plaintiffs.
3　　　MS. ZINSER:  Diana Zinser from
4　Spector Roseman & Kodroff for private
5　plaintiffs.
6　　　MS. ROBERTS:  Michaela Roberts
7　from Venable for Merck.
8　　　MS. DYKSTRA:  Lisa Dykstra,
9　Morgan Lewis for Merck.
10　　　MS. DIMATTIO:  Melina DiMattio,
11　Morgan Lewis.  Also for Merck.
12　　　MS. SCHMIDT:  Margaret Erin
13　Rogers Schmidt for Merck.
14　　　MR. MACORETTA:  On the phone?
15　　　MR. KELLER:  Is Jeffrey Keller
16　from Keller Grover on behalf of the
17　Relators.
18　　　VIDEOGRAPHER:  Will the court
19　reporter now, please, swear in the
20　witness?
21　　　　　- - -
22　　　DIPTI GULATI, PhD, after having
23　been duly sworn, was examined and
24　testified as follows:

Page 11

1　　　　　- - -
2　　　VIDEOGRAPHER:  You may now
3　begin.
4　　　　　- - -
5　　　　EXAMINATION
6　　　　　- - -
7　BY MR. MACORETTA:
8　　Q.　Dr. Gulati, good morning.
9　　A.　Good morning.
10　　Q.　We met a few minutes ago.  My
11　name is John Macoretta.  I'll be asking the
12　questions today.
13　　　Have you ever been deposed
14　before?
15　　A.　No.
16　　Q.　Okay.  I'm sure your lawyers
17　have talked to you about it.  I'll just
18　review a couple of things now.
19　　　First of all, you have to
20　verbalize your answer.  You have to say yes
21　or no or whatever you're going to say.  I can
22　see you nod your head, but the court reporter
23　can't write that down.  All right?
24　　A.　Yes.

Page 12

1　　Q.　If you give an answer and I
2　don't understand it, I'm going to ask you to
3　explain it.  So can we agree now that if I
4　ask a question and you don't understand what
5　I'm asking, you'll tell me?  All right?
6　　A.　Yes, I'll ask for clarification.
7　　Q.　Okay.  Great.
8　　　　　- - -
9　　　(Exhibit Gulati-1, Report of
10　Dipti Gulati, MS, D.PHIL., was marked
11　for identification.)
12　　　　　- - -
13　BY MS. SCHMIDT:
14　　Q.　Is this -- what's in front of
15　you now is marked as -- marked as Exhibit 1
16　is your expert report in this matter.  Right?
17　　A.　That's correct.
18　　Q.　Is this the first time you've
19　served as an expert in litigation?
20　　A.　Yes.
21　　Q.　So you haven't written expert
22　reports similar to this in any other cases?
23　　A.　No.
24　　Q.　How much are you being paid?

Page 13

1　　A.　I have been paid $400 per hour.
2　　Q.　About how much is your bill to
3　date?
4　　A.　Total -- I was asked to give
5　advice and -- on the several reports.  Are
6　you asking me how much is my bill for the
7　report or giving advice on different things
8　or just related to this report?
9　　Q.　Anything relating to this
10　litigation, whether it's this report or
11　something else.
12　　A.　I spent about 7, 800 hours
13　throughout the year.
14　　Q.　So we could say 7 or 800 times
15　400 would be your total?
16　　A.　Correct.
17　　Q.　And beyond this report, what
18　else were you giving advice on?
19　　A.　There were several other --
20　　　MS. SCHMIDT:  Objection to the
21　extent it calls for communications
22　between counsel and the witness around
23　things other than what's called for in
24　the stipulation.

4 (Pages 10 - 13)

Page 14

1    If you're asking her for the
2 substance of advice that she provided
3 in any kind of consulting capacity or
4 other capacity that's not reflective
5 of her opinions, I'm going to object.
6 BY MR. MACORETTA:
7    Q.    I think I'm -- I don't want you
8 to tell me specifically what you said.  I'm
9 asking generally what you did beyond this
10 report.
11    A.    I did provide advice on several
12 topics related to the, like, general, like,
13 what is the guidance, how directly applicable.
14    Q.    How what?
15    A.    How guidance apply to the
16 vaccines.  And what is the industry standard
17 and all.  So I mean, the major part was that.
18 And recently, I mean, I wrote -- this report
19 was written in June.  I mean, I spent about
20 150, 200 hours spent doing that.  Other than
21 that -- I mean, mostly it was consulting and
22 providing advice.
23    Q.    Did you review the reports of
24 any of Merck's other experts?

Page 15

1    A.    I did.
2    Q.    Which experts?
3    A.    I think several of them.  I did
4 read report from Dr. Mark Schenerman.
5    Q.    Schenerman, okay.
6    A.    I did Dr. Stark's report.  Only
7 the applicable sections, not the whole thing.
8    Q.    Okay.
9    A.    I did read Dr. Kessler's
10 report.  I did do the general overview of
11 Dr. Calcott's report, only the applicable
12 section, not the whole thing.  So several
13 reports I did read.
14    Q.    So those experts, the four you
15 just listed, are all experts on the
16 plaintiff's side of the case.  Right?
17    A.    That is my understanding.
18    Q.    You understand Merck that has
19 other experts other than you.  Right?
20    A.    That's what I understand.  But
21 I don't know all the details on that.
22    Q.    Did you review any of the
23 expert reports of any of Merck's experts?
24    A.    I did review -- I mean, you

Page 16

1 mean the expert outside the company or the
2 people who work for the company?
3    Q.    Let's start with outside the
4 company.
5    A.    I think Dr. Calcott was Merck's
6 expert.  No.  Was he?  No, he was not.
7 Actually he was on the other side.  So I
8 don't think I did see any of those reports.
9    Q.    Since you filed your report,
10 you submitted this report in June, did you
11 look at anything else?
12    A.    After reading this report --
13 after writing this report, I did read
14 Dr. Kessler's report.  That's all.
15    Q.    Did you review the supplemental
16 report submitted by Dr. Stark?
17    A.    Two-page report supplement,
18 yes, I did.
19    Q.    Did you review any of the
20 depositions of any of the experts in this
21 case?
22    A.    Yes.  One or two depositions.
23 I think I had Dr. Kessler's deposition.  I
24 think.  I think that's -- there were -- I

Page 17

1 did -- yeah, that's -- there was no -- I
2 mean, one or two depositions.  I mean, that's
3 what comes to mind right now.
4    Q.    Did you review Dr. Calcott's or
5 Dr. Stark's deposition?
6    A.    I think I read Dr. Stark's
7 deposition, but not any other deposition.
8 Not Dr. Calcott's deposition.
9    Q.    Do you have -- today, do you
10 have any changes or additions to your report?
11    A.    No.
12    Q.    Any further opinions in the
13 case other than what's in your report?
14    A.    No.
15    Q.    Okay.  Great.
16    Let me start -- I want to start
17 in the middle of your report.  Towards the
18 back you discuss several stability -- let me
19 back up a little bit.  Let me back up.  We're
20 going to come to that.  Let me back up a
21 little bit.  I'm sorry.
22    Your report has your experience.
23 Can you tell me generally your experience
24 with stability modeling and stability programs?

5 (Pages 14 - 17)

Appx19555

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 18

1    A.    I have been working in this
2 industry, I mean, since 1996 and I have been
3 involved in stability program in different
4 ways, in different capacities.  Initially
5 doing the -- supporting the stability
6 program, then developing stability program,
7 then managing stability program and setting
8 up the stability operations, stability labs
9 and providing oversight of the stability
10 program.
11    Q.    Was part of your jobs relating
12 to stability to communicate with regulators
13 about what the stability program saw or
14 discovered?
15    A.    Yes.  It is part of providing
16 oversight of the stability program and
17 working with regulatory department to do the
18 submission.  So submissions.  And I have been
19 in the roles, different level roles in the
20 area of quality and also head of quality
21 several times.
22        So in the companies I worked,
23 the structure was that you communicate, like
24 all the direct communication happens through

Page 19

1 the regulatory affairs department.  You
2 provide all the data and submissions to
3 regulatory affairs.  But yes, indirectly.
4    Q.    So you weren't -- well, has it
5 ever been the case that you were the person
6 communicating directly with the regulatory
7 authority?
8    A.    No.  To regulatory affairs.
9    Q.    Have you ever been in meetings
10 with regulators concerning stability issues?
11    A.    No, not directly.
12    Q.    How are you indirectly in a
13 meeting?
14    A.    Because all the communication
15 which happens with the regulatory affairs is
16 the liaison interface with CBER or CDER, any
17 kind of regulatory authority.  You get all
18 the information and then you have all the
19 internal meetings, and you submit all that
20 information to regulatory affairs and they
21 will submit that information to the
22 regulatory; they will submit, send
23 supplements and all.  You review all the data
24 and supplements and all.  But finally direct

Page 20

1 liaison is the regulatory affairs.
2    Q.    Well, in this case, we're going
3 to look later today and in your report, there
4 are several examples where several people
5 from Merck meet with several people from
6 CBER.  Right?
7    A.    That is correct.
8    Q.    You were never in that
9 situation where you'd be one of the several
10 people from the company meeting with a group
11 of regulators.  Right?
12    A.    Just going directly one-to-one
13 interaction, no.
14    Q.    Or group -- or four-to-four
15 interaction or group interaction?
16    A.    Most of my interaction with the
17 regulatory agencies has been during the
18 inspection.  During the inspection there is
19 any portion of our stability program that are
20 results, I will provide all that information.
21 This was like -- there are two kind of
22 interactions as I understand.  You are
23 working with the office of compliance where
24 you are defending your work during

Page 21

1 inspections.  Another one is when you are
2 doing supplements.
3        So during inspections I have
4 direct interactions several times, several
5 inspectors from CBER, CDER, European and
6 Canada and all those different countries.
7 For the -- the way the structure is set up in
8 the company that I work for, that all the
9 submission part you provide all the data to
10 regulatory affairs and work with them to
11 develop the supplement, but they will be the
12 direct interact -- directly interacting.  And
13 I was not -- that part I was not involved
14 direct interaction, but office of compliance
15 part, I was involved in direct interaction.
16    Q.    When you say inspections --
17 we're going to look today at some documents
18 relating to a Form 483 report.  Is that the
19 inspections you're talking about or is it
20 something else?
21    A.    Yes, that's what I'm talking
22 about.
23    Q.    So you've been involved in
24 inspections that have resulted in a Form 483

6 (Pages 18 - 21)

Appx19556

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 22

1  report?
2      A.    Yes.
3      Q.    Have you been involved in
4  responding to those Form 483 reports?
5      A.    Many times, working within the
6  company and also working with clients.  I
7  mean, the last six years, I have been helping
8  my clients to respond to warning letter 483,
9  developing the remediation plan and
10 corrective and preventative action plans.
11     Q.    Before you were consult -- and
12 you became a consultant in 2012, I think.
13 Right?
14     A.    That is correct.
15     Q.    Before you were a consultant,
16 were you ever at a company where you received
17 a warning letter?
18     A.    Actually in my roles I never
19 got any quality -- in my position, whatever
20 area I was responsible for as head of
21 quality, we never got any 483 warning letter.
22 But most of my work responding to 483 warning
23 letter -- I mean, when I was in QA, I managed
24 the level role.  I'm responsible for certain

Page 23

1  units.  So my unit never got 483.  When I
2  went up to a higher level and I was
3  responsible for whole operation, I never got
4  any 483.  So I have -- we had inspections,
5  but no 483 warning letters.
6      Q.    So I guess I say congratulations
7  for that.
8      A.    Thank you.
9      Q.    And just so I understand, a
10 warning letter is a more serious piece of
11 correspondence from the FDA than a 483
12 report.  Is that fair?
13         MS. SCHMIDT:  Objection.
14         THE WITNESS:  That's one -- it
15     is one level higher.  Once you get --
16     once you are inspected and you get 483
17     observation, you're supposed to
18     respond and you're supposed to have
19     the corrective action plan, corrective
20     and preventative action plan.
21         If your responses are accepted,
22     then it stops there.  If regulators
23     need more information, I mean, there
24     could be the next level where it could

Page 24

1  be a warning letter or it could be
2  other things, untitled letters.  There
3  are so many other things.
4  BY MR. MACORETTA:
5      Q.    Or a what letter?
6      A.    Untitled letter.
7      Q.    Untitled letter, okay.
8      A.    Yeah.
9      Q.    What would be the step after a
10 warning letter then?
11     A.    Well, I don't know, I'm not
12 expert in that area.  I don't work for FDA.
13 So there could be many steps.  In my
14 experience, I mean, there are so many things
15 which could happen, but, I mean, I don't want
16 to comment on that.  That's not what, I mean,
17 I do.
18     Q.    In your role as a consultant,
19 have you ever advised clients or helped
20 clients respond to warning letters?
21     A.    Several.  Even with the consent
22 decree responses and remediation plans.
23     Q.    Let me show you what we're
24 going to mark as Exhibit 2, which I think is

Page 25

1  your LinkedIn page.
2             - - -
3         (Exhibit Gulati-2, LinkedIn
4      page, was marked for identification.)
5             - - -
6  BY MR. MACORETTA:
7      Q.    So as with many things today,
8  take a look at that, Dr. Gulati, take as much
9  time as you want.  I'm going to tell you that
10 I printed this yesterday.  I'm going to ask
11 you is this a copy of your current LinkedIn
12 page?
13     A.    Yes, that is correct.
14     Q.    And PJI Biotech, that's you?
15     A.    That's me.
16     Q.    What does PJI mean, stand for?
17     A.    I just picked few words from
18 here and there.
19     Q.    Okay.
20     A.    Few letters actually.
21     Q.    All right.  Does PJI Biotech
22 have employees other than you?
23     A.    Not at this point.
24     Q.    Let me go down to your

7 (Pages 22 - 25)

Appx19557

Page 26

1 experience. I'm going to skip the first --
2 I'm going to come back. I'm going to skip a
3 little text. And at the bottom of the first
4 page onto the second is your experience. It
5 says, "Worked with global law firms to
6 develop comprehensive quality and regulatory
7 strategy for biologics...."
8        Do you see that?
9    A.    Yes.
10   Q.    Is that talking about this
11 litigation or something else?
12   A.    There are other places. This
13 is one. And there are other places also.
14 There are other places I have done the
15 similar things. There are other clients I
16 worked with, I did the same thing.
17   Q.    So other cases where law firms
18 hired you to do a regulatory strategy?
19   A.    In this -- I'm so sorry, I
20 misspoke.
21        You worked with -- yeah, this
22 global law firm, this applies to this
23 particular case.
24   Q.    Anything else? Just this case?

Page 27

1    A.    I worked with lawyers with
2 other clients, but not hired by law firm.
3    Q.    So you wrote a report about
4 what Merck did right or wrong --
5    A.    Yes.
6    Q.    -- in this case, but did you do
7 anything in this case or did you do anything
8 with the law firm and Merck to develop a
9 comprehensive quality or regulatory strategy
10 relating to MMR?
11        MS. SCHMIDT: Objection.
12 BY MR. MACORETTA:
13   Q.    You can answer.
14   A.    I did -- I provide advice on
15 different aspects on different questions. I
16 mean, there were different questions and I
17 answered, I provided advice how regulations
18 apply. So that's my general answer.
19   Q.    And the advice you applied, did
20 you come to that after looking at the
21 documents in this case?
22        MS. SCHMIDT: I'm going to have
23        the same objections as before. To the
24        extent that this is about advice that

Page 28

1 she was providing to the law firm
2 outside of context of her opinions, if
3 it's not related to communications we
4 had with her about facts, data or
5 assumptions that made their way into
6 her report, I'm going to object to her
7 testifying about consulting or advice
8 that she provided.
9        If it's a description, if you
10 have questions about this particular
11 bullet or what she meant by it, you
12 can ask -- like, I'll allow her to
13 answer that, but I'm not going to
14 allow her to get into what she told
15 us.
16 BY MR. MACORETTA:
17   Q.    Well, I'm not going to --
18 without telling me what the advice was,
19 Dr. Gulati, is whatever advice you gave from
20 Merck derived at least in part from any of
21 the materials you looked at in the case
22 preparing your report?
23   A.    Could you, please, repeat that
24 question?

Page 29

1    Q.    Sure. In preparing your
2 report, you looked at a whole lot of internal
3 Merck documents. Right?
4    A.    I looked at Merck documents.
5    Q.    And there's a list -- in fact,
6 there's a list of them at the back of your
7 report. Right?
8    A.    There's a list, yes. There is
9 appendix.
10   Q.    Then you said in addition to
11 this report, you also gave some advice to
12 Merck. Right?
13   A.    Yes. On different topics.
14   Q.    Okay. Any -- my question is,
15 is any of the advice you gave to Merck on
16 those different topics based at all on any of
17 the documents you looked at in preparing your
18 report?
19        MS. SCHMIDT: Objection.
20        THE WITNESS: I'm not sure
21        about that. Because -- I mean, are
22        you asking me the advice I gave? I
23        mean, was it not -- was it related to
24        report or was it not related to the

8 (Pages 26 - 29)

**Appx19558**

Page 30

1    report, if that's what you're asking
2    me?
3  BY MR. MACORETTA:
4        Q.    No.  Well, let me ask that.
5  Was it related to the report or not related
6  to the report?
7        MS. SCHMIDT:  Objection.
8        THE WITNESS:  Some of that is
9        outside, not related to the report.
10 BY MR. MACORETTA:
11       Q.    But some of it was related to
12 the report?
13       A.    Yes, some of it was.
14       MS. SCHMIDT:  Objection.
15       THE WITNESS:  Yes.
16 BY MR. MACORETTA:
17       Q.    You can keep going.
18       A.    Some of it was related to, but
19 some of it was outside the scope of this
20 report.
21       Q.    Now -- and what caused you to
22 give that advice?  Meaning some lawyers hired
23 you to do a report in this litigation.  Did
24 Merck also say at the same time, hey, we'd

Page 31

1  like you to give us some advice on something;
2  or is it the case that in looking at things
3  for your report and documents, you said, hey,
4  Merck, let me give you an advice on this?
5        MS. SCHMIDT:  Objection.  That
6        gets very close to the substance of
7        what Merck, through its counsel, asked
8        her to do.
9        MR. MACORETTA:  I don't think
10       it does at all.  I didn't ask her for
11       the substance.  I'm just trying to
12       understand how she came to give this
13       other advice and whether she used
14       anything in her report to give the
15       advice.
16       MS. SCHMIDT:  I think the
17       question was we'd like you to give
18       advice on something or were you
19       looking at documents and said, hey,
20       can I give you advice.  That's getting
21       very close to the line of what the
22       advice was, and I'm not comfortable
23       with her testifying about that.
24       MR. MACORETTA:  I didn't ask

Page 32

1    what the advice was.  I don't know
2    what topic it is or what the advice
3    is.  What -- let me try it this way:
4  BY MR. MACORETTA:
5        Q.    What caused you to give advice
6  to Merck beyond writing your report?
7        MS. SCHMIDT:  Objection.
8  BY MR. MACORETTA:
9        Q.    You can answer.
10       A.    I mean, any questions about
11 regulations I -- any questions how
12 regulations and guidelines are applicable to
13 certain things, I mean, that's what I
14 provided advice on.
15       Q.    On some of the same topics that
16 are in your report?
17       MS. SCHMIDT:  Objection.
18 BY MR. MACORETTA:
19       Q.    You can answer that.
20       A.    I mean some of the topics were
21 in the scope, which scope of the report and
22 some outside.
23       Q.    Why don't you tell me which
24 topics were within the scope of the report,

Page 33

1  please?
2        A.    That's a good question.
3        Q.    Thank you.
4        MS. SCHMIDT:  Objection.
5        THE WITNESS:  About the GMP of
6        the stability program and stability of
7        mumps vaccine, which is in my report.
8        Like a stability program, GMP
9        manufacturing, how to do the modeling
10       for stability program, setting up
11       stability program.
12       Most of the advice was related
13       to the stability program, which is the
14       scope of this report.
15 BY MR. MACORETTA:
16       Q.    So now I'm back to my question.
17 Now I'm back to the earlier question.  So at
18 some point you give Merck some advice about
19 GMP or modeling or stability programs.
20 Right?  You have to say.
21       A.    Yes.
22       MS. SCHMIDT:  Objection.
23 BY MR. MACORETTA:
24       Q.    What caused you to give that

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 34

1  advice; meaning, did you volunteer that
2  advice based on something you saw or did
3  Merck come to you and say, please, give us
4  advice on this?
5        MS. SCHMIDT:  Objection.
6  BY MR. MACORETTA:
7     Q.   You can answer.
8        MS. SCHMIDT:  I understand why
9     you're asking her the questions.  My
10    concern is, I don't see a suggestion
11    in this bullet that she was working
12    for Merck.  The bullet says she was
13    working for the global law firm.  To
14    the extent that that refers to us,
15    it's work around the litigation.  So
16    if there are questions about work she
17    did in connection with the litigation,
18    she can answer those.  But that's what
19    she was doing.
20       MR. MACORETTA:  But she just
21    said that work she did for the
22    litigation caused her to give advice.
23    I mean, Morgan Lewis doesn't make
24    mumps vaccine, Merck does.

Page 35

1        MS. SCHMIDT:  You can ask her
2     if she gave advice to Merck.
3        THE WITNESS:  I didn't.
4  BY MR. MACORETTA:
5     Q.   Who did you give the advice to?
6     A.   The law firm.  That's what is
7  written here, the global law firm.  So I
8  worked with attorneys of -- worked with
9  attorneys to give advice to attorneys, not to
10 Merck.
11    Q.   Do you know if any of your
12 advice was taken or used by Merck?
13    A.   I have no idea.
14    Q.   What caused -- were you hired
15 by the law firm to give advice beyond writing
16 a report?
17    A.   I was hired by the law firm to
18 give advice on mainly -- the job description
19 was mainly the stability programs.
20       MS. DYKSTRA:  John, maybe if we
21    can clarify, between the litigation
22    and non-litigation versus her report
23    and non-report?
24 BY MR. MACORETTA:

Page 36

1     Q.   Well, why don't we talk about
2  the whole scope.  That's fair enough.
3        When we're talking about the
4  law firm, we're talking about Morgan Lewis.
5  Right?
6     A.   Correct.
7     Q.   Okay.  Morgan Lewis hired you
8  to look at documents and write a report.
9  Correct?
10       MS. SCHMIDT:  Objection.
11       THE WITNESS:  Morgan Lewis
12    hired me to provide advice on
13    stability program.  And then when I
14    got hired, that was not very clear,
15    but at some point of time I was asked
16    to write a report and I wrote the
17    report.
18 BY MR. MACORETTA:
19    Q.   So you were hired by Morgan
20 Lewis to do things, to do other things before
21 they told you to write a report?
22    A.   No.
23       MS. SCHMIDT:  Objection.
24       THE WITNESS:  I was hired to

Page 37

1  give advice on the stability program
2  because I'm a consultant and I have
3  been giving advice to different
4  clients and different companies in the
5  area of GMP and biologics and small
6  molecules.  I was hired to look at the
7  stability program mainly.  And, I
8  mean, at that time -- I mean, I wasn't
9  sure I would write a report at one
10 point of time, but we worked, as we
11 worked through the case, I was asked
12 to write report and I wrote the report
13 about stability program.
14 BY MR. MACORETTA:
15    Q.   So it wasn't like you were
16 hired for two separate things.  Right?
17       MS. SCHMIDT:  Objection.
18       THE WITNESS:  No.  I mean, I
19    was hired for the stability program,
20    the view of the stability program.
21 BY MR. MACORETTA:
22    Q.   When were you hired?
23    A.   I was hired last December.
24 December of 2017.

10 (Pages 34 - 37)

Appx19560

Page 38

1    Q.    And part of the work product of
2  whatever you were hired for was the report
3  you wrote. Right?
4    A.    That is right.
5         MS. SCHMIDT: Objection.
6  BY MR. MACORETTA:
7    Q.    Was there other work product?
8  Was it, the advice you gave beyond your
9  report, contained in some written document?
10    A.    No.
11    Q.    How did you convey the advice?
12         MS. SCHMIDT: Objection.
13  BY MR. MACORETTA:
14    Q.    You can answer. Without telling
15  me the advice, how did you convey the advice?
16    A.    Work meetings. We worked -- we
17  had scheduled meetings. We had meetings and
18  then we convey what I think about something,
19  any topic, if asked.
20    Q.    Meetings with the lawyers from
21  Morgan Lewis?
22    A.    That is correct.
23    Q.    People from Merck at the
24  meetings?

Page 39

1    A.    No, never.
2    Q.    Is this the only time you've
3  been hired by a law firm to give advice on a
4  company's product?
5    A.    First time. Direct hire. I
6  mean, indirectly I work, but direct hire.
7    Q.    In analyzing Merck and giving
8  the advice, did you look at other Merck
9  documents or information beyond what you
10  considered for this report?
11         MS. SCHMIDT: Objection.
12  BY MR. MACORETTA:
13    Q.    You can answer.
14    A.    I mean, I am going to say I
15  looked at most -- a lot of documents which
16  was in the scope of this report. So -- and
17  based on those documents, I developed this
18  report, I developed my opinions and I
19  developed the report.
20    Q.    And the advice you gave Merck
21  beyond the report, was that based on any
22  Merck documents or information beyond the
23  documents you used for your opinion?
24    A.    I mean, I don't want to say

Page 40

1  much about it because that's outside the
2  scope. I mean, here I was asked to talk
3  about just this report.
4    Q.    You don't really get to do
5  that. You can answer yes or no without -- I
6  understand you don't want to tell me what the
7  documents are, but I think you can answer a
8  yes or no question.
9         Was the advice you gave Merck
10  based on any documents or information beyond
11  the documents or information you considered
12  when writing your report?
13         MS. SCHMIDT: Objection.
14         THE WITNESS: Could you, please,
15    rephrase that question?
16  BY MR. MACORETTA:
17    Q.    Sure. You said you wrote a
18  report and you gave Merck some advice.
19  Correct?
20    A.    Correct.
21         MS. SCHMIDT: Objection.
22         THE WITNESS: On the stability
23    program.
24  BY MR. MACORETTA:

Page 41

1    Q.    And in your report you
2  considered and you list various documents and
3  information you looked at. Correct?
4    A.    Yes. There's an appendix there.
5    Q.    And the advice you gave Merck
6  on its stability program, in coming to that
7  advice, did you consider any Merck documents
8  or information other than the things in the
9  appendix?
10         MS. SCHMIDT: Objection.
11         THE WITNESS: Most of the
12    documents I reviewed to develop this
13    report are listed in the appendix.
14    There could be few documents which are
15    not listed, but most of the documents
16    I looked at are listed in the report.
17  BY MR. MACORETTA:
18    Q.    And the advice you gave Merck,
19  you said it related to stability and GMP?
20    A.    Yes.
21    Q.    Did you -- without telling me
22  what it is, did you give Merck any advice on
23  any subject that is not covered by your
24  report?

11 (Pages 38 - 41)

Appx19561

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 42

1     MS. SCHMIDT:  Objection.
2         THE WITNESS:  So I was asked to
3   give advice on stability program
4   basically.  And I looked up several
5   documents to review the stability
6   program and build my opinion and wrote
7   this report.  There are a few other
8   things I provided advice.  It's
9   outside the scope of this report,
10  so...
11  BY MR. MACORETTA:
12      Q.    Does it relate to stability?
13      A.    No.
14      Q.    But you did give some advice on
15  stability?
16      A.    Whatever I give advice, based
17  on that, I did develop this report.
18      Q.    Okay.
19      A.    Yes.
20      Q.    What was the advice you gave
21  Merck or Morgan Lewis relating to stability?
22      MS. SCHMIDT:  Objection.
23      MR. MACORETTA:  That's all the
24  same thing.  I think I am allowed to

Page 43

1   ask that.  She just confirmed it's the
2   same stuff.
3       MS. SCHMIDT:  If it's a
4   question about the opinions that she's
5   expressed in her report, I'm perfectly
6   comfortable with her explaining her
7   opinions.  If it's asked in the
8   context what did she communicate to
9   Morgan Lewis and it's a suggestion
10  that it's outside the context of the
11  opinions or her report, I'm not
12  comfortable with that.
13      MR. MACORETTA:  She just said
14  it's within the context.
15      MS. SCHMIDT:  So then ask her a
16  question about what's in the report
17  and make it clear.
18      MR. MACORETTA:  Oh, I'm coming
19  to that.
20      MS. SCHMIDT:  I'm just concerned
21  that the question is unclear.
22      MR. MACORETTA:  Are you
23  instruct -- the objection is unclear?
24      MS. SCHMIDT:  My objection is,

Page 44

1   I think when you asked the question
2   about what she conveyed to Morgan
3   Lewis about stability, that's a
4   question about her communications with
5   counsel.  That's different than a
6   question about her opinion.
7       MR. MACORETTA:  Are you
8   instructing her not to answer it?
9       MS. SCHMIDT:  Yes.  Because
10  it's outside the scope of our
11  stipulation about what she's allowed
12  to testify about.  It's right here.
13      MR. MACORETTA:  You know what,
14  we'll deal with this at a break.
15  That's fine.
16      MS. SCHMIDT:  That's fine.
17      MR. MACORETTA:  Okay.  We're
18  going to come back to that.
19  BY MR. MACORETTA:
20      Q.    You read the Complaint in this
21  matter?  Did you read the Complaint that
22  forms the basis of the lawsuit or starts the
23  lawsuit?
24      MS. SCHMIDT:  Objection.

Page 45

1       THE WITNESS:  No, I did not.  I
2   don't know what -- no.  I don't
3   know -- I mean, I did work with
4   attorneys on specific topics, specific
5   documents and, like, give advice on
6   specific document.  And based on that
7   advice, I build opinions which are in
8   this report.
9   BY MR. MACORETTA:
10      Q.    Got it.  So you don't -- well,
11  what's your understanding of what the lawsuit
12  is about?
13      A.    Not much.  I mean, this is the
14  first time I've been involved in something
15  like working through this -- the lawsuit.
16      Q.    Do you under -- so you don't
17  really know what the plaintiffs are suing
18  Merck over?
19      A.    No, I don't --
20      MS. SCHMIDT:  Objection.
21      THE WITNESS:  -- have a
22  complete understanding.
23  BY MR. MACORETTA:
24      Q.    Well, why don't you tell me

12 (Pages 42 - 45)

Appx19562

Page 46

1  your incomplete understanding.
2         MS. SCHMIDT:  Objection.
3         THE WITNESS:  I mean, I have
4  vague knowledge, so I would rather not
5  say.
6  BY MR. MACORETTA:
7      Q.    Okay.  I'm going to go page 2
8  of your report, under heading number II,
9  "Assignment."  The second paragraph.  "For
10 this assignment, I was provided a list of
11 documents associated with Merck's Mumps
12 containing vaccines...."
13        Do you see that?
14     A.    Yes, I see that.
15     Q.    Then you say, "I had access to
16 all relevant documents needed and
17 requested...."
18        Was it the case that you
19 requested documents beyond which you were
20 provided?
21     A.    Yes.  I requested a few more
22 documents which were referenced.
23     Q.    You say you read Dr. Kessler's
24 report and reviewed his deposition.  Right?

Page 47

1      A.    Yes.  It was part of the --
2  yes.
3      Q.    Are you familiar at all with
4  Dr. Kessler before this case?
5      A.    No.  This is the first time
6  I -- I mean, I knew and read about the
7  report.
8      Q.    He was the former head of the
9  FDA.  Right?
10     A.    I saw that in the report, yes.
11     Q.    But you didn't know who he was
12 before this?
13     A.    No.
14     Q.    Did you see in Dr. Kessler's
15 report and his deposition that he expressed a
16 public health concern about the number of
17 doses that could possibly have a low potency?
18        MS. SCHMIDT:  Objection.
19 BY MR. MACORETTA:
20     Q.    Do you recollect any of that
21 discussion?
22     A.    I read his report.
23     Q.    And his deposition?
24     A.    I read his deposition.

Page 48

1      Q.    He says that he believes
2  there's -- he has a concern that there's a
3  public health issue that millions of doses
4  could potentially be at a low potency.
5  Right?  Do you remember this?
6         MS. SCHMIDT:  Objection.
7         THE WITNESS:  I remember
8     reading it, but, again, I -- I mean,
9     that's not my area of expertise.  So
10    I -- I mean, determining what is
11    public health issue and not, I mean,
12    it's not my area of expertise.
13 BY MR. MACORETTA:
14     Q.    What is your PhD in?
15     A.    PhD in chemistry, organic
16 chemistry.
17     Q.    But do you agree or disagree
18 with Dr. Kessler that the possibility that
19 there could be millions of doses at low
20 potency is a public health concern?
21        MS. SCHMIDT:  Objection.
22        THE WITNESS:  I have no opinion
23    on that.  I'm just pretty much not
24    like expert in that area because, I

Page 49

1     mean, that's -- I cannot draw -- make
2     any determination or draw any
3     conclusion about that just because I'm
4     not expert.  I would ask some expert,
5     you know, whether it is that issue or
6     not.
7  BY MR. MACORETTA:
8      Q.    But you're an expert in stability?
9      A.    Correct.
10     Q.    One reason we do stability is
11 to make sure that no patients get a dose
12 below the potency they're supposed to get.
13 Right?
14        MS. SCHMIDT:  Objection.
15        THE WITNESS:  We do the
16    stability studies, and all we do
17    the -- run the stability program in
18    the manufacturing part of an
19    organization to make sure that it
20    meets the expiry specification, the
21    product on stability program meets the
22    expiry specification.
23 BY MR. MACORETTA:
24     Q.    The reason that we care that it

13 (Pages 46 - 49)

Appx19563

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 50

1  meets the expiry specification is because the
2  expiry specification is believed to be the
3  lowest effective dosage.  Right?
4          MS. SCHMIDT:  Objection.
5          THE WITNESS:  I'm not sure about
6      that, because expiry specification
7      is the expiry specification.
8  BY MR. MACORETTA:
9      Q.    Why is there an expiry
10  specification, then?
11      A.    So when you are getting the
12  product approval, you do a lot of studies,
13  development on all the data you collect, and
14  then you do a filing, you propose certain
15  specification and you get an approval from
16  regulatory agency that this is going to be
17  your release and expiry specification.  And
18  this is going to be your process.  This is
19  going to be your method.  You are going to
20  manufacture your product according to the
21  approved process, tested according to the
22  approved methods, and release it according to
23  the approved specification.  So that is part
24  of the filing.  So -- and then -- so based on

Page 51

1  that you set up certain specification.  It
2  is -- when you say it is an expiry
3  specification, that's all it means.  It means
4  it is an expiry specification.
5      Q.    But I'm asking you what's the
6  point of the FDA requiring products to have
7  an expiry specification?  Why do they do
8  that?
9          MS. SCHMIDT:  Objection.
10         THE WITNESS:  So, I mean FDA is
11     requiring -- you want to make sure
12     that your product is stable throughout
13     your shelf life.
14  BY MR. MACORETTA:
15      Q.    Why?
16      A.    Because if it is not stable and
17  if it doesn't meet the expiry specification,
18  I mean, there could be patient implications.
19  So that's why you want to make sure it is
20  stable.
21      Q.    And by "patient implications,"
22  you mean the patient might not be getting
23  enough of the medicine.  Right?
24         MS. SCHMIDT:  Objection.

Page 52

1          THE WITNESS:  It could mean
2      anything.  I mean, when you set up the
3      expiry specification, it just means
4      this is where -- this is the -- this
5      should be your potency or any quality
6      attribute.  This should be the potency
7      at the end of shelf life or at the end
8      of expiry.  That's all it means.  It
9      doesn't mean -- it doesn't draw any
10     conclusion about whether there is a
11     patient safety implication or not.
12     That's all it means.
13         There are other things in
14     addition to the stability data which
15     has to be looked at before you draw
16     any conclusion and determination.
17         So I mean, I wrote this, I
18     was -- I looked at the stability data,
19     stability program, all the things
20     related to the stability program and
21     that's all I -- like you have end --
22     you have release specification, you
23     have end expiry specification.  You
24     should meet that.  That makes sure

Page 53

1      that your product quality is still
2      good at the end of the shelf life.
3      Yes, it is related to the patient
4      implication, but what is regulation,
5      it's not my scope of assignment.
6  BY MR. MACORETTA:
7      Q.    What do you mean by "still good
8  at the end of shelf life," if you know what
9  I'm saying?
10     A.    It meets that specification,
11  end expiry specification.
12     Q.    Let me try again.  So what is
13  the point of having an end expiry
14  specification?  What is your understanding of
15  why the FDA requires an end expiry
16  specification?
17         MS. SCHMIDT:  Objection.
18         THE WITNESS:  So end expiry,
19     like you set up the release
20     specification, you set up the end
21     expiry specification and your product
22     should have that kind of potency or
23     any of the quality attribute at the
24     end of the shelf life.  Whether that

14 (Pages 50 - 53)

Appx19564

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 54

1    particular value or specification --
2    that particular potency or any of the
3    quality attribute has -- it just
4    ensures the quality of the product at
5    the end of expiry.  It is related to
6    the patient safety.  How -- I mean,
7    there's a lot more goes into that.  I
8    mean, you cannot -- just because your
9    end expiry specification -- I mean,
10   you have end expiry specification
11   which means -- and you don't meet that
12   specification doesn't mean there's --
13   like there's a patient implication,
14   patient safety risk.  There is any
15   risk.  There's a lot more -- you have
16   to look at lot more data and other
17   things you have to look before you
18   make that determination.  For example,
19   if you have -- you don't meet the
20   expiry specification.  You have expiry
21   specification in your file and you
22   don't meet it, you might have to do a
23   little bit of investigation to make
24   sure that your results are valid,

Page 55

1    first.  And once you determine your
2    result is valid and it is real OS,
3    then you would do --
4        COURT REPORTER:  And it is what?
5        THE WITNESS:  Out of
6    specification.
7    BY MR. MACORETTA:
8        Q.    OOS.  OOS, right, that means
9    out of specification.  Right?
10       A.    Correct.
11       Q.    Keep going.  I'm sorry, I
12   didn't mean to interrupt you.
13       A.    So if your result is out of
14   specification, then you would do some other
15   assessments like a clinical assessment,
16   medical assessment, health alert assessments,
17   before you make any other determination.
18       Q.    What's the point of having a
19   release specification?
20       A.    You want to make sure that you
21   have the intended product quality.  So
22   release specification, I mean, for all the
23   quality attributes are defined to make sure
24   product has adequate quality when it is

Page 56

1    released.
2        Q.    What does quality mean in that
3    sentence?
4        A.    So in the manufacturing -- on
5    the manufacturing side, you have this product
6    quality attributes.  So you have -- I mean,
7    based on all the studies and all you do, you
8    determine you need to have this much percent
9    of potency, and this much percent of purity,
10   all those things.  You have hundred -- made
11   up of 20 of quality attributes to release a
12   product, release a lot of the product.  So
13   you need to -- I mean, you have specification,
14   release specification to ensure the product
15   quality.
16       Q.    So in this case, you'd agree
17   that there's a lot of discussion that Merck
18   needs to make sure its mumps vaccine meets
19   the label specification at the end of expiry.
20   Right?
21       MS. SCHMIDT:  Objection.
22       THE WITNESS:  You are supposed
23   to meet the specification end of
24   expiry.

Page 57

1    BY MR. MACORETTA:
2        Q.    Okay.  And we're going to come
3    back to why you're suppose to in a second.
4        But in this case Merck says,
5    well, one way we could try to meet that
6    specification is to raise the release
7    potency.  Right?  You saw documents
8    discussing this?
9        MS. SCHMIDT:  Objection.
10       THE WITNESS:  Okay.  So now
11   we're talking about the mumps potency,
12   because I thought we were talking --
13   BY MR. MACORETTA:
14       Q.    We were talking generally, now
15   I'm talking just about mumps case.
16       A.    Just about mumps, okay.
17       Q.    Now I'm talking just about
18   mumps in this case.
19       A.    Mumps case, okay.
20       Q.    So in this case, Merck says at
21   various times, well, one way we could make
22   sure we meet the end expiry is to raise the
23   release potency.  Right?
24       MS. SCHMIDT:  Objection.

15 (Pages 54 - 57)

Appx19565

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 58

1    THE WITNESS: So in 1997, like
2  in -- based on my reading the
3  supplements and several of the
4  communication, in 1997 there was a --
5  1996, 1997 there was a discussion
6  between CBER and Merck to clarify what
7  did label claim mean. And early 1998
8  it was clear -- it was clarified or
9  determined that 4.3, which was
10 supposed to be the release potency, is
11 not a release potency, it is expiry
12 potency. So once that switch was made
13 from 4.3 release to expiry, Merck and
14 CBER were working together to
15 determine what should the path. And
16 there was a lot of data analysis, all
17 the studies and all those were done
18 which were in supplements. And it was
19 decided in collaboration between Merck
20 and CBER that your target manufacturing
21 should be 5.2, your target release
22 should be 5.0 and your expiry -- if
23 you are going to meet the expiry of
24 4.3, your target manufacturing and

Page 59

1  release should be 5.2 and 5.0. I
2  mean, that what's it is in supplement.
3  BY MR. MACORETTA:
4    Q.   So why couldn't Merck just make
5  the release higher?
6    MS. SCHMIDT: Objection.
7    THE WITNESS: Are you asking me
8  why can't Merck make release higher
9  than 5.0?
10 BY MR. MACORETTA:
11   Q.   Yes.
12   A.   It was based on the analysis of
13 the historical data. Not only at Merck but
14 also at CBER. Because CBER was collecting --
15 because CBER releases all the mumps lots.
16 And before releasing any lot to market, I
17 mean, it is -- it goes to CBER and CBER
18 releases -- issues the release certificate.
19 So CBER has the data and also Merck has the
20 data. And both of them are doing analysis
21 and at that point both of them decided that
22 historical log loss and all those studies
23 were done. And based on the historical log
24 loss of 0.7, 5.0 is the right potency at

Page 60

1  release to assure that vaccine meets the end
2  expiry of 4.3.
3    Q.   Wouldn't it be safer to just
4  make it a little higher? I mean, if you
5  release at 5.0 and you know it's going to
6  lose 4.7, you're going to get to right at the
7  minimum, 4.3. Right?
8    MS. SCHMIDT: Objection.
9  BY MR. MACORETTA:
10   Q.   Why don't you just release it
11 at 5.1 and 5.2 and give yourself some more
12 cushion if you're Merck?
13   MS. SCHMIDT: Objection.
14   THE WITNESS: Based on reading
15 the supplement, it appears that data
16 showed that your average log loss is
17 0.55. So you're adding 1.5, you round
18 it up to 6 and then you added another
19 standard deviation of .1. And at the
20 same time you did add all that
21 cushion, you also changed the process
22 and also changed the assay which is
23 going to be 50 percent less variable.
24 So that is going to -- I mean, all

Page 61

1  that was added. Several improvements
2  were made to the assay to reduce the
3  variability of the assay which is
4  going to affect the log loss eventually.
5  BY MR. MACORETTA:
6    Q.   By the way, by 1999, this
7  debate about what the end expiry potency
8  meant -- what the label potency meant was
9  over, right, Merck and FDA had both agreed
10 that the dosage on the label has to be in the
11 vial at the end expiry. Right?
12   MS. SCHMIDT: Objection.
13   THE WITNESS: At the end of
14 1999, when supplement was submitted
15 in September -- to CBER in
16 September '99, it was clear that --
17 the proposal was that your end expiry
18 is going to be 4.3, it used to be
19 released before, but now it is going
20 to be labeled, it is going to be 4.3
21 and expiry is going to be 4.3. And in
22 order to meet that, your release
23 specification is going to be 5.0 and
24 your target manufacturing is going to

16 (Pages 58 - 61)

Appx19566

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 62

1 be 5.2. I mean, that's the cushion
2 you're building.
3 BY MR. MACORETTA:
4     Q.    I understand all that. But by
5 1999 there would -- in 1997 there was a
6 debate about whether the 4.3 on the label was
7 a release specification or an expiry
8 specification. Right?
9         MS. SCHMIDT: Objection.
10         THE WITNESS: Yes.
11 BY MR. MACORETTA:
12     Q.    By 1999, that debate was
13 resolved and everybody agreed that the 4.3 on
14 the label for mumps was an end expiry
15 specification. Right?
16         MS. SCHMIDT: Objection.
17         THE WITNESS: So there was a
18 discussion in, starting '97 -- I'm
19 just rewording what you said. Like,
20 there was a discussion in 1997 that
21 whether the 4.3 is a release or
22 expiry. And after two years of
23 discussion, early 1998, Merck and CBER
24 were clear that 4.3 is the expiry

Page 63

1 potency which used to be release
2 before. So the old precedence was
3 releasing the lot at 4.3 and then
4 follow the historical transfer
5 stability. In 1998, CBER said, and
6 Merck and CBER, they said that 4.3 is
7 going to keep expiry potency. So now
8 because it used to be release, 4.3
9 used to be release and now we made it
10 to expiry, we know that there are
11 going to be lots which are not going
12 to -- because if you're releasing at
13 4.3, you're not going to meet expiry
14 of 4.3. So then -- so that was set
15 one discussion. Then set two
16 discussions started between CBER and
17 Merck, how -- I mean, what are we
18 going to do to make sure that it meets
19 4.3 expiry specification. There was a
20 first supplement which was submitted
21 based on the three different studies I
22 remember. And the proposal was that
23 expiry specification should be 3.7.
24 We are going to change it to 3.7 based

Page 64

1 on the log loss and other studies.
2 And then -- I think then that -- there
3 was -- that was not approved and then
4 there was another supplement in 1999
5 where it was proposed that we are
6 going to keep the label claim same and
7 4.3 is going to be expiry, but we are
8 going to increase the target
9 manufacturing and set up the release
10 specification to 5.0. So that was the
11 set two of discussion. And the
12 supplement was submitted, approved in
13 February of 2000.
14 BY MR. MACORETTA:
15     Q.    So by 2000 -- after 2000 there
16 was no more discussion on what the 4.3 in the
17 label meant. Everybody, meaning Merck and
18 FDA, both understood that the 4.3 meant end
19 expiry. Right?
20     A.    It was clear from the
21 supplement and approval process, yes.
22     Q.    In 1999, you were working in
23 the pharmaceutical industry. Right?
24     A.    Yes, I was working in

Page 65

1 pharmaceutical industry.
2     Q.    What was your understanding
3 then as to what the amount of product in the
4 label means, end expiry or release?
5     A.    That was my first -- that was
6 my first job in the industry in 1999. Second
7 job as a manager of method validation and --
8     Q.    And release, and product
9 release. Right? In September 1999 you were
10 working for FUJIFILM Diosynth
11 Biotechnologies. Right?
12     A.    Yes.
13     Q.    And you were the manager of
14 product release. Right?
15     A.    Yes.
16     Q.    So when you look at the -- what
17 products were you working on then?
18     A.    I was working on clinical and
19 commercial product. I was responsible for
20 releasing growth hormone antagonist. That
21 was one product. And another --
22         COURT REPORTER: Releasing
23 what? Just repeat it.
24         THE WITNESS: Growth hormone

17 (Pages 62 - 65)

Appx19567

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 66

1    antagonist, GHA.
2 BY MR. MACORETTA:
3        Q.    Let me just -- let's take that
4 product, that growth hormone antagonist.
5 That had a label obviously.  Right?
6        A.    Yes.
7        Q.    Somewhere in the label it said
8 how much of the active ingredient is in each
9 dose.  Right?
10       A.    Yes.
11       Q.    Somewhere in the label it said
12 here's the end expiry.  Right?
13       A.    Yes.
14       Q.    1999, did you understand the
15 amount of product on the label to be the
16 amount that was going to be in there at end
17 expiry or the amount of product that was
18 going to be there in release?
19           MS. SCHMIDT:  Objection.
20 BY MR. MACORETTA:
21       Q.    You can answer.
22       A.    In this particular case, the
23 product I was working on and other products I
24 was working on, I was working on eight or

Page 67

1 nine products at that time, yes, it was my
2 understanding that label is the end expiry.
3        Q.    So Merck's position in 1997
4 that the label means release, was that
5 position unique to Merck or did everybody in
6 the industry think this in 1997 or 1998?
7           MS. SCHMIDT:  Objection.
8           THE WITNESS:  Based on reading
9       the supplements, it is my
10      understanding that was the
11      circumstances for this one particular
12      vaccine.  That was the position for
13      this one particular vaccine.
14 BY MR. MACORETTA:
15       Q.    What about Merck's other
16 vaccines, did Merck have this position across
17 the board?
18          MS. SCHMIDT:  Objection.
19          THE WITNESS:  I don't know
20      because I did not look at any other
21      product of Merck's, but --
22 BY MR. MACORETTA:
23       Q.    Okay.  Are -- I'm sorry, I
24 didn't mean to interrupt.

Page 68

1        Are you aware of any other
2 pharmaceutical product ever at any company
3 where the manufacturer has taken the position
4 that the amount in the label is a release
5 specification and not an end expiry
6 specification?
7           MS. SCHMIDT:  Objection.
8 BY MR. MACORETTA:
9        Q.    You can answer.
10       A.    Based on my experience working
11 for companies and providing consulting advice
12 to other companies, I have not come across
13 such examples.  But I'm sure there are there.
14 So, I mean, personally I did not see any of
15 these examples, but I saw example in this
16 particular case.
17       Q.    If a company were -- if a
18 pharmaceutical company were to hire you as a
19 consultant today and ask you, the dosage on
20 the label, is that supposed to be a release
21 potency or an expiry potency, what would your
22 answer be?
23           MS. SCHMIDT:  Objection.
24 BY MR. MACORETTA:

Page 69

1        Q.    You can answer.
2        A.    I'm going to answer in general
3 terms, not this particular case, because this
4 particular case is different circumstances
5 based on reading all the supplements and all
6 the historical communication.
7        Q.    I understand.  I'm asking you
8 in general.  I'm not asking about mumps.
9        A.    Right.  In general, I would say
10 that this is the -- I mean, this is -- it's
11 the label claim is supposed to be released in
12 general.
13       Q.    Released, not end expiry.
14       A.    I'm sorry, the expiry.
15       Q.    In general, okay.  So if some
16 company other than Merck called you today and
17 said the amount of product in the label,
18 that's supposed to be in there at end expiry,
19 right, your answer would be right?
20          MS. SCHMIDT:  Objection.  Asked
21      and answered.
22          THE WITNESS:  If somebody asked
23      me --
24 BY MR. MACORETTA:

18 (Pages 66 - 69)

Appx19568

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 70

1    Q.    That was a bad question.  Let
2  me try again.  You know what, okay, let me
3  strike that question.
4        Today, if a company asked you that
5  should the amount of product on the label be
6  the amount that's in there at end expiry,
7  your answer would be yes, wouldn't it?
8        MS. SCHMIDT:  Objection.
9        THE WITNESS:  My answer would
10        be label claim, whatever is the label
11        claim, it should be there at the end
12        expiry.
13  BY MR. MACORETTA:
14    Q.    If you were -- if a
15  pharmaceutical company had asked you that
16  same question in 1999, would your answer be
17  the same as it is today?
18        MS. SCHMIDT:  Objection.
19        Incomplete hypothetical.
20        THE WITNESS:  My answer, in
21        that company, the products I was
22        working on will be yes.  I'm not
23        talking in general all the products in
24        the industry what's going on because I

Page 71

1        don't have all the specific detail.
2        But the products I was working on, my
3        answer will be yes.
4  BY MR. MACORETTA:
5    Q.    As we sit here today, you can't
6  tell me any pharmaceutical product or company
7  that took the position Merck did in 1997 that
8  the amount on the labels are release potency?
9        MS. SCHMIDT:  Objection.  Asked
10        and answered.
11  BY MR. MACORETTA:
12    Q.    Is that correct?
13    A.    I have not seen all the products
14  in the industry.  What I have seen based on
15  that, that's my understanding.
16        MS. SCHMIDT:  John, we've being
17        going an hour.
18        MR. MACORETTA:  This is a fine
19        spot.
20        VIDEOGRAPHER:  The time is now
21        9:44.  Off the video record.
22            - - -
23        (A recess was taken.)
24            - - -

Page 72

1        VIDEOGRAPHER:  The time is now
2        10:02.  We are back on the video
3        record.  This begins media two.
4  BY MR. MACORETTA:
5    Q.    Dr. Gulati, we're back on the
6  record.  I'm looking, again, at your LinkedIn
7  profile.
8    A.    Yes.
9    Q.    In the second paragraph of your
10  description, it says, "In my current role, I
11  collaborate with global leadership...."
12        Do you see that?
13    A.    Yes.
14    Q.    What does that mean?  What do
15  you mean by "global leadership"?
16    A.    So in companies there are like
17  a site level departments and then there is
18  corporate or global department.  So mostly in
19  my consulting, since the time I started
20  consulting, I have been working with the
21  global team to do the risk assessment of the
22  site.  So global means the corporate
23  leadership, corporate quality, like vice
24  president of global quality.  President of

Page 73

1  the company.  Something -- I mean those
2  leadership positions.
3    Q.    At a high level, not down to
4  individual plant managers or things like
5  that.  Right?
6    A.    That is correct.
7    Q.    Then it says compliance risk
8  management in the second line.  What's
9  compliance risk management?
10    A.    So when you are doing the risk
11  assessment for a site or multiple sites, you
12  are assessing the compliance to the
13  regulations for all the quality systems which
14  are in place.  And then once you have
15  identified the risk, you are now trying to
16  figure out which is the high risk and which
17  is the low risk.  And then you manage risk,
18  you say, okay, this is my high risk, I'm
19  going to do this one right away, this is my
20  high priority risk, high category risk.  And
21  then based on that, you develop a plan for
22  remediating those risks.
23    Q.    So when we say compliance risk
24  management, you mean the risk of the company

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 74

1  not being in compliance with certain regulatory
2  rules. Right?
3  　　　　MS. SCHMIDT: Objection.
4  　　　　THE WITNESS: I mean, I use the
5  　　word compliance as quality and
6  　　compliance. So there are some gaps in
7  　　terms of quality and also compliance
8  　　to regulation.
9  BY MR. MACORETTA:
10  　　Q.　What do you mean by gaps?
11  　　A.　Gaps means, for example, you
12  have a quality system, like, for example, and
13  you are supposed to do, like, a -- I'm going
14  to do a very simple system which is very
15  common, like a deviation system, how do you
16  handle deviation. So you're supposed to --
17  as per regulation you ae supposed to -- and
18  also the guidance is -- which supplement the
19  regulations, that you're supposed to
20  deviation, you're supposed to initiate any
21  kind of incident you observe immediately
22  within 24 hours. Then you're supposed to
23  close very quickly so that you have
24  implemented appropriate corrective and

Page 75

1  preventative action plans and all that stuff
2  we have done.
3  　　　　So I mean, like, when you do
4  the risk assessment, you see that, okay, so I
5  did not -- I mean, what is the risk. I mean,
6  you did not follow certain things, but risk
7  of the impact would be very low. But there
8  are certain things you didn't follow, impact
9  would be very high. So you're doing the
10  categorization of the risk. You're saying
11  that these are like a -- you have risk model.
12  I mean, you do the RPN numbers and all risk
13  priority number and then you based on that
14  you do the risk categorization. And then you
15  do the implementation plan on high risk
16  activities within this much period we have to
17  complete and so forth.
18  　　Q.　So when you say that, you mean
19  you're prioritizing or ranking the various
20  situations in which the company may not be in
21  compliance with the regulation?
22  　　A.　Yes.
23  　　Q.　In your report you talk about
24  BPDRs, biologic product deviation reports.

Page 76

1  Right?
2  　　A.　Yes.
3  　　Q.　You're familiar with them?
4  　　A.　Yes, I have been involved in
5  those in my couple of roles.
6  　　Q.　In what roles have you been
7  involved in BPDRs?
8  　　A.　I mean, in one of my role we
9  have, like, a similar, like, we had the
10  marketed product and we found a deviation and
11  we did the assessment based on the data
12  review and made a determination what should
13  be the path forward. So I've been involved
14  in a couple of roles. Like, one of the roles
15  you have to do the field corrective action.
16  There's no impact but there is -- you can
17  just change the -- change a few things in the
18  field. I mean, you can correct it. So I
19  have been involved in those.
20  　　Q.　That's when you were at a
21  company. Right?
22  　　A.　Yes, as a company.
23  　　Q.　As opposed to being a consultant?
24  　　A.　Not consulting, a company.

Page 77

1  　　Q.　So since you've been a consultant,
2  have you given any opinions to anybody on
3  anything relating to BPDRs?
4  　　A.　I have developed the -- I have
5  developed the recall programs. I did recall
6  programs.
7  　　Q.　Recall.
8  　　A.　Product recall programs.
9  And -- for the clients. And during the --
10  because I've been -- I mean, I audited, like,
11  as a consultant about 40, 50 companies. As a
12  part of quality system assessment, risk
13  assessment, you look at the recall program
14  and also look at the recall, examples of
15  recall, how they were managed and how the
16  mock recalls because, I mean, those
17  situations are rare so you still have mock
18  recall every year, looked at all of the
19  processes, how effective the processes were.
20  And reviewed some of the protocols, recall
21  protocols.
22  　　　　I was working with one of the
23  clients and they were working on one of the
24  recalls. So part of the team to review the

20 (Pages 74 - 77)

Appx19570

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 78

1 protocols.

2     Q.    That's reviewing the protocols
3 for a recall as opposed to actually
4 conducting a recall. Right?

5     A.    Not leading the recall. Because
6 the lead for the recall team will do five
7 different activities. I mean, you develop
8 the protocol where you are seeing what level
9 recall is and then who needs to be notified,
10 consignee, wholesaler, retailers, doctors and
11 all. So recall protocol is a recall
12 strategy, you know, what will be the extent,
13 who will be notified, how they will be
14 notified. So as part of developing that
15 strategy.

16     Q.    You can put that aside for a
17 second.

18     We talked this morning about
19 conversation -- earlier about conversations
20 in 1997, '98, '99 between Merck and the FDA
21 over the fact that for some point in time
22 Merck was treating the 4.3 for mumps on its
23 label as a release potency. Right?

24     MS. SCHMIDT: Objection.

Page 79

1 BY MR. MACORETTA:

2     Q.    Do you remember this?

3     A.    Yes. No. Let me complete. In
4 1997 that was the understanding of CBER and
5 Merck both, that 4.3 was the release potency.

6     Q.    Wait a minute. You're saying
7 that CBER thought in 1997 the potency in the
8 label should be interpreted as a release
9 potency as well?

10     A.    Yes, that's what is written in
11 the supplements. Because both the parties
12 understood that 4.3 was a release potency,
13 not expiry. That's why all the data for last
14 30 years was evaluated based on the
15 historical trends.

16     Q.    Where does it ever say that
17 CBER understood the 4.3 would be release
18 potency?

19     A.    It was in several supplements.
20 I mean, if you read the 1998 supplement,
21 there are several other communications which
22 says that because of the NCVR review there
23 has to be labeled claim review. And if you
24 read other supplement, the historical

Page 80

1 precedence for the lots was to evaluate --
2 release at 4.3 and evaluate stability based
3 on the historical trend. So there are
4 supplements --

5     Q.    Where does CBER say that
6 was okay? You can look at your report. I'm
7 asking you to point me to a specific place
8 where CBER ever says CBER interpreted 4.3 to
9 be a release potency?

10     A.    CBER was releasing all the
11 lots, I mean, at 4.3, 4.4, all the lots over
12 the time which are released by CBER, some of
13 the lots are released at that potency, 4.3
14 and 4.4. And if you read the several
15 communications, I mean, it appears that you
16 have to clarify that 4.3 is not a release
17 potency which means everybody's understanding
18 it is a release potency and Merck was doing
19 that for the last 30 years. So, I mean, you
20 would think that CBER -- and CBER is
21 releasing all the lots, all the details
22 submitted to them and they are releasing lots
23 at 4.4. I mean, it is very clear from all
24 the data and supplements --

Page 81

1     Q.    Well, you're saying it's clear
2 from the data, and I'm asking you if you can
3 point to any piece of paper where CBER says
4 we understand the release potency, 4.3 to be
5 a release potency?

6     MS. SCHMIDT: Objection. Asked
7 and answered. You can answer.

8     THE WITNESS: I mean, I didn't
9 see, like, those exact same words, but
10 there are several communications
11 between CBER and Merck where it is
12 very clear that historical precedence
13 is to evaluate stability data based on
14 the historical trend. And that was
15 historical precedence. I mean, one of
16 the specific communication I remember
17 that -- that is between CBER and Merck
18 that we don't have to do any BPDRs for
19 the OP overfill lots because
20 historical precedence was to evaluate
21 data based on historical trend. Also,
22 I mean, in the warning letter, there
23 was a request somewhere that because
24 you have been releasing -- I mean, you

21 (Pages 78 - 81)

Appx19571

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 82

1    assume that your release is 4.3, what
2    would be the worst case potency.  I
3    mean, there are so many different
4    communications when you read, this is
5    the impression you get, that it is --
6    I didn't see exact words, but it is
7    the understanding of what CBER and
8    Merck.
9    BY MR. MACORETTA:
10    Q.    Can you point -- you're saying
11    that, but I'm asking you to point me to
12    any -- you just said several communications.
13    You have your report in front of you.  Please
14    tell me what communications where CBER says
15    it's our understanding that the release
16    potency is 4.3?
17        MS. SCHMIDT:  Objection.  Asked
18        and answered.
19    BY MR. MACORETTA:
20    Q.    You can answer.
21    A.    I mean, based on all the
22    supplements, that's what I understand.
23    Q.    Where in the supplements --
24    that you reviewed.  Right?

Page 83

1    A.    Right.
2    Q.    Where in the supplements -- by
3    the way, the supplements are submitted by
4    Merck.  Right?
5    A.    Correct, and approved by CBER.
6    Q.    That's right.  So Merck says
7    something -- you're taking the fact that CBER
8    approved it to mean that CBER blessed it
9    or -- approved the supplement, that means
10    that CBER understood something else earlier
11    on?
12    A.    I mean, that's what the
13    impression you get when you read those
14    supplements and the requests which are coming
15    out of the CBER.  It appears that that was
16    the understanding of what the parties.  And
17    it was happening for last 30 years.  I mean,
18    why it was acceptable for the last 30 years.
19    Q.    Well, where is the piece of
20    paper then where CBER says our understanding
21    is changed, now it's going to be an end
22    expiry study?
23        MS. SCHMIDT:  Objection.
24        THE WITNESS:  I think there was

Page 84

1    communication in 1996 that labeled,
2    and it was internal communication, I
3    think it was involved.  There was a
4    communication where the label -- the
5    way the label was written, it was not
6    very clear that 4.3 was release of
7    expiry.  And that's why it was revised
8    and clarified.  And it appears from
9    the communication that both the
10    parties were under the same impression.
11    BY MR. MACORETTA:
12    Q.    What communication are you
13    talking about?
14        MS. SCHMIDT:  Objection.
15        THE WITNESS:  There were
16    several communications.
17        MR. MACORETTA:  What's the
18    objection to that?  Hold on.  What's
19    your objection to that question?
20        MS. SCHMIDT:  She just
21    described --
22        MR. MACORETTA:  No, she said
23    there was a communication.
24    BY MR. MACORETTA:

Page 85

1    Q.    I'm asking you to specifically
2    identify who is it is from, the date or
3    anything about it.  My next question is going
4    to be do you cite it in your report and
5    where?
6        MS. SCHMIDT:  And you can look
7    at your report to answer questions
8    about your report.
9        THE WITNESS:  So -- that's
10    fine.  So there are supplements where
11    we are trying to -- CBER and Merck is
12    trying to -- there are several
13    communications.  I mean, emails and
14    supplements everywhere.  It is like
15    the effort which is going on between
16    CBER and Merck to reset the release to
17    5.0 and all that.  I mean, that's what
18    the impression you get.  This is the
19    understanding.  And there was a
20    99-year supplement where Merck wrote
21    that now we are clear that this is an
22    expiry specification.  So now we are
23    going to work on all the historical
24    data for release of the spec and you

22 (Pages 82 - 85)

Appx19572

Page 86

1      can look at the supplement in 1998.
2      And before that there was some
3      communication in 1996 and 1997.  There
4      are so many communications.
5  BY MR. MACORETTA:
6      Q.    You say there are so many
7  communications.  I understand your impression
8  and I'm asking you which specific
9  communications form your impression?
10     A.    I have to go back and look at
11 the data.  I don't remember off the top of my
12 head.
13     Q.    So you can't -- so as we're
14 sitting here right now you can't tell me the
15 answer to that question, can you?
16          MS. SCHMIDT:  Dr. Gulati, you
17     can look at your report to answer
18     questions about your report.
19          THE WITNESS:  I would look at
20     one of the supplements is January 28,
21     1998.  There was another paragraph
22     somewhere.
23 BY MR. MACORETTA:
24     Q.    The January 28, 1998, supplement?

Page 87

1      A.    Submission.  Yes.
2      Q.    Submission?
3      A.    Yes.
4      Q.    And that's -- what is that?  Is
5  it a letter -- what is that submission or
6  where are you referring to in your report?
7      A.    I'm referring to page number 18,
8  section 69.
9      Q.    So I'm looking at that.  Where
10 in that January 28, 1998, letter does CBER
11 say we understand that 4.3 was meant to be
12 release potency?
13     A.    If we look at that as a part --
14 in 1999, after extensive discussion between
15 Merck and CBER regarding end expiry
16 specification, CBER directed and Merck agreed
17 to -- okay, that's that word, increasing the
18 potency.
19          MS. SCHMIDT:  Objection.  The
20     January '98 letter is longer than the
21     summary that's in her report.
22          MR. MACORETTA:  Okay.
23 BY MR. MACORETTA:
24     Q.    Well, the paragraph you just

Page 88

1  quoted, paragraph 68, doesn't say anywhere
2  that CBER understood --
3      A.    69, I mean, I'm just trying to
4  look at this, because I know somewhere we
5  wrote down, you know, how the, like, sequence
6  of events.
7      Q.    I understand.  Take as much
8  time as you need.
9          MR. KELLER:  This is Jeff
10     Keller.  Off the record.
11          - - -
12          (A discussion off the record
13     occurred.)
14          - - -
15          THE WITNESS:  If you go to
16     page 35, section 121.
17 BY MR. MACORETTA:
18     Q.    121?
19     A.    Yes.
20     Q.    Okay.
21     A.    So there are some references
22 there, February 26, 1996, teleconference
23 between CBER and there are a few other
24 people.

Page 89

1      Q.    Okay.
2      A.    So the current label says that
3  was one of the communications, I mean,
4  where -- which gives the understanding that
5  it was the understanding on both sides.
6      Q.    Well, that's a note -- that's
7  notes from somebody at Merck reporting what
8  somebody at CBER said.  Right?
9          MS. SCHMIDT:  Objection.  To
10     the extent you remember.
11          THE WITNESS:  Bob is, I
12     think --
13 BY MR. MACORETTA:
14     Q.    I'll break it down.
15 Ms. Abraham worked at Merck, didn't she?
16     A.    Bob Yetter was at CBER.
17     Q.    Ms. Abraham's notes -- so
18 Ms. Abraham worked at Merck.  Right?
19     A.    Uh-huh.
20     Q.    So you're relying on somebody
21 at Merck's notes reporting what somebody at
22 CBER said.  Right?
23     A.    So if you go to one --
24 paragraph 122, the notes also reflect that

23 (Pages 86 - 89)

Appx19573

Page 90

1 Dr. Baylor indicated that lots made before
2 any increase to potency are still considered
3 acceptable based on historical precedence.
4      Q.    Yes.
5      A.    Dr. David Wonnacott notes that
6 I reminded Dr. Baylor that we do not consider
7 the load to be out of specification.  This is
8 like a part of the communication.
9           MS. SCHMIDT:  Make sure you
10      take your time so that --
11 BY MR. MACORETTA:
12      Q.    Take your time.
13           MS. SCHMIDT:  You can review
14      your report.
15 BY MR. MACORETTA:
16      Q.    Let me know when you're done.
17 You know what, let me make it easier on you.
18 Let me show you, let me mark as Exhibit 3 --
19           MS. SCHMIDT:  I just -- I'm
20      sorry, I just want to make sure she's
21      finished answering the question.
22 BY MR. MACORETTA:
23      Q.    Don't let me interrupt you,
24 Dr. Gulati.  Were you finished your answer?

Page 91

1      A.    I'm just trying to read the
2 whole paragraph to see if I can find more
3 references.
4      Q.    That's fine.  Keep going.  You
5 let me know when you've completed your search
6 for references.
7           MS. SCHMIDT:  Objection.
8           THE WITNESS:  So, I mean,
9      that's -- those are the two
10      paragraphs, so 1996 teleconference,
11      then there is discussion with
12      Dr. Baylor, and then there is 1998
13      prior approval supplement, January 1998
14      prior approval supplement.
15 BY MR. MACORETTA:
16      Q.    Are you done?
17      A.    Uh-huh.
18           - - -
19      (Exhibit Gulati-3, 5/12/99 Memo,
20      00094960, marked for identification.)
21           - - -
22 BY MR. MACORETTA:
23      Q.    Let me show you what we're
24 going to mark as Exhibit 3.  That is the memo

Page 92

1 you're referencing in paragraph 122, isn't
2 it?
3      A.    I read this.
4      Q.    Do you know Dr. Baylor?
5      A.    No, not personally.
6      Q.    You know he's an expert
7 retained by Merck in this case?
8      A.    Yes, I know that.
9      Q.    Did you review his report?
10      A.    No, I did not.
11      Q.    Ever talk to him?
12      A.    No.
13      Q.    But you're relying on what
14 Merck says he said.  Right?
15           MS. SCHMIDT:  Objection.
16           THE WITNESS:  I'm relying on
17      what is, like there are several
18      communication, and also the whole
19      effort which is going on, the
20      supplements which are submitted and
21      all the efforts were going on to
22      change the -- to change the
23      manufacturing target.
24 BY MR. MACORETTA:

Page 93

1      Q.    If you look at the end of
2 paragraph 122, it's the last line on page 35
3 over to page 36, Based on my experience, I
4 understand this communication to confirm that
5 lots dah, dah, dah.  This communication means
6 Exhibit 3, right, what you're talking about
7 in the rest of paragraph 122?  Right?
8      A.    This is one communication and
9 also the discussion, I mean, going on through
10 the supplements between Merck and CBER
11 starting 1998 and also in 1999.
12      Q.    That's not what you say at the
13 end of paragraph 122, is it?  You say, Based
14 on my experience, I understand this
15 communication to confirm that lots...were
16 expected to test below 4.3 and that was
17 understood by CBER.  That's what you said.
18 Right?
19      A.    This is one of the communications
20 that is correct.
21      Q.    I understand.  But in this
22 paragraph, that -- Exhibit 3 is the only
23 communication you reference.  Right?
24      A.    I'm also talking about 159,

24 (Pages 90 - 93)

Appx19574

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 94

1  reference 159 and 158, which were like
2  February 26, 1996, communication.  And 159 is
3  a supplement, I think.
4      Q.  No, 159 is Exhibit 3, isn't it?
5  Take a look at your footnote and the Bates
6  number on the bottom of Exhibit 3.
7      A.  This is what you're --
8      Q.  Yes.  Your Footnote 159
9  references the piece of paper you have in
10  your hand as Gulati-3, doesn't it?
11      A.  It does.  But here's 158 also.
12      Q.  I understand that.  And 158 are
13  some other notes of a conversation in 1996.
14  Right?
15      A.  Right.  Uh-huh.
16      Q.  So to reach your understanding
17  at the end of the paragraph, at the end of
18  paragraph 122, that lots were expect -- lots
19  manufactured before 9/99 were expected to
20  test before 4.3 and CBER understood that,
21  you're relying, at least in part, on
22  Gulati-3, aren't you?
23      A.  This is one, yes.
24      Q.  It's one of the two things you

Page 95

1  say you're relying on.  Right?
2          MS. SCHMIDT:  Objection.
3          THE WITNESS:  There are other
4      things also in other supplement which
5      imply the same thing.
6  BY MR. MACORETTA:
7      Q.  But that's not what you say
8  here.  Right?
9      A.  In this particular paragraph,
10  the conclusion is based on two references,
11  two to three references.
12      Q.  And you're relying, at least in
13  part, on Gulati-3, which is Dave Wonnacott
14  saying what Norman Baylor said.  Right?
15      A.  Yes.
16      Q.  Why didn't you just call
17  Dr. Baylor and ask him if that's what he
18  said?
19      A.  That's beyond the scope of my
20  assignment.
21      Q.  Why is that beyond the scope of
22  your assignment?
23          MS. SCHMIDT:  Objection.
24          THE WITNESS:  I'm hired to

Page 96

1      provide my opinion based on all the
2      data and all the documents about what
3      was going on --
4  BY MR. MACORETTA:
5      Q.  But you said at the beginning --
6      A.  And what do I think.
7      Q.  But you said at the beginning
8  you could ask for more, right, you didn't
9  just have to take what Merck gave you?
10          MS. SCHMIDT:  Objection.
11  BY MR. MACORETTA:
12      Q.  Right?
13      A.  At that time --
14          MS. SCHMIDT:  What is the
15      question?  Sorry.
16  BY MR. MACORETTA:
17      Q.  Well, let me go back to the
18  question.  Why didn't you just call Dr. Baylor
19  and ask him what he said or if he said it?
20          MS. SCHMIDT:  Objection.
21  BY MR. MACORETTA:
22      Q.  You can answer.
23      A.  Well, I think -- I mean, that's
24  not scope of my assignment.  That's what I

Page 97

1  understand.
2      Q.  But in part you're reaching
3  your understanding in this paragraph based on
4  a memo saying what Dr. Baylor said in 1999.
5  Right?
6          MS. SCHMIDT:  Objection.
7          THE WITNESS:  Yes.  It's based
8      on one of the -- this is one of the
9      references in reaching that
10      conclusion.  And there are like 20
11      people there.  I mean, I couldn't call
12      all of them.  My -- the scope of my
13      assignment was to review the documents
14      and provide an opinion based on what
15      you think.
16  BY MR. MACORETTA:
17      Q.  But your understanding is not
18  what 20 other people said, your understanding
19  is based on what Norman Baylor said in 1999.
20  Right?
21          MS. SCHMIDT:  Objection.
22          THE WITNESS:  He was working
23      for CBER at that time and he was
24      working on the mumps vaccine.  So he's

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 98

1    knowledgeable about this particular
2    case. So he's -- I mean, what he says
3    carries -- like, he's official, right.
4    He's working, he's an employee of the
5    FDA. He carries -- I mean, his
6    opinion is important.
7    BY MR. MACORETTA:
8        Q.    Well, is this his opinion or a
9    statement of his understanding? This isn't
10   his opinion. Right?
11       MS. SCHMIDT: Objection.
12       THE WITNESS: This is not
13   opinion. It's like this is more like
14   to me a decision.
15   BY MR. MACORETTA:
16       Q.    So because Dr. Baylor was an
17   official with FDA, what he said about the
18   product was important to your understanding
19   of what the FDA understood. Right?
20       MS. SCHMIDT: Objection.
21       THE WITNESS: It was his
22   responsibility, so what he says is
23   important.
24   BY MR. MACORETTA:

Page 99

1        Q.    This part where you say
2    Dr. Baylor understands that some of the lots
3    are going to test below 4.3. Merck never
4    cites this conversation in response to any of
5    the 483s or the warning letters about
6    products being below 483, do they?
7        MS. SCHMIDT: Objection.
8        THE WITNESS: As a response to
9    483, Merck did provide what was
10   requested in the observation, what was
11   the observation. So all the
12   information relevant to the
13   observation was provided. I mean, I
14   read the response to the 483 and the
15   warning letter. Whatever was
16   requested was provided.
17   BY MR. MACORETTA:
18       Q.    But if you're relying on the
19   fact that somebody from the FDA in 1998 said,
20   yeah, we understand your product is below
21   4.3, Merck then gets not only a 483 but a
22   warning letter saying your product is below
23   4.3, wouldn't you have expected Merck to say
24   wait a minute, Dr. Baylor told us in 1998

Page 100

1    that was okay or he knew that that was
2    happening?
3        MS. SCHMIDT: Objection.
4    BY MR. MACORETTA:
5        Q.    Wouldn't you have expected
6    Merck to use this valuable statement from the
7    FDA in defense of the 483 and the warning
8    letter?
9        MS. SCHMIDT: Objection.
10   BY MR. MACORETTA:
11       Q.    You can answer that question.
12       A.    So when I read the 483 and when
13   I read -- I mean, when I read the response to
14   483, Merck did provide all the supplements
15   and everything and the reasons why BPDRs were
16   not done. I mean, that's all I can say.
17   Because that's -- whatever information was
18   requested and whatever was the documentation,
19   like supplements and all that and other
20   things were provided, that -- because we have
21   been working with the office of vaccine
22   research on increasing the specification.
23   And there is a clarification of the label
24   now, so we submitted the supplement and it

Page 101

1    got approved and we are using new process
2    now.
3        So all that information was
4    provided. And then I mean, probably CBER
5    wanted more information based on whatever was
6    provided, and they requested that you do an
7    analysis of the lots around that release
8    potency is 4.3 and summary analysis for the
9    worst case expiry.
10       Q.    Dr. Baylor was still at the FDA
11   and involved with MMR in 2001 and 2002 when
12   the 483s and the warning letters were issued.
13   Right?
14       MS. SCHMIDT: Objection. To
15   the extent you know, you can answer.
16       THE WITNESS: I don't know if
17   he was there or not.
18   BY MR. MACORETTA:
19       Q.    If you were advising Merck in
20   2002 how to respond to a BPDR and you saw
21   Exhibit 3, wouldn't you tell Merck you should
22   mention that in the BPDR, that Dr. Baylor
23   already said he knows about it?
24       MS. SCHMIDT: Objection.

26 (Pages 98 - 101)

Appx19576

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 102

1	THE WITNESS:  I don't have like
2	what happened before what kind of
3	discussion were going on.  So, I mean,
4	for me --
5	BY MR. MACORETTA:
6	Q.	I'm not asking you that.  I'm
7	asking what you would do in if you were
8	advising Merck based on that?
9	MS. SCHMIDT:  Objection.
10	THE WITNESS:  I mean, I don't
11	know what to -- how to answer this
12	question because, I mean, I don't have
13	all the information when this
14	warning -- I mean, the response was
15	drafted, what was going on, what was
16	the discussion during the inspection
17	and what was the discussion with the
18	inspectors during the inspection and
19	what was the discussion with office of
20	vaccine research at that time and
21	why -- what was put in the response at
22	that time.  I mean, I don't have all
23	that information based on that.  I
24	mean, it's difficult to say.

Page 103

1	BY MR. MACORETTA:
2	Q.	By the way, if what you say is
3	true, that in 1999 CBER knew the lots were
4	going to test below 4.3, why would they even
5	issue a 483 or warning letter two years
6	later?
7	MS. SCHMIDT:  Objection.
8	THE WITNESS:  I mean, I
9	didn't -- I don't work for -- I didn't
10	work for CBER, so for me it's
11	difficult to answer that question.
12	BY MR. MACORETTA:
13	Q.	So you don't know?
14	A.	Yeah, I don't know.  I was not
15	at CBER.
16	Q.	That's fine.  All right.  Go to
17	a different topic.
18	MR. MACORETTA:  Let me show you
19	what we're going to mark as Gulati-4.
20	- - -
21	(Exhibit Gulati-4, MMRII
22	Protocol 007 - Mumps End Expiry Study,
23	01649759 - 01649780, was marked for
24	identification.)

Page 104

1	- - -
2	BY MR. MACORETTA:
3	Q.	All I'm going to ask you about
4	is something at the bottom of page 5.  Take
5	as much time as you want to read it, but I'm
6	going to talk to you about the bottom of page
7	5.
8	MS. SCHMIDT:  I'm sorry, just
9	under this 2.1.1?
10	BY MR. MACORETTA:
11	Q.	I'm going to ask you about
12	2.1.1, yes.  Let me know when you want to
13	chat about that, Dr. Gulati.
14	A.	Okay.
15	Q.	Dr. Gulati, have you seen this
16	document before?
17	A.	I think I have seen it, but I
18	read very quickly because I was not really
19	involved in, like, a Protocol 007.  But this
20	is part of the document to provide background
21	information.
22	Q.	So it's within your appendix
23	and something you considered?
24	A.	Yes.

Page 105

1	Q.	Okay.  Great.  And you
2	understand on the cover it says, "Prepared by
3	PDT...."  Do you see that?
4	A.	Yes.
5	Q.	Do you understand that to be
6	the product development team?
7	A.	Yes.
8	Q.	Great.
9	A.	I mean, I don't know, but it
10	could be anything else because it's not clear
11	here.  It's PDT is probably what we're
12	referring to.
13	Q.	So 2.1.1 at the bottom of page
14	5, During communications with CBER in '96 to
15	'98, it became evident that the agency did
16	not agree with our proposal that the
17	specifications noted in our label were the
18	minimum release potencies for MMRII.  Do you
19	see that?
20	A.	I see that.
21	Q.	Are you telling me that that
22	statement is wrong?
23	MS. SCHMIDT:  Objection.
24	THE WITNESS:  I'm not saying

27 (Pages 102 - 105)

Appx19577

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 106

1    anything. I'm just saying that what's
2    written here is written here.
3    BY MR. MACORETTA:
4        Q.    Okay. And this does not say
5    that CBER ever agreed that 4.3 was a release
6    potency. Right?
7        MS. SCHMIDT: Objection.
8        THE WITNESS: I mean, Merck has
9    been releasing this product for the
10   last 30 years with the target
11   manufacturing of 4.9 and releasing the
12   lot at 4.3 and submitting all the data
13   to CBER and CBER is releasing all the
14   lots. It's happening for the last
15   30 years. I mean, that gives the
16   impression that CBER did understand
17   that it was a release potency.
18   BY MR. MACORETTA:
19       Q.    I understand that's the
20   impression. I'm asking you if you can point
21   to -- before we said -- I asked you if you
22   could point to anything where CBER said
23   that's our understanding, and we talked about
24   that. And I'm suggesting -- and I'm asking

Page 107

1    you if anything in here says CBER understood
2    4.3 to be a release potency?
3        MS. SCHMIDT: Asked and
4        answered. Objection.
5    BY MR. MACORETTA:
6        Q.    You can answer.
7        A.    So I mean, I already answered
8    that question. I mean, what was the
9    understanding, what I understand reading the
10   supplements, and -- I mean, this line also
11   pretty much confirms that because it's saying
12   that -- I mean, there is a -- I mean, I have
13   to look at more data. I really am not able
14   to say for sure what does this mean because I
15   don't know what kind of communication which
16   are referenced here from 1996 to 1998. I
17   looked at certain communication from 1996 to
18   1998 and to draw the inference that both CBER
19   and Merck was -- understood that 4.3 was
20   expiry, here it it's something is said, I
21   mean, it says the communication between 1996
22   and 1998, but I'm not sure what kind of
23   communication are they talking about because,
24   I mean --

Page 108

1        Q.    And if you go down a couple of
2    lines it talks about arguments for
3    demonstrated immunogenicity at lower
4    potencies. Do you see that discussion?
5        A.    Yes, I see that discussion.
6        Q.    You're familiar -- you saw
7    documents where Merck makes these various
8    arguments for demonstrated immunogenicity at
9    lower potencies?
10       A.    I saw some of the documents
11   which were related to what I was looking at.
12       Q.    And you would agree with the
13   statement here that the FDA rejected those
14   arguments. Right?
15       MS. SCHMIDT: Objection.
16       THE WITNESS: I mean this is
17       outside the scope of my assignment. I
18       mean, I did look at some of the
19       documents for Study 007 in reference
20       to what I was asked to do. But Study
21       007 is outside the scope of my --
22   BY MR. MACORETTA:
23       Q.    But this is not talking about
24   007. Right? The arguments for demonstrated

Page 109

1    immunogenicity at lower potencies --
2        A.    It's talking immunogenicity.
3        Q.    Yes. And 007 was certainly
4    testing immunogenicity?
5        A.    Yes.
6        Q.    But 007 was not under way in
7    '96 to '98. Right?
8        A.    Yes, I think it started later.
9        Q.    Let me go to your report and
10   some of the models. You talk about four
11   different models, stability models that Merck
12   uses. Right?
13       A.    Three different stability --
14       Q.    I'm sorry, three different
15   stability models. And I believe that
16   discussion starts the paragraph 149 on
17   page 41. Your Model Number 1. 1999 the
18   profile was developed in collaboration with
19   CBER. Do you see that?
20       A.    Yes.
21       Q.    Okay. And the reason we did
22   this -- the reason Merck did in model was to
23   figure out how much product needed to be in a
24   mumps -- a dose of mumps vaccine release to

28 (Pages 106 - 109)

Appx19578

Page 110

1 make sure it had sufficient product at end
2 expiry. Right?
3         MS. SCHMIDT: Objection.
4         THE WITNESS: The objective of
5     the model was to do the analysis and
6     determine what is the log loss over
7     the period of 24 months. So objective
8     of the model to use the analysis to
9     establish the specification at
10    release.
11 BY MR. MACORETTA:
12    Q.    We want to determine -- Merck
13 wants to determine -- Merck and CBER want to
14 determine the log loss over 24 months so they
15 can figure out how much to put in at the
16 beginning. Right?
17    A.    Yes, in general terms.
18    Q.    This is indeed the model Merck
19 relies on to raise the minimum release
20 potency to 5.0. Right?
21    A.    This is the model which was
22 used to establish the release specification
23 of 5.0.
24    Q.    This model is created by Merck

Page 111

1 and CBER. Right?
2     A.    This was a collaborative
3 effort, yes.
4     Q.    But it's the case that the
5 calculations CBER did were incorrect and
6 created too low a loss, isn't it?
7         MS. SCHMIDT: Objection.
8         THE WITNESS: I'm not sure what
9     you mean by that.
10 BY MR. MACORETTA:
11    Q.    Let's go back to Exhibit 4.
12 Let's take a look at page 6. I'm on the
13 paragraph that starts -- the third paragraph
14 down, in September '99. This was in response
15 to a communication from CBER specifying that
16 the mumps minimum release potency --
17        MS. SCHMIDT: She's not with
18    you, John.
19        MS. DYKSTRA: Where are you?
20    You're going too fast.
21 BY MR. MACORETTA:
22    Q.    I'm sorry, page 6, paragraph --
23 page 6 of Exhibit 4, the paragraph that
24 starts, "In September 1999...," near the top.

Page 112

1 Second sentence. This was in response to a
2 communication from CBER specifying that the
3 mumps minimum release potency be set at 5.0
4 log TCID50 per dose to support an end expiry
5 claim of 4.3 log.. following their evaluation
6 of our product stability profile and potency
7 assay variability for mumps.
8         Do you see that?
9     A.    I see that.
10    Q.    That's true, right?
11    A.    Yes, that's in supplement.
12    Q.    The next sentence says, "The
13 release potency recommended by CBER, however,
14 was low, in having neglected to include all
15 the elements associated with post-release
16 potency losses, as well as an invalid
17 calculation leading to underestimation of
18 release assay variability."
19        Do you see that?
20    A.    I see what it reads.
21    Q.    Do you have any reason to think
22 it's not true?
23    A.    Yes. I have reasons to think
24 it's not true because I looked at -- when I

Page 113

1 looked at this model, I also looked at the
2 realtime data which was generated, and -- I
3 mean, I looked at the supplements and I
4 looked at the chart and realtime data, like
5 stability trend charts from '77 to -- I mean,
6 I don't know, 20 years of data, what it was
7 showing. I also looked at the historical
8 analysis which was submitted in the
9 supplement and what it was showing. So --
10 and also the realtime stability data which
11 was generated during -- I mean 1997, 1998,
12 1999. I mean, different pre-fill lots. And
13 what log loss it was showing, like, stability
14 data was showing, and I saw the log loss,
15 realtime data log loss was .3 to .6. So
16 based on realtime data, I mean, I see that
17 why Model 1 calculated the log loss of .7,
18 maximum log loss including the standard
19 deviation.
20    Q.    Here Merck is saying that
21 CBER's log loss is wrong and too low. Right?
22        MS. SCHMIDT: Objection.
23        THE WITNESS: I mean, I don't
24    know what this document is saying.

29 (Pages 110 - 113)

Appx19579

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 114

1  I'm just going to go by the supplement
2  1999 which was approved and the study
3  which was presented and that's the
4  position of the company.
5  BY MR. MACORETTA:
6      Q.    Wait a minute.  The data -- the
7  supplement was approved, but it was approved
8  using the data that at least Exhibit 4 says
9  had too low a calculation.  Right?
10     MS. SCHMIDT:  Objection.
11     THE WITNESS:  I mean, Exhibit 4
12  says what it says.  But what I'm
13  basing -- I mean, what I am looking at
14  the supplements and the historical
15  data analysis and what did that show.
16  And based on that, it was CBER and
17  Merck both worked on determining the
18  specification.  And the specification
19  based on that was determined to be
20  5.0.
21     Now, this supplement says
22  something, I don't know what does that
23  mean.  I mean, of course, sounds like
24  it's all related, but, again, looking

Page 115

1  at the realtime data and analysis, I
2  believe what was submitted in
3  supplement in 1999, September '99, I
4  mean, that was the data which was
5  showing.  That was based on the
6  historical realtime data.
7  BY MR. MACORETTA:
8      Q.    But this sentence says that
9  CBER's calculation of that data was too low,
10  doesn't it?
11     MS. SCHMIDT:  Objection.
12     THE WITNESS:  I mean, I
13  don't -- I mean, this is some kind of
14  study.
15     MS. SCHMIDT:  Wait for a
16  question.
17     THE WITNESS:  I mean, there is
18  an official position in the supplement.
19  BY MR. MACORETTA:
20     Q.    Did you do anything to figure
21  out if CBER's calculation was too low or not?
22     MS. SCHMIDT:  Objection.
23     THE WITNESS:  I was asked to
24  provide an opinion what I think about

Page 116

1  the data in the -- which was available
2  in those years and what were the
3  calculations done.  I didn't go try to
4  plug in the numbers, but the analysis
5  which was submitted, which was done in
6  1998, 1999, I looked at the analysis
7  and, I mean, those were the results.
8  .55 was the log loss.
9  BY MR. MACORETTA:
10     Q.    Well, I understand, but here
11  are documents that say that the calculations
12  were wrong, right, at least in part?
13     MS. SCHMIDT:  Objection.
14  BY MR. MACORETTA:
15     Q.    Right.  I mean, isn't that what
16  they say?
17     MS. SCHMIDT:  Objection.
18  BY MR. MACORETTA:
19     Q.    You can answer.
20     MS. SCHMIDT:  Is the question
21  what does --
22  BY MR. MACORETTA:
23     Q.    Let me try again.
24     You said you looked at the

Page 117

1  calculations in the 1999 supplement.  Right?
2      A.    I looked at the analysis and
3  the results in 1999 supplements.
4      Q.    Okay.  And did you ever look to
5  see if the calculation CBER did were too low?
6      MS. SCHMIDT:  Objection.
7      THE WITNESS:  I relied on
8  whatever was in the supplement.
9  Whatever was submitted and whatever
10  was approved.
11  BY MR. MACORETTA:
12     Q.    So Merck submits a supplement.
13  Right?
14     A.    Uh-huh.
15     Q.    But according to this, Merck
16  knew that the data in the supplement was
17  wrong.
18     MS. SCHMIDT:  Objection.
19  BY MR. MACORETTA:
20     Q.    So you didn't check to figure
21  out whether the data really was wrong?
22     A.    So in supplement -- I mean,
23  data was submitted which was -- I mean, based
24  on several analyses there's certain amount --

30 (Pages 114 - 117)

Appx19580

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 118

1 some data was submitted and log loss was
2 determined to be .55, and it was overall .7.
3 And then there is CBER who has all the -- who
4 is releasing all the lots who has all the
5 data, they're looking at data on their side
6 and they're also supporting the same
7 analysis.
8      So I mean, I believe if both
9 parties -- there are two independent parties
10 are looking at some kind of analysis coming
11 to some conclusion, that is correct.
12      Q.   If Merck submitted a supplement
13 with data it knew was incorrect, that would
14 be inappropriate.  Right?
15           MS. SCHMIDT:  Objection.
16      That's an incomplete hypothetical.
17 BY MR. MACORETTA:
18      Q.   You can answer.
19      A.   Could you, please, repeat the
20 question?
21      Q.   If Merck -- I'll make it a more
22 complete hypothetical.  If Merck submitted
23 its September 1999 supplement with data on
24 loss of mumps vaccine over time that Merck

Page 119

1 the new was incorrect, that would be
2 inappropriate on Merck's part, wouldn't it?
3      A.   I mean, based on review of
4 documents and supplements, I see what was
5 submitted.  I mean, this is internal
6 communication, Merck's internal
7 communication, and I don't think it is
8 submitted with any of the supplement.  So, I
9 mean, I'm going with what Merck submitted as
10 a supplement to get the approval.  So I mean,
11 in any company when you -- before you -- when
12 you do a study, I mean, it's very normal, you
13 know, when you do a study, you see some kind
14 of result, people say, oh, people provide
15 their opinion, but they are not -- those are
16 not the final position.  This was the final
17 result and final analysis which was submitted
18 as a part of the supplement.  And I mean,
19 that's what I'm going to rely on.  There
20 could be many communications where people
21 might be saying different.  We do rely on
22 what was officially submitted.
23      Q.   I'm going to move to strike
24 that answer as non-responsive.  I'm going to

Page 120

1 try again.  I'm going to ask a hypothetical.
2      If Merck submitted the
3 September 1999 supplement with data Merck
4 knew was incorrect, would that be
5 inappropriate on Merck's part?
6           MS. SCHMIDT:  Objection.  Asked
7      and answered.  She gave an answer.
8           MR. MACORETTA:  She didn't give
9      an answer.  She gave a long speech
10      that had nothing -- that didn't answer
11      the question.  Go ahead, you can
12      answer.
13           MS. SCHMIDT:  What is the
14      question?
15           MR. MACORETTA:  Could you read
16      back the question, Linda?
17           MS. DYKSTRA:  John, there's no
18      reason to yell at the witness.
19           MR. HOWARD:  There's no
20      reason --
21           MS. DYKSTRA:  There's no reason
22      to yell at the witness.
23           MR. HOWARD:  My head is
24      pounding.  It's been all day.

Page 121

1           MS. DYKSTRA:  You might not
2      like her answers but she did answer.
3           MR. MACORETTA:  She didn't.
4      All right.
5      If your head is pounding, take
6      an aspirin.
7      Please read back the question
8      and the answer.  You can answer.
9           MS. SCHMIDT:  We're also
10      approaching an hour and maybe
11      everybody could use a break.
12           MR. MACORETTA:  After she
13      answers this questions maybe.
14           MS. SCHMIDT:  Do you want to
15      read back the question?  I'm sorry for
16      interrupting.
17      - - -
18      (The court reporter read the
19      pertinent part of the record.)
20      - - -
21           MS. SCHMIDT:  Objection.  She
22      answered the question.
23 BY MR. MACORETTA:
24      Q.   You can answer.

31 (Pages 118 - 121)

Appx19581

Page 122

1      A.    Merck submitted a supplement in
2   September '99 based on two years of
3   discussion with CBER and data analysis and
4   going back and forth what is the right
5   proposal, right approach and what should be
6   the right specification.  And based on two
7   years of discussion, which was, first
8   supplement was in 1998, not approved because
9   proposal was to reduce the expiry to 3.7, and
10  then a lot more discussion and data analysis.
11  And this supplement is submitted based on a
12  lot of work which went into that.
13      So, I mean, that's what --
14  that's the data which has been discussed
15  between CBER and also Merck.  And CBER has
16  done its own analysis independently because
17  they have all the data.  And all the --
18  they're getting all the stability data and
19  everything.  They're doing their own
20  analysis.  Both of them are getting the same
21  results.  That's why, I mean, in some
22  communication even I read that Merck
23  directed -- sorry, CBER directed Merck to do
24  that because they did it their own analysis.

Page 123

1      So these two independent party
2   did some analysis.  Merck did an analysis.
3   CBER did an independent analysis.  CBER
4   agreed with Merck's analysis and Merck
5   submitted a supplement and that proposal was
6   approved.  So I'm going to pretty much rely
7   on the supplement which was submitted where
8   both of them would collaborate to be able to
9   accept the specification.
10      Q.    Is a pharmaceutical company
11  submitting a prior approval supplement
12  supposed to be truthful in everything in the
13  supplement?
14      MS. SCHMIDT:  Objection.
15  BY MR. MACORETTA:
16      Q.    As a general matter.
17      A.    Companies submit the supplement
18  based on the realtime data and analysis.  And
19  they are truthful because it goes in their
20  favor, I mean.
21      Q.    I don't understand your answer.
22  I asked a general matter are people -- are
23  you suppose to tell the truth in everything
24  you submit in a prior approval supplement?

Page 124

1      A.    Yes, I think all the data
2   analysis is supposed to be truthful.
3      Q.    Is supposed to be in every
4   case.  Right?  I'm not asking what happened
5   here, I'm asking as a general.
6      A.    I thought they were general.
7   In my experience, wherever the data analysis
8   submitted is based on realtime data, whatever
9   realtime data is.
10      Q.    If a client came to you and
11  said, hey, the regulators made a
12  miscalculation in our favor on something
13  relating to stability, should we tell them
14  about it, what would your answer be?
15      MS. SCHMIDT:  Objection.
16      THE WITNESS:  It would depend
17      on the situation, what was -- I mean,
18      you have to look at all the
19      information, whole thing, what is the
20      background, what is the information,
21      what is not correct, what is the
22      calculation.  I mean, you have to look
23      at the whole package.
24  BY MR. MACORETTA:

Page 125

1      Q.    Well, when would your answer
2   ever be that, no, you don't have to tell the
3   regulators about their miscalculation?  What
4   would that scenario be?
5      A.    If you know for sure and you
6   have done all the analysis and you have
7   confirmed and you have looked at all the
8   background data and you have confirmed that
9   there was some kind of error, and you will go
10  through the proper reporting mechanism.  I
11  mean, for example, what is BPDR?  That is,
12  like, when you find the error after you
13  release the product, and you go
14  through the BPDR mechanism.  In a filing if
15  you find something like that, I mean, there
16  will be supplements which will be supporting
17  to the main filing.  So once you have
18  confirmed all that, then you will provide
19  that information and submit that information.
20      Q.    So if you confirm that
21  something in an earlier filing is incorrect,
22  you're supposed to file a supplement to fix
23  that.  Right?
24      MS. SCHMIDT:  Objection.

32 (Pages 122 - 125)

Appx19582

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 126

1    THE WITNESS: If you found that
2  you have provided some data and there
3  was some kind of calculation error in
4  the data which might -- which will
5  impact any of the quality or anything,
6  you would provide that additional
7  information once you have the
8  confirmation.
9  BY MR. MACORETTA:
10    Q.    Okay. In 2002, people at Merck
11  are saying the data in -- that CBER used was
12  wrong?
13    MS. SCHMIDT: Objection.
14  BY MR. MACORETTA:
15    Q.    Do you see -- did Merck ever
16  file a supplement to its PAS to correct that
17  mistake?
18    MS. SCHMIDT: Objection.
19    THE WITNESS: There is
20  something said that, but there's no
21  basis behind that. There's no
22  supporting document. I mean, there's
23  a sentence, I know you're asking me
24  to, I mean, agree to that. But, I

Page 127

1  mean, there should be -- what is the
2  basis, I mean, it's just a random
3  sentence.
4  BY MR. MACORETTA:
5    Q.    Well, let's look at what we're
6  going to mark as Gulati-5.
7    MS. SCHMIDT: If we're
8  switching documents, do we want to
9  take break?
10    MR. MACORETTA: I'd rather stay
11  on this topic frankly. But, you know
12  what, it's up to the witness.
13    MS. SCHMIDT: She needs to
14  take --
15    MR. MACORETTA: That's fine.
16  If you want to take a break, we'll
17  take a break.
18    THE WITNESS: Okay.
19    VIDEOGRAPHER: The time is now
20  11:01. We are off the video record.
21    - - -
22    (A recess was taken.)
23    - - -
24    VIDEOGRAPHER: The time is now

Page 128

1  11:16. We are back on the video
2  record.
3    - - -
4    (Exhibit Gulati-5, 5/3/02
5  Email, 00498385 - 00498387, was marked
6  for identification.)
7    - - -
8  BY MR. MACORETTA:
9    Q.    All right. Dr. Gulati, what's
10  in front of you now has been marked Gulati
11  Exhibit 5. You read Mr. Schofield's
12  deposition transcript, right, you reviewed
13  that?
14    A.    I did.
15    Q.    And I could tell you that this
16  is an exhibit to his transcript and he talked
17  about it as well. So if you want to take a
18  look on the second page of this document, I'm
19  going to go down to the -- which Mr. Schofield
20  purports to be his recollections about MMR
21  stability, I'm going to go down to the one,
22  two, three, four, five, six -- yeah, sixth
23  bullet point where it says, CBER meeting
24  Number 2 where we were told how to adjust...

Page 129

1    Do you see that?
2    A.    I see that.
3    Q.    "...CBER noticed current lots
4  less stable, Rastogi (mis)calculates lower
5  release specification."
6    Do you see that?
7    A.    I see that.
8    Q.    That is, again, Mr. Schofield
9  expressing his recollection that CBER
10  miscalculated the release specification,
11  isn't it?
12    MS. SCHMIDT: Objection.
13    THE WITNESS: I mean, I -- it's
14  hard to interpret what he means, but,
15  I mean, I can see what's written here
16  and I don't know what is in the
17  reference. I mean, I can't tell just
18  reading that one line.
19  BY MR. MACORETTA:
20    Q.    Well, did you read Mr.
21  Schofield's deposition where he talks about
22  this issue and the recognition that CBER
23  miscalculated?
24    MS. SCHMIDT: Objection.

33 (Pages 126 - 129)

Appx19583

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 130

1　　　THE WITNESS: I read
2　Mr. Schofield's deposition, and I know
3　what he talked about it, but, I mean,
4　I don't exactly remember right now.
5　BY MR. MACORETTA:
6　　Q.　Do you recollect Mr. Schofield
7　saying that he did not tell CBER about its
8　miscalculation?
9　　　MS. SCHMIDT: Objection. She
10　just --
11　BY MR. MACORETTA:
12　　Q.　You can answer that.
13　　A.　I mean, it's very -- I remember
14　the question. It's very difficult -- I mean,
15　just reading that line, it is very difficult
16　for me to say what is the context, I mean, in
17　what context he's talking about
18　miscalculation and other things. I mean,
19　this is something I can't say looking at
20　this.
21　　Q.　As part of your work, you
22　didn't investigate this issue at all, right,
23　whether CBER miscalculated?
24　　　MS. SCHMIDT: Objection.

Page 131

1　　　THE WITNESS: I did not
2　investigate the miscalculation issues,
3　but I read all the supplements which
4　were -- and the realtime data and
5　release certificates that realtime
6　data was supporting what were the
7　calculation were saying. I mean, the
8　calculation and the realtime data was
9　very well aligned.
10　BY MR. MACORETTA:
11　　Q.　So then is Mr. Schofield wrong
12　that CBER miscalculated?
13　　A.　I don't know what is the
14　context here. So I mean, I don't know how to
15　answer that.
16　　Q.　In making your analysis, did
17　you rely on any data that wasn't submitted to
18　the FDA or just what was submitted to the
19　FAA?
20　　A.　Mostly what was submitted to
21　FDA.
22　　Q.　You didn't look at any other
23　Merck internal discussions or data?
24　　A.　I looked at the internal

Page 132

1　discussion for the background what was going
2　on to understand the whole situation. But
3　mostly I relied on my opinions mostly on
4　formal communications.
5　　Q.　Let's go back to Exhibit 4.
6　I'm still on page 6, I'm in the next
7　paragraph that starts, "...was expected..."
8　　　MS. SCHMIDT: She's not there
9　yet.
10　　　MR. MACORETTA: Sure.
11　　　MS. DYKSTRA: Which paragraph?
12　　　MR. MACORETTA: The paragraph
13　that starts, "It was expected..."
14　　　MS. SCHMIDT: Is this the
15　middle paragraph on page 6?
16　　　MR. MACORETTA: It is.
17　BY MR. MACORETTA:
18　　Q.　"It was expected that
19　increasing the mump component would be an
20　interim measure...?"
21　　　Do you see that?
22　　A.　I see that.
23　　Q.　Do you understand that to be
24　the case that any overfill of -- or any

Page 133

1　increase in the release potency would be an
2　interim measure?
3　　A.　It is written here, but I don't
4　see it in the supplement, 1999 supplement,
5　1999 supplement.
6　　Q.　Would that be important to you
7　whether it was an interim measure or not?
8　　　MS. SCHMIDT: Objection.
9　　　THE WITNESS: The way I look at
10　it, that there's a supplement, there
11　is, like, a historical analysis based
12　on -- the historical data analysis.
13　Based on that historical data,
14　specifications were proposed and they
15　were approved and -- CBER did their
16　own calculation and they approved
17　those. And they request -- I mean,
18　nowhere in the supplements which were
19　submitted to CBER, and nowhere in the
20　approval which was done by CBER as per
21　the letters, I don't see anywhere
22　which indicates to me that it was
23　interim.
24　BY MR. MACORETTA:

34 (Pages 130 - 133)

Appx19584

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 134

1    Q.    Okay.  Part of the supplement
2  was to effectively double the amount of mumps
3  virus in every dose.  Right?
4        MS. SCHMIDT:  Objection.
5        THE WITNESS:  Increase the
6    target to 5.0 -- to release to 5.0.
7    So that would be -- I mean, initially
8    target was 4.9, it was increased to
9    5.2 and release was 5.0.  So about,
10   yeah, that.
11 BY MR. MACORETTA:
12   Q.    .3 log means essentially
13 doubling.  Right?
14   A.    Uh-huh.  It could be.  I don't
15 have the log table in front of me, but...
16   Q.    Okay.  So part of the solution,
17 Merck's proposed solution to this was to
18 essentially double the amount of mumps virus
19 in every dose.  Right?
20       MS. SCHMIDT:  Objection.
21       THE WITNESS:  Proposed, I mean,
22   there were two proposals.  There was
23   the first proposal in 1998 which was
24   not approved, was to release -- to

Page 135

1    reduce the expiry potency to 3.7.
2    Then second proposal was to increase
3    the target and set up the specification
4    for release.  And because I don't have
5    log table in front of me, I cannot
6    just say it's doubled or not.
7  BY MR. MACORETTA:
8    Q.    And that -- the next part of
9  the sentence says, "...and that Merck would
10 commit to performing an End Expiry trial for
11 mumps to identify an appropriate lower expiry
12 specification."
13   Do you see that?
14   A.    I see that.  This is something --
15 I read the supplement from 1998 and I read
16 the supplement from 1999.  This was something
17 which was started -- which was proposed and I
18 think started when the first supplement was
19 submitted in 1998 where the proposal was to
20 reduce the expiry to 3.7.  So this study
21 proposal was started at that time to support
22 the first proposal, to set up the expiry to
23 3.7.  So this study was in support -- it was
24 started.  But then I don't see much of

Page 136

1  discussion of this study in supplement 1999,
2  supplement '99.
3    Q.    But part of the agreement with
4  FDA was that Merck was going to increase the
5  amount of mumps virus in the supplement, but
6  that it was also going to do the end expiry
7  trial.  Right?
8        MS. SCHMIDT:  Objection.
9        THE WITNESS:  That was not in
10   1999 supplement.  I don't remember
11   seeing it.
12 BY MR. MACORETTA:
13   Q.    I understand it wasn't in the
14 supplement, but did you look at other
15 documents that suggested that was the case?
16   A.    I saw this study proposal in
17 1998 supplement where end expiry was supposed
18 to be 3.7 and then there like to support that
19 3.7 study will be done.  I mean, that I
20 remember.  But in 1999 supplement which was
21 approved, I didn't see anything.
22   Q.    So you don't know if the
23 sentence is true, that it was expected that
24 increasing the mump component would be

Page 137

1  interim and that Merck would commit to
2  performing an end expiry trial?
3    A.    I don't think -- I mean, I
4  don't -- I'm not sure if it did -- it's
5  applicable to 1999 supplement because I saw
6  all the discussion in 1998 supplement where
7  the proposal was different.
8        MR. MACORETTA:  Let me show you
9    what we're going to mark as Gulati-6.
10       - - -
11       (Exhibit Gulati-6, 2/3/00 Memo,
12   00095144 & 00095145, was marked for
13   identification.)
14       - - -
15 BY MR. MACORETTA:
16   Q.    The first question is, have you
17 seen this before?
18   A.    Probably did.  I don't
19 think -- because I looked at thousands of
20 documents, so...
21   Q.    Sure.  I'm going to ask you
22 about the bottom of this page, the first page
23 and the top of the second page where Dr. --
24 we read what Dr. McKee says Dr. Baylor

35 (Pages 134 - 137)

Appx19585

Page 138

1  stated.
2          The last four words on the
3  page, "He also indicated that...," and it
4  goes over to the other side, ...CBER viewed
5  the higher mumps release titer as an interim
6  measure until the results from the mumps end
7  expiry clinical trial became available?
8          Do you see that?
9          MS. SCHMIDT:  You can take your
10         time to review as much of the document
11         as you need, Dr. Gulati.
12         THE WITNESS:  I read that.
13 BY MR. MACORETTA:
14     Q.   Okay.  So does this change your
15 opinion as to whether or not the higher mumps
16 release titer was viewed as an interim
17 measure and that there needed to be an end
18 expiry trial?
19         MS. SCHMIDT:  Objection.  I
20         think that mischaracterizes her
21         earlier testimony.
22 BY MR. MACORETTA:
23     Q.   You can answer.
24     A.   I read what is written here,

Page 139

1  but I didn't see that in the supplement which
2  was approved by CBER.
3      Q.   Well, would you expect it to be
4  in the supplement?
5      A.   Yes.  Because --
6      Q.   You expect the supplement to
7  say that we're only doing this on an interim
8  measure and that you need to commit to an end
9  expiry trial?
10     A.   Yes, I would expect to see it
11 either in supplement all the letters, CBER
12 approval letters because if you look at the
13 CBER approval letter, it says very clearly
14 for six months you have to monitor all the
15 adverse -- once you release the high titer
16 lots, you have to monitor adverse events for
17 six months.  I mean, there are conditions
18 which are very critical for the high titer.
19 So there was nothing like that in approval
20 letters.  So I mean, that's what I read.
21     Q.   So Dr. Baylor is saying it in
22 Exhibit 6 and Merck is saying it in Exhibit 5
23 are incorrect or you just don't know if
24 they're correct?

Page 140

1          MS. SCHMIDT:  Object to form.
2          THE WITNESS:  I just -- I mean,
3      I don't know if it is correct.
4  BY MR. MACORETTA:
5      Q.   How about -- I'm going to go
6  over to page 7 of Exhibit 4, which is the
7  Merck document.  I'm sorry, the paragraph
8  that starts at 2.1.3, "At CBER's
9  recommendation...," in the middle of page 7.
10 Do you see that?
11     A.   I see that.
12     Q.   Okay.  It says, "...Merck
13 designed a stability study with lots
14 manufactured to the new mumps target and
15 promised to set permanent release
16 specifications with the data obtained from
17 that study."
18         Do you have reason to disagree
19 with that?
20     A.   I read that.
21         MS. SCHMIDT:  Objection.
22         THE WITNESS:  I mean, I read
23     what is written here.
24 BY MR. MACORETTA:

Page 141

1      Q.   Well, do you agree with it?
2      A.   I mean, I have no comments on
3  this because, I mean, yes, I read what is
4  written here.  I mean, I'm not sure.
5      Q.   Well, you analyzed the Merck
6  stability studies.  Right?
7      A.   Right.
8      Q.   You give an opinion on them.
9  Right?
10     A.   Correct.
11     Q.   Is it not your understanding
12 that Merck did those studies because CBER
13 asked them to, or at least one of the
14 studies?
15         MS. SCHMIDT:  Objection.
16         THE WITNESS:  I mean, are you
17     asking about the 007 study?
18 BY MR. MACORETTA:
19     Q.   No, I'm asking about the
20 stability study.
21     A.   Which stability study?  There
22 were so many of them?
23     Q.   Any of them.
24     A.   So I mean, end stability study

36 (Pages 138 - 141)

Appx19586

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 142

1  is part of the program, stability program.
2  Which study?
3       Q.    The ASM model, the advanced
4  stability model.
5           MS. SCHMIDT:  Sorry, what is
6       the question?
7  BY MR. MACORETTA:
8       Q.    Do you understand that CBER --
9  that Merck undertook that study at CBER's
10  recommendation?
11      A.    I don't understand which study
12  you're referencing.
13      Q.    Okay.  All right.  That's fine.
14  Let me go to the next sentence.  "Recent
15  calculations show...."
16          Do you see that sentence?
17      A.    I see that.
18      Q.    Okay.  It says it "...can
19  support an end expiry claim of 4.0...the
20  intermediate dose used in the...expiry
21  trial."
22          Do you see that?
23      A.    I see that.
24      Q.    But at the time the end expiry

Page 143

1  on the label was 4.3.  Right?
2           MS. SCHMIDT:  Objection.
3           THE WITNESS:  Yes, approved in
4       2000, it was 4.3.
5  BY MR. MACORETTA:
6       Q.    Yes.  So recent calculations
7  show that the new higher target of 5.0 and a
8  release of 5.0 can support 4.0.  Right?  But
9  they can't support 4.3.  Right?
10          MS. SCHMIDT:  Objection.
11          THE WITNESS:  I read that
12      sentence.  And I mean, do I agree with
13      that?  No, I don't.
14  BY MR. MACORETTA:
15      Q.    Why?
16      A.    Because this is written in
17  2002.  I mean, it's not clear which study
18  recent calculation, what calculation they're
19  talking about, that's one that's based on
20  which.  And if they're talking about the
21  Model 2, which is in my report, it could be
22  that, or it could be something else.  I mean,
23  just reading this sentence, I don't know.
24  Because there are hundreds of studies which

Page 144

1  are going on as you can see from the
2  supplements.
3       Q.    Well, if we assume this is a
4  high level report, you don't think it's just
5  some random study.  Right?
6           MS. SCHMIDT:  Objection.
7           THE WITNESS:  I agree that it
8       is high level report and it's not a
9       random study, but I need to know which
10      specific study they are talking about
11      here.
12  BY MR. MACORETTA:
13      Q.    Let's say it's Model 2 in your
14  report.
15      A.    Okay.
16      Q.    So Model 2 shows that they can
17  meet 4.0 but not 4.3.  Right?
18          MS. SCHMIDT:  Objection.
19          THE WITNESS:  Right.  As I said
20      in my report, that Model 2, like in
21      this particular case, I just want to
22      clarify that we are talking about the
23      overfill lots.
24  BY MR. MACORETTA:

Page 145

1       Q.    Well, that's what the sentence
2  talks about in Exhibit 4.  Right?
3       A.    Right.  So it's talking about
4  the overfill lots, and it's talking about the
5  Model 2 as it applies to overfill lots.  And
6  as I said in my report, that my -- this
7  Model 2 was developed as per request from
8  CBER in the warning letter to determine the
9  worst case scenario.  Like, if you, like,
10  assume that all the lots were released at
11  4.3, what would be the worst end expiry for
12  the lots if they're released at 4.3.
13          So Merck took the data from the
14  1995 to 1998 which was the worst log loss
15  period.  And based on only small data set for
16  the period of three years, it developed the
17  model.  And this showed the log loss of 1.0
18  and it was submitted in the prior approval
19  supplement and also the warning letter
20  response.  But if you look at the overall --
21  so, okay.  So that's what that model showed,
22  whatever data set is the small data set,
23  small number of years.  And it shows log loss
24  of, maximum log loss of 1.0, it was submitted

37 (Pages 142 - 145)

Appx19587

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 146

1  in the warning letter.  And as a result, what
2  is the end expiry was submitted in the
3  warning letter.
4      So what you mention here in
5  this Exhibit 4, this is like over titer --
6  overfill lots.  So that model doesn't -- like
7  I said in my report, that model is not
8  applicable to overfill lots because you don't
9  have the -- it's not based on the real, like,
10  data from the overfill lot because overfill
11  lots are manufactured differently, they're
12  tested differently and so the data set which
13  is this Model 2 is not applicable to overfill
14  lot.
15      Q.   Of course by October 2002, we
16  would have 24 months of stability data on
17  overfill lots, wouldn't we?
18          MS. SCHMIDT:  Objection.
19          THE WITNESS:  I mean, my
20          understanding in reading the
21          supplement and annual report, it was
22          by 2003, because I think the way they
23          put the stability, it takes the time
24          to collect the data and generate the

Page 147

1          report.  So I think by 2002 to 2003,
2          two years of data was available,
3          stability data was available and which
4          was not supporting in this model also.
5  BY MR. MACORETTA:
6      Q.   On the over -- two years of
7  data on the overfill lot was available?
8      A.   Yes.
9      Q.   Okay.  Where's the model that
10  analyzes that?
11      A.   You have --
12      Q.   Only the overfill lots.
13      A.   You have realtime data from
14  overfill lots.  I mean, you have those high
15  titer lots from 1998, 1999.  You have 2000.
16  I mean, all those -- you have, like, from
17  some years you have partial data and you have
18  full data set from 1990 -- high titer -- 1999
19  high titer lots.  And that's not supporting
20  this model.  It makes sense to me.
21      Q.   Well, why wouldn't you take the
22  realtime data on the overfill lots and redo
23  the model with what you believe to be the
24  better data?  Why didn't -- where is that

Page 148

1  model?
2      A.   I don't know.
3          MS. SCHMIDT:  Objection.  Form.
4  BY MR. MACORETTA:
5      Q.   It doesn't exist as far as you
6  know.  Right?
7      A.   That's correct.  What I have
8  seen, I don't see it.
9      Q.   There needed to be some model
10  for the overfill to figure out what overfill
11  was necessary to meet the end expiry.  Right?
12          MS. SCHMIDT:  Object to form.
13          THE WITNESS:  It's not a
14          general rule to have a model.  I mean,
15          what I'm looking when I read all the
16          documents and supplements, model 1 we
17          have this issue, we need to change the
18          target manufacturing, we are going to
19          start doing a historical analysis,
20          develop model, we did develop Model 1.
21          Now we have discussion from CBER to do
22          the worst case analysis assuming 4.3
23          is the release potency.  We develop
24          another model because we took the

Page 149

1          worst case lot, worst case period and
2          smaller data set and we saw what would
3          be the worst case scenario and worst
4          case expiry potency.
5          So we develop that lot -- that
6          data to analyze the lots in the
7          market, 1998 and 1999 lots which are
8          manufactured using old process.  So
9          that was that model.  So then -- now
10          we are -- we have overfill lots.  I
11          mean, do we have -- we have realtime
12          data and CBER analyzes the stability
13          based on the realtime data.  Do we
14          have to develop the model?  I mean,
15          what's the objective, why would we do
16          it?  Do we want to develop the model?
17          It all depends on what was required
18          and needed at that time.
19  BY MR. MACORETTA:
20      Q.   But as of October 1, 2002,
21  there doesn't seem to be a better model,
22  right, as of Gulati-4?
23          MS. SCHMIDT:  Objection.
24          THE WITNESS:  There is a model

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19588

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 150

1    which was developed in 2001 for
2    warning letter response and I -- as
3    far as I have further documents I've
4    seen, I don't remember seeing any
5    other model.
6    BY MR. MACORETTA:
7        Q.    Until 2004 or 2005?
8        A.    '05, yes.
9        Q.    Correct?  Your various issues
10   with Model 2, right, and I'm going to go to
11   page, I guess it's 42, 43 of your report.
12       A.    Yes.
13       Q.    Okay.  The various times Merck
14   discusses that model internally, they don't
15   raise any of these issues, do they?
16           MS. SCHMIDT:  Objection.
17           THE WITNESS:  The communication
18       I read -- I mean, I didn't -- because
19       I didn't read all the communication,
20       but the sample of the communication I
21       read, they didn't talk about the
22       specific issue I mentioned in the
23       report.
24   BY MR. MACORETTA:

Page 151

1        Q.    Any of the specific issues you
2    mention in this report for Model 2.  Right?
3        A.    It's not the communications I
4    have seen -- I don't see the discussion of
5    these specific process.  I mean, there is a
6    discussion that we are making a process
7    change and we are making assay change.  I
8    mean, those discussions are there and in
9    different supplements.
10       Q.    But Phil Bennett and Tim
11   Schofield are the Merck statisticians
12   involved with this, some of the Merck
13   statisticians with this.  Right?
14           MS. SCHMIDT:  Objection.
15           THE WITNESS:  I mean, there
16       could be more people involved, but I
17       saw the memo where Phil Bennett was
18       one of the statisticians.
19   BY MR. MACORETTA:
20       Q.    You looked at his deposition
21   transcript as well.  Right?
22       A.    Yes, I looked at Phil Bennett's
23   deposition.
24       Q.    In no place in Phil Bennett's

Page 152

1    deposition or Tim Schofield's deposition do
2    they say that what you call Model 2 had any
3    of the problems you mentioned, do they?
4        A.    So I am an independent expert
5    and I am not looking at what they're saying.
6    I'm looking at the data overall and what is
7    my opinion on that data.  When I look at
8    all the data and all the communication, this is
9    what -- and when I look at the model and I
10   look at the realtime data, how it is not
11   supporting the model.  And based on my
12   experience, when you make a -- because
13   modeling -- I mean, it's done for specific
14   purposes.  Modeling is only good, you know,
15   if you have the right data set.  And, you
16   know, it depends on what kind of conclusion
17   you're trying to draw.  It has to be
18   validated with realtime data.  I mean, you
19   cannot take just certain model and apply to
20   certain data randomly, it has to be right
21   model built on the right data set.  Then you
22   can get the good conclusion and determination.
23   Otherwise, I mean, it's like, you know,
24   garbage in/garbage out.

Page 153

1        Q.    But all the Merck statisticians
2    had access to all the data you looked at.
3    Right?
4            MS. SCHMIDT:  Objection.
5            THE WITNESS:  I don't know.
6    BY MR. MACORETTA:
7        Q.    Well, did you look at any data
8    other than what was provided to you by Merck?
9        A.    I looked at the data provided
10   to me by Merck.
11       Q.    Do you have any reason to think
12   that the Merck statisticians internally
13   didn't have that same data?
14       A.    I don't know, I mean, what they
15   had access to because -- I mean, I don't
16   know.
17       Q.    Okay.  There's no document that
18   says here's Model 2 but it's wrong for these
19   following reasons, for the ones listed in
20   your report.  You can't point me to any
21   document in Merck where anybody says that.
22   Right?
23       A.    I remember one of the
24   depositions I read, I think it was Roberta

39 (Pages 150 - 153)

Appx19589

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 154

1  McKee's deposition, and she was the
2  decision-maker at that time in terms of
3  quality, and she understood that these models
4  were based on certain assumptions. They were
5  built based on -- this Model 2 specifically
6  was built based on certain assumption. And
7  it was -- I mean, her understanding as well
8  was it was not applicable.
9      Q.    She's not on the list of
10 depositions you read, is she?
11     A.    I read her deposition later.
12     Q.    Later. So I asked you at the
13 beginning if you had looked at anything
14 beyond your report, you said no. I'm sorry,
15 she is on your list. I'm sorry, I misspoke.
16         But her opinion was not that
17 the model wasn't reliable. Right? She
18 understood that it was based on some
19 assumptions, but Roberta McKee never said
20 this model is not reliable.
21         MS. SCHMIDT: Objection.
22 BY MR. MACORETTA:
23     Q.    Did she?
24         MS. SCHMIDT: It's a whole

Page 155

1  deposition transcript.
2         MR. MACORETTA: I'm asking her
3      what she relied on or if she can point
4      me to anybody at Merck who agrees with
5      her. She said Roberta McKee.
6         THE WITNESS: So I mean, yes, I
7      read the deposition and I mean, that
8      one, that's one place I saw that. And
9      she was the head of quality. I'm
10     sure -- I mean, her opinion has high
11     value, and she understood that Model 2
12     was based on certain assumption and
13     was not fully applicable.
14 BY MR. MACORETTA:
15     Q.    We're going to come back to
16 what Roberta -- anything other than Roberta
17 McKee, any other document or person at Merck
18 who reached any of the same conclusions about
19 Model 2 that you did?
20         MS. SCHMIDT: Objection. I
21     think she has answered this question.
22         THE WITNESS: Yeah.
23         MR. MACORETTA: Okay. You know
24 what, I'll withdraw it if she already

Page 156

1  answered it. That's fine.
2  BY MR. MACORETTA:
3      Q.    In your discussion of Model 2,
4  you don't cite to any academic sources or
5  references or textbooks or anything like that
6  to support any of your conclusions, do you?
7      A.    I have -- I mean, I don't know
8  whether I cite it or not, but if you look at
9  the ICH Q8 guidance, and I had some
10 presentations, I want to see what those were,
11 where you can see that, it's written very
12 clearly, those presentations, I have some
13 presentations from regulatory FDA which says
14 very clearly that model is only good if --
15 actually I cited the go to guidance document
16 which says that. I did cite that somewhere.
17     Q.    Where?
18     A.    I want to see where it is.
19         MS. SCHMIDT: Look at your
20     whole report, Dr. Gulati. It's more
21     than just the one page. And you have
22     the appendix.
23         THE WITNESS: There is a 2006
24     guidance document or WHO on vaccine

Page 157

1  stability, and it talks about the
2  model. This is -- it's on page
3  number 8 of the appendix. "WHO
4  Guideline on Stability Evaluation of
5  Vaccines."
6  BY MR. MACORETTA:
7      Q.    Okay. But 2006 guideline -- of
8  course, those guideline -- would those
9  guidelines have applied in 2001 and 2002?
10     A.    They were released in 2006.
11     Q.    So they weren't there in 2001
12 and 2002. Right?
13     A.    I mean, if you look at some of
14 the FDA communication, it says very clearly
15 that, you know, these models are prediction
16 model. They're only good once they're
17 validated. If they're not validated -- I
18 mean, like for -- I mean, I can give you a
19 general example. For small molecule drugs
20 where you have like a predicted, you know,
21 stability decrease and all that stuff, people
22 do rely on model to predict the stability
23 values and all. Where, I mean, biologics you
24 just rely on realtime data, but for small

40 (Pages 154 - 157)

Appx19590

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 158

1　molecule you do rely on those models. But
2　your model you build. Once you build, you
3　tweak it once you have realtime data
4　available. So you're not supposed to rely on
5　the model which you have built on very
6　limited data. You tweak it once you have
7　realtime data and more data available. So it
8　is there in several guidance. I have looked
9　at the ICH Q8 quality design guidance.
10　　　Q.　Of course -- well, all right.
11　We agreed that Merck didn't tweak this model
12　until, you say, '05. Right?
13　　　A.　Yes.
14　　　　　MS. SCHMIDT: Objection. I'm
15　not sure that's what she testified to.
16　　　　　THE WITNESS: It was tweaked in
17　2004, '05.
18　BY MR. MACORETTA:
19　　　Q.　Your other reason the model is
20　inaccurate, the process changed, the assay
21　changed, the inadequate study design, what
22　academic or other source are you citing for
23　these problems?
24　　　A.　I'm citing these problems based

Page 159

1　on 20 years of my experience and reading so
2　many guidance documents how they work with
3　each other, how they relate with each other.
4　I mean, validation of everything in
5　manufacturing environment is very important.
6　I mean, if your study shows -- even think
7　about the assay. You develop assay, gives
8　you a result, you validate it to confirm that
9　it is going to give you that result
10　consistently. You validate the process to
11　make sure it's going to give you the same
12　result consistently. So validation in
13　manufacturing environment is very critical.
14　When you're producing something for
15　commercial lot which is going to go to
16　patient in market, that decision has to be on
17　the validated model. And this is not a
18　validated model.
19　　　Q.　Okay. And you cite to nothing
20　for that other than your experience, right,
21　you can't cite to a specific document that
22　says that? Right?
23　　　　　MS. SCHMIDT: Objection.
24　　　Argumentative, and it's not what she

Page 160

1　just said.
2　BY MR. MACORETTA:
3　　　Q.　Can you cite to something
4　specific that says what you just said?
5　　　A.　I just cite the WHO 2006
6　stability guidance.
7　　　Q.　And all the change -- all the
8　problems with Model 2 you identify, nobody at
9　Merck identified. Right?
10　　　　　MS. SCHMIDT: Objection.
11　　　　　THE WITNESS: I don't know.
12　　　　　MS. SCHMIDT: Asked and
13　　　answered.
14　BY MR. MACORETTA:
15　　　Q.　But you haven't seen anybody at
16　Merck who identified?
17　　　A.　I mean --
18　　　Q.　During this time there was no
19　other model. Right? This is what Merck was
20　relying on. Right?
21　　　A.　There was Model 1 Merck was
22　relying on to set up the overfill lot
23　specification.
24　　　Q.　After the overfill came into

Page 161

1　existence, they were relying on Model 2.
2　Right?
3　　　　　MS. SCHMIDT: Objection.
4　　　　　THE WITNESS: I won't say that
5　because this -- reading the
6　communication, it's my understanding
7　this particular model was developed to
8　answer the warning letter cushion.
9　There was a cushion in the warning
10　letter to do some kind of analysis
11　using the worst case lot and worst
12　case potency and see what is the worst
13　case expiry.
14　　　　　So, I mean, I see what -- see
15　why this model was requested in
16　certain way because it was, like,
17　understanding of both the parties that
18　release specification was 4.3 before
19　1998. So now you have those lots
20　manufacturing with the understanding
21　of release potency of 4.3 which are
22　released by CBER and they're in the
23　market. So what -- so now we change
24　that to expiry. So what would be the

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 162

1　　worst case potency for the lots in the
2　　market. And what is the implication.
3　　I mean, that's -- that was the
4　　discussion, that was the issue we were
5　　trying to resolve using this model.
6　　　　So this model was developed
7　　with the specific objective. And are
8　　you going -- I mean, I won't even say
9　　this was the -- if you look at the
10　　warning letter request, there were
11　　marketed lots in the market from 1998
12　　and 1999 with the old process. And at
13　　that time there was some lots,
14　　overfill lot in the market. CBER did
15　　not request any analysis for the
16　　overfill lot, only the lots which were
17　　manufactured using old process.
18　BY MR. MACORETTA:
19　　Q.　I understand. So at the
20　beginning -- I'm looking at page 42, small
21　(b), "MODEL 2... In October 2000, as per
22　CBER request, Merck performed an analysis...."
23　　　　Do you see that?
24　　A.　Uh-huh.

Page 163

1　　Q.　So Model 2 is created because
2　CBER requested it. Right?
3　　A.　In the warning letter, yes.
4　　Q.　Then let's go to the next page,
5　small Roman numeral iv. I think it was
6　appropriate that Merck did not report this
7　model to CBER. Do you see that? Do you see
8　where I'm reading?
9　　A.　Yes, I see.
10　　Q.　So CBER asked for a model and
11　your conclusion is that the model was so bad
12　that Merck was appropriate in not reporting
13　it to CBER?
14　　　　MS. SCHMIDT: Objection.
15　　Argumentative. Can we, please --
16　　　　MR. MACORETTA: I agree that
17　　it's argumentative.
18　　　　MS. SCHMIDT: -- take the tone
19　　down a little bit? She's answering
20　　your question.
21　　　　MR. MACORETTA: Make your
22　　objection. You can answer the
23　　question.
24　　　　MS. SCHMIDT: I did make the

Page 164

1　　objection.
2　　　　MR. MACORETTA: Okay.
3　BY MR. MACORETTA:
4　　Q.　You can answer the question,
5　Dr. Gulati.
6　　　　MS. SCHMIDT: I'm asking you to
7　　take the tone down a little bit.
8　　There's no reason for it.
9　　　　MR. MACORETTA: I hear your
10　　request.
11　　　　THE WITNESS: So this
12　　particular sentence applies to the
13　　overfill lot. For the, like the
14　　underfill lot, I mean, I'm using that
15　　terminology, but the lots before,
16　　like, the overfill lots. This
17　　information was reported in the
18　　warning letter response what is the --
19　　an October 2000 supplement, prior
20　　approval supplement, that is
21　　analysis -- what the analysis -- what
22　　this model was showing and there was a
23　　breakdown and all -- there's a table,
24　　I remember, in the supplement. And

Page 165

1　　all log loss of .7 and standard
2　　deviation of .22, all that was in the
3　　warning letter response and what is
4　　the expected expiry potency range.
5　　3.9 to 3.3 was there. So all that was
6　　reported for the pre-overfill lot.
7　　For post-overfill lots there was no
8　　request for the -- from the CBER. And
9　　also the model was not applicable to
10　　post-overfill lot. So under the
11　　circumstances, that's what I am
12　　talking about here.
13　BY MR. MACORETTA:
14　　Q.　Nobody at Merck makes that
15　conclusion. Right? We don't have to report
16　it to CBER because of everything you just
17　said. Right? You haven't seen any document
18　where anybody at Merck says that?
19　　　　MS. SCHMIDT: Objection.
20　　　　THE WITNESS: I never seen a
21　　document either way that don't report
22　　or report. Either way it doesn't say
23　　anything.
24　BY MR. MACORETTA:

42 (Pages 162 - 165)

Appx19592

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 166

1    Q.    Oh, you don't see -- well,
2    we're going to come to some documents in
3    that. But you can't -- you don't see any
4    documents where it says we shouldn't report
5    it because of all of these reasons. Right?
6        MS. SCHMIDT: Objection.
7        THE WITNESS: I mean, I saw a
8    lot of documents and there is a lot of
9        discussion back and forth. I saw
10       that, that there was a discussion on
11       this analysis when applied to overfill
12       lot. But that's all I saw. The
13       internal discussion people sharing
14       their view, point of view and on that
15       analysis, on overfill lots.
16   BY MR. MACORETTA:
17       Q.    Let me just make sure I
18   understand. Model 2 was designed to calculate
19   the release potency for the overfill lots.
20   Right?
21       A.    Model 1 was.
22       MS. SCHMIDT: Objection.
23   BY MR. MACORETTA:
24       Q.    Okay. Was Model -- so CBER

Page 167

1    requested Merck to perform -- Model 2 was
2    done for log loss of the pre-overfill lots.
3    Right? Now, are you telling me, then, that
4    it was given to CBER, the result of that
5    analysis was given to CBER?
6        A.    Yes.
7        Q.    Then what are you talking about
8    when you say in small iv, "...I think it was
9    appropriate that Merck did not report this
10   model to CBER?
11       A.    I meant for the overfill lot.
12       Q.    What model are you talking
13   about?
14       A.    Model 2.
15       Q.    But you just said Model 2 was
16   done for the pre-overfill lots.
17       A.    Yes, that is correct. So
18   basically what I'm saying here is that
19   Model 2 was done for pre-overfill lot which
20   was reported, Model 2 doesn't apply to the
21   post-overfill lot because of following these,
22   and that's why it's appropriate not to
23   report. Because this reporting a model based
24   on wrong data and making a decision based on

Page 168

1    wrong model is very high.
2        MR. MACORETTA: Let me show you
3        what we're going to mark as Gulati-7.
4        - - -
5        (Exhibit Gulati-7, 2/27/01
6        Memo, 00500697 & 0050069, was marked
7        for identification.)
8        - - -
9    BY MR. MACORETTA:
10       Q.    Dr. Gulati, is this Model 2,
11   what we've marked as Gulati-7?
12       A.    Yes.
13       Q.    Okay. It seems to have been
14   created by Phil Bennett. Right?
15       A.    I see that February, 2/27/2001.
16       Q.    Phil Bennett was asked at his
17   deposition if he stood behind it, and he said
18   yes, didn't he?
19       MS. SCHMIDT: Objection.
20       Assumes facts not in evidence. Do you
21       have the transcript? Do you want
22       to --
23       MR. MACORETTA: She read it.
24       She'll say she doesn't know if she

Page 169

1    doesn't know.
2        THE WITNESS: There's so many
3        depositions, and it's like an 80,
4        90-page deposition. I don't remember
5        each and every word.
6    BY MR. MACORETTA:
7        Q.    And the first part of Model 2
8    is calculating the end expiry potency for
9    lots released at 4.3. Right?
10       MS. SCHMIDT: Objection to
11       form.
12   BY MR. MACORETTA:
13       Q.    The expiry potency estimation
14   for product at the minimum release titer?
15       A.    Expiry, yes. Potency estimation
16   for product at -- yes.
17       Q.    And the minimum release titer
18   they're using there is 4.3, isn't it?
19       A.    Yes, they're using 4.3 as
20   minimum release titer.
21       Q.    Okay. And the second part is
22   "Current Product." So this says for product
23   manufactured on or after 9/13/99, where the
24   minimum release is 5.0, here's the calculation.

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 170

1　Right?
2　　　MS. SCHMIDT: Objection.
3　　　THE WITNESS: I can see that.
4　BY MR. MACORETTA:
5　　Q.　So this model says that for
6　everything in the overfill, the end expiry
7　potency is going to be 4. Right?
8　　　MS. SCHMIDT: Objection.
9　　　THE WITNESS: I see the
10　　calculations here.
11　BY MR. MACORETTA:
12　　Q.　Okay. All right. Was there --
13　during this time and before '05, was there
14　ever any other model in Merck calculating
15　what the end expiry potency of the overfill
16　product would be?
17　　A.　Model 1 --
18　　　MS. SCHMIDT: Objection.
19　　　THE WITNESS: -- was the one
20　　which was pretty much telling you what
21　　should be -- I mean, end expiry
22　　potency was already determined, but
23　　that was the Model 1 which was setting
24　　up specification for the overfill

Page 171

1　　product.
2　BY MR. MACORETTA:
3　　Q.　So when I -- so if somebody at
4　Merck were to look at this in 2001 and
5　nothing else, they would conclude that doing
6　the overfill to 5.0 still does not mean you
7　can guarantee 4.3 at expiry. Right?
8　　　MS. SCHMIDT: Objection. She
9　　can't answer for somebody at Merck.
10　　And if it's a hypothetical, she may
11　　need more information.
12　BY MR. MACORETTA:
13　　Q.　You can answer the question.
14　We said at the beginning if you don't
15　understand, you're going to tell me, right,
16　Dr. Gulati?
17　　A.　Could you, please, rephrase
18　that?
19　　Q.　Sure. In February of 2001,
20　this document suggests that overfilled
21　product will not meet its end expiry of 4.3.
22　Right?
23　　　MS. SCHMIDT: Objection.
24　　　THE WITNESS: There is analysis

Page 172

1　in that document which is done for --
2　I mean, I read that it's done for
3　overfill lot. But what does -- I
4　mean, I cannot draw any conclusion
5　based on this. I mean, it's just
6　like -- it just sounds like to me
7　somebody just threw something in there
8　which is not supposed to be thrown in
9　there.
10　BY MR. MACORETTA:
11　　Q.　What do you mean by somebody
12　threw something in there?
13　　A.　Like I said in my report, that
14　Model 1 -- Model 2 was developed for a
15　specific purpose using the worst case loss
16　period using the very small data set to
17　calculate -- do the worst case estimation.
18　Overfill lots is completely different
19　process. You have to have different model
20　for this overfill lot. I'm developing a
21　model with 1995 to 1998 lot to respond to the
22　warning letter, and now I have this overfill
23　lot with new process, new assay and
24　everything, I just threw something in there,

Page 173

1　in that formula. I mean, that's all it is.
2　　Q.　So Phil Bennett just went crazy
3　when they did this --
4　　A.　I'm not saying that.
5　　Q.　-- there's no basis to do it?
6　　A.　I'm not saying that.
7　　　MS. SCHMIDT: That's not what
8　　she testified.
9　　　THE WITNESS: I'm not saying
10　　that.
11　BY MR. MACORETTA:
12　　Q.　All right. Model -- do you
13　have any problem with the first half of this
14　model?
15　　　MS. SCHMIDT: Objection.
16　　　THE WITNESS: First half, no.
17　　I mean, I did -- it's all reported.
18　　Analysis is what it is requested in
19　　the warning letter. And it's very
20　　specific analysis which is requested
21　　in the warning letter based on that
22　　worst case period log loss. That's
23　　what the analysis is and that was
24　　reported in the warning letter

44 (Pages 170 - 173)

Appx19594

Page 174

1    response and also in prior approval
2    supplement 2000.
3  BY MR. MACORETTA:
4    Q.    So you don't have -- you don't
5  think anything is wrong with the first half
6  of this model, right --
7         MS. SCHMIDT:  Objection.
8  BY MR. MACORETTA:
9    Q.    -- with the calculation based
10  on a 4.3 release log?
11    A.    The first of the model was -- I
12  mean, like I said before, it was developed
13  for certain reason with certain assumptions
14  that you -- because these lots are in the
15  market from 1995 to 1998 and we have to take
16  that period, data from that period and do
17  some kind of estimate, worst case estimate
18  that what would be the worst case expiry.
19  That's what is done here and that's what is
20  reported in supplement and the response.  So
21  this is specific analysis for specific --
22  with specific objective in mind to see what
23  is the patient impact for the lots in the
24  market.

Page 175

1    Q.    So are your criticisms -- your
2  criticisms of Model 2 on page 42 and 43 of
3  your report, are they directed to the first
4  model or just to the second model?
5    A.    It is directed to the overfill
6  lots.
7    Q.    So they're not directed to this
8  first model modeling what happens to a lot at
9  4.3 release?
10    A.    This is applicable to the lots
11  manufactured from in 1998 and 1999 because
12  the data set is from the same period and same
13  process.
14    Q.    So the model on page 1 of
15  Gulati-7 that flows over to page 2, what are
16  your criticisms of that model, if any?
17    A.    One criticism to this model is
18  if you look at the realtime stability data
19  from three lots in 1998 that data doesn't
20  support that model either.  So if you -- this
21  one shows you maximum log loss of 4.0.  And
22  if you look at the realtime stability data --
23  three lots data in 1998, it gives you log
24  loss of maximum .3 to .6.  So that -- so I

Page 176

1  don't know what kind of data set went into
2  developing this model, but when I look at the
3  end of stability reports, that data doesn't
4  support this model.  Even that data.  And
5  that was supposed to be, like, worst case,
6  but still it doesn't support this model.
7    Q.    You just looked at the data
8  from the what, the three lots in the annual
9  stability reports?
10    A.    Yes.
11    Q.    Well, do you understand that
12  Mr. Bennett had access to a lot more data
13  than that?
14         MS. SCHMIDT:  Objection.
15         THE WITNESS:  Yeah, I worked on
16    20 lots.
17  BY MR. MACORETTA:
18    Q.    20 lots.  So 20 is better than
19  three.  Right?
20         MS. SCHMIDT:  Objection.
21         THE WITNESS:  Yes.
22  BY MR. MACORETTA:
23    Q.    Okay.  So I don't understand.
24  So your criticism is that there are three

Page 177

1  lots that don't support his 20 lot analysis?
2    A.    This is -- I mean, my -- that
3  the -- for the period 1995 to 1998 this model
4  was developed with 20 lot data.  I mean, it
5  is done for specific purpose, specific
6  calculation was done.  It was submitted.  The
7  only -- there's only that -- that's the only
8  one criticism because when I look at the
9  realtime data, it's -- I mean, I'm not saying
10  this model is not correct for that period,
11  because it's the right process, right data
12  set and larger number of lots.  I'm not
13  saying that, that it does not get for that
14  period or for that lot, but it is -- it
15  doesn't support -- the stability data is not
16  supporting it.  So there is like a three
17  lots -- I want to finish this.
18    Q.    Go ahead.
19    A.    Three lots of stability data
20  from 1998 and then there was a retained from
21  1998 which were pulled out at 27 months which
22  went into second BPDR.  So there are four or
23  five lots there.  They're, like, retained
24  also, did not support this.  Retained best at

45 (Pages 174 - 177)

Appx19595

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 178

1 which pull out at 24 to 27 months.
2         So retained from, like, from
3 the same year, 1998 for five lots retains.
4 Also showed the log loss of .3 to .6. So
5 there are eight lots which are -- this is
6 based on 20 lots. And there are eight lots
7 data is showing .3 to .6. So I'm sure there
8 are, like, really, really -- there are some
9 really, really worse lot which is giving it
10 high value from that period. But I'm just
11 trying to make a point here. I mean, I don't
12 have criticism against that because it's from
13 the right data set, right period. It's just
14 observation.
15     Q.   So how do you know that the
16 eight lots you're talking about weren't in
17 the 20 that Phil Bennett considered?
18     A.   I don't know that.
19     Q.   So they could be?
20     A.   They could be.
21     Q.   Okay. And that issue of there
22 are some lots that don't support this is your
23 only criticism or problem with the first
24 model in Gulati-7. Right?

Page 179

1     A.   Yes. For the pre-overfill lot.
2     Q.   And there's no question that
3 the second model in Gulati-7 has the same
4 formula. Right?
5         MS. SCHMIDT: Objection.
6 BY MR. MACORETTA:
7     Q.   He doesn't change any of the
8 inputs. He changes the data, but he's doing
9 the same thing, right, the initial potency
10 minus loss equals end expiry potency with a
11 standard deviation. Right?
12         MS. SCHMIDT: Objection to the
13     extent --
14         THE WITNESS: I don't know,
15     because this is a formula, if that's
16     what you're asking.
17 BY MR. MACORETTA:
18     Q.   Yes. You have no criticism --
19 that's what I'm asking.
20     A.   The formula.
21     Q.   Your only criticism is with the
22 data used in the formula?
23     A.   Yes.
24     Q.   Okay. As of this time in 2001,

Page 180

1 what other models should Merck have been
2 relying on that actually existed to figure
3 out the potency and end expiry potency of the
4 overfill lots?
5         MS. SCHMIDT: Objection. Form.
6         THE WITNESS: I'm not sure
7     about that. What model should be
8     there or should not be there. I mean,
9     I'm not sure.
10 BY MR. MACORETTA:
11     Q.   This is the only one they were
12 using, right, you didn't see another one, did
13 you?
14         MS. SCHMIDT: Objection.
15     That's not what she testified.
16         THE WITNESS: So this one I saw
17     for the specific purpose. I saw
18     Number 1 for specific purpose and
19     that's all I saw. Then I saw third
20     model in 2004, 2005.
21 BY MR. MACORETTA:
22     Q.   It's your opinion that it was
23 okay for Merck not to tell CBER about the
24 second part of Number 2?

Page 181

1     A.   It is very risky to report
2 something based on incorrect data because it
3 could -- I mean, risk of reporting that data
4 is very high because you might just say that,
5 you know, a hundred lots might be in effect
6 and it's not correct because you don't have
7 the right data set to draw that conclusion
8 and -- because these decisions, if you make
9 the wrong decision, it could end up into
10 recall and drug shortage. I mean, there are
11 all kinds of stuff which could -- there are
12 very -- implication and patient may not be
13 getting what they're supposed to be getting.
14 So you have to be very careful because you
15 don't want to release a bad lot but you don't
16 want to reject a good lot either. So you
17 have to take all the factors into
18 consideration before you make any decision to
19 go and report. And you cannot just keep on
20 doing this analysis and this analysis and
21 going to CBER all the time unless you have
22 confirmed it and you have made a final
23 conclusion that this is the analysis. Then
24 would you go and report it.

46 (Pages 178 - 181)

Page 182

1      Q.    But nobody at Merck you can
2   point to thought this was the wrong analysis,
3   right, Model 2?
4            MS. SCHMIDT: Objection. I
5      think that's been asked and answered
6      ten times now.
7   BY MR. MACORETTA:
8      Q.    You can answer the question.
9      A.    It's just not applicable. When
10   I look at it, it makes me very uncomfortable
11   when I see this because it's the wrong data
12   set and you could make -- it could lead to
13   wrong conclusion and wrong decisions.
14      Q.    Wouldn't it --
15      A.    The risk is very high. I mean,
16   risk of making a decision based on wrong data
17   set and wrong model is very, very high.
18      Q.    Wouldn't it be better to tell
19   the regulators here's what our model says but
20   here are the problems with it?
21            MS. SCHMIDT: Objection.
22   BY MR. MACORETTA:
23      Q.    As opposed to just not telling
24   them about the model at all?

Page 183

1            MS. SCHMIDT: Objection.
2   BY MR. MACORETTA:
3      Q.    You can answer the question.
4      A.    I have to think about it a
5   little bit. I mean -- I mean, you do a lot
6   of analysis within the company, a lot of
7   monitoring programs and a lot of
8   investigations. There is no regulatory
9   requirement to report everything. And you
10   would report the right amount of -- the right
11   data and confirm data and validated data the
12   way as per regulatory requirements. If I'm
13   doing ten different analyses in all different
14   directions, I'm not going to go report every
15   analysis to regulatory agency unless I have
16   confirmed it with some kind of data set and
17   I'm sure this is the right analysis and this
18   is the right result. So you would do all
19   that pre-work before you make a decision to
20   report an analysis. Or anything else for
21   that matter. I mean, investigation, I mean,
22   you just don't go and, I mean, you have
23   stability, you just don't go to BPDR, you do
24   that investigation, you confirm that result

Page 184

1   and then you do BPDR. Any regulatory
2   reporting, before you do that, you need to do
3   all your investigation and complete that
4   properly.
5      Q.    So as to the FDA, there's no
6   regulatory requirement to report everything.
7   What is the regulatory requirement on what
8   you're supposed to report?
9            MS. SCHMIDT: Objection.
10            THE WITNESS: Like, once your
11      product is marketed, you're supposed
12      to -- you do the filing, you have an
13      agreement with FDA that these are the
14      specification and all. Any time there
15      is any deviation which affects the
16      marketing product you do biological
17      product deviation. Any time you make
18      any changes to your process, product
19      or specification, you go through the
20      change process where you get those
21      changes to the filing approved from
22      the CBER. So you have, like, a
23      process to get all those things
24      approved, report and approved from

Page 185

1   CBER before you implement it.
2   BY MR. MACORETTA:
3      Q.    Suppose Model 2 had all the --
4   solved all the problems you wanted, they took
5   out -- they took realtime stability data and
6   it's still indicated that Merck was below the
7   minimum release specification at -- I'm
8   sorry, was below the end expiry specification
9   at the end of shelf life. Would Merck have
10   had an obligation to report it to FDA then?
11      A.    Are you asking me that if there
12   was any OOS result would you report it?
13      Q.    No. I'm asking you if Merck's
14   best validated based on rock solid data
15   internal model showed that they were not
16   going to meet an end expiry specification,
17   would Merck have had to report that to the
18   FDA?
19            MS. SCHMIDT: Objection. Are
20      you asking her to speculate that there
21      was such a thing?
22            MR. MACORETTA: I'm asking her
23      opinion as a regulatory expert on
24      that, I guess, hypothetical.

47 (Pages 182 - 185)

Appx19597

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 186

1       MS. SCHMIDT: She's not a
2   regulatory expert.
3       MR. MACORETTA: Well, as a
4   stability expert. You're right. As
5   an -- she's talking about -- she gave
6   an opinion on what you have to report
7   or not. So I'm asking her when you
8   wean have to report or something else
9   you might have to report.
10      MS. SCHMIDT: Do you need the
11  question again?
12      THE WITNESS: Yes.
13      MR. MACORETTA: Can you read
14  back the question, Linda?
15          - - -
16      (The court reporter read the
17  pertinent part of the record.)
18          - - -
19      THE WITNESS: If you have a
20  validated model which you -- right, it
21  does says it, and all the right
22  parameters and everything is based
23  on -- like a model is built on the
24  basis -- based on the right that's

Page 187

1   invalidated. If you get some similar
2   information, something -- that kind of
3   information and it is supported with
4   your realtime data also because you
5   have lots in stability, then you would
6   report it because, I mean, there are
7   so many avenues you will report it
8   through.
9       We have to keep that in mind.
10  One thing, that for biologics all the
11  evaluations, CBER does make the
12  determination based on the realtime
13  data. So based on realtime -- all the
14  good data. I did build this model.
15  Now I have these lots on stability.
16  If you built that model on realtime
17  data and you have lots on stability,
18  your lots on stability will start
19  failing because you will start seeing
20  OOS. And if you start seeing OOS,
21  there's a mechanism to confirm it and
22  then do BPDR. You would do the BPDR
23  in that case.
24  BY MR. MACORETTA:

Page 188

1       Q.   So is it not possible to build
2   a useful model until two years after you put
3   the higher dose product on stability?
4       MS. SCHMIDT: Object to form.
5       THE WITNESS: Could you,
6   please, repeat that question?
7   BY MR. MACORETTA:
8       Q.   If you need realtime data and
9   realtime data takes 24 months, was it even
10  possible to make a reliable model until you
11  have 24 months of stability data?
12      A.   I mean, in my experience, you
13  will -- if you do a model below 24 months of
14  data, it won't be reliable.
15      Q.   So why would CBER even ask for
16  a model then?
17      MS. SCHMIDT: Objection.
18      THE WITNESS: Did CBER ask for
19  a model?
20  BY MR. MACORETTA:
21      Q.   Well, how would you calculate
22  whether or not the overfill was sufficient to
23  meet end expiry until you have 24 months of
24  data?

Page 189

1       A.   So you have all the analysis
2   and also you have realtime data. When -- I
3   mean, all that this was going on, there was
4   18 months of data available on the overfill
5   lot, not for 24 months, and that was showing
6   that your log loss is .5, I mean, by
7   18 months. There's a table in my report
8   which shows three overfill lots.
9       Q.   Let me show you what we're
10  going to mark as Gulati-8.
11      A.   Page number 43.
12      MS. SCHMIDT: It's 12:15. Do
13  you have time for lunch? Oh, and I'm
14  sorry, were you done with your answer,
15  Dr. Gulati?
16      THE WITNESS: I am done.
17      MR. MACORETTA: I want to do it
18  now, but it's up to Dr. Gulati. I'm
19  happy to keep going.
20      MS. SCHMIDT: Do you need to
21  take a break?
22      THE WITNESS: How much is it,
23  one hour?
24      MR. MACORETTA: I don't know.

48 (Pages 186 - 189)

Appx19598

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 190

1    There's going to be a couple of --
2    there's going to be a series of --
3        MS. DYKSTRA:  Is this a new
4    topic?
5        MR. MACORETTA:  No, it's the
6    same.  It's a variation.  I'm not
7    totally changing gears here.  If you
8    want to take break, take a break.  If
9    you don't want to take a break, that's
10    fine.  But the natural breaking point
11    is going to be a half an hour from
12    now, if that's what you're asking.
13        THE WITNESS:  Okay.  Then we'll
14    take a half an hour -- after half an
15    hour.
16        MR. MACORETTA:  I'll show you
17    what we're marking as Exhibit 8.
18        - - -
19        (Exhibit Gulati-8, 3/13/01
20    Memo, 00024453 & 00024454, was marked
21    for identification.)
22        - - -
23    BY MR. MACORETTA:
24    Q.    All right.  Have you seen

Page 191

1    Exhibit 8 before, Dr. Gulati?
2    A.    Yes.
3    Q.    Okay.  And with it -- and
4    Exhibit 8, heading number 2, "If CBER
5    proposes short-dating of the product in order
6    to address label compliance issue," and Phil
7    Bennett is assigned to do a statistical
8    assessment to determine what shelf life is
9    needed to maintain 4.3.  Do you see that?
10    A.    I see that.
11        MR. MACORETTA:  Let me show you
12    what we're going to mark as Exhibit 9.
13        - - -
14        (Exhibit Gulati-9, 3/13/01
15    Email, 00562218 & 00562219, was marked
16    for identification.)
17        - - -
18    BY MR. MACORETTA:
19    Q.    Exhibit 9 is Phil Bennett's
20    statistical assessment in response to Exhibit
21    8, isn't it?  It's dated the next day.
22        MS. SCHMIDT:  Objection.
23        THE WITNESS:  Okay.
24    BY MR. MACORETTA:

Page 192

1    Q.    So Phil Bennett does a
2    statistical assessment that says he concludes
3    that expiry dating needs to be 12 months in
4    order to provide 95 percent confidence that a
5    lot released at 5.0 will be above 4.3 at
6    expiry.  Do you see that on Exhibit 9?
7        MS. SCHMIDT:  Objection to
8    form.
9        THE WITNESS:  I see Exhibit 9.
10    BY MR. MACORETTA:
11    Q.    Okay.  And that was -- that
12    fact was never revealed to the FDA, was it?
13        MS. SCHMIDT:  Objection.
14        THE WITNESS:  So isn't this the
15    same analysis which went into the
16    warning letter response?  It's not
17    different.  It's the same thing.
18    BY MR. MACORETTA:
19    Q.    Where in the warning letter
20    response -- the warning letter response says
21    our analysis shows we need 12-month dating?
22    A.    No, it talks about the log loss
23    of .703 at 24 months and the 95 confidence
24    interval.  Well, it is like a 1.0.  That's

Page 193

1    what this analysis --
2    Q.    I understand that.  But
3    nowhere -- can you point me to where Merck
4    ever says to the FDA our analysis suggests
5    that we need to have 12-month data to have 95
6    percent confidence the product will meet its
7    end expiry specification?
8    A.    I don't remember seeing any
9    supplement which says that.
10    Q.    If Merck knew -- and nothing in
11    Phil Bennett says I can't do the analysis,
12    the analysis doesn't have enough data, it's
13    junk, he just does the analysis.  Right?
14        MS. SCHMIDT:  Objection.
15        THE WITNESS:  He's asked to do
16    some analysis and he has done some
17    analysis.
18    BY MR. MACORETTA:
19    Q.    Okay.  All right.  And Merck
20    never reveals that analysis to the FDA as far
21    as you know.  Right?
22        MS. SCHMIDT:  Objection.
23        THE WITNESS:  I mean, this
24    is -- I mean, there's no way I can say

49 (Pages 190 - 193)

Appx19599

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 194

1    that this analysis was done in
2    relation to this.  I see an analysis
3    and I see log loss of .7 and I see
4    1.0.  It looks more to me what memo
5    you showed me before.  That's all I
6    can say looking at this analysis.  I
7    don't see any relevance between these
8    two.  There's no way I can say for
9    sure.  I mean, it is a continuation of
10   same discussion, I'm just trying
11   see --
12   BY MR. MACORETTA:
13       Q.    Even though it's the next day?
14       A.    Next day, in a company there
15   hundreds of people, hundreds of communications,
16   hundreds of studies.  You can't say that.
17       Q.    So you can't draw anything from
18   the fact that on March 13 Phil Bennett was
19   assigned to do an analysis and the next day
20   he sends that same analysis?
21       A.    Just looking at this, I cannot
22   say.  Looking at this I can't say.
23       Q.    Okay.  If Phil Bennett actually
24   did this analysis, should it have been -- is

Page 195

1    it your opinion that Merck didn't need to
2    show it to the FDA or tell the FDA that our
3    internal analysis shows our dating should be
4    12 months?
5        MS. SCHMIDT:  Objection.
6        THE WITNESS:  I mean, I have
7    to -- this is like -- you know, just
8    looking at these two pages, it's
9    difficult to draw that conclusion,
10   that this was all related and that's
11   what it's talking about.  I mean, I
12   can't say much of just looking at
13   this.  I need to look at a lot more.
14   BY MR. MACORETTA:
15       Q.    What else would you need to
16   look at?
17       A.    I mean, what I see here is that
18   we are going to plan to CBER meeting and we
19   need to do some analysis and he does some
20   analysis.  I don't know if this is the
21   analysis requested and this is what he did.
22   I mean, this request for analysis, it's not
23   clear what analysis, and there is analysis
24   done, it's not clear what -- where it applies

Page 196

1    and even if it is related.  This is --
2        Q.    Let's suppose hypothetically
3    that it was the analysis.  Should Merck have
4    revealed the fact of this analysis that our
5    dating needs to be 12 months to the FDA?
6        MS. SCHMIDT:  Objection.
7        THE WITNESS:  This is not even
8    same distribution list.  If you look
9    at the name of the people, they don't
10   match.  I mean, it could be something
11   else.  I'm just trying to see.
12   There's not -- it was sent to Keith.
13   BY MR. MACORETTA:
14       Q.    Okay.  All right.  We'll come
15   back to this.  Let me try again.
16       If Merck's best internal
17   analysis showed that expiry dating needed
18   to be 12 months to be in compliance with the
19   label, should Merck have revealed that fact
20   to the FDA?
21       MS. SCHMIDT:  Objection.  Are
22   you asking her to speculate about
23   there being some best analysis that
24   showed 12 months?

Page 197

1        MR. MACORETTA:  I'm asking a
2    hypothetical.
3        MS. SCHMIDT:  So you can answer
4    if you understand the hypothetical.
5        THE WITNESS:  So if Merck is
6    doing any study internally to set up
7    the shelf life and all that stuff, I
8    mean, that needs to be submitted and
9    approved.  I mean, that is a process
10   for changing any of that stuff.
11       So are you saying it's based on
12   this data?  Because, I mean, any time
13   you want to make any change to
14   approved specification, you need to do
15   all the study and submit a supplement
16   and get an approval before you
17   implement it.
18   BY MR. MACORETTA:
19       Q.    But if you know you need to do
20   it and your shelf life needs to be shorter,
21   are you telling me you don't need to say
22   anything to the FDA until you draft up
23   supplement?
24       A.    Based on what?

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 198

1    Q.    Based on whatever your internal
2  analysis is.
3    A.    Based -- I mean, it has to -- I
4  need to see more information before I say
5  anything. Because you already have a set of
6  specification with the target for release
7  5.0. You just set up the specification.
8  You're making the overfill lots right now and
9  now -- I mean, you can -- you have already
10  gotten all that approved. If you're going to
11  change anything to 12 months, shelf life to
12  12 months, you need to do all the studies,
13  stability data for those lots. I mean, all
14  that information has to be there. What is it
15  in this, why would you reduce to 12 months
16  when you have already -- I mean, you know,
17  already have done all the analysis and
18  approved the supplements and all?
19    Q.    I'll come back to that.
20         So are you telling me that you
21  don't need to tell the FDA that you want to
22  change to 12 months or internally you've
23  concluded you need to change to 12 months
24  until you've done all the background

Page 199

1  information?
2         MS. SCHMIDT: Objection.
3         THE WITNESS: Based on what?
4  BY MR. MACORETTA:
5    Q.    Based on --
6    A.    I mean, based on what to tell
7  the FDA? I mean, I want to understand the
8  context here. What's the context? Why would
9  I go -- I mean, suddenly I think that, oh,
10  yeah, it should be 12 months. I think it
11  should be 12 months and I just go tell CBER,
12  don't you have to do all the background work?
13    Q.    The context is if CBER proposes
14  short-dating. Right? Isn't that in
15  Exhibit 8?
16    A.    Did CBER propose short-dating?
17    Q.    If -- number 2, If CBER
18  proposes short-dating of the product in order
19  to address label compliance.... So the
20  context is what are we going to say if CBER
21  purpose short-dating. And Phil Bennett's
22  analysis is 12 months.
23    A.    No, it doesn't. It doesn't say
24  that here. It just says -- so this is --

Page 200

1  you're saying that this analysis is the
2  request -- I mean -- so I mean, looking at --
3  first of all, I have a few comments here.
4  There is a meeting going on --
5         MS. DYKSTRA: Objection. Do
6    not laugh at the witness.
7  BY MR. MACORETTA:
8    Q.    Answer your question.
9         MS. DYKSTRA: We can pause
10    right now and take a break if you need
11    to calm down.
12         MR. MACORETTA: I don't need to
13    calm down. Make an objection, don't
14    make an objection, we don't need any
15    personal asides. It's inappropriate.
16         MS. DYKSTRA: My objection is
17    don't laugh at the witness during the
18    question.
19         MR. MACORETTA: Okay. That's
20    fine.
21  BY MR. MACORETTA:
22    Q.    Answer the question, please,
23  Dr. Gulati.
24    A.    So there's a planning meeting

Page 201

1  going on. And in the planning meeting
2  there's a discussion that -- there are like a
3  few points which this group is trying to
4  discuss and cover, and they're requesting the
5  information. So I mean, the information,
6  first of all, I don't see if it's the same
7  group. It is relevant, I don't see that,
8  because you look at the distribution list, it
9  looks different. And the second thing is --
10  I mean, it's just an analysis and you need a
11  lot more than those two memo to go and report
12  to CBER. You need to have all study plan and
13  lots and which lots. I mean, this is just
14  two pieces of paper. I mean, based on these
15  two pieces of paper, would I make a decision
16  to report anything to CBER? No. I need to
17  look at a lot more data before I say anything
18  about it.
19    Q.    Did you see any data, any
20  documents at Merck where anybody responds to
21  Phil Bennett and said we need more data or
22  detail before we can decide what to do with
23  this?
24    A.    I don't know, because I have

51 (Pages 198 - 201)

Appx19601

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 202

1  not seen any following communication or prior
2  communication.
3      Q.   You didn't look for any?
4      MS. SCHMIDT: Objection.
5  BY MR. MACORETTA:
6      Q.   In doing your analysis, you
7  didn't. Right?
8      MS. SCHMIDT: Objection. Why
9  don't you ask her whether she did?
10     MR. MACORETTA: What was your
11 objection? Why don't I ask her what?
12     MS. SCHMIDT: Objection.
13 BY MR. MACORETTA:
14     Q.   Let me try again.
15     In your review of documents,
16 did you see anybody at Merck saying we need
17 more data or analysis on what our shelf life
18 is before we should report to the FDA in this
19 time period?
20     A.   You're asking me that question
21 based on these two documents and I'm finding
22 it difficult to answer that because there is,
23 like, a discussion, there's a meeting with a
24 few people which happened and there is

Page 203

1  another email with different distribution
2  list and we are trying to relate those two
3  together and trying to say that should have
4  been reported. I mean, I have no comment
5  really.
6      MR. MACORETTA: You know what,
7  now is a good time for lunch. Why
8  don't we take a break.
9      VIDEOGRAPHER: The time is now
10 12:26. We are off the video record.
11        - - -
12     (A recess was taken.)
13        - - -
14     VIDEOGRAPHER: The time is now
15 13:30. We are back on the video
16 record. This begins media four.
17 BY MR. MACORETTA:
18     Q.   All right. Dr. Gulati, good
19 afternoon.
20     A.   Good afternoon.
21     Q.   This morning we talked about
22 models Merck was using and you mentioned that
23 a model needed to be validated. Right?
24     A.   Yes, I mentioned that.

Page 204

1      Q.   How do you validate a model?
2      A.   So once you have -- I'm going
3  to take a specific example. For example, if
4  you're doing, looking at stability data, for
5  example, you will get data from a few lots,
6  like, a statistically significant number of
7  lots. So you go, like, a certain number of
8  lots and you build a model. Then you
9  validate it with the realtime data. Realtime
10 data -- so you build a model and it gives you
11 certain predicted value at certain time point
12 for release or for expiry. And if your
13 realtime data is -- first you use the
14 realtime data and then for the future lot
15 realtime data does agree with all of that --
16 all the predicted value, that's how you will
17 validate the model.
18     Q.   So until you have realtime
19 data, you can't validate it then?
20     A.   If you don't have realtime
21 data, you cannot even build a model because
22 you need to have the real data to build a
23 model.
24     Q.   Well, but your objection to

Page 205

1  Merck's Model Number 2, at least the second
2  half, is that it's using the wrong data.
3  Right?
4      MS. SCHMIDT: Objection.
5      THE WITNESS: Correct, for the
6  overfill lot.
7  BY MR. MACORETTA:
8      Q.   But at the time they built it,
9  there was no realtime stability data for the
10 overfilled lots. Right?
11     A.   Correct. Not the complete data
12 set. In 2001 it was about 18 months of data
13 was available.
14     Q.   So is it your opinion that
15 Merck should have validated Model Number 2 by
16 looking at that 18 months of realtime
17 stability data?
18     A.   I would say until you have the
19 full data set, you won't build a model for
20 the overfill lot because you rely on the
21 realtime data you're getting on your release
22 and stability lot like every other company
23 does. I mean, not many companies have these
24 models to predict the values.

52 (Pages 202 - 205)

Appx19602

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 206

1    Q.    But Merck did?
2    A.    Merck did.
3    Q.    So the Model Number 2 in
4  Gulati-7, Phil Bennett's model, when he sent
5  this memo in February of '01, your position
6  is there wasn't enough realtime data to even
7  partially validate it.  Right?
8        MS. SCHMIDT:  Objection.
9        THE WITNESS:  My suggestion is
10       there was not even realtime data to
11       build a model for overfill lot.
12  BY MR. MACORETTA:
13    Q.    So how is Merck supposed to
14  figure out if the overfill is going to be
15  sufficient if they couldn't build a model?
16       MS. SCHMIDT:  Objection.
17       THE WITNESS:  They already did
18       figure it out based on the 20 years of
19       historical data what is your maximum
20       log loss, potential maximum log loss.
21       And they did change the specification
22       based on that.  And the real time
23       stability data did support that, that
24       it was the right calculation.

Page 207

1  BY MR. MACORETTA:
2    Q.    But that was data on the
3  underfilled lots on the original lots.  Right?
4    A.    The original lots, yes.
5    Q.    But I thought you told me that
6  data wasn't good enough to build a model for
7  overfill?
8        MS. SCHMIDT:  Objection.
9        Misstates her prior testimony.
10  BY MR. MACORETTA:
11    Q.    You can answer.
12    A.    So that data was not right to
13  predict the values for overfill lot but that
14  data was right to set up the specification
15  what should be the release specification to
16  make sure that your product meets the expiry
17  of 4.3.
18    Q.    How could it be right for one
19  purpose and not the other?  Aren't you using
20  it to predict the same thing, how much is
21  going to be lost over time?
22    A.    You're predicting that in
23  historical how much you lost over the
24  24 months historically based on last

Page 208

1  20 years.  On average you have been losing
2  .55 over the 24 months.  And then you're
3  adding some standard deviation.  And that
4  tells you what is your -- what is your --
5  what should be your target release potency.
6    Q.    But Phil Bennett didn't use
7  that .55, he used a .7 in the first half of
8  Model Number 2.  Right?
9    A.    Which he calculated based on
10  the lots from 1995 to 1998.
11    Q.    You don't think he should have
12  done that, you think he should have used some
13  larger set of lots?
14       MS. SCHMIDT:  Objection.
15       Misstates her testimony.
16  BY MR. MACORETTA:
17    Q.    Was that the right set of lots
18  to use for that calculation?
19    A.    That was the right set of lots
20  to use for what he was trying to do.  He was
21  trying to create a response to the warning
22  letter and he was trying to do an assessment
23  for the lots manufactured in 1990 --
24  pre-overfill lots manufactured in 1998 and

Page 209

1  1999.  And he used the data from 1995 to
2  1998.  I mean, that is right data because
3  those lots for three years, same process,
4  same assay.  And he's trying to assess the
5  market impact of those lots.  So that is,
6  right, it does say to me what kind of, like,
7  analysis he was trying to do.  So...
8    Q.    But you're saying it wasn't the
9  right data set for the second half of this
10  model to predict stability of the overfill
11  lots?
12    A.    That is correct.
13       MS. SCHMIDT:  Objection.
14       THE WITNESS:  That is correct.
15       Because that -- the data set he used
16       was with the old process and old
17       method.  The new process and new
18       method is giving you -- like it's a
19       different -- new process and new model
20       method is different parameters
21       altogether.  So if you're going to
22       make a prediction of stability for
23       overfill lot, you need to use the data
24       from overfill lot.

53 (Pages 206 - 209)

Appx19603

Page 210

1　BY MR. MACORETTA:
2　　　Q.　But in February of 2001 he
3　didn't have any data from overfill lots,
4　right, or he didn't have complete data?
5　　　A.　Correct.  And then don't need
6　to build model if you don't have correct
7　data.
8　　　Q.　So he shouldn't have built a
9　model at all?
10　　　A.　You should not -- they didn't.
11　They didn't build the model.  They just had
12　the model from 19 -- I mean, from the old,
13　you know, process.  And that's what they did
14　apply to the lots in the market.
15　　　Q.　So when Merck releases the
16　first overfill lot in 2000, is it your
17　position that there was no model they could
18　have built to predict whether that lot --
19　could accurately predict whether that lot,
20　that overfill lot would have met the end
21　expiry potency at 24 months?
22　　　A.　They already had that analysis.
23　That if they -- if total maximum log loss
24　is -- maximum log loss is .7.  And based on

Page 211

1　that if you set up the target manufacturing
2　to 5.2 and you release at 5.0, there is
3　assurance that your lots are going to meet
4　the expiry of 4.3.  Because it is going to
5　be -- it was only .55, in some cases even .5,
6　and there was a little bit of cushion of .2.
7　So it's --
8　　　Q.　So you don't have an issue with
9　Phil -- did you have an issue, then, with --
10　the second half of Model 2 with Phil Bennett
11　saying you just don't like his log loss,
12　right, you don't like the .7 he used, it
13　would be okay if he had used the .55 to do
14　this formula?
15　　　MS. SCHMIDT:  Objection.
16　　　Mischaracterizes her testimony.
17　BY MR. MACORETTA:
18　　　Q.　You can answer.
19　　　A.　So second part.  If he used the
20　realtime data from the overfill lots, I will
21　be more comfortable.  I mean, I will say
22　that, yes, you can draw a conclusion out of
23　that, but because he did not use the realtime
24　data and that model was built basically to

Page 212

1　assess the market impact of the logs from
2　1998 and 1999 pre-overfill lot.
3　　　Q.　Well, the second part wasn't.
4　The second part was built to assess the
5　release based on the current production
6　practices?
7　　　A.　It was not built.  It was not
8　built.  The second part, I mean, what I did
9　from that memo, the second part is just I'm
10　going to -- this model I built using lots
11　from 1995 to 1998 and I did apply it to the
12　marketed product manufactured in 1998 and
13　1999 with old process.  I'm just going to
14　throw this data into the same model.  That's
15　what the second analysis looks like.
16　　　Q.　And you don't like it because
17　he used the same data.  If he had used the
18　original .55 loss data that they used to
19　originally determine the overfill, that would
20　be okay?
21　　　MS. SCHMIDT:  Objection.
22　　　THE WITNESS:  Could you,
23　　　please, repeat that question?
24　BY MR. MACORETTA:

Page 213

1　　　Q.　Sure.  You don't have a problem
2　with Phil Bennett's formula in the second
3　model.  Right?
4　　　MS. SCHMIDT:  Objection.  Asked
5　　　and answered.
6　　　THE WITNESS:  As I said, that
7　　　this is like formula is correct.
8　　　You're taking all the possible
9　　　variability.
10　BY MR. MACORETTA:
11　　　Q.　That's right.  Okay.  So what
12　you don't like is the .7 loss that he used,
13　you think he should have used what?
14　　　MS. SCHMIDT:  Objection.
15　　　THE WITNESS:  .7 is result of
16　　　some kind of analysis.  What I'm
17　　　saying is that 95 to 98 lots were the
18　　　old process lots.  And that analysis,
19　　　that was the worst case loss period
20　　　for this particular component of the
21　　　mumps.  And during that period the log
22　　　loss was higher and he took that
23　　　particular data set from that period,
24　　　very limited number of lots, short

54 (Pages 210 - 213)

Appx19604

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 214

1    period of time to do the worst case
2    analysis for the marketed product
3    manufactured during that period. It
4    is not reasonable to take the same
5    model and apply to something which is
6    manufactured with different process
7    and method. And that is not
8    something --
9    BY MR. MACORETTA:
10    Q.    And then my question is, is it
11    your position that there could be no model
12    for the newly manufactured product until you
13    had two years of stability data?
14    A.    Until you have complete data
15    set, I mean, why you have to -- I mean, is
16    there a need to predict something? Because
17    right now you did -- you had that -- you did
18    Model 1 because there was a need. The
19    objective of the Model 1 was to determine
20    what is the manufacturing target and the
21    release specification. So that was the
22    objective. There was everything, every
23    analysis which has been done in, like, all
24    those years was -- there was an objective.

Page 215

1    So right now we have to set up the
2    specification. It's industry standard to
3    look at the historical data because that will
4    give you the reliable specification. We
5    looked at the 20 years of historical data and
6    that tells us that we are getting average log
7    loss of .5, around .5. We add the standard
8    deviation, we come to .7. That gives us --
9    that's a reliable estimate. It gives us a
10    reliable estimate of the log loss, and we can
11    set up the specification based on the
12    reliable estimate.
13        Then there is -- so there was a
14    need. There was a need to build a model.
15    The second time there was a warning letter
16    and there was another analysis was requested
17    by CBER. So then we built another model to
18    address that cushion. And the request there
19    was we want to do the worst case analysis
20    because we are going to assume all the lots
21    are released at 4.3. And that was the worst
22    case log loss period. So take the lots from
23    1995 to 1998 because it is more representative
24    of the lots which are still in market, and do

Page 216

1    an analysis. So we pick the worst case time
2    period, smaller number of lots and did an
3    analysis which is great. I mean, it gives
4    you rough estimate -- or worst case scenario
5    that your worst case expiry is 3.3 to 3.9,
6    which is great. Now -- I mean, after you
7    change the specification you already are
8    running the stability test unless you have
9    all -- at least reasonable amount of data set
10    to build a model or do any prediction, I
11    mean, you should wait to get that --
12    Q.    What are you calling a
13    reasonable amount of data set, the full two
14    years or something less?
15    A.    Full two years.
16    Q.    So before two years you just
17    can't do any model?
18    A.    I mean, is there a need to do a
19    model? Because you're doing all kind of
20    reporting and deviations and everything based
21    on your realtime stability data. Most of the
22    companies do that, they don't have a model.
23    Q.    So when Phil Bennett was
24    assigned in number 8 to do a statistical

Page 217

1    assessment to determine what the shelf life
2    is needed to maintain 4.3, what should he
3    have done?
4        MS. SCHMIDT: Objection. If
5        that's contrary --
6        THE WITNESS: I mean, you're
7        asking what Phil Bennett should have
8        done?
9    BY MR. MACORETTA:
10    Q.    Well, if that assignment was
11    given to you. We looked at Exhibit 9 and you
12    don't think that that was the right analysis,
13    so I'm asking you what analysis, what would
14    have been the appropriate analysis for Phil
15    Bennett to run or any statistician to run in
16    response to an assignment in March of 2001 to
17    assess what the shelf life is needed to
18    maintain 4.3?
19    A.    I mean, I'm not a statistician.
20    I don't know how to do the statistical
21    analysis. I'm looking at his results. I
22    mean, there was a discussion and there is a
23    request to do some kind of analysis. And
24    whatever he thought -- even if it is related,

55 (Pages 214 - 217)

Appx19605

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 218

1  looking at this distribution list not
2  matching, I don't even think it is related.
3  But let's assume it is related.
4      Q.   Okay.
5      A.   I mean, I don't know what --
6  it's not very clear just reading that.
7  Again, I mean, these are competent people.
8  They're talking to each other.  But as an
9  outside person, when I read this, I mean, I
10  cannot draw a relationship.
11     Q.   So if the FDA had -- if CBER
12  had, in fact, said to Merck in 2001, what is
13  the current shelf life which will assure that
14  your product will maintain 4.3 at the end of
15  the shelf life, how should Merck have done
16  that analysis in 2001?
17         MS. SCHMIDT:  Objection.
18         THE WITNESS:  I mean, Merck
19     already did that analysis in 1998 to
20     show that 4.3, if you set target at
21     5.2 and release at 5.0, you will meet
22     expiry of 4.3.
23  BY MR. MACORETTA:
24     Q.   So Merck should -- so they

Page 219

1  should just rely on that old '98 analysis?
2         MS. SCHMIDT:  Objection.
3         THE WITNESS:  And why not when
4     there's 20 years of data based -- it's
5     based on 20 years of realtime data.
6  BY MR. MACORETTA:
7      Q.   That's the -- well, yeah, but
8  it's based on pre-overfill data, too.  Right?
9      A.   Correct.  So you did -- you're
10  trying to set up the specification for the
11  overfill, I mean, for the -- to make sure
12  that you meet 4.3.  Your 20 years of data is
13  showing that maximum log loss is only .7, it
14  cannot go beyond that.  You add that and then
15  set up the specification.
16         Now, if you -- and I'm not
17  talking this particular specific case.  If
18  this -- generally, if you -- unless you have
19  collected enough data with a new process, you
20  just have changed the process.  You did work
21  for three years and you did all the analysis.
22  You changed the process.  Now once you have
23  changed the process, you need to wait before
24  you start saying, oh, no, I made a mistake,

Page 220

1  it's wrong.  You need to get whole complete
2  data set before you start to draw any
3  conclusion.
4      Q.   Nobody at Merck did that,
5  right, nobody at Merck said let's just rely
6  on the old analysis?  Right?
7         MS. SCHMIDT:  Objection.
8  BY MR. MACORETTA:
9      Q.   In answers to these.  I mean,
10  we can look at lot of documents, we're going
11  to look at a lot of documents from '01 and
12  '02 where they say our analysis shows we're
13  not going to meet the 4.3 shelf life.  Right?
14         MS. SCHMIDT:  Objection.
15  BY MR. MACORETTA:
16     Q.   Nobody says, well, what do you
17  mean, the '98 analysis is fine.  Right?
18     A.   '99 supplement.
19     Q.   The '99 supplement analysis?
20     A.   Yeah.
21     Q.   Nobody at Merck says '99
22  supplement analysis is fine, why do we need
23  to do anything else?
24         MS. SCHMIDT:  Objection.

Page 221

1  BY MR. MACORETTA:
2      Q.   You can answer.
3      A.   I mean, I know I saw a lot of
4  discussion regarding, like, you know, the --
5  it's a different analysis.  There's a lot of
6  emails back and forth regarding different
7  analysis, but I rely on what -- when you do
8  the supplement, that was Merck's position.
9  And that's what went into supplement in 1999.
10  And based on -- because it was an official
11  communication, I'm going to say that they
12  believed that it is going to meet the -- I
13  mean, that analysis was right, and it is
14  going to meet the specification, expiry
15  specification.
16     Q.   We see several Merck documents
17  where they believe that analysis is wrong and
18  it's too low.  Right?
19         MS. SCHMIDT:  Objection.
20         THE WITNESS:  Not the official
21     communication.
22  BY MR. MACORETTA:
23     Q.   No, they never officially
24  communicate to CBER that the analysis was

56 (Pages 218 - 221)

Appx19606

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 222

1  wrong, I agree with that. But we see
2  several Merck internal documents where they start on
3  the assumption that that analysis is wrong?
4  MS. SCHMIDT: Objection.
5  THE WITNESS: I don't remember
6  seeing any supplement saying that, any
7  official supplement which went to CBER
8  saying that.
9  BY MR. MACORETTA:
10  Q. I understand. I understand.
11  And I agree with you that there's no official
12  supplement where they -- where Merck says the
13  analysis we did in '99 PAS was wrong. I'm
14  talking to you about internal Merck documents
15  where they say the calculation was wrong.
16  You've seen them. Right?
17  MS. SCHMIDT: Objection.
18  THE WITNESS: I have seen
19  internal Merck documents and having
20  the discussion and sharing the
21  results. That's all I've seen. I
22  have not seen anybody saying anything
23  else either way.
24  MR. MACORETTA: Okay. We're

Page 223

1  going to mark as Exhibit 10, Gulati-10.
2  - - -
3  (Exhibit Gulati-10, ORRC
4  Clinical and Regulatory Review
5  Committee Agenda 10/8/02, 00780210 -
6  00780265, was marked for identification.)
7  - - -
8  BY MR. MACORETTA:
9  Q. I'm going to direct you a few
10  pages back. You can look as much as you
11  want, but I'm going to direct you to page 7
12  of the main document, which ends in Bates
13  number page 221.
14  MS. SCHMIDT: Take your time.
15  MR. MACORETTA: Take your time.
16  We can take a break if you need to.
17  MS. SCHMIDT: I'm sorry, take
18  your time.
19  MR. MACORETTA: You want to
20  take a break?
21  THE WITNESS: No, I'm good.
22  MS. SCHMIDT: Let's take a
23  quick break.
24  MR. MACORETTA: Sure.

Page 224

1  MS. SCHMIDT: Can we go off the
2  record?
3  MR. MACORETTA: Sure.
4  VIDEOGRAPHER: 13:48. We're
5  off the video record.
6  - - -
7  (A recess was taken.)
8  - - -
9  VIDEOGRAPHER: The time is
10  13:49. We are back on the video record.
11  BY MR. MACORETTA:
12  Q. I'm going to direct you to page
13  7 which is a Bates number page ending in 221.
14  A. Yes. Okay.
15  Q. I'm going to talk about 2.1.3,
16  "Initiation of Stability study." First of
17  all, this is -- if we go up a few pages, this
18  is prepared by the PDT. Do you see that on
19  page 215?
20  A. Page 215? 217 and 215. Yes, I
21  see that.
22  Q. Have you reviewed this document
23  before as part of your analysis?
24  A. Probably I did, but I don't

Page 225

1  remember everything from here.
2  Q. So in the middle of page 7 --
3  let me to go to the paragraph in the middle
4  that starts, "The model Merck has employed
5  guarantees...." The second sentence, The
6  calculation performed by CBER in '99 was
7  incomplete in having neglected to include all
8  the essential elements associated with
9  post-release potency losses, as well as an
10  invalid calculation leading to
11  underestimation of release assay variability.
12  Do you see that?
13  A. I see that.
14  Q. As a result, the release
15  potency at 5.0 to support an end expiry claim
16  was low and could not be supported by the
17  correct model. Do you see that?
18  A. Yes, I see that.
19  Q. All right. Well, did you
20  consider this statement by Merck in your
21  analysis of whether or not Model 1 was valid
22  and should be used by Merck?
23  A. Model 1 was developed based on
24  three -- I mean 20 years of data, realtime

57 (Pages 222 - 225)

Appx19607

Page 226

1  data.  And the analysis was done by CBER as
2  well as Merck.  So based on that, it is my
3  understanding that Model 1 was -- I mean,
4  was -- is more reliable and applicable model
5  because it's based on the realtime data for
6  larger period of time.  It gives you all kind
7  of variability from one year to other year
8  and all that.
9      Q.    But this statement in a Merck
10 document says Model 1's calculation is wrong
11 because it doesn't include all the elements
12 with post-release potency losses.  Right?
13          MS. SCHMIDT:  Objection.
14          THE WITNESS:  I mean, I don't
15      know what does -- I mean, I don't know
16      what to conclude out of that.  I saw
17      the supplement based on the -- I mean,
18      based on the supplement and approval,
19      the specifications are approved.  This
20      is, I mean, some kind of
21      communication, but we have already
22      approved the specification based on
23      the study we did over the three years.
24      We don't even have complete data set

Page 227

1      from the new process.  I mean, this is
2      all internal discussion, whatever is
3      going on.  I don't have -- I don't
4      know, I can't comment on this.  I'm
5      just going by what has changed, what
6      is approved.  And right now
7      realtime -- we have realtime data
8      which is supporting what was approved
9      in the supplement in 1999.  Whatever
10     specifications were set, all the
11     stability logs are meeting specification
12     from since 1999.  They are showing
13     overall average log loss of .3 to .6.
14     So based on that data and -- I mean, I
15     can see that the model which was built
16     using 20 years of data was correct.
17 BY MR. MACORETTA:
18     Q.    Even though here Merck says
19 it's not?
20         MS. SCHMIDT:  Objection.
21         THE WITNESS:  I mean anybody
22     can say anything.  But your realtime
23     data is what you rely on.  And
24     realtime data is consistently showing

Page 228

1      you that your log loss is around .3 to
2      .6, and it is all the products, all
3      the lots are meeting release and
4      expiry specification.
5  BY MR. MACORETTA:
6      Q.    But in October of 2002, Merck
7  thought that it was not meeting the expiry,
8  it could not meet the expiry specification of
9  4.3 with product released at 5.0, at least
10 according to this document.  Right?
11         MS. SCHMIDT:  Same objection.
12     I think you asked what the document
13     says three times.
14 BY MR. MACORETTA:
15     Q.    You can answer the question.
16     A.    Realtime data is saying that it
17 is meeting the specification.  It is -- the
18 realtime data is confirming again and again
19 that Model 1 is correct.
20     Q.    But wait a minute.  Merck
21 didn't have realtime data as of
22 October 2002 when they wrote this.  Right?
23     A.    October 2002 there should be
24 about two years of data and also there should

Page 229

1  be, like, lots from 1999, 2000, 2001 and
2  2002.  So you have completed aside from 1999
3  and you have, like, 12 to 18 months of data
4  set from other years.  So that -- I mean, you
5  can see that.  You can tell looking realtime
6  data that the Model 1, realtime data was
7  supporting Model 1.
8      Q.    So how do you explain why
9  people at Merck would talk about it like
10 they're not meeting the specification and
11 discuss options if they're not meeting the
12 specifications?
13         MS. SCHMIDT:  Objection.
14         THE WITNESS:  I don't know why.
15     I mean, I don't know, I can't answer
16     that.
17 BY MR. MACORETTA:
18     Q.    Your analysis, you didn't
19 consider this an important factor, these
20 discussions with Merck that our calculations
21 show are not going to meet shelf life?
22         MS. SCHMIDT:  Objection to form.
23         THE WITNESS:  What I'm looking
24     at is that we have this 20 years of

58 (Pages 226 - 229)

Appx19608

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 230

1  data, we are setting up the
2  specification.  There are two -- CBER
3  and Merck who are looking up the data.
4  They did set up the specification.
5  Then you're running the real -- you
6  did change the process.  Your realtime
7  data is meeting the specification, and
8  there is no OOS after changing the
9  specification.  Why Merck is having
10  this internal discussion, I don't
11  know.  I mean, I read so many
12  discussions which are going on.  I
13  mean, I can't say why.  But I'm
14  looking at the specification which are
15  approved by CBER based on analysis
16  which is done by Merck independently
17  and CBER independently.  And there are
18  results which are generated on a
19  regular basis which are supporting
20  what was approved.  So there is some
21  lot of -- these -- I ID'd what you are
22  showing me here and I see that.  And I
23  see from this I will conclude that
24  there are a lot of internal discussions

Page 231

1  which are going on.  I mean, that's
2  all I see it as.  Because your
3  realtime data is meeting
4  specification, no stability points are
5  failing.  There is no stability OOS
6  since 1999 since the time you started
7  manufacturing overfill lot.
8  BY MR. MACORETTA:
9      Q.    What you're calling internal
10  discussions here, you didn't see any internal
11  discussions along the lines of what you said,
12  that said don't worry about it, our realtime
13  data is fine.  Right?  You can't point me to
14  any of them, can you?
15      A.    I have not seen all the
16  internal discussions.  I have seen some of
17  those discussions.
18      Q.    I mean, can you point me to any
19  that say what you say, don't worry about it,
20  our realtime data is fine?
21      MS. SCHMIDT:  Objection.
22      THE WITNESS:  I'm just looking
23  at -- I'm drawing my conclusion based
24  on the realtime annual stability which

Page 232

1  is signed by all the quality
2  representatives.  And all the data is
3  trended and all the tables are there.
4  I mean, all the data is there.  I
5  mean, yes, there are some discussion I
6  see here, but, I mean, there are still
7  discussions, nothing else.  There is
8  no conclusion drawn either way.
9  BY MR. MACORETTA:
10      Q.    But there's no -- but on one
11  side are some documents of internal
12  discussions saying this is a problem, our
13  modeling shows a problem.  And you're
14  saying -- and I'm asking you to point me to
15  any document contemporaneous with this inside
16  Merck that says the opposite, it's not a
17  problem because of our realtime data?
18      MS. SCHMIDT:  Okay.
19  BY MR. MACORETTA:
20      Q.    Can you point me to any such
21  document?
22      MS. SCHMIDT:  Objection.
23  BY MR. MACORETTA:
24      Q.    You can answer.

Page 233

1      A.    I would only say that I have
2  not -- I didn't read all the Merck
3  communications so, I mean, I can't answer that.
4  I'm sure there are communications out there.
5      Q.    And the person giving this
6  presentation, well, let's see -- withdraw.
7          How much realtime -- we went
8  back and forth on this.  Would a year of
9  realtime data help in forming the analysis of
10  whether the model is right or wrong?
11      A.    If your expiry -- your shelf
12  life is two years, it's good to have two
13  years of data so that you have two years of
14  realtime data.
15      Q.    Well, in let's say late 2001 or
16  early 2002, when you didn't yet have two
17  years of real data, should someone at Merck
18  have looked at the realtime data you had up
19  to a year or 18 months?
20      A.    Yes.  I mean, probably they
21  had -- at least I would expect there was
22  18 months of data.
23      Q.    And it would have informed
24  whatever analysis of the model to look at

59 (Pages 230 - 233)

Appx19609

Page 234

1 that data. Right?
2          MS. SCHMIDT: Objection. If
3     you're asking her to answer on behalf
4     of someone at Merck. She can provide
5     her expert opinion here.
6 BY MR. MACORETTA:
7     Q.   In your opinion -- in your
8 opinion, would it have formed an analysis of
9 the models we're talking about to look at 12
10 to 18 months of realtime data on the overfill
11 product?
12     A.   So there's a table in my report
13 which gives you the results from realtime
14 data from overfill lot. They're called high
15 titer lots.
16     Q.   Where are they?
17     A.   It's page 43.
18     Q.   So these are three lots before
19 the overfill. Right?
20     A.   These are overfill lots. These
21 are, like, high titer lots.
22     Q.   These are lots that happen to
23 be -- okay. All right. That's fine. So
24 here are three lots. And you interpret this

Page 235

1 to say that even at 24 months they were above
2 4.3. Right?
3     A.   Yes.
4     Q.   Is this a chart you created?
5     A.   I think I got this chart from
6 one of the annual stability reports.
7     Q.   Okay. But -- okay. That's
8 fine. But you didn't take it out of an
9 internal Merck document at the time saying
10 let's look at the overfill lots?
11     A.   Could you, please, ask that
12 question again? Because I got it from annual
13 stability reports so that was a Merck document.
14          MR. MACORETTA: Let me show you
15     what we're going to mark as Gulati-11.
16               - - -
17          (Exhibit Gulati-11, 1/25/02
18     Email, 00024008 - 00024010, was marked
19     for identification.)
20               - - -
21 BY MR. MACORETTA:
22     Q.   Gulati-11 is -- have you seen
23 this before?
24     A.   Probably, yes.

Page 236

1     Q.   Gulati-11, in the earlier email,
2 Cynthia Morrisey is asking Phil Bennett to
3 look at shelf life using the newer data, more
4 recent data for high mumps loss. Right?
5 That's the email that goes from page 009 onto
6 page 010. Right? And then Phil Bennett
7 responds to that on the first page. Right?
8          MS. SCHMIDT: I'm sorry, she's --
9          MR. MACORETTA: Sure. Go
10     ahead.
11          THE WITNESS: Yeah, I see that.
12 BY MR. MACORETTA:
13     Q.   Okay. And Phil Bennett does
14 what you suggest he should do and he looks at
15 whatever data they have so far on the
16 overfill lots, at least in part. Right?
17          MS. SCHMIDT: Objection.
18          THE WITNESS: Yes, I see that.
19 BY MR. MACORETTA:
20     Q.   "The early loss of the newer
21 lots (high titer) appears steeper." Right?
22 That's what he says.
23          MS. SCHMIDT: I'm sorry. John,
24     you're jumping back and forth between

Page 237

1     the two. Are you on the first page
2     now?
3 BY MR. MACORETTA:
4     Q.   I'm on the first page. I'm in
5 the middle of the first paragraph. You see
6 where Phil Bennett says, "The early loss of
7 the newer lots (high titer) appears steeper"?
8     A.   I see that.
9     Q.   So Phil Bennett does what you
10 suggest he should do and looks at whatever
11 data they have on the overfill lots and comes
12 to the same conclusion, that with creative
13 math and the updated stability data for fills
14 made from '99 the -- '95 to '99, the shelf
15 life is 15 to 16 months. Right?
16          MS. SCHMIDT: Objection to the
17     extent you're characterizing the
18     document as Phil Bennett doing
19     anything that Dipti recommended.
20 BY MR. MACORETTA:
21     Q.   I don't think I -- well, okay.
22 You can answer the question.
23          MS. SCHMIDT: If you understand
24     the question, you can answer it.

60 (Pages 234 - 237)

Appx19610

Page 238

1    THE WITNESS: So, yes, I see
2  the email and Phil Bennett is sending
3  this e-mail, but, again, like I said
4  in my report, like this model, he is
5  using to do all the analysis is not
6  valid for overfill lots. And it's the
7  same thing -- I mean, this is the same
8  thing applying 1998, 1995 to 1998
9  data, worst case model to overfill
10  lot.
11  BY MR. MACORETTA:
12    Q.    He's saying the new lots aren't
13  going to help us.
14    MS. SCHMIDT: Objection.
15  BY MR. MACORETTA:
16    Q.    Right?
17    MS. SCHMIDT: Mischaracterizes
18  the document.
19    THE WITNESS: Basically I
20  mean -- like, I'm going to repeat the
21  same thing. That he is -- the same
22  thing, what memo you showed me before,
23  that applying that old model based on
24  1995 to 1998 data to current lot.

Page 239

1  BY MR. MACORETTA:
2    Q.    So when Phil Bennett was tasked
3  by Cynthia Morrisey to calculate the expiry
4  period that is supported with 95 confidence,
5  95 percent confidence by current product
6  released at 5.0, what data should he have
7  used?
8    A.    For overfill lot you mean?
9    Q.    For the calculation what -- on
10  Ms. Morrisey's email, what is the expiry
11  period that is supported with 95 percent
12  confidence by our current product which is
13  released at 5.0?
14    MS. SCHMIDT: She didn't have
15  it in front of her. You've got to
16  slow down.
17  BY MR. MACORETTA:
18    Q.    Do you see where I'm at,
19  Dr. Gulati?
20    A.    I see.
21    Q.    You're with me, okay.
22    A.    I see what --
23    MS. SCHMIDT: Dr. Gulati, you
24  didn't have the email in front of you.

Page 240

1  I'm sorry, you just have to wait a
2  second. So if you want to read to her
3  from the email, she now has it in
4  front of her. You can start or reread
5  the question.
6  BY MR. MACORETTA:
7    Q.    On page 009, the paragraph that
8  begins with, "One of the backup plans...,"
9  Cynthia Morrisey is repeating Keith's
10  question, what is expiry period that is
11  supported, with 95 percent confidence, by our
12  current product which is released at 5.0.
13  And Phil Bennett gives an answer which you
14  said you disagree with because he's using 95
15  to 99 data. Right?
16    A.    Correct.
17    Q.    Okay. What should Phil Bennett
18  have done to answer that question?
19    A.    I don't know what he should
20  have done, but in my opinion, realtime data
21  should be used to draw any conclusion once
22  you have changed the process and method.
23    Q.    And he says -- he's looking at
24  the realtime data supports this, right, the

Page 241

1  early loss of the newer lots high titer
2  appears steeper?
3    MS. SCHMIDT: Objection to the
4  preamble of that. If you're asking
5  whether it says that --
6  BY MR. MACORETTA:
7    Q.    Isn't that what -- I mean,
8  isn't that using whatever realtime data he
9  has?
10    A.    He -- I know what it is saying
11  here, but, again, I mean, I disagree with, I
12  mean, request and conclusion.
13    Q.    So you think he should have
14  just said this is an impossible question for
15  me to answer?
16    MS. SCHMIDT: Objection.
17    THE WITNESS: I mean, I don't
18  know what he should have said. But, I
19  mean, he's a statistician. He is a
20  statistician. He is doing whatever
21  he's asked to do. But the question is
22  did he have the right data set to draw
23  any conclusion. And that's the question.
24  BY MR. MACORETTA:

61 (Pages 238 - 241)

Appx19611

Page 242

1    Q.    You said that the data he used
2  is the wrong data?
3    A.    It's not applicable.  I'm not
4  going to say right or wrong.  It's not
5  applicable.
6    Q.    So he's wrong to have applied
7  it in this sense?
8    A.    He should get the data from the
9  new process and new -- from the overfill
10  lots.
11    Q.    But we don't have two years of
12  data from the overfill lots by January of
13  '02.  Right?  So what should he have done in
14  that event?
15    A.    I mean, you can do anything you
16  want to do, but don't draw any conclusion and
17  then you cannot make any decision, quality
18  decision based on that.  I mean, you can do
19  anything.  I mean, I can take a random model
20  and put all that stuff into statistical
21  package and draw -- I mean, you can do
22  anything you want to do.  But can you draw a
23  conclusion and rely on the conclusion and
24  make a quality decision based on conclusion,

Page 243

1  that's the question.
2    Q.    That' right.  And you think --
3  and you don't think you can based on the
4  information Phil Bennett used here?
5    A.    For the overfill lot, yes, I
6  think you cannot use the lots data from 1995
7  to 1998 to make any decision about the lots
8  manufactured, overfill lot.
9    Q.    When is the first time you ever
10  saw Merck do a model based on data from the
11  overfill lots?
12    A.    I saw in 2004 and 2005.
13    Q.    Did you reference the 2004
14  model in your report?
15    A.    It is Model 3.
16    Q.    Model 3.  Okay.  We're going to
17  come to that.  Okay.
18        So until they had complete
19  overfill data, is it your position that there
20  was no model you could use to make a decision
21  on?
22    MS. SCHMIDT:  Objection.  I
23    know this is coming up here.  I think
24    you have asked that question eight

Page 244

1  times now.
2    MR. MACORETTA:  Okay.
3    THE WITNESS:  Like I said, you
4    can build any model any way, but you
5    cannot make any quality decision based
6    on model unless it's validated.
7  BY MR. MACORETTA:
8    Q.    I'm going to go back to your
9  report, your Model 3.  I'm on page 44 of your
10  report.
11    MS. SCHMIDT:  We're getting it.
12  BY MR. MACORETTA:
13    Q.    I guess I'm on page 44 of your
14  report, Model 3.  You're referencing a 2005
15  model.  Right?
16    A.    Yes.
17    Q.    So prior to Model 3 in 2005 --
18  actually you know what, do we have Model 3,
19  2005?  Grab that.  I know we do.
20    MR. MACORETTA:  Let me show you
21    what we're going to mark as Gulati-12.
22        - - -
23    (Exhibit Gulati-12, 7/13/05
24    Letter, 00141789 - 00141906, was

Page 245

1    marked for identification.)
2        - - -
3  BY MR. MACORETTA:
4    Q.    To help you, I believe that
5  that is on page 123 of Exhibit 12.  Let me do
6  it this way:  Model 3, is that what you have
7  a cutout from in middle of page 45?
8    A.    Uh-huh.  Yes.
9    Q.    Okay.  You got that cutout on
10  your page 45 from the same model that's on
11  page 123 of Exhibit 12.  Right?
12    A.    Yes.
13    Q.    And that is part of Merck's
14  submission for change in the product to use
15  rHA.  Right?
16    A.    Yes.
17    Q.    Submitted the July 13, 2005?
18    A.    Yes.
19    Q.    By which time there would have
20  definitely been two years of stability data
21  on the overfill lots.  Right?
22    A.    That is correct.
23    Q.    Do you know what lots were
24  included in the calculations used to create

62 (Pages 242 - 245)

Appx19612

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 246

1  your Model 3?
2      A.    So on the supplement, I can see
3  there were lots, there were 34 lots included.
4      Q.    What are you looking at?
5      A.    I'm looking at my report and
6  there's a reference there, reference 206.
7      Q.    Okay.  But these were not
8  overfill lots, were they?
9      A.    I think 30 or 31 lots were
10 overfill lots.
11     Q.    Well, were there any -- was
12 Mumpsvax ever overfilled, was Merck selling
13 Mumpsvax, the individual product, after it
14 overfilled?
15         MS. SCHMIDT:  Objection.
16         Answer if you know.
17 BY MR. MACORETTA:
18     Q.    You know what, let me strike
19 that question.
20         Did you do any analysis to
21 check to determine if all of the 34 lots in
22 this model were from overfill lots?
23     A.    So I looked at the table
24 where -- I mean, on the lots.  And I looked

Page 247

1  at the era of the lots, when they were
2  manufactured, and there were two or three
3  lots which were there from '95 -- one lot was
4  '95, '96, and '97, and the rest of them were
5  after 1999.
6      Q.    What table, what table are you
7  referring to here?
8      A.    That was one of the table which
9  was referenced which gave like lots, 34 lots
10 details.
11     Q.    And is that what your footnote
12 206 is?  Is that what you're saying?
13     A.    Could be.
14     Q.    Well --
15     A.    I don't have everything in
16 front of me, I can't say for sure.
17     Q.    You're telling me you looked at
18 table of lots, and I'm asking you what table
19 you looked at, and the answer is you're not
20 sure?
21         MS. DYKSTRA:  She just told you
22     what table.
23         MS. SCHMIDT:  She described the
24     table.

Page 248

1      MS. DYKSTRA:  She doesn't have
2      to get the exhibits for you.
3  BY MR. MACORETTA:
4      Q.    All right.  That's fine.  You
5  don't know if it's footnote 206 or not.
6  That's fine.  That's fair enough.
7          Does it bother you at all that
8  at least one of the lots in that analysis was
9  a pre-overfill lot?
10         MS. SCHMIDT:  Objection.
11         THE WITNESS:  No, it doesn't.
12 BY MR. MACORETTA:
13     Q.    What would be the justification
14 for using pre-overfill lots in this analysis?
15     A.    I don't know how he did the
16 analysis and how he made the decision.  But
17 when I looked at the table, I saw that 90 --
18 80 or 90 percent lots were overfill lots.
19 That tells me it's applicable data set.
20     Q.    You just said the best data is
21 data -- is realtime data from the overfill
22 lots.  Right?
23         MS. SCHMIDT:  Objection.  I
24     think that misstates what she's

Page 249

1  testified to.
2          THE WITNESS:  Yes, the data set
3      should be from -- it should be
4      realtime data.
5  BY MR. MACORETTA:
6      Q.    Wouldn't it be better to use
7  just realtime data from overfill lots?
8          MS. SCHMIDT:  Objection.
9          THE WITNESS:  I think what
10     happened in -- I don't know how these
11     calculations were done in the -- in
12     this particular case.  But if you want
13     to build a model, you need to go by
14     the realtime data with the overfill
15     lot.  And that's my position.
16 BY MR. MACORETTA:
17     Q.    And this model is less than
18 perfect because some of the realtime data was
19 not overfill lots.  Right?
20         MS. SCHMIDT:  Objection.  Vague.
21         THE WITNESS:  90 percent of --
22     I mean, if that's the right table,
23     what I looked at, 90 percent of the
24     lots were overfill lots.  The majority

63 (Pages 246 - 249)

Appx19613

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 250

1    of data was from overfill lots.  And --
2  BY MR. MACORETTA:
3      Q.    I'm going to show you what your
4  footnote 206 is and I don't think it's the
5  table we're talking about.  I'm going to show
6  you what we're going to mark as Exhibit 13,
7  which, if I'm reading it right, is the Bates
8  number referenced.
9          MR. MACORETTA:  Please mark
10      that as Gulati-13.
11              - - -
12        (Exhibit Gulati-13, 6/30/06
13      Memo, 01894917 & 01894918, was marked
14      for identification.)
15              - - -
16  BY MR. MACORETTA:
17      Q.    So is this what you used to
18  look at the 34 --
19      A.    Yes.
20      Q.    Is this what you considered to
21  decide what the 34 lots were?
22      A.    Yes, this is where I got all
23  the information.
24      Q.    And it doesn't say anywhere in

Page 251

1  here the dates of all of those lots.  Right?
2      A.    It doesn't.  I tried to see one
3  of the tables which I could get some
4  information, I don't know whether that was
5  the right table, but I mean, here it doesn't
6  say.
7      Q.    Indeed it does say, "An
8  analysis was performed on completed and
9  ongoing studies of mumps stability data (1995
10  to present)...."  Right?
11      A.    It does --
12      Q.    In the first two lines.
13      A.    It does say that.
14      Q.    Okay.  So the analysis in your
15  Model Number 5 here does not contain just
16  overfill lots.  Right?
17      A.    It contains few lots from the
18  prior period.
19      Q.    Well, you don't know how many
20  lots it contains from the prior period, do
21  you?
22          MS. SCHMIDT:  Objection.
23      That's not what she testified to.
24  BY MR. MACORETTA:

Page 252

1      Q.    How many lots does it contain
2  from the prior period?
3          MS. SCHMIDT:  Objection.  If
4      you can answer from this document.
5          THE WITNESS:  Based on the
6      table I looked, only three from the
7      prior period.
8  BY MR. MACORETTA:
9      Q.    What table is that that you're
10  referring to?
11          MS. SCHMIDT:  We can take a --
12      we can look for it at the break if
13      there's a question that you want to
14      ask about it.
15          THE WITNESS:  Maybe, yeah.
16  BY MR. MACORETTA:
17      Q.    You can do that if you want,
18  but if you can answer it now, you tell me.
19  And if you can't answer it, you can say you
20  don't know.
21          MS. SCHMIDT:  So the question
22      is what table is it that you're
23      referring to?
24  BY MR. MACORETTA:

Page 253

1      Q.    What table did you look at to
2  tell the year or date of the 34 lots that
3  were used in Model 3?  Why don't we do it
4  a -- I prefer not to take a break now, but
5  you can --
6          MS. SCHMIDT:  That's fine.
7  BY MR. MACORETTA:
8      Q.    -- do whatever you want to do.
9  But I need you to answer the question right
10  now.  If your answer is I don't know, your
11  answer is I don't know.
12      A.    I looked at -- when I wrote
13  this report I looked at this memo to
14  determine which lots were used.  And I added
15  that -- I mean, I got that information from
16  this particular memo which is in my report
17  also.  I also tried to look at some of the
18  documents which were provided to me.  And I
19  looked at -- there was one table which kind
20  of was related to the memo and I looked at
21  that table and I mean, if that is the right
22  table, then, I mean, there are two, three
23  lots I saw just because I wanted to confirm
24  this statement.  And, I mean, that's all.  I

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 254

1  mean, I don't know more than that.

2      Q.    And even by your count there
3  were at least two or three lots that were
4  pre-overfill among these 34.  Right?

5      A.    Looking at that third table, yes.

6      Q.    You told me before that Model 2
7  was not reliable because it didn't have
8  realtime data on overfilled lots.  So then
9  why is Model 3 reliable if it includes
10  realtime data on pre-overfill lots?

11      MS. SCHMIDT:  Objection.
12      Mischaracterizes what she testified to.

13  BY MR. MACORETTA:

14      Q.    You can answer.

15      A.    So this model includes several
16  other parameters which were not there in the
17  prior models such as storage time at 22 to
18  27, then minus 20 storage, and storage as
19  reconstitution.  Looking at that data, I can
20  see that this model was -- like, there were a
21  lot of other variabilities which were added
22  to this model and this was a very conservative
23  model.  So this model, because all this
24  parameters which are added here, that made it

Page 255

1  very conservative model.  That's all I can
2  say.

3      Q.    So -- I'm sorry.  So let me go
4  back to some version of Model 2.

5      A.    Yes.

6      MS. SCHMIDT:  Do you want her
7      to find something?

8      MR. MACORETTA:  Gulati-7.

9  BY MR. MACORETTA:

10      Q.    I want to compare Gulati-7,
11  Model 2 to Model 3.  And is it --

12      A.    Yes.

13      Q.    And in Model 2, both parts,
14  they just estimate the potency loss.  Right?

15      A.    Yes.

16      Q.    And they come up with the
17  number, that .703 number.  Right?

18      MS. SCHMIDT:  Objection.

19      THE WITNESS:  Yes.

20  BY MR. MACORETTA:

21      Q.    Is it your position, then, that
22  Model 2 -- the potency loss calculated in
23  Model 2, where does that show up in the chart
24  in Model 3?

Page 256

1      MS. SCHMIDT:  Objection.

2      THE WITNESS:  Okay.  Before I
3  answer any question, I just want to
4  clarify one thing.  The objective of
5  Model 2 is to do the worst case
6  analysis.  The objective of Model 3 is
7  to set up the specifications.  So you
8  are making a change here from you're
9  going from HSA to recombinant HSA.
10  And you're making a change.  So like I
11  said in my report, when you don't --
12  like during the development stage or
13  when you're making a change, you only
14  have three lots of data available to
15  support the change and you build a
16  very conservative model.  You want to
17  add all kind of variability because
18  you don't have realtime data at that
19  time to say anything.  This model is
20  intended to use -- to support the
21  changes.  So we are changing our raw
22  material from HSA to recombinant HSA.
23  At this time when we are trying to do
24  this estimate, we are -- we are

Page 257

1  take -- we have only three lots of
2  data to support this change.  So we
3  are -- this model is very conservative
4  model because it's including a lot of
5  variability into that, because you
6  don't have any data, and this model is
7  to set up the specification, to set up
8  the specification for a change,
9  because you're ache making a process
10  change here.

11  BY MR. MACORETTA:

12      Q.    I thought this model was based
13  on 34 lots of data in Model 3.

14      A.    Correct.  But --

15      Q.    Okay.

16      A.    Correct, I agree with that.  So
17  34 lots, when you look at the historical data
18  from 34 lots which are stored at 2 to 8
19  degrees for 24 months, it shows you log loss
20  of 0.4397.

21      Q.    Yes.

22      A.    Right?

23      Q.    Okay.

24      A.    And then on top of that -- so

65 (Pages 254 - 257)

Appx19615

Page 258

1  this is your realtime data.  34 lots which
2  has few pre-overfill lot, but 31 post-overfill
3  lot.  It is giving you log loss of .43.
4  Right?
5        Q.    Yes.
6        A.    So if you go -- just like
7  realtime data, you will be using only that
8  number of .43, because, you know, that's
9  realtime data.  But now because we want to
10 make it a very conservative model, we added
11 all those other things which we generally
12 don't add when we'd be setting up the
13 specification.  So this is, like, based on
14 very limited, very, very small data set.  We
15 are trying to establish the specification for
16 the change.  After change, there's a new
17 process, you have a new specification.  So
18 based on that, you did -- you added other
19 parameters also.  So this is a very
20 conservative model basically.  In addition to
21 the realtime data which is showing log loss
22 of .44, we are adding other variabilities
23 also which are already included in realtime
24 data.

Page 259

1        Q.    Wait a minute.  What do you
2  mean they're already included in the realtime
3  data?
4        A.    Realtime -- like, this is -- so
5  this is a little complex, you know, principle.
6        MS. SCHMIDT:  Just go slow.
7        THE WITNESS:  So I'm making
8  my -- I fill my vials.  I'm packaging.
9  I did store them at the room
10 temperature for this much of time.  I
11 packaged them and then I tested them.
12 So I got like -- I have this five
13 years of overfill lot.  I did all of
14 that activity and I did get a result.
15 So based on that result, for five
16 years I calculated the log loss of
17 0.43.
18 BY MR. MACORETTA:
19       Q.    That's the storage in the
20 refrigerator.  I thought you were talking
21 about the storage at room temperature.
22       A.    What I'm saying is when you
23 manufacture a product, you fill the vials,
24 you -- then you store it at room temperature,

Page 260

1  you're doing all the packaging and stuff.
2  Then you release the product, then you'd test
3  the product and then you'd release the
4  product.  So that's the potency result.  So
5  when you get the potency result, your product
6  has gone through all the sealing, packaging,
7  storage, recon and everything.  All those
8  other things we added here, it is -- product
9  has already gone through that, those steps,
10 and you get a potency result.  So if you go
11 just by realtime data, realtime log loss,
12 it's only .45.
13       Q.    So are you suggesting that it's
14 double counting by taking the storage of 2.8
15 and adding the following reconstitution and
16 the 23 to 27?
17       MS. SCHMIDT:  Objection.
18       THE WITNESS:  Yes.
19 BY MR. MACORETTA:
20       Q.    I don't understand.  Or are you
21 saying that that storage at 23 to 27 and the
22 storage following reconstitution are also
23 included in 4.3?
24       A.    4.3, yeah.  But you're adding

Page 261

1  it because you're making a change.  You want
2  a lot of cushion around it.  Because it's
3  like you have only right now, 3 -- you
4  develop another model where you want it to be
5  very conservative so that you have a lot of
6  cushion in there.
7        Q.    So why isn't this in Model 1?
8        A.    Model 1 is all the realtime
9  data.  This one is realtime data of 20 years.
10 This is only three lot -- I mean, you right
11 now --
12       Q.    Let me just stop you.  What in
13 Model 3 is only three lots?
14       A.    You have 34 lots of data for at
15 the 2 to 8 degree storage.
16       Q.    Yes.
17       A.    And then you are -- you do add
18 other variability, right.  So based on, like,
19 data from 1990 -- or 34 lots you build a
20 model.  Right.  Now you're trying to
21 predict -- using this model you're trying to
22 predict the parameters for -- to predict the
23 end expiry and everything for the lots where
24 you're making a charge to rHA.

66 (Pages 258 - 261)

Appx19616

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 262

1　　Q.　Okay.

2　　A.　Right.　So if you look at here,

3　look here, you don't have that many rHA lots.

4　I mean, it's a very conservative model

5　because you're adding all the other

6　variability which is already included in your

7　2 to 8 degree centigrade.

8　　Q.　So where do the three lots come

9　into play?

10　　A.　There are only five rHA, like,

11　recombinant lots.　Where you are -- where you

12　have data available here.　Five rHA lots.　I

13　mean, those are the only lots which are

14　recombinant raw material lots.

15　　Q.　But when we did Model 1 to

16　change from 4.3 release to 5.0 release, why

17　didn't we do the same thing?

18　　MS. SCHMIDT:　Objection.

19　BY MR. MACORETTA:

20　　Q.　Why didn't Merck do the same

21　thing?　I shouldn't say we.　When Merck did

22　Model 1 to analyze the potent -- what should

23　be the release potency when it went from 4.3

24　to 5.0, why didn't Merck use all the same

Page 263

1　columns in the same conservatism that you

2　just described?

3　　MS. SCHMIDT:　Objection.

4　　THE WITNESS:　I don't know.

5　BY MR. MACORETTA:

6　　Q.　Are you saying they should

7　have?

8　　A.　I don't know.　I'm basically

9　saying at that time you had -- I mean, it was

10　all done based on whatever realtime data was

11　available and you calculated the log loss and

12　you added that.　Now because Merck -- because

13　once you have more data available, you are

14　trying to develop a comprehensive model.

15　This is the comprehensive statistical release

16　model which will be used in future also to

17　manage any change you make.　Right.　So this

18　is the model they came up with, that we are

19　going to take the realtime release data and

20　log loss from the realtime data and we are

21　going to add other things into that.　So I'm

22　going to -- just keep this aside and I'm

23　going to explain the concept what I'm talking

24　about.

Page 264

1　　MS. SCHMIDT:　I'm sorry, I'm

2　objecting to the last question.

3　BY MR. MACORETTA:

4　　Q.　Are you done your answer?

5　　A.　No.　I don't -- okay.　So --

6　　MS. SCHMIDT:　Sorry to interrupt

7　you.

8　　THE WITNESS:　Sorry.　So when

9　you -- then you're making a change or

10　when you are changing a parameter, and

11　you're running three, four lots at the

12　small scale level and you may not be

13　doing all that study at the

14　manufacturing level.　So you don't --

15　when you do -- when you get any kind

16　of analysis on results from those

17　smaller number of lots which you're

18　using to make a change and put them on

19　the stability, you add all those

20　additional parameters, once you put

21　into the manufacturing condition, you

22　add all the additional variability

23　which come into play.　That's what is

24　the comprehensive statistical release

Page 265

1　model.　You take the realtime data,

2　whatever you're getting and you're

3　adding more -- any potential

4　variability which could come into play

5　which could be -- which could come

6　into play and you're trying to make

7　that model a very conservative model.

8　In my opinion it is a very conservative

9　model, because in addition to the --

10　it's based on realtime data and other

11　things which could be potentially

12　highly variable parameter.　And when

13　you put in only three lots into that,

14　you have very limited data set

15　available.　Variability, once you have

16　larger, you could have higher

17　variability.　I mean, that's --

18　BY MR. MACORETTA:

19　　Q.　So are you suggesting, then,

20　that the numbers for loss rate for storage of

21　23 to 27 and storage of 2 to 8 degrees

22　following reconstitution are derived from

23　something other than the 34 lots they use for

24　the storage of 2 to 8 degrees?　Don't those

67 (Pages 262 - 265)

Appx19617

Page 266

1  numbers come from the same 34 lots?
2        MS. SCHMIDT:  Objection.
3        THE WITNESS:  I don't know.  I
4  don't know.  And I'm not sure
5  actually.  I did not look into that
6  come part, which lots it's coming
7  from.  But only thing I looked at the
8  realtime data, and I didn't look at
9  where is that coming from.
10  BY MR. MACORETTA:
11        Q.    So you don't know where the
12  other -- where the 23 to 27 and the 2 to 8
13  following reconstitution is coming from?
14        A.    Correct, I don't know.
15        Q.    Then how do you know it's
16  double counting the 4.39?
17        MS. SCHMIDT:  Objection.
18        THE WITNESS:  I know that
19  you're realtime log loss is 4.3.  That
20  I know based on this particular memo
21  which is right here.  So that I know
22  and all those numbers, where it is
23  coming from, I don't know.  There is
24  some kind of study or something else

Page 267

1        it is coming from, I don't know.
2  BY MR. MACORETTA:
3        Q.    Then how do you know they're
4  double counted?  How do you know it's not in
5  addition to the 4.39?
6        MS. SCHMIDT:  Objection.
7        THE WITNESS:  It is.  I mean,
8  looking at this table, this is like a
9  storage 2 to 8, 24 months, it's very
10  clear in this table that it is
11  realtime data.
12  BY MR. MACORETTA:
13        Q.    Okay.
14        A.    I cannot tell just from this
15  table where those numbers are coming from.
16  But I know that in addition to realtime data,
17  you're adding those numbers looking at this
18  table.
19        Q.    How do you know that?
20        A.    I can see in this formula right
21  here.
22        Q.    Where does it say -- I just
23  don't understand.  I mean, all it says here
24  is the data comes from 34 lots.  Where does

Page 268

1  it say that some data comes from 34 lots and
2  some data comes from somewhere else?
3        A.    It doesn't say that.  And I
4  don't know.  That's what I'm saying.  I don't
5  know.  Only thing I can say here, that
6  storage at 2 to 8 and log loss of .397 and
7  24 months, I get that information from this
8  memo that the breakdown of lot is presented.
9  And that's all I know that it is coming from,
10  like, realtime data from 24 months from these
11  lots when you take into consideration these
12  lots.  Other, I don't know where it is
13  coming -- where those numbers, probably
14  they're coming from some kind of study design
15  or something else.  But it's not -- I'm not
16  sure it is coming from realtime data.  From
17  the same lot.
18        Q.    You don't know where it come --
19        A.    Yes, I don't know if it is
20  coming from the same lot.
21        Q.    Okay.  You called this model
22  conservative, but conservative is good,
23  right, we want to be conservative?
24        A.    Conservative is good because

Page 269

1  you get a lot of --
2        MS. SCHMIDT:  Objection.
3        THE WITNESS:  Unless, I mean,
4  you -- I want to explain this, like,
5  how the process works.  So I'm making
6  a change.  I'm just going to take this
7  out and I want to explain my thought
8  process.  So I'm making a change to my
9  process.  I'm changing my raw material
10  to -- X to Y.  I'm going to -- I'm
11  doing this studies, like small level
12  studies where I make, like, 3 to 5
13  lots with the different raw material.
14  Because I'm making the small scale
15  lot, I'm not going -- my lot is not
16  going through the same manufacturing
17  condition where you spend a lot of,
18  like you don't have the same number of
19  vials so you don't spend that much
20  time sealing, packaging and all that
21  stuff, right.  So now when I'm going
22  to make a prediction for this
23  particular lot, this particular
24  process, I'm going to add additional

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 270

1 packaging and sealing log loss time
2 and other log loss time which will
3 come into play once you go into
4 manufacturing. So I'm adding all that
5 stuff here because I don't really have
6 all that information like that. And I
7 mean, I don't know where it is coming
8 from, so I'm going to say I don't
9 know, but most of the time this comes
10 from some kind of study, some kind of
11 separate study.
12 BY MR. MACORETTA:
13    Q.    Some kind of separate study of
14 the same product?
15    A.    Same product, same product.
16 Yeah. And it could be different scale and
17 all.
18    Q.    This is the analysis used to --
19 or this Model 3 is what Merck used to gain
20 approval for rHA. Right?
21       MS. SCHMIDT: Objection.
22       THE WITNESS: This model was
23    submitted as a comprehensive
24    statistical release model which Merck

Page 271

1    submitted to get approval for allergy.
2 BY MR. MACORETTA:
3    Q.    So is a comprehensive
4 statistical release model more reliable than,
5 say, Model 2?
6       MS. SCHMIDT: Objection.
7       THE WITNESS: So, again, I
8    won't compare this one with the
9    Model 2. I would compare it --
10    because the objective of Model 2 is
11    different than objective this model.
12    This model is used to determine the
13    minimum release potency as you can see
14    in the supplement and as you can see
15    in the formula right here. So
16    objective here is to determine what
17    would be the -- once you change the
18    raw material, what would be the --
19    what should be the -- because you want
20    to keep expiry at 4.3, you want to see
21    what is the minimum release potency.
22    So you -- it's -- the objective here
23    is to determine the minimum release
24    potency, the same as Model 1. This is

Page 272

1    like adding few more extra variability
2    into the models, a few more loss, a
3    few more potential losses.
4 BY MR. MACORETTA:
5    Q.    And so just so I understand,
6 I'm going back to Model 2 and the .703
7 potency loss. All right. I mean, you can
8 look at it if you want. But that model says
9 that the potency loss -- the shelf life loss
10 is .703, right, Model 2 --
11    A.    Yes.
12    Q.    -- based on whatever data
13 Mr. Bennett used.
14       MS. SCHMIDT: You're reading
15    from the first part of the page.
16 BY MR. MACORETTA:
17    Q.    Right?
18    A.    Yes.
19    Q.    Well, both parts of the page
20 he's using the .7 as the potency loss. Right?
21    A.    Based on lots manufactured from
22 '95 to '98.
23    Q.    Yes. Okay. So what Mr. Bennett
24 is calling potency loss in Model 2, is that

Page 273

1 just the storage at 2.8 in Model 3 or is that
2 all of the factors in Model 3?
3       MS. SCHMIDT: Objection.
4       THE WITNESS: It's just the
5    storage.
6 BY MR. MACORETTA:
7    Q.    So in Model 2 there would be
8 some amount of additional loss because of
9 reconstitution and sealing, inspection and
10 packaging?
11       MS. SCHMIDT: Objection.
12       THE WITNESS: I won't put it
13    that way. So this one is your
14    realtime data. And that one is for
15    when you're making a change and you
16    are trying to predict something, when
17    you're making a change in raw material
18    and you're trying to predict
19    something. So, I mean, those are two
20    different things. It's not like for
21    like because --
22 BY MR. MACORETTA:
23    Q.    Where is the -- there's no
24 question, right, that in 2001 a vial of mumps

69 (Pages 270 - 273)

Appx19619

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 274

1 vaccine was going to have some loss for
2 storage of 23 to 27 and some loss after
3 reconstitution. Right?
4     MS. SCHMIDT: Objection.
5     THE WITNESS: But this data is
6     based on the commercial lots, right.
7 BY MR. MACORETTA:
8     Q.   I understand. I understand.
9 I'm just trying to understand. Can we agree
10 that there will be some loss after
11 reconstitution and some loss during sealing,
12 inspecting and packaging in 2001?
13     A.   Yes.
14     MS. SCHMIDT: Objection.
15 BY MR. MACORETTA:
16     Q.   And is that loss captured
17 anywhere in Model 2?
18     A.   It's captured in Model 1 and
19 Model 2 in the average log loss.
20     Q.   So the .7 in Model 2 includes
21 the 2 to 8 plus the sealing, inspection, plus
22 the reconstitution. Right?
23     MS. SCHMIDT: Objection.
24     THE WITNESS: Yes.

Page 275

1 BY MR. MACORETTA:
2     Q.   Okay. Thank you.
3     MS. SCHMIDT: We've been going
4     more than an hour at this point. Is
5     it --
6     MR. MACORETTA: Yeah, we can
7     take a break. This is a fine time.
8     VIDEOGRAPHER: The time is
9     14:41. We are off the video record.
10     This ends media four.
11         - - -
12     (A recess was taken.)
13         - - -
14     VIDEOGRAPHER: The time is now
15     15:16. This begins media five. We
16     are back on the video record.
17 BY MR. MACORETTA:
18     Q.   All right. Dr. Gulati, we're
19 back on the record.
20     First question, were you able
21 to identify whatever list of lots you looked
22 at before?
23     A.   Okay.
24     Q.   Were you able to do that over

Page 276

1 the break? We talked about there's 34 lots
2 and you recollected having some list of when
3 they were made that you couldn't identify
4 before. Were you able to identify it now?
5     A.   We didn't have access to that
6 information.
7     MS. SCHMIDT: Yes, we talked on
8     the break to talk about where she
9     recalls seeing that document.
10 BY MR. MACORETTA:
11     Q.   So where do you recall seeing
12 that document?
13     A.   We saw this list of lots when
14 we were looking at Dr. Stark's supplement and
15 the report.
16     Q.   So you looked at -- that was
17 after your report. Right?
18     A.   Yes, that is correct.
19     Q.   Okay. Okay. Looking at
20 Exhibit 12, which is the rHA supplemental
21 application that we were looking at before,
22 the page we were on. You're right there.
23     MS. SCHMIDT: No, no.
24 BY MR. MACORETTA:

Page 277

1     Q.   Is that your report?
2     MS. SCHMIDT: This is her
3     report.
4     MS. DYKSTRA: Which one?
5     MR. MACORETTA: I'm looking at
6     Exhibit 12. Actually we can do it
7     from your -- yeah, let's do it from
8     Exhibit 12. The page we were on
9     before.
10     MS. SCHMIDT: So page 123?
11 BY MR. MACORETTA:
12     Q.   Yes. It says, the text above
13 the chart, the second line says, ...needed to
14 ensure, with 95 percent probability, that the
15 minimum expiry potency of 4.3.... Do you see
16 that?
17     A.   Yes.
18     MS. SCHMIDT: Do you see it?
19     THE WITNESS: It's right here,
20     yeah.
21 BY MR. MACORETTA:
22     Q.   The idea here -- you called
23 this before a worst case analysis. Right?
24     MS. SCHMIDT: Objection.

70 (Pages 274 - 277)

Appx19620

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 278

1     THE WITNESS: No, I didn't call
2   this worst case analysis.
3   BY MR. MACORETTA:
4     Q.   Okay. I'm sorry. So the idea
5   here is not to predict an average, but to
6   estimate that all or at least 95 percent of
7   the lots would be above minimum potency at
8   expiry. Right?
9     MS. SCHMIDT: Objection.
10     THE WITNESS: This is to
11   determine the minimum release potency
12   because your expiry potency is pretty
13   much 4.3 and then determine the
14   minimum release potency.
15   BY MR. MACORETTA:
16     Q.   So what does 95 percent
17   probability mean there?
18     A.   So, again, I'm not a
19   statistician, but 90 -- in general terms
20   95 percent probability, you can have 95
21   percent confidence. With 95 percent
22   confidence you can say that it is going to be
23   meeting the expiry potential 4.3.
24     Q.   That every lot will meet that

Page 279

1   expiry potential. Right?
2     A.   Yes, it applies to every lot.
3     Q.   This Exhibit 12 is dated, if
4   you look at the front, July 13th, and it's a
5   supplement or it's an amendment to the sBLA.
6   Right?
7     A.   Yes, I see it's amendment to
8   sBLA.
9     MR. MACORETTA: I'm going to
10   hand -- what we're going to mark as
11   Exhibit 13 -- or did we do that?
12   Exhibit 14, is pages from the original
13   sBLA.
14     - - -
15     (Exhibit Gulati-14, Supplemental
16   Biologics License Application, 00137854,
17   00137855, 00138585, 00138586 & 00138707,
18   was marked for identification.)
19     - - -
20   BY MR. MACORETTA:
21     Q.   Take a look at that. To avoid
22   providing everybody with too much paper, I
23   have not produced the first 123 pages,
24   122 pages of the sBLA. This is the --

Page 280

1   Exhibit 14 is the cover letter, the table of
2   contents and the page I want to talk about.
3   All right. Do you see that?
4     A.   Yes, I see that.
5     Q.   So the original sBLA is
6   June 30, 2004. Right? That's what it says
7   on the first page.
8     A.   Yes, it is.
9     Q.   And if we look at the --
10     MS. SCHMIDT: Objection.
11   BY MR. MACORETTA:
12     Q.   If we compare the chart in the
13   original to the chart in the amendment --
14     MS. SCHMIDT: I'm sorry, I'm
15   just going to object. I understand
16   the reason for being efficient with
17   the pages, but you can answer
18   questions from these few pages to the
19   extent you can. If you can do it with
20   just these pages from the June 2004
21   submission that's excerpted here, you
22   can. But so I understand, you're
23   asking her to look at the those
24   charts?

Page 281

1   BY MR. MACORETTA:
2     Q.   I want to compare the two
3   charts. If we look at the chart from the
4   original, the loss at 2 to 8 degrees is
5   .54338 for 24 months. Do you see that?
6     A.   Yes, I see that.
7     Q.   Then if we go to the amendment,
8   the loss is .4397 per 24 months. Right?
9     A.   Yes, I see that.
10     Q.   So what changed in the year
11   between these two? Do you know what changed
12   to cause the loss to go down between the
13   original and the supplement?
14     MS. SCHMIDT: Object to form.
15     THE WITNESS: I mean, I don't
16   know which data went into this
17   calculation. This one I have some
18   information which data went into that
19   calculation. So, I mean, I won't
20   be -- I don't know. That's the
21   answer.
22   BY MR. MACORETTA:
23     Q.   Did you invest -- did you try
24   to investigate what data went into it or why

71 (Pages 278 - 281)

Appx19621

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 282

1  this number changed in a year?
2          MS. SCHMIDT: Objection to form.
3          THE WITNESS: I was just trying
4  to understand how the different models
5  were developed. So my objective was
6  to look at the comprehensive statistical
7  models. So I didn't investigate into
8  how these numbers did change and why
9  and what data went into that.
10 BY MR. MACORETTA:
11     Q.   Well, these are the same
12 models, right, in the amendment -- in the
13 original and the amendment, it's just that
14 the data has changed. Right?
15         MS. SCHMIDT: Objection.
16         THE WITNESS: Yes, I
17 understand. Yes, I understand that
18 these are -- this is the looking at --
19 it's the same formula, it's just the
20 data is different.
21 BY MR. MACORETTA:
22     Q.   The other difference is in the
23 original there is a negative storage loss at
24 minus 20. Right? Which was taken to zero in

Page 283

1  the amendment. Right?
2      A.   Yes, I see that.
3      Q.   And it's not possible to
4  actually gain product at minus 20 degrees.
5  Right?
6          MS. SCHMIDT: Objection.
7  BY MR. MACORETTA:
8      Q.   Or is it?
9      A.   It's the variability of the
10 assay. I mean, it's the variability of the
11 calculation, I mean assay. That's what gives
12 you that number zero.
13     Q.   It's not that there's actually
14 more mumps virus in the product?
15         MS. SCHMIDT: Objection.
16         THE WITNESS: Yes. There is
17 not -- yes.
18 BY MR. MACORETTA:
19     Q.   So do you know what caused
20 Merck to re-run whatever calculations it did
21 and create the amendment?
22         MS. SCHMIDT: Objection to
23 form.
24         THE WITNESS: Honestly I really

Page 284

1  don't know. Probably there was some
2  kind of request, additional request
3  made and there was some changes, but
4  honestly I don't know.
5  BY MR. MACORETTA:
6      Q.   Okay. And since you thought
7  the formula in the amendment was right, I
8  presume that you think the formula in the
9  supplement is the conservative formula as
10 well. Right?
11         MS. SCHMIDT: Objection.
12 Answer to the extent you can with the
13 time you've had with this.
14         THE WITNESS: The formula is
15 the same in both supplements. I call
16 it a conservative model because there
17 were additional parameters added. And
18 I understand why it is added, because
19 this model is a comprehensive
20 statistical release model which Merck
21 is planning to use moving forward for
22 all the changes. I mean, it's a
23 long-term model. And intent here is
24 to have a very conservative model

Page 285

1  which can be applied consistently
2  moving forward. So that's why I call
3  it conservative model, because there
4  are other things added to provide
5  whatever cushioning is needed and
6  whatever variability needs to be
7  added. So, I mean, that's --
8  BY MR. MACORETTA:
9      Q.   But you don't know what data
10 went into the original calculation that got
11 the higher loss. Right?
12         MS. SCHMIDT: Objection.
13         THE WITNESS: The first -- I
14 don't know.
15 BY MR. MACORETTA:
16     Q.   And the original loss -- the
17 original calculation shows -- is based on --
18 shows a minimum expiry of 4.1. Right?
19     A.   It does show that. I can see
20 that in the supplement. But I don't know
21 what's the basis of that.
22     Q.   Well, whatever it was, it's
23 what Merck told the FDA in the original
24 supplement. Right?

72 (Pages 282 - 285)

Appx19622

Case: 23-2553    Document: 58-12    Page: 222    Date Filed: 12/06/2023
Case: 23-2553    Document: 50-12    Page: 222    Date Filed: 12/06/2023

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 286

1    A.    Yes.
2          MS. SCHMIDT:  Objection.
3          THE WITNESS:  So whatever -- I
4    don't know what's the basis, what kind
5    of communication were held between
6    CBER and Merck to use 1. -- 4.1 as
7    minimum expiry.  I don't know the
8    background, the whole background of
9    this.
10   BY MR. MACORETTA:
11         Q.    So when Merck does the
12   conservative model using at least some
13   overfill data in the BLA supplement and it
14   shows an expiry of 4.1, shouldn't that have
15   caused concern in Merck that product labeled
16   at 4.3 wasn't going to meet its expiry?
17         MS. SCHMIDT:  Objection.
18   Objection to the basis of that
19   question.
20         THE WITNESS:  So are you asking
21   me that June 2004 supplement, why it
22   is 4.1?  I mean --
23   BY MR. MACORETTA:
24         Q.    No, the June model Merck

Page 287

1    submitted shows an expiry of 4.1.  Right?
2          A.    The supplement does show expiry
3    of -- minimum expiry of 4.1.
4          Q.    Okay.  In June 2004 the label
5    still said 4.3.  Right?
6          MS. SCHMIDT:  Objection.
7          THE WITNESS:  Looking at the
8          stability, annual stability report,
9          that's my understanding that expiry
10         specification was 4.3 in June 2004.
11   BY MR. MACORETTA:
12         Q.    Okay.  So now in June 2004,
13   Merck submits to the FDA a model that says
14   expiry at 4.1.  Should that have caused
15   concern within Merck that it was out of
16   compliance with the label?
17         MS. SCHMIDT:  Objection.  Are
18   you asking her to speculate?  Does she
19   know?
20   BY MR. MACORETTA:
21         Q.    You can answer the question.
22         A.    I don't have all the information
23   to know where it is coming from and what is
24   the background behind it, what were the prior

Page 288

1    discussions.  So, I mean, I can't comment on
2    this.
3          Q.    Well, did you see anything
4    where -- did you see any discussion about it
5    with the FDA or Merck?
6          A.    Not that I remember.
7          Q.    I mean, here's a model that's
8    good enough to give to the FDA that says 4.1.
9    Shouldn't that have been reliable for Merck
10   to consider internally whether it's meeting
11   the label specification of 4.3?
12         MS. SCHMIDT:  Objection to form.
13         THE WITNESS:  I mean, I can't
14         comment on this.  I don't know why it
15         is 4.1, because based on all the
16         communication I read in 2004, minimum
17         expiry was 4.3.  So I don't know what
18         is the basis behind this.
19   BY MR. MACORETTA:
20         Q.    Well, I understand you don't
21   know the basis, but it's what they submitted.
22   Right?
23         MS. SCHMIDT:  Objection.
24         THE WITNESS:  This is what I

Page 289

1          see here.
2    BY MR. MACORETTA:
3          Q.    So if you had a client who did
4    this, who submitted a model to the FDA that
5    predicted an end expiry lower than the label,
6    would you advise them to take further steps
7    to investigate that or to change the label?
8          MS. SCHMIDT:  Objection.
9          THE WITNESS:  I mean, it's
10         not -- if you have approved
11         specification of 4.3 in expiry, why
12         would you even submit a supplement
13         with 4.1.  And that's why I'm assuming
14         there is some kind of background
15         discussion, that's why it was
16         submitted.  I don't know what's the
17         discussion behind it, what's the
18         background behind it.  Because this I
19         know that in 2004 the approved label
20         claim or end expiry specification was
21         4.3.
22   BY MR. MACORETTA:
23         Q.    So I'm going to ask you the
24   same questions I asked before.  In 2004, did

73 (Pages 286 - 289)

Appx19623

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 290

1  you see any other Merck estimate of end
2  expiry other than what's in here that
3  suggests a higher number than 4.1?
4       MS. SCHMIDT:  Objection.
5       THE WITNESS:  I don't
6    understand what are you asking
7    because, I mean, there was no change
8    in the end expiry specification which
9    is approved by CBER.  So as far as I
10   under -- whatever I have seen, the
11   documents I have seen, the end expiry
12   specification in 2004 is 4.3.
13  BY MR. MACORETTA:
14      Q.   I understand.  I agree that the
15  end expiry specification is 4.3 in 2004.  I'm
16  asking -- I'm saying that Merck now generates
17  a model that says it's not meeting that end
18  expiry specification.  Shouldn't Merck have
19  taken some action?
20      MS. SCHMIDT:  Objection.  I
21    think that's been asked and answered,
22    and I think she has already said that
23    she didn't look at this.
24      THE WITNESS:  I don't know

Page 291

1    what's the basis behind it.  So
2    it's -- I mean, I don't know what to
3    say because I know that at that time
4    approved end expiry was 4.3.  Why 4.1
5    is used as minimum expiry, I'm sure
6    there was discussion, that's why
7    supplement is submitted.  But I don't
8    know, I didn't read all the
9    communications which went before this
10   submission.
11  BY MR. MACORETTA:
12      Q.   Hypothetically if a company
13  generates a model that gives to the FDA that
14  shows the end expiry is less than the label,
15  should the company be concerned about that
16  and look into taking some action?
17      MS. SCHMIDT:  Objection.
18    Vague.  Incomplete hypothetical.
19      THE WITNESS:  This is like --
20    this is like -- to me it looks like
21    that -- I mean, unless you have
22    approval of end expiry of 4.1, you
23    would not put that in a supplement.
24    So what went behind putting that

Page 292

1    number at minimum expiry, I mean,
2    there -- as far as whatever documents
3    I have seen, I didn't see any approval
4    from CBER for that.  So I don't know
5    what's the rationale behind putting
6    this here.  I mean -- and I know it is
7    not approved so it's there in
8    supplement.  And why it was put in
9    that supplement, I don't know.
10  BY MR. MACORETTA:
11      Q.   I understand you don't know why
12  it was in the supplement, but the fact that
13  it was in the supplement, I'm asking you
14  shouldn't Merck have taken action once it
15  developed the model, a reliable model that
16  showed end expiry less than the label?
17      MS. SCHMIDT:  Objection.
18    Assumes facts not in evidence.  I
19    don't know that she said Merck didn't
20    take any action.  What she said is she
21    doesn't -- she didn't look at this
22    model.
23      THE WITNESS:  I don't know why
24    it is there.  I mean, I would ask that

Page 293

1    question, too.  When I see supplement
2    like that, I would ask why it is that
3    was the rationale behind it when there
4    is approved specification is 4.3.  So
5    that's what I would ask that question.
6    But I don't know why it is there and
7    what kind of discussion went behind,
8    because, I mean, I don't know really
9    looking at this.
10  BY MR. MACORETTA:
11      Q.   Shouldn't that have been part
12  of your analysis of Merck's stability
13  modeling, to ask why they had -- they gave
14  the model to the FDA that was less than the
15  approved label specification?
16      MS. SCHMIDT:  Objection.
17      THE WITNESS:  This is not
18    approved supplement.  So, I mean, this
19    doesn't -- I mean, this is approved
20    supplement.  The value of 4.2 was
21    used, so...
22  BY MR. MACORETTA:
23      Q.   Wait a minute.  In June 2004,
24  Merck told the FDA it thought the expiry was

74 (Pages 290 - 293)

Appx19624

Page 294

1  4.1.  Right?
2         MS. SCHMIDT:  Objection.
3  Mischaracterizes the document.
4         THE WITNESS:  I mean, I don't
5  know why would it be like that.  I
6  just don't have all the information
7  why it is like that.
8  BY MR. MACORETTA:
9     Q.    And once -- I'm not asking you
10 why it was like that.  I'm asking which --
11 but once it happened, shouldn't that have
12 triggered concern into Merck that they're
13 telling the FDA the expiry specification is
14 lower than the label?
15        MS. SCHMIDT:  Objection.
16        THE WITNESS:  I mean, Merck
17 submitted that supplement.  Right?
18 This is whose supplement.  This is
19 Merck's supplement.
20 BY MR. MACORETTA:
21    Q.    Yes.  A year later.
22    A.    They put this value in there.
23 I don't know why they -- I mean, why did they
24 put that value in there.

Page 295

1     Q.    Which value are you talking
2  about?
3     A.    4.1.
4     Q.    You don't know.  And I understand
5  you don't.  Earlier when we talked about
6  Model 2 and the fact that it showed 4.1, your
7  position was that model is not reliable for a
8  whole bunch of reasons.  Merck was okay not
9  telling the FDA about it.  Right?  That's a
10 fair summary of your position?
11        MS. SCHMIDT:  Objection.
12        THE WITNESS:  Because my
13 position was that realtime data which
14 was available at that time, which was
15 about 18 months of realtime data, was
16 not supporting that model.  And that
17 model was applicable because it was
18 not based on the right data set with
19 the overfill lot.
20 BY MR. MACORETTA:
21    Q.    Now we got a model in 2004 that
22 has realtime data that shows 4.1, and the
23 question is why didn't Merck take action
24 based on that?

Page 296

1         MS. SCHMIDT:  Objection.
2         THE WITNESS:  Is 4.1 realtime
3  data?
4         MS. SCHMIDT:  I'm sorry, you
5  have to wait.  Objection.  Foundation.
6  She doesn't -- she didn't use the
7  document.  She hasn't looked at it
8  before.  We're a dozen questions in on
9  a document that she's seeing an
10 excerpt of for the first time today.
11 BY MR. MACORETTA:
12    Q.    Why didn't you use this
13 document?  It was available to you, wasn't
14 it?
15        MS. DYKSTRA:  Which document
16 are you referring to?
17        MR. MACORETTA:  The document --
18        MS. DYKSTRA:  The supplement or
19 amendment?
20        MR. MACORETTA:  No.  The June
21 2004 -- yes, it's confusing when the
22 first one is the supplement.  But,
23 yes, the supplement.  The supplement,
24 yes.

Page 297

1  BY MR. MACORETTA:
2     Q.    Why didn't you consider the
3  June 2004 supplement?
4         MS. DYKSTRA:  In what context?
5         MR. MACORETTA:  In any context.
6  In analyzing whether or not Merck did
7  the right thing when they submitted a
8  stability analysis to the FDA that was
9  below the label claim.
10        MS. SCHMIDT:  Objection.  That
11 mischaracterizes her opinion and her
12 testimony.
13        MS. DYKSTRA:  And the document.
14 BY MR. MACORETTA:
15    Q.    You can answer.
16        MS. SCHMIDT:  Do you remember
17 the question?  Do you remember the
18 question?
19        THE WITNESS:  So could you,
20 please, repeat the question?
21 BY MR. MACORETTA:
22    Q.    Sure.  Why did you not consider
23 this document in your analysis?
24        MS. DYKSTRA:  Which document?

75 (Pages 294 - 297)

Appx19625

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 298

1    Please be specific.
2        MR. MACORETTA:  I'm sorry.
3    Gulati-14, the June 2004 supplement
4    for rHA.
5        MS. DYKSTRA:  In which part of
6    her analysis?
7    BY MR. MACORETTA:
8        Q.    In any part of your analysis.
9        A.    I mean, if you look at my
10   report, I'm just talking about what models
11   were built over the period of time and what
12   data was included, for example, the realtime
13   data.  There is like a storage loss rate and
14   other things.  I did provide an opinion on
15   different models, how -- further objective
16   and how they were applicable.  So, I mean,
17   this -- I don't know where is this coming
18   from.  I just don't have any background, I
19   have not looked at any supporting documents
20   where it is coming from.
21       Q.    Well, this is -- Gulati-14 is a
22   different stability model, right, it's not
23   Model 2 and it's not Model 3?  Correct?
24       MS. SCHMIDT:  Objection.

Page 299

1    Foundation.
2    BY MR. MACORETTA:
3        Q.    You can answer that.
4        A.    So there is a model in 2000 --
5    June 2004 supplement and July 2005
6    supplement.  They are the same model.  I
7    mean, I form my opinion about the different
8    model developed based on looking at 2005
9    supplement because this was approved
10   supplement.  This was one of the supplements
11   which was submitted and --
12       Q.    It's a separate model that
13   existed.  Your Model 3 is the June 2005
14   document.  Right?
15       A.    Yes.  And model is still the
16   same, it's just the values are different.
17   Model is still the same in both.
18       Q.    I agree.  And you like the
19   formula in Model 3.  Right?  You think that's
20   an appropriate formula to use.  Right?
21       MS. SCHMIDT:  Objection.
22   BY MR. MACORETTA:
23       Q.    You can answer that.
24       A.    What I'm saying in my report is

Page 300

1    that Model 3 is a model which was built --
2    which is a comprehensive statistical release
3    model which Merck built in 2005 to be used in
4    future in moving forward to determine the
5    minimum release potency.  Because your expiry
6    is fixed.  So any time you make change any or
7    more data, you might have some of the
8    information which might indicate that your
9    minimum release potency has to be lower or
10   higher or something like that.
11       So this is a model.  I'm just
12   talking about this was the model which was
13   built which included different parameters,
14   for example, storage log loss at 2 to 8 minus
15   20 during recon study and sealing,
16   inspection, packaging.
17       Q.    I understand it was a model
18   that was built, but it was a version of a
19   model that was built a year earlier, right,
20   at least?  Right?
21       MS. SCHMIDT:  Objection.
22       MR. MACORETTA:  You know what,
23   we'll do it this way:  Let me show you
24   what we're going to mark as Gulati-15.

Page 301

1    We'll do them both -- we'll do them
2    one at a time.
3        - - -
4        (Exhibit Gulati-15, 3/29/04
5    Internal Merck stability calculation,
6    00722649 & 00722650, was marked for
7    identification.)
8        - - -
9    BY MR. MACORETTA:
10       Q.    Let me show you what we've --
11   did you consider Gulati-15 at all in your
12   analysis?
13       A.    There were so many ongoing
14   communication, I considered the final 2005
15   analysis as a final analysis because there
16   was a lot of back and forth between CBER and
17   Merck.  So this was submitted, not approved.
18   Finally this was submitted and approved.  So
19   I did go by the July 2005 model.
20       Q.    Did you consider at all
21   Gulati-15, this March 29, 2004, internal
22   Merck stability calculation?
23       A.    I looked at it.
24       Q.    Okay.  And this document --

76 (Pages 298 - 301)

Appx19626

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 302

1  well, by March of 2004 there would have been
2  at least some realtime data for the
3  overfilled lots.  Right?
4      MS. SCHMIDT:  Objection.
5      THE WITNESS:  By March 2004,
6      yes, I'm sure -- yes, there was a
7      stability data available for overfill
8      lots.
9  BY MR. MACORETTA:
10     Q.   This is a model, this is a
11  stability model that Merck was using.  Right?
12     MS. SCHMIDT:  Objection.
13  BY MR. MACORETTA:
14     Q.   Let me put it this way:  Why
15  didn't you discuss at all this model in
16  Gulati-15?
17     A.   Are you asking me that why
18  didn't I discuss this model in my report?
19     Q.   Yes, I am.
20     A.   In my opinion this model and
21  the one I discussed in my report is the same
22  because it is using the same formula and it
23  is using the same parameters to calculate the
24  minimum release potency.  Minimum -- I mean,

Page 303

1  there was -- there is this supplement where
2  minimum release and -- I mean, I don't know,
3  but probably it's proposed, this is some kind
4  of proposal which was developed and submitted
5  in this supplement.  It was not approved.
6  But, I mean, when I'm talking about the
7  model, I'm talking about the parameters which
8  are included in calculating the release,
9  minimum release potency.  So that's what I'm
10  talking about.
11     So now there is a supplement
12  which uses the same basic fundamental model
13  and uses the same parameter.  But -- and then
14  there is another supplement where there's a
15  proposal for minimum expiry, different
16  minimum expiry.  And it was submitted, not
17  approved.  I mean, how -- I mean, it doesn't
18  affect the model which I am -- I'm trying to
19  explain here that this is the model which is
20  built for future use going forward and that's
21  why it was more conservative so that it can
22  be used for any kind of changes you're making
23  to the product.  And you can use the same
24  standard model every time you submit a change

Page 304

1  supplement or whether you've done studies,
2  small scale, large scale.  You can still --
3  this is like a more universal model.  That's
4  what I'm trying to say here, that this is --
5  I mean, there's a Model 1 which was developed
6  to set up the specification one time.
7  Model 2 is worst case model which was
8  developed to answer certain questions.  And
9  then when Merck had, like, in 2005 or 2004
10  some data, enough data from the overfill lot,
11  Merck developed a comprehensive model which
12  can be used going forward for everything.
13  It's a generic and overall model.  It's very
14  conservative whether you make lots at small
15  scale, large scale, 3, 2, 5.  Because it has
16  a lot of variability built into that, you can
17  keep using it without making a model every
18  time you have to make a change.  So it can be
19  used going forward.  You don't have to do
20  modeling every time something is requested.
21     Q.   So in March -- as I'm looking
22  at Gulati-15, in March 2004 when Phil Bennett
23  issues this very conservative model after
24  realtime overfill data is available, did you

Page 305

1  see any evidence that anyone at Merck
2  expressed any concern that this model shows
3  end of shelf life below the labeled claim?
4      MS. SCHMIDT:  Objection.
5      THE WITNESS:  I think Merck
6      knew what is the end of shelf life
7      was, approved end of shelf life was.
8      But, I mean, the number they plugged
9      in is 4.1.  I mean, I don't know --
10     like I said before, I don't know
11     what's the basis behind that and what
12     is the rationale behind that.  I mean,
13     just because it's not the approved
14     specification.  I'm assuming there was
15     a proposal submitted, it was part of
16     the proposal or something like that.
17  BY MR. MACORETTA:
18     Q.   So absent some proposal or
19  discussion with FDA, this model should have
20  triggered concern at Merck.  Right?
21     MS. SCHMIDT:  Objection.
22     Vague.
23  BY MR. MACORETTA:
24     Q.   You can answer.

77 (Pages 302 - 305)

Appx19627

Page 306

1    MS. SCHMIDT: I'm worried she's
2    speculating about these documents.
3        THE WITNESS: Yes. Because, I
4    mean, I don't know really, that's why
5    -- I don't know why it is 4.1, what's
6    the background behind that.
7    BY MR. MACORETTA:
8        Q.    You haven't seen any proposal
9    or discussion with FDA about the model in
10   Gulati-15 before the supplement is filed.
11   Right?
12       MS. SCHMIDT: Objection.
13       THE WITNESS: Where there
14       was communication, I have seen. I
15       don't know where that number is coming
16       from. I mean, where's the study,
17       where's the design, why this number is
18       4.1 here. I don't know.
19   BY MR. MACORETTA:
20       Q.    But you think -- and I'm asking
21   you, absent some discussion, shouldn't this
22   have triggered a concern within Merck that
23   this model shows an expiry lower than the
24   shelf life?

Page 307

1        MS. SCHMIDT: Objection.
2        THE WITNESS: It is not this
3        model which is showing -- giving you
4        the number 4.1. You're getting this
5        from somewhere else and just plugging
6        into this model to calculate. So this
7        model is not calculating that number.
8        You're plugging that number into this
9        model.
10   BY MR. MACORETTA:
11       Q.    Wait a minute. How are you
12   getting that? The inputs to this model are
13   the various losses during storage. Right?
14   At the bottom of page 2, minimum expiry plus
15   total loss plus variance equals minimum
16   release. Right?
17       MS. SCHMIDT: Objection.
18       Dr. Gulati, you can answer to the
19       extent you understand this document
20       and spent time studying it and how it
21       came together with the calculations.
22       THE WITNESS: So yes.
23   BY MR. MACORETTA:
24       Q.    So I don't understand how

Page 308

1    you're saying this model does not show an end
2    expiry of 4.1?
3        A.    Where does it -- I don't see it
4    here.
5        Q.    Well, this model is assuming a
6    minimum expiry of 4.1. Right?
7        A.    Yes. That's an assumption.
8    But I don't -- this calculation in this table
9    is about that total log loss. That's the
10   number which is coming out from this
11   analysis. Where is that coming from, what is
12   the source document for that, I don't know.
13       Q.    Well, let me ask you this.
14       MS. SCHMIDT: Objection.
15   BY MR. MACORETTA:
16       Q.    Let me ask you this: If we
17   change the minimum expiry to 4.3 in this
18   formula, the minimum release would have to be
19   5.2, wouldn't it?
20       MS. SCHMIDT: Objection.
21       THE WITNESS: I am little bit
22       of puzzled because I don't know where
23       that number is coming from, what's the
24       source document from that, what is the

Page 309

1        rationale behind that.
2    BY MR. MACORETTA:
3        Q.    Regardless of the source, if we
4    changed it to 4.3, the minimum release behind
5    the equal sign would have to be 5.2, wouldn't
6    it?
7        MS. SCHMIDT: I'm sorry. We're
8        in the same spot. She's just said she
9        can't answer or that she's puzzled,
10       she doesn't know where this is coming
11       from. And you're asking the question
12       again. If she can answer it, she can
13       answer it. But it's the same question
14       that you just asked.
15   BY MR. MACORETTA:
16       Q.    Can you answer that question?
17       A.    No, because I'm just trying to
18   figure out where that number is coming from.
19   It's not calculated here.
20       Q.    You can't confirm that if we
21   add .2 to the minimum expiry, we're going to
22   have to add .2 to the minimum release at the
23   back end on this formula?
24       MS. SCHMIDT: Objection.

78 (Pages 306 - 309)

Appx19628

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 310

1      THE WITNESS:  I can do the
2  math.
3  BY MR. MACORETTA:
4      Q.    What's the answer when you do
5  the math?
6      A.    But I still -- I mean, I'm
7  still wondering why would you put this number
8  when your -- in 2004 your approved release
9  expiry is 4.2.
10     Q.    I don't know.  And regardless
11  of why he put it there, the answer to the
12  math is what I said, right, if you add .2 at
13  the beginning, you have to add .2 at the end?
14  Right?
15     MS. SCHMIDT:  Object to the
16  form.
17  BY MR. MACORETTA:
18     Q.    I think I'm waiting on an
19  answer for that question.
20     A.    If you're asking me how to do
21  the math, I mean, that's fine, I can do the
22  math.  But, I mean, I don't know where that
23  number is coming from and, I mean, I can't
24  comment on that if I don't know the source

Page 311

1  document.
2      MR. MACORETTA:  Let me show you
3  what we're going to mark as Gulati-16.
4          - - -
5      (Exhibit Gulati-16, 11/4/04
6  Memo, 00722667 & 00722668, was marked
7  for identification.)
8          - - -
9  BY MR. MACORETTA:
10     Q.    Have you seen this document
11  before?
12     A.    I've seen this memo.
13     Q.    Okay.  You didn't like the 4.1
14  on Gulati-15.  If we go to the back of
15  Gulati-16, that starts with a minimum expiry
16  of 4.3.  Right?
17     MS. DYKSTRA:  Objection.  Let's
18  not -- can you keep your commentary to
19  yourself?
20  BY MR. MACORETTA:
21     Q.    You can answer the question.
22     MS. SCHMIDT:  Objection.  I'm
23  sorry.  She's not answering that
24  question.  You didn't like.  That's

Page 312

1  not what she's testified to.
2  BY MR. MACORETTA:
3      Q.    Dr. Gulati, is the back of
4  Gulati-16 --
5      MS. DYKSTRA:  Excuse me.  Will
6  you, please, let her finish her
7  objection.
8      MR. MACORETTA:  I'll withdraw
9  the question.  I'll withdraw the
10  question.
11     MS. SCHMIDT:  Okay.  But let's
12  not do it by speaking over me.  I'm
13  sitting right here.  Got it?
14     MR. MACORETTA:  Are you done?
15     MS. SCHMIDT:  Are you?
16     MR. MACORETTA:  No, I've got a
17  lot of questions to ask.
18     MS. SCHMIDT:  Good, so let's
19  get to them.
20  BY MR. MACORETTA:
21     Q.    Dr. Gulati, the back of
22  Gulati-16 says a minimum expiry of 4.3.
23  Right?
24     MS. SCHMIDT:  I'm sorry, where

Page 313

1  are you?
2  BY MR. MACORETTA:
3      Q.    I'm on the back page, the
4  bottom of page 2 of 2 of Gulati-16 in the
5  little box.  Do you see it, Dr. Gulati?
6      A.    I see it.
7      Q.    Okay.  And there, using the
8  math in this document, says if you have a
9  minimum expiry of 4.3 and you assume the
10  losses at 35 hours out of refrigeration in
11  24 months, it gets to a minimum release of
12  5.1, doesn't it?
13     A.    Yes, that's what it says here.
14     Q.    At this time, the minimum
15  release spec was 5.0, wasn't it?
16     A.    Yes.  In 2004, this is 2004,
17  release spec was 5.0.
18     Q.    At this time the assumption was
19  40 hours time out of refrigeration, not 35.
20  Right?
21     MS. SCHMIDT:  Objection.
22     THE WITNESS:  So this
23  calculation shows 35 hours and
24  40 hours both.

79 (Pages 310 - 313)

Appx19629

Page 314

1  BY MR. MACORETTA:
2      Q.    That's right. But at 35 hours
3  out of release to meet the minimum expiry,
4  the minimum release potency would have to be
5  higher than it was at that time, wouldn't it?
6          MS. SCHMIDT: Objection.
7          THE WITNESS: So that's -- this
8      is what this data is showing in this
9      memo.
10  BY MR. MACORETTA:
11      Q.    Yes. So shouldn't the creation
12  of Gulati-16 have trigger concern at Merck
13  that this memo suggests that Merck cannot
14  meet the end expiry at the current minimum
15  release potency?
16          MS. SCHMIDT: Object to form.
17          THE WITNESS: I see what the
18      memo is saying, but I don't know what
19      kind of data went into 2 to 8 storage.
20      I mean, what kind of lots were there,
21      I mean, how was this calculated. It
22      doesn't say here, though.
23  BY MR. MACORETTA:
24      Q.    Well, it says at the front what

Page 315

1  it's trying to do, right, is to calculate the
2  required minimum release specification for an
3  expiry specification of 4.3. Right? That's
4  what the summary paragraph says. Right?
5          MS. SCHMIDT: Objection.
6          THE WITNESS: This memo shows
7      that he's trying to do some analysis
8      and taking some different parameters
9      and trying to calculate the minimum
10      release spec.
11  BY MR. MACORETTA:
12      Q.    Under all the parameters he
13  calculates the minimum release specification
14  he gets to was higher than the minimum
15  release specification in existence at the
16  time, isn't it?
17          MS. SCHMIDT: Objection.
18          THE WITNESS: He's trying to
19      develop -- I mean, Merck is trying to
20      develop -- at this point, Merck is
21      trying to develop model and trying to
22      include different parameter and trying
23      to do a different analysis. And I see
24      there's exploratory like a phase for

Page 316

1      all different type of models, I mean,
2      trying to -- it's like a process of
3      trying to finalize or come up with a
4      very reliable model. This is part of
5      the process. In 2004 there is some
6      analysis. 2005, again, there is
7      analysis. Another -- like there are
8      so many analyses, in each one of those
9      analyses.
10  BY MR. MACORETTA:
11      Q.    But this model in Gulati-16 is
12  after Merck submitted the supplement in June
13  of 2004. Right?
14          MS. SCHMIDT: Objection.
15          THE WITNESS: The supplement is
16      dated June 2004 and this memo is dated
17      November 2004.
18  BY MR. MACORETTA:
19      Q.    That's right. So whatever
20  Merck is trying to do -- by the way, you
21  don't know what Merck is trying to do. Have
22  you seen some document or something
23  indicating what Merck is trying to do here?
24      A.    No. I don't know what's

Page 317

1  subjective. I have seen the memo, but I
2  don't know what's the objective and why these
3  different numbers are from different places
4  are taken. I'm sure there is a lot of
5  background information and discussion which I
6  did not see.
7      Q.    So absent knowing anything in
8  that background, shouldn't this memo have
9  triggered concern at Merck that it wasn't
10  meeting the label specifications?
11          MS. SCHMIDT: Objection.
12          THE WITNESS: No. In my
13      opinion, no. It won't trigger a
14      concern because we are in the process
15      of building a model and we don't have
16      any model finalized and approved yet.
17      And we have this realtime stability
18      data which is all in the specification
19      which is not showing the concern which
20      are shown in these memos. It's not --
21      I mean, none of the stability data is
22      showing what these memos are saying
23      here.
24          I'm going to give you a few

80 (Pages 314 - 317)

Appx19630

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 318

1  examples.  For example, in this, one
2  of the memo you showed that end expiry
3  is 4.1.  If you look at the -- all the
4  realtime stability data, you're
5  staying well above 4.3.  I mean, all
6  of your lots which are put on
7  stability as a part of study are
8  annual stability, you are getting
9  results above 4.3.  There is no OOS.
10  The range log loss is .3 to .6.  So
11  that is one piece of the whole
12  analysis.  You did increase the titer.
13  You put the lots on stability.  And
14  your stability lots are written in
15  that specification, no OOS, 4.3 is
16  from the data.  Your data is
17  indicating that this is the right log
18  loss and these are the right
19  specification.  So that is one part of
20  the -- what is going on.
21      Another part, I mean, I see
22  that Merck is trying to do different
23  analyses and trying to build a
24  comprehensive statistical release

Page 319

1  model which can be used in future long
2  term.  I mean, it could be their
3  permanent model to determine the
4  minimum release potency.  So those are
5  two parallel efforts.  So, I mean this
6  data -- I mean, this -- I mean, this
7  will not raise a concern to me because
8  your realtime data is annual report,
9  annual stability report.  All realtime
10  data is passing the spec, there's no
11  issue there with the process with the
12  overfill lots.
13  BY MR. MACORETTA:
14      Q.    But the real --
15      A.    This is a process of setting
16  up -- defining what is the right model for
17  this particular product.  And in the process
18  you are going through so many scenarios and
19  you are making so many assumptions.  And
20  those are reflected in these memos and in
21  supplements.  But your realtime data is
22  passing the specification.  That's a key
23  point.  CBER does evaluate compliance based
24  on label compliance -- based on realtime

Page 320

1  data, not based on the prediction models.
2  Prediction models which Merck is trying to
3  build here, they're built for specific
4  purpose.  And it doesn't matter what your
5  prediction model says, your lot is not OOS
6  based on what precision model is saying.
7  Your lot is OOS based on realtime data, out
8  of specification based on realtime data, not
9  based on prediction model.
10      So, yes, this prediction model
11  is saying so many different things, but it
12  doesn't raise concern in my mind.  If I had
13  to look at -- if I am the one who is looking
14  at realtime data and I'm looking at all those
15  memos.  I mean, I don't give much weight to
16  this as a long as my realtime data is within
17  specification.
18      Q.    So can you point me to any
19  academic sources that say the realtime data
20  is much more important than the prediction
21  models?
22      A.    I can point you to, like, a lot
23  of guidances and regulation where for
24  biologics you base the compliance based on

Page 321

1  realtime data.  Also, if you look at the, I
2  think it's a warning letter, of the warning
3  letter when Merck got for this same issue, it
4  is very clearly written that you should be
5  basing product compliance based on realtime
6  data and meeting the specification, not on
7  the historical trend.  I mean, that is the
8  expectation from regulators.
9      Q.    Where does it say that other
10  than that warning letter?
11      A.    It says also in some of the
12  stability guidance I have looked at.  I see
13  guidelines.  And I don't know which specific
14  one, but it is in the ICH guideline that for
15  biologics you measure -- your stability
16  program is based on realtime data, not on the
17  prediction models.  For small molecules like,
18  for example, like, chemical drugs where your
19  stability pathway is very much predicted,
20  people generally use these models.  But,
21  again, in that -- even in the small case, in
22  the small molecule case, your model is to --
23  you treat your model based on realtime data.
24  I mean, generally these -- okay, I'm going to

81 (Pages 318 - 321)

Appx19631

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 322

1    stop.

2        Q.    I'm trying to understand.  You

3    don't cite any of those guidances as

4    something you've relied on in your report, do

5    you?

6        A.    I think I can check.

7            MS. SCHMIDT:  Objection.  That

8        mischaracterizes her report.  You can

9        look through your report for where you

10        discuss the ICH guidelines and other

11        regulations.

12    BY MR. MACORETTA:

13        Q.    Yes.  Please -- let me

14    re-characterize.

15            Can you, please, identify where

16    in your report you rely on any ICH guidelines?

17        A.    I think there's a section in my

18    report.

19            MS. SCHMIDT:  Why don't you

20        move everything else to the side for a

21        second.  I'm going to hand it to you.

22            THE WITNESS:  This 39.  Page 39.

23        This whole section page 39, CBER

24        evaluates compliance based on what is

Page 323

1        the realtime data, not based on

2        historical --

3    BY MR. MACORETTA:

4        Q.    I'm sorry, I see that headline.

5    What is the source that supports that claim?

6        A.    One of the sources like we have

7    here is the warning letter itself.  CBER did

8    request that you evaluate the product based

9    against the specification, not the historical

10    trends.  So that is one reference.

11        Q.    Okay.  That's one.  Any others?

12        A.    I don't see them referenced

13    here.

14            MS. SCHMIDT:  But you have your

15        full report in front of you so you can

16        take your time.

17            THE WITNESS:  ICH Q5C, if you

18        look at page number 9.  So, I mean,

19        ICH Q5C is applicable to biological

20        product.

21    BY MR. MACORETTA:

22        Q.    I'm sorry, where are you?

23        A.    Page number 9, section number

24    G.

Page 324

1        Q.    Okay.

2        A.    And if you see 30G I have a

3    reference of ICH Q5C.

4        Q.    And that's citing to an ICH

5    guidance.  Right?

6        A.    Yes.

7        Q.    ICH isn't CBER.  Right?

8        A.    ICH is International Community

9    of Harmonization.  FDA and European

10    regulatory authorities and Japanese

11    regulatory authorities are key members of the

12    ICH which -- who develops these guidelines.

13    And there are other countries which are also

14    part of it.  And there is another guidance

15    like WHO stability guidance.  It's in one of

16    my appendix.  It's in that one, too.  2000 --

17    it's on page 8 of appendix.

18        Q.    Of the appendix.

19        A.    It is WHO guideline on

20    stability evaluation.

21        Q.    So which of your opinions does

22    that support?

23        A.    It supports my opinion.

24            MS. SCHMIDT:  Are you asking

Page 325

1        her where it's referenced in her

2        report?

3            MR. MACORETTA:  I mean, I can

4        do it more specifically.

5    BY MR. MACORETTA:

6        Q.    Let me try it this way:  The

7    headline on page 39, "CBER Evaluates Product

8    Compliance Based on Whether Test Results from

9    Real Time Potency Data...Not Based on

10    Compliance With Modeling...."

11            What documents support that

12    claim?

13        A.    I told you that one is that

14    warning letter, one is ICH 5Q, one is WHO

15    guidance on stability.  And I'm sure there is

16    somewhere in CFR.  I have not looked at it

17    specifically.  But, I mean, I can't say

18    unless I go back and look at it.  These three

19    documents I'm sure.

20        Q.    Is there anything from CBER

21    that says we're going to evaluate product

22    compliance based on realtime data, not

23    modeling?

24            MS. SCHMIDT:  Objection.  You

82 (Pages 322 - 325)

Appx19632

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 326

1    mean other than the warning letter?
2    BY MR. MACORETTA:
3        Q.    I'm going to talk about the
4    warning letter.  Anything other than the
5    warning letter?
6        A.    I told you two guidance
7    documents which are developed by -- FDA is
8    part -- one of the parties who is -- who
9    develops the ICH guideline.  They are part of
10   the International Community of Harmonization.
11   So all the guidance is developed and approved
12   by FDA and EMEA and also Japanese regulatory
13   authority.
14       Q.    So are all the ICH guidelines
15   binding on US pharmaceutical companies?
16       A.    They're called guidelines, not
17   the binding.  Regulations are binding.  But
18   they provide you a little bit more direction
19   in terms of interpretation.
20       Q.    So the ICH and WHO guidelines
21   and the warning letter.  Right?  Anything --
22   and nothing -- anything else you can think of
23   right now?
24       A.    I can't say for sure, I mean,

Page 327

1    about regulation, but I have to go back and
2    check if it is clearly written there.
3        Q.    How about your opinions on
4    modeling, your opinion is that the model
5    should be based on realtime data.  Right?
6        A.    Yes.
7        MS. SCHMIDT:  Objection.
8        THE WITNESS:  That's industry
9    standard.
10   BY MR. MACORETTA:
11       Q.    Okay.  Where is that industry
12   standard written down?
13       A.    If you look at the WHO
14   guideline on vaccine stability, it is in that
15   guideline also.
16       Q.    Are you calling the WHO
17   guidelines the industry standard?
18       A.    It is like a -- it's not
19   industry standard, but it is also in the WHO
20   guideline.
21       Q.    Anything else you can think of
22   right now?
23       A.    There are other documents I
24   know, but I cannot just, like, think of it

Page 328

1    right now.  I can go back and look and
2    provide the list.  And there are several
3    other documents which also mention the same
4    thing for biologics, biological products.
5        Q.    Any documents from CBER directly?
6        A.    I'm sure there are FDA guidance
7    doing this.  Okay, so, yeah, right now I
8    don't have it, but I have to go back and look
9    because all the ICH guidelines get converted
10   into FDA guidance to industry.  And those are
11   there.  Like, there is some FDA guidance
12   during those equivalent to ICH Q5C.  And I
13   have go look at -- pull it out.  I mean,
14   there are several other references, too.  I
15   just cannot say on the top of my head.
16       Q.    The warning letter, I'll show
17   you.
18       MR. MACORETTA:  Let's mark the
19   warning letter as Exhibit 17.
20       - - -
21       (Exhibit Gulati-17, Warning
22   Letter, 00209399 - 00209409, was
23   marked for identification.)
24       - - -

Page 329

1    BY MR. MACORETTA:
2        Q.    The part of the warning letter,
3    you quote is on page -- the Bates page ending
4    402 at the top, page 4 of the letter.  Right?
5        A.    Yes.
6        Q.    Products must meet their
7    specifications, not the historic trend
8    throughout the labeled expiry period.  Right?
9        A.    Yes, I see that.
10       Q.    And that came about because in
11   2000 Merck's MMR -- Merck's mumps vaccine was
12   not meeting the labeled expiry specification,
13   was it?
14       MS. SCHMIDT:  Objection.
15       THE WITNESS:  So in 1998 when
16   expiry specification -- when the
17   release specification of 4.3 was
18   changed to expiry specification of
19   4.3, I mean, it was very clear to both
20   CBER and Merck that lots will be --
21   because their release is 4.3, they're
22   not going to be 4.3 at the expiry.
23   That was the understanding.
24   BY MR. MACORETTA:

83 (Pages 326 - 329)

Appx19633

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 330

1    Q.    So if you call 4.3 an expiry
2 specification, Merck was not meeting it with
3 lots before the overfill.  Right?
4         MS. SCHMIDT:  Objection.
5         THE WITNESS:  Looking at the
6     stability data -- I mean, I looked at,
7     like, few stability OOSs which are
8     there.
9 BY MR. MACORETTA:
10    Q.    Let me try again.  If you -- if
11 4.3 is deemed to be the expiry specification,
12 lots before the overfill were not meeting
13 that expiry specification.  Is that correct?
14         MS. SCHMIDT:  Objection.
15         THE WITNESS:  It was like
16     understanding of both CBER and Merck
17     that lots which are released with the
18     specification of 4.3 are not going to
19     be 4.3 at expiry, and that's why this
20     whole effort initiative started to
21     change the specification, target
22     manufacturing and release, set up the
23     release specification.  So that was
24     understanding of both CBER and Merck

Page 331

1     that lots may not meet end expiry of
2     4.3.
3 BY MR. MACORETTA:
4    Q.    In this warning letter, CBER
5 says the lots don't meet the expiry
6 specification.  And Merck's response was --
7 your response indicated the stability profile
8 of each lot was within the expected range
9 based on historical trends.  That's what
10 Merck said.  Right?
11         MS. SCHMIDT:  Objection.
12         THE WITNESS:  That's what is
13     written in this letter, I can see
14     that.
15 BY MR. MACORETTA:
16    Q.    So when CBER says your lots
17 aren't meeting 4.3, Merck did not come up
18 with a model that says here's a model that
19 shows they're meeting 4.3.  Right?  Merck did
20 not generate that model?
21         MS. SCHMIDT:  Objection.
22 BY MR. MACORETTA:
23    Q.    Right?
24    A.    Merck did not generate that

Page 332

1 model to show that it is meeting expiry or
2 not meeting expiry.
3    Q.    Merck's answer to not meeting
4 expiry is that the product is performing the
5 same way it always has.  Right?
6         MS. SCHMIDT:  Objection.
7         THE WITNESS:  So when Merck
8     received 483 --
9 BY MR. MACORETTA:
10    Q.    Go ahead.
11    A.    So when Merck received 483 for
12 not submitting BPDRs, the response was that
13 we have been manufacturing that product, we
14 have been releasing and doing the stability
15 assessment as we have been doing for the last
16 30 years.  And before, it was understanding
17 before, 4.3 was considered release
18 specification.
19    Q.    So how does CBER saying
20 products have to meet their labeled
21 specifications in the context of the warning
22 letter support your headline that says, "CBER
23 Evaluates Product Based on...Test Results
24 from Real Time Potency Data...," not modeling?

Page 333

1    A.    So what I understand here
2 reading this, because Merck's response was
3 that we have been assessing the stability
4 based on the historical trend, I mean,
5 they're saying that it should be based on the
6 realtime -- meeting the realtime data and
7 meeting the specification, not on the
8 historical trend.  Basically that's what they
9 are saying.
10    Q.    But Merck wasn't offering up
11 any modeling as a justification that it was
12 meeting end expiry.  Right?
13         MR. MACORETTA:  Objection.
14         THE WITNESS:  In the 483
15     response, Merck did give all the
16     history behind the product how things
17     evolved and what was the evaluation in
18     terms of understanding of specification.
19     And, I mean, in that response, Merck
20     also said that product is meeting
21     the -- because historically, for the
22     last 30 years, we have been evaluating
23     stability based on historical trends.
24     As long as the log loss is within

84 (Pages 330 - 333)

Appx19634

Page 334

1  historical trend, the result is not
2  considered OOS.  And that's what they
3  were saying and here the observation
4  is that -- I mean, why based on -- you
5  should meet the specification, not the
6  historical trend.  Not only toward
7  release but toward the expiry.
8  BY MR. MACORETTA:
9      Q.    But how does that statement
10 from CBER support your claim that CBER
11 evaluates product compliance based on
12 realtime data, not modeling?  There was no
13 modeling in response to the 483, was there?
14     A.    Historical trend is -- I mean,
15 it's more like a -- where you have hundreds
16 of lots of data and it is trending a certain
17 way.  That is more like a -- they're not
18 saying it's model, but it is more like a
19 trending kind of tool.
20     Q.    So there was no model before
21 Model 1, right, in your report?
22     MS. SCHMIDT:  Objection.
23 Mischaracterizes what she --
24     THE WITNESS:  There was a

Page 335

1  trend, stability trend database and
2  stability was assessed according to
3  that trend data, using the trend
4  database.  You can call it database or
5  you can call it model.  I mean, it is
6  a trend.  It's a historical trend.
7  BY MR. MACORETTA:
8      Q.    But that model did not suggest
9  that the product -- that all the lots were
10 going to meet 4.3.  Right?
11     MS. SCHMIDT:  Objection.
12     THE WITNESS:  In the last
13 30 years your release specification
14 was 4.3.  There was no expiry
15 specification.
16 BY MR. MACORETTA:
17     Q.    I understand that.  Although
18 CBER at some point disagrees with that and
19 writes a 483 on it.  Right?
20     MS. SCHMIDT:  Objection.
21     THE WITNESS:  CBER in 1996 to
22 1998 is having a discussion for two
23 years to figure out what is the
24 release and what is the expiry

Page 336

1  specification, because historically
2  4.3 was a release specification.
3  BY MR. MACORETTA:
4      Q.    That's right.  But in 2000 CBER
5  issues a 483 and then a warning letter that
6  says you're not meeting your end expiry
7  specification.  Right?
8      MS. SCHMIDT:  Objection.
9      THE WITNESS:  I see the 483 and
10 the warning letter.
11 BY MR. MACORETTA:
12     Q.    And Merck does not respond to
13 either one of them saying here is a model
14 showing that we were meeting our 483 before
15 the overfill, do they?
16     MS. SCHMIDT:  Objection.  Asked
17 and answered.
18     THE WITNESS:  I mean, I'm going
19 to answer again that -- I mean, Merck
20 did provide all the history on the
21 product, how the product has been
22 tested and released and stability for
23 the last 30 years.  This is what they
24 have been doing.  Until 1996 when

Page 337

1  there was a discussion between CBER
2  and Merck that we have to redefine the
3  label claim, and 4.3 is not release
4  anymore, it is going to be expiry.  A
5  lot of discussion going on and Merck
6  did provide that history in the
7  response.  Now, why there was 483 and
8  why there was warning letter and why
9  FDA did that, I don't know.  I don't
10 know what's the rationale behind it.
11 Only thing I know I've seen the
12 communication and the history and how
13 things were done historically, and I
14 also saw the communication and
15 discussion between CBER and Merck that
16 we need to clarify that 4.3 is not
17 release but expiry.  So I'm making my
18 conclusion based on all the
19 communication I saw.
20 BY MR. MACORETTA:
21     Q.    I understand, but you're
22 supporting your conclusion that CBER doesn't
23 use modeling to evaluate compliance on the
24 February 2001 warning letter.  And I'm asking

85 (Pages 334 - 337)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 338

1  you to tell me what modeling CBER rejected in
2  the February 2001 warning letter?
3      MS. SCHMIDT:  Objection.
4      THE WITNESS:  I'm saying that
5  warning letter says that you evaluated
6  product based on meeting specification,
7  not based on historical trend.  In my
8  mind, if you have a lot of -- like,
9  20 years of historical trend, it's
10  like -- it's a model.  I mean, you're
11  trying to fit all your realtime data
12  into that historical trend.  It is
13  indirectly a model.  The database is a
14  model.  So they're saying that don't
15  fit that into that historical trend or
16  whatever your history is showing.  Try
17  to meet the specification.
18  BY MR. MACORETTA:
19      Q.    Of course, Merck and the FDA
20  never called all of that historical data a
21  model in the context of the 483 or the
22  warning letter, did they?
23      MS. SCHMIDT:  Objection.
24      THE WITNESS:  I mean historical

Page 339

1  trends are -- I mean, what is -- any
2  model has a lot of historical data.  I
3  mean, that's how you build a model.
4  So I mean, it is historical trend and
5  it is similar to the model because it
6  has lot of -- lot of data and you're
7  trying to say that here are -- over
8  the year for 12 months I'm staying in
9  this range and for 20 years all my
10  points are falling in that range.
11      MS. SCHMIDT:  Before we switch
12  documents, can we talk about when
13  we're going to take a break?
14      MR. MACORETTA:  Sure.  We can
15  do it now.
16      VIDEOGRAPHER:  The time is now
17  16:23.  We are off the video record.
18      - - -
19      (A recess was taken.)
20      - - -
21      VIDEOGRAPHER:  The time is now
22  16:39.  This begins media six.  We are
23  back on the video record.
24      - - -

Page 340

1      (Exhibit Gulati-18, Supplemental
2      Expert Report of Philip B. Stark,
3      Ph.D., was marked for identification.)
4      - - -
5  BY MR. MACORETTA:
6      Q.    Dr. Gulati, back on the record.
7  I want to talk now about Dr. Stark's
8  conclusions.  What's marked in front of you
9  as Exhibit 18 is Dr. Stark's supplemental
10  report.  You said you've looked at this
11  before.  Right?
12      A.    Yes.
13      Q.    You looked at Dr. Stark's
14  original report as well?
15      A.    Yes, I did look at the report.
16      Q.    And what Dr. Stark is referring
17  to is how the .4397 calculation for storage
18  of two to eight months was made in the chart
19  that's in the June '05 model.  Right?
20      A.    Yes.
21      Q.    And if we go back to Gulati-13,
22  which is Tim Schofield's model --
23      MS. SCHMIDT:  I reshuffled, I
24      put them in order for her.

Page 341

1      THE WITNESS:  Oh, it's in
2      order?
3      MS. SCHMIDT:  13.
4      THE WITNESS:  Yes.
5      MS. SCHMIDT:  Should be 13.
6      THE WITNESS:  13 is this one,
7      yes.
8  BY MR. MACORETTA:
9      Q.    At the bottom of the first page
10  Mr. Schofield says that a pooled slope across
11  the 34 lots was determined.  Right?  Do you
12  see that?
13      A.    Uh-huh.
14      Q.    Did you check to verify if
15  Mr. Schofield was right, that he used a
16  pooled slope here?
17      MS. SCHMIDT:  Objection.
18      THE WITNESS:  Okay.  So this
19      part we're looking?
20  BY MR. MACORETTA:
21      Q.    Yes.
22      A.    So -- well, I'm not a
23  statistician so I did not verify if it is
24  pooled slope.

86 (Pages 338 - 341)

Appx19636

Page 342

1    Q.    Do you know what a pooled slope
2  is?
3    A.    I don't know really.
4    Q.    You don't have an opinion on
5  whether or not that's the way to do this at
6  all, do you?
7        MS. SCHMIDT: Objection.
8        THE WITNESS: I know that based
9    on whatever slope he calculated, the
10   log loss was 0.4397.
11 BY MR. MACORETTA:
12   Q.    I understand. That's coming
13 from 34 loss -- 34 lots. Right?
14   A.    Yes.
15   Q.    According to this.
16   A.    That's what it says here, yes.
17   Q.    So why wouldn't you just add up
18 the 24-month loss on all 34 and divide it by
19 34 to get an average?
20       MS. SCHMIDT: Objection.
21 BY MR. MACORETTA:
22   Q.    Why would you use any kind of
23 pooled slope calculation?
24   A.    I think you do -- I mean, you

Page 343

1  could calculate and divide, but you do
2  statistical analysis, it gives you certain
3  confidence. Because then you express the
4  values in terms of confidence interval that,
5  you know, with this much confidence interval,
6  I can say that this is the log loss, this is
7  the determined log loss or slope or standard
8  error, any of the parameters.
9    Q.    Dr. Stark's opinion is that
10 whatever calculation was done to get the
11 figure in the June '05 model was done using a
12 30-month loss, not a 24-month loss. Right?
13 That's at least Dr. Stark's view?
14   A.    I read that in Dr. Stark's
15 report.
16   Q.    And you disagree with that?
17       MS. SCHMIDT: Objection.
18       THE WITNESS: I see -- I read
19   Dr. Stark's report and I understand
20   from the report that he did the linear
21   regression analysis from zero to
22   24 months and zero to 30 months and he
23   did calculate the slope. And he's
24   getting different slope if he does the

Page 344

1    linear regression analysis zero to 24
2    and zero to 30 months. And with the
3    linear regression analysis what I
4    understand that he's considering slope
5    to be linear from zero to 24 and zero
6    to 30 months.
7  BY MR. MACORETTA:
8    Q.    So putting aside what Merck
9  actually did, would you agree that the proper
10 way to do this is look at that data just at
11 24 months and not the 30 months?
12       MS. SCHMIDT: Objection.
13       THE WITNESS: It depends. I
14   mean, again, I'm going to say I'm not
15   a statistician and I know simple math
16   and I know how to use Excel. So if
17   you have the linear slope, your slope
18   is linear, it doesn't matter whether
19   you are getting -- like you're
20   calculating data using 24 months or --
21   I mean, if you have a linear slope, it
22   doesn't matter if you're using
23   24 months or 30 months of data,
24   because you're calculating slope per

Page 345

1    month per unit. You know, unit could
2    be six months or one month. You're
3    calculating slope per month. If your
4    log loss is linear, your slope,
5    whether you use 24 months or 30 months
6    of data is going to be constant. Then
7    once you get the slope per unit which
8    is -- which could be six months or it
9    could be one month, you multiply with
10   the 24 months, I mean, if you're using
11   over the 24 months. And -- I mean,
12   that's how you do the calculation.
13 BY MR. MACORETTA:
14   Q.    That's if the slope is linear.
15 Right?
16   A.    Yes.
17   Q.    If the slope is not linear, you
18 shouldn't do the calculation -- doing it that
19 way is going to create a different result?
20       MS. SCHMIDT: Objection.
21       THE WITNESS: Yes. And that's
22   what Dr. Stark is saying.
23 BY MR. MACORETTA:
24   Q.    Well, Merck was saying all

87 (Pages 342 - 345)

Appx19637

Page 346

1  along that the slope was not linear, right,
2  that it was biphasic?
3      A.   Yes.
4          MS. SCHMIDT: Objection.
5          THE WITNESS: He's saying --
6      Merck is saying -- Merck supplements
7      are saying that slope is biphasic.
8  BY MR. MACORETTA:
9      Q.   Meaning it loses more at the
10  beginning than at the end?
11         MS. SCHMIDT: Objection.
12         THE WITNESS: Yes. Zero to six
13     months is one phase and 6 to 30 months
14     is second phase, it's linear.
15  BY MR. MACORETTA:
16     Q.   The slope is lesser in the
17  second phase than it is in the first phase.
18  Right?
19     A.   Yes, that is correct. The
20  slope is lesser in the second phase.
21     Q.   So there if we took data from
22  30 months as oppose to 24 months, the
23  30-month data would give us a lower loss
24  because we'd be using more of the lesser

Page 347

1  slope. Right?
2          MS. SCHMIDT: Objection.
3          THE WITNESS: So if -- I mean,
4      I would like to explain this, if you
5      don't mind.
6          So you're reading supplements
7      from Merck. It appears that slope is
8      biphasic. I mean, it's all over the
9      supplements. Single phase is zero to
10     six months, is linear from zero to
11     six months, that's phase one. And
12     then second phase is what they call is
13     the terminal slope, which is 6 to
14     30 months. So the way Merck is doing
15     the analysis, they're calculating the
16     slope, they're taking the data from 6
17     to 30 months with the consideration
18     it's linear and they're calculating
19     slope per month or per unit, or per
20     unit, whatever it is. And then you
21     took 30 months, 6 to 30 months of
22     data, you calculate slope per month.
23     And then you multiply with 18 months
24     because your total shelf life is 24.

Page 348

1      So you get the 18-month log loss
2      there. And then whatever is the log
3      loss in 18 months, you add six months
4      of first phase log loss, and that's
5      how you calculate the total log loss.
6  BY MR. MACORETTA:
7      Q.   Is that how Mr. Schofield did
8  it in Gulati-13?
9          MS. SCHMIDT: Objection.
10         THE WITNESS: I don't know how
11     he did it, but reading the supplements
12     up till 2005, and one of the
13     supplements, one of the memo, I think
14     February 2005, it is very clear that
15     terminal phase slope from 6 to
16     30 month is calculated and then phase
17     one is added. I mean, this is how
18     start supplement starting from 1999
19     and other communication until 2005.
20     It's my understanding that Merck is
21     calculating the log loss that way.
22  BY MR. MACORETTA:
23     Q.   So let me ask you, Dr. Stark
24  says when I calculate the slope using data up

Page 349

1  to 24 months, I get a different number. Do
2  you disagree with his calculation?
3      A.   I agree with his calculation --
4          MS. SCHMIDT: Objection.
5          THE WITNESS: -- because he's
6      using linear -- he's using linear
7      analysis from zero to 24 months, and
8      he's -- like, this is, like, you know,
9      you have a plot, you have zero to 24
10     months. He's going linear and the
11     zero to 30 months he's going to go --
12     going linear, and your slope will be
13     different. So I agree with what he's
14     saying, but my comment here is Merck
15     is not doing the same way. And I'm
16     not statistician, I'm going to say
17     that again and again. But reading
18     this, I understand that he is
19     considering that as a linear slope and
20     it's different. But Merck is doing it
21     differently. So methodology is
22     different.
23  BY MR. MACORETTA:
24     Q.   But you don't know how Dr. --

88 (Pages 346 - 349)

Appx19638

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 350

1  how Mr. Schofield did it for this one, for
2  Gulati-13. Right?
3      A.  I don't know how he did it for
4  this one. But I looked at some of the memos
5  until -- I mean, there was a memo in
6  February 2005 where it is written clearly
7  that terminal phase slope from 6 to 30 months
8  was used to do the slope calculation.
9          MS. SCHMIDT: I'm sorry.
10  Objection that last question.
11  BY MR. MACORETTA:
12      Q.  What's that memo? Do you
13  reference that in your report anywhere?
14      A.  I'm not sure if I referenced it
15  in my report, but I remember looking at it
16  recently.
17      Q.  So I'm going to go to
18  paragraph 151 of your report, which is the
19  last paragraph.
20          So Dr. Schenerman makes the
21  same observation as Dr. Stark, right, that
22  Merck was using data out to 30 months, 30
23  months and they should have stopped at
24  24 months? Right?

Page 351

1          MS. SCHMIDT: Objection.
2          THE WITNESS: I read
3      Dr. Schenerman's report, and that's
4      what he said.
5  BY MR. MACORETTA:
6      Q.  And you disagree with that
7  conclusion, that Merck was using data beyond
8  24 months?
9          MS. SCHMIDT: Objection.
10          THE WITNESS: I know reading
11      the supplements and memo that Merck
12      was using biphasic and using terminal
13      phase slope and using data 6 to
14      30 months. This is what I read in
15      supplements and other communication.
16  BY MR. MACORETTA:
17      Q.  So Merck was using data past
18  24 months?
19          MS. SCHMIDT: Objection.
20          THE WITNESS: Based on review
21      of supplements.
22  BY MR. MACORETTA:
23      Q.  Okay.
24      A.  So this is something I wrote

Page 352

1  before I read Dr. Stark's report. I read
2  that report later.
3      Q.  So your statement in the
4  middle -- I'm going to read the sentence in
5  the middle of paragraph 151, "In fact, the
6  slope from 2000 to 2004 was calculated using
7  24 months of data; when the slope was
8  calculated in 2005, it was also calculated
9  based on 24 months of data." You don't --
10  you don't agree with that anymore?
11      A.  Once I read Dr. Stark's report,
12  I went in depth into what -- like, what he
13  was saying and then, I mean, I agree that
14  Merck was using zero to 30 months of data --
15  6 to 30 months of data for every terminal
16  phase slope.
17          MR. MACORETTA: I'm going to
18      show you what we're going to mark as
19      19.
20              - - -
21          (Exhibit Gulati-19, Chart, was
22      marked for identification.)
23              - - -
24  BY MR. MACORETTA:

Page 353

1      Q.  So my question for this,
2  Dr. Gulati, is earlier we talked about some
3  data that Dr. Stark had that you used to
4  figure out what the 34 lots were in the
5  analysis, in the June 2005 analysis. Is this
6  the data you were referring to?
7          MS. SCHMIDT: Objection. I
8      think that misstates the way she
9      explained it before.
10          THE WITNESS: I think this was
11      data set and I need to confirm, but
12      this is the data set which is in that
13      memo, 34 lots in this, like,
14      Exhibit 13.
15  BY MR. MACORETTA:
16      Q.  In Exhibit 13 it says 34 lots.
17  What tells us which 34 lots out of this were
18  used?
19      A.  I don't know. It doesn't tell
20  me anything. I'm just trying to see, I mean,
21  if it's the same lot. I cannot say for sure.
22  It could be, it could not be.
23      Q.  So let me back up. There's 34
24  lots used to calculate the June 2005 loss.

89 (Pages 350 - 353)

Appx19639

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 354

1  Right?
2       A.    Yes.
3            MS. SCHMIDT: Objection.
4  BY MR. MACORETTA:
5       Q.    My question before was, what 34
6  lots are these?
7       A.    Right.
8       Q.    And I'm trying to -- how do you
9  know the answer to that, if you know the
10  answer to that?
11           MS. SCHMIDT: Sorry. Can we go
12      to her report?
13           MR. MACORETTA: Sure.
14           MS. SCHMIDT: Do you have your
15      report in front of you?
16           THE WITNESS: Yes. Yes, so
17      these 34 lots are 21 MMR II HSA lots,
18      5 rHA lots, 8 Mumpsvax HSA lot.
19  BY MR. MACORETTA:
20      Q.    Yep. How do you know which 34
21  lots they were? I asked for pre- or
22  post-overfill.
23      A.    Yes.
24      Q.    And can you figure out what 34

Page 355

1  lots Merck used and whether they were pre- or
2  post-overfill?
3            MS. SCHMIDT: Objection.
4            THE WITNESS: I can't figure it
5       out. I just looked at this table and
6       I tried to see if those were the same
7       lot. It appears that way, but I have
8       no way to confirm it.
9  BY MR. MACORETTA:
10      Q.    Which were the same lots?
11      A.    These -- this table you just
12  presented. It could be, I don't know.
13      Q.    I don't know. I mean, are
14  there only 34 lots? There's a lot of
15  entries, but I didn't try to figure it out by
16  lot. Did you look at this and conclude that
17  there were 34 lots in this table if we sorted
18  it by lot?
19      A.    I did not conclude anything,
20  but I tried to figure out if these were the
21  same lot, and there is some correlation.
22  And, I mean, I could not reach any
23  conclusion. But, I mean, I tried to see if
24  these were there or not. And if these were

Page 356

1  the lots, how many lots were there. So I
2  just tried to look at the table, but I could
3  not confirm if these are the same lots.
4       Q.    Okay. So back to my original
5  question. Do you know how many of the 34
6  lots were post-overfill lots?
7            MS. SCHMIDT: Objection. I do
8       think we covered this earlier, but if
9       the question is about interpreting it
10      from here, she can --
11           MR. MACORETTA: Well, we did
12      cover it. I thought she said I used
13      the data and now she's not sure. So
14      I'm just trying --
15           THE WITNESS: Yes.
16           MR. MACORETTA: I'm not trying
17      to cover the same ground. I just want
18      to nail it down.
19           MS. SCHMIDT: I understand.
20           THE WITNESS: Yes. So I'm just
21      trying to figure out -- I mean, when I
22      looked at this memo, I tried to go
23      through this table, I mean, this is
24      the table presented. And it looked

Page 357

1  like these are the lots which are
2  used, but I could not confirm it, but
3  I still went ahead and see how many in
4  this table, if by any chance this is
5  the -- these are the lots, I mean, how
6  many were from overfill and pre-overfill
7  or pre 1999 and post 1999. So I
8  looked at it, but, again, I mean, I
9  did not confirm if this is the same
10  table, what is being used here.
11  BY MR. MACORETTA:
12      Q.    Okay. I'll show you what we're
13  going to mark as Gulati-20.
14           MR. MACORETTA: That's one for
15      you.
16           MS. SCHMIDT: Thank you.
17           - - -
18           (Exhibit Gulati-20, Biological
19      Product Deviation Report, 00754233 -
20      00754238, was marked for identification.)
21           - - -
22  BY MR. MACORETTA:
23      Q.    All right. Dr. Gulati, Gulati-20
24  is a BPDR. Right?

90 (Pages 354 - 357)

Appx19640

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 358

1    A.    Yes, this is BPDR.

2    Q.    And this is Merck in April of
3  2001 filing a product deviation report for
4  five lots. Right?

5    A.    Yes. These are retention
6  sample tested at 24 months from 1998,
7  manufactured in 1998.

8    Q.    Or 2000 -- or 22 months in some
9  cases?

10    A.    Yes. In some cases it is 22
11 months.

12    Q.    What's a retention sample?

13    A.    Retention sample is when you
14 manufacture any batch, you pull out some
15 retention sample which are generally --
16 whatever samples you require to release a
17 batch, you pull out double of those samples,
18 at least, and then you put it under -- in
19 the -- at the storage condition. And you do
20 visual examination of those samples, once in
21 a year to see if there is any visual
22 deterioration of the product and do an
23 investigation. But generally retention
24 samples are kind of pulled out for every

Page 359

1  batch you manufacture.

2    Q.    I'm going to go to page 4. The
3  one, two, third paragraph says, "Evaluation
4  by Active Stability Monitoring...."

5        Do you see that?

6    A.    I see that.

7    Q.    What's active stability
8  monitoring?

9    A.    So active stability monitoring
10 is a program. Generally it's part of the
11 stability monitoring program. Anytime --
12 once you get a result, for anytime one for
13 stability, you try to see what is the --
14 you're actively managing the stability
15 program. You try to see at 18 months, what's
16 your maximum allowed -- I mean, what is your
17 expected value and are you getting the value
18 within the same rate. I mean, there is a
19 range you develop, I mean, in case of Merck,
20 there was a maximal allowed differences at
21 certain point. And you should be within the
22 same range. You're actively monitoring the
23 stability of your product. As soon as you
24 get a point, you try to figure out it might

Page 360

1  go out of spec at some point of time.

2    Q.    Okay. And at the end of this
3  paragraph it talks about -- well, this
4  paragraph talks about the prior approval
5  supplement to increase the release potency to
6  5.0. Do you see that?

7    A.    I see that.

8    Q.    And then it says -- and it
9  talks about assay changes. Then it says,
10 "These changes were implemented to ensure
11 that, in the future, potency for lots at
12 expiry would meet the current specification
13 of 4.3."

14        You see that. Right?

15    A.    I see that.

16    Q.    And the concept here of all the
17 analysis is to ensure that every lot meets
18 the 4.3. Right?

19        MS. SCHMIDT: Objection.

20        THE WITNESS: It was part of
21    the prior approval supplement. I
22    mean, it was -- sorry, it was 1999
23    prior approval supplement. We did
24    several things. We changed the target

Page 361

1    manufacturing, we set up the release,
2    we changed our assay format to -- from
3    1.3 to 1.6. I mean, we did several
4    things. And it's one of those things
5    which was done to ensure that product
6    meets the expiry of 4.3.

7  BY MR. MACORETTA:

8    Q.    So Merck says here we added
9  more and we did that to make sure we get to
10 4.3. Right?

11    A.    That's what Merck is saying
12 here.

13        MS. SCHMIDT: Objection.

14 BY MR. MACORETTA:

15    Q.    Okay. But Merck does not
16 reveal in this BPDR Phil Bennett's
17 calculations from two weeks earlier in March
18 where he concludes that the shelf life is
19 going to be -- it's going to be only 12
20 months at 4.3, right, that we looked at
21 earlier? What I would call -- what you call
22 Model 2. Right?

23        MS. SCHMIDT: Objection.

24        THE WITNESS: Which memo is

91 (Pages 358 - 361)

Appx19641

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 362

1    that?
2    BY MR. MACORETTA:
3        Q.    That would be Exhibit 9.
4        A.    Okay.  So you are talking about
5    pre-overfill lot, if I understand correctly.
6        Q.    Yes.  Well, I'm talking about
7    the modeling Phil Bennett did which
8    undoubtedly used some data from some
9    pre-overfill lots, yes.
10       A.    So are you asking me why it is
11   not here?
12       Q.    I'm asking you, don't you think
13   that Merck should have put in the BPDR, by
14   the way, we have a model from two weeks ago
15   that says we're not going to ensure in the
16   future potency of the lots would need 4.3?
17           MS. SCHMIDT: Objection.
18           THE WITNESS: That model was
19       submitted -- I mean, that model was
20       developed and submitted in the warning
21       letter response.  Correct?
22   BY MR. MACORETTA:
23       Q.    Which model are you talking
24   about?

Page 363

1        A.    The Model 2 for the pre-overfill
2    lot.  That's what you're asking me.
3        Q.    I'm asking why they didn't
4    mention it in this BPDR and shouldn't they
5    have?
6            MS. SCHMIDT: I'm sorry.  So
7        she doesn't follow the question, can
8        we make sure that you understand -- do
9        you understand what the question is?
10           THE WITNESS: That's what I'm
11       trying to clarify.  Are you asking me
12       that why Model 1 for pre -- Model 2
13       for pre-overfill lot is not mentioned
14       here?  Is that what you're asking?
15   BY MR. MACORETTA:
16       Q.    I'm asking you why model --
17   whatever you want to call Model 2 is not
18   mentioned in this BPDR, yes.
19       A.    And these lots were
20   manufactured in 1998, and the details were
21   tested -- okay.  So 1998.
22           So my question is why would --
23   I mean, why would you provide that model here
24   in BPDR, because BPDR is for reporting the

Page 364

1    biological -- I mean, any deviation which you
2    observed on any of the marketed lots.  And
3    this is for the retained sample there was a
4    deviation which was reported and all the
5    investigations were performed and all the
6    detail was reported here.
7        Q.    Well, once Merck says we made
8    changes to ensure that in the future potency
9    for lots at expiry would meet the current
10   specification of 4.3, doesn't Merck have to
11   say, by the way, we have a model apparently
12   that says they're not going to do that?
13           MS. SCHMIDT: Objection.
14           THE WITNESS: I mean, the way
15       I'm reading it here -- I mean, this
16       paragraph evaluation of active
17       stability monitoring program indicates
18       that performance of this lot is
19       inconsistent with the historical.  And
20       then these are the changes we have
21       made and we have already implemented.
22       So this is -- I'm just trying to
23       figure out that why would you put
24       model here and if you would put a

Page 365

1        model here or not.
2    BY MR. MACORETTA:
3        Q.    Well, if you're asking me a
4    question, once Merck says we made changes to
5    ensure that the potency -- that in the future
6    potency for lots at expiry would meet the
7    current specification of 4.3, don't they have
8    to reveal that they have a model that
9    indicates that that statement may not be
10   true, that the potency of all future lots
11   would meet the current spec of 4.3?
12           MS. SCHMIDT: So that -- the
13       question part of that was I think the
14       question that you just asked.
15           THE WITNESS: I mean, are you
16       asking -- I mean, are we talking what
17       the future lots or -- I mean, these
18       lots are already in market.  Right?
19   BY MR. MACORETTA:
20       Q.    Well, Merck -- I didn't put
21   this in the BPDR.  For whatever reason, Merck
22   said we made a bunch of changes to ensure
23   that future lots would be okay.  Right?
24       A.    Yes.

92 (Pages 362 - 365)

Appx19642

Page 366

1    Q.    Okay. They didn't have to put
2  that in the BPDR, did they?
3    A.    They are trying to say that. I
4  mean, in 1998 we manufactured this lot with
5  the old release specification of 4.3, and now
6  we have clarified that 4.3 is expiry. So --
7  and CBER's office of compliance requested
8  that starting -- I mean, and now onwards you
9  are going to do BPDR for any lot which is out
10 of spec on stability and -- so, I mean, Merck
11 did follow that and they added additional
12 information that those were the lots, 1998,
13 these are the 1998 manufactured lots. They
14 were manufactured with the release
15 specification of 4.3. But now we have
16 changed the process to change the release to
17 5.0 and made we have made other improvements
18 to show that future lots will be 4 -- will
19 meet that specification.
20   Q.    So they put a sentence in there
21 that says we did all these changes to ensure
22 that future lots will meet the specification.
23 Right?
24   A.    There's a sentence, yes.

Page 367

1    Q.    Once Merck says that, shouldn't
2  they also reveal the fact that by the way, we
3  have a calculation from two weeks ago that
4  indicates that future lots will not meet the
5  specification?
6       MS. SCHMIDT: Objection.
7       THE WITNESS: I don't
8    understand that, why. Why would you
9    put that information when you, again,
10   as I said that, that you just change
11   -- made the changes, you have the new
12   process in place and you have a
13   stability data which is showing it
14   will meet the specification. And, I
15   mean, why would you say that here,
16   that future lots will not meet
17   specifications?
18 BY MR. MACORETTA:
19   Q.    Well, because the only model
20 Merck had at the time showed they weren't
21 going to meet the specification. That is
22 what number 9 says. Right?
23      MS. SCHMIDT: Objection.
24 BY MR. MACORETTA:

Page 368

1    Q.    That is what the Bennett model
2  says. Right?
3       MS. SCHMIDT: Objection.
4       THE WITNESS: Like I said
5    before, that Model 2 is developed for
6    a specific purpose to respond to the
7    warning letter. I mean, there is no
8    other model which applies to the
9    future lot at that time.
10 BY MR. MACORETTA:
11   Q.    Yep. So why wouldn't you
12 reveal it? If you were advised -- let me
13 strike that.
14      If you were advising a client
15 and reporting to the BPDR, wouldn't you
16 advice them to include all the relevant
17 information in the BPDR?
18   A.    I am -- I mean, I would advise
19 to include all the applicable information in
20 the BPDR. And that model is not applicable
21 to the future lots, so I won't put it for the
22 future lots.
23   Q.    Why is it not applicable to the
24 future lots? Phil Bennett says it's

Page 369

1  applicable to the future lots. Right?
2       MS. SCHMIDT: Objection.
3       THE WITNESS: Phil Bennett is a
4    statistician who is doing the analysis
5    he's asked to do. I mean, he is not
6    making a quality decision there. He's
7    just presenting his analysis.
8  BY MR. MACORETTA:
9    Q.    So did somebody else at Merck
10 make a quality decision that this is no good
11 and that's why it didn't make its way into
12 the BPDR?
13      MS. SCHMIDT: Objection.
14      THE WITNESS: I don't know why
15   it didn't go to the BPDR, but I would
16   not expect it to be in BPDR when you
17   are not sure that this is an
18   applicable model at that time unless
19   you have gotten enough data. So at
20   this point I won't submit it to -- I
21   mean, it should not be included in the
22   BPDR. Again, like I said, there's a
23   very high risk of including such
24   information into BPDR when you are not

93 (Pages 366 - 369)

Appx19643

Page 370

1        sure about it, when you don't have any
2        confirmation and validation.
3    BY MR. MACORETTA:
4        Q.    If you're not sure, shouldn't
5    you include it, shouldn't you err on the side
6    of telling the regulators more as opposed to
7    less?
8            MS. SCHMIDT:  Objection.
9            THE WITNESS:  I mean, you have
10           so much information in the company, if
11           you start giving the regulators all
12           the information which you have -- I
13           mean, you -- I mean, you have all kind
14           of information which is not confirmed,
15           which is ongoing discussion.  I mean,
16           you have to give the relevant and
17           right and confirmed information.
18    BY MR. MACORETTA:
19        Q.    Well, Roberta McKee signed the
20    BPDR and she's on the cc of Phil Bennett's
21    memo, right, so she had both pieces of
22    information?
23            MS. SCHMIDT:  Objection.
24    BY MR. MACORETTA:

Page 371

1        Q.    So should -- why should --
2    should Ms. McKee have included Phil Bennett's
3    calculation in the BPDR?
4            MS. SCHMIDT:  I'm sorry.  She's
5            answered that question at least twice
6            now.
7    BY MR. MACORETTA:
8        Q.    And then the question is why
9    should she not have done it?  That's what I'm
10   trying to get to.
11           MS. SCHMIDT:  Objection.  Same
12           objection.  Why isn't it there?  Would
13           you have included it?  Why shouldn't
14           you have included it?
15   BY MR. MACORETTA:
16       Q.    You can answer the question.
17       A.    It's not applicable.  That's
18   why you won't include it for the future lots.
19       Q.    What makes it not applicable?
20           MS. SCHMIDT:  Objection.
21           THE WITNESS:  Because it's not
22           based on the data, using the realtime
23           data.
24   BY MR. MACORETTA:

Page 372

1        Q.    Because there was no realtime
2    data then.  Right?
3        A.    Yes.  It was not realtime.
4        Q.    Okay.  Can you point me to any
5    academic publication, textbook, guidance that
6    says what you just said, meaning you don't --
7    it's not applicable if you don't have
8    realtime data for the model?
9            MS. SCHMIDT:  Objection.
10           THE WITNESS:  Are you saying --
11           I mean, I'm just trying to process
12           that question, that -- I mean, are you
13           asking me that if you don't have
14           realtime data, model is not
15           applicable, is that what you're
16           saying?
17   BY MR. MACORETTA:
18       Q.    No.  That's what you're saying.
19   Right?
20       A.    Yes.
21       Q.    And I'm asking you what is the
22   basis for you concluding that?
23       A.    My basis is it's not -- I mean,
24   it's not applicable because it's not built

Page 373

1    based on the right data set.  It's not built
2    based on the data for the product we are
3    making some kind of prediction on.  So now we
4    have -- I mean, yes, it is same product, but
5    with the new process and everything, it is
6    different product at the same time because we
7    made changes to the whole process and method
8    and how we are doing testing and all.  So you
9    want to use the model for anything and making
10   rough estimate on anything of worst case
11   scenario.  I mean, all that makes sense.  But
12   making a prediction and making a quality
13   decision on the batch is not -- I mean, you
14   can't rely on that model because it's not
15   going to give you right decision because it's
16   not built based on the right data set.
17       Q.    So your opinion that it's not
18   applicable --
19       A.    It's not applicable, yes.
20       Q.    Can you point to me to anyone
21   other than Dipti Gulati who has ever
22   expressed that same opinion in a book, in a
23   guidance, from the FDA, anywhere?
24           MS. SCHMIDT:  Objection.  Let's

94 (Pages 370 - 373)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 374

1     just watch the tone.
2   BY MR. MACORETTA:
3     Q.   You can answer the question.
4       MR. MACORETTA:  I object to
5   your claim that the tone is improper.
6   We have a video.
7       THE WITNESS:  I can find you
8   some publications from CDER and other
9   regulators that -- I mean, model is
10  built to -- for certain reason.  And,
11  I mean, models are built for a certain
12  reason.  Models are only good if
13  they're based on some -- with the
14  reasonable data.  Only then they're
15  good and they give you valuable
16  information.  If you build a model
17  based only wrong data, it doesn't give
18  you information which is valuable and
19  accurate.  And making a decision based
20  on that is very high risk.  I mean,
21  you could pull out the lots which are
22  really good lots.  You might recall
23  lots which are good lots.
24  BY MR. MACORETTA:

Page 375

1     Q.   I understand that.  I'm
2   asking -- first of all, in your report, do
3   you cite any, at any source other than your
4   own opinion to support the idea that this
5   model was not applicable to anything and it
6   wasn't built on reliable data?
7       MS. SCHMIDT:  Objection.
8       THE WITNESS:  I didn't mention
9   that in the report, right?  Are you
10  asking me is there any other where
11  I --
12  BY MR. MACORETTA:
13    Q.   That's your opinion, that it's
14  not reliable.  Right?  And I'm trying to
15  challenge that to say can you point to some
16  other expert or some well-stated principle
17  that says that, says the same thing you do?
18    A.   Yes.  I think there is -- in my
19  report I reference something.  I want to see
20  that report.  The reference number 188 is
21  "WHO 2006 Stability Guidance."  It says the
22  same thing.  These, like, are coming out that
23  stability guidance -- WHO 2006 Stability
24  Guidelines.

Page 376

1     Q.   WHO 2006 Stability Guidelines,
2   right?  Is that what you're saying?
3     A.   Yes.
4     Q.   If I look -- that's Footnote
5   188.  Right?
6     A.   That is correct.
7     Q.   That's a footnote to a sentence
8   that said, "Prerequisite for an accurate
9   model are consistency of manufacturing,
10  quantitative results of the assay, the use of
11  appropriate study design and data analysis."
12  Right?
13    A.   Yes.
14    Q.   So which of those things did
15  Model 2 not have?
16    A.   It's like a manufacturing
17  process change.  It should be, like, if
18  you're -- if manufacturing process in 19 --
19  from 1995 to 1998 is same as after overfill.
20  So it's not consistent.  Your assay is
21  different, your assay results not because
22  your assays is run differently.  Then what --
23  like, how do you -- what kind of data you're
24  using for the model.  I mean, that's

Page 377

1   important.  I mean, your model is only
2   accurate if it has the right data put in
3   there and you did the right analysis.  That's
4   what it says and that's what I'm saying.
5     Q.   Other than this WHO 2006
6   guideline, can you point to any other
7   academic reference, either in your -- first
8   of all, in your report, and second of all,
9   anywhere, that supports what you're saying,
10  that this model wasn't applicable?
11      MS. SCHMIDT:  Objection.
12      THE WITNESS:  It's not about
13  this model, but in general about the
14  modeling.  There is some information
15  in ICH Q8 guideline also.  And I also
16  remember looking at one of the FDA
17  communications, like just one example,
18  that let's say your model is
19  predicting value, a value, and your
20  realtime data is giving you -- like,
21  your model is giving you out-of-spec
22  result and your realtime data is
23  within the spec, then you have to
24  tweak the model, model is not accurate

95 (Pages 374 - 377)

Appx19645

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 378

1     and it's not validated.
2     BY MR. MACORETTA:
3        Q.    What publication says that?
4        A.    There is one of the
5     presentations I saw from CBER -- CDER and
6     CBER.
7        Q.    Is that something you relied on
8     in creating this report?
9        A.    For creating this report, I
10    relied on ICH Q8 and also the other virtual
11    guidelines and other things I looked at, and
12    my 20 years of industry experience.  I mean,
13    I've been doing this for 20 years.  That's
14    what we do for the stability program.  So I
15    relied on all the literature and everything.
16       Q.    I understand that.  I'm asking
17    you to tell me what literature you relied on.
18    We've got the ICH guideline and we got -- you
19    can't identify the CBER presentation in any
20    more detail?
21       MS. SCHMIDT:  Guidelines.  It's
22       the ICH guidelines.
23    BY MR. MACORETTA:
24       Q.    Can you identify whatever CBER

Page 379

1     presentation you're talking about?
2        A.    I have that, but, I mean, right
3     now I don't -- I can't provide you right now.
4        Q.    You didn't cite it in the
5     appendix.  Right?
6        A.    I didn't cite it in the appendix.
7        Q.    So what is the company's
8     obligation in the BPDR?  What are they
9     supposed to report?
10       A.    In BPDR, when you have any
11    deviation for the marketed product, it could
12    be for release batch, it could be for
13    stability or it could be for label changes,
14    some kind of error which you found after
15    release the batch to the market.  You do the
16    biological product deviation reporting, you
17    do an internal investigation assessment, do
18    the biological product reporting and you do
19    the impact assessment and all the plan like
20    how are you going to correct it and all that,
21    and if there's any other action required.  I
22    mean, all that stuff you provide in the BPDR.
23       Q.    The obligation is to be
24    truthful, though.  Right?

Page 380

1        A.    Yes, you have to be truthful.
2        Q.    We've talked a lot about
3     Merck's regulatory obligations today.  Does
4     Merck have the obligation to the customers
5     who are using the product to be truthful?
6        MS. SCHMIDT:  Objection.
7        THE WITNESS:  At what stage and
8        in what way?
9     BY MR. MACORETTA:
10       Q.    In any stage.  Well, in 1990 --
11    well, if you bought MMR in 1999 or let's say
12    early 2000, you bought a pre-overfill lot,
13    that label was not correct, right, when we
14    understand 4.3 to be expiry?
15       MS. SCHMIDT:  Objection.
16    BY MR. MACORETTA:
17       Q.    Or may not be correct.  Did
18    Merck have any obligation to tell that to the
19    public?
20       MS. SCHMIDT:  Objection.
21       THE WITNESS:  Merck was
22       manufacturing product like that for
23       30 years and it is being released by
24       CBER, each and every lot is released

Page 381

1     by CBER.  I mean, at that time --
2     because we changed the spec or Merck
3     and CBER together changed the spec
4     from, you know, sudden change in spec,
5     you -- it was 4.3 was released and it
6     was -- it became expiry.  So at that
7     point -- I mean, everybody understands
8     that some of the lots may not -- both
9     CBER and Merck understand because now
10    whatever lots we have released at 4.3
11    are not going to meet expiry at 4.3.
12    And we are trying to change spec at
13    that point.  So I mean, it is --
14    everybody understands that.  And we
15    have been doing that for the last
16    30 years.  We have been releasing
17    product that way for the last
18    30 years.  It's not something for the
19    first time.
20    BY MR. MACORETTA:
21       Q.    Everybody in your answer means
22    Merck and CBER.  Right?
23       A.    Yes.  Everybody.
24       Q.    But it does not include

96 (Pages 378 - 381)

Appx19646

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 382

1  physicians buying the product or mothers
2  whose kids are getting the product. Right?
3       A.    I mean -- when I say everybody,
4  Merck and CBER.
5       Q.    How about the physicians buying
6  the product and the mothers whose kids are
7  getting the product, does Merck have any
8  obligation to tell them what's going on?
9       MS. SCHMIDT:  Objection.
10      THE WITNESS:  The product was
11  approved that way. It has been
12  manufactured that way. It has been
13  released that way. Now we are
14  changing the requirement, but -- I
15  mean, even you change the requirement,
16  it did not change how product has been
17  manufactured and released historically.
18  And patient and everybody is getting
19  the same product which they're getting
20  now. So there is no change in the
21  product. It's just change in the
22  expectation from CBER and what is --
23  first what is the delays and what's
24  the expiry. That's why we are trying

Page 383

1  to set up the specification to meet
2  the new expectation. But in terms of
3  product, nothing changed. The process
4  didn't change. Your assay didn't
5  change. The way you are releasing the
6  product didn't change. I mean,
7  nothing changed basically. I mean,
8  Merck has obligation to inform if
9  you're recalling a product. I mean,
10  you do -- do you send out that
11  information so close to physicians.
12  And you do the media communication,
13  all kind the stuff you do when you're
14  recalling a lot. I mean, that's the
15  regulatory requirement. But basically
16  when we change those -- when we made
17  that sudden change, I mean, nothing
18  changed, your product is still made
19  the same way, it's tested the same
20  way, it's released the same way. Only
21  thing is now we have changed the
22  requirement and we are trying to
23  change the process and everything to
24  meet those new requirements.

Page 384

1  BY MR. MACORETTA:
2       Q.    So Merck didn't have any
3  obligation to tell the public any of that?
4       MS. SCHMIDT:  Objection.
5       THE WITNESS:  I mean, I'm not
6  going to make that determination.
7  That's not something -- my area of
8  expertise. I won't make that
9  determination.
10  BY MR. MACORETTA:
11      Q.    Well, why not, you've been in
12  the pharmaceutical industry 20-some years,
13  don't you have an understanding of what a
14  pharmaceutical company's obligations are to
15  the patients?
16      MS. SCHMIDT:  Objection.
17      THE WITNESS:  I understand when
18  you make a decision for recall you
19  have to, I mean, inform -- I mean, you
20  do recall at different levels, you
21  know, it's a wholesaler or whatever,
22  retailer, patient and all that. You
23  do all kind of communication at that
24  stage. At the BPDR stage the

Page 385

1  communication goes to CBER. So at
2  different stages you're communicating
3  to different regulatory authority and
4  then in case of recall, you go to that
5  level.
6  BY MR. MACORETTA:
7       Q.    I agree with your statement
8  factually. And in this case Merck indeed did
9  discuss internally whether a recall was
10  necessary. Right?
11      MS. SCHMIDT:  Objection.
12      THE WITNESS:  Yes. Yes, it
13  did.
14  BY MR. MACORETTA:
15      Q.    Okay. I agree that at a
16  certain stage you should talk to certain
17  people. I'm asking you whether or not Merck
18  had an obligation beyond its regulatory
19  requirements to tell the customers that you
20  may not be getting 4.3 of mumps depending on
21  when you take this shot?
22      MS. DYKSTRA:  Objection. That
23  is not in her expertise.
24      MS. SCHMIDT:  Objection. Asked

97 (Pages 382 - 385)

Appx19647

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 386

1    and answered.

2        MR. MACORETTA:  And then she

3    can tell us -- you can tell me again.

4    And I asked why it's not your

5    expertise and then she answered the

6    question.

7        MS. SCHMIDT:  You did.  You've

8    asked her the question four times now

9    and she said it's not her area of

10    expertise.  She said she has some

11    experience with recalls.

12  BY MR. MACORETTA:

13        Q.    So whose responsibility would

14  that be at Merck to make that --

15        MS. SCHMIDT:  It's not her area

16    of expertise.  She's not an expert on

17    the company.  She's a stability

18    expert.

19        THE WITNESS:  I don't know who

20    will be making that decision because

21    every company has a different

22    structure.  But, I mean, it would

23    be -- if it goes to a certain level, I

24    mean, there would be some company

Page 387

1    official will be making that decision.

2  BY MR. MACORETTA:

3        Q.    So all the time you worked for

4  pharmaceutical companies you never considered

5  what's my obligation to tell the truth to the

6  people who are taking the product?

7        MS. SCHMIDT:  Objection.

8        THE WITNESS:  There are

9    different departments who make that

10    decision.  I mean, it's not done by

11    quality.  Quality is part of the team,

12    but there are other departments who

13    make that.

14  BY MR. MACORETTA:

15        Q.    That obligation doesn't fall to

16  everybody at the company?

17        MS. SCHMIDT:  She answered the

18    question.  Objection.

19        THE WITNESS:  Obligation for

20    the quality, yes.

21        MR. MACORETTA:  Let me show you

22    what we're going to mark as Gulati-21.

23        - - -

24        (Exhibit Gulati-21, 10/17/02)

Page 388

1    Memo, 01649892 & 01649893, was marked

2    for identification.)

3        - - -

4  BY MR. MACORETTA:

5        Q.    21.  And while you look at

6  this, Dr. Gulati, I can tell you that the

7  metadata shows that this memo came from

8  Roberta McKee and was generated October 17,

9  2002.  Even show it doesn't say that, the

10  data produced with it identifies that fact to

11  us.

12        A.    I need a few minutes to read

13  this.

14        Q.    Sure.

15        A.    Okay.

16        Q.    Okay.  Roberta McKee, I think

17  you referenced earlier, was a senior

18  executive at Merck.  Right?

19        MS. SCHMIDT:  Objection.

20        THE WITNESS:  Yes, I understand

21    that.

22  BY MR. MACORETTA:

23        Q.    She signed -- she's the point

24  of contact for the BPDR.  Right?

Page 389

1        A.    Yes.

2        Q.    So in September or October 2002

3  Ms. McKee concludes that we do not believe we

4  have adequate, 95 percent, confidence that

5  the current manufacturing process supports

6  the 4.3 log/dose label claim.  Do you see

7  that in the first -- in the second paragraph?

8        A.    Yes.

9        Q.    Okay.  And then she says, "As

10  such, an immediate corrective action must be

11  taken."  Right?

12        A.    Yeah, I see that.

13        Q.    Okay.  Was Ms. McKee wrong to

14  conclude -- to state the conclusion that in

15  October 2002 that Merck didn't have

16  confidence that it could meet the 4.3?

17        MS. SCHMIDT:  Objection.

18        THE WITNESS:  I mean, I'm

19    seeing what this memo reads, I don't

20    see her name.  I don't know -- there

21    was no confidence, why -- I mean, I

22    can see that it was based on some

23    analysis.  Probably Phil Bennett's.

24    But I consider this memo as a part of

98 (Pages 386 - 389)

Appx19648

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 390

1    discussion. Whatever -- I mean, the
2    analysis, whichever was available at
3    that time, there was ongoing
4    discussion.
5    BY MR. MACORETTA:
6    Q.    Well, she says, "As such, an
7    immediate corrective action must be taken."
8    Right?
9         MS. SCHMIDT: Objection.
10   BY MR. MACORETTA:
11   Q.    Do you see that at the end of
12   the paragraph?
13   A.    I see that.
14   Q.    But Merck took no corrective
15   action --
16        MS. SCHMIDT: Objection.
17   BY MR. MACORETTA:
18   Q.    -- on this issue, did they?
19   A.    I mean, yes, that's the
20   discussion that we -- that there should be
21   corrective action. But, I mean, this -- I
22   can see the discussion, that there's a
23   discussion going on, there should be
24   corrective action. And it's just one of the

Page 391

1    memo. There are hundreds of communications
2    like that back and forth.
3    Q.    Did you consider this memo in
4    reaching your conclusions?
5    A.    No, I didn't.
6    Q.    When you say "back and forth,"
7    what's on the other side of this, were there
8    memos that says, yes, we do have confidence
9    and we don't need a corrective action?
10        MS. SCHMIDT: Objection.
11        THE WITNESS: I mean by back
12    and forth, I saw several memos and
13    emails and chain of emails. I mean,
14    that to me is back and forth because
15    people are bouncing back and forth and
16    saying things about the analysis.
17    And, I mean this look like one of that
18    kind of communication. I made -- I
19    mean, when I look at the data, I
20    looked at this communication, what
21    discussion was going on. But when I
22    built my opinion, my opinion was based
23    on looking at the data itself and what
24    this data was telling me. So I see

Page 392

1    the communication you are showing me.
2    BY MR. MACORETTA:
3    Q.    But Ms. McKee obviously thought
4    she had enough data in October of 2002 to
5    consider a corrective action. Right?
6        MS. SCHMIDT: Objection. She's
7    obviously not testifying about what
8    Merck -- Roberta McKee thought in
9    October of 2002.
10   BY MR. MACORETTA:
11   Q.    You can answer that.
12   A.    I don't see Roberta's name here.
13   Q.    I'm going to represent to you
14   that the metadata indicates that this memo is
15   from her and that she said that at her
16   deposition.
17        MS. SCHMIDT: Objection.
18   BY MR. MACORETTA:
19   Q.    It represents the date of
20   October 17th. So let's remove the question
21   of whether or not it's Roberta McKee's memo.
22        MS. SCHMIDT: I'm sorry, what
23    was the question?
24   BY MR. MACORETTA:

Page 393

1    Q.    Let me try it again.
2        So what memos can you point to
3    me in the company that say we are -- at this
4    time or in response to this that says, we are
5    in compliance that we have 95 percent
6    confidence that we're going to meet 4.3?
7    A.    The communication which I
8    depend on, that we have confidence we meet
9    4.3, is the prior approval supplement from
10   1999 which is approved and which was -- like,
11   the whole change was implemented.
12   Q.    But Ms. McKee saw that in 2002
13   or she had the opportunity to see it, right,
14   and that wasn't enough?
15        MS. SCHMIDT: Objection.
16   BY MR. MACORETTA:
17   Q.    So since 19 -- since that prior
18   approval supplement, what memos or
19   communications within Merck can you point me
20   to that says we do have confidence that we're
21   going to meet 4.3?
22   A.    That is one, I think, key
23   communication I consider the supplement
24   because it was based on several -- I mean, a

99 (Pages 390 - 393)

Appx19649

Page 394

1  lot of discussion and two, three years of
2  analysis of data and different proposals,
3  like the proposal in 1998 then got rejected
4  and this is the proposal. I think that is
5  the key communication which -- to assure that
6  the product is going to meet 4.3. And
7  realtime data. I mean, realtime data is
8  showing you under 2002 that it is meeting the
9  4.3.
10      Q.    Where are the documents that
11  say the realtime data is showing we meet 4.3?
12      A.    I looked at the annual
13  stability report.
14      Q.    So other than the prior
15  approval supplement and the annual stability
16  report, can you point me to any other
17  document that says we have confidence we're
18  going to meet 4.3?
19          MS. SCHMIDT: Objection.
20          THE WITNESS: I don't have to
21      look amount any other data. Because I
22      looked at three years of analysis and
23      the communication, 1998, 1999. And
24      then I looked at the stability data,

Page 395

1      realtime stability data of the lots.
2      I mean, I see the historical data
3      analysis and coming up with the
4      conclusion on that. And then I'm
5      looking at the realtime stability data
6      and it is all aligned. It's all
7      together. It's all the same thing. I
8      mean, I didn't have to look anywhere
9      else. Because realtime stability data
10     is the real data.
11  BY MR. MACORETTA:
12      Q.    And yet everybody in Merck
13  including Roberta McKee, reached an opposite
14  conclusion. Right?
15          MS. SCHMIDT: Objection.
16  BY MR. MACORETTA:
17      Q.    I mean, I can show you a
18  hundred more like this where people say
19  there's a problem, and I'm asking you to show
20  me any where people say there's not, and
21  you're pointing to data and the PAS. I'm
22  asking you if you can show me anything in an
23  email where somebody says there's not a
24  problem?

Page 396

1          MS. SCHMIDT: Objection. She
2      gave an answer to the question that
3      was very similar to the one you just
4      asked. We're going over the same
5      territory.
6  BY MR. MACORETTA:
7      Q.    I just want to make sure that I
8  have the full universe of documents you're
9  relying on for this. Other than the PAS and
10  the realtime stability data, is there
11  anything else?
12      A.    Realtime stability data and PAS
13  is the formal communication and formal
14  document. Your realtime -- you're releasing
15  your product based on realtime data. You're
16  submitting realtime data to CBER to release
17  the product and CBER is releasing product
18  based on realtime data. Those are the key
19  things I'm considering in coming to my
20  opinions.
21          There are a lot of
22  communication, there's thousands -- I mean,
23  I'm sure I have seen about 40, 50, you have
24  seen thousands of such communications. But,

Page 397

1  again, your realtime data which is what is
2  used to release a product, to make a decision
3  whether there should be a BPDR, to make a
4  decision whether there should be a recall,
5  it's all the realtime stability data, all
6  realtime release data which is the --
7      Q.    Can you point me to a single
8  person or document at Merck that says just
9  what you just said, that realtime stability
10  data is what we should be looking at and
11  nothing else?
12          MS. SCHMIDT: Objection.
13          THE WITNESS: I have seen some
14      communication, I have not seen all of
15      them. So what I -- I mean, that's
16      all. What I have seen --
17  BY MR. MACORETTA:
18      Q.    Which one? Can you point me to
19  any specifically?
20      A.    I mean, that is -- are you
21  asking me any communication which is
22  discussing that realtime data should be used?
23      Q.    Yes.
24      A.    I mean, for biological product

100 (Pages 394 - 397)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 398

1 that's what you do and that's what the
2 guidance say and that's what the regulation
3 says, so that's how you make the decision
4 based on realtime data.
5 Q. That's what you're saying in
6 2018, and I'm asking you if you can show me
7 anybody at Merck who was saying that in 2000
8 or 2002?
9 MS. SCHMIDT: Objection.
10 BY MR. MACORETTA:
11 Q. You can answer.
12 A. I was just trying to think when
13 was -- I mean, that was the understanding. I
14 understand you're saying that in 2018 I'm
15 saying that and that was 2002. I mean, for
16 biologics, it has -- in my experience, it has
17 been always that you rely on realtime data.
18 So that is the industry standard and that is
19 the expectation and that's the guidance,
20 so...
21 Q. Can you point to anybody in
22 Merck who said that, that we just rely on
23 realtime data?
24 MS. SCHMIDT: Objection.

Page 399

1 That's just what she just -- we're
2 going over the same question.
3 MR. MACORETTA: And until she
4 says -- until she points me to one who
5 says no, I'm going to have to keep
6 going because she keeps asking and
7 she's tipping around the edges.
8 MS. SCHMIDT: But she's
9 answered. She's not.
10 BY MR. MACORETTA:
11 Q. So, no, you can't point me to a
12 single person or document in Merck that says
13 we should rely on realtime stability data,
14 can you?
15 MS. SCHMIDT: Objection.
16 THE WITNESS: I'm going to say
17 that I have not seen all the
18 communication. Whatever -- I have
19 seen some communication. I don't know
20 if there is any communication like
21 that, what I have seen.
22 BY MR. MACORETTA:
23 Q. Doesn't it trouble you or cause
24 concern to your opinion that you can't find

Page 400

1 anybody at Merck that says the same thing
2 you're saying now?
3 MS. SCHMIDT: Objection.
4 THE WITNESS: I mean, like I
5 said, what I have seen -- I mean, I
6 see a lot of discussion. I mean, I
7 saw Roberta McKee's deposition. She
8 mentioned something on similar lines
9 that we built that model to make some
10 assumptions and realtime data is
11 passing, something like that,
12 something on the same lines. Other
13 than that, I mean, I looked at a few
14 communications, I see a lot of
15 discussion. I mean, I -- I mean,
16 that's all I can say.
17 MR. MACORETTA: Let me show you
18 what we're going to mark as Gulati
19 Number 22.
20 - - -
21 (Exhibit Gulati-22, 10/31/02
22 Email, 00094134 & 00094135, was marked
23 for identification.)
24 - - -

Page 401

1 MS. SCHMIDT: John, we've been
2 going a little more than an hour, do
3 you think you have --
4 MR. MACORETTA: How much time
5 do I have left? 30 minutes. I would
6 prefer to just keep going, but I'll
7 take another -- I'm going to use it
8 all, so yeah.
9 MS. SCHMIDT: Dr. Gulati, do
10 you need a break?
11 THE WITNESS: I can keep going,
12 I'm okay. What do you think?
13 MS. SCHMIDT: I'm asking you if
14 you need a break?
15 THE WITNESS: I'm okay.
16 MS. SCHMIDT: Okay. Keep going.
17 BY MR. MACORETTA:
18 Q. In this email Ms. McKee in the
19 text in the middle says, "Given that our most
20 recent stability analysis for mumps does not
21 support the current label claim, Merck is
22 required to report this finding to FDA."
23 Do you see that? You have to
24 answer.

101 (Pages 398 - 401)

Appx19651

Page 402

1      A.    I'm just trying to see when was
2  the memo date. I'm checking -- yes, I see
3  that.
4      Q.    Do you agree with that
5  statement, that if Merck's stability analysis
6  didn't support the current label claim, Merck
7  had to report that to the FDA?
8          MS. SCHMIDT: Objection.
9          THE WITNESS: So I read what
10      this memo is saying. I mean,
11      apparently -- I mean, there are --
12      there's like a -- she's talking about
13      making a cross-functional team and
14      confirm, like, how is the analysis, if
15      there are any errors and all that
16      stuff. So this is like trying to
17      figure something out. I mean, what
18      does that mean. For example, there
19      should be a team to confirm the
20      accuracy of stability analysis. What
21      are the action taken and what to me
22      might impact and all. That's all I
23      see.
24  BY MR. MACORETTA:

Page 403

1      Q.    If Merck concluded that it had
2  a valid and reliable stability analysis that
3  showed it didn't support the current label
4  claim, was Merck required to report that to
5  the FDA?
6          MS. SCHMIDT: Objection.
7          THE WITNESS: If you're
8      stability -- this is 2002. So you
9      have the overfill lot and you have
10      stability data from the overfill lot.
11      So if any of the overfill lots meet --
12      you have any of the overfill lot which
13      are OOS, you're supposed to submit
14      BPDR. I mean, in that case, you will
15      report the BPDR and what other
16      analysis you have available at that
17      time. But if your realtime data is
18      not showing any OOS, just -- and it is
19      supporting whatever specs were set in
20      1999, providing any additional
21      analysis is only going to -- it's
22      misleading, it's going to create
23      confusion. And its risk is very high.
24      I mean, because your realtime data is

Page 404

1      passing. Again, I'm going to go back
2      to the same point. In -- when we talk
3      about these communications in 2002,
4      your realtime data is passing.
5      Basically that's what I'm looking at.
6  BY MR. MACORETTA:
7      Q.    So you disagree with Ms. McKee
8  that Merck was required to report the most
9  recent stability finding to the FDA?
10          MS. SCHMIDT: Objection.
11          THE WITNESS: There were no
12      stability failures, so I don't know
13      what she is talking about, what she
14      wants to report. An analysis, I mean,
15      what analysis is that? I don't know.
16  BY MR. MACORETTA:
17      Q.    So you -- so if Merck does not
18  have an OOS lot but has an analysis that says
19  its product can't meet the label claim, Merck
20  did not have to report that to the FDA, is
21  that what you're saying now?
22      A.    If you do not -- if your
23  realtime data is all passing and you have
24  created all those different models which is

Page 405

1  showing something else, you have to report
2  that, whatever the realtime data is telling
3  you. You have to report based on the
4  realtime data, not what this model is
5  predicting.
6      Q.    So even if the model was rock
7  solid and based on good historical data, just
8  the model by itself without an out-of-spec
9  lot, you don't have to report to the FDA. Is
10  that your testimony?
11          MS. SCHMIDT: Objection.
12          THE WITNESS: If your model is
13      rock solid and it is predicting OOS,
14      and your realtime stability data is
15      not showing OOS, your model is not
16      rock solid. Because it should be --
17      it should be -- your realtime data
18      should be supporting the model. If
19      your model is saying this lot is going
20      to fail 24-month time point, and it is
21      really failing 24-month time point,
22      that's when you say your model is rock
23      solid.
24  BY MR. MACORETTA:

102 (Pages 402 - 405)

Appx19652

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 406

1     Q.    Is there some FDA regulation or
2  guidance that says when you're supposed to
3  report to the FDA on this?  Is there some
4  piece of paper in the FDA that says if it's
5  just a model and there's nothing out of spec,
6  you don't have to report it?
7          MS. SCHMIDT:  Objection.
8          THE WITNESS:  FDA regulations
9     say if you have -- when should you do
10    BPDR, what kind of changes you should
11    be reporting, how you should be
12    reporting, when you should be doing
13    recall.  Those are the guidance.
14    There is no guidance which says you
15    should be reporting more.
16 BY MR. MACORETTA:
17    Q.    But there's no guidance that
18 says you shouldn't either?
19        MS. SCHMIDT:  Objection.
20        THE WITNESS:  Yes.  It doesn't
21    say either way.
22 BY MR. MACORETTA:
23    Q.    So what is the basis for your
24 opinion that you don't have to report it?

Page 407

1         MS. SCHMIDT:  Objection.
2     Because all the regulatory requirements
3     are reporting requirements based on
4     realtime data.  There is no regulatory
5     requirement based on model.  When
6     you're doing -- like, your BLA filing,
7     when you're filing your product for
8     the first time, you do a lot of
9     modeling to do some kind of
10    determination and all that stuff.  But
11    you don't report model, you report the
12    results of the analysis.  And based on
13    the model your setting of the spec,
14    that's what you're reporting in the
15    filing.  You're using those models to
16    come up with some kind of
17    specification, release specification,
18    stability specification and all that.
19    And that's what goes in the -- in your
20    supplements or in your filings.  You
21    don't report the model.  The model
22    doesn't get reported into your
23    submissions.
24 BY MR. MACORETTA:

Page 408

1     Q.    Can you point me to any
2  academic literature or textbooks that say
3  what you just said, that you don't have to
4  report it if there's no out-of-spec lot?
5     A.    If I look, I can find it.  I
6  mean, I didn't -- I have been working on --
7  like, I have been doing this for so long, and
8  I have not come across.  I do read a lot of
9  guidance documents as soon as new guidance
10 come up, and I have not seen anywhere that
11 you're supposed to report the model.  You're
12 supposed to report the data which is derived
13 from the model.  For example, if you came up
14 were some kind of spec based on certain model
15 and you establish the spec, you report all
16 that stuff, whatever is required by, you
17 know, CTD guidance.  There's a -- when you do
18 a submission, there's a quality section,
19 there's a clinical and there's non-clinical
20 section.  Whatever is required, you put
21 there.  But there's no requirement for
22 reporting a model.
23    Q.    And your opinion, you don't
24 have to report it, to report a model, is

Page 409

1  based solely on the fact that there's no
2  requirement for reporting a model.  Right?
3          MS. SCHMIDT:  Objection.
4     Mischaracterizes her testimony.  You
5     asked her the basis of her opinion and
6     she spoke to you for three minutes.
7  BY MR. MACORETTA:
8     Q.    I'm trying to lock it in to
9  understand.
10        MS. SCHMIDT:  I know.
11 BY MR. MACORETTA:
12    Q.    I'm trying to understand the
13 foundation for your opinions.  There should
14 be no surprise why I'm asking this question.
15        Can you point me to anybody
16 else who has the same opinion that you do,
17 that you don't have to report a model, any
18 other academic, professor, ex-regulatory
19 person?
20    A.    I mean, I might -- I have to go
21 back and look.  I think there is, like,
22 guidelines for common technical document, for
23 the CTD, which says -- it does clarify what
24 should be there in the filing and whatnot.

103 (Pages 406 - 409)

Appx19653

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 410

1 But I have to go back and look and confirm.
2 And modeling is not -- it says no -- like,
3 you know, there's, like, establish condition
4 and there's supporting data. I mean, you
5 don't always put that data. So I can go back
6 and look. I don't know.
7      Q.   But you can't -- as you sit
8 here today you can't tell me anybody else who
9 has ever expressed the same thing you do --
10 you have. Right?
11          MS. SCHMIDT: Objection.
12          THE WITNESS: I am not sure yet
13      what are you asking me.
14 BY MR. MACORETTA:
15      Q.   Can you tell me any expert --
16 anybody who claims to be an expert, anybody
17 in the pharmaceutical industry, anybody who
18 wrote a textbook. Anyone who has ever
19 expressed the same opinion that you don't
20 have to tell the FDA about a model?
21          MS. DYKSTRA: Objection. She
22      said she reported -- she identified
23      guidance.
24          MR. MACORETTA: That's what she

Page 411

1      identified guidance, now I'm asking
2      for humans or other experts.
3          MS. DYKSTRA: The people who
4      write the FDA guidance are humans.
5 BY MR. MACORETTA:
6      Q.   If you say there's nobody else
7 then that's fine. Can you tell me anybody
8 else?
9          MS. DYKSTRA: FDA.
10          MR. MACORETTA: Pardon?
11 BY MR. MACORETTA:
12      Q.   Can you tell me anybody else?
13      A.   I mean, there's a guidance
14 document which tells you something, and that
15 is the position of the regulators.
16      Q.   Okay. Ms. McKee had a
17 different view of this than you did, right,
18 she thought you had to report it?
19          MS. SCHMIDT: Objection.
20          THE WITNESS: I mean, based on
21      the regulation and guidance, there's
22      nowhere I found that you have to
23      report a model. I found the
24      information that you develop the model

Page 412

1 at different stages; at the
2 development stage to set up the
3 specification, at post-commercial
4 stage to monitor, to do the
5 monitoring. But I mean, none of those
6 models -- there's no requirement to
7 report any of those models. Those are
8 maintained in the companies -- within
9 the company and if CBER requests, they
10 can ask. But you report the output of
11 the model but not the model. I mean,
12 I have not seen any guidance in my
13 experience.
14 BY MR. MACORETTA:
15      Q.   The output of the model would
16 be --
17      A.   Specification.
18      Q.   -- the calculation that you're
19 not going to meet, that you're not going to
20 meet the specification. Right?
21          MS. SCHMIDT: Objection.
22          THE WITNESS: The output of the
23      model is the specification you
24      developed in the Model 1. You came up

Page 413

1      with the specification based on the --
2      whatever model you develop, log loss
3      model you develop. So you came up
4      with the specification. You report
5      those specifications, this is the
6      target. If you look at the
7      supplement -- I mean, supplement and
8      all, it's like what is the target,
9      what is the release and that's what
10      you report.
11 BY MR. MACORETTA:
12      Q.   So if Merck was not really at
13 risk -- if Merck wasn't at risk of falling
14 out of specification, why did it spend all
15 this time trying to lower the specification?
16          MS. SCHMIDT: Objection.
17      Foundation.
18 BY MR. MACORETTA:
19      Q.   You can answer.
20      A.   What lower specification, you
21 mean --
22      Q.   From 4.1 to 4.3. 4.3 to 4.1,
23 I'm sorry.
24      A.   Oh, you mean the one which got

104 (Pages 410 - 413)

Appx19654

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 414

1  approved in 2007?
2      Q.   Yes.  If Merck was never in
3  danger of missing 4.3, why bother to move the
4  specification down to 4.1?
5          MS. SCHMIDT:  Objection.  Calls
6      for speculation.
7  BY MR. MACORETTA:
8      Q.   You can answer.
9      A.   I don't know why.  I mean, I
10 don't know why.  I know that based on that
11 Model 1 you have certain spec.  And that
12 gives you assurances that your product is
13 going to meet expiry.
14     Q.   Then why spend all the time to
15 remove the expiry?
16         MS. SCHMIDT:  Objection.  Asked
17     and answered.
18         MR. MACORETTA:  Okay.  You
19     know, why don't we take a break for
20     the minute now, I may be done.
21         VIDEOGRAPHER:  Time is 17:55.
22     We are off the video record.
23          - - -
24         (A recess was taken.)

Page 415

1          - - -
2          VIDEOGRAPHER:  The time is now
3      18:08.  We are back on the video
4      record.
5  BY MR. MACORETTA:
6      Q.   Dr. Gulati, if at some point
7  after Merck submitted the 1998 PAS and after
8  it was approved even, Merck concluded that
9  data in that supplement was wrong or
10 incorrect, would Merck have had an obligation
11 to tell that to FDA?
12         MS. SCHMIDT:  Objection.
13         THE WITNESS:  If Merck draw any
14     conclusion based on some kind of data
15     and analysis and it's all confirmed
16     and, I mean, then -- I mean, you would
17     like to discuss it with the
18     regulatory, with CBER.
19         In this particular case,
20     1998 analysis -- 1999 analysis was
21     done by Merck and CBER both
22     independently.  So this was more of a
23     collaborative effort.  I mean -- so, I
24     mean, those specifications are set and

Page 416

1  supplement was submitted kind of in
2  collaboration because in a lot of
3  communication I see that language,
4  that CBER directed us to do that.
5  CBER directed us to set up this
6  specification.  I mean, there is some
7  of that language I see in some of the
8  communication.
9      So, I mean, in general, if you
10 find there is some kind of error after
11 you made a submission, yes, you will
12 report it.  What this seems like a
13 different case to me, reading the
14 communication, because kind of sounds
15 like that Merck took pretty much a
16 very much lead role -- sorry, CBER
17 took a lead role and both of them
18 worked together to set up the
19 specification.  And then -- I mean,
20 there is realtime data getting
21 generated and, you know, it's all
22 passing.  So in general, yes, if you
23 find some error, you will report it.
24 BY MR. MACORETTA:

Page 417

1      Q.   Okay.  Great.  If you could go
2  to paragraph 83 of your report on page 23.
3      A.   Paragraph 83.
4      Q.   Paragraph 83, page 23, "Mumps
5  stability lots tested...."  When you're
6  talking about mumps stability lots tested,
7  and later in the paragraph "...ongoing
8  stability after-market testing...," that's
9  what you're calling realtime data.  Right?
10     A.   Yes, that's the annual
11 stability, right.  And that's the realtime
12 data.
13     Q.   Okay.  When you're talking
14 about realtime data --
15     A.   Yes.
16     Q.   -- this is what you're talking
17 about?
18     A.   Yes.
19     Q.   Okay.  And you say in here that
20 "The purpose...is to monitor the product over
21 its shelf life and to determine that the
22 product remains, and can be expected to
23 remain, within specifications...."  Right?
24     A.   Under the storage condition of

105 (Pages 414 - 417)

Appx19655

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 418

1  label --
2      Q.    Yes.
3      A.    -- yes, that's correct.
4      Q.    But the realtime data -- I'm
5  going to the last sentence. "They...," which
6  I think you mean is the realtime data.
7  Right?
8      A.    Uh-huh.
9      Q.    "...are not (and are not
10  intended to be) representative of potential
11  worst-case scenarios which may be assessed
12  through other modeling and/or calculations."
13      Do you see that?
14      A.    So there is applicable to the
15  stability lots. They mean stability lots are
16  not representative of potential' worst case
17  scenario which may be assessed through
18  modeling or other calculation.
19      So basically what I'm trying to
20  say here, that stability lot -- I mean, they
21  are giving you them on, like, their part of
22  the stability monitoring program and
23  realtime -- you're looking at the realtime
24  data. I mean, they're not giving you the

Page 419

1  worst case scenario. That's what I think I'm
2  trying to say here.
3      Q.    So just because a lot doesn't
4  fall out of specification doesn't mean that
5  no lot will ever fall out of specification.
6  Right?
7      MS. SCHMIDT: Objection.
8  BY MR. MACORETTA:
9      Q.    A stability lot doesn't fall
10  out of specification?
11      A.    So based on my experience with
12  the stability program you generally -- I
13  mean, or even regulatory requirement, you put
14  one lot on annual stability per year, and
15  you're releasing all the lot based on your
16  specification. And, I mean, that one lot is
17  representative of all the lots manufactured
18  that year. If you -- this lot is -- it's
19  like doing sampling, I'm making this many
20  lots, I picked out one sample. I'm going to
21  put it on stability. And it is showing me
22  whatever is manufactured the whole year is
23  going to be stable. And because I have built
24  all that into my spec, this is just a

Page 420

1  confirmatory kind of testing.
2      Q.    But the fact that a lot -- that
3  lots are not out of spec doesn't mean your
4  worst case model is wrong, does it?
5      MS. SCHMIDT: Objection.
6      THE WITNESS: Worst case model
7  is applicable for the -- like, for the
8  worst case analysis. Realtime
9  stability data is not worst case
10  analysis. There will be other worst
11  case analysis. We are just
12  monitoring, we are making 50 lots. We
13  are putting one lot on stability and
14  we are making sure, because we do not
15  make any changes to the process or the
16  methods, it's a confirmatory testing
17  that you're still making sure that it
18  is still meeting the expiry. It's
19  like pulling out a sample, you know,
20  out of, you know, the box. If there
21  are like a hundred apples and pulling
22  out one apple and then putting it on
23  the table and if this apple -- because
24  all the apples came out of the same

Page 421

1  tree, and if this apple is not going
2  to -- is going be stable for
3  24 months, which means all of the
4  apples are going to be stable for
5  24 months because they're all coming
6  out of the same process.
7  BY MR. MACORETTA:
8      Q.    Then what's the point of doing
9  a worst case modeling if the sample confirms
10  that everything else is good?
11      A.    Worst case modeling, in this
12  particular -- there are like so many reasons
13  to do the worst case modeling. In this
14  particular case we were -- there was a
15  concern that what is the -- because what is
16  the impact on the lots which are still on
17  market from 1998 and 1999. And let's say if
18  you release all the lots in 4.3, what is your
19  worst case expected potency. And whatever is
20  your worst case expected potency is very
21  hard, patient impact. I mean, that's the
22  analysis that was -- analysis was done. What
23  is the worst case expiry potency and what is
24  the impact to the patient. So that's why we

106 (Pages 418 - 421)

Appx19656

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 422

1    want to say --
2        Q.    Well, wait a minute.  So Merck
3    did that what is the impact to the patient
4    with the worst case lots?
5        A.    The request was what is the
6    worst case potency.  And in that warning
7    letter response there was justification based
8    on clinical data that there is no patient
9    impact.  So even in the worst, worst case,
10   our patient is not impacted.  And that's what
11   CBER was trying to make sure and that's why
12   CBER selected 4.3 as a release potency for
13   all the lots.  All the lots were -- most of
14   the lots I looked at the table were released
15   from 4.4 to 5.4, but CBER did choose 4.3
16   because that was the release specification.
17   And if you're, like, taking the worst --
18   like, worst case release value and do the
19   worst case -- take the worst case period and
20   do the worst case analysis.  So worst -- so
21   that way you're just trying to make sure that
22   your patient impact, there's no patient
23   impact and you have data to support there is
24   no patient impact.

Page 423

1        Q.    Did you look at Merck's
2    analysis of no patient impact to see if it
3    was appropriate?
4            MS. SCHMIDT:  Objection.
5            THE WITNESS:  I mean, I'm not
6        expert in that area, so I did see the
7        medical assessment, and I'm sure it
8        came out from a medical expert.  And I
9        just -- I read it and -- I mean, I
10       cannot make an assessment whether it
11       is right or wrong.
12   BY MR. MACORETTA:
13       Q.    But some people at Merck
14   concluded that there could be an impact with
15   the lowest lots.  Right?
16           MS. SCHMIDT:  Objection.
17           THE WITNESS:  Did they?  I
18       don't --
19           MR. MACORETTA:  Let me show you
20       what I'm going to mark as Gulati-23.
21           - - -
22       (Exhibit Gulati-23, 2/26/01
23   Email, 00549510 - 00549535, was marked
24   for identification.)

Page 424

1            - - -
2    BY MR. MACORETTA:
3        Q.    Before we go into that, because
4    my time is short, I just want to go back to
5    my earlier question.
6        A.    Okay.
7        Q.    You consider Model 1 and
8    Model 3 worst case analyses.  Right?
9            MS. SCHMIDT:  Objection.
10           THE WITNESS:  No.  Model 2 for
11       pre-fill lot is worst case analysis.
12   BY MR. MACORETTA:
13       Q.    How about Model 3 that was used
14   for the rHA submission?
15       A.    It's not worst case.  It's
16   conservative model which is set up to --
17   which is built to determine the release
18   specification when you're making any changes.
19       Q.    So Model 2 is a worst case, and
20   we're talking about the pre-fill or the
21   overfill part of Model 2?
22       A.    Pre-fill.
23       Q.    Okay.  How about the overfill
24   part of Model 2, would you consider that a

Page 425

1    worst case analysis?
2        A.    For that I already said that is
3    not applicable.
4        Q.    Okay.
5        A.    That Model 2 is not applicable.
6        Q.    Gulati-23 is an email from
7    Dorothy Margolskee talking about end expiry
8    lots at potencies below 4.3.
9            MS. SCHMIDT:  I'm sorry, where
10       are you?
11   BY MR. MACORETTA:
12       Q.    Let me go to -- have you seen
13   this before?
14       A.    I think I went through, yes, I
15   went through it.
16       Q.    Okay.  Dr. Margolskee here is
17   talking, if you go to page 4, I guess, of the
18   memo, comments re the lot -- the 6 lots less
19   than 3.7 at 24 months end expiry.
20           Do you see that?
21       A.    I see that.
22       Q.    Okay.  She doesn't offer any
23   medical justification or confidence that
24   under 3.7 is okay.  Right?

107 (Pages 422 - 425)

Appx19657

Page 426

1        MS. SCHMIDT:  Objection.  You
2    can look at the whole document if you
3    need to.
4  BY MR. MACORETTA:
5        Q.    You can.
6        A.    Because -- I mean, I remember
7  in BPDR and in warning letter response when
8  that predicted range was 3. -- minimum was
9  3.3 and medical assessment and, I mean, field
10  efficacy study and everything indicated that
11  as long as you're above 3.1, you would have
12  adequate response.  I mean, that's what I
13  remember.
14        Q.    Do you remember --
15        A.    Adequate response.
16        Q.    Do you understand the basis of
17  Merck's claim that we'd have an adequate
18  response above 3.1?
19        A.    I'm not a clinician or a
20  medical expert.  I'm just relying on what the
21  I read.
22        Q.    Just relying on what?
23        A.    What I read in the warning
24  letter response.

Page 427

1        Q.    Okay.  All right.  So
2  Model 1 -- I'm sorry, you said Model 1 was
3  not intended to be a worst case scenario
4  model?
5        MS. SCHMIDT:  Objection.
6        THE WITNESS:  It was the real
7    case scenario model.  Model 1 is based
8    on realtime data.  And the objective
9    of the model is to set up the
10    specification based on realtime data
11    so that it is reliable.  And that was
12    done based on the realtime data.
13  BY MR. MACORETTA:
14        Q.    And Model 2 was a worst case
15  scenario model?
16        A.    It was a worst case scenario
17  model because it took only a subset of the
18  data.  Model 1 took, like, years and years of
19  data.  I mean, vaccines are biological
20  products and potency is a biological assay.
21  Variability is very high even day to day.  So
22  year to year because you will see the impact
23  of the season.  I mean, you will see all kind
24  of variability.  So more years of data, more

Page 428

1  time period to include, more reliable the
2  results are.
3        Q.    So Model 3, the June '04
4  version, the 2004 versions we looked at, if
5  no lots actually fell out of spec, does that
6  prove that that model is wrong?
7        MS. SCHMIDT:  Objection.
8        THE WITNESS:  You're asking me
9    Model 3 is wrong?
10  BY MR. MACORETTA:
11        Q.    I'm asking you -- I'm asking
12  you the first part of Model 3 or the second
13  part at 4.1.  If no lots actually fell out of
14  specification, does that prove that that
15  model is wrong?
16        MS. SCHMIDT:  Objection.
17        THE WITNESS:  Are you talking
18    about Model 2, like, which one are you
19    talking about?
20  BY MR. MACORETTA:
21        Q.    I'm talking about -- let me
22  pick one of these.  Let's go to Gulati-15,
23  which is the March '04 model, which
24  predicts --

Page 429

1        A.    15.
2        Q.    Or I can go to, yeah, to 15 or
3  I can -- which is the same model, I think,
4  which is in 14.
5        MS. SCHMIDT:  I'm sorry, so
6    which one are you looking?
7  BY MR. MACORETTA:
8        Q.    15 and 14 are the same model, I
9  believe.  So let's go to 15.
10        A.    Okay.
11        Q.    Model -- 15 contemplates a 4.1
12  end expiry.  Right?
13        MS. SCHMIDT:  What are you --
14    15?
15        MR. MACORETTA:  Yeah.
16        THE WITNESS:  So that memo
17    somewhere here.
18        MS. SCHMIDT:  It's okay.
19  BY MR. MACORETTA:
20        Q.    Model -- this model
21  contemplates minimum expiry of 4.1.  Right?
22        MS. SCHMIDT:  Objection.
23        THE WITNESS:  This model does
24    not say anything about 4.1.  4.1 is

108 (Pages 426 - 429)

Appx19658

Page 430

1  coming from somewhere, some source
2  document, and I don't know what is
3  that source document.  I said that
4  before also.
5      MR. MACORETTA:  You know what,
6  that's it.  I don't have any further
7  questions.  Thank you.
8      VIDEOGRAPHER:  We are now off
9  the video record at 18:25.  This now
10 concludes today's testimony given by
11 Dipti Gulati.  Total number of media
12 units used was six and will be
13 retained by Veritext Legal Solutions.
14          - - -
15      (Witness excused.)
16          - - -
17      (Deposition concluded at
18 6:25 p.m.)
19
20
21
22
23
24

Page 432

1      C E R T I F I C A T E
2
3
      I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
   testimony was taken before me, pursuant to
5  notice, at the time and place indicated; that
   said deponent was by me duly sworn to tell
6  the truth, the whole truth, and nothing but
   the truth; that the testimony of said
7  deponent was correctly recorded in machine
   shorthand by me and thereafter transcribed
8  under my supervision with computer-aided
   transcription; that the deposition is a true
9  and correct record of the testimony given by
   the witness; and that I am neither of counsel
10 nor kin to any party in said action, nor
   interested in the outcome thereof.
11
      WITNESS my hand and official seal this
12 17th day of December, 2018.
13
14
15
   _____
   Linda Rossi Rios, RPR, CSR
16 Notary Public
17
18
19
20
21
22
23
24

Page 431

1      CERTIFICATE OF DEPONENT
2
3      I have read the foregoing transcript of
4  my deposition and except for any corrections or
5  changes noted on the errata sheet, I hereby
6  subscribe to the transcript as an accurate record
7  of the statements made by me.
8
9
      _____
10        DIPTI GULATI, Ph.D.
11
12 SUBSCRIBED AND SWORN before and to me
13 this ____ day of _____, 20___.
14
15
16    _____
17        NOTARY PUBLIC
18
19
20 My Commission expires:
21
22
23
24

Page 433

1      INSTRUCTIONS TO WITNESS
2      Please read your deposition over
3  carefully and make any necessary corrections.
4  You should state the reason in the
5  appropriate space on the errata sheet for any
6  corrections that are made.
7      After doing so, please sign the errata
8  sheet and date it.
9      You are signing same subject to the
10 changes you have noted on the errata sheet,
11 which will be attached to your deposition.
12     It is imperative that you return the
13 original errata sheet to the deposing
14 attorney within thirty (30) days of receipt
15 of the deposition transcript by you.  If you
16 fail to do so, the deposition transcript may
17 be deemed to be accurate and may be used in
18 court.
19
20
21
22
23
24

109 (Pages 430 - 433)

Appx19659

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 434

1         ERRATA SHEET

        VERITEXT LEGAL SOLUTIONS

2        330 OLD COUNTRY ROAD

        MINEOLA, NEW YORK 11501

3        516-608-2400

4  NAME OF CASE: USA VS. MERCK & CO., INC.

    DATE OF DEPOSITION: DECEMBER 5, 2018

5  NAME OF DEPONENT: DIPTI GULATI, Ph D.

6  PAGE  LINE(S)  CHANGE    REASON

7  ____|_____|_____|_____

8  ____|_____|_____|_____

9  ____|_____|_____|_____

10  ___|_____|_____|_____

11  ___|_____|_____|_____

12  ___|_____|_____|_____

13  ___|_____|_____|_____

14  ___|_____|_____|_____

15  ___|_____|_____|_____

16  ___|_____|_____|_____

17  ___|_____|_____|_____

18  ___|_____|_____|_____

19  ___|_____|_____|_____

20  ___|_____|_____|_____

21  _____

      DIPTI GULATI, Ph D.

22

  SUBSCRIBED AND SWORN TO BEFORE ME

23  THIS___DAY OF _____, 20__.

  _____  _____

24  (NOTARY PUBLIC)    MY COMMISSION EXPIRES:

110 (Page 434)

Appx19660

11/26/2019
Declaration of G. Reilly
EXHIBIT 395

Appx19661

# BIOLOGICAL STABILITY PROGRAM

# ANNUAL STABILITY REPORT

MMD – Vaccine & Sterile Quality Operations - Biological Stability Unit

DOCUMENT NUMBER/NAME:

**M-M-R®II STABILITY DATA SUMMARY FOR 2001 ANNUAL STABILITY REPORT**

#MMR01.00 (orig.)

Originator Signature/Date

Sally Wong    *Sally Wong  8-21-01*
Sr. Project Scientist

Auditor Signature/Date

Traci Sinding    *Traci Sinding  8.21.01*
Auditor

Approval Signature/Date

Cynthia F. Morrisey    *[signature]  8-26-01*
Sr. Scientist

Distribution in Addition to Annual Review Binder Recipients:

| | |
|---|---|
| S. Galford ( for inclusion in 2001 Annual Review) | WP36A-101 |
| P. Lucas | WP35-201 |
| C. Petroski | WP35-105 |
| C. Costanza | WP36A-101 |
| D. Gulbinski | WP38B-4C |
| M. Rosolowsky | WP35-105 |
| M. Kandil | UN-B121 |
| P. DeHaven | WP44-I130 |
| Biological Stability Unit File | |

CONFIDENTIAL

## M-M-R®II  2001 Annual Review
### Executive Summary

This document is a summary of the M-M-R®II stability data for the 2001 Annual Review.

This Annual Stability Report includes 21 lots of M-M-R®II. They are regular production lots of either single dose or ten dose M-M-R®II on stability study at the recommended storage condition with testing validated between 4/1/00 and 3/31/01. The lots included in this analysis are the following:

| Lot | Dosage | Study | Purpose |
|---|---|---|---|
| 0067H* | single | BS0165 | 5 °C with −20 °C Control Concurrent Study / 1998 Annual |
| 0291H* | single | BS0165 | 5 °C with −20 °C Control Concurrent Study |
| 0615040* | ten | BS0165 | 5 °C with −20 °C Control Concurrent Study / 1998 Annual |
| 0624918* | single | BS0167 | Control Lot for o-GOS Study |
| 0627847* | single | BS0182 | Clinical Mumps Expiry Trial Study |
| 0628001* | single | BS0182 | Clinical Mumps Expiry Trial Study |
| 0628706* | single | BS0187 | Control Lot for Albumin-free Diluent Study |
| 0633752* | single | BS0225 | Mumps High Titer Study/1999 Annual |
| 0633815* | single | BS0225 | Mumps High Titer Study |
| 0634034* | single | BS0225 | Mumps High Titer Study |
| 0500954* | single | BS0206 | REDACTED – OMP |
| 0631655 | single | BS0204 | New Albumin Vendor Study |
| 0631656 | single | BS0204 | New Albumin Vendor Study |
| 0632464 | single | BS0204 | New Albumin Vendor Study |
| 0634129 | single | BS0224 | New Albumin Vendor Study |
| 0636850 | single | BS0242 | New Albumin Vendor Study |
| 0636851 | single | BS0242 | New Albumin Vendor Study |
| 0998K | single | BS070K | 2000 Annual |
| 0507J* | ten | BS071J | 1999 Annual |
| 1434K | ten | BS071K | 2000 Annual |
| 1832K | ten | BS071L | 2001 Annual |

\* Reported in previous Annual Stability Report.

Trend Analyses of measles, mumps, and rubella potency and moisture and comparison to historical data are summarized in Table 1.

All test results within this annual report period (physical appearance, measles potency, mumps potency, rubella potency, moisture, sterility, closure integrity, and restoration) are within the current specification limits, with the following noted exceptions. In addition, test results for control lots 0624918 and 0628706 held at transfer conditions (-20°C for 12 months then transferred to 2-8°C for 24 months) are not included in this report. Since the transfer to 2-8°C occurred more than 12 months from the date of manufacture for both lots, the conditions of the transfer branch of these studies are not representative of marketed product.

Measles Potency:



REDACTED – OMP

CONFIDENTIAL

**M-M-R®II** 2001 Annual Review
Executive Summary



Mumps Potency:

Lot 0624918: Mumps potency result at the 24-month interval was below the specification limit. The Stability Test Investigation concluded that the out-of-specification result is in agreement with the previous time points and the historical loss rate for mumps.

Lot 0627847: Mumps potency results at the 24 and 30-month intervals were below the specification limit. The Stability Test Investigations concluded that the out-of-specification results are in agreement with the previous time points and the historical loss rate for mumps and may have been due to a lower than average release potency.

Lot 0627847: Mumps Reconstitute and Store potency results, 0, 4, and 8-hour incubation times, at the 24-month interval were below the specification limit. The Stability Test Investigation concluded that the out-of-specification results are in agreement with the previous stability results for this lot and the historical log loss of mumps; in addition the low release value contributed to the failing stability results.

Lot 0628001: Mumps Reconstitute and Store potency result, 0-hour incubation time, at the 24-month interval was below the specification limit. The Stability Test Investigation concluded that the out-of-specification result may be attributed to assay variability.

Lot 0628706: Mumps Reconstitute and Store potency, 8-hour incubation time, at the 24-month interval was below the specification limit. The Stability Test Investigation concluded the out-of-specification result may be attributed to assay variability. A Biological Product Deviation Report was filed for this failure on March 5, 2001.



MRK-KRA01632747
MRK-CHA01632747

**Appx19664**

**M-M-R®II** 2001 Annual Review
Executive Summary



Overall, the stability data in this Annual Stability Report demonstrate stability that is consistent with the historical performance for this product. In September 1999 a process change was made to increase the level of mumps virus in M-M-R®II family vaccines containing mumps component. The process change was implemented to increase the likelihood that lots will meet the mumps potency expiry specification of $\geq 3.6$ -log $TCID_{50}$/0.1mL and the release specification of $\geq 4.3$ -log $TCID_{50}$/0.1mL. Additionally, in September 1999 the measles release potency specification was raised from 2.3 to 2.8 -$\log_{10}TCID_{50}$/0.1mL to ensure that potency for lots at expiry would meet the specification of $\geq 2.3$ -$\log_{10}TCID_{50}$/0.1mL.

Please call if you have any questions or need additional information.
Sally Wong -25087

AN_MMR01

CONFIDENTIAL

MRK-KRA01632748
MRK-CHA01632748

Appx19665



**M-M-R®II 2001 Annual Review**
**Executive Summary**
**M-M-R®II Stability at 5 (2 to 8)°C**

Table 1

Stability Results Summary:

(Testing validated through 3/31/01)

| Lot | Log Change/Yr Measles Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Log Change/Yr Mumps Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Log Change/Yr Rubella Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Change/Yr Moisture (%, w/w) | No. of Intervals Used for Analysis |
|---|---|---|---|---|---|---|---|---|
| 0067H | REDACTED – OMP | 6 | -0.15 | 6 | REDACTED – OMP | 8 | 0.40 | 5 |
| 0291H | | 6 | -0.18 | 6 | | 8 | 0.32 | 4 |
| 0615040 | | 6 | -0.12 | 6 | | 8 | 0.06 | 5 |
| 0624918 | | 6 | -0.28 | 6 | | 10 | 0.72 | 9 |
| 0627647 | | 6 | -0.24 | 6 | | 8 | 0.47 | 4 |
| 0628001 | | 6 | -0.17 | 6 | | 8 | 0.50 | 4 |
| 0028706 | | 5 | -0.22 | 5 | | 9 | 0.07 | 7 |
| 0500954 | | 4 | -0.29 | 4 | | 6 | NR | NR |
| 0631655 | | 4 | -0.12 | 4 | | 6 | NR | NR |
| 0631656 | | 4 | -0.27 | 4 | | 6 | NR | NR |
| 0632464 | | 4 | -0.27 | 4 | | 6 | NR | NR |
| 0507J | | 4 | 0.02 | 4 | | 6 | NR | NR |
| Historical Average Standard Deviation ± 3 SD Range Number of Lots | N/A | N/A | -0.17 0.17 (-0.67 to 0.33) 68 | N/A | N/A | N/A | +0.11 ±0.28 (-0.73 to 0.95) 64 | N/A |
| Historical Average Multi-dose Lots Standard Deviation ± 3 SD Range Number of Lots | N/A | N/A | N/A | N/A | N/A | N/A | +0.06 ±0.33 (-0.93 to 1.05) 60 | N/A |

NR: Not required. No analysis required since there were less than three intervals.

Slope calculations for potency were based on the date of packaging or date placed at 5 (2-8)°C.

Changes are determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time.

Slope calculations for potency were performed on house standard-adjusted data. Historical average potency data has been rounded to two significant figures.

Due to the bi-phasic kinetics of measles and mumps potency stability loss observed in the historical stability database, the linear regressions performed use only data from the 6-month stability interval through the current interval of the stability study (18 months or greater). Linear regression analysis of rubella potency loss is calculated using all data from the initial interval forward.

Historical average data for measles, mumps, and rubella potency are from regular production Live Virus Vaccine lots stored at 2-8°C which contain the measles, mumps, and rubella components: monovalent, bivalent, and trivalent formulations are included. Both single-dose and multi-dose formulations are included.

For moisture, results of release testing are included in the analysis. The change per year is calculated from the average percent moisture at each interval tested.

Historical average moisture data has been provided for both single-dose lots (first average reported) and multi-dose lots. Monovalent, bivalent, and trivalent formulations are included.

CONFIDENTIAL

MRK-KRA01632749
MRK-CHA01632749

Appx19666

Graph of Measles Potency Change Per Year vs. Selected Lots



REDACTED – OMP

CONFIDENTIAL

**Graph of Mumps Potency Change Per Year vs. Selected Lots**

Mumps potency analyses have been validated on lots with testing completed through 18 months. The change per year is determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time. The graph contains the corresponding historical average as reference.



MRK-KRA01632751
MRK-CHA01632751

**Appx19668**

11/26/2019
Declaration of G. Reilly
EXHIBIT 396

Appx19669



# STABILITY PROGRAM

## ANNUAL STABILITY REPORT

MMD – Vaccine Regulatory & Analytical Sciences - Biological Stability Unit

---

DOCUMENT NUMBER/NAME:

**M-M-R®II ANNUAL STABILITY REPORT FOR 2004 ANNUAL REVIEW**

#MMR04.00

---

Originator Signature/Date

*for M.H.*    25-MAY-2004

Michael Huang
Senior Project Scientist

---

Statistical Author/Date

Milauni Patel
Stability Scientist    *Milauni Patel*    25-MAY-2004

---

Auditor Signature/Date

Christine Meyer
Auditor    *Christine Meyer*    26 May 2004

---

Approval Signature/Date

*Susan Penix for HG*    26 MAY 2004

Henrietta Grosz
Stability Statistical Supervisor

---

Approval Signature/Date

Susan Penix    *Susan Penix*    26 MAY 2004
Stability Senior Project Scientist

---

Distribution in Addition to Annual Review Binder Recipients:

| | |
|---|---|
| I. Heafner (for inclusion in 2004 Annual Review) | WP38M-9 |
| P. Lucas | WP35-201 |
| M. Rosolowsky | WP37A-102 |
| P. DeHaven | WP53B-100 |
| D. Zacholski | BLB-22 |
| C. Morrisey | WP37B-103 |
| Biological Stability Unit File | |

2004 M-M-R®II Annual
Page _1_ of _36_

MRK-KRA01632833
MRK-CHA01632833

Appx19670



Restricted
R ⊙ Confidential
limited access

## Executive Summary

This document is a summary of the M-M-R®II stability data for the 2004 Annual Review.

This Annual Stability Report includes nine (9) regular production lots of single dose M-M-R®II on stability at the recommended storage condition with testing validated between 01-APR-2003 and 31-MAR-2004.

The lots included in this analysis are the following:

| Lot | Dosage | Study | Purpose |
|---|---|---|---|
| 0640794* | Single | BS0291 | Lot with Stainless Steel Agglomerates |
| 0641017* | Single | BS0280 | Control Lot, rHA Clinical Study |
| 0643956* | Single | BS0298 | Control Lot, rHA Study |
| 0643750* | Single | BS0299 | Control Lot, New lyophilization Cabinets (LY-801 and LY-802) |
| 0644709* | Single | BS0303 | Control Lot, Alternative (WG) Chicken Flock |
| 0734L* | Single | BS070L | 2001 Annual |
| 0232M* | Single | BS070M | 2002 Annual |
| 0391N | Single | BS070N | 2003 Annual |
| 0647679 | Single | BS0318 | Increased Stopper Sterilization Cycle |

* Reported in previous Annual Stability Report.

Statistical analyses of measles, mumps, and rubella potency data are summarized in Table 1. Statistical analyses of pH and Restoration data are summarized in Table 2. Trend Analysis for Moisture was also completed and summarized in Table 2; however, historical data for Aquatest VIII was not available for comparison.

All stability test results within this annual report period for measles potency, mumps potency, rubella potency, physical appearance, moisture, restoration time, closure integrity, pH, sterility, and general safety are within the current specification limits.

Overall, the stability data in this Annual Stability Report demonstrate stability that is consistent with the historical performance for this product.



REDACTED – OMP

Originator
BSU Analyst: U. MOHSENI
Date: 25-MAY-2004
Signature: Mr. Clile

Second Scientist Reviewed
BSU Auditor: CM
Date: 25 May 2004
Signature: C Zwleya

2004 M-M-R®II Annual
Page 2 of 34

MRK-KRA01632834
MRK-CHA01632834

Appx19671



M-M-R®II 2004 Annual Review
Executive Summary

M-M-R®II

Table 1
Stability Results Summary:
(Testing validated through 31-MAR-2004)

| Lot | Log Change/Yr Measles Potency [Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Log Change/Yr Mumps Potency [Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Log Change/Yr Rubella Potency [Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis |
|---|---|---|---|---|---|---|
| 0640794 | REDACTED – OMP | 5 | -0.25 | 5 | REDACTED – OMP | 7 |
| 0641017 | | 8 | -0.22 | 8 | | 13 |
| 0643956 | | 4 | -0.13 | 4 | | 9 |
| 0643750 | | 4 | -0.10 | 4 | | 6 |
| 0644709 | | 3 | -0.23 | 3 | | 5 |
| 0734L | | 6 | -0.20 | 5 | | 9 |
| 0232M | | 4 | -0.32 | 4 | | 6 |
| 0391N | | NR | NR | NR | | NR |
| 0647679 | | NR | NR | NR | | NR |
| Historical Average Standard Deviation ± 3 SD Range Number of Lots | N/A | | -0.17 0.17 (-0.67 to 0.33) 68 | | N/A | |

NR: Not required. No analysis required since there were less than three intervals.
N/A: Not Applicable.

Slope calculations for potency were based on the date of packaging or date placed at 5°C (2 to 8)°C.

Changes are determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time.
Slope calculations for potency were performed on house standard-adjusted data. Historical average potency data has been rounded to two significant figures.
Due to the bi-phasic kinetics of measles and mumps potency stability loss observed in the historical stability database, the linear regressions performed use only data from the 6-month stability interval through the current interval of the stability study (18 months or greater). Linear regression analysis of rubella potency loss is calculated using all data from the initial interval through the current interval.

Historical average data for measles, mumps, and rubella potency are from regular production Live Virus Vaccine lots stored at 2 to 8°C which contain the measles, mumps, and rubella components; monovalent, bivalent, and trivalent formulations are included. Both single-dose and multi-dose formulations are included.

Second Scientist Reviewed
BSU Auditor  My
Date: 21 May 2004
Signature: C Meyer

Analyst  M Patil
21-may-2004
Milan Patil

2004 M-M-R®II Annual
Page _3_ of _36_

CONFIDENTIAL



Restricted
Confidential
limited access

M-M-R®II 2004 Annual Review
Executive Summary

M-M-R®II

Table 2
Stability Results Summary:
(Testing validated through 31-MAR-2004)

| Lot | pH Change/Yr. | No. of Intervals Used for Analysis | Restoration Change/Yr. | No. of Intervals Used for Analysis | Change/Yr Moisture (%, w/w) | No. of Intervals Used for Analysis |
|---|---|---|---|---|---|---|
| 0540794 | 0.02 | 5 | NR | NR | 0.00 | 7 |
| 0541017 | 0.00 | 6 | 1.3 | 4 | 0.01 | 8 |
| 0643955 | 0.00 | 4 | NR | NR | 0.05 | 6 |
| 0643750 | 0.00 | 4 | NR | NR | 0.31 | 6 |
| 0644709 | NR | NR | NR | NR | NR | NR |
| 0734L | 0.03 | 6 | 3.3 | 4 | 0.14 | 6 |
| 0232M | -0.06 | 4 | NR | NR | 0.47 | 6 |
| 0391N | NR | NR | NR | NR | NR | NR |
| 0647679 | NR | NR | NR | NR | NR | NR |
| Historical Average Standard Deviation ± 3 SD Range Number of Lots | 0.00 0.02 (-0.06 to 0.06) 12 | N/A | 1.8 5.1 (-13.4 to 17.1) 23 | N/A | Not Available[1] | N/A |

NR: Not required. No analysis required since there were less than three intervals.
N/A: Not Applicable.

Slope calculations were based on the date of packaging or date placed at 5°C (2 to 8)°C.

Changes are determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time.

[1]Historical Karl Fisher Aqualast VII: average not available due to insufficient data.

Analyst  M. Pili
31-MAR-2004
Milani Pili

Second Scientist Reviewed
BSU Auditor:
Date: 21 May 2004
Signature:

2004 M-M-R®II Annual
Page 4 of 36

MRK-KRA01632836
MRK-CHA01632836

Appx19673



Graph of Measles Potency Change Per Year vs. Selected Lots



2004 M-M-R©II Annual
Page _5_ of _36_

Second Scientist Reviewed
BSU Auditor: ___
Date: 20 May 2004
Signature: ___

CONFIDENTIAL

MRK-KRA01632837
MRK-CHA01632837

**Appx19674**



Graph of Mumps Potency Change Per Year vs. Selected Lots

Mumps potency analyses have been completed on lots with testing validated through 18 months. The change per year is determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time. The graph contains the corresponding historical average as reference.



2004 M-M-R®II Annual
Page 6 of 36

11/26/2019
Declaration of G. Reilly
EXHIBIT 397

Appx19676



Restricted
R Confidential
limited access

# STABILITY PROGRAM
# ANNUAL STABILITY REPORT

MMD – West Point Quality Operations – Stability Unit

DOCUMENT NUMBER/NAME:

**M-M-R®II ANNUAL STABILITY REPORT FOR 2005 ANNUAL REVIEW**

AN_MMR05.00

Originator Signature/Date

*Kathleen Illig*        31-MAY-2005

Kathleen Illig
Sr. Stability Analyst

Approval Signature/Date

*Deanne Hertzog*        31-MAY-2005

Deanne Hertzog
Sr. Stability Coordinator

Distribution in Addition to Annual Review Binder Recipients:

I. Heafner (for inclusion in 2005 Annual Review)      WP38M-9
R. Hudosky      WP55-201
P. DeHaven      WP53B-100
D. Zacholski      BLB-22
E. Mathewson      WP37B-101
WPQO Stability Unit Files

AN_MMR05

CONFIDENTIAL

MRK-KRA01634117
MRK-CHA01634117

**Appx19677**



**Restricted**
R **Confidential**
**limited access**

## M-M-R®II 2005 Annual Review
### Executive Summary

This document is a summary of the M-M-R®II stability data for the 2005 Annual Review. This Annual Stability Report includes twelve regular production lots of single dose M-M-R®II on stability at the recommended storage condition of 5 °C (2–8 °C) and one smaller scale production lot with testing validated through 31-MAR-2005. The lots included in this annual report are the following:

| Lot | Fill Date | Table | Study | Purpose |
|---|---|---|---|---|
| 0640794[a] | 19-MAY-2001 | 3, 4 | BS0291 | Lot Containing Stainless Steel Particle Agglomerates |
| 0232M[a] | 10-APR-2002[b] | 5, 6 | BS070M | 2002 Annual |
| 0643750[a] | 16-MAY-2002 | 7, 8 | BS0299 | Control Lot, New Lyophilization Cabinets (LY-801 and LY-802) |
| 0643956[a] | 10-JUN-2002 | 9, 10 | BS0298 | Control Lot, rHA (Recombinant Human Albumin) Study |
| 0644709[a] | 19-SEP-2002 | 11 | BS0303 | Control Lot, Alternative Flock (White Leghorn Chicken Strain, WG) |
| 0501239 | 16-OCT-2002 | 12, 13 | BS0303 | Alternative (WG) Chicken Flock |
| 0501240 | 16-OCT-2002 | 14, 15 | BS0303 | Alternative (WG) Chicken Flock |
| 0501241 | 16-OCT-2002 | 16, 17 | BS0303 | Alternative (WG) Chicken Flock |
| 0391N[a] | 09-APR-2003[b] | 18, 19 | BS070N | 2003 Annual |
| 0647679[a] | 19-AUG-2003 | 20, 21 | BS0318 | Increased Stopper Sterilization Cycle |
| 0649811 | 14-APR-2004 | 22, 23 | BS0360 | 2004 Annual |
| BWO045000003 | 03-MAY-2004 | 24 | BS0363 | Control Lot, Clinical rHA Program, Manufactured at 1/3 Batch Size |
| 0650345 | 05-JUN-2004 | 25 | BS0404 | Control Lot, New Lyophilization Cabinets (LY-803 and LY-804) |

[a] Reported in previous Annual Stability Report.
[b] Date of packaging.

Statistical trend analyses of measles, mumps, and rubella potency data for current lots on stability are summarized in Table 1 with a comparison to historical potency data. Statistical trend analyses of pH and restoration data for current lots on stability are summarized in Table 2 with a comparison to historical data. Trend analyses of moisture data for current lots on stability are summarized in Table 2; however, historical data for moisture determination was not available for comparison. Measles, mumps, and rubella potency changes per year for current lots on stability versus historical averages are displayed in Figure 1, Figure 2, and Figure 3, respectively. pH and restoration changes per year for current lots on stability versus historical averages are displayed in Figure 4 and Figure 5, respectively. Trend analyses for moisture changes per year for current lots on stability are displayed in Figure 6.

Potency results for Lot BWO045000003 met the specification limits; however, the potency value did not meet Active Stability Monitoring (ASM) criteria for this annual review period in that the measles potency was outside of the three-sigma historical range for absolute potency at the 0-Day (initial) interval. All ASM criteria were met following expanded testing and no further action was required.

Control procedure "Determination of Moisture by the Karl Fischer Coulometric Titrator Method", CP 9110.695, was updated to include the use of Aquatest 2010 which replaced Aquatest 8 in April 2004.

All stability test results within this annual report period for measles potency, mumps potency, rubella potency, physical appearance, moisture, restoration time, closure integrity, pH, sterility, and general safety are within the current specification limits. Overall, the stability data in this Annual Stability Report demonstrate stability that is consistent with the historical performance for this product.

Please call if you have any questions or need additional information.

Kathleen J. Illig x28297 *2005*

AN_MMR05

Page 2 of 33

**CONFIDENTIAL**

**MRK-KRA01634118**
**MRK-CHA01634118**

**Appx19678**



Restricted
Confidential
Limited access

## M-M-R®II 2005 Annual Review
### Executive Summary

Table 1: Statistical Analyses of Measles, Mumps, and Rubella Potency Data.

| Lot | Log Change/Year Measles Potency log $TCID_{50}/0.1$ mL | Number of Intervals Used for Analysis | Log Change/Year Mumps Potency log $TCID_{50}/0.1$ mL | Number of Intervals Used for Analysis | Log Change/Year Rubella Potency log $TCID_{50}/0.1$ mL | Number of Intervals Used for Analysis |
|---|---|---|---|---|---|---|
| 0640794 | REDACTED – OMP | 6 | −0.19 | 6 | REDACTED – OMP | 8 |
| 0232M | | 6 | −0.20 | 6 | | 8 |
| 0643750 | | 6 | −0.21 | 6 | | 8 |
| 0643956 | | 6 | −0.19 | 6 | | 11 |
| 0644709 | | 5 | −0.25 | 5 | | 7 |
| 0501239 | | 5 | −0.06 | 5 | | 7 |
| 0501240 | | 5 | −0.22 | 5 | | 7 |
| 0501241 | | 5 | −0.17 | 5 | | 7 |
| 0391N | | 4 | −0.23 | 4 | | 6 |
| 0647679 | | NR | NR | NR | | NR |
| 0649811 | | NR | NR | NR | | NR |
| BWO045000003 | | NR | NR | NR | | NR |
| 0650345 | | NR | NR | NR | | NR |
| Historical Average Standard Deviation (SD) ± 3 SD Range Number of Lots | | Not Applicable | −0.17 0.17 (−0.67 to 0.33) 68 | Not Applicable | | Not Applicable |

NR: Not required; no analysis required since data were unavailable for less than three intervals and/or through 18 months.

Changes are determined using linear regression analysis of at least 3 data points. Slope calculations for potency were performed on house standard-adjusted data and were based on the date of packaging or date placed at 5 °C (2 to 8 °C).

Historical average potency data has been rounded to two significant figures. Due to the bi-phasic kinetics of measles and mumps potency stability loss observed in the historical stability database, the linear regressions performed use only data from the 6-month stability interval through the current interval of the stability study (18 months or greater). Linear regression analysis of rubella potency loss is calculated using all data from the initial interval through the current interval. Historical average data for all potency results are from regular production Live Virus Vaccine lots (single-dose and multi-dose formulations are included) stored at 2 to 8 °C which contain the measles, mumps, and rubella components; monovalent, bivalent, and trivalent formulations are included.

All potency results for measles, mumps, and rubella for the current lots on stability are within ±3 standard deviations of the historical average.

AN_MMR05

CONFIDENTIAL

MRK-KRA01634119
MRK-CHA01634119

Appx19679



## M-M-R®II 2005 Annual Review
### Executive Summary

Table 2: Statistical Analyses of pH, Restoration, and Moisture Data.

| Lot | pH Change/Year | Number of Intervals Used for Analysis | Restoration Change/Year | Number of Intervals Used for Analysis | Moisture (w/w%) Change/Year | Number of Intervals Used for Analysis |
|---|---|---|---|---|---|---|
| 0640794 | 0.03 | 6 | −1.69 | 4 | 0.01 | 8 |
| 0232M | −0.02 | 6 | 0.51 | 4 | 0.04 | 8 |
| 0643750 | 0.02 | 6 | −0.51 | 4 | 0.00 | 8 |
| 0643956 | 0.01 | 6 | −8.30 | 5 | −0.14 | 8 |
| 0644709 | NT | NT | NT | NT | NT | NT |
| 0501239 | 0.00 | 5 | −2.64 | 3 | −0.20 | 7 |
| 0501240 | 0.00 | 5 | −2.64 | 3 | −0.23 | 7 |
| 0501241 | 0.00 | 5 | −2.64 | 3 | −0.16 | 7 |
| 0391N | 0.06 | 5 | NR | NR | −0.54 | 6 |
| 0647679 | 0.00 | 3 | NR | NR | −0.76 | 5 |
| 0649811 | 0.00 | 3 | NR | NR | −0.20 | 3 |
| BWO045000003 | NR | NR | NR | NR | −0.40 | 3 |
| 0650345 | NR | NR | NR | NR | NR | NR |
| Historical Average<br>Standard Deviation (SD)<br>± 3 SD Range<br>Number of Lots | 0.00<br>0.02<br>(−0.06 to 0.06)<br>14 | Not Applicable | 1.9<br>4.9<br>(−12.8 to 16.5)<br>25 | Not Applicable | Not Available [a] | Not Applicable |

[a] Not Available; historical average for moisture determination is not available due to insufficient data.
NR: Not required; no analysis required since data were unavailable for less than three intervals.
NT: Not tested; testing not required by stability protocol.

Slope calculations were based on the date of packaging or date placed at 5 °C (2 to 8 °C). Changes are determined using linear regression analysis.

All results for pH and restoration for the current lots on stability are within ± 3 standard deviations of the historical average. Results for moisture for the current lots on stability indicate a minute increase over time (0.00 to 0.04 w/w% change per year) or a decrease over time (−0.14 to −0.76 w/w% change per year), both acceptable results for moisture testing with the majority of lots decreasing.

CONFIDENTIAL

MRK-KRA01634120
MRK-CHA01634120

Appx19680



Restricted
R ⊕ Confidential
limited access

**M-M-R®II 2005 Annual Review**
**Executive Summary**

Figure 1: Statistical Analyses of Measles Potency for Current Lots on Stability Versus the Historical Average.



CONFIDENTIAL

MRK-KRA01634121
MRK-CHA01634121

**Appx19681**



Restricted
R ✪ Confidential
Limited access

### M-M-R®II 2005 Annual Review
### Executive Summary

Figure 2: Statistical Analyses of Mumps Potency for Current Lots on Stability Versus the Historical Average.



CONFIDENTIAL

MRK-KRA01634122
MRK-CHA01634122

**Appx19682**

11/26/2019
Declaration of G. Reilly
EXHIBIT 398

 **MERCK**

Restricted
R Confidential
limited access



*West Point Quality Operations - Stability Unit*

| | | | |
|---|---|---|---|
| DATE: | 25-Apr-2008 | | |
| TO: | GMP Compliance Annual Review Group | LOC: | WP 38M-1A |
| CC: | Mary Macchi | LOC: | |
| | Nancy Laible | | WP 82-22 |
| | Ed Mathewson | | WP 37B-101 |
| | Bonnie Stankunas | | UG 2D-68 |
| | Mark Stannard | | WP 35-201 |
| | WPQO-Stability Product File | | |
| FROM: | Jim Lucchese | LOC: | WP 37B-103 |
| SUBJECT: | STABILITY ANNUAL REVIEW for: | | |

M-M-R®II and M-M-R®II with rHA (Recombinant Human Albumin)

Author Signature: _____  Date: 25-APR-2008

Second Scientist
Review Signature: _____  Date: 30-APR-2008

---

### EXECUTIVE SUMMARY

The Stability Annual Review for M-M-R®II and M-M-R®II with rHA has been completed. This memo confirms that the stability data continues to demonstrate consistent performance throughout the registered shelf-life. No atypical trends in the results or out-of-specification results were observed for lots tested during the review period. All data continue to demonstrate acceptable stability to support product expiry.

### Comments

- In 2006 WPQO–Stability began to recruit packaged lots to meet the annual requirements. Prior to 2006 annual lots were recruited from fill lots. Since a new product number is assigned when a fill lot is packaged, the study tables below are separated by packaged and fill lots. The 04681 product number for the packaged lots represents fill lots with a product number of 04953-00 (M-M-R®II with rHA). The 04011 product number for the packaged lot represents a fill lot with a product number of 04680 (M-M-R®II).

This report includes data approved through 04-Apr-2008.

All lots active during the past year within the West Point stability program have been reviewed. The table below lists all active studies and/or completed studies that generated additional data since the previous annual report.

---

CONFIDENTIAL                                                          MRK-KRA01633948
                                                                     MRK-CHA01633948

**Appx19684**

Restricted
R ⊙ Confidential
limited access

*M-M-R®II Stability Annual Review*

**Table 1.**    List of Stability Studies for 04680 (M-M-R®II, 1X Single Dose)

| Study # | Study Start Date | Storage Condition | Purpose of Study | Study Status |
|---|---|---|---|---|
| 0649811 | 15-Sep-2004 | 5°C (2 to 8°C) | 2004 Annual Lot;<br>Lot for an increase in the autoclave sterilization cycle to support CR WP2-02-0348 and for use of EP50500 vials to support CR WP2-03-0222 | COMPLETE |
| 0650749 | 26-Aug-2005 | 5°C (2 to 8°C) | Reconstitute and store testing with room temperature diluent; inverted orientation | COMPLETE |
| 0650753 | 26-Aug-2005 | 5°C (2 to 8°C) | Reconstitute and store testing with room temperature diluent; inverted orientation | COMPLETE |
| 0650941 | 26-Aug-2005 | 5°C (2 to 8°C) | Reconstitute and store testing with room temperature diluent; inverted orientation | COMPLETE |
| 0653366 | 09-Nov-2005 | 5°C (2 to 8°C) | 2005 Annual Lot | ACTIVE |
| 0653338 | 14-Nov-2005 | 5°C (2 to 8°C) | REDACTED – OMP | ACTIVE |
| 0654024 | 01-Feb-2006 | 5°C (2 to 8°C) | 2005 Annual Lot;<br>Control lot for two lots manufactured with new igloo stoppers to support CR WP2-05-0270 | ACTIVE |
| 0654024-Helvoet | 01-Feb-2006 | 5°C (2 to 8°C) | Lot manufactured with Helvoet Igloo stopper to support CR WP2-05-0270 | COMPLETE |
| 0654024-West | 01-Feb-2006 | 5°C (2 to 8°C) | Lot manufactured with West Igloo stopper to support CR WP2-05-0270 | COMPLETE |

**Table 2.**    List of Stability Studies for 04681 (M-M-R®II with rHA, 10X Single Dose)

| Study # | Study Start Date | Storage Conditions | Purpose of Study | Expiry | Study Status |
|---|---|---|---|---|---|
| 0986F | 22-Aug-2006 | 5°C (2 to 8°C) | 2006 Annual Lot | 16-Aug-2008 | ACTIVE |
| 1327F | 30-Nov-2006 | 5°C (2 to 8°C) | 2006 Annual Lot | 04-Nov-2008 | ACTIVE |
| 0281U | 12-Feb-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 02-Feb-2009 | ACTIVE |
| 0526U | 29-Mar-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 24-MAR-2009 | ACTIVE |
| 1482U | 08-Oct-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 14-SEP-2009 | ACTIVE |

CONFIDENTIAL                                                                    MRK-KRA01633949
MRK-CHA01633949

Appx19685

R ⊙ Restricted
Confidential
limited access

*M-M-R®II Stability Annual Review*

Table 3.    List of Stability Studies for 04011 (M-M-R®II, 1840X Single Dose)

| Study # | Study Start Date | Storage Conditions | Purpose of Study | Expiry | Study Status |
|---------|------------------|--------------------|------------------|--------|--------------|
| 0293F | 12-May-2006 | 5°C (2 to 8°C) | 2006 Annual Lot | 22-Nov-2008 | ACTIVE |
| 1675U | 27-Dec-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 27-Dec-2009 | ACTIVE |

Table 4.    List of Stability Studies for 04953-00 (M-M-R®II with rHA)

| Study # | Study Start Date | Storage Condition | Purpose of Study | Study Status |
|---------|------------------|-------------------|------------------|--------------|
| 0653131 | 14-Nov-2005 | 5°C (2 to 8°C) | Demonstration lot for M-M-R®II with rHA REDACTED – OMP REDACTED – OMP slotted stoppers, and EP-compliant vials to support CR WP2-05-0081 | ACTIVE |
| 0653132 | 14-Nov-2005 | 5°C (2 to 8°C) | Demonstration lot for M-M-R®II with rHA REDACTED – OMP REDACTED – OMP slotted stoppers, and EP-compliant vials to support CR WP2-05-0081 | ACTIVE |
| 0659704 | 19-Aug-2007 | −20°C (−25 to −15°C); 5°C (2 to 8°C) | Transfer study to support a storage time of 18 months at −20°C followed by storage of the product for 30 months at 5°C | ACTIVE |
| 0660022 | 20-Sep-2007 | −20°C (−25 to −15°C); 5°C (2 to 8°C) | Transfer study to support a storage time of 18 months at −20°C followed by storage of the product for 30 months at 5°C | ACTIVE |

AR-08-M-M-R®II.doc                                                                Page 3 of 12

CONFIDENTIAL



Restricted
R ⊕ Confidential
limited access

*M-M-R®II Stability Annual Review*

### SITE REVIEW OF STABILITY DATA

#### Expiry and Market Support

- The maximum expiry for M-M-R®II currently listed in ORION is 24 months.

- For product 04681, WPQO-Stability conducts stability studies to support the following markets: Australia, Bangladesh, Canada, China, Korea, New Zealand, Pakistan, Philippines, Romania, Singapore, Sri Lanka, Taiwan, Thailand, United Arab Emirates, USA, and Vietnam.

- For product 04011, WPQO-Stability conducts stability studies to support the following markets: Argentina, Austria, Azerbaijan, Belgium, Brazil, Canada, Cyprus, Czech Republic, Denmark, Finland, France, Georgia, Germany, Greece, Hungary, Iceland, Ireland, Italy, Luxembourg, Mexico, Netherlands, Norway, Poland, Portugal, Russia, Slovakia, Spain, Sweden, Switzerland, Turkey, and United Kingdom.

- For product 04953-00, WPQO-Stability conducts stability studies to support the following markets: Australia, Austria, Belgium, Bulgaria, Canada, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Iraq, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, Switzerland, United Kingdom, and USA.

- WPQO-Stability supports the worldwide markets for this product. Expiry of the product is either 18 months or 24 months depending on the market country (reference ORION). To support both expiries, all routine long term stability studies are conducted through 30 months.

### DATA ANALYSIS

Based on the current General Stability Protocol (Revision 3, Effective Date 13-Jul-2007), the required stability tests for this product are Appearance; Measles, Mumps, and Rubella Potency; Measles, Mumps, and Rubella Reconstituted Potency; Moisture; pH; Restoration Time; and Sterility. Closure Integrity testing is only required for M-M-R®II lots manufactured with HSA. The specifications referenced below are from Revision 5 (Edition Date 27-Apr-2008) of the Measles, Mumps, and Rubella Vaccine Quality Standard.

Changes are determined using linear regression analysis of at least 3 data points. Potency data is reported in units of log $TCID_{50}$/dose, however, the regression analysis is performed on individual replicates reported in log $TCID_{50}$/0.1 mL. Slope calculations for potency were performed on house standard-adjusted data and were based on the date of packaging or the date placed at $5°C$ (2 to $8°C$) for fill lots.

Due to the bi-phasic kinetics of measles and mumps potency stability loss observed in the historical stability database, the linear regressions performed use only data from the 6-month stability interval through the current interval of the stability study (18 months or greater). Linear regression analysis of rubella potency loss is calculated using all data from the initial stability interval through the current interval. Evaluation Limits are based on data for all potency results from regular production Live Virus Vaccine lots (single-dose formulations) stored at $5°C$ (2 to $8°C$) which contain the measles, mumps, and rubella components; M-M-R®II, M-M-R®II with rHA, and monovalent formulations are included. Evaluation limits were determined in the memo from M. Patel, "Early Warning Limits for Filled Container M-M-R®II" issued 09-Apr-2008.

---

AR-08-M-M-R®II.doc                                                      Page 4 of 12

CONFIDENTIAL

MRK-KRA01633951
MRK-CHA01633951

Appx19687

Restricted
R ⊖ Confidential
limited access

*M-M-R®II Stability Annual Review*

Table 5. Results of Statistical Analysis

| Lot | Measles Potency (Log change per month) [log TCID$_{50}$/0.1 mL] | Last interval tested/ # of Intervals Used | Mumps Potency (Log change per month) [log TCID$_{50}$/0.1 mL] | Last interval tested/ # of Intervals Used | Rubella Potency (Log change per month) [log TCID$_{50}$/0.1 mL] | Last interval tested/ # of Intervals Used |
|---|---|---|---|---|---|---|
| 0649811 | REDACTED – OMP | 30M / 6 | −0.0030 | 30M / 6 | REDACTED – OMP | 30M / 8 |
| 0650749 | | N/A | Insufficient Data | N/A | | N/A |
| 0650753 | | N/A | Insufficient Data | N/A | | N/A |
| 0650941 | | N/A | Insufficient Data | N/A | | N/A |
| 0653366 | | 24M / 5 | −0.0195 | 24M / 5 | | 24M / 7 |
| 0653338 | | 24M / 5 | −0.0213 | 24M / 5 | | 24M / 7 |
| 0654024 | | 24M / 5 | −0.0235 | 24M / 5 | | 24M / 7 |
| 0654024-Helvoet | | 24M / 5 | −0.0307 | 24M / 5 | | 24M / 7 |
| 0654024-West | | 24M / 5 | −0.0338 | 24M / 5 | | 24M / 7 |
| 0653131 | | 24M / 5 | Insufficient Data | N/A | | N/A |
| 0653132 | | 24M / 5 | Insufficient Data | N/A | | N/A |
| 0293F | | 18M / 4 | −0.0221 | 18M / 4 | | 18M / 6 |
| 0986F | | 18M / 4 | −0.0137 | 18M / 4 | | 18M / 6 |
| 1327F | | N/A | Insufficient Data | N/A | | 12M / 5 |
| 0281U | | N/A | Insufficient Data | N/A | | 12M / 5 |
| 0526U | | N/A | Insufficient Data | N/A | | 9M / 4 |
| 1842U | | N/A | Insufficient Data | N/A | | N/A |
| 1675U | | N/A | Insufficient Data | N/A | | N/A |
| 0659704 | | N/A | Insufficient Data | N/A | | N/A |
| 0660022 | | N/A | Insufficient Data | N/A | | N/A |

| Evaluation Limits | Measles Potency | | Mumps Potency | | Rubella Potency | |
|---|---|---|---|---|---|---|
| 9-month | REDACTED – OMP | | N/A | | REDACTED – OMP | |
| 12-month | | | N/A | | | |
| 18-month | | | (−0.0457 to 0.0161) | | | |
| 24-month | | | (−0.0350 to 0.0024) | | | |
| 30-month | | | (−0.0295 to 0.0009) | | | |

N/A: Not Applicable.
TCID: Tissue Culture Infectivity Dose.
M: Month.

CONFIDENTIAL

MRK-KRA01633952
MRK-CHA01633952

Appx19688



Table 6.    Results of Statistical Analysis – pH and Moisture

| Lot | pH (change per month) | Last interval tested/ # of Intervals Used | Moisture (change per month) [%] | Last interval tested/ # of Intervals Used |
|---|---|---|---|---|
| 0649811 | 0.0011 | 30M / 8 | –0.0110 | 30M / 8 |
| 0650749 | Insufficient Data | N/A | Test Not Required | N/A |
| 0650753 | Insufficient Data | N/A | Test Not Required | N/A |
| 0650941 | Insufficient Data | N/A | Test Not Required | N/A |
| 0653366 | 0.0017 | 24M / 7 | 0.0016 | 24M / 7 |
| 0653338 | 0.0003 | 24M / 7 | 0.0032 | 24M / 7 |
| 0654024 | 0.0000 | 24M / 7 | –0.0050 | 24M / 7 |
| 0654024-Helvoet | 0.0000 | 24M / 7 | –0.0013 | 24M / 7 |
| 0654024-West | 0.0000 | 24M / 7 | –0.0052 | 24M / 7 |
| 0653131 | 0.0000 | 24M / 7 | 0.0083 | 24M / 7 |
| 0653132 | 0.0000 | 24M / 7 | 0.0012 | 24M / 7 |
| 0293F | 0.0024 | 18M / 6 | 0.0095 | 18M / 6 |
| 0986F | –0.0019 | 18M / 6 | 0.0110 | 18M / 6 |
| 1327F | –0.0100 | 12M / 5 | 0.0167 | 12M / 5 |
| 0281U | 0.0000 | 12M / 5 | 0.0067 | 12M / 5 |
| 0526U | 0.0000 | 9M / 4 | 0.0000 | 9M / 4 |
| 1482U | Insufficient Data | N/A | Insufficient Data | N/A |
| 1675U | Insufficient Data | N/A | Insufficient Data | N/A |
| 0659704 | Insufficient Data | N/A | Insufficient Data | N/A |
| 0660022 | Insufficient Data | N/A | Insufficient Data | N/A |
| **Evaluation Limits** | **pH (change/month)** | | **Moisture (change/month)** | |
| 9-month | (–0.0399 to 0.0359) | | (–0.1295 to 0.1232) | |
| 12-month | (–0.0199 to 0.0252) | | (–0.0890 to 0.0874) | |
| 18-month | (–0.0157 to 0.0168) | | (–0.0760 to 0.0749) | |
| 24-month | (–0.0071 to 0.0072) | | (–0.0464 to 0.0375) | |
| 30-month | (–0.0053 to 0.0057) | | (–0.0313 to 0.0226) | |

N/A: Not Applicable.
M: Month.

**CONFIDENTIAL**

MRK-KRA01633953
MRK-CHA01633953

**Appx19689**

Restricted
R  Confidential
limited access

*M-M-R®II Stability Annual Review*

**Measles Potency**



REDACTED – OMP

**CONFIDENTIAL**

MRK-KRA01633954
MRK-CHA01633954

Appx19690

Restricted
R ⊖ Confidential
limited access

*M-M-R®II Stability Annual Review*

### Mumps Potency
Shelf-life specification:     ≥4.3 log $TCID_{50}$/dose
                              ≥3.6 log $TCID_{50}$/0.1 mL

**Mumps Potency Change Per Month**



**Figure 2.     Statistical Evaluation for Mumps Potency.**

All individual mumps potency results reported for these lots were within the shelf-life specification and the slopes were within the interval-specific slope ranges derived from a historical data set. Mumps potency exhibited a negative slope for all lots stored at 5°C. The observed change rates are typical of the product and do not present a stability concern. All lots are expected to remain within shelf-life specifications throughout the 30-month post-expiry interval.

CONFIDENTIAL                                                        MRK-KRA01633955
                                                                   MRK-CHA01633955

Appx19691

Restricted
R ⊘ Confidential
limited access

*M-M-R®II Stability Annual Review*

**Rubella Potency**



REDACTED – OMP

**CONFIDENTIAL**                                              MRK-KRA01633956
MRK-CHA01633956

Appx19692

Restricted
R 🔷 Confidential
limited access

*M-M-R®II Stability Annual Review*

## pH
Shelf-life Specification:  6.2 to 6.8

### pH Change Per Month



Figure 4.    Statistical Evaluation for pH.

All pH results reported for these lots were within the shelf-life specification and the slopes were within the interval-specific slope ranges derived from a historical data set.  The results of the analysis indicate little or no change in pH over time.  All lots are expected to remain within shelf-life specifications throughout the 30-month post-expiry interval.

CONFIDENTIAL                                                        MRK-KRA01633957
                                                                   MRK-CHA01633957

Appx19693

Restricted
R ⊕ Confidential
limited access

*M-M-R®II Stability Annual Review*

### Moisture
Shelf-life Specification:  ≤3.0%

#### Moisture Change Per Month



**Figure 5.    Statistical Evaluation for Moisture.**

All individual moisture results reported for these lots were within the shelf-life specification and the slopes were within the interval-specific slope ranges derived from a historical data set. Moisture results for lots 0281U, 0293F, 0653131, 0653132, 0653338, 0653366, 0986F, and 1327F exhibited a positive slope over time. The remaining lots indicate a negative or zero slope for moisture results over time. The observed change rates are typical of the product and do not present a stability concern. All lots are expected to remain within the shelf-life specifications throughout the 30-month post-expiry interval.

### Reconstituted Potency
Measles Shelf-life specification:  ≥3.0 log $TCID_{50}$/dose
Mumps Shelf-life specification:  ≥4.3 log $TCID_{50}$/dose
Rubella Shelf-life specification:  ≥3.0 log $TCID_{50}$/dose

All individual Reconstituted Potency results reported for these lots were within the shelf-life specification and indicate no stability concerns. All lots are expected to remain within the shelf-life specifications throughout the 30-month post-expiry interval.

CONFIDENTIAL                                              MRK-KRA01633958
                                                         MRK-CHA01633958

**Appx19694**



### *All Other Tests*

All individual results reported for all lots were within the shelf-life specifications for all qualitative tests. The product showed no stability concerns and all lots are expected to meet the shelf-life specifications throughout the 30-month post-expiry interval.

### RETENTION SAMPLE INFORMATION

West Point Quality Operations Laboratory Services – Retention completed the annual examination of retention samples for 2007 (Reference memo to Keith Goodling from Henry Koch, dated 18-Jan-2008). Representative samples of finished market packages retained at West Point were examined. Defects were noted as follow:

- Lot 1384F: 1 vial contained a particulate on the surface of the lyophilized plug. Internal investigation 07-66658 was initiated on 19-Dec-2007.

### CONCLUSION

The long-term stability data for M-M-R®II continue to demonstrate acceptable stability in support of the 18-month and 24-month product expiry and through the 30-month post-expiry interval.

### ATTACHMENTS

I.   Stability Study Summary Tables (WPQO-Stability product file only)
II.  Statistical Analyses (WPQO-Stability product file only)

**CONFIDENTIAL**

11/26/2019
Declaration of G. Reilly
EXHIBIT 399

Alison L. Fisher, Ph.D.
Associate Director
Worldwide Regulatory Affairs
Vaccines/Biologics

Merck & Co., Inc.
P.O. Box 4, BL3-22
West Point PA 19486-0004
Tel 484 344 3761
Fax 484 344 2962
Email alison_fisher@merck.com

February 28, 2005


MERCK
Research Laboratories

Norman Baylor, Ph.D.
Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Vaccines Research and Review (HFM-400)
Document Control Center (HFM-99)
Woodmont Office Center, Suite 200N
1401 Rockville Pike
Rockville, MD 20852-1448

Dear Dr. Baylor:

### Measles, Mumps, and Rubella Virus Vaccine Live
### (M-M-R®ᵢᵢ)

### STN 101069/5068

### RESPONSE TO FDA REQUEST FOR INFORMATION

Reference is made to a letter from CBER on December 30, 2004 regarding the above supplement.. In addition to Merck responses, the letter from CBER is attached for your convenience.

We consider the information included in this submission to be a confidential matter, and request that the Food and Drug Administration not make its content, nor any future communications in regard to it, public without first obtaining the written permission of Merck & Co., Inc.

We appreciate your time and consideration in this matter. Should you have any comments or questions regarding the responses provided, please address them directly to me at 215-(484) 344-3761 or in my absence, Dr. Ercem Atillasoy at (484) 344-7811.

Sincerely yours,

Alison Fisher, PhD.
Associate Director
Worldwide Regulatory Affairs
Vaccines and Biologics

Attachment

Federal Express

Q:\Winterbottom\Responses to CBER for rHA 2005

**CONFIDENTIAL**                          **MRK-KRA02078926**
**MRK-CHA02078926**

**Appx19697**

2. **In Module 3, Volume 8, Tab 3.2.P.8.2: post approval stability protocol and stability commitments, you state that a minimum of one lot per year of M-M-R-II with rHA or HSA will be recruited as an annual stability lot. As discussed over the past several years for the MMR family of products, we recommend increasing the number of lots of product placed on stability from 1 lot annually to a minimum of 3 lots annually. Please comment.**

Response:

Merck & Co., Inc. (Merck) commits to place a minimum of three lots of M-M-R®II on stability each year, based on statistical models that have been developed to improve the annual stability program. Additionally, Merck is evaluating new methods of statistical analysis that will increase the ability to detect changes in a product's stability profile. Details of this new approach to the annual stability program will be communicated to the agency in a separate filing this year.

**CONFIDENTIAL**

MRK-KRA02078927
MRK-CHA02078927

11/26/2019
Declaration of G. Reilly
EXHIBIT 400

 **MERCK**
Manufacturing Division


Restricted
R   Confidential
limited access

*Global Vaccine and WP Pharm Stability*

| | | | |
|---|---|---|---|
| DATE: | 23-Mar-2010 | | |
| TO: | GMP Compliance Annual Review Group | LOC: | WP 38M-1A |
| CC: | Amy Keegan | LOC: | WP 37A-104 |
| | Don Monkovic | | WP 37B-101 |
| | Mark Stannard | | WP 35-201 |
| | Philippe Schoone | | MMD Haarlem |
| | Global Vaccine and WP Pharm Stability Product File | | |
| FROM: | Jim Lucchese | LOC: | WP 37B-103 |
| SUBJECT: | STABILITY ANNUAL REVIEW for: | | |
| | M-M-R®II and M-M-R®II with rHA (Recombinant Human Albumin) | | |

Author Signature: _____     Date: 23-MAR-2010

Second Scientist
Review Signature: _____     Date: 01-APR-2010

## EXECUTIVE SUMMARY

The Stability Annual Review for M-M-R®II and M-M-R®II with rHA has been completed. This memo confirms that the stability data continues to demonstrate consistent performance throughout the registered shelf-life. No atypical trends in the results or out-of-specification results were observed for lots tested during the review period. All data continue to demonstrate acceptable stability to support product expiry.

## Comments

- **Study 0662056** was terminated based on the outcome of APR 2008-285-0088, which determined that the sterility of buffer used in the manufacture of lot 0662056 could not be ensured. The stability study had been tested at Time Zero, 3 months, and 6 months; all results were within specification. PCR WP2-08-0083 will be supported by Study 0662348, which is currently on stability.

- **Measles and Mumps Potency:** In previous annual reviews, the slope evaluations for measles and mumps potency did not include data at Time Zero and 3 months due to the biphasic kinetics observed at accelerated storage conditions. However, the biphasic kinetic approach will no longer be used so that atypical potency trends can be identified earlier in the study. As a result, the Evaluation Limits were recalculated to include the early stability intervals of Time Zero and 3-months.

This report includes data approved through 22-Mar-2010.

All lots active during the past year within the West Point stability program have been reviewed. The tables below list all active studies and/or completed studies that generated additional data since the previous annual report.

---

AR-10-M-M-R®II.doc                                                                 Page 1 of 25

CONFIDENTIAL

MRK-KRA01458201
MRK-CHA01458201

**Appx19700**

M-M-R®II Stability Annual Review

Table 1.    List of Stability Studies for M-M-R®II

| Study | Study Start Date | Storage Conditions | Purpose of Study | Expiry | Study Status |
|-------|------------------|--------------------|------------------|--------|--------------|
| 1675U | 27-Dec-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 27-Dec-2009 | ACTIVE |
| 0887X | 22-Sep-2008 | 5°C (2 to 8°C) | 2008 Annual Lot | N/A | ACTIVE |

N/A: Not Applicable. Expiry Date is not assigned to packaged lots intended for international shipment (0887X).

Table 2.    List of Stability Studies for M-M-R®II with rHA

| Study | Study Start Date | Storage Conditions | Purpose of Study | Expiry | Study Status |
|-------|------------------|--------------------|------------------|--------|--------------|
| 0986F | 22-Aug-2006 | 5°C (2 to 8°C) | 2006 Annual Lot | 16-Aug-2008 | COMPLETE |
| 1327F | 30-Nov-2006 | 5°C (2 to 8°C) | 2006 Annual Lot | 04-Nov-2008 | COMPLETE |
| 0281U | 12-Feb-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 02-Feb-2009 | COMPLETE |
| 0526U | 29-Mar-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 24-Mar-2009 | COMPLETE |
| 1482U | 08-Oct-2007 | 5°C (2 to 8°C) | 2007 Annual Lot | 14-Sep-2009 | ACTIVE |
| 0659704 | 19-Aug-2007 | −20°C (−25 to −15°C); 5°C (2 to 8°C) | Transfer study to support a storage time of 18 months at −20°C followed by storage of the product for 30 months at 5°C. | N/A | ACTIVE |
| 0660022 | 20-Sep-2007 | −20°C (−25 to −15°C); 5°C (2 to 8°C) | Transfer study to support a storage time of 18 months at −20°C followed by storage of the product for 30 months at 5°C. | N/A | ACTIVE |
| 0454X | 20-Mar-2008 | 5°C (2 to 8°C) | 2008 Annual Lot | 13-Mar-2010 | ACTIVE |
| 0811X | 05-Jun-2008 | 5°C (2 to 8°C) | To support APR 2007-223V-0071 where the mumps potency result was at or below the low end of the release specification limits for M-M-R®II with rHA lots filled from 05-Oct-2007 through 12-Dec-2007. | 29-May-2010 | ACTIVE |
| 1120X | 04-Sep-2008 | 5°C (2 to 8°C) | 2008 Annual Lot | 12-Aug-2010 | ACTIVE |
| 1726X | 09-Dec-2008 | 5°C (2 to 8°C) | 2008 Annual Lot | 04-Dec-2010 | ACTIVE |

AR-10-M-M-R®II.doc

CONFIDENTIAL

MRK-KRA01458202
MRK-CHA01458202

Appx19701


Restricted
R Confidential
limited access

M-M-R®II Stability Annual Review

| Study | Study Start Date | Storage Conditions | Purpose of Study | Expiry | Study Status |
|---|---|---|---|---|---|
| 0661069 | 07-Apr-2008 | 5°C (2 to 8°C) | To support APR 2007-285-0228 for the addition of the monovalent bulks in an order different from that specified in the product license. | N/A | ACTIVE |
| 0662066 | 27-May-2008 | 5°C (2 to 8°C) | To support APR 2008-208-0003 for a dark, oily substance observed floating on the liquid surface and in rings coating the interior of two lots of CIP220 (STERIS®). Also to support PCR WP2-08-0083, which assigned a process loss of 0.17 log for mumps bulk 2095442 | N/A | TERMINATED |
| 0662348 | 19-Aug-2008 | 5°C (2 to 8°C) | To support APR 2008-208-0003 for a dark, oily substance observed floating on the liquid surface and in rings coating the interior of two lots of CIP220 (STERIS®). This study includes measles bulk lot 2126131 (Product 39929-05) and rubella bulk lot 2125122 (Product 39933-05) which were affected by the CIP issue. Also to support PCR WP2-08-0083, which assigned a process loss of 0.17 log for mumps bulk 2095442 | N/A | ACTIVE |
| REDACTED – OMP | | | | | |
| 0661791 | 10-Sep-2008 | 5°C (2 to 8°C) | To support APR 2008-207-0015 and BPD 08-005 for the cleaning validation failure of a tank and transfer line used in the manufacture of culture media used in the production of this M-M-R®II lot. | N/A | ACTIVE |
| REDACTED – OMP | | | | | |



AR-10-M-M-R®II.doc

CONFIDENTIAL

MRK-KRA01458203
MRK-CHA01458203

Appx19702

M-M-R®II Stability Annual Review

| Study | Study Start Date | Storage Conditions | Purpose of Study | Expiry | Study Status |
|---|---|---|---|---|---|
| REDACTED – OMP | | | | | |
| 1665X | 06-Mar-2009 | 5°C (2 to 8°C) | To support APR 2009-285-0220 for the addition of bulk material in the incorrect order: Measles, Rubella, Mumps | N/A | ACTIVE |
| 0427Y | 01-Apr-2009 | 5°C (2 to 8°C) | 2009 Annual | 27-Mar-2011 | ACTIVE |
| 0664892 | 28-May-2009 | 5°C (2 to 8°C) | To support a CBER requirement to place vials known to include Stainless Steel particles on stability | N/A | ACTIVE |
| REDACTED – OMP | | | | | |
| 1116Y | 14-Aug-2009 | 5°C (2 to 8°C) | 2009 Annual | 06-Aug-2011 | ACTIVE |
| REDACTED – OMP | | | | | |
| 1660Y | 03-Dec-2009 | 5°C (2 to 8°C) | 2009 Annual | 25-Nov-2011 | ACTIVE |
| REDACTED – OMP | | | | | |
| 0666508 | 19-Jan-2010 | 5°C (2 to 8°C) | To support PCR WP2-09-0260 to support storage of the sealed vials at 2 to 8°C for a total of 4 days between sealing and inspection | N/A | ACTIVE |

N/A: Not Applicable. Expiry Date is not assigned to fill lots or packaged lots intended for international shipment (1665X, 0786Y, and 1496Y).

Restricted
R Confidential
limited access

CONFIDENTIAL

## SITE REVIEW OF STABILITY DATA

### Expiry and Market Support

- The maximum expiry for M-M-R®II currently listed in ORION is 24 months.

- For product 04681, Global Vaccine and WP Pharm Stability conducts stability studies to support the following markets: Australia, Canada, China, Korea, New Zealand, Romania, Singapore, Sri Lanka, Taiwan, Thailand, USA, and Vietnam.

- For product 04011, Global Vaccine and WP Pharm Stability conducts stability studies to support the following markets: Argentina, Austria, Azerbaijan, Belgium, Brazil, Canada, Denmark, Finland, France, Georgia, Greece, Hungary, Iceland, Ireland, Italy, Luxembourg, Mexico, Netherlands, Norway, Poland, Portugal, Russia, Sweden, Switzerland, and United Kingdom.

- For product 04953-00, Global Vaccine and WP Pharm Stability conducts stability studies to support the following markets: Argentina, Australia, Austria, Belgium, Brazil, Bulgaria, Canada, China, Colombia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Guatemala, Hong Kong, Hungary, Iceland, Indonesia, Iran, Ireland, Italy, Korea, Latvia, Lithuania, Luxembourg, Malaysia, Malta, Mexico, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Singapore, Slovakia, Slovenia, Spain, Sweden, Switzerland, Taiwan, Thailand, Turkey, United Kingdom, USA, and Vietnam.

- Global Vaccine and WP Pharm Stability supports the worldwide markets for this product. Expiry of the product is either 18 months or 24 months depending on the market country (reference ORION). To support both expiries, all routine long term stability studies are conducted through 30 months.

## DATA ANALYSIS

Based on the current General Stability Protocol (Revision 3, Effective Date 13-Jul-2007), the required stability tests for this product are Appearance; Measles, Mumps, and Rubella Potency; Measles, Mumps, and Rubella Reconstituted Potency; Moisture; pH; Restoration Time; and Sterility. Closure Integrity testing is only required for M-M-R®II lots manufactured with HSA. The specifications referenced below are from Revision 19 (Edition Date 17-Mar-2010) of the Measles, Mumps, and Rubella Vaccine Quality Standard.

Changes are determined using linear regression analysis of at least 3 data points. Potency data is reported in units of log $TCID_{50}$/dose, however, the regression analysis is performed on individual replicates reported in log $TCID_{50}$/0.1 mL. Slope calculations for potency were performed on house standard-adjusted data and were based on the date of packaging or the date placed at 5°C (2 to 8°C) for fill lots.

Evaluation Limits are based on data for all potency results from regular production Live Virus Vaccine lots (single-dose formulations) stored at 5°C (2 to 8°C) which contain the measles, mumps, and rubella components, M-M-R®II, M-M-R®II with rHA, and monovalent formulations are included. REDACTED – OMP
REDACTED – OMP
REDACTED – OMP   Evaluation limits for Measles and Mumps potency were determined in the memo from H. Grosz, "Recalculated Filled Container M-M-R®II Early Warning Limits for Measles and Mumps Potency Using Results for All Stability Time Points Including Early Time Points" issued 26-Jan-2010.

Studies included in Tables 1 and 2 that are not listed in Tables 3 or 4 did not have sufficient data to perform the statistical analysis.

CONFIDENTIAL                                                          MRK-KRA01458205
                                                                     MRK-CHA01458205

Appx19704

*M-M-R®II Stability Annual Review*

Table 3.    Results of Statistical Analysis – Measles, Mumps, and Rubella Potency

| Study | Measles Potency (Log change per month) [log TCID$_{50}$/0.1 mL] | Last interval tested/ # of Intervals Used | Mumps Potency (Log change per month) [log TCID$_{50}$/0.1 mL] | Last interval tested/ # of Intervals Used | Rubella Potency (Log change per month) [log TCID$_{50}$/0.1 mL] | Last interval tested/ # of Intervals Used |
|---|---|---|---|---|---|---|
| 0986F | REDACTED – OMP | | −0.0133 | 30M / 8 | REDACTED – OMP | |
| 1327F | | | −0.0127 | 30M / 8 | | |
| 0281U | | | −0.0167 | 30M / 8 | | |
| 0526U | | | −0.0165 | 30M / 8 | | |
| 1482U | | | −0.0124 | 24M / 7 | | |
| 1675U | | | −0.0208 | 18M / 6 | | |
| 0454X | | | −0.0146 | 18M / 6 | | |
| 0661069 | | | −0.0097 | 18M / 6 | | |
| 0811X | | | −0.0089 | 18M / 6 | | |
| 0662348 | | | −0.0183 | 12M / 5 | | |
| 0663161 | | | −0.0150 | 12M / 5 | | |
| 0661791 | | | −0.0239 | 12M / 5 | | |
| 1120X | | | −0.0103 | 12M / 5 | | |
| 0887X | | | −0.0174 | 12M / 5 | | |
| 0662864 | | | −0.0272 | 12M / 5 | | |
| 0663098 | | | −0.0328 | 12M / 5 | | |
| 0663165 | | | −0.0322 | 12M / 5 | | |
| 0663169 | | | −0.0039 | 12M / 5 | | |
| 1726X | | | −0.0208 | 12M / 5 | | |
| 1665X | | | −0.0484 | 9M / 4 | | |
| 0659704 | | | −0.0489 | 9M / 4 | | |
| 0660022 | | | −0.0524 | 9M / 4 | | |
| 0427Y | | | −0.0302 | 9M / 4 | | |
| 0786Y | | | −0.0233 | 6M / 3 | | |

| Evaluation Limits | Measles Potency | | Mumps Potency | | Rubella Potency | |
|---|---|---|---|---|---|---|
| 6-month | REDACTED – OMP | | (−0.0799 to 0.0206) | | REDACTED – OMP | |
| 9-month | | | (−0.0565 to 0.0053) | | | |
| 12-month | | | (−0.0506 to 0.0020) | | | |
| 18-month | | | (−0.0395 to 0.0001) | | | |
| 24-month | | | (−0.0312 to −0.0069) | | | |
| 30-month | | | (−0.0286 to −0.0054) | | | |

N/A: Not Applicable.
TCID: Tissue Culture Infectivity Dose.
M: Month.

---

AR-10-M-M-R®II.doc                                                    Page 6 of 25

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 401

Appx19706

 Centers for Disease
Control and Prevention

## Mumps

# Mumps Cases and Outbreaks



*AK, AL, AR, AZ, CA, CO, CT, DC, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, TN, TX, UT, VA, VT, WA, WI, WV

**Preliminary data reported to CDC  Mumps outbreaks are not reportable

## Mumps Cases

From January 1 to October 11, 2019, 48 states* and the District of Columbia in the U.S. reported mumps infections in 2,618** people to CDC.

Before the U.S. mumps vaccination program started in 1967, about 186,000 cases were reported each year, but the actual number of cases was likely much higher due to underreporting. Since the two-MMR dose vaccination program was introduced in 1989, U.S. mumps cases decreased more than 99%, with only a few hundred cases reported most years. However, since 2006, there have been several increases in cases and outbreaks about every 5 years (see below).



* Case count is preliminary and subject to change.

**Cases as of October 11, 2019. Case count is preliminary and subject to change.

Source: Morbidity and Mortality Weekly Report (MMWR), Notifiable Diseases and Mortality Tables

## Outbreaks

Appx19707

Mumps outbreaks can still occur in U.S. communities of people who previously had one or two doses of MMR vaccine. This is particularly common in close-contact settings. High vaccination coverage helps limit the size, duration, and spread of mumps outbreaks.

- From 2015 to 2017, the U.S. saw a range of different mumps outbreak settings and sizes. Cases started to increase in late 2015. From January 2016 to June 2017, health departments reported 150 outbreaks (9,200 cases), including households, schools, universities, athletics teams and facilities, church groups, workplaces, and large parties and events.
  - The largest outbreak occurred in a close-knit community in northwest Arkansas that resulted in nearly 3,000 cases.
  - Two large outbreaks from Iowa and Illinois each involved several hundred university students.
  - About half of outbreaks involved greater than 10 cases.
- From 2009 to 2010, two large outbreaks occurred.
  - One outbreak involved over 3,000 people and mostly affected students who were part of a close-knit religious community in New York City and attended schools in which they participated in activities that involved very close contact. The outbreak started when an infected student returned from the United Kingdom where a large mumps outbreak was occurring.
  - The second outbreak involved about 500 people, mostly school-aged children, in the U.S. Territory of Guam.
- In 2006, the United States experienced a multi-state mumps outbreak involving more than 6,500 reported cases. This resurgence predominantly affected college-aged students living in the Midwest, with outbreaks occurring on many different Midwestern college campuses.

For more information about mumps outbreaks see Mumps Outbreak Articles.

# For General Public

- Outbreak-Related Questions and Answers for Patients
  - What is CDC's role in responding to mumps cases and outbreaks?

# For Health Professionals

- Manual for the Surveillance of Vaccine-Preventable Diseases, Chapter 9: Mumps
- Laboratory Testing for Mumps Infection
- Mumps Information for Health Providers

Related Page

Mumps Outbreak Articles

Page last reviewed: September 17, 2019

11/26/2019
Declaration of G. Reilly
EXHIBIT 402

Appx19709

 Centers for Disease
Control and Prevention

## Vaccines and Preventable Diseases

# Mumps Vaccination

Pronounced (muhmps)

Mumps is a contagious disease that is caused by a virus. Mumps typically starts with fever, headache, muscle aches, tiredness, and loss of appetite. Then, most people will have swelling of their salivary glands. This is what causes the puffy cheeks and a tender, swollen jaw.

Mumps can be prevented with MMR vaccine. This protects against three diseases: measles, mumps, and rubella. CDC recommends children get two doses of MMR vaccine, starting with the first dose at 12 through 15 months of age, and the second dose at 4 through 6 years of age. Teens and adults also should also be up to date on their MMR vaccination.

MMR vaccine is very safe and effective. The mumps component of the MMR vaccine is about 88% (range: 31-95%) effective when a person gets two doses; one dose is about 78% (range: 49%–92%) effective.

Children may also get MMRV vaccine, which protects against measles, mumps, rubella, and varicella (chickenpox). This vaccine is only licensed for use in children who are 12 months through 12 years of age.

Before the U.S. mumps vaccination program started in 1967, mumps was a universal disease of childhood. Since the pre-vaccine era, there has been a more than 99% decrease in mumps cases in the United States. Mumps outbreaks can still occur in highly vaccinated U.S. communities, particularly in settings where people have close, prolonged contact, such as universities and close-knit communities. However, high vaccination coverage helps to limit the size, duration, and spread of mumps outbreaks. In the event of an outbreak, public health authorities may recommend that people at increased risk for mumps get a third dose of MMR or MMMRV to improve their protection against the disease.

CDC recommends that children get two doses of MMR vaccine:

- the first dose at 12 through 15 months of age, and
- the second dose at 4 through 6 years of age.

Teens and adults should also be up to date on MMR vaccinations.



## What Everyone Should Know
Basic information for people interested in the vaccine

## Information for Healthcare Professionals
Vaccine recommendations and contraindications; composition, dosage, and administration; handling and storage

Page last reviewed: March 28, 2019

**Appx19710**

11/26/2019
Declaration of G. Reilly
EXHIBIT 403



# Mumps Vaccination

Mumps vaccine is the best way to prevent mumps. This vaccine is included in the combination measles-mumps-rubella (MMR) and measles-mumps-rubella-varicella (MMRV) vaccines. Two doses of mumps vaccine are 88% (range: 66-95%) effective at preventing the disease; one dose is 78% (range: 49%â^'91%) effective. The first vaccine against mumps was licensed in the United States in 1967, and by 2005, high two-dose childhood vaccination coverage reduced disease rates by 99%. Children should receive the first dose of mumps-containing vaccine at 12-15 months and the second dose at 4-6 years. All adults born during or after 1957 should have documentation of one dose. Adults at higher risk, such as university students, health care personnel, and international travelers, and persons with potential mumps outbreak exposure should have documentation of two doses of mumps vaccine or other proof of immunity to mumps.

## For Those Getting Vaccinated

Recommendations and other useful information about mumps vaccination.

- Mumps Vaccine Basics (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#vacc)
- Beliefs and Concerns (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#concerns)
- Vaccine Safety (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#safety)
- Who Should Not be Vaccinated? (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#notvacc)

## Clinical Information for Healthcare Professionals

Mumps references and resources, provider education tools, and materials for patients.

- Clinical Vaccine Information on Mumps (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#clinical)
- Vaccine Recommendations (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#recs)
- Healthcare Worker Vaccination (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/vac-hcw.htm)
- References & Resources (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#ref)
- Provider Education (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#ed)
- Materials for Patients (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#patient)
- Vaccine Questions (https://web.archive.org/web/20120530161646/http://www.cdc.gov/vaccines/vpd-vac/mumps/vac-faqs-tech.htm)

Appx19712

## Related Links

- <u>Mumps: Questions and Answers</u> 📄 [102 KB - 4 pages]
  <u>(https://web.archive.org/web/20120530161646/http://www.immunize.org/catg.d/p4211.pdf)</u> 🔗
  <u>(https://web.archive.org/web/20120531164053/http://www.cdc.gov/Other/disclaimer.html)</u>
  Ready-to-print version of one of the CDC-reviewed Q&A materials located on Immunization Action
  Coalition's website (www.vaccineinformation.org).

---

🔗 This symbol means you are leaving the CDC.gov Web site. For more information, please see CDC's <u>Exit Notification and Disclaimer</u> <u>(https://web.archive.org/web/20120530161646/http://www.cdc.gov/Other/disclaimer.html)</u> policy.

---

**Copyrighted images:** Images on this website which are copyrighted were used with permission of the copyright holder and are not in the public domain. CDC has licensed these images for use in the materials provided on this website, and the materials in the form presented on this website may be used without seeking further permission. Any other use of copyrighted images requires permission from the copyright holder.

---

Page last reviewed: May 22, 2012
Page last updated: May 22, 2012
Content source: <u>National Center for Immunization and Respiratory Diseases (NCIRD)</u>, <u>Division of Viral Diseases</u>

---

Centers for Disease Control and Prevention   1600 Clifton Rd. Atlanta, GA 30333, USA
800-CDC-INFO (800-232-4636) TTY: (888) 232-6348 - <u>cdcinfo@cdc.gov</u>



**Appx19713**

11/26/2019
Declaration of G. Reilly
EXHIBIT 404



## Mumps Vaccination

Mumps vaccine (MMR vaccine or MMRV vaccine), is the best way to prevent mumps. Mumps vaccine effectiveness has been estimated at 62-91% for one dose and 76-95% for two doses. The first vaccine against mumps was licensed in the United States in 1967, and by 2005, high two-dose childhood vaccination coverage reduced disease rates by 99%.

Children should receive the first dose of mumps-containing vaccine at 12-15 months and the second dose at 4-6 years. All adults born after 1956 should have documentation of one dose. Adults at higher risk, such as university students, health care personnel, and persons with potential mumps outbreak exposure should have documentation of two doses of mumps vaccine or other proof of immunity to mumps.

## For Those Getting Vaccinated

Recommendations and other useful information about mumps vaccination.

- Mumps Vaccine Basics (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#vacc)
- Beliefs and Concerns (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#concerns)
- Vaccine Safety (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#safety)
- Who Should Not be Vaccinated? (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#notvacc)

## Clinical Information for Healthcare Professionals

Mumps references and resources, provider education tools, and materials for patients.

- Clinical Vaccine Information on Mumps (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#clinical)
- Vaccine Recommendations (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#recs)
- Healthcare Worker Vaccination (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/vac-hcw.htm)
- References & Resources (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#ref)
- Provider Education (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#ed)
- Materials for Patients (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/default.htm#patient)
- Vaccine Questions (https://web.archive.org/web/20091208104712/http://www.cdc.gov/vaccines/vpd-vac/mumps/vac-faqs-tech.htm)

Appx19715

## Related Links

- **MUMPS: QUESTIONS AND ANSWERS** 📄 🔗
  (https://web.archive.org/web/20091208104712/http://www.immunize.org/catg.d/p4211.pdf) Ready-to-print version of one of the CDC-reviewed Q&A materials located on Immunization Action Coalition's Vaccine Information website.

---

🔗 This symbol means you are leaving the CDC.gov Web site. For more information, please see CDC's **Exit Notification and Disclaimer** (https://web.archive.org/web/20091208104712/http://www.cdc.gov/Other/disclaimer.html) policy.

---

**Copyrighted images:** Images on this website which are copyrighted were used with permission of the copyright holder and are not in the public domain. CDC has licensed these images for use in the materials provided on this website, and the materials in the form presented on this website may be used without seeking further permission. Any other use of copyrighted images requires permission from the copyright holder.

---

Page last reviewed: November 12, 2009
Page last updated: November 12, 2009
Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

---

Centers for Disease Control and Prevention   1600 Clifton Rd. Atlanta, GA 30333, USA
800-CDC-INFO (800-232-4636) TTY: (888) 232-6348, 24 Hours/Every Day -
cdcinfo@cdc.gov



Appx19716

11/26/2019
Declaration of G. Reilly
EXHIBIT 405

**To:**        Modlinger, Alan[alan.modlinger@merck.com]
**From:**    Ernst-Gerner, Janet
**Sent:**    Fri 9/23/2016 11:53:22 AM
**Importance:**        **Normal**
**Subject:**    FW: M-M-R II Defense Team [Confidential]
MMR II USPI Sections Highlighted for removal PLR.docx

**From:** Kollmar, James Joseph
**Sent:** Tuesday, June 07, 2016 9:51 PM
**To:** Ernst-Gerner, Janet; Bland IV, Richard H.; Kuter, Barbara J.; Richardson, Elizabeth;
Khanna, Vinay; Helmond, Frans; Wolfson, Lara J.; Shea, Jack; Keegan, Amy
**Subject:** RE: M-M-R II Defense Team [Confidential]


**Confidential**


Hi Team,


Can you please include Amy Keegan on future correspondence. Amy is the GRT Lead
for MMR II.


Our MMR II label is in the old format. The new format Physician Label Rule (PLR) was
"designed to make information in prescription drug labeling easier for health care
practitioners to access, read and use to facilitate practitioners' use of labeling to make
prescribing decisions." "The FDA expects that most sections or subsections from
labeling in the old format can be moved, with little or no modification, to corresponding
sections in the PLR format. However, the labeling in the old format may not include the
information specified by the new regulations, or the content of a section may not
adequately reflect scientific information needed for safe and effective use of the drug. In
this case, the labeling must be updated (201.56(a))." Most notably -"by regulation, all
express or implied claims in labeling must be supported by substantial evidence. If
unsubstantiated claims currently exist in labeling, the applicant must revise the labeling
to remove such claims (201.56(a)(3))".


Our MMR II label contains multiple instances where the data is not supported by


**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    **MRK-KRA02008691**
                                                                                             **MRK-CHA02008691**

Appx19718

substantial evidence. Please see the attached MMR II US PI. I highlighted the text in yellow which will need to be amended or removed. Other sections, for example Pregnancy will need to be totally rewritten to the new Pregnancy Lactation and Labeling Rule (PLLR). The Adverse Reactions section will need to be revised to only include those adverse events for which there is some basis to believe there is a casual relationship between the drug and the occurrence of the adverse event.

The labeling update will be resource intensive. Prior PLR updates to REDACTED – CMP ProQuad took 1 to 2 years to complete. We need to balance the advantage of having an updated label which is easier for the healthcare provider to use vs. the information in the current label which we will lose.

Best Regards,

Jim

**From:** Ernst-Gerner, Janet
**Sent:** Tuesday, June 07, 2016 9:54 AM
**To:** Bland IV, Richard H.; Kuter, Barbara J.; Richardson, Elizabeth; Khanna, Vinay; Helmond, Frans; Kollmar, James Joseph; Wolfson, Lara J.; Shea, Jack
**Subject:** M-M-R II Defense Team [Confidential]

**Confidential**

Hi Everyone,

For those who don't know me, I am the US Marketing Leader for the Pediatric Vaccines. This email is to kick off a process to look at what we should be doing now in anticipation of competition for M-M-R II in the US in 2018.   GSK has

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

publically communicated that they plan to file for FDA approval of Priorix in 2017. We are currently assuming a 1Q2018 US launch, but will continually assess timing.

A lot of work has been done in the past in anticipation of an approval for Priorix and where we compete in ex-US markets, so we have a foundation to build upon. I have attached clinical data for Priorix/comparison to M-M-R II to this email.

I would like to cover the follow at a first meeting:

- Clinical Data/Publications – Barb Kuter/Frans Helmond

o  Topline summary of Clinical advantages and disadvantages of Priorix vs. M-M-R II

o  Are there any additional studies it would make sense to consider to strengthen our position ?

- Regulatory- Jim Kollmar

o  Evaluate our current label – is there additional data we would like to add? This comes with moving to PLR, does it make sense? What are the challenges and what data will we give up in the label?

- MMD- Vinay Khanna

o  Are there any product changes we should consider to improve our competitive position?

Please let me know if you think anyone else should be included in this group and if you have any questions.

Thanks

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA02008693
MRK-CHA02008693

Janet

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA02008694
MRK-CHA02008694

11/26/2019
Declaration of G. Reilly
EXHIBIT 406

Appx19722

# M-M-R® II
## (MEASLES, MUMPS, and
## RUBELLA VIRUS VACCINE LIVE)

### DESCRIPTION

M-M-R® II (Measles, Mumps, and Rubella Virus Vaccine Live) is a live virus vaccine for vaccination against measles (rubeola), mumps, and rubella (German measles).

M-M-R II is a sterile lyophilized preparation of (1) ATTENUVAX® (Measles Virus Vaccine Live), a more attenuated line of measles virus, derived from Enders' attenuated Edmonston strain and propagated in chick embryo cell culture; (2) MUMPSVAX® (Mumps Virus Vaccine Live), the Jeryl Lynn™ (B level) strain of mumps virus propagated in chick embryo cell culture; and (3) MERUVAX® II (Rubella Virus Vaccine Live), the Wistar RA 27/3 strain of live attenuated rubella virus propagated in WI-38 human diploid lung fibroblasts.[1,2]

The growth medium for measles and mumps is Medium 199 (a buffered salt solution containing vitamins and amino acids and supplemented with fetal bovine serum) containing SPGA (sucrose, phosphate, glutamate, and recombinant human albumin) as stabilizer and neomycin.

The growth medium for rubella is Minimum Essential Medium (MEM) [a buffered salt solution containing vitamins and amino acids and supplemented with fetal bovine serum] containing recombinant human albumin and neomycin. Sorbitol and hydrolyzed gelatin stabilizer are added to the individual virus harvests.

The cells, virus pools, and fetal bovine serum are all screened for the absence of adventitious agents.

The reconstituted vaccine is for subcutaneous administration. Each 0.5 mL dose contains not less than 1,000 $TCID_{50}$ (tissue culture infectious doses) of measles virus; 12,500 $TCID_{50}$ of mumps virus; and 1,000 $TCID_{50}$ of rubella virus. Each dose of the vaccine is calculated to contain sorbitol (14.5 mg), sodium phosphate, sucrose (1.9 mg), sodium chloride, hydrolyzed gelatin (14.5 mg), recombinant human albumin (≤0.3 mg), fetal bovine serum (<1 ppm), other buffer and media ingredients and approximately 25 mcg of neomycin. The product contains no preservative.

Before reconstitution, the lyophilized vaccine is a light yellow compact crystalline plug. M-M-R II, when reconstituted as directed, is clear yellow.

### CLINICAL PHARMACOLOGY

Measles, mumps, and rubella are three common childhood diseases, caused by measles virus, mumps virus (paramyxoviruses), and rubella virus (togavirus), respectively, that may be associated with serious complications and/or death. For example, pneumonia and encephalitis are caused by measles. Mumps is associated with aseptic meningitis, deafness and orchitis; and rubella during pregnancy may cause congenital rubella syndrome in the infants of infected mothers.

The impact of measles, mumps, and rubella vaccination on the natural history of each disease in the United States can be quantified by comparing the maximum number of measles, mumps, and rubella cases reported in a given year prior to vaccine use to the number of cases of each disease reported in 1995. For measles, 894,134 cases reported in 1941 compared to 288 cases reported in 1995 resulted in a 99.97% decrease in reported cases; for mumps, 152,209 cases reported in 1968 compared to 840 cases reported in 1995 resulted in a 99.45% decrease in reported cases; and for rubella, 57,686 cases reported in 1969 compared to 200 cases reported in 1995 resulted in a 99.65% decrease.[3]

Clinical studies of 284 triple seronegative children, 11 months to 7 years of age, demonstrated that M-M-R II is highly immunogenic and generally well tolerated. In these studies, a single injection of the vaccine induced measles hemagglutination-inhibition (HI) antibodies in 95%, mumps neutralizing antibodies in 96%, and rubella HI antibodies in 99% of susceptible persons. However, a small percentage (1-5%) of vaccinees may fail to seroconvert after the primary dose (see also INDICATIONS AND USAGE, *Recommended Vaccination Schedule*).

A study[4] of 6-month-old and 15-month-old infants born to vaccine-immunized mothers demonstrated that, following vaccination with ATTENUVAX, 74% of the 6-month-old infants developed detectable neutralizing antibody (NT) titers while 100% of the 15-month-old infants developed NT. This rate of seroconversion is higher than that previously reported for 6-month-old infants born to naturally immune mothers tested by HI assay. When the 6-month-old infants of immunized mothers were revaccinated at 15

1

CONFIDENTIAL

MRK-KRA02008695
MRK-CHA02008695

Appx19723

months, they developed antibody titers equivalent to the 15-month-old vaccinees. The lower seroconversion rate in 6-month-olds has two possible explanations: 1) Due to the limit of the detection level of the assays (NT and enzyme immunoassay [EIA]), the presence of trace amounts of undetectable maternal antibody might interfere with the seroconversion of infants; or 2) The immune system of 6-month-olds is not always capable of mounting a response to measles vaccine as measured by the two antibody assays.

There is some evidence to suggest that infants who are born to mothers who had wild type measles and who are vaccinated at less than one year of age may not develop sustained antibody levels when later revaccinated. The advantage of early protection must be weighed against the chance for failure to respond adequately on reimmunization.{5,6}

Efficacy of measles, mumps, and rubella vaccines was established in a series of double-blind controlled field trials which demonstrated a high degree of protective efficacy afforded by the individual vaccine components.{7-12} These studies also established that seroconversion in response to vaccination against measles, mumps, and rubella paralleled protection from these diseases.{13-15}

Following vaccination, antibodies associated with protection can be measured by neutralization assays, HI, or ELISA (enzyme linked immunosorbent assay) tests. Neutralizing and ELISA antibodies to measles, mumps, and rubella viruses are still detectable in most individuals 11 to 13 years after primary vaccination.{16-18} See INDICATIONS AND USAGE, *Non-Pregnant Adolescent and Adult Females*, for Rubella Susceptibility Testing.

The RA 27/3 rubella strain in M-M-R II elicits higher immediate post-vaccination HI, complement-fixing and neutralizing antibody levels than other strains of rubella vaccine{19-25} and has been shown to induce a broader profile of circulating antibodies including anti-theta and anti-iota precipitating antibodies.{26,27} The RA 27/3 rubella strain immunologically simulates natural infection more closely than other rubella vaccine viruses.{27-29} The increased levels and broader profile of antibodies produced by RA 27/3 strain rubella virus vaccine appear to correlate with greater resistance to subclinical reinfection with the wild virus,{27,29-31} and provide greater confidence for lasting immunity.

## INDICATIONS AND USAGE

*Recommended Vaccination Schedule*

M-M-R II is indicated for simultaneous vaccination against measles, mumps, and rubela in individuals 12 months of age or older.

Individuals first vaccinated at 12 months of age or older should be revaccinated prior to elementary school entry. Revaccination is intended to seroconvert those who do not respond to the first dose. The Advisory Committee on Immunization Practices (ACIP) recommends administration of the first dose of M-M-R II at 12 to 15 months of age and administration of the second dose of M-M-R II at 4 to 6 years of age.{32} In addition, some public health jurisdictions mandate the age for revaccination. Consult the complete text of applicable guidelines regarding routine revaccination including that of high-risk adult populations.

*Measles Outbreak Schedule*

*Infants Between 6 to 12 Months of Age*

Local health authorities may recommend measles vaccination of infants between 6 to 12 months of age in outbreak situations. This population may fail to respond to the components of the vaccine. Safety and effectiveness of mumps and rubella vaccine in infants less than 12 months of age have not been established. The younger the infant, the lower the likelihood of seroconversion (see CLINICAL PHARMACOLOGY). Such infants should receive a second dose of M-M-R II between 12 to 15 months of age followed by revaccination at elementary school entry.{32}

Unnecessary doses of a vaccine are best avoided by ensuring that written documentation of vaccination is preserved and a copy given to each vaccinee's parent or guardian.

*Other Vaccination Considerations*

*Non-Pregnant Adolescent and Adult Females*

Immunization of susceptible non-pregnant adolescent and adult females of childbearing age with live attenuated rubella virus vaccine is indicated if certain precautions are observed (see below and PRECAUTIONS). Vaccinating susceptible postpubertal females confers individual protection against subsequently acquiring rubella infection during pregnancy, which in turn prevents infection of the fetus and consequent congenital rubella injury.{33}

2

CONFIDENTIAL

MRK-KRA02008696
MRK-CHA02008696

Women of childbearing age should be advised not to become pregnant for 3 months after vaccination and should be informed of the reasons for this precaution.

The ACIP has stated "If it is practical and if reliable laboratory services are available, women of childbearing age who are potential candidates for vaccination can have serologic tests to determine susceptibility to rubella. However, with the exception of premarital and prenatal screening, routinely performing serologic tests for all women of childbearing age to determine susceptibility (so that vaccine is given only to proven susceptible women) can be effective but is expensive. Also, 2 visits to the health-care provider would be necessary — one for screening and one for vaccination. Accordingly, rubella vaccination of a woman who is not known to be pregnant and has no history of vaccination is justifiable without serologic testing — and may be preferable, particularly when costs of serology are high and follow-up of identified susceptible women for vaccination is not assured."{33}

Postpubertal females should be informed of the frequent occurrence of generally self-limited arthralgia and/or arthritis beginning 2 to 4 weeks after vaccination (see ADVERSE REACTIONS).

*Postpartum Women*

It has been found convenient in many instances to vaccinate rubella-susceptible women in the immediate postpartum period (see PRECAUTIONS, *Nursing Mothers*).

*Other Populations*

Previously unvaccinated children older than 12 months who are in contact with susceptible pregnant women should receive live attenuated rubella vaccine (such as that contained in monovalent rubella vaccine or in M-M-R II) to reduce the risk of exposure of the pregnant woman.

Individuals planning travel outside the United States, if not immune, can acquire measles, mumps, or rubella and import these diseases into the United States. Therefore, prior to international travel, individuals known to be susceptible to one or more of these diseases can either receive the indicated monovalent vaccine (measles, mumps, or rubella), or a combination vaccine as appropriate. However, M-M-R II is preferred for persons likely to be susceptible to mumps and rubella; and if monovalent measles vaccine is not readily available, travelers should receive M-M-R II regardless of their immune status to mumps or rubella.{34-36}

Vaccination is recommended for susceptible individuals in high-risk groups such as college students, health-care workers, and military personnel.{33,34,37}

According to ACIP recommendations, most persons born in 1956 or earlier are likely to have been infected with measles naturally and generally need not be considered susceptible. All children, adolescents, and adults born after 1956 are considered susceptible and should be vaccinated, if there are no contraindications. This includes persons who may be immune to measles but who lack adequate documentation of immunity such as: (1) physician-diagnosed measles, (2) laboratory evidence of measles immunity, or (3) adequate immunization with live measles vaccine on or after the first birthday.{34}

The ACIP recommends that "Persons vaccinated with inactivated vaccine followed within 3 months by live vaccine should be revaccinated with two doses of live vaccine. Revaccination is particularly important when the risk of exposure to wild-type measles virus is increased, as may occur during international travel."{34}

*Post-Exposure Vaccination*

Vaccination of individuals exposed to wild-type measles may provide some protection if the vaccine can be administered within 72 hours of exposure. If, however, vaccine is given a few days before exposure, substantial protection may be afforded.{34,38,39} There is no conclusive evidence that vaccination of individuals recently exposed to wild-type mumps or wild-type rubella will provide protection.{33,37}

*Use With Other Vaccines*

See DOSAGE AND ADMINISTRATION, *Use With Other Vaccines*.

**CONTRAINDICATIONS**

Hypersensitivity to any component of the vaccine, including gelatin.{40}

Do not give M-M-R II to pregnant females; the possible effects of the vaccine on fetal development are unknown at this time. If vaccination of postpubertal females is undertaken, pregnancy should be avoided for three months following vaccination (see INDICATIONS AND USAGE, *Non-Pregnant Adolescent and Adult Females* and PRECAUTIONS, *Pregnancy*).

Anaphylactic or anaphylactoid reactions to neomycin (each dose of reconstituted vaccine contains approximately 25 mcg of neomycin).

3

CONFIDENTIAL

Febrile respiratory illness or other active febrile infection. However, the ACIP has recommended that all vaccines can be administered to persons with minor illnesses such as diarrhea, mild upper respiratory infection with or without low-grade fever, or other low-grade febrile illness.[41]

Patients receiving immunosuppressive therapy. This contraindication does not apply to patients who are receiving corticosteroids as replacement therapy, e.g., for Addison's disease.

Individuals with blood dyscrasias, leukemia, lymphomas of any type, or other malignant neoplasms affecting the bone marrow or lymphatic systems.

Primary and acquired immunodeficiency states, including patients who are immunosuppressed in association with AIDS or other clinical manifestations of infection with human immunodeficiency viruses;[41-43] cellular immune deficiencies; and hypogammaglobulinemic and dysgammaglobulinemic states. Measles inclusion body encephalitis[44] (MIBE), pneumonitis[45] and death as a direct consequence of disseminated measles vaccine virus infection have been reported in immunocompromised individuals inadvertently vaccinated with measles-containing vaccine.

Individuals with a family history of congenital or hereditary immunodeficiency, until the immune competence of the potential vaccine recipient is demonstrated.

## WARNINGS

Due caution should be employed in administration of M-M-R II to persons with a history of cerebral injury, individual or family histories of convulsions, or any other condition in which stress due to fever should be avoided. The physician should be alert to the temperature elevation which may occur following vaccination (see ADVERSE REACTIONS).

*Hypersensitivity to Eggs*

Live measles vaccine and live mumps vaccine are produced in chick embryo cell culture. Persons with a history of anaphylactic, anaphylactoid, or other immediate reactions (e.g., hives, swelling of the mouth and throat, difficulty breathing, hypotension, or shock) subsequent to egg ingestion may be at an enhanced risk of immediate-type hypersensitivity reactions after receiving vaccines containing traces of chick embryo antigen. The potential risk to benefit ratio should be carefully evaluated before considering vaccination in such cases. Such individuals may be vaccinated with extreme caution, having adequate treatment on hand should a reaction occur (see PRECAUTIONS).[46]

However, the AAP has stated, "Most children with a history of anaphylactic reactions to eggs have no untoward reactions to measles or MMR vaccine. Persons are not at increased risk if they have egg allergies that are not anaphylactic, and they should be vaccinated in the usual manner. In addition, skin testing of egg-allergic children with vaccine has not been predictive of which children will have an immediate hypersensitivity reaction...Persons with allergies to chickens or chicken feathers are not at increased risk of reaction to the vaccine."[47]

*Hypersensitivity to Neomycin*

The AAP states, "Persons who have experienced anaphylactic reactions to topically or systemically administered neomycin should not receive measles vaccine. Most often, however, neomycin allergy manifests as a contact dermatitis, which is a delayed-type (cell-mediated) immune response rather than anaphylaxis. In such persons, an adverse reaction to neomycin in the vaccine would be an erythematous, pruritic nodule or papule, 48 to 96 hours after vaccination. A history of contact dermatitis to neomycin is not a contraindication to receiving measles vaccine."[47]

*Thrombocytopenia*

Individuals with current thrombocytopenia may develop more severe thrombocytopenia following vaccination. In addition, individuals who experienced thrombocytopenia with the first dose of M-M-R II (or its component vaccines) may develop thrombocytopenia with repeat doses. Serologic status may be evaluated to determine whether or not additional doses of vaccine are needed. The potential risk to benefit ratio should be carefully evaluated before considering vaccination in such cases (see ADVERSE REACTIONS).

## PRECAUTIONS

*General*

Adequate treatment provisions, including epinephrine injection (1:1000), should be available for immediate use should an anaphylactic or anaphylactoid reaction occur.

Special care should be taken to ensure that the injection does not enter a blood vessel.

**Comment [JJK1]:** Recent articles have been published on this topic that is supportive of this statement

4

MRK-KRA02008698
MRK-CHA02008698

Appx19726

Children and young adults who are known to be infected with human immunodeficiency viruses and are not immunosuppressed may be vaccinated. However, vaccinees who are infected with HIV should be monitored closely for vaccine-preventable diseases because immunization may be less effective than for uninfected persons (see CONTRAINDICATIONS) {42,43}

Vaccination should be deferred for 3 months or longer following blood or plasma transfusions, or administration of immune globulin (human).{47}

Excretion of small amounts of the live attenuated rubella virus from the nose or throat has occurred in the majority of susceptible individuals 7 to 28 days after vaccination. There is no confirmed evidence to indicate that such virus is transmitted to susceptible persons who are in contact with the vaccinated individuals. Consequently, transmission through close personal contact, while accepted as a theoretical possibility, is not regarded as a significant risk.{33} However, transmission of the rubella vaccine virus to infants via breast milk has been documented (see *Nursing Mothers*).

There are no reports of transmission of live attenuated measles or mumps viruses from vaccinees to susceptible contacts.

It has been reported that live attenuated measles, mumps and rubella virus vaccines given individually may result in a temporary depression of tuberculin skin sensitivity. Therefore, if a tuberculin test is to be done, it should be administered either before or simultaneously with M-M-R II.

Children under treatment for tuberculosis have not experienced exacerbation of the disease when immunized with live measles virus vaccine;{48} no studies have been reported to date of the effect of measles virus vaccines on untreated tuberculous children. However, individuals with active untreated tuberculosis should not be vaccinated.

As for any vaccine, vaccination with M-M-R II may not result in protection in 100% of vaccinees.

The health-care provider should determine the current health status and previous vaccination history of the vaccinee.

The health-care provider should question the patient, parent, or guardian about reactions to a previous dose of M-M-R II or other measles-, mumps-, or rubella-containing vaccines.

*Information for Patients*

The health-care provider should provide the vaccine information required to be given with each vaccination to the patient, parent, or guardian.

The health-care provider should inform the patient, parent, or guardian of the benefits and risks associated with vaccination. For risks associated with vaccination see WARNINGS, PRECAUTIONS, and ADVERSE REACTIONS.

Patients, parents, or guardians should be instructed to report any serious adverse reactions to their health-care provider who in turn should report such events to the U.S. Department of Health and Human Services through the Vaccine Adverse Event Reporting System (VAERS), 1-800-822-7967.{49}

Pregnancy should be avoided for 3 months following vaccination, and patients should be informed of the reasons for this precaution (see INDICATIONS AND USAGE, *Non-Pregnant Adolescent and Adult Females*, CONTRAINDICATIONS, and PRECAUTIONS, *Pregnancy*).

*Laboratory Tests*

See INDICATIONS AND USAGE, *Non-Pregnant Adolescent and Adult Females*, for Rubella Susceptibility Testing, and CLINICAL PHARMACOLOGY.

*Drug Interactions*

See DOSAGE AND ADMINISTRATION, *Use With Other Vaccines*.

*Immunosuppressive Therapy*

The immune status of patients about to undergo immunosuppressive therapy should be evaluated so that the physician can consider whether vaccination prior to the initiation of treatment is indicated (see CONTRAINDICATIONS and PRECAUTIONS).

The ACIP has stated that "patients with leukemia in remission who have not received chemotherapy for at least 3 months may receive live virus vaccines. Short-term (<2 weeks), low- to moderate-dose systemic corticosteroid therapy, topical steroid therapy (e.g. nasal, skin), long-term alternate-day treatment with low to moderate doses of short-acting systemic steroid, and intra-articular, bursal, or tendon injection of corticosteroids are not immunosuppressive in their usual doses and do not contraindicate the administration of [measles, mumps, or rubella vaccine]."{33,34,37}

*Immune Globulin*

Administration of immune globulins concurrently with M-M-R II may interfere with the expected immune response.{33,34,47}

Comment [JJK2]: This information is based on a review article which can be used instead of ref 47

Comment [JJK3]: This information is based on a review article which we can be used instead of ref 33,34 and 47

5

MRK-KRA02008699
MRK-CHA02008699

Appx19727

See also PRECAUTIONS, *General.*
*Carcinogenesis, Mutagenesis, Impairment of Fertility*
M-M-R II has not been evaluated for carcinogenic or mutagenic potential, or potential to impair fertility.
*Pregnancy*
*Pregnancy Category C*
Animal reproduction studies have not been conducted with M-M-R II. It is also not known whether M-M-R II can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Therefore the vaccine should not be administered to pregnant females; furthermore, pregnancy should be avoided for 3 months following vaccination (see INDICATIONS AND USAGE, *Non-Pregnant Adolescent and Adult Females* and CONTRAINDICATIONS).

In counseling women who are inadvertently vaccinated when pregnant or who become pregnant within 3 months of vaccination, the physician should be aware of the following: (1) In a 10-year survey involving over 700 pregnant women who received rubella vaccine within 3 months before or after conception (of whom 189 received the Wistar RA 27/3 strain), none of the newborns had abnormalities compatible with congenital rubella syndrome;{50} (2) Mumps infection during the first trimester of pregnancy may increase the rate of spontaneous abortion. Although mumps vaccine virus has been shown to infect the placenta and fetus, there is no evidence that it causes congenital malformations in humans;{37} and (3) Reports have indicated that contracting wild-type measles during pregnancy enhances fetal risk. Increased rates of spontaneous abortion, stillbirth, congenital defects and prematurity have been observed subsequent to infection with wild-type measles during pregnancy {51,52} There are no adequate studies of the attenuated (vaccine) strain of measles virus in pregnancy. However, it would be prudent to assume that the vaccine strain of measles virus is also capable of inducing adverse fetal effects.
*Nursing Mothers*
It is not known whether measles or mumps vaccine virus is secreted in human milk. Recent studies have shown that lactating postpartum women immunized with live attenuated rubella vaccine may secrete the virus in breast milk and transmit it to breast-fed infants.{53} In the infants with serological evidence of acquired rubella, none exhibited severe disease; however, one exhibited mild clinical illness typical of acquired rubella.{54,55} Caution should be exercised when M-M-R II is administered to a nursing woman.
*Pediatric Use*
Safety and effectiveness of measles vaccine in infants below the age of 6 months have not been established (see also CLINICAL PHARMACOLOGY). Safety and effectiveness of mumps and rubella vaccine in infants less than 12 months of age have not been established.
*Geriatric Use*
Clinical studies of M-M-R II did not include sufficient numbers of seronegative subjects aged 65 and over to determine whether they respond differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger subjects.

## ADVERSE REACTIONS

The following adverse reactions are listed in decreasing order of severity, without regard to causality, within each body system category and have been reported during clinical trials, with use of the marketed vaccine, or with use of monovalent or bivalent vaccine containing measles, mumps, or rubella.
*Body as a Whole*
Panniculitis; atypical measles; fever; syncope; headache; dizziness; malaise; irritability.
*Cardiovascular System*
Vasculitis.
*Digestive System*
Pancreatitis; diarrhea; vomiting; parotitis; nausea.
*Endocrine System*
Diabetes mellitus.
*Hemic and Lymphatic System*
Thrombocytopenia (see WARNINGS, *Thrombocytopenia*); purpura; regional lymphadenopathy; leukocytosis.

> **Comment [JJK4]:** This entire section will need to be rewritten to comply with PLR Final Rule June 30, 2015

> **Comment [JJK5]:** Entire section will need to be rewritten to be consistent with PLR – a "laundry list" of AE is not warranted

6

CONFIDENTIAL

MRK-KRA02008700
MRK-CHA02008700

*Immune System*

Anaphylaxis and anaphylactoid reactions have been reported as well as related phenomena such as angioneurotic edema (including peripheral or facial edema) and bronchial spasm in individuals with or without an allergic history.

*Musculoskeletal System*

Arthritis; arthralgia; myalgia.

Arthralgia and/or arthritis (usually transient and rarely chronic), and polyneuritis are features of infection with wild-type rubella and vary in frequency and severity with age and sex, being greatest in adult females and least in prepubertal children. This type of involvement as well as myalgia and paresthesia, have also been reported following administration of MERUVAX II.

Chronic arthritis has been associated with wild-type rubella infection and has been related to persistent virus and/or viral antigen isolated from body tissues. Only rarely have vaccine recipients developed chronic joint symptoms.

Following vaccination in children, reactions in joints are uncommon and generally of brief duration. In women, incidence rates for arthritis and arthralgia are generally higher than those seen in children (children: 0-3%; women: 12-26%),{17,56,57} and the reactions tend to be more marked and of longer duration. Symptoms may persist for a matter of months or on rare occasions for years. In adolescent girls, the reactions appear to be intermediate in incidence between those seen in children and in adult women. Even in women older than 35 years, these reactions are generally well tolerated and rarely interfere with normal activities.

*Nervous System*

Encephalitis; encephalopathy; measles inclusion body encephalitis (MIBE) (see CONTRAINDICATIONS); subacute sclerosing panencephalitis (SSPE); Guillain-Barré Syndrome (GBS); acute disseminated encephalomyelitis (ADEM); transverse myelitis; febrile convulsions; afebrile convulsions or seizures; ataxia; polyneuritis; polyneuropathy; ocular palsies; paresthesia.

Encephalitis and encephalopathy have been reported approximately once for every 3 million doses of M-M-R II or measles-, mumps-, and rubella-containing vaccine administered since licensure of these vaccines.

The risk of serious neurological disorders following live measles virus vaccine administration remains less than the risk of encephalitis and encephalopathy following infection with wild-type measles (1 per 1000 reported cases).{58,59}

In severely immunocompromised individuals who have been inadvertently vaccinated with measles-containing vaccine; measles inclusion body encephalitis, pneumonitis, and fatal outcome as a direct consequence of disseminated measles vaccine virus infection have been reported (see CONTRAINDICATIONS). In this population, disseminated mumps and rubella vaccine virus infection have also been reported.

There have been reports of subacute sclerosing panencephalitis (SSPE) in children who did not have a history of infection with wild-type measles but did receive measles vaccine. Some of these cases may have resulted from unrecognized measles in the first year of life or possibly from the measles vaccination. Based on estimated nationwide measles vaccine distribution, the association of SSPE cases to measles vaccination is about one case per million vaccine doses distributed. This is far less than the association with infection with wild-type measles, 6-22 cases of SSPE per million cases of measles. The results of a retrospective case-controlled study conducted by the Centers for Disease Control and Prevention suggest that the overall effect of measles vaccine has been to protect against SSPE by preventing measles with its inherent higher risk of SSPE.{60}

Cases of aseptic meningitis have been reported to VAERS following measles, mumps, and rubella vaccination. Although a causal relationship between the Urabe strain of mumps vaccine and aseptic meningitis has been shown, there is no evidence to link Jeryl Lynn™ mumps vaccine to aseptic meningitis.

*Respiratory System*

Pneumonia; pneumonitis (see CONTRAINDICATIONS); sore throat; cough; rhinitis.

*Skin*

Stevens-Johnson syndrome; erythema multiforme; urticaria; rash; measles-like rash; pruritis.

Local reactions including burning/stinging at injection site; wheal and flare; redness (erythema); swelling; induration; tenderness; vesiculation at injection site.

7

CONFIDENTIAL

MRK-KRA02008701
MRK-CHA02008701

Appx19729

*Special Senses — Ear*
  Nerve deafness; otitis media.
*Special Senses — Eye*
  Retinitis; optic neuritis; papillitis; retrobulbar neuritis; conjunctivitis.
*Urogenital System*
  Epididymitis; orchitis.
*Other*
  Death from various, and in some cases unknown, causes has been reported rarely following vaccination with measles, mumps, and rubella vaccines; however, a causal relationship has not been established in healthy individuals (see CONTRAINDICATIONS). No deaths or permanent sequelae were reported in a published post-marketing surveillance study in Finland involving 1.5 million children and adults who were vaccinated with M-M-R II during 1982 to 1993.(61)
  Under the National Childhood Vaccine Injury Act of 1986, health-care providers and manufacturers are required to record and report certain suspected adverse events occurring within specific time periods after vaccination. However, the U.S. Department of Health and Human Services (DHHS) has established a Vaccine Adverse Event Reporting System (VAERS) which will accept all reports of suspected events.(49) A VAERS report form as well as information regarding reporting requirements can be obtained by calling VAERS 1-800-822-7967.

## DOSAGE AND ADMINISTRATION

*FOR SUBCUTANEOUS ADMINISTRATION*
*Do not inject intravascularly.*
  The dose for any age is 0.5 mL administered subcutaneously, preferably into the outer aspect of the upper arm.
  The recommended age for primary vaccination is 12 to 15 months.
  Revaccination with M-M-R II is recommended prior to elementary school entry. See also INDICATIONS AND USAGE, *Recommended Vaccination Schedule.*
  Children first vaccinated when younger than 12 months of age should receive another dose between 12 to 15 months of age followed by revaccination prior to elementary school entry{32}. See also INDICATIONS AND USAGE, *Measles Outbreak Schedule.*
  Immune Globulin (IG) is not to be given concurrently with M-M-R II (see PRECAUTIONS, *General* and PRECAUTIONS, *Drug Interactions*).
  CAUTION: A sterile syringe free of preservatives, antiseptics, and detergents should be used for each injection and/or reconstitution of the vaccine because these substances may inactivate the live virus vaccine. A 25 gauge, 5/8" needle is recommended.
  To reconstitute, use only the diluent supplied, since it is free of preservatives or other antiviral substances which might inactivate the vaccine.
  *Single Dose Vial* — First withdraw the entire volume of diluent into the syringe to be used for reconstitution. Inject all the diluent in the syringe into the vial of lyophilized vaccine, and agitate to mix thoroughly. If the lyophilized vaccine cannot be dissolved, discard. Withdraw the entire contents into a syringe and inject the total volume of restored vaccine subcutaneously.
  It is important to use a separate sterile syringe and needle for each individual patent to prevent transmission of hepatitis B and other infectious agents from one person to another.
  Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. M-M-R II, when reconstituted, is clear yellow.
*Use With Other Vaccines*
  M-M-R II should be given one month before or after administration of other live viral vaccines.
  M-M-R II has been administered concurrently with VARIVAX® [Varicella Virus Vaccine Live (Oka/Merck)], and PedvaxHIB® [*Haemophilus b* Conjugate Vaccine (Meningococcal Protein Conjugate)] using separate injection sites and syringes. No impairment of immune response to individually tested vaccine antigens was demonstrated. The type, frequency, and severity of adverse experiences observed with M-M-R II were similar to those seen when each vaccine was given alone.
  Routine administration of DTP (diphtheria, tetanus, pertussis) and/or OPV (oral poliovirus vaccine) concurrently with measles, mumps and rubella vaccines is not recommended because there are limited data relating to the simultaneous administration of these antigens.

> **Comment [JJK6]:** Will need to update this paragraph

8

CONFIDENTIAL

MRK-KRA02008702
MRK-CHA02008702

Appx19730

However, other schedules have been used. The ACIP has stated "Although data are limited concerning the simultaneous administration of the entire recommended vaccine series (i.e., DTaP [or DTwP], IPV [or OPV], Hib with or without Hepatitis B vaccine, and varicella vaccine), data from numerous studies have indicated no interference between routinely recommended childhood vaccines (either live, attenuated, or killed). These findings support the simultaneous use of all vaccines as recommended."[62]

## HOW SUPPLIED

No. 4681 — M-M-R II is supplied as follows: (1) a box of 10 single-dose vials of lyophilized vaccine (package A), **NDC** 0006-4681-00; and (2) a box of 10 vials of diluent (package B). To conserve refrigerator space, the diluent may be stored separately at room temperature.
*Storage*
**To maintain potency, M-M-R II must be stored between -58°F and +46°F (-50°C to +8°C). Use of dry ice may subject M-M-R II to temperatures colder than -58°F (-50°C).**
Protect the vaccine from light at all times, since such exposure may inactivate the viruses.
Before reconstitution, store the lyophilized vaccine at 36°F to 46°F (2°C to 8°C). The diluent may be stored in the refrigerator with the lyophilized vaccine or separately at room temperature. **Do not freeze the diluent.**
It is recommended that the vaccine be used as soon as possible after reconstitution. Store reconstituted vaccine in the vaccine vial in a dark place at 36°F to 46°F (2°C to 8°C) and discard if not used within 8 hours.
**For information regarding stability under conditions other than those recommended, call 1-800-MERCK-90.**

## REFERENCES

1. Plotkin, S.A.; Cornfeld, D.; Ingalls, T.H.: Studies of immunization with living rubella virus. Trials in children with a strain cultured from an aborted fetus, Am. J. Dis. Child. *110:* 381-389, 1965.

2. Plotkin, S.A.; Farquhar, J.; Katz, M.; Ingalls, T.H.: A new attenuated rubella virus grown in human fibroblasts: Evidence for reduced nasopharyngeal excretion, Am. J. Epidemiol. *86:* 468-477, 1967.

3. Monthly Immunization Table, MMWR 45(1): 24-25, January 12, 1996.

4. Johnson, C.E.; et al: Measles Vaccine Immunogenicity in 6- Versus 15-Month-Old Infants Born to Mothers in the Measles Vaccine Era, Pediatrics, 93(6): 939-943, 1994.

5. Linneman C.C.; et al: Measles Immunity After Vaccination: Results in Children Vaccinated Before 10 Months of Age, Pediatrics, 69(3): 332-335, March 1982.

6. Stetler, H.C.; et al: Impact of Revaccinating Children Who Initially Received Measles Vaccine Before 10 Months of Age, Pediatrics 77(4): 471-476, April 1986.

7. Hilleman, M.R.; Buynak E.B.; Weibel, R.E., et al: Development and Evaluation of the Moraten Measles Virus Vaccine, JAMA 206(3): 587-590, 1968.

8. Weibel, R.E.; Stokes, J.; Buynak E.B.; et al: Live, Attenuated Mumps Virus Vaccine 3. Clinical and Serologic Aspects in a Field Evaluation, N. Engl. J. Med. 276: 245-251, 1967.

9. Hilleman, M.R.; Weibel, R.E.; Buynak E.B.; et al: Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation, N. Engl. J. Med. 276: 252-258, 1967.

10. Cutts, F.T.; Henderson, R.H.; Clements, C.J.; et al: Principles of measles control, Bull WHO 69(1): 1-7, 1991.

11. Weibel, R.E.; Buynak, E.B., Stokes, J.; et al: Evaluation Of Live Attenuated Mumps Virus Vaccine, Strain Jeryl Lynn, First International Conference on Vaccines Against Viral and Rickettsial Diseases of Man, World Health Organization, No. 147, May 1967

12. Leibhaber, H.; Ingalls, T.H.; LeBouvier, G.L.; et al: Vaccination With RA 27/3 Rubella Vaccine. Am. J. Dis. Child. 123: 133-136, February 1972.

13. Rosen, L.: Hemagglutination and Hemagglutination-Inhibition with Measles Virus, Virology 13: 139-141, January 1961.

14. Brown, G.C.; et al: Fluorescent-Antibody Marker for Vaccine-Induced Rubella Antibodies, Infection and Immunity 2(4): 360-363, 1970.

15. Buynak, E.B.; et al: Live Attenuated Mumps Virus Vaccine 1. Vaccine Development, Proceedings of the Society for Experimental Biology and Medicine, 123: 768-775, 1966.

9

**CONFIDENTIAL**

**MRK-KRA02008703**
**MRK-CHA02008703**

**Appx19731**

16. Weibel, R.E.; Carlson, A.J.; Villarejos, V.M.; Buynak, E.B.; McLean, A.A.; Hilleman, M.R.: Clinical and Laboratory Studies of Combined Live Measles, Mumps, and Rubella Vaccines Using the RA 27/3 Rubella Virus, Proc. Soc. Exp. Biol. Med. 165: 323-326, 1980.

17. Unpublished data from the files of Merck Research Laboratories.

18. Watson, J.C.; Pearson, J.S.; Erdman, D.D.; et al: An Evaluation of Measles Revaccination Among School-Entry Age Children, 31st Interscience Conference on Antimicrobial Agents and Chemotherapy, Abstract #268, 143, 1991.

19. Fogel, A.; Moshkowitz, A.; Rannon, L.; Gerichter, Ch.B.: Comparative trials of RA 27/3 and Cendehill rubella vaccines in adult and adolescent females. Am. J. Epidemiol. 93: 392-393, 1971.

20. Andzhaparidze, O.G.; Desyatskova, R.G.; Chervonski, G.I.; Pryanichnikova, L.V.: Immunogenicity and reactogenicity of live attenuated rubella virus vaccines, Am. J. Epidemiol. 91: 527-530, 1970.

21. Freestone, D.S.; Reynolds, G.M.; McKinnon, J.A.; Prydie, J.: Vaccination of schoolgirls against rubella. Assessment of serological status and a comparative trial of Wistar RA 27/3 and Cendehill strain live attenuated rubella vaccines in 13-year-old schoolgirls in Dudley, Br. J. Prev. Soc. Med. 29: 258-261, 1975.

22. Grillner, L.; Hedstrom, C.E.; Bergstrom, H.; Forssman, L.; Rigner, A.; Lycke, E.: Vaccination against rubella of newly delivered women, Scand. J. Infect. Dis. 5: 237-241, 1973.

23. Grillner, L.: Neutralizing antibodies after rubella vaccination of newly delivered women: a comparison between three vaccines, Scand J. Infect. Dis. 7: 169-172, 1975.

24. Wallace, R.B.; Isacson, P.: Comparative trial of HPV-77, DE-5 and RA 27/3 live-attenuated rubella vaccines, Am. J. Dis. Child. 124: 536-538, 1972.

25. Lalla, M.; Vesikari, T.; Virolainen, M.: Lymphoblast proliferation and humoral antibody response after rubella vaccination, Clin. Exp. Immunol. 15: 193-202, 1973.

26. LeBouvier, G.L., Plotkin, S.A.: Precipitin responses to rubella vaccine RA 27/3, J. Infect. Dis. 123: 220-223, 1971.

27. Horstmann, D.M.: Rubella. The challenge of its control, J. Infect. Dis. 123: 640-654, 1971.

28. Ogra, P.L.; Kerr-Grant, D.; Umana, G.; Dzierba, J.; Weintraub, D.: Antibody response in serum and nasopharynx after naturally acquired and vaccine-induced infection with rubella virus, N. Engl. J. Med. 285: 1333-1339, 1971.

29. Plotkin, S.A.; Farquhar, J.D.; Ogra, P.L.: Immunologic properties of RA 27/3 rubella virus vaccine, J. Am. Med. Assoc. 225: 585-590, 1973.

30. Liebhaber, H.; Ingalls, T.H.; LeBouvier, G.L.; Horstmann, D.M.: Vaccination with RA 27/3 rubella vaccine. Persistence of immunity and resistance to challenge after two years, Am. J. Dis. Child. 123: 133-136, 1972.

31. Farquhar, J.D.: Follow-up on rubella vaccinations and experience with subclinical reinfection, J. Pediatr. 81: 460-465, 1972.

32. Measles, Mumps, and Rubella — Vaccine Use and Strategies for Elimination of Measles, Rubella, and Congenital Rubella Syndrome and Control of Mumps: Recommendations of the Advisory Committee on Immunization Practices (ACIP), MMWR 47(RR-8), May 22, 1998.

33. Rubella Prevention: Recommendation of the Immunization Practices Advisory Committee (ACIP), MMWR 39(RR-15): 1-18, November 23, 1990.

34. Measles Prevention. Recommendations of the Immunization Practices Advisory Committee (ACIP), MMWR 38(S-9): 5-22, December 29, 1989.

35. Jong, E.C., The Travel and Tropical Medicine Manual, W.B. Saunders Company, p. 12-16, 1987.

36. Committee on Immunization Council of Medical Societies, American College of Physicians, Phila., PA, Guide for Adult Immunization, First Edition, 1985.

37. Recommendations of the Immunization Practices Advisory Committee (ACIP), Mumps Prevention, MMWR 38(22): 388-400, June 9, 1989.

38. King, G.E.; Markowitz, L.E.; Patriarca, P.A.; et al: Clinical Efficacy of Measles Vaccine During the 1990 Measles Epidemic, Pediatr. Infect. Dis. J. 10(12): 883-888, December 1991.

39. Krasinski, K., Borkowsky, W.: Measles and Measles Immunity in Children Infected With Human Immunodeficiency Virus, JAMA 261(17): 2512-2516, 1989.

40. Kelso, J.M.; Jones, R.T., Yunginger, J.W.: Anaphylaxis to measles, mumps, and rubella vaccine mediated by IgE to gelatin, J. Allergy Clin. Immunol. 91: 867-872, 1993.

41. General Recommendations on Immunization, Recommendations of the Advisory Committee on Immunization Practices, MMWR 43(RR-1): 1-38, January 28, 1994.

42. Center for Disease Control: Immunization of Children Infected with Human T-Lymphotropic Virus Type III/Lymphadenopathy-Associated Virus, Annals of Internal Medicine, 106: 75-78, 1987.

CONFIDENTIAL

MRK-KRA02008704
MRK-CHA02008704

Appx19732

43. Krasinski, K.; Borkowsky, W.; Krugman, S.: Antibody following measles immunization in children infected with human T-cell lymphotropic virus-type III/lymphadenopathy associated virus (HTLV-III/LAV) [Abstract]. In: Program and abstracts of the International Conference on Acquired Immunodeficiency Syndrome, Paris, France, June 23-25, 1986.

44. Bitnum, A.; et al: Measles Inclusion Body Encephalitis Caused by the Vaccine Strain of Measles Virus. Clin. Infect. Dis. 29: 855-861, 1999.

45. Angel, J.B.; et al: Vaccine Associated Measles Pneumonitis in an Adult with AIDS. Annals of Internal Medicine, 129: 104-106, 1998.

46. Isaacs, D.; Menser, M.: Modern Vaccines, Measles, Mumps, Rubella, and Varicella, Lancet 335: 1384-1387, June 9, 1990.

47. Peter, G.; et al (eds): Report of the Committee on Infectious Diseases, Twenty-fourth Edition, American Academy of Pediatrics, 344-357, 1997.

48. Starr, S.; Berkovich, S.: The effect of measles, gamma globulin modified measles, and attenuated measles vaccine on the course of treated tuberculosis in children, Pediatrics 35: 97-102, January 1965.

49. Vaccine Adverse Event Reporting System — United States, MMWR 39(41): 730-733, October 19, 1990.

50. Rubella vaccination during pregnancy — United States, 1971-1981. MMWR 31(35): 477-481, September 10, 1982.

51. Eberhart-Phillips, J.E., et al. Measles in pregnancy: a descriptive study of 58 cases. Obstetrics and Gynecology, 82(5): 797-801, November 1993.

52. Jespersen, C.S.; et al: Measles as a cause of fetal defects: A retrospective study of ten measles epidemics in Greenland. Acta Paediatr Scand. 66: 367-372, May 1977.

53. Losonsky, G.A.; Fishaut, J.M.; Strussenber, J.; Ogra, P.L.: Effect of immunization against rubella on lactation products. II. Maternal-neonatal interactions, J. Infect. Dis. 145: 661-666, 1982.

54. Landes, R.D.; Bass, J.W.; Millunchick, E.W.; Oetgen, W.J.: Neonatal rubella following postpartum maternal immunization, J. Pediatr. 97: 465-467, 1980.

55. Lerman, S.J.: Neonatal rubella following postpartum maternal immunization, J. Pediatr. 98: 668, 1981. (Letter)

56. Gershon, A.; et al: Live attenuated rubella virus vaccine: comparison of responses to HPV-77-DE5 and RA 27/3 strains, Am. J. Med. Sci. 279(2): 95-97, 1980.

57. Weibel, R.E.; et al: Clinical and laboratory studies of live attenuated RA 27/3 and HPV-77-DE rubella virus vaccines, Proc. Soc. Exp. Biol. Med. 165: 44-49, 1980.

58. Bennetto, L; Scolding, N. Inflammatory/post-infectious encephalomyelitis. J Neurol Neurosurg Psychiatry 2004;75(Suppl 1):i22-8.

59. Fenichel, GM. Neurological complications of immunization. AnnNeurol 1982;12(2):119-28.

60. CDC, Measles Surveillance, Report No. 11, p. 14, September 1982.

61. Peltola, H.; et al: The elimination of indigenous measles, mumps, and rubella from Finland by a 12-year, two dose vaccination program. N. Engl. J. Med. 331: 1397-1402, 1994.

62. Centers for Disease Control and Prevention. Recommended childhood immunization schedule — United States, January-June 1996, MMWR 44(51 & 52): 940-943, January 5, 1996.

Dist. by: Merck Sharp & Dohme Corp., a subsidiary of

⊕ **MERCK & CO., INC.,** Whitehouse Station, NJ 08889, USA

For patent information: www.merck.com/product/patent/home.html

Copyright © 2015 Merck Sharp & Dohme Corp., a subsidiary of **Merck & Co., Inc.**
All rights reserved.

Revised: 10/2015

uspi-v205c-i-1510r005

**CONFIDENTIAL**

**MRK-KRA02008705**
**MRK-CHA02008705**

**Appx19733**

11/26/2019
Declaration of G. Reilly
EXHIBIT 407

**To:**        Kuter, Barbara J.[barbara_kuter@merck.com]
**From:**      Papania, Mark (CDC/CCID/NCIRD)
**Sent:**      Fri 2/12/2010 11:33:48 AM
**Importance:**        Normal
**Subject:**   RE: Mumps research priorities during ongoing outbreak

Barb,

Could you please send me their e-mail addresses so I can invite them?

Thanks,

Mark


**From:** Kuter, Barbara J. [mailto:barbara_kuter@merck.com]
**Sent:** Thursday, February 11, 2010 10:51 PM
**To:** Papania, Mark (CDC/CCID/NCIRD)
**Subject:** RE: Mumps research priorities during ongoing outbreak


Mark,


Thanks for the invitation. I had also asked that 3 of my colleagues from Merck (Mark Feinberg, Susan Manoff, and David Krah) also be included in this meeting. I had previously sent those names to Jane Seward. Is it OK if I extend an invitation for them to attend?


Many thanks.


Barb Kuter

————

**From:** Papania, Mark (CDC/CCID/NCIRD) [mailto:myp7@cdc.gov]
**Sent:** Thursday, February 11, 2010 6:51 PM
**To:** stanley.plotkin@vaxconsult.com; Walter.Orenstein@gatesfoundation.org; Wharton, Melinda (CDC/CCID/NCIRD); Cochi, Steve (CDC/CCID/NCIRD); Rubin, Steven A.

**CONFIDENTIAL**

(FDA); Kuter, Barbara J.; arvinam@leland.stanford.edu; ra@microbio.emory.edu;
Offit, Paul
**Cc:** Armstrong, Gregory (CDC/CCID/NCIRD); Gallagher, Kathleen
(CDC/CCID/NCIRD); Seward, Jane (CDC/CCID/NCIRD); Anderson, Larry
(CDC/CCID/NCIRD)
**Subject:** Mumps research priorities during ongoing outbreak

Dear Immunization Colleagues,

I am sure you are aware of the ongoing mumps outbreak in New York and New
Jersey, now with cases under investigation in Connecticut. The high proportion of
cases among persons who have received two doses of MMR raises issues
concerning the vaccine effectiveness and duration of protection. Also, the
outbreak highlights some of the limitations of the currently available mumps
diagnostic tests. The ongoing outbreak may provide opportunities for research to
address these and other mumps prevention issues.  We would like to invite you
to attend a brief session at CDC to discuss mumps research priorities from 2:00 –
4:00 PM on February 25th (following the ACIP meeting.) We will set up a
conference call for those who are not able to attend in person.

We will be sending more details along with a meeting agenda shortly, but we
wanted to get this brief invitation to you as quickly as possible in case those of
you attending the ACIP meeting need to adjust your travel plans. I will be
coordinating this Mumps Research Priority Discussion. Please let me know as
soon as possible by email mpapania@cdc.gov or phone (770) 265-6483 if you
will be available to attend.

Sincerely,

Mark Papania, MD, MPH

Medical Epidemiologist

On behalf of the Division of Viral Diseases,

National Center for Immunization and Respiratory Diseases, CDC

Larry Anderson, MD, Director

Jane Seward, MBBS, MPH, Deputy Director

Notice:  This e-mail message, together with any attachments, contains
information of Merck & Co., Inc. (One Merck Drive, Whitehouse Station,
New Jersey, USA 08889), and/or its affiliates Direct contact information
for affiliates is available at
http://www.merck.com/contact/contacts.html) that may be confidential,
proprietary copyrighted and/or legally privileged. It is intended solely
for the use of the individual or entity named on this message. If you

**CONFIDENTIAL**

are not the intended recipient, and have received this message in error, please notify us immediately by reply e-mail and then delete it from your system.

CONFIDENTIAL

MRK-KRA00351990
MRK-CHA00351990

11/26/2019
Declaration of G. Reilly
EXHIBIT 408

**To:**    Kitchen, Chester J[chet_kitchen@merck.com]; Dekleva, Michael
L.[michael_dekleva@merck.com]; Kuter, Barbara J.[barbara_kuter@merck.com]; Goveia,
Michelle[michelle_goveia@merck.com]; Manoff, Susan[susan_manoff@merck.com]; Porreca, D
Scott[scott_porreca@merck.com]; Bresnitz, Eddy A.[eddy_bresnitz@merck.com]; Krah, David
L[david_krah@merck.com]
**From:**    Kitchen, Chester J
**Sent:**    Thur 2/25/2010 11:56:53 AM
**Importance:**    **Normal**
**Subject:**    RE: ACIP Mumps Slides

Rough transcript of comments from Mumps outbreak section:

Baker (ACIP) - was it the same genotype as 2006?
Yes
Baker (ACIP)- anything special about that strain regarding virulence or transmissibilty
- Gallagher (CDC)- As far as we know, no.  We know that some studies have been done to look at
whether the current vaccine can develop neutralizing antibodies and they can.
Ceislak (ACIP)- duration of immunity…
- Gallagher (CDC)-Median is about 10 years since vaccination.  Some cases have seen vaccination more
recently
Increased incidence with time since vaccination?
- Gallagher (CDC)-Peaks at 10 years and beyond.  Nature of outbreaks is focused at these schools and
these age groups attend
Katz - are you doing any serologic or virologic analysis to look at non overt cases.
- Gallagher (CDC)-Not yet.  Unfortunately, these cases are still continuing.
Middleman - did you notice a difference in those who received 2 doses versus 1 or no doses
- Gallagher (CDC)-Most common is orchitis.  There is a statistically significant difference in those who
received non or 1 dose versus 2 doses.
Keidel? (ACIP) - will there be any national plans to religious groups to make sure people are vaccinated
before upcoming religious holidays to catch up those who may not have been fully immunized?
- Gallagher (CDC)-Officials are starting to talk to the affected communities.  The Jewish boys attend
schools called Yeshivas, which are mixture of day students and students who are boarded there.  The
kids who are boarded may be introducing mumps into other orthodox Jewish communities.  Giving
information to those kids and their families to make sure they are up to date on shots
Salzbury (UK) - even though Sam Katz thinks it's my fault, I won't accept it. **REDACTED – OMP**
**REDACTED – OMP**

Meissner - mumps component does not work as well as measles or rubella. Can Dr. Katz or Plotkin
comment?
- Katz - in the absence of Dr. Hilleman who is no longer with us, I'd rather not speak badly about JL, even
though JL is still with us... Urabe was more reactogenic so the Japanese dropped it.  As far as I'm aware,
both outbreaks (006 and 2009-10) suggest that there is not long-lasting immunity.  With mumps it is
probably T-cell instead of B-cell.
Plotkin - agree that the efficacy data of single dose is less than one would wish and less than other 2
components.  Japan does not use mumps vaccine any longer and they do have a problem that has been
written about.  Regarding relative safety and efficacy, JL is only strain along with GSK derivative, are the
only ones without aseptic meningitis.  There are comparative data that show Urabe is somewhat more
effective than JL.  Also depends on duration of immunity.  Complex situation.  I do feel that we need a
better mumps vaccine strain than we currently have.
Temte (ACIP)- all of these kids have been immunized in a limited set of clinics, any issues with storage
and handling of vaccines?
- Gallagher (CDC)-Within the clinics giving 3rd dose, there are only 3-4 providers.  In these communities
we have not assessed vaccine storage.  Others live in NYC and received their vaccine there.
Jane Zucher (New York Health Dept) - regarding the risk of orchitis in those who contracted mumps,

**CONFIDENTIAL**

there is a 4-fold higher risk or orchitis in post pubertal males without vaccination versus those who received 2 doses (8 vs 2%?).  No issues with storage or handling.  REDACTED – OMP REDACTED – OMP Passover holiday coming up but another holiday coming up in the next week or so. They have been doing a lot of vaccination activities in advance of this holiday since UK gave us measles before a Jewish holiday last year. Outbreak really took off after holidays in September.

Sorry for the choppy wording...trying to get draft notes out quickly to the team in advance of the meeting this afternoon.

Best regards,
Chet

| From: | Kitchen, Chester J |
|---|---|
| Sent: | Thursday, February 25, 2010 8:55 AM |
| To: | Kitchen, Chester J; Dekleva, Michael L.; Kuter, Barbara J.; Goveia, Michelle; Manoff, Susan; Porreca, D Scott |
| Subject: | RE: ACIP Mumps Slides |

Here is a better quality scan:

<< File: Mumps Outbreak Handout - Feb10 ACIP.pdf >>
Chet

| From: | Kitchen, Chester J |
|---|---|
| Sent: | Thursday, February 25, 2010 8:44 AM |
| To: | Dekleva, Michael L.; Kuter, Barbara J.; Goveia, Michelle; Manoff, Susan; Porreca, D Scott |
| Subject: | ACIP Mumps Slides |

All,
Attached is a scan of the mumps outbreak slides that will be presented this morning.

Best regards,
Chet

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 409

Appx19741

To:          Porreca, D Scott[scott_porreca@merck.com]
Cc:          Dekleva, Michael L.[michael_dekleva@merck.com]; Haupt, Kim[kim_haupt@merck.com]
From:        Kitchen, Chester J
Sent:        Fri 2/26/2010 1:44:19 PM
Importance:          Normal

Hi Scott. Would you please forward this to the PDT?

Thanks,
Chet

### ACIP discusses factors leading to mumps outbreak in the Northeast

The number of cases linked to a June mumps outbreak at a New York summer camp has climbed to 2,336, CDC officials reported during the **Advisory Committee on Immunziation Practices'** meeting this week.

After initial spread into other populations throughout the state and **areas of New Jersey**, CDC epidemiologist **Kathleen Gallagher, DSc, MPH**, said the disease has now been exported to Connecticut, Quebec and Israel.

Incidence remains highest among boys in the Hasidic community because they usually spend longer hours at private schools, Gallagher said, mostly around other people belonging to this population. In addition to day students, these schools also board students from a variety of other regions and states. Therefore, boys potentially exposed to mumps may inadvertently spread the disease among other communities when they return home for holidays, emphasizing the importance of up-to-date, two-dose vaccinations in this age group.

The potential for a three-dose **measles-mumps-rubella vaccine** (M-M-R II, Merck) was also a focal point at the meeting. Currently, officials in Orange County, New York have tried administering a third dose to children in efforts to control the outbreak. Although little data are available, Gallagher said studies to evaluate the efficacy of a three-dose vaccine regimen are ongoing.

Additional discussion addressed the genotype responsible for the outbreak, as well as the current vaccine's ability to effectively prevent the spread of disease. Officials have identified genotype G from the United Kingdom, which was also present in the 2006 mumps outbreak, as the culprit for the current outbreak. Gallagher noted that there was "nothing special" about genotype G, and the MMRV may develop antibodies to this strain.

Nevertheless, other committee members said the mumps component of the MMRV has always been less effective than the measles and rubella components, and some attributed this to the strain contained in the vaccine.

"It's a complex situation that we have, but as I've said to my colleagues from Merck, we do need a better mumps strain than we currently have," Stanley A. Plotkin, MD, of Sanofi-Pasteur, said. "Even though we have a number of [mumps strains], none of them are perfect." - *by Melissa Foster*

Source: Pediatric SuperSite: http://www.pediatricsupersite.com/print.aspx?rid=61325

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 410

Appx19743

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0047687



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0047688





HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0047689

**Appx19746**

11/26/2019
Declaration of G. Reilly
EXHIBIT 411



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0047654



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0047655

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0047656

**Appx19750**

11/26/2019
Declaration of G. Reilly
EXHIBIT 412



CONFIDENTIAL

GSK-MMR-0195819

**Appx19752**



CONFIDENTIAL

GSK-MMR-0195820

Appx19753



CONFIDENTIAL

GSK-MMR-0195821

**Appx19754**



CONFIDENTIAL



CONFIDENTIAL

GSK-MMR-0195823

Appx19756



CONFIDENTIAL

GSK-MMR-0195824

**Appx19757**



CONFIDENTIAL

GSK-MMR-0195825

Appx19758



3

CONFIDENTIAL    GSK-MMR-0195826

Appx19759



4

GSK-MMR-0195827

**Appx19760**



CONFIDENTIAL



CONFIDENTIAL

GSK-MMR-0195829

**Appx19762**



7

CONFIDENTIAL

**Appx19763**



CONFIDENTIAL   GSK-MMR-0195831



9

GSK-MMR-0195832

Appx19765



CONFIDENTIAL

GSK-MMR-0195833

Appx19766



CONFIDENTIAL

GSK-MMR-0195834

**Appx19767**



CONFIDENTIAL



CONFIDENTIAL                                                                                   GSK-MMR-0195836

**Appx19769**



CONFIDENTIAL

GSK-MMR-0195837



CONFIDENTIAL

GSK-MMR-0195838

**Appx19771**



CONFIDENTIAL

GSK-MMR-0195839

**Appx19772**



CONFIDENTIAL

GSK-MMR-0195840

**Appx19773**



CONFIDENTIAL

GSK-MMR-0195841

**Appx19774**



CONFIDENTIAL

GSK-MMR-0195842

**Appx19775**

11/26/2019
Declaration of G. Reilly
EXHIBIT 413

Appx19776

| To: | FILE | 4/9/01 |
|---|---|---|
| FROM: | Katalin Abraham<br>Biologics Licensing | WP36A-202 |

SUBJECT:   Minutes, Meeting with CBER on 4/4/01 Regarding Mumps Stability

**Background**

Representatives from Merck met with CBER on April 4, 2001 to review and discuss Merck's stability program for biological products. Copies of the letter, McKee to Midthun, 3/30/01, were faxed to CBER (Norman Baylor, Kathryn Carbone Peter Patriarca and Luba Vujcic) prior to the meeting, on 3/30/01. The letter included background information on the following topics: Development and Implementation of an Ongoing Biological Stability Program; Nonlinear Kinetics of Live Virus Vaccines; Adjustment to a House Standard; Mumps Stability Profile; and Mumps End Expiry Preliminary Subset Analysis.

The objectives of the meeting were:

- Review Merck's stability program for biological products
- Gain concurrence on program elements
- Describe active stability monitoring
- Describe non-linear modeling of live virus vaccine stability data
- Describe adjustment to the house standard
- Identify modifications/enhancements to facilitate detection of shifts/trends in stability profile
- Discuss the results of the interim analysis of the data from the mumps end-expiry clinical trial (if time permitted)

The agenda and presenters for the meeting were:

- Introduction (R. McKee)
- Stability Program Review (C. Morrisey)
- Program Enhancements (C. Morrisey)
- Mumps Kinetics (T. Schofield)
- Adjustment to a House Standard (T. Schofield)
- Mumps Stability (C. Morrisey)
- Mumps End-Expiry Interim Analysis (J. Sadoff)
- Wrap-up (R. McKee)

**Meeting Attendees**

Merck: Philip S. Bennett, Mark Galinski, Roberta L. McKee, Cynthia Morrisey, Manal Morsy, Taryn Rogalski-Salter, Jerry Sadoff, Tim Schofield and Katalin Abraham

CBER: Chintamani Atreya, Norman Baylor, John Cleveland, Judy Beeler, Kathryn Carbone, Henry Hsu, Peter A. Lachenbruch, Loris McVittie, Peter Patriarca, Steven Rubin, Luba Vujcic

**Meeting Summary**

The goals and agenda for the meeting were presented by Dr. McKee, followed by an overview of the stability program by Ms. Morrisey. Ms. Morrisey emphasized the prospective, controlled and documented practices in place for the stability studies performed for licensed biological products with particular focus on the studies of the mumps component of M-M-R®II. Her presentation included a description of the active stability monitoring program for M-M-R®II. The subsequent presentation by Mr. Schofield on

**CONFIDENTIAL**

**MRK-KRA00049238**<br>**MRK-CHA00049238**

mumps degradation kinetics and house standard adjustment initiated active discussion among attendees on these topics. This discussion consumed the remainder of the time scheduled for the meeting and the rest of the agenda items were not discussed. CBER's expectations for our stability program for M-M-R®II follow below, under "Outcomes."

CBER representatives acknowledged at several points during the discussion that they know that M-M-R®II is a "good product that we don't want to have to recall." Dr. Carbone commented that we are now "swimming in new waters," referring to compliance.

Merck demonstrated to CBER that their concerns have been taken seriously and that Merck has made appropriate modifications to the stability program. On several occasions, Dr. Carbone stated that she was "glad to see we were doing that," referring to the use of various data analysis methodologies. It was evident that CBER was not familiar with the details provided to them in previous supplements addressing stability monitoring, despite the fact that the backgrounder provided for this meeting summarized and referenced them. They were directed to various sections within the supplements for their post-meeting review.

#### Outcomes

1. Dr. Carbone emphasized that CBER's concern is that vaccines (in this case, mumps-containing vaccines) remain at or above the minimum potency through expiry. Although they were interested in the Company's efforts to analyze degradation kinetics and assure manufacturing consistency over time, they felt this was more in the manufacturer's area of concern. Dr. Carbone explained that CBER wants, with 95% confidence, that lots be at or above 4.3 $\log_{10}$ $TCID_{50}$ mumps/dose at expiry. She explained that 4.3 is the lower bound of the expiry potency and that CBER calculations indicated that the expiry titer should be 4.6. Although this point was not discussed further, CBER did indicate that their purpose for annual stability studies is to assure that the minimum potency is met for batches made within the time period covered by the studies. To that end, they felt that one annual lot was insufficient and look to Merck for a proposal that will address their concern. They expect the number of lots on stability to increase and indicated that the number of lots manufactured per year should fit into the equation. They also inquired about how the stability lot was chosen and what assurances were in place to prevent the choice from being biased. Merck's goal for stability studies has been to monitor the process to assure that the release specifications continue to be appropriate. To address CBER's purpose will require a re-evaluation of the program.

Assignment: Merck will develop a plan for the number of lots, number of stability intervals, and assay format to be used in its annual stability program. That plan will be devised in conjunction with the data analysis methodology that will be employed to address the goals of the program and will be reviewed with CBER statisticians and product people. (VBR and Biological Stability Unit to prepare proposal)

2. In the context of the discussion on mumps degradation kinetics, Dr. Carbone noted that CBER "did not know what to do with accelerated stability data" and that they only looked at real time data in new licenses and in supplements to assess product performance over time. CBER has not been convinced that mumps degradation is bi-phasic under label storage conditions and requested further evaluation of more recent stability data as well as of the 16 lots previously evaluated by Dr. Suresh Rastogi (CBER).

Assignment: CBER requested that Merck evaluate the mumps degradation kinetics for lots on stability 1995-1998 and for the 16 lots discussed with Dr. Rastogi (McKee to Egan, 1/8/99, Attachment 4). Different analysis methods suggested by CBER include linear regression, bi-phasic kinetics and spline. (VBR to evaluate)

3. CBER is postponing further discussion of house standard adjustment until another face-to-face meeting is scheduled. Merck's presentation supported house standard adjustment to provide better control over the manufacturing process and also to better compare inter-laboratory potency results. Dr. Carbone

2

CONFIDENTIAL

questioned its utility since house standard adjustment provides only minimal improvement in intra-laboratory variability. When it was explained to her that the sample results track the house standard's performance, Dr. Carbone requested potency graphs on new and old house standards run concurrently to evaluate this.

Assignment: Merck will provide the graphs of potency data collected during qualification for a new house standard (BAD to provide data to VBR for analysis)

Assignment: A face-to-face meeting with CBER will be scheduled to address the assignments following points 1-3 above. (VSQO to schedule)

4. Dr. Carbone requested that Merck notify CBER when it appears that a lot on stability may go out of specification, noting that, if additional data proved otherwise, that should also be communicated. She requested that this be worked into the SOPs for stability studies. Dr. Baylor commented that the logistics of implementing this need to be discussed.

Assignment: Roberta McKee will follow up with Norman Baylor on this subject.

Stability slides prepared for the meeting are enclosed.

3

**CONFIDENTIAL**

**MRK-KRA00049240**
**MRK-CHA00049240**

**Appx19779**

11/26/2019
Declaration of G. Reilly
EXHIBIT 414

**To:**      Hoath, Cathy[cathy_hoath@merck.com]; Godshall, Colleen E.[colleen_godshall@merck.com]; Keegan, Amy[amy_romanowski@merck.com]
**Cc:**      Kreuz, Dawn M.[dawn_kreuz@merck.com]; Lucchese, James A[james_lucchese@merck.com]
**From:**    Wong, Sally S
**Sent:**    Tue 2/26/2013 9:30:50 AM
**Importance:**      Normal
**Subject:**  RE: Commitment wording question

Cathy and All,

I agree that the decision on the stability schedule does reside with us. But the whole question on the 30 month interval is somewhat compounded by the fact that the 30 month interval is still considered part of the filed annual schedule.

As a compromise, we decided to test the initial Durham lots (engineering and PPQ) with the 30 month interval and then switch over for the annual program to a 24 month schedule (supported by including the 24 month protocol in section 8.2).

Our goal is to be able to support the 24 month expiry for the WP and Durham product --- any additional buffer in the model needs to go into the TOR bucket. **REDACTED – OMP**
**REDACTED – OMP**                                                                         If there any questions on expiry extension for MMR, we can explain this point to them with actual data when it is available.

Sally

| | |
|---|---|
| **From:** | Hoath, Cathy |
| **Sent:** | Tuesday, February 26, 2013 8:39 AM |
| **To:** | Godshall, Colleen E.; Wong, Sally S; Keegan, Amy |
| **Cc:** | Kreuz, Dawn M.; Lucchese, James A |
| **Subject:** | RE: Commitment wording question |

Knowing what we know about process losses and the stability profile, it seems like we should let them know that the data won't support expiry extension and we should delete the timepoint.

**From:** Godshall, Colleen E.
**Sent:** Monday, February 25, 2013 3:12 PM
**To:** Hoath, Cathy; Wong, Sally S; Keegan, Amy
**Cc:** Kreuz, Dawn M.; Lucchese, James A
**Subject:** RE: Commitment wording question

They want a competitive advantage for our product. I explained to them that we would not be pursuing this. That if we make any changes, it is likely to be to increase TOR. But they still asked if we would be willing to add the 30 month. Sally's group added it for them.

**From:** Hoath, Cathy
**Sent:** Monday, February 25, 2013 3:07 PM
**To:** Wong, Sally S; Keegan, Amy; Godshall, Colleen E.
**Cc:** Kreuz, Dawn M.; Lucchese, James A

**CONFIDENTIAL**

**MRK-KRA01556424**
**MRK-CHA01556424**

**Appx19781**

**Subject:** RE: Commitment wording question

I agree that we should not pursue reducing to one lot in the Durham file. There may be some value in the data over the next few years as the process is stabilized and removal of the testing at this point would be tough to justify in the midst of such a significant change and add unnecessary risk. I also agree that this project would require prioritization.

As far as the 30 month time point goes, Colleen, do you know why that was requested by the JV?

---

**From:** Wong, Sally S
**Sent:** Monday, February 25, 2013 10:25 AM
**To:** Keegan, Amy; Godshall, Colleen E.; Hoath, Cathy
**Cc:** Kreuz, Dawn M.; Lucchese, James A
**Subject:** RE: Commitment wording question

Thank you Amy.

Yes - it would help if we could remove the post expiry time point for annual studies (update the protocol in section 8.2). We will plan to perform the 30 month interval for engineering and PPQ.

Sally

---

| **From:** | Keegan, Amy |
|---|---|
| **Sent:** | Monday, February 25, 2013 10:20 AM |
| **To:** | Wong, Sally S; Godshall, Colleen E.; Hoath, Cathy |
| **Cc:** | Kreuz, Dawn M. |
| **Subject:** | RE: Commitment wording question |

Hi Sally,

The final decision for the technical recommendation is to retain the scheme for a minimum of three lots per site is with stability.

However, since there is quite a bit of discussion around the process overall just now, it seems a hard sell to decrease stability testing just now.

Does it help, though, to finally get the 30-month point off the books? We could put that update in Durham filing, perhaps, with minimal risk.

And yes, any new activity does need to go through a reprioritization process at this time.

Tx!
AK

---

**CONFIDENTIAL**

**MRK-KRA01556425**
**MRK-CHA01556425**

**From:** Wong, Sally S
**Sent:** Friday, February 22, 2013 6:49 PM
**To:** Godshall, Colleen E.; Keegan, Amy; Hoath, Cathy
**Cc:** Kreuz, Dawn M.
**Subject:** RE: Commitment wording question

All,

As much as I would like to commit to only one lot for Durham, I do not think this would meet the spirit of the original commitment (since we did not have multiple sites at the time it was written and the concern was over a product stability issue that should not be site specific).

If we commit to one lot for the Durham site, I think we would need to tell the story of why we consider one lot appropriate (based upon WP data). This has the potential to bog down the Durham filing.

After reading the commitment again and our discussion this week, it seems to me like we should save the proposal for a future supplement that would cover both sites. I am still gathering the financials (8 lots of stability lots each year versus 2) - then I am guessing it would need to go through a pre-approval process to be added to the CMC list of projects...

Amy / Cathy - what are your thoughts?

Sally

---

| | |
|---|---|
| **From:** | Godshall, Colleen E. |
| **Sent:** | Friday, February 22, 2013 2:14 PM |
| **To:** | Keegan, Amy; Wong, Sally S; Hoath, Cathy |
| **Subject:** | RE: Commitment wording question |

Thanks Amy,

Sally and I have been discussing how many annual lots of MMR Durham should put on stability each year. For our other vaccines, it's standard to put one lot on stability annually from each site. But for MMR, we currently put 4 lots on stability annually - and I believe we may do the same for ProQuad.

Sally explained to me that the need to put 3 lots on stability (we committed to 3, we actually put 4 on stability each year - which is necessary to do the statistics) came from discussions with CBER after a time when we had regular mumps stability failures. CBER thought that our stability program - with 1 annual lot - was insufficient to detect trends. Since that time we have changed our mumps targeting and we no longer get stability failures. In addition, the enhanced stability program involving 4 annual lots has not found any trends. The enhanced stability program was implemented in late 2006, but we really didn't have trend results using the data until the end of 2008.

Sally would like to submit a supplement to do away with the enhanced stability program at WP. And still up for decision is whether or not we need to do 4 annual lots for Durham. I would like

**CONFIDENTIAL**

**MRK-KRA01556426**
**MRK-CHA01556426**

to include in the Durham PAS that we will put one lot up on stability.

Amy found the original commitment, and we did not say we would put 3 lots up on stability annual from each site.  We only said that we would put 3 lots on annually.

Any thoughts on this decision?

Colleen

---

**From:** Keegan, Amy
**Sent:** Friday, February 22, 2013 1:52 PM
**To:** Wong, Sally S
**Cc:** Godshall, Colleen E.
**Subject:** RE: Commitment wording question

Hi Sally,

Here's what I found.  Cover for the responses + the specific response/commitment related to stability.

<< File: Stability Commitment_2005.pdf >>
Pls let me know if you need anything else!
AK

---

**From:** Wong, Sally S
**Sent:** Thursday, February 21, 2013 12:13 PM
**To:** Keegan, Amy
**Cc:** Godshall, Colleen E.
**Subject:** Commitment wording question

Hi Amy,

Would you look up the Merck response on the Enhanced Annual Stability Program for MMR?

The commitment to enhanced stability monitoring for MMR was in response to a CBER question on the rHA original submission.  I thought I had kept a copy of the response but can not find it.

The time frame is 2005.

Thank you!

*Sally Wong*
Vaccine and Biological Stability
215-652-5087

**CONFIDENTIAL**

**MRK-KRA01556427**
**MRK-CHA01556427**

**CONFIDENTIAL**

**MRK-KRA01556428**
**MRK-CHA01556428**

**Appx19785**

11/26/2019
Declaration of G. Reilly
EXHIBIT 415

Appx19786

**To:**       Stannard, Mark J.[mark_stannard@merck.com]
**From:**     Bernardo, Joseph D
**Sent:**     Wed 11/30/2016 11:13:44 AM
**Importance:**       **Normal**
**Subject:**   Follow up on the Question on the TCID50/0.1 vs /dose conversion (MMR potency)

Hi Mark – to follow up more on our conversation to the TCID 50 calculation question:

Why do we add 0.7 to the TCID50/0.1 mL to get the TCID 50 / dose value?

The answer is that there is 0.5 mL / dose or 5 x 0.1 mL -- log of 5 is 0.7 that is the rationale.

I know we talked about the dose volume in there, but I wanted to add the log conversion information as it provides additional clarity.

Let me know if you have any more questions.

Joe

**CONFIDENTIAL**

11/26/2019
Declaration of G. Reilly
EXHIBIT 416

Page 1

```
 1             IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3
 4   UNITED STATES OF AMERICA,    ) Civl Action No.
     ex rel., STEPHEN A.          ) 2:10-04374 (CDJ)
 5   KRAHLING and JOAN A.         )
     WLOCHOWSKI,                   )
 6                                 )
                 Plaintiffs,       )
 7                                 )
     vs.                           )
 8                                 )
     MERCK & CO., INC.,           )
 9                                 )
                 Defendant.        )
10   _____)
     IN RE:  MERCK MUMPS VACCINE  ) Master File No.
11   ANTITRUST LITIGATION         ) 2:12-cv-03555 (CDJ)
                                   )
12   THIS DOCUMENT RELATES TO:    )
     ALL ACTIONS                   )
13   _____)
14
15
16             - HIGHLY CONFIDENTIAL -
17
18       VIDEOTAPED DEPOSITION OF ROBERTA L. McKEE
19                   Tucson, Arizona
                     March 30, 2017
20                     9:06 a.m.
21
22
23
24   Prepared by:
     JEFFREY W. BARTELT, CR, RPR
25   Certificate No. 50363
```

Appx19789

Page 2

1             I N D E X
2 WITNESS:
3 ROBERTA L. McKEE                    PAGE
4
     Examination by Mr. Keller.................7
5
6
7
8
9         E X H I B I T S
10
11 NO.      DESCRIPTION           PAGE
12 Exhibit 1   MCKEE_000001 - 000002...............15
13 Exhibit 2   LinkedIn profile....................15
14 Exhibit 3   MRK-KRA00018608 - 00018610.........58
15 Exhibit 4   MRK-KRA00049178....................88
16 Exhibit 5   MRK-KRA00049239 - 00049240.........89
17 Exhibit 6   MRK-KRA01899087 - 01899253........100
18 Exhibit 7   MRK-KRA00590949 - 00590958........112
19 Exhibit 8   MRK-KRA00331641 - 00331645........125
20 Exhibit 9   MRK-KRA01896274 - 01896275........130
21 Exhibit 10  MRK-KRA00286728 - 00286729........142
22 Exhibit 11  MRK-KRA00286794 - 00286805........143
23 Exhibit 12  MRK-KRA00286730 - 00286735........143
24 Exhibit 13  PUBLIC0000666 - 0000670...........151
25 Exhibit 14  MRK-KRA00684945...................168

Page 3

1         E X H I B I T S
2
3 NO.      DESCRIPTION           PAGE
4 Exhibit 15  MRK-KRA01896072 - 01896073........172
5 Exhibit 16  MRK-KRA00549218 - 00549219........182
6 Exhibit 17  MRK-KRA01480843 - 01480864........186
7 Exhibit 18  MRK-KRA00754239 - 00754244........207
8 Exhibit 19  MRK-KRA01537603 - 01537611........223
9 Exhibit 20  MRK-KRA00562218 - 00562219........235
10 Exhibit 21  MRK-KRA00616610...................241
11 Exhibit 22  Backup Slides - Mumps Stability.....241
12 Exhibit 23  MRK-KRA00616622 - 00616640........241
13 Exhibit 24  MRK-KRA00754233 - 00754238........252
14 Exhibit 25  MRK-KRA00561350 - 00561355........263
15 Exhibit 26  MRK-KRA01649892 - 01649893........275
16 Exhibit 27  Metadata..........................275
17 Exhibit 28  MRK-KRA00094134 - 0094135.........286
18 Exhibit 29  MRK-KRA00561113 - 00561114........295
19 Exhibit 30  Metadata..........................302
20 Exhibit 31  MRK-KRA00027716...................304
21 Exhibit 32  MRK-KRA00560717 - 00560720........306
22 Exhibit 33  MRK-KRA00501762 - 00501765........313
23
24
25

Page 4

1      VIDEOTAPED DEPOSITION OF ROBERTA L. McKEE
2 commenced at 9:06 a.m. on March 30, 2017, at the law
3 offices of RUSING, LOPEZ & LIZARDI, PLLC, 6363 North
4 Swan Road, Suite 151, Tucson, Arizona, before
5 JEFFREY W. BARTELT, a Certified Reporter, CR No.
6 50363, for the State of Arizona
7
8            * * *
9     A P P E A R A N C E S
10
11 For the Relators:
   KELLER GROVER LLP
12 By:  Jeffrey F. Keller, Esq.
       James P. Carroll, Jr., Esq.
13     1965 Markte Street
       San Francisco, California 94103
14     jfkeller@kellergrover.com
15
   For Merck and Dr. McKee:
16 VENABLE LLP
   By:  Kathleen S. Hardway, Esq.
17      Melissa M. O'Toole-Loureiro, Esq.
        Michaela F. Roberts, Esq. (Via telephone)
18      750 East Pratt Street, Suite 900
        Baltimore, Maryland 21202
19      kshardway@venable.com
20
   For Merck and Dr. McKee:
21 MORGAN, LEWIS & BOCKIUS
   By:  Margaret Erin Rodgers Schmidt, Esq.
22      1701 Market Street
        Philadelphia, Pennsylvania 19103
23
   Also present:
24  Timothy Howard, In-House Counsel, Merck
    Cody Warren, CLVS
25

Page 5

1            Tucson, Arizona
2            March 30, 2017
3            9:06 a.m.
4
5            * * *
6      THE VIDEOGRAPHER:  We are now on the record.
7 Please note the microphones are sensitive and may
8 pick up whispering and private conversations.
9 Please turn off all cell phones or place them away
10 from the microphones as they can interfere with the
11 deposition audio.  Recording will continue until all
12 parties have agreed to go off the record.
13      My name is Cody Warren representing Veritext
14 Legal Solutions.  Today's date is March 30th, 2017,
15 and the time is approximately 9:06 a.m.
16      This deposition is being held at Rusing,
17 Lopez & Lizardi located at 6363 North Swan Road,
18 Suite 151, in Tucson, Arizona, and is being taken by
19 the counsel for the plaintiff.
20      The caption of this case is the United
21 States of America ex rel., Krahling and Wlochowski
22 vs. Merck & Company, Inc. and Merck Mumps Vaccine
23 Antitrust Litigation.
24      The name of our witness is Roberta McKee.
25      At this time will the attorneys present in

2 (Pages 2 - 5)

Page 6

1 the room and everyone attending remotely please
2 identify themselves and state whom they represent.
3        MR. KELLER:  Sure.  Jeffrey Keller from
4 Keller, Grover on behalf of the relators.
5        MR. CARROLL:  James Carroll, Keller, Grover
6 on behalf of the relators.
7        MS. HARDWAY:  Kathleen Hardway from Venable
8 for Merck and Dr. McKee.
9        MS. O'TOOLE-LOUREIRO:  Melissa
10 O'Toole-Loureiro from Venable for Merck and
11 Dr. McKee.
12        MS. SCHMIDT:  Margaret Rogers Schmidt from
13 Morgan, Lewis for Merck and Dr. McKee.
14        MR. KELLER:  Can we get the folks who are
15 listening on -- to introduce themselves.
16        Tim?  Michaela?
17        MR. HOWARD:  Tim Howard, in-house counsel
18 for Merck.
19        MS. ROBERTS:  Michaela Roberts from Venable
20 on behalf of Merck and Dr. McKee.
21        MR. KELLER:  Anybody else on the line?
22
23              ROBERTA MCKEE,
24 called as a witness herein, having been duly sworn,
25 was examined and testified as follows:

Page 7

1
2              * * *
3
4              EXAMINATION
5 BY MR. KELLER:
6    Q.  Good morning, Dr. McKee.  Can you state your
7 full name for the record.
8    A.  Roberta Lynn McKee.
9    Q.  Are you known by any other names?
10    A.  My full name is Roberta Lynn McKee.
11    Q.  Okay.  Just asking.
12    A.  Legal name.
13    Q.  Have you ever had your deposition taken
14 before?
15    A.  Not that I recall.  Not like -- not that I
16 understand how this will be.
17    Q.  Okay.  Let me kind of -- I'm sure your
18 lawyers have spent a -- some time with you
19 explaining the process with you, but I think it's
20 always helpful to sort of have it refreshed before
21 we start today.  As you can see, Jeff is going to
22 write down everything that we say here today, when
23 you speak, when I speak, when your counsel speaks,
24 and so it's really important that we don't speak
25 over each other, so if you can give me the benefit

Page 8

1 of letting me finish my question before you answer
2 it.  I know in typically -- in normal conversation
3 we typically know exactly what they are asking, so
4 you basically jump in and start answering before
5 somebody has actually finished the question, but
6 when Jeff finishes his job here, he's going to print
7 this thing out into a transcript which is going to
8 have the questions and answers, and if you say
9 something in between of a question, that comes next
10 and you end up with a really sort of choppy
11 transcript at the end of the day, so -- and I will
12 sometimes be in the middle of trying to formulate
13 the back end of a question, and so if you can just
14 give me a second to finish the question before you
15 answer; is that fair?
16    A.  Sure.
17    Q.  Perfect.  You're doing a great job using
18 words to express yourself.  Though Jeff is amazing
19 at his job and he will be able to capture if you
20 jump up on the table or nod with your head yeses or
21 nos or uh-huh's or huh-uh's and we are better -- I'd
22 appreciate it if you use words.  If the answer is
23 yes, if the answer is no, please use yes or no
24 instead of an uh-huh or huh-uh; is that fair?
25    A.  Yes.

Page 9

1    Q.  Okay.  You understand that you're under oath
2 and it's the same here answering questions in this
3 room in a deposition as if you were in a -- at a
4 courthouse in front of a judge and a jury?  Do you
5 understand that?
6    A.  I do.
7    Q.  So you are under penalty of perjury.  Do you
8 understand that?
9    A.  I do.
10    Q.  Okay.  Perfect.
11        It's really important that if you don't
12 understand my question that you let me know,
13 otherwise we are all going to assume that you do
14 understand the question; is that fair?
15    A.  Yes.
16    Q.  Okay.  Great.
17        Is there any reason why you can't have your
18 deposition taken today?  Are you on any sort of
19 medication that would affect your ability to tell
20 the truth today?
21    A.  No.
22    Q.  Perfect.  I ask that question because you
23 only -- you only have to do this once to have
24 somebody who has taken a sedative or something and
25 not too far into the deposition you realize that

3 (Pages 6 - 9)

Appx19791

Page 10

1 somebody took something and it's -- they are not
2 even coherent, so we usually ask up front. It's
3 nothing in particular to you. It's just a common
4 question that we ask.
5       You have multiple counsel here today. Are
6 they all representing you?
7    A. Yes.
8    Q. Okay. Are you paying them for your -- for
9 the attorneys' fees that are generated by their
10 representation?
11      MS. HARDWAY: Object to form.
12    Q. BY MR. KELLER: I will rephrase. Are you
13 paying anybody attorneys' fees for your
14 representation here today?
15    A. No.
16    Q. Okay. Has these counsel ever represented
17 you in the past?
18      MS. HARDWAY: Object to form.
19    Q. BY MR. KELLER: I will give you -- let me
20 strike the question.
21      Your counsel can object and she does that
22 for the record. It's not an instruction for you not
23 to answer. It's not an instruction as to how to
24 answer. That would be inappropriate. She does it
25 purely for the record, so if she objects, you still

Page 11

1 need to answer the question. Okay?
2    A. Could you repeat the question.
3    Q. Of course. When I say strike, it means
4 I'm -- that question is thrown out and I will start
5 off with a new one.
6    A. Okay.
7    Q. Has these three counsel in this room today,
8 have they ever represented you in the past?
9    A. No.
10    Q. When did you first speak with your
11 counsel?
12    A. I believe the first contact was in the fall
13 of last year.
14    Q. Sometime between September and December?
15    A. I believe so. I don't remember the date
16 specifically.
17    Q. Okay. How many times have you met with your
18 counsel?
19    A. I met once in the fall and then this week.
20    Q. Okay. And in the fall, how long did you
21 meet for?
22    A. Several hours.
23    Q. And this past week, how long -- how many
24 hours did you meet with them?
25    A. Maybe 12.

Page 12

1    Q. 12 hours. And that was in one day or two
2 days?
3    A. On two separate days.
4    Q. Two separate days. Did they show you
5 documents?
6    A. Yes.
7    Q. Okay. Do you recall how many documents they
8 showed you?
9      MS. HARDWAY: Object to form.
10      And I'm going to instruct the witness not to
11 answer that question.
12      MR. KELLER: How is that privileged in any
13 way, the number of documents?
14      MS. HARDWAY: To the extent that we showed
15 her one or 100, I'm going to instruct the witness
16 not to answer. The content of the meetings with the
17 witness are privileged.
18      MR. KELLER: Not the number of documents
19 that are reviewed are privileged.
20    Q. BY MR. KELLER: Are you going to follow your
21 counsel's instruction not to answer?
22    A. Yes.
23    Q. Okay. Did you bring any documents with you
24 to those meetings?
25    A. Did I bring any documents?

Page 13

1    Q. Sure.
2    A. No.
3    Q. Did you have any documents related to your
4 job at Merck that you kept in your -- at your
5 residence?
6      MS. HARDWAY: Object to form.
7      THE WITNESS: No.
8    Q. BY MR. KELLER: When you left, you left
9 Merck in 2004; correct?
10    A. That's correct.
11    Q. Okay. And when you left, did you have any
12 documents that you had in your personal possession
13 relating to your job at Merck?
14    A. No.
15    Q. No. Has anybody asked you to -- let me --
16 during the time that you worked at Merck, did you
17 have a personal e-mail?
18    A. A personal e-mail?
19    Q. Yes.
20    A. I honestly don't remember when I got my
21 first e-mail. I don't remember.
22    Q. Okay.
23    A. I may have --
24    Q. Did anybody ask you to search any personal
25 electronic files that you may have regarding issues

4 (Pages 10 - 13)

Appx19792

Page 14

1 in this case?
2    MS. HARDWAY: Object to form.
3    THE WITNESS: No one made a request of me to
4 search any e-mail.
5    Q. BY MR. KELLER: Did anybody make any request
6 for you to search your -- any documents in your
7 possession regarding issues in this case?
8    MS. HARDWAY: Object to form.
9    THE WITNESS: No one requested me because I
10 don't have any, so I think -- I think -- you know, I
11 don't have any.
12    Q. BY MR. KELLER: Okay.
13    A. It's a company policy that when you leave
14 you are required to leave all company-related
15 materials, and, actually, it wasn't a practice of
16 mine that I even kept things at home. I kept
17 everything in my office, so it really wasn't --
18    Q. Did you have a laptop when you worked at
19 Merck?
20    A. I did.
21    Q. Did you return that laptop when you left
22 Merck?
23    A. Yes, I did.
24    MR. KELLER: I want to mark as Exhibit 1 a
25 document that was produced to us.

Page 15

1    (Deposition Exhibit No. 1 was marked for
2       identification.)
3    THE WITNESS: Uh-huh.
4    Q. BY MR. KELLER: Which is your CV that was
5 produced to us earlier this week. Can you take a
6 minute and tell me if this is your CV.
7    A. Yes.
8    Q. Is it current?
9    A. Yes.
10    Q. Anything on this CV that you've left off?
11    MS. HARDWAY: Object to form.
12    Q. BY MR. KELLER: Any jobs in the interim
13 between the time you worked at Merck through your
14 time at Boston Consulting, any other jobs that you
15 took that you didn't identify in this CV?
16    A. I'm not sure I understand what you mean.
17    Q. Sure. Is this CV complete and accurate?
18    A. It is complete -- yes. Yes.
19    MR. KELLER: Fair enough. Let me mark as
20 Exhibit 2.
21    (Deposition Exhibit No. 2 was marked for
22       identification.)
23    Q. BY MR. KELLER: Exhibit 2 is a printout of
24 your LinkedIn profile.
25    A. Uh-huh.

Page 16

1    Q. And can you take a minute and take a look at
2 this and tell me if this is a true and correct copy
3 your LinkedIn profile, to the best of your
4 knowledge?
5    A. I believe so.
6    Q. Did you prepare it?
7    A. I haven't checked it lately, but, yes --
8    Q. Did you --
9    A. -- I believe so.
10    Q. Sorry. I didn't mean to step on you.
11    Did you prepare this LinkedIn profile?
12    A. I did.
13    Q. Okay. And if you look on the second page
14 which is -- I will focus on your time at Merck, it
15 says you started at Merck in May of 1987 through
16 April of 2004.
17    A. Uh-huh.
18    Q. It says you were there for 17 years. That's
19 the time you worked at Merck; correct?
20    A. That's correct.
21    Q. Was that your first job out of getting your
22 Ph.D. -- your Ph.D.?
23    A. Yes. I joined Merck as a post-doctoral
24 fellow.
25    Q. And you've always worked in the

Page 17

1 manufacturing quality side?
2    A. When I joined Merck I worked in the Merck
3 research laboratories as a post-doctoral fellow, and
4 I did that for about two-and-a-half years, and then
5 I took a role in the manufacturing organization.
6    Q. And so you spent about 15 years on the
7 manufacturing side; is that a fair assessment?
8    A. At Merck.
9    Q. Yes, at Merck.
10    And then you left and you went to
11 Bristol-Myers Squibb; correct?
12    A. That's correct.
13    Q. Why did you leave Merck after 17 years?
14    A. I was recruited there to -- for a more
15 senior level role, and I thought it was a good
16 career move, and I elected to accept it.
17    Q. You didn't leave for any concerns you had at
18 some of the practices that occurred at Merck?
19    MS. HARDWAY: Object to form.
20    THE WITNESS: No, not at all.
21    Q. BY MR. KELLER: And when you went to
22 Bristol-Myers Squibb, did you continue your work as
23 a -- in the manufacturing side?
24    A. Yes. All of these roles are in the global
25 manufacturing organization at BMS.

5 (Pages 14 - 17)

Page 18

1    Q. Okay. And when you were at Merck, when you
2  left in April of 2004, you were the Vice President
3  of Vaccine and Sterile Quality Operations;
4  correct?
5    A. That's correct.
6    Q. How long were you in that position?
7    A. I don't know if I recall the dates
8  specifically, but at the level of vice president,
9  perhaps four years.
10    Q. And what was your position before that?
11    A. I was an executive director of --
12    Q. In the same, Vaccine Sterile Quality
13  Operations?
14    A. It had a different name, organizational
15  name. I think might have been Biologics Quality
16  Operations or something like that. I don't recall
17  precisely, but there was a name change.
18    Q. Did your job duties change when you went
19  from an executive director to a VP?
20    A. At some point the scope of the role
21  increased because my scope went from supporting
22  strictly the biologics products to then including
23  some non-biologic, but other sterile products.
24    Q. So prior to -- let me back up.
25       So in 2004 -- in 2000 when you became the

Page 19

1  director -- I mean, the vice president -- let me
2  strike that.
3       When you left being an executive director,
4  how long were you -- strike that.
5       How long were you the executive director in
6  the Biologics Quality Operations?
7    A. I think -- again, I don't recall it
8  precisely, but I think I was there maybe two years
9  in that role, something like that. '98, maybe.
10    Q. And what was your role before -- your
11  position before that?
12    A. My role before that was this director of
13  biological testing and bioanalytical development.
14    Q. And did your job duties change when you
15  became the executive director?
16    A. Really, the -- yes. Yes, they did. That's
17  correct.
18    Q. Were you still in this -- prior to 1998,
19  were you still involved in biologics and quality
20  assurance with regard to biologics?
21    A. Yes.
22    Q. Okay. When you say on Exhibit 1, your CV,
23  that you were responsible for all quality control
24  laboratory operations, can you describe for me what
25  you mean by that.

Page 20

1    A. The scope of this role was I had
2  responsibility for the quality control testing
3  laboratories and the -- there was a technical
4  support, quality technical support department, as
5  well, that was also part of my responsibilities,
6  which was called bioanalytical development.
7    Q. And the technical support, can you just give
8  me an example of what -- when you say technical
9  support?
10    A. The technical support, that department,
11  bioanalytical development, would do troubleshooting,
12  support new product introduction, installing new
13  lab -- new methods into the quality control
14  laboratories and also had served some other
15  functions around reference standard preparation and
16  some stability testing and things like that.
17    Q. And so stability testing, was that a big
18  part of your job responsibilities?
19       MS. HARDWAY: Object to form.
20    Q. BY MR. KELLER: During the time that you --
21  let me start from the beginning. Prior to your
22  position from 1998 through 1990.
23       MS. HARDWAY: So I'm sorry. Can you -- what
24  was the question?
25    Q. BY MR. KELLER: Sure. Was stability --

Page 21

1       MR. KELLER: Can I get her answer back. I
2  can see it.
3    Q. BY MR. KELLER: You had testified that part
4  of your job duties was stability testing. What did
5  you mean by stability testing?
6    A. What I mean is that it had -- I had
7  responsibility for the stability program, so lots
8  would be put up on stability. They would be tested,
9  and then the results compiled and reports issued.
10    Q. This job responsibility for the stability
11  testing, did you have that responsibility through
12  your entire tenure at Merck from 1990 through the
13  time you left in 2004 at one level or another?
14       MS. HARDWAY: Object to form.
15       THE WITNESS: So the stability
16  responsibility that I described was inclusive when I
17  moved to the executive director and then ultimately
18  the VP role which was that senior leadership quality
19  role.
20    Q. BY MR. KELLER: Is it fair to say that when
21  you were the director you supervised the program at
22  a much -- let me strike that.
23       During this time period from 1990 through --
24  let me back up.
25       From 1998 through 2004 when you were the VP

6 (Pages 18 - 21)

Page 22

1 of vaccine and sterile quality operations, were you
2 the person who was responsible in MMD for ensuring
3 stability testing?
4     MS. HARDWAY:  Object to form.
5     THE WITNESS:  What I can say is that within
6 my scope of responsibilities was that.  The
7 colleagues that performed that work didn't report
8 directly to me.  They reported -- even in this role
9 from 1990 to 1998, they reported to someone else who
10 reported to me, so there was some, if you will --
11 more direct oversight by others than myself, but
12 certainly within my scope of responsibility, yes.
13     Q.  BY MR. KELLER:  And you were the head person
14 responsible for this stability testing, though;
15 correct?
16     MS. HARDWAY:  Object to form.
17     THE WITNESS:  I was the head of biological
18 testing and bioanalytical development which includes
19 stability.
20     Q.  BY MR. KELLER:  Okay.  And who did you
21 report to during the period of when you were the
22 vice president of vaccine and sterile quality
23 operations between 1998 and 2004?
24     A.  I believe -- I'm just trying to confirm in
25 my mind of when -- I think when that transition

Page 23

1 happened, but it was -- I reported to Michael
2 Angelo.
3     Q.  What was his position?
4     A.  Mike was the -- I believe his title was
5 Senior Vice President of Quality for Merck.
6     Q.  And that included drug products and
7 biological products; correct?
8     A.  That's correct.
9     Q.  And do you know who Michael Angelo reported
10 to during this time frame of 1998 through 2004?
11     A.  I know that it changed over time.  Initially
12 he reported to Bernie Kelly and at some point he
13 ultimately -- he reported to Dick Clark, and I think
14 there was one other person in between there.
15     Q.  Okay.  And Dick Clark, what was his
16 position?
17     A.  Dick Clark was the president of Merck
18 Manufacturing Division.
19     Q.  Great.  And so in your LinkedIn profile you
20 said -- you identify yourself as the head quality
21 executive for all matters related to vaccine and
22 sterile products quality and GMP compliance.  Do you
23 see that?
24     A.  I do.
25     Q.  What did you understand GMP compliance to

Page 24

1 mean when you wrote this?
2     A.  What -- in my responsibilities as the head
3 quality executive, I am the overseer of the quality
4 system employed by Merck to ensure that we operate
5 in a way that is compliant with current good
6 manufacturing practices, and that's what I mean
7 there.
8     Q.  And that current good manufacturing
9 practices, when you say compliant with that, is that
10 a requirement that's required by the FDA?
11     MS. HARDWAY:  Object to form.
12     THE WITNESS:  It's an expectation to perform
13 operations consistent with the principles of good
14 manufacturing.
15     Q.  BY MR. KELLER:  Would it be fair to say that
16 if the company did not comply with good
17 manufacturing practices that the products that they
18 sell could be withdrawn from the market or recalled
19 by the market -- from the market --
20     MS. HARDWAY:  Object to form and --
21     Q.  BY MR. KELLER:  -- by the FDA?  Let me
22 finish, please.
23     MS. HARDWAY:  Object to form, and to the
24 extent it requires a legal conclusion, I'm going to
25 object to that as well.

Page 25

1     You can answer if you're able.
2     THE WITNESS:  So could you repeat the
3 question, please.
4     Q.  BY MR. KELLER:  Sure.  If a manufacturer
5 such as Merck manufactured products that were not in
6 conformity with good manufacturing practices, is one
7 of the results that could happen would be the FDA
8 requiring that products be recalled from the
9 market?
10     MS. HARDWAY:  I'm going to repeat my
11 objections to form and to the extent they call for a
12 legal conclusion.
13     THE WITNESS:  So I can't speak to what
14 FDA -- decisions FDA would make based on any
15 observations they may make or conclusions.  I don't
16 think I can do that.
17     Q.  BY MR. KELLER:  So you've never heard of the
18 FDA recalling product because a company had bad
19 manufacturing practices?
20     MS. HARDWAY:  Object to form.  That wasn't
21 your question.
22     MR. KELLER:  I'm asking you that question.
23     THE WITNESS:  Actually, I am -- I am aware
24 that recalls occur.  Whether or not they are
25 mandated by the FDA, I don't know that.

7 (Pages 22 - 25)

Page 26

1  Q. BY MR. KELLER: I see. Let me go back to
2  your LinkedIn profile. You go on to say that part
3  of your job responsibilities as a vice president of
4  vaccine sterile quality operations is to ensure that
5  policies and procedures were in place and in force
6  as related to the quality of vaccine and sterile
7  products supplied to the market and that they were
8  manufactured in compliance with all applicable
9  regulatory requirements worldwide. Do you see
10 that?
11  A. I do.
12  Q. What did you mean by that? What regulatory
13 requirement are you talking to?
14  A. What I mean is that in the filings
15 associated with the products, there are requirements
16 stated in there to be met, and so as I mentioned
17 before about the quality system that -- which is
18 composed of procedures and ways of working, to
19 ensure that those expectations and commitments that
20 are made are fulfilled.
21  Q. And those expectations and commitments made,
22 that's to the FDA; correct?
23  A. And any other regulatory authority.
24  Q. Throughout the world; correct? You are
25 not responsible -- you are responsible for more than

Page 27

1  just the United States, but also the worldwide --
2  the world regulatory authorities with regard to
3  Merck's products sold outside the U.S., too;
4  correct?
5  MS. HARDWAY: Object to form.
6  THE WITNESS: Okay. Can you please restate
7  that.
8  Q. BY MR. KELLER: Sure. Your responsibilities
9  were not just limited to the United States, correct,
10 for products sold in the U.S.?
11  A. I -- my responsibility was for the products
12 that were manufactured in the vaccine and sterile
13 scope regardless of where they were distributed.
14  Q. And the last sentence in your LinkedIn
15 profile says that you successfully navigated
16 compliance issues with regulatory authorities. Do
17 you see that?
18  A. I do.
19  Q. Did you have any compliance issues with the
20 FDA?
21  MS. HARDWAY: Object --
22  Q. BY MR. KELLER: With regard to your job
23 duties during this time frame?
24  MS. HARDWAY: Object to form.
25  THE WITNESS: What I -- the intent of that

Page 28

1  sentence or what I was conveying was that there were
2  on occasion inspectional observations that raised
3  concern, that I led efforts to develop effective
4  corrective actions to meet their concerns and
5  expectations.
6  Q. BY MR. KELLER: Let me back up to some of
7  your testimony a minute ago. You said under part of
8  your job duties was to supervise the folks that were
9  running the stability program during your time frame
10 that you were the vice president of quality, vaccine
11 sterile quality. You talked about a stability
12 program. I really want to focus in on the potency
13 component of that. Do you understand what the term
14 potency means?
15  MS. HARDWAY: Object to form.
16  Q. BY MR. KELLER: With respect to vaccines?
17  A. What I can say is that in each -- for each
18 product and each -- there are a set of
19 specifications. There can be somebody called a
20 potency specification, so as it relates to any given
21 product, I interpret potency to mean as how it was
22 defined for that product.
23  Q. And when you say specifications, what do you
24 mean by specifications?
25  A. Specifications are the criteria that a

Page 29

1  product is expected to meet --
2  Q. And --
3  A. -- under -- at certain time points.
4  Q. And the criteria that the product is
5  expected to meet, is that something that is set
6  forth in the product's label?
7  A. Not completely.
8  Q. Okay. When you say not completely, can you
9  explain to me what you mean not completely?
10  A. I'm -- first of all, I'm not an expert on
11 the label as it -- if label means package insert.
12 It's not -- it's outside of my scope of
13 responsibilities, so there may or may not be
14 elements of the specifications that I was referring
15 to in there. I'm not fully aware of that. What I'm
16 referring to are in the -- what's known today as the
17 biologics license application for a given product.
18 It states the criteria that must be met, various
19 parameters, potency, sterility, moisture content, a
20 whole host of things, so when I use the word
21 specification, that's what I'm referring to.
22  Q. And so let's talk about the M-M-R II
23 product, the mumps, measles and rubella product.
24 Are you familiar with that product?
25  A. I am.

8 (Pages 26 - 29)

Appx19796

Page 30

1    Q.  Did you have responsibilities over that
2  product in your job duties as the vice president?
3    A.  I did.
4      MS. HARDWAY:  Object to form.
5    Q.  BY MR. KELLER:  Okay.  And with respect to
6  potency of that product, do you understand if there
7  is any relationship between potency and the products
8  efficacy?
9      MS. HARDWAY:  Object to form.
10      THE WITNESS:  I don't -- I'm not a
11  clinician, nor was I involved on the -- in the
12  clinical work, so I don't have any direct experience
13  in the relation of those.
14    Q.  BY MR. KELLER:  Do you understand the rules,
15  the CFR's with respect to potency?
16      MS. HARDWAY:  Object to form.
17      THE WITNESS:  Could you clarify or be more
18  specific --
19    Q.  BY MR. KELLER:  Sure.
20    A.  -- with that question.
21    Q.  As part of your job duties, did you have to
22  become familiar with the Code of Federal Regulations
23  with respect to vaccine or biologics as part of your
24  job duties?
25    A.  Yes, I'm familiar with the CFR.

Page 31

1    Q.  Okay.  Are you familiar with the CFR that
2  defines potency?
3    A.  I haven't read it in a while, but I'm -- I
4  have read it.
5    Q.  Okay.  And when you read it, did you have an
6  understanding that the CFR's definition of potency
7  requires that the product have a certain capacity to
8  affect a given result?
9      MS. HARDWAY:  Object to form.
10      THE WITNESS:  My recollection of the CFR as
11  it relates to potency is that is a very general statement about
12  that a product should have its purported potency, so
13  whatever has been established for that product, it
14  is to meet that.
15    Q.  BY MR. KELLER:  So let me just -- when you
16  worked at Merck, and I want to focus on the mumps
17  component of the M-M-R II vaccine.  Did you
18  understand that there was a -- specifications with
19  regard to potency; correct?
20      MS. HARDWAY:  Object to form.
21      THE WITNESS:  Yes.
22    Q.  BY MR. KELLER:  What was your understanding
23  of what the specifications were for the mumps
24  component of M-M-R II -- or the standalone -- let me
25  strike that.

Page 32

1      When you worked at Merck, the mumps vaccine
2  was sold in -- as a single standalone vaccine
3  product and then in a -- in a product that combined
4  other vaccines in one shot; correct?
5      MS. HARDWAY:  Object to form.
6      THE WITNESS:  It's -- I recall there is the
7  trivalent vaccine, measles, mumps and rubella,
8  M-M-R.
9    Q.  BY MR. KELLER:  Yes.
10    A.  Or M-M-R II.  There is also a mumps vacs,
11  vaccine which is a monovalent vaccine.
12    Q.  Okay.  So the -- let's talk about just the
13  mumps vaccine.  Did you understand that there was
14  specifications for potency with respect to that
15  vaccine?
16    A.  Yes.
17    Q.  Okay.  And what is your understanding what
18  those specifications with regard to potency were
19  during the time that you were the vice president?
20      MS. HARDWAY:  Object to form.
21    Q.  BY MR. KELLER:  Of quality.
22    A.  The potency specification for mumps, I
23  believe, was 4.3 TCID 50.
24    Q.  And that was the only specification you
25  recall?

Page 33

1      MS. HARDWAY:  Object to form.  With regard
2  to potency; is that the question?
3      MR. KELLER:  Yes.
4      THE WITNESS:  That's -- yes, that's the one
5  I -- yes, that's the potency specification.
6    Q.  BY MR. KELLER:  Ever hear the term release
7  potency?
8    A.  Yes.
9    Q.  Is that a specification?
10    A.  The specification -- so the potency -- let
11  me put it in my words, and if you need to follow up,
12  we can.  The specification -- at the time that the
13  product was manufactured and prior to it being
14  judged to be acceptable or not, it was tested in the
15  laboratory, and there was a quality standard that
16  lists what those specifications should be.  As I
17  mentioned, the potency for mumps, I believe, needed
18  to be 4.3.  If it met, if it tested at 4.3 or
19  higher, it was -- and all of the other tests were --
20  met their acceptance criteria, then that would be
21  acceptable for the product to be released once it
22  had been released by CBER.  CBER also did a -- CBER
23  concurred on the release of every lot that we
24  manufactured.
25    Q.  So it's your testimony during the time that

9 (Pages 30 - 33)

Appx19797

Page 34

1  you were the head of vaccine quality, sterile
2  quality operations in MMD, that as long as the
3  product met 4.3 log at the time of release that it
4  met its specification?
5      MS. HARDWAY:  Object to form.
6      THE WITNESS:  That was the established --
7  and I believe that ultimately over time that
8  specification changed, but that was the
9  specification that was in the quality standard, as I
10 recall, and in the approved filing.
11     Q.  BY MR. KELLER:  And you say that that
12 specification changed over time.  Can you tell me
13 when that changed, if you recall?
14     A.  I don't remember precisely when it changed.
15 Honestly, I don't remember.
16     Q.  Do you recall what it changed to?
17     A.  It changed to 5.0.
18     Q.  As the minimum release specification?
19     A.  As the minimum potency that the product
20 needed to test at in order to be -- and, again,
21 along if all the other specifications were met, in
22 order for that lot to be a candidate for release.
23     Q.  Did -- do you understand what the term
24 potency loss means?
25     A.  I interpret potency loss to mean a drop in

Page 35

1  the measured potency for a sample.
2      Q.  Okay.  And did -- based on your 17 years at
3  Merck working in the manufacturing side with
4  biologics, including mumps, was there an
5  understanding that the mumps products would lose
6  potency over the life of the product from release to
7  the end of its shelf life expiry?
8      MS. HARDWAY:  Object to form.
9      THE WITNESS:  Yes.
10     Q.  BY MR. KELLER:  Do you recall when you first
11 learned that there was potency loss with respect to
12 the mumps products at Merck?
13     A.  Probably in 1990.  These are live virus
14 vaccines and any -- they're -- they do have negative
15 slopes, so it was -- it's not unexpected.
16     Q.  Was potency loss a concern that
17 manufacturing had for the mumps products --
18     MS. HARDWAY:  Object to form.
19     Q.  BY MR. KELLER:  -- during this time frame
20 that you were at Merck?
21     A.  What do you mean by concern, or can you --
22     Q.  Regulatory concern.
23     MS. HARDWAY:  Object to form.
24     Q.  BY MR. KELLER:  Let me strike that.  Do you
25 know what the word concern means?

Page 36

1      MS. HARDWAY:  Object to form.
2      THE WITNESS:  What I'm -- what I would say
3  is that the -- ensuring that -- or let me see.  The
4  potency of the product, specifically mumps or mumps
5  vacs or mumps and M-M-R II over the life of the
6  product was a topic of conversation and a topic of
7  discussion not only within the company, but also
8  with the agency.
9      Q.  BY MR. KELLER:  Okay.  And so did you ever
10 have a concern that the potency loss with the mumps
11 products would raise regulatory concern --
12     MS. HARDWAY:  Object to form.
13     Q.  BY MR. KELLER:  -- with respect to
14 compliance with FDA regulations?
15     MS. HARDWAY:  Object to form.
16     THE WITNESS:  I was engaged in a number of
17 discussions and meetings both internally and with
18 the agency on the topic which were focused on
19 characterizing the change in potency over the expiry
20 period.
21     Q.  BY MR. KELLER:  During the time that you
22 worked at -- let me strike that.
23     This change in potency over the -- was there
24 any analysis done during the time that you were in
25 the vice president position where the mumps potency

Page 37

1  changed?
2      MS. HARDWAY:  Object to form.  Vague and
3  overbroad.
4      THE WITNESS:  What I can say is that
5  performing analyses of potency or any other
6  parameter over the expiry period for a product was
7  normal course as part of stability testing.
8      Q.  BY MR. KELLER:  I get that, but was there
9  analyses done that showed that there was a
10 statistically meaningful change in the potency of
11 the mumps products during the time that you were the
12 vice president and head of quality for MMD --
13     MS. HARDWAY:  Object to form.
14     Q.  BY MR. KELLER:  -- for biologics?
15     MS. HARDWAY:  Object to form.  Vague and
16 overbroad.
17     THE WITNESS:  There were many analyses done
18 of the potency loss, both specifically on mumps as
19 well, as I said, of course, across all parameters.
20     Q.  BY MR. KELLER:  My question was, was there a
21 statistically meaningful drop in the mumps potency
22 during the time that you were vice president at
23 Merck for mumps?
24     MS. HARDWAY:  Object to form.
25     THE WITNESS:  So it was understood and I

10 (Pages 34 - 37)

Page 38

1  understood that there was a potency loss over the
2  expiry period and it was statistically meaningful.
3      Q.  BY MR. KELLER:  Thank you.
4      A.  But I think your question was, was there
5  analysis of something changing.  What I'm saying is,
6  as I said before, it's a live virus vaccine product.
7  It will change over time.  That's normal and
8  expected for the product.  There were a number of
9  statistical analyses done and statistical analyses
10  are models aimed to try to understand it and see
11  whether or not those models or those predictions
12  are, in fact, truly representative of the product.
13  So I know that we conducted a number of them.  It's
14  not unexpected that the potency changes.  The
15  studies that were done were to try to understand or
16  best characterize what that profile looked like.
17      Q.  And those studies that were conducted did
18  find a statistically meaningful drop in the potency
19  over the shelf life of mumps products, correct,
20  during the time frame that you were the vice
21  president of vaccine sterile quality operations in
22  MMD?
23      MS. HARDWAY:  Object to form and asked and
24  answered.
25      THE WITNESS:  So could you clarify what you

Page 39

1  mean by statistically meaningful?
2      Q.  BY MR. KELLER:  You don't understand what
3  that means?
4      MS. HARDWAY:  Object to form.  She's asking
5  you to clarify.  She's entitled to do that so she
6  can understand your question, like you instructed
7  her at the beginning of the day.
8      MR. KELLER:  I don't need your commentary.
9  Just object.
10      MS. HARDWAY:  I'm not providing commentary.
11      MR. KELLER:  Just object.
12      MS. HARDWAY:  I'm just defending the witness
13  at the deposition.  If she doesn't understand a part
14  of your question, she's entitled to ask.
15      MR. KELLER:  Well, that's a fair
16  characterization.
17      Q.  BY MR. KELLER:  What do you understand
18  statistically meaningful to mean?
19      A.  That the -- if you look at data sets and you
20  apply a statistical methodology, that under the
21  assumptions of that methodology, if they meet the
22  criteria, you can say, yes, they are different or
23  they are not.  So that's what I understand what
24  statistically meaningful -- to say whether it's
25  statistically different is -- can be dependent upon

Page 40

1  the statistical methodology that you apply.
2      Q.  BY MR. KELLER:  Does statistical meaningful
3  have any -- strike that.
4      What is the significance of a finding that a
5  potency loss is statistically meaningful?
6      MS. HARDWAY:  Object to form.
7      THE WITNESS:  As a -- statisticians that I
8  work with -- you can have something that is
9  statistically meaningful but practically not
10  relevant.
11      Q.  BY MR. KELLER:  Okay.  Do you recall any
12  during the time that you were the vice president of
13  vaccine and sterile quality operations between 1987
14  and 2004 that the statistically meaningful drops in
15  potency of the mumps products was not relevant?
16      MS. HARDWAY:  Object to form.
17      THE WITNESS:  I'm not saying that -- when I
18  make that statement, what I'm saying is it has to be
19  looked at versus what the expectations are, so you
20  could have a change in a parameter over time from
21  one time point to another, that from the beginning
22  to the end are statistically meaningful --
23  statistically different, period.  You can have that,
24  but if that difference is still within a
25  specification, that's an example of when I say it

Page 41

1  doesn't have a practical relevance to whether or not
2  you would say something was acceptable or not.  It
3  was just a characterization of the performance of
4  the product over whatever period of time you might
5  be looking at.
6      Q.  BY MR. KELLER:  And so the models that you
7  testified earlier that would help you characterize
8  the potency loss, what models were you referring
9  to?
10      MS. HARDWAY:  Object to form.
11      THE WITNESS:  Well, first of all, I
12  personally don't do any of those analyses.  I'm not
13  a statistician, so I'm really not familiar with the
14  specifics of the models that are used -- or that
15  were used.
16      Q.  BY MR. KELLER:  When a model -- you would
17  get reports from statistical modeling of potency
18  loss from your people that reported to you;
19  correct?
20      MS. HARDWAY:  Object to form.
21      Q.  BY MR. KELLER:  During this time frame that
22  you were the vice president?
23      MS. HARDWAY:  Same objection.
24      THE WITNESS:  I may or may not have gotten
25  reports when I was -- depending upon the role I

11 (Pages 38 - 41)

Appx19799

Page 42

1 played.
2     Q. BY MR. KELLER: Okay. Do you recall
3 receiving any reports from Merck statisticians
4 discussing whether or not its products complied with
5 the specifications for the mumps products?
6     MS. HARDWAY: Object to form. Overbroad.
7     Q. BY MR. KELLER: At any time during the time
8 you worked at Merck.
9     MS. HARDWAY: Same objections.
10     THE WITNESS: I received -- I received
11 statistical analyses that were done, sure.
12     Q. BY MR. KELLER: And how did you use those
13 reports as part of your job duties?
14     MS. HARDWAY: Object to form.
15     THE WITNESS: They were -- I'm not sure if I
16 understand the question about when you say how did I
17 use the --
18     Q. BY MR. KELLER: Why did you receive these
19 reports about stability potency with respect to the
20 mumps components? The statistical analysis, why
21 would you receive them?
22     MS. HARDWAY: Object to form.
23     THE WITNESS: I believe I received them
24 because of -- particularly at the time of when there
25 were discussions within -- with the agency about

Page 43

1 mumps potency, and they could be in response to
2 questions raised by CBER or requests of -- for
3 information and so that they would be shared both
4 internally and then with the agency.
5     Q. BY MR. KELLER: Okay. As part of your -- in
6 both your -- in your CV and in your LinkedIn, you
7 said you're the head quality executive; correct?
8     A. Uh-huh.
9     Q. As part of being the head quality executive,
10 a part of your job is to ensure that the
11 specifications of the products that Merck -- that
12 you had responsibility over, M-M-R II and the mumps
13 products, that they complied with their
14 specifications; correct?
15     MS. HARDWAY: Object to form.
16     THE WITNESS: Yes. As I said before, you
17 have a quality system of procedures and controls
18 that are designed to ensure that that happens.
19     Q. BY MR. KELLER: And potency is one of those
20 quality systems; correct?
21     A. Potency is not an element of the quality
22 system. Potency is an attribute of a product.
23     Q. Right, but that attribute of the product,
24 your quality systems are to ensure that the
25 attributes of that product are complied with;

Page 44

1 correct?
2     A. The quality system is designed to ensure
3 that those specifications are met.
4     Q. Okay.
5     MS. HARDWAY: Jeff, when you get a good --
6 when you're done, we have been about an hour, so if
7 you're at a stopping point.
8     MR. KELLER: Sure.
9     MS. HARDWAY: Just a quick.
10     MR. KELLER: Yeah. We can go off the
11 record.
12     THE VIDEOGRAPHER: We are going off the
13 record. The time is 10:01 a.m.
14     (WHEREUPON, a short break was taken from
15     10:01 a.m. to 10:18 a.m.)
16     THE VIDEOGRAPHER: We are back on the
17 record. The time is 10:18 a.m.
18     Q. BY MR. KELLER: We have a lot to cover
19 today, so I'm going to try to get through this as
20 quickly as I can. I will warn you that if we don't
21 finish today we are going to request a second day,
22 but I'm going to do my best efforts to get done
23 today, so just to give can you a bit of a
24 pre-warning as to that, so --
25     MS. HARDWAY: And you're entitled to seven

Page 45

1 hours on the record. I don't know if what --
2     MR. KELLER: That's fine. We will make a
3 motion to compel an additional day if we need to.
4 I'm just telling you that I'm going to do my best to
5 get through my -- what I need to get through today.
6 I have got to get through all of this. If I need
7 more time, we are going to make a motion to seek a
8 second day.
9     MS. HARDWAY: What's going to be the basis
10 of your motion, Jeff?
11     MR. KELLER: Important information,
12 important witness.
13     MS. HARDWAY: Okay. That's a new one to me,
14 but as far as I know, the federal rules give you
15 seven hours on the record, and we will --
16     MR. KELLER: They do, and I'm sure --
17     MS. HARDWAY: We are here and we will give
18 you seven hours on the record.
19     MR. KELLER: -- the Magistrate Judge will
20 hear all about that if we don't get done. I'm just
21 telling you that's what my plan is, and I don't want
22 to bring you back again, so I'm just giving you a
23 bit of a warning that, you know, we have a lot to
24 cover, so let's try to do that quickly.
25     MS. HARDWAY: She's here for the seven hours

12 (Pages 42 - 45)

Appx19800

Page 46

1  and she'll --
2      Q.  BY MR. KELLER:  All right.  Doctor, do you
3  know what the term shelf life means?
4      A.  I use and I believe -- and how it's been
5  used is the period between -- however its -- a
6  product is approved, what that beginning date is,
7  and the period up until which the expiry date or
8  expiration date for the lot is defined.
9      Q.  And so for the mumps products, was there a
10 shelf life that you're aware of?
11     A.  Yes.
12     MS. HARDWAY:  Object to form.
13     Q.  BY MR. KELLER:  Do you know what that shelf
14 life was?
15     A.  I believe it was 24 months.
16     Q.  Okay.  And that's stamped on every dose,
17 correct?
18     MS. HARDWAY:  Object to form.
19     THE WITNESS:  The shelf life is not stamped
20 on every dose.
21     Q.  BY MR. KELLER:  The expiry date is; correct?
22     A.  The expiration date for the lot is stamped
23 on every dose.
24     Q.  Okay.  And is the shelf life, is that a
25 specification?

Page 47

1      A.  In the way that I was describing
2  specifications before, no, it's not a specification.
3  It is -- it's just in the definition of the
4  product.
5      Q.  Okay.
6      A.  So, in other words, there is not a test that
7  you do each time.  It's just, you know, what is
8  attributed to that product.
9      Q.  During the time that you were the vice
10 president of vaccine quality operations, and what
11 role did shelf life play with respect to potency
12 laws, if any --
13     MS. HARDWAY:  Object to form.
14     Q.  BY MR. KELLER:  -- with regard to your job
15 duties?
16     A.  I don't understand the question.
17     Q.  Sure.  Did the specification for potency,
18 was it your understanding that that specification
19 for potency included the time from release through
20 the end of the shelf life?
21     A.  So let me state what I understand, and then
22 if there is a follow-up, we can do that.  So the --
23 in specification for the product, there was a
24 potency specification that was tested that it would
25 meet -- that it needed to meet in order for the

Page 48

1  product to be released.  So we performed that test,
2  and then we performed testing over stability, over
3  the -- over the -- on stability studies we would
4  repeat that testing at defined intervals.
5      Q.  Why?
6      MS. HARDWAY:  Object to form.
7      THE WITNESS:  Stability testing is routinely
8  performed on every product.
9      Q.  BY MR. KELLER:  Why?
10     MS. HARDWAY:  Object to form.
11     THE WITNESS:  To monitor the product and
12 compare it to the expectations for the product to
13 verify that it is consistent with those.
14     Q.  BY MR. KELLER:  When you say expectations,
15 that it meets the potency?
16     A.  That it meets the specification, potency and
17 others.
18     Q.  And so was there a specification for potency
19 at the end of the shelf life?
20     A.  So this actually is a topic that was of
21 discussion with the agency even before my period as
22 becoming the VP that you referenced before and
23 through period of time with the agency --
24 historically in that the way that the product, as I
25 understand, was licensed, it had a release back, but

Page 49

1  there was no defined expiry specification, and so
2  that was my understanding historically.  I mean, the
3  product is -- what is it, over 40 years old or so,
4  so I think at the time -- in those days, I don't
5  know that it was necessarily required.
6      Q.  Are you aware of any other vaccine at Merck
7  during your tenure that did not have an end expiry
8  specification for potency?
9      MS. HARDWAY:  Object to form and overbroad
10 and relevance.
11     THE WITNESS:  I do not recall the
12 specifications of the products in detail well enough
13 to reliably answer that.
14     Q.  BY MR. KELLER:  Sure.  So is it your
15 testimony that it was Merck's view that there was no
16 end expiry specifications for its mumps products --
17     MS. HARDWAY:  Object to form.
18     Q.  BY MR. KELLER:  -- during the time frame
19 that you were the vice president?
20     MS. HARDWAY:  Object to form.  Overbroad.
21     THE WITNESS:  Particularly in this period, I
22 know when I entered into this role there were
23 discussions.  My predecessor had led discussions
24 with the agency about expectations for potency
25 and -- with them, so over that period of time.  So,

13 (Pages 46 - 49)

Appx19801

Page 50

1 again, could you just repeat the question just to
2 make sure I answer that.
3    Q. BY MR. KELLER: That's okay. Let me do
4 this. Yeah. Did there come a time during your --
5 during this 1997 to 2004 time frame where this --
6 where there was an expectation for an end expiry
7 specification for potency for mumps products?
8    MS. HARDWAY: Object to form.
9    THE WITNESS: There were -- yes. It became
10 a more explicit discussion and expectation.
11    Q. BY MR. KELLER: And did -- do you recall
12 what that specification -- strike that.
13    Do you recall what that expectation became?
14    MS. HARDWAY: Object to form.
15    THE WITNESS: I -- again, I know that --
16 that there was some evolution, but my recollection
17 is that 4.3 was established as that it would be
18 treated as the expiry specification.
19    Q. BY MR. KELLER: Merck sold product -- strike
20 that.
21    Merck released mumps products that had an
22 expiry potency that was below 4.3, correct, during
23 the time that you were the VP from 1998 through
24 2004?
25    MS. HARDWAY: Object to form. Overbroad.

Page 51

1    Q. BY MR. KELLER: Let me strike that. Are you
2 aware of whether or not Merck released product that
3 it had projected to have an end expiry potency below
4 4.3 during the time you were there from 1998 through
5 2004?
6    MS. HARDWAY: Object to form. Overbroad.
7    THE WITNESS: What I can say is that
8 whatever product that we were releasing, we had
9 established specifications that it would meet, and
10 we had confidence that, in fact, it was going to
11 meet expectations throughout the shelf life.
12    Q. BY MR. KELLER: And how did you gain that --
13    A. I never was part of any conversations around
14 that we would knowingly release or distribute
15 product that we didn't think was going to meet those
16 expectations throughout the shelf life.
17    Q. The confidence that you testified, how did
18 you gain that confidence?
19    A. Through the analyses that we had done and
20 particularly with the -- and stability testing is a
21 confirmatory vehicle.
22    Q. And this confirmatory vehicle of stability
23 testing, are you looking to see what the potency --
24 to confirm what the potency will be at the end of
25 the shelf life, the end expiry specification?

Page 52

1    A. On the stability study, the product is
2 tested at multiple intervals, including at the point
3 of expiry, and the purpose of that is so that you
4 can get -- you can look at the characteristics over
5 the shelf life and see how that performs.
6    Q. And that's how you gain the confidence that
7 the product will meet the end expiry specification
8 of 4.3 during your time frame?
9    MS. HARDWAY: Object to form. Overbroad.
10    THE WITNESS: That's one element of the
11 confidence of that and, in fact, it would meet.
12    Q. BY MR. KELLER: What are the other
13 elements?
14    A. Things such as the manufacturing process.
15 Performing that according to the established
16 procedures. The controls in place to ensure that
17 during the course of manufacturing it wasn't exposed
18 to unexpected conditions that would change the
19 profile, et cetera. So it's not just quality
20 control testing that tells us why we believe
21 something is satisfactory. It is the complement of
22 how it's made and all the controls around it.
23    Q. And those controls, do you consider
24 stability testing to be one of those controls?
25    A. I was referring to manufacturing controls,

Page 53

1 so stability is an after-the-fact exercise.
2    Q. And that's an exercise to gain confidence
3 that the product will meet its specifications;
4 correct?
5    MS. HARDWAY: Object to form.
6    THE WITNESS: Stability testing is
7 performed. As I mentioned before, there is a
8 established program for all products and it is,
9 again, to monitor that, in fact, they meet the
10 expectations.
11    Q. BY MR. KELLER: Okay. And that monitoring,
12 are you making projections about what you -- you
13 don't test every lot over a period of time that is
14 released to the public, do you?
15    A. That's correct. We do not test every lot.
16    Q. So you take a sampling of those lots to gain
17 this confidence; correct?
18    A. That's correct.
19    Q. And so the sampling of those lots, you
20 create statistical models to establish that
21 confidence; correct?
22    MS. HARDWAY: Object to form.
23    THE WITNESS: The -- we can apply the --
24 we can apply statistics and statistical models to
25 look at data and to help us understand how the

14 (Pages 50 - 53)

Page 54

1  product may or may not perform, but those are
2  models, and so what -- what's really most important
3  is the actual data and the results we get, because
4  models are not necessarily representative of the
5  product, particularly something like a biological
6  product that is -- by nature it's a living organism,
7  it has a lot of extra variability compared to, let's
8  say, a tablet which has a much more -- the amount of
9  variability and precision is a lot different than in
10  something like a live virus vaccine, something that
11  has temperature sensitivity, you know.
12      Q.  BY MR. KELLER:  So you're saying that you
13  don't put a lot of stock into the stability
14  modeling, that the only thing that you really think
15  is -- has any real strength to rely upon for
16  decision making is the actual results that are -- of
17  those lots that are put on stability testing; is
18  that your testimony?
19      MS. HARDWAY:  Object to form.
20      THE WITNESS:  Well, those aren't my words,
21  right, so I didn't say I don't take stock.  I
22  take -- and particularly -- and I think, really, in
23  the role, the role that I play as the head of
24  quality, that's information, and I am open, and, in
25  fact, the entire organization open to -- I mean,

Page 55

1  that's why those -- that's why various analyses are
2  performed because we seek to understand how the
3  product -- the true attributes of the product and
4  identifying which models are most -- are more
5  representative than others, what signals that tells
6  us about the product, so I -- they are valuable
7  information.
8      Q.  BY MR. KELLER:  Okay.  And this valuable
9  information of the stability modeling, do they help
10  you assess the risk of meeting specifications in the
11  products, for example, for mumps?
12      MS. HARDWAY:  Object to form.
13      THE WITNESS:  They -- the models help ask
14  certain questions about the product.  The
15  verification of those models or the applicability or
16  the robustness of those models is confirmed or
17  denied by the actual results that you get on
18  stability.  So if something predicts one result and
19  you see a different result consistently, it would
20  say that perhaps that model isn't really as
21  representative as we thought.  Maybe it's a
22  different model or a different way of looking at the
23  data would be more predictive of what we could
24  expect at various points throughout the shelf
25  life.

Page 56

1      Q.  BY MR. KELLER:  But what do those models --
2  as part of your job, you have to determine whether
3  or not what risk the company faces of not meeting
4  specification for the products it releases;
5  correct?
6      MS. HARDWAY:  Object to form.
7      THE WITNESS:  As part of my job -- so
8  products come into manufacturing that have a body of
9  data and evidence around them, so that's been --
10  that have been reviewed and approved by the agency
11  that say that that's sufficient, that is robust
12  for -- to be used in commercial manufacturing.  My
13  role is to ensure that those ways of manufacturing
14  are followed.  The systems, as I mentioned
15  earlier -- that the quality system is in place to
16  make sure that all of those things collectively are
17  done as expected such that the product that comes
18  out the other end is exactly as expected.  And so
19  the stability is just one form of monitoring.  It's
20  one way to monitor that, in fact, those things have
21  occurred as expected and intended.
22      Q.  BY MR. KELLER:  Okay.  Do those models also
23  help you assess the risk of things happening that
24  were not expected or not intended?
25      MS. HARDWAY:  Object to form.

Page 57

1      THE WITNESS:  The models may provide
2  information about whether or not something has
3  changed.
4      Q.  BY MR. KELLER:  And if something changed,
5  that helps you understand the risk of not meeting
6  the specification; correct?
7      MS. HARDWAY:  Object to form.
8      THE WITNESS:  It may or may not have an
9  impact on whether or not it has an impact on the
10  specification, but it can be a helpful indicator if
11  something is changed in the product or something is
12  different than what we would have expected.
13      Q.  BY MR. KELLER:  Is it your testimony that
14  the stability program has no relationship to Merck's
15  risk assessment of whether or not its products meet
16  specification?
17      MS. HARDWAY:  Object to form.
18      THE WITNESS:  That is not my testimony.
19      Q.  BY MR. KELLER:  Do you agree that part of
20  the stability program is to assess the risk of its
21  products meeting the specifications?
22      MS. HARDWAY:  Object to form.  Vague.
23      THE WITNESS:  My testimony is that the
24  stability program provides information about -- and
25  the performance of stability and the results -- the

15 (Pages 54 - 57)

Page 58

1 testing results from the product that you test on
2 stability give confidence or can identify if there
3 are changes in the overall performance of that
4 product when manufactured as intend.
5    Q. BY MR. KELLER: If you sell a product that
6 is out of specification, what are the regulatory
7 implications of that?
8       MS. HARDWAY: Object to form. And to the
9 extent you're asking her to make legal conclusions,
10 I will object to that as well.
11      THE WITNESS: It's a hypothetical. I don't
12 believe I have ever sold a product out of a
13 specification, so what --
14      MR. KELLER: Fair enough. Let's mark this
15 next exhibit as Exhibit 3.
16         (Deposition Exhibit No. 3 was marked for
17         identification.)
18    Q. BY MR. KELLER: For the record, Exhibit 3 is
19 a document that bears Bates stamp number 18608
20 through 10. When I say Bates numbers, as part of
21 our legal process, when documents are produced,
22 there is numbers placed at the bottom so we can
23 actually identify them easily.
24    A. Okay.
25    Q. So when I refer to the numbers, I won't go

Page 59

1 into the MRK, yada, yada, yada. I will just
2 identify the numbers --
3    A. Okay.
4    Q. -- as to help you sort of figure that. Can
5 you tell me, this is a document that's dated June
6 18th, 1999, entitled Prior Approval Supplement.
7 Doctor, I think the last page of this document has
8 your signature. Do you recognize this document as a
9 document that you prepared and signed?
10      MS. HARDWAY: Can you just give her a minute
11 to look at it, Jeff?
12      MR. KELLER: Sure.
13      THE WITNESS: I have scanned the document.
14    Q. BY MR. KELLER: Is that your signature on
15 the last page?
16    A. That is.
17    Q. Did you prepare this document?
18    A. I -- I was part of the preparation of this
19 document.
20    Q. Okay.
21    A. I wasn't the sole contributor to the
22 document.
23    Q. And this was a letter that you helped
24 prepare that was sent to the FDA, CBER, the Center
25 for Biological Evaluation and Research; correct?

Page 60

1    A. That's correct.
2    Q. And if I use CBER throughout this
3 deposition, you'll understand what I'm talking
4 about?
5    A. Yes.
6    Q. Okay.
7    A. I understand it to be as you just stated.
8    Q. And what is a prior approval supplement?
9    A. A prior approval supplement is a form of
10 amendment to an existing product license that
11 describes changes from the current process to the
12 proposed process as articulated within the
13 supplement.
14    Q. And this -- if I use the term PAS, you'll
15 understand that as a prior approval supplement?
16    A. Okay.
17    Q. And this PAS that was submitted to CBER in
18 June of 1999, was this to increase the minimum
19 release specifications for mumps products?
20    A. Yes.
21    Q. Okay. And prior to this time -- do you know
22 why the minimum release specification had to have
23 been increased during this time frame?
24      MS. HARDWAY: Object to form and
25 foundation.

Page 61

1       THE WITNESS: Do I know why?
2    Q. BY MR. KELLER: Sure.
3    A. This -- if I recall, this -- at this time
4 there were -- we had been in discussions -- Merck
5 had been in discussions with CBER over a number of
6 months or years, even. I'm not exactly sure when
7 those conversations initially began, where, in fact,
8 I believe Merck was clear about how it was treating
9 this, and the agency asked that it be modified and
10 clarity about meeting -- that the 4.3 was to be the
11 expectation for expiry, so in order to do that and
12 in recognition, as I stated before, that it's a live
13 virus product that does change potency over time,
14 it -- you would want to increase the minimum release
15 specification in order to ensure that you would meet
16 the expiry.
17    Q. When you say ensure meet expiry, what do you
18 mean by the word ensure?
19    A. What I -- when I use the word ensure, I mean
20 to give confidence that, in fact, it will meet that
21 expiry. Usually supported by data. I mean, it
22 actually -- it is supported by data.
23    Q. Okay. If you look on this document, the
24 first sentence says: This supplement is in
25 reference to an increase in the domestic release

16 (Pages 58 - 61)

Appx19804

Page 62

1 titer for our mumps-containing vaccines and changes
2 to the assay format for potency testing. Do you see
3 that?
4 　　A. Yes.
5 　　Q. And in the next sentence, it says: This
6 proposal was intended to provide a high level of
7 assurance that the minimum potency titers are
8 maintained through expiry. Do you see that?
9 　　A. The third sentence?
10 　　Q. Yes.
11 　　A. Yes.
12 　　Q. What did you mean by provide a high level of
13 assurance when you wrote this?
14 　　A. I don't recall precisely what I was thinking
15 that many years ago, but I believe it means, as I
16 said before, to provide confidence that it would
17 meet the expectation that the agency had for this
18 product.
19 　　Q. Which is that it would have a 4.3 potency
20 through its entire shelf life of 24 months;
21 correct?
22 　　A. I think that's what this says. Yes.
23 　　Q. There is also a discussion here about a --
24 in the second paragraph, in the third sentence, it
25 says: Therefore, we have undertaken a clinical

Page 63

1 study, initiated in February of 1999, to evaluate
2 the immunogenicity of mumps when administered to
3 children at a targeted expiry of 5,000 3.7 log TCID
4 dose. Do you see that?
5 　　A. Yes.
6 　　Q. Did you understand that that clinical study
7 was -- is Protocol 7 which was an assay that was
8 looking to reduce the potency at end expiry for the
9 mumps product?
10 　　MS. HARDWAY: Object to form.
11 　　THE WITNESS: I believe that the clinical
12 study referenced here was Protocol 007.
13 　　Q. BY MR. KELLER: Perfect. And so the request
14 that -- your statement here is that it will -- it's
15 targeted an end expiry of 3.7 log. That was one of
16 the dosages that were being tested in Protocol 7;
17 correct?
18 　　MS. HARDWAY: Object to form and
19 foundation.
20 　　THE WITNESS: I -- my recollection of that
21 study in detail -- I don't have a very strong
22 recollection of what that study was in detail. That
23 was done by the MRL colleagues in the clinical side
24 of the organization who were accountable or
25 responsible for conducting that study.

Page 64

1 　　Q. BY MR. KELLER: Okay.
2 　　A. So I don't know if that's the only one, if
3 there were -- the extent of the others, et cetera.
4 　　Q. Did you have any discussions when you
5 were -- during this time frame of June of 1999
6 through the time you left in 2004 about Protocol
7 7 --
8 　　MS. HARDWAY: Object to form.
9 　　Q. BY MR. KELLER: -- with your colleagues at
10 Merck?
11 　　MS. HARDWAY: Object to form. Overbroad.
12 　　THE WITNESS: What I can say is that I
13 were -- I did participate in meetings where
14 protocol -- where this particular protocol or this
15 study was referenced or discussed.
16 　　Q. BY MR. KELLER: Do you recall any discussion
17 during any of those meetings or conversations where
18 there was a discussion about the protocol, Merck
19 having concerns about the protocol, the validity of
20 that protocol in terms of the scientific soundness
21 of that protocol?
22 　　MS. HARDWAY: Object to form.
23 　　THE WITNESS: I don't know precisely what
24 you mean by scientific soundness.
25 　　Q. BY MR. KELLER: Do you recall any

Page 65

1 discussions at Merck that said that the protocol
2 was -- they couldn't rely upon that protocol to tell
3 whether or not a kid would be protected from getting
4 the mumps --
5 　　MS. HARDWAY: Object to form.
6 　　Q. BY MR. KELLER: -- disease?
7 　　MS. HARDWAY: Object to form.
8 　　THE WITNESS: I don't remember anyone -- I
9 don't remember anyone stating that as you just
10 articulated it.
11 　　Q. BY MR. KELLER: Do you recall them
12 discussing any concerns about the scientific
13 soundness of that protocol?
14 　　MS. HARDWAY: Object to form. Overbroad and
15 asked and answered.
16 　　THE WITNESS: I don't -- I don't actually --
17 I don't recall much about the trial itself. I may
18 have participated in or been present in meetings,
19 but the details of that, it's not my area of
20 expertise. I'm not -- so -- so -- so I really -- I
21 don't remember any of that.
22 　　Q. BY MR. KELLER: Do you recall ever relying
23 upon the results of Protocol 7 in any of your
24 interactions with CBER with respect to issues with
25 stability on the mumps products?

17 (Pages 62 - 65)

Appx19805

Page 66

1      MS. HARDAWAY:  Object to form.  Vague and
2  overbroad.
3      THE WITNESS:  What I can say is that while I
4  don't recall the details of the study, how it was
5  done, any concerns that -- at all, frankly, that to
6  a degree that you were just mentioning.  What I did
7  understand about the study was that by testing it at
8  different dosages would provide direct clinical
9  experience and begin to create a correlation
10  between -- between that, so it would --
11      Q.  BY MR. KELLER:  Between?
12      A.  Between -- or to say that if, in fact -- so,
13  for example, in this -- this second paragraph that
14  we were we were looking at, as stated here, we have
15  undertaken a clinical study to evaluate the
16  immunogenicity of mumps when administered to
17  children at targeted potency of 3.7.  Once they are
18  completed, then we can reevaluate the label claim or
19  the end expiry based upon that because you would
20  have direct relationship between the result and what
21  the end expiry would be.
22      Q.  So was one of the goals of Protocol 7 to
23  reduce the potency for end expiry from 4.3 to 3.7?
24      MS. HARDAWAY:  Object to form and foundation.
25      THE WITNESS:  I don't -- I understood the

Page 67

1  applicability of 007 in this -- in this regard as we
2  have just discussed.  Whether there were others or
3  other information on the clinical side, I really
4  can't comment.  I don't -- I'm not familiar with
5  that.
6      Q.  BY MR. KELLER:  But from your side, from
7  MMD's side, that clinical study, as you understood
8  it, was to reduce the end expiry potency from 4.3
9  down to 3.7; correct?
10      MS. HARDAWAY:  Object to form and foundation.
11      THE WITNESS:  I understood that that would
12  be supportive evidence for a modification to the
13  label claim which is as stated in this sentence
14  here, once the studies are completed, the label
15  claim will be re-evaluated.
16      Q.  BY MR. KELLER:  And the label claim at that
17  point was 4.3; correct?
18      A.  Yes, I believe so.
19      Q.  And the study was looking to reduce -- to
20  show that it was clinically effective at 3.7;
21  correct?
22      MS. HARDAWAY:  Object to form.
23      THE WITNESS:  In my terms, my lay terms are
24  that it was tested in children at -- at least one
25  dose, 3.7.  There were other doses.  I don't recall

Page 68

1  precisely, but that as I said before, that that
2  information then would be used to reevaluate the
3  label claim.
4      Q.  BY MR. KELLER:  Do you know why Merck was
5  looking to reevaluate the label claim?
6      MS. HARDAWAY:  Object to form.
7      THE WITNESS:  My recollection of the
8  discussions with the agency over time were that as
9  Merck was not -- Merck was -- Merck was releasing
10  product -- we told them we were releasing product
11  and that we viewed the label claim as the minimum
12  release specification.  I think this was really
13  to -- the purpose of reevaluating it was to bring --
14  well, the purpose to reevaluate it was to provide
15  greater clarity or greater -- or to bring -- to
16  bring to bear the data that would allow re -- or
17  modification of the 4.3 from a release spec and
18  really get a definitive, so then if that were the
19  release, what would be the expiry, or redefining the
20  expiry based upon relative to a release
21  specification.
22      Q.  BY MR. KELLER:  At this time frame of June
23  of 1999, were you aware that Merck's own internal
24  analysis showed that it could not meet 4.3 log
25  unless it increased the minimum release

Page 69

1  specification?
2      MS. HARDAWAY:  Object to form.  And just to
3  be clear, she's here as a fact witness, not as a
4  30(b)(6) witness, so to the extent she herself has
5  personal knowledge of what you're asking, she can
6  answer, but she's not here to speak for the company.
7      MR. KELLER:  Your speaking objections are
8  not necessary.
9      MS. HARDAWAY:  I can make whatever objections
10  I like to.  Thank you.
11      THE WITNESS:  So could you restate the
12  question, please.
13      Q.  BY MR. KELLER:  Sure.  Are you aware
14  personally of any internal analysis at Merck that
15  showed that unless the minimum release specification
16  was increased pursuant to this PAS of June of 1999
17  that Merck could not meet the end expiry potency of
18  4.3 at the end of the shelf life of the mumps
19  products?
20      MS. HARDAWAY:  Object to form.
21      THE WITNESS:  I'm aware that there were
22  statistical analyses done, statistical models
23  applied to the data to characterize that profile
24  and -- to characterize the profile and what -- and
25  to get assessment of what the log loss would be over

18 (Pages 66 - 69)

Page 70

1 the shelf life.

2    Q. BY MR. KELLER: But did you have any
3 personal knowledge that those models had shown or
4 presented a concern that if the minimum release
5 specification was not raised to the 4.9 as listed in
6 Merck's PAS that Merck would be selling product or
7 releasing product that would not meet 4.3 at the end
8 of its shelf life and that was the reason why the
9 PAS was submitted?

10    MS. HARDWAY: Object to form, foundation.

11    THE WITNESS: I believe that there is a
12 statistical -- and I'm aware of that there were
13 statistical analyses done that were used to develop
14 this proposal based on data, on statistical analysis
15 of stability data.

16    Q. BY MR. KELLER: But you don't know -- so
17 it's your testimony you do not know personally
18 whether or not there was any internal analysis that
19 showed that unless Merck increased its minimum
20 release specification as set forth in the PAS that
21 it would not be able to meet the end expiry
22 specifications of 4.3 log for its mumps products?

23    MS. HARDWAY: Object to form.

24    THE WITNESS: I know that -- I'm sorry.

25    MS. HARDWAY: You can answer.

Page 71

1    THE WITNESS: I know that there were
2 statistical analyses done, that depending upon the
3 model applied and the question you were answering,
4 or asking and answering could project varying --
5 varying potencies. Again, the applicability of the
6 models didn't always match the actual results that
7 we received.

8    Q. BY MR. KELLER: But you -- I will ask the
9 question again. Are you personally aware of any
10 models that showed or presented evidence that would
11 project that if Merck did not raise its minimum
12 release specification pursuant to this PAS that it
13 would be releasing product than would not be able to
14 meet the end expiry of 4.3 at the end of its shelf
15 life?

16    MS. HARDWAY: Object to form. Asked and
17 answered.

18    THE WITNESS: I'm aware --

19    Q. BY MR. KELLER: It's a yes or no -- it's a
20 yes or no question. Either you know it or you
21 don't.

22    MS. HARDWAY: She's entitled to provide
23 whatever answer she wants, Jeff. You can't
24 characterize the answer for her.

25    THE WITNESS: I'm aware of studies that were

Page 72

1 done. Yes, I'm personally aware of studies that
2 were done that showed log loss and confidence
3 intervals around them, and I know that statistical
4 analyses that were done were a basis for the
5 rationale as articulated in this document from June
6 17th, 1999.

7    Q. BY MR. KELLER: I will ask the question one
8 more time. We can spend all day here, if you want
9 it. Do you personally know whether or not those
10 analyses that you testified to that showed log loss
11 with confidence intervals projected or provided
12 evidence that if Merck did not raise its minimum
13 release specification that lots that it released to
14 the market could not meet the end expiry
15 specifications of 4.3 log?

16    MS. HARDWAY: Object to form. Asked and
17 answered.

18    THE WITNESS: I'm aware of analyses that --
19 I'm aware of statistical analyses on stability data
20 in the attempt to model that data to make
21 predictions on what the average losses and the
22 confidence intervals about those were. I'm aware of
23 those, yes --

24    Q. BY MR. KELLER: Okay.

25    A. -- personally.

Page 73

1    Q. Are you aware of the results of those?

2    A. I'm sure I have seen the results of those at
3 some point or another.

4    Q. Did the results of those models project that
5 the end expiry for some lots that were released at
6 the then current release specifications would not
7 meet 4.3 log at the end of expiry?

8    MS. HARDWAY: Object to form. Asked and
9 answered.

10    THE WITNESS: Those models -- as I would use
11 the word evidence, they were not -- those were --
12 those were models. They were hypotheses. They were
13 not actual data, so my answer is characterizing that
14 while hypothetically and under a certain set of
15 circumstances or assumptions that might be placed in
16 that model, they could draw certain conclusions,
17 certainly, with confidence intervals over a range of
18 numbers, but they were not -- those are not
19 necessarily the data that we observed in our
20 studies.

21    Q. BY MR. KELLER: So the data you observed in
22 your studies were at this time frame you only took
23 one lot, one lot from each batch and put it on
24 stability; correct?

25    MS. HARDWAY: Object to form.

19 (Pages 70 - 73)

Appx19807

Page 74

1    Q.  BY MR. KELLER:  Let me back up.  How many
2  lots are in a batch for mumps during the time frame
3  that you were at Merck?
4    A.  Could you clarify the question because I
5  used the word lot and batch --
6    Q.  Same.
7    A.  -- the same, so I'm not sure what -- when
8  you say a lot in a --
9    Q.  How many doses are in a lot?
10    A.  I don't recall the number of doses in a lot
11  of vaccine.  I think they varied, so I don't -- I
12  don't recall.
13    Q.  So back to my question.  Those analyses that
14  you saw, did they project losses, that a certain
15  percentage of the loss release at the then minimum
16  current specification would not meet 4.3 at the end
17  of 24 months?
18       MS. HARDWAY:  Object to form.  Asked and
19  answered.
20       THE WITNESS:  Did those analyses project?
21  As I said, my -- I have seen analyses.  Analyses
22  were done on the stability data with certain
23  assumptions in mind and with -- under certain
24  assumptions you come up with one set of predictions.
25  With other assumptions and other models you can come

Page 75

1  up with different predictions, so they were all
2  inputted information into helping us characterize
3  and understand the stability profile for the
4  product.
5    Q.  BY MR. KELLER:  So as you sit here today,
6  you don't recall the results of any of those models
7  that you reviewed during this time frame?
8    A.  The results of --
9    Q.  Let me strike that.
10       So is it your testimony that these models
11  that show -- that project log loss and confidence
12  intervals, they play no role in determining whether
13  or not the -- play no role in setting what the
14  minimum specification is for Merck's mumps
15  products?
16       MS. HARDWAY:  Object to form.  Asked and
17  answered.  That's not what she testified.
18       THE WITNESS:  The -- as I mentioned before,
19  they are information and that through the models
20  they seek to determine or to help understand the
21  profile of the product.  If the data, the actual
22  data that we measure is consistent with the model,
23  it gives you confidence that, in fact, the model is
24  predictive.  If you don't -- if the results that you
25  get are not necessarily consistent with the model,

Page 76

1  it suggests that maybe that's not the most
2  applicable way or the most appropriate way with
3  whatever assumptions are associated with that model
4  that represents the product.  So it can be
5  informative.  It's a good -- it's a test of is this
6  the way we should characterize the product using
7  this model or this approach.
8    Q.  BY MR. KELLER:  I see.  Why did Merck change
9  its minimum release specification then in June of --
10  as set forth in this PAS of June 1999 if these
11  models were just suggestive?
12       MS. HARDWAY:  Object to form and
13  mischaracterize the submission, but go ahead.
14       THE WITNESS:  The -- as I mentioned before
15  on the dialogue with the agency prior to this period
16  and up until this period, and I think even beyond,
17  there had been expectations set -- or Merck had
18  conveyed to the agency about how it was using the
19  specification, the label claim number, and through
20  those discussions over time the agency wanted Merck
21  to establish a release specification that would
22  ensure that the label spec would be met during
23  expiry.  So statistical analyses were part of the
24  information that went into the logic and rationale
25  to come up with changing that minimum

Page 77

1  specification.
2    Q.  BY MR. KELLER:  Did it also come up with
3  changing the end expiry specification?
4       MS. HARDWAY:  Object to form.
5       THE WITNESS:  In this proposal, this was a
6  proposal that offered an alternative, so depending
7  upon the release potency, the product dating would
8  be adjusted accordingly, because if 4.3 is the
9  specification to be met, if it tested lower, it
10  would have less time on the market, less time on the
11  shelf, et cetera, as indicated in this table on page
12  2.
13    Q.  BY MR. KELLER:  Did CBER approve of this
14  plan of reducing the shelf life from 24 months down
15  to 12 months depending on the release titer?
16    A.  My recollection is that this was ultimately
17  not approved.
18    Q.  BY MR. KELLER:  Okay.  And what was
19  ultimately approved, if you recall?
20    A.  Ultimately, I believe that the -- really,
21  after discussion, because even this proposal -- my
22  recall -- because we had many conversations.  This
23  was a regular dialogue that Merck was having with
24  the agency, that I think at the time that we
25  submitted this we believed that this was consistent

20 (Pages 74 - 77)

Page 78

1 and acceptable with what the agency was looking for.
2 Ultimately, I think with further discussion as
3 conveyed to us, further discussion internally at
4 CBER, they wanted us to take a different approach
5 and a simpler approach.
6     Q. And what was that approach?
7     A. Which I believe was to not have variable
8 dating and to have one established release titer
9 which is -- which is -- I believe it was 5.0 which
10 is as I referred -- I think you had asked me this
11 question earlier and that was the 5.0 that I was
12 referring to go.
13     Q. So when Merck proposed that for in this PAS
14 that for product that would release, you know, at or
15 above 4.7 -- or strike that.
16     For a product that would be released at 4.7,
17 that would be a 12-month shelf life. Do you see
18 that?
19     A. On Table --
20     Q. Yes.
21     A. Yes.
22     Q. Do you know -- you understand that Merck
23 sells its mumps products to the Government;
24 correct?
25     MS. HARDWAY: Object to form and foundation.

Page 79

1     Q. BY MR. KELLER: Let me strike that. Do you
2 know whether or not Merck sells its mumps products
3 to the Government, the CDC?
4     A. Yes.
5     Q. Do you understand what the contractual terms
6 of that agreement is with respect to shelf life on
7 the product?
8     MS. HARDWAY: Object to form. You mean in
9 June of 1999?
10     MR. KELLER: Yes.
11     THE WITNESS: No. That was really on the
12 commercial side and I wasn't familiar or know any
13 detail what those parameters were.
14     Q. BY MR. KELLER: Did you ever hear -- did you
15 ever come to understand that the CDC required as
16 part of its contracts that the shelf life that is
17 provided required for them would be 12 months as a
18 date of receipt by the CDC?
19     MS. HARDWAY: Object to form. Again, are we
20 talking about June of '99?
21     MR. KELLER: Yes.
22     THE WITNESS: I don't know. Again, I don't
23 know the specifics of those contractual requirements
24 with the CDC.
25     Q. BY MR. KELLER: Had you ever seen any

Page 80

1 documentation that established that the contractual
2 requirements for the CDC was that it had to have at
3 least 12 months of product shelf life upon delivery
4 to the CDC?
5     MS. HARDWAY: Object to form.
6     THE WITNESS: I may have seen documents that
7 stated that, but the precise nature of the terms of
8 the contract, I'm not familiar with.
9     Q. BY MR. KELLER: Okay.
10     A. Or the expectation.
11     Q. If -- I'm just confused. If Merck had a
12 contractual obligation with the CDC to provide
13 product that had at least 12 months' shelf life upon
14 delivery, why were you submitting a proposal that
15 would reduce the shelf life to 12 months?
16     MS. HARDWAY: Object to form and foundation.
17 To the extent this --
18     Q. BY MR. KELLER: Let me strike that. Do you
19 recall any discussions with respect to the
20 preparation of this PAS to the CBER about this
21 12-month shelf life as to whether or not that would
22 violate Merck's contract with the CDC?
23     MS. HARDWAY: Object to form, and to the
24 extent you're asking her about a legal conclusion,
25 she's not --

Page 81

1     MR. KELLER: I'm asking her about her
2 discussions. It's not a legal conclusion what she
3 discussed. It's an improper objection.
4     Go ahead.
5     THE WITNESS: My recollection about the
6 discussions associated with the compilation and the
7 preparation of this were around the technical nature
8 of the release titer and the associated -- and the
9 expiry dating it could support. I don't personally
10 recall being -- again, it's not my area of focus.
11 I'm not saying that I might not have been in a
12 conversation where those things were discussed, but
13 it wasn't my area of focus and what was the subject
14 of this prior approval supplement.
15     Q. BY MR. KELLER: Have you ever -- after the
16 submission of this PAS from 1999 through the time
17 you left in April of 2004, ever been informed that
18 there were projections that the shelf life of
19 M-M-R II product with respect to the mumps component
20 was below 12 months?
21     MS. HARDWAY: Object to form. Overbroad.
22     THE WITNESS: I don't recall. There were
23 many analyses and different -- so I don't -- I don't
24 recall that specifically, no.
25     Q. BY MR. KELLER: Do you recall reviewing one

21 (Pages 78 - 81)

Appx19809

Page 82

1 such analysis where you concluded that you were
2 required to file a biological product deviation
3 report?
4     MS. HARDWAY:  Object to form.
5     Q. BY MR. KELLER:  Let me strike.  Do you know
6 what a biological product deviation report is?
7     A. I do.
8     Q. What is that?
9     A. It's a submission to the agency when a
10 company identifies something associated with a
11 marketed lot, a marked product, something that's
12 been in commercial distribution that may impact the
13 quality of the product.
14     Q. And quality of product, the potency of the
15 product?
16     MS. HARDWAY:  Object to form.
17     THE WITNESS:  Potency can be an element of
18 the quality of the product, yes.
19     Q. BY MR. KELLER:  Its ability to meet its end
20 expiry shelf life?
21     A. Not necessarily that.  What I'm saying is if
22 we were to measure -- if on stability, for example,
23 you were to measure something that were inconsistent
24 or did not meet the established specification, that
25 would be an example.

Page 83

1     Q. Did you ever --
2     A. Not necessarily a prediction.
3     Q. Not a prediction.  You don't consider a
4 prediction of not meeting specification rising to
5 the level of the need to file a BPDR?
6     MS. HARDWAY:  Object to form.
7     THE WITNESS:  No.  And, in fact, I recall
8 in a meeting with the agency where we were talking
9 about, I believe, mumps, among other things, and
10 talking about -- because, again, we were in constant
11 and regular conversations with the agency, and so
12 there was a discussion about how much and -- how to
13 keep them informed about observations we might make,
14 and there was a specific discussion about should we
15 through one of our statistical models have a
16 prediction that it might fall below specification
17 whether or not we needed to -- that would be
18 something that we should report as a BPDR, and, in
19 fact, Norman Baylor of the agency said, no, that is
20 not something that we would have to do, so he stated
21 that specifically, but certainly if we did have a
22 result, we would -- that measured outside of the
23 specification, we would need to tell them.
24     MR. KELLER:  We need to change the
25 videotape.

Page 84

1     THE VIDEOGRAPHER:  This concludes media
2 number one in the continuing deposition of Roberta
3 McKee.  We are going off the record.  The time is
4 11:19 a.m.
5     (WHEREUPON, a short break was taken from
6     11:19 a.m. to 11:37 a.m.)
7     THE VIDEOGRAPHER:  This is the beginning of
8 media number two in the continuing deposition of
9 Roberta McKee.  We are back on the record.  The time
10 is 11:37 a.m.
11     Q. BY MR. KELLER:  Dr. McKee, you -- before we
12 had to change the tape, you testified that you had a
13 conversation with Norman Baylor regarding the filing
14 of BPDR's.  Do you recall when that conversation
15 was?
16     A. I don't recall precisely the date, but it
17 would have been after 2000 because there wasn't a
18 BPDR regulation before that.
19     Q. And so the BPDR -- before that there was an
20 errors and omissions regulation, something similar,
21 but they changed the regulation in that time frame
22 to BPDR's?
23     A. There was an error and accident
24 regulation.
25     Q. Okay.  And so when you spoke to Dr. Baylor,

Page 85

1 what did he tell you?
2     MS. HARDWAY:  Object to form.
3     THE WITNESS:  Can you be more specific --
4     Q. BY MR. KELLER:  Sure.
5     A. -- about your --
6     Q. You said you had a conversation with
7 Dr. Baylor where he told you that you were not
8 required to submit a BPDR for observations, and what
9 observations did he say you didn't have to submit
10 BPDR's for?
11     A. I believe what I said was that during the
12 course of a meeting with the -- with Norman Baylor
13 and others at CBER, the topic of -- reviewing of
14 stability data and discussing the knowledge of that
15 and the information that we had at that time was a
16 subject there.  In the course of that
17 conversation -- so it wasn't just myself and Norman;
18 there were others there, talking about whether or
19 not if there were predictions that from analyses
20 that product might fall below the specification and
21 should that be reported, and Norman specifically
22 said -- or not as a quote, but what he described was
23 that that -- just, you know, a prediction was not
24 something that would be subject to a BPDR, but it
25 would be specific observations.  If we actually saw

22 (Pages 82 - 85)

Page 86

1 out-of-specification results, that's what would be
2 appropriate to notify via that -- via a BPDR.
3    Q. So at this meeting with Norman Baylor where
4 he told you that projections of product falling
5 below the specifications did not need to be reported
6 in a BPDR, did he say that it had to be reported in
7 any other mechanism to the FDA?
8    A. No.
9    Q. So it was your understanding that if a model
10 that Merck had put together that projected that its
11 product would not meet specification and expiry, it
12 had no obligation to disclose that to CBER?
13    MS. HARDWAY: Object to form.
14    THE WITNESS: That discussion with Norman
15 was about what was in or out of scope of a BPDR. We
16 didn't discuss about any other obligations or any
17 other requirements; however, we had ongoing dialogue
18 with them and just shared a lot of information.
19 They would ask questions or we would seek questions
20 and get information from, so back and forth, so
21 there were a lot of discussions. So we didn't talk
22 about anything specifically with regard to reporting
23 requirements formally other than what was in the
24 scope of a BPDR.
25    Q. BY MR. KELLER: Gotcha. Did anybody else at

Page 87

1 that meeting have a different opinion as to what was
2 required by the BPDR's?
3    MS. HARDWAY: Object to form.
4    THE WITNESS: If I remember correctly,
5 that -- it was -- actually, the point came up
6 because one of the other CBER colleagues asked about
7 it, and it was in the course of that discussion --
8 actually, I recall letting the CBER colleagues have
9 that discussion. We were not necessarily -- we
10 weren't engaging in that part of the conversation,
11 and that's when at the end of their dialogue they
12 came back and said as I stated previously about
13 Norman.
14    Q. BY MR. KELLER: Norman Baylor, he's not in
15 the compliance department of CBER, is he?
16    MS. HARDWAY: Object to form.
17    THE WITNESS: I don't recall what
18 division -- I don't recall the hierarchy at CBER and
19 the organizational charts. I apologize.
20    Q. BY MR. KELLER: At that meeting, did
21 Mr. Baylor inform you that he had to get approval
22 from compliance as to that conclusion?
23    MS. HARDWAY: Object to form.
24    Q. BY MR. KELLER: And he would get back to
25 you?

Page 88

1    MS. HARDWAY: Object to form.
2    THE WITNESS: I don't recall him using words
3 that I would -- that he had to get approval. I
4 generally believe and understand that they dialogue
5 across -- across the elements of the agency, yes.
6    Q. BY MR. KELLER: Did you ever get a formal
7 written confirmation of that understanding that you
8 didn't have to file a BPDR if your projections
9 showed a projected -- if your models projected that
10 your product could not meet end expiry for a certain
11 percentage of the lots released to the public?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: No. I mean -- no, we never
14 got -- so we generally would have minutes to
15 meetings, but I don't recall specifically the
16 follow-up from Norman on that point.
17    Q. BY MR. KELLER: Sure.
18    A. If there was anything that -- that there was
19 a different expectation than what was discussed and
20 conveyed to us in that meeting.
21    MR. KELLER: Can you get me 49238.
22    Let me mark as Exhibit 4 --
23    (Deposition Exhibit No. 4 was marked for
24    identification.)
25    Q. BY MR. KELLER: Which is a document that

Page 89

1 bears Bates stamp number 49178 which is an e-mail
2 which is dated April 9th, 2001. Subject: Minutes,
3 CBER meeting of April 4th, 2001. Attached are the
4 minutes from the April 4th meeting with CBER on
5 mumps. The stability slides prepared for that
6 meeting are also attached.
7    And let me mark as Exhibit 5 --
8    (Deposition Exhibit No. 5 was marked for
9    identification.)
10    Q. BY MR. KELLER: 5, the actual minutes, and
11 they bear Bates stamp number 49238 through 240. And
12 if you can take a minute to look at those two
13 documents.
14    Tell me if you recall these minutes of the
15 meeting, and I will just direct your attention to
16 save you some time. The discussion that you appear
17 to be referring to is on page 240 under Assignment,
18 number 4. I will tell you that I'm not going to ask
19 you questions about this document other than the
20 last paragraph.
21    A. Okay. I just want to --
22    Q. We will come back to it. You can read it
23 later when I actually get to this document, but
24 since we are talking about your discussion with
25 Norman Baylor, I thought we can just jump ahead.

23 (Pages 86 - 89)

Appx19811

Page 90

1    A. Okay.
2    Q. On page 4, can you read number 4 on page
3 240. First of all, do you recall receiving these
4 mini meeting minutes with CBER on April 4th, 2001?
5    A. I don't recall specifically receiving them.
6    Q. If you look on the e-mail in Exhibit 4,
7 you're identified as one the recipients.
8    A. Uh-huh.
9    Q. Do you believe that you actually did receive
10 this?
11    A. Uh-huh.  Sure.
12    Q. Any reason to believe you didn't receive
13 it?
14    A. No reason to believe I didn't receive it.
15    Q. Was it your common practice to review the
16 meeting minutes regarding meetings that you
17 participated in?
18    A. Yes.
19    Q. And you participated in this meeting;
20 correct?
21    A. I did.
22    Q. Okay.  So can you read for the record number
23 4 and the assignment thereafter.
24    A. Uh-huh.  Dr. Carbone requested that Merck
25 notify CBER when it appears that a lot on stability

Page 91

1 may go out of specification, noting that, if
2 additional data proved otherwise, that should also
3 be communicated.  She requested that this be worked
4 into the SOP's for stability studies.  Dr. Baylor
5 commented that the logistics of implementing this
6 need to be discussed.
7    Q. And then under Assignment it says -- under
8 you, what does that say?
9    A. Roberta McKee will follow up with Norman
10 Baylor on this subject.
11    Q. Did you follow up with Norman Baylor on this
12 subject?
13    A. I believe --
14    Q. You said at this meeting, it happened at
15 this meeting.  Is this the meeting that you recall
16 this happening where you discussed with -- where
17 Norman Baylor stated that you -- that Merck was not
18 required in the BPDR's to disclose projections of
19 its product not meeting end expiry specifications?
20    A. I believe this was the meeting where that --
21 the conversation that I was referring to, I believe
22 this is the meeting.
23    Q. What are the purpose of the meeting minutes?
24 Is that to capture what happened during the
25 meetings?

Page 92

1    MS. HARDWAY:  Object to form.
2    THE WITNESS:  It's the -- as a record of the
3 key elements of the discussion.
4    Q. BY MR. KELLER:  But here in these meeting
5 minutes that were created, they are dated April 9th,
6 2001, five days after the meeting.  It states that
7 you have to follow up on this subject with Norman
8 Baylor, that he needed to -- that he states, Dr. --
9 these meeting minutes state Dr. Baylor commented
10 that the logistics of implementing this needs to be
11 discussed.
12    A. Uh-huh.
13    Q. Who did it need to be discussed with?
14    A. I think -- I think he meant it needed to be
15 discussed internally.
16    Q. At CBER?
17    A. At CBER.
18    Q. Did he ever get back to you after this April
19 meeting of 2001 and tell you specifically that you
20 didn't have to issue these BPDR's, or you're just
21 referring to the conversation that you had during
22 this meeting?
23    MS. HARDWAY:  Object to form.
24    THE WITNESS:  I don't recall the specific
25 conversation with Norman on this specific point

Page 93

1 following this, but I certainly had a number of
2 conversations with Norman after this because we --
3 as this dialogue continued.
4    Q. BY MR. KELLER:  But you testified he told
5 you at this meeting --
6    A. Uh-huh.
7    Q. -- that you didn't have to file BPDR's based
8 on projections of product not meeting end expiry
9 specifications, but here in these meeting minutes it
10 says they have to do further -- that the logistics
11 of this has to be further discussed which you
12 identify internally at CBER.
13    A. Uh-huh.
14    Q. So did you have a misunderstanding, or are
15 these minutes just incorrect?
16    MS. HARDWAY:  Object to form.
17    THE WITNESS:  No, I think that what -- so
18 maybe this is a good opportunity for me to clarify.
19 I think this is consistent with what I was saying in
20 that the conversation with -- where this occurred,
21 Dr. Carbone made the comment, I think as in these
22 minutes describes, that, in essence, wanted to be
23 informed about the -- you know, as we continued to
24 characterize the product, and Norman interjected
25 that that was out of scope for what he understood to

24 (Pages 90 - 93)

Page 94

1 be for the BPDR, and basically at the meeting he
2 said, you know, to not do that, you know, and --
3 but -- and he said we will have, you know, some
4 conversations, but --
5     Q.  BY MR. KELLER:  Did you ever have any
6 conversations?
7         MS. HARDWAY:  Object to form.  And, also, I
8 don't know if she was done yet, but she said but,
9 and you interrupted her.
10    Q.  BY MR. KELLER:  I apologize if I interrupted
11 you.
12    A.  So what Norman was having those -- my
13 interpretation -- or what I was referring to was
14 that Norman was going -- wasn't having
15 conversations, necessarily, with me; it was to have
16 conversations within the agency to ensure alignment,
17 so --
18    Q.  But you never got a written confirmation
19 that that's what was CBER's formal position on
20 responses to BPDR's?
21        MS. HARDWAY:  Object to form.
22        THE WITNESS:  I don't recall ever getting a
23 written response, and what I would say is that for
24 many of -- that wouldn't be unique to this question
25 or any other question.  Very rarely does the agency

Page 95

1 provide a written response, only when it's in
2 response to a written supplement or -- so you can
3 get verbal things and you will -- in fact, what we
4 do is we would document them and oftentimes -- and
5 we would put them in our files based upon what they
6 said, but getting a written document from the
7 agency -- or not getting a written document from the
8 agency is not unusual at all.  It's, in fact, par
9 for the course.
10    Q.  BY MR. KELLER:  So as you sit here today, do
11 you recall reviewing stability models that projected
12 that the product would not meet its end expiry
13 potency for months where you yourself said we have
14 to file BPDR on that after this meeting on April
15 1st, 2001, regarding the mumps product?
16        MS. HARDWAY:  Object to form.  Asked and
17 answered.
18        THE WITNESS:  I certainly looked at
19 stability models and looked at the analyses that
20 were performed that came my way and/or even ones
21 that I might have requested, so I looked at those,
22 yes.  Yes, I did.
23    Q.  BY MR. KELLER:  So there were projections of
24 mumps product not -- strike that.
25        You are aware of projections that you

Page 96

1 reviewed that projected that the mumps product would
2 not meet an expiry for certain number of lots based
3 on those projections and it was your opinion that a
4 BPDR should be issued?
5        MS. HARDWAY:  Object to form.  And I object
6 to the preamble of the question.  That's -- and
7 foundation.
8        THE WITNESS:  And, again, the question is --
9 I'm sorry.  What is the question?
10        Could you repeat the question.
11        MR. KELLER:  So -- can you read the question
12 back?
13        (Question read back)
14        THE WITNESS:  So as I stated before, I'm
15 aware of analyses, various analyses that were
16 performed.  At the -- I think depending upon the
17 time frame of what we are talking about, whether or
18 not the judgment of that needed to be the subject of
19 a BPDR varied and that -- and it varied.
20    Q.  BY MR. KELLER:  So it changed.  At a certain
21 point you understood that a projection of a product
22 not meeting its specification would be required to
23 be reported as a BPDR; is that correct?
24        MS. HARDWAY:  Object to form.
25        THE WITNESS:  It may or may not.

Page 97

1 depended on the circumstance and the time frame.
2    Q.  BY MR. KELLER:  But sometime after this
3 April 2001 meeting; correct?
4        MS. HARDWAY:  Object to form.
5        THE WITNESS:  I don't recall specifically
6 from a timeline perspective.
7    Q.  BY MR. KELLER:  Did you ever conclude that
8 based on the stability model that projected that a
9 certain number of lots would not meet end expiry for
10 the mumps product required Merck to file a BPDR?
11        MS. HARDWAY:  Object to form.
12    Q.  BY MR. KELLER:  Yourself, did you?
13    A.  I may have done that.
14    Q.  Okay.  Did Merck follow that
15 recommendation?
16        MS. HARDWAY:  Object to form.
17        THE WITNESS:  I don't recall the context of
18 the situation.  Without more information about
19 specifically what we are talking about, it's hard to
20 precisely answer that question.
21    Q.  BY MR. KELLER:  So at a certain point you no
22 longer believe that Norm Baylor's so-called
23 statement to you that you didn't have to file, that
24 that changed later on, that you had to file BPDRs,
25 correct, based on your understanding?

25 (Pages 94 - 97)

Page 98

1    MS. HARDWAY: Object to form.
2    THE WITNESS: My -- each -- whenever
3  confronted with information, we would make decisions
4  and I would make decisions about what I felt needed
5  to be reported to the agency.
6    Q. BY MR. KELLER: Do you recall that in 2000
7  that during a CBER inspection of MMD that there was
8  issues that were raised about Merck's stability
9  program --
10    MS. HARDWAY: Object to form.
11    Q. BY MR. KELLER: -- with respect to mumps?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: I know there was an inspection
14  in 2000 and -- or I don't know if I have the dates
15  precisely, so there were -- so I don't have the
16  specifics, no.
17    Q. BY MR. KELLER: But you know there was an
18  inspection of the manufacturing facility where mumps
19  potency issues came up; correct?
20    MS. HARDWAY: Object to form.
21    THE WITNESS: There was an inspection and I
22  believe that there were -- the topic of stability
23  testing and perhaps mumps was there. I don't recall
24  specifically, but, yes.
25    Q. BY MR. KELLER: Do you know what a 483 is?

Page 99

1    A. Yes.
2    Q. What is a 483?
3    A. A 483 is a document issued at the end of an
4  inspection.
5    Q. Okay.
6    A. By the investigators that list observations
7  made during the inspection. Their observations made
8  during the inspection.
9    Q. Did you ever hear the term significant
10  deficiency?
11    A. Yes.
12    Q. Is that used in turn -- in relation to the
13  issuance of 483's?
14    A. Not to my knowledge.
15    MR. KELLER: Let me mark this next exhibit
16  as Exhibit 7.
17    (Deposition Exhibit No. 7 was marked for
18    identification.)
19    Q. BY MR. KELLER: And I'm not going to ask you
20  to look at -- read this whole document.
21    MS. HARDWAY: I think we are 6.
22    MR. KELLER: Sorry. You're right.
23    (Deposition Exhibit No. 7 was
24    withdrawn.)
25

Page 100

1    (Deposition Exhibit No. 6 was marked
2    for identification.)
3    Q. BY MR. KELLER: I apologize. I'm not going
4  to ask you to read this entirely thick monster
5  document. I really just want to ask you to take a
6  look at it and tell me if you recognize the
7  signature.
8    Let me -- for the record, Exhibit 6 is a
9  document that bears Bates stamp number 1899087
10  through 253. It's 152 pages long. It's dated
11  October 24th, 2000, titled Measles, Mumps, and
12  Rubella Virus Vaccine Live Statistical Analysis of
13  Potency on Stability. And at 9088 through 89 is a
14  letter from you, Dr. McKee, to CBER.
15    A. Uh-huh.
16    Q. Is that your signature on this document?
17    A. Yes.
18    Q. Okay. And do you recall -- if you want to
19  take a minute to look at this document, I'm not
20  going to ask you to read the entire document. I
21  just have a couple questions, really, in the second
22  paragraph. Why don't we start the first paragraph.
23  It says a teleconference --
24    MS. HARDWAY: Hang on a second. Can you
25  just let her take a look.

Page 101

1    THE WITNESS: I just want to orient myself
2  to it, if I can.
3    Q. BY MR. KELLER: Sure.
4    A. Okay.
5    Q. Do you recall writing this letter?
6    A. Not specifically, no.
7    Q. Do you have any reason to believe that you
8  didn't prepare this letter?
9    A. I have no reason to believe I didn't prepare
10  it.
11    Q. Okay. And this was prepared in the ordinary
12  course of your job duties at Merck?
13    A. Yes.
14    Q. If you look in the first sentence, it says:
15  A teleconference to discuss stability testing for
16  measles, mumps, and rubella virus vaccine live was
17  held on August 10, 2000, between Drs. Kathryn
18  Carbone and Luba Vujcic, V-U-J-C-I-C, CBER and
19  Dr. Roberta McKee and a host of other folks. Do you
20  see that?
21    A. Yes.
22    Q. In the second paragraph at the end, it says:
23  As requested by CBER in the teleconference, we are
24  providing the following information. Do you see
25  that?

26 (Pages 98 - 101)

Appx19814

Page 102

1    A.  Yes.
2    Q.  So this document is a response to requests
3  that were made by CBER at that August 10, 2000
4  teleconference; correct?
5    A.  That's how I read it.
6    Q.  Okay.  And if you look in the first bullet
7  point in the last -- in the first indented
8  paragraph, the last sentence says:  Stability
9  protocol describes our plan for prospective analysis
10  in support of the potency claims for the product.
11  Do you see that?
12    A.  I'm sorry.  You're on the -- where are you?
13    Q.  I'm sorry.  The second bullet point.
14    A.  So the second bullet point, the stability
15  protocol request number, et cetera?
16    Q.  Yes.  It says:  The stability protocol
17  describes our plan for prospective analysis in
18  support of potency claims for the product.  Do you
19  see that?
20    A.  Yes.
21    Q.  And what did you understand the meaning of
22  prospective analysis?  What does that mean?  What's
23  your understanding of what you meant when you wrote
24  that?
25    A.  Well, without being able to see the

Page 103

1  protocol, I can't be sure.
2    Q.  Well, what is prospective?  That means in
3  the future; correct?
4    A.  Yes.
5    Q.  Okay.  Let me direct your attention to the
6  last bullet point on page 89.  9089.  And under
7  here it says:  Retrospective analysis of stability
8  for the five-year period preceding the process
9  change to support the higher mumps titer implemented
10  for all lots manufactured on or after September 13,
11  '99.  Do you see that?
12    A.  I'm sorry.  You're on --
13    Q.  The last bullet.
14    A.  The last bullet, okay.  Yes, I see this.
15    Q.  And so Merck conducted a retrospective
16  analysis for the stability of its product going back
17  five years; correct?
18    MS. HARDWAY:  Object to form.
19    THE WITNESS:  Retrospective -- so this is
20  2000, retrospective analysis of stability data for
21  the five-year period preceding the process change,
22  so preceding September '99.
23    Q.  BY MR. KELLER:  And the process change,
24  that's the increase in the minimum spec, correct,
25  specification, the PAS?

Page 104

1    A.  The process change was the change in the
2  target titer, the target fill, and also in that
3  supplement was a change to the minimum release.
4    Q.  Okay.
5    A.  I believe.
6    Q.  So that's the 5.0 was the minimum release;
7  correct?
8    A.  That's what I believe this is referring
9  to.
10    Q.  Do you recall that the target was set at 5.2
11  log?
12    MS. HARDWAY:  Object to form.
13    THE WITNESS:  I believe -- I -- that's what
14  I recall, that it was.
15    Q.  BY MR. KELLER:  If you go on -- do you
16  recall that Merck conducted a five-year analysis of
17  its stability from the date of the process change,
18  the change in the minimum spec and the target back
19  five years; correct?
20    A.  Until looking at this document, I didn't
21  recall specifically that we had done that, no.
22    Q.  Fair enough.  If you look at the last -- the
23  next paragraph, it says:  When these analyses
24  requested by CBER were performed, an apparent change
25  in the product profile for the product was observed.

Page 105

1  Do you see that?
2    MS. HARDWAY:  I think you misread that,
3  Jeff.
4    MR. KELLER:  I'm sorry.  Why don't I have
5  you read it for me.
6    THE WITNESS:  This indented -- oh, here.
7    Q.  BY MR. KELLER:  Yeah.  Sorry.
8    A.  When these analyses requested by CBER were
9  performed, an apparent change in the potency profile
10  for the product was observed.  It's unclear whether
11  the difference is due to a shift or a trend in the
12  data.  It is also not known whether these empirical
13  observations are an artifact of the -- are an
14  artifact of the data collection methods.  We are
15  further investigating these observations and request
16  an opportunity to discuss our findings with CBER at
17  a face-to-face meeting.  We will contact CBER to
18  discuss the timing for this meeting.
19    Q.  Do you recall there being a meeting where
20  you personally discussed this apparent change in
21  potency profile for the product?
22    MS. HARDWAY:  Object to form.
23    THE WITNESS:  I don't recall specifically in
24  the chronology the precise meeting at this point.
25  You know, this is 17 years ago, so --

27 (Pages 102 - 105)

Page 106

1    Q. BY MR. KELLER: I get that.
2    A. I don't recall the specific -- what I do
3 recall was the ongoing conversation that we had with
4 the agency on this topic. As you've seen, and even
5 as I think is noted in this first paragraph that
6 goes back to 1998 where, you know, we continued to
7 discuss and share data and information with them
8 over the period, so --
9    Q. So if you -- in the last bullet point, this
10 retrospective five-year analysis, there is an
11 Attachment 8. Analyses are provided for all three
12 virus components, measles, mumps, rubella,
13 Attachment 8. Can you turn to page 9199. And
14 that's attached at the beginning of Attachment 8.
15 And there it says -- one is introduction, two is
16 statistical analysis of stability data from -- for
17 1987 through 2000. A is summary. B is database
18 characteristics and rationale for the statistical
19 approach used, and C is statistical analysis
20 results. Do you see that?
21    A. Yes.
22    Q. Let me just direct your attention to 9204
23 which is Table 2. That table. Do you recall seeing
24 that table before?
25    A. Not until today.

Page 107

1    Q. Okay.
2    A. I saw a lot of data tables in my time.
3    Q. Sure. Let me just direct your attention, if
4 you can, to this table. It's broken up by date of
5 manufacture by different time ranges. Do you see
6 that in the left-hand column?
7    A. Yes.
8    Q. And in the second column from the end on the
9 right, it says shelf life loss. Do you see that?
10    A. Yes.
11    Q. And so if you look for the different time
12 ranges, you'll see that the shelf loss increased
13 from December '86 to April '93 of .506 to January
14 '95 to May of '98 to .703. Do you see that?
15    A. I see the numbers in the table, yes.
16    Q. Is this typical results or a report that you
17 would see for stability modeling that was done at
18 Merck during the time that you were the head quality
19 person --
20    MS. HARDWAY: Object.
21    Q. BY MR. KELLER: -- for MMD?
22    MS. HARDWAY: Object to form.
23    THE WITNESS: Actually, this was a specific
24 study. Most stability studies didn't do this kind
25 of analysis of such a broad period.

Page 108

1    Q. BY MR. KELLER: I see.
2    A. They looked within different periods.
3    Q. But they would look for the similar data,
4 the terminal face slope per year, forecasted lots at
5 24 month expiry, shelf life loss and release;
6 correct?
7    MS. HARDWAY: Object to form.
8    THE WITNESS: Not typically in the stability
9 studies would you do forecasting, necessarily, that
10 I recall in the normal stability reports. Just the
11 routine stability reports we do not -- I don't
12 recall them necessarily being reported in this
13 way.
14    Q. BY MR. KELLER: Okay.
15    A. So --
16    Q. Do you recall this analysis here -- this
17 doesn't get, this doesn't get -- this doesn't show
18 the confidence interval for these projections or for
19 this analysis, does it?
20    A. It shows the average, the number of lots,
21 and the standard deviation.
22    Q. Okay. You don't know -- you don't know if
23 that standard deviation represents the confidence
24 interval as part of that analysis or not?
25    MS. HARDWAY: Object to form.

Page 109

1    THE WITNESS: I don't.
2    Q. BY MR. KELLER: Okay. Fair enough. Let me
3 direct your attention to page 9209 under Conclusions
4 and Follow-Up Actions. And if you can just turn
5 your attention to 921 -- 9212 in the last paragraph.
6 Can I ask you to read that into the record for me.
7    A. 9209, you said.
8    Q. 9212.
9    A. 9212. I'm sorry.
10    Q. It's the final of the conclusion.
11    A. The paragraph on page 9212?
12    Q. Yeah. Starting there.
13    A. Okay. Since that report was completed, we
14 have implemented both the mumps process change,
15 increasing the target titer at a minimum -- excuse
16 me, increasing the target titer at manufacture from
17 4.9 log 10 TCID 50 per dose to 5.2 log 10 TCID 50
18 per dose, and the change in the release
19 specification for mumps, 4.3 log TCID 50 per dose to
20 5.0 log 10 TCID 50 per dose. Additionally, changes
21 in the potency assay format to reduce variability
22 have been implemented. Decreases in assay
23 variability should improve the precision of values
24 obtained during release and stability testing and
25 should allow for increased accuracy and analysis of

28 (Pages 106 - 109)

Appx19816

Page 110

1 stability slope and overall shelf life loss. The
2 observation of an increased loss in potency of
3 about, redacted, for measles and rubella and 0.17
4 log for mumps, parenthesis Table 4, over time
5 periods compared may not be predictive of future
6 stability results on lots tested in an improved
7 potency assay format and manufactured with an
8 increased mumps titer release -- mumps release titer
9 of 5.0.
10    Q. Did you draft that?
11    A. Did I draft this?
12    Q. Yes.
13    A. I don't believe so, no.
14    Q. Did you review it before it was attached to
15 the letter that you sent to CBER?
16    A. I don't recall reviewing it.
17    Q. Do you have any reason to believe that you
18 didn't review it?
19    A. I have no reason to believe I didn't review
20 it, but I don't recall doing so.
21    Q. Do you have any reason to believe that this
22 paragraph is incorrect in any way?
23    A. Honestly, I would have to go back and sort
24 of read it in context of the rest of the report to
25 answer that in the affirmative.

Page 111

1    Q. If it was incorrect -- was it your practice
2 to review submittals to CBER before you signed the
3 cover letters attaching the information?
4    A. Yes.
5    Q. Okay. And if there was -- if you found
6 something that was incorrect or inaccurate in what
7 was being presented to CBER, would you have not
8 attached that to CBER as part of a letter that you
9 signed?
10    MS. HARDWAY: Object to form.
11    THE WITNESS: If I found something that I
12 found to be inaccurate in a document, I wouldn't --
13 I would go back to the authors and the team that was
14 compiling this and make sure that it's corrected or
15 understand what the point is that's trying to be
16 made so that I could sign the document.
17    Q. BY MR. KELLER: So the fact that this was
18 attached to a submission to CBER, would that lead
19 you to believe that you didn't believe that there
20 was anything inaccurate in the statement that you
21 just read?
22    MS. HARDWAY: Object to form.
23    THE WITNESS: Yes. I think I would have
24 followed that process. I don't recall doing so, but
25 I -- that was my standard operating procedure.

Page 112

1    Q. BY MR. KELLER: Do you recall who worked on
2 the stability analysis that was attached to this
3 submission to CBER on October of 2000?
4    A. No, not -- no, I don't recall specifically
5 who the players might have been.
6    Q. Do you know who Phil Bennett is? Phil
7 Bennett?
8    A. Yes.
9    Q. Who was Phil Bennett during this time frame
10 of 2000 -- October 2000, if you recall?
11    A. I don't recall exactly which role he was in
12 at that time.
13    Q. Do you recall that he was the
14 statistician?
15    A. Yes.
16    Q. Okay. Did he work for MMD or MRL?
17    A. Both.
18    Q. Both. Okay.
19    MR. KELLER: Let me mark this next exhibit
20 as Exhibit 7.
21    (Deposition Exhibit No. 7 was marked for
22    identification.)
23    Q. BY MR. KELLER: You can set that aside, if
24 you'd like.
25    And, for the record, Exhibit 7 is a document

Page 113

1 that bears Bates stamp number 590949 through 958.
2 It's dated December 14th, 2000, from T. Schofield,
3 and, Dr. McKee, you're cc'd on this. Subject is
4 consultation with Dr. William Fairweather on vaccine
5 stability and it identifies as the attendees of this
6 meeting Phil Bennett, Jim Clair, Bill Fairweather,
7 Henrietta Grotz, G-R-O-T-Z, Cindy Morrisey
8 M-O-R-R-I-S-E-Y, Tim Schofield and Sally Wong. Do
9 you see that?
10    A. Yes.
11    Q. Are you familiar with Dr. Fairweather?
12    A. No.
13    Q. Do you recall receiving this memorandum?
14 And in the first sentence of the memorandum it says
15 a group of members of vaccine biometrics research
16 and the stability unit of bioanalytical development
17 met on Friday, November 3rd, 2000, with Dr. William
18 Fairweather, Flower Valley Consulting, Inc. to
19 discuss issues related to the interpretation of
20 vaccine stability studies at Merck. Do you see
21 that?
22    A. I see that.
23    Q. Does that refresh your memory of Merck
24 engaging Dr. Fairweather to help them with their
25 stability modeling?

29 (Pages 110 - 113)

Page 114

1      MS. HARDWAY: Object to form.
2      THE WITNESS: No. I don't recall that -- I
3 don't recall this consultation occurring.
4      Q. BY MR. KELLER: Okay. You're cc'd on this
5 document. Do you typically review documents that
6 you're cc'd on?
7      A. It depends on the document.
8      Q. Okay. This document -- this meeting
9 occurred November 3rd which is about, you know, a
10 week to 10 days after the submittal to CBER where
11 you write in Exhibit 6 that there is an apparent
12 change in the potency profile of our product. We
13 are further investigating it and you are -- you want
14 to discuss your findings at a meeting with CBER;
15 correct?
16      MS. HARDWAY: Object to form.
17      Q. BY MR. KELLER: Is that a fair summary of
18 that document?
19      MS. HARDWAY: The document is the
20 document.
21      THE WITNESS: Is this a fair summary which
22 document?
23      Q. BY MR. KELLER: Is that a fair summary of
24 Exhibit 6 as I just stated it?
25      MS. HARDWAY: I'm going to object to form.

Page 115

1 The document speaks for itself.
2      THE WITNESS: I heard you, in essence,
3 paraphrase the penultimate paragraph of this memo.
4      Q. BY MR. KELLER: Thank you. So was it
5 your -- based on that -- based on that document,
6 Merck was going to meet with CBER to discuss this
7 change in -- apparent change in the potency profile
8 which we saw earlier for mumps was an increase in
9 potency loss over a range of time. Do you recall
10 that?
11      MS. HARDWAY: Object to form.
12      THE WITNESS: Well, I would need to read
13 that, but what I think -- what we were saying here
14 is that we saw a change in the profile, and I'm not
15 clear on -- I would want to go back and -- I don't
16 recall precisely when we said what the profile was,
17 but that was just solely potency loss if there
18 wasn't some other characteristic or change in the
19 attributes of the profile, so I don't know that.
20      Q. BY MR. KELLER: So let's go back to Exhibit
21 7 which is a memo that you were cc'd on. Who is
22 Timothy Schofield or Tim Schofield?
23      A. Tim Schofield.
24      Q. I'm sorry. Schofield. I apologize.
25      A. That's okay. Tim Schofield was a

Page 116

1 statistician in, I believe, a group called Vaccine
2 Biometrics Research, which is probably what VBR
3 means here.
4      Q. And here they talk about a stability unit of
5 biologic -- bioanalytical development. What is --
6 do you understand what was meant by that?
7      A. The stability unit of bioanalytical
8 development as noted here in the first paragraph
9 refers to the stability unit that we discussed
10 earlier today which is a component of -- it's the
11 team that has responsibility for setting up the
12 studies, ensuring that the tests get performed, and
13 then subsequently reviewing and summarizing the
14 data, and as part of the ongoing stability program,
15 they are within bioanalytical development.
16      Q. And that team reported to -- ultimately to
17 you; correct?
18      A. I believe at this time this team reported to
19 Taryn Rogalski-Salter who -- I don't remember if at
20 that time Taryn reported directly to me or to
21 someone else and reported to me, but they were
22 within the scope of my organization.
23      Q. Okay. And so that may be a reason why you
24 were cc'd on this document because it was within
25 your organization. Are you typically cc'd on all

Page 117

1 documents that are generated regarding meetings with
2 consultants?
3      MS. HARDWAY: Object to form.
4      THE WITNESS: No.
5      Q. BY MR. KELLER: Do you recall -- let's go
6 through this document a little bit.
7      A. Well, just to the point about the
8 consultants just to clarify, so I don't think
9 whether I'm cc'd on a document is necessarily
10 related to whether it's a consultant. It's whether
11 someone felt that's something I should see, so it
12 could be a consultant, it could be anything else, so
13 I think it's -- what I would say, it's probably
14 irrelevant that it was with a consultant.
15      Q. BY MR. KELLER: Okay.
16      A. Okay.
17      Q. Let me turn your attention to the second
18 page of this document at 950. Can you read for me
19 the top paragraph for the record.
20      A. Sure. During the team biologics inspection,
21 it was noted that there has been a high proportion
22 of stability failures for measles and mumps potency
23 in the M-M-R family of products. Approximately 50
24 percent of stability study lots filled between 19xx
25 and 19xx display stability failures at one or more

Veritext Legal Solutions
212-279-9424         www.veritext.com         212-490-3430

Page 118

1 time points, and that these failures have increased
2 in frequency recently relative to past experience.
3 See figure in Attachment 2. While many of these
4 failures can be accounted for through historically
5 lower mumps fill levels of M-M-R vaccines, there
6 continues to be an unacceptable risk of current
7 product failure. This has serious implications for
8 the vaccines, potentially culminating in a recall or
9 branding of the M-M-R family of vaccines.
10    Q. So when Mr. Schofield is writing this memo
11 and cc'g you, you testified that if something was
12 important that you would get memos. Mr. Schofield's
13 statement here that there continued to be an
14 unacceptable risk of current product failure, that
15 would have been important for you to know;
16 correct?
17        MS. HARDWAY: Object to form.
18        THE WITNESS: I don't know -- you know, I
19 think that's a good question for Tim. I don't know
20 exactly what he was -- you know, what he was
21 necessarily thinking here, but -- what he was
22 thinking here.
23    Q. BY MR. KELLER: Right. Does this refresh
24 your memory that you saw this document?
25    A. No --

Page 119

1    Q. Okay.
2    A. -- actually.
3    Q. Do you have any reason to believe that --
4 what's your opinion of Dr. Schofield? Is he -- do
5 you believe he's a competent statistician?
6    A. Tim was a colleague of mine who supported
7 the efforts and I had no reason to question his
8 capability and his role.
9    Q. If Mr. Schofield is saying that there
10 continues to be an unacceptable risk of current
11 product failure as a result of these recent increase
12 in stability failures, does that surprise you to see
13 this memo?
14        MS. HARDWAY: Object to form.
15        THE WITNESS: I think what would be useful
16 for me would be to sort of read the context of how
17 this paragraph is being positioned relative to the
18 rest, so it's hard to speculate anything about it
19 and without --
20    Q. BY MR. KELLER: Sure.
21    A. -- without giving it a review.
22    Q. Go ahead and take a review of it.
23    A. Okay.
24        MR. KELLER: Why don't we go off the record
25 while you do that.

Page 120

1        VIDEOGRAPHER: We are going off the record.
2 The time is 12:26 p.m.
3        (Brief break taken.)
4        THE VIDEOGRAPHER: We are back on the
5 record. The time is 12:30 p.m.
6    Q. BY MR. KELLER: Doctor, you've had a chance
7 to review Exhibit 7. Does that help you refresh
8 your memory that you had seen this memo in the
9 past?
10    A. I actually don't recall this memo. I don't
11 recall it.
12    Q. Okay. And you testified earlier that you,
13 know, it would not surprise you for Schofield to
14 submit a memo to you if he -- of something that
15 was -- strike that.
16        Do you recall any discussions at Merck
17 regarding Mr. Schofield's characterization that
18 there continues to be an unacceptable risk of
19 current product failure?
20        MS. HARDWAY: Object to form. Overbroad.
21        THE WITNESS: I was engaged in a number of
22 meetings with Tim and other colleagues and mumps and
23 the mumps stability profiles were a subject of some
24 of those meetings, so, yes.
25    Q. BY MR. KELLER: In fact, you recall meeting

Page 121

1 with Tim Schofield -- or at a meeting with Tim
2 Schofield where he presented a presentation where
3 you concluded that a BPDR had to be issued, didn't
4 you, regarding the mumps product?
5        MS. HARDWAY: Object to form.
6        THE WITNESS: I don't recall that
7 specifically. I don't recall that specifically.
8    Q. BY MR. KELLER: Here Mr. Schofield states:
9 This has serious implications for these vaccines
10 potentially culminating in a recall. Do you see
11 that?
12    A. Yes.
13    Q. And here he's talking about current product
14 failure; correct?
15        MS. HARDWAY: Object to form. She's already
16 told you she's -- this is not her document and she
17 doesn't remember it.
18    Q. BY MR. KELLER: Let me back up and strike
19 that question.
20        Have you -- do you recall ever having
21 discussions at Merck regarding the mumps products
22 stability where there was discussions about recall
23 of that product from the market?
24        MS. HARDWAY: Object to form.
25        THE WITNESS: I don't recall discussions

31 (Pages 118 - 121)

Appx19819

Page 122

1 debating whether or not product should be recalled,
2 necessarily. No, I don't. I don't.
3      Q. BY MR. KELLER: When Mr. Schofield --
4 Schofield states here this has serious implications
5 for these vaccines potentially culminating in a
6 recall or branding of the M-M-R family of vaccines,
7 what do you understand what he meant by the term
8 branding?
9      MS. HARDWAY: Object to form. This isn't
10 her document. She's already told you she doesn't
11 remember it. And let me just say for the record
12 that to your point earlier about --
13      MR. KELLER: I don't need your -- I don't
14 need your running commentary.
15      MS. HARDWAY: You made a comment on the
16 record about extending this a second day, so I'm
17 entitled to respond to that now that we are getting
18 into multiple questions asking her to interpret a
19 document that she didn't author, that she's told you
20 she didn't remember, so I'm just putting it out
21 there that to the extent you want to spend your time
22 with questions like that is certainly not going to
23 warrant any kind of argument for a second day.
24      MR. KELLER: I will take it up with the
25 Court.

Page 123

1      Q. BY MR. KELLER: Doctor, from your 25 years
2 of experience in manufacturing quality --
3      A. Uh-huh.
4      Q. -- what do you understand the term branding
5 to mean?
6      MS. HARDWAY: Object to form and
7 foundation.
8      THE WITNESS: That's actually not a term
9 used in the manufacturing environment.
10      Q. BY MR. KELLER: Okay. Did you ever hear the
11 term misbranding? Strike that.
12      Have you ever heard the term that a product
13 may be termed misbranded if it doesn't meet its
14 specifications?
15      A. I believe in -- there may be some reference
16 in regulations on that language, but I don't
17 remember those specifically.
18      Q. Fair enough. There is a reference here to
19 an active stability monitoring protocol on the first
20 page.
21      A. Uh-huh.
22      Q. Do you know, was there an active stability
23 monitoring program at Merck during this time
24 frame?
25      A. Yes.

Page 124

1      Q. Can you describe for me what that is, an
2 active stability monitoring program?
3      A. That -- to the best of my recollection,
4 that's a term that was applied to improvements in
5 the stability program that were made over time to
6 make them more -- make it more responsive to sort of
7 the contemporary expectations.
8      Q. When you say contemporary expectations, what
9 do you mean by that?
10      A. What I mean is that historically for years
11 stability -- stability monitoring is something that
12 was always done, but how it was done and the
13 approaches that were taken have become more
14 sophisticated and more tailored over time depending
15 upon the product, and so what was acceptable many
16 years ago is not necessarily acceptable today for a
17 whole variety of reasons, and so this active
18 stability monitoring is a reflection of Merck's
19 effort to respond to those expectations and
20 dialogues with CBER, et cetera, and how the program
21 was changed to respond to that.
22      Q. Did that program, did it project that
23 whether or not a -- strike that.
24      Did it make projections about whether or not
25 the product would meet specification for all lots

Page 125

1 that were released to the market?
2      A. I don't recall specifically what those
3 reports were. I didn't necessarily receive the
4 individual reports. As I mentioned, this was a team
5 which reported into someone who -- and, again, I
6 don't recall whether she reported directly to me or
7 indirectly to me at that time.
8      MR. KELLER: Okay. Let me mark this next
9 Exhibit as Exhibit 8.
10      (Deposition Exhibit No. 8 was marked for
11 identification.)
12      Q. BY MR. KELLER: For the record, Exhibit 8 is
13 a document that's bears Bates stamp numbers 1 -- I'm
14 sorry. 331641 through 45. And there is a memo in
15 the first three pages dated October 31st from Manal
16 Morsy to a host of folks, and there is also a series
17 of e-mails and these were produced from Bonita
18 Stancosi's files, but I want to direct your
19 attention to the e-mails on 1644 and 1645. And let
20 me direct your attention to the earliest e-mail
21 dated October 31st, 2000. And here --
22      MS. HARDWAY: Can you just give her a chance
23 to look at the -- get herself familiar.
24      MR. KELLER: Sure. I'm just stating for the
25 record. I'm still not finished stating for the

32 (Pages 122 - 125)

Appx19820

Page 126

1 record. For the record, this October 31st, 2000
2 e-mail was sent from T-A-R-Y-N Rogalaski-Salter to
3 you, Dr. McKee, and Rosolowsky regarding BPC
4 emerging issues.
5    Q. BY MR. KELLER: Doctor, do you recall
6 receiving this e-mail?
7       MS. HARDWAY: Give her a minute to take a
8 look now. Yeah.
9       THE WITNESS: No.
10    Q. BY MR. KELLER: Okay. What is the BPC?
11    A. This was a governance body co-chaired by
12 senior leaders in Merck Manufacturing and Merck
13 Research Laboratories.
14    Q. Were you a member of the BPC?
15    A. I was.
16    Q. And what does BPC stand for?
17    A. The B stands for Biologics. I'm not sure if
18 it was Biologics Product Committee or something like
19 that. I don't know for sure.
20    Q. And so here this e-mail says: Roberta, I
21 don't know if you are checking messages, but two
22 important issues came up yesterday at BPC emerging
23 issues. Number one, can you read number one for
24 me?
25    A. Mumps stability - Dorothy/Mike King gave you

Page 127

1 the assignment to detail what our approach will be
2 to the apparent increase in loss rate of our recent
3 mumps lots, e.g. overfill? Wait for the clinical
4 trial? How to play the issue with CBER when we get
5 a response to our request for a meeting. This is
6 not a surprise as we, quote, unquote, own the
7 regulatory piece. The issue of dealing with the
8 compliance group versus the product group was raised
9 and what is acceptable by one based on sound science
10 may not be sufficient for the compliance folks.
11    Q. Now that you've read that, does this help
12 refresh your memory about whether or not you
13 received this e-mail?
14    A. It doesn't help.
15    Q. Do you have any reason -- you don't have any
16 reason to believe you didn't receive it, though;
17 correct?
18    A. No.
19    Q. Was it your practice when you got e-mails to
20 review them?
21    A. Eventually.
22    Q. Okay.
23    A. I got a lot of them.
24    Q. I think we all do.
25       Here, this reference to Dorothy, is that

Page 128

1 Dorothy Margolskee?
2    A. I believe so, yes.
3    Q. And who was Dorothy Margolskee at this time
4 frame?
5    A. I don't recall her position, but she was a
6 senior leader in the Merck Research Laboratories.
7    Q. Okay. And who is Mike King?
8    A. Mike King, I believe, was the -- a senior
9 leader. Senior leader in charge of several
10 functions, including technology, manufacturing
11 technology.
12    Q. Was it typical for Dorothy Margolskee and
13 Mike King to give you assignments?
14    A. They were the chairs. I believe they at
15 that time were the co-chairs of the BPC.
16    Q. Okay. Let me -- if you can look at the --
17    A. So probably because Taryn is sending me this
18 note. I didn't attend this meeting, so I don't have
19 the context of that because otherwise I would know.
20 I would have gotten an assignment.
21    Q. Can you -- on November 1st you write an
22 e-mail back to Taryn, Ronald, S-A-L-E-R-N-O, and
23 Mark Rosolowsky regarding this BPC emerging issues
24 and you cite the importance is high and you write --
25 can you read what you wrote?

Page 129

1    A. Ron, number one -- or regarding number one,
2 Ron, please coordinate detailing the options we have
3 for moving forward in light of the mumps stability
4 data. We need to get a cross-functional group (high
5 level) together to assess the options and finalize
6 our strategy in preparation for an upcoming meeting
7 with CBER. Target the week of the 13th for the
8 group review. This is a very high proprietary. If
9 this interferes with other commitments and you
10 cannot resolve, please bring these to my attention.
11 Roberta.
12    Q. What is a cross-functional group? What did
13 you understand cross-functional group to mean when
14 you wrote this?
15    A. To mean representatives from relevant
16 knowledgeable -- from relevant functions
17 knowledgeable on the subject matter.
18    Q. And so here it's on the mumps stability
19 data. The results of mumps stability data. You
20 were looking for cross-functional folks that were
21 relevant and knowledgeable on the mumps stability;
22 correct?
23       MS. HARDWAY: Object to form.
24       THE WITNESS: Yes.
25    Q. BY MR. KELLER: Okay. And what did you mean

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1 by high level?
2     A. I'm not exactly sure what I meant when I
3 said that. At this point I'm not -- I'm not sure
4 exactly what I meant.
5     Q. Is high level, does it -- did you -- could
6 it have been you wanted senior management from these
7 relative -- relevant and knowledgeable folks to
8 participate in this cross-functional group?
9     MS. HARDWAY: Object to form.
10     THE WITNESS: I think it's fair to say for
11 me what -- that I meant, you know, the people that
12 sort of a manager level or up who would have
13 knowledge, not necessarily someone who might be
14 doing more transactional work.
15     Q. BY MR. KELLER: Okay. Do you recall that
16 cross-functional group being put together of
17 managers to address this issue of the increase in
18 stability loss for the mumps products?
19     A. I don't necessarily recall it, no.
20     MR. KELLER: Let me mark this next exhibit
21 as Exhibit 9.
22         (Deposition Exhibit No. 9 was marked for
23         identification.)
24     Q. BY MR. KELLER: For the record, Exhibit 9 is
25 a document that bears Bates stamp numbers 1896274

Page 131

1 through 75. It's a memo from Bonnie
2 S-T-A-N-K-U-N-A-S, Biologic Licensing, to meeting
3 attendees. Minutes, November 10th, 2000 meeting
4 regarding preparation for a discussion with CBER on
5 the statistical analysis of mumps potency stability,
6 and it's cc to Keith Chirgwin, you, Dr. McKee, Manal
7 Morsy, Tim O-B-A-R-A, Chris Petroski and Henrietta
8 Ukwu. And can you take a minute to look at this
9 memo and recall whether or not you recall receiving
10 this memo?
11     A. Okay. I have taken a look.
12     Q. In Exhibit 8 you were assigned to come up
13 with an approach how to deal with this apparent
14 increase in loss rates. Is the folks at this
15 meeting -- or is this the meeting where the
16 cross-functional group at high level was -- met to
17 come up with a path forward for options as to how to
18 deal with the upcoming meeting with CBER regarding
19 mumps stability data?
20     MS. HARDWAY: Object to form.
21     THE WITNESS: I don't know if this,
22 necessarily, is the same group of people that I was
23 referring to here in my note to Ron, but I read this
24 document as that this group of people were putting
25 together a strategy for the meeting agenda that we

Page 132

1 would have with CBER and how to prepare for it and
2 to have -- and discuss these topics. That's my
3 understanding.
4     Q. BY MR. KELLER: Do you recall, now that
5 you've read this memo, that you recall receiving
6 this -- reviewing this memo in the past?
7     A. Again, it's a long time ago. I don't recall
8 this specific memo, no.
9     Q. Do you have any reason to believe that you
10 didn't receive it and review it when you received
11 it?
12     A. I have no reason to believe that I didn't
13 receive it.
14     Q. I mean, they are putting together a path
15 forward for a -- can you go read the first paragraph
16 of this memo.
17     A. Starting with the meeting?
18     Q. Yes.
19     A. A meeting was held with Kati Abraham, Phil
20 Bennett, Peggy Carson, John Dingerdissen, Mark
21 Galinski, John Hennessey, Cindy Morrisey, Taryn
22 Roglaski-Salter, Mark Rosolowsky, Ron Salerno, Tim
23 Schofield, Alan Shaw, Scott Thaler and Bridget
24 Wright on 11/10/00 to discuss path forward in
25 preparation for a discussion with CBER regarding the

Page 133

1 statistical analysis of mumps potency stability
2 forwarded to CBER in an October 24, 2000
3 communication.
4     Q. So these folks -- is it your understanding
5 these folks based on this memo were put together to
6 come up with a path forward as to how to discuss the
7 results that were submitted in October of 2000 to
8 CBER?
9     MS. HARDWAY: Object to form.
10     Q. BY MR. KELLER: Let me back up. Does this
11 lead you to believe that these folks are, in fact,
12 coming up with a path forward as to how to deal with
13 these -- this statistical stability data of the
14 increase that you had -- was referenced in your
15 November 1st, 2000 e-mail?
16     MS. HARDWAY: Object to form.
17     THE WITNESS: So I'm reading -- I'm reading
18 from this document, which it appears to me that what
19 this group was doing was putting together an outline
20 of an upcoming meeting with the agency and how we
21 wanted to use the time with them, would go down
22 these -- and was broken down into these elements.
23     Q. BY MR. KELLER: Would that be something that
24 you would be -- would be involved in, discussing
25 stability data with CBER?

34 (Pages 130 - 133)

Appx19822

Page 134

1    A.  Eventually, or I have discussed stability --
2  or been in conversations with -- and meetings with
3  CBER where stability data was discussed.
4    Q.  Okay.  Can you read to me the first bullet
5  point after it says:  A strategy for a meeting
6  agenda was discussed as follows, to find the
7  observed differences in product stability.  Can you
8  read that bullet point to me for the record.
9    A.  A statistical analysis of mumps potency --
10  or, well, I'm sorry.  Define the observed
11  differences in product stability.  A statistical
12  analysis of mumps potency stability requested by
13  CBER in the teleconference of 8/11/00 showed that
14  the average potency loss for mumps over 24 months is
15  approximately 0.7 log 10 TCID 50 for the past five
16  years versus a potency loss of 0.55 log 10 TCID 50
17  over the previous five-year period.  Cindy Morrisey,
18  or C. Morrisey, presented BPC slides summarizing the
19  observation.  Based on this potency loss analysis,
20  some of the lots filled at the new target may fall
21  below 4.3 log 10 TCID 50 prior to product expiry.
22    Q.  So this reference to new target, that's
23  after the overfill that happened in September of
24  1999; correct?
25    MS. HARDWAY:  Object to form.

Page 135

1    THE WITNESS:  You're referring to in this
2  paragraph?
3    Q.  BY MR. KELLER:  Yes, the last sentence.
4    A.  Over the previous -- over the past five
5  years.
6    Q.  And based on this potency loss analysis,
7  some of the lots filled at the new --
8    A.  Oh.
9    Q.  -- target titer may fall below 4.3 log prior
10  to product expiry.  Do you see that?
11    A.  I see that sentence, yes.
12    Q.  So what do you understand that sentence
13  means based on your 25 years of experience and being
14  intimately involved in the communication with CBER
15  around the stability models and data?  What do you
16  understand that to mean?
17    MS. HARDWAY:  And I'm just going to object
18  to form and foundation that she didn't write this
19  document.
20    MR. KELLER:  Go ahead.
21    THE WITNESS:  What I believe -- or what I --
22  the way I interpret that sentence is that if you --
23  if this model, this -- if that statistical analysis
24  is representative of the product, then the following
25  could occur.  It says it may occur.

Page 136

1    Q.  BY MR. KELLER:  Right.
2    A.  So I'm just reading it literally.
3    Q.  But for the new target, that's for product
4  after the overfill; correct?
5    MS. HARDWAY:  Object to form.
6    Q.  BY MR. KELLER:  Strike that.  When I say
7  overfill, you understand that as part of that
8  September 1999 PAS that was filed, they increased
9  the amount of mumps in every dose; correct?
10    A.  The target potency, yes, was increased.
11    Q.  Do you understand that to be the overfill as
12  the term used at Merck?
13    A.  Not necessarily.  I always use the word
14  target, whatever the target was.
15    Q.  So this reference to new target, that's the
16  new target that was increased from 4.9 to 5.2;
17  correct?
18    A.  I believe so.
19    Q.  And so here the statistical analysis is
20  projecting that some of these lots that are filled
21  after the target had been increased from 4.9 to 5.2
22  may fall below the end expiry specification of 4.3
23  at 24 months; correct?
24    MS. HARDWAY:  Object to form and
25  foundation.

Page 137

1    THE WITNESS:  Well, what this document is
2  doing is Bonnie Stankunas is reporting, I presume,
3  what Cindy or some others in this meeting concluded
4  from that analysis.  I don't know.  I wasn't at the
5  meeting, so I can't -- I don't have the context
6  around the depth of the conversation.
7    Q.  BY MR. KELLER:  Sure.  Let me direct your
8  attention to the next page.  This is -- let me
9  strike that.
10    This is the type of memo that you would
11  review in the ordinary course of your job duties, a
12  discussion about a potential product being released
13  that may fall below the specification of the
14  product; correct?
15    MS. HARDWAY:  Object to form.
16    THE WITNESS:  What I would say is I might
17  get this memo.  The way I would operate is I would
18  probably really having realtime conversations with
19  the people who were there.
20    Q.  BY MR. KELLER:  Okay.
21    A.  And, you know, that's where I could ask my
22  own follow-ups and seek to understand information,
23  rather than just taking it this and only this to
24  understand, you know, what transpired and what the
25  thinking was, et cetera.

35 (Pages 134 - 137)

Page 138

1    Q. Sure. As of the date of this memo, November
2 10th -- I mean, of this meeting, November 10th,
3 2000, do you recall any discussion about Merck's
4 then -- after the increase of the titer from 4.9 to
5 5.2 that its then released products may fail to meet
6 the end expiry specification?
7        MS. HARDWAY: Object to form. Overbroad.
8        THE WITNESS: I don't recall specific
9 conversations. If I understand your question
10 correctly, I don't understand -- I don't recall
11 specific conversations about that.
12    Q. BY MR. KELLER: Do you recall general
13 conversations about Merck releasing product after
14 the increase in titer from 4.9 to 5.2 that its
15 product may not meet specification at end expiry for
16 mumps?
17        MS. HARDWAY: Object to form and foundation.
18        THE WITNESS: I don't recall conversations,
19 you know, knowingly releasing product that we didn't
20 have confidence was going to meet specification.
21    Q. BY MR. KELLER: Okay. Let me direct your
22 attention to the next page, and it's the second
23 bullet point from the top. It says -- can you read
24 that for me?
25    A. Issue is one of compliance. Reporting error

Page 139

1 and accident reports for OOS stability values.
2    Q. What does OOS stand for based on your
3 experience at Merck?
4    A. Out of specification.
5    Q. What is an out of specification?
6    A. A result that doesn't meet the established
7 specification.
8    Q. Okay. And here, this is one of compliance,
9 reporting errors and accident reports. That was the
10 procedure in place before the BPDR's; correct?
11        MS. HARDWAY: Object to form.
12        THE WITNESS: There was -- prior to BPDR's,
13 there was a different -- or the error and accident
14 regulation was revised and -- into the biologic
15 product deviation reporting.
16    Q. BY MR. KELLER: So this issue is one of
17 compliance. Was that something that was under your
18 responsibility at MMD compliance with product
19 specification?
20        MS. HARDWAY: Object to form and
21 foundation.
22        THE WITNESS: I'm not actually sure what
23 Bonnie meant in that context here.
24    Q. BY MR. KELLER: But --
25    A. So --

Page 140

1    Q. As part of your job duties, did you have the
2 duty with regard to compliance with the product
3 specification and reporting out of compliance
4 product to CBER?
5        MS. HARDWAY: Object to form.
6        THE WITNESS: If -- so if we obtained
7 results that were out of specification, we were
8 obligated to report them, and those reports would
9 come from my office and oftentimes from me
10 personally.
11    Q. BY MR. KELLER: Okay. In here under the
12 proposed path forward, it lays out six different
13 proposals. Do you see that?
14    A. I do.
15    Q. And so the last proposal was to short date
16 the product. What do you understand short dating to
17 mean?
18        MS. HARDWAY: Object to form and
19 foundation.
20        THE WITNESS: Again, I didn't write this
21 document, so I think -- I interpret that as the --
22 to revise the expiry, the shelf life period.
23    Q. BY MR. KELLER: Under three it says file
24 urea stabilizer. Is that a stabilizer that would
25 increase the stability of the product -- strike

Page 141

1 that.
2        What do you understand this urea stabilizer
3 to mean --
4        MS. HARDWAY: Object to form.
5    Q. BY MR. KELLER: -- based on your experience
6 at Merck?
7        MS. HARDWAY: Object to form and
8 foundation.
9        THE WITNESS: I don't recall the specifics
10 of the GWS33/urea stabilizer and the specifics of
11 that.
12    Q. BY MR. KELLER: Do you recall there being
13 any discussions during this time frame to increase
14 the stability of the mumps product by changing the
15 stabilizer that is used in the product?
16        MS. HARDWAY: Object to form.
17    Q. BY MR. KELLER: To decrease the potency loss
18 over the life of the shelf -- of the product over
19 its shelf life?
20        MS. HARDWAY: Object to form.
21        THE WITNESS: I recall in the broader
22 context across this discussion -- of these
23 discussions of M-M-R evaluating the stabilizer.
24    Q. BY MR. KELLER: Evaluating, determining
25 whether or not a new stabilizer would be

36 (Pages 138 - 141)

Appx19824

Page 142

1 implemented?

2    A. As a process improvement, right. Is

3 there -- is there -- to provide greater assurance

4 for the product.

5    Q. Okay. Assurance as to what?

6    A. To provide greater assurance that it

7 continues to meet specification.

8    MR. KELLER: Thank you. Why don't we break

9 for lunch. This is a good time.

10    THE VIDEOGRAPHER: This concludes media

11 number two in the continuing deposition of Roberta

12 McKee. We are going off the record. The time is

13 1:02 p.m.

14    (WHEREUPON, a lunch break was taken from

15    1:02 p.m. to 2:11 p.m.)

16    THE VIDEOGRAPHER: This is the beginning of

17 media number three in the continuing deposition of

18 Roberta McKee. We are back on the record. The time

19 is 2:11 p.m.

20    MR. KELLER: Dr. McKee, I'd like to mark as

21 the next exhibit a document Bates numbered 286728

22 through 29 as Exhibit 10.

23    (Deposition Exhibit No. 10 was marked for

24    identification.)

25    Q. BY MR. KELLER: And for the record, Exhibit

Page 143

1 10 is an e-mail from Linda Schaffer dated Wednesday,

2 December 20th, 2000, to a laundry list of folks.

3 Dr. McKee, you're listed as a recipient of this.

4    And I'm going to mark as Exhibit 11 an

5 attachment to that e-mail.

6    (Deposition Exhibit No. 11 was marked for

7    identification.)

8    MR. KELLER: Which is Exhibit 11, bearing

9 Bates stamp number 286794 through 805 entitled Mumps

10 Stability Background, Attachment 6.

11    And if you look at Exhibit 10, the subject

12 is December 8th, 2000 BPC technology transfer

13 summary, and it says: Please find the draft summary

14 of the 08Dec00 BPC technology transfer meeting

15 attached below for your revisions, and Attachment 6,

16 and it attaches a memo -- they didn't copy it. Hold

17 on one second. Can you see if you can find -- thank

18 you. Exhibit 12 is the memo attached.

19    (Deposition Exhibit No. 12 was marked for

20    identification.)

21    Q. BY MR. KELLER: Which bears Bates stamp

22 number 286730 through 35.

23    A. Okay.

24    Q. And I apologize for how these were produced.

25 But do you recall participating in a biologics

Page 144

1 process council meeting on December 8th, 2000?

2    A. No.

3    Q. Do you have reason to believe that you

4 didn't attend that meeting?

5    A. No.

6    Q. If you look on Exhibit 12 in the memo, at

7 286730, the first page of it, it identifies you as

8 one of the attendees to that meeting?

9    A. Yes.

10    Q. Does that lead you to believe that you

11 participated in this biologics process council

12 meeting?

13    A. Yes.

14    Q. Okay. And if you draw your attention to

15 page 5 of that memo at 286734, under Recent CBER

16 Regulatory Inspection Trends, Dr. McKee, you're

17 identified as having provided a discussion about

18 that as well as providing Attachment 6. Do you see

19 that?

20    MS. HARDWAY: Object to form.

21    Q. BY MR. KELLER: Let me back up a second. On

22 286734 where it says recent CBER regulatory

23 inspection trends, do you recall giving a

24 presentation to the BPC about that topic?

25    A. No.

Page 145

1    Q. Do you have reason to believe that you

2 didn't provide that presentation?

3    MS. HARDWAY: Object to form.

4    THE WITNESS: No.

5    Q. BY MR. KELLER: The last page under BPC

6 assignments at 286735, number one, it says Dr. R.

7 McKee provided an update on issues identified in

8 lesson learned to BPC February 2001 as well as

9 planned to communicate the issues to all teams.

10    Do you recall what was discussed, what that

11 assignment was?

12    A. No, I don't.

13    Q. Do you know who -- if you look on in Exhibit

14 11, which is the attachment to this memo, Exhibit

15 12, Attachment 6 in the upper right-hand corner,

16 mumps stability background?

17    A. You mean the attachment to Exhibit 10?

18    Q. Yes.

19    A. Yeah. Okay.

20    Q. Which Exhibit 11 is an attachment -- Exhibit

21 12 is an attachment to Exhibit 10, and Exhibit 11 is

22 an attachment to Exhibit 12.

23    A. Got it.

24    Q. Got it. So do you recall preparing this

25 mumps stability background presentation?

37 (Pages 142 - 145)

Page 146

1    MS. HARDWAY:  Object to form and
2 foundation.
3    THE WITNESS:  No.
4    Q. BY MR. KELLER:  Do you have any reason to
5 believe that you didn't present these slides to the
6 BPC council on December 8, 2000?
7    MS. HARDWAY:  Object to form and
8 foundation.
9    THE WITNESS:  I don't recognize this, so I
10 don't know that I gave this presentation, offhand.
11    Q. BY MR. KELLER:  If you look at the attendees
12 on Exhibit 12 at 286730, is there anybody else there
13 that would have given this presentation on your
14 behalf?
15    A. When I look at document Exhibit No. 12,
16 which I believe are the minutes from this meeting,
17 and you're saying this was a presentation at this
18 meeting, it looks like Dr. Ron Salerno presented
19 Attachment 6.
20    Q. And then you look on number 4 below that,
21 CBER recent regulatory inspection trends, also
22 Attachment 6.
23    A. Okay.
24    Q. So did you both present off of this
25 PowerPoint presentation?

Page 147

1    A. I don't recall that.
2    Q. Do you have any reason to believe that you
3 didn't present partially on this presentation?
4    A. I don't recall presenting it, so I just
5 don't recall.
6    Q. Was it -- did you typically -- you went to
7 this meeting, though, according to the meeting
8 minutes; correct?
9    A. Yes.
10    Q. Okay.  If you look on Exhibit 11, the
11 attachment on the second page, 286795, there is a
12 issue -- a list of key issues results of statistical
13 analysis.  Do you see that?
14    A. Yes.
15    Q. Do you recall discussing that recent trend
16 in potency loss that was reported in October of 2000
17 at this meeting?
18    A. No.
19    Q. Do you have any reason to believe that you
20 didn't -- that this wasn't discussed at that
21 meeting?
22    MS. HARDWAY:  Object to form and
23 foundation.
24    THE WITNESS:  I have no reason to believe
25 anything about what was specifically presented,

Page 148

1 so --
2    Q. BY MR. KELLER:  Well, do you -- it's
3 attached to the memo --
4    A. Uh-huh.
5    Q. -- as being a summary of that meeting
6 minutes; correct?  Exhibit 12 is a summary of the
7 meeting minutes?
8    A. Yes.
9    Q. And attached to that is this attachment.
10 Does that lead you to believe that these slides were
11 presented at this meeting?
12    A. Yes.
13    Q. Okay.  You just don't recall specifically as
14 you sit here today; correct?
15    A. Correct.
16    Q. Okay.  If you look on page 286797 under
17 Current Action Plans, it says:  File error and
18 accident reports for lots of M-M-R II on stability
19 that fall below 4.3 log within 24 months.  Do you
20 see that?
21    A. Yes.
22    Q. Is that something that you would personally
23 sign those reports?
24    A. I don't believe I ever filed an error and
25 accident report.

Page 149

1    Q. Did you ever file BPDR's?
2    A. I did.
3    Q. And it says follow-up submission of October
4 24th with a teleconference with CBER to discuss
5 proposed path forward presented in the next few
6 slides.  Do you see that?
7    A. Yes.
8    Q. So those are the -- we had seen memos
9 earlier discussing proposed path forward to discuss
10 with CBER.  Do you recall discussing those proposed
11 options as topic areas to discuss with CBER as a
12 result of that October 24, 2000 submission to
13 CBER?
14    MS. HARDWAY:  Object to form.
15    THE WITNESS:  I don't recall this meeting
16 and these particular conversations, no, as I sit
17 here today.
18    Q. BY MR. KELLER:  Do you recall any discussion
19 on the next page regarding mumps stability that no
20 additional change in manufacturing titer above the
21 5.2 target in effect now is recommended at this time
22 pending.  Do you see that?
23    A. Yes.
24    Q. And so the first --
25    A. I see the sentence, so --

38 (Pages 146 - 149)

Page 150

1    Q. The first point says: Results of the
2 interim analysis of the mumps expiry trial on mumps
3 at lowering the target titers 4.0 and 3.7 log that
4 are available in the first -- Q1, 2001. Do you see
5 that?
6    A. Yes.
7    Q. Do you recall a discussion of -- that
8 regarding the submission of those interim analysis
9 results to CBER as -- in connection with the -- the
10 meetings at CBER, you were having with CBER
11 regarding stability issues on mumps?
12    MS. HARDWAY: Objection; vague and
13 overbroad.
14    THE WITNESS: I don't -- I don't recall
15 these discussions, no.
16    Q. BY MR. KELLER: If you look on page 286800
17 under Mumps Stability Proposed Path Forward
18 continued, it says: If the expiry -- interim expiry
19 titer clinical results are questionable, potential
20 actions and their implications may include, and the
21 first bullet point is short day product propose 18
22 months. Do you see that?
23    A. Yes.
24    Q. Do you recall any discussion in this time
25 frame where Merck was considering reducing the shelf

Page 151

1 life of its mumps products because of the stability
2 issues that it was seeing in current product?
3    MS. HARDWAY: Object to form. Overbroad.
4    THE WITNESS: So this time frame is 2000?
5    Q. BY MR. KELLER: Yes. This is December 8th,
6 2000.
7    A. No, I don't -- I don't recall any
8 conversations on that.
9    Q. Are you surprised to see that one of the
10 options here is to -- is to change the
11 specifications from 24 months down to 18 months?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: I don't -- I don't really have
14 any reaction to it, necessarily.
15    MR. KELLER: All right. Let's move on to
16 the next document. I'm going to mark as Exhibit
17 13.
18    (Deposition Exhibit No. 13 was marked for
19    identification.)
20    Q. BY MR. KELLER: Doctor, Exhibit 13 is a
21 document with a Bates No. Public 666 through 670
22 which is a warning letter from CBER to you,
23 Dr. McKee, dated February 9, 2001, and I will
24 represent to you that Merck had produced a copy of
25 this document, only heavily redacted, bearing Bates

Page 152

1 stamp numbers 209399 through 403. Can you tell me
2 if you have ever seen this warning letter before?
3    A. Yes.
4    Q. Okay. And what is a warning letter?
5    A. A warning letter is a communication from the
6 agency expressing their concerns outside of the
7 inspection setting with regard to observations at
8 the firm.
9    Q. Okay. Can you read the first paragraph of
10 the warning letter for the record, please.
11    A. The Food & Drug Administration (FDA)
12 conducted an inspection of your facility located at
13 Summneytown Pike, West Point, Pennsylvania, between
14 August 14th and October 11th, 2000. During the
15 inspection our investigators documented significant
16 deviations from the applicable standards and
17 requirements of section 502(a)(2)(B) of the Federal
18 Food Drug & Cosmetic Act (FD&C Act), and Title 21
19 Code of Federal Regulations (21 CFR), parts 211 and
20 600-680 as follows.
21    Q. And there is several observations that are
22 made as part of this letter; correct?
23    A. Correct.
24    MS. HARDWAY: Object to form.
25    Q. BY MR. KELLER: And so in your 17 years at

Page 153

1 Merck, had you seen in your head of quality job
2 duties a warning letter documenting significant
3 deviations?
4    MS. HARDWAY: Object to form.
5    THE WITNESS: In my 17 years at Merck?
6    Q. BY MR. KELLER: Yes.
7    A. I saw this warning letter.
8    Q. Any other warning letters?
9    A. Not to my recollection.
10    Q. Okay. So this was a -- did you consider
11 this a significant event with respect to your job
12 duties as overseeing the quality of the vaccine
13 products?
14    MS. HARDWAY: Object to form.
15    THE WITNESS: This is a significant event.
16    Q. BY MR. KELLER: Okay. When here it says
17 significant deviations, do you have an understanding
18 what that means?
19    A. No. That's not a term I'm used to seeing in
20 these -- in FDA communications.
21    Q. Can you turn your attention to page 3 at
22 668, observation -- well, number six. Can you read
23 that statement into the record.
24    A. Number six?
25    Q. Yeah.

39 (Pages 150 - 153)

Page 154

1    A.  Failure to describe in any annual report any
2  changes in the production process or test methods
3  that have a minimal potency -- excuse me, a minimal
4  potential to have an adverse effect on the identity,
5  strength, quality, purity or potency of the product
6  as they relate to the safety or effectiveness of the
7  product (21 CFR 601.12(d)) in that the Director,
8  Center for Biologics Evaluation and research was not
9  notified of the change in passage level of redacted
10  cells used for potency determination of measles and
11  mumps virus vaccines.
12    Q.  So the question for you is this statement
13  where it says test, failure to describe an annual
14  report any changes in the production process or test
15  methods.  What do you understand as test methods to
16  be meant by that CFR?
17    A.  Test --
18    Q.  Let me back up.  You responded to this
19  warning letter; correct.
20    MS. HARDWAY:  Object to form.
21    THE WITNESS:  Yes.  A response was prepared
22  and submitted to this warning letter.
23    Q.  BY MR. KELLER:  You were intimately involved
24  in that response, weren't you?
25    MS. HARDWAY:  Object to form.

Page 155

1    THE WITNESS:  I was.
2    Q.  BY MR. KELLER:  You helped draft that
3  response, didn't you?
4    A.  Yes.
5    Q.  You went through several drafts before you
6  finalized that response letter; correct?
7    MS. HARDWAY:  Object to form.
8    THE WITNESS:  I believe so, yes.
9    Q.  BY MR. KELLER:  Did you review those drafts
10  before?
11    A.  I believe so, yes.
12    Q.  Okay.  And so part of your job was to
13  understand what the warning letter said, correct, as
14  part of your job duties as head of quality?
15    A.  Yes.
16    Q.  Did you confer with anybody at Merck other
17  than your counsel or inside counsel as to what the
18  term test methods meant?
19    A.  No.
20    Q.  Okay.  Do you understand what test methods
21  mean?
22    A.  I believe that test methods here mean
23  methods used to evaluate product.
24    Q.  Would you consider stability models to be
25  included as test methods?

Page 156

1    MS. HARDWAY:  Object to form.
2    Q.  BY MR. KELLER:  Let me strike that.  Is it
3  Merck's -- let me rephrase that again.  Strike that.
4    Do you consider stability -- stability
5  modeling to be included in test methods as
6  identified in this paragraph?
7    A.  No.
8    Q.  You don't.  Would you consider any stability
9  analysis of data to be included in test methods as
10  identified by this paragraph?
11    MS. HARDWAY:  Object to form.  Asked and
12  answered.
13    THE WITNESS:  No.
14    Q.  BY MR. KELLER:  Do you believe that Merck
15  had any obligation to report the results of its
16  stability modeling projections as part of this -- of
17  the annual report process?
18    MS. HARDWAY:  Object to form.
19    THE WITNESS:  I believe Merck had the
20  responsibility to provide stability analyses in the
21  annual report, provide the stability, yeah.
22    Q.  BY MR. KELLER:  Do you believe that Merck
23  had an obligation to report in its annual report
24  this change in stability that it identified as part
25  of the meeting documents we have gone through over

Page 157

1  the last couple hours?
2    MS. HARDWAY:  Object to form.  Vague.
3    THE WITNESS:  I don't -- what I can say is,
4  is the fact that it was not filed tells me that from
5  the assessment of the change, the conclusion was
6  that that was not required based on the description
7  of the -- of what would be required, what kinds of
8  changes required notification.
9    Q.  BY MR. KELLER:  Who would make that decision
10  at Merck?
11    A.  Those --
12    MS. HARDWAY:  Object to form.
13    THE WITNESS:  Decisions such as those would
14  be made in the licensing area, regulatory.
15    Q.  BY MR. KELLER:  And who in the licensing
16  area would be making those decisions during this
17  time frame?
18    A.  I don't know the specific individual.
19    Q.  That would be somebody -- somebody other
20  than yourself would make that decision whether or
21  not to report this to the FDA?
22    A.  Yes.
23    Q.  We had seen a document earlier where there
24  was a couple documents talking about risk that mumps
25  current product released at the new titers at 5.2

40 (Pages 154 - 157)

Page 158

1  log may not support an end expiry of 4.3. Would
2  that be something that you would be involved in
3  discussing with the licensing group about whether or
4  not to report that to CBER?
5      MS. HARDWAY: Object to the preamble and to
6  form.
7      THE WITNESS: Not -- I would -- what I would
8  say is in general conversations about what was --
9  and discussions about mumps analyses, current and
10  evolving information were discussed not only with
11  the licensing, but others across the organization.
12     Q. BY MR. KELLER: What others would be
13  involved in that decision making, whether or not to
14  report it to CBER?
15     A. When I say others, what I mean is sort of
16  collecting to make sure that there is a good
17  understanding of the scope of the observation,
18  et cetera, and ultimately in the licensing team
19  would make those decisions based upon what the
20  expectations are in the regulations.
21     Q. Who was the head of the licensing team
22  during this time frame, February of 2001?
23     A. I don't recall precisely who was the head of
24  it. I know it changed several times over my tenure
25  in that role, so I couldn't be absolutely certain as

Page 159

1  I sit here today.
2      Q. Okay. Can you turn to 669, fDA 483
3  observation 3. And can you read the first
4  paragraph.
5      A. Regarding the mumps virus vaccine live
6  stability data, your response indicated the
7  stability profile of each lot was within the
8  expected range based on historical trends. Products
9  must meet their specifications, not the historical
10  trend throughout the labeled expiry period.
11     Q. What do you -- what did you understand when
12  you read this what CBER meant by saying products
13  must meet their specifications, not the historical
14  trend throughout the label expiry period?
15     A. What I understood at this time -- you know,
16  what -- well, during -- this was a topic that was
17  discussed extensively during the inspection prior to
18  receipt of this letter, and so we had conveyed to
19  the investigators about the ongoing dialogue that we
20  had had with the agency, what we had shared, the
21  information we had shared with them, the
22  transparency about what that product profile looked
23  like, and so we had felt that we had shared that
24  information, and never had -- it had been expressed
25  that that was unacceptable, and so this was a

Page 160

1  different expectation being conveyed by the
2  investigators in this inspection. So this
3  represented a different and frankly new perspective
4  to us in the course of that inspection.
5      Q. And so is it fair to say that CBER in this
6  warning letter stated that they required that every
7  lot meet specification that's released to the
8  market, not just historical trends?
9      MS. HARDWAY: Object to form.
10     THE WITNESS: The last sentence says
11  products must meet their specifications, not the
12  historical trend throughout the label expiry
13  period.
14     Q. BY MR. KELLER: Did you understand that to
15  mean that every lot that is released to the public
16  must meet its end expiry study, not just historical
17  trends?
18     MS. HARDWAY: Object to form.
19     THE WITNESS: Yes. Yes.
20     Q. BY MR. KELLER: Fair enough.
21     A. Yeah.
22     Q. And so how -- now that you got this
23  statement that all lots released must meet its end
24  expiry specification, how does Merck go about to
25  ensure that happens?

Page 161

1      MS. HARDWAY: Object to form.
2      THE WITNESS: Merck, the assurance that that
3  happens is through execution of established
4  manufacturing processes and monitoring of that data
5  through our stability program to confirm that, in
6  fact, we were getting -- you know, we were -- we
7  were -- to confirm, in fact, that product throughout
8  its expiry period was meeting specification.
9      Q. BY MR. KELLER: And how do you monitor it?
10     A. Through stability.
11     Q. So -- and you use statistical models to do
12  that, don't you?
13     A. No. There are two things, so there is one,
14  you perform the actual tests and measure and you
15  compare those results against the specification. In
16  addition, you can look at trends and to provide some
17  insight as to sort of looking at it not just on a
18  point-by-point basis, but looking at the overall
19  profile for the product, but the results that we
20  focused on were the actual product specifications,
21  because the trend line is just a trend line. It's a
22  model, it's a hypothesis, so the data don't always
23  fit the hypothesis, and so, really, we were looking
24  at the confirmatory nature of the data that we were
25  testing of the product.

41 (Pages 158 - 161)

Appx19829

Page 162

1    Q. And what data would you be testing to get
2  that --
3    A. Or the -- excuse me. Not data. The samples
4  we would be testing would be the stability samples
5  that we put up in the stability program.
6    Q. So you don't test every -- we talked
7  about -- you didn't -- Merck doesn't test every lot
8  that it releases over a period of time to confirm
9  that that lot met its end expiry specification;
10  correct?
11    A. Correct. No company does.
12    Q. Right. So how does it ensure itself that
13  other lots -- in fact, it only tests very few lots,
14  doesn't it?
15    MS. HARDWAY: Object to form.
16    Q. BY MR. KELLER: During this time frame.
17    A. It -- I don't recall the number of lots and
18  how the number of lots evolved. I know that they
19  were increased with time. I don't recall the
20  number, precise number of lots.
21    Q. Did it increase from one lot a year to three
22  lots a year?
23    A. Well, we actually -- because if you have a
24  process change or other kinds of things, if there
25  are other studies, you could put additional lots up.

Page 163

1  You are required to at least put up one lot on an
2  annual stability. I don't recall in a year where
3  only one lot ever went up on stability.
4    Q. So the only way that your -- based on your
5  testimony that Merck confirmed that its product --
6  that each -- every mumps dose that it released would
7  be able to meet its specification end expiry is just
8  through the stability testing it did that it tracked
9  over time; correct?
10    MS. HARDWAY: Object to form.
11    THE WITNESS: No. The confidence that you
12  have that the product -- because you can't test
13  every lot. You don't test every lot. No company or
14  industry -- it's not the industry standard, nor is
15  it the regulatory expectation. The way you have
16  confidence is that you have an established
17  manufacturing process that it is executed according
18  to that process. Should there be any exception to
19  that process that it would be evaluated and
20  confirmed or even in those cases even monitored to
21  check for something. So it is the collective data,
22  the collective experience of manufacturing and
23  knowing how that performs which is then confirmed or
24  denied, but confirmed through the stability
25  testing.

Page 164

1    Q. BY MR. KELLER: And so I think we are going
2  in circles here. We will come back to that. Can
3  you read the next paragraph of this warning letter.
4    A. The second paragraph on page 4?
5    Q. Yes.
6    A. Our investigators reported that the data in
7  your firm's files showed that a number of mumps
8  vaccine stability samples representing lots
9  manufactured before the formulation change -- before
10  the formulation was changed during February 2000
11  failed to meet the minimum potency specification.
12  Product manufactured before February 2000 may still
13  be on the market because the expiry period is two
14  years. Please submit an analysis of mumps stability
15  data according to the range of potencies you would
16  expect the various mumps vaccine products to reach
17  at the two-year expiration date, for the analysis
18  assumed the initial potency is the minimum release
19  potency specification that was in effect before
20  February 2000. Please summarize the available data
21  regarding product efficacy at the lower end of the
22  this potency range.
23    Q. So CBER asked you to do an unless to
24  identify for those products that it considered may
25  still be out of -- may still be on the market within

Page 165

1  the 24-month shelf life what range of potencies
2  Merck would expect to see at the end of expiry for
3  those still on the market; correct?
4    A. Please submit an analysis of mumps stability
5  data describing the range of potencies you would
6  expect for the various mumps vaccine products to
7  reach at the two-year expiration date, yes.
8    Q. Who worked on that analyses; do you know?
9    A. I don't recall precisely who worked on that,
10  no.
11    Q. Were you involved in that process?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: I'm sure I was provided the
14  output of that analysis and would have engaged in
15  conversations around it, but I don't recall them
16  specifically.
17    Q. BY MR. KELLER: Do you know whether or not
18  Merck -- did you -- in your response, did you
19  respond by providing information requested in FDA
20  observation -- FDA 483 Observation 3 regarding those
21  products that may still be on the market?
22    A. I believe -- I don't recall specifically the
23  response, but I fully expect that we gave a complete
24  response to the observation that they cited, so,
25  yes.

42 (Pages 162 - 165)

Appx19830

Page 166

1    Q.  Did you ever conclude how many doses that
2  were part of these potential lots that were released
3  and had a projected end expiry below the end expiry
4  specification?
5    MS. HARDWAY:  Object to form and foundation.
6    THE WITNESS:  I don't recall ever
7  calculating the number of doses.
8    Q.  BY MR. KELLER:  Do you recall anybody ever
9  providing you with that data?
10    A.  No.
11    Q.  In the last sentence of that paragraph,
12  please summarize the available data regarding
13  product efficacy at the lower end of this potency
14  range.  Do you see that?
15    A.  Uh-huh.
16    Q.  What do you understand was asked for
17  there?
18    A.  Well, this -- this sentence here, this
19  request would have been something I would have
20  provided to my MRL and clinical colleagues because
21  this is their area of expertise.
22    Q.  Do you recall that the response that Merck
23  gave regarding this observation was providing
24  results from an interim analysis of Protocol 7,
25  plaque reduction neutralization data?

Page 167

1    MS. HARDWAY:  Object to form.  Asked and
2  answered.
3    THE WITNESS:  I don't recall -- I actually
4  don't recall the specific response to observation
5  number 3 or, frankly, any other observation in the
6  483.
7    Q.  BY MR. KELLER:  Do you recall -- you
8  testified earlier that this was -- you know, and I
9  will use my words, a big deal that Merck got a
10  483 -- I mean, a warning letter for product out of
11  specification.  Do you recall -- I may have asked
12  this -- who was involved in drafting the --
13  primarily responsible for drafting the response of
14  this?
15    MS. HARDWAY:  I'm just going to object to
16  the mischaracterization of her testimony at the
17  beginning of that question and then object to
18  form.
19    MR. KELLER:  You can answer.
20    THE WITNESS:  Can you repeat the
21  question.
22    Q.  BY MR. KELLER:  Sure.  Who was involved in
23  responding to this warning letter?
24    A.  I don't recall the list of people that would
25  have been involved or that were involved in the

Page 168

1  preparation of the warning letter response.
2    MR. KELLER:  Let me mark as Exhibit 14.
3    (Deposition Exhibit No. 14 was marked for
4    identification.)
5    Q.  BY MR. KELLER:  A document that bears Bates
6  stamp number 684945 which is an e-mail from Susan
7  Gallagher to Phil Bennett.
8    A.  Uh-huh.
9    Q.  Urgent, BPC emerging issues M-M-R stability,
10  and please note a location has not been determined.
11  And it says:  This is an urgent meeting requested by
12  Dr. McKee to find options regarding the M-M-R
13  stability as presented in the mumps stability
14  submission of October 27.  Please refer to Ron
15  Salerno's e-mail of November 1st, and there is a
16  bunch of invitees.  Do you see that?
17    A.  Uh-huh.
18    Q.  Do you recall requesting a meeting -- strike
19  that.
20    Is this the cross-functional meeting that
21  you identified in Exhibit 8 dated November 1st,
22  2000?
23    A.  Exhibit 8 was these minutes.
24    Q.  Go to the last page.  Yeah, your e-mail.
25    A.  November 1st, 2000.  So, I'm sorry, the

Page 169

1  question?  So that -- I made that request in
2  November --
3    Q.  Is this the cross-functional meeting that
4  you had requested?
5    A.  I don't know.  I don't believe so.  The
6  timing is off.
7    Q.  You don't believe so?
8    A.  The timing is off.
9    Q.  Okay.  Is this a second meeting of that
10  cross-functional group?
11    MS. HARDWAY:  Object to form.
12    THE WITNESS:  I don't know what meeting this
13  is necessarily referring to.
14    Q.  BY MR. KELLER:  Okay.  It's that BPC
15  emerging issues M-M-R stability.  That's what
16  Exhibit 8 was talking about; correct?  BPC emerging
17  issues from --
18    A.  Correct.
19    Q.  And so it related to that same group, that
20  high-level management group regarding stability
21  issues; correct?
22    MS. HARDWAY:  Object to form and asked and
23  answered.
24    THE WITNESS:  I don't know this meeting.  I
25  don't know -- I mean, that group would meet on

43 (Pages 166 - 169)

Page 170

1 multiple occasions, so whether or not the same group
2 of people were attesting or not, I just don't know.
3    Q. BY MR. KELLER: This group of folks, do you
4 know who Kati Abraham is?
5    A. Yes.
6    Q. What was her job during this time frame?
7    A. I believe that Kati was in Biologics
8 Licensing or Vaccine Regulatory Analytical Sciences.
9 I know the name changed over time.
10    Q. Was it her responsibility to make a decision
11 whether or not to report a product that was out of
12 specification pursuant to stability models
13 results?
14    MS. HARDWAY: Object to form.
15    Q. BY MR. KELLER: In annuals -- in annual
16 reports?
17    MS. HARDWAY: Object to form.
18    THE WITNESS: Was it -- can you repeat
19 the --
20    Q. BY MR. KELLER: Strike that. You testified
21 that the licensing department would handle decisions
22 whether or not to report -- what to report in an
23 annual report previously. Is she part of that
24 team?
25    A. To clarify, what I was referring to was that

Page 171

1 as process changes are made and the determination of
2 how -- whether or not it needs to be notified, and
3 if it does need to be notified, is it a prior
4 approval supplement, is it a CBE 30, is it some
5 other regulatory mechanism, those decisions based
6 upon the nature of a change and then the path you
7 follow would be made by someone like Kati.
8    Q. Okay.
9    A. So I don't know if that relates to your
10 question about --
11    Q. I'm trying to understand what her role was
12 in this meeting.
13    And Phil Bennett, you testified, he's a
14 statistician; correct?
15    A. I believe at this time he was in that
16 statistical group.
17    Q. And Peggy Carson?
18    A. I don't recall what her role was at this
19 time.
20    Q. And Jerald Sadoff?
21    A. I don't know Jerry's precise role. He was
22 in MRL.
23    MR. KELLER: Let me mark this next exhibit
24 as Exhibit 15.
25

Page 172

1    (Deposition Exhibit No. 15 was marked for
2 identification.)
3    Q. BY MR. KELLER: It doesn't have the
4 attachment.
5    Exhibit 15 is a memo from Phil Bennett
6 with -- bears Bates stamp numbers 1896072 through
7 1896073 dated February 27th, 2001. This exhibit was
8 used as Exhibit 24 at Schofield's deposition. From
9 Mr. Bennett to you, Dr. McKee, and Keith Chirgwin,
10 subject: Mumps stability and potency estimations.
11 Can you tell me if you've ever seen this document
12 before?
13    A. Yes.
14    Q. And when did you see this document?
15    MS. HARDWAY: Object to form. Overbroad.
16    THE WITNESS: I'm sure I saw it in 2001.
17    Q. BY MR. KELLER: Okay. And here, can you
18 read the first sentence?
19    A. Two analyses of the mumps stability data
20 have been performed in response to a request by
21 CBER.
22    Q. And the next sentence?
23    A. The first looks at a hypothetical lot with a
24 known potency equal to the minimum release
25 specification; the second evaluates our current

Page 173

1 production practices.
2    Q. So Mr. Bennett -- did you agree with
3 Mr. Bennett's characterization that CBER had
4 requested an evaluation of Merck's current
5 production practices?
6    MS. HARDWAY: Object to form.
7    THE WITNESS: I don't know the nature of
8 what the request is here. I don't know the nature
9 of the request, but I presume that CBER made a
10 request because we were always responsive to any
11 requests that they made and made sure that we
12 complied with them.
13    Q. BY MR. KELLER: Okay. When you -- when was
14 the last time you saw this document?
15    A. I saw it this week.
16    Q. And so this analysis that Mr. Bennett
17 conducted, was that -- why was he sending this
18 directly to you?
19    MS. HARDWAY: Object to form.
20    THE WITNESS: I don't recall why this was
21 addressed to me and Keith Chirgwin. I don't
22 recall.
23    Q. BY MR. KELLER: Do you recall whether or
24 not -- did you ever talk to Phil Bennett about this
25 memo?

44 (Pages 170 - 173)

Page 174

1    MS. HARDWAY: Object to form.
2    THE WITNESS: I don't recall speaking
3 specifically to Phil about this memo back in 2001.
4    Q. BY MR. KELLER: If you look on the second
5 page under Current Product, can you read what comes
6 after that?
7    A. In parenthesis for product manufactured?
8    Q. Yes.
9    A. On or after 9/13/99, the minimum release
10 specification for mumps is 5.0 log 10 TCID 50 per
11 0.5 ML dose.
12    Q. And can you read the paragraph below that
13 for the record, please?
14    A. A similar analysis can be performed to
15 estimate the lower 95 percent confidence bound on
16 product currently being manufactured with a target
17 fill of 5.2 log 10 TCID 50 per 0.5 ML dose and
18 released based on a one-by-six assay. The expected
19 average loss remains 0.703. However, the total
20 variability must include a factor for the
21 uncertainty in the relative potency estimate. The
22 standard deviation of the mumps one-by-six assay is
23 0.09. Combining this with the variability
24 calculated above for the loss yields.
25    Q. And they have -- and there is a

Page 175

1 calculation?
2    A. And then there is a calculation.
3    Q. And can you go ahead and finish reading the
4 rest of this document?
5    A. Not the calculation? Attach that --
6    Q. Let's skip over the calculation.
7    A. Okay. From these values, the lower 95
8 percent confidence bound for the loss from release
9 through expiry for the mumps is calculated as 1.02.
10 Given our current minimum release specification
11 limit of 5.0, we have 95 percent confidence that
12 each lot will be at or above 4.0 through expiry.
13    Q. At the time of this memo in February 2001,
14 the end expiry specification was 4.3; correct?
15    A. Yes, I believe so.
16    Q. And so what is the significance of this 95
17 percent confidence that he addresses in this memo?
18    MS. HARDWAY: Object to form.
19    MR. KELLER: To the extent that you know.
20    THE WITNESS: The significance of the 95
21 percent confidence?
22    Q. BY MR. KELLER: Yes.
23    A. It means at the lowest sense of probability.
24 You know, it's a statistical term.
25    Q. And so was that a term that's typically used

Page 176

1 in the industry for purposes of -- from a
2 statistical standpoint for projecting potency
3 loss?
4    MS. HARDWAY: Object to form.
5    THE WITNESS: 95 -- using the term 95
6 percent confidence bound or 95 percent confidence
7 limit is not uncommon around any calculation,
8 whether it's on potency or anything else. It's
9 based -- it's a reflection of the variability of the
10 data.
11    Q. BY MR. KELLER: Was this the best estimate
12 of the potency loss of the current product as of the
13 date of this memo?
14    MS. HARDWAY: Object to form.
15    THE WITNESS: It is an analysis. I don't
16 know if it's -- I can't say it's the best analysis.
17 It was employing one approach to evaluate based on
18 the data in the population that Phil provides what
19 might occur, again, hypothetically.
20    Q. BY MR. KELLER: Got you. And when he
21 reports the 1.02 log lot, 1.02, do you understand it
22 to be a log loss of 1.02 from the date of release
23 through end expiry?
24    A. What I understand, this is -- regardless of
25 the date, I understood this to be from the -- back

Page 177

1 his assumption above from just assuming a 5.0.
2    Q. So that's where he gets -- they would be
3 able to meet would be at or above 4.0. If you
4 release at 5.0 with a one log loss, that gets you
5 down to 4.0; correct?
6    MS. HARDWAY: Object to form.
7    THE WITNESS: With all the assumptions with
8 this model with -- you know, again, using this
9 hypothesis, that was his conclusion from the outcome
10 of that.
11    Q. BY MR. KELLER: Okay. And if that's the --
12 assuming that this model -- based on this model the
13 one log loss would not meet 4.3 end expiry
14 specification; correct?
15    MS. HARDWAY: Object to form.
16    THE WITNESS: I think to that question Phil
17 would be the best to describe the assumptions and
18 caveats associated with the model and how to
19 interpret that.
20    Q. BY MR. KELLER: But you testified earlier
21 that you would get these memos discussing
22 stability?
23    A. Uh-huh.
24    Q. Why would you get this memo discussing
25 stability? Why would you get a memo discussing

45 (Pages 174 - 177)

Appx19833

Page 178

1 from -- well, Phil Bennett's characterization that
2 these two models -- or these two analyses were
3 requested by CBER; correct?
4     A.  That's what he said, yes.
5     Q.  Okay.  And you have no reason to believe
6 that that's not true; correct?
7     A.  I don't.
8     Q.  Okay.  And so if these models are requested
9 by CBER, do you know whether or not Merck ever
10 disclosed to CBER this 1.20 log loss projection that
11 Phil Bennett made?
12     MS. HARDWAY:  Object to form.
13     THE WITNESS:  I don't know if -- I don't
14 know that.  I don't recall.  I don't know.
15     Q.  BY MR. KELLER:  Would this model analysis
16 that Phil Bennett conducted, would that -- would
17 that be used as part of your assessment as to
18 whether or not Merck had confidence in its release
19 specification --
20     MS. HARDWAY:  Object.
21     Q.  BY MR. KELLER:  -- to meet end expiry
22 specifications?
23     MS. HARDWAY:  Object to form and foundation.
24     THE WITNESS:  In analyses that were done
25 were -- were all taken into consideration.  These

Page 179

1 analyses, if there were other analyses, because
2 there was a really full and thorough vetting of
3 information.
4     Q.  BY MR. KELLER:  This was actually circulated
5 to Kati Abraham, J. Clair, J. Heyse, C. Morrisey, M.
6 -- C. Morrisey.  Manal Morsy, M. Rosolowsky, T.
7 Schofield.  Phil Bennett reported to Schofield;
8 correct?
9     A.  I'm not sure if Tim was his direct manager
10 or not.  I'm not sure.
11     Q.  So you don't recall, but Schofield
12 circulated a memo to you saying that there was
13 significant risk that Merck's -- some products would
14 not meet the current release specification after the
15 increase in titer, and now Phil Bennett is doing an
16 analysis that identifies that based on his analysis
17 that there was a one log loss from the time of
18 release to end expiry and that based on that one log
19 loss that while Merck could meet 4.0 through end
20 expiry, it's inferred that it wouldn't be able to
21 meet 4.3; correct?
22     MS. HARDWAY:  Object to form and
23 foundation.
24     THE WITNESS:  What this -- what this
25 analysis is is an analysis using a certain set of

Page 180

1 assumptions in a calculation based on data.  It's a
2 hypothetical situation.  What I can say -- so with
3 this analysis and as I have been saying all along,
4 that with regard to stability analyses and regard to
5 models that you apply to try to understand the data
6 set and try to understand, really, the true profile,
7 those need to be confirmed by actual data, and in my
8 recollection, I don't recall -- despite this
9 analysis, any lot that we tested on stability
10 manufactured after September 13th, 1999, that fell
11 below the 4.3 established release specification.  So
12 while I respect the work that's done and, frankly,
13 I'm sure as part of discussions was included because
14 the culture was one to hear all voices and make sure
15 that we were making the best and the right decisions
16 for the company, the data in and of itself also
17 played a very important role, and that's not
18 reflected in this analysis because this just -- he's
19 responding, it appears, to a request.
20     Q.  BY MR. KELLER:  Do you know if -- here Phil
21 Bennett says that these analysis were requested by
22 CBER.  Do you know whether or not Merck ever
23 provided this analysis to CBER?
24     MS. HARDWAY:  Object to form and foundation.
25     THE WITNESS:  And I believe you asked that

Page 181

1 before.  I don't -- I'm not aware whether or not
2 this memo or these excerpts specifically were
3 provided to the agency.  What I do know, as I have
4 said before, there have been and there were ongoing
5 conversations with the agency on this topic and a
6 regular sharing of information, number one, so
7 whether it was in this memo or others, I think those
8 conversations occurred.  I also say that, frankly,
9 we tracked -- if CBER made requests, we made sure
10 that we fulfilled those requests, and so if they
11 asked for something, I have very high
12 level of confidence that we provided what they asked
13 for.
14     Q.  BY MR. KELLER:  So you would be surprised
15 if -- if CBER asked for at as Mr. Bennett states
16 they did, these two analyses, that you would be
17 surprised that Merck didn't provide this data, this
18 analysis to CBER; correct?
19     MS. HARDWAY:  Object to form and
20 foundation.
21     THE WITNESS:  What I will say is in order
22 to answer your question I would want to understand
23 the specific request by CBER, did they request --
24 you know, what did they request and what was the
25 scope of that request.

46 (Pages 178 - 181)

Page 182

1    MR. KELLER:  Let me mark this next exhibit
2 as Exhibit 16.
3         (Deposition Exhibit No. 16 was marked for
4         identification.)
5    Q. BY MR. KELLER:  For the record, Exhibit 16
6 is a two-page document that bears Bates stamp number
7 549218 through 219.  For the record, it is a memo
8 from Keith Chirgwin to a series of folks, including
9 you, Dr. McKee.  This exhibit was used at Morsy --
10 as Morsy 12 and Schodel 7.  And under the subject it
11 says:  Urgent mumps expiry, tomorrow's
12 teleconference.  Can you take a minute and tell me
13 if you recall receiving this e-mail dated March 1st,
14 2001.
15    A. I don't recall this meeting, no.
16    Q. Here, the teleconference talks about, number
17 one, preparation for an RMC discussion on March 8th.
18 Do you understand what the RMC stands for?
19    A. No, I don't recall what that is.  That was
20 not an MMD forum.
21    Q. Did you ever hear of a committee called the
22 Recall Committee?
23    A. Yes.
24    Q. Do you know whether or not there was a
25 recall committee convened as a result -- in this

Page 183

1 time frame?
2    MS. HARDWAY:  Object to form.
3    THE WITNESS:  I don't recall.
4    Q. BY MR. KELLER:  Okay.  If you look under the
5 Agenda, can you read the -- under the agenda for
6 MMD.
7    A. MMD, follow-up discussion with CBER - lots
8 out of compliance.
9    Q. Do you understand what is referred to
10 there -- meant by lots out of compliance?
11    A. I didn't write this e-mail, so, I mean, I
12 don't know what Keith -- I can't really speak for
13 Keith and what he was saying there.
14    Q. What do you understand from your 17 years at
15 Merck what out of compliance means from MMD
16 standpoint?
17    MS. HARDWAY:  Object to form.
18    THE WITNESS:  Out of compliance is a broad
19 term.  Depends on the context.
20    Q. BY MR. KELLER:  Well, the context here is an
21 urgent mumps expiry teleconference.  Does that help
22 you put it in context?
23    MS. HARDWAY:  Object to form and foundation.
24    THE WITNESS:  I really can't speak for Keith
25 and what he meant and why he used the words he used

Page 184

1 and what he was thinking.
2    Q. BY MR. KELLER:  Did you participate in this
3 teleconference?
4    A. I don't recall this teleconference.
5    Q. You don't recall any urgent mumps expiry
6 teleconferences after receiving a warning letter
7 from CBER?
8    MS. HARDWAY:  Objection; asked and
9 answered.
10    THE WITNESS:  I don't recall this meeting.
11    Q. BY MR. KELLER:  Do you recall any meeting
12 where that warning letter was discussed?
13    A. I have a general recollection that meetings
14 occurred following receipt of the warning letter and
15 engaging with colleagues in -- really, in preparing
16 the response and follow up, but any specific
17 meeting, I don't have specific recollection of those
18 meetings.
19    Q. So this reference to lots out of compliance,
20 you don't recall discussing at that teleconference
21 regarding MMD regarding mumps end expiry?
22    MS. HARDWAY:  Objection; asked and
23 answered.
24    THE WITNESS:   As I said, I don't recall
25 this teleconference, so --

Page 185

1    Q. BY MR. KELLER:  If you look under your name,
2 there is Mike King and Mike Angelo.  Who is Mike
3 King?
4    A. Mike King, as I mentioned before, is the --
5 he held -- perhaps his -- I'm not sure of his title,
6 but of manufacturing technology as well as some
7 other functions, so a technical -- a technical --
8 technical role.
9    Q. And I'm sorry.  Mike Angelo again?
10    A. Mike Angelo was the senior vice president of
11 quality for the company.
12    Q. Gotcha.  And on the last page under Overall
13 - RMC Presentation, there is Dorothy Margolskee.
14 You talked about her being at MRL.  Who is David
15 B-L-O-I-S; do you know?
16    A. David Blois, I don't recall the department
17 that he was in.
18    Q. Do you recall what his position was?
19    A. I don't recall specifically his position.
20 He was in -- I do know he was in MRL, but I don't
21 recall precisely the role and level of David.
22    MS. HARDWAY:  I think, Jeff, we are at about
23 another hour.  Can we take a quick break?
24    MR. KELLER:  Sure.
25    MS. HARDWAY:  Thank you.

47 (Pages 182 - 185)

Appx19835

Page 186

1    THE VIDEOGRAPHER: We are going off the
2 record. The time is 3:09 p.m.
3    (WHEREUPON, a short break was taken from
4    3:09 p.m. to 3:47 p.m.)
5    (Deposition Exhibit No. 17 was marked for
6    identification.)
7    THE VIDEOGRAPHER: We are back on the
8 record. The time is 3:47 p.m.
9    MS. HARDWAY: Jeff, just before we get
10 started, I wanted to put one thing on the record,
11 which is Exhibit 13 which was a copy of the warning
12 letter appears to be an unproduced version of this
13 warning letter, and pursuant to our document
14 request, specifically 117 and 118 and your responses
15 to those document requests, this certainly fell
16 within the request, and my understanding is you
17 agreed not to withhold any publicly available
18 documents you got in response to those requests.
19    So, number one, I would reiterate our
20 request and your complete response to the same.
21 Number two, ask you if you plan on using any more of
22 these unproduced document today, and if so,
23 just hand -- if you could hand over a copy now, that
24 would be great.
25    MR. KELLER: I have given you a copy. And,

Page 187

1 for the record, I specifically identified the exact
2 same document that was found in your records
3 produced to us, so --
4    MS. SCHMIDT: What she clarified was a
5 different version because you said it contained
6 redactions, so if this is a different document that
7 was not produced to us prior to sitting here today
8 which --
9    MR. KELLER: Well, that's the exact same
10 document that you redacted when you produced to us.
11 Has everything in here we talked about. Everything
12 in here is exactly as you would have produced it
13 other than the fact that you redacted --
14    MS. HARDWAY: Jeff, it's not -- whether the
15 content is the same is not the important point. The
16 important point is the fact that we have pending
17 document requests that you've agreed to be
18 responsive to and that those document requests go
19 back quite a ways as do your responses to those
20 requests, so to the extent that you have any more
21 responsive documents to our request, I'd ask that
22 you produce them immediately, and if you intend to
23 use any more today with this witness, I'd ask that
24 you give them to -- a copy of them to us now so we
25 have a chance to look at them before you're going to

Page 188

1 question the witness about them.
2    MR. KELLER: For the record, I have no other
3 public documents to show the witness today. For the
4 record, this is a warning letter submitted from the
5 FDA to Merck. Merck received this document.
6 Clearly it's in their files. And, three, send us an
7 e-mail with that request and we will respond.
8    MS. HARDWAY: My understanding is that there
9 have been clear requests, clear responses, numerous
10 e-mails, numerous meet and confers. The content is
11 completely irrelevant. If it's responsive, it's
12 responsive. So I just will, once again, reiterate
13 our request, and to the extent you have not complied
14 and been responsive to those requests, I'd ask
15 again, and I'm not sure which time this -- which
16 repeat this would be, but for the X time I would ask
17 that you respond to our request. I just want to put
18 that on the record before we get started again.
19    MR. KELLER: I don't agree with you, but
20 we can do that by -- off the record by e-mail,
21 phone, or letter.
22    MR. KELLER: Let me mark -- I marked Exhibit
23 17 which bears Bates stamp numbers 1480843 through
24 64 which is an e-mail and attached document, and the
25 e-mails are dated March 5th, 2001. And the second

Page 189

1 e-mail dated March 13th, 2001, from Mark Rosolowsky
2 to Keith Chirgwin, Jerald Sadoff and Dr. McKee,
3 draft MRL response to OBS number 3.
4    Q. BY MR. KELLER: And, Doctor, you've had a
5 chance to review this document; correct?
6    A. It's a lengthy document, so I had a chance
7 to skim it and get the essence of it.
8    Q. Do you recall ever seeing this document
9 before?
10    A. I don't recall seeing this specific e-mail
11 at this time.
12    Q. Do you recall seeing -- you testified
13 earlier you saw drafts of responses to Observation 3
14 of the warning letter; correct?
15    A. Yes.
16    Q. Do you believe this to be a draft of Merck's
17 response to the 483 Observation No. 3?
18    A. I believe -- I read this that this -- as
19 Mark -- I just can read what Mark says. It's a --
20 this is a component of the response, I guess, form
21 Keith -- that Keith had drafted and Mark commented
22 on. So I don't know whether it's the entire
23 response. I would have to do the audit of that, but
24 it seems to be consistent with that.
25    Q. Who is Mark Rosolowsky? Did he work in your

48 (Pages 186 - 189)

Page 190

1 group?
2    A. Yes.
3    Q. Okay. And what was his position during this
4 time frame?
5    A. I believe in this time frame he was the
6 leader of the licensing group or vaccine regulatory
7 and analytical sciences.
8    Q. Okay.
9    A. I believe.
10    Q. And so --
11    A. I don't believe -- he had helped -- the
12 reason my -- just to be clear -- or just to say
13 where I'm coming from is he had had a different role
14 prior to that, but also had worked for me, and I
15 don't remember exactly at the point of his
16 transition, but -- so that's the degree of certainty
17 around that answer.
18    Q. Gotcha. Now, do you recall that Mark
19 Rosolowsky was working with Keith Chirgwin on the
20 response to the warning letter of February 2001?
21    A. No, not specifically.
22    Q. Does this refresh your memory that he was?
23    A. This suggests that to me, yes.
24    Q. Which what about Jerald Sadoff; do you
25 recall him working on the draft?

Page 191

1    A. No.
2    Q. Do you recall -- other than yourself working
3 on the draft, who do you recall working on the draft
4 to the warning letter of February of 2001?
5    MS. HARDWAY: Objection. I think this is
6 asked and answered.
7    THE WITNESS: To -- so there would have been
8 a host of people depending upon which -- what --
9 which component of the warning letter. There were
10 different people focused on different elements of
11 the warning letter, so --
12    Q. BY MR. KELLER: Okay.
13    A. Depending upon the subject matter expertise
14 required.
15    Q. Got. It, but since you were signing the
16 letter, you reviewed the drafts; correct?
17    A. I might not have reviewed every draft in --
18 as they were being generated, but I certainly would
19 have reviewed compilations of seeing the whole
20 response, so whether or not I reviewed this specific
21 draft at the time, I can't say.
22    Q. I will represent to you that -- and we can
23 go over the actual response on March 8th. This is
24 March 5th, so this is a draft pretty close to the
25 final March 8th that was ultimately submitted. And

Page 192

1 I will show you the document in a minute. You can
2 take my word that you submitted. You signed in on
3 or about March 8th, 2001. Would you have seen
4 drafts that close to the time that it was going to
5 be submitted?
6    A. Yes.
7    Q. Okay. And here you testified you don't
8 recall seeing this particular draft. Let me direct
9 your attention to the actual draft. It's a red
10 lined version; correct?
11    A. It's a version with edits.
12    Q. Right. And the edits are sort of in the red
13 lined format of -- it looks like a Word document.
14 Does that make sense?
15    MS. HARDWAY: Object to form.
16    THE WITNESS: It looks like a Word
17 document.
18    Q. BY MR. KELLER: Okay. And so on the first
19 page of this at 1480844 it says: Draft response to
20 FDA 43 Observation No. 3 request. Please submit an
21 analysis of mumps stability data describing the
22 range of potencies you would expect the various
23 mumps vaccine products to reach at the two-year
24 expiration date. Do you see that?
25    A. Yes.

Page 193

1    Q. And then under that it says: Analysis of
2 mumps stability data in M-M-R II. Do you see
3 that?
4    A. Yes.
5    Q. And can you read the next sentence?
6    A. The estimated average potency loss (log 10
7 TCID 50 per 0.5 ML dose) through 24 months of shelf
8 life is estimated to be 0.7 (95 percent lower
9 confidence bound equal 1.0).
10    Q. That's what Phil Bennett's memo of February
11 27 provided that one point log loss; correct?
12    MS. HARDWAY: Object to form and
13 foundation.
14    THE WITNESS: I believe that's consistent
15 with the memo that you shared that Phil authored.
16    Q. BY MR. KELLER: Based on your knowledge, did
17 Merck ever disclose to CBER that based on its
18 analysis of mumps stability data that it was
19 projecting based on 95 percent lower confidence
20 bound a one log loss in its mumps product?
21    A. I'm sorry. Can you say that again.
22    Q. Sure. Did -- are you aware of Merck ever
23 disclosing that one log loss of its mumps product
24 based on an analysis of mumps stability data in
25 M-M-R II to CBER?

49 (Pages 190 - 193)

Appx19837

Page 194

1    MS. HARDWAY: Object to form and
2 foundation.
3    THE WITNESS: I don't recall. I do note
4 this paragraph, fourth paragraph says that these
5 estimates were provided in October of 2000.
6    Q. BY MR. KELLER: Okay. So you believe that
7 in that statement that there was a representation of
8 one log loss?
9    MS. HARDWAY: Object to form.
10    THE WITNESS: I'm just reading this
11 sentence.
12    Q. BY MR. KELLER: Do you recall that,
13 though?
14    A. No, I don't recall it specifically.
15    Q. Let me go back to Exhibit 6, please. And if
16 you turn your attention under -- it's part of
17 Attachment 8 on page 1899221, let me know when you
18 get there.
19    A. I'm sorry. Which page?
20    Q. 1899221 -- I'm sorry 211. It's page 111 of
21 the submission, if that helps you.
22    A. Okay.
23    Q. And if you see in the center of the page, it
24 says: The conclusion from the March 1999
25 manufacturing investigation can be summarized as

Page 195

1 follows. Four bullet points down, can you read that
2 bullet point?
3    A. For the measles and mumps-containing
4 vaccines, the average potency losses and the
5 corresponding lower 95 percent confidence limits
6 estimated from all the stability data were redacted
7 for measles and 0.6 and approximately 0.8 log 10
8 TCID 50 per dose for mumps after house standard
9 adjustment.
10    Q. And so when you see the .8 -- approximately
11 .8 log, you understand it to be the 95 percent
12 confidence limits?
13    MS. HARDWAY: Object to form.
14    Q. BY MR. KELLER: Do you understand that to
15 be -- that's what it's referring to?
16    MS. HARDWAY: Object to form.
17    THE WITNESS: In -- yeah. I'm just reading
18 the paragraph that's -- that's what I would take
19 from that.
20    Q. BY MR. KELLER: Okay. So let me direct your
21 attention back to Exhibit 17. If you look on the
22 next page on -- let me -- do you recall disclosing
23 that 1.0 log loss as part of the response to the
24 warning letter that you signed?
25    MS. HARDWAY: Object to form.

Page 196

1    THE WITNESS: I'm sorry. What is the
2 question?
3    Q. BY MR. KELLER: The question is --
4    A. Do I recall? We are on this document now?
5    Q. Yes.
6    A. Okay.
7    Q. The one log loss that's identified in this
8 draft, do you recall reporting that to CBER in
9 the -- in your response to the warning letter that
10 you filed that you signed on or about March 8th,
11 2001?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: I don't recall. Just so I --
14 you're asking about the finalized version of this
15 response?
16    Q. BY MR. KELLER: Yes.
17    A. I don't recall --
18    Q. Okay.
19    A. -- the final version.
20    Q. I direct your attention to the next page.
21 And at 1480845 the middle --
22    A. Just one thing I was going to say, that
23 this -- the reference that I said before about the
24 following mumps stability estimates are given in
25 submission, page 104, I see that as in this document

Page 197

1 it's number six on that page, so that's where that
2 information that was previously communicated --
3 that's the reference, to confirm the reference.
4    Q. And you're pointing to the .703, average
5 number of lots 20, standard deviation .222?
6    A. Right. In the line that says January '95 to
7 May of '98 and shows that analysis there. It's
8 repeated here.
9    Q. Correct. Thank you.
10    Now, can I get you to direct your attention
11 back to Exhibit 17?
12    A. Yes.
13    Q. Which is the draft to the warning letter.
14 In the middle of the page it starts: Range of
15 potencies expected at two-year expiration date. Do
16 you see that?
17    A. Yes.
18    Q. And it goes on to say: The range of
19 assigned release potencies for lots manufactured
20 before February of 2000, and it says which are still
21 on the market as stricken, which have not yet
22 reached the end of shelf life is 4.4 to 5.4 log
23 using the calculation above, and there is a bunch
24 stricken out. Then it says: There are a total of
25 223 lots of M-M-R II with end of shelf titers

50 (Pages 194 - 197)

Page 198

1 potentially less than 4.3 TCID. Do you see that?
2    A. Yes.
3    Q. And so below that it says: The distribution
4 of these lots by assigned release potencies and
5 corresponding lower 45 confidence bound for worst
6 case end of shelf life potencies (95 percent LB
7 stability losses) for lots during this period is as
8 follows presented in Table 1. Do you see that?
9    A. No. I'm sorry. You were reading the
10 deleted part as well; is that right?
11    Q. Yeah. I read the deleted part as well.
12    A. Okay. Let me --
13    Q. And the worst case is deleted out; correct?
14 Let me strike that. Why don't you read that for me,
15 that sentence.
16    MS. HARDWAY: Which sentence?
17    MR. KELLER: Starting with the distribution
18 of these lots.
19    THE WITNESS: The distribution of these lots
20 by assigned released potencies and corresponding
21 lower 95 percent confidence bound for, and then
22 lined out, worst case end of shelf life potencies,
23 and then lined out, 95 percent LB stability losses
24 for lots during this period is as follows. That's
25 all lined out, and then are presented in Table 1.

Page 199

1    Q. BY MR. KELLER: And so then Table 1
2 identifies the release potency and end expiry
3 potency in number of lots that fall within those
4 ranges; correct?
5    A. That's what -- the title of the table
6 release and expiry potencies of lots released before
7 February 2000 which have not reached end of shelf
8 life.
9    Q. Right. So do you understand that these 223
10 lots were potentially still on the market based on
11 their shelf life that was captured for those lots;
12 correct?
13    MS. HARDWAY: Object to form.
14    Q. BY MR. KELLER: Do you understand my
15 question?
16    A. No. I'm sorry.
17    Q. Sure. Do you understand that these 223 lots
18 are lots that potentially may still be on the market
19 because they are within their 24 month shelf life?
20    A. If the title of the table is, as I
21 understand it, it says that these 223 lots have not
22 reached the end of shelf life yet and they were
23 released before February of 2000. I'm just reading
24 the document.
25    Q. So is it fair to say that those lots could

Page 200

1 still be on the market; correct?
2    A. I think what the author was saying was that
3 they were on -- they were on the market at the time
4 that this was prepared.
5    Q. Okay. And so for six lots the end expiry
6 was projected to be between 3.4 and 3.6; correct?
7    A. Yes.
8    Q. And for 100 lots, the expiry and potency was
9 projected to be between 3.7 and 3.9. Do you see
10 that?
11    A. Yes.
12    Q. And for 117 lots, the end expiry potency was
13 projected to be between 4 and 4.2. Do you see
14 that?
15    A. Yes.
16    Q. Do you know whether or not Merck ever
17 disclosed to CBER these 223 lots below 4.3 that may
18 still be on the market?
19    MS. HARDWAY: Object to form.
20    Q. BY MR. KELLER: Let me strike that. It's a
21 bad question.
22    Do you know as you sit here today whether or
23 not Merck ever disclosed to CBER the existence of
24 223 lots that were then potentially still on the
25 market that Merck projected that its end expiry will

Page 201

1 be three below 4.3 log, the specification for those
2 products --
3    MS. HARDWAY: Object --
4    Q. BY MR. KELLER: -- at end expiry?
5    MS. HARDWAY: Object to form.
6    THE WITNESS: Well, and I don't have the
7 final version, so it would have been disclosed at a
8 minimum -- whether or not it was disclosed at other
9 point in time, and I'm not sure, but what this is
10 saying is saying that if you use that statistical
11 model and those assumptions and apply this math, the
12 1.001, or whatever. Maybe there is a question about
13 what the number would be, whatever that number
14 turned out to be, but if you apply that math, this
15 is -- doesn't say that this is what the potencies
16 are. It says that's what the -- it's saying that
17 there is the potential that that's what that could
18 be.
19    Q. BY MR. KELLER: Okay.
20    A. As I read this. I don't have the final
21 version.
22    Q. We will get to that in a minute.
23    A. Okay.
24    Q. Let me direct your attention to page
25 1480848. And in the first paragraph at the top,

51 (Pages 198 - 201)

Appx19839

HIGHLY CONFIDENTIAL

Page 202

1 there is a highlighted section that's in the draft.
2 Can you read that for me starting with between?
3     A.  Between mid 1994 and late 1996, 77 lots,
4 approximately eight million doses, were released at
5 titers of 4.6 log TCID 50 per dose or below, and 35
6 lots, approximately 36 million doses, were released
7 at 4.5 TCID 50 or below.  These lots would have
8 expired between mid 1996 and late 1998.  The
9 demonstrated filed effectiveness, which I think that
10 means field, effectiveness of the vaccine between
11 this 2.5 to five-year period suggests no problem
12 under current epidemiological conditions with lots
13 released with the potential expiry as low as 3.5 to
14 3.6 log TCID per dose.
15     Q.  Do you know where that information came
16 from?
17     A.  No, I do not.
18     Q.  Do you have any reason to believe that
19 information is incorrect?
20     A.  I don't know where the information came
21 from, so I don't feel qualified to judge its
22 accuracy or not.
23     Q.  Do you know whether or not that information
24 was disclosed to CBER at any point?
25     MS. HARDWAY:  Object to form.

Page 203

1     THE WITNESS:  I don't know the origin of
2 this information, so I'm not -- I don't know.
3     Q.  BY MR. KELLER:  Do you know if that
4 information was ever disclosed to the CDC?
5     A.  I don't know.
6     Q.  In the current epidemiological conditions,
7 this is as of 2001, do you see that?  That they are
8 concluding that there is no problem?
9     MS. HARDWAY:  Object to form.
10     THE WITNESS:  The last sentence, you're
11 saying?
12     Q.  BY MR. KELLER:  Yes.
13     A.  I see the sentence, yes.
14     Q.  If -- you're aware that in 2006 there was
15 significant outbreaks of mumps?
16     MS. HARDWAY:  Object to form.
17     Q.  BY MR. KELLER:  Let me strike that.  Are you
18 aware of outbreaks in mumps after you left Merck?
19     A.  No.
20     Q.  No?  Never heard of the outbreaks of 2006,
21 2009 and '10, and the one that's happening right
22 now?
23     A.  No.
24     MS. HARDWAY:  Objection; asked and
25 answered.

Page 204

1     THE WITNESS:  No.  No.
2     Q.  BY MR. KELLER:  Would outbreaks affect,
3 based on your 17 years working at Merck, whether or
4 not there was a problem with the epidemiological --
5 whether or not there was epidemiological -- strike
6 that.  Let's move on.
7     Let me direct your attention to page
8 1480861.  Actually, can you back up a second.  Can
9 you go to page 1480855.
10     A.  Okay.
11     Q.  There is a series of bold, looks like
12 comments to this draft that says:  Hmmmm, Jerry:  Do
13 you mean that lots were at the end of shelf life but
14 not low enough or that we couldn't find old lots?
15 Do you see that?
16     A.  Yes.
17     Q.  Jerry, you understand that to be Jerry
18 Sadoff; correct?
19     MS. HARDWAY:  Object to form and
20 foundation.
21     THE WITNESS:  I be didn't write this, so I
22 don't know who that is.
23     Q.  BY MR. KELLER:  You don't.  Okay.
24     A.  No.
25     Q.  Do you know who Emilio Emini is?

Page 205

1     A.  I remember the name.
2     Q.  Did you ever talk to Emilio Emini?
3     A.  I'm sure I spoke to Emilio Emini at one
4 point or another in my time at Merck.
5     Q.  Do you recall speaking to him in response to
6 this warning letter of February of 2001?
7     A.  No.
8     Q.  Do you recall any discussions at Merck as
9 part of responding to -- strike that.
10     Do you recall any discussions at Merck
11 regarding Protocol 7, the plaque reduction
12 neutralization assay that was run, whether or not
13 there was a belief that the results were highly
14 artificial?
15     MS. HARDWAY:  Object to form and foundation.
16     THE WITNESS:  I am -- those -- that -- that
17 study, the clinical study and any analyses were
18 outside of my area, so I wasn't close to that
19 information.
20     Q.  BY MR. KELLER:  Okay.  Merck provided the
21 preliminary results of Protocol 7 to CBER in
22 response to the warning letter, didn't it?
23     MS. HARDWAY:  Object to form.
24     THE WITNESS:  I believe so.  I think that --
25     Q.  BY MR. KELLER:  Do you know why?

52 (Pages 202 - 205)

Appx19840

Page 206

1    A. I don't recall why precisely.
2    Q. Do you recall that was in order to ensure
3 CBER -- strike that.
4        One of the things that CBER requested was
5 for Merck to provide whatever data it had that
6 showed that the vaccine worked at the lowest
7 potencies as part of their warning letter.  Do you
8 remember that?
9        MS. HARDWAY: Object to form.
10       THE WITNESS: What I remember is -- or what
11 I can say is just what you've shared recently
12 because I haven't seen this warning letter of late,
13 but their request is what's dated in the warning
14 letter.
15    Q. BY MR. KELLER: Please summarize the
16 available data regarding product efficacy at the
17 lower end of this potency range.  Do you see that?
18    A. Uh-huh.
19    Q. And so was that why Protocol 7 was submitted
20 to CBER?
21       MS. HARDWAY: Object to form.
22    Q. BY MR. KELLER: As proof that the vaccine
23 was effective at the lower range?
24       MS. HARDWAY: Object to form.
25       THE WITNESS: The response to that and the

Page 207

1 rationale and the thinking behind and how to respond
2 to that was outside of my personal scope, so that
3 would be on the clinical side, and the clinicians
4 would be able to speak to things like product
5 efficacy.
6        MR. KELLER: Let's mark this next exhibit as
7 Exhibit 18.
8        (Deposition Exhibit No. 18 was marked for
9        identification.)
10    Q. BY MR. KELLER: For the record, Exhibit 18
11 is a document that bears Bates stamp number 754239
12 through 44 entitled Biological Product Deviation
13 Report Form, and I will ask you, Dr. McKee, if you
14 recognize this document?
15    A. I recognize the document.  I recognize the
16 BPDR.
17    Q. Do you recognize this specific BPDR that was
18 submitted on March 5th, 2001?
19    A. I'd have to look it over, but --
20    Q. Sure.
21    A. Yes.
22    Q. Okay.  And when was --
23    A. That's the date on it.  It was submitted on
24 the 5th.
25    Q. On the 5th of March, 2001, and identifies

Page 208

1 that the -- it was discovered on January 4th and
2 January 16, 2001.  Do you see that?
3    A. Yes.
4    Q. And if you look on -- and your name is
5 identified as a person of contact on this; right?
6    A. Correct.
7    Q. And is that because you're the head of
8 quality?
9    A. Yes.
10    Q. Okay.  If you look on the second page of the
11 deviation -- of the BPDR form under Description, it
12 says: An investigation was initiated into a recent
13 out-of-specification result for single dose files of
14 M-M-R II lot 0628706 at the 24-month stability
15 interval for potency of measles and mumps at the
16 four-hour and eight-hour reconstitute and store
17 intervals, respectively.  Do you see that?
18    A. Yes.
19    Q. And so that -- was that a lot that was on
20 stability monitoring?
21    A. I don't -- it says it was the 24-month
22 stability interval for potency for measles and
23 mumps, so I assume it was a stability lot.
24    Q. And so if you look on page 754242 under B7
25 follow-up, in the middle of the first paragraph it

Page 209

1 says: Our medical assessment determined that
2 clinical studies have shown that the minimum dose
3 required to immunize a seronegative child has been
4 found to be as low as 1.3 log TCID dose for measles
5 and 3.1 log TCID dose for mumps.  Do you see that?
6    A. Yes.
7    Q. Where did you get that information?
8    A. So whenever -- as I said before, in
9 reporting the agency, so in this case there was an
10 observation of a result below the specification,
11 which is what prompted this report, so when this
12 event occurs, we do a -- or we would do a
13 comprehensive investigation sort of looking at how
14 the testing was performed to make sure that it was
15 representative, going back and reviewing
16 manufacturing records to identify if there is any --
17 in other words, looking for explanations of it and
18 that's what's really reflected on page 3.
19        On page 4 here, this is where we then say,
20 well, okay.  If that result is valid, what are the
21 consequences of that, because we need to make a
22 decision about what we would do with regard to this
23 material, and so as part of that would be to get a
24 medical assessment, so we would reach out to the
25 relevant clinical colleagues in MRL, in this case,

53 (Pages 206 - 209)

Page 210

1 to provide a medical assessment on the product, and
2 so they would have been the ones who provided this
3 information so our medical assessment determined in
4 the sentence that you read, so this would have come
5 from the MRL team.
6    Q. You don't specifically know where that came
7 from. You just rely upon your colleagues to provide
8 that data to you?
9       MS. HARDWAY: Object to form.
10      THE WITNESS: Well, I -- yes, I do rely, and
11 I think that there is -- I have no reason to doubt
12 the assessment that they perform. They are
13 clinicians. They know the product. They know it
14 very well, and so, yes, I accept their assessment.
15    Q. BY MR. KELLER: Do you do any independent
16 investigation to confirm that that 3.1 log dose for
17 mumps had been found in clinical studies to immunize
18 seronegative children?
19      MS. HARDWAY: Object to form.
20      THE WITNESS: So to answer your question, I
21 personally did not do any verification of this
22 number. However, as part of our processes for any
23 documents that we submit, particularly to the
24 agency, we, quote, unquote, audited them, and so the
25 auditors looking through documents would go and find

Page 211

1 what's the source of this. And so I believe that a
2 source document with this information was
3 identified, otherwise it would have been flagged for
4 me and said what's the basis of this. So, you know,
5 because anything that we were saying, particularly
6 in communication with the agency, we wanted to make
7 sure that it was backed up. That was the way we
8 operated.
9    Q. BY MR. KELLER: Have you -- did any -- are
10 you familiar with any discussions at Merck that the
11 basis for that 3.1 log mumps claim that that
12 potency, the product is immunogenetic as based on
13 data from the 1960s?
14      MS. HARDWAY: Object to form and foundation.
15      THE WITNESS: I don't -- I personally do not
16 know the origin of that data, that source data that
17 you just mentioned. I don't know.
18    Q. BY MR. KELLER: Would it cause you concern
19 to know that the origin of that source data was from
20 13 kids -- 13 kids that were done in the dosing
21 studies for the original mumps submissions to get
22 approval for that product?
23      MS. HARDWAY: Object to form.
24      THE WITNESS: I'm not qualified to judge the
25 power of that study. That's not my -- my area of

Page 212

1 expertise.
2    Q. BY MR. KELLER: Okay. That doesn't sound
3 like it's limited data?
4       MS. HARDWAY: Object to form. Asked and
5 answered.
6    Q. BY MR. KELLER: Strike that. Did you ever
7 hear any criticism that that claim is limited in its
8 ability to be relied upon?
9       MS. HARDWAY: Object to form.
10      THE WITNESS: I don't recall the discussions
11 about this.
12    Q. BY MR. KELLER: If you go into the third
13 paragraph, it says: Our investigation concluded
14 that the specific out-of-specification results for
15 both measles and mumps are within the variability of
16 the potency assay. These results are consistent
17 with potency values at or near the minimum
18 specification. Active stability monitoring
19 indicates that the performance of this lot is
20 consistent with historical performance of previous
21 lots on this product -- of this product. Do you see
22 that?
23    A. I do.
24    Q. Active stability monitoring, you've
25 testified earlier that -- well, what is active

Page 213

1 stability monitoring? Strike that.
2       What is active stability monitoring?
3    A. Active stability monitoring is the program,
4 the name of the program that was used and put in
5 place to set up the studies, submit the studies for
6 testing, collect the data that would be analyzed,
7 and then analyze the data and file the reports.
8    Q. Okay. Do you where -- what data they
9 analyzed to confirm that these -- this lot was
10 consistent with historical performance?
11    A. I don't know the specifics of that. Again,
12 this is 17 years ago.
13    Q. And this paragraph goes on. Can you read
14 where it says to ensure?
15    A. To ensure that the lots will meet the mumps
16 potency specification of 4.3 TCID 50 per dose at
17 expiry. The minimum specification was revised from
18 4.3 to 5.0 log TCID 50 per dose at release. On
19 2/11/00 a prior approval supplement was approved
20 that included these changes.
21    Q. What do you understand the words to ensure
22 mean? What were you -- what did you mean when you
23 said to ensure?
24    A. The logic behind this would be back in the
25 prior approval supplement that was submitted and

54 (Pages 210 - 213)

Page 214

1 approved on -- in February of '00.
2    Q. Do you believe -- do you think that that
3 could be interpreting that once that prior approval
4 supplement was approved and the minimum spec was
5 revised that all lots that were released with that
6 change would meet specification and expiry?
7    MS. HARDWAY: Object to form and foundation.
8    THE WITNESS: The expectation and the
9 rationale for that supplement was the change, not
10 only in the specification, but also in the target
11 potency to provide assurance that the lots that were
12 manufactured would meet the end -- would meet the
13 specification 4.3 at the 24-month time point.
14    Q. BY MR. KELLER: Why are you referring to
15 this change, this PAS in response to BPDR; are you
16 representing that in the future that as part of the
17 BPDR that you're ensuring that the product will meet
18 current specifications going forward?
19    MS. HARDWAY: Object to form.
20    Q. BY MR. KELLER: Is that why you put this in
21 here?
22    A. The reason that this is put in here is -- so
23 the expectations in a BPDR is to report what
24 happened, report in a concise way the results of
25 your investigation, whatever corrective action you

Page 215

1 need to take, and what's the preventative action,
2 and so this sentence and the rationale for including
3 this on the document is to say that in order to
4 prevent future issues, this is -- this was the
5 decision that we made. And, again, like I said,
6 through a lot of discussion with the agency and
7 alignment on this approach looking at the data and
8 analyzing the data, this was the conclusion and the
9 path forward that we took.
10    Q. Okay.
11    A. And, by the way, we also made a
12 recommendation here, so based on the fact that the
13 potency values as reported here would not be
14 expected to lead to a lack of immunity, Merck and
15 company believes that no further action is
16 warranted, so we were notifying the agency. Our
17 position that no market action, for example, that a
18 recall would not need -- would not be required for
19 such a lot, and so we submit these reports, and when
20 we submit them and then we follow up with the agency
21 and say did you get the report, do you have any
22 concerns or questions about the report, to make sure
23 that there is no misstep or misalignment with the
24 conclusions that we have drawn, so we didn't want to
25 be surprised by that.

Page 216

1    Q. Did you ever contact the CDC about these
2 conclusions?
3    MS. HARDWAY: Object to form and
4 foundation.
5    Q. BY MR. KELLER: Strike that. Did you ever
6 contact the CDC about these lots being out of
7 compliance?
8    MS. HARDWAY: Object to form and
9 foundation.
10    THE WITNESS: I have never contacted the
11 CDC.
12    Q. BY MR. KELLER: Ever in your job at Merck?
13    A. I never contacted the CDC in my job.
14    Q. Okay. Let me --
15    A. And, by the way, the one thing I would also
16 point out here on this lot, the observation was at
17 expiry point, so, really, at the point this was --
18 the lots were already -- would not be used because
19 they were expired, but because it was at that
20 24-month period, took the conservative approach to
21 report it.
22    Q. But you didn't mention at all the one log
23 loss identified by Phil Bennett in the inference
24 that based on his modeling that Merck would not meet
25 end expiry for current product?

Page 217

1    MS. HARDWAY: Object to form and foundation.
2    THE WITNESS: As I said, the corrective and
3 preventative actions as described here are
4 summarized, as I have already mentioned, and
5 preventive meaning the execution of the prior
6 approval supplement that we previously discussed.
7    Q. BY MR. KELLER: But you didn't disclose Phil
8 Bennett's memo; correct?
9    MS. HARDWAY: Object to form. Asked and
10 answered.
11    MR. KELLER: You can answer.
12    THE WITNESS: What we provided was this.
13    Q. BY MR. KELLER: Okay. You didn't disclose
14 Tim Schofield's conclusion that there is an
15 unacceptable risk of current product failure with
16 regard to end expiry as set forth in that memo?
17    MS. HARDWAY: Object to form and
18 foundation.
19    THE WITNESS: In this memo we didn't report
20 on any modeling or hypotheses or -- or those kinds
21 of analyses here. What was important was the data
22 that -- the actual data on the lot and actual data
23 that we were subsequently receiving on products that
24 were manufactured in the knew paradigm.
25    Q. BY MR. KELLER: So is it your position you

55 (Pages 214 - 217)

Page 218

1 had no obligation at all to disclose complete
2 information?
3        MS. HARDWAY: Object to form. That's not
4 what she said.
5        Q. BY MR. KELLER: Let me back up then. I'm
6 confused. You have two individuals in Merck's
7 status -- statistical departments both concluding --
8 both coming to the same conclusion that Merck's
9 current product cannot meet its end expiry
10 specification for 4.3 log, or at least there is an
11 unacceptable risk of that happening, and so as the
12 preventive corrective action to ensure that it
13 doesn't -- that there is -- it doesn't happen again,
14 you state that the PAS and the increase in the
15 minimum release potency and in the target would
16 ensure that there would not be any
17 out-of-specification lots or out of product, out of
18 specification?
19        MS. HARDWAY: I'm going to object to form
20 and foundation, and to the extent that you were
21 grouping two different documents together as if they
22 were one, and I object to that as well. And if
23 you're able to.
24        MR. KELLER: No more speaking objections.
25 You can object to form.

Page 219

1        THE WITNESS: I'm not sure I --
2        MS. HARDWAY: Let me just be clear. I can
3 state my objection clearly as I have. I'm not --
4 there is no coaching going on. I'm being clear in
5 my objections. That is it.
6        Q. BY MR. KELLER: I'm just trying to
7 understand this. So you just testified that in this
8 BPDR that for corrective actions and to ensure
9 prospectively going forward that the product will
10 meet specification that Merck filed that PAS and
11 made -- took the actions pursuant to that PAS?
12        A. Uh-huh.
13        Q. But the information that you're receiving
14 from Phil Bennett and Tim Schofield and at that
15 meeting of November 10th where they -- there is a
16 discussion and there is a concern that somebody felt
17 that the new target may fall below 4.3 prior to
18 product expiry. They are voicing concern about
19 Merck's ability to comply with the specifications.
20 Why didn't you disclose that to CBER? Isn't that
21 misleading to say that you've -- by filing this PAS
22 that all product going forward is going to be in
23 specification, but your internal -- folks internally
24 are telling you that there is a risk that it won't.
25        MS. HARDWAY: Object to form, foundation.

Page 220

1 Asked and answered. Compound. And I object to the
2 preamble.
3        THE WITNESS: This document and the scope of
4 this document and the expectation from the agency
5 for filing a biological product deviation report are
6 about specific events, and that's exactly what was
7 done in this document.
8        MR. KELLER: Okay. Let's mark this the next
9 exhibit. Let me -- let me go back to Exhibit 5
10 which is that November -- I mean, April 9th, 2001
11 meeting minutes with CBER regarding mumps stability.
12 Exhibit 5.
13        A. Yes.
14        Q. And so you were at that meeting; correct?
15        A. Let me --
16        Q. You were at that meeting?
17        A. We are jumping around in time frame, so I
18 just want to make sure I orient myself to which one
19 we are talking about.
20        Q. Sure. In the middle of the page it says the
21 agenda and presenters for the meeting were, and it
22 says introduction, R. McKee. Do you see that?
23        A. Yes.
24        Q. So you were at that meeting?
25        A. Yes.

Page 221

1        Q. On the next page at 49239, in the first full
2 paragraph, can you read that starting CBER
3 representative.
4        A. Page 239?
5        Q. Yeah.
6        A. The first --
7        Q. First full paragraph starting CBER
8 representative.
9        A. CBER representatives acknowledged at several
10 points during the discussion that they know M-M-R II
11 is a, quote, good product that we don't want to have
12 to recall, end quote. Dr. Carbone commented that we
13 are now, quote, swimming in new waters, quote,
14 referring to compliance.
15        Q. Do you recall what was the concern about
16 that they -- that CBER doesn't want to recall the
17 product?
18        MS. HARDWAY: Object to form. Are you
19 asking for CBER's concern?
20        Q. BY MR. KELLER: You were at that meeting;
21 correct?
22        A. I was at the meeting.
23        Q. Do you recall what the CBER representative
24 was talking about with respect to a recall?
25        A. I think what Dr. Carbone, as I remember

56 (Pages 218 - 221)

Page 222

1 this -- this comment, which wasn't -- it was sort of
2 a -- sort of a comment, it wasn't a big discussion
3 topic, as I recall, but I think what she's
4 describing is that what we know about the product
5 and the experience that we with the product and all
6 the history of this product that this product works.
7 We have a lot of confidence in this product. This
8 product works. What we have is a compliance -- as
9 it says, referring to a compliance, that, you know,
10 strictly speaking, compared to -- in the
11 interpretation of the expiry and the like, I think
12 topics we have been talking about. I think that's
13 what this is about, but, again, you would have to
14 ask Dr. Carbone what she really meant.
15    Q. Was there a concern that CBER would recall
16 the mumps products because of these
17 out-of-specification results that showed up in the
18 warning letter?
19    MS. HARDWAY: Object to form. She can speak
20 for herself, not the company.
21    THE WITNESS: Yeah. I don't know -- I don't
22 know if CBER had a concern over recall of the
23 product or not. I don't know.
24    Q. BY MR. KELLER: Were there any discussions
25 at Merck regarding concern about a recall?

Page 223

1    MS. HARDWAY: Object to form.
2    THE WITNESS: Any time that we would see
3 anything that would be out of spec, for example, we
4 would ask the question, is this an action that we
5 would need to take, so under those circumstances,
6 yes.
7    Q. BY MR. KELLER: Do you know who was involved
8 in those discussions? Do you recall?
9    MS. HARDWAY: Object to form. Overbroad.
10    THE WITNESS: Those discussions would be
11 dependent upon the product, whatever year it was,
12 who was in what position when, so I can't speak
13 specifically.
14    (Deposition Exhibit No. 19 was marked for
15       identification.)
16    Q. BY MR. KELLER: I'm going to mark as Exhibit
17 19 a March 8, 2001 response to the warning letter
18 from Dr. McKee to CBER. Why don't we go off the
19 record for a moment so Dr. -- I mean, Dr. McKee can
20 take a look at this, but I'm just going to ask you
21 to really focus on the first page. I'm not going to
22 ask you any questions about observations -- any
23 observations other than Observation 3?
24    A. Okay.
25    THE VIDEOGRAPHER: This conclude media

Page 224

1 number three in the continuing deposition of Roberta
2 McKee. We are going off the record. The time is
3 4:35 p.m.
4    (Brief break taken.)
5    THE VIDEOGRAPHER: This is the beginning of
6 media number four in the continuing deposition of
7 Roberta McKee. We are back on the record. The time
8 is 4:41 p.m.
9    Q. BY MR. KELLER: Dr. McKee, I have marked
10 Exhibit 19 which is the March 8, 2001 response to
11 the warning letter of February 2001. Dr. McKee, you
12 signed this letter for Merck; correct?
13    A. Yes.
14    Q. Okay. And so did you review this letter
15 before you signed it?
16    A. Yes, I did.
17    Q. You also -- I showed you Exhibit 17 of a
18 draft, correct, of the letter?
19    A. You showed me Exhibit 17 which had a draft
20 for -- I don't know if that was all of number three,
21 but you showed me this part here.
22    Q. The response to Observation No. 3;
23 correct?
24    A. Okay. Uh-huh.
25    Q. It's -- Observation No. 3 in this final

Page 225

1 draft is significantly different, isn't it?
2    MS. HARDWAY: Object to form.
3    THE WITNESS: I didn't compare them side by
4 side, so I don't know.
5    Q. BY MR. KELLER: Okay. There was no
6 discussion of the one log loss in the final
7 submission, was there?
8    MS. HARDWAY: Object to form.
9    Q. BY MR. KELLER: Let me strike that. There
10 was no discussion of one log loss that was in the
11 draft of Exhibit 17, was there?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: The log loss that was
14 reported -- the log loss that was reported was the
15 one that was associated with the lots through --
16 prior to February of 2000, if I read this correctly,
17 so this applied to -- this analysis applied to the
18 lots, the set of lots that are discussed here. I
19 think I also read in here that we disclosed that you
20 need -- since use of incomplete data sets may
21 influence the conclusions disproportionately due to
22 the biphasic kinetics of degradation, this was only
23 lots with at least 24 months of data were included
24 in the analysis. So that -- I believe that that one
25 log loss that you're referring to are for lots that

57 (Pages 222 - 225)

Page 226

1 would have been manufactured after the process
2 change and -- which was September of '99, I believe,
3 so that would have been September of 2001. So those
4 lots at this juncture would not yet have had a full
5 data set, and so that's why I believe that's not
6 relevant here.
7     Q. BY MR. KELLER: I see. Was there any
8 discussion about the 223 lots that were identified
9 in the prior draft that were projected to
10 potentially be below 4.3 log?
11     MS. HARDWAY: Object to form. Vague.
12     Q. BY MR. KELLER: That was stricken from the
13 final version; correct?
14     A. I apologize. I don't recall the context of
15 the 223, the lots release below February 27. I'm
16 sorry, could you restate the question, please?
17     Q. Sure. In the draft there was a
18 discussion -- there was -- whoever drafted this --
19 strike that.
20         In the prior draft of March 5th, 2001, three
21 days prior to this final version, the draft had a
22 disclosure of 223 lots of M-M-R II with end of shelf
23 life titers potentially less than 4.3 TCID. That
24 was removed and stricken from the final version;
25 correct.

Page 227

1     MS. HARDWAY: Object to form.
2     THE WITNESS: What I see here is that at the
3 top of page 7 of the document, which is 7609, it
4 reports the average loss rate of .703 logs, which as
5 we mentioned a moment ago is what would be the
6 relevant analysis for this population of lots and
7 which was previously submitted to the agency in
8 2000, and then it says, thus, it is assumed that the
9 initial potency is 4.3 logs, so this analysis goes
10 to the lowest potency at which it would be released,
11 so it is really a reflection of the worst case, so
12 these 223 -- there were six lots -- actually, it
13 doesn't look like any lot was released at 4.3. It
14 looks like, if this is correct in this draft, was
15 4.4, so rather than provide that, it was providing
16 saying that if it is assuming the initial potency is
17 4.3 which would have been the absolute lowest, it
18 conveys -- it does the math on this to say that the
19 expected at expiry is 3.6.
20         So I think you are correct that that table
21 is not here, but I think the intent of the message
22 of what's the -- how do you apply the statistical
23 analysis to that population of data is conveyed.
24     Q. BY MR. KELLER: It just doesn't disclose how
25 many lots that affected; correct?

Page 228

1     MS. HARDWAY: Object to form.
2     THE WITNESS: The total number of lots is
3 not included here.
4     Q. BY MR. KELLER: Do you think that's --
5     A. But the agency would know -- the agency
6 would have access to how many lots. They release --
7 CBER releases every batch of product, so when those
8 lots are released, they know -- they review the data
9 and can even do testing, their own testing in their
10 own laboratories to get a sense on that, so they
11 have access to the number of lots. That's not
12 anything that they wouldn't have or couldn't have.
13     Q. Do you know who made the decision to take
14 out that chart?
15     A. No.
16     MS. HARDWAY: Object to form.
17     Q. BY MR. KELLER: Was it you?
18     A. I don't know.
19     Q. Okay. Let me -- let's go back to the first
20 page of the warning letter. I mean, the response to
21 the warning letter.
22     A. Okay.
23     Q. Can you read the first paragraph for the
24 record.
25     A. We acknowledge receipt on February 14th,

Page 229

1 2001, of the warning letter. (CBER - 01 - 012)
2 regarding the inspection of our West Point,
3 Pennsylvania facility between August 14th and
4 October 11th, 2000. Following receipt of the FDA
5 form 483 at the close of that inspection, we
6 undertook an in-depth critical evaluation of each of
7 the 24 observations and developed a comprehensive
8 remediation plan based on three guiding principles.
9 One, ascertain the underlying cause of each
10 observation, two, fix the specific example cited and
11 apply systemic corrections where appropriate, and,
12 three, incorporate additional management oversight
13 to monitor the effectiveness of the corrective
14 actions.
15     Q. So this --
16     A. Our response detailing our plan was provided
17 to you on October 24th, 2000.
18     Q. And then in the next paragraph, can you read
19 that one, please?
20     A. In total, 54 commitments were identified to
21 address the 24 specific observations. To date, 52
22 of these commitments have been completed and the
23 remaining two which will be completed by March and
24 December 2001 are in progress and are on track. As
25 we discussed during our meeting on March 1st, 2001,

58 (Pages 226 - 229)

Appx19846

Page 230

1 we believe that the actions taken to date
2 comprehensively address all concerns raised during
3 the referenced inspection as well as in the
4 subsequent warning letter.
5     Q. Okay. So when you talk about the in-depth
6 critical evaluation in the development of
7 comprehensive remediation plans, for purposes of the
8 out of specification of mumps at end expiry, was it
9 your conclusion that by filing the PAS in September
10 of 1999 which was approved in February of 2002 that
11 that solved -- that was all that Merck was required
12 to do?
13     MS. HARDWAY: Object to form.
14     THE WITNESS: Without going back and looking
15 at each of the specific commitments, I don't know
16 that I can --
17     Q. BY MR. KELLER: Sure.
18     A. -- fairly answer that question.
19     Q. Let's turn our attention to Observation 3.
20     A. Okay.
21     Q. And specify --
22     A. But what I would say -- let me just -- if I
23 can just complete my thought here, which is what's
24 described here was that whenever we would get an
25 observation, we would look comprehensively at,

Page 231

1 really, what was the root cause. Why did that
2 happen? What were the circumstances around that and
3 to identify and what we believe to be effective
4 corrective action, so it wasn't that we wanted to
5 look -- we wanted to actually prevent them perhaps
6 not just in the one example, but how might this
7 scenario apply to another product or another
8 situation so that there really was a global
9 corrective action. It wasn't sufficient to identify
10 or correct just a single -- you know, in one area,
11 if it could potentially occur elsewhere. So the
12 idea was to comprehensively address. And then the
13 third point around management oversight was that
14 it's really to monitor, that, in fact, the
15 approaches that we were taking were, indeed,
16 effective, and so that would apply whether it is on
17 any of the observations or even Observation No. 3.
18 So we took corrective actions, but it didn't mean
19 that the company was that and that was it and we
20 weren't going to look anymore. We were going to
21 continue to monitor and confirm that, in fact, the
22 path we had taken was the right one. Okay?
23     Q. Okay. Do you know how many doses were on
24 those 223 lots that were in the prior draft?
25     MS. HARDWAY: Object to form and

Page 232

1 foundation.
2     THE WITNESS: I don't know. I don't know.
3 I'm sorry.
4     Q. BY MR. KELLER: Do you have a rough estimate
5 of how many doses are in each lot?
6     MS. HARDWAY: Object to form. Asked and
7 answered.
8     THE WITNESS: Yeah. I think we asked this
9 earlier. I don't recall the volume of the number of
10 vials in a lot. I think they varied by product, so
11 I don't recall.
12     Q. BY MR. KELLER: Okay. Turn your attention
13 to 608 which is Merck's response to Observation 3.
14     A. Okay.
15     Q. And it says: For clarity, each point will
16 be addressed individually. Can you read the first
17 paragraph?
18     A. With regard to expectations for products
19 meeting specifications throughout the labeled
20 expiry. We agree. As stated in our October 24th,
21 2000 communication, we historically considered the
22 M-M-R label titers to reflect minimum release
23 specifications. As such, measured potency results
24 below label specification observed during stability
25 monitoring M-M-R II were not considered atypical.

Page 233

1 As a result of communication with CBER over the last
2 several years, we have implemented changes,
3 including an increase in the mumps content of the
4 product in September of 1999 to ensure compliance
5 with the labeled titer through expiry. Today, all
6 products have end expiry specifications consistent
7 with their label.
8     Q. What did you mean when you say today all
9 products have end expiry specifications consistent
10 with their label?
11     A. This is an example of what I was describing
12 on the cover page which is -- so we would look to
13 see if there were any questions or ambiguities of
14 what's the difference between a release spec and an
15 expiry spec for any given product we looked across
16 the product line to make sure that we were not
17 simply looking at the example that the agency
18 cited.
19     Q. So you looked to see whether or not if there
20 was other evidence that Merck's products have an
21 end -- has products that do not meet end expiry for
22 its mumps products, correct, besides the one
23 specific examples raised in the warning letter;
24 correct?
25     MS. HARDWAY: Object to form.

59 (Pages 230 - 233)

Page 234

1    THE WITNESS: No. No, that's not what I
2 said. What I was saying is simply to have very
3 clearly established release specifications and
4 expiry specifications has nothing to do with
5 whatever lots we were doing. It was that when you
6 looked across the products, was it very clear to us
7 what those were for each and every product that we
8 have. We didn't want to find ourselves -- perhaps
9 there would be some other example for some other
10 older product that perhaps at the time that those
11 products were licensed that that specificity wasn't
12 required. They are really sort of bringing it up to
13 what we heard from CBER as contemporary
14 expectations.
15    Q. BY MR. KELLER: So are you not representing
16 that all current product will meet specifications?
17    MS. HARDWAY: Object to form.
18    THE WITNESS: What I'm saying in this
19 sentence is that all products have specifications to
20 say that this product must meet this parameter at
21 expiry, whether it's potency, moisture, pH,
22 whatever.
23    Q. BY MR. KELLER: And so when you say as we
24 have implemented changes, including an increase in
25 the mumps content of the product in September to

Page 235

1 ensure compliance with the label titer through
2 expiry. Do you see that?
3    A. Uh-huh.
4    Q. Is it fair to say that CBER was expecting
5 that all product after that change would meet the
6 specifications at end expiry for its mumps
7 products -- for your mumps products?
8    MS. HARDWAY: Object to form.
9    THE WITNESS: What I can say is that through
10 our own analyses through sharing those analyses with
11 CBER and the many communications that we had, an
12 engagement we had with them on this topic, we
13 believed and they agreed that that approach should
14 provide assurance that we would meet 4.3 for the
15 products we were talking about.
16    Q. BY MR. KELLER: And over the 24 month --
17    A. Yes. Yes. We agreed on that.
18    MR. KELLER: Let me mark the next exhibit as
19 Exhibit 20.
20    (Deposition Exhibit No. 20 was marked for
21    identification.)
22    Q. BY MR. KELLER: For the record, Exhibit 20
23 is an e-mail, two e-mails, one from Keith Chirgwin
24 to a series of people including you, Dr. McKee, and
25 a second e-mail from Phil Bennett to a series of

Page 236

1 individuals, again, including yourself, Dr. McKee,
2 and the documents bear Bates numbers 562218 through
3 562219. And I want to draw your attention to the
4 March 13th, 2001 e-mail. This is five days after
5 the response to the warning letter was submitted,
6 and it's entitled Preparation for CBER discussion
7 amongst stability expiry. It says: Attached,
8 please find summary assignments from today's
9 planning meeting for the anticipated CBER discussion
10 on mumps stability expiry later this month. Do you
11 see that?
12    A. I do.
13    Q. Okay. Do you recall receiving this
14 e-mail?
15    A. No.
16    Q. Okay. And in the attachment there is a
17 chart of expiry 24 months through --
18    A. 2219?
19    Q. Yeah, 2219. Do you see that?
20    A. Yes.
21    Q. Okay. And if you look at the e-mail from
22 Phil Bennett two days later, again, you are
23 identified as being a recipient of this?
24    A. Uh-huh.
25    Q. Do you have any reason to believe you didn't

Page 237

1 receive this e-mail?
2    A. I have no information either way that I
3 would have received -- I don't -- yeah, I have no
4 reason to believe I didn't receive it, but I don't
5 recall receiving it.
6    Q. Under Preparation -- under -- can you read
7 what Phil Bennett is writing to you as well as a
8 host of other folks?
9    A. Following are the loss and variability
10 estimates for mumps at various time points. Our
11 expiry dating needs to be 12 months in order to
12 provide 95 percent confidence that a lot released at
13 5.0 will be above 4.3 at expiry.
14    Q. What do you understand that to mean?
15    MS. HARDWAY: Object to form, foundation.
16    Q. BY MR. KELLER: Let me back up a second.
17 Why was Phil Bennett providing an estimate of shelf
18 life on mumps -- on Merck's current release of
19 product?
20    A. I don't know why he was doing that.
21    Q. Does that concern you that he's estimating
22 only 12 months of product at the current release,
23 minimum release specification?
24    MS. HARDWAY: Object to form and
25 foundation.

60 (Pages 234 - 237)

Page 238

1    THE WITNESS:  What do you mean by concern?
2    Q.  BY MR. KELLER:  Do you have a concern?  You
3 just wrote a letter in response to a warning letter
4 that you had testified was significant.  You had
5 never received those before about mumps not meeting
6 end expiry specification and now the statistician
7 who has been involved in doing stability modeling
8 for your group is now reporting that based on his
9 analysis that the expiry needs to be 12 months to be
10 able to meet that four three -- 4.3 log end expiry
11 specification.  That doesn't concern you?
12    MS. HARDWAY:  Object to the preamble of that
13 question and object to form and foundation.
14    MR. KELLER:  You can answer.
15    THE WITNESS:  So what I would say is whether
16 it's Phil and what Phil did here or anybody, if
17 anyone had a concern -- and you can see Phil sent
18 this to a lot of people, which is not unusual, but,
19 you know, there was a broader group of people who
20 were communicating on these kinds of topics, it
21 allowed a robust forum for discussion and putting
22 that into context and understanding what exactly
23 that meant.  So, you know, I don't -- so, to me,
24 it's a piece of information that I'm sure was
25 subsequently discussed and vetted and put into

Page 239

1 context and understood what -- whether -- you know,
2 what to do with that perspective.
3    Q.  BY MR. KELLER:  This was in preparation for
4 a meeting with CBER; correct?
5    A.  Uh-huh.  Uh-huh.
6    Q.  Do you know whether or not that was ever
7 disclosed to CBER at that meeting?
8    MS. HARDWAY:  Object to form.
9    THE WITNESS:  I don't know.  I don't recall
10 the preparation.  I don't recall that, no.
11    Q.  BY MR. KELLER:  Okay.
12    A.  I don't recall.
13    Q.  Would you expect that --
14    MS. HARDWAY:  Object to form.
15    Q.  BY MR. KELLER:  I'm not done yet.  Would you
16 expect that this information would have been
17 disclosed to CBER having just filed a response to a
18 warning letter on this exact issue of stability?
19    MS. HARDWAY:  Object to form and
20 foundation.
21    THE WITNESS:  I -- what I will say is that
22 the -- I expect that the stability analyses and a
23 broader context around what we know about the
24 product, what the -- our statistical analysis tell
25 us, what our real data tell us, that would be

Page 240

1 brought into that conversation.  Whether or not this
2 statement and this specific table, I don't know.  I
3 can't say that.
4    Q.  BY MR. KELLER:  Well, did, in fact, you
5 state later on based on these stability models that
6 were being run by Phil Bennett required Merck to
7 issue a BPDR because that you cannot meet the end
8 expiry potency of 4.3 and there was less than
9 12-month shelf life?
10    MS. HARDWAY:  Object to form, foundation.
11    Q.  BY MR. KELLER:  You don't remember that?
12    MS. HARDWAY:  Object to form, foundation.
13 Vague.
14    THE WITNESS:  Whenever a concern is raised,
15 we ask the question should it be -- should -- is
16 this -- what's new, what's different.  Is there
17 something here that requires -- so it gets a
18 cross-functional audience of people with relevant
19 knowledge about it to assess that information and
20 make an ultimate decision about whether that
21 notification is required.
22    Q.  BY MR. KELLER:  Do you recall there being
23 any discussion at Merck that the minimum release
24 specification that was raised as part of the PAS in
25 September or February of 2000 that those

Page 241

1 calculations that were made by CBER were incorrect
2 and did not represent the total loss that Merck had
3 anticipated?
4    MS. HARDWAY:  Object to form and
5 foundation.
6    THE WITNESS:  I don't -- I don't recall
7 that.
8    MR. KELLER:  Let me mark this next exhibit
9 as Exhibit 21.
10    MS. HARDWAY:  Jeff, if we are -- because I
11 think we have been over an hour now.
12    MR. KELLER:  Sure.
13    MS. HARDWAY:  If we could take another
14 break, that would be great.
15    MR. KELLER:  Sure.
16    THE VIDEOGRAPHER:  We are going off the
17 record.  The time is 5:03 p.m.
18    (WHEREUPON, a short break was taken from
19    5:03 p.m. to 5:27 p.m.)
20    THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 5:27 p.m.
22    MR. KELLER:  Let me mark an Exhibit 21, 22
23 and 23.
24    (Deposition Exhibit Nos. 21, 22 and 23
25    were marked for identification.)

61 (Pages 238 - 241)

Appx19849

Page 242

1    Q.  BY MR. KELLER:  Exhibit 21 bears Bates stamp
2  number 616610.  Exhibit 22 bears Bates stamp number
3  616616, and it's a presentation through 10 pages,
4  the presentation.  And Exhibit 23 is -- bears Bates
5  stamp number 616622 through 640.
6        And, for the record, Exhibit 21 is an e-mail
7  from Joye Bramble to a series of recipients,
8  including you, Dr. McKee, regarding final TPAC
9  presentation - mumps stability, and attached are two
10  documents, and the documents that are attached are
11  in Exhibit 22 and 23.
12        And it says:  All, see attached below the
13  final set of slides for MRL's section of the TPAC
14  presentation on mumps stability.  Joye.
15        Dr. McKee, do you recall receiving this
16  e-mail with the attachments attached, Exhibits 22
17  and 23?
18    A.  No.
19    Q.  What is the TPAC?
20    A.  I don't recall what that forum was,
21  honestly.  I don't recall that forum.
22    Q.  Okay.  That's within MRL, though; correct?
23    A.  I don't know if the scope is just MRL or
24  what.  I'm not sure.  I don't recall that forum.
25    Q.  Sure.  Do you have any reason to believe you

Page 243

1  didn't receive this e-mail with the attachments?
2    A.  No, I have no reason to think otherwise.
3    Q.  Okay.  There is a mumps stability TPAC
4  backup which is the Exhibit 22.  Who would have
5  prepared those slides with regard to stability based
6  on your best estimation?
7        MS. HARDWAY:  Object to form to the extent
8  it calls for speculation.
9        MR. KELLER:  You can answer.
10        THE WITNESS:  I don't know who would have
11  prepared these slides.
12    Q.  BY MR. KELLER:  Okay.  If you look on
13  Exhibit 22 on page 2 of that exhibit, there is a
14  stability data provided to CBER.  Do you see that?
15    A.  They are not numbered, but this page here?
16    Q.  It's the second page.  Page --
17    A.  The table?
18        MS. HARDWAY:  Jeff, is your copy Bates
19  stamped?
20        MR. KELLER:  Mine is.  Unfortunately, we had
21  to print it out in native.
22        MS. HARDWAY:  Okay.
23        MR. KELLER:  I represent it's those Bates
24  numbers, but --
25        MS. HARDWAY:  Yeah.  I just want to make

Page 244

1  sure because it was hard when you say a page
2  number.
3        MR. KELLER:  That's why I'm --
4        MS. HARDWAY:  Okay.
5        MR. KELLER:  It's page 2 of the one that
6  says backup slides, mumps stability.
7        THE WITNESS:  Okay.
8    Q.  BY MR. KELLER:  Under the second asterisk it
9  says:  Using FDA guidelines for stability analysis.
10  Do you see that?
11        MS. HARDWAY:  Jeff, I'm sorry again.
12  What -- I don't think --
13        MR. KELLER:  Sorry.  It must be backwards
14  then.
15        MS. HARDWAY:  Your document --
16        MR. KELLER:  It should be the same document.
17  Yeah, it's the second page.  Exhibit 22, page 2.
18  It's just --
19        MS. HARDWAY:  Okay.
20        MR. KELLER:  -- native.  They just look
21  differently.
22        MS. HARDWAY:  Okay.
23    Q.  BY MR. KELLER:  If you go to look at the
24  second page, using FDA guidelines for stability
25  analysis, do you understand what that is?

Page 245

1        MS. HARDWAY:  Object to form.
2    Q.  BY MR. KELLER:  Let me strike that.  Is
3  there FDA guidelines for stability analysis?
4    A.  I'm not -- I don't recall precisely what
5  they are.
6    Q.  Okay.  And so can you read that paragraph?
7    A.  Using FDA guidelines for stability analyses,
8  the minimum release specification should be based on
9  the average lost estimate, plus a factor for
10  variability in the loss estimation and in the
11  release potency determination.  Based on the
12  10/24/2000 data analysis and estimates for release
13  potency assay variability, the minimum release
14  specification should be 1.0 log above our minimum
15  expiry specification to provide 95 percent
16  confidence that the lot will remain above the expiry
17  spec throughout its shelf life.
18    Q.  And at the time of this document, March
19  2001, the minimum release specification was 5.0;
20  correct?
21    A.  Yes.
22    Q.  And so based on this statement of what the
23  FDA guidelines are in that stability analysis
24  provided to CBER on October 24th, 2000, is it fair
25  to say that an end expiry potency specification

62 (Pages 242 - 245)

Appx19850

Page 246

1 would have to be 4.0 to meet that one log loss?
2     MS. HARDWAY: Object to form and foundation.
3     THE WITNESS: Well, I don't know the
4 specifics of that, but what I would say is that
5 these are guidelines, and so I don't know if -- I
6 mean, I think guidelines to help think about this,
7 but, actually, I don't know the context of this
8 slide. I don't -- I don't have the broader context
9 of this slide.
10     Q. BY MR. KELLER: You've never -- you've never
11 heard that -- seen that analysis before?
12     A. I don't recall this table. I don't recall
13 this table.
14     Q. Do you believe that analysis is incorrect?
15     MS. HARDWAY: Object to form and
16 foundation.
17     Q. BY MR. KELLER: Based on your 17 years of
18 experience running the -- being the head of quality
19 at Merck?
20     MS. HARDWAY: Same objections.
21     THE WITNESS: I have 17 years of experience
22 of quality at Merck or 15-ish at Merck. I don't
23 think that helps me, necessarily, judge the accuracy
24 of this table, so I don't -- I just don't know. I
25 don't have -- it's a slide, so I don't have the

Page 247

1 context of it.
2     Q. BY MR. KELLER: Given at a presentation to
3 TPAC, you don't know what TPAC is; correct?
4     A. I don't recall the forum. I don't recall --
5     Q. Let me direct your attention --
6     A. -- who attended that forum.
7     Q. -- to page 5 with the mumps expiry dating
8 chart, and under this chart -- have you ever seen
9 this chart before? You're right. It's the same
10 chart that was attached to Phil Bennett's memo about
11 the 12-month shelf life.
12     A. So yes.
13     Q. Okay. And when you say yes, you've seen it
14 today, but you don't recall seeing -- do you recall
15 seeing it previously?
16     A. I don't recall seeing this.
17     Q. Okay. And under this chart it identifies at
18 shelf life of 12 months that the 95 lower bound
19 expiry titer is 4.31; correct?
20     MS. HARDWAY: Object to form, foundation.
21     THE WITNESS: This table states what you
22 just said, I believe. You asked me to read the
23 table. 4.31 is in this box here, yeah.
24     Q. BY MR. KELLER: And so that -- you
25 understand it to be -- represent the end expiry

Page 248

1 titer?
2     MS. HARDWAY: Object to form and
3 foundation.
4     Q. BY MR. KELLER: Based on your experience at
5 Merck, the 15 years as the head of quality?
6     MS. HARDWAY: Same objection.
7     THE WITNESS: What I understand about this
8 table is that applying the model that was applied by
9 Phil as articulated here on this Exhibit No. 20, but
10 if you apply that math to these numbers, these --
11 into the release titer, these are -- the minimum
12 release titer, these are the numbers you get.
13     Q. BY MR. KELLER: Okay. So at 12 months
14 the -- is it fair to state in order to meet the 4.3
15 end expiry specification, based on this model there
16 would only be 12-month shelf life?
17     MS. HARDWAY: Object to form and
18 foundation.
19     THE WITNESS: Can you just repeat the
20 question so --
21     MR. KELLER: Can you read it back.
22     (Question read back.)
23     MS. HARDWAY: Restate my objections.
24     THE WITNESS: According to this analysis is
25 I think -- in the previous question, this analysis

Page 249

1 using those assumptions suggest or conclude -- you
2 know, the result of that application of that model
3 to this is 4.3 at 12 months, according to this
4 table. I haven't done the math myself to confirm
5 the accuracy, but, you know, I don't have any
6 reason, necessarily, to question it.
7     Q. BY MR. KELLER: Okay. If you turn your
8 attention to Exhibit 23 which is the clinical issues
9 exhibit that was attached to this e-mail.
10     A. Okay.
11     Q. This one actually has Bates numbers --
12     A. Yes.
13     Q. -- so this will be a little bit easier to
14 identify. Let me direct your attention to 6163 --
15 I'm sorry, 616638 of Exhibit 23 titled Expiry Trial
16 Results Implications. Do you see that?
17     MS. HARDWAY: Just can you just give her a
18 minute to orient herself to the document?
19     MR. KELLER: Sure.
20     THE WITNESS: This page here?
21     Q. BY MR. KELLER: Yes.
22     A. Yes. Got it.
23     Q. The expiry trial, you understand it to be
24 Protocol 7; correct?
25     A. Yes.

63 (Pages 246 - 249)

Page 250

1  Q. And so in implications -- here it says label
2  change. Do you recall being involved in any
3  presentations where it was discussed as in this
4  document, quote, stability data require -- require
5  lowering labeled months potency from 4.3 to 4.0
6  log. Do you see that?
7  A. I see that.
8  Q. Do you recall any discussion that the
9  stability data required that the end expiry potency
10  specification be reduced from 4.3 to 4.0?
11  MS. HARDWAY: Object to form and
12  foundation.
13  THE WITNESS: I don't recall any -- I don't
14  recall any specific meetings or discussions stating
15  that. What I read here, and as I have said before,
16  if you apply that model and that math and, you know,
17  looking here to have 24 months, you would --
18  that's -- that's logically to me about where this
19  comes from, but that's assuming that that model is
20  representative of the product that we are talking
21  about.
22  Q. BY MR. KELLER: Okay. This model -- Phil
23  Bennett's model is being circulated widely as a
24  statement that Merck can't meet its current end
25  expiry specification; correct?

Page 251

1  MS. HARDWAY: Object to form and foundation.
2  THE WITNESS: I don't know how widely it was
3  distributed, but --
4  Q. BY MR. KELLER: Well, you saw the e-mails.
5  It went to -- let's see. There is a long list of
6  this. It went to Keith Chirgwin, Kati Abraham,
7  Ronald Salerno, Mark Rosolowsky, you, Dr. McKee,
8  Manal Morrisey, Tim Schofield, Joseph Heyse, Holly
9  Matthews, John Hartzel, Jerald Sadoff, Joye Bramble,
10  Mark Galinski, Cynthia Morrisey, William
11  Collingwood, Mark Twyman, Emilio Emini, Emilio
12  Emini, Dorothy Margolskee, Henrietta Ukwu. Do you
13  see that?
14  A. I do.
15  Q. Those represent senior management at Merck,
16  don't they?
17  MS. HARDWAY: Object to form.
18  THE WITNESS: These -- the colleagues on
19  this e-mail are at varying levels at least at the
20  time I knew them.
21  Q. BY MR. KELLER: But they were senior
22  management on that circulation list; correct?
23  MS. HARDWAY: Object to form.
24  THE WITNESS: I wouldn't say that all these
25  people were senior management.

Page 252

1  Q. BY MR. KELLER: But there are senior
2  management there?
3  A. There are.
4  Q. Margolskee, Ukwu, they are senior
5  management; correct?
6  A. Yes, they are.
7  Q. So is Keith Chirgwin?
8  A. I don't recall what his level was at the
9  time.
10  Q. He was an MRO, regular --
11  A. He reported -- I thought he reported in to
12  Henrietta, so he was a subordinate of hers. I'm
13  not -- but, again, I don't recall.
14  Q. And Schofield who had written that memo
15  about the unacceptable risk of current product
16  failure on November 3rd, 2000, he's also on this
17  list; correct?
18  MS. HARDWAY: Object to preamble. Object
19  to form.
20  THE WITNESS: Yes, Timothy Schofield is on
21  the distribution list of Phil's memo, Exhibit 20.
22  MR. KELLER: Let me mark this next exhibit
23  as Exhibit 24.
24  (Deposition Exhibit No. 24 was marked for
25  identification.)

Page 253

1  Q. BY MR. KELLER: For the record, Exhibit 24
2  is another BPDR dated April 20th, 2001, bearing
3  Bates stamp number 754233 through 238. And let me
4  ask you if you recognize this BPDR as one that you
5  had issued out of your office pursuant to your
6  signature?
7  A. Yes, I believe I did.
8  Q. And this one represented multiple lots that
9  were out of specification for mumps end expiry
10  potency; correct?
11  MS. HARDWAY: Object to form.
12  THE WITNESS: May I take a moment to review?
13  MR. KELLER: Sure. We can go off the record
14  while she does that.
15  VIDEOGRAPHER: We are going off the record.
16  The time is 5:42 p.m.
17  (Brief break taken.)
18  THE VIDEOGRAPHER: We are back on the
19  record. The time is 5:44 p.m.
20  Q. BY MR. KELLER: So, Dr. McKee, now that you
21  reviewed Exhibit 24, the April 20th, 2001 BPDR
22  regarding mumps product. These were lots that were
23  for mumps product that was released that had -- were
24  out of specification for end expiry; correct?
25  A. These are lots that were -- let me see.

64 (Pages 250 - 253)

Page 254

1 Hold on. So these are lots -- as it states in the
2 second paragraph on the Bates number ending 234,
3 these were lots that were selected that based on
4 recent stability analyses, expiry potencies would be
5 predicted to be low -- to be below 3.7 log TCID 50
6 per dose. These lots were manufactured, I believe,
7 prior to the process change.
8    Q. And so they were retested; correct?
9    A. Correct.
10    Q. And then they came out to be below 4.3,
11 anyway; correct?
12    A. Well, they were tested at expiry.
13    Q. Right.
14    A. Right. Uh-huh.
15    Q. So they were below 4.3 log; correct?
16    A. They were below 4.3, but what's interesting
17 about these is that the statistical model that we
18 have been talking about that predicted that they
19 would be below 3.7 provides evidence, in fact, that
20 none of these are at 3.7 and they range from 3.9 to
21 4.3. Again, and so as I was saying, the model --
22 the data -- it's an indicator and it's something
23 that we should look at. It's the best -- it's an
24 effort to try to model what we believe the profile
25 will be, but at the -- at least in this case where

Page 255

1 the model would have predicted these to be lower,
2 actually, they ended up testing higher.
3    Q. So the model can predict what individual
4 lots would be at end expiry?
5    MS. HARDWAY: Object to form.
6    Q. BY MR. KELLER: I'm confused, Doctor. I
7 really am. So it's your testimony that because
8 these lots that were predicted to be at below 3.7
9 log based on the model came in at above that, came
10 in at 3.9 or 4.2 or 4.0 or 4.3 that that means the
11 model is inaccurate because these were actually
12 higher?
13    A. A model isn't accurate or inaccurate in a
14 black and white sense. What it is, it's really --
15 it's how robustness and how representative it is, so
16 it's not a black and white situation. What I'm
17 saying is that based upon -- and even some of the
18 other tables we were looking at and we described
19 that you would come down to some specific
20 conclusions about expiry dating periods or what a
21 potency might be, if you released at one level what
22 it might be, using that model for these five lots,
23 it was predicted based upon the model that we should
24 see results to be 3.7 or below, or this says below
25 3.7, and all I'm pointing out is that using that

Page 256

1 model and taking it very strictly based on that
2 math, that the reality doesn't always play out as
3 you believe, so it suggests that maybe it doesn't
4 fully represent or even necessarily, you know,
5 accurately represent the profile of the product.
6    Q. It's a -- the analysis that there is a lower
7 bound confidence level --
8    A. Uh-huh.
9    Q. There is a risk to it. That's what your --
10 that's what these models are projecting is risk,
11 aren't they?
12    MS. HARDWAY: Objection.
13    Q. BY MR. KELLER: That a single lot will have
14 that result based on the probability of that model;
15 correct?
16    MS. HARDWAY: Object to form.
17    THE WITNESS: The model predicts an average
18 and a 95 percent confidence interval.
19    Q. BY MR. KELLER: So if you took, based on
20 that model, every lot that was released and you
21 tested every lot through its range of expiry through
22 24 months, doesn't that model predict that a certain
23 percentage of those lots will fall below that
24 number, that that -- all those -- all of those lots
25 will fall below that model?

Page 257

1    MS. HARDWAY: Object to form.
2    THE WITNESS: I'm sorry. Could you repeat
3 that question?
4    Q. BY MR. KELLER: Sure. I'm trying to
5 understand your testimony. Your testimony appears
6 to say that because you projected a 3.7 log end
7 expiry loss for these lots because of their release
8 specification that this shows that the model is
9 inaccurate. Is that your testimony?
10    MS. HARDWAY: No, that's not -- that's not
11 her testimony.
12    MR. KELLER: Let her answer.
13    MS. HARDWAY: But you've gone back over
14 this --
15    MR. KELLER: Let her answer.
16    MS. HARDWAY: -- and I'm just -- you've now
17 been trying to mischaracterize it a number of
18 different times, but if she's able to answer it, go
19 ahead and answer it again.
20    MR. KELLER: You're just coaching the
21 witness.
22    MS. HARDWAY: I am not coaching the witness,
23 Jeff. You've been asking this question. She's been
24 testifying very fully and completely to answer your
25 question.

65 (Pages 254 - 257)

Appx19853

Page 258

1      MR. KELLER: Go ahead and answer the
2  question, please.
3      MS. HARDWAY: You just don't like her
4  answers.
5      THE WITNESS: The model, as stated here in
6  the second paragraph, predicts that we would see
7  values below 3.7 for these lots that were
8  manufactured and had a release potency result, and
9  actually what I'm saying is that none of the five
10  are -- yielded results which are consistent with the
11  prediction of the model.
12      Q.  BY MR. KELLER: Didn't you, in fact, discuss
13  this exact issue in a series of e-mails where you
14  stated that I understand and agree that the
15  probability of all these extremes being realized on
16  a single lot is very low; however, there are no
17  controls to ensure that they do not occur.  Do you
18  recall stating that regarding the specific issue of
19  whether or not these projections will identify
20  whether or not a single lot will fall out of
21  compliance?
22      MS. HARDWAY: Object to form.  Vague.
23      THE WITNESS: Did you share that document?
24  I don't recall.
25      Q.  BY MR. KELLER: You don't recall?

Page 259

1      Did you share that?  I mean --
2      Q.  We will go over it in a minute.  I'm asking.
3      A.  Okay.
4      Q.  We will get there in a minute.
5      A.  Okay.
6      Q.  Let me ask you a question.  Each one of
7  these -- five of these six lots were below the end
8  expiry potency; correct?
9      A.  Each of these lots were below -- well, the
10  numbers are here, so you can see one of them -- one
11  of them tested at 4.3.  The other four tested
12  between 3.9 and 4.2.
13      Q.  Okay.  Let me direct your attention to page
14  4 of the BPDR regarding the follow-up.
15      A.  Okay.
16      Q.  At 754236.  Can you read the third
17  paragraph?
18      MS. HARDWAY: And can I just state an
19  objection for the record?  You've been asking her
20  throughout the day to read parts of documents into
21  the record without a question, and so having her
22  read passages of documents into the record without a
23  question is improper, and I'm just going to object
24  to this question and all the previous ones where all
25  she's doing is reading into the record.  But go

Page 260

1  ahead.
2      MR. KELLER: Go ahead and read it.
3      THE WITNESS: Evaluation by active stability
4  monitoring indicates that the performance of these
5  lots is consistent with the historical performance
6  of this product manufactured during this time frame.
7  On 2/11/2000 a prior approval supplement was
8  approved that included an increase in the mumps
9  release potency specification from 4.3 to 5.0 log
10  TCID 50 per dose.  Furthermore, changes were made to
11  the potency test format which were designed to
12  reduce assay variability by increasing the number of
13  replicates tested.  These changes were implemented
14  to ensure that in the future potency for lots at
15  expiry would meet the current specification of 4.3
16  log TCID 50 per dose.
17      Q.  BY MR. KELLER: So when you wrote in this
18  BPDR that these changes were implemented to ensure
19  that in the future potency for these lots at expiry
20  would meet the specifications of 4.3 log dose, do
21  you believe that CBER was expecting that all future
22  doses released to the public after the PAS that was
23  filed or approved in February of 2000 would meet
24  those specifications?
25      MS. HARDWAY: Object to form and calls for

Page 261

1  speculation.
2      THE WITNESS: So you're asking me what CBER
3  believed?
4      Q.  BY MR. KELLER: Well, would you expect them
5  when you represent that in the future to ensure that
6  in the future -- strike that.
7      What did you mean when you said these
8  changes were implemented to ensure that in the
9  future the potency of the lots at expiry would meet
10  the current specifications of 4.3 log?
11      A.  The -- this is a -- the summary of the
12  scientific basis that was presented in the
13  supplement to make the associated changes such
14  that -- which were twofold, primarily -- threefold.
15  They were to increase the target of manufacturer,
16  increase the minimum release potency, and I believe
17  make changes to the assay to reduce variability to
18  get a better estimate.  So those changes
19  collectively would provide assurance that the lots
20  that would be manufactured would meet the minimum
21  specification, which is different than the lot --
22  the way and the conditions under which these lots in
23  this BPDR were manufactured and tested.
24      Q.  Did you have any obligation to respond to
25  this BPDR to disclose that any evidence that Merck

66 (Pages 258 - 261)

Appx19854

HIGHLY CONFIDENTIAL

Page 262

1 had that its current product could not meet
2 specification at end expiry?
3     MS. HARDWAY:  Object to form and
4 foundation.
5     THE WITNESS:  The scope of the BPDR is
6 pretty clear in that you need to describe the -- you
7 know, what is the event and respond to the
8 components as described in the form, so what was the
9 event, what were the contributing factors, and what
10 were the follow-ups.
11    Q.  BY MR. KELLER:  And isn't it also true that
12 BPDR requires you to represent what actions are
13 taken to ensure that the deviation doesn't occur in
14 the future?
15    MS. HARDWAY:  Object to form.
16    THE WITNESS:  That is included in the
17 follow-up, and in this case it is, as we were just
18 discussing, included in the third paragraph on page
19 4 of 6 or Bates page 754236.
20    Q.  BY MR. KELLER:  And what are you referring
21 to?
22    A.  I'm referring to, furthermore, changes were
23 made to the potency test format -- I'm sorry.  On
24 2 -- February 11th, 2000, a prior approval
25 supplement was approved that included an increase in

Page 263

1 the mumps release potency specification from 4.3 to
2 5.0.  Furthermore, changes were made to the potency
3 test format which were designed to reduce assay
4 variability by increasing the number of replicates
5 tested.  These changes were implemented to ensure
6 that in the future potency for lots at expiry would
7 meet the current specification of 4.3 log TCID 50
8 per dose.
9     MR. KELLER:  Okay.  Let me mark this next
10 exhibit as Exhibit 25.
11    (Deposition Exhibit No. 25 was marked for
12     identification.)
13    Q.  BY MR. KELLER:  For the record, Exhibit 25
14 is a series of e-mails bearing Bates No. 561350
15 through 355, and I'd like to direct your attention
16 to the e-mail dated January 21st, 2002, which was
17 about 10 months after the filing of the BPDR we just
18 went through, and this is from Christopher Petroski
19 to Keith Chirgwin, Jeffrey C-H-O-D-A-K-E-W-I-T-Z and
20 Joye Bramble, Florian Schodel, Emilio Emini, you,
21 Dr. McKee.
22    Who was Christopher Petroski?
23    A.  He is a colleague, I believe at that time,
24 in the biologics licensing or vaccine regulatory
25 analytical sciences organization.

Page 264

1     Q.  Okay.  Can you take a minute to read this
2 e-mail?
3     A.  So reading the Chris -- Chris's e-mail?
4     Q.  Sure.
5     A.  Okay.  I have read that.
6     Q.  Okay.  In here he's talking about the two
7 BPDR's that we just went through, correct, the March
8 2001 and the April 2001 BPDR's regarding mumps
9 product at end expiry?
10    MS. HARDWAY:  Object to form and
11 foundation.
12    THE WITNESS:  I don't -- I assume so.
13    Q.  BY MR. KELLER:  Okay.  Do you recall
14 receiving this e-mail?
15    A.  No.
16    Q.  Do you have any reason to believe that you
17 didn't receive it?
18    A.  No.
19    Q.  Okay.  Here he writes:  In both cases we
20 stated that we implemented a new mumps release
21 specification 5.0 dose to ensure lots of expiry
22 would meet 4.3 at expiry.  Therefore, from CBER's
23 point of view, they may be expecting all recent lots
24 after increasing the mumps component -- content and
25 increasing the release specification to meet 4.3

Page 265

1 through expiry.  That may explain the fact there has
2 been no negative feedback in response to the BPDR's.
3 Do you see that?
4     A.  I see that.
5     Q.  Okay.  Do you recall any discussion about
6 why CBER did not come back and discuss -- strike
7 that.
8     Did CBER ever come back and discuss these
9 BPDR's with your team?
10    A.  No, but it was common practice that after
11 submitting the BPDR we would reach out to them to
12 confirm that they received it, that it had been
13 reviewed, and asked them if they had any questions
14 or concerns about the BPDR.
15    Q.  Here Chris Petroski is stating that from
16 CBER's point of view they may be expecting all
17 recent lots to meet the 4.3 expiry.  Is that what
18 he's saying there?
19    MS. HARDWAY:  Object to form and
20 foundation.
21    THE WITNESS:  I can just read what Chris
22 wrote, therefore from CBER's point of view, they may
23 be expecting all recent lots other than increasing
24 the mumps -- after increasing the mumps content
25 increasing the release specification to meet the 4.3

67 (Pages 262 - 265)

Appx19855

HIGHLY CONFIDENTIAL

Page 266

1 per dose.
2    Q. BY MR. KELLER: And he says that may explain
3 the fact that there has been no negative feedback.
4 Do you see that?
5    A. I see that.
6    MS. HARDWAY: Object to form. Asked and
7 answered.
8    Q. BY MR. KELLER: So is it fair to say that at
9 least Chris Petroski viewed that those two BPDR's
10 were representing that Merck was meeting the
11 current -- for its current product after the PAS,
12 that its current product was meeting the end expiry
13 expiration specifications?
14    MS. HARDWAY: Object to form and foundation.
15 The document is the document, which she didn't
16 write.
17    THE WITNESS: I didn't write -- I didn't
18 write this document, so I don't know. I can't
19 really speak for Chris and what he was thinking or
20 intending to convey other than his words on the
21 paper.
22    Q. BY MR. KELLER: And so Chris goes on to say:
23 I spoke with Cindy Morrisey, stability, and Phil
24 Bennett, biometrics. Do you see that?
25    A. I do.

Page 267

1    Q. And who is Cindy Morrisey?
2    A. Cindy Morrisey was in the stability unit.
3    Q. Okay. Is that a unit that was under your
4 responsibility?
5    A. Yeah. I believe we talked about that. It
6 was in the bioanalytical development organization.
7    Q. So Chris goes on in this e-mail that you
8 have no reason to believe you didn't receive and
9 says: Even at current release specification,
10 approximately seven percent of the lots are expected
11 to be below 4.3 at expiry. Do you see that?
12    A. Yes.
13    Q. So did you ever respond back to them and --
14 do you recall ever responding back to them saying
15 that's incorrect?
16    MS. HARDWAY: Object to form, foundation.
17    THE WITNESS: I don't ever recall -- I don't
18 recall whether or not I responded to Chris in this
19 e-mail, send him an e-mail or -- I don't recall.
20    Q. BY MR. KELLER: Do you ever recall reaching
21 out to CBER regarding the BPDR's that were sent on
22 March 2001 and April 2001 to update them that, in
23 fact, the folks in stability and folks in biometrics
24 had concluded that even at the current release
25 specification that about seven -- approximately

Page 268

1 seven percent of the lots are expected to be below
2 the 4.3 end expiry.
3    MS. HARDWAY: Object to form and
4 foundation.
5    THE WITNESS: So you're -- can you just
6 repeat the question?
7    Q. BY MR. KELLER: Sure. Did you or anybody in
8 your team based on your knowledge go back to CBER
9 and update them that the BPDR's that they had --
10 that you had submitted may be inaccurate as of the
11 date of this e-mail?
12    MS. HARDWAY: Object to form and
13 foundation.
14    THE WITNESS: I'm not aware. No, I don't
15 recall, that I'm not aware that anyone did that.
16    Q. BY MR. KELLER: Okay. And seven percent of
17 the lots, do you have an estimate of how many doses
18 that could represent?
19    MS. HARDWAY: Object to form. Asked and
20 answered.
21    THE WITNESS: I don't, but, again, I would
22 say -- what I would say about -- or what strikes me
23 here is that, again, this is applying that model and
24 that analysis, but to the best of my knowledge, and
25 even through the course of my tenure through 2004, I

Page 269

1 don't recall ever seeing a result below 4.3 on
2 mumps.
3    Q. BY MR. KELLER: Just the folks who were
4 making these projections are estimating that seven
5 percent of the lots will likely fall below that;
6 correct?
7    MS. HARDWAY: Object to form.
8    THE WITNESS: That's what this says. What
9 I'm saying is that while that's a prediction or a
10 statement there, in -- from all of our monitoring,
11 the active stability monitoring we were doing, I
12 don't recall ever having a result that fell outside
13 of the specification for lots from the current
14 September of '99 forward.
15    Q. BY MR. KELLER: Do you consider Christopher
16 Petroski senior management at Merck during this time
17 frame?
18    MS. HARDWAY: Object to form.
19    THE WITNESS: I believe -- I don't believe
20 Chris reported directly to me, so I don't know that
21 I would call him senior management.
22    Q. BY MR. KELLER: Was he part of the
23 management, though?
24    MS. HARDWAY: Object to form.
25    THE WITNESS: He was not part of my

68 (Pages 266 - 269)

Appx19856

HIGHLY CONFIDENTIAL

Page 270

1 management team.

2      Q.  BY MR. KELLER:  He was part of the
3 biological licensing team; correct?

4      A.  He was a colleague in that organization.  I
5 believe he was a colleague in that organization at
6 that time.

7      Q.  Do you know who he reported to?

8      A.  I believe at this time the leader of the
9 vaccine regulatory and analytical sciences was Mark
10 Rosolowski.

11      Q.  So he goes on to state in the third
12 paragraph, If we cannot get approval for an end
13 expiry of 4.0, there is a still a risk that we will
14 obtain out-of-specification potency values of mumps
15 at expiry.  Do you see that?

16      A.  I do.

17      Q.  And so the -- when he talks about getting
18 approval, do you understand that to be Protocol 7?

19      MS. HARDWAY:  Object to form and
20 foundation.

21      THE WITNESS:  Yeah, I can't speak to what
22 Chris was referring to.

23      Q.  BY MR. KELLER:  Okay.  Here he goes on to
24 say, CBER has not made us take any market action in
25 our past relative to potency values below 4.3 dose,

Page 271

1 however, the difference now would be the fact that
2 our corrective actions, adding more months and
3 increasing the release specification, did not ensure
4 we meet 4.3 dose at expiry as previously indicated.
5 Do you see that?

6      A.  Yes.

7      Q.  He thinks that Merck cannot ensure that it
8 meets its end expiry specifications there.  Is that
9 a fair assessment of what he's saying here?

10      MS. HARDWAY:  Object to form and
11 foundation.

12      THE WITNESS:  I don't know what Chris
13 Petroski is thinking.

14      Q.  BY MR. KELLER:  That's what he says, isn't
15 it?

16      MS. HARDWAY:  Object to form and
17 foundation.

18      THE WITNESS:  He says there is still a risk
19 that we will be obtaining out-of-specification
20 potency values for the mumps at expiry, and, again,
21 I come back to that's assuming that, in fact, that
22 model and that calculation method is a -- is
23 representative of the product that we were
24 manufacturing, so he is -- this is a hypothetical
25 that if, in fact, that's true that there would be a

Page 272

1 risk.  That's how I read that.

2      Q.  BY MR. KELLER:  Okay.  And that risk is
3 continuing from the February 27, 2001 memo that Phil
4 Bennett provided.  Now a year later that risk still
5 exists.  It's still being talked about regarding
6 Merck not being able to ensure that it meets the 4.3
7 end expiry.  Do you see that?

8      MS. HARDWAY:  Object to the preamble and
9 form and foundation.

10      THE WITNESS:  Do I see --

11      Q.  BY MR. KELLER:  This is a year later and
12 they are still -- that model is still being relied
13 upon as a potential risk to Merck not meeting its
14 end expiry specification; correct?

15      MS. HARDWAY:  Object to form and
16 foundation.

17      THE WITNESS:  So, if you recall, the lots
18 that this model and this analysis apply to were
19 first manufactured in late 2000 or '99, so that
20 means whatever data -- we would have limited data
21 even two years later on this because partial
22 analyses we know are not represented due to the
23 biphasic nature of the data.  We knew that, so there
24 would still be limited data, and so I think it still
25 is appropriate to ask the question we have this

Page 273

1 model.  Now as we are getting data, does it -- is it
2 representative or not.  So I'm not -- the fact that
3 there is a -- still a discussion around this, I
4 think it's actually a healthy discussion to keep in
5 front of us and say are the things we are doing --
6 and even as Chris says, are the corrective actions
7 that we took effective if we start seeing numbers
8 below, that would suggest that they weren't and
9 there would have to be additional action.  As I said
10 before, management -- we were watching this.  We
11 said in the warning letter we were going to be
12 monitoring this.  So I'm not at all surprised that
13 this remains a topic of discussion and I think it's
14 a healthy one.

15      Q.  BY MR. KELLER:  But as you sit here today,
16 you don't believe that Merck ever disclosed this
17 risk to CBER?

18      MS. HARDWAY:  Object to form and
19 foundation.

20      THE WITNESS:  I'm not aware of the breadth
21 of conversations and the many conversations that we
22 have.  I do know that stability was a frequent
23 conversation with them, and whether or not that
24 specific analysis was shared with them, I do not
25 recall or -- I just don't recall.

69 (Pages 270 - 273)

Page 274

1     MR. KELLER:  Let me mark this next exhibit
2  as Exhibit 32.
3         (Deposition Exhibit No. 32 was marked for
4         identification.)
5     Q. BY MR. KELLER:  Exhibit 32 is a document
6  that was produced very recently bearing Bates stamp
7  number -- I'm sorry.  Can I have that back for a
8  second.
9     A. Sure.
10    MR. KELLER:  Let me strike that.  I have the
11 wrong one.  I will mark the next exhibit as 27.
12        (Deposition Exhibit No. 32 was
13        withdrawn.)
14        (Deposition Exhibit No. 27 was marked for
15        identification.)
16    Q. BY MR. KELLER:  Which is a document that
17 bears Bates stamp number 1649892.
18    MS. HARDWAY:  I think we are on 26.
19    THE WITNESS:  26.
20    MR. KELLER:  How did I lose 26?  Oh, I'm
21 sorry.  It's the last one here.  I apologize.  I'm a
22 little bit tired, but --
23    MS. HARDWAY:  So this one that you just gave
24 us we are not using?
25    MR. KELLER:  We are going to use right now.

Page 275

1  I'm going to mark it as 26.
2     MS. HARDWAY:  Oh, all right.  I'm sorry.
3     MR. KELLER:  Strike everything I said before
4  that.
5         (Deposition Exhibit No. 27 was
6         withdrawn.)
7         (Deposition Exhibit No. 26 was marked for
8         identification.)
9     Q. BY MR. KELLER:  For the record, I'm going to
10 mark Exhibit 26 which bears Bates stamp number
11 1649892 through 93 which is a document that was
12 produced recently by Merck.  And I will ask you to
13 take a look at this document and tell me if you
14 recognize this document.  It is a -- and I will
15 represent to you that Merck has represented to us as
16 part of the metadata of this document that you are
17 the author of this document and that the date of the
18 document is October 17th, 2002.
19    And why don't I just mark for the record
20 Exhibit 27 which is the metadata that was provided
21 to us by Merck along with this document.
22        (Deposition Exhibit No. 27 was marked for
23        identification.)
24    Q. BY MR. KELLER:  And for the record, we just
25 redacted off our own computer systems identification

Page 276

1  numbers and file for work product purposes, but can
2  you tell me if you recognize this letter as
3  something that you wrote?
4     A. I don't recall precisely writing it, but I'm
5  not -- I could have written this, yes.  I probably
6  did write it.  You got it from my computer, so I
7  think that's good reason to think that I'm the one
8  who authored this.
9     Q. Okay.  And here it says Mike.  Do you know
10 who you were referring to when you said Mike?  Was
11 this -- what Mike was this?  Was this -- do you
12 recall?
13    A. This would have been Mike Angelo.
14    Q. Okay.  And so in here, can you read the
15 first sentence?
16    A. From my perspective, the highest proprietary
17 is ensuring compliance to the label claim.
18    Q. Okay.  And does that sound like your
19 language?
20    A. Yes.
21    Q. Okay.  And did you believe that when you
22 wrote that?
23    A. Yes.
24    Q. Okay.  And so can you read the second
25 paragraph -- the first paragraph.  I'm sorry.  The

Page 277

1  second paragraph.  Strike that.
2     Can you read the second paragraph, please?
3     A. It is CBER's understanding (as was ours)
4  that Merck took temporary, underlined temporary,
5  measures in our 1999 -- measures in 1999 to
6  accomplish this (add more mumps and change release
7  spec).  Based on recent stability analyses using the
8  revised stability model, we now believe that we do
9  not have adequate (95 percent) confidence that the
10 current manufacturing process supports the 4.3 log
11 TCID 50 dose label claim.  As such, an immediate
12 corrective action must be taken.  I see we have at
13 least two options.
14    Q. Does that refresh your memory that at a
15 certain point now you believe that the data that was
16 in the stability models led to the conclusion that
17 Merck could no longer ensure that its current
18 product met its end expiry potency?
19    MS. HARDWAY:  Object to form.
20    THE WITNESS:  What I believe I was conveying
21 to Mike here was that the discussions that were
22 occurring in the organization and that whatever risk
23 there was associated with that and that we needed --
24 I wanted him to be aware -- he was the senior vice
25 president of quality.  It's important that he be

70 (Pages 274 - 277)

Appx19858

Page 278

1 aware as I had assembled the full scope of
2 information around this topic.
3     Q. BY MR. KELLER: And so you are calling for
4 immediate corrective action; correct?
5     A. Uh-huh.
6     Q. And what corrective action were you calling
7 for?
8     A. Well, I was outlining that -- in essence, as
9 I described before, in the course of monitoring the
10 fact -- the effectiveness of what we had done, I
11 wanted to -- you know, it's in that vein,
12 if you will, of sort of monitoring the work and the
13 changes that we had made and the effectiveness that
14 they had.
15     Q. Do you know whether or not one of the --
16 whether or not Merck ever disclosed this -- your
17 conclusion, your belief that Merck can no longer
18 ensure that it meets its end expiry for the mumps
19 product?
20     MS. HARDAWAY: Object to form.
21     THE WITNESS: I don't know -- I don't know
22 if -- when you say Merck, I don't know if -- if
23 you're saying this particular document or that
24 particular sentence was shared specifically with
25 CBER. I don't know that.

Page 279

1     Q. BY MR. KELLER: Okay. Do you believe that
2 based on the information that you received that drew
3 you to this conclusion that a BPDR would be
4 required?
5     MS. HARDAWAY: Object to form.
6     THE WITNESS: I -- you know, at this -- when
7 did you say this document was?
8     Q. BY MR. KELLER: October 17th, 2002.
9     A. So I think that the landscape around BPDR's
10 and what the scope was and how they were being
11 handled was an evolving period of time, and so we
12 were learning as with the rest of the industry about
13 what was in scope and what was not in scope to be
14 filed.
15     Q. I see. You go on -- you make two proposals.
16 One is pursue the 4.0 log dose end expiry claim
17 based on the recent clinical trial. Do you see
18 that?
19     A. Yes.
20     Q. That's Protocol 7; correct?
21     A. I believe so.
22     Q. Here you write probably -- probable that we
23 will not meet the pre-established criteria for
24 success of the trial. Do you see that?
25     A. I see that.

Page 280

1     Q. Where did you get that information?
2     A. I don't know exactly.
3     Q. Okay. So that will likely not be a good
4 option if you can't -- if that study doesn't allow
5 you to get to 4.0; correct?
6     MS. HARDAWAY: Object to form.
7     THE WITNESS: I -- I don't -- what's the
8 question? I'm sorry.
9     Q. BY MR. KELLER: I will strike it. It's
10 okay.
11     In the third bullet point, can you read the
12 third bullet point for me?
13     A. May have to change label claim highlighting
14 the lower response rate. This is expected to put us
15 at a competitive disadvantage. Previous discussion
16 with Jeff C. indicated that this may not be
17 necessary.
18     Q. Who is Jeff C.?
19     A. I don't know. I think that's Jeff
20 Chodakewitz.
21     Q. And what competitive disadvantage are you
22 referring to here?
23     A. This is -- I believe in this bullet I was
24 conveying a perspective from Jeff or others.
25     Q. Okay.

Page 281

1     A. So I had compiled perspectives, so there is
2 the perspective of Phil Bennett and stability
3 analyses, there is perspective of clinical folks
4 about what they are -- how they are thinking about
5 the trial and maybe this is other information.
6     Q. And in the second bullet point, can you read
7 the second bullet point and the second option that
8 you had laid out as part of the options going
9 forward?
10     A. Would have to argue and gain CBER
11 concurrence that the criteria were arbitrarily set
12 and the response rates are still satisfactory.
13     Q. Okay. And for number two -- and you got
14 that from folks from MRL; is that where you got that
15 information?
16     A. I can't say for sure.
17     Q. Okay. Do you know if you got this
18 information as part of a cross-functional group
19 meeting?
20     A. I can't say for sure.
21     Q. And number two, the second option you lay
22 out, what is the second option?
23     A. Modify the product profile (add more
24 mumps/change release specs/shorten expiry dating,
25 etc.)

71 (Pages 278 - 281)

Page 282

1  Q. When you say add more mumps overfill --
2  increase the release titer?
3     A. Increase the manufacturing target.
4     Q. Okay. So from 5.2 to some number higher
5  than that; correct?
6     A. That would be changing the release target
7  upwards, yes.
8     Q. And here in the first bullet point you say
9  based on discussion with Manal Morsy, clinical would
10  likely not support another doubling, add .3 log, the
11  most -- the amount needed to preserve 24 months
12  shelf life, of the mumps content due to lack of
13  experience at these high titers. Do you see that?
14    A. Uh-huh.
15    Q. So the first increase of the target titer
16  from 4.9 to 5.2 doubled the amount of mumps in each
17  shot; is that correct?
18    MS. HARDWAY: Object to form.
19    THE WITNESS: I don't recall what the fill
20  target was prior to 5.2.
21    Q. BY MR. KELLER: Okay. What did you mean
22  when you say -- when you said this, clinical would
23  not support another doubling?
24    A. Again, I can only read here. I don't recall
25  the precise authoring of this -- this exchange. I

Page 283

1  just don't require -- I don't recall writing it in
2  2012 or '2. '2. Excuse me.
3     Q. You also in the first sentence of this -- or
4  second sentence, you talk about the PAS as being a
5  temporary measure that both CBER understood and
6  Merck understood. Can you explain what you meant
7  when you wrote that?
8     A. I believe that, if I remember correctly,
9  that in the original filing that it was intended
10  that we would manufacture under those conditions and
11  reassess at a later point in time.
12    Q. Did CBER understand that that would be a
13  temporary measure until Merck was able to complete
14  its Protocol 7 clinical trial?
15    MS. HARDWAY: Object to form and
16  foundation.
17    THE WITNESS: I believe -- based on what I
18  wrote here, and I think that's right, I believe
19  that, again, just as I described, that we made
20  this -- we submitted a prior approval supplement
21  with changes and that at a point later in time after
22  we had more data we would evaluate whether or not we
23  would change the course or make changes.
24    Q. BY MR. KELLER: In the third bullet point
25  under number two, under where you state, Norman

Page 284

1  Baylor has commented to me on numerous occasions
2  that the additional mumps in the product was
3  expected to be temporary. Do you see that?
4     A. Uh-huh.
5     Q. Is that where you got the expectation that
6  the PAS that increased the -- that raised titer from
7  4.9 to 5.2 was considered by CBER, at least Norman
8  Baylor, to be a temporary measure?
9     A. Yes. As I have just been describing.
10    Q. You go on to write in here, Given what we
11  know today, we must make a decision ASAP. Do you
12  see that?
13    A. I do.
14    Q. Do you know if a decision was made?
15    A. I'm not sure I know what you mean about -- I
16  mean, there were a lot of decisions that could be --
17  I'm not sure if I understand.
18    Q. With respect to options one or two?
19    A. What I would say is that the purpose of this
20  was to raise this issue and to make sure that there
21  were awareness and stimulate dialogue about what, if
22  any, action that we needed to take as a company, so
23  I don't recall actually what transpired after
24  November or whenever --
25    Q. October?

Page 285

1     A. October 2002, you said?
2     Q. Yes.
3     A. Yeah.
4     Q. Doctor, what information changed from Phil
5  Bennett's February 27, 2001 projection of the one
6  log loss and not -- and unable to meet 4.3 at end
7  expiry that was later reiterated in numerous
8  documents that resulted in a 12-month shelf life and
9  your Exhibit 26 where you now confirm that you
10  believe that Merck cannot meet its end expiry. What
11  new information came in?
12    MS. HARDWAY: Object to the preamble and
13  object to the form.
14    THE WITNESS: I'm not sure what new
15  information came in other than we have continued to
16  get stability data. We continue to get -- I think
17  they did the interim analysis on the clinical trial,
18  so there was -- from the time that this was
19  originally begun until then, you know, data were
20  being gathered, so on a number of fronts.
21    Q. BY MR. KELLER: In the last page you write:
22  I think the stabilizer is critical to our long-term
23  success. Do you see that?
24    A. Yes.
25    Q. What did you mean when you wrote that?

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

Page 286

1    A. I think -- let me see. Let me go back. I
2 believe that there was also a program underway
3 looking at modification of the excipients of the
4 product that would be an improved stabilizer for the
5 product versus the existing one. I think that's
6 what that refers to.
7    Q. To help reduce the amount of potency loss
8 over the life of the product?
9        MS. HARDWAY: Object to form.
10       THE WITNESS: To improve the stability.
11    Q. BY MR. KELLER: Did Merck ever go forward
12 with that during the time that you were there?
13    A. I believe there was work on modified
14 stabilizers. I don't recall the outcome of that or
15 whether those were even completed during my
16 tenure.
17    MR. KELLER: Let me mark this next exhibit
18 as Exhibit 28.
19        (Deposition Exhibit No. 28 was marked for
20        identification.)
21    Q. BY MR. KELLER: Exhibit 28 is a document
22 that bears Bates stamp number 94134 through 94135,
23 and it's an e-mail from Jonelle Rittenhouse sent on
24 behalf of Roberta McKee, October 31st, 2002, to a
25 series of folks, Chirgwin, C-H-O-D-A-K-E-W-I-T-Z,

Page 287

1 Susan B-E-H-R-E-N-S, Keith Chirgwin, Barry
2 Garfinkle, Donna Gulbinski, Robert Dolan, Mark
3 Rosolowsky, Rahu S-I-N-G-H-V-I, Timothy Schofield,
4 Mark Twyman. Do you see that?
5    A. Yes.
6    Q. Do you -- who was Jonelle Rittenhouse?
7    A. Jonelle Rittenhouse was my administrative
8 assistant.
9    Q. Okay. So she circulated this e-mail on your
10 behalf? Do you see that?
11    A. Yes.
12    Q. Do you recall requesting that she circulate
13 this e-mail?
14    A. No.
15    Q. Do you recall -- under the subject it says:
16 Updated. High proprietary, exclamation point, all
17 caps. Mumps label claim, FDA communication, R.
18 McKee, and there is a list of other names after
19 that. Do you see that?
20    A. Uh-huh.
21    Q. Do you recall calling for a teleconference?
22    A. No.
23    Q. In this your assistant apparently on -- do
24 you have any reason to believe that you didn't make
25 this request of your assistant?

Page 288

1    A. No.
2    Q. Okay. In the middle of this it says: We
3 apologize for the short notice and early hour of
4 this high proprietary teleconference. Your
5 flexibility is greatly appreciated. Below is
6 background on the issue from Roberta McKee. Do you
7 see that?
8    A. Uh-huh.
9    Q. Do you recall providing information to your
10 assistant to circulate to set up a high proprietary
11 teleconference regarding mumps stability?
12    A. No.
13    Q. Can you read the paragraph that is
14 attributed to you.
15    A. Read the paragraph that is --
16    Q. Yeah. Given that our --
17    A. The first paragraph?
18    Q. Yes.
19    A. Given that our most recent stability
20 analysis for mumps does not support the current
21 label claim, Merck is required to report this
22 finding to FDA. The biological product deviation
23 reporting regulation requires that this report be
24 made within 45 days of knowledge of the event. I
25 consider Tim's presentation last Friday as day one

Page 289

1 which means that the final report must be submitted
2 by Friday, December 6th.
3    Q. And so do you recall calling a meeting to
4 discuss the need to issue a BPDR on this, the recent
5 stability analysis on mumps?
6    A. I don't recall calling the meeting.
7    Q. Do you recall whether or not that BPDR was
8 ever submitted to CBER regarding the recent -- the
9 most recent stability analysis for mumps?
10    A. I don't recall a BPDR being submitted.
11    Q. Okay. Do you recall coming to the
12 conclusion that one was required? Does this refresh
13 your memory that you concluded that and called a
14 teleconference to discuss that?
15       MS. HARDWAY: Object to form.
16       THE WITNESS: I recall that by based upon
17 information brought forward and in this case by Tim
18 Schofield, which it says as of whatever last Friday
19 was on that, that I wanted to air his -- I wanted
20 exposure of what he presented and cross-functional
21 review and assessment of that information to come to
22 some conclusion about it or assess it, so even as I
23 say here, I give some additional information about
24 what I want this group to do, confirm the -- so, for
25 example, confirm the accuracy of the stability

73 (Pages 286 - 289)

Appx19861

Page 290

1  analysis. So is it really correct? Are there
2  things that we should do? What is the path forward?
3  So, really, to discuss the observation and findings.
4  So like I would do any time there would raise a
5  question about a product, whether it's this product
6  or it was any other product, it was really my role
7  as the head of quality to make sure that it was
8  properly vetted and assessed and that we were making
9  what we believed to be the right and the appropriate
10  decision with regard to that information and
11  whatever action need to be taken.
12  Q. BY MR. KELLER: So there was a concern that
13  the current product that was being released would be
14  out of specification; correct?
15  MS. HARDWAY: Object to form.
16  THE WITNESS: What this says is that there
17  was another stability analysis, so I don't recall
18  precisely what that stability analysis was. The
19  details of it, I don't recall, but there was
20  another -- a recent analysis over and above what had
21  been done prior, so I wanted to raise it up again
22  and make sure that we were having the right --
23  having the right conversation about it.
24  Q. BY MR. KELLER: At the bottom of the first
25  page you say: Senior management leadership is

Page 291

1  critical to provide appropriate guidance and
2  direction on path forward. Do you see that?
3  A. Uh-huh.
4  Q. Therefore your attendance is important. I
5  appreciate your accommodation of this request.
6  Is it your understanding that you called a
7  high-priority teleconference with senior management
8  to make a determination as to what the path forward
9  would be for the most recent stability analysis for
10  mumps --
11  MS. HARDWAY: Object to form.
12  Q. BY MR. KELLER: -- that concluded that the
13  current label does not meet specification for end
14  expiry?
15  MS. HARDWAY: Object to form.
16  THE WITNESS: So I'm sorry. The question --
17  what is the question, please.
18  MR. KELLER: Read it back, please.)
19  (Question read back.)
20  THE WITNESS: So is it my testimony that I
21  called this meeting with these people?
22  Q. BY MR. KELLER: And that their senior
23  management.
24  A. Some of these people are -- I would say are
25  in the senior management ranks, not all.

Page 292

1  Q. Who is in the senior management ranks based
2  on your knowledge at Merck during this time frame?
3  A. Some of the folks I don't know what level
4  they are, but Dolan, Garfinkle were certainly there,
5  and I don't recall Chodakewitz, what his level --
6  actually, even what his role was. These other
7  colleagues, if I recall, were -- or these other
8  names represent colleagues who reported into others,
9  perhaps either Garfinkle or Dolan or outside of the
10  organization.
11  Q. Let me mark this next exhibit. During all
12  these cross-functional meetings that you were
13  talking about here, do you recall there being a
14  cross-functional meeting that ultimately discussed
15  what to do about your belief that the product
16  doesn't meet end expiry based on this most recent
17  stability analysis?
18  MS. HARDWAY: Object to form.
19  THE WITNESS: I don't recall the meeting.
20  This is -- these people come from different
21  functions, so in my terminology I would say that's
22  cross-functional to some degree.
23  Q. BY MR. KELLER: Do you recall any discussion
24  about disclosing the need for a BPDR and
25  disclosure -- let me strike that.

Page 293

1  Do you recall any discussion about
2  disclosing this most recent stability analysis
3  results to the CDC?
4  MS. HARDWAY: Object to form and
5  foundation.
6  THE WITNESS: No. What I do know, I will
7  say that one of the things that we would commonly
8  do, particularly as I mentioned, this is a period of
9  time where the regulations were being -- or the
10  expectations -- the guidance, in fact. I don't
11  think CBER had even issued a guidance until -- on
12  BPDR's and BPDR reporting until -- maybe it was
13  late -- it was sometime in 2001. I don't even think
14  the final guidance was approved until after I
15  departed, so this was really an evolving landscape,
16  and so what we -- what -- and, again, I don't
17  recall, but it was not uncommon that if we had
18  questions about whether or not something was
19  required to be filed that we would reach out to the
20  responsible representative for BPDR's which was -- I
21  remember Sharon O'Callahan at the agency and ask for
22  her opinion.
23  Q. BY MR. KELLER: Did you ask her for her pain
24  on this particular case?
25  A. I don't recall whether or not we made that

74 (Pages 290 - 293)

Appx19862

Page 294

1 call, but I can tell you that it was common practice
2 to consult with Sharon O'Callahan, and particularly
3 the agency, particularly because it was, as I said,
4 an evolving landscape about what the expectation.
5 There weren't a lot of examples out there. We
6 wanted to make sure they fit and, furthermore, you
7 know, we had been cited, as we talked about earlier
8 in the warning letter, and we wanted to ensure that
9 we were meeting the expectations on the agency on
10 that front. So, again, I don't recall in this
11 particular situation, but it's possible that that
12 was part of the effort to make the determination
13 about whether or not notification on that form was
14 required.
15     Q. But you don't know whether or not that ever
16 happened; correct?
17     A. I don't -- I don't recall.
18     Q. But based on this e-mail, you believed at
19 this time frame that a BPDR should be submitted?
20         MS. HARDWAY: Object to form.
21         THE WITNESS: What I was saying in this
22 e-mail was that there was a new analysis and it
23 needed to be vetted, and so I put the timeline out
24 there because the assessment needed to be done
25 within the very precise regulated time frame of 45

Page 295

1 days from date of discovery, so it couldn't be
2 something that we will talk about and be, if you
3 will, unscheduled about. So that's what's behind
4 the timing that I describe in this e-mail.
5     Q. BY MR. KELLER: So when you say Merck is
6 required to report this finding to the FDA, what did
7 you mean by that?
8     A. I think I meant that based on what I
9 believed or what I saw from this analysis which says
10 occurred from Tim's presentation -- and, again,
11 first of all, I don't quite remember because I don't
12 remember writing this or providing this information
13 to Jonelle to forward on, but initial assessment
14 provided by Tim, I want to make sure that if we need
15 to do it that we are going to do it, and without
16 other information, that's a default position.
17     MR. KELLER: Let me mark this next exhibit
18 as Exhibit 29.
19         (Deposition Exhibit No. 29 was marked for
20         identification.)
21     Q. BY MR. KELLER: Exhibit 29 is a document --
22 I'm sorry -- that bears Bates stamp numbers 561113,
23 and there is a attachment at 1114 of -- through --
24 which has three pages to it. It's a PowerPoint
25 presentation. And this is dated Friday, October

Page 296

1 25th, 2002. And subject: Mumps stability
2 assessment. All, thank you for participating in
3 this morning meeting. Attached is the slide deck
4 with the scenarios proposed for consideration to
5 discuss -- to address mumps end expiry and shelf
6 life discussed at today's meeting. Do you see
7 that?
8     A. Yes, I do.
9     Q. And this is from Keiko Simon. Do you see
10 that?
11     A. Yes.
12     Q. Who is Keiko Simon?
13     A. I'm just reading from her signature that
14 she's in project management.
15     Q. Okay. And so this was sent from her to
16 yourself, Mr. Chodakewitz, Robert Dolan, Mark
17 Galinski, Susan B-E-H-R-E-N-S, Cynthia Morrisey,
18 Phil Bennett, Jonathan Hartzel, amongst other
19 people. Do you see that?
20     A. Yes.
21     Q. If you look at your Exhibit 28 which is
22 the -- I'm sorry. Yeah, 28, where you talk about I
23 consider Tim's presentation last Friday as day one,
24 and this was dated October 31st, and -- in Exhibit
25 28, and Exhibit 29 is dated Friday, October 25th,

Page 297

1 does this lead you to believe that you -- this is
2 the presentation that you're referring to that gave
3 our most recent stability analysis for mumps?
4         MS. HARDWAY: Object to form.
5         THE WITNESS: I don't know if this is Tim's
6 analysis, what's on these slides. I don't know
7 that. I don't recall.
8     Q. BY MR. KELLER: Okay. Do you recall -- do
9 you have any reason to believe you didn't receive
10 these slides?
11     A. I don't have a reason to believe I didn't
12 get this e-mail, yeah.
13     Q. The meeting that you said you participated
14 on Friday, last Friday the 25th, Friday, that would
15 have been -- the Friday before that is the same
16 date, October 25th; correct?
17         MS. HARDWAY: Object to form and
18 foundation.
19         THE WITNESS: I don't know what -- I don't
20 know that.
21     Q. BY MR. KELLER: And the Tim you're referring
22 to here is -- on Exhibit 28 is Tim Schofield;
23 correct?
24     A. I believe so.
25     Q. Okay. Let me direct your attention to the

75 (Pages 294 - 297)

Appx19863

Page 298

1 slides and let me direct your attention to page 2
2 and 3 of the slides that are Bates numbers 56114,
3 slide two and slide three. Do you recall seeing the
4 short-term scenarios identified on slide two and the
5 short-term scenarios identified on slide three?
6    A. So do I -- I'm sorry. Do I recall --
7    Q. Yes.
8    A. -- reviewing these scenarios?
9    Q. Yes.
10    A. I will take a look at them.
11    I don't recall reviewing these specific
12 scenarios.
13    Q. Was it typical for you to receive these kind
14 of mumps stability reports --
15    MS. HARDWAY: Object to form.
16    Q. BY MR. KELLER: -- projecting end expiry?
17    MS. HARDWAY: Object to form.
18    THE WITNESS: It was not typical that I
19 would receive these.
20    Q. BY MR. KELLER: Okay. And so here, if you
21 look on slide two and slide three -- I apologize.
22 Under scenario number one, it says short date.
23 10-month shelf life. Do you see that?
24    A. Yes.
25    Q. Do you recall that at the meeting with Tim

Page 299

1 Schofield that there was a presentation that
2 discussed that the shelf life was, in fact, based on
3 his most recent stability analysis in October of
4 2002 that the shelf life was 10 months?
5    MS. HARDWAY: Object to form and
6 foundation.
7    THE WITNESS: I don't recall this meeting or
8 this discussion.
9    Q. BY MR. KELLER: Would that lead you -- the
10 time frame matches from your Exhibit 28 where you
11 talked about meeting -- going -- considering Tim
12 Schofield's presentation last Friday as day one for
13 the timed issue of BPDR. This time frame matches,
14 doesn't it?
15    MS. HARDWAY: Object to form and
16 foundation.
17    THE WITNESS: Again, I would have to get a
18 calendar to look at this, so if -- so I think if
19 this was Thursday, minus seven would be 24, so 25 --
20 the 25th, this memo was written the 25th, so the
21 meeting happened that day. You're correct. So the
22 timeline matches. I apologize. I had to --
23    Q. BY MR. KELLER: Gotcha.
24    A. -- get a calendar in my mind.
25    Q. And so based on this presentation document

Page 300

1 that was circulated to you and to Tim Schofield and
2 Phil Bennett and the other folks on the 25th and
3 thanking you for participating in this morning
4 meeting, does that lead you to believe that you, in
5 fact, participated in this meeting on October 25th,
6 Friday, October 25th, 2002, where these slides were
7 presented?
8    MS. HARDWAY: Object to form.
9    THE WITNESS: I don't recall if I
10 participated in this meeting or not.
11    Q. BY MR. KELLER: But you have no reason to
12 believe that you didn't?
13    MS. HARDWAY: Object to form. Asked and
14 answered.
15    THE WITNESS: I have no reason to believe I
16 did or I didn't.
17    Q. BY MR. KELLER: So if these projections
18 were -- if the presentation slides that were
19 presented at this October 25th, 2002 meeting are
20 projecting a 10-month shelf life, would that cause
21 you concern? Is that the concern that you had that
22 forced you to want to get senior management
23 leadership together to make decisions about what to
24 do?
25    MS. HARDWAY: Object to form and

Page 301

1 foundation.
2    THE WITNESS: So, again, I don't recall this
3 meeting, but from this note, which I have no reason
4 to question that I authored, I am referring to the
5 recent stability analysis, so that's a pretty broad
6 statement that could include a number of elements of
7 the analysis. So I don't -- I can't say sitting
8 here that I know precisely that there was one
9 element or a combination of elements. I'm just
10 saying it was because of a presentation made by Tim
11 on the previous Friday.
12    Q. BY MR. KELLER: And this presentation was
13 made on the previous Friday. We are identified as
14 receiving -- participating in this meeting;
15 correct?
16    MS. HARDWAY: Object to form and
17 foundation.
18    THE WITNESS: And, again, I don't -- I don't
19 even know that this is necessarily Tim's. It
20 doesn't say in here that this document -- I don't
21 think it's clear that this is Tim's presentation,
22 unless I missed that somewhere. I don't see that
23 that's necessarily his presentation, so this may or
24 may not be, you know, directly related to that.
25    MR. KELLER: Let me mark this next exhibit

76 (Pages 298 - 301)

Appx19864

Page 302

1 as Exhibit 30.
2     (Deposition Exhibit No. 30 was marked for
3     identification.)
4   Q. BY MR. KELLER: Exhibit 30, again, is
5 another document that was produced. This is a
6 document from the data that was produced by Merck
7 identifying the author of the documents that are
8 produced as part of this e-mail, and if --
9   A. This e-mail, number --
10   Q. Exhibit 29.
11   A. Two nine. Okay.
12   Q. And the author is identified as Tim
13 Schofield. Under document type, attachment.
14 Document title: Mumps stability. Subject: Mumps
15 assessment (v2).ppt.
16     MS. HARDWAY: Can you share where you're
17 referring to? I don't know that she was with you.
18   Q. BY MR. KELLER: The second page of Exhibit
19 30, the metadata that was provided by Merck to us as
20 part of the production in this case identified Tim
21 Schofield as the author of the PowerPoint
22 presentation. Does that help you lead you to
23 conclude based on all the facts I presented that
24 this was, in fact, the meeting that you reached the
25 conclusion that Merck's current recent stability

Page 303

1 analysis for mumps does not support the current
2 label claim?
3     MS. HARDWAY: Object to form and foundation.
4 You can't ask her to interpret metadata that she
5 doesn't -- she's never seen. You're making
6 representations to her about what it means.
7     MR. KELLER: You can answer.
8     THE WITNESS: I don't know how this is
9 generated or -- you know, I can only read the paper,
10 so I really don't know how to interpret this
11 document.
12   Q. BY MR. KELLER: Let me ask you this.
13   A. Yes.
14   Q. If Tim Schofield did, in fact, author mumps
15 assessment (v2).ppt and this was circulated on
16 Friday, October 25th, 2002, in an e-mail thanking
17 the participants in this for the morning meeting and
18 you're identified on the e-mail, does that help lead
19 you to conclude that this is, in fact, what you
20 reviewed or was presented to you that led you to
21 believe that the most recent stability analysis for
22 mumps does not support the current label claim?
23     MS. HARDWAY: Object to form and foundation
24 and asked and answered several times now.
25     MR. KELLER: You can answer.

Page 304

1     THE WITNESS: And I apologize. That was
2 sort of a long statement and I'm not sure precisely
3 what the question was in that statement.
4     MR. KELLER: Sure.
5     THE WITNESS: If you could repeat just the
6 question part.
7     MR. KELLER: Can you read the question
8 back, please.
9     (Question read back.)
10     THE WITNESS: I must say I'm really not
11 clear what the question is, so maybe if -- maybe if
12 you could restate it in another way.
13   Q. BY MR. KELLER: I will withdraw it.
14     Let me mark this next exhibit as Exhibit 31.
15     (Deposition Exhibit No. 31 was marked for
16     identification.)
17   Q. BY MR. KELLER: Exhibit 31 is a document
18 that bears Bates stamp number 27716. It's another
19 e-mail. This one from Charlotte Shay on behalf of
20 Dr. McKee dated November 26. Subject: High
21 priority, exclamation point, all caps, mumps label
22 compliance FDA communication follow-up, McKee, and
23 this is another request for a teleconference or a
24 meeting confirmation. Do you see that?
25   A. Are you referring to the top of this

Page 305

1 document up here?
2   Q. Yes. You can take a minute to recall. Do
3 you recall -- and you're actually a recipient of
4 this. Who is Charlotte Shay?
5   A. I don't know.
6   Q. Do you recall calling a meeting -- if you
7 see, actually, the e-mail below that from Jonelle
8 Rittenhouse, that's your assistant; correct?
9   A. Correct.
10   Q. Okay. And so do you recall requesting a
11 meeting? The topic is mumps label claim, FDA
12 communication follow-up, and there is the invitees.
13 There is a list of people?
14   A. Yes.
15   Q. Was this -- do you recall discussing your
16 conclusion that based on Tim Schofield's most recent
17 stability analysis that mumps -- that mumps product
18 was out of compliance with its end expiry
19 specification to be discussed at this meeting?
20     MS. HARDWAY: Object to form and foundation.
21 Now you're mischaracterizing the exhibits.
22   Q. BY MR. KELLER: I will strike that.
23     Do you recall discussing your conclusion
24 that given the most recent stability analysis for
25 mumps does not support the current label claim that

77 (Pages 302 - 305)

Appx19865

Page 306

1 you called this meeting?
2     MS. HARDWAY:  Object to form.
3     THE WITNESS:  I don't recall calling this
4 meeting.
5     Q.  BY MR. KELLER:  Okay.  And this -- these
6 invitees, these include senior management, don't
7 they?
8     A.  The invitees listed down below here?
9     Q.  Yes.
10     A.  There are some people here that I would
11 consider senior management, yes.
12     Q.  Okay.  But you don't recall what you
13 discussed at that meeting?
14     A.  No.
15     MR. KELLER:  Let me mark this next exhibit
16 as Exhibit 32.
17         (Deposition Exhibit No. 32 was marked for
18         identification.)
19     Q.  BY MR. KELLER:  And for the record, Exhibit
20 32 is a document that bears Bates stamp number
21 560717 through 720.  It's a series of e-mails.  And
22 I will direct your attention to the e-mail on 719
23 through 720 which was from Keith Chirgwin to Manal
24 Morsy and, Dr. McKee, you are cc'd on this.
25 Subject:  Path forward for mumps end expiry.  Do you

Page 307

1 see that?
2     A.  Uh-huh.
3     Q.  And so in the first paragraph, it says:  In
4 discussion today with Roberta's working group -- do
5 you see that?
6     A.  Yes.
7     Q.  -- agreement was reached on the path forward
8 to support 4.3 mumps through end of shelf life.  Do
9 you see that?
10     A.  Yes, I do.
11     Q.  And it says:  The agreed upon changes are 18
12 months shelf life, 38 hours maximum TOR, 12 months
13 at negative 20C storage, four hours reconstitution
14 and a 1 by 12 two-stage testing format.  Do you see
15 that?
16     A.  Uh-huh.
17     Q.  Do you recall reaching agreement on November
18 26, 2002, to change the label for the mumps product
19 to decrease the shelf life from 18 months -- from 24
20 months to 18 months and make other changes to the
21 manufacturing of the product?
22     MS. HARDWAY:  Object to form.
23     THE WITNESS:  I don't recall this.  Again,
24 this is 15 years ago and there were, you know, many
25 discussions, so I don't recall this specific

Page 308

1 discussion that's described here, no.
2     Q.  BY MR. KELLER:  In order to change the shelf
3 life and reduce the reconstitution time on the
4 product, a label change would be required;
5 correct?
6     A.  What do you mean by label change?
7     Q.  Well --
8     A.  Or can you clarify what you mean by label
9 change?
10     Q.  What is the reconstitution that's referenced
11 here?  Is that at the doctor's office?
12     A.  Or the administrator.
13     Q.  Whoever is preparing the shots be given to
14 kids; correct?
15     A.  Correct.
16     Q.  And so if that's a change from previously --
17 do you understand before that the reconstitution was
18 eight hours; correct?
19     A.  Yes.
20     Q.  Okay.  To change it from eight hours to four
21 hours would require a label change; correct?
22     A.  I don't believe it requires a label
23 change.
24     Q.  Doesn't the label instruct the doctor how to
25 prepare?

Page 309

1     A.  Oh, excuse me.  You're right.  You're right.
2 It does in the -- when I'm thinking of a label, I'm
3 not -- I'm thinking -- I think you're using a
4 different interpretation of label than I am.
5     Q.  Okay.
6     A.  Okay.
7     Q.  What do you understand the label to be?
8     A.  The physical label on the vial.
9     Q.  Okay.  But you understand that the label may
10 also include the package insert; correct?
11     A.  I accept now that you're referring to the
12 more -- to the holistic scope of label.
13     Q.  Okay.  And so --
14     A.  When you work in manufacturing for many
15 years and you put labels on things, that's what you
16 think about first, so I apologize for not
17 appreciating the scope of what you're describing.
18     Q.  And so it's commonly understood that the
19 label at Merck is a representation of not just the
20 physical label on the vial --
21     A.  Sure.
22     Q.  -- but, actually, it includes all the packet
23 inserts describing the product and its pharmacology
24 and safety and how to use the product; correct?
25     A.  Instructions for use, correct.  Yes.

78 (Pages 306 - 309)

Appx19866

Page 310

1    Q.  And so do you recall -- so at this point a
2  decision was made by your working group to change
3  the label; correct?
4        MS. HARDWAY:  Object to form.
5        THE WITNESS:  At this -- again, I don't
6  recall this meeting, so I can only take at face
7  value what was stated here, so these are agreed upon
8  changes to -- I would say to the process.
9        MS. HARDWAY:  I'm sorry.  Can I just put on
10  the record, too, that I want to object to
11  foundation, as well, to that last question.  I
12  apologize.
13    Q.  BY MR. KELLER:  Do you recall discussions at
14  Merck regarding changing the label to decrease the
15  shelf life claim and to change the reconstitution
16  time?
17    A.  I don't recall.  Again, it was 15 years ago
18  and there were -- it's just a long time ago.
19    Q.  So based on the current -- the most recent
20  stability data that we had discussed earlier in
21  Exhibit 28, the path forward was to change the label
22  and reduce the shelf life; correct?
23        MS. HARDWAY:  Object to form and
24  foundation.
25    Q.  BY MR. KELLER:  Amongst other manufacturing

Page 311

1  changes?
2        MS. HARDWAY:  Same objections.
3        THE WITNESS:   Again, I don't recall those
4  meetings specifically.  I can only read what -- this
5  note written by Keith Chirgwin reflecting that.
6    Q.  BY MR. KELLER:  Did Merck ever file a PAS
7  that you're aware of to change the label and reduce
8  the shelf life?
9        MS. HARDWAY:  Object to form and
10  overbroad.
11        THE WITNESS:  I don't recall.
12    Q.  BY MR. KELLER:  Okay.  Do you recall ever
13  reviewing a pass to change the shelf life and change
14  the reconstitution time?
15    A.  I don't recall.
16    Q.  And do you recall any discussion about
17  informing the CDC that based on Merck's recent
18  stability analysis that the label change would be
19  required?
20        MS. HARDWAY:  Object to form and
21  foundation.
22        THE WITNESS:  I don't recall any such
23  discussion, and as I have stated before, I was
24  not -- I'm not on the interface, was never on the
25  interface with CDC.  I don't think I have ever had a

Page 312

1  conversation with anyone from CDC.
2    Q.  BY MR. KELLER:  So if Merck planned to
3  change the shelf life from 24 months to 18 months
4  for its product, was there any discussion about
5  determining whether or not the product that had
6  already been released with a 24-month shelf life was
7  actually used by a child or given to a child at or
8  about that end of expiry to determine whether or not
9  the product was efficacious and would protect that
10  child from getting mumps?
11        MS. HARDWAY:  Object to form and
12  foundation.
13        THE WITNESS:  And the question was, was
14  there any discussions?
15    Q.  BY MR. KELLER:  Do you recall any
16  discussions, yes.
17    A.  I don't recall any discussions about that,
18  no.
19        MR. KELLER:  Why don't we mark this next
20  exhibit.
21        Can we take a break real quick?
22        THE VIDEOGRAPHER:  This concludes media
23  number four in the continuing deposition of Roberta
24  McKee.  We are going off the record.  The time is
25  7:01 p.m.

Page 313

1        (WHEREUPON, a short break was taken from
2        7:01 p.m. to 7:12 p.m.)
3        (Deposition Exhibit No. 33 was marked for
4        identification.)
5        THE VIDEOGRAPHER:  This is the beginning of
6  media number five in the continuing deposition of
7  Roberta McKee.  We are back on the record.  The time
8  is 7:12 p.m.
9    Q.  BY MR. KELLER:  Dr. McKee, you've had a
10  chance to review Exhibit 33 which is a series of
11  e-mails discussing the measles PAS, and if you
12  direct your attention to the last page, which is the
13  September 16th, 2002 e-mail from Florian Schodel to
14  you, Doctor, and cc'd Chirgwin, Morsy, Galinski, and
15  it says: Dear Roberta, a question in the context of
16  the PAS Mark is putting together.  Should we
17  specifically go to the new stability protocol for
18  mumps or is that bound to unravel the mumps
19  situation without real urgency to submit?  I had not
20  picked that one up, unfortunately, but Manal did.
21  Do you see that?
22    A.  Yes.
23    Q.  Do you know what the new stability protocol
24  that Dr. Schodel is referring to there?
25        MS. HARDWAY:  Object to form and

79 (Pages 310 - 313)

Appx19867

Page 314

1 foundation.

2　　THE WITNESS: So, no, and, in fact, I think
3 in my response to him I told him I didn't follow his
4 question, what stability protocol are you referring
5 to.

6　Q. BY MR. KELLER: Okay. And then he responds:
7 If we apply the same logic for reasons for mumps
8 based on stability estimates, it looks like we might
9 have to short date M-M-R with an end expiry of 4.3
10 logs, but I spoke with Keith and I thought it
11 through again and I don't see how we would avoid the
12 problem applying the same logic as the right thing
13 to do and avoids test failures on stability through
14 shelf life. Therefore, I withdraw my comment. Do
15 you see that?

16　　MS. HARDWAY: Object to form and
17 foundation.

18　　THE WITNESS: I see that, yes.

19　Q. BY MR. KELLER: Okay. Do you -- do you know
20 what Dr. Schodel is referring to about what is the
21 right thing to do?

22　　MS. HARDWAY: I'm going to object to form
23 and foundation. We are at seven hours, so the
24 deposition is concluded. I will let, as a courtesy,
25 the witness answer this one last question, but I

Page 315

1 will object to the admissibility of the answer based
2 on the fact that we are beyond the seven hours.

3　　THE WITNESS: So this was written by Florian
4 and I -- I really can't speculate as to what Florian
5 was thinking or what he believed any of -- you know,
6 what -- the right thing to do as you asked. I don't
7 know. I don't know what that means.

8　　MR. KELLER: Okay. You are going to not let
9 me ask anymore questions?

10　　MS. HARDWAY: Yeah. We are at the seven
11 hours, so we are done.

12　　MR. KELLER: Okay. We -- I don't conclude
13 this deposition. We will seek a motion to compel a
14 second day to complete what I will say is one
15 document and a few other documents, but I assume --
16 I request another hour, but I am not -- we will deal
17 with that with the Court.

18　　MS. HARDWAY: Can I have the basis for the
19 request to have additional time with this witness?

20　　MR. KELLER: This witness was the head of
21 quality at Merck during relevant time dealing with
22 potency issues that raise to the level of being out
23 of specification. She has -- she authored or
24 received numerous documents on this topic, was
25 making decisions, therefore, yes, her testimony is

Page 316

1 very relevant, and so we have deposed numerous
2 witnesses who do not know the answers to some of the
3 most basic questions as to what they wrote. So,
4 yes, there is a foundation and a basis to depose
5 this witness for an additional two hours, and I
6 would request two hours, but we can take that up
7 with the Court.

8　　Thank you, Dr. McKee. I appreciate your
9 time.

10　　MS. HARDWAY: And I just want to put on the
11 record, first of all, the fact that she may or may
12 not have relevant information is not the basis for
13 additional time beyond the seven hours. She's a
14 former employee. She's not a party to this case.
15 She's a fact witness. She's been responsive
16 throughout the day. You had her read many e-mails
17 and other documents that she didn't author that she
18 didn't remember. You asked her numerous times to
19 read things into the record which also took up time.
20 I gave you many courtesies throughout the day to
21 allow her to read documents off the record several
22 times throughout the day.

23　　So as far as I'm concerned, besides the fact
24 that the rules just do not permit a fact witness to
25 be deposed beyond seven hours, there are numerous

Page 317

1 additional grounds that we have to oppose your
2 motion and we will indeed do so.

3　　MR. KELLER: Excellent. Look forward to
4 seeing you in Court.

5　　Thank you, Dr. McKee.

6　　THE VIDEOGRAPHER: This concludes today's
7 deposition of Roberta McKee consisting of five
8 DVD's. We are going off the record. The time is
9 7:16 p.m.

10　　(WHEREUPON, the deposition was
11　　concluded at 7:16 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

80 (Pages 314 - 317)

Appx19868

Page 318

1  STATE OF ARIZONA          )
2                            ) ss
3  COUNTY OF MARICOPA         )
4
5
6  BE IT KNOWN that the foregoing deposition
7  was taken by me, JEFFREY W. BARTELT, CR No. 50363, a
8  Certified Reporter for the State of Arizona; that
9  prior to being examined, the witness named was duly
10 sworn to testify to the whole truth; that the
11 questions propounded and the answers of the witness
12 thereto were taken down by me and thereafter reduced
13 to computerized transcription under my direction and
14 supervision; that the foregoing is a true and
15 correct transcript of all proceedings had upon the
16 taking of said deposition, all done to the best of
17 my skill and ability.
18      I further certify that I am in no way
19 related to any party to said action nor in any way
20 interested in the outcome thereof.
21      DATED at Phoenix, Arizona, this 11th day of
22 April, 2017.
23
24          JEFFREY W. BARTELT
            CR No. 50363
25

Page 319

1       ACKNOWLEDGMENT OF DEPONENT
2       I, ROBERTA L. McKEE, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony taken on 3/30/17, and further certify
5  that it is a true and accurate record of my
6  testimony (with the exception of the corrections
7  listed below):
8  Page  Line        Correction
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21
          _____
          ROBERTA L. McKEE
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS _____ DAY OF _____, 20___.
24
   _____   _____
25 (NOTARY PUBLIC)     MY COMMISSION EXPIRES:

81 (Pages 318 - 319)

Appx19869

11/26/2019
Declaration of G. Reilly
EXHIBIT 417

Appx19870



# Vaccine & Biological Stability Protocol

| Measles, Mumps, and Rubella Live Virus Vaccine | |
|---|---|
| Trade Name: | M-M-R® II |
| Biological Agent: | Measles, Mumps, and Rubella Live Virus Vaccine |
| Process Stage: | ☒ Drug Product   ☐ Drug Substance   ☐ Intermediate<br>☐ Stock Seed   ☐ Master Seed   ☐ Other |
| Protocol Type: | ☐ Engineering/Demonstration   ☒ General Annual<br>☐ Formal Stability Study   ☒ Commercial Process Change<br>☐ Process Performance Qualification   ☐ Other |
| Document Version Number: | 4 |
| Document Version Date: | 06-Sep-2016 |
| Document Prepared by: | Dawn M. Kreuz |

**See Last Page for Signatures**

C Confidential

VSP-Measles, Mumps, and Rubella Live Virus Vaccine Final Container

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714300
MRK-CHA01714300

Appx19871

Stability Protocol: Measles, Mumps, and Rubella Live Virus Vaccine (Revision 4)

## Purpose

This protocol represents the minimum requirements for annual stability programs and stability studies initiated to support major or minor process changes. This general stability protocol serves as the basis for site specific stability programs.[1]

## General Testing Requirements

| Time Zero Testing | |
|---|---|
| Long Term Stability | Samples are submitted for testing at the 0-month interval. Release results are not used. |
| Accelerated Stability | Generate New Time Zero results. Samples should be frozen at -20°C ± 5°C and tested in the same assay run as the other intervals to reduce variability. |

- ➤ Testing will be performed using methods detailed in the current Quality Standard, regulatory filing or other approved document.
- ➤ Testing should satisfy stability requirements for all intended markets.[2]
- ➤ Deviations from the approved protocols, without appropriate approval, are strictly prohibited.[3]
- ➤ A sufficient number of back-up samples will be stored at each stability condition to support investigations and retests as necessary.

## Specifications

- ➤ The approved stability specifications will be documented in a Merck Quality Standard.
- ➤ The testing site shall review the stability data for conformance to appropriate specifications.
- ➤ The testing site shall evaluate data statistically where appropriate.[4]
- ➤ All atypical results shall be appropriately investigated and documented.
- ➤ After the initial interval, specifications will not apply to results from testing at accelerated conditions.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714301
MRK-CHA01714301

Appx19872

Stability Protocol: Measles, Mumps, and Rubella Live Virus Vaccine (Revision 4)

## General Product Information

| Biological Agent: | Measles, Mumps, and Rubella Live Virus Vaccine | | | |
|---|---|---|---|---|
| Process Stage: | ☒ Drug Product | ☐ Drug Substance | ☐ Intermediate | |
| | ☐ Stock Seed | ☐ Master Seed | ☐ Other | |
| Product Numbers: | • Product 04953 Single Dose Vial with rHA West Point | | | |
| | • Product 37225 Single Dose Vials with rHA Durham VMF | | | |
| Manufacturing Site(s): | West Point and Durham | | | |
| Product Expiry: | 24 months | | | |
| Labeled Storage Condition: | ☐ Liquid N₂ | ☐ –70°C | ☐ –40°C | ☐ –20°C |
| | ☐ –15°C | ☒ 5°C | ☐ Room Temp | ☐ Other |

## Container Closure System

☒ Market Package (Primary Only)        ☒ Market Package (Secondary Packaged)
☐ Production Container                  ☐ Simulated Stability Container

| Primary Container: | 3 mL glass vial |
|---|---|
| Primary Closure: | 13 mm lyo rubber stopper with Aluminum seal |
| Secondary Container: | N/A |
| Packaging Site(s): | Haarlem, West Point, Wilson |

## Sample Handling

☐ Store Upright Only                    ☐ Store Inverted Only
☐ Store Horizontally Only               ☒ Unspecified Sample Orientation
☒ Protect Samples from Light            ☐ Do Not Freeze Samples

Page 3 of 8

 Confidential

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714302
MRK-CHA01714302

Appx19873

Stability Protocol: Measles, Mumps, and Rubella Live Virus Vaccine (Revision 4)

## FSS/PPQ/Annual/Process Change Long Term Stability Protocol

*Product Specific Annual Stability Requirements[a]*

| Product Code(s) | Manufacturing Site(s) | Package(s) | Min. No. of Annual Lots |
|---|---|---|---|
| 04953 | West Point, PA | Glass Vial | 4 Lot per product code[β] |
| 37225 | Durham, NC | Glass Vial | 4 Lot per product code[β] |
| **Total Number of Annual Lots Across All Sites, Codes & Packages** | | | **8 Total** |

[a] The annual stability protocol may also be used in place of the process change stability protocol to support minor process changes in some cases. Guidance will be provided in Trackwise through the CR review process.

[β] The regulatory commitment requires three studies for each site, however four studies are initiated annually for each site to support the Enhanced Annual Program evaluation.

C Confidential

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714303
MRK-CHA01714303

Appx19874

Stability Protocol: Measles, Mumps, and Rubella Live Virus Vaccine (Revision 4)

### Long Term Stability Testing Schedule

| Storage Condition | Packages | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5 ± 3°C / AMB | Glass Vial | | | | | | | | |
| | | Intervals (Months) | | | | | | | |
| Test Name[α] | Method Number | 0 | 3 | 6 | 9 | 12 | 18 | 24 | 30 |
| Characteristics | 991160055GEN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Container Closure Integrity | 080080285GEN | See separate protocols for site annual requirements and testing schedules[α,δ] | | | | | | | |
| Infectivity Titration | 060520125GEN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Infectivity Titration - Reconstitute and Store [β] | 060520125GEN | ✓ | NR | NR | NR | ✓ | ✓ | ✓ | NR |
| Moisture | 060590059GEN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| pH | 991160058GEN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Restoration | 060590063GEN | ✓ | NR | NR | NR | ✓ | NR | ✓ | ✓ |
| Sterility | 992230023GEN | ✓ | NR | NR | NR | NR | NR | ✓ | NR |

[α] Refer to the Quality Standard for country-specific and/or product-number specific testing requirements.

[β] Samples are reconstituted with room temperature diluent and stored at 5 ± 3°C for 8 hours prior to testing.

✓: Testing to be performed at the indicated interval.

NR: Testing is not required at the indicated interval.

C Confidential

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714304
MRK-CHA01714304

Appx19875

Stability Protocol: Measles, Mumps, and Rubella Live Virus Vaccine (Revision 4)

## FSS/PPQ/Process Change Accelerated Stability Protocol

When accelerated stability data is required, samples should be tested according to the following schedule:

*Accelerated Stability Testing Schedule*

| Storage Condition | Packages | | | | |
|---|---|---|---|---|---|
| 25 ± 2°C / AMB | Glass Vial | | | | |
| | | Intervals[β, γ] (Weeks) | | | |
| Test Name[α] | Method Number | 0 | 4 | 8 | 12 |
| Infectivity Titration | 060520125GEN | ✓ | ✓ | ✓ | ✓ |

[α] Refer to the Quality Standard for country-specific and/or product-number specific testing requirements.

[β] Specifications are applicable to the initial interval only. Intervals tested after Time Zero are for information only.

[γ] Samples will be frozen at -20°C ± 5°C after each interval pull date. Infectivity Titration testing for all intervals for each lot will be tested together in the same assay run to reduce variability.

✓: Testing to be performed at the indicated interval.

Stability data can also be evaluated at 37 ± 2°C / AMB for early evaluation following a process change. If 37 ± 2°C / AMB data is desired, samples should be tested according to the following schedule:

*Accelerated Stability Testing Schedule*

| Storage Condition | Packages | | | | | |
|---|---|---|---|---|---|---|
| 37 ± 2°C / AMB | Glass Vial | | | | | |
| | | Intervals[β, γ] (Weeks) | | | | |
| Test Name[α] | Method Number | 0 (0 Days) | 0.43 (3 Days) | 1 | 2 | 3 | 4 |
| Infectivity Titration | 060520125GEN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

[α] Refer to the Quality Standard for country-specific and/or product-number specific testing requirements.

[β] Specifications are applicable to the initial interval only. Intervals tested after Time Zero are for information only.

[γ] Samples will be frozen at -20°C ± 5°C after each interval pull date. Infectivity Titration testing for all intervals for each lot will be tested together in the same assay run to reduce variability.

✓: Testing to be performed at the indicated interval.

Page 6 of 8

C Confidential

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01714305
MRK-CHA01714305

Appx19876

Stability Protocol: Measles, Mumps, and Rubella Live Virus Vaccine (Revision 4)

## Revision History

| Version Number | Version Date | Project Number | Explanation of Changes |
|---|---|---|---|
| 4 | 06-Sep-2016 | BIO-13166 | Updated protocol using current MIDAS template.<br><br>Removed HSA product codes since M-M-R II is no longer made from HSA bulk material.<br><br>Added method 080080285GEN for Container Closure Integrity testing and associated endnotes to the Long Term Stability Testing Schedule (TR #371651).<br><br>Added Accelerated Stability Schedule for the 37°C/AMB accelerated condition. |
| 3 | 13-Jul-2007 | PR09683 | Update to protocol template T5.<br><br>Added annual requirement for product 37225 for VMF.<br><br>Removed annual requirement for ten dose vial as it is no longer manufactured.<br><br>Added product codes 04011, 04013 and 04029 to the protocol.<br><br>Updated method numbers and test names for consistency with the Quality Standard.<br><br>Removed all tests except for Infectivity Titration from the Accelerated Stability schedule as this condition would only be run for special studies and no routine accelerated stability protocol is filed anywhere.<br><br>Removed acceptance criteria sections as the specifications are maintained in the Quality Standard. |
| 2 | 23-Jun-2006 | PR08995 | Removed 3, 6, 9, & 18 month test stations for Restoration Time from the Long-Term stability schedule as these stations were added to the schedule in revision 1 by mistake.<br><br>Removed 4 and 8 week test stations for Restoration Time, Moisture and pH from the Accelerated stability schedule as these stations were added to the schedule in revision 1 by mistake.<br><br>Added Closure Integrity testing back into the long-term stability schedule for M-M-R® II lots manufactured with HSA only due to worldwide regulatory requirements for this product.<br><br>Revised Closure Integrity SOP number to the current SOP number for this test.<br><br>Added footnote to Reconstitution tests to indicate diluent temperature, sample storage temperature and reconstituted solution storage time. |
| 1 | 28-APR-2006 | PR08491 | Included M-M-R® II manufactured with rHA.<br><br>Added a requirement to store samples inverted and protect from light during incubation.<br><br>Removed closure integrity testing. This test is not required since sterility testing is performed.<br><br>Added 4 and 8 week test stations for Moisture and pH to the accelerated stability schedule.<br><br>Revised the pH SOP number to the current SOP number. Added new SOP number for physical appearance. |

 Confidential

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714306
MRK-CHA01714306

Appx19877

Stability Protocol: Measles, Mumps, and Rubella Live Virus Vaccine (Revision 4)

| | | | |
|---|---|---|---|
| | | | Changed the number of lots required for routine testing from 1 to 3 as per commitment to FDA. |
| 0 | 10-JUN-2005 | PR08205 | RAS General Stability Protocol Format Update. |

**Biological Stability Unit (BSU) Protocol Revision History**

00    Original

01    Potency changed from a 3x1 to a 1x6 format. Potency testing added to the 3 and 6-month intervals. All tests except sterility are to be performed at the initiation of the stability study.

02    WHO potency testing in 3x1 format has been replaced with 1x6 thermal stability testing. Moisture testing using Aquatest IV instrument (MOISTAQUA, MOISTAQUASS) has been replaced by the Aquatest VIII instrument or equivalent (MOIST/KFCOUL). The LIMS codes have been changed to reflect instrument usage. All tests except potency tests {#2-4 on Test Schedule (section VI.)} will be performed at the initial interval only if these tests were not performed within the previous 3 months as part of release testing. Format changes throughout this protocol have been made in accordance with SOP 233-SU301X. The Acceptance Criteria section (VII.) includes a table defining the test specification limits and the statistical analyses performed.

03    Header and Text: Reformatted M-M-R®II to M-M-R® II throughout document. Section III. Changed wording in sentence from "This protocol may be used for annual lots of monovalent, bivalent, or trivalent Measles-, Mumps-, and Rubella-containing vaccine product currently marketed." to "This protocol is used for annual lots of monovalent, bivalent, or trivalent Measles-, Mumps-, and Rubella-containing vaccine product currently marketed." Section VII.B. Description of active stability monitoring of live virus vaccine results removed from protocol and referenced to SOP 233-SU317X. Minor formatting changes in accordance with current SOPs.

04    Reconstitute and Store potency assay format changed from 3x1 to 1x6. Increased testing frequency of moisture test and reconstitute and store test in response to failures for these tests on this product. Removed EP thermal stability (WHO) testing since there are no regulatory requirements for performing the test on stability. The test has been performed on stability for approximately 7 years; however, data has not been reported or requested by any regulatory agency in that time. Added pH testing in accordance with regulatory requirements and expectations. Reference: "Guidance for Industry-Stability Testing of Drug Substances and Drug Products", June 1998. Added test schedules specific for each M-M-R®II family product.

05    Revised the footnote to the test schedules to state that potency testing must be done at the initial stability interval. Revised the footnote to the test schedule to state that release tests can be reported as initial stability results if the initial interval is scheduled less than 1 month from the fill date. Added statement to the acceptance criteria that post-expiry (30 months) results may not meet specifications.

---

[1] MMD Quality Manual Guideline GDL 30.06 – *"Stability Protocols"*.

[2] MMD Quality Manual Guideline GDL 30.04 – *"Stability Samples and Planning"*

[3] MMD Quality Manual Guideline GDL 30.05 – *"Stability Study: Initiation/Modification/Termination"*.

[4] MMD Quality Manual Guideline GDL 30.07 – *"Stability Data Management, Data Analysis, and Trending"*.

[5] Stability Program for Container Closure Integrity: Lyophilized Vaccine Products, Durham

[6] Stability Program for Container Closure Integrity: Lyophilized Live Virus Vaccine Products, West Point

Confidential

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                MRK-KRA01714307
                                                             MRK-CHA01714307

Appx19878

## DOCUMENT APPROVALS

**Document ID:**    0901435084b74105
**Document Name:**    VSP-MMR II FC

| Server Date | Signed by | Outcome |
|---|---|---|
| 09-Sep-2016 14:03 GMT-0400 | Wong,Sally S | Approve |
| **Reason for Signature** | Approval, Authorization | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

| | | |
|---|---|---|
| **Reason for Signature** | | |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01714308
MRK-CHA01714308

11/26/2019
Declaration of G. Reilly
EXHIBIT 418

**Appx19880**

# BIOLOGICAL STABILITY PROGRAM

# ANNUAL STABILITY REPORT

MMD - Bioanalytical Development Dept. - Biological Stability Unit

DOCUMENT NUMBER/NAME:

**M-M-R®II STABILITY DATA SUMMARY FOR 2000 ANNUAL STABILITY REPORT**

#MMR00.00 (orig.)

Originator Signature/Date

Mary J. Macchi    *Mary J. Macchi  6/2/00*
Sr. Project Scientist

Auditor Signature/Date

Sally Wong    *Sally Wong  6 12/00*
Sr. Auditor

Approval Signature/Date

Cynthia F. Morrisey    *Sally Wong for C.M. 6 12/00*
Sr. Scientist

Distribution in Addition to Annual Review Binder Recipients:

| | |
|---|---|
| K. Abraham | WP36A-202 |
| S. Galford ( for inclusion in 2000 Annual Review) | WP36A-101 |
| P. Koser | WP36A-202 |
| T. Rogalski-Salter | WP38A-2 |
| M. Rosolowsky | WP36A-211 |
| B. Stankunas | WP36A-202 |
| S. Prabhu | WP36A-101 |
| C. Petroski | WP28-100 |

Biological Stability Unit File

**CONFIDENTIAL**

This document is a summary of the M-M-R®II stability data for the 2000 Annual Review.

This Annual Stability Report includes eighteen lots of M-M-R®II. They are regular production lots of either single dose or ten dose M-M-R®II on stability study at the recommended storage condition with testing validated between 4/1/99 and 3/31/00.

The lots included in this analysis are the following:

| Lot† | Dosage | Study | Purpose |
|------|--------|-------|---------|
| 1006D* | single | BS-070D | 1996 Annual |
| 1348D* | ten | BS-071D | 1996 Annual |
| 0624E* | single | BS-070E | 1997 Annual |
| 1238E* | ten | BS-071E | 1997 Annual |
| 0621727* | single | BS-0110 | New Albumin Vendor Study |
| 0621999* | single | BS-0110 | New Albumin Vendor Study |
| 0067H* | single | BS-0165 | 4°C with -20°C Control Concurrent Study / 1998 Annual |
| 0291H* | single | BS-0165 | 4°C with -20°C Control Concurrent Study |
| 0615040* | ten | BS-0165 | 4°C with -20°C Control Concurrent Study / 1998 Annual |
| 0624918* | single | BS-0167 | Control Lot for o-GOS Study |
| 0627847* | single | BS-0182 | Clinical Mumps Expiry Trial Study |
| 0628001* | single | BS-0182 | Clinical Mumps Expiry Trial Study |
| 0628706* | single | BS-0187 | Control lot for Albumin-free Diluent Study |
| 0633752 | single | BS-0225 | Mumps High Titer Study/1999 Annual |
| 0633815 | single | BS-0225 | Mumps High Titer Study |
| 0634034 | single | BS-0225 | Mumps High Titer Study |
| 0507J | ten | BS-071J | 1999 Annual |
| 0500954 | single | BS-0206 | REDACTED – OMP |

* Reported in previous Annual Stability Report.

Trend Analyses of measles, mumps, and rubella potency and moisture and comparison to historical data are summarized in Table 1.

All test results (physical appearance, measles potency, mumps potency, rubella potency, moisture, sterility, closure integrity, and restoration) are within the current specification limits, with the following exceptions.

Mumps Potency:

　　Lot 1006D: Mumps potency results at the 18-, 24-, and 30-month intervals were below the current specification limit. Stability test investigations 98-S006, 99-S009, and 99-S014 concluded that the results are in agreement with the previous time points and the historical loss rate for mumps.

　　Lot 1348D: Mumps potency results at the 3-, 6-, 12-, 18-, 24-, and 30-month intervals were below the current specification limit. The potency of the mumps bulk used for this fill was overestimated and the lot was released near the minimum release specification. Reference stability test investigations 97-S017, 97-S025, 97-S075, 99-S011, 98-S036, and 99-S008.

　　Lot 0624E: Mumps potency results at the 24-month interval were below the current specification limit. Stability test investigation 99-S017 concluded that the results were in agreement with the previous time points and the historical loss rate for mumps. The mumps potency results at the 30-month interval were within the current specification limit.

　　Lot 0621727: Mumps potency results at the 24- and 30-month intervals were below the current specification limit. Stability test investigations 98-S034 and 99-S013 concluded that the results were in agreement with the previous time points and the historical loss rate for mumps.

　　Lot 0621999: Mumps potency results at the 24- and 30-month intervals were below the current specification limit. Stability test investigations 98-S038 and 99-S016 concluded that the results were in agreement with the previous time points and the historical loss rate for mumps.

MRK-KRA01633602
MRK-CHA01633602

Lot 0067H: Initial mumps potency results were below the current specification limit at the 24-month interval. Upon expanded testing, the average of all 12 valid replicates was within the current specification limit. Reference stability test investigation 00-S003.

Lot 0624918: Mumps potency results at the 24-month interval were below the current specification limit. Stability test investigation 00-S008 concluded that the results were in agreement with the previous time points and the historical loss rate for mumps.

Lot 0627847: Mumps potency results at the 6-, 9-, 12-, and 18-month intervals were below the current specification limit. Stability test investigations 99-S005, 99-S018, and 99-S031 concluded that the results were in agreement with the previous time points and the historical loss rate for mumps, and the out-of-specification results may have been due to a lower than average release potency.

Lot 0500954: An atypical interval trend was observed during active stability monitoring at the 3-month interval. However, the interval trend at the 6-month interval was typical. Stability test investigation 00-S004 concluded that this atypical result at the 3-month interval should have no impact on the stability profile of the product.

Measles Potency:



REDACTED – OMP

Moisture:

Lot 0624918: Moisture results at the 18-month interval were above the current specification limit. Stability test investigation 99-S020 concluded that the results may be attributed to a higher than average percentage moisture increase observed for this lot. In addition, the trend of this lot at the 18-month interval is in agreement with the previous time points. At the 24-month interval, the moisture results were within the current specification limit, but out of trend with the previous time points. Stability test investigation 00-S005 concluded that the vials tested at the 24-month interval may not be representative of the lot. Expanded testing is required to confirm the result, but additional vials were unavailable due to vial shortages for this lot.

Overall, the stability data in this Annual Stability Report indicate that these lots demonstrate acceptable stability, consistent with the historical performance for this product.

Please call if you have any questions or need additional information.

AN_MMR00                                          M.J.M -27452

**CONFIDENTIAL**



### M-M-R® II Stability at 2-8°C

Table 1

Stability Results Summary:

(Testing validated through 3/31/00)

| Lot | Log Change/Yr[7,8] Measles Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis[4] | Log Change/Yr[7,8] Mumps Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis[4] | Log Change/Yr[7,8] Rubella Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis[4] | Change/Yr[7] Moisture (%, w/w) | No. of Intervals Used for Analysis[9] |
|---|---|---|---|---|---|---|---|---|
| 1006D[1] | REDACTED – OMP | 5 | -0.18 | 5 | REDACTED – OMP | 5 | 0.20 | 5 |
| 1348D[1] | | 5 | -0.07 | 5 | | 5 | -0.24 | 5 |
| 0624E[1] | | 5 | -0.30 | 5 | | 5 | 0.54 | 4 |
| 1238E[1] | | 6 | -0.17 | 6 | | 6 | 0.10 | 4 |
| 0621727[2] | | 6 | -0.22 | 6 | | 6 | 0.21 | 4 |
| 0621999[2] | | 6 | -0.31 | 6 | | 6 | 0.27 | 4 |
| 0067H[3] | | 5 | -0.15 | 5 | | 5 | 0.54 | 4 |
| 0291H[4] | | 5 | -0.24 | 5 | | 5 | NR[10] | NR |
| 0615040[2] | | 5 | -0.16 | 5 | | 5 | 0.16 | 4 |
| 0624918[2] | | 6 | -0.28 | 6 | | 6 | 1.38 | 9 |
| 0627847[2] | | 4 | -0.20 | 4 | | 4 | NR | NR |
| 0628001[2] | | 4 | -0.31 | 4 | | 4 | NR | NR |
| 0628706[2] | | 4 | -0.05 | 4 | | 4 | 0.08 | 6 |
| Historical Average Standard Deviation S.D. Range[5] Number of Lots[6] | N/A | N/A | -0.17 ± 0.17 (-0.68, 0.34) 63 | N/A | N/A | N/A | +0.10 ±0.28 (-0.74, 0.94) 92 | N/A |

[1] Slope calculations for potency were performed on house standard-adjusted data. Slope calculations for potency and moisture were based on a date that was back-calculated 24 months from the package expiry date for lot nos. 1006D, 1348D, 0624E and 1238E.
[2] Slope calculations for potency were performed on house standard-adjusted data. Slope calculations for potency and moisture were based on the date samples were transferred from -20°C storage to 2-8°C for lot nos. 0621727, 0621999, 0615040, 0624918, 0627847, 0628001, and 0628706.
[3] Slope calculations for potency were performed on house standard-adjusted data. Slope calculations for potency and moisture were based on the date of packaging for lot no. 0067H.
[4] Slope calculations for potency were performed on house standard-adjusted data. Slope calculations for potency and moisture were based on the date of study initiation for lot no. 0291H.
[5] Standard Deviation Range equals Historical Average ± 3 S.D.
[6] "Number" is the number of lots used in the historical average. Historical average data for measles and rubella potency and moisture are from regular production Live Virus Vaccine lots stored at 2-8°C which contain the measles, mumps and rubella components; monovalent, bivalent, and trivalent formulations are included. Historical average potency data has been rounded to two significant figures. In addition, Live Virus Vaccine lots used for historical average moisture data are single and multi- dose lots, which have the same formulation matrix and lyophilization characteristics as M-M-R®II single dose product.
[7] Changes are only determined on those lots with testing through at least 18 months and a minimum of 3 data points. They are determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time.
[8] Due to the bi-phasic kinetics of potency stability loss observed in the historical stability database, the linear regressions performed on these lots use only data from the 6-month stability interval through the current interval of the stability study (18 months or greater).
[9] Results of release testing are included in the analysis. The change per year is calculated from the average percent moisture at each interval tested.
[10] NR: Not required. No analysis required since there were less than three data points.

MRK-KRA01633604
MRK-CHA01633604

Appx19884



**Graphs of Measles, Mumps and Rubella Potency and Moisture Change Per Year vs. Selected Lots**

Potency and moisture analyses have been performed on lots with testing completed through 18 months. The change per year is determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time. Each graph contains the corresponding historical average as reference.



Measles Potency Change Per Year

REDACTED – OMP

CONFIDENTIAL

MRK-KRA01633605
MRK-CHA01633605

Appx19885



MRK-KRA01633606
MRK-CHA01633606

Appx19886

11/26/2019
Declaration of G. Reilly
EXHIBIT 419

# BIOLOGICAL STABILITY PROGRAM

# ANNUAL STABILITY REPORT

MMD – Vaccine & Sterile Quality Operations - Biological Stability Unit

DOCUMENT NUMBER/NAME:

**M-M-R®II STABILITY DATA SUMMARY FOR 2002 ANNUAL STABILITY REPORT**

#MMR02.00 (orig.)

Distribution in Addition to Annual Review Binder Recipients:

| | |
|---|---|
| S. Galford ( for inclusion in 2002 Annual Review) | WP36A-101 |
| P. Lucas | WP35-201 |
| C. Petroski | WP37A-104 |
| D. Gulbinski | WP37B-101 |
| M. Rosolowsky | WP37A-102 |
| D. Zacholski | UN-B121 |
| P. DeHaven | WP53B-100 |
| Biological Stability Unit File | |

**CONFIDENTIAL**

# ◆ MERCK

## Audit Signature Form – Unqualified Site

| Product/Facility | M-M-R®II / MMD, West Point |
|---|---|
| Document Description and/or Title | M-M-R®II Stability Data Summary For 2002 Annual Stability Report |
| Contributing Department | VRAS - Stability |

| **Author** Comment: | The document has been reviewed for accuracy, completeness, and compliance with existing standards, assurance of second person review of data/information, and contains the required source documentation.<br><br>Printed Name: _Janet Matthews_<br><br>Signature: _Janet D Matthews_ Date: _28 June 02_ |
|---|---|
| **Document Reviewer** Comment: | The attached data/information has been reviewed for completeness, consistency, organization, and presentation.<br><br>Printed Name: _Sally Wing_<br>*(Can be the same as Director/Manager/Team Leader or Designee)*<br><br>Signature: _Sally Wing_ Date: _28 JUN 02_ |
| **Director/Manager/Team Leader or Designee** Comment: | The attached information has been reviewed for scientific clarity, content, and conclusions.<br><br>Printed Name: _Sally Wing_<br><br>Signature: _Sally Wing_ Date: _28 JUN 02_ |
| **Auditor** Comment: | The attached information has been **AUDITED** 100% and was found to be accurate, complete and in compliance with established standards. **Total Pages Audited = 70**<br><br>Printed Name: _Lisa A. Mills_<br><br>Signature: _Lisa Mills_ Date: _28 Jun 02_<br><br>Author is in agreement with all observations. YES ☑ NO ☐ |
| **Director/Manager or Designee** Comment: | The attached information has received final review and approval.<br><br>Printed Name: _Sally Wing_<br>*(Can be the same as Director/Manager/Team Leader or Designee)*<br><br>Signature: _Sally Wing_ Date: _28 JUN 02_<br><br>See audit document and/or Audit Report Memo for responses to specific observations. |

**CONFIDENTIAL**

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR: _____
DATE: _28 Jun 02_

**M-M-R®II  2002 Annual Review**
**Executive Summary**

This document is a summary of the M-M-R®II stability data for the 2002 Annual Review.

This Annual Stability Report includes 22 lots of M-M-R®II. They are regular production lots of either single dose or ten dose M-M-R®II on stability study at the recommended storage condition with testing validated between 01-APR-01 and 31-MAR-02. The lots included in this analysis are the following:

| Lot | Dosage | Study | Purpose |
|---|---|---|---|
| 0628706* | Single | BS0187 | Control Lot, Albumin-Free Diluent Study |
| 0628706TR | Single | BS0187 | Control Lot, Albumin-Free Diluent Study (Transfer arm) |
| 0500954* | Single | BS0206 | REDACTED – OMP |
| 0500955 | Single | BS0206 | |
| 0500956 | Single | BS0206 | |
| 0500957 | Single | BS0206 | |
| 0631655* | Single | BS0204 | New Albumin Vendor Study |
| 0631656* | Single | BS0204 | New Albumin Vendor Study |
| 0632464* | Single | BS0204 | New Albumin Vendor Study |
| 0633752* | Single | BS0225 | Mumps High Titer Study/1999 Annual |
| 0633815* | Single | BS0225 | Mumps High Titer Study |
| 0634034* | Single | BS0225 | Mumps High Titer Study |
| 0634129* | Single | BS0224 | New Albumin Vendor Study |
| 0636850* | Single | BS0242 | New Albumin Vendor Study |
| 0636851* | Single | BS0242 | New Albumin Vendor Study |
| 0640794 | Single | BS0291 | Lot with Stainless Steel Agglomerates |
| 0641017 | Single | BS0280 | Control Lot, rHA Clinical Study |
| 0998K* | Single | BS070K | 2000 Annual |
| 0734L | Single | BS070L | 2001 Annual |
| 0507J* | Ten | BS071J | 1999 Annual |
| 1434K* | Ten | BS071K | 2000 Annual |
| 1832K* | Ten | BS071L | 2001 Annual |

* Reported in previous Annual Stability Report.

Trend Analyses of measles, mumps, and rubella potency and moisture and comparison to historical data are summarized in Table 1.

All test results within this annual report period (physical appearance, measles potency, mumps potency, rubella potency, moisture, sterility, closure integrity, and restoration) are within the current specification limits, with the following noted exceptions.

Measles Potency:



REDACTED – OMP

Mumps Potency:

Lot 0631655: Mumps potency result at the 24-month interval was below the specification limit. The Stability Test Investigation concluded that the OOS result was not inconsistent with results for lots that were formulated prior to the 1999 process change for mumps.

Lot 0632464: Mumps potency result at the 24-month interval was below the specification limit. The Stability Test Investigation concluded that the OOS result was not inconsistent with results for lots that were formulated prior to the 1999 process change for mumps.

**CONFIDENTIAL**

**M-M-R®II** 2002 Annual Review
Executive Summary

Mumps Potency continued:

Lot 0631655: Mumps Reconstitute and Store potency result at the 24-month interval, 8-hours incubation time, was below the specification limit. The Stability Test Investigation concluded that the OOS result was not inconsistent with results for lots that were formulated prior to the 1999 process change for mumps.

Lot 0631656: Mumps Reconstitute and Store potency result at the 24-month interval, 8-hours incubation time, was below the specification limit. The Stability Test Investigation concluded that the OOS result was not inconsistent with results for lots that were formulated prior to the 1999 process change for mumps.

Lot 0632464: Mumps Reconstitute and Store potency results at the 24-month interval, 4 and 8-hours incubation times, were below the specification limit. The Stability Test Investigation concluded that the OOS results were not inconsistent with results for lots that were formulated prior to the 1999 process change for mumps.

Lot 0500955: Mumps Reconstitute and Store potency results at the 24-month interval, 4 and 8-hours incubation times, were below the specification limit. The Stability Test Investigation concluded that given the variability of the 3 x 1 assay format, and the 0.7 log historical loss rate for mumps, a lot released at 4.3 -$\log_{10}$TCID$_{50}$/0.1 mL may not meet the expiry specification at 24-months for mumps reconstitute and store potency when tested by the 3x1 assay format.

Potency results on the following lots met the specification limit, however, the potency value did not meet Active Stability Monitoring criteria:



REDACTED – OMP

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR: _____
DATE: 28-Jan-02

CONFIDENTIAL



M-M-R®II  2002 Annual Review
Executive Summary

Out-of-trend results continued:



Lot 1434K: Mumps potency was outside of the two-sigma historical range for early phase loss at the 12-month interval. The house standard-adjusted average mumps potency result at 12-months was higher than the house standard-adjusted release potency, (3.90 vs. 3.77 $-\log_{10}TCID_{50}/0.1mL$). An additional interval was added to confirm the out-of-trend result, and at 15-months the house standard-adjusted mumps potency result was 3.75 $-\log_{10}TCID_{50}/0.1mL$ and the early phase loss percentile ranking was considered not unusual. The Stability Test Investigation concluded that the apparent increase in mumps potency for the subject lot at 12-months may be attributed to assay variability, particularly the greater variability inherent in the 3 x 1 assay format used at time of release.

Lot 0633752: Mumps potency was outside of the two-sigma historical range for terminal phase slope at the 18-month interval, and did not pass Predicted Expiry analysis. Following expanded testing for mumps potency, the terminal phase slope was no longer considered unusual. However, the lot still failed to meet the Predicted Expiry criteria therefore a 20-month interval was added. The calculations at 20-months did not support the Predicted Expiry values calculated at 18-months. The Stability Test Investigation concluded that current ASM methodology is impacted by variability in the mumps assay, and that impact is reduced when the analysis is performed on a more complete data set (i.e., as results from additional intervals become available).

Lot 0633815: Mumps potency was outside of the two-sigma historical range for terminal phase slope at the 18-month interval, and did not pass Predicted Expiry analysis. Following expanded testing for mumps potency, the terminal phase slope was no longer considered unusual. However, the lot still failed to meet the Predicted Expiry criteria therefore a 20-month interval was added. The calculations at 20-months did not support the Predicted Expiry values calculated at 18-months. The Stability Test Investigation concluded that current ASM methodology is impacted by variability in the mumps assay, and that impact is reduced when the analysis is performed on a more complete data set (i.e., as results from additional intervals become available).

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR: ~~_____~~
DATE: ~~28-Jun-02~~

CONFIDENTIAL

M-M-R®II  2002 Annual Review
Executive Summary

Out-of-trend results continued:

Lot 0500955:  This lot failed the stability protocol acceptance criteria of having a greater than 5% decrease in potency from the study control lot after 24 months storage at 5°C. Lot 0500955 has a mumps terminal phase slope that is 38% lower compared to the control lot.  In addition, lot 0500955 has a rubella slope that is 42% lower compared to the control lot.  Vaccine Biometrics Research determined that the protocol acceptance criterion of 5% was too small given the variability of the loss estimates.  The Stability Test Investigation concluded that the new rubella stock seed test lots demonstrate stability that is consistent with historical lots made with the current stock seed.

Lot 0500956:  This lot failed the stability protocol acceptance criteria of having a greater than 5% decrease in potency from the study control lot after 24 months storage at 5°C.  Lot 0500956 has a measles terminal phase slope that is 20% lower compared to the control lot.  Vaccine Biometrics Research determined that the protocol acceptance criterion of 5% was too small given the variability of the loss estimates.  The Stability Test Investigation concluded that the new rubella stock seed test lots demonstrate stability that is consistent with historical lots made with the current stock seed.



REDACTED – OMP

The M-M-R®II annual stability protocol was revised with the following changes effective 01-AUG-2001:

Reconstitute and Store potency assay format changed from 3 x 1 to 1 x 6.
Increased testing frequency of moisture test (added at every interval) and reconstitute and store potency test (added to 12- and 18-month intervals) in response to failures for these tests on this product.
Removed EP thermal stability (WHO) testing since there are no regulatory requirements for performing the test on stability.
Added pH testing in accordance with regulatory requirements and expectations, Reference: "Guidance for Industry-Stability Testing of Drug Substances and Drug Products", June 1998.

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR:
DATE: 29 - Sems - 02

**M-M-R®II 2002 Annual Review**
**Executive Summary**

Overall, the stability data in this Annual Stability Report demonstrate stability that is consistent with the historical performance for this product. In September 1999 a process change was made to increase the level of mumps virus in M-M-R®II family vaccines containing mumps component. The process change was implemented to increase the likelihood that lots will meet the mumps potency expiry specification of $\geq 3.6$ -log $TCID_{50}/0.1mL$ and the release specification of $\geq 4.3$ -log $TCID_{50}/0.1mL$. Additionally, in September 1999 the measles release potency specification was raised from 2.3 to 2.8 -$log_{10}TCID_{50}/0.1mL$ to ensure that potency for lots at expiry would meet the specification of $\geq 2.3$ -$log_{10}TCID_{50}/0.1mL$.

REDACTED – OMP

Please call if you have any questions or need additional information.
Janet Matthews -31391

AN_MMR02

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR:
DATE: 29-June-02

**CONFIDENTIAL**

MRK-KRA01633535
MRK-CHA01633535

Appx19894

**M-M-R®II  2002 Annual Review**
**Executive Summary**

**M-M-R®II Stability at 5 (2 to 8)°C**

Table 1
Stability Results Summary:
(Testing validated through 31-MAR-02)

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR: ~~illegible~~
DATE: 28 June 02

| Lot | Log Change/Yr Measles Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Log Change/Yr Mumps Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Log Change/Yr Rubella Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Change/Yr Moisture (%, w/w) | No. of Intervals Used for Analysis |
|---|---|---|---|---|---|---|---|---|
| 0628709 | REDACTED – OMP | 6 | -0.26 | 6 | REDACTED – OMP | 10 | 0.07 | 8 |
| 0628706TR | | 6 | -0.22 | 6 | | 8 | 0.03² ³ | 8 |
| 0560954 | | 6 | -0.14 | 6 | | 8 | -0.03⁴ | 4 |
| 0560955 | | 6 | -0.21 | 6 | | 8 | -0.10⁴ | 4 |
| 0560956 | | 6 | -0.11 | 6 | | 8 | -0.14⁴ | 4 |
| 0560957 | | 6 | -0.16 | 6 | | 8 | 0.02⁴ | 4 |
| 0631655 | | 6 | -0.22 | 6 | | 8 | 0.13 | 4 |
| 0631656 | | 6 | -0.22 | 6 | | 8 | 0.03 | 4 |
| 0632464 | | 6 | -0.25 | 6 | | 8 | 0.03 | 4 |
| 0633752 | | 6 | -0.33 | 6 | N/A¹ | N/A⁵ | N/A⁵ | N/A⁵ |
| 0633815 | | 6 | -0.29 | 6 | N/A¹ | N/A⁵ | N/A⁵ | N/A⁵ |
| 0634034 | | 6 | -0.31 | 5 | N/A¹ | N/A⁵ | N/A⁵ | N/A⁵ |
| 0634129 | | 5 | -0.31 | 5 | N/A¹ | 0.11⁴ | 3 |  |
| 0636850 | | 4 | -0.19 | 4 | N/A¹ | -0.06⁴ | 3 |  |
| 0636851 | | 4 | -0.31 | 4 | N/A¹ | 0.16² | 3 |  |
| 0507J | | 6 | -0.09 | 6 | | 8 | 0.21 | 4 |
| 0998K | | 4 | -0.32 | 4 | N/A¹ | NR | NR |  |
| Historical Average Standard Deviation ± 3 SD Range Number of Lots | N/A | | -0.17 0.17 (-0.67 to 0.33) 68 | N/A | | | 0.16 ±0.27 (-0.65, 0.96) 65 | N/A |
| Historical Average Multi-dose Lots Standard Deviation ± 3 SD Range Number of Lots | N/A | | N/A | N/A | | | 0.11 ±0.25 (-0.63, 0.85) 50 | N/A |

NR: Not required.  No analysis required since there were less than three intervals.
Slope calculations for potency were based on the date of packaging or date placed at 5°C (2 to 8)°C.
Changes are determined using linear regression analysis.  A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time.
Slope calculations for potency were performed on house standard-adjusted data. Historical average potency data has been rounded to two significant figures.
Due to the bi-phasic kinetics of measles and mumps potency stability loss observed in the historical stability database, the linear regressions performed use only data from the 6-month stability interval
through the current interval of the stability study (18 months or greater). Linear regression analysis of rubella potency loss is calculated using all data from the initial interval forward.
Historical average data for measles, mumps, and rubella potency are from regular production Live Virus Vaccine lots stored at 2 to 8°C which contain the measles, mumps, and rubella components;
monovalent, bivalent, and trivalent formulations are included.    Both single-dose and multi-dose formulations are included.
For moisture, results of release testing are included in the analysis.  The change per year is calculated from the average percent moisture at each interval tested.
Historical average moisture data has been provided for both single-dose lots (first average reported) and multi-dose lots.  Monovalent, bivalent, and trivalent formulations are included.

Footnotes continued on next page.

CONFIDENTIAL

MRK-KRA01633536
MRK-CHA01633536

Appx19895

**M-M-R®II  2002 Annual Review**
**Executive Summary**

**M-M-R®II Stability at 5 (2 to 8)°C**

**Table 1**
Stability Results Summary:
(Testing validated through 31-MAR-02)

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR: _____
DATE: 29-June-02

[1] Slope analysis of rubella potency is excluded for lots manufactured after process change to increase mumps titer.  Results from early timepoints were falsely elevated due to incomplete neutralization of the mumps component.  Mumps antiserum dilution was changed from 1:100 to 1:10 on 18-SEP-2000 to ensure complete neutralization, and intervals tested thereafter did not display interference from the mumps virus.  Consequently, the rubella potency values obtained were significantly lower than values at the earlier intervals, resulting in unusual slopes that do not accurately represent the potency degradation of the lots.
[2] Result generated using Aquatest VIII method.  All other moisture results generated using Aquatest IV.
[3] Release result was generated using Aquatest IV and therefore was not included in the analysis.
[4] No release testing performed.
[5] Slope analysis of moisture change was not performed on this lot.  Moisture was tested by Aquatest IV method at the initial and 12-month intervals.  Aquatest VIII method was used at the 18- and 24-month intervals.  LIMS test codes were updated to the Aquatest VIII method to be consistent with latest revision of the M-M-R®II Annual protocol, and Aquatest IV was discontinued on this lot in error.

CONFIDENTIAL

MRK-KRA01633537
MRK-CHA01633537

Appx19896

**Graph of Measles Potency Change Per Year vs. Selected Lots**



REDACTED – OMP

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR
DATE: 28 June 07

**CONFIDENTIAL**

MRK-KRA01633538
MRK-CHA01633538

**Appx19897**

## Graph of Mumps Potency Change Per Year vs. Selected Lots

Mumps potency analyses have been completed on lots with testing validated through 18 months. The change per year is determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time. The graph contains the corresponding historical average as reference.



Mumps Potency Change per Year

AUDITED
DATA AUDITING - DEPT. 299
MMD, WEST POINT
AUDITOR: _____
DATE: 28 - June - 02

MRK-KRA01633539
MRK-CHA01633539

**Appx19898**

11/26/2019
Declaration of G. Reilly
EXHIBIT 420



Restricted
R ◯ Confidential
limited access

# BIOLOGICAL STABILITY PROGRAM

## ANNUAL STABILITY REPORT

MMD – Vaccine & Sterile Quality Operations - Biological Stability Unit

DOCUMENT NUMBER/NAME:

M-M-R®II STABILITY DATA SUMMARY FOR 2003 ANNUAL STABILITY REPORT

#MMR03.00rev01

Originator Signature/Date

*Pamela Muschiitz*    3L MAY 2003

Pamela Muschiitz
Scientist

Second Scientist Review/Date

*Charles J. Gonce*  30-MAY-2003

Charles Gonce
Auditor

Approval Signature/Date

*Susan Penix*    30-MAY-2003

Susan Penix
Senior Project Scientist

Distribution in Addition to Annual Review Binder Recipients:

| | |
|---|---|
| D. Slipiec (for inclusion in 2003 Annual Review) | WP38M-9 |
| P. Lucas | WP35-201 |
| M. Galinski | WP37A-104 |
| M. Rosolowsky | WP37A-102 |
| P. DeHaven | WP53B-100 |
| D. Zacholski | BLB-22 |

Biological Stability Unit File

**CONFIDENTIAL**

**MRK-KRA01632888**
**MRK-CHA01632888**

Second Scientist Reviewed
Reviewed by: _C. Gavre_
Date: _30 -May - 2003_



Restricted
R ⬦ Confidential
Limited access

M-M-R®II  2003 Annual Review
Executive Summary

This is revision 01 of the 2003 M-M-R®II Annual Report which clarified the footnote on Table 22.

This document is a summary of the M-M-R®II stability data for the 2003 Annual Review.

This Annual Stability Report includes 16 lots of M-M-R®II. They are regular production lots of either single dose or ten dose M-M-R®II on stability study at the recommended storage condition with testing validated between 01-APR-2002 and 31-MAR-2003. The lots included in this analysis are the following:

| Lot | Dosage | Study | Purpose |
|------|--------|--------|---------|
| 0633752* | Single | BS0225 | Mumps High Titer Study/1999 Annual |
| 0633815* | Single | BS0225 | Mumps High Titer Study |
| 0634034* | Single | BS0225 | Mumps High Titer Study |
| 0634129* | Single | BS0224 | New Albumin Vendor Study |
| 0636850* | Single | BS0242 | New Albumin Vendor Study |
| 0636851* | Single | BS0242 | New Albumin Vendor Study |
| 0640794* | Single | BS0291 | Lot with Stainless Steel Agglomerates |
| 0641017* | Single | BS0280 | Control Lot, rHA Clinical Study |
| 0643956 | Single | BS0298 | Control Lot, rHA Study |
| 0643750 | Single | BS0299 | Control Lot, New lyophilization Cabinets (LY-801 and LY-802) |
| 0644709 | Single | BS0303 | Control Lot, Alternative (WG) Chicken Flock |
| 0998K* | Single | BS070K | 2000 Annual |
| 0734L* | Single | BS070L | 2001 Annual |
| 0232M | Single | BS070M | 2002 Annual |
| 1434K* | Ten | BS071K | 2000 Annual |
| 1832K* | Ten | BS071L | 2001 Annual |

* Reported in previous Annual Stability Report.

Trend Analyses of measles, mumps, and rubella potency in comparison to historical data are summarized in Table 1. Trend Analyses for moisture was also completed; however, historical data for Aquatest VIII was not available for comparison.

All test results within this annual report period (physical appearance, measles potency, mumps potency, rubella potency, moisture, sterility, closure integrity, and restoration) are within the current specification limits, with the following noted exceptions:

Measles Potency:



REDACTED – OMP

MRK-KRA01632889
MRK-CHA01632889

Appx19901



M-M-R®II  2003 Annual Review
Executive Summary

REDACTED – OMP



Potency results on the following lots met the specification limit; however, the potency value did not meet Active Stability Monitoring criteria:

REDACTED – OMP



Lot 1832K: The average mumps potency result at the 12-month interval met the specification limit. However, this lot was considered unusual for early-phase loss, and displayed an unusual interval trend using house standard-calibrated data. The house standard-calibrated average mumps potency result at 12 months was higher than the house standard-calibrated potency result at release (4.07 vs. 3.97 $-\log_{10}TCID_{50}/0.1$ mL) and the percentile ranking was outside of the maximum allowable difference compared to historical data. Furthermore, the change in potency between the 12-month and the 9-month intervals resulted in an interval trend that was outside of the acceptable range. The conclusion of the Stability Test Investigation was that the atypical interval trend for the subject lot at 12-months may be attributed to expected assay variability.

The M-M-R®II annual stability protocol was revised with the following changes effective 31-JAN-2003:

Revised the footnote to the test schedules to state that potency testing must be done at the initial stability interval.
Revised the footnote to the test schedule to state that release tests can be reported as initial stability results if the initial interval is scheduled less than 1 month from the fill date.
Added statement to the acceptance criteria that post-expiry (30 months) results may not meet specifications.

Overall, the stability data in this Annual Stability Report demonstrate stability that is consistent with the historical performance for this product.

REDACTED – OMP

2nd Scientist
Reviewed By: _C. Grove_
Date: _27-May-2003_

MRK-KRA01632890
MRK-CHA01632890

Appx19902



M-M-R®II  2003 Annual Review
Executive Summary

REDACTED – OMP

Please call if you have any questions or need additional information.

Pamela Muschlitz –24302                                                    AN_MMR

2nd Scientist
Reviewed By: _C. GENCE_
Date: ___27-mm-2003

**CONFIDENTIAL**

MRK-KRA01632891
MRK-CHA01632891

Appx19903



M-M-R®II 2003 Annual Review
Executive Summary

M-M-R®II Stability at 5 (2 to 8)°C

Table 1
Stability Results Summary:
(Testing validated through 31-MAR-2003)

2nd Scientist
Reviewed By: *C. Graves*
Date: *27-MAY-2003*

| Lot | Log Change/Yr Measles Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Log Change/Yr Mumps Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals for Analysis | Log Change/Yr Rubella Potency [-Log₁₀(TCID₅₀/0.1mL)] | No. of Intervals Used for Analysis | Change/Yr Moisture (%, w/w) | No. of Intervals Used for Analysis |
|---|---|---|---|---|---|---|---|---|
| 0633752 | REDACTED – OMP | 6 | -0.27 | 6 | REDACTED – OMP | N/A[1] | N/A[2] | N/A[2] |
| 0633815 | | 6 | -0.26 | 6 | | N/A[1] | N/A[2] | N/A[2] |
| 0634034 | | 6 | -0.23 | 6 | | N/A[1] | N/A[2] | N/A[2] |
| 0634129 | | 6 | -0.24 | 6 | | N/A[1] | 0.11 | 4 |
| 0636850 | | 6 | -0.19 | 6 | | N/A[1] | 0.04 | 5 |
| 0636851 | | 6 | -0.25 | 6 | | N/A[1] | 0.14 | 5 |
| 0640794 | | NA | N/A | N/A | | N/A | N/A | N/A |
| 0641017 | | NA | N/A | N/A | | N/A | 0.05 | 6 |
| 0643956 | | NA | N/A | N/A | | N/A | N/A | N/A |
| 0643750 | | NA | N/A | N/A | | N/A | N/A | N/A |
| 0644709 | | NA | N/A | N/A | | N/A[1] | N/A | N/A |
| 0998K | | 6 | -0.22 | 6 | | N/A[1] | 0.02 | 5 |
| 0734L | | 4 | -0.30 | 4 | | 4 | 0.08 | 6 |
| 0232M | | NA | N/A | N/A | | N/A | N/A | N/A |
| 1434K | | 5 | -0.08 | 5 | | 5 | -0.33 | 4 |
| 1832K | | 5 | 0.01 | 5 | | 5 | 0.34 | 5 |
| Historical Average Standard Deviation ± 3 SD Range Number of Lots | N/A | | -0.17 0.17 (-0.67 to 0.33) 68 | | N/A | | Not Available[3] | N/A |
| Historical Average Multi-dose Lots Standard Deviation ± 3 SD Range Number of Lots | N/A | | N/A | N/A | N/A | | Not Available[3] | N/A |

NR: Not required.  No analysis required since there were less than three intervals.
Slope calculations for potency were based on the date of packaging or date placed at 5°C (2 to 8)°C.
Changes are determined using linear regression analysis.  A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time.
Slope calculations for potency were performed on house standard-adjusted data. Historical average potency data has been rounded to two significant figures.
Due to the bi-phasic kinetics of measles and mumps potency stability loss observed in the historical stability database, the linear regressions performed use only data from the 6-month stability interval through the current interval of the stability study (18 months or greater).  Linear regression analysis of rubella potency loss is calculated using all data from the initial interval forward.

MRK-KRA01632892
MRK-CHA01632892

**Appx19904**



M-M-R®II  2003 Annual Review
Executive Summary

M-M-R®II Stability at 5 (2 to 8)°C

2nd Scientist
Reviewed By: _C. Gruwie_
Date: _27. May - 2003_

Table 1
Stability Results Summary:
(Testing validated through 31-MAR-2003)

Historical average data for measles, mumps, and rubella potency are from regular production Live Virus Vaccine lots stored at 2 to 8°C which contain the measles, mumps, and rubella components; monovalent, bivalent, and trivalent formulations are included.    Both single-dose and multi-dose formulations are included.
For moisture, results of release testing are included in the analysis.  The change per year is calculated from the average percent moisture at each interval tested.
Historical average moisture data has been provided for both single-dose lots (first average reported) and multi-dose lots.  Monovalent, bivalent, and trivalent formulations are included.

[1] Slope analysis of rubella potency is excluded for lots manufactured after process change to increase mumps titer.  Results from early timepoints were falsely elevated due to incomplete neutralization of the mumps component.  Mumps antiserum dilution was changed from 1:100 to 1:10 on 18-SEP-2000 to ensure complete neutralization, and intervals tested thereafter did not display interference from the mumps virus.  Consequently, the rubella potency values obtained were significantly lower than values at the earlier intervals, resulting in unusual slopes that do not accurately represent the potency degradation of the lots.
[2] Slope analysis of moisture change was not performed on this lot.  Moisture was tested by Aquatest IV method at the initial and 12-month intervals.  Aquatest VIII method was used at the 18, 24 and 30-month intervals. LIMS test codes were updated to the Aquatest VIII method to be consistent with latest revision of the M-M-R®II Annual protocol, and Aquatest IV was discontinued on this lot in error.
[3] Historical Karl Fisher Aquatest VIII average not available due to insufficient data.

**CONFIDENTIAL**

MRK-KRA01632893
MRK-CHA01632893

Appx19905



Graph of Measles Potency Change Per Year vs. Selected Lots



REDACTED – OMP

CONFIDENTIAL



Graph of Mumps Potency Change Per Year vs. Selected Lots

Mumps potency analyses have been completed on lots with testing validated through 18 months. The change per year is determined using linear regression analysis. A positive change indicates an estimated increase over time, while a negative change indicates an estimated decrease over time. The graph contains the corresponding historical average as reference.



2nd Scientist
Reviewed By: _C Gauge_
Date: _28 May - 2013_

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 421

Appx19908

| STANDARD OPERATING PROCEDURE | | TEMPORARY OFFICIAL COPY |
|---|---|---|
| **PAGE NO.**<br>1 of 9 | **DEPT. NAME**<br>Vaccine and Sterile Quality Operations - Biological Stability Unit | **SOP NO.**<br>233-SU317X |
| **EFFECTIVE DATE**<br>11/10/00 | **TITLE**<br>ACTIVE STABILITY MONITORING OF LIVE VIRUS VACCINE POTENCY RESULTS | **SUPERSEDED DATE**<br>NEW |

| SOP PREPARED BY | DATE | VBR APPROVAL | DATE |
|---|---|---|---|
| C. Morrisey | 10-12-00 | T. Schofield | 10/16/00 |
| **DEPT. 233 APPROVAL** | **DATE** | **BIOLOGICS LICENSING APPROVAL** | **DATE** |
| T. Rogalski-Salter  *Taryn Rogalski Salter* | 10/16/00 | K. Abraham  *Karabin Amahai* | 10/13/00 |
| **QA APPROVAL** | **DATE** | **DEPT. 223 APPROVAL** | **DATE** |
| *Bridget Wright* | 10-16-00 | R. Derrickson  *RBI* | 10/13/2000 |

I.   **PURPOSE**

This SOP describes the general procedures and responsibilities for Active Stability Monitoring (ASM) of potency results for live virus vaccines on stability in the Biological Stability Unit (BSU).

II.  **SCOPE**

A.   ASM may be used for live virus vaccine products on stability in the BSU. Specific ASM programs will be developed according to the general procedures and responsibilities outlined in this SOP. Specific ASM programs will be documented, approved, and updated as required in this SOP.

B.   Specific ASM programs, when implemented, will be used to evaluate potency results at appropriate stability intervals for all lots representative of marketed product and stored at the recommended storage conditions. Stability testing of lots or storage conditions which are not representative of marketed product may also be evaluated using ASM at the discretion of the Biological Stability Unit.

C.   Failure to meet ASM criteria following initial or expanded testing is not an out-of-specification event. A Stability Test Investigation may be conducted in response to a potency result which does not meet ASM criteria; however, any activities required to investigate an out-of-specification potency result will supercede all activities associated with the ASM program.

III. **BACKGROUND**

Live virus vaccines typically show a measurable amount of non-first-order kinetic potency loss throughout the shelf-life of the product when stability studies are performed at the recommended storage conditions. Potency results are evaluated against end-of-shelf-life specifications at all stability intervals, but this analysis is a more meaningful indicator of product quality at or near the expiry date. ASM is used to provide a more thorough analysis of potency results at various stability intervals, and may serve as an "early warning" indicator of product quality prior to the expiry date.

X indicates this SOP is cross-referenced to Dept. 223.

1.

CONFIDENTIAL

MRK-KRA00049165<br>MRK-CHA00049165

**Appx19909**

Since live virus vaccine potency assays are based on cell-culture techniques, they are subject to assay variability inherent in the biological analytical system. Therefore, ASM addresses potency assay variability by providing for expanded testing as appropriate, and by providing an analysis of the overall stability profile of the lot, in addition to individual stability interval results. Lastly, ASM is used to compare stability results for a single lot to historical stability results from multiple lots. Historical analysis is used to monitor product quality and consistency over time, and is also useful in evaluating developmental formulations or proposed process changes.

IV.    DEFINITIONS

A.    Maximum Allowable Difference (MAD): A predetermined range of ASM results for a specific stability interval which concludes that a specific lot is comparable to historical lots. ASM results which are outside of the MAD indicate that the potency results at a specific stability interval for a current lot are not comparable to historical data, or are "unusual".

B.    Initial Results: Average potency test results which are obtained from the first set of valid test replicates run for a specific lot at a particular stability interval. The minimum number of valid test replicates needed to determine initial results is defined in specific potency assay control procedures.

C.    Expanded Results: Average potency test results which are obtained from the first and subsequent set(s) of valid test replicates run for a specific lot at a particular stability interval. The minimum number of valid test replicates needed to determine expanded results is defined in specific potency assay control procedures.

D.    Initial Interval: The first stability interval which is tested for a particular lot on stability study in the BSU. Since live virus vaccines may be held frozen prior to initiating a stability study, the initial stability interval may occur several months after release testing has been completed. The initial interval is named as the number of months that the product has been stored at packaged label claim storage conditions.

E.    Early or Late Intervals: The first several (early) or last several (late) stability intervals which are tested for a particular lot on stability study in the BSU. Early and late intervals are designed to allow for non-first-order kinetic degradation, and may be defined for each Specific ASM Program, based on the kinetic model used to describe potency loss over product shelf-life.

V.    PROCEDURE

A.    Specific ASM Programs

Specific ASM Programs will be defined, documented, and approved for each live virus vaccine product or product family prior to implementation. The specific ASM Program will describe the ASM methods to be used at each stability interval, the historical data used for evaluation, the statistical analysis performed, and the MADs established for applicable ASM methods at each stability interval.

Note:    Attachment I lists the ASM methods used for current ASM Programs. Additional detail regarding current ASM Programs will be documented in accordance with Section V. E. below.

B.    ASM Methods

The following ASM methods may be used to analyze stability potency results for specific live virus vaccine ASM Programs. ASM programs will specify which methods will be used at each stability interval. All ASM methods will be used to evaluate both initial and expanded potency test results, if expanded potency testing is performed at a particular interval.

1.    Method 1

Absolute Potency Method: This method is used at the initial stability interval, and may also be used for subsequent stability intervals. This method compares the stability interval results of a single lot to the same stability interval results of multiple historical lots.

2

CONFIDENTIAL

MRK-KRA00049166
MRK-CHA00049166

Appx19910

ACTIVE STABILITY MONITORING OF LIVE VIRUS VACCINE
POTENCY RESULTS

SOP No.:  233-SU317X
Eff. Date:  11/10/00
Page:  3 of 9

2. Method 2

Early Phase Slope Method: This method is used for live virus vaccine products which display non-first-order kinetic degradation. This method compares the loss observed at early stability intervals for a single lot to the loss calculated from those same intervals for multiple historical lots.

3. Method 3

Late Phase Slope Method: This method is used for the linear or terminal phase portion of the degradation profile for live virus vaccine products which display non-first-order kinetic degradation. This method compares the slope calculated from late stability interval results for a single lot to the slopes calculated from those same intervals for multiple historical lots.

Note: For live virus vaccines which exhibit first order kinetic degradation, Method 3 above will be used, and all stability intervals will be designated as late intervals.

4. Method 4

Interval Trend Method: This method evaluates the change in potency results between a specified stability interval and the previous stability interval for a single lot against the change in potency results between those same stability intervals for multiple historical lots. This method is used as a possible indicator of recent events that may have impacted stability study potency assay results.

5. Method 5

Predicted Expiry Method: This method is used to predict the potency result at the expiry interval or to predict the interval at which the end-expiry potency specification result will be obtained for a single lot. This method uses the slope and potency values from the Late Phase Slope Method to calculate the predicted expiry potency and predicted expiry interval. Since this method does not compare current lots to historical lots, no MAD is defined for this method.

C. Historical Data

Each ASM Program will utilize historical data to set the MADs for each of the analysis methods listed above, with the exception of the Predicted Expiry Method. The historical data must be from the same product/product family as that being analyzed by ASM. The historical data must be of sufficient quantity with respect to number of lots and number of completed intervals for each lot, using statistical criteria to define "sufficient." The historical data must be complete and accurate; documentation outlined in V.E. below will include an explanation of any data which were not available or not used for the statistical analysis. Since ASM Programs are developed and implemented, in part, to address assay variability, historical data which were adjusted to an appropriate reference standard or house standard will be used when available.

D. Statistical Analysis

Each ASM Program will employ a documented statistical analysis to determine historical ranges (MADs) for each of the ASM methods to be used for a particular ASM Program, with the exception of the Predicted Expiry Method. ASM evaluation of current lots will use the statistically derived MADs as a basis of comparison for determining if a current lot is comparable to historical lots or is "unusual" compared to historical lots.

3

CONFIDENTIAL

MRK-KRA00049167
MRK-CHA00049167

Appx19911

ACTIVE STABILITY MONITORING OF LIVE VIRUS VACCINE
POTENCY RESULTS

SOP No.:  233-SU317X
Eff. Date:  11/10/00
Page:  4 of 9

E.  **Documentation**

Attachment I will be maintained to document current ASM methods to be used for current ASM Programs. Additional documentation will be maintained for each ASM Program to describe the historical data used in the statistical analysis, including number and type of lots, stability intervals analyzed, and any exceptions for the historical data as discussed in V.C above. Differences within the historical data will also be described and justified (e.g., data from different assay formats or assay methods, data from different processes, formulations, dosages, container/closure systems, etc.) The documentation will describe the statistical analysis performed to determine historical values and ranges, including specific equations or calculations as appropriate. The documentation will define MADs for each ASM Method which will be used to compare current lots to historical lots.

The ASM program documentation will also describe special considerations such as analysis of "reconstitute and store" potency data, developmental ASM methods, or ASM analysis of developmental products.

The ASM program documentation will list implementation dates for the overall program and/or specific portions of the program if a phased-in approach is used. ASM program documentation, including updates described in V.F. below, will be approved by BSU, Biologics Licensing, Vaccine Biometrics Research, and Biological Quality Assurance and maintained in BSU files.

Stability studies which are already ongoing when an ASM Program is initiated or updated will apply appropriate ASM criteria to stability intervals occurring on or after the defined ASM implementation date. New or updated ASM criteria will not be applied retrospectively to stability intervals prior to the defined ASM implementation date.

F.  **Updates**

Updates will be made to each ASM Program on an annual basis, although more frequent updates may be made as needed. ASM Program updates will include new stability data for established historical lots, new historical lots, new products or images within the product family, new formulations, or other significant changes to a product or product family. ASM Methods used for a particular ASM Program may be changed as appropriate, including ASM Methods to be used at each stability interval and definition of specific intervals as early or late. ASM Program updates will also include an updated statistical analysis of historical data and calculated MADs. ASM Program updates will be documented and approved as in V.E. above, and will include implementation dates for the updates.

Individual lots which do not meet ASM criteria for Methods 1, 2, 3, or 5 at one or more intervals (i.e., "unusual" lots) will generally be excluded from the historical data set to prevent drift in ASM criteria over time. Similarly, although developmental lots may be evaluated using ASM criteria, they will not be included in the historical data set until they are considered to be representative of market product. Justification for inclusion or exclusion of unusual lots in the historical data set will be documented during ASM Program updates.

G.  **ASM Analysis**

Attachment II Part A must be completed and approved to document ASM analysis of potency data at each stability interval for a specific lot within 30 days of initial or expanded average potency test results. If all ASM criteria are met, Attachment II Part A will indicate that no follow up action is required for the specific lot at the stability interval indicated.

H.  **Follow Up Actions**

If the MAD is not met (i.e., ASM concludes current lot to be "unusual" compared to historical lots for Methods 1-4 in Section V.B) or if the ASM analysis does not meet the criteria for the Predicted Expiry Method (Method 5 in Section V.B), follow up actions will be as follows:

4

CONFIDENTIAL

MRK-KRA00049168
MRK-CHA00049168

**Appx19912**

ACTIVE STABILITY MONITORING OF LIVE VIRUS VACCINE
POTENCY RESULTS

1.    Methods 1-5 for Initial Test Results:

    a)    If initial test results do not meet ASM criteria, expanded testing is performed at that same interval.

    b)    If expanded testing is not possible at that same interval (e.g., sample representative of stability interval is not available), see V.H.2.b below for Methods 1, 2, and 4 or V.H.4.b below for Methods 3 and 5.

2.    Methods 1, 2, and 4 for Expanded Test Results:

    a)    If expanded test results meet ASM criteria, no further action is required.

    b)    If expanded testing is not possible, or expanded test results do not meet ASM criteria, an additional interval is added (as per Attachment II Part C) or a Stability Test Investigation is required (as per SOP 233-SU303).

    c)    If an additional interval is not possible due to limited inventory of sample, a Stability Test Investigation is required.

3.    Methods 1, 2, and 4 for Additional Interval Test Results:

    a)    If initial test results for the additional interval meet ASM criteria, see step V. H. 3. d. below.

    b)    If initial test results for the additional interval do not meet ASM criteria, expanded testing is performed at that same interval.

    c)    If expanded testing is not possible at that same interval (e.g., sample representative of stability interval is not available), or if expanded test results for the additional interval do not meet ASM criteria, a Stability Test Investigation is required.

    d)    If initial or expanded test results for the additional interval meet ASM criteria, a Stability Test Investigation will be performed to examine differences in test results between the original interval and the additional interval.

4.    Methods 3 and 5 for Expanded Test Results:

    a)    If expanded test results meet ASM criteria, no further action is required.

    b)    If expanded testing is not possible, or expanded test results do not meet ASM criteria, a Stability Test Investigation is required. An additional interval may be added as follow up to the STI.

5.    Methods 3 and 5 for Additional Interval Test Results:

    a)    If initial test results meet ASM criteria, no further action is required, since Methods 3 and 5 use results from both the original interval and the additional interval.

    b)    If initial test results do not meet ASM criteria, Sections V.H.1 and V.H.4 of this SOP will be followed as applicable, since Methods 3 and 5 use results from both the original interval and the additional interval.

I.    Documentation of ASM Follow Up Actions

    1.    Attachment II Part B will be used to document follow up actions required for potency results which do not meet ASM criteria. Attachment II Part B must be completed and approved within 30 days of initial or expanded average potency test results, but prior to implementation of any follow up actions. Attachment II Part C must be completed and approved, as applicable, before an additional stability interval is implemented.

5

MRK-KRA00049169
MRK-CHA00049169

Appx19913

ACTIVE STABILITY MONITORING OF LIVE VIRUS VACCINE
POTENCY RESULTS

SOP No.:   233-SU317X
Eff. Date:   11/10/00
Page:   6 of 9

2.   Section V.H will be followed for each viral component evaluated by ASM.  If results for more than one viral component do not meet ASM criteria at a given stability interval, expanded testing or additional intervals for one viral component may be coordinated with or superceded by expanded testing or additional intervals for a different viral component according to sample availability.  Coordination activities for multiple viral components will be explained and justified on Attachment II Part B.

3.   If an additional interval is added, no documentation other than Attachment II Part C will be required.

4.   Stability Test Investigations performed in response to potency results which do not meet ASM criteria will include a Laboratory Investigation in the same document.

5.   If initial test results do not meet ASM criteria for Methods 1, 2, 3, or 5, and an STI was required for that lot at the previous stability interval for the same ASM Method for the same viral component, then an STI for the current interval may be performed without completing other follow up activities outlined above.  Expanded testing or scheduling of additional intervals may be performed, but are not required prior to completion of the STI for the current interval.  Similarly, the Laboratory Investigation portion of the Stability Test Investigation may be omitted, at the discretion of BSU.  These allowances do not apply to Method 4 results, since Method 4 evaluates differences between the current interval and the previous interval.

6.   Any activities required to investigate an out-of-specification potency result will supercede all activities associated with the ASM program.  If test results are out-of-specification and do not meet ASM criteria for any of the Methods outlined above, ASM follow up for any single viral component or combination of viral components will be superceded by activities performed to investigate the out-of-specification results.  ASM follow up activities which are coordinated with or superceded by an out-of-specification investigation will be explained and justified on Attachment II Part B.

6

CONFIDENTIAL

MRK-KRA00049170
MRK-CHA00049170

Appx19914

### ATTACHMENT I

### ASM METHODS FOR CURRENT ASM PROGRAMS

1. M-M-R®II Product Family lots manufactured to conform to a minimum release specification of 3.6 $\log_{10}TCID_{50}$/0.1 mL for the mumps viral component.

   Measles, Mumps, and Rubella potency results will be evaluated by ASM.

   Method 1:  used for all stability intervals

   Method 2:  used for initial, 3, 6, 9, and 12 month stability intervals

   Method 3:  used at stability intervals $\geq$ 18 months, using potency results from $\geq$ 6 month stability intervals for Measles and Mumps, using all potency results for Rubella

   Method 4:  used for all stability intervals

2. M-M-R®II Product Family lots manufactured to conform to a minimum release specification of 4.3 $\log_{10}TCID_{50}$/0.1 mL for the mumps viral component.

   Measles, Mumps, and Rubella potency results will be evaluated by ASM.

   Method 1:  used for initial stability interval, but with no upper MAD

   Method 2:  used for initial, 3, 6, 9, and 12 month stability intervals

   Method 3:  used at stability intervals $\geq$ 18 months, using potency results from $\geq$ 6 month stability intervals for Measles and Mumps, using all potency results for Rubella

   Method 4:  used for all stability intervals

   Method 5:  used at stability intervals $\geq$ 18 months, using the linear regression analysis of late intervals from Method 3

7

CONFIDENTIAL

MRK-KRA00049171
MRK-CHA00049171

Appx19915

ACTIVE STABILITY MONITORING OF LIVE VIRUS VACCINE
POTENCY RESULTS

SOP No.:   233-SU317X
Eff. Date:   11/10/00
Page:   8 of 9

## ATTACHMENT II

**Part A**

Product Name _____

Item # _____

ASM Program # _____ from Attachment 1

Lot # _____

Interval _____

Interval was   ☐ scheduled on protocol
               ☐ added as a result of ASM

Date of Average Potency Result _____

Viral Component _____

ASM Evaluation of   ☐ Initial   ☐ Expanded   average potency test results.

Note:  Attach spreadsheet or worksheet showing ASM calculations.

|          | Potency Percentile | Results Within MAD | Results Outside MAD* |
|----------|--------------------|--------------------|----------------------|
| Method 1 | _____              | ☐                  | ☐                    |
| Method 2 | _____              | ☐                  | ☐                    |
| Method 3 | _____              | ☐                  | ☐                    |
| Method 4 | _____              | ☐                  | ☐                    |

|          | Predicted Potency at Expiry | | Predicted Interval to Meet Expiry Spec. | |
|----------|-------------|-------------|------------------|--------------------|
|          | Above Spec. | Below Spec.* | Past Expiry Date | Before Expiry Date* |
| Method 5 | ☐           | ☐            | ☐                | ☐                  |

☐ *Follow up actions required, see Part B.*

☐ No follow up actions required.

BSU Analyst Name_____

BSU Auditor Name_____

BSU Approval Name_____

Signature and Date _____

Signature and Date _____

Signature and Date _____

8

CONFIDENTIAL

MRK-KRA00049172
MRK-CHA00049172

Appx19916

ACTIVE STABILITY MONITORING OF LIVE VIRUS VACCINE
POTENCY RESULTS

SOP No.:    233-SU317X
Eff. Date:  11/10/00
Page:       9 of 9

## ATTACHMENT II (Cont'd.)

**Part B**

Follow Up Actions:

☐    Expanded testing at same interval (for initial test results only)

☐    Additional interval added (see Attachment II Part C)

☐    Stability Test Investigation (ref. SOP 233-SU303)

☐    Other (explain and justify below)

Explanation and Justification for Other follow up actions:

_____
_____
_____
_____
_____
_____
_____
_____

BSU Analyst Name_____       Signature and Date _____

BSU Approval Name_____       Signature and Date _____

**Part C**

Additional _____ month interval added.

Sample inventory is sufficient to accommodate additional interval.

BSU Analyst Name_____       Signature and Date _____

BSU Approval Name_____       Signature and Date _____

9

CONFIDENTIAL

MRK-KRA00049173
MRK-CHA00049173

Appx19917

11/26/2019
Declaration of G. Reilly
EXHIBIT 422

Appx19918

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| ⬡ MERCK | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | △ Proprietary |
| **Version: 2.0** | **Author:** David C. DeLong | **Page: 1 of 11** |

1. Purpose and Scope

   To establish the procedures to be followed by Vaccine & Biological Stability (VBS) to manage real time stability trend monitoring through the use of the Early Warning (EW) Evaluation System in the West Point Stability LIMS. The Early warning system is used to evaluate results that exceed the early warning limits generated by, or entered into, the EW Evaluation System. The EW Evaluation System is intended to monitor data in real time to predict if a batch on stability will exceed shelf-life specifications, determine if the current results of a stability batch differ significantly from the previous timepoints or to determine if a batch differs significantly from a defined historical data set.

   Early warning limits will be established on a product and test-specific basis. Once implemented, the limits will be used for the long term conditions for studies conducted by VBS to support annual requirements, process change requests (PCRs), or investigations. The early warning limits may also be used to evaluate the stability profile in the annual stability review.

2. Safety and Environmental Precautions

   There are no potential safety or environmental concerns with this procedure.

3. Procedure

   A. SETTING EARLY WARNING LIMITS

   VBS will determine the values used for the real time stability trend monitoring on a test and product-specific basis. This may include collaboration with MMD Center of Mathematical Sciences. Each test is reviewed to determine if sufficient historical data is available and to determine the appropriate real time trend monitoring analysis to be applied per test (see Section 3.B). At least ten stability batches through expiry are recommended in order to statistically define EW limits. In the absence of sufficient historical data, developmental data may be used as a source of comparison. Logical limits may be set based upon existing data, the current stability profile, release loss model, internal release limits (for Time Zero), the method validation package, or sound scientific and/or statistical judgment.

   B. USING EARLY WARNING LIMITS

   For pharmaceutical products, the EW Evaluation System compares the current data, in real time, versus the historical data available in Stability LIMS at the time of testing. The comparison is done for the same product (active ingredient and strength), the same packaging type, under the same storage condition (upright and inverted orientations are treated as different conditions) for all batches older in age than batches for the analyzed test result.

   For vaccine and biological products, EW Evaluation System compares the current data versus product and test specific EW limits.

   The types of real time stability trend analyses executed by the EW evaluation system may be dependent upon the sample age, number of intervals tested, and availability of data population (Pharmaceutical products). The following analyses are performed by the EW system:

   1. **Result is not within maximum allowable difference (MAD).** This real time monitoring tool is required for all quantitative trendable components.

      a) **Current against previous timepoints** – The warning indicates that the absolute difference between the current timepoint and the previous timepoint exceeds a predefined MAD value. This analysis is applied to pharmaceutical testing only.

   Note: Unless specifically determined for a product, LIMS uses default MAD values for the current against previous timepoint analysis. The default MAD values are 3% for composite assay, 0.2% for any single degradate, and 10% for the average value of dissolution testing. A statistician may be consulted to perform the appropriate analyses to recommend a new MAD, in coordination with VBS.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714343
MRK-CHA01714343

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| **MERCK** | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | Proprietary |
| **Version:** 2.0 | **Author:** David C. DeLong | **Page:** 2 of 11 |

b) **Current versus calculated acceptable deviation from the slope** – The warning indicates that the absolute difference between the current timepoint and the expected value for the timepoint (calculated from the regression line of the batch) exceeds a predefined MAD value. This analysis is applied to vaccine testing but may also be used for pharmaceutical or biological testing (instead of "Current against previous timepoints" described above) where statistically appropriate. There are no default values for this analysis; MAD limits may be statistically calculated and configured in LIMS for each test.

Additional types of real time monitoring tools within the EW evaluation system may be implemented based upon historical performance. Components that exhibit a significant trend should be considered for current against historical Time Zero, Predicted result at last timepoint and Current against historical slopes.

2. **Current against historical Time Zero** – **Time Zero result not within preset limits**. This warning indicates the test result for the current Time Zero exceeds the range of the EW limits. Internal release limits in the Quality Standard and stability release loss models should be considered to assist in determining the appropriate TZ limits. EW limits should be rounded to same number of decimal places as the result entered into LIMS. Components that exhibit a significant trend should be considered for Current against historical Time Zero, Predicted result at last timepoint and Current against historical slopes.

3. **Predicted result at last timepoint** – **Predicted result at ## months is out of specification**. Based on the available study data (minimum 3 timepoints, including the initial timepoint and the current timepoint) for a batch at a long term storage condition, EW Evaluation System will predict the assay value at the last scheduled stability interval in LIMS. If the predicted assay value at the last stability interval in LIMS is outside the EW limit, the system will trigger an EW notification. EW limits should be rounded to same number of decimal places as the result entered into LIMS. The accuracy of this analysis is limited by the number of stability intervals and duration of the study.

   a) LIMS currently applies the current slope to determine the predicted value at the last stability interval. In some cases, the last stability interval in LIMS may not represent expiry for the study. (Eg, expiry is 24 months, but the study goes to 30 months)

   b) Validity of EW notifications generated by this analysis should be considered if extrapolations are greater than twice the data available for the component. For example, studies or tests may only require 3 or 4 test intervals, so turning on this function at the third interval is recommended. However, for studies that require n=5 or greater intervals, activation of this EW tool may be considered after more than 3 data points.

4. **Current against historical slopes** – **Current slope not within EW limits.** Based on the available study data (minimum 3 timepoints, including the initial timepoint and the current timepoint) for a batch at a long term storage condition, EW Evaluation System will determine the slope. This slope will be compared against the EW limits determined from the historical slopes at the same condition (requires 3 or more historical slopes). If the slope of the current batch does not fall in this range, the EW Evaluation System will trigger an EW notification to indicate that the current batch has a different slope when compared with the historical slopes of the product. Slope EW limits should not exceed 4 decimal places.

   a) Validity of EW notifications generated by this EW tool should be considered for studies with greater than 5 test intervals. For example, studies or tests may only require 3 or 4 test intervals, so turning on this function at the third interval is recommended. However, for studies that require n=5 or greater intervals, activation of this EW tool may be considered after more than 3 data points.

5. **Trend Limits** – **Result not within performance benchmarks.** This analysis is currently performed outside of the EW Evaluation System in LIMS. Based upon available data, results are expected to be within a defined upper and lower range applied throughout the duration of the study. This EW tool maybe appropriate for components that exhibit a flat near zero slope over time.

The EW system in LIMS should not trigger an EW notification for the following cases:

   The current slope is zero (pharmaceutical products only).

   The current slope is negative for a degradate, a related substance, or an impurity.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01714344
MRK-CHA01714344

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| ⬥ MERCK | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | Proprietary |
| **Version:** 2.0 | **Author:** David C. DeLong | **Page:** 3 of 11 |

The storage condition is an accelerated (non-recommended) storage condition.

In the event an EW notification is received for one of these three occurrences, further investigation is not required. The EW notification should be printed, annotated with justification with no further investigation and placed in the study folder.

EW limits should not include more decimal places than the result it is being compared against (TZ, MAD or Predicted) and should not be more than 4 decimal places (for slopes). Any flagged result that rounds to the EW limit will not require an evaluation of the result. In this instance, print out the email notification and add "Rounds to the Limit." Initial and date the email and place in the study folder.

C. NOTIFICATION OF SIGNIFICANT NEGATIVE STABILITY TRENDS

   1. A significant out of trend (OOT) is a significant negative trend or unexpected result where the risk of generating a subsequent OOS result may occur. This could be sample results which differ from previous time points of the batch or sample results which differ significantly from historical data.

   2. Internal notification is required if, following an initial evaluation, an unconfirmed significant OOT result is observed for a licensed product, drug substance, or intermediate. The stability analyst documents the issue using the Stability Alert Form as per SOP 06-STB-136X

   3. Significant negative stability trends, defined as an evaluation of stability data per ICH Q1E and GDL 30.07 that shows a projection/prediction of potential OOS results within the product shelf-life, for distributed product to the EU/EEA (European Union / Economic Area) require reporting to EU authorities according to EU GMP Guide 6.32.

D. EVALUATION/DOCUMENTATION

   1. Notification

When the data entry to a task in Stability LIMS is committed by a testing chemist or technician, EW Evaluation System will execute data evaluation against the historical data and/or predefined EW limits in real time. If the current data falls outside the limits for that task, an email notification of the EW data is sent to the responsible stability analyst or other designated mailbox via the MS Outlook e-mail system. The EW e-mail notification will provide the type of warning (as described in Section 3.B), a summary of the sample information, data for the current test, as well as the EW limits used for comparison.

The target is to evaluate the EW notification within 1 business day, but no later than 2 business days.

   2. Evaluation of Early Warning Notifications

     a) Stability analysts must apply scientific rationale to determine if the result or study is OOT. The result is considered OOT if the value is truly unexpected for the product. The study is considered OOT if it exhibits a negative trend compared to the established stability profile for the product. Additional guidance is provided in Attachment I.

     b) If a data entry or laboratory error is suspected, contact the laboratory supervisor to perform an initial assessment of the validity of the result.

     c) The stability analyst will obtain the additional information needed for the evaluation, which may include the following:

       (1) Determine if the result is within the range of available stability data for the product. The prior annual review could be reviewed.

       (2) Obtain the stability data for the study at previous intervals.

       (3) Calculate the slope if there are at least 3 time points and slope was not provided in the notification.

       (4) Determine the next interval scheduled for the test.

       (5) Obtain the variability of the method if available.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714345
MRK-CHA01714345

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| **MERCK** | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | Proprietary |
| **Version:** 2.0 | **Author:** David C. DeLong | Page: 4 of 11 |

    (6) Discuss the evaluation with a Stability group leader.

3. Documenting Early Warning Events

    a) If the data are not considered OOT:

       (1) The stability analyst must complete an Abbreviated EW Evaluation form (see Attachment II).

       (2) Use one form per study; however, multiple EW notifications for a single study may be evaluated on one form.

       (3) The stability analyst documents the scientific rationale applied to determine that the EW result is not OOT. At minimum, this should include a review of historical data for the study and/or the product.

       (4) The stability analyst prints the EW notification email(s) and staples it to the form.

       (5) A stability group leader or designee must review the evaluation. When concurrence on the evaluation is reached, the stability analyst must copy the text of the EW form into the corresponding task(s) in LIMS with an attachment type of EARLY WARNING.

       (6) The signed, original form is then filed in the study folder.

    b) If the data are considered OOT:

       (1) The stability analyst must document the deviation according to SOP 06-QUA-125AX, Deviation Data Collection and Investigation.

       (2) If there is a significant negative trend or unexpected result where the risk of generating a subsequent OOS result may occur (significant OOT), internal notification is required according to SOP 06-STB-136X. This procedure specifies the distribution list for the Stability Alert Form and responsibilities for sending/receiving the alerts.

       (3) The investigation is performed as per 06-LQA-307X or other appropriate site procedure. SOP 06-STB-136X provides additional guidance and links to investigation tools.

4. Stability Review

As part of the investigation, the stability analyst performs a review based on the type and nature of the situation. The review focuses on evaluating and determining the potential impact of the result on the product stability. The review should also include the product history, study history, the most recent annual review, and statistical analysis of stability results. Areas to be reviewed by the stability analyst include, but are not limited to:

    a) When the study is associated with a new primary package type or a primary packaging change, review the available packaging documents to determine if the packaging is the possible cause of the EW data.

    b) To evaluate an EW associated with a Time Zero test result, review the manufacturing documents, such as PCRs and investigations related to the manufacturing batches. Also review and compare the data to the release testing data for the affected batch, if available. Determine if a process change, laboratory testing issue or a manufacturing deviation may have caused the difference for the current Time Zero data.

    c) For a study which is set up with more than one long term storage condition (i.e. 25°C/Ambient Humidity and 30°C/Ambient Humidity) in different orientations (i.e. upright and inverted), an EW notification may be generated for one specific condition or orientation. Compare the test results under all long term storage conditions/orientations for the study to determine if the EW is expected under the particular condition/orientation.

    d) Review the data for all previous timepoints for the current batch to determine if there is a trend or shift. A trend for a data set shows a gradual increase or decrease over time. A shift of a data set shows a step-wise change to a high or low value at a timepoint and remains at the high or low value afterwards. Shifts may be a result of changes to laboratory equipment, methods, critical reagents, or manufacturing processes.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| ⬢ MERCK | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | ⚠ Proprietary |
| **Version:** 2.0 | **Author:** David C. DeLong | **Page:** 5 of 11 |

e) Compare the data profile of the current batch to the historical data for the same product, with the same packaging type, and under the same storage condition. Apply statistical analysis to determine if the current batch and the historical batches are poolable (p-value of slopes > 0.05). Also when applicable, determine if the data of the current batch and any historical batches shows a trend or a shift during shelf life.

5. Recommended Follow-Up Activities

Based upon the laboratory and stability reviews, the investigation team will determine if a follow up activity is required. The team must use scientific rationale to recommend appropriate follow-up activities for the testing laboratory and stability administration. The recommended follow-up activities include, but are not limited to:

a) Recommendations based on issues related to testing methods:

    (1) If the changes in the laboratory equipment, testing method or critical reagents are suspected to cause a shift in the results that triggered the EW notification email(s), communicate the potential issue to VBS and Laboratory Operations management for evaluation.

    (2) If the historical data of a product shows high variability from timepoint to timepoint, but no trend, there may be an issue with the testing method. Communicate the potential issue to VBS and Laboratory Operations management for evaluation.

    (3) If the testing method has changed over time, evaluate the MAD with the assistance of a statistician to determine the need to change the MAD value in Stability LIMS.

b) Recommendations based on issues related to packaging:

    (1) If a package change associated with the study is determined to impact the stability results, the stability analyst should notify the change initiator, packaging technology, and/or manufacturing/technical operations groups about the impact. The approved investigation will be forwarded to these departments for further action.

    (2) If a package associated with a product is determined to impact the stability results, the stability analyst should notify packaging technology, and/or manufacturing/technical operations groups about the impact. The approved investigation will be forwarded to these departments for further action.

c) Recommendations based on the EW results of Time Zero:

    (1) If the current Time Zero results, which triggered an EW notification, agree with the available release testing data, and/or reflect the batch related process changes or manufacturing deviations, no follow up actions are required for the testing laboratory and stability administration.

    (2) If the current Time Zero results, which triggered an EW notification, are not confirmed by the available release testing data, the cause of the difference should be investigated. Upon conclusion of the investigation, re-evaluate the reportable/valid results.

d) Recommendations related to EW notifications for one out of multiple long term storage conditions/positions:

    (1) If the stability review of the historical data indicates that the result is expected for the current timepoint at one specific long term storage condition/position, no follow up actions are required for the testing laboratory.

    (2) As a recommended follow up activity for stability administration, evaluate the specific storage condition/position for the product.

e) Recommendations related to EW notifications and/or stability profiles showing significant decrease or increase over time:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| ⬢ MERCK | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | Proprietary |
| **Version:** 2.0 | **Author:** David C. DeLong | **Page:** 6 of 11 |

(1) If the data for the current batch shows a trend of significant decrease or increase for an assay, but the historical data of the same product/condition does not have the same trend, closely monitor the batch in question throughout its shelf life. Additional test intervals with the relevant assay only may be added to the study schedule (i.e. test the batch every 6 months instead of every 12 months).

(2) If the same trend of significant decrease or increase in an assay is observed in the current batch as well as in the historical data for the same product/condition, determine a more appropriate MAD for the assay. Consult with a statistician to perform a statistical analysis and determine an appropriate mechanism to be used for a specific assay.

f) Recommendations related to the predicted failure at the last timepoint:

Note:  *It is important to identify the expiry of the product and confirm that the predicted failure at the last timepoint agrees with the stability profile of the batch and/or the product. If the predicted value cannot be confirmed by the stability profile of the batch and/or the history of the product, use recommendation Section 3.D.5.g for the follow up actions.*

(1) If the age of the current timepoint is ≥ ½ expiry, closely evaluate the current results and monitor the next timepoint. A test interval prior to the next timepoint may be added with the affected assay only. If result represents a significant negative stability trend, proceed with notification as described in Section 3.C.

(2) If the age of the current timepoint is < ½ expiry, closely monitor the batch throughout shelf life. Additional test intervals with the affected assay only may be added to the study schedule (i.e. test the batch every 6 months instead of every 12 months).

g) Recommendations for EW notifications with no identified causes from stability review:

(1) For a case in which the EW at the current timepoint cannot be explained by the profile of the current batch or the product history, and/or no root causes can be determined, potentially add a timepoint prior to the next timepoint with the affected assay only. The EW will be re-evaluated when the test for the additional (or next scheduled) timepoint is completed.

E. LIMITS FOR TRUNCATED DATA

Each test result in Stability LIMS is stored in two fields, text and numeric. The numeric field is the value entered by the laboratory, and when completed in multiple replicates, the average value is also stored in text and numeric fields. The text field is stored by rounding the numeric field to the number of decimal places used in the specification and used for reporting the data. The EW Evaluation system utilizes the numeric entry (or calculated result) for comparison to the calculated or configured EW limits.

Guidance on the entry of degradation and impurity stability test results is provided in GDL 30.07, Stability Data Management, Data Analysis and Trending, which states that results are typically entered into LIMS to three decimal places. This ensures that an accurate evaluation is completed on these numbers, which are often less than 1.0%.

F. PERIODIC REVIEW OF LIMITS

VBS will monitor the effectiveness of established EW limits based upon a number of factors:

1. The frequency and nature of EW notifications received for a product and/or test. Frequent EW notifications of a similar nature for a test may indicate that the limits require review. All reviews will be documented in the product EW file.

2. The performance of tests compared to historical values analyzed during the Stability Annual Product Review. Any trends or deviations to historical EW limits indicated during the batch-specific analysis in the Stability Annual Product Review may indicate that the limits require review. The EW limit review will be documented in the product EW file, not in the Stability Annual Product Review.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| ⬧ MERCK | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | Proprietary |
| **Version:** 2.0 | **Author:** David C. DeLong | **Page:** 7 of 11 |

3. The availability of additional data, or sufficient data for new products. If insufficient data exists to establish statistical EW limits (i.e 10 batches), EW limits will be calculated when data is available. For tests that have insufficient data to establish EW limits:

   a) During completion of the Stability Annual Product Review, the availability of test data will be evaluated and documented in the product EW file. If sufficient data is available, the EW limits will be established per the Setting Early Warning Limits section of this SOP.

   b) Alternatively, an analysis including the expected timing that data will be available may be performed and documented in the product EW file. After the date has been reached, the EW limits may be set as described above. If this analysis has been completed and timing determined, a review of the documentation should be completed annually during the Stability Annual Product Review until the limits have been established.

   VBS and the MMD Center for Mathematical Sciences may collaborate on reviewing and defining values used for the real time stability trend analysis on a test and product-specific basis.

4. Related Documents

  A. MMD Quality Manual Guideline GDL 30.07 - Stability Data Management, Data Analysis, and Trending

  B. SOP 06-STB-136X, Stability Out of Specification and Significant Out of Trend Investigations

  C. SOP 30-STB-141X, Stability Sample Time Requirements

  D. SOP 06-LQA-307X, Laboratory Investigation Procedure

  E. SOP 06-QUA-125AX, Deviation Data Collection and Investigation

  F. "Identification of Out-of-Trend Stability Results", PhRMA CMC Statistics and Stability Expert Teams, from Pharmaceutical Technology, April 2003.

  G. "Identification of Out-of-Trend Stability Results", Part II, PhRMA CMC Statistics, Stability Expert Teams, from Pharmaceutical Technology, October 2, 2005.

5. Definitions

N/A

6. Change History

  A. Transferred content from SOP 169-132 to new template.

  B. Aligned SOP with MMD Guideline "Stability Data Management Data Analysis, and Trending."

    1. Required "current against previous time points" for all quantitative trendable components.

    2. Included 'trend limits' as an early warning tool.

  C. Replaced the term ± 3 SDs (standard deviations) with "preset limits" that may or may not be limits based off of 3 standard deviations throughout the document.

  D. Allowed for "Predicted result at last timepoint" and "Current against historical slopes" to be activated after more than 3 intervals have been generated.

  E. Added that the early warning limit should not include more decimal places than the value being evaluated and that early warning limits should not be more than 4 decimal places.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714349
MRK-CHA01714349

Appx19925

| **&#9673; MERCK** | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** **30-STB-132** | **Title:** Real Time Stability Trend Monitoring | Proprietary |
| **Version: 2.0** | **Author:** David C. DeLong | **Page:** 8 of 11 |

F. Early Warning notifications that round to the early warning input do not require an abbreviated evaluation, but the notification should be printed and added to the study folder with the following text "Rounds to the Limit" along with the analyst initials and date.

G. Minor format changes and edits throughout the document.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714350
MRK-CHA01714350

**Appx19926**

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| ⬢ MERCK | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| Document Number: 30-STB-132 | Title: Real Time Stability Trend Monitoring | Proprietary |
| Version: 2.0 | Author: David C. DeLong | Page: 9 of 11 |

## ATTACHMENT I

### Examples of EW Notifications with No Stability Impact

1. Warning type: Current against historical slopes – Current slope not within input limits.

   a. Situation: The current slope for an assay is different when compared with the historical slopes, but the current assay value is confirmed to be consistent to the historical data. The shift of the current slope is due to the atypically low or high assay values at the previous timepoints. This situation is most likely due to testing variability that resulted in atypical low or high assay values at the previous timepoints. There is no stability concern for the product.

   b. Situation: The current slope for an assay differs from the historical slopes, but indicates a smaller change of the assay values when compared to the historical slopes. Estimate the assay value at expiry using the worst case for the current batch/condition:

   *Estimated assay value at expiry = Lowest or highest assay value + Current slope x (Months of expiration – Months of the timepoint with lowest or highest assay value).*

   If the estimated assay value at expiry is within the shelf-life specification, the EW issue has no stability concern.

   c. Situation: For a degradate, the current slope differs from the historical slopes, but the increase of the degradate value is smaller for the current batch than the historical batches. Estimate the degradate value at expiry using the worst case for the current batch/condition:

   *Estimated degradate value at expiry = Highest degradate value + Current slope x (Months of expiration – Months of the timepoint with highest degradate value).*

   If the estimated degradate value at expiry is within the shelf-life specification, there is no stability concern.

   d. Situation: The current slope is a small value (i.e. absolute value of a slope is < 0.1%/month for a pharm assay, or < 0.01%/month for a degradate), but the warning is triggered because the average of historical slopes is smaller and the ± 3SDs range is narrow. Review of all data for the batch in question shows that the current test results are in agreement with the previous timepoints. This type of EW is triggered because the historical data used for the statistical analysis has little variation. There is no stability concern for the batch and the product.

   e. Situation: The current slope is outside the range of historical slopes, but the batch is performing similarly to historical batches when compared against data through the current timepoint. This type of EW is triggered because there was a limited number of timepoints used to determine the slope of the current batch (i.e. predicted slope at 6 or 9 months versus historical slope based on data through expiry).

2. Warning type: Current against previous timepoints – Result is not within maximum allowable difference (MAD).

   a. Situation: The current test results differ from the immediate previous timepoint but are in agreement with the earlier timepoints of the batch. In this case, the EW is most likely due to the testing variability associated with the previous timepoint. The EW does not translate into any stability concerns for the current batch.

   b. Situation: The current test results represent the last timepoint of the batch. The data differs from the previous timepoint, but is within the shelf-life specifications and more favorable when compared to the previous timepoint. In this case, the EW is most likely due to the testing variability associated with the previous timepoint. The current batch has no stability concerns.

   c. Situation: The batch only has test data at Time Zero and the current timepoint. The difference between the current timepoint and Time Zero exceeds the predefined MAD, but the data at the current timepoint is more favorable when compared to Time Zero data. Also, the data at the current timepoint is in agreement with the historical data of the product. More data points for the batch are required to determine the profile and evaluate the EW.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| ⬢ MERCK | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | ⬡ Proprietary |
| **Version:** 2.0 | **Author:** David C. DeLong | **Page:** 10 of 11 |

    d. <u>Situation:</u> A degradate/impurity/related substance testing method monitors 2 or more components plus the total degradates/total impurities/total related substances. An EW is triggered because the total degradates/total impurities/total related substances value exceeded the default MAD (0.2%) relative to the previous timepoint. But no result for any single component exceeded the default MAD (0.2%) when compared to the previous timepoint. An EN is not required for this situation.

3. Warning type: Predicted Result at Last Timepoint - Predicted results at X months is out of specification

    a. <u>Situation:</u> The result at the last timepoint of a study is predicted to be out of specification; however, the last timepoint of the study is after the expiry timepoint of the study. Based on the slope and data generated to date, the result at the expiry timepoint should be manually predicted. If the predicted result at the expiry timepoint is within specification, the current batch has no stability concerns.

*Note - If the post expiry timepoint was scheduled to support a product expiry extension, an investigation may be warranted. This should be determined on a case by case basis.*

4. Warning type: Current against historical Time Zero – Time Zero result not within input limits.

    a. <u>Situation:</u> The current Time Zero test results are within the shelf-life specifications. The warning is generated based on a statistical result from a small data population (< 6 historical Time Zero values). These early warnings should be processed case by case. If an EW (of this type) shows no indication of a stability concern for the current batch (i.e. historical product slope indicates the study will remain within specification throughout expiry), an EN is not needed. If the current Time Zero result is near the shelf-life specification or shows a stability concern, further processing of the EW is required and an EN must be initiated.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714352
MRK-CHA01714352

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

| **⬥ MERCK** | STANDARD OPERATING PROCEDURE | West Point, PA |
|---|---|---|
| **Document Number:** 30-STB-132 | **Title:** Real Time Stability Trend Monitoring | Proprietary |
| **Version: 2.0** | **Author:** David C. DeLong | **Page:** 11 of 11 |

### ATTACHMENT II

*This attachment is provided as an example.*
*It may be modified as needed, provided the SOP requirements are maintained.*

 **Confidential**

| **VACCINE & BIOLOGICAL STABILITY ABBREVIATED EARLY WARNING EVALUATION** |
|---|
| **Product Name:** |
| **User Sample ID:** |
| **Number of EW emails attached:** |
| **Evaluation of Data** |
| |
| **Above text has been entered into LIMS?   Yes ☐** |
| **Signatures** |

| Prepared by: | Reviewed by:* |
|---|---|
| Date: | Date:* |

\* Signature indicates agreement with evaluation and conclusions as well as confirmation of text in LIMS.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714353
MRK-CHA01714353

**Appx19929**

EFFECTIVE Effective Date: 21-SEP-2016 GMT-0400
Document Printed On: 14-NOV-2016

## DOCUMENT APPROVALS

**Document ID:**     0901435084b63ae5
**Document Name:**   30-STB-132 Real Time Stability Trend Monitoring

| Server Date | Signed by | Outcome |
|---|---|---|
| 07-Sep-2016 09:19 GMT-0400 | Wampler,Marisol M. | Approve |
| **Reason for Signature** | Approval, Authorization | |
| | | |
| 07-Sep-2016 09:26 GMT-0400 | Monkovic,Don D. | Approve |
| **Reason for Signature** | Quality approval | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |
| | | |
| **Reason for Signature** | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01714354
MRK-CHA01714354

11/26/2019
Declaration of G. Reilly
EXHIBIT 423

Restricted
R ⊘ Confidential
limited access

# Label Claim Compliance of M-M-R$^{®}$$_{II}$

**Background**

Since licensure of M-M-R$^{®}$$_{II}$, the label has stated that "each 0.5 mL dose contains not less than 1,000 TCID$_{50}$ of measles virus, 20,000 TCID$_{50}$ of mumps virus, and 1,000 TCID$_{50}$ of rubella virus." In addition, these potencies have been explicitly stated as the minimum release specifications in the approved product license application. Historically, M-M-R$^{®}$$_{II}$ was manufactured "to contain" the designated amount of virus with no guarantee of a specified potency at expiry. Demonstrated effectiveness with regard to eradication of disease throughout the history of the product supported this approach. It was not until 1996 that regulatory agencies began to raise the label claim compliance question and challenge Merck's position on this issue.

From 1996 to 1998 there was a series of communications with CBER regarding the interpretation of the label potency claim. In December 1998, Merck committed to end-expiry titers for each of the three viruses. In order to accomplish this, CBER was notified that an increase in the amount of mumps used to manufacture the product would be required. No manufacturing changes were recommended for measles or rubella. Concurrent with this request, proposals were made to modify the potency assay to increase precision (including changing the assay format and calibrating the measured result to the House Standard) and to determine the appropriate release potencies using non-linear fit of stability data. Discussions of the Merck proposal progressed for another six months. During this time, CBER performed an evaluation of safety at higher mumps titers. Following completion of their analysis, they directed Merck to implement a process change as soon as possible to ensure compliance to the label claim at expiry. They accepted the proposed change in manufacturing target for mumps, as well as the proposed release specification based on their analysis of Merck stability data. They also accepted a proposal to improve assay precision via the assay format change to 1x6, but did not accept the proposal to calibrate results to the House Standard. They were interested in having the manufacturing change implemented quickly and felt that review and evaluation of House Standard calibration would take too long. Finally, CBER requested and Merck subsequently implemented a stability study of lots made with increased mumps, to confirm tentative release potencies for the its products. Beginning in September 1999, all lots were manufactured and tested in accordance with the agreed-upon changes.

In August 2000, the FDA (Team Biologics) conducted its biennial GMP inspection of Merck's vaccine and biological manufacturing facilities. During the course of the inspection, the investigators took issue with the fact that Error & Accident Reports, as required by 21CFR600.14, were not filed in response to measles and mumps stability failures within the product shelf-life. Merck responded that the stability observed for pre-September 1999 out-of-specification (OOS) lots was consistent with historical performance of the product. In addition, Merck had been in active discussion with CBER since 1996 and recently received approval for manufacturing changes to ensure compliance of potency through expiry. Management reasoned that further notification in the form of Error & Accident Reports was not necessary.

CONFIDENTIAL

MRK-KRA00322066
MRK-CHA00322066

Appx19932



# Label Claim Compliance of M-M-R®$_{II}$

In February 2001, Merck received a Warning Letter reiterating concerns from the Team Biologics inspection. With regard to M-M-R®$_{II}$ label claim compliance, they stated that "Products must meet their specifications, not the historical trend throughout the labeled expiry period." In addition, and more seriously, they challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). Merck responded that we agreed with their expectations and reiterated that all corrective actions necessary to meet label claim compliance have been taken. With regard to product efficacy, we provided an interim analysis of an ongoing mumps end-expiry trial to justify efficacy of lower potency product. CBER accepted the Merck response.

**Current Issue**



**Measles Stability Investigation**



CONFIDENTIAL

MRK-KRA00322067
MRK-CHA00322067

**Appx19933**

Restricted
R Confidential
limited access

## Label Claim Compliance of M-M-R®II



**Corrective Action**



CONFIDENTIAL

MRK-KRA00322068
MRK-CHA00322068

Appx19934

Restricted
R ⊕ Confidential
limited access

## Label Claim Compliance of M-M-R®II



REDACTED — OMP

### M-M-R®II Process Capability

The potential effect of these changes on the reject rate of filled M-M-MR®II was investigated. Production data from September 1999 to March 2002 were used for the estimation. The average calibrated release potency for 535 M-M-R®II filled lots was $3.88 \log_{10} TCID_{50}$ / dose, with a standard deviation of 0.122. Based on these values, if the new production target fill average is 4.00 log TCID50/dose, it is expected that approximately 78% of the lots will pass the release test after the initial 1 x 6 assay. Of the remaining 22% which require extended 1x6 testing, 20% are expected to pass and less than 2% are expected to be rejected for measles potency outside of the proposed acceptance range (3.8 to 4.2 $\log_{10} TCID_{50}$ / dose). Note that these calculations are based on the average success rate over a long term and a potential high failure rate in lot release

CONFIDENTIAL

MRK-KRA00322069
MRK-CHA00322069

Appx19935

## Label Claim Compliance of M-M-R®$_{II}$

could be experienced during short time periods. In addition, if the systematic variability in the potency assay cannot be removed by potency calibration for unknown reasons, significantly higher failure rate may occur.

**Technical Justification for Assumptions**

The proposed solution to the measles compliance issue is dependent on several critical assumptions. These are:

(1) Calibration to a standard
(2) Two-stage testing at the specification limits
(3) Non-linear stability kinetics of live virus vaccines
(4) Upper potency specification

The technical justification for these assumptions is discussed below:

Calibration to a standard in cell culture based bioassays

Cell culture based assays are subject to drifts and fluctuations due to uncontrollable variations in cell culture conditions and other methodological factors. It is common practice to consider calibration to a standard as a means to mitigate the effects of these variables. While the laboratory has successfully optimized its assays for testing measles, mumps, and rubella potency, differences in sensitivity continue to persist both within the lab as well as across testing laboratories. The increased variability from these fluctuations hinder efforts to consistently target filled container potencies, and obtain reliable estimates of product losses and thereby valid release limits. Excess variability has also yielded a high frequency of out-of-specification measurements during annual long-term stability monitoring of manufactured product.

During early interactions with CBER regarding mumps stability, Merck proposed two enhancements to its live virus potency assays: (1) an increase in testing from 3-vials tested in a single run of the potency assay (3x1) to 6-vials tested across 6-independent runs (1x6); and (2) calibration to a concurrently tested house standard. While the increased testing format was agreed upon, CBER refused to act upon the recommendation for calibration, citing lack of substantial improvement to the performance characteristics of the assay and potential masking of control of the procedure. In more recent interactions CBER has agreed to consider further evidence for the utility of calibration, and for control of the assay.

To that end Merck has compiled data showing parallel performance of test lots of vaccine and the assay standard. Those data reveal excellent concordance between materials tested over the entire control range of the assay. While Merck has always practiced statistical process control on its live virus potency assays, it has recently incorporated procedures to detect shifts and trends that may forecast a breakdown in assay performance.

**CONFIDENTIAL**

MRK-KRA00322070
MRK-CHA00322070

Appx19936

Restricted
R Confidential
limited access



## Label Claim Compliance of M-M-R®II

Two-stage testing at specification limits

The minimum release potency for live virus vaccines is a function of potency loss and release assay variability. As such, increased testing provides a basis for reducing the minimum release limit and the resulting target potency for the product. Increased testing can be managed through a stage-wise plan, involving an initial series of runs (1x6 assay format) at a restrictive specification for the product, followed with an additional series of runs if that limit is not met. The results from the additional series are combined with the primary series, yielding a more precise estimate of the product potency. This combined assay result (1x12 assay format) is then compared to the nominal release specification, and the lot is released if it meets that limit. This two-stage approach is predicted to result in reduced assay load relative to a fixed format in which 12-runs are performed on every lot. Conventional practice (1x6 assay format) will be maintained for stability testing, followed by the addition of a retest time-point if a measurement falls outside of specifications.

Non-linear kinetics of live virus vaccines

The nonlinear character of the stability kinetics of live virus vaccines has been acknowledged as early as 1981, in publications which describe "bi-phasic" potency decay of measles vaccine[1,2]. This same kinetics has been observed historically for Merck products, including Varivax® in addition to measles, mumps, and rubella containing vaccines. Because a nonlinear kinetic model has not been routinely used for stability analysis this has led historically to poor estimation of decay rates for Merck products, as well as inaccurate predictions of potency through the shelf-life of these products.

During recent interactions regarding long term monitoring of annual lots of mumps containing vaccines, CBER disagreed with approaches that acknowledge the nonlinear kinetics of Merck's products, claiming that the data did not appear to support a nonlinear model, and predictions made using a linear model would tend to under-predict potency at expiry and thus be conservative. Supporting data at accelerated temperatures and for measles stability were not accepted as evidence of nonlinear kinetics for mumps, as these were extrapolations to mumps stored at 2-8 °C. Recently completed studies with MMR®II lots have demonstrated a continued pattern of nonlinear kinetics, particularly for the measles component. These data will be utilized to support estimation of potency loss for currently manufactured product, and must therefore be treated in recognition of the nonlinear kinetics to obtain valid estimates of release potency. The nonlinear kinetics must be acknowledged also during annual long term stability monitoring of manufactured lots, so that Merck does not risk reacting to biased predictions of low potencies at end of expiry.

CONFIDENTIAL

MRK-KRA00322071
MRK-CHA00322071

Appx19937

Restricted
R ⊘ Confidential
limited access

# Label Claim Compliance of M-M-R®II

Clinical Justification for Measles Upper Specification



REDACTED – OMP

**Regulatory Strategy for M-M-R®II**

Prior to filing the Biological Product Deviation Report and notifying FDA Office of Compliance of the stability nonconformance, Merck will conduct a teleconference with the FDA's Office of Vaccines to notify them of the out-of-specification results for measles potency on stability. The purpose of the conversation will be to: a) communicate that as a corrective action, Merck intends to file a Prior Approval Supplement (PAS) to include addition of 0.1 log $TCID_{50}$ of measles virus to the formulation, calibration of all assay results to the house standard, implementation of upper specification limits for all three viruses and implementation of two-stage testing at the specification limits; and b) to schedule a date for an in-depth discussion of these changes and the associated PAS for M-M-R®II. The implications of this PAS to ProQuad® filing will also be discussed.

According to FDA regulations, Merck is required to submit a Biological Product Deviation Report to the FDA Office of Compliance by July 26th. This document will contain a root cause analysis and corrective actions related to the stability failures and our plan to bring the M-M-R®II product into compliance with the label claim for measles potency. With respect to regulatory communications outside the United States, Merck will notify the head of regulatory of APMSD (the license holder of M-M-R®II in the European Union). We will define a regulatory notification and approval strategy in concert with our joint venture partners. The strategy for filing our specification and process changes M-M-R®II in the rest of world markets will be determined via the normal network of Merck registration managers.

CONFIDENTIAL

MRK-KRA00322072
MRK-CHA00322072

Restricted
R ⊘ Confidential
limited access

# Label Claim Compliance of M-M-R®II

## Regulatory Strategy for ProQuad®

Specifications for measles, mumps, and rubella in M-M-R®II are critical to the ProQuad® program for two reasons. First, the current regulatory expectation is that for a new vaccine such as ProQuad®, maximum release specifications will be a requirement for licensure. CBER has agreed that the clinically supported potency specifications (i.e. minimum effective dose and maximum safe dose) for measles, mumps, and rubella in the ProQuad® formulation should be based on experience with M-M-R®II. This understanding was communicated to Merck by CBER explicitly during the End of Phase II meeting for ProQuad® on January 31, 2000. Merck has reaffirmed this understanding in the recent pre-BLA background document submitted to CBER earlier this year. Further, calibration of the measles potency assay to a house standard is critical to the manufacture of ProQuad. As discussed in the previous section, both the maximum potency specification for measles in M-M-R®II and the need for calibration in the potency assay will be a discussed in the upcoming planned teleconference with CBER. The product reviewers for M-M-R®II who will participate in this teleconference are the same reviewers who are responsible for the ProQuad® BLA. As noted above, the previously communicated regulatory expectation is that M-M-R®II and ProQuad® will be linked with respect to potency specifications. During this teleconference for M-M-R®II, Merck will explicitly reconfirm that we plan to maintain the link between these two products in terms of potency measurement and specifications by adopting the same approach to assay calibration and the same maximum release specifications for M-M-R®II and ProQuad®. This teleconference will therefore provide the opportunity to obtain CBER feedback and concurrence on the approach to maximum release specifications and assay calibration for both M-M-R®II and ProQuad®.

Detailed discussion of these issues as they relate to ProQuad® can be found in the attached document from the ProQuad® Technology Transfer Team:



ProQuad BPC
backgrounder 28MAY...

## References

[1] Allison, L.M.C, et.al. (1981) An accelerated stability test procedure for lyophilized measles vaccines, *Journal of Biological Standardization*, (9), pp. 185-194.

[2] Mann, G.F., et.al. (1983) Stability of Further-Attenuated Measles Vaccines, *Reviews of Infectious Diseases*, 5(3), pp. 482-486.

CONFIDENTIAL

MRK-KRA00322073
MRK-CHA00322073

Appx19939

11/26/2019
Declaration of G. Reilly
EXHIBIT 424

Restricted
R ◆ Confidential
limited access

# PROPOSED NEW STABILIZER FOR M-M-R®II

## Prepared by M-M-R®II PDT

## July 12, 2002

## (don't forget attachments and TOC)

New stabilizer background package:  DRAFT 12 July02                                        1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00239179
MRK-CHA00239179

Appx19941



Restricted
R ⬡ Confidential
limited access

## I. INTRODUCTION

Since 1996, the M-M-R®$_{II}$ franchise has been inundated with issues and concerns with the current product stability and tolerability profile that has led to numerous short-term program fixes to maintain the product on the market.    The issues can be broken down into the following categories and programs that have already been approved by the Vaccine T-PAC:

    **1.  Thermal Stability**

        **Issue:**  In 1996, the European regulatory agencies requested that Merck's M-M-R®$_{II}$ vaccine meet the newly-adopted European Pharmacopoeia requirements for thermal stability which includes a minimum release specification for all individual components and no greater than one log loss in potency following hold of the final container at $37^{\circ}$C for one week. Due to the inconsistency in registered potency claims for M-M-R®$_{II}$ among the EU member states and a lack of a common understanding regarding the meaning of those claims (release or end-of-shelf life), an accurate assessment of the product's reliability with respect to meeting these requirements could not be made.  However, based upon a variety of calculations, Merck's product did not meet these requirements more than 5-50% of the time.

        **Programs:**  Optimized GOS (short-term - currently on hold with the file completed) and ProQuad®-4°C Stabilizer Development (long-term)

    **2.  Release Dose vs. Expiry Dose**

        **Issue:**  During communications with CBER in 1997-98, it became evident that they did not agree with our proposal that the specifications noted in our label were the minimum release potencies for M-M-R®$_{II}$.    CBER interpreted these specifications as "expiry" potencies. Following an evaluation of M-M-R®$_{II}$ when using these specifications as "expiry" potencies, it became evident that the mumps component would not be able to meet these specifications when following the current manufacturing practices.  **REDACTED – OMP**
**REDACTED – OMP**

        **Programs:**  Mumps File Submission (to increase mumps target for filling and modifications to assay format to reduce potency assay variability) (short-term) and Mumps End Expiry (long-term)

    **3.**  **REDACTED – OMP**

    **4.  Tolerability**

        **Issue:**  When Glaxo-SmithKleing (GSK) launched their new measles, mumps, and rubella vaccine (Priorix®) in the EU, they positioned their product as low "stinging" compared to Merck's M-M-R®$_{II}$.  Merck has lost sales in many EU countries due to this counter-detailing approach.

        **Program:**  ProQuad®-4°C Stabilizer Development with low phosphate formulation (long-term) and Local Tolerability Clinical Study - Protocol #008 (program discounted prior to study initiation)

It was expected that by 2003 or 2004 the M-M-R®$_{II}$ franchise would be replaced in the US, EU, Australia and Canada with ProQuad®-4°C, which would have a suitable stability profile and an improved formulation for tolerability.  Thus, this new combination product (i.e. ProQuad®-4°C) would serve as the long-term technical strategy to solve the stability issues for measles and mumps components.  Additionally,

New stabilizer background package:  DRAFT 12 July02

2

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**


Restricted
R Confidential
limited access

there was also a previous assumption that ProQuad®-4°C would be utilized as the second dose for measles, mumps, and rubella for school entry requirements.

Based upon recent information from MVD, it is now unlikely that ProQuad®-4°C will be adopted for the second dose of measles, mumps, and rubella, absent of a second dose requirement for varicella, M-M-R®$_{II}$ will continue to be used in the US. Additionally, MVD is continuing to develop markets for measles, mumps, and rubella, which will not likely be interested in the varicella component and the associated additional costs.

Consequently, ProQuad®-4°C can no longer be the long-term strategy for addressing the measles and mumps stability issues. Also, as none of short-term programs have addressed in totality the original issues identified in 1996, a new approach to solving these issues is required. To further complicate the existing situation, issues with product stability have recently been exacerbated due to concerns raised by FDA inspectors regarding continued failure of measles and mumps in annual stability studies and questions regarding why Merck continued to distribute M-M-R®$_{II}$ product following these stability failures. As such, the M-M-R®$_{II}$ PDT is recommending that we pursue a New Stabilizer program to finally address the issue of M-M-R®$_{II}$ product stability once and for all!

The goal of the proposed New Stabilizer program is to change from the use of the current M-M-R®$_{II}$ stabilizer (GOS - gelatin, Medium O, and sorbitol) to a urea-containing stabilizer (GWS33 / V300) in the manufacture of M-M-R®$_{II}$. A stabilizer change for M-M-R®$_{II}$ is an opportunity to improve the product stability profile and to comply better with minimum potency through shelf-life of the product (typical shelf-life of 24 months). It is also an opportunity to improve adherence to EU thermal stability studies and requirements independent of NIBSC testing. Additionally, utilizing a low phosphate stabilizer (which is a characteristic of the proposed new stabilizer) is anticipated to improve local tolerability. This can offset a major competitive difference and the platform positioning for GSK Priorix® vaccine worldwide.

## II. BACKGROUND/HISTORY

The background on the issues briefly noted in the introduction above is summarized in this section to provide more detail on their history as this is important to understand the context of the newly proposed stabilizer program. A chronology of the meetings and events relevant to stabilizer enhancement requirements is provided in Attachment 1.

### A. EU Thermal Stability

In 1996, the European Pharmacopoeia (EP) monograph for combined measles, mumps, and rubella vaccines was modified to include a thermal stability test requirement despite petitions by Merck to delete this requirement citing lack of technical relevance. The EP thermal stability test consisted of incubating the product at 37°C for one week. The criteria for acceptance in 1996 had two components: 1.) the product could not lose more than one log less of viral infectivity (i.e. potency) following incubation at 37°C as compared to the unincubated control for each individual component and 2.) the product must maintain a minimum potency after incubation of 3.0, 3.7, 3.0 $\log_{10}$ TCID$_{50}$/dose for measles, mumps, and rubella, respectively. The 1996 performance of M-M-R®$_{II}$ against these specifications is summarized in Table 1 below. Approximately 50% of the of M-M-R®$_{II}$ lots tested failed the test specifications based upon the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    MRK-KRA00239181
                                                              MRK-CHA00239181

definitions utilized and data only from 1996 lots (other data not shown demonstrated performance as low as a 5% passing rate).

**Table 1: EP Thermal Stability: Performance Against Specifications**

| Component | Original Thermal Stability Requirements | | 1996 Performance for M-M-R®II | |
|---|---|---|---|---|
| | Potency After Incubation ($\log_{10}$ TCID$_{50}$/dose) | Log Loss | Potency After Incubation | Log Loss |
| REDACTED – OMP | | | | |
| Mumps | 3.7 | 1.0 | $4.0 \pm 0.2$ | $1.0 \pm 0.2$ |
| REDACTED – OMP | | | | |

Consequently, a program (Optimized GOS or OGOS) to enhance the thermal stability of M-M-R®II was initiated in 1996. The purpose of the project was to meet thermal stability requirements for lots of M-M-R®II supplied to the European market. REDACTED – OMP
REDACTED – OMP                                                                          Project plans
and tentative filing dates (target 1999) were presented by Merck to the release authorities of the Member States of the EU in 1996 and 1997.

The overall characteristics of the OGOS formulated vaccine (presented to VPAC in 1998) are summarized in Table 2 below. Note: this program was only designed to enhance the ability of M-M-R®II to meet the EP Thermal Stability test criteria. The team was not requested to have any technical goals to enhance real time (2-8°C) product stability.

**Table 2: Optimized GOS formulation goals**

| | | | |
|---|---|---|---|
| Rejection Rate | $\leq 4.5\%$ | REDACTED – OMP | |
| Moisture Content | $\leq 1\%$ | Mumps Potency | 4.9 log TCID$_{50}$ per dose |
| Lyophilization Cycle | $< 65$ hours | REDACTED – OMP | |
| Fill Volume | 0.5 ml | | |
| pH | $6.4 – 6.8$ | Mumps Thermal Stability | $\leq 0.8$ log TCID$_{50}$ loss |
| Lyo Loss | $\leq 0.2$ | REDACTED – OMP | |

As an interim measure in April 1996, Merck was able to negotiate (with the EP) an alternative interpretation of acceptable thermal stability (an interim agreement) while improvements to the stabilizer were being aggressively pursued. This interim agreement allowed Merck to continue to supply M-M-R®II to the EU, as 95% of lots tested at Merck met these modified requirements (see Table 3). The interim agreement focused on minimum "unincubated" potencies for each component with an associated log loss requirement following incubation at 37°C. The specifications varied based upon product dating (18 vs. 24 months) and based upon minimum unincubated potencies. REDACTED – OMP

New stabilizer background package: DRAFT 12 July02                                                    4

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                     MRK-KRA00239182
                                                                    MRK-CHA00239182

**Appx19944**



Restricted
**R** ○ **Confidential**
*limited access*

REDACTED – OMP

Table 3: Interim EP Thermal Stability Agreement: Performance Against Specifications

| Component | Modified Thermal Stability Requirements | | | 1996 Performance for M-M-R®$_{II}$ | |
|---|---|---|---|---|---|
| | Unincubated Potency Minimum (24 mo. dating) ($\log_{10}$ TCID$_{50}$/dose) | Unincubated Potency Minimum (18 mo. dating) ($\log_{10}$ TCID$_{50}$/dose) | Log Loss | Unincubated Potency ($\log_{10}$ TCID$_{50}$/dose) | Log Loss |
| REDACTED – OMP | | | | | |
| Mumps | 4.5 | 4.3 | 1.0 | 4.9 ± 0.2 | 1.0 ± 0.2 |
| | 4.6 | 4.4 | 1.1 | | |
| | ≥4.7 | ≥4.5 | 1.2 | | |
| REDACTED – OMP | | | | | |

The interim agreement was later extended in January 1997. However, Merck was informed that as of January 1998, the product had to comply with the regulation as written, which had been modified further to eliminate the minimum potency requirement. Eventually, the agreement became effective as a permanent measure in January 1999 following completion of the OGOS program.

In early 1998, subsequent to completion of the OGOS development program and initiation of preparation of the file, the use of a contract facility (NIBSC) for performance of the thermal stability test was implemented. Due to differences in the performance or sensitivities of the potency assays between Merck and NIBSC, NIBSC was able to assure that 100% of our lots tested in their laboratories met the modified criteria. Additionally, the marketing environment had changed since initiation of the OGOS program. Prior to 1999-2000, it was expected that SmithKline Beecham would enter the US market with a competitive measles, mumps and rubella trivalent vaccine (Priorix®). However, their product never materialized in the US market. Additionally, the OGOS lyophilization cycle of 65 hours was substantially longer than the current 40 hours for M-M-R®$_{II}$ and was to have a substantial impact on lyophilization capacity. With the lack of a competitive product sharing the market as originally planned in the vaccine LROP, lyophilization capacity was already being maximized. The additional impact on capacity due to the longer lyophilization cycle of the OGOS formulation made its implementation a challenging business decision at best. As such, in 2000 following completion of the regulatory file supplement, BPC and TPAC agreed to put the OGOS program on hold (file was not submitted) until the business or regulatory climate changed. Thus, making the NIBSC testing of our product a critical factor for managing this strategy.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                                    MRK-KRA00239183
                                                                                 MRK-CHA00239183

Appx19945



Restricted
R ⬧ Confidential
limited access

## B. Expiry Specifications

During development of monovalent measles, mumps, and rubella vaccines, dose ranging studies in children demonstrated satisfactory immunogenicity using low doses of each component. In light of potential loss of potency over the two-year storage at 2-8 °C, these products and their combinations were manufactured to these minimum levels, plus an excess thought to adequately compensate for virus instability. For Measles, Mumps and Rubella Virus Vaccine Live, the minimum potencies of 3.0, 4.3 and 3.0 log $TCID_{50}$/dose for the measles, mumps and rubella components, respectively, were the specifications for the product release prior to 1998. At the time, there were no minimum potencies defined at expiry in our label. During communications with CBER and European regulatory agencies in 1997, the need to clarify the label claims for potency of Measles, Mumps and Rubella Virus Vaccine Live and to define them in terms of the minimum potencies present at expiry became evident.

## 1. Mumps End Expiry

During communications with CBER in 1997-98, it became evident that the agency did not agree with our proposal that the specifications noted in our label were the minimum release potencies for M-M-R®$_{II}$. Instead, they defined these specifications as expiry potencies, since the language in the label stated "Upon reconstitution, the product will not contain less than…". Arguments for the demonstrated immunogenicity at lower potencies of the monovalents and the apparent effectiveness of Merck's release strategy due to the virtual eradication of disease in the US and Finland where the product was used exclusively were further rejected, due to the small number of children used in the studies, and the circumstantial nature of the justification. CBER asked Merck to demonstrate that the mumps "expiry" specification could be met as per their interpretation. As such, an evaluation was performed by Merck to assess using our release specification as an expiry specification based upon product manufacturability and stability. Inquiries from the agency focused on the mumps component, due to ambiguous labeling between vaccine marketed domestically and overseas.

It was determined that the mumps component could not meet its specifications if current manufacturing practices were followed. As such, we had to change our manufacturing process to increase the amount of mumps component in the product. Additionally, measles product stability was borderline leaving us vulnerable to random failures simply due to process and assay variability. Subsequently, the team continued to analyze annual stability data for trends in measles failure (see section C).

In September 1999, Merck submitted a Prior Approval Supplement (PAS) with changes in the mumps target manufacturing potency and the minimum release specification of 4.3 log $TCID_{50}$/dose for mumps along with a change in the potency assay testing format to improve assay variability. This was in response to a communication from CBER specifying that the mumps minimum release potency be set at 5.0 log $TCID_{50}$/dose to support an end expiry claim of 4.3 log $TCID_{50}$/dose following their evaluation of our product stability profile and potency assay variability for mumps. The calculation performed by CBER, however, was flawed (see section B.2), in that it did not include the appropriate estimates of variability for the Merck assay or for the mumps degradation rate. A similarly calculated release limit was proposed for measles and rubella.

It was expected that increasing the mumps component would be an interim measure and that Merck would commit to performing an End Expiry trial for mumps to identify an appropriate lower expiry specification. As such, an End Expiry clinical study was designed using three different mumps potencies in the design: 4.9 log $TCID_{50}$/dose (potency at release), 4.0 log $TCID_{50}$/dose (an intermediate potency), and 3.7 log

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239184
MRK-CHA00239184

Restricted
R ⊘ Confidential
limited access



$TCID_{50}$/dose (the lower mumps expiry potency specified in the EP). Lots were "aged" to the respective potencies of 4.0 and 3.7 log $TCID_{50}$/dose to mimic natural degradation of the product from the release potency during storage. The study was initiated in February 1999 and enrollment was completed by August 2000. An interim analysis was performed in 2001 and the data suggested that only the dose of 4.0 log $TCID_{50}$ achieved non-inferiority (or similarity) to a dose of 4.9 log $TCID_{50}$

Filing for to change the label claim for mumps minimum potency at end of shelf life from 4.3 log TCID50/dose to 4.0 log TCID50/dose in M-M-R®$_{II}$ is expected in 1Q2003..

## 2. Minimum Release Specification

Due to potency losses after release testing, and release assay variability, Merck has employed a model which guarantees distribution of product that will retain adequate potency through shelf-life, with a high degree of confidence. That model utilizes estimates of decay rates and their statistical errors, together with assay variability, to calculate a statistically derived minimum release potency for manufactured lots:

Minimum Release = *Minimum Potency* + *Σ Losses* + 1.65 · *Error*,

where the *Minimum Potency* is the labeled potency, *Σ Losses* is the sum of the estimated losses derived from prospectively designed stability studies, 1.65 is a factor guaranteeing 95% confidence, and *Error* is the accumulation of statistical errors associated with stability estimates, plus release assay variability. This model represents standard practice in the industry, and has been used successfully in the licensures of Varivax®, Varivax®II, and Varivax®III.

The calculation performed by CBER in 1999 was flawed in having neglected to include all the elements associated with post-release potency losses, as well as an invalid calculation leading to underestimation of release assay variability. As a result the release potency at 5.0 log $TCID_{50}$/dose to support an end expiry claim of 4.3 log $TCID_{50}$/dose was low, and could not be supported by the correct model. While Merck recognized these flaws, it felt that there was a high enough degree of uncertainty regarding current stability of M-M-R®II vaccine that it couldn't provide a reliable release specification at that time. At CBER's recommendation Merck designed a stability study with lots manufactured to the new mumps target, and promised to set permanent release specifications with the data obtained from that study.

Recent calculations show that the manufacturing target of 5.2 $TCID_{50}$/dose and associated release potency of 5.0 $TCID_{50}$/dose can support an end of expiry claim of 4.0 $TCID_{50}$/dose, the dose demonstrated to be effective in an interim analysis of the mumps expiry trial.

Similarly calculated tentative release specifications were proposed at the time for measles and rubella. Current estimates of potency loss rates, and the same factor for assay variability were used in the CBER model. While it was also recognized that these limits were low, Merck planned to await the results of the prospectively designed stability study to derive permanent release specifications for these components.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239185
MRK-CHA00239185

Appx19947



Restricted
R ⬡ Confidential
limited access

### C. Recent Stability Investigations

### 1. History  (need dates to breakout specific historical chronology, note years and purpose of meetings with CBER)

Multiple regulatory interactions ensued since the declaration of tentative release potencies for measles ,mumps, and rubella. While Merck was completing the stability study, Team Biologics conducted an inspection of the Vaccine Manufacturing Facility.  A thorough survey of the stability records uncovered a history of individual stability failures.  CBER requested that Merck perform an analysis to see if there was a trend of more failures recently than in the past.  That analysis showed there was a trend in product stability for all 3-components, with a statistically significant trend for mumps and rubella, but not for measles.

At this same time Merck met with CBER to share an Active Stability Monitoring plan (ASM), which was developed to highlight shifts and trends in the stability characteristics of product lots, as well as conformance to labeled potency specifications.  The plan furthermore acknowledges the nonlinear kinetics of live virus vaccine kinetics and utilizes potencies that have been calibrated to a house standard.  While CBER agreed with the ASM, it refused to accept nonlinear modeling of the stability profiles and calibration.  The basis for denial of the nonlinear kinetics was that the change in kinetics rates was only slight for mumps, and a linear model would be conservative, predicting a lower potency by the end of shelf-life.  Further evidence from accelerated (room temperature) measles kinetics was rejected on the basis of extrapolation from a nonrepresentative storage temperature. The basis for refusal of calibration to a house standard was that Merck had not supplied sufficient evidence for calibration, and might be masking a problem in the potency assay.  Merck agreed to assemble data to demonstrate the value of calibration, and the accuracy of calibrated potencies over the range of the assay.  Merck would further propose mechanisms to guarantee continuous control of its potency assays.

As part of its response to the ASM, CBER requested that Merck put more than a single lot of mumps containing vaccine(s) onto annual stability.  CBER made several suggestions for the selection of the number of lots chosen, borrowing from standard sampling rules for detecting defects from batches of a manufacturing process.  Merck argued that these rules were inappropriate, and would yield a prohibitive number of lots on stability (~20-lots per year).  It was decided that Merck return with a statistically derived plan, that would have acceptable statistical properties to detect lots that would be predicted to fall below minimum potency before expiry, and not flag acceptable product stability.  Based on a thorough evaluation of the mumps stability databases, an Enhanced Stability Program was developed incorporating 1-lot per month from the mumps manufacturing process. The Enhanced Program is expected to improve the quality of annual stability monitoring of Merck's measles, mumps, and rubella containing vaccines, by making more effective use of the stability data gathered to detect product that is out of compliance as well as shifts in the products' stability characteristics.  The program is also expected to reduce the number of Biological Product Deviation Resports (BPDR's) that must be filed with the FDA due to misinterpretation of stability measurements.



REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239186
MRK-CHA00239186

Appx19948

Restricted
R ◉ Confidential
limited access

REDACTED – OMP



## III. PROGRAM DRIVERS

### A. Regulatory

As noted above:

- Historically, M-M-R®$_{II}$ was manufactured at or above the minimum potencies of 3.0, 4.3, and 3.0 log TCID$_{50}$/dose (or 1000, 20000, and 1000) for measles, mumps, and rubella, respectively.

- In communications with CBER in 1997, the need to clarify the label claims for the potency of M-M-R®$_{II}$ and to define them in terms of minimum potencies present at expiry was conveyed to Merck.

- In 1998, in conjunction with a proposal to change the potency test format and raise the release specification for mumps, Merck acknowledged that the end-expiry potencies for product in the US would be 3.0, 4.3, and 3.0 log TCID$_{50}$/dose for measles, mumps, and rubella, respectively.

- In September 1999 Merck submitted a Prior Approval Supplement (PAS) with changes in the mumps target manufacturing potency and the minimum release specification of 4.3 log TCID$_{50}$/dose for mumps along with a change in the potency assay testing format. This was in response to a communication from CBER specifying that the mumps minimum release potency be set at 5.0 log TCID$_{50}$/dose to support an end expiry claim of 4.3 log TCID$_{50}$/dose.

- In 2000 and as a result of Team Biologics inspection, Merck received a 483 observation for failure to file Error & Accident Reports for stability failures, citing several examples of measles and mumps stability time-points below expiry specification. Because of the ongoing discussions with CBER, we

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00239187
MRK-CHA00239187

Appx19949

Restricted
**R** ⊙ **Confidential**
*limited access*



believed these M-M-R®$_{II}$ stability failures represented a special case that did not warrant reporting, given the fact that the stability profiles of the lots in question were within the historical profile of this product.  In the ensuing Warning Letter, FDA stated that products must meet their specifications, not the historical trend throughout the expiry period.

- In 2002, M-M-R®$_{II}$ stability failures also came under close scrutiny during this year's Team Biologics inspection.  This inspection yielded another 483 observation related to M-M-R®$_{II}$ potency failures on stability.  Although the observation itself was due to the lack of documented assessment of potential impact on other lots manufactured that were represented by the stability lots, during the inspection the lead investigator questioned why Merck continued to distribute product following these stability failures.

String of key short term fixes:

- In February 2000, a PAS was approved authorizing an increase in the target manufacturing potency for mumps of 5.2 log TCID$_{50}$/dose and an increase in the release specification of 5.0 log TCID$_{50}$/dose.
- Furthermore, the ongoing mumps end-expiry clinical study is expected to support a mumps expiry specification of 4.0 log TCID$_{50}$/dose.  These changes, coupled with a change in the potency test format, were expected to ensure meeting end-expiry specifications for mumps.  However, recent data suggests that a larger loss has been noted for measles and mumps...



REDACTED – OMP

- Proposed  PAS  with  recommended  REDACTED – OMP

REDACTED – OMP  (2) increase in assay format from 1x6 to 1x12 together with a decrease in shelf-life from 24-months to 21-months at 2-8 °C to achieve minimum release potency (3) calibration of all potencies to a house standard to reduce the effects of trends and shifts in the live virus vaccine potency assays.

In summary, and based on the above concerns and from a regulatory compliance prospective we recommend moving forward with the new stabilizer for M-M-R®$_{II}$ to ensure minimum potency stability through-out the shelf –life of the product for the three M-M-R®$_{II}$ components measles, mumps and rubella to assure a long term resolution and termination of the unceasing string of short term fixes.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    MRK-KRA00239188
MRK-CHA00239188

**Appx19950**

Restricted
R  Confidential
limited access

## B. Marketing Rationale

M-M-R®$_{II}$ will provide annual revenue of approximately $280 million (25 million doses) worldwide at the end of the decade.  This is based on the use of M-M-R®$_{II}$ for the second dose in a two-dose strategy in the developed countries as PROQUAD will be used for the primary infant dose.

It was originally anticipated that there would be a two dose varicella recommendation in highly developed countries (US, EU, Canada, New Zealand and Australia) which would have led to nearly universal cannibalization of MMRII in those markets.  However, in the absence of a second dose varicella recommendation and its reimbursement, there will remain a significant market for M-M-R®$_{II}$ for the scheduled second dose. PROQUAD is no longer assumed for a two dose regeme .

Since the majority of the world has no varicella recommendation (only USA and Canada currently have a varicella recommendation), it is doubtful that ProQuad® will replace M-M-R®$_{II}$ in total.  Many of the strategic countries (China, Korea, Poland, Turkey, Latin America) targeted for MMRII development and growth will have limited uptake of the varicella antigen, requiring continued need for  MMRII as integral component in the pediatric franchise.  Also, any expanded worldwide measles, mumps and rubella eradication efforts would utilize M-M-R®$_{II}$ not ProQuad®.

In addition to the demand-related support for the product, there is a competitive issue.  Competitively, GSK exploits the real/perceived tolerability advantage of Priorix versus M-M-R®$_{II}$ that is impacting market share.  This is a significant marketing issue that this project can help to address.

The customer will buy this product based on experience with the brand M-M-R®$_{II}$ and the need to prevent measles, mumps and rubella.   The existing unique positioning of M-M-R®$_{II}$ providing demonstrated effectiveness and protection for over 28 years; provide information on the importance of the second dose and on our excellent safety profile will continue to be motivators for the new formulation of M-M-R®$_{II}$.  The product continues to fit with the commercial division's lead position as a supplier of a full range of pediatric vaccines.  This newly formulated product will replace the existing M-M-R®$_{II}$ formulation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    MRK-KRA00239189
                                                                             MRK-CHA00239189

Appx19951



**R** Restricted Confidential limited access

## IV. Proposed Development Program

### A. Process Development

Within the past few years, the stabilities of lyophilized formulations of MeV, MuV, and RuV have been evaluated in alternative stabilizers as part of M-M-R®$_{II}$ and ProQuad® programs. GWS33/Urea (V300), a previous candidate stabilizer for ProQuad®-4°C, not only imparts better thermal stability but also improves M-M-R®$_{II}$ storage stability at refrigerated temperatures compared to GOS, the current stabilizer for M-M-R®$_{II}$. V300 also contains a lower level of phosphate buffer than the currently used GOS and may be more tolerable upon injection.

**Table 4.  Composition of stabilizers and formulations evaluated for M-M-R®$_{II}$. All values given as amount per 0.5 mL dose.  V404 composition is included for comparison.**

| Component | M-M-R®II Current Stabilizer (GOS) | M-M-R®II Optimized Stabilizer (OGOS) | New M-M-R®II Formulation (GWS33/urea; V300) | ProQuad® 4°C Spike Formulation (V404) | ProQuad® Frozen (PGS) |
|---|---|---|---|---|---|
| Sorbitol | **15 mg** | **21 mg** | **29 mg** | 15 mg | 1.1 mg |
| Gelatin (Porcine)Hydr. | 15 mg | 10 mg | 14 mg | 11 mg | 10 mg |
| Medium 199 | 3.4 mg | 0.6 mg | 0.62 mg | 0.62 mg | 0.83 mg |
| Sodium Phosphate, Monobasic + Dibasic | 5.3 mg | 3.7 mg | 1.1 mg | 1.4 mg | 0.34 mg |
| Sodium Chloride | 2.5 mg | 1.8 mg | 0.77 mg | 2.3 mg | 2.4 mg |
| Sucrose | **1. 9 mg** | **12 mg** | **17 mg** | **19 mg** | 21 mg |
| Sodium Bicarbonate | 0.4 mg | 0.3 mg | 0.17 mg | 75 µg | 89 µg |
| Albumin, human | 0.3 mg | 0.2 mg | < 0.31 mg | < 0.25 mg | < 0.31 mg |
| Medium MEM, Eagle | 0.1 mg | 0.1 mg | 0.14 mg | 0.14 mg | 0.14 mg |
| Potassium phosphate, Monobasic + Dibasic | **130 µg** | **32 µg** | **45 µg** | **91 µg** | 105 µg |
| Potassium Chloride | - | - | - | 58 µg | 60 µg |
| Neomycin | 25 µg | 17 µg | 5.0 µg | 5.0 µg | 6.3 µg |
| Monosodium L-Glutamate | **20 µg** | 17 µg | - | **0.38 mg** | 0.40 mg |
| Phenol Red | 3.4 µg | 2.5 µg | 0.93 µg | 0.93 µg | 1.1 µg |
| Urea | - | - | **2.5 mg** | **2.5 mg** | - |

Thermal and long-term stability data from two independent studies which employed V300 for formulation of MeV/MuV/RuV-containing vaccines have been analyzed. These include the MMR(-V) development lot (study No. 1) and a lab scale Final Container Stability Study with rHA/HSA-containing M-M-R®$_{II}$ formulated with V300 and GOS stabilizers (study No. 2). A brief summary is given below (for details see Attachment # 1).

In the study No. 1, an MMD development lyophilization run was conducted to determine the feasibility of manufacturing the ProQuad®-4°C  product in V300 stabilizer. The standard manufacturing process was

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    MRK-KRA00239190
                                                                 MRK-CHA00239190

Appx19952



Restricted
**R** Confidential
*limited access*

utilized to formulate the MeV/MuV/RuV vaccine. **REDACTED – OMP**
**REDACTED – OMP** After formulation, the material was filled and lyophilized in MMD cabinets. The manufacturing scale development lot indicated improved stability at 37°C. All live vaccine viruses pass the thermostability test with 0.6 log being the greatest observed loss. Analysis of long-term stability data for MeV and MuV shows that 0.5 log or less potency is lost after 24 months at 2-8°C. No significant trend or difference is observed for RuV (Attachment # 1 and 2). Thus, stability of MeV and MuV at 2-8°C appears to be better than in the current M-M-R®$_{II}$ stabilizer (GOS). In study No. 2 , the effect of replacing HSA with rHA in the bulk processes for M-M-R®$_{II}$ was evaluated. Stability studies were initiated with MeV, MuV, and RuV bulks containing either rHA or HSA and formulated with V300 or GOS stabilizer, respectively. The vaccine samples were filled, liquid nitrogen frozen and lyophilized at the lab scale in MRL. The lyophilization yields, the short-term thermal stability (37 °C for 7 days) and long-term stability  data at 2-8°C  (up to 18 months) and 15°C (up to 6 months) have been analyzed. Thermostability of all viruses is improved in V300 compared to GOS stabilizer. Lyophilization loss is comparable in both stabilizers for MuV and RuV **REDACTED – OMP**
**REDACTED – OMP** A significant improvement in stability characteristics of V300 over GOS stabilized materials is observed for MeV and MuV stored at both 2-8°C and 15°C. The measured improvement in predicted 24-month potency is equal to 0.43 log $TCID_{50}$/dose for MeV, and 0.33 log $TCID_{50}$/dose for MuV. In addition to significantly improved stability at 4°C, the data at 15°C indicate MeV and MuV are more stable in the new formulation. **REDACTED – OMP** The 2-8°C stability losses for the GOS-stabilized materials were consistent with the historical experience for commercial MeV, MuV, and RuV containing vaccines.

The estimated timeline for M-M-R®$_{II}$ V300 program spans over four years (for details see attachment #3). The timeline stands as follows: In 4Q 2002, preparation of formulation and stabilizer batch records will be completed. The liquid stability and shipping stability experiments will be finished. Lyophilization process development experiments will be initiated. In 2003, the lyo process development experiments will be followed by completion of lyo process development lots . In addition, the formulation/fill process development experiments, mixing process, equipment experiments (followed by completion of formulation/fill process development lots) will be finished. In 4Q 2003, the formulation/fill process development lots, storage stability experiments, scale up lyo lots and preliminary assay qualifications will be initiated. In 2004, the lyo lots will be assayed and engineering lots will be completed. Preparation and release of clinical lots will be initiated in 2Q 2004. In 2005, validation lots followed by their testing will be completed. Furthermore, a clinical trial will be completed. In 2006, testing of validation lots will be completed and a BLA prepared.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    **MRK-KRA00239191**
**MRK-CHA00239191**

**Appx19953**

Restricted
R ◆ Confidential
limited access

## B. Development Program Parameters and Goals

### Table 5: New Stabilizer Formulation Parameters

| Category | Parameter |
|---|---|
| Expiry potency for Me, Mu, Ru | REDACTED – OMP |
| | MuV:  4.0 log $TCID_{50}$/dose (currently 4.3 log $TCID_{50}$/dose) |
| | REDACTED – OMP |
| Upper potency limit | Uncalibrated |
| | REDACTED – OMP |
| | MuV: ≤5.6 log $TCID_{50}$/dose |
| | REDACTED – OMP |
| | Calibrated |
| | REDACTED – OMP |
| | MuV: ≤5.4 log $TCID_{50}$/dose |
| | REDACTED – OMP |
| Maximum manufacturable potency loss (maximum potency - minimum release) | REDACTED – OMP |
| | MuV:  ≤0.6 log |
| | REDACTED – OMP |
| Preferred shelf life | 24 months at 2-8°C |
| Definition of filling model | Uncalibrated |
| | Calibrated |
| Current assay variability (1x6 format) | REDACTED – OMP |
| | MuV:  0.084 |
| Liquid Stability | REDACTED – OMP |
| | MuV:  0.1 log |
| | REDACTED – OMP |
| TOR (40 hrs. maximum) | |
| | MuV: |
| | REDACTED – OMP |
| Shipping at 10°C | |
| pH | 6.4-6.8 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239192
MRK-CHA00239192

Appx19954

Restricted
R ⊙ Confidential
limited access

**Table 6: New Stabilizer Formulation Goals**

| Category | Range |
|---|---|
| Rejection rate | ≤4.5% |
| Moisture content | ≤2.0% [to be defined further based upon stabilizer characteristics and cake appearance] |
| Lyophilization cycle | <65 hours |
| Lyophilization loss | REDACTED – OMP<br>MuV: 0.3  REDACTED – OMP<br>RuV: 0.3 |
| Buffering Concentration | |
| Release potency | MeV:<br>MuV:<br>RuV: |
| Thermal stability | REDACTED – OMP<br>MuV: ≤0.8 log loss (avg)<br>REDACTED – OMP |
| Real time stability* | MeV:<br>MuV:<br>RuV: |
| Reconstitution loss (8 hours) | REDACTED – OMP<br>MuV: ≤0.1 log loss (avg)<br>REDACTED – OMP |

*  Calculate using the following assumptions:  TOR = 0.1 log loss, lyo loss = 0.3 logs, no stability losses at -20°C and reconstitution stability losses of 0.1 logs for each antigen.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239193
MRK-CHA00239193

Appx19955



Restricted
R Confidential
limited access

## C. Regulatory Strategy

### 1. Clinical Requirements

We do not have clinical experience with GWS33/urea in the context of any other vaccine, however, it is expected that at the time of M-M-R®$_{II}$ (GWS33/urea) filing there will be clinical experience with ProQuad®-4°C in which another urea containing stabilizer formulation (V404) is evaluated. To determine if a clinical trial will be required to bridge between the current M-M-R®$_{II}$ product with GOS and the proposed new stabilizer GWS33/urea (V300), we evaluated the differences in stabilizer formulations used in M-M-R®$_{II}$ and ProQuad®-4°C. Table 4 (section IV.A) compares between GOS, OGOS, the proposed new urea containing stabilizer GWS33/urea (V300) for M-M-R®$_{II}$ and the urea containing stabilizer (V404) used in ProQuad®-4°C. GWS33/urea (V300) formulation is closer (but not identical) to the OGOS formulation (except for the urea component) than it is to either of the GOS (current M-M-R®$_{II}$) or the urea containing formulation (V404) used in ProQuad®-4°C.

Based on previous communications with CBER (namely the OGOS discussion and also more recent communication regarding stability requirements for multi-dose image M-M-R®$_{II}$/rHA and the stability program ongoing discussions with CBER) it is unlikely that CBER will accept bridging to a new stabilizer without a clinical trial. Therefore the regulatory path-forward recommendation is to file a manufacturing supplement (6 month review cycle) supported with a bio-equivalence clinical trial.

### 2. Filing Strategy

M-M-R®$_{II}$/GWS33 (V300) will be filed as a manufacturing supplement (6 month review cycle) in the US and as a variation in the EU (3-6 month review cycle), supported by bio-equivalence clinical trial data results (comparing M-M-R®$_{II}$/rHA with GOS and M-M-R®$_{II}$/rHA with GWS33/urea (V300)).

Proposed file content:

1. Complete manufacturing and quality control information of M-M-R®$_{II}$ with GWS33 (V300) and formulation component comparisons between GWS33 (V300) and GOS.

2. Bio-equivalence clinical trial (M-M-R®$_{II}$/rHA with GOS and M-M-R®$_{II}$/rHA with GWS33 (V300).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239194
MRK-CHA00239194

Appx19956

Restricted
R Confidential
limited access

## D. Clinical Strategy/Proposed Study Design

The clinical study will be a randomized, double-blind (operating under in-house blinding), multi-center study to evaluate the safety, tolerability, and immunogenicity of M-M-R®$_{II}$ manufactured with GWS33/urea (V300) or M-M-R®$_{II}$ manufactured with GOS in healthy children between 12 and 18 months of age.   Subjects will be randomized to receive a single subcutaneous dose of M-M-R®$_{II}$ manufactured with the new and new stabilizer or M-M-R®$_{II}$ manufactured with the current GOS stabilizer.  Local and systemic tolerability will be monitored for 42 days (Luwy tolerability followed for 42 days?? Don't you mean safety? – perhaps tolerability duroing the first 15 minutes post vaccination or during 1st 24 hours???) following vaccination using a vaccination report card (VRC).   Serum will be collected from all subjects immediately prior to vaccination and 6 weeks (+/- 1 week) following vaccination.   All sera will be analyzed for measles, mumps, and rubella antibody levels by ELISA.   For each subject, the expected duration of the study is 6 weeks.   Approximately 1,210 healthy infants (~605/group) between 12 and 18 months of age will be enrolled in the study. (would we consider including a Priorix arm???)

The primary endpoints for this study are the measles, mumps, and rubella 6-week seroconversion rates (as measured by ELISA) for both the M-M-R®$_{II}$ manufactured with the new GWS33 (V300) stabilizer group and the M-M-R®$_{II}$ manufactured with the current GOS stabilizer group.   For all subjects, temperatures, injection-site reactions, systemic reactions, and serious adverse experiences will be recorded for 42 days after vaccination. The equivalence margin for the first primary hypothesis is 5 percentage points.   The lower bound for an acceptable immune response to measles, mumps, and rubella is 90%.  Both hypotheses will be tested using a one-sided $\alpha=0.05$.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239195
MRK-CHA00239195

Appx19957


Restricted
Confidential
limited access

## E. Risk Mitigation

The following table summarizes the issues / risks in development of the new stabilizer for M-M-R®II and risk mitigation.

### ISSUES/RISKS FOR MMR II
### NEW STABLIZER DEVELOPMENT AND LICENSURE

| FUNCTION | RISK | PROBABILITY OF OCCURRENCE | IMPACT | RISK MINIMIZATION | CONTIGENCY PLAN |
|---|---|---|---|---|---|
| Technical/Process | New stabilizer formulation does not achieve technical goals | Low | High: delay in program licensure | Pilot scale study in MRL and large scale development run in MMD provide preliminary data that stabilizer formulation is acceptable. | Need different formulation |
| Technical – Analytical | Matrix affects observed in assay. | Low/medium | Low/medium: delay in program to address assay issues | Perform preliminary assay qualifications with development material. | Consider use of PCR assay |
| Manufacturing | Lyophilization cycle time is greater than 65 hours | Low | High: reduction in MMD capacity for manufacture of lyophilized products | Lyophilization cycle development to optimize cycle and large scale development run already performed in MMD. | Need to evaluate additional lyophilization capacity |
| Business | Licensure of urea not obtained for MMR II | Low/medium | High: delay in program licensure | Negotiate with AvP as soon as program is chartered. | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239196
MRK-CHA00239196

Appx19958

Restricted
R ◆ Confidential
*limited access*

## F. Timeline

A proposed program timeline is attached to give an order of magnitude estimate of the overall program timeline. A detailed, finalized program timeline will be provided once the program has been approved and a Technology Transfer Team has been assembled.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                MRK-KRA00239197
                                                             MRK-CHA00239197

Appx19959



Restricted
R ● Confidential
limited access

**Attachment 1:  Chronology of Meetings and Events Relevant to Stabilizer Enhancements**

| Date | Issue / Meeting |
|---|---|
| 1991 | EP proposes to include thermal stability requirement for measles, mumps and rubella containing vaccines. M-M-R®$_{II}$ does not meet the specification. |
| 1993 | Merck petitions EP to delete requirement, citing lack of relevance, supported by data. |
| 1996 | EP adopts thermal stability requirement.  Merck negotiates an alternative interpretation of acceptable thermal stability (interim agreement) and indicates that improvements to the stabilizer are being aggressively pursued.   Interim agreement allows supply of M-M-R®$_{II}$ to EU. |
| 2/27/97 TPAC | Stabilizer enhancement program reviewed and approval received for 1997 costs, total program costs, FTEs, and program implementation strategy (HSA-free diluent program added in 1998). Marketing risks (inability to respond to tenders, etc.), effect on product cost, and effect on lyo capacity presented. |
| 9/5/97 BPC | Approval received to manufacture engineering and consistency lots for OGOS.  Impact on lyo capacity reiterated.  Final numbers for lyo cycle times versus current cycle times presented.  Marketing risks reemphasized. |
| 9/17/97 | EP ends interim agreement, requires Merck to meet new 1999 requirement for thermal stability as of 1/1/98, and suggests that Merck use another lab for thermal stability testing.  Merck indicates that minor changes to current stabilizer improve thermal stability and that the filing is anticipated for 1999.  Based on historical data, Merck expects fewer than half of lots to meet the new requirement. |
| 10/97 BPC | Presentation on meeting with EP and pathforward while OGOS implementation is pursued  OGOS timelines reiterated. |
| 11/97 | Merck contracts NIBSC to perform thermal stability testing, allowing continued supply of M-M-R®$_{II}$ to Europe. |
| 11/97 | Merck meets with CBER regarding HSA and indicates that HSA removal will be pursued one step at a time, starting with diluent used in formulation. |
| 12/97 | Merck meets with CBER and indicates that stabilizer enhancements, intended to improve thermal stability for those countries that require it, are being pursued. |
| 1/98 BPC | Presentation on HSA-free diluent program.  Approval to proceed with HSA-free diluent program evaluating GOS and OGOS formulations received. |
| 2/9/98 BPC | Updated contract for 1998 activities presented.  Approval received to develop multi-dose images using OGOS formulation. |
| 2/98 TPAC | Presented all M-M-R®$_{II}$ programs - reiterated dates for OGOS/HSA-free diluent. |
| 4/98 BPC | Presentation on LVV stabilizer strategy.   Approval received for OGOS, 4C VZV, MMRV formulation integration and timelines.  Also, presented integration with CWE cell banks and rHA.  No major objections raised other than to reaffirm the need to stay focused. |
| 6/22/98 BPC | Updated OGOS contract with removal of 50 dose image from program provided. |
| 1998 | Agreement with CBER on design and criteria for success for mumps expiry trial to support lower minimum claimed mumps potency |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00239198
MRK-CHA00239198

Appx19960

Restricted
R Ⓒ Confidential
limited access

| Date | Issue / Meeting |
|------|-----------------|
| 7/20/98 BPC | Update memo sent to BPC on HSA-free diluent program on development and engineering runs. Data provided on GOS and OGOS formulations. |
| 8/25/98 BPC | BPC provided with final data on engineering run with OGOS formulation. Gave BPC opportunity to stop consistency lots to be initiated in August 1998 with OGOS formulation. |
| 10/5/98 BPC | Regulatory filing strategy memo for OGOS provided. |
| 1/19/99 | Merck meets with CBER and indicates that HSA-free diluent and stabilizer enhancements supplement is expected to be filed 2-3Q99. |
| 1/ 99 | Using NIBSC release data for thermal stability, Merck can supply EU. UK requires Merck data, not NIBSC, be reported on protocols. Few lots of the subset able to be supplied to the UK (HSA issues) pass in Merck's lab. Merck starts collaborative study with NIBSC to determine path forward. |
| 2/26/99 | Initiation of Mumps End Expiry study designed to evaluate changing expiry specficiation from 4.3 to 4.0 or 3.7 log $TCID_{50}$/dose for mumps. |
| 9/99 | Ongoing CBER concerns about misbranding result in agreement to increase the minimum release spec for mumps from 4.3 to 5.0 log $TCID_{50}$/dose |
| 2/00 | A Prior Approval Supplement was approved authorizing an increase in the target manufacturing potency for mumps of 5.2 log $TCID_{50}$/dose and an increase in the release specification of 5.0 log $TCID_{50}$/dose while the team awaits completion of the mumps end expiry study. |
| 8/18/00 | LPO for Mumps End Expiry study (42 day read). |
| 10/00 | Mumps stability data submitted to CBER show 95% LB=1.0 log loss, therefore, 5.0 log $TCID_{50}$/dose minimum release specification does not ensure 4.3 log $TCID_{50}$/dose at expiry. |
| 11/00 | Acceptablity of PRN assay and validation confirmed with CBER. CBER requests acceptance criteria for controls. Plans for subset analysis discussed. |
| 2000 Team Biologics inspection | Merck received a 483 observation for failure to file Error & Accident Reports for stability failures, citing several examples of measles and mumps stability time-points below expiry specification. |
| 2/01 | Subset analysis indicates that 4.0 log $TCID_{50}$/dose (but not 3.7 log $TCID_{50}$/dose) will likely be acceptable minimum expiry titer for mumps. |
| 3/01 | Subset analysis results included in response to FDA warning letter regarding compliance with expiry potency claim for mumps. |
| 2002 Team Biologics inspection | M-M-R®$_{II}$ stability failures also came under close scrutiny during the inspection. This inspection yielded another 483 observation related to M-M-R®$_{II}$ potency failures on stability. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00239199
MRK-CHA00239199

Appx19961

11/26/2019
Declaration of G. Reilly
EXHIBIT 425

Appx19962

Restricted
R ⊖ Confidential
limited access

*Today's Date: 02 Oct 2002*

# CRRC

## *Clinical and Regulatory Review Committee*

### *Agenda – 08 October 02*

## *RESTRICTED*
## *Document*

**CONFIDENTIAL**

**MRK-KRA00780210**
**MRK-CHA00780210**



# CRRC
## *Clinical and Regulatory Review Committee*
### Agenda – 08 October 2002

**October 08, 2002**                                    *Today's Date: 02Oct02*
*RY 34-A1023 and BLX 1019 (Videoconference)*

| CRRC Co-Chairs | |
|---|---|
| **Executive Chair** | **Dr. D. Greene** |
| **Clinical Co-Chair** | **Dr. B. Gertz** |
| **BARDS Co-Chair** | **Dr. R. Bain** |
| **Regulatory Co-Chair** | **Dr. B. Goldmann** |

NEUROSCIENCE



*10:30 p.m.*                                              (30 min)

**VACCINE**
MMRII
*11:00 p.m.*   *Protocol Review – "MMRII protocol #007, Mumps End Expiry*    (40 min)
*study: AIGENT assay issues impact on study criteria and path*
*forward".*
Drs. Morsy, Manal, and Jon Hartzel

Invitees: Manal Morsy, Joye Bramble, Florian Schodel, Joe
Heyse, Dave Krah, Alan Shaw, Joe Antonello, Holly Matthews,
Barb Kuter, Keiko Simon
**Note: Background for this item is posted to KMDR.**

1

**CONFIDENTIAL**                                    **MRK-KRA00780211**
                                                          **MRK-CHA00780211**

**Appx19964**



# CRRC
### Clinical and Regulatory Review Committee
Agenda – 08 October 2002

**DIABETES**

11:40 a.m.    REDACTED – OMP    (30 min)



**DEVELOPMENT PROJECTS (Rahway)**

12:10 p.m.    REDACTED – OMP    (10 min)

**DEVELOPMENT PROJECTS**

12:20 p.m.    REDACTED – OMP    (10 min)

**DEVELOPMENT PROJECTS**

12:30 p.m.    REDACTED – OMP    (10 min)

2

MRK-KRA00780212
MRK-CHA00780212

Appx19965



Restricted
R ✪ Confidential
limited access

# CRRC
## *Clinical and Regulatory Review Committee*
### Agenda – 08 October 2002

**DEVELOPMENT PROJECTS**

| | | |
|---|---|---|
| *12:40 p.m.* | REDACTED – OMP | (10 min) |

**DEVELOPMENT PROJECTS**

| | | |
|---|---|---|
| *12:50 p.m.* | REDACTED – OMP | (10 min) |

| | | | |
|---|---|---|---|
| *1:00 p.m.* | **WPS&E** <br> *WPS&E Safety Update* <br> Ms. Linda Hostelley <br> <u>Note</u>: **There is no background for this item.** | Standing <br> Item | (10 min) |

3

**MRK-KRA00780213**
**MRK-CHA00780213**

**Appx19966**

| To: | **CRRC** |
| --- | --- |
| **From:** | **PDT for M-M-R®II** |
| **Date:** | **October 2, 2002** |
| **Subject:** | **Background Document: M-M-R®II Protocol #007 – Mumps End Expiry Study: AIGENT Assay Issues and Impact on Study Criteria.** |

Attached is a background document from the M-M-R®II PDT summarizing the issues surrounding the Mumps End Expiry study, specifically the functional antibody assay (AIGENT Assay) and the impact on study criteria for success. The background package includes the following: a summary of the history leading up to the requirement for the Mumps End Expiry study to establish minimum mumps potency for M-M-R®II end of shelf life; an assessment of the probability of meeting the Mumps end expiry study criteria for success; and the team's proposed path forward/ options being considered.

Decision Requested: Concurrence on the PDT recommendation to accelerate development of the New Stabilizer for M-M-R®II in order to improve the stability and tolerability of the vaccine (activity to be chartered at the October 10th HHPAC MRL-Marketing Interface meeting).

10/02/02

**CONFIDENTIAL**

**MRK-KRA00780214**
**MRK-CHA00780214**

**Appx19967**

Restricted
R Confidential
limited access

# M-M-R®II Protocol #007 - Mumps End Expiry Study: AIGENT Assay Issues and Impact on Study Criteria

## October 2, 2002

## Prepared by PDT for M-M-R®II

CONFIDENTIAL



Restricted
R ♻ Confidential
*limited access*

# Table of contents

1.  EXECUTIVE SUMMARY ........................................................................................................ 3

2.  BACKGROUND AND RATIONALE ...................................................................................... 5

   2.1   M-M-R®II LABEL CLAIMS AND INTERACTIONS WITH REGULATORY AGENCIES ............................... 5

3.  MUMPS END-EXPIRY CLINICAL TRIAL............................................................................ 7

   3.1   SELECTION OF VACCINE POTENCIES............................................................................... 7
   3.2   CLINICAL ASSAYS USED FOR THE MEASUREMENT OF MUMPS-SPECIFIC RESPONSES........................ 8
   3.3   CLINICAL STUDY DESIGN AND OBJECTIVES .................................................................... 8

4.  CURRENT STATUS OF MUMPS END-EXPIRY CLINICAL TRIAL ............................ 9

   4.1   CLINICAL ASPECTS OF THE TRIAL..................................................................................... 9
   4.2   PLAQUE REDUCTION NEUTRALIZATION (PRN) ANTIBODY RESULTS............................................ 10

5.  STATISTICAL EVALUATION FOR STUDY SUCCESS.................................................. 17

6.  IMPACT OF MUMPS END EXPIRY TRIAL ON COMPLIANCE, MANUFACTURING, AND MARKETING OF M-M-R®II.................................................................................................. 19

7.  IMPACT ON MUMPS BULK VACCINE MANUFACTURING ........................................ 19

8.  IMPACT ON MARKETING........................................................................................................ 20

9.  CONCLUSIONS AND PATHFORWARD ............................................................................... 20

10.  REFERENCES ............................................................................................................................ 22

CONFIDENTIAL

MRK-KRA00780216
MRK-CHA00780216

**Appx19969**


Restricted
R ⬡ Confidential
limited access

## 1. Executive Summary

During communications with CBER in 1996-98, it became evident that the agency did not agree with our proposal that the specifications noted in our label were the minimum release potencies for M-M-R®$_{II}$. Instead, they defined these specifications as end-expiry potencies, since the language in the label stated "… each 0.5 ml dose contains not less than…". Arguments for the demonstrated immunogenicity at lower potencies of the monovalents and the apparent effectiveness of Merck's release strategy, due to the virtual eradication of disease in the US and Finland where the product was used exclusively were further rejected, because of the small number of children used in the studies and the circumstantial nature of the justification. CBER asked Merck to demonstrate that the mumps "expiry" specification could be met as per their interpretation.

To address this issue the following actions were taken by Merck:

1. Merck committed to a clinical study to evaluate lower end expiry potencies and a new functional antibody assay was developed at the request of CBER to be used for that study. This study was initiated in February 1999 with LPO (day 42) in September 2000.

2. To maintain the product on the market while the end expiry study was in progress, CBER specified that the mumps minimum release potency be increased to 5.0 log $TCID_{50}$/dose to support an end expiry claim of 4.3 log $TCID_{50}$/dose. This change was implemented in September 1999.

Subsequent to completion of the end expiry study, a series of issues arose with the serology assay and samples that have now put the success of this study at risk. The issues are summarized below:

1. In August 2001, CBER inspection of the serology laboratory resulted in concerns over GMP issues (i.e. data handling, spreadsheet validation, etc.). These issues resulted in a substantial delay in completion of serology testing.

2. Invalid samples (per 1) were identified for retesting, but GMP issues were not resolved until May 2002. Consequently, samples were retested in June –August 2002 but sample storage exceeded the 1 year time limit specified by the SOP. The issue was communicated to CBER, and CBER suggested that a pre/post retest analysis be performed.

3. Upon retest, samples showed a change in antibody titer (~ 3 fold reduction) and a background document was submitted to CBER (September 20, 2002) to obtain concurrence on invalidating retest results from 2002 and testing of available frozen retains from this subset.

Based upon these evolving issues, there are now several outstanding risks for the successful completion of the end expiry study. First, The study may not meet the 5% equivalence criteria between release and the highest tested expiry dose and/or lower 95% CI for 90% seroconversion rate. Second, M-M-R®$_{II}$ may have to remain at the current expiry dose of 4.3 log TCID50/dose which would only support ≤ 12 months expiry using current data in the stability model.

As a result of these issues the team is now proposing the following recommendations:

CRRC Oct2; Background package

CONFIDENTIAL

MRK-KRA00780217
MRK-CHA00780217

Appx19970



Restricted
**R** Confidential
*limited access*

1. Accelerate the new stabilizer program for M-M-R®$_{II}$ in order to improve the stability and the tolerability of the vaccine. Team chartering is expected at the October 10, 2002 HHPAC MRL-Marketing Interface meeting. If program is initiated in 1Q03 – timing of submission without clinical trial / cross referencing clinical data from the ProQuad®$_{refrigerated}$ study would be 3-4Q05 – timing of the submission that includes conducting a clinical trial would be 1-2Q06.

2. The team is also evaluating other options to be considered as short-term fixes, since a new stabilizer program would require approximately three years before being implemented. The options and risks are outlined below:
    - Maintaining 4.3 log TCID50/dose expiry potency specification- evaluation underway to define conditions to achieve a shelf-life of 18 months if possible (such as reduction of TOR or time post reconstitution, etc.).
    - Change label to reflect lower than 96% protection – this would require negotiating with CBER to relax the criteria of success; however, this would lower the bar for the competition.
    - Repeat Mumps End Expiry Study – issues include technical feasibility, time to completion with no assurance that we would succeed the second time, and completing the study and filing would potentially consume the same timeframe required to correct the stability problem by accelerating the new stabilizer program.
    - Increase overfill level of mumps – issues include manufacturing capacity limitations and lack of adequate safety data to support overfill.

Decision Requested: Concurrence on the PDT recommendation to accelerate development of the New Stabilizer for M-M-R®II in order to improve the stability and tolerability of the vaccine (to be chartered at the October 10th HHPAC MRL-Marketing Interface meeting).

CRRC Oct2; Background package                                                            4

**CONFIDENTIAL**

**MRK-KRA00780218**
**MRK-CHA00780218**

**Appx19971**



Restricted
R ⊘ Confidential
limited access

## 2. Background and Rationale

Since its introduction in 1978, M-M-R®$_{II}$ has been shown to be highly immunogenic and generally well tolerated. As of today, more than 400 million doses of M-M-R®$_{II}$ have been administered worldwide. Widespread use of a two-dose M-M-R®$_{II}$ schedule (a first dose given at 12-15 months followed by a second dose between 4-6 years of age) has been responsible for greater than 99% reduction in the incidence of each of the three targeted diseases in the United States and other countries with similar policy. Despite the demonstrated effectiveness of the vaccine, many compliance issues related to the long-term stability of its three components have plagued M-M-R®$_{II}$. In contrast to rubella, both measles and mumps are relatively unstable viruses and are susceptible to significant potency losses over time (even at normal storage conditions at 2-8°C) (1).

Early studies of the Merck monovalent Mumps vaccine have shown that the minimum dose of vaccine virus needed to achieve 100% seroconversion is 1268 (~3.1 $\log_{10}$) TCID$_{50}$/dose for mumps (2). Based on these data and on real-time stability data, it has generally been assumed that M-M-R®$_{II}$ vaccine released with mumps potency at or above the minimum release and stored at 2-8°C for 24 months would provide adequate immunogenicity. However, the minimum immunizing dose studies were performed in a relatively small number of individuals (~11 subjects per group) and have not been repeated in recent years or with the trivalent M-M-R®$_{II}$ vaccine (3). Therefore, in order to determine the minimum expiry potency for M-M-R®$_{II}$, it was essential to demonstrate the immunogenicity of M-M-R®$_{II}$ at the reduced titers expected at expiry.

### 2.1    M-M-R®$_{II}$ Label Claims and Interactions with Regulatory Agencies

M-M-R®$_{II}$ original license specified that a 0.5 mL dose M-M-R®$_{II}$ contains not less than 1000 TCID$_{50}$ of measles virus, 5000 TCID$_{50}$ of mumps virus, and 1000 TCID$_{50}$ of rubella virus (3.0 log TCID$_{50}$/dose measles, 3.7 log TCID$_{50}$/dose mumps and 3.0 log TCID$_{50}$/dose rubella). In the 1980's, the label was revised from 5000 TCID$_{50}$ (3.7 log) to 20,000 TCID$_{50}$ (4.3 log) of mumps per 0.5 mL dose due to assay modifications (changes in the cell line used for Mumps virus quantitation that reported higher apparent potencies) that improved assay sensitivity by four-fold.

#### 2.1.1    Regulatory Interactions with CBER

During communications with CBER in 1996-98, it became evident that the agency did not agree with our proposal that the specifications noted in our label were the minimum release potencies for M-M-R®$_{II}$. Instead, they defined these specifications as end-expiry potencies, since the language in the label stated "… each 0.5 ml dose contains not less than…". Arguments for the demonstrated immunogenicity at lower potencies of the monovalents and the apparent effectiveness of Merck's release strategy, due to the virtual eradication of disease in the US and Finland where the product was used exclusively were further rejected, because of the small number of children used in the studies, and the circumstantial nature of the justification. CBER asked Merck to demonstrate that the mumps "expiry" specification could be met as per their interpretation. As such, an evaluation was performed by Merck to assess using our release specification as an expiry specification based upon product manufacturability and stability. Inquiries from the agency focused on the mumps component, due to sporadic mumps failures in annual stability studies with mumps-containing vaccines.

CONFIDENTIAL

MRK-KRA00780219
MRK-CHA00780219

**Appx19972**

Restricted
R ⊕ Confidential
limited access



It was determined that the mumps component could not meet its specifications if current manufacturing practices were followed. As such, the manufacturing process had to change to increase the amount of mumps component in the trivalent product.

In September 1999, Merck submitted a Prior Approval Supplement (PAS) with changes in the mumps target manufacturing potency along with a change in the potency assay testing format to improve assay variability. This was in response to a communication from CBER specifying that the mumps minimum release potency be set at 5.0 log $TCID_{50}$/dose to support an end expiry claim of 4.3 log $TCID_{50}$/dose following their evaluation of our product stability profile and potency assay variability for mumps. The release potency recommended by CBER, however, was low, in having neglected to include all the elements associated with post-release potency losses, as well as an invalid calculation leading to underestimation of release assay variability.

It was expected that increasing the mumps component would be an interim measure and that Merck would commit to performing an End Expiry trial for mumps to identify an appropriate lower expiry specification. As such, an End Expiry clinical study was designed using three different mumps potencies: 4.9 log $TCID_{50}$/dose (potency at release), 4.0 log $TCID_{50}$/dose (an intermediate potency), and 3.7 log $TCID_{50}$/dose (the lower mumps expiry potency specified in the EP). Lots were "aged" to the respective potencies of 4.0 and 3.7 log $TCID_{50}$/dose to mimic natural degradation of the product. The study was initiated in February 1999 and enrollment was completed by August 2000. An interim analysis was performed in 2001 and the data suggested that only the dose of 4.0 log $TCID_{50}$/dose was highly likely to achieve non-inferiority (or similarity) to a dose of 4.9 log $TCID_{50}$/dose. Filing for a change to the label claim for mumps minimum potency at end of shelf life from 4.3 log $TCID_{50}$/dose to 4.0 log $TCID_{50}$/dose in M-M-R®$_{II}$ was expected in 1Q2003 until the recent assay issues surfaced.

It was anticipated that filing for a change to the label claim for mumps minimum potency at end of shelf life from 4.3 log $TCID_{50}$/dose to 4.0 log $TCID_{50}$/dose in M-M-R®$_{II}$ will:  1) ensure meeting end-expiry specifications; 2) improve process capability for the manufacturability of mumps-containing vaccines in the future; and 3) provide leeway to develop an enhanced annual mumps stability program.

### 2.1.2    Recent Stability Investigations

Multiple regulatory interactions ensued since the declaration of tentative release potencies for mumps.    In August 2000, Team Biologics conducted an inspection of the Vaccine Manufacturing Facility. During the course of the inspection, the investigators took issue with the fact that Error & Accident Reports, as required by 21CFR §600.14, were not filed in response to mumps stability failures within the product shelf-life. Merck responded that the stability observed for pre-September 1999 out-of-specification (OOS) lots was consistent with historical performance of the product. In addition, Merck had been in active discussion with CBER since 1996 and recently received approval for manufacturing changes to ensure compliance of potency through expiry. Management reasoned that further notification in the form of Error & Accident Reports was not necessary.

CONFIDENTIAL

MRK-KRA00780220
MRK-CHA00780220

Appx19973


**Restricted**
**R** **Confidential**
*limited access*

In February 2001, Merck received a Warning Letter reiterating concerns from the Team Biologics inspection. With regard to M-M-R®$_{II}$ label claim compliance, they stated that "Products must meet their specifications, not the historical trend throughout the labeled expiry period." In addition, and more seriously, they challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). Merck responded that we agreed with their expectations and reiterated that all corrective actions necessary to meet label claim compliance have been taken. With regard to product efficacy, we provided an interim analysis of an ongoing mumps end-expiry trial to justify efficacy of lower potency product. CBER accepted the Merck response.

### 2.1.3   Initiation of Stability study

At CBER's recommendation, and due to potency losses after release and release assay variabilities, Merck designed a stability study with lots manufactured to the new mumps target and promised to set permanent release specifications with the data obtained from that study. Recent calculations show that the manufacturing target of 5.2 log TCID$_{50}$/dose and associated release potency of 5.0 log TCID$_{50}$/dose can support an end of expiry claim of 4.0 log TCID$_{50}$/dose (at 24 months dating), the intermediate dose used in the mumps end-expiry trial.

The model Merck has employed guarantees with a high degree of confidence the distribution of product retaining adequate potency through shelf-life. The calculation performed by CBER in 1999 was incomplete in having neglected to include all the elements associated with post-release potency losses, as well as an invalid calculation leading to underestimation of release assay variability. As a result the release potency at 5.0 log TCID$_{50}$/dose to support an end expiry claim of 4.3 log TCID$_{50}$/dose was low and could not be supported by the correct model. While Merck recognized this shortcoming, it felt that there was a high enough degree of uncertainty regarding current stability data of M-M-R®$_{II}$ vaccine that it couldn't provide a reliable release specification at that time. At CBER's recommendation, Merck designed a stability study with lots manufactured to the new mumps target and promised to set permanent release specifications with the data obtained from that study.

Recent calculations show that the manufacturing target of 5.2 log TCID$_{50}$/dose and associated release potency of 5.0 log TCID$_{50}$/dose can only support an end of expiry claim of 4.0 log TCID$_{50}$/dose (at 24 month dating), the dose demonstrated to be effective in an interim analysis of the mumps expiry trial. However, the model does not support an end expiry claim of 4.3 TCID$_{50}$/dose at end of shelf life (current estimations suggest a shelf life < 12 month, a potentially non-marketable shelf life).

## 3.   Mumps End-Expiry Clinical Trial

### 3.1   Selection of vaccine potencies

An End Expiry clinical study was designed using three different mumps potencies: 4.9 log TCID$_{50}$/dose (potency at release), 4.0 log TCID$_{50}$/dose (an intermediate potency), and 3.7 log TCID$_{50}$/dose (the lower mumps expiry potency specified in the EP). Lots were "aged" to the respective Mumps potencies of 4.0 and 3.7 log TCID$_{50}$/dose to mimic natural degradation of the product. Vaccines were incubated at room temperature (20 to 25C) for 48 and 84 days,

**CONFIDENTIAL**

**MRK-KRA00780221**
**MRK-CHA00780221**


Restricted
R  Confidential
limited access

respectively in order to achieve the targeted mumps potencies. Potencies were targeted so that the upper bounds of the 95% confidence intervals on the potencies were no greater than those desired for expiry.

**Table 1: Virus potencies and treatment conditions**

| Material | Measles (log $TCID_{50}$) | Mumps (log $TCID_{50}$) | Rubella (log $TCID_{50}$) | Treatment Conditions |
|---|---|---|---|---|
| Control | REDACTED – OMP | 4.9 | REDACTED – OMP | No Treatment |
| Sublot #1 | | 4.0 | | 48 days RT |
| Sublot #2 | | 3.7 | | 84 days RT |

### 3.2  Clinical assays used for the measurement of Mumps-specific responses.

Although ELISA-based assays have been used in more recent Merck M-M-R$^{®}_{II}$ clinical trials, CBER stated that for the purposes of the expiry protocols, a neutralizing antibody assay for mumps would be necessary. A new functional Mumps Neutralization assay (AIGENT or PRN assay) was therefore developed and validated. The validation package sent to CBER was based on the evaluation of 57 infants aged 12 to 23 months, immunized with M-M-R$^{®}_{II}$ and Varivax® concomitantly. Although 7 subjects had mumps-specific antibody at baseline, all 50 initially seronegative infants had adequate mumps antibody levels at 6 weeks post-immunization (100% seroconversion rate).

### 3.3  Clinical Study Design and Objectives

Healthy children, 12-18 months of age, were randomly assigned to receive 1 of 3 sublots from 1 parent filled lot of M-M-R®II, based on the Mumps potency (current release and two simulated expiry potencies) and followed for 42 days (primary immunogenicity endpoint) and 1 year (persistence endpoint). In addition to the study vaccine (M-M-R®II), study participants also received one dose of marketed, unaged, varicella monovalent vaccine (Varivax®) on the day of vaccination.

#### 3.3.1  The primary objective of the study was two-fold:

- To demonstrate similarity (noninferiority, δ=5 percentage points) in the proportion of children who developed Mumps neutralizing antibodies between children immunized with M-M-R$^{®}_{II}$ containing Mumps at 4.9 log $TCID_{50}$/dose (control group) and those receiving M-M-R$^{®}_{II}$ containing either Mumps at 4.0 log $TCID_{50}$/dose (test group #1) or 3.7 log $TCID_{50}$/dose (test group #2). Similarity corresponds to the 90% two-sided confidence interval for the difference in proportions excluding a decrease of 5 percentage points or more.

- To demonstrate that children receiving a simulated expiry dose of mumps containing vaccine would develop acceptable neutralizing antibodies to mumps. The statistical criterion requires that the lower bound of the 95% two-sided confidence interval on the observed proportion of children who develop neutralizing antibodies be >90%.

CONFIDENTIAL

MRK-KRA00780222
MRK-CHA00780222

**Restricted**
**R** ◇ **Confidential**
*limited access*



If the 4.0 log $TCID_{50}$/dose is found to be an acceptable expiry potency for mumps (i.e., both null hypotheses are rejected), then additional primary hypotheses will be tested comparing the release potency and the second sublot potency of 3.7 log $TCID_{50}$/dose. Both the similarity in the proportion of subjects developing mumps-specific neutralizing antibodies and the 95% confidence interval lower bound immune response acceptability criterion of 90% or higher immune response will be used.

### 3.3.2 *The* secondary objectives *were the following:*

- To show similarity (not more than 5 percentage points difference based on a 90% two-sided confidence interval) in the proportion of responders (as measured by seroconversion rates by ELISA at 6 weeks post-vaccination). The expected seroconversion rates to measles, mumps, and rubella in the control group were RE 95, REDAC respectively.

- To show that M-M-R®$_{II}$ containing either 4.0 log $TCID_{50}$/dose or 3.7 log $TCID_{50}$/dose of mumps will be generally safe and well tolerated.

## 4.    Current Status of Mumps End-Expiry Clinical Trial

### 4.1    *Clinical aspects of the Trial.*

The study was initiated in February 1999 and the enrollment of 1997 subjects (approximately 13% more than the targeted enrollment of 1770 subjects) was achieved in September 2000. By August 2001, about 1858/1997 subjects (93%) completed the 42 days post-vaccination follow-up and 1485/1997 (74.4%) completed the 1-year persistence section of the study.

Immunogenicity measurements
Serum samples were taken prior to vaccination and at 42 days and approximately 1 year post-vaccination to determine titer persistence.

- *Neutralizing antibody test*
  Samples were tested for mumps neutralizing antibodies by a plaque reduction neutralization (PRN) immunostaining based assay. Samples were tested at dilutions ranging from 1:32 through 1:4096, and those tested negative at all dilutions were assigned a titer of 1:16 and considered seronegative. A 4-fold rise in mumps antibody titer was required for a seroconversion in the assay.

- *ELISA assays*
  Samples were also tested for measles, mumps, and rubella antibodies by the enzyme-linked immunosorbent assay (ELISA) and for varicella by the glycoprotein antigen-based enzyme-linked immunosorbent assay (gpELISA).

  For mumps, the seroconversion rate is the proportion of subjects who are seronegative (antibody titers <10 ELISA Ab units) at baseline and are seropositive (antibody titers >10 ELISA Ab units) 6 weeks post-vaccination. Although there is currently no WHO

**CONFIDENTIAL**                                                           **MRK-KRA00780223**
                                                                           **MRK-CHA00780223**

Restricted
R ⊖ Confidential
limited access

seroprotective cutoff for mumps, a cutoff of 10 ELISA Ab units is 4-fold greater than the seroprotective cutoff utilized in the previous non-wild-type mumps ELISA assay.

- Note: Although both PRN and ELISA were to be performed for samples obtained at 1 year post-vaccination, only ELISA was performed after an agreement was achieved with CBER based on the strong concordance between mumps PRN and ELISA assays.

### 4.2    *Plaque Reduction Neutralization (PRN) Antibody results.*

#### 4.2.1    *Interim analysis based on the three treatment groups*

An interim analysis of the immunogenicity for mumps neutralizing antibody was planned on a randomly selected subset of approximately 600 subjects (~200 per group) in order to provide an early read of the mumps immunogenicity data as measured in the PRN assay in the expiry groups. Analysis was performed by an unblinded statistician not associated with the study.

Results showed seroconversion rates of 94.6% (CI 90.1%, 97.5%), 93.1% (CI 88.3%, 96.4%), and 88% (CI 82.1%, 92.5%) among the control mumps release potency group (4.9 log $TCID_{50}$/dose), high simulated (4.0 log $TCID_{50}$/dose), and low simulated (3.7 log $TCID_{50}$/dose) mumps expiry titer groups (Table 2). Based on the interim results and on a final enrollment of 1997 subjects, the probability of meeting the 90% lower bound criterion for the high simulated (4.0 log $TCID_{50}$/dose) mumps expiry group was estimated to be approximately 70%. Of note, the observed seroconversion rate in the control group was 94.6% in comparison to those measured during the PRN assay validation with 100% seroconversion.

The reverse cumulative distribution of mumps antibody titers was similar when comparing subjects in the control release potency group and those immunized with the highest simulated mumps expiry potency. However, a slight difference in the mumps antibody response titers was observed between the control group and the lowest simulated mumps expiry potency group (Table 3).

CONFIDENTIAL

MRK-KRA00780224
MRK-CHA00780224

**Appx19977**



Restricted
Confidential
limited access

*Table 2: Interim Summary of the Percent of Subjects Who Develop Neutralizing Antibodies to Mumps,[†] Geometric Mean Titers (GMTs), and Median Titers and Associated 95% Confidence Intervals in Initially Seronegative Subjects[‡]*

| | Treatment Group | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ~4.9 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 186) | | | ≤4.0 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 196) | | | ≤3.7 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 183) | | |
| Parameter | n | Observed Response | 95% CI | n | Observed Response | 95% CI | n | Observed Response | 95% CI |
| SCR | 168 | 94.6% | (90.1%, 97.5%) | 175 | 93.1% | (88.3%, 96.4%) | 167 | 88.0% | (82.1%, 92.5%) |
| GMT | 168 | 1290.2 | (1054.9, 1577.9) | 175 | 1361.9 | (1102.5, 1682.4) | 167 | 1028.3 | (791.2, 1336.4) |
| Median Titer | 168 | 2048 | (1591.3, 2635.8) | 175 | 2048 | (1571.5, 2668.9) | 167 | 2048 | (1475.5, 2844.5) |

[†] ≥4-fold rise in antibody titer, i.e., 1:16 to 1:64 where 1:16 is assigned to titers below 1:32, the limit of detection.

[‡] Regardless of protocol violations or day ranges.

N = From the randomly selected subset, the number of subjects vaccinated in each treatment group.

n = From the randomly selected subset, the number of initially seronegative subjects in each treatment group with postvaccination serology.

CRRC Oct2; Background package

11

CONFIDENTIAL

Restricted
R Confidential
limited access

*Table 3: Reverse Cumulative Distribution of Mumps Titers 6 Weeks Postvaccination as Measured by Neutralization in Initially Seronegative Subjects by Treatment Group*



10/02/02

CONFIDENTIAL

MRK-KRA00780226
MRK-CHA00780226

Restricted
R ⊖ Confidential
limited access



### 4.2.2   *Preliminary analysis based on the overall seroconversion rates*

First serum samples were sent to Merck Virus and Cell Biology laboratory in May 1999. Because the PRN assay was not fully developed REDACTED – OMP
REDACTED – OMP                    serum samples were thawed in August 2000 RED
REDACTED – OMP           After the validation assays were completed, approximately 1997 serum pairs were tested by PRN between December 2000 and August 2001. Following CBER inspection, testing was suspended and the lab was instructed to retest a subset of serum samples for which results were declared invalid by CBER (clerical errors, …). Serum samples remained stored at 4°C while waiting for CBER to agree to recommence testing. Because of the delay in CBER response, retests were started in June 2002 and samples were kept at 4°C beyond the storage limit (maximum of 1 year at 4°C) as specified in the laboratory Standard Operational Procedures (SOP).

The effect of long term storage on PRN results was evaluated on a subset (78 paired samples) by comparing the original and the retest results. These samples were selected because although results were technically correct in the primary run, assays were declared invalid due to clerical errors in scoring plaques in the negative control (no virus) wells. All results of internal controls (high and low positive adult sera stored as frozen aliquots) in the retest assays were comparable to values obtained in the primary run, underscoring the lack of change in the assay performance. The retest results were significantly different from the original results with a significantly lower seroconversion rate as well as lower geometric mean titers (~3 fold difference).

In a blinded analysis of the PRN assay results, the overall seroconversion rate for all 1799 complete serum pairs was 88.1%. However, a higher seroconversion rate (91.9%) was observed for serum pairs tested within the SOP specified 1 year storage limit compared to 66.4% for those tested outside the 1 year window period (Table 4), underscoring conclusions derived from the comparison of original and retest results from the subset of 78 pair samples (see above). Given the significant decline in antibody levels, the team has proposed to invalidate data from the testing carried out in June-August 2002 on ~300 pairs stored over 1 year at 4°C.

A subset of field retained serum samples was obtained from the study sites. These samples were stored at temperature of –20°C or below and could be used for the testing of samples deemed invalid. Only 1/3 of the 300 invalid pairs are available for a new round of PRN testing.

10/02/02

Restricted
R ⟐ Confidential
limited access

*Table 4: Preliminary evaluation of the overall seroconversion rate by PRN assay*

| Testing Period | Length of Storage (4°C) | Number of pairs tested | Number of complete pairs | Positive at baseline (%) | Seroconversion rates | Median Titers |
|---|---|---|---|---|---|---|
| Dec-00 to Aug-01 | < 1 year | 1686 | 1537 | 222(14.4%) | 91.9% | 2048 |
| Jun-02 to Aug-02 | > 1 year | 264 | 262 | 30 (11.5%) | 66.4% | 512 |
| | Overall (No limit) | 1950 | 1799 | 252 (14%) | 88.1% | 2048 |

### 4.2.3    Preliminary ELISA results.

The preliminary ELISA results showed comparable seroconversion rates between the control group and subjects who received M-M-R®$_{II}$ containing 4.0 log TCID$_{50}$/dose, with seroconversion rates of 98 % (confidence interval 96.6%, 99%) and 97.3% (confidence interval 95.7-98.5%), respectively. The difference between the 2 groups was less than 5 percentage points and the lower bound for the 95% confidence interval in the tested group was above 90% (Table 5).

The seroconversion rate was lower (93.9%; CI 91.7%, 95.7%) among subjects who received M-M-R®$_{II}$ containing the lowest tested potency (3.7 log TCID$_{50}$/dose), and although the lower bound for the 95% confidence interval was >90%, the difference in the proportion of responders between the control and the tested groups (observed at 4.1% with CI between 6.1% and 2.3%) did not satisfy the statistical criteria for similarity.

10/02/02

**MRK-KRA00780228**
**MRK-CHA00780228**

**Appx19981**

Restricted
R Confidential
limited access

*Table 5: Preliminary Summary of the Mumps Seroconversion Rate (SCR - as Measured by the Wild-Type Mumps ELISA)[†],[‡]*
*Geometric Mean Titers (GMTs), and Median Titers and Associated 95% Confidence Intervals in Initially Seronegative Subjects[‡]*

| | Treatment Group | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ~4.9 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 671) | | | ≤4.0 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 659) | | | ≤3.7 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 660) | | |
| Parameter | n | Observed Response | 95% CI | n | Observed Response | 95% CI [§] | n | Observed Response | 95% CI [§] |
| SCR | 606 | 98.0% (594/606) | (96.6%, 99.0%) | 599 | 97.3% (583/599) | (95.7%, 98.5%)[ǁ] | 591 | 93.9% (555/591) | (91.7%, 95.7%)[ǁ] |
| GMT | 606 | 84.8 | (78.6, 91.5) | 599 | 84.9 | (78.8, 91.4) | 591 | 83.2 | (76.2, 90.9) |

[†] Samples with antibody titers <10 are considered seronegative, while samples with antibody titers ≥10 are considered seropositive.

[‡] Regardless of protocol violations or day ranges.

[§] The lower bound of the 95% CI being >90% implies that the value of the parameter is statistically significantly greater than the pre-specified acceptability criterion (90%) and allows for a conclusion of acceptability.

[ǁ] p-value < 0.001

N = Number of subjects vaccinated in each treatment group.

n = The number of initially seronegative subjects in each treatment group with postvaccination serology.

CI = Confidence Interval.

10/02/02

CONFIDENTIAL

MRK-KRA00780229
MRK-CHA00780229

Appx19982



Restricted
R Confidential
limited access

**Table 6: Reverse Cumulative Distribution of Mumps Titers 6 Weeks Postvaccination as Measured by the Wild-Type Mumps ELISA in Initially Seronegative[†] Subjects by Treatment Group[‡]**



V205-7 A2B  May 23, 2001

[†] Samples with antibody titers <10 are considered seronegative.
[‡] Regardless of protocol violations or day ranges.

10/02/02

**CONFIDENTIAL**

**MRK-KRA00780230**
**MRK-CHA00780230**



Restricted
**R** ☼ Confidential
*limited access*

## 5. Statistical evaluation for Study Success

M-M-R®$_{II}$ Protocol 007 was originally powered (92.4%) on a total sample size of 1770 subjects (protocol amendment 1). It was assumed that approximately 5% would be seropositive at baseline to mumps (based on the PRN assay – the assay had not been developed at the time, thus there were no data to support this assumption), that 10% would be lost to follow-up (or for other violations), and that the response rates (seroconversion) for the three treatment groups (release group, and two expiry groups) would be 95%. (NOTE: If the true response rate for the release group was 95% and the true response rate for the two expiry groups was 94%, the overall power dropped to 72.7%). Thus, it was assumed that approximately 1506 subjects (502 per group) would be available for the primary mumps PRN analyses. In order for an expiry dose to be acceptable, it must be similar (using a 5 percentage point non-inferiority margin) to the release dose, and have an acceptable response rate (95% confidence interval lower bound greater than 90%).

The final enrollment for the study was, in fact, 1997 subjects. The study was intentionally over-enrolled due to the expected lower response rates using the mumps PRN assay. At this point it is known that approximately 130 subjects have a missing baseline and/or 6-week serology result, and that approximately 300 subjects will be excluded due to the 2002 test issue. In addition, based on a preliminary review of the serology data still blinded to treatment group, approximately 14% of the subjects tested positive to mumps at baseline based on the mumps PRN assay. Thus, prior to flagging any of the other violations (e.g., day range violations, development of disease), the approximate number of subjects available for the primary mumps PRN analyses is 1314 (approximately 438 per group).

Based on the preliminary subset analysis performed in 1Q01 (approximately 600 subjects, 510 evaluable), the overall seroconversion rate (based on the PRN assay) was 92.0% (469/510), and the seroconversion rates for the release (4.9 log $TCID_{50}$) and the test (4.0 log $TCID_{50}$) mumps potency groups were 94.6% (159/168) and 93.1% (163/175), respectively. Given these estimates, the probability of meeting the acceptability hypothesis for the 4.0 mumps potency group was estimated to be approximately 70%, assuming the total sample size at the end of the study was 1997. These estimates, however, were based on the modified SOP rules, which CBER did not accept. Upon applying the original SOP rules to the subset, the overall seroconversion rate increased to 93.0% (409/440) [the unblinded treatment group estimates were not recalculated]. Using all the unscreened serology data currently available, the overall seroconversion rate is 91.9% (1208/1315).

Assuming that after applying flags for other violations that 1290 subjects (430 per group) are evaluable for the primary PRN analyses, the lowest response rate that could be observed in the 4.0 mumps potency group and still meet the acceptability lower bound of 90% is 93.3% (401/430). If the release group is assumed to have a response rate of 95%, the lowest observed response rate that could be observed and still meet the similarity hypothesis is 93.0% (400/430). Given the response rates observed at the interim analysis and the current overall seroconversion estimate, it is quite possible that this study will fail on one or both of the primary hypotheses.

The goal throughout the development of the mumps PRN assay was to create an assay that achieved a 95% seroconversion rate. Utilizing input from CBER, Merck was able to obtain a

10/02/02

Restricted
R ⊖ Confidential
limited access



seroconversion estimate of 100% (50/50) in the validation of the assay, with a 95% confidence interval of (94.2%, 100%). Based on the lower bound of the confidence interval being less than 95% and the supporting evidence from the interim analysis (the seroconversion estimate of the release group was 94.6%), the true assay performance may be less than 95%. Even with only slight deviations from 95%, the overall power for the study, especially for the lower bound of 90% criterion, is greatly impacted.

Given the stringent criteria set forth by CBER for the study which included both a 5 percentage point equivalence margin and a lower bound criterion of 90%, there is concern that the study may fail on either one or both of the criteria due to the decrease in evaluable sample size and the uncertainty in the mumps PRN assay performance. In the table below are power estimates for the comparison of an Expiry Group to the Release Group based on the expected evaluable sample size of 430 per group. These estimates are calculated based on various hypothetical response rates for the two groups. The power estimates incorporate both the equivalence hypothesis and the lower bound hypothesis.

*Table 7: Power to Rule Out a Difference of 5.0 Percentage Points and a Lower Bound of 90% with 430 Evaluable Subjects Per Group*

| Expected True Rate in Control Group | True Decrease Between Control and Mumps Expiry Group | | |
|---|---|---|---|
| | 0.0 Percentage Points | 1.0 Percentage Points | 2.0 Percentage Points |
| 96% | 97.1% | 83.6% | 51.9% |
| 95% | 92.5%[†] | 67.5% | 30.9% |
| 94% | 77.0% | 41.4% | 13.5% |
| 93% | 48.5% | 18.4% | 4.4% |
| 92% | 22.0% | 6.1% | 1.1% |

[†] Based on 502 evaluable subjects in the original protocol, the power was 96.1%.

*Equivalence $\alpha = 0.05$ (One-sided), Lower Bound $\alpha = 0.025$ (One-sided)*

10/02/02

CONFIDENTIAL

MRK-KRA00780232
MRK-CHA00780232

Restricted
R ☺ Confidential
*limited access*



## 6. Impact of Mumps End Expiry Trial on Compliance, Manufacturing, and Marketing of M-M-R®II

Preliminary results from the M-M-R®II stability studies suggest that the current mumps release potency of 5.0 log $TCID_{50}$/dose does not support an end-expiry mumps potency of 4.3 log $TCID_{50}$/dose after 24 months storage at 2-8°C as specified in the M-M-R®II label. The failure to secure a 4.0 log $TCID_{50}$/dose will imply the revision and lowering of the vaccine shelf-life. In close collaboration with MMD, the team is actively evaluating the magnitude of the issue and the associated marketing implications. A tightening of the manufacturing specifications such as a reduction of the time out of refrigeration (TOR) and an improvement of the biological assays used for the measurement for the virus potency are being considered. Also, issues related to the mumps end-expiry trial has hampered the filing of M-M-R®II in Japan (through our partner Kaketsuken). Maintenance of a mumps end-expiry at 4.3 log $TCID_{50}$/dose and the reduction of the vaccine shelf-life will significantly decrease the competitive advantage of Kaketsuken over other local vaccines manufacturers (anticipated 24 months self-life for M-M--R®II versus 12 months for other measles-containing vaccines marketed in Japan).

## 7. Impact on Mumps Bulk Vaccine Manufacturing

The Mumps stability issue has two primary impacts in manufacturing, at the filling, formulation, and release of M-M-R®<sub>II</sub> and at the level of bulk vaccine manufacturing. In order to meet the claimed expiry titer for 24 months, the team is evaluating several scenarios one of which is that additional mumps bulk (approximately 0.2 $log_{10}$ $TCID_{50}$/dose) would need to be added during final product formulation in order to release the finished product at a higher titer. A direct consequence of this change would be the need to implement an upper potency specification to ensure that release lots do not exceed historically defined limits associated with known safety and tolerability. This would impose a potential manufacturing window of 0.4 $log_{10}$ $TCID_{50}$/dose (between minimum and maximum specification). In order to fill within this manufacturing window, additional potency testing (~20-40%) would be required to release lots within specifications due to potency assay variability. In addition, there may be an increase in rejected M-M-R®<sub>II</sub> lots that would not meet either specification.

The increase in Mumps bulk volume would consume the bulk vaccine at ~63% greater rate. In order to support the increased bulk consumption, the capacity of the 100 Unit, where the bulk vaccine product is manufactured, is also impacted. Currently, Mumps is manufactured in the 100 Unit and the facility's capacity is approximately nine pooled lots per year. Assuming that three to four mumps pools per year are required to meet current market demand for M-M-R®II, the proposed increased final formulation requirement would fit within the 100 Unit's current capacity to manufacture Mumps bulk vaccine. However, the 100 Unit will be upgraded in 2003 to improve the facility infrastructure, to meet EP regulatory requirements, and to make the facility a shared suite for manufacturing both Measles and Mumps bulk vaccine. The transfer of Measles manufacturing from the 300 Unit into this facility will reduce the Mumps capacity 40-50% (RE **REDACTED – OMP** ). The increased final formulation requirement together with the proposed reduction in the 100 Unit Mumps capacity could take future Mumps manufacturing to the edge of the Unit's capacity.

10/02/02

Restricted
R ⊘ Confidential
*limited access*

## 8. Impact on Marketing

An adjustment to the shelf life of M-M-R®$_{II}$ from 24 to 18 or 12 months will have a commercial impact on the business in several ways:

- Domestic and international increased product write offs due to heightened customer returns and shortened inventory management time frames,
- International loss of share due to a competitive disadvantage (competitors at 24 months)
- International increased risk of local market acceptability by modifying purchase &/or regulatory requirements in some countries (i.e. Korea, New Zealand)
- International ability to participate in certain tenders requiring minimum fixed shelf life at delivery.
- Domestic and International incremental investment in sales representative/promotional emphasis to educate customers/customer service handing and corresponding opportunity costs.

Domestically, dollar ($) revenue impact will be minimal for either an 18 or 12 month end expiry scenario assuming no competition. However, the shorter the shelf life the more significant the write-offs, destruction, customer returns costs and inventory management costs will be. This will require further investigation to project costs.

Internationally, the time from packaging until the product is salable in market varies due to local release requirements (in some cases up to 5 months). A necessary action step will require that each country's release and distribution process has to be reviewed for the opportunity to find more efficiencies as well as assessing revenue impact for each individual country

In the interim, the estimate for the an 18 month shelf life and a 12 month shelf life are as follows (based on calculations using baseline LROP 2003 to 2011):

- 18 month Scenario - assuming a loss of 15% in market share in international markets (Europe and ROW) projects to a revenue impact of $212 million for the LROP period.

- 12 month scenario - assuming a loss of 35% in market share in international markets (Europe and ROW) projects to a revenue impact of $496 million through the LROP time frame.

## 9. Conclusions and Path forward

Based upon the issues described above with the retest samples, a background document was sent to CBER to request concurrence on the following:

- Invalidate the results from the June-August 2002 retest due to the significant decline in antibody titers associated with extended (well beyond one year) storage at 4°C.

- Perform a primary immunogenicity analysis for the mumps PRN assay based on a per-protocol approach, excluding subjects identified as protocol violators and excluding subjects whose mumps PRN samples were tested during June-August 2002.

10/02/02



- Test by PRN assay available frozen retention samples from the study sites for some of the invalid mumps PRN samples (approximately 1/3 of the 300 pairs) and that the results be included in the clinical study database. x

- Perform a separate mumps PRN immunogenicity analysis that includes the results from the frozen retention samples.

As a result of these issues the team is now proposing the following recommendations:

1. Accelerate the new stabilizer program for M-M-R$^®_{II}$ in order to improve the stability and the tolerability of the vaccine. If program is initiated in 1Q03 – timing of file without clinical trial / cross referencing ProQuad $_{refrigerated}$ would be 3-4Q05 – timing of file with clinical trial would be 1-2Q06.

2. The team is also evaluating other options to be considered as short term fixes, since a new stabilizer program would require approximately three years before being implemented. The options and risks are outlined below:
   - Maintaining 4.3 log TCID50/dose expiry potency specification- evaluation underway to define conditions to achieve a shelf-life of 18 months if possible (such as reduction of TOR or time post reconstitution etc).
   - Change label to reflect lower than 96% protection – this would require negotiating with CBER to relax the criteria of success; however, this would lower the bar for the competition.
   - Repeat Mumps End Expiry Study – issues include technical feasibility, time to completion with no assurance that we would succeed the second time, and completing the study and filing would potentially consume the same timeframe required to correct the stability problem by accelerating the new stabilizer program.
   - Increase overfill level of mumps – issues include manufacturing capacity limitations and lack of adequate safety data to support overfill.

10/02/02

**CONFIDENTIAL**

Restricted
R ⊙ Confidential
_limited access_

## 10. References

1. McAleer W.J., Markus H.Z., McLean A.A., Buynak E.B. and Hilleman M.R. 1980. Stability on storage at various temperatures of live measles, mumps, and rubella virus vaccines in a new stabilizer. J Biol Stand;8:281-287

2. Stokes J., Weibel R.E., Buynak E.B. and Hilleman M.R. 1967. Live attenuated Mumps virus vaccine. II Early clinical studies. Pediatrics;39:363-371

3. Buynak E.B., Weibel R.E., Whitman J.E., Stokes J. and Hilleman M.R. 1969. Combined live measles, mumps, and rubella virus vaccine. JAMA;207:2259-62

10/02/02

**CONFIDENTIAL**

**MRK-KRA00780236**
**MRK-CHA00780236**

**Appx19989**

# M-M-R®<sub>II</sub>

Protocol #007 - Mumps End Expiry study:
AIGENT Assay Issues and Impact on Study Criteria

Presenters:

Manal Morsy: Regulatory
Jonathan Hartzel: BARDS

J. Bramble: PDT leader
A. Shaw: Virus & Cell Biology

CRRC
October 08, 2002

1

CONFIDENTIAL

MRK-KRA00780237
MRK-CHA00780237

Appx19990

# M-M-R®$_{II}$

## Presentation Goals/ Decisions Requested

- **Purpose:**

  - **Update CRRC on:**

    » **Status of Mumps End Expiry study #007**

    » **Estimated risk of failing study criteria of success**

  - **Review options under evaluation to support the current mumps expiry titer (4.3 log TCID50) through end of shelf-life**

  - **Request CRRC support to accelerate the M-M-R®II New Stabilizer program (long-term fix for maintaining stability through product shelf-life)**

CONFIDENTIAL

MRK-KRA00780238
MRK-CHA00780238

Appx19991

3

# M-M-R®$_{II}$
## Presentation Agenda

- **Agenda:**

  » **Background**

  » **Mumps End Expiry Clinical Trial : current status**

  » Statistical evaluation for study success

  » Impact of mumps end expiry study outcome
     » Regulatory compliance
     » Filing in Japan

  » Short-term options under evaluation

  » Decision requested

CONFIDENTIAL

MRK-KRA00780239
MRK-CHA00780239

**Appx19992**

4

# Mumps End Expiry Study (#007): Background

- In 1996, CBER noted that the minimum release spec for mumps equals minimum claimed potency (i.e. no allowance for stability losses over claimed shelf-life)

- Merck committed to a clinical study to evaluate lower end expiry potencies.

- In 1999, CBER specified that the mumps minimum release potency be set at 5.0 log $TCID_{50}$/dose to support an end expiry claim of 4.3 log $TCID_{50}$/dose.

- The release potency recommended by CBER neglected to include all elements, including a full accounting of post-release losses

CONFIDENTIAL

MRK-KRA00780240
MRK-CHA00780240

Appx19993

# Mumps End Expiry Study (#007): Background

- Multiple regulatory interactions ensued, which led to Merck commitment to:

  » (1) increase the mumps fill target to meet a tentative release limit of 4.3 log $TCID_{50}$/dose

  » (2) design a stability study with lots manufactured to the new mumps target and

  » (3) set permanent release specifications with the data obtained from that study.

5

CONFIDENTIAL

# Mumps End Expiry:
## Clinical Study (#007)

- Objective:

  Comparison of the immunogenicity of M-M-R®$_{II}$ at potencies (3.7 & 4.0 log TCID$_{50}$) below claimed end expiry (4.3 log TCID$_{50}$) to M-M-R®$_{II}$ with a standard release potency (4.9 log TCID$_{50}$)

- Vaccination Group/ Number of Subjects

  » M-M-R®$_{II}$ (mumps potency 4.9 log TCID$_{50}$) - 590
  » M-M-R®$_{II}$ (mumps potency 4.0 log TCID$_{50}$) - 590
  » M-M-R®$_{II}$ (mumps potency 3.7 log TCID$_{50}$) - 590

- Blood samples at Day 1 and 42 (+ 1yr persistence)

- Enrollment complete.  FPI:  Feb99; LPO (day 42):  Sept00

6

CONFIDENTIAL

MRK-KRA00780242
MRK-CHA00780242

Appx19995

7

# Mumps End Expiry Study (#007): Issues

- AIGENT Assay (PRN)

  » New functional antibody assay developed at the request of CBER

  » CBER Inspection of serology laboratory resulted in concerns over GMP issues (i.e. data handling, spreadsheet validation, etc.) in August 2001

  » Invalid samples identified for retesting – sample storage exceeds 1 year time limit specified by SOP; issue communicated to CBER

  » CBER requested that a retest analysis be performed on subset of samples in April 2002 (to compare original and retest results)

CONFIDENTIAL

MRK-KRA00780243
MRK-CHA00780243

Appx19996

8

# Mumps End-Expiry Trial: Timeline



**February 1999**: First Patient In (FPI)

**August 2000**: REDACTED – OMP
(Thawing of first specimen and Storage at 4°C)

**September 2000**: Last Patient Out (LPO)

**December 2000**: Start of Mumps PRN testing

**August 2001**: - End of Mumps PRN testing (Primary testing period)
- CBER inspection – resolution in May 2002

**June-August 2002** : Retest of Invalid assays by PRN (Second testing period)

CONFIDENTIAL

9

# Mumps End Expiry Study (#007): Status

- CBER Communication

  » Background Document to CBER - September 20

  » Obtain concurrence on invalidating test results from 2002 and testing of available frozen retains from this subset

CONFIDENTIAL

10

# M-M-R®$_{\mathrm{II}}$
## Presentation Agenda

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » **Statistical evaluation for study success**

  » Impact of mumps end expiry study outcome
    » Regulatory compliance
    » Filing in Japan

  » Short-term options under evaluation

  » Decision requested

CONFIDENTIAL

11

# Criteria for Acceptable Mumps End Expiry Dose

- Primary endpoint based on a mumps neutralization assay

- End expiry dose must be similar (non-inferior) to the release dose

  » 5 percentage point non-inferiority margin

  » One-sided alpha of 0.05

- End expiry dose must have an acceptable antibody response

  » Lower bound of the 95% two-sided confidence interval >90%.

CONFIDENTIAL

MRK-KRA00780247
MRK-CHA00780247

Appx20000