**23-2553**

IN THE

# United States Court of Appeals

FOR THE THIRD CIRCUIT



UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

*On Appeal from the United States District Court
for the Eastern of District of Pennsylvania
The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK*

## JOINT APPENDIX
## VOLUME XLIII OF XLV
## Pages Appx20001 to Appx20500
## (Filed Under Seal)

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*

# Table of Contents

**Page**

### Volume III
### (Filed Under Seal)

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
(Doc. 250) ................................................................... Appx181

Statement of Material Facts by Defendant in Support of
Its First Dispositive Motion, dated October 25, 2019
(Doc. 281-3) ............................................................... Appx185

Statement of Material Facts by Defendant in Support of
Its Fourth Dispositive Motion, dated October 25, 2019
(Doc. 287-3) ............................................................... Appx247

Statement of Material Facts by Relators,
dated October 25, 2019 (Doc. 294) .......................... Appx295

Declaration of Gary Reilly, for Relators,
in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

Exhibit 1 to Reilly Declaration -
Expert Report of Eugene Shapiro, M.D.,
dated March 13, 2018. ........................................... Appx438

Exhibit 2 to Reilly Declaration -
Expert Report of Dr. Robert Malone, M.D.,
dated March 13, 2018 ............................................. Appx460
***(Cont'd in Vol IV)***

### Volume IV
### (Filed Under Seal)

Exhibit 3 to Reilly Declaration -
Expert Report of David A. Kessler, M.D.,
dated March 14, 2018, with Schedules
and Appendices ...................................................... Appx551
***(Cont'd in Vol V)***

**Table of Contents**
**(Continued)**

**Page**

**Volume V**
**(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ...................................................... Appx1483
*(Cont'd in Vol VI)*

**Volume VI**
**(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 .............................................................. Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018 ...................................................... Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017 ......................................................... Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018 ....................................................... Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016 ....................................................... Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 .............................................................. Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 .............................................................. Appx1945

**Table of Contents**
**(Continued)**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ............................ Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 ............................................................. Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
*(Cont'd in Vol VII)*

**Volume VII**
**(Filed Under Seal)**

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 ........................................................... Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ............................................................ Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 ............................................................ Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) .................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ........................................ Appx2232

**Table of Contents**
**(Continued)**

**Page**

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ............................................................ Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ....................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ................................................................. Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ................................................................. Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018 ... Appx2476
*(Cont'd in Vol VIII)*

**Volume VIII**
**(Filed Under Seal)**

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ................................................................. Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) ............................................................ Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ............................................................ Appx2538

**Table of Contents**
**(Continued)**

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................ Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ....................................................... Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 ........................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ....................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) ................................................... Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

**Table of Contents**
**(Continued)**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ....................... Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ..................................................... Appx2938
*(Cont'd in Vol IX)*

**Volume IX**
**(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 .......................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 ..................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 ........................................................ Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) .......................................................... Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) ..................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 .............................................................. Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) ..................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) ..................................................... Appx3552

**Table of Contents**
**(Continued)**

**Page**

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

**Table of Contents**
**(Continued)**

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ...................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 ............................................................... Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ...................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ........................................................ Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ...................................................... Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

**Table of Contents**
**(Continued)**

**Page**

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ..................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ..................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) ..................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................ Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ..................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ......................................................... Appx3910

**Table of Contents**
**(Continued)**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ....................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ....................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ........................ Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) ..................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) ......................................................... Appx3991
*(Cont'd in Vol XI)*

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

**Table of Contents**
**(Continued)**

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ...................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ...................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ....................................................... Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ....................................................... Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ....................................................... Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ...................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ...................... Appx4091

**Table of Contents**
**(Continued)**

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) ..................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) .......................................................... Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) .................................................... Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) .......................................................... Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) .......................................................... Appx4227

**Table of Contents**
**(Continued)**

**Page**

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ...................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ...................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ...................................................... Appx4467

**Table of Contents**
**(Continued)**

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) .................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) .................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 ................................................................. Appx4497
*(Cont'd in Vol XII)*

**Volume XII**
**(Filed Under Seal)**

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016 .................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) .................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) ................................................... Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

**Table of Contents**
**(Continued)**

**Page**

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ...................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 ........................................................... Appx4879
*(Cont'd in Vol XIII)*

**Volume XIII**
**(Filed Under Seal)**

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ...................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ........................................................ Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) ........................................................... Appx5103

**Table of Contents**
**(Continued)**

**Page**

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) ......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) ..................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ....................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ............... Appx5158

**Table of Contents**
(Continued)

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) .................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ................ Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ....................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

**Table of Contents**
**(Continued)**

**Page**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ................................................ Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) ..................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) .......................................... Appx5466
***(Cont'd in Vol XIV)***

**Volume XIV**
**(Filed Under Seal)**

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) ..................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

xix

**Table of Contents**
**(Continued)**

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................. Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ...................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ........................................................ Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ....................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ........................................................... Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ........................................................ Appx5868

**Table of Contents**
**(Continued)**

**Page**

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ..................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ..................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ..................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ..................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ..................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ..................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ..................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ..................................................... Appx5892

**Table of Contents**
**(Continued)**

**Page**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 ......................................................... Appx5896
*(Cont'd in Vol XV)*

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 ........................................................ Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ......................................................... Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) ..................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................. Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) ............................................... Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

**Table of Contents**
**(Continued)**

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) ..................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) ................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

**Table of Contents**
**(Continued)**

**Page**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) .................................................... Appx6493
*(Cont'd in Vol XVI)*

**Volume XVI**
**(Filed Under Seal)**

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) .................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

**Table of Contents**
**(Continued)**

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ....................... Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 ............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ..................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ....................................................... Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ....................................................... Appx6645

**Table of Contents**
**(Continued)**

**Page**

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ..................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017 ........................................................ Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ..................................................... Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ..................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 ........................................................ Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ..................... Appx6830

**Table of Contents**
**(Continued)**

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ......................... Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) .................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ...................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ........................ Appx7000
*(Cont'd in Vol XVII)*

**Volume XVII**
**(Filed Under Seal)**

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ....................... Appx7010

**Table of Contents**
**(Continued)**

**Page**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 ......................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ...................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ............... Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ....................... Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) .......................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 ......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 .............................................................. Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ...................................... Appx7169

**Table of Contents**
**(Continued)**

**Page**

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ............................................................ Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ............................................................ Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ............................................................ Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ............................................................ Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ............................................................ Appx7202

**Table of Contents**
(Continued)

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) .............................................................................. Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ......................................................... Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ............................ Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ......................................................... Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 ............................................................. Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 ......................................................... Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 .............................................................. Appx7403
***(Cont'd in Vol XVIII)***

**Table of Contents**
**(Continued)**

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 .............................................................. Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ....................... Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ...................................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) ..................................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 ................................................................. Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................ Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................ Appx7609

xxxi

**Table of Contents**
**(Continued)**

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014) ................................................................. Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 ........................................................ Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 ................................................................. Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008 ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) ................................................. Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................ Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

**Table of Contents**
**(Continued)**

**Page**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC ..................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC ..................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................. Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................. Appx7987
*(Cont'd in Vol XIX)*

**Volume XIX**
**(Filed Under Seal)**

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC ..................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC ..................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC ..................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC ..................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC ..................................... Appx8127

**Table of Contents**
**(Continued)**

**Page**

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC ..................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ...................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ........................................................ Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 ................................................. Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 ........................................................... Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) ........................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) ........................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) ........................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) ........................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ........................................................ Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ........................................................ Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ........................................................ Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ........................................................ Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ........................................................ Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ........................................................ Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ........................................................ Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ........................................................ Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ........................................................ Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ........................................................ Appx8395

**Table of Contents**
**(Continued)**

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) .......................................................... Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) .......................................................... Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) .......................................................... Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) .......................................................... Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 ............................................................... Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) ................................................... Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) ..................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) ..................................................... Appx8478
*(Cont'd in Vol XX)*

**<u>Table of Contents</u>**
**(Continued)**

**Page**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) .................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) .................................................. Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) .................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) .................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) .................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) .................................................. Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) .................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) .................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) ................................................. Appx8718

**Table of Contents**
**(Continued)**

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ..................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ..................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ..................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ..................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ..................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ................................................... Appx8996
*(Cont'd in Vol XXI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) .................................................. Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) ...................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) ...................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) ...................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) .................................................. Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) ...................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) ...................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

**Table of Contents**
(Continued)

Page

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 ................................................................ Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

**Table of Contents**
**(Continued)**

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ...................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ...................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ........................................................ Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ...................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ......................................................... Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ......................................................... Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ...................................................... Appx9420

**Table of Contents**
(Continued)

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) .................................................................... Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ............................................................ Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) .......................................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 ..................................................... Appx9448
*(Cont'd in Vol XXII)*

**Volume XXII**
**(Filed Under Seal)**

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ............................................................ Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 ......................................................... Appx9621

Declaration of Lisa C. Dykstra in Support of
Defendant's Motions for Summary Judgment,
executed October 25, 2019 (Doc. 295) .................................. Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

**Table of Contents**
**(Continued)**

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 ................................................................ Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) .......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ....................................................... Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 ......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 ................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................. Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) ................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) ................................................... Appx9805
*(Cont'd in Vol XXIII)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXIII**
**(Filed Under Seal)**

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D. .................................................. Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) .................................................. Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016 .......................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) .................................................. Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ................ Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) .................................................. Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107) ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
**(Continued)**

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) ..................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................. Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) ................................................... Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) .................................................. Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) .................................................. Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

**Table of Contents**
**(Continued)**

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ....................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

**Table of Contents**
**(Continued)**

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 .................................................... Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ............................................ Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ............................... Appx10319

**Table of Contents**
**(Continued)**

**Page**

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ....................................................... Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet ............................................................... Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 ................................................................. Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) .................................................. Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) .................................................. Appx10497
*(Cont'd in Vol XXIV)*

**Table of Contents**
**(Continued)**

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ............................................... Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) .................................................. Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) ................................................ Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) ................................................ Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) ................................................ Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) .................................................. Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) .................................................. Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) .................................................. Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) .................................................. Appx10789

**Table of Contents**
**(Continued)**

**Page**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ............................................... Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) .................................................... Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) .................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) .................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) .................................................... Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) .................................................... Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) .................................................... Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) .................................................... Appx10988
*(Cont'd in Vol XXV)*

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 .............................................................. Appx11017

1

## Table of Contents
### (Continued)

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ........................................ Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ............................................... Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 ...................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................. Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 ............................................. Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ....... Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 ................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ........................ Appx11086

**Table of Contents**
(Continued)

Page

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 ............................................................. Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 ...............................................................Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ........................................................Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) .............Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) .......Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017 ......................................................Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ...........................Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil. .................................................Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 .............................................................Appx11194

**Table of Contents**
(Continued)

Page

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 .................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 .......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................. Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 ............................. Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 ........................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ............................................................. Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 ................................................................... Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

**Table of Contents**
**(Continued)**

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al.*, *Viral Infections*,
(7th Edition, Chapter 180) .................................................... Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................. Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ......................... Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................. Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) .................................................. Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ....................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ................................................................. Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers ................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

**Table of Contents**
**(Continued)**

**Page**

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ............................................................ Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ........................................................ Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ............................... Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ............................... Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ........................................................ Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label .................................................... Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ............................... Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) .................................................. Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) .................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................ Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) .................................................... Appx11713

**Table of Contents**
**(Continued)**

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) .................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) .................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) .................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) .................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) .................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) .................................................... Appx11764

**Table of Contents**
**(Continued)**

**Page**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) ..................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) ..................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
***(Cont'd in Vol XXVII)***

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) ..................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) ..................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ....................................................... Appx12248

**Table of Contents**
(Continued)

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855) ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................... Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) .................................................. Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

**Page**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................ Appx12294
*(Cont'd in Vol XXVIII)*

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................. Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) ............................................. Appx12506
*(Cont'd in Vols XXIX, XXX, and XXXI)*

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) .................................................... Appx14066

**Table of Contents**
**(Continued)**

**Page**

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ................................................ Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
*(Cont'd in Vol XXXII)*

**Volume XXXII**
**(Filed Under Seal)**

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) .................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) .................................................... Appx14537

**Table of Contents**
**(Continued)**

**Page**

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) ..................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................ Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) ................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................ Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) ................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
**(Continued)**

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................ Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ....................................................... Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) .................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ....................................................... Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) .................................................... Appx14988

**Table of Contents**
**(Continued)**

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) .............................................. Appx14997
*(Cont'd in Vol XXXIII)*

**Volume XXXIII**
**(Filed Under Seal)**

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) ............... Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................. Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) ................................................... Appx15389

**Table of Contents**
**(Continued)**

**Page**

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin .................................................... Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) .................................... Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) ................................... Appx15494
*(Cont'd in Vol XXXIV)*

**Volume XXXIV**
**(Filed Under Seal)**

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ............................................ Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................... Appx15556

**Table of Contents**
**(Continued)**

**Page**

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) ................................................................. Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 .................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 .......................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ........................................................ Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) .......................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ........................ Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members ................................................. Appx15738

# Table of Contents
## (Continued)

**Page**

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 .............................................. Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ......................... Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) ............................................... Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) ................................... Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ......................... Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ....................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies .................................................... Appx15794

**Table of Contents**
**(Continued)**

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) .................. Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ....................................................... Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) .................................................. Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) .................................................. Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) .................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) .................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) .................................................. Appx15897

**Table of Contents**
**(Continued)**

**Page**

Exhibit 228 to Dykstra Declaration -
M-M-R®II Label (October 2003)
(MRK-KRA00757092-5) ...................................................... Appx15901

Exhibit 229 to Dykstra Declaration -
M-M-R®II Label (September 2002)
(MRK-KRA00757096-9) ...................................................... Appx15906

Exhibit 230 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757104-7) ...................................................... Appx15911

Exhibit 231 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757108-11) ...................................................... Appx15916

Exhibit 232 to Dykstra Declaration -
M-M-R®II Label (April 19999)
(MRK-KRA01449029-40) ...................................................... Appx15921

Exhibit 233 to Dykstra Declaration -
M-M-R®II Label (February 2014)
(MRK-KRA01449226-36) ...................................................... Appx15934

Exhibit 234 to Dykstra Declaration -
M-M-R®II Label (June 2014)
(MRK-KRA01449243-53) ...................................................... Appx15946

Exhibit 235 to Dykstra Declaration -
M-M-R®II Label (October 2015)
(MRK-KRA01449260-70) ...................................................... Appx15958

Exhibit 236 to Dykstra Declaration -
M-M-R®II Label (February 2000)
(MRK-KRA01449271-5) ...................................................... Appx15970

Exhibit 237 to Dykstra Declaration -
M-M-R®II Label (March 2010)
(MRK-KRA01449276-83) ...................................................... Appx15976

**Table of Contents**
**(Continued)**

**Page**

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) ................................................... Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) ................................................... Appx15994
*(Cont'd in Vol XXXV)*

**Volume XXXV**
**(Filed Under Seal)**

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................ Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) ................................................... Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ......................................... Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ......................................... Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website ................................... Appx16173

**Table of Contents**
**(Continued)**

**Page**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) .......................................... Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................................. Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 .......................................... Appx16342

Defendant Merck's Response to Relators' Statement of
    Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

**Volume XXXVI**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra, for Merck, in Support of
    Response to Relators' Statement of Material Facts,
    executed November 26, 2019 (Doc. 299) ............................ Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ......................................................... Appx16521

**Table of Contents**
**(Continued)**

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851 .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 .......................................................................... Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004 ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017 ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil. .................................................... Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................. Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ....................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) ................................................ Appx16569

# Table of Contents
## (Continued)

**Page**

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) ................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................. Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ................................................. Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ........................................ Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 ................................................................. Appx16820

**Table of Contents**
**(Continued)**

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 ........................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) .................................................... Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ............................................................. Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 ............................................................ Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) .................................................... Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
*(Cont'd in Vol XXXVII)*

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) ........................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

**Table of Contents**
**(Continued)**

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 .................................................. Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................ Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................ Appx17425
**(Cont'd in Vol XXXVIII)**

**Volume XXXVIII**
**(Filed Under Seal)**

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ................................................ Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

**Table of Contents**
**(Continued)**

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
*(Cont'd in Vol XXXIX)*

**Volume XXXIX**
**(Filed Under Seal)**

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" .......................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" .............................................................. Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................. Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" .................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................. Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases" ................................................... Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

**Table of Contents**
**(Continued)**

**Page**

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................. Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 .................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ....................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

**Table of Contents**
**(Continued)**

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high
vaccination era," by Marshall, Helen and Plotkin, Stanley,
*Lancet Infectious Diseases*, (2019) 19:118-119 ................... Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and
rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current
Opinion in Virology*, (2019) 34:110-116 .............................. Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin,
Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*,
(2013) 32(10):1156-1157 .................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough)
Publications ......................................................................... Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and
Resources ........................................................................... Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ...................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland,
dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed
May 30, 2019 .................................................................... Appx18428

**Table of Contents**
**(Continued)**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 ................................................. Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
***(Cont'd in Vol XL)***

**Volume XL**
**(Filed Under Seal)**

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

**Table of Contents**
**(Continued)**

**Page**

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ............................................................. Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 ................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ................................................ Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 .................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ........................................................... Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) ................................................................ Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) ................................................................ Appx18646

**Table of Contents**
(Continued)

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) .................................................................... Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) ......................................................... Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH .................................................... Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ............................................................. Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 .......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 .......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ............................................................. Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ............................................................. Appx18747

**Table of Contents**
**(Continued)**

**Page**

Relators' Responses to Merck's Statements of Material Facts in
  Support of Its First and Fourth Summary Judgment Motions
  and Their Corresponding Additional Statement of Material
  Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
  Merck's Four Motions for Summary Judgment,
  executed November 26, 2019 (Doc. 300) ............................ Appx18984

    Exhibit 361 to Reilly Declaration -
    Deposition Testimony of Amy Keegan,
    taken April 27, 2017 ............................................................ Appx18996
    *(Cont'd in XLI)*

**Volume XLI**
**(Filed Under Seal)**

    Exhibit 362 to Reilly Declaration -
    Memorandum titled "Delay of Filing for Optimized
    GOS/HAS-free Diluent for M-M-R®II" with Attachment,
    dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

    Exhibit 363 to Reilly Declaration -
    The Current Manufacturing Target Titer for the Mumps
    Component of Measles, Mumps, and Rubella Virus Vaccine
    Live M-M-R®II (MRK-CHA00576983-93) ...................... Appx19077

    Exhibit 364 to Reilly Declaration -
    Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
    M.D., dated December 10, 1998, with Attachment
    (MRK-CHA00756233-55) ................................................... Appx19089

    Exhibit 365 to Reilly Declaration -
    Excerpts from Clinical and Regulatory Review Committee
    Critical Activities, issued August 15, 2001
    (MRK-CHA01724860-25029) ............................................. Appx19113

**Table of Contents**
**(Continued)**

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) .............................................. Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) ............................................. Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) .................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) .................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) .................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................. Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ................ Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) ................................................... Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) .............................................. Appx19202

**Table of Contents**
**(Continued)**

**Page**

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 ......................................................... Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) ..................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) ............................... Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 ......................................................... Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ............................................................ Appx19455

**<u>Table of Contents</u>**
**(Continued)**

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) .................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) ..................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) ................................................... Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) ..................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ...................................... Appx19498
***(Cont'd in Vol LXII)***

**Table of Contents**
**(Continued)**

**Page**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) ................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................. Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018  ..................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

**Table of Contents**
**(Continued)**

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) ...................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ........................................ Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 .................................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 ....................................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ................................................................ Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
**(Continued)**

**Page**

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) ...................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................. Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) ..................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ......................................................... Appx19788

**Table of Contents**
**(Continued)**

**Page**

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) .................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) .................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) .................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) .................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) .................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) .................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

**Page**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
***(Cont'd in Vol XLIII)***

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................ Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) ................................................. Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ............................................................. Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................... Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

# Table of Contents
## (Continued)

**Page**

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................ Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) ................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) .................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................ Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) .................................................. Appx20176

## Table of Contents
### (Continued)

**Page**

Exhibit 442 to Reilly Declaration -
Deposition Testimony of  Thomas McGuire, Ph.D.,
taken July 2, 2018 ................................................................. Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009.................................. Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 ............................................... Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ........................................................ Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) ............................................................... Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 .............................................................. Appx20360

**Table of Contents**
**(Continued)**

**Page**

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 311) ............................................................................ Appx20427

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 314) ............................................................................ Appx20486
*(Cont'd in Vol XLIV)*

**Volume XLIV**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra in Support of Defendant's
Replies and Response to Motions for Summary Judgment,
executed December 20, 2019 (Doc. 315) .............................. Appx20545

Exhibit 330 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ....................................................... Appx20552

Exhibit 331 to Dykstra Declaration -
Email from Paul Lanzetta to Thomas Romanus
and John Comonitski, dated August 19, 2011
(MRK-KRA00955764-955765) .......................................... Appx20555

Exhibit 332 to Dykstra Declaration -
Excerpts from Deposition Testimony of Cynthia Morrisey,
taken July 27, 2017 ............................................................. Appx20558

Exhibit 333 to Dykstra Declaration -
Table of Contents for Information Submitted with Merck's
BLA for the replacement of Human Serum Albumin with
Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

Exhibit 334 to Dykstra Declaration -
FDA's Draft Guidance for Industry Stability Testing of
Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

**Table of Contents**
**(Continued)**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) .......................................................... Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............ Appx21035

**Table of Contents**
**(Continued)**

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31) ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) ..................................................................... Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) ..................................................................... Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) ..................................................................... Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ........................................... Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) ........................................ Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009) ............................................................. Appx21120

**Table of Contents**
(Continued)

Page

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 ................... Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................ Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) ........................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) ............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................ Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) ................................................................. Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 ......................................................... Appx21192

## Table of Contents
### (Continued)

**Page**

Defendant's Response to the United States' Statement of
    Interest in Response to the Parties' Summary Judgment
    Briefing, dated January 18, 2021 (Doc. 323)....................... Appx21194

Defendant Merck's Reply to Relators' Response Regarding
    the United States' Statement of Interest (Doc. 328) .......... Appx21206

12

# M-M-R®II Protocol 007: Mumps End Expiry

Interim Summary of the Percent of Subjects Who Develop Neutralizing Antibodies to Mumps[†] and Median Titers 6 Weeks Postvaccination and Associated 95% Confidence Intervals in Initially Seronegative Subjects[‡]

| | Treatment Group | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ~4.9 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 186) | | | ≤4.0 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 196) | | | ≤3.7 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 183) | | |
| Parameter | n | Observed Response | 95% CI | n | Observed Response | 95% CI | n | Observed Response | 95% CI |
| SCR | 168 | 94.6% (159/168) | (90.1%, 97.5%) | 175 | 93.1% (163/175) | (88.3%, 96.4%) | 167 | 88.0% (147/167) | (82.1%, 92.5%) |
| Median Titer | 168 | 2048.0 | (1591.3, 2635.8) | 175 | 2048.0 | (1571.5, 2668.9) | 167 | 2048.0 | (1474.5, 2844.5) |

† ≥4-fold rise in antibody titer, i.e., 1:16 to 1:64 where 1:16 is assigned to titers below 1:32, the limit of detection.

‡ Regardless of protocol violations or day ranges.

ˡ Percentage of subjects with 6-week titer >4096

N = Number of subjects vaccinated in each treatment group.

n = Number of initially seronegative subjects in each treatment group with postvaccination serology.

CI = Confidence Interval.

CONFIDENTIAL

13

# Interim Analysis Conclusions

- The responses for all three groups were lower than the expected 95%.

- The 3.7 End Expiry potency had a very low chance of meeting the success criteria for the study.

- Given these results, the probability of meeting the acceptability criterion for the 4.0 End Expiry potency was estimated to be approximately 70%.

CONFIDENTIAL

MRK-KRA00780249
MRK-CHA00780249

Appx20002

14

# Decreased Power for Primary Hypotheses

- Loss of ~300 paired samples due to testing outside of assay SOP 1-year window.

- Higher pre-positive rate (14%) than originally anticipated (5%).

- Anticipate only 430 subjects per group, instead of 502 per group.

- Potentially lower response rate in the Release group (94.6%) than originally anticipated (95%).

CONFIDENTIAL

MRK-KRA00780250
MRK-CHA00780250

Appx20003

15

# Overall (Blinded) Seroconversion Rate Estimates

| Timepoint | Overall SCR |
|---|---|
| Interim Analysis (modified SOP) | 92.0% (469/510) |
| Interim Analysis (original SOP) | 93.0% (409/440) |
| Complete Data (excluding ~300 paired samples tested outside the assay SOP 1-year window) | 91.9% (1208/1315) |

CONFIDENTIAL

MRK-KRA00780251
MRK-CHA00780251

Appx20004

16

# Required SCR for Success

- Assuming 430 subjects per group and a 95% SCR in the Release group, the observed SCR in the 4.0 Expiry group must be:

  » Acceptability: ≥93.3%

  » Similarity (non-inferiority): ≥ 93.0%

- Note: Observed 93.1% SCR in the interim analysis for the 4.0 Expiry group.

CONFIDENTIAL

17    Power to Rule Out a Difference of 5.0 Percentage Points and to Meet a Lower Bound of 90% with 430 Evaluable Subjects Per Group

| Expected True Rate in Control Group | True Decrease Between Control and Mumps Expiry Group | | | |
|---|---|---|---|---|
| | 0.0 Percentage Points | 1.0 Percentage Points | 2.0 Percentage Points |
| 96% | 97.1% | 83.6% | 51.9% |
| 95% | **92.5%**[?] | 67.5% | 30.9% |
| 94% | 77.0% | 41.4% | 13.5% |
| 93% | 48.5% | 18.4% | 4.4% |
| 92% | 22.0% | 6.1% | 1.1% |

[?] Based on 502 evaluable subjects in the original protocol, the power was 96.1%.

CONFIDENTIAL

MRK-KRA00780253
MRK-CHA00780253

# M-M-R®<sub>II</sub>
## Presentation Agenda

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » Statistical evaluation for study success

  » **Impact of mumps end expiry study outcome**
    - » **Regulatory compliance**
    - » **Filing in Japan**

  » Short-term options under evaluation

  » Decision requested

CONFIDENTIAL

MRK-KRA00780254
MRK-CHA00780254

Appx20007

# M-M-R®$_{II}$

19

# Mumps End Expiry Study (#007): Regulatory Implications

- Recent calculations using the new stability monitoring model show that the current manufacturing target of 5.2 log $TCID_{50}$/dose and associated release potency of 5.0 log $TCID_{50}$/dose supports an end of expiry claim of 4.0 log $TCID_{50}$/dose (at 24 months dating), the intermediate dose used in the mumps end-expiry trial – **but not an end expiry of 4.3 log $TCID_{50}$/dose at 24 month.**

- Estimated* shelf-life with 4.3 log $TCID_{50}$ is **≤12 months, a potentially non-marketable shelf life**

* Calculations are under review and evaluation

CONFIDENTIAL

MRK-KRA00780255
MRK-CHA00780255

Appx20008

20

# JNDA for M-M-R®$_{II}$:
## Status

- **Program Objective:** Expand the M-M-R®$_{II}$ market into Japan to increase vaccine revenues (~$8MM annually by 2009).

<u>Target</u>

JNDA Final review     (Aug – Sept 02)          **Oct 02**

**Critical path:**
Resolution of mumps end expiry

Filing of JNDA        (End Sept 02)            **Dec 02**

Review (15-24 month) - Approval              2Q04 - 4Q04

CONFIDENTIAL

21

# JNDA for M-M-R®$_{II}$:
## Status

- Minimum claimed mumps potency for Japan:
  - » Current US label claim specifies mumps potency at end of 24 month shelf-life is equal or above 4.3 log TCID$_{50}$
  - » Recent stability estimate does not support label claim
  - » Options:
    - Delay file until evaluation of options for short-term fixes are complete
      - Feasibility of future change unclear
      - Delay filing for Kaketsuken creates marketing competitive disadvantage
      - With CTD implementation in 2003, will require rewriting file
    - File with minimum mumps potency of 4.3 log TCID$_{50}$ and 12 month shelf-life
      - Feasibility of future change unclear
      - Competitive disadvantage
      - Inconsistent with M-M-R®$_{II}$ label in the US or ROW for shelf-life
    - Delay file until mumps end expiry data analysis is complete and provide in file for Japanese agency review

CONFIDENTIAL

22

# M-M-R®$_{\text{II}}$
## Presentation Agenda

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » Statistical evaluation for study success

  » Impact of mumps end expiry study outcome
     » Regulatory compliance
     » Filing in Japan

  » **Short-term options under evaluation**

  » Decision requested

CONFIDENTIAL

# Background

- M-M-R® $_{II}$ label :

  "Clinical studies of 279 triple seronegative children, 11 months to 7 years of age, demonstrated that M-M-R® $_{II}$ is highly immunogenic and generally well tolerated. In these studies, a single injection of the vaccine induced ....**mumps neutralizing antibodies in 96%**,...of susceptible persons."

- CBER has been insistent on stringent criteria for success in M-M-R® $_{II}$ studies

  » Modest decreases in coverage rates translate into outbreaks (experience over the last 10 or 15 years)

  » There is the notion that even a modest decrease in SCR could lead to potentially important public health impact in terms of disease control

  » For consistency with required criteria of success from other sponsors

  » In general there often is a high expectation for efficacy for vaccines because of the risk / benefit considerations in giving vaccines to healthy individuals

23

CONFIDENTIAL

24

# Short-term options under evaluation

- The team is evaluating the following short-term options:

  » Maintaining 4.3 log $TCID_{50}$/dose expiry potency specification
    – Reduction in maximum allowed TOR in manufacturing
    – Increase overfill of mumps

  » Attempt to negotiate regulatory agency acceptance of the clinical data supporting 4.0 log $TCID_{50}$
    – Change label to reflect lower than 96% protection

  » Repeat Mumps End Expiry Study

- The team will report to CRRC upon conclusion of evaluation and determination of feasible options



CONFIDENTIAL

MRK-KRA00780260
MRK-CHA00780260

Appx20013

25

# Short-term options under evaluation

- **Maintaining 4.3 log TCID$_{50}$/dose expiry potency specification:**

  Using new stability monitoring model, current estimate for shelf-life is < 12 month

  » Issue:
    - Label compliance

  » Evaluation underway to define conditions to achieve a shelf-life of 18 months if possible such as reduction of TOR or time post reconstitution, etc.

  » Increase overfill level of mumps
    - Mumps bulk vaccine manufacturing capacity limitations
    - Lack of adequate safety data to support increased titer overfill
    - Implementation of a maximum release specification requirement which may result in an increase in rejection of M-M-R®$_{II}$ lots

CONFIDENTIAL

26

# Short-term options under evaluation

- ## Change label to reflect lower than 96% protection

  » Issues include:

    – If study fails, this would require negotiating with CBER to relax the criteria of success

    – Relaxing the criteria for success would lower the bar for the competition and facilitate entry into the U.S. market

CONFIDENTIAL

27

# Short-term options under evaluation

- ## Repeat Mumps End Expiry Study:

  » Issues include:

    – Technical feasibility of generating clinical supplies and conducting study

    – Time to completion (at least 3 years – short term fixes are still required)

    – No assurance that we would succeed the second time

    – Completing the study and filing would potentially consume the same timeframe required to correct the stability problem by accelerating the new stabilizer program.

CONFIDENTIAL

28

# M-M-R®$_{II}$

## CRRC - Oct. 08, 2002

- **Agenda:**

  » Background

  » Mumps End Expiry Clinical Trial : current status

  » Statistical evaluation for study success

  » Impact of mumps end expiry study outcome
    » Regulatory compliance
    » Filing in Japan

  » Short-term options under evaluation

  » **Decision requested**

CONFIDENTIAL

29

# Decisions Requested

- Path-forward for the Japan M-M-R®$_{II}$ file :

  » Delay file until evaluation of short-term options is complete (Dec 02–Jan 03)

- CRRC support to accelerate the new stabilizer program for M-M-R®$_{II}$ in order to improve the stability and the tolerability of the vaccine

  » If program is initiated in 1Q03:

  – timing of file without clinical trial / cross referencing clinical data to ProQuad refrigerated study would be 3-4Q05

  – timing of file with clinical trial would be 1-2Q06

  » Program was presented at Vaccine T-PAC Aug02 and awaiting decision at MRL Interface Meeting om Program prioritization with other in-line products

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 426

# Analytical Approach for MMR in Japan

## Tim Schofield

## Vaccine Biometrics Research



CONFIDENTIAL

MRK-KRA00719989
MRK-CHA00719989

Appx20020

# Outline

- ICH stability analysis
- Affect of calibration on product shelf-life
- Determining release potency and process performance
- Sensitivity analysis

2



CONFIDENTIAL

MRK-KRA00719990
MRK-CHA00719990

Appx20021

# ICH Stability Analysis

- Changes made to mumps component of MMR in 1999 at the request of the US FDA
  - Mumps release potency established to be

    $5.0 \log_{10} TCID_{50}/dose$
  - Increased target from 4.9 to $5.2 \log_{10} TCID_{50}/dose$
  - Conducted formal stability study on three "high-titer" mumps lots

3



Restricted
Confidential
limited access

CONFIDENTIAL

MRK-KRA00719991
MRK-CHA00719991

**Appx20022**

# ICH Stability Analysis









4

CONFIDENTIAL

MRK-KRA00719992
MRK-CHA00719992

Appx20023

# ICH Stability Analysis
## • Linear analysis





**Long Term Stability of MMR II at 2-8 C**
**Mumps**

Parallelism: P=0.87



5

Restricted
Confidential
limited access

MRK-KRA00719993
MRK-CHA00719993

Appx20024

# ICH Stability Analysis

- ## Non-linear analysis
  - ### Biphasic kinetics

$$Potency = a_1 \cdot e^{-b_1 \cdot t} + a_2 \cdot e^{-b_2 \cdot t}$$



REDACTED – OMP



6

Restricted
Confidential
limited access

MRK-KRA00719994
MRK-CHA00719994

Appx20025

REDACTED – OMP



CONFIDENTIAL

MRK-KRA00719995
MRK-CHA00719995

# Release Potency and Process Performance

- ICH analysis appropriate for pharmaceuticals
  - Easy to achieve target potency
  - Highly stable
  - Little variability
- ICH analysis does not guarantee that future lots will maintain adequate potency through expiry

8



CONFIDENTIAL

MRK-KRA00719996
MRK-CHA00719996

Appx20027

# Release Potency and Process Performance



- Regulatory expectations
  - Protect vaccinee (95% confidence of receiving potent vaccine through expiry)
  - Satisfactory process performance (≥95% chance of meeting release specifications)

9



CONFIDENTIAL

# Release Potency and Process Performance

- ## *Release potency*



$$Release = Minimum + \Sigma\ Losses + 1.65 \cdot \Sigma\ Error^2$$

- - **Losses** = Total estimated loss for :
  - TOR • Shelf-life loss • Recon & store loss
- $\Sigma\ Error^2$ = Combined uncertainties
- 1.65 = 95% Lower Bound

10



CONFIDENTIAL

MRK-KRA00719998
MRK-CHA00719998

Appx20029

# Release Potency and Process Performance

| Condition | Time |
|---|---|
| 2-8C Shelf Life  (months) | 24 |
| TOR Allowed  (hours) | 40 |
| -20C storage (months) | 12 |
| recon hours allowed | 8 |
| assay format (Reps 1x n ) | 6 |

| Measles | Potency |
|---|---|
| REDACTED – OMP | |

| Mumps | Potency | | Current |
|---|---|---|---|
| Minimum Release Spec | 5.2 | | 5.0 |
| Upper Release Spec | 5.4 | | 5.4 |
| Target | 5.30 | | 5.20 |

| Rubella | Potency |
|---|---|
| REDACTED – OMP | |

11

Restricted
R Confidential
limited access

CONFIDENTIAL

MRK-KRA00719999
MRK-CHA00719999

Appx20030

# Release Potency and Process Performance

- ***Process performance***



- Product distribution fits into manufacturing window
- High probability of successfully releasing lots



12



CONFIDENTIAL

MRK-KRA00720000
MRK-CHA00720000

**Appx20031**

# Release Potency and Process Performance

| Condition | Time |
|---|---|
| 2-8C Shelf Life  (months) | 24 |
| TOR Allowed  (hours) | 40 |
| -20C storage (months) | 12 |
| recon hours allowed | 8 |
| assay format (Reps 1x n ) | 6 |

| Measles | Potency |
|---|---|
| REDACTED – OMP | |

| Mumps | Potency |
|---|---|
| Minimum Release Spec | 5.2 |
| Upper Release Spec | 5.4 |
| Target | 5.30 |
| % Pass (max 5.4) | 86.8% |

| Rubella | Potency |
|---|---|
| REDACTED – OMP | |

13



CONFIDENTIAL

MRK-KRA00720001
MRK-CHA00720001

Appx20032

# Sensitivity Analysis

| Condition | Time |
|---|---|
| 2-8C Shelf Life  (months) | 24 |
| TOR Allowed  (hours) | 40 |
| -20C storage (months) | 12 |
| recon hours allowed | 8 |
| assay format (Reps 1x n ) | 6 |

| Mumps | Potency |
|---|---|
| Minimum Release Spec | **5.2** |
| Upper Release Spec | 5.4 |
| Target | **5.30** |
| % Pass (max 5.4) | 86.8% |

| | Time |
|---|---|
| ) | 24 |
| ) | 40 |
| ) | 12 |
| d | 8 |
| ) | 6 |

86.8%

- Modify process conditions . . .
- . . .to improve the predicted probability of success

14

Restricted
R Confidential
limited access

CONFIDENTIAL

MRK-KRA00720002
MRK-CHA00720002

Appx20033

# Sensitivity Analysis



40 Hours TOR
24-Month Shelf-Life
8-Hours Recon & Store
1x6 Assay Format

**87% Success**



## Shorten Shelf-Life



40 Hours TOR
18-Month Shelf-Life
8-Hours Recon & Store
1x6 Assay Format

**96% Success**

15

**Restricted**
R ⊙ **Confidential**
**limited access**

**CONFIDENTIAL**

# Sensitivity Analysis

- Data:
  - 9 packaged lots of manufactured since 1995
- Analysis:
  - bi-phasic kinetics model used to predict shelf-life loss and uncertainty
  - Historical studies used to predict -20C, TOR, and R/S losses and uncertainties
  - Calibrated assay performance from historical experience
- Objective:
  - Maintain mumps target (release) potency at 5.2 (5.0), while preserving ≥95% probability of success.

16



CONFIDENTIAL

MRK-KRA00720004
MRK-CHA00720004

Appx20035

# Sensitivity Analysis

| Condition | Current | 21 Mo. | 1x12 | 18+4 |
|---|---|---|---|---|
| 2-8C Shelf Life  (months) | 24 | 21 | 21 | 18 |
| TOR Allowed  (hours) | 40 | 40 | 40 | 38 |
| -20C storage (months) | 12 | 12 | 12 | 12 |
| recon hours allowed | 8 | 8 | 8 | 4 |
| assay format (Reps 1x n ) | 6 | 6 | 12 | 12 |
| **Measles** | | | | |
| REDACTED – OMP | | | | |
| | | | | |
| **Mumps** | | | | |
| Minimum Release Spec | 5.2 | 5.2 | 5.1 | 5.0 |
| Upper Release Spec | 5.4 | 5.4 | 5.4 | 5.4 |
| Target | 5.30 | 5.30 | 5.25 | 5.20 |
| % Pass (max 5.4) | 86.8% | 86.8% | 95.5% | 98.8% |
| **Rubella** | | | | |
| REDACTED – OMP | | | | |

17



Restricted
Confidential
limited access

# Summary

- Developmental lots should be selected from the current manufacturing process
- ICH analysis should acknowledge nonlinear kinetics
- Calibration improves variability
  - Reduced error of loss rate
  - Increased power to detect differences in slopes
  - Improved release assay variability
- ICH analysis fails to guarantee adequate potency through expiry for future lots

18



CONFIDENTIAL

MRK-KRA00720006
MRK-CHA00720006

Appx20037

# Summary

- Regulatory expectations
  - Lower release limit must be used to protect vaccinee (95% guarantee)
  - ≥95% of lots should meet release specifications
- The release limit is calculated from losses and uncertainties
- The manufacturing window is defined by the lower and upper release limits

19



CONFIDENTIAL

MRK-KRA00720007
MRK-CHA00720007

Appx20038

# Summary

- The manufacturer can vary process parameters to achieve regulatory expectations
- Proposed processing changes
  - 24-months $\rightarrow$ 18-months shelf-life
  - 40-hours $\rightarrow$ 38-hours TOR
  - 8-hours $\rightarrow$ 4-hours R/S
  - 1x6 assay format $\rightarrow$ 2-tiered 1x12 for Measles and Mumps
- Consequences of changes
  - Product target and release remain at current levels
  - Predicted ≥95% success rate for all immunogens

20



CONFIDENTIAL

MRK-KRA00720008
MRK-CHA00720008

# 11/26/2019
# Declaration of G. Reilly
# EXHIBIT 427

Appx20040

 **MERCK**

**MEMO**

---

**TO:** Members of M-M-R®II
Competitive Task Force

**CC:** Tom Vernon                                                                **LOC:** WP97A-337

**FROM:** David Nalin                                                            **LOC:** WP97A-343

**SUBJECT:** <u>Mumps neutralizing antibody test vs. efficacy and             **DATE:** 09/10/99
effectiveness</u>

Per our recent discussion of the use of a particular wild strain requested by the FDA for use in mumps neutralizing antibody testing, the following points may be considered:

1. The vaccine was shown to confer over 95% protective efficacy in a double-blinded randomized efficacy trial before licensure.

2. The vaccine as manufactured has contributed to achievement of mumps containment in Finland, thereby demonstrating its ability to eliminate endogenous mumps circulating strains. In the U.S., 1998 brought historically low numbers of mumps cases, approximately 600 nationwide, again illustrating the effectiveness of the vaccine in national control programs.

2. To pick a particular strain for use in neutralizing antibody testing for mumps antibody in vaccinees, when that strain yields a figure of about 70% seroconversion by the particular conformation of neut assay used, is illogical, to say the least. If reflective of field activity, a 30% failure rate after the first dose would have created an enormous pool of susceptibles, making the current proven levels of control impossible.

A neutralizing antibody test should be used which parallels several other types of test and gives results corresponding to observed efficacy in the field trial.

3. Reference was made to a recent Swiss effectiveness report. Please note that postmarketing field estimates of effectiveness are fraught with error, most often yielding results suggesting much lower protection than that seen using the same vaccine in a true efficacy trial. Walt Orenstein et al discusses the many reasons for this in the attached article.

Specifically, in the Swiss trial, there is no mention of the age when the children were vaccinated, and whether any were vaccinated prior to 15 months of age. The groups may have differed in the percentage of primary failures based on age, degree of exposure and exposure inoculum size depending on economic or crowding subgroups, etc. A sample of 165 children cannot be a yardstick for tens of millions of children who provide the database for national surveillance programs.

**CONFIDENTIAL**

**MRK-KRA00061698**
**MRK-CHA00061698**

**Appx20041**

The fact that the cases which occurred in vaccinees occurred in children 8 yrs. old or older could be due to earlier age of vaccination in those children. The authors did not mention whether, as in the U.S., any change in age of vaccination has occurred in that time frame.

If the mumps cases in vaccinees (14% attack rate in Jeryl Lynn™ vaccinees) were due to secondary vaccine failure this would be most atypical, given the small numbers of cases in countries using the vaccine exclusively. The second dose, given to prior seroconverters, boosts titers transiently, but titers quickly return to baseline.

The authors do not indicate the numbers of children in each group; but the small total number of 165 and the fact they were divided into 4 different groups suggests that one quarter were Jeryl Lynn™ vaccinees. If so, then out of 41 such vaccinees, a 14% case attack rate boils down to 6 vaccinee cases. The numbers are too small, and the likelihood of local factors, errors or undiscovered aberrations influencing the observed outcome too great, to warrant broad conclusions.

Many of you are familiar with factors affecting the markedly different outcomes associated with different tweakings of neut assays, eg. for measles (See Albrecht attachment).

It would be best to try harder to persuade the FDA not to use an unrealistic format for the mumps neut test as a criterion for real-world protection.

CONFIDENTIAL

L Schlegel et al. 319 (7206): 352        25 / Berghclz



BMJ 1999;319:352 (7 August)

**Papers**

> Reprint (PDF) of this article
> Send a response to this article
> PubMed citation
> Related articles in PubMed
> Download to Citation Manager
> Search Medline for articles by:
  Schlegel, M. || Vernazza, P. L
> Alert me when:
  New articles cite this article

> Collections under which this article appears:
  Infectious Diseases:
    Other Infectious Diseases
  Paediatrics:
    Other Paediatrics
  Public Health:
    Prevention and health promotion

# Comparative efficacy of three mumps vaccines during disease outbreak in eastern Switzerland: cohort study

Matthias Schlegel, *attending physician* [a], Joseph J Osterwalder, *head* [b], Renato L Galeazzi, *department chief* [a], Pietro L Vernazza, *senior research fellow* [c].

[a] Department of Medicine, Kantonsspital, 9007 St Gallen, Switzerland, [b] Emergency Department, Kantonsspital, 9007 St Gallen, [c] Institute for Clinical Microbiology and Immunology, 9001 St Gallen

Correspondence to: Dr Vernazza Pietro.Vernazza@kssg.ch

After the introduction of immunisation against measles, mumps, and rubella, numerous outbreaks of mumps were reported in the 1980s and '90s in Switzerland and southern Europe. [1] [2] The Rubini strain is still widely used in Europe, [3] and we report here a large outbreak of mumps in a population with a high vaccination rate and examine the differential efficacy of the three vaccine strains.

## ▶ Participants, methods, and results

An outbreak was investigated in a small village in Switzerland. All children (ages 5-13) were included in the cohort. Information on immunisation status was obtained from vaccine certificates. The person who investigated the cases of mumps was blinded with regard to the vaccination status. A case was defined if mumps virus was isolated on culture, if a doctor confirmed the diagnosis, or if the typical clinical picture was described in a sibling of a patient with confirmed disease. The absence of IgG antibodies to mumps virus served as confirmation of full susceptibility to mumps in non-vaccinated children without clinical signs of the disease.

The cohort comprised 165 children. All questionnaires sent to their parents were returned and evaluated (response rate 100%). All immunised children had received their immunisation before the age of 2 years, almost half with the Rubini strain (table). Sixty six cases of epidemic parotitis occurred, resulting in an overall attack rate of 40%. Altogether 11 (16%) children had parotid enlargement without fever; only one case (vaccinated with the Rubini strain) had a complicated course that required hospital admission. The attack rate was similar in unvaccinated children (63%) and children vaccinated with the Rubini strain (67%) but significantly lower in those vaccinated with the Jeryl-Lynn (14%) or the Urabe strain (8%) (table). When the attack rate for the two currently

- Top
- Participants, methods, and...
- Comment
- References

06.08.1999 09:55

CONFIDENTIAL

MRK-KRA00061700
MRK-CHA00061700

Appx20043

available vaccine strains was compared the relative risk of developing mumps was 4.8-fold greater (95% confidence interval 2.1 to 11.1) in children vaccinated with the Rubini compared with the Jeryl-Lynn strain. The low vaccine efficacy of the Rubini strain was observed throughout all age groups. In contrast, cases of mumps in children vaccinated with the Jeryl-Lynn or Urabe strains occurred only at the age of 8 or older. In the three vaccine categories no difference in the severity of mumps was observed.



View this table:
[in this window]
[in a new window]

## ▶ Comment

More than a decade after systematic vaccination was introduced, the incidence of mumps is still high in Switzerland, Spain, and Italy. Several explanations for this are under discussion: inadequate

- Top
- Participants, methods, and...
- Comment
- References

vaccination rates, natural periodicity, and other factors such as differences in viral strains and loss of mucosal immunity. This study is notable because it describes an outbreak in a rural population with a high vaccination rate (95%). The attack rate of 63% in the unvaccinated group is consistent with other published reports. When compared with no vaccination, immunisation with the Rubini strain resulted in no detectable benefit.

Several serological surveys show comparable seroconversion rates for the Rubini, Jeryl-Lynn, and Urabe strains, but under field conditions other variables might be more relevant. This study supports the general importance of postmarketing surveillance.

To eliminate a disease a vaccination programme must achieve a high coverage with a vaccine that results in a substantial (>85%) vaccine efficacy.[4] The Rubini strain investigated in this study clearly did not fulfil the second requirement. From a public health perspective, immunisation against mumps with the Rubini strain should be strongly discouraged unless the field efficacy of this vaccine is convincingly shown.

A second vaccination dose is generally recommended between the ages of 7 and 10 years. Other countries, such as Finland, eliminated indigenous mumps by instituting a two dose regimen with the Jeryl-Lynn strain.[5] In agreement with this recommendation, we found no cases of mumps in children under 7 vaccinated with the Jeryl-Lynn or Urabe strain.

## ▶ Acknowledgments

We thank the parents and children for providing the information for this study. We especially thank Diane Feldman for editing the manuscript, Dr Thomas Ammann (general practitioner) for the clinical data collection, Dr Hanspeter Zimmermann for general advice, Dr Christoph Minder for statistical advice, Dr Detlev Schultze and Edith Zwicky for laboratory support, and Isabella Brenner for

06.08.1999 09:53

CONFIDENTIAL

MRK-KRA00061701
MRK-CHA00061701

Appx20044

logistical support. PLV is supported by a grant from the Swiss National Foundation (3233-48902.96).

Contributors: MS was the primary investigator involved in the discussion of the core ideas, study design, development of the questionnaire, data collection, and analysis and wrote the manuscript. PLV initiated the study; participated in the study design, data documentation, and analysis; and contributed to the writing of the paper. JJO discussed core ideas, participated in the study design, performed the statistical analysis, and edited the paper. RLO discussed core ideas, participated in the protocol design and interpretation of the data, and edited the paper. PLV is guarantor for the study.

## ➤ Footnotes

Funding: None.

Competing interests: None declared.

## ➤ References

> - Top
> - Participants, methods, and...
> - Comment
> - References

1. Expanded Programme on Immunization. Immunization coverage against measles, mumps and rubella. *Wkly Epidemiol Rec* 1993; 68: 83-86[Medline].

2. Germann D, Strőhle A, Eggenberger K, Steiner CA, Matter L. An outbreak of mumps in a population partially vaccinated with the Rubini strain. *Scand J Infect Dis* 1996; 28: 235-238[Medline].

3. D'Argenio P, Citarella A, Selvaggi MT, Benvento CPN. Field evaluation of the clinical effectiveness of vaccines against pertussis, measles, rubella and mumps. *Vaccine* 1998; 16: 818-822[Medline].

4. Anderson RM, May RM. Modern vaccines: immunisation and herd immunity. *Lancet* 1990; 335: 641-645[Medline].

5. Peltola H, Heinonen OP, Valle M, Paunio M, Virtanen M, Karanko V, et al. The elimination of indigenous measles, mumps, and rubella from Finland by 12-year, two-dose vaccination program. *N Engl J Med* 1994; 331: 1397-1402[Medline].

*(Accepted 5 March)*

© British Medical Journal 1999

CONFIDENTIAL

MRK-KRA00061702
MRK-CHA00061702

Appx20045

- Reprint (PDF) of this article
- Send a response to this article
- PubMed citation
- Related articles in PubMed
- Download to Citation Manager
- Search Medline for articles by:
  Schlegel, M. || Vernazza, P. L.
- Alert me when:
  New articles cite this article

- Collections under which this article appears:
  **Infectious Diseases:**
  Other Infectious Diseases
  **Paediatrics:**
  Other Paediatrics
  **Public Health:**
  Prevention and health promotion

06.08.1999 09:53

CONFIDENTIAL

TOTAL P.04

MRK-KRA00061703
MRK-CHA00061703

Appx20046

11/26/2019
Declaration of G. Reilly
EXHIBIT 428



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                                   Office of the Secretary

Office of the General Counsel
Public Health Division
CDC/ATSDR Branch
1600 Clifton Road, N.E., MS D53
Atlanta Georgia 30333
(404) 639-7200

July 31, 2018

Ms. Kathleen S. Hardway
Attorney at Law
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202

Re:    *Touhy* approved testimony - *United States ex rel. Krahling v. Merck & Co, Inc.*, No. 10-4374 (E.D. Pa.); *In Re: Merck Mumps Vaccine Antitrust Litigation*, No. 12-3555 (E.D. Pa.)

Dear Ms. Hardway:

Thank you for providing the expert reports by former CDC employees William Nichols and William Atkinson, and former ACIP member Jonathan Temte. I am writing to remind you of the scope of the testimony that the CDC authorized these individuals to provide in the above-captioned litigation and to observe aspects of the reports that appear to be incomplete or inaccurate.

As you know, the CDC authorized consultation and testimony by these three individuals subject to the parameters listed on page 3 of the attached May 24, 2018, *Touhy* authorization letter. In particular, the CDC only authorized these individuals to "represent their own views and experiences in testimony and reports," and directed that they "cannot represent CDC's or ACIP's views, including in terms of potential future agency/committee actions." The CDC further directed these individuals to "state for the record" at the outset of any deposition or trial testimony that "their testimony represents their own views and does not represent the official positions of HHS or the CDC."

Based on our review of their expert reports, these individuals did not state in their reports that their opinions are limited to their own views based on their own personal experiences and are not the official positions of the agency. Consequently, a number of statements in their reports may be interpreted to be outside the scope of the opinions that the CDC authorized them to provide. These statements include, but are not limited to, the following:

- "CDC has understood for more than a decade, and currently understands, that mumps vaccine is about 88% effective in preventing mumps after two doses." (Atkinson at 8)
- "Even if, as the Complaint alleges, Merck's Mumps-Containing Vaccines had a 'diminished' or lower than expected vaccine effectiveness rate, efficacy rate, seroconversion rate, or level of potency, that would not materially impact the CDC's decision to contract for the purchase of Merck's Mumps-Containing Vaccines." (Nichols at 4-5)

**EXHIBIT**
ATKINSON
PENGAD 800-631-6989
1/30/19

**Appx20048**

Ms. Kathleen S. Hardway – Page 2

- "While the CDC views Merck's Mumps-Containing Vaccines as safe and effective, the CDC understands that vaccines, including the Merck's Mumps-Containing Vaccines, are not 100% effective." (Nichols at 6)
- "Even if the vaccine effectiveness rate, efficacy rate, seroconversion rate, or level of potency was somehow ever established to be lower than what the CDC expects or expected, that would not materially impact the CDC's decision to contract for the purchase of Merck's Mumps-Containing Vaccines." (Nichols at 16-17)
- "In light of this, even if the effectiveness of the mumps component of Merck's Mumps-Containing Vaccines, which are MMR and MMRV combination vaccines, was somehow established to be lower than expected, the CDC would continue to contract for the purchase of these vaccines to protect against measles, rubella, and varicella." (Nichols at 20)
- "As a result, negotiation by Merck and the CDC over the price of Merck's Mumps-Containing Vaccines is essentially pro forma, as the CDC would not walk away from the negotiation demanding a lower price and leave children vulnerable by interrupting the supply of the vaccine to those most in need." (Nichols at 21)
- "Even if the mumps vaccine component showed decreased clinical effectiveness, which it has not for decades, there would be no interest in discontinuing ACIP's recommendation and/or removing MMR from the current recommended schedules." (Temte at 48)

Please remind these three witnesses to be mindful of the scope of their authorized testimony and state on the record at the outset of any deposition or trial testimony that "their testimony represents their own views and does not represent the official positions of HHS or the CDC." Note also that agency and Department of Justice legal counsel will be present at the depositions of each of these individuals and will object to any testimony outside the scope of the *Touhy* authorization.

In addition, we observe statements in the reports that appear to be inaccurate or incomplete, perhaps in part due to the witnesses' failure to qualify that their opinions are based on their personal knowledge from their CDC or ACIP experience and limit them to the time period during which they were employed at CDC or served as a member of the ACIP. These statements include, but are not limited to, the following:

- Dr. Atkinson asserts that post-licensure vaccine effectiveness monitoring is the "sole responsibility" of state and local health departments and CDC and that "[n]either the FDA nor the manufacturer participate in the evaluation of post-licensure vaccine effectiveness." In fact, FDA can ask manufacturers to conduct post-licensure effectiveness studies. For example, the manufacturer of the recently licensed shingles vaccine, at the request of the FDA, is conducting post-marketing studies of the long-term efficacy and immunogenicity of the vaccine. (Atkinson at 17)
- Mr. Nichols lists the procurement process using the obsolete term "best and final offer." The Federal Acquisition Regulations now use the term "final proposal revision." (Nichols at 12-13)
- Mr. Nichols comments in his report on the issue of whether a vaccine's effectiveness might affect contracting for the vaccine. He states: "I am not aware of the CDC ever declining, based on clinical considerations such as 'diminished' efficacy or effectiveness, to contract for the purchase of a vaccine that the ACIP had placed on the VFC program list." In fact, in 2016 CDC cancelled the contract to purchase live attenuated influenza vaccine (LAIV) after the ACIP voted at its June 2016 meeting to

Ms. Kathleen S. Hardway – Page 3

        remove LAIV from the VFC program vaccine list based on data showing the vaccine's poor or relatively lower effectiveness during the years 2013 through 2016. (Nichols at 4-5, 11, 17)

- Dr. Temte represents directly or indirectly that the CDC's publication of ACIP recommendations in the CDC publication Morbidity and Mortality Weekly Report (MMWR) are products of the ACIP's MMRV Safety Work Group or MMR Work Group. In fact, work groups to ACIP do not directly advise the CDC or publish in the MMWR. Rather, such work groups provide information not to CDC, but to the parent committee which then, under the requirements of the Federal Advisory Committee Act, deliberates and votes whether to provide advice to CDC. Such deliberated/approved recommendations of the full ACIP, upon acceptance by the CDC Director, are published in the MMWR. (Temte at 19, 21, 37, and 38)

The witnesses may wish to review the accuracy and completeness of their reports in light of these observations. Our identification of these particular statements is not intended to imply HHS or CDC endorsement of the accuracy of the remainder of the expert reports.

Let me know if you have any questions.

Sincerely,

Kevin M. Malone
Senior Attorney

Attachment

cc:    William Atkinson, M.D.
       William Nichols
       Jonathan Temte, M.D.
       Nancy Messonnier, M.D.
       Joel M. Sweet, Esq.
       Gerald B. Sullivan, Esq.
       Holly Snow, Esq.
       Elise Harris, Esq.



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

May 24, 2018

Ms. Kathleen S. Hardway
Attorney at Law
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202

Re:  Request for Deposition Testimony - *United States ex rel. Krahling v. Merck & Co, Inc.*, No.
10-4374 (E.D. Pa.); *In Re: Merck Mumps Vaccine Antitrust Litigation*, No. 12-3555 (E.D. Pa.)

Dear Ms. Hardway:

This is in response to your January 10, 2018 letter requesting testimony from and expert
consultation by two former employees of the Centers for Disease Control and Prevention (CDC)
and two former members of CDC's Advisory Committee on Immunization Practices (ACIP) on
behalf of Merck & Co., Inc. in the above-captioned *Qui Tam* False Claims Act and antitrust
cases regarding Merck's mumps-containing vaccines. The relators and plaintiffs in this
consolidated litigation generally allege that Merck misrepresented the effectiveness of its
mumps-containing vaccines to the U.S. Department of Health and Human Services (HHS) in
terms of Food and Drug Administration licensure of these vaccines, CDC's recommendations on
the use of vaccines, and the vaccines' sale to the CDC for administration in the Vaccines for
Children (VFC) Program. They further allege Merck engaged in anti-competitive practices.

CDC is a component agency of HHS. Pursuant to HHS regulations codified in 45 C.F.R. Part 2,
current and former HHS employees are not authorized to participate, give depositions or trial
testimony, or provide consultation regarding information acquired in the performance of their
official duties in private litigation or other proceedings in which the United States is not a party,
absent authorization by the agency. The bases for this policy, as articulated in Section 2.1(b), are
to minimize the disruption of official duties and the necessity of the Department to maintain
impartiality in disputes between private litigants. In *United States ex rel. Touhy v. Ragen*, 340
U.S. 462 (1951), the Court recognized the authority of federal agencies to limit their employees'
involvement in such actions. The Eleventh Circuit U.S. Court of Appeals has also specifically
recognized HHS's authority to limit the involvement of CDC employees in such litigation. [see
*Moore, et al. v. Armour Pharmaceutical Co., et al.*, 927 F.2d 1194 (11th Cir. 1991)].

**Appx20051**

Hardway – Page 2

Section 2.4 of the *Touhy* testimony regulations requires the satisfaction of three criteria before testimony by a current or former HHS employee is allowed. First, the request must be made in writing and state the nature of requested testimony. Second, the request must explain why the testimony is unavailable by any other means. Finally, the request must provide reasons why the testimony would be in the interests of HHS or the Federal Government.

After consulting with the Office of the General Counsel regarding your request, I have determined that the testimony and consultation you seek is in the interest of HHS/CDC to the extent not otherwise available through production of documents through the Freedom of Information Act (FOIA) or through relevant testimony and documents available in the private sector or from other federal agencies. Merck counsel have submitted FOIA requests to CDC and the agency has responded by providing relevant agency materials.

While the U.S. government is not currently a party intervenor to this litigation, CDC has a clear interest in the outcome of the two cases given its public health mission to decrease vaccine-preventable infectious diseases, in particular in pediatric populations, and to do so efficiently at an appropriate cost to the public. CDC and its Advisory Committee on Immunization Practices (ACIP) effectively define the standard of medical care through recommendations on the proper use of pediatric and adult vaccines. Critical to that is the agency receiving accurate information from the vaccine manufacturers to better inform CDC/ACIP guidance. In addition, CDC has a major programmatic role in accomplishing reduction in vaccine-preventable infectious disease through the agency's VFC Program by using scarce public health federal funding to purchase effective vaccines for administration to children by public and private VFC providers throughout the country. In that role, CDC is the largest purchaser of mumps vaccine in the United States.

You have requested testimony on the following matters:

1. The sophistication, knowledge and processes of CDC and ACIP, with specific regard to mumps, the mumps vaccines, and mumps outbreaks.
2. CDC's understanding of the public health consequences if the mumps virus is uncontrolled, and the impact the mumps vaccine has had on the number of reported cases of mumps since the initial introduction of the vaccine.
3. The factors considered by CDC and ACIP in their evaluation of a vaccine, including specifically the mumps vaccine and the role of effectiveness and immunogenicity data in those evaluations.
4. The VFC program, including specifically the basis for CDC vaccine purchases under the program, including the mumps vaccine.
5. CDC's and ACIP's understanding of the safety, efficacy and effectiveness of Merck's mumps vaccine, and the basis for that understanding.
6. CDC's and ACIP's monitoring of the safety and effectiveness of Merck's mumps vaccine.

Hardway – Page 3

    7. CDC's and ACIP's recommendations concerning Merck's mumps vaccine, including the basis for those recommendations.

In the interest of CDC in this litigation, I am authorizing requested testimony and consultation by former CDC employees Dr. William Atkinson and Mr. William Nichols, and two former Special Government Employees who are former members of the ACIP, Dr. Jonathan Temte and Dr. Cody Meissner, regarding the matters specified above, subject to the parameters that follow:

    1. The scope of any testimony regarding CDC/ACIP matters shall be limited to that necessary to address the needs of this litigation and in the interest of the public health mission of CDC.

    2. Notwithstanding the way you characterize the requested testimony above, these former CDC employees and ACIP members can only represent their own views and experiences in testimony and reports and cannot represent CDC's or the ACIP's views, including in terms of potential future agency/committee actions. Accordingly, at the outset of any testimony, in deposition or at trial, these four individuals must state for the record that their testimony represents their own views and does not represent the official positions of HHS or the CDC. Further, the witnesses are not authorized to testify about any privileged information they obtained, or privileged communications they had, while working for CDC or serving as a member of the ACIP.

    3. Merck legal counsel shall provide CDC with timely notice of any depositions or trial testimony by any of these four individuals. In addition, agency counsel and U.S. Department of Justice (DOJ) counsel must be allowed to participate in any depositions of these four individuals.

    4. Merck legal counsel must allow CDC and DOJ to review all deposition transcripts and, if appropriate, lodge any legal objections to the witnesses' testimony during the deposition or prior to their being filed with the court or otherwise used in any way in support of this or other litigation.

    5. Further, this *Touhy* approval is conditioned on providing CDC the opportunity for timely review of any expert reports prepared in whole or in part by any of these four individuals prior to use in any testimony or other public use in this litigation.

This limited approval of your *Touhy* requests is not an endorsement by HHS or CDC of the accuracy of any statements that the witnesses may make in a report, a deposition or as witnesses at trial. CDC reserves the right to correct inaccuracies by filing a brief with the court or by otherwise correcting the record in an appropriate manner.

Finally, you have requested that should any of these former CDC employee and/or former ACIP member witnesses become unavailable during the litigation whether you could reach out directly to agency legal counsel Kevin Malone to seek approval of replacement witnesses. I will take that under advisement in concert with the Office of the General Counsel should such a circumstance

Hardway – Page 4

present and determine at that time an expeditious way to consider approval of any proposed substitute former CDC employee and/or former ACIP member witnesses.

Please contact Mr. Malone in the Office of the General Counsel with any questions regarding this *Touhy* approval. In addition, this approval is contingent on providing Mr. Malone timely written notice of any depositions and trial testimony, along with other information specified above. You can reach him at KMalone@cdc.gov or (404) 639-7201.

Sincerely,

*Robert R. Redfield, MD*

Robert R. Redfield, M.D.
Director, CDC

cc:    William Atkinson, M.D.
       William Nichols
       Jonathan Temte, M.D.
       Cody Meissner, M.D.
       Nancy Messonnier, M.D.
       Kevin M. Malone, Esq.
       Joel M. Sweet, Esq.
       Gerald B. Sullivan, Esq.
       Holly Snow, Esq.

11/26/2019
Declaration of G. Reilly
EXHIBIT 429

Appx20055

# Ensuring the Safety of Vaccines in the United States

Last updated July 2011

For more information on vaccines, vaccine-preventable diseases, and vaccine safety:
*http://www.cdc.gov/vaccines/conversations*

- Currently, the United States has the safest, most effective vaccine supply in its history.

- The United States' long-standing vaccine safety system ensures that vaccines are as safe as possible. As new information and science become available, this system is, and will continue to be, updated and improved.

- The U.S. Food and Drug Administration (FDA) ensures the safety, effectiveness, and availability of vaccines for the United States. Before the FDA licenses (approves) a vaccine, the vaccine is tested extensively by its manufacturer. FDA scientists and medical professionals carefully evaluate all the available information about the vaccine to determine its safety and effectiveness.

- Although most common side effects of a vaccine are identified in studies before the vaccine is licensed, rare adverse events may not be detected in these studies. Therefore, the U.S. vaccine safety system continuously monitors for adverse events (possible side effects) after a vaccine is licensed. When millions of people receive a vaccine, less common side effects that were not identified earlier may show up.

**Adverse Events and Side Effects** Adverse events reported to the Vaccine Adverse Event Reporting System (VAERS) are not necessarily side effects caused by vaccination. An *adverse event* is a health problem that happens after vaccination that may or may not be caused by a vaccine. By definition, a *side effect* has been shown to be linked to a vaccine by scientific studies.

## | Prelicensure: Vaccine Safety Testing |

The U.S. Food and Drug Administration (FDA) must license (approve) a vaccine before it can be used in the United States. FDA regulations for the development of vaccines ensure their safety, purity, potency, and effectiveness. Before a vaccine is approved by FDA for use by the public, results of studies on safety and effectiveness of the vaccine are evaluated by highly trained FDA scientists and doctors. FDA also inspects the vaccine manufacturing sites to make sure they comply with current Good Manufacturing Practice (cGMP) regulations.

### Vaccine Development

Vaccine development begins in the laboratory before any tests in animals or humans are done. If laboratory tests show that a vaccine has potential, it is usually tested in animals. If a vaccine is safe in animals, and studies suggest that it will be safe in people, clinical trials with volunteers are next.

### Clinical Trials

Typically, there are three phases of clinical trials. Vaccines that are being developed for children are first tested in adults. FDA sets guidelines for the three phases of clinical trials to ensure the safety of the volunteers.

Phase 1 clinical trials focus on safety and include 20–100 healthy volunteers. In Phase 1, scientists begin to learn how the size of the dose may be related to side effects. If possible at this early stage, scientists also try to learn how effective the vaccine may be.

If no serious side effects are found in Phase 1, next is Phase 2, which involves several hundred volunteers. This phase includes studies that may provide additional information on common short-term side effects and how the size of the dose relates to immune response.

In Phase 3 studies, hundreds or thousands of volunteers participate. Vaccinated people are compared with people who have received a placebo or another vaccine so researchers can learn more about the test vaccine's safety and effectiveness and identify common side effects.

Clinical trials are conducted according to plans that FDA reviews to ensure the highest scientific and ethical standards. The results of the clinical trials are a part of FDA's evaluation to assess the safety and effectiveness of each vaccine. In addition to evaluating the results of the clinical trials, FDA scientists and medical professionals carefully evaluate a wide range of information including results of studies on the vaccine's physical, chemical, and biological properties, as well as how it is manufactured, to ensure that it can be made consistently safe, pure, and potent.







The trials and all other data must show that the vaccine's benefits outweigh the potential risks for people who will be recommended to receive the vaccine. Only if a vaccine's benefits are found to outweigh its potential risks does the FDA grant a license for the vaccine, allowing it to be used by the public.

## | Postlicensure: Vaccine Safety Monitoring |

After vaccines are licensed, they are monitored closely as people begin using them. The purpose of monitoring is to watch for adverse events (possible side effects). Monitoring a vaccine after it is licensed helps ensure that the benefits continue to outweigh the risks for people who receive the vaccine.

Monitoring is essential for two reasons. First, even large clinical trials may not be big enough to reveal side effects that do not happen very often. For example, some side effects may only happen in 1 in 100,000 or 1 in 500,000 people.

Second, vaccine trials may not include groups who might have different types of side effects or who might have a higher risk of side effects than the volunteers who got the vaccine during clinical trials. Examples of these groups include people with chronic medical conditions, pregnant women, and older adults.

If a link is found between a possible side effect and a vaccine, public health officials take appropriate action by first weighing the benefits of the vaccine against its risks to determine if recommendations for using the vaccine should change.

The Advisory Committee on Immunization Practices (ACIP), a group of medical and public health experts, carefully reviews all safety and effectiveness data on vaccines as a part of its work to make recommendations for the use of vaccines. The ACIP modifies recommendations, if needed, based on safety monitoring.

### VAERS

Postlicensure monitoring begins with the Vaccine Adverse Event Reporting System (VAERS), a national system used by scientists at FDA and the Centers for Disease Control and Prevention (CDC) to collect reports of adverse events (possible side effects) that happen after vaccination. Health care professionals, vaccine manufacturers, vaccine recipients, and parents or family members of people who have received a vaccine are encouraged to submit reports to VAERS if they experience any adverse events after getting any vaccine.

Scientists monitor VAERS reports to identify adverse events that need to be studied further. All serious reports are reviewed by medical professionals on a daily basis. VAERS data provide medical professionals at CDC and FDA with a signal of a potential adverse event. Experience has shown that VAERS is an excellent tool for detecting potential adverse events. Reports of adverse events that are unexpected, appear to happen more often than expected, or have unusual patterns are followed up with specific studies.

VAERS data alone usually cannot be used to answer the question, "Does a certain vaccine cause a certain side effect?" This is mainly because adverse events reported to VAERS may or may not be caused by vaccines. There are reports in VAERS of common conditions that may occur by chance alone that are found shortly after vaccination. Investigation may find no medical link between vaccination and these conditions.

To know if a vaccine causes a side effect, scientists must know whether the adverse event is occurring after vaccination with a particular vaccine more often than would be expected without vaccination. They also need to consider whether the association between the vaccine and the adverse event is consistent with existing medical knowledge about how vaccines work in the body.

### VSD

Scientists use CDC's Vaccine Safety Datalink (VSD) to do studies that help determine if possible effects identified using VAERS are actually related to vaccination. VSD is a network of eight managed care organizations across the United States. The combined population of these organizations is more than 9.2 million people.

Scientists can use VSD in two ways. First, scientists can look back in medical records to see if a particular adverse event is more common among people who have received a particular vaccine. Second, instead of looking back, scientists can use Rapid Cycle Analysis (RCA) to continuously look at information coming into VSD to see if the rate of certain health conditions is higher among vaccinated people. This second approach is new, and it allows results to be obtained much more quickly.

### Vaccine Manufacturing

Once a vaccine is licensed, FDA regularly inspects vaccine manufacturing facilities to make sure they are following strict regulations. Vaccines are manufactured in batches called lots, and vaccine manufacturers must test all lots of a vaccine to make sure they are safe, pure, and potent. Vaccine lots cannot be distributed until released by FDA.

| the science |

**The Complicated Task of Monitoring Vaccine Safety**
by S.S. Ellenberg and R.T. Chen. *Public Health Reports.* January-February 1997. Vol 112: pages 10-21. *http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1381831/pdf/pubhealthrep00042-0012.pdf*

**Vaccine Safety: Current Systems and Recent Findings**
by Melinda Wharton. *Current Opinion in Pediatrics.* February 2010. Vol 22: pages 88-93. *http://www.cdc.gov/vaccines/spec-grps/hcp/conversations-refs.htm*

**The Vaccine Safety Datalink: Immunization Research in Health Maintenance Organizations in the USA**
by R.T. Chen et al. *Bulletin of the World Health Organization.* 2000. Vol 78: pages 186-194. *http://www.who.int/bulletin/archives/78(2)186.pdf*

**Postlicensure Monitoring of Intussusception After RotaTeq Vaccination in the United States, February 1, 2006 to September 25, 2007**
by Penina Haber et al. *Pediatrics.* June 2008. Vol 121: pages 1206-1212. *http://pediatrics.aappublications.org/cgi/reprint/121/6/1206?maxtoshow=&hits=10&RESULTFORMAT=&fulltext=Rotateq&andorexactfulltext*

For more information on vaccines call 800-CDC-INFO (800-232-4636) or visit *http://www.cdc.gov/vaccines.*

11/26/2019
Declaration of G. Reilly
EXHIBIT 430

**To:**      DeLong, Diana[diana_delong@merck.com]; De Camara, Jennifer
M[jennifer_decamara@merck.com]
**Cc:**      McDaid, Ken B.[kenneth_mcdaid@merck.com]
**From:**    Duffy, Colleen M
**Sent:**    Wed 12/14/2005 9:46:20 AM
**Importance:**      Normal
**Subject:** Fw: Solicitation # 2006-N-082574

REDACTED – PRIVILEGED

-----Original Message-----
From: Biltz, Berta
To: Duffy, Colleen M
Sent: Wed Dec 14 09:28:08 2005
Subject: RE: Solicitation # 2006-N-082574


Colleen, this is the Project Officer's comments.  Please address the
issues below in your final proposal revision.

-----------------------------------------------------------------
-------
From: Ellington, Rex
Sent: Tuesday, December 13, 2005 4:19 PM
To: Biltz, Berta
Subject: RFP 2006-N-082574, MMR-V Vaccine


Berta,


1)  Merck has proposed a minimum shelf life of 8 months for the new
MMR-V vaccine (brand name ProQuad).  The solicitation requested 12
months minimum shelf life.  CDC understands that this situation is
related to the later than anticipated licensure and launch of this new
vaccine and that Merck expects this to be a short term situation.  If
CDC accepts a minimum shelf life of 8 months, will Merck agree to
replace any MMR-V vaccine ordered by immunization projects through the
CDC contract that expires before it can be used?  CDC will work with
Merck to coordinate the return and re-supply of any such vaccine.

2) Merck's initial proposal listed a price of $718.53 per package of 10
single-dose vials, but also indicated that the price is $71.85 per dose.
Merck also clarified that this proposed price does not include federal
excise tax of $3.00 per dose.  To eliminate potential conflicts
concerning the package price and the per dose price, Merck is requested
to propose a package price which can be divided by 10 to equal a unit
price that does not have to be rounded.  Example: package price of
$718.50, per dose price of $71.85 or package price of $718.53, unit
price of 71.853.

3) Merck is requested to consider submitting a lower price.  (The
proposed per dose price including federal excise tax is $5.93 higher

**CONFIDENTIAL**

**MRK-KRA00942187**
**MRK-CHA00942187**

than the separate CDC per dose prices for MMR ($16.67) and varicella ($52.25).  Merck is also requested to provide a copy of its commercial price list for this vaccine.

4) Merck is requested to confirm acceptance of the minimum order size of 10 doses per destination.

5) Merck's request to amend clauses C.1.5 and C.1.26 (as listed in Merck's current contract) to reflect ProQuad is acceptable to CDC.

-----Original Message-----
From: Biltz, Berta
Sent: Tuesday, December 13, 2005 4:15 PM
To: 'colleen_duffy@merck.com'
Subject: Solicitation # 2006-N-082574

Thank you for your time today.  As discussed, we would like to ask for your final revised proposal by Midnight, EST, tomorrow. Please submit it via e-mail to Bbiltz@cdc.gov.

I think these are the issues that we discussed and would like you to include in your final proposal revision:

        a. If the shelf life of 8 months is currently unavailable, Would Merck provide a replacement at the end of the 8 months at no additional cost to the CDC?

        b. Please consider proposing a lower price as indicated by e-mail earlier today.

        c. Please confirm that no restrictions with the supply exists and that immediate delivery is available FOB Dest.

        d. Please send the draft that you forwarded to Lisa regarding the modified clauses for my review and inclusion in the Mod.

Mr. Rex Ellington, the Project Officer, may add something more tomorrow, which I will forward expeditiously.

CONFIDENTIAL

MRK-KRA00942188
MRK-CHA00942188

11/26/2019
Declaration of G. Reilly
EXHIBIT 431

**DeLong, Diana**

| | |
|---|---|
| **From:** | Agnew, Kevin |
| **Sent:** | Friday, March 14, 2014 9:36 AM |
| **To:** | DeLong, Diana |
| **Subject:** | FW: 2014 VFC Contract |

FYI....Tammy approved the pricing, so Todd's approval is below

**From:** Skjeveland, Eric T.
**Sent:** Friday, March 14, 2014 9:22 AM
**To:** Agnew, Kevin; Sprague, Tammy S.
**Subject:** FW: 2014 VFC Contract

FYI – we should we good to go.

**From:** Sprague, Tammy S.
**Sent:** Friday, March 14, 2014 9:17 AM
**To:** Nichols, Todd; Skjeveland, Eric T.
**Cc:** Hall, James S.; Egge, Steven R
**Subject:** RE: 2014 VFC Contract

I don't expect that this will adversely impact the commercial business, especially with the adjustment to include the premium on the syringe image.

Thanks,
Tammy

**From:** Nichols, Todd
**Sent:** Friday, March 14, 2014 8:28 AM
**To:** Skjeveland, Eric T.
**Cc:** Hall, James S.; Egge, Steven R; Sprague, Tammy S.
**Subject:** Re: 2014 VFC Contract

Eric,

Since I am out of the office today please check in with Tammy to make sure this approach doesn't adversely impact the Commerical business moving forward with Syringes? If this is not the case, I approve.

Thanks!

On Mar 13, 2014, at 6:13 PM, "Skjeveland, Eric T." <eric.skjeveland@merck.com> wrote:

> Todd,
> Tomorrow morning, we will submit our 2nd best and final offer (BAFO) to CDC for the VFC contract. REDAC
> REDACTED – OMP

1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01673057
MRK-CHA01673057

REDACTED – OMP

See below for a table which summarizes our revised pricing as well as shows a comparison to commercial and catalog pricing. Please note, in most cases the lowest commercial price is on the Kaiser contract, and in some cases, is very close to VFC pricing. Since CDC is now using commercial pricing as a comparator for VFC prices, we may want to reevaluate our contract prices especially for Kaiser.

| Product Name | NDC | Image | Catalog Current Price Per Dose | CDC 2014 BAFO Price Per Dose (w/o FET) | Lowest Commercial Non-Performance Price Per Dose (w/o FET) | CDC |
|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | |
| M-M-R II W/DILUENT | 00006468100 | 10x vial | $ 53.89 | $ 17.79 | $ 48.50 | - |
| REDACTED – OMP | | | | | | |
| PROQUAD | 00006499900 | 10x vial | $ 154.64 | $ 100.16 | $ 141.81 | |
| REDACTED – OMP | | | | | | |

Defenitions:
Meet Compliance Measures: PDs have 1% Service Fee for meeting 5 metrics (Dist Fee, Inv, Mgt, Serv levels, returns, Inv Accuracy
Prefered Status: REDACTED – OMP
Co-Preferred Stats: Available for use within the Program
Commitment Letter: Per RL, non-performance

Please let me know if you have questions.

Thanks,
Eric

**From:** Skjeveland, Eric T.
**Sent:** Tuesday, March 04, 2014 6:07 PM
**To:** Nichols, Todd
**Subject:** 2014 VFC Contract

Todd,
As you know, we are in the midst of negotiation with CDC for the 2014 VFC contract and expect to submit our best and final offer (BAFO) by close of business on Friday, March 7. The CDC is taking a

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01673058
MRK-CHA01673058

couple of new approaches this year in an attempt to rein in vaccine costs and to ensure the government is getting a fair and reasonable price:

- CDC added a new FAR (Federal Acquisition Regulation) clause to the contract solicitation which requires manufacturers to provide commercial pricing information to help the government make a determination that the contract prices we are offering are fair and reasonable. We have provided similar information in the past, but in a more informal way. The new FAR clause is quite specific in what is required and must be submitted in writing. Furthermore, the government retains the right to request additional information if they are not satisfied with the original response.

- CDC, for the first time, counter proposed prices in writing after we submitted our initial offer (historically the pricing negotiation was done verbally before we submitted our BAFO). CDC's proposed prices were the lower of either FCP (Federal Ceiling Price) or current VFC price + 0.3% (CPI for healthcare commodities). In either case, the proposed prices are significantly lower than our planned BAFO prices and would result in approx. $170M shortfall vs budget this year.

Following are our next steps:

- After evaluating a number of possible pricing scenarios, we intend to move forward as planned with our original BAFO prices in response to CDC's counterproposal. The BAFO prices represent an approx. $13M upside vs. budget with a weighted overall price increase of 4.6% vs current VFC prices. I believe the probability of CDC accepting or rejecting this offer is about the same as the other pricing scenarios we considered, therefore better to go in a little strong with our prices with the expectation that CDC will likely respond by requesting additional information per the new FAR clause and/or ask for a lower price. Although I believe it is unlikely CDC will push us to go to FCP prices on the VFC contract, we are prepared to defend our proposed prices as fair and reasonable.


REDACTED – PRIVILEGED

- I expect CDC to respond to our BAFO prices next week and will convene a group to discuss and plan our next steps.

One additional point and possible risk is the uncertainty on how other manufacturers will respond to CDC's new approach. If our competitors reduce their prices in a meaningful way, we may be compelled to do the same. GSK and Rotarix present the greatest financial risk REDACTED – OMP
REDACTED – OMP . First opportunity to assess will be on April 1 when the new contract prices are announced.

Please let me know if you have any questions.


Thanks,
Eric

3

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01673059
MRK-CHA01673059

**Appx20064**

11/26/2019
Declaration of G. Reilly
EXHIBIT 432

Appx20065



March 07, 2014

Centers for Disease Control & Prevention
Procurement and Grants Office
Contracts and Purchases Branch
ATTN: Ms. Berta Biltz
2920 Brandywine Road, MS-K14
Atlanta, GA 30341-4146

**SUBJECT:**     **CDC Request for Final Proposal to RFP 2014-N-15784**
              **Consolidated Vaccines for Children Contract**

Dear Ms. Biltz:

This letter is in response to the teleconferences held on February 25, 2014 and the email received on February 27, 2014 regarding Merck's bid for the Consolidated Vaccines for Children Contract. Please be advised that our responses to the issues raised are attached hereto and represent our best and final offer.

All terms and conditions of this final proposal revision are considered proprietary and confidential Merck information.

If you have any questions or require additional information, please feel free to contact Kevin Agnew, Customer Manger, at (215) 652-4008. We look forward to our continued relationship in the coming contract year.

Sincerely,

Eric T. Skjeveland, Director
Customer Marketing – Merck Vaccines

Attachment(s): Merck Talking Points RFP 2014-N-15784 with edits
              RFP 2014-N-15784 with Edits
              Attachment A

**CONFIDENTIAL**

**MRK-KRA01655048**
**MRK-CHA01655048**

Solicitation No. 2014-N-15784

February 20, 2014
Updated with Merck Comments in Green

Merck Pediatric Vaccine Proposal, RFP 2014-N-157-84

Recommended Changes to all solicitations/proposals:

1. Clause C.3.21, following C.3.29, should read C.3.30.
   Merck Response: Merck accepts this revision.
2. Clause C.3.29 – Price Change – should read: *"All price change effective dates shall be approved by the CDC Contracting Officer and shall occur on the first day of the following month"*
   Merck Response: Merck accepts this revision.

Specific comments:

For some items listed below increased maximums are requested:

CDC wants to be sure that Merck is aware that there are significant challenges for CDC to increase the value of a government contract after competitive award, without compelling circumstances such as a national vaccine shortage.





CONFIDENTIAL

MRK-KRA01655049
MRK-CHA01655049

Appx20067



REDACTED – OMP

CDC response: This is acceptable.

**SPECIAL CLAUSES**

### C.3.2.  Packaging and Packing Requirements

1. Packaging: All items shall be packaged in standard commercial manner.

2. Packing:

> (a) Product shall be packed to ensure maintenance of appropriate temperature during transit and safe arrival at destination. Non-frozen vaccines shipped in case-pack size or greater quantities will have temperature monitoring devices included with each shipment.

> (b) Vaccine Shipment Temperature Excursions:

In the event the temperature monitoring device records a temperature excursion that occurred during transit, the Contractor will provide the Project Officer with documentation that includes a description of the event including the vaccines and lot numbers investigated, time of excursion, noting the temperatures and potential impact to product quality. Upon review of the summary provided, CDC will notify Merck if the vaccine is accepted or rejected.

> i.  Product shall be packed to ensure maintenance of FDA recommended temperature during transit and safe arrival at destination. An electronic temperature monitoring device is required with each shipment unless Contractor has obtained prior approval from CDC to use an alternative monitoring method.

> ii.  Contractor will provide the Contracting Officer Representative (COR) with documentation that explains the cause of each temperature excursion and stability data used by the contractor to determine if the cold chain was adversely affected by temperature variance. Upon review of data provided, CDC will notify appropriate parties if the vaccine is accepted or rejected

 **Confidential**

CONFIDENTIAL

CDC response. This is acceptable.

### C.3.3.   Contract Period of Performance

The contract period of performance shall begin on the date of award and shall end on 03/31/2015.

CDC response:  This is acceptable.

### C.3.5.   Place of Delivery

1. The following applies to all Contract Line Item Numbers **REDACTED – OMP**
   **REDACTED – OMP**

   (a) Contractor shall be required to deliver vaccine F.O.B. Destination, as directed by delivery orders, only to the designated CDC centralized distribution centers in Aurora, CO and Memphis, TN (provided that the private distributor indemnifies or obtains insurance to indemnify, defend and hold harmless the Contractor from any claims and costs arising from or resulting from the distributor's handling of the vaccine purchases under this contract; the Contractor agrees that it will not require any indemnification by the distributor to extend the liability caused by acts or omissions of the Contractor).



**REDACTED – OMP**

The Contractor shall be required to deliver vaccines F.O.B. Destination, as directed by delivery


C  Confidential

CONFIDENTIAL

orders to the CDC centralized distribution locations currently in Aurora, CO and Memphis, TN. The Contractor shall be required to deliver frozen vaccines F.O.B. destination as directed by delivery orders.

CDC response: This is acceptable. CDC requests adding CNMI to the list of sites where varicella vaccine is distributed.

Merck response: The addition of the Commonwealth Northern Mariana Islands (CNMI) is acceptable.

### C.3.7.    Product Licensure

a. The vaccines produced and delivered under this contract shall be manufactured under a current establishment and product license issued by the Food and Drug Administration as indicated below:
____2____

b. The Current Good Manufacturing Practice Regulations (CGMPR's) (21CFR Parts 210 211) will be the standard to be applied for manufacturing, processing and packing of drugs, chemicals and biologicals, and reagents.

c. The Contractor shall advise the Contracting Officer immediately as soon as Contractor becomes aware of any relocation of his prime manufacturing facility or the relocation of any subcontractor's facility, and if at any time during the life of the contract, the item listed under this contract fails to meet CGMPR's and/or a negative Food and Drug Administration Quality Assurance Evaluation is received; the contract may be terminated, in whole or in part, without further liability to the Government.

CDC response: This is acceptable

### C.3.14.    Method of Payment

a. Federal Government: The Government will use electronic funds transfer to the maximum extent possible when making payment under this contract IAW/FAR Clause 52.232-33, payment by Electronic Funds Transfer - Central Contractor Registration.

b. Awardees: Awardees authorized to order vaccine using funds for State and Local Orders will be required to comply with all terms and conditions hereunder, including the Prompt Payment Act and all payment provisions required by this agreement. Merck acknowledges that the CDC is limited in its ability to enforce the Prompt Payment Act with the Awardees.

CDC response: CDC proposes the following revision to C.3.14.b:
Awardees authorized to order vaccine using funds for State and Local Orders will be required to comply with all terms and conditions hereunder, including the Prompt Payment Act and all payment provisions required by this agreement. Merck acknowledges that the CDC is unable to enforce the Prompt Payment Act with the Awardees using state/local/CHIP funds.

Merck Response: Merck accepts CDC revised language.

### C.3.18.    Federal Excise Tax Credit

C Confidential

CONFIDENTIAL

MRK-KRA01655052
MRK-CHA01655052

**Appx20070**

Negotiated prices for the vaccines included in this Contract may include a Federal Excise Tax (See Continuation of SF 1449 for applicable Contract Line Item Numbers). If for any reason the vaccine is returned (other than for resale) or destroyed, the Contractor shall within 6 months following the date the vaccine is returned or destroyed, file a claim for credit or refund relative to any tax previously paid on such vaccine. The Contractor agrees to credit or refund the amount of such excise tax to the purchaser to the extent that the Contractor receives a credit or refund from the Federal Government. Any such credit or refund to the purchaser is expressly conditioned upon the authorized purchaser providing a written summary of events leading to the request for credit or refund. The purchaser shall return all undistributed vaccine to the agent of the Contractor for proper disposal, unless destruction or condition of the vaccine renders return impossible. If destruction or condition of the vaccine renders return impossible and is therefore destroyed by the purchaser, the authorized purchaser must provide a written summary of events to the Contractor within 30 days of said destruction. If a contract is in place with the Contractor at the time when a credit or refund is ~~due~~ issued; the purchaser may elect to receive vaccine which will be purchased at the current contract price in lieu of a ~~cash payment~~ credit or refund. Otherwise, the Contractor shall refund the amount due to the purchaser's account. If a credit or refund is issued by the Contractor for state or local funds, it shall be submitted to the state or local public health entity identified in the request for FET credit. If a credit or refund is issued by the Contractor to the Federal Funds account, it shall contain the Contractor's DUNS and TIN/EIN and shall be submitted either via EDI (credit) or to the following address (check):

> Centers for Disease Control and Prevention
>
> Financial Management Office
>
> Attn: Debt Management Branch
>
> P.O. Box 15580
>
> Atlanta, GA 30333

CDC response:    This is acceptable.

### C.3.19.  Delinquent Delivery Report

a.  The Contractor shall provide CDC with a weekly listing of all CDC orders that have not been shipped within the agreed upon delivery schedule specified in the contract. The report shall include the following information: project name, order number, date of order, and status of order in number of pending/undeliverable doses. Depending upon the nature of the delinquencies, the CDC may request this report less often during the Contract performance period and in this situation, frequency and method of providing such reports shall be mutually agreed upon by the Contractor and CDC.  This report shall provide an explanation as to the cause for the delinquent deliveries as well as when the vaccine will be delivered, as it is known by the Contractor at the time of the report.  This notification shall not relieve the Contractor from meeting its obligations under the contract and shall not limit the Government's rights to seek relief for any breach of contract for failure to perform, including termination for cause.  Notwithstanding the foregoing, the CDC agrees to work with the Contractor in good faith to allow the Contractor to remedy the effect of any supply shortage on contract performance, even if the contract performance is not specifically relieved by FAR 52.212-4(f).

b.  CDC acknowledges that the explanation as to the cause for delinquent deliveries and when vaccine will be delivered is confidential and proprietary information to the Contractor, and shall not use such information other than for CDC's internal tracking and reporting purposes and shall not further disclose such information without the Contractor's prior written consent unless required by law or other Federal authority. The Contractor acknowledges that the failure to fill orders as well as data associated with such failure are not confidential or proprietary data but are data incidental to contract performance. In the event that CDC is required by law or

 **Confidential**

CONFIDENTIAL

MRK-KRA01655053
MRK-CHA01655053

other Federal authority to disclose the explanation as to the cause for the delinquent deliveries and when vaccine will be delivered. CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority.

~~The Contractor shall provide CDC with a weekly electronic listing of all CDC orders that have not been shipped within the agreed upon delivery schedule. The report shall include the following information: project name, order number, date of order, and status of order in number of pending/undelivered doses. The report shall also provide an explanation as to the cause for the delinquent delivery as well as when the vaccine will be delivered. This notification shall not relieve the contractor from meeting its obligations under the contract and shall not limit the Government's right to seek relief for any breach of contract for failure to perform, including termination for cause.~~

CDC response: This is acceptable

### C.3.26    Use of VFC Provider Lists and Distribution of Material

a.  Contractors are prohibited from utilizing VFC providers' lists obtained from any source for any mailing or other communication with VFC providers, except as approved in writing by the CDC COR. In addition, contractors are prohibited from otherwise communicating with VFC providers regarding the VFC program, except as approved in writing by the CDC COR. To the extent that Contractors have established relationships with VFC providers or authorized purchasers under this contract that are independent from the VFC program, communications related to such independent relationships are not covered by this provision and do not require CDC consent.

b.  Contractors are prohibited from providing names and/or addresses of VFC providers to any third party, except as needed to comply with the terms of this contract, in which cases the CDC COR shall be notified in writing, of such use.

c.  Any Contractor that ships vaccine directly to VFC providers is prohibited from inserting any promotional or other material that is promotional in nature for any product that the Contractor produces, into shipping containers for vaccine purchased under this contract, except for material related to use of the vaccine as approved in writing by the CDC COR. Additionally any shipping container inserts that are required, such as handling instructions or educational materials, should not contain any promotional material as part of its content. Notwithstanding the foregoing, to the extent that Contractors have established relationships with VFC providers or authorized purchasers under this contract that are independent from the VFC program, communications related to such independent relationships are not covered by this provision and do not require CDC COTR consent.

CDC response: This is acceptable.

### ~~C.3.21    52.215-20 Requirements for Certified Cost or Pricing Data and Data Other Than Certified Cost or Pricing Data. (Oct 2010)~~

~~(a) Exceptions from certified cost or pricing data.~~
~~(1) In lieu of submitting certified cost or pricing data, offerors may submit a written request for exception by submitting the information described in the following paragraphs. The Contracting Officer may require additional supporting information, but only to the extent necessary to determine whether an exception should be granted, and whether the price is fair and reasonable.~~

 **Confidential**

CONFIDENTIAL

MRK-KRA01655054
MRK-CHA01655054

(i) *Identification of the law or regulation establishing the price offered.* If the price is controlled under law by periodic rulings, reviews, or similar actions of a governmental body, attach a copy of the controlling document, unless it was previously submitted to the contracting office.

(ii) *Commercial item exception.* For a commercial item exception, the offeror shall submit, at a minimum, information on prices at which the same item or similar items have previously been sold in the commercial market that is adequate for evaluating the reasonableness of the price for this acquisition. Such information may include—

(A) For catalog items, a copy of or identification of the catalog and its date, or the appropriate pages for the offered items, or a statement that the catalog is on file in the buying office to which the proposal is being submitted. Provide a copy or describe current discount policies and price lists (published or unpublished), e.g., wholesale, original equipment manufacturer, or reseller. Also explain the basis of each offered price and its relationship to the established catalog price, including how the proposed price relates to the price of recent sales in quantities similar to the proposed quantities;

(B) For market-priced items, the source and date or period of the market quotation or other basis for market price, the base amount, and applicable discounts. In addition, describe the nature of the market;

(C) For items included on an active Federal Supply Service Multiple Award Schedule contract, proof that an exception has been granted for the schedule item.

(2) The offeror grants the Contracting Officer or an authorized representative the right to examine, at any time before award, books, records, documents, or other directly pertinent records to verify any request for an exception under this provision, and the reasonableness of price. For items priced using catalog or market prices, or law or regulation, access does not extend to cost or profit information or other data relevant solely to the offeror's determination of the prices to be offered in the catalog or marketplace.

(b) *Requirements for certified cost or pricing data.* If the offeror is not granted an exception from the requirement to submit certified cost or pricing data, the following applies:

(1) The offeror shall prepare and submit certified cost or pricing data, data other than certified cost or pricing data, and supporting attachments in accordance with the instructions contained in Table 15-2 of FAR 15.408, which is incorporated by reference with the same force and effect as though it were inserted here in full text. The instructions in Table 15-2 are incorporated as a mandatory format to be used in this contract, unless the Contracting Officer and the Contractor agree to a different format and change this clause to use Alternate I.

(2) As soon as practicable after agreement on price, but before contract award (except for unpriced actions such as letter contracts), the offeror shall submit a Certificate of Current Cost or Pricing Data, as prescribed by FAR 15.406-2.

(End of provision)

*Alternate I (Oct 2010).* As prescribed in 15.408(l) (and see 15.403-5(b)(1)), substitute the following paragraph (b)(1) for paragraph (b)(1) of the basic provision:

(b)(1) The offeror shall submit certified cost or pricing data, data other than certified cost or pricing data, and supporting attachments in the following format: [Insert description of the data and format that are required, and include access to records necessary to permit an adequate evaluation of the proposed price in accordance with 15.408, Table 15-2, Note 2. The description may be inserted at the time of issuing the solicitation, or the Contracting Officer may specify that the offeror's format will be acceptable, or the description may be inserted as the result of negotiations.]:

(a) Submit the cost portion of the proposal via the following electronic media: [*electronic spreadsheet*]

**1.3   FAR 52.215-21 Alternate III Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data – Modifications – Alternate III (Oct 1997)**

(c) Submit the cost portion of the proposal via the following electronic media: [*electronic spreadsheet*]

 Confidential

**CONFIDENTIAL**

CDC response: Please provide the requested information in accordance with C.3.30 Requirements for Certified Cost or Pricing Data and Data Other Than Certified Cost or Pricing Data. (Oct 2010). CDC will discuss this during our negotiation.

Merck Response: Merck's proposal in the attachment titled "Attachment A" is based upon providing information under 15.403-3 - Requiring data other than certified cost or pricing data. Merck believes that vaccines meet the commercial item exception (see 15.403-3(3)) and therefore certified cost and pricing data is not required. Please insert FAR 52.215-20 Requirements for Cost or Pricing Data or Information other than cost or Pricing Data (Oct 2010)(Alternate IV-Oct 2010) in its place.

C.3.30 – Duty to Warn

a. The Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC), and State agencies as authorized (hereinafter referred to in this contract clause C.3.30 as the Government) represent and agree that all programs which are supplied vaccine under this contract shall take appropriate steps to assure either (1) that such vaccine is administered to each patient on the basis of an individualized medical judgment by a physician; or (2) that such vaccine is administered after meaningful warnings related to the risks and benefits of vaccination are provided to such patient (or the patient's parent or legal guardian), in form and language understandable to such patient, parent, or guardian, including through use of appropriate version of the most recent vaccine information materials.

b. If any claim or action is asserted against the Contractor arising in whole or in part from an alleged failure by the Government to carry out its responsibilities under paragraph (a) above, the Contractor shall promptly notify the Contracting Officer and furnish to him copies of all pertinent documents served upon or received by the Contractor. The Government shall provide reasonable assistance and full cooperation including, but not limited to making witnesses available to testify and providing relevant documents to the Contractor arising from the Government's alleged failure to carry out its responsibilities under paragraph (a) above. The Government shall have the option to participate in the defense of that portion of such claim or action which arises from the alleged failure of the Government to carry out its responsibilities under paragraph (a) above.

c. In the event of the Government's breach of or failure to carry out its responsibilities under paragraph (a) above, any measure of resulting damages to the Contractor shall include, but need not be limited to, damages (including money judgments, reasonable attorneys' fees, and other costs) sustained in connection with claims against the Contractor for personal injuries caused by such breach or failure. The Contractor agrees to take appropriate steps to mitigate any such claims by diligently defending claims brought against it or when appropriate by entering into reasonable settlement agreements. The entry of a judgment against the Contractor in connection with a claim for personal injury allegedly resulting in whole or in part from the Government's breach of, or failure to carry out, its obligations under paragraph (a). This provision shall not limit any other right of the Contractor to obtain damages or other relief for any breach of this contract or for the settlement of any dispute arising under this contract."

CDC response: This is acceptable.

Merck response: Merck added in the missing paragraph (c) that was included in the RFP and is consistent with current contracts.

C.3.31 Confidentiality-


Confidential

CONFIDENTIAL

MRK-KRA01655056
MRK-CHA01655056

Appx20074

In the course of the Contractual relationship between the Contractor and the CDC, the CDC acknowledges that certain information provided by the Contractor shall be considered confidential and proprietary information to the Contractor (including, but not limited to information as to cause for delinquent deliveries as provided under Section C.3.19), and shall not use such information other than for CDC's internal tracking and reporting purposes and shall not further disclose such information without the Contractor's prior written consent unless required by law or other Federal authority. The Contractor shall mark all information they deem to be confidential or proprietary accordingly. If the CDC has reason to question the proprietary nature of information deemed such by the Contractor, the CDC will enter into discussions with the Contractor to reach a mutual agreement.   In the event that CDC is required by law or other Federal authority to disclose such confidential and proprietary information, CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority.

CDC response:   This is acceptable.

PRICING:

CDC Response: After reviewing Merck's business proposal, the Government requests additional discounts as follows:

| Brand | Packaging | 2014 NDC | Orig (w/ FET) | 2013 NDC | Counteroffer | Counteroffer Basis |
|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | |
| M-M-R II | 10 doses | 00006-4681-00 | OBRA '93 | 00006-4681-00 | $19.82 | 2013 + CPI |
| ProQuad | 10 doses | 00006-4999-00 | $106.17 | 00006-4999-00 | $95.40 | 2013 + CPI |

| Brand | Packaging | 2014 NDC | Orig (w/ FET) | 2013 NDC | Counteroffer | Counteroffer Basis |
|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | |

| Brand | Packaging | 2014 NDC | Orig (w/ FET) | 2013 NDC | Counteroffer | Counteroffer Basis |
|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | |

Merck Response:

 Confidential

CONFIDENTIAL

Merck has taken CDC's request to review pricing submitted under consideration. Please note that Section B has been updated accordingly with the best and final offer. Prices submitted are consistent with catalog price increases and reflect changes in the current market place. Additional background information requested pursuant to 15.403-3 is in Attachment A hereto. Merck is concerned by the CDC's counteroffer to limit prices to FCP or FSS prices. Congress imposed a price ceiling only on certain pediatric vaccines that were covered by federal contracts in effect as of May 1, 1993. However, according to the legislative history, Congress specifically declined to extend price caps to new vaccines under the VFC program in order to encourage manufacturer investments in the costly research and development of such vaccines. Furthermore, due to the growing trend of Universal Purchase states receiving funding through private funding sources (e.g. Managed Care Organizations, Insurance Companies, etc.), the size of the private market is continuing to decrease. We would be happy to discuss this further at your convenience.

 Confidential

**CONFIDENTIAL**

**MRK-KRA01655058**
**MRK-CHA01655058**

**Appx20076**

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS | | | 1. REQUISITION NUMBER | | PAGE 1 OF |
|---|---|---|---|---|---|
| OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30 | | | | | 25 |
| 2. CONTRACT NO. | 3. AWARD/EFFECTIVE DATE | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | | 6. SOLICITATION ISSUE DATE |
| | | | 2014-N-15784 | | 01/24/2014 |
| 7. FOR SOLICITATION INFORMATION CALL: ▷ | a. NAME | Berta Biltz | b. TELEPHONE NUMBER (No collect calls) | | 8. OFFER DUE DATE/ LOCAL TIME |
| | | | (770) 488-2643 | | |
| 9. ISSUED BY | CODE | 2538 | 10. THIS ACQUISITION IS | 11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED | 12. DISCOUNT |
| Centers for Disease Control and Prevention (PGO) Acquisition & Assistance Branch B 2920 Brandywine Road Atlanta, GA 30341-5539 | | | UNRESTRICTED | X SEE SCHEDULE | |
| | | | X SET ASIDE:      % FOR | | |
| | | | SMALL BUSINESS | 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | |
| | | | SMALL DISADV. BUSINESS | 13b. RATING | |
| | | | 8(A) | 14. METHOD OF SOLICITATION | |
| | | | SIC: | | |
| | | | SIZE STANDARD: | RFQ      IFB      X RFP | |
| 15. DELIVER TO | CODE | | 16. ADMINISTERED BY | | CODE 2538 |
| to be indicated by the individual delivery orders placed against the contract | | | Centers for Disease Control and Prevention (PGO) Acquisition & Assistance Branch B 2920 Brandywine Road Atlanta, GA 30341-5539 | | |
| 17a. CONTRACTOR/ OFFEROR CODE 053117021 FACILITY CODE | | | 18a. PAYMENT WILL BE MADE BY | | CODE 434 |
| Merck Sharp & Dohme Corp. One Merck Drive Whitehouse Station, NJ 08889 | | | Centers for Disease Control and Prevention (FMO) PO Box 15580 404-718-8100 | | |
| TELEPHONE | | | Atlanta, GA 30333-0080 | | |
| 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | | | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED      SEE ADDENDUM | | |

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | VFC 2014 | | | | |
| | "See Continuation Page" | | | | |
| | (Attach Additional Sheets as Necessary) | | | | |

| 25. ACCOUNTING AND APPROPRIATION DATA | | 26. TOTAL AWARD AMOUNT (For Govt. Use Only) |
|---|---|---|
| | | |

| | 27a. SOLICITATION |
|---|---|
| | 27b. CONTRACT/PURCHASE ORDER |

| 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ___ COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN. | 29. AWARD OF CONTRACT: REFERENCE ___ OFFER DATED ___. YOUR OFFER ON SOLICITATION (BLOCK 5) INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS: |
|---|---|
| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA (Signature of Contracting Officer) |
| 30b. NAME AND TITLE OF SIGNER (Type or print) Eric T. Skjeveland, Director Customer Marketing – Merck Vaccines | 30c. DATE SIGNED 01/07/2014 | 31b. NAME OF CONTRACTING OFFICER (Type or print) | 31c. DATE SIGNED |

| 32a. QUANTITY IN COLUMN 21 HAS BEEN | | 33. SHIP NUMBER | 34. VOUCHER NUMBER | 35. AMOUNT VERIFIED CORRECT FOR |
|---|---|---|---|---|
| RECEIVED   INSPECTED   ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED | | PARTIAL   FINAL | | |
| | | 36. PAYMENT | | 37. CHECK NUMBER |
| 32b. SIGNATURE OF AUTHORIZED GOVT REPRESENTATIVE | 32c. DATE | COMPLETE   PARTIAL   FINAL | | |
| | | 38. S/R ACCOUNT NUMBER | 39. S/R VOUCHER NUMBER | 40. PAID BY |
| | | 42a. RECEIVED BY (Print) | | |
| 41a. I CERTIFY THIS AMOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42b. RECEIVED AT (Location) | | |
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41c. DATE | 42c. DATE RECD. | 42d. TOTAL CONTAINERS | |

| AUTHORIZED FOR LOCAL REPRODUCTION      SEE REVERSE FOR OMB CONTROL NUMBER AND PAPERWORK BURDEN STATEMENT | STANDARD FORM 1449 (10-95) |
|---|---|

**CONFIDENTIAL**

MRK-KRA01655059
MRK-CHA01655059

Appx20077

# TABLE OF CONTENTS

| Section | Document/Clause/Provision | Page No. |
|---|---|---|
| A | Standard Form 1449 | 1 |
| B | Continuation of SF1449 (Block 19 – 24) | 2 |
| C | Contract Clauses | 35 |
| D | Contract Documents, Exhibits or Attachments | 59-20 |
| E | Solicitation Provisions | 85-22 |

CONFIDENTIAL

MRK-KRA01655060
MRK-CHA01655060

Appx20078

Solicitation No. 2014-N-15784

## SECTION B - CONTINUATION OF SF1449

The National Center for Immunization and Respiratory Diseases (NCIRD) requires the award of multiple indefinite quantity, indefinite delivery contracts for the purchase of standard commercial pediatric vaccines, manufactured under a current establishment and product license issued by the U.S. Food and Drug Administration. The vaccines awarded under these contracts will be purchased for NCIRD's immunization Awardees to support pediatric immunization programs as provided under Section 317(j) of the Public Health Service Act and Vaccine for Children (VFC) program, established pursuant to Section 13631 of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93).



| ITEM | SUPPLIES / SERVICES | QTY / UNIT | UNIT PRICE | EXTENDED PRICE |
|------|---------------------|------------|------------|----------------|
| REDACTED – OMP | | | | |
| REDACTED – OMP | | | | |

Page 2

CONFIDENTIAL

MRK-KRA01655061
MRK-CHA01655061

Appx20079

Solicitation No. 2014-N-15784



REDACTED – OMP

Page 3

MRK-KRA01655062
MRK-CHA01655062

Solicitation No. 2014-N-15784



**REDACTED – OMP**

| 12. | Measles, Mumps & Rubella (MMR) vaccine M-M-R II NDC-00006-4681-00 Pkg of 10 single dose vials Min. Shelf Life: 12 Months | Maximum: 844,588 Doses Minimum: 100 Doses | $13.37 per dose (EET Not Included) $20.06 per dose ___ |

Page 4

CONFIDENTIAL

MRK-KRA01655063
MRK-CHA01655063

Appx20081

Solicitation No. 2014-N-15784



CONFIDENTIAL

MRK-KRA01655064
MRK-CHA01655064

Appx20082

Solicitation No. 2014-N-15784

REDACTED – OMP

| 20. | Measles, Mumps & Rubella (MMR-V) and Varicella vaccine <br> Product <br> NDC 00000-0000-00 <br> Size of single dose vials <br> Min. Shelf Life: 12 Months <br> Min. Order Size: 10 Doses <br> Fed. Excise Tax: $3.00 per dose | Maximum: 3.3M Doses <br><br> Guaranteed Min./Maximum: 10% Doses | $150.00 Per Dose (FET Not Included) <br><br> $103.15 net (FET Cwb FET) |
|---|---|---|---|

REDACTED – OMP

Estimated Total based on Maximum Doses

**B.1 Background:** The Centers for Disease Control and Prevention (CDC) awards contracts for the purchase of standard commercial pediatric vaccines. Vaccines are one of the most cost-effective ways to prevent disease and reduce healthcare costs. The Vaccine for Children (VFC) program, established pursuant to Section 13631 of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93), guarantees federal support for the purchase and supply of sufficient quantities of vaccine to the States to cover a defined group of children. The program helps assure the implementation of effective immunization practices and proper use of vaccines to achieve higher immunization coverage. Children (18 years-of-age or younger) who qualify for immunization through the VFC purchase program include those who are (1) Medicaid-eligible, (2) without health insurance, (3) American Indian/Alaska native (as defined in Subsection (h)(3) of the OBRA '93), or (4) children with health insurance, which does not cover the cost of vaccines, if they receive their immunizations at a Federally-qualified health center or rural health clinic (as defined by the Social Security Act). Health care providers who agree to certain requirements are eligible through the States to receive free vaccine through this VFC purchase program. The vaccines awarded under these contracts provide an opportunity for the use of immunization Assistance contracts. State health departments, and certain local health centers authorized to order immunization as provided under OBRA '93 and Section 317(j) of the Public Health Service Act. In addition, States may opt to purchase vaccine for state vaccine-eligible children under any resulting contracts using their State funds under 42 USC 1396s(a)(4)(B). Such orders shall not be subject to rebates by the manufacturers provided that such orders are compliant with the minimum and maximum order quantities set forth in Section B Continuation at ST 1339. The establishment of these contracts provides an opportunity to utilize VFC funds and Section 317 vaccine purchase direct assistance (DA) grant funds to obtain vaccine at prices below those available in the commercial market place. In addition, States may opt to purchase additional quantities of vaccine under any resulting contract to provide immunizations for children who are not federally vaccine-eligible children.

This solicitation will result in firm-fixed price, indefinite delivery/indefinite quantity delivery contracts for the purchase of standard commercial vaccines described herein, manufactured under a current establishment and product license issued by the U.S. Food and Drug Administration (FDA) and as otherwise set forth herein.

**B.2 Definitions:**

OBRA Orders – Vaccine orders under Section 1928(a) (2)(A) of the Social Security Act.

317 Orders – Vaccine orders under Section 317(j) of the Public Health Service Act

State and Local Orders – Vaccine orders placed by authorized immunization programs using state or local funds in accordance with Section 1928(d)(4)(B) of the Social Security Act.

Page 6

CONFIDENTIAL

MRK-KRA01655065
MRK-CHA01655065

Appx20083

Solicitation No. 2014-N-15784

Manufacturer – As defined in Subsection (h) (4) of the Social Security Act, means any corporation, organization, or institution, whether public or private, which Manufacturers, imports, processes, or distributes under its label any pediatric vaccine

Awardees – Includes State health departments and certain local health agencies authorized to order hereunder

CONFIDENTIAL

MRK-KRA01655066
MRK-CHA01655066

Appx20084

Solicitation No. 2014-N-15784

## SECTION C - CONTRACT CLAUSES

**C.1.    52.212-5 Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items.** (SEPT 2013)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

    (1) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

\_\_\_Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

    (2) 52.233-3, Protest After Award (Aug 1996) (31 U.S.C. 3553).

    (3) 52.233-4, Applicable Law for Breach of Contract Claim (Oct 2004) (Pub. L. 108-77, 108-78).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items.

    ☒ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Sept 2006), with Alternate I (Oct 1995) (41 U.S.C. 253g and 10 U.S.C. 2402).

    ☒ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).

    \_\_ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (June 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)

    \_\_ (4) 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards (Jul 2013) (Pub. L. 109-282) (31 U.S.C. 6101 note).

    \_\_ (5) 52.204-11, American Recovery and Reinvestment Act—Reporting Requirements (Jul 2010) (Pub. L. 111-5).

    ☒ (6) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment. (Aug 2013) (31 U.S.C. 6101 note).

    \_\_ (7) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (Jul 2013) (41 U.S.C. 2313).

    ☒ (8) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (May 2012) (section 738 of Division C of Pub. L. 112-74, section 740 of Division C of Pub. L. 111-117, section 743 of Division D of Pub. L. 111-8, and section 745 of Division D of Pub. L. 110-161).

    \_\_ (9) 52.219-3, Notice of HUBZone Set-Aside or Sole-Source Award (Nov 2011) (15 U.S.C. 657a).

    \_\_ (10) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (JAN 2011) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

    \_\_ (11) [Reserved]

    \_\_ (12)(i) 52.219-6, Notice of Total Small Business Set-Aside (Nov 2011) (15 U.S.C. 644).

    \_\_ (ii) Alternate I (Nov 2011).

    \_\_ (iii) Alternate II (Nov 2011).

    \_\_ (13)(i) 52.219-7, Notice of Partial Small Business Set-Aside (June 2003) (15 U.S.C. 644).

    \_\_ (ii) Alternate I (Oct 1995) of 52.219-7.

CONFIDENTIAL

MRK-KRA01655067
MRK-CHA01655067

Appx20085

Solicitation No. 2014-N-15784

___ (iii) Alternate II (Mar 2004) of 52.219-7.

☒ (14) 52.219-8, Utilization of Small Business Concerns (Jul 2013) (15 U.S.C. 637(d)(2) and (3)).

☒ (15)(i) 52.219-9, Small Business Subcontracting Plan (Jul 2013) (15 U.S.C. 637(d)(4)).

___ (ii) Alternate I (Oct 2001) of 52.219-9.

___ (iii) Alternate II (Oct 2001) of 52.219-9.

___ (iv) Alternate III (Jul 2010) of 52.219-9.

___ (16) 52.219-13, Notice of Set-Aside of Orders (Nov 2011)(15 U.S.C. 644(r)).

___ (17) 52.219-14, Limitations on Subcontracting (Nov 2011) (15 U.S.C. 637(a)(14)).

___ (18) 52.219-16, Liquidated Damages—Subcontracting Plan (Jan 1999) (15 U.S.C. 637(d)(4)(F)(i)).

___ (19)(i) 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (Oct 2008) (10 U.S.C. 2323) (if the offeror elects to waive the adjustment, it shall so indicate in its offer).

___ (ii) Alternate I (June 2003) of 52.219-23.

___ (20) 52.219-25, Small Disadvantaged Business Participation Program—Disadvantaged Status and Reporting (Jul 2013) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

___ (21) 52.219-26, Small Disadvantaged Business Participation Program—Incentive Subcontracting (Oct 2000) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

___ (22) 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (Nov 2011) (15 U.S.C. 657 f).

___ (23) 52.219-28, Post Award Small Business Program Representation (Jul 2013) (15 U.S.C. 637(a)(2)).

___ (24) 52.219-29, Notice of Set-Aside for Economically Disadvantaged Women-Owned Small Business (EDWOSB) Concerns (Jul 2013) (15 U.S.C. 637(m)).

___ (25) 52.219-30, Notice of Set-Aside for Women-Owned Small Business (WOSB) Concerns Eligible Under the WOSB Program (Jul 2013) (15 U.S.C. 637(m)).

___ (26) 52.222-3, Convict Labor (June 2003) (E.O. 11755).

___ (27) 52.222-19, Child Labor—Cooperation with Authorities and Remedies (Mar 2012) (E.O. 13126).

___ (28) 52.222-21, Prohibition of Segregated Facilities (Feb 1999).

___ (29) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

___ (30) 52.222-35, Equal Opportunity for Veterans (Sep 2010)(38 U.S.C. 4212).

___ (31) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010) (29 U.S.C. 793).

___ (32) 52.222-37, Employment Reports on Veterans (SEP 2010) (38 U.S.C. 4212).

___ (33) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496).

___ (34) 52.222-54, Employment Eligibility Verification (JUL 2012). (Executive Order 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

___ (35)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA–Designated Items (May 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

___ (ii) Alternate I (May 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

___ (36) 52.223-15, Energy Efficiency in Energy-Consuming Products (DEC 2007) (42 U.S.C. 8259b).

Page 9

CONFIDENTIAL

MRK-KRA01655068
MRK-CHA01655068

Appx20086

Solicitation No. 2014-N-15784

___ (37)(i) 52.223-16, IEEE 1680 Standard for the Environmental Assessment of Personal Computer Products (DEC 2007) (E.O. 13423).

___ (ii) Alternate I (DEC 2007) of 52.223-16.

☒ (38) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging While Driving (AUG 2011) (E.O. 13513).

___ (39) 52.225-1, Buy American Act—Supplies (Feb 2009) (41 U.S.C. 10a-10d).

___ (40)(i) 52.225-3, Buy American Act—Free Trade Agreements—Israeli Trade Act (Nov 2012) (41 U.S.C. chapter 83, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, Pub. L. 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43).

___ (ii) Alternate I (Mar 2012) of 52.225-3.

___ (iii) Alternate II (Mar 2012) of 52.225-3.

___ (iv) Alternate III (Nov 2012) of 52.225-3.

☒ (41) 52.225-5, Trade Agreements (SEPT 2013) (19 U.S.C. 2501, et seq., 19 U.S.C. 3301 note).

☒ (42) 52.225-13, Restrictions on Certain Foreign Purchases (June 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

___ (43) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Jul 2013) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008, 10 U.S.C. 2302 Note).

___ (44) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

___ (45) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

___ (46) 52.232-29, Terms for Financing of Purchases of Commercial Items (Feb 2002) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

___ (47) 52.232-30, Installment Payments for Commercial Items (Oct 1995) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

☒ (48) 52.232-33, Payment by Electronic Funds Transfer—System for Award Management (Jul 2013) (31 U.S.C. 3332).

___ (49) 52.232-34, Payment by Electronic Funds Transfer—Other than System for Award Management (Jul 2013) (31 U.S.C. 3332).

___ (50) 52.232-36, Payment by Third Party (Jul 2013) (31 U.S.C. 3332).

___ (51) 52.239-1, Privacy or Security Safeguards (Aug 1996) (5 U.S.C. 552a).

___ (52)(i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).

___ (ii) Alternate I (Apr 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

[Contracting Officer check as appropriate.]

___ (1) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, et seq.).

___ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (May 1989) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

CONFIDENTIAL

MRK-KRA01655069
MRK-CHA01655069

Appx20087

Solicitation No. 2014-N-15784

___ (3) 52.222-43, Fair Labor Standards Act and Service Contract Act—Price Adjustment (Multiple Year and Option Contracts) (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

___ (4) 52.222-44, Fair Labor Standards Act and Service Contract Act—Price Adjustment (Sep 2009) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

___ (5) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (Nov 2007) (41 U.S.C. 351, et seq.).

___ (6) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services—Requirements (Feb 2009) (41 U.S.C. 351, et seq.).

___ (7) 52.222-17, Nondisplacement of Qualified Workers (JAN 2013) (E.O.13495).

___ (8) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247).

___ (9) 52.232-15, Accepting and Dispensing of $1 Coin (Sept 2008) (31 U.S.C. 5112(p)(1)).

(d) *Comptroller General Examination of Record.* The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records—Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

(i) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).

(ii) 52.219-8, Utilization of Small Business Concerns (Jul 2013) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(iii) 52.222-17, Nondisplacement of Qualified Workers (JAN 2013) (E.O. 13495). Flow down required in accordance with paragraph (l) of FAR clause 52.222-17.

(iv) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

Page 11

CONFIDENTIAL

MRK-KRA01655070
MRK-CHA01655070

Appx20088

Solicitation No. 2014-N-15784

(v) 52.222-35, Equal Opportunity for Veterans (Sep 2010) (38 U.S.C. 4212).

(vi) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010) (29 U.S.C. 793).

(vii) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(viii) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, et seq.).

(ix) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

___ Alternate I (Aug 2007) of 52.222-50 (22 U.S.C. 7104(g)).

(x) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (Nov 2007) (41 U.S.C. 351, et seq.).

(xi) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services-Requirements (Feb 2009) (41 U.S.C. 351, et seq.).

(xii) 52.222-54, Employment Eligibility Verification (JUL 2012).

(xiii) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Jul 2013) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

(xiv) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

(xv) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Apps. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of clause)

*Alternate I (Feb 2000).* As prescribed in 12.301(b)(4)(i), delete paragraph (d) from the basic clause, redesignate paragraph (e) as paragraph (d), and revise the reference to "paragraphs (a), (b), (c), or (d) of this clause" in the redesignated paragraph (d) to read "paragraphs (a), (b), and (c) of this clause."

*Alternate II (Jul 2012).* As prescribed in 12.301(b)(4)(ii), substitute the following paragraphs (d)(1) and (e)(1) for paragraphs (d)(1) and (e)(1) of the basic clause as follows:

(d)(1) The Comptroller General of the United States, an appropriate Inspector General appointed under section 3 or 8G of the Inspector General Act of 1978 (5 U.S.C. App.), or an authorized representative of either of the foregoing officials shall have access to and right to—

(i) Examine any of the Contractor's or any subcontractors' records that pertain to, and involve transactions relating to, this contract; and

(ii) Interview any officer or employee regarding such transactions.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), and (c), of this clause, the Contractor is not required to flow down any FAR clause in a subcontract for commercial items, other than—

(i) *Paragraph (d) of this clause.* This paragraph flows down to all subcontracts, except the authority of the Inspector General under paragraph (d)(1)(ii) does not flow down; and

(ii) *Those clauses listed in this paragraph (e)(1).* Unless otherwise indicated below, the extent of the flow down shall be as required by the clause—

Page 12

CONFIDENTIAL

MRK-KRA01655071
MRK-CHA01655071

Appx20089

Solicitation No. 2014-N-15784

    (A) 52.203-13, Contractor Code of Business Ethics and Conduct (Apr 2010) (Pub. L. 110-252, Title VI, Chapter 1 (41 U.S.C. 251 note)).

    (B) 52.203-15, Whistleblower Protections Under the American Recovery and Reinvestment Act of 2009 (June 2010) (Section 1553 of Pub. L. 111-5).

    (C) 52.219-8, Utilization of Small Business Concerns (Jul 2013) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $650,000 ($1.5 million for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

    (D) 52.222-26, Equal Opportunity (Mar 2007) (E.O. 11246).

    (E) 52.222-35, Equal Opportunity for Veterans (Sep 2010) (38 U.S.C. 4212).

    (F) 52.222-36, Affirmative Action for Workers with Disabilities (Oct 2010) (29 U.S.C. 793).

    (G) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

    (H) 52.222-41, Service Contract Act of 1965 (Nov 2007) (41 U.S.C. 351, et seq.).

    (I) 52.222-50, Combating Trafficking in Persons (Feb 2009) (22 U.S.C. 7104(g)).

    (J) 52.222-51, Exemption from Application of the Service Contract Act to Contracts for Maintenance, Calibration, or Repair of Certain Equipment—Requirements (Nov 2007) (41 U.S.C. 351, et seq.).

    (K) 52.222-53, Exemption from Application of the Service Contract Act to Contracts for Certain Services—Requirements (Feb 2009) (41 U.S.C. 351 et seq.).

    (L) 52.222-54, Employment Eligibility Verification (Jul 2012).

    (M) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

    (N) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

**C.2 The following FAR Clause is incorporated by reference:**

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.212-4 | Contract Terms and Conditions—Commercial Items (Jul 2013) |

**C.3    SPECIAL CLAUSES**

**C.3.1.    Shelf Life**

    Vaccine provided under this contract shall have a minimum 12 month shelf life remaining upon delivery to the consignee, or as specified within each Contract Line Item Number (See Section B, Continuation of SF 1449).

**C.3.2.    Packaging and Packing Requirements**

1. Packaging:  All items shall be packaged in standard commercial manner.

Page 13

CONFIDENTIAL

MRK-KRA01655072
MRK-CHA01655072

Appx20090

Solicitation No. 2014-N-15784

2. Packing:

(a) Product shall be packed to ensure maintenance of appropriate temperature during transit and safe arrival at destination. Non-frozen vaccines shipped in case-pack size or greater quantities will have temperature monitoring devices included with each shipment.

(b) Vaccine Shipment Temperature Excursions:

In the event the temperature monitoring device records a temperature excursion that occurred during transit, the Contractor will provide the Project Officer with documentation that includes a description of the event including the vaccines and lot numbers investigated, time of excursion, noting the temperatures and potential impact to product quality. Upon review of the summary provided, CDC will notify Merck if the vaccine is accepted or rejected.

a.   Product shall be packed to ensure maintenance of FDA recommended temperature during transit and safe arrival at destination. An electronic temperature monitoring device is required with each shipment, unless Contractor has obtained prior approval from CDC to use an alternative monitoring method.

b.   Contractor will provide the Contracting Officer Representative (COR) with documentation that explains the cause of each temperature excursion and stability data used by the contractor to determine if the cold chain was adversely affected by temperature variance. Upon review of data provided, CDC will notify appropriate parties if the vaccine is accepted or rejected.

### C.3.3.   Contract Period of Performance

The contract period of performance shall begin on the date of award and shall end 12 months later. CDC will provide Contractor with official end date at time of award on 03/31/2015.

### C.3.4.   Time of Delivery

Delivery is required to be made at destination within 15 working days after receipt of electronic, written, or telephonic order (telephone orders to be confirmed in writing).

### C.3.5.   Place of Delivery

i.   The following applies to all Contract Line Item Numbers **REDACTED – OMP**
**REDACTED – OMP**

(a)   Contractor shall be required to deliver vaccine F.O.B. Destination, as directed by delivery orders, only to the designated CDC centralized distribution centers in Aurora, CO and Memphis, TN (provided that the private distributor indemnifies or obtains insurance to indemnify, defend and hold harmless the Contractor from any claims and costs arising from or resulting from the distributor's handling of the vaccine purchases under this contract, the Contractor agrees that it will not require any indemnification by the distributor to extend the liability caused by acts or omissions of the Contractor).

**REDACTED – OMP**

Page 14

CONFIDENTIAL

MRK-KRA01655073
MRK-CHA01655073

Solicitation No. 2014-N-15784



The Contractor shall be required to deliver vaccines F.O.B. Destination, as directed by delivery orders to the CDC centralized distribution location currently at Aurora, CO and Memphis, TN. The Contractor shall be required to deliver frozen vaccines F.O.B. destination as directed by delivery orders.

**C.3.6.    Amendment to OBRA Statue**

In the event of an amendment of 42 U.S.C. Section 1396(s), any terms of the contract affected by such an amendment will be modified in accordance with the revised statute. The Contracting Officer and the Contractor shall meet to discuss such modifications to the contract before finalization of any changes to the contract.

**C.3.7.    Product Licensure**

a.  The vaccines produced and delivered under this contract shall be manufactured under a current establishment and product license issued by the Food and Drug Administration as indicated below:

b.  The Current Good Manufacturing Practice Regulations (CGMPR's) (21CFR Parts 210 211) will be the standard to be applied for manufacturing, processing and packing of drugs, chemicals and biologicals and reagents.

c.  The Contractor shall advise the Contracting Officer immediately as soon as Contractor becomes aware of any relocation of his prime manufacturing facility or the relocation of any subcontractor's facility, and if at any time during the life of the contract, the item listed under this contract fails to meet CGMPR's and/or a negative Food and Drug Administration Quality Assurance Evaluation is received; the contract may be terminated, in whole or in part, without further liability to the Government.

Page 15

CONFIDENTIAL

MRK-KRA01655074
MRK-CHA01655074

Appx20092

Solicitation No. 2014-N-15784

C.3.8.    Placement of Orders

a.   All vaccine under this contract will be ordered by delivery orders. Orders shall be placed by the Health and Human Services (HHS), the Centers for Disease Control and Prevention (CDC), on behalf of eligible awardees or by Awardees. Orders may be placed by CDC by telephone (confirmed in writing) or by electronic transfer. Contractors should be able to interface with the CDC Electronic Vaccine Ordering System.

b.   Orders shall be submitted to the Ordering Address specified in Contract Clauses Paragraph C.1.12; Contractor's Ordering/Payment Address and shall contain the following minimum information:

  1.   Date of order
  2.   Contract number and order number;
  3.   Item description, quantity and unit price
  4.   Delivery or performance date;
  5.   Place of delivery or performance (including consignee);
  6.   Packaging, packing and shipping instructions, if any;
  7.   Accounting and appropriation data;
  8.   Statement to indicate if partial deliveries are not acceptable; (lack of a statement shall be construed to mean partial deliveries are acceptable and payment shall be made as required elsewhere herein)
  9.   Any other pertinent data.

C.3.9.    Delivery Order Limitations

a.   Minimum Order Size: Individual delivery orders issued under this contract must meet the minimum order size as specified within each Contract Line Item Number (See  Section B, Continuation of SF 1449). When the Government requires supplies covered by this contract in amounts less than stated above, the Government is not obligated to purchase, nor is the Contractor obligated to furnish those supplies under this contract.

b.   Maximum Order: The maximum quantity specified within each Contract Line Item Number (See Section B, Continuation of SF 1449) is the maximum number of doses that may be ordered during the contract period of performance. Contractors are advised that the maximum quantity represents their commitment to the Government under their contract.

c.   Delivery Orders shipments:

1.   The Government reserves the right to reject vaccine doses that exceed delivery order requirements. The Government shall notify the Contractor when excess doses have been delivered to distribution sites. The Contractor is responsible for contacting the distribution site to make arrangement for the return of the excess doses and will be responsible for shipping cost associated with their return.

2.   Bulk order shipments, when possible, shall consist of

  a. One NDC per skid

  b. Full skid quantities with same lot number

  c. Full case quantities (when total order size allows)

CONFIDENTIAL

MRK-KRA01655075
MRK-CHA01655075

Appx20093

Solicitation No. 2014-N-15784

### C.3.10.  FAR 52.216-18. Ordering (Oct 1995)

a.  Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from the effective date of the contract through the expiration date of the contract.

b.  All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

c.  If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally or by written telecommunications only if authorized in the Schedule.

### C.3.11.  FAR 52.216-22 Indefinite Quantity (Oct 1995)

a.  This is an indefinite quantity contract for the supplies specified and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

b.  Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies designated in the Schedule as the "minimum."

c.  Except for any limitations on quantities in the Delivery Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

d.  Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after fifteen (15) working days beyond the expiration date of the contract.

### C.3.12.  Contractor's Ordering/Payment Address

Submission of all orders for Contractor's vaccines and payment of invoices shall be addressed as referenced below:

ORDERING ADRESS              PAYMENT ADDRESS

Merck Vaccine Division       Merck Sharp & Dohme Corp.
P.O. Box 4 MS ZB-750         P.O. Box 5254
West Point, PA  19486        Carol Stream, IL 60197-5254

Page 17

CONFIDENTIAL

MRK-KRA01655076
MRK-CHA01655076

Appx20094

Solicitation No. 2014-N-15784

## C.3.13. Invoice Submission

1. Invoice submission under this contract will be made as follows:

    a. Federal Government: The Contractor shall submit invoices via Electronic Data Interchange (EDI) in a format to be mutually agreed upon between CDC and the Contractor.

    b. Awardees: The Contractor shall submit one hard copy of its invoice(s) to the address specified on the delivery order.

    c. The Contractor agrees to include the following information on each invoice:

        1. Contractor's name and invoice date;

        2. Contract number, or other authorization for delivery of property and/or services.

        3. Description, cost or price, and quantity of property and/or services actually delivered or rendered;

        4. Shipping and payment terms;

        5. Other substantiating documentation or information as required by the contract;

        6. Name where practicable, title, phone number, and complete mailing address of responsible official to whom payment is to be sent.

        7. NDC and Lot number of vaccine vials shipped;

        8. CDC accounting and appropriation data as described on the delivery order.

        9. Electronic Funds Transfer (EFT) and Taxpayer Identification Number (TIN)

## C.3.14. Method of Payment

    a. Federal Government: The Government will use electronic funds transfer to the maximum extent possible when making payment under this contract IAW/FAR Clause 52.232-33, payment by Electronic Funds Transfer - Central Contractor Registration.

    b. Awardees: Awardees authorized to order vaccine using funds for State and Local Orders will be required to comply with all terms and conditions hereunder, including the Prompt Payment Act and all payment provisions required by this agreement. Merck acknowledges that the CDC is unable to enforce the Prompt Payment Act with the Awardees using State/local/CHIP funds by others.

## C.3.15. Contract Officer Representative (COR)

Page 18

CONFIDENTIAL

MRK-KRA01655077
MRK-CHA01655077

Appx20095

Solicitation No. 2014-N-15784

A COR will be designated in writing by the Contracting Officer to serve during the period of performance of the contract. The COR shall be responsible for guidance in regard to the technical aspect of the contract, provide a point for liaison between the Contractor and other Government agencies and be the general focal point to address technical and logistical problems relating to the performance under the contract. The COR shall not have the authority to make any commitments or authorize any changes which affect the contract price, terms and/or conditions; any such changes shall be referred to the Contracting Officer for action.

## C.3.16.  Return Privileges

Return privileges for credit, reimbursement or exchange do not apply to this contract except vaccines not conforming to the specifications set forth herein, which are limited to credit or exchange only.

## C.3.17.  Restrictions on Use of Vaccines

Vaccines obtained under this contract shall be used only in children 18 years of age and younger as authorized under Section 1928 of the Social Security Act.  Sale of such vaccine to any person or entity or reimbursement of vaccine costs is strictly prohibited.  Free distribution of such vaccine is also prohibited, except where such vaccine is administered in the context of Federal and Awardee immunization program activities.

## C.3.18.  Federal Excise Tax Credit

Negotiated prices for the vaccines included in this Contract may include a Federal Excise Tax (See Continuation of SF 1449 for applicable Contract Line Item Numbers).  If for any reason the vaccine is returned (other than for resale) or destroyed, the Contractor shall within 6 months following the date the vaccine is returned or destroyed, file a claim for credit or refund relative to any tax previously paid on such vaccine.  The Contractor agrees to credit or refund the amount of such excise tax to the purchaser to the extent that the Contractor receives a credit or refund from the Federal Government.  Any such credit or refund to the purchaser is expressly conditioned upon the authorized purchaser providing a written summary of events leading to the request for credit or refund.  The purchaser shall return all undistributed vaccine to the agent of the Contractor for proper disposal, unless destruction or condition of the vaccine renders return impossible.  If destruction or condition of the vaccine renders return impossible and is therefore destroyed by the purchaser, the authorized purchaser must provide a written summary of events to the Contractor within 30 days of said destruction.  If a contract is in place with the Contractor at the time when a credit or refund is requested; the purchaser may elect to receive vaccine which will be purchased at the current contract price in lieu of a cash payment/credit or refund.  Otherwise, the Contractor shall refund the amount due to the purchaser's account.  If a credit or refund is issued by the Contractor for state or local funds, it shall be submitted to the state or local public health entity identified in the request for FET credit. If a credit or refund is issued by the Contractor to the Federal Funds account, it shall contain the Contractor's DUNS and TIN/EIN and shall be submitted either via EDI (credit) or to the following address (check):

> Centers for Disease Control and Prevention
>
> Financial Management Office
>
> Attn: Debt Management Branch
>
> P.O. Box 15580
>
> Atlanta, GA 30333

## C.3.19.  Delinquent Delivery Report

Page 19

CONFIDENTIAL

MRK-KRA01655078
MRK-CHA01655078

Appx20096

Solicitation No. 2014-N-15784

a.  The Contractor shall provide CDC with a weekly listing of all CDC orders that have not been shipped within the agreed upon delivery schedule specified in the contract. The report shall include the following information: project name, order number, date of order, and status of order in number of pending/undeliverable doses. Depending upon the nature of the delinquencies, the CDC may request this report less often during the Contract performance period and in this situation, frequency and method of providing such reports shall be mutually agreed upon by the Contractor and CDC. This report shall provide an explanation as to the cause for the delinquent deliveries as well as when the vaccine will be delivered, as it is known by the Contractor at the time of the report. This notification shall not relieve the Contractor from meeting its obligations under the contract and shall not limit the Government's rights to seek relief for any breach of contract for failure to perform, including termination for cause. Notwithstanding the foregoing, the CDC agrees to work with the Contractor in good faith to allow the Contractor to remedy the effect of any supply shortage on contract performance, even if the contract performance is not specifically referenced by FAR 52.212-4(f).

b.  CDC acknowledges that the explanation as to the cause for delinquent deliveries and when vaccine will be delivered is confidential and proprietary information to the Contractor, and shall not use such information other than for CDC's internal tracking and reporting purposes and shall not further disclose such information without the Contractor's prior written consent unless required by law or other Federal authority. The Contractor acknowledges that the failure to fill orders as well as data associated with such failure are not confidential or proprietary data but are data incidental to contract performance. In the event that CDC is required by law or other Federal authority to disclose the explanation as to the cause for the delinquent deliveries and when vaccine will be delivered, CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority. The Contractor shall provide CDC with a weekly electronic listing of all CDC orders that have not been shipped within the agreed upon delivery schedule. The report shall include the following information: project name, order number, date of order, and status of order in number of pending/undelivered doses. The report shall also provide an explanation as to the cause for the delinquent delivery as well as when the vaccine will be delivered. This notification shall not relieve the contractor from meeting its obligations under the contract and shall not limit the Government's right to seek relief for any breach of contract for failure to perform, including termination for cause.

## C.3.20.  Biological Surveillance Data Reports

The Contractor shall submit a monthly report of historical sales data for the United States by month specifying the name of the vaccine, NDC #, and the total number of doses sold (segregated by CDC and non-CDC sales), in a standardized format acceptable to the Contractor and the CDC. The report shall be submitted electronically to the COR by the 15th of the month. Information related to vaccine sales through CDC contracts is not considered proprietary. CDC acknowledges that those reports pertaining to private sales unrelated to this contract are confidential and proprietary information of the Contractor, and shall not use reports for any purpose other than CDC's internal tracking and reporting purposes and shall not further disclose such reports without the Contractor's prior written consent unless required by the law or other Federal authority; provided that, no Contractor authorization shall be required for the CDC to include the data from the Contractor's report in a report in which aggregated data from multiple Contractors is summarized, so long as, with respect to multi-sourced products, the CDC's aggregated report does not include any data which could be individually identified as the Contractor's. In the event that CDC is required by law or other Federal authority to disclose such reports required to be held confidential hereunder, CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority.

CONFIDENTIAL

MRK-KRA01655079
MRK-CHA01655079

Appx20097

Solicitation No. 2014-N-15784

### Data Reports to Manufacturers

The Government will submit monthly reports of all vaccine data specifying doses by project, zip code, and NDC # in a standardized format. For all vaccines except direct ship vaccines, the Government shall provide distribution data. Because the Government does not distribute direct ship vaccines, purchase data will be provided. The reports shall be submitted electronically to the Contractor by the 15th of the month for the previous month. The Government shall also provide the Contractor with an annual Vaccine Ordering Forecasting Application (VOFA)/Vaccine Tracking System (VTrckS) spend plan for each grantee and an annual VFC providers list during the first quarter of the fiscal year.

### C.3.21. Prohibitions on Inducements

The Contractor is expressly prohibited from offering, providing or arranging inducements of any kind to providers or authorized purchasers ordering vaccine under this contract for the purpose of obtaining orders for vaccine. Examples of such inducements include, but are not limited to: entertainment, meals, and free or reduced prices for syringes, vaccines, or other medical products or supplies. If the Contractor has entered into similar agreements with the authorized purchasers which offer inducements relative to its commercial business, these agreements must be clear that they do not apply to purchases made under the CDC Federal contracts.

### C.3.22. Contract Changes

Notwithstanding FAR Clause 52.212-4(c), Changes, the parties hereby agree that modifications for incremental funding and other administrative changes (e.g., changes to CDC accounting data) that do not affect the terms and conditions of the contract may be made unilaterally by the CDC.

### C.3.23. Vaccine images

Upon contract award, the Contractor agrees to provide via email camera-ready vaccine product images in .pdf format and written authorization for CDC to use the images to the COR. CDC will use the images to illustrate the Contractor's products on the CDC vaccine ordering system. The Contractor agrees to provide CDC with updated product images if there is a change in packaging and vaccine images for new NDCs added to the contract during the period of performance.

### C.3.24. Advance Notice of Supply Issues

The Contractor agrees to provide advance notification to COR and the CDC Contracting Officer of any supply issue which will result in the Contractor's failure to deliver vaccine within the agreed upon delivery schedule specified in the contract. This notification shall be given as soon as the Contractor becomes aware of the scope of the problem that will impede the timely delivery of vaccine. This notification shall not relieve the contractor from meeting its obligations under the contract and shall not limit the Government's right to seek relief for any breach of contract for failure to perform, including termination for cause. Furthermore, any deviation from the delivery schedule due to a vaccine supply issue will demonstrate reasonably equal treatment with respect to the fulfillment of orders between CDC and the contracting non-government customers.

### C.3.25. Authorized Distribution of Record (ADR) Agreements

In accordance with the Prescription Drug Marketing Act (PDMA) of 1998, it is requested that all suppliers provide a written statement included as an attachment in Section D of this solicitation, which designates the CDC as the ADR for all vaccines subject to distribution under this contract.

CONFIDENTIAL

MRK-KRA01655080
MRK-CHA01655080

Appx20098

Solicitation No. 2014-N-15784

#### C.3.26    Use of VFC Provider Lists and Distribution of Material

a.   Contractors are prohibited from utilizing VFC providers' lists obtained from any source for any mailing or other communication with VFC providers, except as approved in writing by the CDC COR. In addition, contractors are prohibited from otherwise communicating with VFC providers regarding the VFC program, except as approved in writing by the CDC COR. To the extent that Contractors have established relationships with VFC providers or authorized purchasers under this contract that are independent from the VFC program, communications related to such independent relationships are not covered by this provision and do not require CDC consent.

b.   Contractors are prohibited from providing names and/or addresses of VFC providers to any third party, except as needed to comply with the terms of this contract, in which cases the CDC COR shall be notified in writing of such use.

c.   Any Contractor that ships vaccine directly to VFC providers is prohibited from inserting any promotional or other material that is promotional in nature for any product that the Contractor produces, into shipping containers for vaccine purchased under this contract, except for material related to use of the vaccine as approved in writing by the CDC COR. Additionally any shipping container inserts that are required, such as handling instructions or educational materials, should not contain any promotional material as part of its content. Notwithstanding the foregoing, to the extent that Contractors have established relationships with VFC providers or authorized purchasers under this contract that are independent from the VFC program, communications related to such independent relationships are not covered by this provision and do not require CDC COTR consent.

#### C.3.27.    New FDA Product License

Manufacturers who receive a new FDA product license for a vaccine already included with the scope of a VFC resolution may have the new product added to its contract by modification if it is determined that adding the product is in the best interest of the Government. Such new products must be consistent with VFC formulary schedules (regarding periodicity and dosage regimens) as established for the vaccines by the Advisory Committee on Immunization Practices (ACIP). New FDA licensed product added to this contract must comply with Price Changes clause.

#### C.3.28.    ACIP Approved Product

When a new vaccine product is approved by the ACIP for inclusion in the VFC Formulary, the Manufacturer of such product may have the new product added to its contract by modification if it is determined that adding the product is in the best interest of the Government. This would include new vaccines, new indications or new formulations for existing products or new dosing regimens for an existing product. New products must comply with Price Changes clause.

#### C.3.29.    Price Changes

All price change effective dates shall be approved by the CDC Contracting Officer and shall occur on the first day of the following month.

CONFIDENTIAL

MRK-KRA01655081
MRK-CHA01655081

Appx20099

Solicitation No. 2014-N-15784

*(illegible faded text)*

CONFIDENTIAL

MRK-KRA01655082
MRK-CHA01655082

Appx20100

Solicitation No. 2014-N-15784

Contracting Officer may specify that the offeror's format will be unacceptable, or the description may be immersed in the result of negotiations).

(to submit the cost portion of the proposal via the following electronic media: [electronic spreadsheet])

1.3   FAR 52.215-21 Alternate III Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data—Modifications—Alternate III (Oct 1997)

(c) Submit the cost portion of the proposal via the following electronic media: [electronic spreadsheet]:

### C.3.31 — Duty to Warn

a.   The Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC), and State agencies as authorized (hereinafter referred to in this contract clause C.3.31 as the Government) represent and agree that all programs which are supplied vaccine under this contract shall take appropriate steps to assure either (1) that such vaccine is administered to each patient on the basis of an individualized medical judgment by a physician, or (2) that such vaccine is administered after meaningful warnings related to the risks and benefits of vaccination are provided to such patient (or the patient's parent or legal guardian), in form and language understandable to such patient, parent, or guardian, including through use of appropriate version of the most recent vaccine information materials.

b.   If any claim or action is asserted against the Contractor arising in whole or in part from an alleged failure by the Government to carry out its responsibilities under paragraph (a) above, the Contractor shall promptly notify the Contracting Officer and furnish to him copies of all pertinent documents served upon or received by the Contractor.  The Government shall provide reasonable assistance and full cooperation including, but not limited to making witnesses available to testify and providing relevant documents to the Contractor arising from the Government's alleged failure to carry out its responsibilities under paragraph (a) above.  The Government shall have the option to participate in the defense of that portion of such claim or action which arises from the alleged failure of the Government to carry out its responsibilities under paragraph (a) above.

c.   In the event of the government's breach of or failure to carry out its responsibilities under paragraph (a) above, any measure of resulting damages to the Contractor shall include, but need not be limited to, damages (including money judgments, reasonable attorneys' fees, and other costs) sustained in connection with claims against the Contractor for personal injuries caused by such breach or failure.  The Contractor agrees to take appropriate steps to mitigate any such claim by diligently defending claims brought against it or when appropriate by entering into reasonable settlement agreements.  The entry of a judgment against the Contractor in connection with a claim for the personal injury allegedly resulting in whole or in part from the Government's breach of, or failure to carry out, its obligations under paragraph (a).  This provision shall not limit any other right of the Contractor to obtain damages or other relief for any breach of this contract or for the settlement of any dispute arising under this contract."

### C.3.32 Confidentiality.

In the course of the Contractual relationship between the Contractor and the CDC, the CDC acknowledges that certain information provided by the Contractor shall be considered confidential and proprietary information to the Contractor (including, but not limited to information as to cause for delinquent deliveries as provided under Section C.2.19), and shall not use such information other than for CDC's internal tracking and reporting purposes and shall not further disclose such information without the Contractor's prior written consent unless required by law or other Federal authority.  The Contractor shall mark all information they deem to be confidential or

Page 24

CONFIDENTIAL

MRK-KRA01655083
MRK-CHA01655083

Appx20101

**Solicitation No. 2014-N-15784**

proprietary, accordingly. If the CDC has reason to question the proprietary nature of information deemed such by the Contractor, the CDC will enter into discussions with the Contractor to reach a mutual agreement. In the event that CDC is required by law or other Federal authority to disclose such confidential and proprietary information, CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority.

CONFIDENTIAL

MRK-KRA01655084
MRK-CHA01655084

Appx20102

Solicitation No. 2014-N-15784

## SECTION D - CONTRACT DOCUMENTS, EXHIBITS OR ATTACHMENTS

D.1    **Websites.** Additional information can be found at www.fob.gov, www.cdc.gov/vaccines; and http://csrc.nist.gov/publications/nistpubs/

D.2    Attachment A -   Authorized Distributor of Record (ADR) Agreement:  Offerors shall complete and return the following agreement with their proposals.

**CONFIDENTIAL**

MRK-KRA01655085
MRK-CHA01655085

Appx20103

Solicitation No. 2014-N-15784

*AUTHORIZED DISTRIBUTOR OF RECORD (ADR) AGREEMENT*

This Agreement hereby represents the ongoing relationship between the supplier named below ("MANUFACTURER / SUPPLIER") and the Centers for Disease Control and Prevention , herein after referred to as CDC, to establish and designate CDC as an Authorized Distributor of Record (ADR) as set forth in the Prescription Drug Marketing Act (PDMA) of 1988 as well as in the implementing federal regulations found at 21 CFR Part 203. CDC here after agrees to comply with all applicable state and federal laws to ensure continued status of this relationship. To further meet the requirements of the PDMA, please forward with the signed agreement an attachment with a list of the specific products that CDC is authorized to distribute or a statement that the CDC is an ADR for the manufacturer's entire product line. Specific products should be identified by the pharmaceutical / vaccine name, dosage form, and strength of the drug and the NDC number.

Check the box that applies:

__ The Distributor is the ADR for Supplier's entire product line.

_X_ The Distributor is the ADR for the products listed on the attachment 1-A.

This agreement shall be valid from the date of dual execution until termination by either party on ninety (90) days written notice. This agreement shall not abridge, supplant, modify, or in any way alter any other pre-existing distribution agreement or any future agreements that may, from time to time, be executed in the furtherance of the business relationship between Manufacturer/ Supplier and the CDC.

This agreement confers no rights upon CDC other than to designate CDC as an Authorized Distributor of Record for Manufacturer/ Supplier. This agreement is not intended to be, nor shall it be, interpreted as a sales agreement or any other type of agreement other than to represent an "ongoing relationship" within the meaning set forth in 21 CFR Part 203.3(u).

*By affixing my signature below, I do hereby acknowledge and represent that I have read this Agreement in its entirety, that I understand its terms, that I am duly authorized to bind my organization to the requirements detailed in the above Agreement and that I agree to ensure that my organization will adhere to such requirement for the duration herein stated.*

Authorized Distributor of Record: **Centers for Disease Control and Prevention (CDC)**

Authorized Signature:_____

Print Name:   _Alan W. Sims, U.S. Government Contracting Officer_

Date: _____

Manufacturer / Supplier: _Merck Sharp & Dohme Corp._

Authorized Signature:_____

Print Name: _Eric T. Skieveland, Director  - Customer Marketing – Merck Vaccines_

Date: _03/07/2014_____

Page 27

**CONFIDENTIAL**

MRK-KRA01655086
MRK-CHA01655086

Appx20104

Solicitation No. 2014-N-15784

## SECTION E - SOLICITATION PROVISIONS

E.1  The following provisions are added by reference:

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.212-1 | Instructions to Offerors - Commercial Items (Jul 2013) |
| 52.212-3 | Offeror Representations and Certifications - Commercial Items (Aug 2013) |
| 52.232-18 | Availability of Funds (Apr 1984) |

E.2  Paragraph ( c) of 52.212-1, Period for acceptance of offers, is deleted in its entirety and the following is substituted therefore:

(c) *Period for acceptance of offers.* The offeror agrees to hold the prices in its offer firm for 60 calendar days from the date specified for receipt of offers, unless another time period is specified in an addendum to the solicitation.

E.3  FAR 52.233-2 Service of Protest (AUG 1996)

a   Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with the agency, and copies of any protests that are filed with the General Accounting Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

> Centers for Disease Control & Prevention
> Attn: Berta Biltz
> 2920 Brandywine Road, Room 3000
> Atlanta, GA 30341-5539

b   The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

E.4  INSTRUCTIONS FOR SUBMISSION OF OFFERS:

a   Offerors shall submit their offers on the basis of Firm-Fixed Price by **Midnight, February 10, 2014.**

b   Offers shall be submitted electronically (via e-mail) in MS Word or MS Excel files to Biltzzb@cdc.gov and zux6@cdc.gov. The following format is required as e-mail subject. The RFP No. **2014-N-15784.KT.doc or .xls** (Where "2014-N-15784 is the respective RFP No. and "KT" are the first two letters of the respective Contractor's name, and ".doc" and ".xls" are the format extensions.)

c   In the event there are electronic transmission problems, the following steps shall be taken:

i.   CDC receives the electronic file timely, but cannot access it. The offeror will be contacted and may be allowed to fax in the portions that cannot be accessed.

ii.   Facsimile quotes are not authorized. Technical inquiries shall be e-mailed to Biltzzb@cdc.gov and zux6@cdc.gov . Telephone inquiries will not be honored.

iii.   Contractor sends electronic file, but receives error message indicating e-mail problems at CDC. Fax in a cover sheet indicating transmission difficulties, and the Contract Specialist will contact the Contractor to arrange an alternate method of submission. Offerors are requested not to fax entire proposals to PGO. Facsimile submission shall only be used after contacting the Contract Specialist.

e   Contractors are responsible for providing accurate and complete information for evaluation. (Failure to do so may rule the quote unacceptable.) Thus, the proposal shall include the following information for evaluation:

i.   The Technical Proposal: Offerors other than vaccine manufacturers shall provide documentation that clearly demonstrates their ability to:

1.   meet the provisions of the Federal Excise Tax Credit contract clause;

2.   provide vaccine maximum quantities specified within each Contract Line Item Number, and

3.   meet the vaccine Shelf Life provision.

4.   produce and deliver vaccines under a current establishment and product license issued by the U.S. Food

Page 28

CONFIDENTIAL

MRK-KRA01655087
MRK-CHA01655087

Appx20105

Solicitation No. 2014-N-15784

and Drug Administration.

ii. Past Performance: Past performance is one indicator of the offeror's ability to perform the contract successfully. The government will evaluate different customers' opinions about *how well* (quality) the offeror has satisfied their requirements. Offerors shall provide, as part of their proposal, a list of clients or former clients for whom they have performed the same or similar work to the one required by this solicitation during the past five years.

**E.5   Inquiries**

Inquiries concerning the solicitation document shall be submitted in writing to the issuing office. Any additions, deletions, or changes to the solicitation will be made by an amendment. OFFERORS ARE INSTRUCTED SPECIFICALLY TO CONTACT ONLY THE SOLICITATION CONTRACTING OFFICE IN CONNECTION WITH ANY ASPECT OF THIS REQUIREMENT PRIOR TO CONTRACT AWARD. PROPOSALS AND ALL CORRESPONDENCE RELATING TO THE SOLICITATION DOCUMENT SHALL BE SUBMITTED TO THE CONTRACTING OFFICE. Inquiries shall be received at the Contracting Office no later than **February 4, 2014** via e-mail to: thdt2@cdc.gov and aev0@cdc.gov .

**E.6   Subcontracting Plan**

The offeror, prior to being awarded a contract, shall submit an acceptable subcontracting plan (see FAR 52.219-9) or demonstrate that no subcontracting opportunities exist. (Note: This requirement does not apply to small business concerns or to offers which do not exceed $500,000.00 ($1,000,000.00 for construction) or to offers from non-domestic concerns.)

CDC Small Business Goals for 2013* are:

| Business Type | CDC's 2013 Goals |
| --- | --- |
| Small Business | 9.00% |
| Small Disadvantaged Business | 5.00% |
| HUBZONE | 3.00% |
| Women-Owned Small Business | 5.00% |
| Service-Disabled Veteran-Owned Small Business Subcontracting (SDVOSB) | 3.00% |
| Veteran-Owned (VOSB) | 3.00% |
| **Total** | **28.00%** |

**E. 7   FAR 52.212-3 Offeror Representations and Certifications**

An offeror shall complete only paragraph (b) of this provision if the offeror has completed the annual representations and certifications electronically at http://orca.bpn.gov

(End of Provision)

**E. 8   52.212-2 Evaluation - Commercial Items (Jan 1999)**

(a) The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. The following factors shall be used to evaluate offers:

> (i) *technical capability of the item offered to meet the Government requirement;*
> (ii) *price;*
> (iii) *past performance*

Technical and past performance, when combined, is equal in importance to price.

---

*Subject to change. Goals for 2014 have not been received yet

CONFIDENTIAL

MRK-KRA01655088
MRK-CHA01655088

Appx20106

Solicitation No. 2014-N-15784

(b) A written notice of award or acceptance of an offer, mailed or otherwise furnished to the successful offeror within the time for acceptance specified in the offer, shall result in a binding contract without further action by either party. Before the offer's specified expiration time, the Government may accept an offer (or part of an offer), whether or not there are negotiations after its receipt, unless a written notice of withdrawal is received before award.

(c) Past performance will be evaluated for **only those offerors remaining in the competitive range** as follows:

1. Each offeror shall be evaluated on its past performance under current and prior contracts. By past performance, the Government means the offeror's record of conforming to specifications and to standards of good workmanship; the contractor's record of forecasting and controlling costs; the offeror's adherence to contract schedules and terms, including the administrative aspects of performance; the offeror's reputation for reasonable and cooperative behavior and commitment to customer satisfaction; and generally, the offeror's business-like concern for the interest of the customer and the degree of quality of deliverables and performance.

2. Past performance will not be scored, but the Government's conclusions about overall quality of the offeror's past performance will be highly influential in determining the relative merits of the offeror's proposal and in selecting the offeror whose proposal is considered the most advantageous/best value to the Government.

3. Evaluation of past performance will be a subjective assessment based on a consideration of all relevant facts and circumstances. It will not be based on absolute standards of acceptable performance.

4. The assessment of the offerors past performance will be used as a means of evaluating the relative capability of the offeror and the other competitors. Thus, an offeror with an exceptional record of relevant past performance may receive a more favorable evaluation than another whose record is acceptable and/or less relevant, even though both may have acceptable technical and business proposals.

5. An offeror without a record of past performance or for whom information on past performance is not available will not be evaluated favorably or unfavorably.

6. Evaluation of past performance information will be reflected in terms of the following degrees of performance assessment:

**Excellent:** A significant majority of the sources of information are consistently firm in stating that the offeror's performance was superior and that they would unhesitatingly do business with the offeror again. Complaints are negligible or unfounded. The offeror has no record of criminal conduct, civil fraud, or negligence, or the record is old and the offeror has demonstrated by more recent performance that corrective action has made the likelihood of such conduct in the future highly improbably. No doubt exists that the offeror will successfully perform the Government's requirements as stated in the RFP.

**Good:** Most sources of information state that the offeror's performance was good, better than average, etc., and that they would willingly do business with the offeror again. Complaints, though perhaps well-founded, are few and relatively minor. The offeror has no record of criminal conduct, civil fraud, or negligence, or the record is old and the offeror has demonstrated by more recent performance that corrective action has made the likelihood of such conduct in the future highly improbable. Little doubt exists that the offeror will successfully perform the Government's requirements as stated in the RFP.

**Neutral:** Either no past performance history exists for the corporation, predecessor companies, key personnel, or major/critical subcontractors, or the offeror's record of past performance was neither predominantly favorable nor unfavorable. In the latter case, sources of information are roughly divided over the quality of the offeror's performance. While some state that they would do business with the offeror again, others are doubtful or would not. Complaints are

balanced by reports of good work. The offeror has no record of criminal conduct, civil fraud, or negligence, or the record is old.

CONFIDENTIAL

MRK-KRA01655089
MRK-CHA01655089

Appx20107

Solicitation No. 2014-N-15784

**Marginal:** Many sources of information made unfavorable reports about the offeror's performance and either express serious doubts about doing business with the offeror again or state that they would refuse to do so. However, there are some favorable reports, and some sources of information indicate that they would do business with the offeror again. There are many significant, serious, and well-founded complaints, but there are some reports of very good performance. The offeror may have been indicted, pled guilty, or may have been found guilty in matters of criminal conduct, but the issues are either unresolved, relatively minor, or do not reflect a company-wide or managerial pattern of wrongdoing. The offeror may have lost civil suits for fraud or negligence, but there is no company-wide or managerial pattern of fraudulent, negligent, or criminal conduct. Some doubt exists that the offeror will successfully perform the Government's requirements as stated in the RFP.

**Poor:** A significant majority of sources of information are consistently firm in stating that the offeror's performance was entirely unsatisfactory and that they would not do business with the offeror again under any circumstances. Customer complaints are substantial or numerous and are well-founded. Or, although not debarred or suspended, the offeror is under indictment or has been convicted of criminal conduct, or has been found civilly liable for fraud or negligence. The offeror either has presented no persuasive evidence of having taken appropriate corrective action that will guard against such conduct in the foreseeable future, or it appears unlikely that the corrective action will be effective. Serious doubt exists that the offeror will successfully perform the Government requirements as stated in the RFP.

(End of Provision)

CONFIDENTIAL

MRK-KRA01655090
MRK-CHA01655090

Appx20108

Solicitation No. 2014-N-15784

AUTHORIZED DISTRIBUTOR OF RECORD (ADR) AGREEMENT

Attachment – 1-A.

List of Products:

Product / Brand Name/NDC

REDACTED – OMP

3. M-M-R II®

(Measles, Mumps, and Rubella Virus Vaccine Live)

NDC 00006-4681-00

REDACTED – OMP

Page 32

CONFIDENTIAL

MRK-KRA01655091
MRK-CHA01655091

Appx20109

Solicitation No. 2014-N-15784

6. ProQuad®

(Measles, Mumps, Rubella and VaricellaVirus Vaccine Live)

NDC 00006-4999-00





Page 33

CONFIDENTIAL

MRK-KRA01655092
MRK-CHA01655092

Appx20110

ATTACHMENT A

The information in the table below is considered confidential and proprietary by Merck Sharp & Dohme Corp.



| Vaccine | | | | Catalog | CDC | Wholesaler | | |
|---|---|---|---|---|---|---|---|---|
| Product Name | NDC | Image | Current Price Per Dose | Current Price Per Dose | Current Price Per Base | Commercial Pricing | Comment |
| REDACTED – OMP | | | | | | | | |
| M-M-R II W/DILUENT | N0006-4681/00 | 10x vial | $ 53.89 | $ 17.51 | Catalog Price | CDC Price is lower than any commercial price | CDC Priced at CPI per OBRA '93 |
| REDACTED – OMP | | | | | | | | |
| PROQUAD | N0006-4999/00 | 10x vial | $ 154.64 | $ 92.12 | Catalog Price | CDC price lower than any commercial price | |
| REDACTED – OMP | | | | | | | | |

Confidential

CONFIDENTIAL

MRK-KRA01655093
MRK-CHA01655093

Appx20111

11/26/2019
Declaration of G. Reilly
EXHIBIT 433

**To:**      Rivera, Cindy L[cindy_rivera@merck.com]
**Cc:**      Agnew, Kevin[kevin_agnew@merck.com]; Skjeveland, Eric T.[eric.skjeveland@merck.com];
Lee, Rosemarie Lisa[rosemarie_lee@merck.com]; Gallagher, Emily C[emily_gallagher@merck.com]
**From:**    DeLong, Diana
**Sent:**    Thur 3/13/2014 1:07:47 PM
**Importance:**    High
**Subject:**    FW: Action:  Approval Request - FINAL CDC VFC Offer Due today by 1pm
Cover Letter CDC VFC Final Offer 2014(2).doc
Attachment A(2).xlsx
2014-N-15784 VFC Edited.doc

Thanks Cindy!

I realize now that I did make the changes but uploaded the incorrect file. I have attached that corrected file.

Thanks

Diana

---

**From:** Rivera, Cindy L
**Sent:** Thursday, March 13, 2014 12:56 PM
**To:** DeLong, Diana
**Cc:** Gallagher, Emily C; Lee, Rosemarie Lisa; Skjeveland, Eric T.; Agnew, Kevin
**Subject:** FW: Action: Approval Request - FINAL CDC VFC Offer Due today by 1pm
**Importance:** High

Approved with the following changes:

- **REDACTED – OMP**
- M-M-R II change price in Final VFC from 17.79 to 17.66
- **REDACTED – OMP**

Assumption is that Attachment A has the correct/final pricing.

Thanks, Cindy

*Cindy Rivera*

Associate Director
Finance / Contract Management
Merck & Co., Inc.
215-652-1220

---

**From:** DeLong, Diana
**Sent:** Thursday, March 13, 2014 8:53 AM
**To:** Rivera, Cindy L; Gallagher, Emily C; Lee, Rosemarie Lisa; Skjeveland, Eric T.

**CONFIDENTIAL**

MRK-KRA01656202
MRK-CHA01656202

**Cc:** Agnew, Kevin
**Subject:** Action: Approval Request - FINAL CDC VFC Offer Due today by 1pm
**Importance:** High

Hi Team

CDC has requested that Merck revise pricing offered on the VFC contract. Per Kevin's review, we are revising pricing on the following products only:

REDACTED – OMP

3.   M-M-R II (due to CPI cap)

REDACTED – OMP

Please review and approve or approve with changes the attached Cover Letter, Edited Solicitation, and Attachment A.

The only changes to the Edited Solicitation that you already approved were to the pricing table in Section B for the above mentioned products.

REDACTED – PRIVILEGED

Please respond by 1pm today.

If you have any questions, please contact either me or Kevin.

Thank you,
Diana

**Diana DeLong**
Sr. Spclst, Fin. Processes & Control
Phone: 215-652-6600 Fax: 215-652-8833
Working remotely Wednesday
In the Office Monday, Tuesday, Thursday, Friday

MRK-KRA01656203
MRK-CHA01656203

11/26/2019
Declaration of G. Reilly
EXHIBIT 434

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0015993



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

11/26/2019
Declaration of G. Reilly
EXHIBIT 435



# Merck's Presentation

## November 10, 2011

Confidential & FOIA Exempt    1

CONFIDENTIAL

MERCK-KRA0002452
MERCK-CHA0002452

## GSK Studies Find High SCRs When Testing the Mumps Component in Merck's M-M-R®II

**Conclusion:**

It is incorrect to believe that Merck had to improperly manipulate assay design or assay results to get favorable SCRs for M-M-R®II's mumps component.

CONFIDENTIAL

MERCK-KRA0002499
MERCK-CHA0002499

11/26/2019
Declaration of G. Reilly
EXHIBIT 436

## Morgan Lewis

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
Tel.  +1.215.963.5000
Fax: +1.215.963.5001
www.morganlewis.com

**Lisa C. Dykstra**
215-963-5207
ldykstra@morganlewis.com

May 18, 2015

Thomas R. Frieden MD, MPH
Director
Centers for Disease Control and Prevention (CDC)
1600 Clifton Road
Atlanta, GA 30329-4027

Katherine Norris
CDC FOIA Officer
Attn: FOIA Office, MS: D54
1600 Clifton Rd, N.E.
Fax:  404-235-1852
Atlanta, GA 30333

Office of the General Counsel
Department of Health and Human Services
200 Independence, S.W.
Washington, DC 20201

Dear Dr. Frieden and Ms. Norris:

We are writing to request the assistance of the Centers for Disease Control and Prevention and your partners in obtaining information relevant to a legal claim (described below) against Merck related to our mumps vaccine and our interactions with the CDC in the context of the CDC's purchase and recommendation of Merck's mumps vaccine (and mumps-containing vaccines) (sold as "M-M-R®II" or as ProQuad) for the Vaccines for Children's (VFC) Program. While Merck firmly disputes all of the allegations made in this action and plans to vigorously defend itself, the breadth of the claims being made requires that we gather a significant amount of information regarding the recommendation and procurement processes managed by the CDC related to the mumps vaccine. Towards this end, we are respectfully requesting the specific information detailed below, and very much appreciate your efforts to help us obtain it.  Please let us know if you have any questions or would like to discuss this matter.

Almaty  Astana  Beijing  Boston  Brussels  Chicago  Dallas  Dubai  Frankfurt  Harrisburg  Hartford  Houston  London  Los Angeles  Miami  Moscow
New York  Orange County  Paris  Philadelphia  Pittsburgh  Princeton  San Francisco  Santa Monica  Silicon Valley  Singapore  Tokyo  Washington  Wilmington

MRK-KRA01374713
MRK-CHA01374713

Appx20122

May 18, 2015
Page 2

By way of background, in 2010 two individuals filed a complaint against Merck in the United States District Court for the Eastern District of Pennsylvania. *U.S. ex rel. Krahling v. Merck*, No. 10-4374, E.D. Pa. Later, companion cases were filed based on the same underlying facts. *In Re: Merck Mumps Vaccine Antitrust Litigation*, No. 12-03555, E.D. Pa. In brief, relators and plaintiffs allege: (1) that Merck made and continues to make misrepresentations about the efficacy of the mumps vaccine and engages in efforts to conceal the diminished efficacy of the vaccine; (2) that the M-M-R®II FDA-approved product label is false because it cites "outdated or unidentified studies" not reflective of what Merck knows today about the mumps vaccine; and (3) that Merck's labeling misrepresents the vaccine's efficacy and improperly influenced the CDC's decision to purchase the vaccine. Relators' allegations are almost exclusively based on their involvement in a 2001 study of the mumps vaccine that Merck conducted to evaluate different potencies of the mumps component of M-M-R®II.

We note that the FDA and the DOJ both investigated the relators' allegations. Initially, in 2001, relators raised their allegations to the FDA. After receiving the allegations, FDA inspected Merck's lab and fully evaluated the allegations. The FDA issued a Form 483 identifying certain procedural and documentary concerns, which Merck responsibly resolved to the FDA's satisfaction. Almost ten years later, relators raised the same allegations in a False Claims Act complaint. DOJ investigated the allegations, and, after a thorough investigation, DOJ declined to intervene in relators' case. Relators nonetheless continue to pursue their claims.

Now, in order to defend itself in the pending actions, pursuant to 45 C.F.R. § 2 *et. seq.*, Merck is respectfully requesting documents identified below, and may seek testimony, for the purposes of disputing relators' and plaintiffs' claims and evaluating the information available to CDC when it purchased the mumps vaccine. The requests also seek documents relating to CDC's knowledge regarding mumps, mumps outbreaks, Merck's mumps vaccines, and other non-Merck mumps vaccines, including the basis for statements regarding the efficacy of Merck's mumps vaccines.

For the purposes of the following requests, we are defining Merck's mumps vaccines as including MumpsVax, MMR or MMR®II, MMR-V and/or ProQuad. Other mumps vaccines should be interpreted to include mumps vaccines manufactured by any entity other than Merck, even if those vaccines are not currently licensed by the FDA. Merck should be interpreted to mean Merck & Co., Inc. or Merck Vaccines or Merck Vaccines Division. Unless otherwise specified, the time period for these requests should be construed as January 1, 1998 to the date of this letter.

Merck agrees to provide reimbursement for the costs associated with the collection and production of documents responsive to these requests. Additionally, if it would be helpful to discuss these

**MRK-KRA01374714**
**MRK-CHA01374714**

Appx20123

May 18, 2015
Page 3

requests and the information CDC may have that relate to these requests, Merck's counsel is available to discuss those issues at your convenience.

Sincerely,

*Lisa C. Dykstra*

Lisa C. Dykstra

cc:    Joel M. Sweet, Assistant United States Attorney
       Margaret L. Hutchinson, Assistant United States Attorney
       Gerald B. Sullivan, Assistant United States Attorney

MRK-KRA01374715
MRK-CHA01374715

Appx20124

May 18, 2015
Page 4

**Merck's Requests to CDC**

The requests below pertain to the contracts between Merck and CDC from 1998 to the present through which CDC purchased Merck's mumps vaccine for use with pediatric patients. Relevant contracts include, but are not limited to, the following:

| Contract No. | Award/ Effective Date | Solicitation Number | Contracting Officer | Project Officers |
|---|---|---|---|---|
| 200-2005-1533 | 4/1/2005 | 2005-N-01706 | Jeffrey Napier | Rex Ellington, Project Officer ("PO") |
| 200-2006-15819 | 4/1/2006 | 2006-N-08323 | Jeffrey Napier | Rex Ellington, PO |
| 200-2007-20306 | 4/16/2007 | 2007-N-09211 | Nancy Norton | Deberal Denson, PO |
| 200-2008-24718 | 4/1/2008 | | Nancy Norton | Deberal Denson, PO |
| 200-2009-29370 | 4/1/2009 | 2009-N-11074 | Nancy Norton | Deberal Denson, PO |
| 200-2010-34037 | 4/1/2009 | | Nancy Norton | Deberal Denson, Contracting Officer Technical Representative ("COTR") |
| 200-2011-38200 | 4/1/2011 | | Nancy Norton | No COTR specified in the contract. |
| 200-2012-50133 | 4/1/2012 | 2012-N-14228 | Nancy Norton | No Contracting Officer Representative specified in the contract. |

**General**

1.    With respect to mumps vaccine generally, please provide:

    a.    Documents related to the efficacy, immunogenicity, effectiveness, or potency of Merck's mumps vaccine.

    b.    Documents related to whether the label for Merck's mumps vaccine is accurate and/or adequate.

**MRK-KRA01374716**
**MRK-CHA01374716**

May 18, 2015
Page 5

    c.  Documents related to testing of Merck's mumps vaccine and whether any additional testing of Merck's mumps vaccine should be conducted.

    d.  Documents related to the efficacy, immunogenicity, or effectiveness of GSK's Priorix vaccine.

    e.  Results and analysis of any testing by or sponsored by CDC regarding the efficacy, immunogenicity, effectiveness or potency of Merck's mumps vaccine, including any studies, testing, assessments or evaluation undertaken in connection with any mumps outbreak between 1998 and the present.

    f.  Documents regarding CDC's understanding of mumps activity cycles and preparations for or expectations of additional mumps outbreaks.

    g.  Documents reflecting CDC's understanding of the cause of mumps outbreaks.

    h.  Information related to the preparation of CDC talking points, briefing binders for CDC or other Government officials, public statements, or other action plans related to investigating and responding to mumps outbreaks, to the extent such materials discuss (i) the potency, efficacy, effectiveness, immunogenicity and/or seroconversion rates of Merck's mumps vaccine or (ii) any concerns about Merck's mumps vaccine.

**CDC's Contracts with Merck and CDC's Purchase of the MMRII Vaccine**

2.    With respect to the contracts between Merck and CDC and CDC's purchasing decisions, please provide:

    a.  Documents related to CDC's decision to purchase Merck's mumps vaccine, including, but not limited to:

        i.  CDC's solicitation(s) for mumps vaccines.

        ii.  Documents reflecting CDC's analysis of offers provided in response to the solicitations for mumps vaccines.

    b.  Documents related to any consideration by CDC regarding purchasing a mumps vaccine other than Merck's mumps vaccine.

    c.  Documents related to any representations made by Merck or CDC during the negotiations or performance of any contract between Merck and CDC that related to

MRK-KRA01374717
MRK-CHA01374717

May 18, 2015
Page 6

Merck's mumps vaccine, the efficacy, effectiveness, immunogenicity or potency of Merck's mumps vaccine, or Merck's ability to comply with the CDC contract.

d.  Documents related to what price CDC should pay for Merck's mumps vaccine.

e.  Documents regarding any discussion of the Duty to Warn contract provision in any of the contracts, including any information CDC relied upon when including that provision in the contract(s) and documents available to CDC when making statements about the safety or efficacy of Merck's mumps vaccine.

f.  Any information received or analyzed by CDC regarding compliance with contract requirements related to the licensing of the mumps vaccine or manufacturing in conformance with current Good Manufacturing Practice (cGMP) regulations.

g.  Documents that the CDC exchanged with the FDA or any other Government agency regarding Merck's compliance with its obligations under its CDC contract(s).

h.  Documents exchanged between CDC and the FDA or any other Government agency regarding the efficacy, effectiveness, potency or immunogenicity of Merck's mumps vaccine purchased through the CDC contract(s).

**ACIP Information**

3.  Please produce documents provided to or received from ACIP and/or the ACIP Working Group on Measles, Mumps, and Rubella, regarding the efficacy, immunogenicity, effectiveness, or potency of Merck's mumps vaccine or regarding mumps outbreaks.

**Immunization Action Coalition**

4.  With respect to the Immunization Action Coalition, please produce:

a.  Documents related to financial support from CDC to IAC for educating HCPs about vaccine recommendations.

b.  Documents related to CDC's technical review of IAC educational materials related to Merck's mumps vaccine, including, but not limited to, data or comments regarding mumps outbreaks and/or the efficacy, effectiveness, potency, or immunogenicity of Merck's mumps vaccine.

MRK-KRA01374718
MRK-CHA01374718

Appx20127

May 18, 2015
Page 7

    c.  Documents related to CDC's technical review of IAC Mumps Q&As (available here: http://www.immunize.org/catg.d/p4211.pdf): "How effective is this vaccine? Postlicensure studies have demonstrated one dose of MMR vaccine is 78% (range, 45%-97%) effective for prevention of mumps. The second dose of MMR is intended to produce immunity in those who did not respond to the first dose, but a very small percentage of people may not be protected even after a second dose."

    d.  Any document or statement by the Immunization Action Coalition to healthcare providers or the public that Merck's mumps vaccine is 95 percent effective.

    e.  Any document or statement by the Immunization Action Coalition to healthcare providers or the public that Merck's mumps vaccine was or is at least 95 percent effective.

**Third Dose/New Vaccine**

5.    Documents related to any analysis by CDC of whether a third dose of the mumps vaccine should be added to the Childhood Immunization Schedule.

6.    Documents related to any analysis by CDC of whether an additional dose of Merck's mumps vaccine should be recommended as a response to, or otherwise in connection with, mumps outbreaks.

7.    Documents regarding CDC support – research, financial, or other public support – for the development of a new mumps vaccine.

MRK-KRA01374719
MRK-CHA01374719

Appx20128

*************** -COMM. JOURNAL- ******************* DATE MAY-18-2015 ***** TIME 17:16 *********

```
        MODE = MEMORY TRANSMISSION              START=MAY-18 17:13    END=MAY-18 17:16

        FILE NO.=601

STN NO.   COMM.   ABBR NO.      STATION NAME/TEL NO.      PAGES    DURATION

 001       OK      ☎          0069#914042351852#       008/008 00:01:24
```

-MORGAN LEWIS PHILADELPHIA-

************************************** -13FLR #2 - 595   - ***** -          215 963 5001- *********

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
TEL. +1.215.963.5000
FAX: +1.215.963.5001
eFax: 877.432.9652
www.morganlewis.com

**Morgan Lewis**

| SEND TO | | | | **FAX MESSAGE** |
|---|---|---|---|---|
| Name: | Katherine Norris, CDC | Firm: | FOIA Office | THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE NAMED RECIPIENT(S). THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU. |
| FAX #: | FOIA Officer | Telephone #: | | |
| | 404-235-1852 | | | |

| FROM | | | |
|---|---|---|---|
| Name: | Lisa C. Dykstra | Floor: | 13 |
| Operator Sending: | Judy | Telephone # | 215-963-5207 |
| FAX #: | | Date Sent: May 18, 2015 | No of Pages: 8 (including cover page) |

| COMMENTS |
|---|

MRK-KRA01374720
MRK-CHA01374720
**Appx20129**

11/26/2019
Declaration of G. Reilly
EXHIBIT 437



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

GSK-MMR-0062029



CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 438



CONFIDENTIAL

GSK-MMR-0058532

**Appx20138**

11/26/2019
Declaration of G. Reilly
EXHIBIT 439

MEMO                                October 10, 2000

TO:   EMILIO EMINI
       ALAN SHAW

SUBJECT: Supporting documents for Stephen Krahling.

Attached please find letters of reference and college transcripts for
Stephen Krahling, who is being considered for a technical level
position in our group.

Steve was a contract employee in our lab from March 15, 1999
through August 17, 2000.  During this time he provided reliable
support for our VZV stability studies as well as a variety of other
projects (including rHA).  Steve graduated from Penn State  in 1995,
and then spent several years doing research in various laboratories.
His undergraduate grades are weak, but I believe that his research
experiences after graduation demonstrate his technical and
scientific skills.    Mr. Krahling interviewed on February 24, 2000
with our group, meeting with myself, Bob Suter, Paul Keller, Alan
Shaw, Tom Palker and Tom Mathews.  Although we were not able to
test Steve's ability to do semi-independent research, his supporting
reference letters indicate that he has the ability to follow-through
on assigned projects in his area of expertise.  He does require extra
focus to avoid straying off into more academic question areas, but
this is expected to be easily manageable.  Steve was not offered a
position immediately, as we were evaluating the status of our open
positions (including the possible "conversion" of some contract
positions into permanent positions).  In August, Steve decided to
return to Penn State to start in a graduate school program.  Since
that time, he has indicated that this was not working out as
expected, and was anxious for an opportunity to return to our group.

Stephen Krahling's technical skills and performance in our lab, and
his ability to "blend in" well with our lab personality, have
identified him as a strong candidate for a technical position to
contribute to existing and upcoming projects.  I believe that his
contributions would increase with additional challenges and
responsibilities that he did not have as a contract employee.

CONFIDENTIAL

MRK-KRA00447565
MRK-CHA00447565

I therefore recommend offering one of our remaining technical positions to Steve.  Please review the attached reference letters, cv and transcripts and let me know how to proceed.  One issue that I would like to identify is the level at which he might be hired.  I believe that he would be a strong entry-level contributor (grade 9), but might not perform as strongly from the start at a higher level.

DK
x23474

**CONFIDENTIAL**

**MRK-KRA00447566**
**MRK-CHA00447566**

**Appx20141**

## STEPHEN A. KRAHLING

809 Willowbrook Dr.
Norristown, PA 19403
(610) 630-0693

**EDUCATION:** The Pennsylvania State University, University Park, PA
B.S. in Microbiology, May 13, 1995

## WORK EXPERIENCE:

**Merck & Co., Inc.** – West Point, PA
Virologist        March 1999 - present

- provided support for experiments to characterize Merck's live virus vaccines
- performed plaque assays to determine the titer of infectious virus in attenuated live varicella vaccine preparations
- conducted mumps infectivity titration by plaque assay
- tested the efficiency of different stabilizers in maintaining virus infectivity
- provided cell culture support for virus potency assays and growth experiments
- maintained detailed written laboratory SOPs

**Penn State University Biochemistry and Molecular Biology Dept** – University Park, PA
Research Technician/ Independent research        1993 -1998

- researched mechanisms of apoptosis
- identified cell receptors involved in phagocytosis of apoptotic cells
- characterized the role of phosphatidylserine in recognition of apoptotic cells
- presented results at weekly lab meetings
- responsible for preparing and publishing data
- extensive lab experience:
    - tissue culture/ cell culture
    - animal injection and surgery
    - work with human blood
    - monoclonal antibody production
    - flow cytometry/ fluorescent microscopy
    - sonication, ultracentrifugation
    - aseptic technique, sterilization procedures, autoclaving
    - PC and Mac computer applications

Lab experience from coursework (Penn State University)

- protein purification, western blotting
- gel electrophoresis, DNA sequencing
- bacterial identification assays, bacterial fermentation

## ACTIVITIES:

volunteer teaching assistant of basic microbiology lab techniques
Academic Dean's List

**CONFIDENTIAL**

MRK-KRA00447567
MRK-CHA00447567

## PUBLICATIONS:

Bret Verhoven, Stephen Krahling, Robert A. Schlegel and Patrick Williamson. 1999. Regulation of phosphatidylserine exposure and phagocytosis of apoptotic lymphocytes. (submitted)

Schlegel, R.A., S. Krahling, M.K. Callahan and P. Williamson. 1999. CD14 is a component of multiple recognition systems used by macrophages to phagocytose apoptotic lymphocytes. Cell Death and Differentiation   6:583-592

Stephen Krahling, Melissa Callahan, Patrick Williamson and Robert A. Schlegel. 1999. Exposure of phosphatidylserine is a general feature in the phagocytosis of apoptotic lymphocytes by macrophages. Cell Death and Differentiation   6:183-189

Callahan, M.K., S.A. Krahling, P. Williamson and R.A. Schlegel. 1997. The role of CD14 in the recognition and phagocytosis of apoptotic thymocytes by macrophages. American Society for Cell Biology Annual Meeting. A109:853

Robert A. Schlegel, Stephen Krahling, Allison J. Christie and Patrick Williamson. 1997. Phosphatidylserine as a signal for recognition and phagocytosis: The proteins involved. Proceedings of the American Oil Chemists Society Meeting on Phospholipids. (in press)

Pradhan, D., S. Krahling, P. Williamson and R.A. Schlegel. 1997. Recognition of apoptotic lymphocytes by macrophages: multiple receptors for a complex signal. Molecular Biology of the Cell 8:767-778

Schlegel, R.A., M. Callahan, S. Krahling and P. Williamson. 1996. Mechanisms for recognition and phagocytosis of apoptotic lymphocytes by macrophages. Mechanisms of Lymphocyte Activation and Immune Regulation VI: Cell Cycle and Programmed Cell Death in the Immune System (S. Gupta and J.J. Cohen, eds) pp 21-28, Plenum, NY

**CONFIDENTIAL**

**MRK-KRA00447568**
**MRK-CHA00447568**

05/04/00 — UNDERGRADUATE TRANSCRIPT SENT TO: —

1 PAGE

STEVE KRAHLING

809 WILLOWBANK DR

NORRISTOWN, PA   19403

**THE PENNSYLVANIA STATE UNIVERSITY**
OFFICE OF THE UNIVERSITY REGISTRAR - UNIVERSITY PARK, PA 16802

| | |
|---|---|
| LAST NAME | KRAHLING |
| FIRST NAME | STEPHEN |
| MIDDLE NAME | ALAN |
| MAJOR/OPTION | MICRB/GEN |
| STUDENT NUMBER | ████ 9866 |

JERSEY SHORE AREA SR HIGH SCH - JERSEY SHORE PA       FALL 90       06/13/72

HIGH SCHOOL NAME AND ADDRESS — DATE OF ADMISSION — DATE OF BIRTH

| COURSE | NO. | TITLE | CREDIT | GRADE | COURSE | NO. | TITLE | CREDIT | GRADE |
|---|---|---|---|---|---|---|---|---|---|
| | | **FALL SEM 1990** | | | | | **FALL SEM 1993** | | |
| MATH | 140 | CALC ANAL GEOM I | 4.0 | B- | MICRB | 401 | MICROB PHYSIOL | 3.0 | C |
| CHEM | 012 | CHEM PRINC | 4.0 | C | MICRB | 410 | PRIN OF IMMUNOL | 3.0 | C+ |
| PHYS | 201L | GENERAL PHYSICS | 4.0 | C | BIOCH | 401 | GEN BIOCHEM | 3.0 | WP |
| ANTH | 002 | INTRO ARCHAEOLOGY | 3.0 | B+ | THEA | 100X | ART OF THEATRE | 3.0 | B |
| | | | | | CHEM | 040 | ORGANIC CHEM | 2.0 | F |
| | | **SPRING SEM 1991** | | | MICRB | 496 | INDEP STUDIES | 2.0 | A |
| MATH | 141 | CAL ANAL GEOM I | 4.0 | C | | | | | |
| CHEM | 013 | CHEM PRINC | 3.0 | C | | | **SPRING SEM 1994** | | |
| PHYS | 202L | GENERAL PHYSICS | 4.0 | WN | GER | 002 | ELEM GERMAN IN | 4.0 | A |
| ENGL | 015 | RHETORIC & COMP | 3.0 | C+ | PHIL | 001 | BASIC PROB OF PHIL | 3.0 | A |
| PHIL | 003 | MORAL VALUE | 3.0 | A | ANTH | 045 | CULTURAL ANTH | 3.0 | A |
| | | | | | METEO | 002 | WEATHER & SOCIETY | 3.0 | B |
| | | **FALL SEM 1991** | | | MICRB | 496 | INDEP STUDIES | 2.0 | A |
| MICRB | 201 | INTRO MICROBIOLOGY | 3.0 | C+ | | | | | |
| CHEM | 014 | EXPER CHEM | 1.0 | C | | | **FALL SEM 1994** | | |
| B M SC | 001 | GENET ECOL EVOL | 3.0 | C+ | BIOCH | 401 | GEN BIOCHEM | 3.0 | C |
| ANTH | 001 | INTRO ANTHROPOLOGY | 3.0 | C | ESACT | 177 | JOGGING T | 1.5 | C |
| C LIT | 108 | MYTHOLOGY | 3.0 | B+ | MICRB | 408 | LAB INSTR PRACT | 2.0 | A |
| | | | | | PSY | 002 | PSYCHOLOGY | 3.0 | B+ |
| | | **SPRING SEM 1992** | | | ANTH | 021 | INTRO BIOL ANTH | 3.0 | C |
| CHEM | 034 | ORGANIC CHEM | 3.0 | A- | CHEM | 040 | ORGANIC CHEM | 2.0 | C |
| MICRB | 202 | INTRO MICRB LAB | 2.0 | D | | | | | |
| PHYS | 265L | INTRO PHYSICS | 4.0 | C | | | **SPRING SEM 1995** | | |
| CHEM | 015 | EXPER CHEM | 1.0 | WP | ENGL | 202C | TECHNICAL WRITING | 3.0 | B |
| ARTS | 003H | POP MEDIA ARTS | 3.0 | C+ | CHEM | 036 | ORG CHEM LAB | 2.0 | C |
| SPCOM | 100B | EFFECTIVE SPEECH | 3.0 | B- | B M B | 402 | GEN BIOCHEM | 3.0 | C |
| | | | | | B M B | 102 | ELEM BIOCHEM LAB | 1.0 | B |
| | | **FALL SEM 1992** | | | CHEM | 015 | EXPER CHEM | 1.0 | C+ |
| MICRB | 251 | MOL/CELL BIOL I | 3.0 | C | MICRB | 252 | MOL/CELL BIOL II | 3.0 | C |
| BIOL | 222 | GENETICS | 3.0 | C+ | ESACT | 031 | BADMINTON I | 1.0 | WN |
| MICRB | 410 | PRIN OF IMMUNOL | 2.0 | WP | | | | | |
| HL ED | 044 | INTRO HUMAN SEX | 1.0 | B+ | | | | | |
| MICRB | 421W | LAB GEN APPL MICRB | 3.0 | C | | | | | |
| ASTRO | 010 | ELEM ASTRO | 2.0 | A- | | | | | |
| | | **SPRING SEM 1993** | | | | | | | |
| BIOCH | 241 | INTRO BIOCH | 3.0 | WF | | | | | |
| MICRB | 410 | MED MICRB | 3.0 | C+ | | | | | |
| ESACT | 117 | EX FOR STRESS MGMT | 1.5 | A- | | | | | |
| MICRB | 450 | MICRB/MOLEC GENET | 2.0 | C | | | | | |
| MICRB | 418 | VIRUSES | 3.0 | D | | | | | |
| MICRB | 422 | PRACT MED MICRB | 3.0 | C | | | | | |

SPECIAL ACTIONS AND NOTES

05-95 B S CONFERRED · MICROBIOLOGY · GENERAL OPTION

Transcript Key is printed on back of Official Transcript.

An Official Transcript is printed on a blue Penn State background

The word COPY will appear if photocopied

Discoloration of this document indicates unauthorized alterations

| TERM/SEM | MAJOR | TERM/SEMESTER | | | CUMULATIVE | | | TOTAL CREDITS EARNED |
|---|---|---|---|---|---|---|---|---|
| | | CREDIT | GRADE PTS | AVERAGE | CREDIT | GRADE PTS | AVERAGE | |
| FALL 90 | SCIEN | 15.0 | 36.67 | 2.44 | 15.0 | 36.67 | 2.44 | 15.0 |
| SPRING 91 | SCIEN | 13.0 | 32.99 | 2.54 | 28.0 | 69.66 | 2.49 | 28.0 |
| FALL 91 | SCIEN | 13.0 | 31.97 | 2.46 | 41.0 | 101.63 | 2.48 | 41.0 |
| SPRING 92 | ASTRO | 15.0 | 36.01 | 2.40 | 56.0 | 137.64 | 2.46 | 56.0 |
| FALL 92 | ASTRO | 12.0 | 29.66 | 2.47 | 68.0 | 167.30 | 2.46 | 68.0 |
| SPRING 93 | MICRB | 11.5 | 24.15 | 2.10 | 79.5 | 191.45 | 2.41 | 79.5 |
| FALL 93 | MICRB | 13.0 | 29.99 | 2.31 | 92.5 | 221.44 | 2.39 | 90.5 |
| SPRING 94 | *MICRB | 14.0 | 53.01 | 3.79 | 106.5 | 274.45 | 2.58 | 104.5 |
| FALL 94 | MICRB | 13.5 | 36.47 | 2.70 | 120.0 | 310.93 | 2.59 | 118.0 |
| SPRING 95 | MICRB | 13.0 | 30.33 | 2.33 | 133.0 | 341.26 | 2.57 | 131.0 |

*DEANS LIST
END OF TRANSCRIPT

*J. Jane Woger*
University Registrar

CONFIDENTIAL

MRK-KRA00447569
MRK-CHA00447569

Appx20144

# PENN STATE

Office of the University Registrar

(814) 865-6357

112 Shields Building
The Pennsylvania State University
University Park, PA 16802

## TRANSCRIPT/ENROLLMENT CERTIFICATION KEY

### RELEASE OF INFORMATION

In compliance with the Family Education Rights and Privacy Act of 1974, this information is released on the condition that the recipient "will not permit any other party to have access to such information without the written consent of the student".

### OFFICIAL TRANSCRIPTS/ ENROLLMENT CERTIFICATIONS

"Penn State" appears in small blue print across the entire face of the official transcript or enrollment certification which is printed on Scrip-Safe™ security paper. The official transcript bears the seal of Penn State and the signature of the University Registrar. The raised university seal is not required.

### ACCREDITATION

The Pennsylvania State University, whose prime purpose has always been to serve the people and the interests of the Commonwealth and the Nation, is accredited by the Middle States Association and is a member of the Association of American Universities.

### CREDITS AND HOURS

Credits are awarded on the semester-hour basis. According to Senate Policy 42-23, a total of at least forty hours of work planned and arranged by the University faculty is required for the average student to gain 1 credit. While the distribution of time varies from course to course, generally one-third of the time is devoted to formal instruction, such as lecture, recitation, laboratory, field trips, etc., and two-thirds of the time to outside preparation.

### COURSE-NUMBERING SYSTEM

UNDERGRADUATE COURSES (1 to 399); General courses accepted in fulfillment of requirements for the bachelor's degree.

ADVANCED UNDERGRADUATE COURSES (400 to 499); Courses open to graduate students, juniors and seniors and, with the special written permission of the head of the department or chairman of the program sponsoring the course, to qualified sophomores and freshmen.

GRADUATE COURSES (500 to 699); Courses restricted to students registered in the Graduate School, seniors with an average of at least 3.50, and other students who have been granted permission to enroll by the dean of the Graduate School. The numbers 600 (on campus) and 610 (off campus) are available for credit in thesis research in all graduate major programs. The numbers 601 and 611 do not denote conventional courses but are used for noncredit special registration for thesis preparation by a Ph.D. candidate.

MEDICAL COLLEGE COURSES (700 to 799); Courses in the 700-799 series are restricted to students working in the M.D. program.

ASSOCIATE DEGREE COURSES (800 to 899); General courses accepted in fulfillment of requirements for the associate degree. Credits received for 800-series courses may be applicable to a particular baccalaureate degree program at the discretion of the appropriate college and major department.

### COURSE SUFFIXES

Letters are frequently used following a course or section number.

- A, B, C, D, E, F, G, I, and K - appear after certain courses where the course content or title differs from the basic course description. They are frequently used for identifying special titles for projects in Independent Study courses (i.e., 297, 497, and 597).

- H - Honors courses or sections.
- J - Individualized instruction courses.
- M - Writing and an honors course.
- S - First year seminar course.
- T - First year seminar and honors course.
- W - Writing course.
- L, P, R - Lecture, Practicum (or laboratory), and Recitation sections.

### BASIS FOR GRADES

Grades shall be assigned to individual students on the basis of the instructor's judgment of the student's scholastic achievement using the grading system below.

### GRADING SYSTEM

For undergraduates, the grades of A, A–, B+, B, B–, C+, C, D, and F indicate a gradation in quality from *excellent* to *failure* and are assigned the following grade-point equivalents:

| UNDERGRADUATE | | GRADUATE | MEDICAL | |
|---|---|---|---|---|
| Grade | Grade-Point Equivalent | Grades and Grade Points ( ) | | |
| A | 4.00 | Passing = A (4) | H | = Honors |
| A- | 3.67 | = B (3) | HP | = High Pass |
| B+ | 3.33 | = C (2) | P | = Pass |
| B | 3.00 | Failing = D (1) | F | = Fail |
| B- | 2.67 | = F (0) | | |
| C+ | 2.33 | | | |
| C | 2.00 | *Graduate average computed on* | | |
| D | 1.00 | *the basis of earned grades in* | | |
| F | 0 | *400, 500, and 600 level courses* | | |

Plus and minus values were added to the undergraduate grading system fall semester 1987.

Student is in *good standing* unless stated otherwise.

### INCOMPLETE GRADE SYMBOLS:

NG = Not reported
DF = Deferred

### OTHER SYMBOLS:

| | | | |
|---|---|---|---|
| P | = Pass | FL | = Fail |
| PS | = Pass | WP/WF/WN | = Late Drop |
| AU | = Audit | WP | = Passing |
| R | = Research | WF | = Failing |
| W | = Withdrawal | WN | = No Grade |
| SA | = Satisfactory | UN | = Unsatisfactory |
| NDC | = Not Degree Credit | INCP & I | = Incomplete Average |
| S | = Proficiency Exam Passed | | |

### METHOD OF CALCULATION OF GRADE POINTS

The number of grade points obtained by a student in any course shall be computed by multiplying the number of credits in the course by the grade-point equivalent of the grade in the course. Courses taken under the satisfactory/unsatisfactory grading system are not used in computing grade points.

Example: History 020, 3 credits, grade B, produces 9 grade points; and Mathematics 021, 3 credits, grade F, produces 0 grade points.

**CONFIDENTIAL**

MRK-KRA00447570
MRK-CHA00447570

Appx20145

# PENNSTATE



Dept. of Biochemistry and Molecular Biology
Eberly College of Science
The Pennsylvania State University
University Park, PA 16802-6007

Robert A. Schlegel
428 South Frear
(814)865-6974 FAX: (814)863-7024
E-mail: ur3@psu.edu

April 10, 2000

Dr. David Krah
Merck and Company
WP16-203
Sumneytown Pike
West Point, PA 19486

Dear Dr. Krah,

This recommendation for Steve Krahling is written in the strongest support for the position he is seeking in your company.

Steve began working in my laboratory while he was an undergraduate, and was assigned to learn the ropes from a postdoctoral fellow. We was very quick to pick up on new laboratory methodologies and was soon making significant contributions to our research goals. From those studies he became a co-author on his first paper. Just about the time Steve was graduating, my postdoc took a position at Yale. There was no doubt whatsoever in my mind that I wished to hire Steve to continue the research and give him sole responsibility for the important project.

During the time he was my technician, Steve was a wonder at generating large amounts of good data, with little supervision. He and I would periodically discuss his experimental results, devise new experiments and prioritize those experiments. Steve would disappear into the lab, work nights and weekends if necessary, and provide me with beautiful, publishable data. He became co-author on another paper.

But Steve was not happy to just be co-author. He wanted to be first author on a paper, an aspiration very rare in my experience. In fact, in my 24 years with my own laboratory, none of the technicians who have ever worked for me have appeared as a first author on a paper. I told Steve that to be first author he would have to write the first draft of all parts of the paper and assume responsibility for readying the manuscript for submission. He accepted the challenge. Now, as I struggle with the Masters theses of several of my students, I appreciate how well Steve writes and how he knew the right way to assemble figures, figure legends, etc. What I'm saying is that his performance was superior to the two students with whose theses I am currently struggling.

An Equal Opportunity University

CONFIDENTIAL

MRK-KRA00447571
MRK-CHA00447571

When Steve decided to leave a position in academia, I had decidedly mixed feelings. If he wanted to move on to something different in his life, I was supportive. But I hated like hell to lose him. In summary, Steve is gifted in the laboratory, with the ability to make experiments work. He was a praise worthy work ethic as well. But more important, he has a mind to go with these other attributes. I did not have to explain rationales for experiments to Steve; he knew. I did not have to explain how the studies fit into the big picture; he knew. Steve is a man of many talents, and I think you can see why he has my very strong recommendation.

If you would like to speak with me further about Steve's qualifications, please do not hesitate to call me at (814) 865-6974.

Sincerely,

*Robert A. Schlegel*

Robert A. Schlegel, Professor and Head
Department of Biochemistry and Molecular Biology

**CONFIDENTIAL**

**MRK-KRA00447572**
**MRK-CHA00447572**





PENN STATE

(814) 865-5497  863-1767
FAX: (814) 863-7024

Department of Biochemistry
and Molecular Biology
Eberly College of Science

The Pennsylvania State University
Paul M. Althouse Laboratory
University Park, PA 16802-4500

May 4, 2000

Dr. David Krah
Merck and Co.
WP16-203
Sumneytown Pike
West Point, PA 19486

Dr. Krah,

Steve Krahling has asked that I write to you in support of his application for promotion. I have known Steve since he started in our lab here at Penn State as a work-study student. Later on he conducted undergraduate research with a PostDoc in our lab and then following his graduation became a valuable technician. Over the years I have watched Steve mature from a naïve but bright undergrad to a thoughtful, careful scientist. Although Steve was Dr. Schlegel's technician, and as such carried out experiments he was directed to perform, he also was allowed the freedom of developing many of his own experiments. Steve became very facile with a number of tissue culture laboratory techniques as well as flow cytometry. In addition, he was expected to keep up with the literature and contribute significantly to the conception and writing of manuscripts and Steve's work resulted in several published papers from this lab. Steve learned to operate very well in this environment to the point that it was difficult for him to leave Penn State.

I am sure that moving to an industry setting was a significant and rewarding change for Steve. I am also sure that you must by now be aware of Steve's potential as a contributing member of any research team. Promotion to a job with greater responsibility would be the next logical step for Steve, for which he has my wholehearted support.

Please feel free to contact me if you have any questions.

Sincerely,

*Margaret S Halleck*

Margaret S. Halleck, PhD.
Sr. Research Associate

An Equal Opportunity University

CONFIDENTIAL

MRK-KRA00447573
MRK-CHA00447573

Appx20148

# Yale University

*Department of Pathology*
*School of Medicine*
*310 Cedar Street*
*P.O. Box 208023*
*New Haven, Connecticut 06520-8023*

*Campus address:*
*108 Lauder Hall*
*310 Cedar Street*
*Telephone: 203 785-2759*
*Fax: 203 785-7303*

April 6, 2000

Dr. David Krah
Merck & Co.
WP16-203
Sumneytown Pike
West Point, PA 19486

Dear Dr. Krah:

I am writing this letter on behalf of Stephen Krahling. Stephen worked with me when I was a postdoctoral fellow at Penn State. When he started in the laboratory, he was working as a work study student doing dishes and other odd jobs for the lab. He was very thorough in what he undertook and I thought he might be good working at the bench. When I asked him if he'd like to learn about my work and try to do some simple experiments, he was immediately enthusiastic. This enthusiasm was sustained during the entire time that I was in the lab. and beyond that. Having whetted his appetite at the bench, he decided to stay on the lab after graduating with a B.S. During his three year stay at Penn State he was an author on five papers, which is an excellent indicator of his ability to work hard, as well as be a team player. I recommend Steve very highly for the job he is applying for in your group.

Please feel free to telephone me at 203-785-2771 should you need further input.

Sincerely,

Deepti Pradhan
Associate Research Scientist
Department of Pathology

**CONFIDENTIAL**

11/26/2019
Declaration of G. Reilly
EXHIBIT 440

**Appx20150**

Monday, 11/29/99
√•Revise/Issue monthly (sent this 11/27/99)
√•Check re Vero 12-well plates for this week
set up 30 x 12-well plates Mon and Wednes
plan MPS Nts:
Nt + anti-IgG enhancement
Nt ± spike with excess "killed" antigen
SBL-1 studies
√•Left message with Bob Suter x3707 re job share for Mary and Kristin-I will let
him know when I hear from them re when they can meet with him
√•Return call to Command Center disregard line x8654 re extend disregard on
WP16-129A CV #2: WPMS pts 36103 and 34300 for 2 wks thru Dec 13
These were off over the weekend and may need addtl repairs

REDACTED – OMP

√•Set up dates and times for lab meetings for next year
every other week, Mon or Tues, 1 h-sent e-mail to Pat
x•Stain MPS Nt from 11/22/99 (if not stained yesterday): 5 trays-these were done
yesterday
√•Stain MPS Nts from 11/23/99 (3 assays): ~1030 AM
√•Review schedule with Jenny
complete Nts from last week
new Nts?
HAU assays
rHA?
REDACTED – OMP
√•HAU assay: **MMRV-**
test Δ viruses for HAU vs crbc
test JL, SBL, Lo1, others vs crbc, AG MRBC, GP RBC
need 1% suspensions of GP RBC and AG MRBC and 0.5% CRBC
√•Bob O'Neill 2nd visit: 115-245 PM
√•Info for tomorrow's lab mtg
timing for rHA growth expts
MPS Nt status
    current
    planned expts
    upcoming trials

CONFIDENTIAL

version // :

<u>Monday, 10/23/00</u>-Dr. Rose appt @ 2 PM-reschedule to Dec 18 @ 2 PM [Mon]
√•Note: Frank Kennedy on vacation
√•MPS Nt training for Dick Ward's group?
Mary covered this
review training and documentation for completion of appropriate training
√•Acetone fix MPS Nt (x652-00): 12 noon
√•Let Jenny, Colleen know re Bioreliance presentation for this Thursday?
√•Note: Jill returning to work tomorrow
Emilio, Alan and Naomi Jergey discussed this-OK
√•Return call to Command Center to extend disregard on WPMS 11112 WP26 -
20°C freezer by SE stairwell on 1st floor-Extend another 2 weeks
√•Reply to Richard Lewis and Deitra re rHA ADP
√•Reply to Vera Byrnes re minutes from Aug CAS mtg-OK
√•Note: Jill called-she will be in tomorrow
She will report first to Health Services @ ~830 AM
Her doctor released her for work, with restrictions, for 3-4 hours/day, effective
Oct 19
She needs to take off next Tuesday (the day after her next injection)-We can
check to see if she is eligible for sick/personal time?

REDACTED – OMP

√•Note: job offer letter went out to Joan Wlochowski today
Staff Virologist, grade 8, $4167.00/month
Also offering 15 vacation days (10 days + additional "due to.. years of prior work
experience"
Note: Frank Kennedy's offer was for Biologist, grade 9 @ $406.00/month.
√•Faxd form to WPMS to update alarm points on single chamber 35°C incubator
in WP16-203 to 35°C ± 1°C
this was listed as 32°C ± 1°C
sent this in yesterday (fax)
old pt = 38513-this unit was reassigned WPMS pt 38057 recently (as part of the
reallocation of WPMS #s in WP16)
√•Reply to Jeff Smith re see if we can get the microplate washer that his group is
discarding
√•Reply to Lorraine Powers in Purchasing re my recent order for 50 vials of rabbit
anti-human IgG, ICN #55008
They have 16 vials in stock,
OK to send these 16, then back-order the balance
This is our PO #H807971W
√•Note: submitted WO to correct temperature in WP16-213C clean-room: WP
#950988 (maxeq #756789)

version // :

from 10/18/00: running @ ~80°F-request adjustment to 68-72°F
(stilll running hot today, ~82°F)
√•Info for tomorrow's CAS presentation
√•MPS Nt: **MMRV-665-00**
test 2 pre-positive and 1 pre-negative pair x 3 replicates
√•Note: Liz coming in ~noon on Wednesday-has interview (in Bev Rich's group-Neil Jain??)
√•Check re info for Tuesday's CAS mtg
•Check re sera to test by Nt tomorrow
sera that were pre-positive or sera that were post-positive at only 1 dilution?
√•Weekly mtg with Jenny
review MPS Nt plan
continue with REDACT Mumps agELISA
REDACTED – OMP¯

Tuesday, 10/24/00
√•Note: Frank Kennedy on vacation
√•Note: Jill returning today
•Note: CAS meetings for the remainder of this year:
Oct 24: 2-5 PM, WP46-1003
Nov 16: 9 AM-12 noon, WP14-1211
Dec 14: 9 AM-12 noon, WP37A-3, Sec. A
√•Plot titration curves for representative sera vs 1:4, 1:6, 1:8 anti-IgG
√•Plot # dilution positive for sera using 1:4, 1:6, 1:8 anti-IgG to demonstrate the "sensitivity shift" using Δ anti-IgG amounts
√•Check re what would the seroconversion rate be for the AIGENT using 2 dils (+) needed for (+) serostatus?
1:4 anti-IgG: 25/27 = 93%
1:6 anti-IgG: 55/59 = 93%
1:8 anti-IgG: 26/29 = 90%
√•Check re training documentation for Dick Ward's staff
Mary completed this
√•Summarize data leading to a recommendation of 1:6 anti-IgG for use in the anti-IgG MPS Nt
add data from x598-00 and x599-00
√•MPS Nt training for Dick Ward's group?
Review status
Has the required training been completed satisfactorily?
yes
√•CAS presentation today: 2-5 PM , WP46-1003
provide update on status of MPS Nt assay development

**CONFIDENTIAL**

version // :

results for pre-positiity
seroconversion rates
training
validation protocol


<u>Wednesday, 10/25/00</u>
√•Note: Frank Kennedy on vacation
√•Note: Mary off 1/2 day today

**REDACTED – OMP**

[black redaction box]

√•Return call to Bill Long-He thinks that we are looking for pre-negative and post-negative sera, or only pre-sera for further testing in AIGENT
I asked for 60 paired sera, pre-negative by Mumps ELISA, 0.5 mL each
We would like these by Tuesday to start running Wednesday

**REDACTED ?? OMP**

[black redaction box]

√•Note: offer letter for Steve went out yesterday-I forwarded the e-mail
notification and forwarded to Pam Kozempel his current address:
Steve Krahling
521 Toftrees Ave
Apt 111
State College, PA 16803
Also forwarded his e-mail address to Pam Kozempel
√•Set up 45 Vero plates for MPS plaque assay for Friday
√•M/M/R/V Potency Assay meeting, 4-5 PM, WP17-2122
√•Note: Mary met with Beth Arnold yesterday-Beth is expecting and will take 6
months off, to return in November.  She may job-share with Mary after her return
(both working 24 h/week)?
Mary meeting with Kevin today for luch to see "how things are going"
√•Note: recd 10 vials of ICN Cappel rabbit IgG fraction to human IgG (whole
molecule), #55008, lot #01396C
Total protein: 11.5 mg/mL
Antibody protein: 5 mg/mL
No preservative in this lot

**CONFIDENTIAL**

**MRK-KRA00490471**
**MRK-CHA00490471**

version // :

<u>Thursday, 10/26/00</u>
√•Note: Frank Kennedy on vacation

**REDACTED ?? OMP**

x•Mtg with Bioreliance re "Mumps production in Vero cells/HN downstream
purification"-sponsored by Bill Long
10-1130 AM, WP17-2122

**REDACTED – OMP**

√•Mtg to discuss End Expiry Interim Analysis Logistics
3-4 PM, UN B120
Joe Antonello to come over tomorrow 9 AM to review validation protocol
plan = run validation, provide validation protocol and preliminary data to CBER
then provide validation data

run set of 600 paired sera from protocol 007 when validation data are available
√cb/dk•Acetone fix MPS Nt from 10/23/00: 615 PM
√jk/cb•Coat ELISA plates with MPS/control for use in the MPS agELISA
√•Note: Emilio suggested that given our MPS Nt "emergency", Alan should tell
Ed Rauch that Beth won't be released to his group until the end of the year. I
suggested to Alan today that this was not necessary. She is already relatively
"uninvolved" (on the phone a majority of the time, unresponsive to Jenny's
requests for help/info with the MPS agELISA). Dragging her time out another 2
months would not be productive. This was supported by the lab members asked.
The consensus is that we would be OK staffing-wise w/o her for the upcoming
MPS Nt testing.
√•Note: MRL-RIS upgrade was done today-My laptop system froze during this-I
called the Help Desk and they suggested removing the Ethernet and Modem
cards during rebott--Then worked OK.
This is case #2016432
√•Check re plans for MPS Nt for tomorrow



REDACTED – OMP

CONFIDENTIAL

MRK-KRA00490472
MRK-CHA00490472

Appx20155

version // :

**REDACTED   OMP**

•Check MPS sequence refs
•Check summary table comparing serum Nt titers using std and anti-IgG enhanced assay
is there a consistent "titer difference"?
•Check re revising AIGENT SOP and the Mumps plaque assay SOP


Friday, 10/27/00
√•Note: Frank Kennedy on vacation
√•Note: Beth off-use up remainder of "comp time" (7 h) "due"
√•Mtg with Joe Antonello @ 9 AM to review validation protocol for MPS AIGENT
MKY, CM, AS sera: triplicates/run x 6 runs
pediatric sera (pre/post): replicates of ???# sera

data from pediatric serum testing to demonstrate seroconversion rate and pre-positive rate
Joe provided an example of a validation protocol from Mike Caulfield

Joe suggests running 6 sera (ideally 2 low, 2 mid, 2 high) x triplicates pe run x 6 separate runs to evaluate variability

we can include pediatric sera (run once) to demonstate pre-positive rate and seroconversion rate

specificity can be addressed from pre/post boost and absorption expt
Quality control: control sera to characterize assay performance + limit to plaque counts?
I mentioned the issue of calling sera positive @ a single dilution "equivocal", with retest to confirm = OK
Joe also suggested considering using something other than a 50% Nt cutoff-I told him that I would look at the previous data to see how this affects pre-positive rate and seroconversion rate?
√•cGMP Training: "cGMP Regulations"
2-330 PM, WP37 aud
me, JK, JD, KH
√dk/jk•MPS Nt: **MMRV-670-00**
test replicates of pre-positive sera and weakly-positive post-vaccination sera

CONFIDENTIAL

MRK-KRA00490473
MRK-CHA00490473

version // :

or test 1:2 thru 1:4096 dils (including DK and MKY serum, a previously pre-positive serum and a weakly positive post-vaccination serum)
√jk/kh•Set up 45 Vero 12-well plates
√•Note: Joan Wlochowski
revised offer (October 27):
Staff Virologist, grade 8, $4292/mo ($51504/yr) + 1-time sign-on bonus of $5000 + 15 days vacation

for recent offers:
Frank Kennedy, Biologist: grade 9, $4065/mo = $48780/yr
Joan Wlochowski original offer: Staff Virologist, grade 8, $4167/mo, 3 wks vacation = $50004/yr
        Joan indicated that she would would like $55K/yr, currently making $49K; Emilio will agree to $51K-$52K + sign-on bonus of a few thousands $$$
Steve Krahling, Virologist, grade 9, $3667/mo = $44004/yr
√•Note re promo dates
me: July 1, 1998
Mary: last promo = Oct 1998
 (worked 9 mo from this thru end of 1999, then 60% of 2000)
Colleen: last promo = Feb 1999
Jenny: started Sept 24, 1999
Jill: started 7/1/96 @ contract, 11/1/96 @ Merck
        on disability 10/20/98 thru 10/23/00)
        target promo in 6 months
Frank: started Oct 9, 2000


Saturday, 10/28/00-in 4 h√
x•Set up Vero plates (100)?
REDACTED – OMP


Sunday, 10/29/00-in 1 h√
√•Fix MPS Nt from 10/26 (x667-00) @ 9 PM
√•Leave message with Beth to add immunostaining to this week's staining schedule

CONFIDENTIAL

MRK-KRA00490474
MRK-CHA00490474

version // :

<u>Monday, 12/4/00</u>
√•mky/jk•Set up Vero plates for MPS Nt assays
set up 130 plates
√•Recd 100 paired sera from protocol 007 (already thawed)
receipt = **MMRV-736-00**
processing = **MMRV-737-00**
√•Note: Jim Searles indicated that they are having a problem with MRC-5 cell
peeling/detachment in the control bottles from a recent lot.  I went over to view
these-The affected cells are from 1 of 2 trucks-Cells appear ~50%
mnacroscopically less dense, with patchy areas of cell detachment (some non-
descript residue remains/debris).  Cells otherwise look OK, no foci in other areas;
cells @ edge of detachment appear OK (flat, stretched-out, not refractile).


<u>Tuesday, 12/5/00</u>
√•Note: Jill out for Drs' procedure
x•MMRII DMT/CSR mtg, 3-430 PM, UN142 (Patrice Benner @ 397-2020; Dara
Pera @ 397-7867)
√•Set up 400 Vero plates for MPS Nt assays
√•Reply w/ comments to MRC-5 SOP to John Hennessey
√•Send memo to Jim Searles re comments from yesterday's observation of MRC-
5 control bottles in MMD Dept 222
√•Aliquot and sterility test sera from protocol 007
completed all available sera from cases #2 thru 3371
√•Note: hood 213F-1 to be certified today by MicroClean
decon'd today-to be certified tomorrow
√•MPS Nt: **MMRV-740-00**
test adult lab sera
and test new lot of anti-IgG
√•Set up pre-dilution of FDA ref immunoglobulin: **MMRV-738-00**
dilute in PBS 1:32
subaliquot in 100 µL amounts and refreeze (31 aliquots)
√•Send note to Kim Ronio re comments/suggested rating for Kevin (she is his
new supervisor)
√•Note to Alan re vacation carryover
√•Note to Danielle Baker re we still are interested in talking to her about a
position in our group
√•Note: Joan Wlochowski called back re start date (she called last Thurs/Fri and
again today)
√•Note: sent draft ratings to Alan
MKY: TP, Leadership Medium/High

**CONFIDENTIAL**

**MRK-KRA00490507**
**MRK-CHA00490507**

version // :

KH: <u>Low</u> EE, Medium
EY: ME, Medium
FK: Not rated
JD: Not rated
CB: TP, Medium
JK: TP, Medium
√•Note: Troy called from the Command Center re freezer 2.4 in WP16-129A in alarm.  This is not one of ours-I double-checked that we did not have anything in this-I left messages with Henry, Paul and Loren, since their names are on the door.  This started warming ~730 AM, and has been on a steady warm (~-56°C @ ~10 AM)
√•Note: reactivated WPMS pt 38183 yesterday-single-chamber CO2 incubator in WP16-213 (incubator #1)-This was repaired yesterday (burned out circuit board)
√•Note: Jim (Instrument Tech: Jim Sarzynski x6634) indicates that the bottom right incubator in WP16-213 is running OK-temp and CO2 are OK
√•Note: Fred (Instrument Tech) called re needs to get in freezer 2.9 in WP16-129A-I gave him the combination
Fred Maxson (sp?)
pager x27723 pager #1621
√•Note: Bev Rich called to say that they are not going to get the remainder of the sera from Protocol 007 to us today
√•Recd supplemental list of sera from Jin Xu to replace those w/o post serum in Protocol 007 testing.  We are to use another seryum from the same center as a replacement
√•Put contact name/phone #s on flammables cabinet in WP16-2 hallway
put contact lab numbers (WP16-203/213)


<u>Wednesday, 12/6/00</u>
√•Start MPS AIGENT assays for Protocol 007
√•Set up 400 Vero plates for MPS Nt assays
√•No growth noted for any sera from yesterday's sterility test
√•MPS Nt assays (2)
**x741-00**
**x742-00**
√•Check serum dates and record observations of serum appearance (hemolysis mostly) from cases #2 thru 3371
√•Check re additional sera from Kelly Buckley/Bev Rich to subaliquot?
recd the remainder of what they have from the 2 lists that Jin Xu provided.
CM and DK subaliquotted and sterility tested sera for Thurs and Fri's testing.

**CONFIDENTIAL**

2000 Schedule, page 429

version // :

Thursday, 12/7/00
√•MPS Nt assays (6)

| expt # | obs # | case # |
|--------|-------|--------|
| x743-00 | 28-40 | 2550-2581 |
| x744-00 | 41-55 | 2585-2697 |
| x745-00 | 56-68 | 2699-2729 |
| x746-00 | 69-83 | 2732-2774 |
| x747-00 | 85-97 | 2780-3367 |
| x748-00 | 98-118 | 3369-3430 |

x•Set up Vero plates for MPS Nt for 12/9 (75)
√•Check serum sterilities from 12/5-all OK-no growth
√•Note: for x748-00, Frank used MM w/o agarose for the 2nd tray
We tried to add concentrated agarose to this rather than refeed, but this did not
gel adequately-Incubate with remainder of assay, but plan to retest these sera
√•Transfer 9 boxes of sera from M-M-R®II Protocol 006 (Competitive Trial) to -
20°C walk-in (bottom right shelf by door)
from WP16-203E 2-8°C to WP16-212F -20°C
√•Note:
Liz in until 6 PM
Frank until 7 PM
Jenny, Colleen until 830 PM


Friday, 12/8/00
√•MPS Nt assays (4)

√•Fix MPS Nt x740-00 from 12/5
~3 PM
√•Check serum sterilities from 12/5 and 12/6-no growth noted
√•Subaliquot 26 paired sera for Monday's Nts
√•Note: recd 10 additional vials of ICN/Cappel #55008 rabbit anti-human IgG lot
01943
√•Note: Mary in today


Saturday, 12/9/00-in 5 h√
√•Note: Jenny and Mary in ~8 AM to ~2 PM
Frank in ~11 AM to ~2 PM
√mky/jk•Set up Vero plates
√jk/dk•Fix MPS Nt assays from 12/6

**CONFIDENTIAL**

**MRK-KRA00490509**
**MRK-CHA00490509**

Appx20160

2000 Schedule, page 430

version // :

~10 AM start
x741-00
then x742-00 (1 h apart)
√•Sort remaining sera for Nt testing
~388 paired sera remain to be subaliquotted
(tested 26 + 78 + 52, 26 for Mon = 182 paired sera tested)
√•Order RCM563: 8 trays to arrive 12/15
√•Order medium 199: ordered 100 bottles
√•Order 12 x 4 L bottles of acetone
√•Check serum sterilities-no growth noted from 12/5 or 12/6
√•Spot 10 µL sera #1092 thru 290 (the same case #s as aliquotted yesterday)
and incubate @ 37°C.
x•Set up extra Vero plates for 12/11 (75)


Sunday, 12/10/00-in 12 h√
√•Note: Jenny, Mary, Frank in ~9 AM to 1130 PM
√•Fix MPS Nt assays from 12/7
x743-00
x744-00
x745-00
x746-00
x747-00
x748-00
√mky/jk/fk•Set up Vero plates
√•Aliquot and sterility test sera for Tuesday's assay (52 pair: #s 292-2249)

CONFIDENTIAL

MRK-KRA00490510
MRK-CHA00490510

Appx20161

version // :

<u>Monday, 12/11/00</u>
x•Seminar: 9-1030 AM, WP97-3429: Dr. Tevethia: "Immunorecessive cytotoxic T-lymphocyte epitopes as inducers of immunity"
√•Set up Vero plates for MPS Nt assays
√•Return comments to 2000-ms-3400 (Kraiouchkine et al)
√•Expenses from Beijing-put on expense report form and return to Colleen Taddeo: $188.65 due to me
√•Fix MPS Nt assays from 12/8
x749-00
x750-00
x751-00
x752-00
√•Check sterilities-no growth on any plates from 12/5, 12/6, 12/9 or 12/10
√•Check info for x752-00 from 12/8/00
√•MPS Nt assays:
(2 assays)
**x753-00**      plate #s 721-780
**x754-00**      plate #s 781-840
√•mky•Subaliquot sera for this week's Nt testing
√•Subaliquot additonal amounts of MKY and CM control sera
MKY = 7-26-00: 10 x 100 µL
CM = x477-99, 7/27/99: 9 x 100 µL
labeled as "MKY control serum 12/11/00" or "CM control serum 12/11/00"
√•Return call to Joan Wlochowski @ 215-489-7289
re Jan 2 start date OK


<u>Tuesday, 12/12/00</u>
√•MPS Nt assays:
(4 assays)
**x755-00**      plate #s 841-900
**x756-00**      plate #s 901-960
**x757-00**      plate #s 961-1020
**x758-00**      plate #s 1021-1080
x•Set up Vero plates for MPS Nt assays?
√•Check sterilities-no growth noted on any plates

√•Return call to Pierre Vanderspuy @ 212-519-6130 re Exec Search for General manager for vaccine operations
He is recruiting for a head of mfg to run a new $35 million mfg plant and bring it up to GMP compliance-located in Quebec City

**CONFIDENTIAL**

**MRK-KRA00490511**
**MRK-CHA00490511**

version // :

√•Return call to Albert Lee-recruiter in RI area (11/29)
vaccine development opportunity
401-434-7614-left message
√•Send note to Deitra Arena/Joan Staub re update for MPS Nt testing for
tomorrow's M-M-R®II Team mtg
cc Lan, Emilio, MKY
√•Note: walk-in 4°C refrig in WP16-204 is back up and running (we can use this
as a temporary overflow storage location for media)
√•Note: Jenny to take off next week (starting Dec 21?), the week between
Christmas and New Years and the day after New Years
Liz to be off Tuesday after Christmas for 1/2 day
Frank off Dec 22, 26-28
√•Note: recd note from Personnel re Steve to start Wednesday, December 27.
√•Note: recd call from Allison x24091 in Health Services re reevaluation of Jill's
work restrictions
No lifting greater than 15 pounds, stooping, no cervical rotations or extension, no
climbing, overhead reaching, no twisting or kneeling
To continue 4 h/day
To be re-evaluated Jan 31
√•Call Dr. Rose to reschedule appt from Mon 12/18 to ???
610-833-5588-reschedule to Thursday Jan 4 @ 245 PM


Wednesday, 12/13/00
√•MPS Nt assays:
(6 assays)
**x759-00**      plate #s 1081-1140
**x760-00**      plate #s 1141-1200
**x761-00**      plate #s 1201-1260
**x762-00**      plate #s 1261-1320
**x763-00**      plate #s 1321-1380
**x764-00**      plate #s 1381-1440
x•Set up Vero plates for MPS Nt assays?
•Check sterilities


Thursday, 12/14/00
x•CAS meeting-*cancelled*
x•MPS Nt assays:
√•Fix MPS Nt assays from 12/11 (2 assays)
√•Reply to Jim Searles re needs memo for APR (temperature excursion)

**CONFIDENTIAL**

**MRK-KRA00490512**
**MRK-CHA00490512**

Appx20163

version // :

Provided e-mail and hard copy
√•Check sterilities-no growth on any plates
√•Note: Liz interviewing with David Kaslow today? (1-2 PM)
She did not say anything about this, but I heard indirectly that this was happening
√•Note: recd e-mail from Michelle Leone yesterday re need to forward form re
status of Liz (cannot be retained for more than 3 more months)
√•Note: walk-in 4°C WP16-203E warmed last night-The A/C mechanics thought
that they had repaired it, but it warmed again ~mid-day to ~12°C (did not go
above ~12°C)-The compressor was found to be broken-Dan and Gene stayed
over to replace the compressor.

REDACTED – OMP

√•Transfer sera from Protocol 007 to WP16-204E walk-in 4°C refrig while WP16-
203E is being repaired

REDACTED – OMP

This has been allowed in the EP
She asked where we want to have this issue-Alan suggested all markets


Friday, 12/15/00
√•Annual Safety Training, 830 AM-12 noon, WP37 aud
x•MPS Nt assays:
??
√•Fix MPS Nt assays from 12/12
(4 assays)
√•Check WP16-203E 4°C refrig
Is this back in operation?
Yes-John Wilson will use charge #874917 = misc charge #
Note: later in the day, a leak in the refrigerant was noted-Gene (?) tracked down
a replacement piece of equipment (trap for inlet side-the old unit was allowing
moisture into the system).  They expect to have this repaired by late afternoon.
We kept the sera from Protocol 007 in WP16-204E until we confirm that this is
repaired.
√•Return comments to 2000-ms-3444 (Smith et al)
√•Return comments to 2000-ms-3467 (Smith et al)
√•Return comments to 2000-ms-3466 (Levin et al)
√•Reply to Michelle Leone re Liz's position-set Feb 16 as last day (Friday)-mailed
this to Michelle @ WP53B-404

CONFIDENTIAL

She started Feb 28, 2000
(Note: Michelle = x21086, fax 215-652-8947)



√•Expenses from Beijing to Peg (Colleen Taddeo signed the form)
√•Forwarded copy of Beijing presentations to Alok Ghosh (x28940)-He is Director of Japan Vaccine Operations and he has been asked to present some of this info to the Japanese.
He is @ 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, WP87-A363, fax 215-993-4489
secretary = Carol Hunsberger: x28952
√•Plan for scale-up of new Vero line from MMD (@ P126)
pass Fri, then next Thurs then following Wednes, then Jan 2 to use the week of Jan 7?
These were passed this Thursday (Dec 14): @ P127


Saturday, 12/16/00-in 8 h√
√•Note: Jenny in ~8 AM to 12 noon
Frank in ~11 AM to 3 PM
√•Fix MPS Nt assays from 12/13 (6 assays)
jk/dk: 1st 2
fk/dk: next 4
√•Check walk-in 4°C WP16-203E
compressor failed-transferred temp-sensitive items to WP16-204E walk-in
Let Bob LaFemina know that we moved materials into his cold room-OK
√•Note: Frank to take Monday off instead of 12/22 for final floating holiday (to attend funeral of girlfriend's grandmother Monday)


Sunday, 12/17/00-in 2 h√
√•Recheck materials in WP16-203E
walk-in @ ~20°C
moved additional materials and put EBME on wet ice
discard expired/un-needed materials

CONFIDENTIAL

MRK-KRA00490514
MRK-CHA00490514

2000 Schedule, page 435

version // :

√Spray down with Spor-Klenz
√•Transfer materials from WP16-203E cold room to storage on ice
√•Check write-up for x 763-00 MPS Nt
√•Pcs
√•Acetone = Fisher certified A.C.S., #A18$^{SK}$-4, UN1090, lot 001441
RCM66 = sterilized 11Dec2000, lot RCM100185
sterilized 17Oct2000, lot RCM100153

**CONFIDENTIAL**

**MRK-KRA00490515**
**MRK-CHA00490515**

**Appx20166**

2000 Schedule, page 436

version // :

<u>Monday, 12/18/00</u>-appt w/ Dr. Rose @ 2 PM-reschedule to Jan 4 @ 245 PM
√•Note: Frank off today for floating holiday
Note: Frank was scheduled to take new hire orientation today (945 AM-2 PM)
√•Note: Jenny has Dr's appt in AM
√•Note: due dates
Performance Reviews due Dec 20 (Dolores needs them by 1/2/01)
Objectives for 2001 due 2/18/01
•Note: Steve to start Dec 27
Health Services orientation Fri 12/29 @ 9 AM
New Employee Orientation Jan 2 @ 945 AM-215 PM
√•Send in disregard for 2-8°C walk-in in WP16-203E: WPMS pt 38019 thru
12/20/00 (Troy called re this)
This was @ ~21°C this AM
√•Called John Wilson x7329 re the walk-in 4°C.
Responsibility for WP16 is now with Malcolm Povitsky @ x8206-Gene the A/C
mechanic confirmed that the compressor burned out-He will order a new unit
today and will prep the system (evacuate and pressure test today)-expect to
return this to service by the end of the week.
√•Check write-up for x 763-00 MPS Nt
√•St. Lucia expenses to Peg
refund due for $1560.60
√•Prepare compressed work schedule review for Colleen
√•Draft monthly and issue
x•Seminar: Yimin Wu, "Malaria transfection: the system development and its
application in pathogenesis studies": 1 PM, WP46-1003


<u>Tuesday, 12/19/00</u>
√•Pollyanna/Christmas lunch for lab
REDACTED – OMP
x•Set up 45-60 Vero plates
√•Draft St. Lucia trip report
√•Check sterilities-no growth
√•Note: The Merck Board approved the flu program today
VaccTech needs to approve, but should be OK
√•Review job share with Mary (3 months since the previous review)
plan next one in 3 months (quarterly)
√•Review Colleen's compressed work schedule
(next one in January)
√•Prepare reviews for Colleen's compressed schedule and "close-out for job
share"

**CONFIDENTIAL**

version // :

•Review job share with Kristin (3 months since the previous review)
xplan next one in 3 months (quarterly)
√Prepare "close-out memo" for Kristin's position
•Note: Mary's job share review ~March, 2001
•Note: Colleen's compressed work schedule review in late January


•Review MPS Nt results
especially check mock values, and pre-positive/post-negative results-double-check counts, look for unusual pairs
•Draft ratings/performance reviews
•St. Lucia trip report
√•Colleen Taddeo called re can I attend a series of meetings in China in March to present the Competititve Trial results?
Beijing, Shanghai, one other place
series of dinner presentations, March 4-10
mtg on Mar 4, then last on Mar 9
plan to leave March 3, return March 10


<u>Wednesday, 12/20/00</u>
√•Note: Jenny on vacation
√•Note: Mary not in-water leak @ parents'
•Note: due dates
Performance Reviews due Dec 20 (Dolores needs them by 1/2/01)
Objectives for 2001 due 2/18/01
√•Note: Steve to start Dec 27
Health Services orientation Fri 12/29 @ 9 AM
New Employee Orientation Jan 2 @ 945 AM-215 PM
√•Extend disregard for WP16-203E cold vault to Dec 22 (x8654)
√•Note: Repairs being made today to WP16-203E
Gene indicates that he found several leaks-repaired these, and pressure tested. He is installing the new compressor today, and suggests letting this run over the weekend to confrim that it is running OK
√•Monthly due-sent this 12/18/00
√•Draft ratings/performance reviews
√•Evaluations due-send by e-mail to Dolores, Peg, Alan
√Kristin
√Mary
√Beth
√Jill-none done-returned to work P/T Oct 24
√Frank-none done-started

**CONFIDENTIAL**

**MRK-KRA00490517**
**MRK-CHA00490517**

Appx20168

version // :

√Jenny
√Colleen
√•Note: Frank submitted a request for comp time for the recent weekend hours
that he worked:
3.5 h on 12/9/00
2.5 h on 12/10
4 h on 12/16
He asked to use 8 h of this for next Friday-OK, but some O/T is expected for a
salaried position
He is having Lasik surgery next week and wants to "use this a comp day rather
than as a sick day"
√•St. Lucia trip report
review/draft with Colleen
issue to Alan/Peg


Thursday, 12/21/00
√•Departmental Christmas lunch: 12 noon-4 PM
√•Pass Vero T150s (to 20)-10 were set up (P128)
√•MPS Nt results
preliminary results

| expt | pre-pos | seroconversions | pre and post neg |
|------|---------|-----------------|------------------|
| x741-00 | 0 | 12 | 1 |
| x743-00 | 1 | 12 | 0 |
| x745-00 | 1 | 10 | 2 |
| x746-00 | 2 | 11 | 0 |
| x748-00 | 1 | 6 | 1 |
| x755-00 | 2 | 11 | 0 |


| expt | mock pfu | MKY titer | CM titer |
|------|----------|-----------|----------|
| x741-00 | 18.2 | 1024 | 4096 |
| x743-00 | 8.67 | 1024 | 16384 |
| x745-00 | 13.42 | 1024 | 8192 |
| x746-00 | 13.08 | 1024 | 8192 |
| x748-00 | 19.17 | 2048 | 8192 |
| x755-00 | 27.55 | 1024 | 4096 |

Forward these to Emilio and Alan
√•Respond to Emilio re timing for Protocol 007 results and validation runs
√•Check re timing to pass Vero for next week-Wednesday

CONFIDENTIAL

version // :

√•Check re schedule for next week
plaque counts
immunostaining
LN2 tanks
Vero passages
Leave note with Liz


Friday, 12/22/00
√•Use as Floating holiday
√•Note: Jill, Frank, Liz in
√•Note: Emilio asked for 2000 rating for Frank (for CAPS purposes; he will receive a rating from his "old" department)-I sent a note to Greg Kresge and Pete Maybo to see if they rated him and if so, what rating did they provide?  (I don't know if union staff are rated?)
√•Recd e-mail from Joan Wlochowski re she has not recd anything yet re confirming Jan 2 as her start date.  I forwarded to her the info on where to report, and sent an e-mail to Elye Jegou, Naomi Yergey and Pam Kozempel re is this in the works to confirm Jan 2 as start date?


Saturday, 12/23/00
√•Note: walk-in WP16-203E not repaired yet
extend disregard thru 12/27


Sunday, 12/24/00


Monday, 12/25/00
*****HOLIDAY*****


Tuesday, 12/26/00
√•Use as Floating holiday
√•Note: Liz in part day-Everyone else off


Wednesday, 12/27/00
√•Note: Stephen Krahling to start
√•Note: Liz in, everyone else off


CONFIDENTIAL

2000 Schedule, page 440

version // :

√•Pass Vero (20 T150s)
√•Check re status of WP16-203E cold vault-charged, leaks repaired, being cooled today
Extend disregard thru Jan 2
√•Orientation info for Steve
√•Note: Liz asked to leave@ 2 PM today-OK

REDACTED – OMP

√•Set up mail boxes for Steve and Joan
√•Check LN2 tanks-OK
√•Note: Vax acct migrated
new user name = krahda
temp password = isid_dec22
change to "bluemoon"
√•Count 2 MPS Nt assays
√•Change lab member names on door signs and mail box
√•Switch Beth's and Kristin's mail boxes to Stephen Krahling and Joan Wlochowski?


Thursday, 12/28/00
x•Use as Floating holiday?
√•Note: Liz, Steve, Jill in
√•Note: Greg Kresge replied re Frank's rating for last year-union employees are not rated-Forwarded this info to Alan and Emilio
√•Check walk-in WP16-203E
running @ 4.1°C for most of day
√•Record results for MPS Nt assays counted yesterday
Count and record additional assay (total of 3)
√•Order:
5 cases T150s, 3 cases 12-well plates, 4 bottles acetone, RCM563, RCM66
√•Review orientation info/plans/locations, etc for Stephen Krahling and Joan Wlochowski
Steve: WP16-203
Joan: WP16-213

Need phones and #s, computer accounts, mail boxes, lab coats/lockers


Friday, 12/29/00
x•Use as Floating holiday?

CONFIDENTIAL

version // :

√•Note: Liz, Steve, Jill in
√•Note: Liz's time card from last week came back unsigned-She sent a note to Michelle Leone/Rachel thatshe did not have this signed because she was the only one in for Friday and all of this week = grossly incorrect.  I signed the duplicate timecard (before the original arrived from Michelle) (Liz said the original was lost).  I later asked if she wanted this week's card signed-She said "No", since she just sent in last week's card.  She indicated that this could be signed Tuesday.
√•Project accounting summaries to Peg

| me: | # days | % | O/T | |
|-----|--------|---|-----|---|
| MMR | 17 | 100 | 27 h | |
| MMRV | 0 | | 0 | |

**REDACTED – OMP**

Vaccine Research:
√M0000444   Vaccine-Viral Infection
Vaccine Development
√M0000713   M-M-RII-Viral Infection-Child-Injection Route

**REDACTED – OMP**

√M0000724: V221, MMRII-Varicella Second Generation-Viral Infection-Child-Injection Route
Name changed to: Quadrivalent MMRII-Varicella Second Generation-Viral Infection-Child-Injection Route

**REDACTED – OMP**

JD on disability leave
returned 10/24/00, 4 h/day in rehab program

distributions for November:

| Project | DK | CM | JK | MKY | KH | FK | JD | Contractors |
|---------|----|----|----|-----|----|----|----|-------------|
| M0000713 | 74 | 20 | 60 | 90 | 62 | 30 | 50 | 30 |
| M0000716 | 10 | 35 | 5 | 5 | 38 | 35 | 25 | 35 |
| M0000724 | 16 | 40 | 25 | 5 | 0 | 35 | 25 | 35 |
| M0000745 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M0000785 | 0 | 5 | 10 | 0 | 0 | 0 | 0 | 0 |

CONFIDENTIAL

MRK-KRA00490521
MRK-CHA00490521

Appx20172

2000 Schedule, page 442

version // :

Note: Mary and Kristin's time combined needs to add up to 100%

combined =  79% '713,  18% '716, 3% for '724

Frank Kennedy: started Oct 9, 2000
Elizabeth Yancoskie left our group Oct 31 (last day)
Kristin Haas left our group Nov 27 (new day in her new job)
JD on disability leave, returned on rehab 10/24/00, 4 h/day
Stephen Krahling started Dec 27, 2000


Contractors for Nov:
Elizabeth Thoryk

O/T for November (weekends/holidays):  57 h for DK

Note: DK weekend O/T for 2000:
Jan= 15 h; Feb = 10 h; Mar = 28 h; Apr = 34 h; May = 28 h; Jun = 28 h; July = 45 h; Aug = 46 h,
Sept = 19 h, Oct = 18 h, Nov = 57 (total thru Nov = 328  h)

distributions for December:

| Project | DK | CM | JK | MKY | SK | FK | JD | Contractors |
|---|---|---|---|---|---|---|---|---|
| M0000713 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| M0000716 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M0000724 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M0000745 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M0000785 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Note: Mary working 3 days/week

Frank Kennedy: started Oct 9, 2000
JD on disability leave, returned on rehab 10/24/00, 4 h/day
Stephen Krahling started Dec 27, 2000

Contractors for Nov:
Elizabeth Thoryk

O/T for December (weekends/holidays):  27 h for DK
O/T: MKY = 8 + 4 + 3 = 15 h
JK =4 + 3 + 4 - 8 = 3 h
FK = 3 + 3 + 4 - 8 = 2 h

CONFIDENTIAL

MRK-KRA00490522
MRK-CHA00490522

Appx20173

2000 Schedule, page 443

version // :

Note: DK weekend O/T for 2000:
Jan= 15 h; Feb = 10 h; Mar = 28 h; Apr = 34 h; May = 28 h; Jun = 28 h; July = 45 h; Aug = 46 h,
Sept = 19 h, Oct = 18 h, Nov = 57, Dec = 27 (total thru 2000 = 354 h)
√•Attendance form to Linda
√•Check WP16-203 cold room-OK, running @ ~4°C
√•Check WP16-212F -20°C walk-in
seemed to be warming slightly yesterday (reaching low of -15°C instead of -20°C-
started doing this yesterday
An A/C mechanic is checkingh on this-some condensation on the compressor,
but seems to be OK
Low temp is ~-15 to -16°C
Gene indicated that he added refrigerant and adjusted the controls to run cooler.
The condenser coils have ice build up (not too bad).  He indicated that this might
need to be shut-down for repairs "soon".
He might be able to provide some upright -20°C freezers.
He indicated that the walk-in 4°C (WP16-203E) looks OK.  Leaks repared.  If this
is still OK Tuesday, we can re-load.
√et•Fill LN2 tanks
√•Spor-Klenz WP16-203E


<u>Saturday, 12/30/00</u>


<u>Sunday, 12/31/00</u>

<u>Monday, 1/1/01</u>
<u>****HOLIDAY****</u>

**CONFIDENTIAL**

**MRK-KRA00490523**
**MRK-CHA00490523**

Appx20174

version // :

Tuesday, 1/2/01
√•Note: Joan Wlochowski to start
She and Steve had oriebtation from ~830 AM to ~230 PM
Steve left ~2 PM due to nosebleed
√•Note: Frank to come in late-He called last Friday to indicate that he needs to
see his eye doctor to follow-up on his eye surgery from last week
•Check with Linda re what category does elective surgery/cosmetic surgery fall
into?  Sick time/personal time?
She suggests checking with Naomi Yergey
√•Note: benefits orientation mtg for Steve today
√•Order 100-150 x 500 mL bottles of medium 199?
#11150-059, medium 199 (1X), liquid, 500 mL bottles, $13.35
√•Note: WP16-203E running OK (~4°C)-call Command Center disregard line @
x8654 to reactivate this pt (WPMS pt 38019, "WP16-203E, +4 CV temp 203E"
•Check WP16-203E walk-in 4°C
If OK, return to WPMS monitoring and restock
√•Check -20°C walk-in WP16-212F.
running @ ~-15°C @ low, high ~-11°C
Gene is to check on this today
√•Return call to Joel Palefsky (sp?) @ UCSF re ref for Christine Kakareka
415-476-1574
started May 4, 1998 as contractor
The position he is looking for is to supervise 4 technicians and coordinate with
several investigators.  I did not think that she was ready for supervisory activity
yet.  He knows several people in the group hgere (he works on HPV), and will
check with them for more info
√•Order combination spill kit (acid/bases/solvents) from Fisher-ordered 2 kits
√•Phone requests to Bernie for Steve and Joan (delivered Joan's 1/3/01)
√•Lab coat/locker request for Joan faxd to Cintas
•Note: due dates
Performance Reviews due Dec 20 (Dolores needs them by 1/2/01)
Objectives for 2001 due 2/18/01


Wednesday, 1/3/01
x•Set up Vero 12-well plates
√•Transfer supplies from WP16-204 to WP16-203E cold room
x•Set up Vero 12-well plates Wednesday to run Friday
√•Send e-mail to Eileen McCarthy re appt for titer checks for Joan

CONFIDENTIAL

MRK-KRA00490524
MRK-CHA00490524

11/26/2019
Declaration of G. Reilly
EXHIBIT 441

Restricted
R ⊕ Confidential
limited access

TO: **M-M-R®$_{II}$ Project Team**

FROM: **Jennifer Ryan**

SUBJECT: **Detailed Minutes, August 8, 2001 Project Team Meeting**

═══════════════════════════════════════════════

II. **MEETING PROCEEDINGS**

A. Team Issues

    1. Review of 2001 Team Accomplishments/2002 Objectives      Bramble
      • The 2001 Accomplishments YTD were reviewed (attachment 1).
      • It was reiterated that the WG file has been delayed to 2002 per the BPC contract due to the need to focus priorities on ProQuad$^{TM}$.



      • REDACTED – OMP

      •

      REDACTED – OMP    Program infrastructure issues included lacking sufficient resources in MRL and MMD to complete the Mumps Expiry Trial filing and WG filing by the proposed target dates due to reprioritization of resources onto other programs.

    2. Update on RT Issue      Shaw
      • No update

    3. Miscellaneous
      • An unannounced inspection by CBER of the Mumps PRN facility was performed during the week of 8/6. There were four observations that were discussed. 1) Spreadsheet in use is not validated, 2) Notebooks do not identify each technician who is performing each task, 3) Raw data was changed and initialed/dated correctly, but with no justification for the change & 4) There is no procedure in place to determine when a Research Lab is assessed to assure suitability for clinical testing prior to startup. It is not known at this time what the implications will be for the mumps end expiry study due to this 483 citation. All testing has been put on hold until these issues have been resolved.

B. Competitive Issues

    1. U.S. Sales/Competition Status & International Update      O'Bara
      • M-M-R®II sales are at 13.5 MM does YTD.
      • The marketing of Measles and Mumps monovalent vaccines have been discontinued. This is due to lyo/inventory constraints and the impact this has on the supply of M-M-R®II. Limited vials of the monovalents are still available, but only being supplied where necessary. The Rubella monovalent vaccine will still be marketed. There will not be any monovalents for the rHA product line.
      • Currently, state funding for vaccines has been severely restricted due to the redirection of funding to the purchase of Prevnar without associated increases in state vaccination budgets.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00209441
MRK-CHA00209441


Restricted
Confidential
limited access

- There has been a lot of activity directed at educational programs by Merck. Publications have been developed which target nurses and provide to them information on many of the issues surrounding the administration of vaccines (True Champions). There is also a publication available for parents, which provides a guide to assist in evaluating vaccine information (Merck Vaccine Experience).
- Due to lyophilization capacity constraints, the 2002 plan is limited to ~20 million doses of M-M-R®II out of a potential 35 million dose market (unconstrained sales projections). There are several countries that have been affected by this inability to supply doses. To further complicate the capacity issues for M-M-R®II, **REDACTED – OMP REDACTED – OMP**

C.  Mumps Expiry Trial

    1.  Status of Mumps PRN Testing                                     Shaw/Krah
- No Update

    2.  Status of ELISA testing                                           Chirmule/Rich
- Testing for antibody to Measles & Mumps wildtype has been completed. Rubella and Varicella testing is on hold until after FDA inspection responses are made and the samples are returned to Clinical Assay R&D.

    3.  Timing for Mumps End Expiry Label change filing:                 Morsy
- The target to file in the US is still on track for April 2002, with the European file to follow in 3Q02. The file types are:
  - Efficacy Supplement - US, Variation Type II - EU, and Variations - ROW. The file components will include:
  i- Clinical Study Report (CSR) (clinical study 007),
  ii-Addendum (or Annex, EU variation submissions) to CSR with justification of similarity of OGOS and GOS (comparative analytical data and as per CBER's suggested historical comparison of immunogenicity),
  ii-Worldwide clinical summary report - summarize clinical data supporting mumps potency claim of 4.0 $\log_{10}$ $TCID_{50}$/dose.
  iv-Expert Opinion Report (EOR) (EU variation submissions), and
  v-Modified label - change in mumps potency from 4.3 $\log_{10}$ $TCID_{50}$/dose to 4.0 $\log_{10}$ $TCID_{50}$/dose.

    4.  Outcome of BSS, July 17-Upper Release Specifications           Bennett/Bramble
- A recommendation for upper release specifications for measles, mumps, and rubella in final product was presented to the BSS. The initial strategy was to use production experience as internal "alert" limits and use clinical data to support actual release specifications. However, the clinical data is not wider than the production data. A strategy on how to handle this data is in-progress and a target of September is in place to present the final clinically relevant specifications to the BSS. A question was raised as to whether these specifications, which are intended for the Japanese file, will be filed in other countries. In the majority of cases, the expiry titer is filed, but there may need to be a notification of the new release specification when implemented.

D.  Regulatory Issues

    1.  Update on Japanese Phase III Trial/Preparation of JNDA          Morsy
- The minimum requirement document to support the file is in review by Merck. Kaketsuken will be meeting with Kikoh for consultation end of August. If Kikoh does not agree with the content of the document, a Sodan meeting will take place October

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

Restricted
R ⊘ Confidential
limited access

10th, where Merck's participation is expected. The target filing date of 4Q01 will likely take place in Jan 02. It is very important that the file takes place in 1Q02; if not, the file will need to be reformatted to the ICH-CTD format which will be enforced in July 2002 in Japan. Additional documents will be supplied to Merck in November 01. Elisa results have been sent. A request has been made to explain why hydrolyzed gelatin is required for M-M-R®II.

2. Status of New IND and Preparation for rHA Filing　　　　　Morsy
   - The strategies for the two files in the US and EU were discussed. The US file will be a manufacturing supplement to the existing license (sBLA) with clinical support, while the EU file will be a complete IMA file (through Centralized Procedure). The target for filing is slated for 2-3Q03. The clinical trial is to start in 4Q01.

E.　rHA Development

   1. Update on rHA Demonstration　　　　　Mathews/Ryan
      - The clinical lot has been filled and is being tested. Several potency data points are available and are satisfactory (attachment 2).
      - Several atypical events have occurred during the manufacture of the demonstration bulks that have caused the exclusion of some of the lots from the demonstration. A total of 4 Mumps Pools have been manufactured; 3 Measles Pools have been manufactured, however an additional pool has been scheduled for September due to a calculation error during Pool #3 that led to insufficient quantity of rHA being added to the virus material; 3 Rubella pools will be manufactured 4Q01-1Q02. The filling of the three demonstration lots is targeted for completion by April 2002.
      - The bulk stability testing has been initiated on pooled harvested virus and clarified virus for 2 mumps pools and 2 measles pools ; the third mumps pool is scheduled for the week of 8/15/01.
      - The bulk potency data for mumps and measles lots are shown in the attachments. These data are consistent with the HSA bulk data.

   2. REDACTED – OMP



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


Restricted
Confidential
**R** limited access

3.  Update on Clinical Program                                                    Severino
    - The protocol for the rHA clinical trial is in circulation, with one outstanding signature. Sites are being identified with a proposed start in October 2001.
    - Data on release of the clinical lot was presented. All potencies are close to the targeted values and well above release specifications (attachment 3).
    - A CAS presentation may be required in order to discuss assays designed to detect antibodies to albumin.

F.  <u>WG Chicken SubTeam</u>

1.  Update on MMD & WG Flocks                                                     Ryan
    - All MMD chickens at all sites remain CAV negative and at full SPF status.

2.  Update on WG Egg Demonstration                                               Galinski
    - M-M-R®II fills using measles and mumps bulks prepared with WG eggs scheduled to be performed 8/22/01.

## III. MISCELLANEOUS

A.  <u>New Members</u>

1.  Narendra Chirmule, from Clinical Assay R&D, has joined the M-M-R®II Project Team.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                    **MRK-KRA00209444**
                                                                 **MRK-CHA00209444**

# ATTACHMENT 1:
# M-M-R®II – 2001 ACCOMPLISHMENTS

|  | TARGET | ACCOMPLISHMENT |
|---|---|---|

## OBJECTIVES MET

| | TARGET | ACCOMPLISHMENT |
|---|---|---|
| • Continue to support positioning of M-M-R®II (and other Merck Live Virus Vaccines) with key thought leaders | 1-4Q01 | Met with key Chinese thought leaders in May. Participated in conference in Malaysia in June. Held Symposia in China during the International Conference of Pediatrics in Sept. Promotion packages distributed to key thought leaders. Presented Jeryl Lynn genetics and clinical information at WHO meeting on mumps and positioned M-M-R®II as the preferred vaccine for global programs. |
| • Provide MRL/MMD presentations to key decision makers in public health and managed care. | 1-4Q01 | Presented at the WHO conference. |
| • Optimize current head to head safety and tolerability data | 1-4Q01 | Data were presented at ESPID in March and the WHO meeting in May, and will be submitted by 4Q01 for publication. |
| • Initiate rHA bulk demonstration | 1Q01 | The demonstration was initiated 04Jan01. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00209445
MRK-CHA00209445

Appx20181

| | | |
|---|---|---|
| • Evaluate feasibility of implementing GWS33/urea with rHA containing bulks (pending GO for the program and requirement for clinical supplement) | 2Q01 | Although data supported feasibility, a NO GO decision was made for the program. |

## OBJECTIVES MET (Cont)

| | | |
|---|---|---|
| • File WG Prior Approval Supplement (Pending GO) | 2Q01 | The file has been delayed to 1Q02 due to a shift of priorities as requested by Senior Management. |
| • Initiate (FPI) M-M-R®II/rHA safety/immunogenicity trial | 4Q01 | On target. |

## UNANTICIPATED ACCOMPLISHMENTS

- Prepared and submitted a new IND to CBER for the M-M-R®II with rHA clinical trial. 3Q01

- Won the Saudi Arabia tender due to positioning of the Jeryl Lynn strain despite higher pricing. 3Q01

- Supported completion of the Phase III study in Japan, and provided supportive information for the JNDA file. 1-4Q01

- Completed PRN and ELISA testing for the Mumps End-Expiry clinical trial. 3Q01

- Obtained concurrence from CBER on our approach to long-term stability for Live Virus Vaccines. 4Q01

- REDACTED – OMP

- Established a wild-type mumps ELISA. 1Q01

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# *M-M-R®II* – 2002 OBJECTIVES

**_Program Objective_**:  Develop a vaccine that meets/exceeds worldwide regulatory requirements and competes effectively with GSK.

| OBJECTIVE | TIMING | WEIGHT |
|---|---|---|
| *Competitive* | | |
| • Continue dissemination and communication of published data from Head to Head study | 1-4Q02 | |
| *Clinical* | | |
| • Complete (LPO) the M-M-R®II with rHA safety/immunogenicity trial* | 3Q02 | |
| REDACTED – OMP | | |
| • Support regulatory strategy for resolution of equipment and facilities issues for measles, mumps, and rubella for new products | 1-4Q02 | |
| *Regulatory* | | |
| • File for licensure of M-M-R®II in Japan | 1Q02 | |
| • File WG Prior Approval Supplement | 2Q02 | |
| • File End-Expiry in the US and EU | 2Q02 | |

\* Proposed MRL Laboratory Objective

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**MRK-KRA00209447**
**MRK-CHA00209447**

**Appx20183**

## <u>Key Development Issues</u>

- **Development of anti-rHA antibody assay**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00209448
MRK-CHA00209448

Appx20184

# Program Infrastructure Issues

- ## Expiry Trial
  1. REDACTED – OMP
  2. **Resources for transfer of PRN data into VDMS**
  3. **Conflicting prioritizations for limited DC resources**

- ## WG
  1. **Potential additional delay in WG file due to lack of MMD Resources**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00209449
MRK-CHA00209449



REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00209450
MRK-CHA00209450



REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00209451
MRK-CHA00209451



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00209452
MRK-CHA00209452

**Appx20188**

# Attachment 3

**Clinical Fill Potency (8/8/01) [Post Meeting Data is Underlined]**

| Lot | 0501262 | Target | AVG. | T 1 | T 2 | T 3 | T 4 | T 5 | T 6 |
|---|---|---|---|---|---|---|---|---|---|
| Measles | REDACTED – OMP | | | | | | | | |
| Mumps | Potency on test Hs Std | 4.5 | 4.6 | 4.5 7/27 4.3 | 4.7 7/27 4.3 | 7/30 | 7/30 | 7/31 | 7/31 |
| Rubella | REDACTED – OMP | | | | | | | | |

| Lot | 0501263 | Target | AVG. | T 1 | T 2 | T 3 | T 4 | T 5 | T 6 |
|---|---|---|---|---|---|---|---|---|---|
| Measles | REDACTED – OMP | | | | | | | | |
| Mumps | Potency on test Hs Std | 4.5 | 4.5 | 4.6 7/23 4.5 | 4.4 7/24 4.2 | 4.2 7/24 4.2 | 4.4 7/25 4.5 | 4.6 7/25 4.3 | 4.5 7/27 4.3 |
| Rubella | REDACTED – OMP | | | | | | | | |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00209453
MRK-CHA00209453

11/26/2019
Declaration of G. Reilly
EXHIBIT 442

HIGHLY CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF PENNSYLVANIA

2
3    -----------------------------------x

UNITED STATES OF AMERICA ex rel,

4
STEPHEN A. KRAHLING and JOAN A.

5
WLOCHOWSKI,

6
               Plaintiffs,      C.A. No.

7
  v.                        10-4374(CDJ)

8
MERCK & CO., INC.,

9
               Defendants.

10   -----------------------------------x
11   IN RE: MERCK MUMPS VACCINE
12   ANTITRUST LITIGATION
13   THIS DOCUMENT RELATES TO:
14   ALL ACTIONS
15   -----------------------------------x
16               HIGHLY CONFIDENTIAL
17           VIDEOTAPED DEPOSITION OF
18            THOMAS McGUIRE, Ph.D.
19            Boston, Massachusetts
20                July 2, 2018
21
22   JOB NO. 2949248
23
             VERITEXT LEGAL SOLUTIONS
24            MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
25            Philadelphia, PA  19103

Appx20191

HIGHLY CONFIDENTIAL

Page 2

1
2
3
4
5
6           July 2, 2018
7           9:08 a.m.
8
9
10          VIDEOTAPED DEPOSITION OF THOMAS
11 McGUIRE, Ph.D., held at Morgan Lewis &
12 Bockius, One Federal Street, Boston,
13 Massachusetts, before MaryJo O'Connor,
14 Registered Merit Reporter, Certified
15 Shorthand Reporter and Notary Public in and
16 for the Commonwealth of Massachusetts.
17
18
19
20
21
22
23
24
25

Page 4

1
2 A P P E A R A N C E S, Continued:
3
4   MORGAN LEWIS LLP
5   Attorneys for Defendants:
6       1701 Market Street
7       Philadelphia, Pennsylvania 19103
8       (215) 963-5000
9   BY:  R. BRENDAN FEE, ESQ.
10      brendan.fee@morganlewis.com
11      ZACHARY M. JOHNS, ESQ.
12      zachary.johns@morganlewis.com
13      LISA DYKSTRA, ESQ.
14      lisa.dykstra@morganlewis.com
15
16
17   VENABLE LLP
18   Attorneys for Defendants:
19       750 E. Pratt Street
20       Suite 900
21       Baltimore, Maryland 21202
22       (410) 244-7638
23   BY:  CHRISTINA L. GAARDER, ESQ.
24       clgaarder@venable.com
25

Page 3

1
2 A P P E A R A N C E S:
3
4   SPECTOR ROSEMAN & KODROFF, P.C.
5   Attorneys for Direct Purchaser
6   Plaintiffs Putative Class:
7       1818 Market Street, Suite 2500
8       Philadelphia, Pennsylvania 19103
9       (215) 496-0300
10  BY:  JEFFREY L. KODROFF, ESQ.
11       jkodroff@srkattorneys.com
12
13
14  CONSTANTINE CANNON LLP
15  Attorneys for the Relaters:
16      335 Madison Avenue
17      New York, New York 10017
18      (212) 350-2769
19  BY:  MARLENE KOURY, ESQ.
20       mkoury@constantinecannon.com
21
22
23
24
25

Page 5

1
2 A P P E A R A N C E S, Continued:
3
4 ALSO PRESENT:
5   Stephen Fink, Analysis Group, Inc.
6   Tina Gonzalez Barton, Merck
7   Tom Tracy, Video Technician
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Appx20192

HIGHLY CONFIDENTIAL

Page 6

1
2      P R O C E E D I N G S
3      VIDEO TECHNICIAN: Good morning
4  everyone. We're going on the record
5  at 9:08 a.m. on July 2, 2018. This
6  is media unit one in the
7  video-recorded deposition of Dr.
8  Thomas McGuire taken by counsel for
9  the Plaintiff in the matter of Merck
10  Mumps Vaccine Antitrust Litigation
11  filed in the U.S. District Court for
12  the District of PA, Case Number
13  10-4374 (CDJ).
14      This deposition is being held at
15  Morgan Lewis & Bockius located at One
16  Federal Street, Boston.
17      My name is Tom Tracy from the
18  firm Veritext, and I am the
19  videographer.
20      The court reporter today is
21  MaryJo O'Connor from the firm
22  Veritext.
23      Would all present please
24  introduce yourself for the record.
25      MR. KODROFF: Jeffrey Kodroff

Page 7

1      T. McGuire - Highly Confidential
2  from the law firm of Spector Roseman
3  & Kodroff on behalf of the Direct
4  Purchaser Plaintiffs.
5      MS. KOURY: Marlene Koury from
6  the law firm of Constantine Cannon on
7  behalf of the Relaters.
8      MR. FEE: Brendan Fee from Morgan
9  Lewis & Bockius on behalf of
10  Defendant Merck & Co.
11      MR. JOHNS: Zack Johns from
12  Morgan Lewis on behalf of Merck.
13      MR. FINK: Stephen Fink from
14  Analysis Group on behalf of Merck.
15      MS. DYKSTRA: Lisa Dykstra of
16  Morgan Lewis on behalf of Merck.
17      MS. GAARDER: Christina Gaarder
18  from Venable LLC on behalf of Merck.
19      MS. BARTON: Tina Gonzalez Barton
20  from Merck.
21      VIDEO TECHNICIAN: And would the
22  court reporter please swear in the
23  witness.
24
25

Page 8

1      T. McGuire - Highly Confidential
2          THOMAS McGUIRE, Ph.D.,
3  having been satisfactorily identified by a
4  Massachusetts drivers license and duly
5  sworn by the Notary Public, was examined
6  and testified as follows:
7  EXAMINATION
8  BY MR. FEE:
9      Q. Good morning, Dr. McGuire.
10      A. Good morning.
11      Q. Could you please state your full
12  name for the record?
13      A. Thomas Gregory McGuire.
14      Q. And you've been deposed before,
15  Dr. McGuire, correct?
16      A. I have, yes.
17      Q. How many times?
18      A. In the order of ten to twelve.
19  Maybe fifteen.
20      Q. When is the last time you've
21  given a deposition?
22      A. It would have been in Solodyn, I
23  believe, which would have been -- the drug
24  involved was Solodyn, and the deposition
25  would have been sometime earlier this year.

Page 9

1      T. McGuire - Highly Confidential
2      Q. Okay. So you basically know the
3  rules of a deposition, right?
4      A. Basically, yes.
5      Q. Okay. You understand you're
6  under oath here today?
7      A. I do understand.
8      Q. What is your understanding of the
9  allegations being made by Plaintiffs
10  against Merck in this case?
11      A. Well, the allegations include
12  that Merck undertook testing of the
13  efficacy of its mumps vaccine that was
14  misleading and led to artificial barriers
15  to entry of competitors.
16      Q. And what specific legal claims
17  are the Plaintiffs asserting, do you know?
18      A. Legal claims. Maybe can you
19  elaborate what you mean in this case by
20  "legal claims"?
21      Q. Are they asserting TORT claims?
22  Are they asserting breach of contract
23  claims? What type of claims are they
24  asserting, do you know?
25      A. I think -- well, there are two

3 (Pages 6 - 9)

Appx20193

Page 10

1     T. McGuire - Highly Confidential
2 sets of Plaintiffs here.  And one set, the
3 Relaters, I believe, is a False Claims Act
4 claim.  I'm not sure that's the right legal
5 term.
6     Q.  Okay.
7     A.  But that's how I understand it.
8         And in the other case, my
9 assignment was to undertake an economic
10 analysis of the consequences of entry of a
11 competitor.
12        Now, I'm thinking backwards, but
13 my understanding would be that the
14 allegations would be that it -- they
15 foreclosed competition.
16     Q.  And is it your understanding that
17 the allegations against Merck are the same
18 for the private Plaintiffs and the
19 Relaters?
20     A.  I'm not -- I said two different
21 things.  I'm not sure what you would mean
22 in this context by "the same."
23     Q.  You don't know what the term "the
24 same" means?
25     A.  I do, but just clarify if you

Page 11

1     T. McGuire - Highly Confidential
2 can.
3     Q.  Are the allegations being made
4 against Merck different for the private
5 Plaintiffs and the Relaters?
6     A.  Well, my understanding is -- I'll
7 be brief, since I'm going to summarize what
8 I just said a few minutes ago -- that one
9 is a false claim and the other is something
10 about competition.  They don't seem to be
11 the same to me.
12     Q.  That's okay.  If that's your
13 understanding, that's fine.
14     A.  That's my understanding.
15     Q.  Let's see if we can get some
16 common ground with respect to certain
17 terminology that I think is going to be
18 used throughout the day today.
19     A.  Okay.
20     Q.  You used the term in your report
21 "common economic impact."  What does that
22 mean to you?
23     A.  Well, it means that the impact is
24 the same, or not different.
25     Q.  Across all members of a putative

Page 12

1     T. McGuire - Highly Confidential
2 class, is that --
3     A.  Well, "a common impact" means
4 there's the same impact across.
5     Q.  That's all you mean by "common
6 impact" when you use it in your report?
7     A.  Well, yeah, I would like to maybe
8 see the context, if there is something else
9 you're asking about.
10     Q.  We'll take a look a little bit
11 later.
12     A.  All right.
13     Q.  What do you mean, you used the
14 term, at least throughout your report and
15 including in the beginning of Paragraph 2,
16 "Market power."  What do you mean by
17 "market power"?
18     A.  By "market power," I mean it
19 characterizes a firm, and the firm has the
20 ability to set price above a competitive
21 level.
22     Q.  What do you mean by "above a
23 competitive level"?
24     A.  Well, a competitive level would
25 have occurred in the absence of exercise of

Page 13

1     T. McGuire - Highly Confidential
2 market power.
3     Q.  It seems circular to me.  What do
4 you mean by "competitive level"?  When you
5 used those words, what do you mean by that?
6         MR. KODROFF:  I'm just going to
7     object because it seems circular to
8     me.  But you can answer the question.
9     A.  I'm sorry, I lost the question.
10     Q.  When you say "price above a
11 competitive level," what do you mean?
12     A.  I mean you're asking a general
13 question, what is "market power."  So I'm
14 giving you a general answer, and it has to
15 do with the ability of a firm to have
16 discretion over price.
17     Q.  Okay.  So do all firms that have
18 discretion over price --
19         MR. KODROFF:  I'm going to
20     object.  I'm not sure he's done
21     answering the question.
22         THE WITNESS:  No, I'm close
23     enough.
24     Q.  Did you finish?
25     A.  Yes.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1      T. McGuire - Highly Confidential
2      Q.  Do all firms that have discretion
3  over price have market power?
4      A.  Well, as a general matter, I
5  would say that's true.
6      Q.  So in your mind any firm that has
7  discretion to set prices has market power?
8      A.  Well, as a general matter, I do
9  agree with that.  I would just comment that
10  market power is not a yes or no.  Market
11  power is a degree of.  So a firm might have
12  a little bit of market power or a firm
13  might have a lot of market power.
14      Q.  So at what point -- or let me ask
15  you this.  Do you have a view at what point
16  in the continuum of market power that
17  market power becomes illegal?
18      MR. KODROFF:  Objection.  Calling
19      for a legal conclusion.  That's not
20      his area of expertise.
21      Q.  You can answer.
22      A.  Is it okay for me to say no?
23      Q.  It's perfectly okay, if that's
24  the truthful answer.
25      A.  So then that's what I'll say.

Page 15

1      T. McGuire - Highly Confidential
2      Q.  Okay, fair enough.  Do you have a
3  view from an economic standpoint when or at
4  what point market power becomes
5  problematic?
6      A.  Problematic isn't a term that's
7  used from an economic standpoint.
8      Q.  What type of term is used from an
9  economic standpoint?
10      A.  It depends on the question you're
11  asking.
12      Q.  At what point from an economic
13  standpoint does market power begin to
14  become harmful to competition?
15      A.  Harmful to competition.  I would
16  interpret that, to be clear on how I'm
17  answering, is it would be harmful to other
18  firms, which isn't the only thing that one
19  would worry about with respect to market
20  power.  But that's how I'm interpreting
21  your question.
22      Q.  Okay.
23      A.  So with respect to harm to
24  competition, at what point?  I have a hard
25  time answering at what point.  It's, again,

Page 16

1      T. McGuire - Highly Confidential
2  something that's continuous and it might
3  start out at a little bit and eventually
4  become a lot, but I can't think of an
5  economic approach to define "at what
6  point."
7      Q.  Okay.  Do you have a view from an
8  economic standpoint at what level market
9  power begins to have an impact on prices
10  that would be charged to consumers?
11      A.  Okay.  This is -- now you're
12  asking about the consumer side it's very
13  clear.  "At what point" is, again, not the
14  way an economist would think about this.
15  This is a continuous thing and a little bit
16  would have a little effect and a lot would
17  have a lot of effect.
18      Q.  You used the term in your report
19  "aggregate damages."  What do you mean by
20  that?
21      A.  "Aggregate" just means total in
22  that context.
23      Q.  So that in the context of your
24  report is the total sum of the damages
25  suffered by the putative class in this

Page 17

1      T. McGuire - Highly Confidential
2  case --
3      A.  Yes.
4      Q.  -- according to your
5  calculations?
6      A.  Yes.  Yes, that's how I
7  understand it.
8      Q.  You also used the term in your
9  report "list prices."  What do you mean by
10  that?
11      A.  I mean catalog prices, something
12  that you would find in a publication.  It's
13  just the, you know, the market price that
14  the firm announces.
15      Q.  So those list prices are prices
16  that do not include any discounts that may
17  be provided or rebates that may be provided
18  to the customer, right?
19      A.  Maybe provides to the customer,
20  yes.  In some cases, customers would not
21  pay list price.  And the form of the
22  difference could take the form of
23  discounts, for example.
24      Q.  So is it fair to say that list
25  prices are not what we would describe as

5 (Pages 14 - 17)

Appx20195

HIGHLY CONFIDENTIAL

Page 18

1     T. McGuire - Highly Confidential
2  net prices, as you used that term in your
3  report?
4     A.  Sometimes they are; sometimes
5  they're not.
6     Q.  So it depends, then, on the
7  particular class member, right?
8     A.  What is "it"?
9     Q.  Whether a discount is provided or
10  not.
11     A.  Well, there may be different
12  discounts for different members of the
13  class, if that's what you're trying to
14  establish.
15     Q.  And -- I'm not trying to
16  establish anything.  I'm just actually
17  asking what you mean.
18     A.  Okay.
19     Q.  So whether net prices are --
20  whether the net prices, you used that term
21  in your report, is the price actually paid
22  by a particular class member depends on the
23  unique circumstances of that class member,
24  right?
25     A.  Well, there will be some kind of

Page 19

1     T. McGuire - Highly Confidential
2  understanding or contract in some cases
3  that will have provisions that would
4  determine the net price and discounts could
5  be present, and they may be different for
6  different class members.
7     Q.  Let's see if we can agree on a
8  couple of concepts before we actually jump
9  into your report.
10        So would you agree with me that
11  as a general proposition the
12  cost-to-benefit ratio of vaccines is high?
13     A.  I think I'm going to agree, but
14  let me just explain how I interpret your
15  question.
16     Q.  Sure.
17     A.  By the cost-to-benefit ratio by
18  benefit would be held benefits, possibly
19  savings and other healthcare costs, would
20  be put on the benefit side.
21        And the cost side, certainly
22  against cost of production, that would be
23  very, very high.
24     Q.  So let me see if I can summarize
25  this.

Page 20

1     T. McGuire - Highly Confidential
2        So the benefit to society at
3  large, including all of these things like
4  cost savings, healthcare benefit, far
5  exceeds the cost of actually selling a
6  vaccine.
7        MR. KODROFF:  Object to form.
8     Q.  Is that right?
9     A.  Well, first you asked a ratio in
10  your earlier form of the question.  And I
11  think you're -- you know, it's kind of
12  getting to the same thing; that vaccines
13  have a lot of social benefits; protecting
14  against illness.  It's a disease that
15  strikes childhood, it has long-term
16  consequences, it savings health care costs,
17  all those things are true.  And those
18  things, if you take the ratio of that in
19  relation to the cost of production, not
20  just cost of selling -- I think cost of
21  selling is a little bit different -- that
22  ratio is hi, yes.
23     Q.  Okay.  And, in your view, is that
24  true for the vaccines in this case?  And by
25  that I mean measles, mumps, rubella and

Page 21

1     T. McGuire - Highly Confidential
2  Merck's quadrivalent measles, mumps,
3  rubella, varicella vaccines?
4     A.  It's a general statement, and I
5  don't see any reason why it would differ
6  for the vaccines in this class.
7     Q.  Okay.  Would you agree with me
8  that demand for vaccines relies on a
9  complex patchwork of financing mechanisms
10  in the United States?
11        MR. KODROFF:  Object to form.
12     A.  Wow, that's really well put.
13  Yeah, I would find that -- I generally
14  agree with that, yes.
15     Q.  That's because that's something
16  that you wrote, right?
17     A.  Yes.  That's why it rang a bell.
18     Q.  And what are those financing
19  mechanisms that affect demand for vaccines?
20     A.  Well, we're talking about demand
21  for a healthcare service here.  And that's
22  distinct from a normal market in
23  which a seller sets a price and the
24  consumer pays that price.  There's no
25  third-party payors involved that

6 (Pages 18 - 21)

Appx20196

HIGHLY CONFIDENTIAL

Page 22

T. McGuire - Highly Confidential

1 intermediate between the sellers and the
2 buyers. There's no additional advisors
3 that are built into the process, as in the
4 case of physicians who have obviously a
5 large role in determining what patients
6 get, if you think of demand as something
7 that is a consumer or a patient.
8
9      And so healthcare is very
10 complex. I study healthcare and it's a
11 special field of economics, and it's a
12 special field because there are all these
13 complications.
14      I'm happy to keep going, but I
15 just wanted to maybe take a breath and see
16 where you want to go with this.
17     Q.  No, that's helpful. So in terms
18 of the financing mechanisms that affect
19 demand for vaccines, would the principal
20 mechanism be the existence of third-party
21 payors in that chain of distribution?
22     A.  I think that's the first thing
23 you think of if you say the word
24 "financing." That's like where does the
25 money come from to pay for something. And

Page 23

T. McGuire - Highly Confidential

1 there are different channels by which the
2 funds are collected that get paid to
3 manufacturers. Some are government; some
4 are private. The government has different
5 programs. Private health insurance takes
6 different forms.
7
8     Q.  And that affects demand for
9 particular vaccines, right? The existence
10 of these intermediaries, let's call them
11 that.
12     A.  There's an important distinction
13 that -- you know, I suspect you know some
14 economics, so let me mention it -- between
15 demand and the point on a demand curve. So
16 when you say to me "demand," then what an
17 economist thinks of is the demand curve.
18 It's something that characterizes the
19 individual, or the consumer, or even the
20 patient in this case.
21      And then the point on the demand
22 curve is determined by the incentives the
23 consumers faces generally, which is
24 affected by the financing mechanism.
25      So there is a distinction between

Page 24

T. McGuire - Highly Confidential

1 what the patient brings to the party, which
2 is the demand curve; and then where the
3 patient ends up in terms of consumption,
4 which depends on the financing. So there's
5 lots of qualifications around that, but I
6 still want to -- don't want to talk too
7 long and let you ask what you're trying to
8 get at.
9     Q.  No, that's fine. I just am
10 trying to understand.
11      So is it fair to say that the
12 existence of these complex financing
13 mechanisms would affect, one, demand
14 generally, as you just described it?
15     A.  Well, again, with a qualification
16 that there is a distinction between demand,
17 which characterizes the consumer, and the
18 point on the demand curve, which is
19 influenced in simple terms by the price a
20 consumer faces and because of the financing
21 mechanisms that might be low or high.
22     Q.  Right. So it affects both: the
23 point on the demand curve and demand
24 generally, right?
25

Page 25

T. McGuire - Highly Confidential

1     A.  Well, no, I wasn't saying that.
2 I was saying in the basic framework of
3 economics, the distinction is between the
4 schedule, the demand schedule, which
5 determines what a consumer would do as a
6 function of different prices which come
7 from the financing side; and the financing,
8 which affects the point on the demand
9 curve.
10     Q.  Okay, fair enough.
11     A.  But I'm still not sure I'm
12 answering your question.
13     Q.  No, I'm just trying to understand
14 that you agree with the statement that you
15 previously wrote very nicely, and I'm just
16 trying to understand what you're saying.
17     A.  Okay.
18     Q.  So let me ask you this. Would
19 you also agree that the pricing for medical
20 products and services in the U.S. is
21 notoriously complex?
22     A.  The -- you're speaking not just
23 about drugs, not just the vaccine, the
24 vaccines, but the entire set of healthcare

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

T. McGuire - Highly Confidential

1    services --
2    Q. Yeah.
3    A. -- in that question.
4        Yes, it is notorious. I guess it
5    probably even merits the term "notorious."
6    Yes, it is complex.
7    Q. If I told you that was something
8    that you actually wrote, would you agree
9    with it?
10   A. Well, I didn't disagree. I
11   didn't back away from it at all.
12   Q. Okay.
13   A. That didn't ring a bell, but.
14   Q. So would vaccines fit within the
15   definition of medical products and services
16   that we just are talking about?
17   A. Well, vaccines are an example of
18   a medical product or service. You know,
19   the word "notorious" was meant to apply
20   just in general. When it comes to any
21   particular thing, like hospital care or
22   physician visits, there's a lot of
23   particulars about how pricing works within
24   those different services that you would

Page 27

T. McGuire - Highly Confidential

1    want to use the right adjective for.
2    Q. Let's take out "notoriously,"
3    just so we avoid any controversy.
4        But in terms of the syllogism,
5    you agree with me, right, that the pricing
6    for medical products is complex, right?
7    A. Yes.
8    Q. And vaccines are a subset of
9    those medical products, right?
10   A. Yes. Your syllogism is fine.
11   Still, health economics doesn't work by
12   syllogisms. It works by particular
13   studies. So even if, you know, Boston is a
14   rich town, every person in Boston isn't
15   rich, so. But we don't --
16   Q. Let me just ask you --
17   A. I'm sure we're on the same page
18   on this.
19   Q. Yeah. Let me just ask you the
20   question. So would you agree with me that
21   the pricing for vaccines is complex?
22   A. The pricing for vaccines depends
23   on different payors. I'd say it also
24   depends on the point of view. Is it

Page 28

T. McGuire - Highly Confidential

1    complex on the point of view of patients?
2    I would say it isn't.
3    Q. How about from your point of
4    view?
5    A. As an economist or --
6    Q. As an economist.
7    A. As an economist, there is, you
8    know, various economic considerations that
9    play into pricing. I mean, complex. It
10   merits professional study, and complexity
11   is something that feeds into that. There
12   is different dimensions about what prices
13   are supposed to do in terms of efficiency
14   and incentives to different parties. So
15   it's getting -- it's complex. I guess I
16   would not object to the word "complex."
17   Q. Okay.
18   A. I'm thinking out loud.
19   Q. No, that's fine. That's fine. I
20   think we're on the same page here.
21       So what we're going to do is take
22   a look at the report that you submitted in
23   this case, which I would like to ask the
24   court reporter to mark as McGuire

Page 29

T. McGuire - Highly Confidential

1    Exhibit 1.
2        (Document marked for
3        identification as McGuire Exhibit 1)
4    Q. Dr. McGuire, you did prepare an
5    expert report in this case, correct?
6    A. Yes.
7    Q. And do you recognize the document
8    that's been put before you and marked as
9    McGuire Exhibit 1 as that expert report?
10   A. Certainly the cover page does.
11   Would you like me to flip through it?
12   Q. If you don't mind.
13   A. (Document review.) Yes, it's my
14   report.
15   Q. Okay. Is this, based on your
16   review, the final version of your report?
17   A. As far as I know.
18   Q. Since you finalized this report,
19   are there any changes that you thought you
20   should make?
21   A. No.
22   Q. Sitting here today, are there any
23   corrections that you think you should make
24   to your report?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 30

1      T. McGuire - Highly Confidential
2      A. No, there aren't.
3      Q. Do you intend to offer any
4 opinions in this case that are not
5 reflected in this report?
6      A. I -- my intentions are to testify
7 on the basis of the report. If I'm asked
8 to do something else, I may. Or if I'm
9 asked questions, I may. But my intention
10 is to testify on the basis of the report.
11      Q. So in Paragraph 16 of your
12 report, which appears on Page 9, you say
13 that Relaters and Plaintiffs, quote, "that
14 Merck secured various mumps-related
15 licenses by misrepresenting and omitting
16 information about Merck's testing of its
17 Mumps Vaccine about how well the Mumps
18 Vaccine" -- "and about how well the Mumps
19 Vaccine protects against disease."
20      Do you see that?
21      A. I do.
22      Q. When you use the term "licenses,"
23 are you referring to the FDA's licenses
24 given to Merck for MMR II and ProQuad?
25      A. Yes.

Page 31

1      T. McGuire - Highly Confidential
2      Q. To whom were the
3 misrepresentations and omissions referred
4 to in this paragraph made, if you know?
5      A. My understanding is they were --
6 it was misrepresentations to the FDA.
7      Q. Anyone else besides the FDA?
8      A. I'm not sure.
9      Q. You don't know one way or the
10 other?
11      A. I'm not sure.
12      Q. Okay. Sitting here today, you're
13 not aware of anyone else other than the
14 FDA, correct?
15      MR. KODROFF: Objection. Asked
16      and answered.
17      A. Yeah, I'm not sure whether there
18 were or not.
19      Q. Do you know -- well, let me ask
20 you this. Have you done any investigation
21 to determine whether or not any
22 misrepresentations or omissions were made
23 to the FDA by Merck in connection with your
24 report?
25      A. For this material, I relied on --

Page 32

1      T. McGuire - Highly Confidential
2 well, let me answer more directly. I
3 didn't undertake any independent
4 investigation on whether there were
5 misrepresentations by Merck.
6      Q. Okay. You were asked to assume
7 that they existed and could be proven, and
8 that's what you did, correct?
9      A. Yes, that's my understanding.
10      Q. Okay. And so is it right to say
11 that you are not expressing any opinion in
12 this case as to whether or not Merck made
13 any misrepresentations or omissions to the
14 FDA?
15      A. Well, my opinions are here. And
16 there's an element that I would just like
17 to comment on --
18      Q. Sure.
19      A. -- which is that, you know, from
20 an economic standpoint, the cost of entry
21 of a competitor would be affected by their
22 understanding of what the standard would be
23 to achieve in terms of a new product.
24      So my comment on your question
25 would be that I do express an opinion.

Page 33

1      T. McGuire - Highly Confidential
2 There is an incentive for a company to make
3 it more difficult for a competitor to
4 enter.
5      Q. Okay. So you're offering an
6 opinion as to the incentives of arrival to
7 potentially enter. But in this particular
8 case, are you offering an opinion as to
9 whether or not Merck made any
10 misrepresentations to the FDA?
11      A. Well, as I said, I didn't
12 undertake an independent examination of
13 that.
14      Q. Okay. So you just assumed it and
15 you're not offering an opinion as to it,
16 right?
17      A. Well, under instruction by
18 counsel, you know, the important thing for
19 me, the input into my report, was the entry
20 of a competitor. And it's really there
21 that I pick up the story and play out what
22 happens after that. There is, obviously,
23 things that happened before that that led
24 to that, but that's really my part of the
25 relay here.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1    T. McGuire - Highly Confidential
2    Q. So you pick up -- your opinion
3 picks up at whether or not there would have
4 been competitive entry and what the effects
5 of that entry would have been on the price
6 of Merck's mumps vaccine, right?
7    A. Well, just to be clear, it's not
8 whether or not they would have been.
9 That's not my understanding of what I was
10 supposed to do. Whether or not they would
11 have been was -- is it Dr. Coppman or
12 Mr. Coppman? -- Coppman. He gave me the
13 inputs saying: Here are the dates that he
14 believes would have been the range of dates
15 that an entry would have taken place. And
16 I say, okay. If there were entry at this
17 state, what would have happened in terms of
18 pricing.
19    Q. So is it correct to say that you
20 are not offering an opinion in this case as
21 to whether or not there would have been
22 competitive entry into the alleged market
23 for mumps vaccine in the United States?
24    A. I'm relying on Coppman for that.
25    Q. Okay, fair enough.

Page 35

1    T. McGuire - Highly Confidential
2    And is it also correct to say
3 that you're not offering an opinion as to
4 whether or not Merck made
5 misrepresentations or omissions to the FDA?
6    A. Yeah, that wasn't part of my
7 assignment.
8    Q. Okay, fair enough.
9    COURT REPORTER: Can you pause.
10 The witness would like some water.
11    Q. I should say, Dr. McGuire, if at
12 any time you want to take a break for
13 water, or for any other reason, just let me
14 know.
15    A. Okay. Thank you.
16    (Pause.)
17    A. I'm ready.
18    Q. Great. So you understand that
19 the private Plaintiffs in this case are
20 bringing the case as a class action, right?
21    A. I do. Yes.
22    Q. What's your understanding, if you
23 have any, of the class definition?
24    A. In this case, it's the direct
25 purchasers. Those who would have bought

Page 36

1    T. McGuire - Highly Confidential
2 directly from the manufacturer.
3    Q. And "the manufacturer," being
4 Merck?
5    A. Being Merck.
6    Q. And do you have a sense of the
7 time frame for the class period in this
8 case, for the class in this case?
9    A. I believe it was defined as 1999
10 forward.
11    Q. Who were the named Plaintiffs in
12 this case, if you know?
13    A. There is a -- Chatham Medical
14 Group is one. I can't remember the
15 Relaters' names. And there are a couple of
16 other physician named Plaintiffs.
17    Q. Did you do anything to confirm
18 that the named class representatives in
19 this case are representative, are actually
20 representative of the putative class?
21    MR. KODROFF: Objection. Calls
22 for a legal conclusion.
23    A. Yeah, I'm not sure what you mean
24 by the question.
25    Q. Did you investigate whether or

Page 37

1    T. McGuire - Highly Confidential
2 not the named Plaintiffs' claims against
3 Merck are representative of the putative
4 class in this case?
5    MR. KODROFF: Same objection.
6 Objection to form.
7    A. Same answer. I don't understand
8 the question.
9    Q. Did you do any analysis of the
10 class representatives' purchases of mumps
11 vaccine from Merck?
12    A. Yes.
13    Q. What did you do?
14    A. I looked at the actual
15 transactions between Merck and their direct
16 purchasers.
17    Q. And I'm speaking now about the
18 specific named Plaintiffs.
19    A. The named Plaintiffs?
20    Q. Yes.
21    A. Yes, Chatham Medical Group at one
22 point I did look at. So, yes, I looked at
23 at least the Chatham Group.
24    Q. And did you look at any of the
25 other named Plaintiffs' transactional data

10 (Pages 34 - 37)

Page 38

1    T. McGuire - Highly Confidential
2 specifically?
3    A. You know, I can't remember.
4 Sorry.
5    Q. Do you know if any of the named
6 Plaintiffs in this case gave depositions?
7    A. Sorry, I don't know.
8    Q. Is it fair to say, then, that you
9 don't recall having reviewed any deposition
10 transcripts of depositions given by any of
11 the named Plaintiffs in connection with
12 your report?
13    A. I don't recall.
14    Q. If you did review them, would it
15 be -- would those depositions be listed in
16 the Materials Considered section of your
17 report?
18    A. I believe they would, yes.
19    Q. What types of persons or
20 organizations are included in the putative
21 class, to the extent you know?
22    A. There are individual physicians,
23 there are buying groups, there are
24 hospitals, there are hospital buying
25 groups, there are wholesalers. There's

Page 39

1    T. McGuire - Highly Confidential
2 insurers. I might be missing something,
3 but that gives a flavor.
4    Q. So one of the types of -- one of
5 the types of groups that would be included
6 in the named -- in the class are
7 wholesalers, right?
8    A. Yes.
9    Q. That's one of the things you
10 mentioned.
11    A. Yes.
12    Q. Is it your understanding that in
13 this particular context wholesalers would
14 purchase vaccine from Merck and resell it?
15    A. Generally a wholesaler wouldn't
16 use it. They would sell it after they buy
17 it, yes.
18    Q. Okay. And is that also true of
19 physician buying groups?
20    A. Well, it's also true that the
21 physician buying group as a corporate
22 entity, or whatever it is, doesn't directly
23 use the vaccines, but it arranges for its
24 distribution to physicians that are members
25 of the group.

Page 40

1    T. McGuire - Highly Confidential
2    Q. Is it your understanding that
3 physician buying groups that are members of
4 the putative class in this case take title
5 of the vaccine?
6    A. I'm not sure that's true.
7    Q. What is your understanding of how
8 the physician buying groups actually work
9 in this case with respect to vaccine sales?
10    A. Can you be a little more
11 specific?
12    Q. Yes, sure. So is it your
13 understanding that physician buying groups
14 don't take title, correct?
15    A. That's --
16    MR. KODROFF: Objection. I
17 thought his last answer was he wasn't
18 sure.
19    Q. So you're not sure one way or the
20 other?
21    A. I said I wasn't sure it was true
22 that they took title, which was my literal
23 answer.
24    Q. Fair. I'm sorry, I misheard you.
25    Do you have a view of how

Page 41

1    T. McGuire - Highly Confidential
2 physician buying groups work with respect
3 to vaccines?
4    A. Generally, I understand the role
5 of buying groups, yes.
6    Q. Okay. And what is that role in
7 general?
8    A. It's to economize on the
9 transaction cost of purchases, and possibly
10 to put the physicians in a better
11 bargaining position in relation to the
12 seller.
13    Q. And by putting physicians in a
14 better bargaining position with respect to
15 the seller, does that mean negotiating
16 discounts or rebates off the purchase price
17 of the vaccine?
18    A. Yes, it can.
19    Q. What other things could it
20 include, if anything?
21    A. I'm sorry, I lost -- can you --
22    Q. Yes, I'm sorry.
23    A. -- remind me what the question
24 was?
25    Q. Sure thing. Other than

11 (Pages 38 - 41)

Page 42

1    T. McGuire - Highly Confidential
2 negotiating discounts or rebates, what
3 other things might a physician buying group
4 do to improve the buying power of
5 physicians vis-à-vis the seller?
6    A.  Okay.  So there is a little bit
7 of a disconnect in your question; one is a
8 cause, and one is an effect.  The buying
9 power is what a physician group might do,
10 and the effect is that it might lead to
11 lower prices.
12       Would you mind -- so I'm not sure
13 how to answer your question.  It didn't
14 seem to make sense to me.
15    Q.  Okay.  No, that's fair.  I'm just
16 trying to understand if other than
17 negotiating discounts and economizing, as
18 you described it, is there any other role
19 that physician buying groups take on
20 vis-à-vis a manufacturer?
21    A.  Well, there could well be.  There
22 could be education campaigns.  I'm not
23 sure.
24    Q.  There are also, as you described
25 it, insurers included in the putative

Page 43

1    T. McGuire - Highly Confidential
2 class; is that right?
3    A.  Yes.
4    Q.  And is it right to say that
5 insurers wouldn't actually administer the
6 vaccine, right?
7    A.  Well, again, an insurer is a
8 corporate entity that collects and
9 distributes money.  It's the physicians
10 that actually administer the vaccine, or
11 their staff.
12    Q.  But it's your understanding that
13 both physicians and insurers are included
14 in the definition of the putative class in
15 this case, right?
16    A.  Yes.
17    Q.  And am I right that in terms of
18 the functioning of the alleged market in
19 this case, insurers play one role and
20 physicians play a different role, right?
21    A.  It's hard to disagree with that
22 statement that, yes, they play different
23 roles.
24    Q.  Yeah, I wasn't trying to be
25 controversial.

Page 44

1    T. McGuire - Highly Confidential
2       So in terms of size -- let's just
3 take physicians as a group, as a subgroup
4 of the putative class in this case.
5    A.  Okay.
6    Q.  There could be large clinics,
7 right?
8    A.  Yes.
9    Q.  And then there could be small
10 one-doctor offices, right?
11    A.  Yes.
12    Q.  And stepping back to the broader
13 definition in the types of entities that
14 are included in the putative class, did you
15 do any analysis to determine what fraction
16 of each type of entity comprised the class?
17    A.  Well, I did in examining the
18 transactions.  They are classified,
19 according to some of the distinctions that
20 I mentioned when you asked the kind of
21 lead-up question.
22       So as part of analyzing the
23 transactions one encounters, the column
24 sums, as it were, that show the percentage
25 of transactions having coming through

Page 45

1    T. McGuire - Highly Confidential
2 different classes of trade is sometimes the
3 word is used -- that is used.
4    Q.  That was the next question I was
5 going to ask you is, if you know what the
6 meaning of "classes of trade" is, but it
7 appears that you do.
8       So do you know what fraction of
9 the class is -- of the purchases by the
10 putative class over the relevant time
11 period are comprised of purchases by
12 wholesalers?
13    A.  I don't remember the exact
14 percentage, but it's not a trivial
15 percentage.  So my guess would be more than
16 ten, less than forty.
17    Q.  And do you have -- I'm going to
18 ask the same question with respect to the
19 insurers that you described.
20    A.  Less than wholesalers, but also
21 not trivial.
22    Q.  And how about physicians?
23    A.  Direct physicians as opposed to
24 through buying groups?
25    Q.  Yes.

12 (Pages 42 - 45)

Appx20202

Page 46

1    T. McGuire - Highly Confidential
2    A.  Again, it would be, you know,
3 there is six or eight of these classes of
4 trade that are all meaningful that this is
5 divided up among, and physicians would be
6 one of them.  My guess is 10 to 20 percent.
7 But I'm really -- you're asking for a
8 number, so I'm making a guess at a number.
9    Q.  Okay.  Did you draw any
10 conclusions in connection with rendering
11 your opinion from the fact that there were
12 various different classes of trade
13 represented in the putative class?
14    A.  Would you mind repeating the
15 question?
16    Q.  Sure.  I'll try it a different
17 way.
18        Did the fact that there are
19 various different classes of trade
20 represented in the putative class in this
21 case have any import for your economic
22 analysis?
23    A.  Well, it's, you know, something
24 that's a background to understand the
25 nature of the buyers in the market.  I'm

Page 47

1    T. McGuire - Highly Confidential
2 not sure what you're getting at
3 particularly.
4    Q.  I'm just asking if it was
5 relevant to your analysis.
6    A.  Yeah, it's relevant.
7    Q.  Did you account for it at all in
8 concluding or in running your damages
9 analysis?
10    A.  Did I account for it?
11    Q.  Yes.
12    A.  The damages analysis, as I'm sure
13 you know, was done in aggregate.  And in
14 aggregate, the accounting takes place by
15 the summing up of different groups.  So one
16 account -- or I accounted for it by the
17 appropriate summing up of the relative
18 importance of the different members of the
19 class.
20    Q.  And when you say you accounted
21 for it in the summing up, what do you mean?
22 What exactly did you do?
23    MR. KODROFF:  Are you asking
24    about his damage?  Specifically about
25    his damage calculation?

Page 48

1    T. McGuire - Highly Confidential
2    MR. FEE:  Yes.
3    MR. KODROFF:  Thank you.
4    A.  Well, the -- you know, in the
5 data, in the Merck data about transactions,
6 these classes are all represented.  And
7 it's against that data that I applied the
8 counterfactual analysis of what would have
9 happened had there been competitors.
10        So the summing up just kind of
11 happens, I don't want to say automatically,
12 but it just happens on the basis of using
13 the disaggregated data.
14    Q.  Let me ask this, and this is a
15 little bit different from the damages
16 analysis.
17        But do you assume, in connection
18 with doing your analyses in this case more
19 broadly, that all of the different classes
20 of trade would have been affected in the
21 same way in the counterfactual world?
22    A.  Well, the method I applied in
23 this case is what economists would call a
24 kind of comparative static where the issue
25 is in the alternative counterfactual, where

Page 49

1    T. McGuire - Highly Confidential
2 there is more than one seller as opposed to
3 one seller, how would that affect prices
4 paid by buyers.
5        So what I did, and I'm sure
6 you're aware of what I did, is to use
7 comparisons of how much lower prices would
8 be in situations where there is
9 competition, and I applied that across the
10 board to the alternative classes of trade.
11    Q.  So you didn't treat any of the
12 different classes of trade differently in
13 the context of that analysis, because you
14 applied that analysis across the board, as
15 you said, right?
16    A.  Well, the implications for
17 different classes of trade vary by their
18 starting point.  Some classes of trade, on
19 average, paid higher prices than other
20 classes of trade.  So then when one applies
21 a change in the percentage discount, it has
22 a different effect on the different
23 classes.
24    Q.  Okay.  So let me ask this.  Going
25 back to the wholesalers that we were

13 (Pages 46 - 49)

Appx20203

Page 50

1    T. McGuire - Highly Confidential
2  talking about, we agree that wholesalers
3  resell MMR vaccine to physicians, right?
4    A.  Yes.
5    Q.  Do you have a view on whether
6  those wholesalers would be better off
7  buying at a higher price or a lower price?
8    A.  I do have a view on that.
9    Q.  Okay.  Let's hear it.
10    A.  This was raised in one of the
11  Defendant expert's reports by Pierre
12  Cremieux, who I'll call Cremieux.  And
13  there is something really funny about the
14  argument; that a buyer and a seller both
15  would benefit by higher prices, which is
16  more or less in sum and summary what the
17  claim is.  That with wholesalers, they
18  differ from other class members because
19  they actually would benefit by higher
20  prices.
21      The thing that's funny about that
22  is that if that were true, then the buyer
23  and the seller would just say, okay, let's
24  raise prices because I'm better off and
25  you're better off.  And, obviously, there

Page 51

1    T. McGuire - Highly Confidential
2  is something absurd about that.
3      So getting around to your
4  question, I do have a view about it.  And
5  my view is that buyers benefit by lower
6  prices.
7    Q.  Even if they resell the vaccine;
8  that's your testimony?
9    A.  Yeah, buyers benefit by lower
10  prices.  It's a general statement that is
11  basic economics that, yes, I stand behind.
12    Q.  What if the reseller resold
13  pursuant to a cost plus contract.  Would
14  that change your view?
15    A.  Well, this is, again, exactly the
16  same issue; that it's a what-if that you're
17  constructing a world in which both the
18  buyer and the seller benefit by higher
19  prices, and it just doesn't make sense
20  economically.
21      Just one more thing.  There is
22  something missing from that if one were to
23  say what if this particular thing.  So it
24  doesn't make sense to me that both a buyer
25  and a seller would benefit by higher

Page 52

1    T. McGuire - Highly Confidential
2  prices.
3    Q.  And that's your opinion even if
4  hypothetically the reseller were to sell
5  pursuant to a cost plus contract?
6    A.  Well, I gave you my opinion on
7  this the last couple of questions.
8    Q.  Well, I'm just asking for -- just
9  to be candid, I just want an answer to that
10  basic question.  If the answer is yes,
11  that's your opinion, that's fine.
12    A.  Well, I gave my opinion a minute
13  ago that something is missing from that if.
14    Q.  Okay, what's missing?
15    A.  The reason something is -- let
16  me -- I'll get around to answer that last
17  part.
18      Something is missing because it
19  doesn't make economic sense that a buyer
20  and a seller would both be interested in
21  higher prices.  So there is something
22  wrong.  You can make an if to say, well,
23  what if there was a particular type of
24  contract that existed between the parties.
25  But there is just something missing,

Page 53

1    T. McGuire - Highly Confidential
2  because it just can't be that buyers and
3  sellers are both gaining in a higher
4  price, whatever if you're asking me to
5  assume.
6      So whatever is missing, I don't
7  know what's missing, but there is something
8  wrong with that model, or that theory.  And
9  if there's, you know, maybe someone else
10  who put it forward has an idea of what else
11  needs to be in there.  But, basically, it's
12  just inconsistent with simple economics
13  that buyers and sellers both benefit from
14  higher prices.
15    Q.  Okay.  But you can't tell me what
16  it is that's actually missing.  You said
17  something is missing.  But I'm just trying
18  to find out what it is.
19    A.  There is lots of things that
20  could be missing, but it's not my theory.
21  So it's -- I just -- I don't agree with the
22  theory.  I don't agree you can come up with
23  an economic transaction where both benefit
24  by higher prices.
25    Q.  Okay.  Under any circumstances?

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1    T. McGuire - Highly Confidential
2    A.  I don't know about any
3 circumstances, but they would be very
4 artificial.  And I -- you get to ask the
5 questions, and I'll do my best to answer
6 them.  But I don't -- I would refer not to
7 construct some artificial theory that
8 creates both a buyer and a seller gaining
9 from higher prices.
10    Q.  Would you agree with me that
11 reimbursement is different across certain
12 members of the class?
13    A.  By "reimbursement" in this case,
14 you mean?
15    Q.  By third-party payors.
16    A.  Let us say a physician would be
17 paid after administration of a vaccine?
18    Q.  Yes.
19    A.  The reimbursement is -- it
20 depends on the rules of the third-party
21 payor.  So it could very well differ across
22 different members of the class, yes.
23    Q.  And it would most likely depend
24 on the payor mix experience by the
25 physician?  In other words, what insurers

Page 55

1    T. McGuire - Highly Confidential
2 or other payors its patient base had?
3    MR. KODROFF:  Object to form.
4    Vague.
5    A.  Yeah, I think I understand the
6 question.  And on average for a physician's
7 practice, if the physician is administering
8 vaccines to children who some are covered
9 by this HMO, some are covered by somebody
10 else, those different payors might set
11 different reimbursement rates.  And so then
12 I'm acknowledging that, if that's what
13 you're trying to get at.
14    Q.  That's all I was trying to get
15 at.
16    And, in fact, you say in your
17 report "provider reimbursement for drug and
18 administrative fees varies across payors";
19 isn't that correct?
20    A.  Yes.
21    Q.  Reimbursement is not an issue for
22 physician buying groups, is it?
23    A.  I think it's primarily an issue
24 for the physicians who obtain the vaccine
25 maybe via a buying group and then have to

Page 56

1    T. McGuire - Highly Confidential
2 cover their cost and whatever their time
3 is.
4    Q.  Right.  So --
5    A.  So I'm agreeing with you, yes,
6 it's an issue for doctors.  Buying groups
7 is more the thing that influences their,
8 you know, market situation, and our role,
9 how valuable we are.  That kind of thing.
10    Q.  And it's also true that with
11 respect to wholesalers, reimbursement isn't
12 an issue, correct?
13    A.  In the same way about the buying
14 groups, that kind of affects their role in
15 this process and possibly their competitive
16 advantage, but the reimbursement is
17 primarily a doctor- or provider-level
18 issue.
19    Q.  For physicians and other
20 healthcare providers, there is two types of
21 reimbursement for vaccines, right?  And by
22 that, I mean one is for the cost of the
23 vaccine and, two, is for an administrative
24 fee, right?
25    A.  That's generally correct, yes.

Page 57

1    T. McGuire - Highly Confidential
2    Q.  So in terms of if a physician is
3 trying to make a determination as to
4 whether its administration of a vaccine is
5 profitable, it might look to the difference
6 between its acquisition cost plus its
7 administrative fee -- or, I'm sorry --
8 they're going to look at the difference
9 between the acquisition cost and what it
10 gets reimbursed, right?
11    MR. KODROFF:  Objection.  Vague.
12    A.  I think I understand the
13 question.  And that would be one factor.
14    Q.  What other factors might the
15 physician look to to determine whether the
16 administration of a particular vaccine is
17 profitable?
18    A.  Is profitable.  Now I'm a little
19 unclear about this question.  In what sense
20 are you asking profitable?  I shouldn't
21 help you, so maybe you can clarify.
22    Q.  So whether -- what I'm asking is
23 what other factors might a physician look
24 to to determine whether it is -- that
25 physician is making a profit on the

15 (Pages 54 - 57)

**Appx20205**

HIGHLY CONFIDENTIAL

Page 58

T. McGuire - Highly Confidential

administration of a vaccine?

A. Well, there is a kind of immediate effect of do I do this or do I not do this. And this has an effect on my kind of cost today, or my marginal cost, in relation to the reimbursement that I receive. And that's one factor that I acknowledged as part of it.

But then am I an attractive pediatrician, is something that would also be affected by what I do.

So it's not simply a matter of the dollars and cents of the reimbursement compared to the acquisition cost. There's other factors a doctor would take into account, even if it's just kind of the money side of the business as opposed to health side of the business.

Q. And with respect to all of those issues that you described, isn't it correct that physicians are going to have different views on those things?

A. Well, I'm -- I wouldn't put it that way. We were talking objective costs,

Page 59

T. McGuire - Highly Confidential

revenues, production kind of. It didn't play -- the physician's views really weren't part of the first question.

Q. Okay. So let's just talk about costs and revenues and the money side of the business, which you just described.

A. Okay.

Q. Isn't it right that those things are going to differ across all physicians?

A. Yeah, physicians could be in different payor mix environments, they might have a different degree of different staff, different costs. So, yes, there could be differences.

Q. Would in your view the extent to which the administration of, take the MMR vaccine in this case, be impacted in the counterfactual world by how profitable the administration of the vaccine was in the actual world?

MR. KODROFF: Objection. Vague.

A. Do you mind repeating it? It kind of came out of the blue towards me.

Q. Yeah, so let's take a concrete

Page 60

T. McGuire - Highly Confidential

sort of an example. So let's say in the actual world a physician is making a $5 profit on the administration of each MMR shot.

Are you with me so far?

A. And by "profit" in this case, I'm really talking about that first component. Like today if I do it, is my reimbursement covering the cost of me procuring it.

Q. Purely the dollars and cents.

A. Like today's dollars and cents.

Q. Correct.

A. Okay.

Q. So you're with me so far?

A. I think so.

Q. So upon the entry of competition, do you think that physician who is making a $5 profit is more or less likely to switch to the competitive vaccine than a physician who is taking a loss?

A. Okay, so this is a different question. Are you withdrawing the earlier one?

Q. I'm just trying to put it in

Page 61

T. McGuire - Highly Confidential

concrete terms.

A. Okay. And so now we're in a counterfactual world in which there are more than one supplier of the same, say, MMR vaccine equivalent.

Q. Yeah.

A. From the standpoint of the physician, what this would mean is that the acquisition costs might fall to me. And then you asked, as I understand it, just to see if I'm keeping up with your question, then you asked would there be a different response of doctors who are making a loss or making a profit on the margin with respect to the administration of the vaccine. Am I with you?

Q. That's right.

A. I don't see why. And the reason I don't see why -- and maybe there is more to your question -- is that both doctors in the actual world have decided on whatever basis they make that decision that, yes, I do want to give this vaccine.

So, as I said, the marginal

16 (Pages 58 - 61)

Page 62

1     T. McGuire - Highly Confidential
2 profit, as we've been calling it, is one of
3 the factors but it's not the only factor.
4 If that were the only factor, obviously,
5 the doctor who is making a loss might not
6 do it at all.  But that doctor making a
7 loss has decided, for either health reasons
8 of my patients or that I want to be a
9 pediatric practice that covers vaccines,
10 even if it's a little painful in this case,
11 then I'm doing it anyway.
12         So I don't see why there would be
13 a different response based on differences
14 in the margin.
15     Q.  Okay.  Did you finish?  I'm
16 sorry.
17     A.  Yes, I did.
18     Q.  Okay.  So is it right to say that
19 whether a physician or healthcare provider,
20 let's use that, is more or less likely to
21 switch from an incumbent MMR to a new
22 entrant, here GSK, depends on a lot of
23 different variables, including the dollars
24 and cents?
25     A.  This is a different question,

Page 63

1     T. McGuire - Highly Confidential
2 too.
3     Q.  Sure.
4     A.  If the products are similar or
5 very much the same, then when this gets
6 transmitted down to the physician level, if
7 one is as good as the other, then really
8 the only distinction is between the price.
9         So if you're asking a kind of
10 comparative static question again, you're
11 keeping all this other stuff the same, the
12 many factors that go into what a doctor
13 decides to do, you're keeping all that
14 stuff the same and you're changing one
15 thing, which is what I understand your
16 question to be doing.  And I'm going to add
17 a competitor, I'm going to reduce the price
18 by some amount, do I expect doctors might
19 behave differently?  Well, generally the
20 effect will be very similar because the
21 effect is the same across all -- the set of
22 people we're talking about.
23     Q.  So is it your view that -- let's
24 take the hypothetical where GSK comes into
25 the market at 1 cent lower than Merck's

Page 64

1     T. McGuire - Highly Confidential
2 price.  Is it your view, then, that all
3 physicians would be equally incentivized to
4 switch to the GSK vaccine, independent of
5 all those other factors?
6     A.  Well, there's a distinction -- I
7 think you'll get to this in the next
8 question -- between incentives and action.
9 So if you ask is the incentive the same,
10 although 1 cent lower price here than
11 there, yes, the incentives are the same.
12     Q.  But the actions could be
13 different?
14     A.  Well, they all, you know, 1 cent
15 is kind of small.  But what is transmitted
16 by the counterfactual world in terms of a
17 price change is something that will have
18 the same impact on all the different -- all
19 the different practices.
20     Q.  But the extent to which that
21 incentive translates into potential action
22 by the physicians depends on a number of
23 things, right?
24     A.  Well, there could be factors that
25 influence how a physician responds to an

Page 65

1     T. McGuire - Highly Confidential
2 incentive.  It might be that 1 cent isn't
3 that important to me, or it might be more
4 important to my colleagues.
5     Q.  So it's going to depend on, one,
6 the extent of the difference in price
7 between the incumbent and the entrant,
8 right?  That's one thing it might depend
9 on; true?
10     A.  And so what is the "it"?  The
11 incentives now, or what are we talking
12 about?
13     Q.  So the extent to which a
14 physician would be inclined to switch from
15 the incumbent to the entrant.
16     A.  "Inclined to switch," which is
17 not an action, either.
18     Q.  Okay.
19     A.  Sorry, you're trying to...
20     Q.  Okay.  So the extent to which --
21 let's take it this way.  The extent to
22 which a physician would switch depends on
23 the delta between the price of the
24 incumbent vaccine and the price of the new
25 entrant vaccine, right?

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    T. McGuire - Highly Confidential
2        MR. KODROFF: Objection. Vague.
3    A. By "delta," I understand you to
4 mean the price difference between one
5 vaccine and another?
6    Q. That would be correct.
7    A. And the response to a price
8 difference between one or another could
9 differ by different physicians.
10    Q. Okay. And what's the reason for
11 that?
12    A. Well, it's similar to just a very
13 simple analogy would be if you have a
14 market demand curve and the price goes up
15 for the consumers in that market demand
16 curve, some of us will respond more than
17 others. The market demand curve is what it
18 is. But each individual doesn't
19 necessarily respond with the same degree of
20 a reduction in quantity.
21    Q. Okay. Let's take a hypothetical
22 and shift it a little bit. What if --
23 well, let's back it up.
24        You said that the incentives
25 would be the same. And we're talking about

Page 67

1    T. McGuire - Highly Confidential
2 incentives, not actions. Because I want to
3 make sure that we're drawing the some
4 distinction that you did.
5        The incentives would be the same
6 if -- for all physicians, if the
7 incumbent -- or, I'm sorry, the new entrant
8 came in at a lower price; is that fair?
9    A. That's generally a fair
10 statement, yes.
11    Q. What if the new entrant came in
12 at a price that was higher than the
13 incumbent vaccine? How would that affect
14 the incentives of various physicians?
15    A. Well, again, the incentives would
16 be, of course, in the other direction --
17 well, no.
18        All right. So let me understand
19 the hypothetical. The actual world: One
20 seller, one price. The counterfactual
21 world, two sellers. The existing seller
22 doesn't change their actions.
23    Q. Correct.
24    A. And the new seller enters at a
25 different price.

Page 68

1    T. McGuire - Highly Confidential
2    Q. Correct.
3        MR. KODROFF: Objection. I think
4 he said higher price.
5    Q. I'm sorry, that's correct.
6    A. At a higher price.
7        MR. FEE: Thank you, Jeff.
8    A. Now that I've clarified that,
9 would you mind, then, asking me what I'm
10 supposed to say about this?
11    Q. Sure. If the counterfactual
12 world a new entrant came in at a price
13 premium to the incumbent vaccine, how, if
14 at all, would that affect the incentives of
15 physicians purchasing that vaccine?
16    A. This is a tough hypothetical,
17 because if I were to say that these
18 products are very similar and a competitor
19 came in at a higher price, from a physician
20 standpoint, there would be no incentive to
21 move to the competitor.
22        And then I say to myself, it then
23 becomes irrational for the entrant to come
24 in and presumably having incurred some
25 costs and offer a higher price.

Page 69

1    T. McGuire - Highly Confidential
2        So it's kind of not adding up in
3 terms of a consistent counterfactual of how
4 those set of behaviors could all exist at
5 the same time. So I'm a little bit at a
6 loss to know what exactly to say.
7    Q. What if the new entrant came in
8 at parity?
9    A. At parity. So exactly the same
10 price?
11    Q. Exactly the same price as the
12 incumbent.
13    A. And then?
14    Q. How would that affect the
15 incentives of various physicians? Would
16 those incentives be affected in the same
17 way?
18    A. Same way as?
19    Q. Across the class. Would all
20 physicians' incentives be the same in a
21 counterfactual world in which a new entrant
22 came in at parity.
23    A. Well, if I'm understanding your
24 question, I would answer by saying if a new
25 entrant entered at parity, meaning exactly

18 (Pages 66 - 69)

Appx20208

HIGHLY CONFIDENTIAL

Page 70

T. McGuire - Highly Confidential

1    the same price, that the incentives on this
2    marginal profit thing that we've been
3    talking about are unchanged for everyone.
4        Q.  And that means that they would
5    still all be different, right?
6        A.  Well, like you asked me about
7    would the incentives be the same, and I
8    answered yes.  But you're going back to a
9    previous discussion --
10        Q.  Sure.
11        A.  -- which isn't a clarification of
12    this last one.
13        Q.  Okay.  But I'm just trying to
14    understand.
15        A.  Make sure I'm not lost here.
16        Q.  So the incentives would be the
17    same in the actual and but-for worlds,
18    correct?  That's what you're saying?
19        A.  The incentives wouldn't change,
20    unless you start adding more complications,
21    which I'll not do unless you want me to.
22    That if the acquisition price is the same,
23    and the same is reliable, the same product,
24    all of those things that one could clarify

Page 71

T. McGuire - Highly Confidential

1    in something like this, then the incentives
2    at the marginal profit would be exactly the
3    same.
4        Q.  And that means across different
5    physicians, whether they'd be more or less
6    likely to switch is going to vary, correct?
7        A.  Well, again, it's an odd
8    knife-edge economic question.  If the
9    incentives don't change, it's not -- it's
10    hard to know what people will do if
11    incentives don't change.
12        Q.  Okay.  And did you look at that
13    at all, what physicians would do if
14    incentives remained unchanged in the actual
15    and but-for world in this case when
16    conducting your analysis?
17        A.  I regard this as bearing on my
18    damages estimation and the aggregate
19    damages estimation.  And what I assumed in
20    that analysis was that the quantities would
21    remain the same.  That is, the quantities
22    of delivery of vaccines by the members of
23    the class would be the same.
24        So I didn't -- I didn't allow for

Page 72

T. McGuire - Highly Confidential

1    differences in incentives in terms of Dr. X
2    starting to do vaccines instead of not, and
3    changes in the quantity.
4        Q.  Okay, fair enough.
5        Do you understand when I use the
6    term "brand loyalty," do you know what I
7    mean by that?
8        A.  I have a general understanding,
9    yes.
10        Q.  Okay.  What's your understanding
11    of the definition of the term "brand
12    loyalty"?
13        A.  It means -- it's normally a
14    term -- I mean it's, of course, a broader
15    term.  But it's normally a term that's used
16    in the sort of conventional drug world
17    where there might be, say, Lipitor, which
18    is a branded version of a product that goes
19    generic.  And even though a generic is
20    exactly a copy of the original molecule,
21    some consumers would still prefer Lipitor
22    because they believe it's a little bit
23    different, and they're labeled brand
24    loyalists in the kind of literature and the

Page 73

T. McGuire - Highly Confidential

1    pharmacy.
2        Q.  Do you have a view as to whether
3    there are in the putative class in this
4    case, whether there are physicians who are
5    brand loyal to Merck's MMR vaccine or its
6    ProQuad vaccine?
7        A.  And in this context, I understand
8    the term "brand loyalist" to be sort of
9    over here with respect to brand and generic
10    drugs.  What are you meaning when you say
11    "brand loyalty" over here in the case of
12    vaccines?
13        Q.  Okay.  So do you have an
14    understanding -- I don't want to -- I was
15    viewing -- well, who cares what I was
16    saying.
17        Do you have a view as to whether
18    there are physicians within the putative
19    class that are loyal to the MMR and ProQuad
20    vaccines?
21        A.  Well, in this case -- in this
22    context, I think the word "loyalty" is a
23    little bit -- of course, it's a
24    non-economic term.  It has a particular

19 (Pages 70 - 73)

**Appx20209**

HIGHLY CONFIDENTIAL

Page 74

1    T. McGuire - Highly Confidential
2 interpretation that a conventional drug
3 generic world.  But that's consumers who
4 are brand loyalists over there.
5        We're talking here about
6 businesses.  The buying groups are a
7 business.  The wholesalers are a business.
8 Physicians even are businesses.  So their
9 kind of world view is different than
10 consumers would be.
11       So my view would be that it's
12 being more of a business decision that
13 could include considerations of who the
14 seller is, but I consider it a business
15 decision -- more of a business decision,
16 not a subjective loyalty or affinity for a
17 seller just because of who they are.
18    Q.  Okay.  So do you know if there
19 are any physicians within the putative
20 class that would not switch to a new
21 entrant vaccine for MMR or ProQuad under
22 any circumstances?
23    A.  Under any circumstances?  That
24 seems a little far-fetched, but I don't
25 know.

Page 75

1    T. McGuire - Highly Confidential
2    Q.  Did you look in connection with
3 your analysis and any contracts between
4 Merck and any members of the putative
5 for purchase of MMR II or ProQuad vaccines?
6    A.  Yes, I did.
7    Q.  And is it your understanding that
8 with respect to at least certain of those
9 contracts, they include incentives for
10 purchasing various vaccines from Merck
11 across the portfolio?
12    A.  Yes.  I do understand that there
13 is sometimes the rebates or discounts would
14 be portfolio-based, which means it's not
15 only with respect to the purchase of this
16 particular one, but other purchases would
17 be involved as well.
18    Q.  And did you -- so let me ask you
19 this.  Some class members have those
20 portfolio-based discounts contractually
21 with Merck, right?  But others by a
22 catalog?
23    A.  Yes, that's correct.
24    Q.  Did you, in terms of doing your
25 analysis in this case, consider those

Page 76

1    T. McGuire - Highly Confidential
2 differences?
3    A.  Well, this is where comparative
4 statics comes in really handy in which one
5 looks at an exogenous change, in this case
6 a number of competitors, and that plays out
7 with the same force, even if there's
8 different baselines.  So there might be
9 different baseline prices for different
10 class members, and portfolio discounts are
11 an example of why those might arise.
12       But in terms of the impact on
13 those baseline prices of an exogenous
14 change, that should be similar.
15    Q.  You have used the word
16 "comparative" -- the phrase "comparative
17 static" a couple of times.
18    A.  Yes.
19    Q.  I want to understand what exactly
20 that means.  So can you tell me?
21    A.  Yeah.  Comparative statics is a
22 common form of analysis in microeconomics.
23 Which characterizes how an equilibrium
24 changes when an exogenous variable changes.
25       Let me give you an example

Page 77

1    T. McGuire - Highly Confidential
2 outside of what we're talking about here.
3 A comparative static might be done on, say,
4 a consumer.  And a consumer is maximizing
5 utility with respect to a budget and facing
6 certain prices, and that's how we get
7 demand curves.
8        So you solve that mathematical
9 problem, you maximize utility, you get
10 quantity demanded, as a function of the
11 exogenous parameters.  The exogenous
12 parameters in this case usually being
13 income and prices.  So quantity demand is a
14 function of a whole bunch of stuff.  And
15 when you think of a demand curve, it just
16 graphs one of those things.
17       So a demand curve has its own
18 price and quantity.  I'm sure you can
19 visualize it.  And a comparative static is
20 how we actually derive the demand curve.
21       So there is a particular set of
22 prices at any one time that the consumer
23 maximizes utility with respect to and makes
24 a set of certain decisions.
25       But for various purposes, we're

20 (Pages 74 - 77)

**Appx20210**

Page 78

1     T. McGuire - Highly Confidential
2 interested in what-ifs, counterfactuals.
3 Economics is set up to study these things.
4 It studies them with the methodology of
5 comparative statics.
6         And in the case of consumer
7 behavior, so what if the price changes by
8 something. And that mathematical exercise,
9 which takes that utility, and so on, and
10 actually recalculates what quantity demand
11 it would be at the new price, is how you
12 get the different points on the demand
13 curve.
14        So comparative statics is behind
15 supply curves, behind demand curves, behind
16 analysis equilibrium, it's behind monopoly
17 behavior. All kinds of things in economics
18 rely on essentially that methodology.
19    Q. That's helpful. Thank you.
20        If I were to look, to the extent
21 you could give me this, if I were to want
22 to look at a textbook to find out what the
23 best explanation of "comparative statics"
24 is, where would you suggest I go?
25        MR. KODROFF: You mean other than

Page 79

1     T. McGuire - Highly Confidential
2 his answer previously?
3    Q. A textbook.
4    A. A textbook. Well, you would
5 probably go to a master's level textbook.
6 Undergraduates may or may not have it
7 expressed in these terms. Sometimes they
8 don't have calculus when they do economics.
9        But once you introduce
10 maximization, which is a calculus-based
11 procedure, then comparative statics is
12 really the bread and butter of agent
13 maximizations.
14    Q. So I'm just trying to thing of
15 terms here. You cited I believe the
16 Pindyck text. Would it be in there in
17 microeconomics?
18    A. It seems likely that it would. I
19 didn't search it for that. But if you
20 want, I'm happy to give you plenty of
21 references tomorrow.
22    Q. No, I'll check. I'm just trying
23 to see if I could get a definition.
24        Do you know if -- strike that.
25        Is your understanding that the

Page 80

1     T. McGuire - Highly Confidential
2 putative class in this case is a nationwide
3 class? So, in other words, represented --
4 represents the various entities we've been
5 talking about this morning all around the
6 country?
7    A. My understanding the sort of
8 class area, the geographic area of this, is
9 the United States.
10    Q. Okay. So kind of by definition,
11 that would include physician groups on the
12 East Coast, right?
13    A. Yes.
14    Q. And that would include
15 wholesalers on the West Coast, right?
16    A. Yes.
17    Q. And various entities in between,
18 right?
19    A. And there's some -- yes.
20    Q. And is it correct that the
21 patient mix among those different physician
22 groups could vary by geography?
23    A. Just can you tell me what you
24 mean by "patient mix"?
25    Q. Yes. So let's just take Chatham

Page 81

1     T. McGuire - Highly Confidential
2 Primary Care, which is in rural Alabama.
3    A. Yes.
4    Q. They're going to have a different
5 patient mix than a provider in, say, West
6 Roxbury, right?
7        MR. KODROFF: I object to the
8     form. What you mean by "patient
9     mix"?
10    A. Well, yeah, you haven't clarified
11 what you mean by "patient mix." They're
12 all kids.
13    Q. A different population of
14 patients.
15    A. Well, they're different. This
16 isn't -- shouldn't be a hard question, but
17 still you haven't defined what you mean.
18    Q. Population of patients. Does
19 that help?
20    A. Are the populations different?
21 By definition, they're different. There is
22 some people in Alabama, and some people in
23 Massachusetts.
24    Q. Okay. Let's take -- let's try
25 socioeconomic dimensions.

21 (Pages 78 - 81)

Page 82

1    T. McGuire - Highly Confidential
2    A.  Okay.
3    Q.  Would they have different
4 socioeconomic dimensions, say, rural
5 Alabama and West Roxbury, Massachusetts?
6    A.  They may well, yes.  There are
7 poor areas where the socioeconomic level
8 will be lower on average than higher income
9 areas.
10    Q.  And would that -- well, do you
11 know what the Vaccines for Children Program
12 is?
13    A.  Yes.
14    Q.  What is it?
15    A.  It's a program created to
16 subsidize and purchase vaccines for
17 uninsured, Medicaid, and some other
18 categories of kids.
19    Q.  So it's basically an entitlement
20 program for vaccines, right?
21    A.  You could think of it as that,
22 yes.
23    Q.  And is it likely that the
24 physician group in rural Alabama is likely
25 to have a higher percentage of VFC patients

Page 83

1    T. McGuire - Highly Confidential
2 than, say, the physician group in West
3 Roxbury, Massachusetts?
4    A.  Well, I will agree with you,
5 without necessarily plugging in those
6 geographies, that a physician in a poor
7 area with lots of uninsured kids, lots of
8 Medicaid kids, will have a higher share of
9 kids that are paid for by the VFC comparing
10 to someone in Newton, Massachusetts, say.
11 They will have some, but not nearly so
12 many.
13    Q.  And did you do anything to
14 account for those differences in putting
15 together your model in this case?
16    A.  Well, again, the data on the
17 private purchasers are from Merck's
18 transaction data.  And the degree to which
19 a physician practice in rural Alabama has
20 relatively few private purchases, they'll
21 be sort of down-weighted in the overall
22 aggregate damages.  So, yes.
23    Q.  Okay.  That's what you did to
24 account for those differences, is you
25 totaled everybody up in the actual and

Page 84

1    T. McGuire - Highly Confidential
2 but-for worlds, and that was the extent of
3 your analysis?
4    A.  Well, the methodology I used
5 recognized the actual share of different
6 buyers, according to the degree of private
7 payors.  So private, yeah, private
8 purchases.
9    Q.  Okay.  But other than doing what
10 you just described, you didn't otherwise
11 account for the differences in the
12 socioeconomic backgrounds of the patient
13 population for the various physicians?
14    MR. KODROFF:  Objection to form.
15    Vague.  And I think asked and
16    answered.
17    A.  I'm not sure where you're going
18 with this question.  But the degree to
19 which I took into account differences in
20 practices had to do with the payor mix,
21 which recognized the source of payment for
22 kids.  And the poorer kids would be more
23 likely to be on VFC, which is I think the
24 pertinent issue to account for.  You know,
25 whether their parents made $15,000 or

Page 85

1    T. McGuire - Highly Confidential
2 $20,000 is not.
3    Q.  Okay.  But you didn't do anything
4 to account for how that may affect the
5 actions of physicians in the but-for world,
6 right?  There is no variable in your model
7 to account for that, correct?  Because it's
8 a static model, right?
9    A.  It's -- the model is, takes as
10 given the quantities that a provider
11 provides.  The quantity that the provider
12 has supplied, which is the way I believe
13 damages should be accounted for.  Here is
14 what they did, here is the price they paid,
15 here is the price they would have paid
16 in a counterfactual world, and you add
17 those things up.
18    So the quantities in that
19 summation are fixed.  Okay, which I
20 think -- does that answer your question?
21    Q.  Sure.  So when you said that you
22 believe that that's the way damages should
23 be accounted for, is there any authority
24 that supports that view either in the
25 literature or the law?

22 (Pages 82 - 85)

Page 86

1　T. McGuire - Highly Confidential
2　A.  Well, I'm not the right person in
3　the law to answer that in the law.  But
4　it's just basic economics.  So if you
5　imagine, again, a buyer paying one price
6　for something, and if they were to continue
7　to buy that and they would be able to pay a
8　lower price for that thing, there is an
9　increase in consumer surplus.  It's a
10　rectangle; that is exactly equal to the
11　quantity times the delta P.
12　Q.  Look, I'm not trying to be...
13　But I just simply asked is there support,
14　other than basic economics, in the
15　literature or the law that says that
16　damages should be calculated in an
17　antitrust case the way you did here?
18　A.  Well, this is a measure of
19　damages to consumers that is supported by,
20　you know, the whole basis of economics and
21　consumer welfare.  That, to me, that's
22　pretty good.
23　Q.  Okay.  The class in this case is
24　comprised of what you describe as direct
25　purchasers who bought MMR and ProQuad over

Page 87

1　T. McGuire - Highly Confidential
2　the course of a 19 -- a roughly 19-year
3　time frame, right?
4　A.  That's correct.
5　Q.  And do you have a view as to
6　whether when Plaintiffs move for class
7　certification in this case, whether that
8　will be the time frame that they put
9　forward?
10　MR. KODROFF:  Objection.  That's
11　a decision of counsel.  Calls for a
12　legal conclusion.
13　A.  I don't think I have a view about
14　that.
15　MR. FEE:  Okay.  Why don't we
16　take a quick break.
17　VIDEO TECHNICIAN:  It is
18　a m.  We are going off the record.
19　(Proceedings recessed at
20　10:39 a.m., and reconvened at
21　a m.)
22　VIDEO TECHNICIAN:  It is
23　a m., and we are back on the record
24　on media number two.
25

Page 88

1　T. McGuire - Highly Confidential
2　BY MR. FEE:
3　Q.  Welcome back, Dr. McGuire.
4　A.  Thank you.
5　Q.  We talked before the break about
6　brand loyalty in the context of
7　pharmaceutical products.  Do you remember
8　that testimony?
9　A.  I do remember, yeah.
10　Q.  And I think you described that
11　type of brand loyalty in the brand/generic
12　space as pertaining to consumers and not
13　physicians, right?
14　A.  That's right.
15　Q.  And so in that particular
16　context, and by that I mean the entry of a
17　generic pharmaceutical where there is a
18　brand incumbent, what are some of the
19　reasons that consumers might be brand
20　loyal?
21　A.  Well, I think the -- my
22　understanding is that -- I'll point to two
23　things:  That consumers may have a belief
24　that's mostly mistaken that a generic isn't
25　equivalent to the brand.  And they may be

Page 89

1　T. McGuire - Highly Confidential
2　just reluctant to risk a product that they
3　haven't, you know, directly used to that
4　point.
5　And the other factor is that
6　depending on their insurance situation, or
7　the consumer's standpoint, the difference
8　between what I have to pay in one case and
9　the other may not be so great.
10　Q.  Okay.  So would those two
11　phenomenon apply to patients in the vaccine
12　world, too?
13　A.  It seems like not a natural step.
14　Q.  Well, so let me ask you this.
15　We've got the MMR vaccine, which has been
16　on the market for -- since the late 1960s,
17　right?
18　A.  Yes.
19　Q.  And might patients be similarly
20　reluctant to want to switch to a new
21　vaccine that had just come on the market a
22　month ago?
23　MR. KODROFF:  Objection to the
24　question.  It's vague.  I'll just
25　leave it there.

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1      T. McGuire - Highly Confidential
2      A.  The word "switch" in your
3  question I think is important and why I
4  think it's not a natural step.
5          In the case of the classic brand
6  loyalists, and you understand the Lipitor
7  example I gave earlier, it's a chronic
8  illness.  People typically take it for
9  years.  When it came off patent, it was a
10  huge savings for consumers.  I would expect
11  there would have been some brand loyalists
12  for Lipitor who did not switch to
13  atorvastatin.
14          Vaccines are a one-shot thing.
15  My kid is vaccinated maybe two doses or
16  something for the same illness, but it's
17  not a chronic condition that people are
18  consuming the same things over time and
19  have any reason to be brand loyal.
20      Q.  Well, except for that they're
21  actually putting this product in their
22  children, right?
23          MR. KODROFF:  Objection.  It
24      assumes that the consumers even know
25      what the brand is.

Page 91

1      T. McGuire - Highly Confidential
2      Q.  Do you have an understanding of
3  whether patients know whether their
4  children are being injected with Merck's
5  MMR vaccine?
6      A.  Well, I'm not sure what parents
7  would know at the time the vaccine is
8  administered.  I certainly didn't know when
9  my kids got vaccinated.
10      Q.  So in this particular context,
11  right, in the vaccine context, you're
12  giving -- you're introducing a virus into
13  an otherwise healthy child, right?
14  Usually.
15      A.  Basically, yeah.
16      Q.  And wouldn't you think that that
17  would also create some degree of concern on
18  the part of the patient such that they
19  would want an established brand to be used
20  instead of a new entrant?
21          MR. KODROFF:  Objection.  Vague.
22      A.  I don't think that necessarily
23  follows at all.  I think patients
24  obviously -- I'm sorry -- families,
25  parents, are obviously concerned about the

Page 92

1      T. McGuire - Highly Confidential
2  health of their children and depend on
3  accurate description of product
4  characteristics to people who are choosing
5  those characteristics in order to make a
6  decision of what vaccine to administer to a
7  child.
8          So I agree with you that it's
9  important and significant.  What I don't
10  agree with is that there is necessarily a
11  incumbent versus new entrant bias on the
12  part of parents.  There are those amongst
13  us that like new things, that think things
14  are better if they're newer.
15          But for the most part, we,
16  parents, depend on the regulatory structure
17  to make -- we depend on manufacturers to be
18  honest with respect to testing.  We depend
19  on the regulatory structure to make a
20  determination of what is good enough to be
21  licensed in our country, and then we depend
22  on physicians to make choices for us about
23  what the particular vaccine is they
24  administer to the kid.
25          So, yes, parents are concerned.

Page 93

1      T. McGuire - Highly Confidential
2  There is a set of, you know, institutions
3  in place that should mostly allay those
4  fears.  But the brand loyalty, I still
5  don't see why that would be a factor here.
6      Q.  Okay.  So you said there are
7  people among us that like new things,
8  right?
9      A.  I did say that, yes.
10      Q.  So there could be some patients,
11  then, that would have a -- would favor the
12  new vaccine?  Is that what you're saying?
13      A.  I'm responding to your kind of a
14  hypothetical to say there is a new one
15  versus an old one, wouldn't you expect some
16  people just to refer the old one because
17  somehow it's been around longer.
18          And while I think that's, of
19  course, possible, there is a countervailing
20  possibility, which is that people like new
21  things.  They think a new thing is new and
22  improved, maybe they think the testing has
23  been better, maybe they think the FDA is
24  more on of stuff now.  So it just didn't --
25  I just didn't see the general -- I wasn't

24 (Pages 90 - 93)

**Appx20214**

Page 94

1     T. McGuire - Highly Confidential
2 agreeing with your general proposition that
3 established vaccines would be favored over
4 new vaccines.
5     Q. So then patients' views in this
6 regard could vary is what you're saying?
7 It doesn't need to be one way or the other?
8     A. With respect to what?
9     Q. With respect to outcomes, whether
10 it be the experience of receiving a vaccine
11 or administration, that sort of thing.
12     MR. KODROFF: Objection. Vague.
13     A. I found it vague.
14     Q. Okay. So I guess you said -- let
15 me just take it as preference. You said
16 some people, patients, may want the new
17 vaccine, right? Because they like new
18 things. That was your testimony.
19     A. Yes. But it was -- yes.
20     Q. And then by the converse, it
21 could also be true, right, that some
22 patients may like the product that's been
23 on the market for 40 years, right?
24     A. Yes. And just to be clear how
25 I'm answering that question, I'm agreeing

Page 95

1     T. McGuire - Highly Confidential
2 with you with the understanding that it's
3 kind of a hypothetical. You're saying
4 there is these two products, maybe
5 consumers know the same thing about them,
6 or they're both been approved by the FDA,
7 and for the same use.
8     And so as far as patients go, the
9 only thing they know is one is old and one
10 is new. In that context, might some prefer
11 the old? Yes. Might some prefer the new?
12 Yes. Might some say either one is fine?
13 All those three are possible.
14     Q. And isn't it right that physician
15 demand for a particular vaccine is derived
16 demand. So it's derived from its patient
17 population; isn't that true?
18     A. Yeah, I will generally agree with
19 that, that the physician is the direct
20 purchaser and has a demand that's
21 reflective of the uses that demand -- that
22 product will be put.
23     So in a sense, it is -- so I'm
24 agreeing with you, yes. Just to clarify
25 what I mean by "derived demand" -- there is

Page 96

1     T. McGuire - Highly Confidential
2 actually a very formal notion of what that
3 is -- but the general idea is there is a
4 production process over here, say,
5 producing health for kids, and the
6 physician is choosing inputs into that that
7 lead to a derived demand in that case for
8 vaccines.
9     Q. Right. And you've written about
10 physicians acting as agents for patients,
11 right?
12     A. Yes, I have.
13     Q. And that model applies here,
14 right, physicians are acting as agents for
15 their patients in terms of the purchase of
16 particular vaccines; isn't that correct?
17     A. That general approach, yes, would
18 apply here.
19     Q. You're a professor at Harvard
20 Medical School, right?
21     A. Yes.
22     Q. What courses do you teach?
23     A. Well, I, for the last several
24 years, I don't have a formal - these are
25 scare quotes - I don't have a formal

Page 97

1     T. McGuire - Highly Confidential
2 teaching obligation, but I do run
3 essentially a course on a voluntary basis.
4     Q. And what is that course?
5     A. It's -- it may even have a number
6 at Harvard, I'm not sure. But the course
7 consists of approximately weekly meetings
8 with what we call our G2s, which means our
9 second year graduate students in the Ph.D.
10 program in health policy who are
11 concentrating in economics, or in health
12 economics. At the end of their second
13 year, they take two exams, a qualifying
14 exam: One is a health economics exam and
15 one is a health policy exam that is like a
16 gateway into the dissertation process. And
17 I run this review session where we meet
18 every week. We go back over some basics.
19 We look for soft spots in the things that
20 they know. We look at past questions. We
21 do past questions. I give them practice
22 exams. I grade those practice exams.
23     So it's kind of a course
24 equivalent that is like maybe a booster, if
25 we use the vaccine analogy, to learning

Page 98

T. McGuire - Highly Confidential

1 T. McGuire - Highly Confidential
2 health economics.
3     Q. Okay. And have any of the
4 courses that you've ever taught at either
5 Harvard or elsewhere involved -- did the
6 curriculum relate to vaccines in any way?
7     A. Relate to vaccines in any way.
8     Q. Did you ever teach students about
9 the economics of vaccine markets?
10     A. You know, I think in this review
11 session that I'm talking about the past few
12 years, issues come up around product
13 development and investment in R&D, that I
14 may have used vaccines as an example, which
15 is -- I'm not -- it seems likely, but I
16 don't recall 100 percent.
17     Q. Okay.
18     A. You're asking ever, in the
19 courses that I've ever taught? So I need
20 to go back --
21     Q. I'm just trying to make this
22 quick, for your sake and for ours. Sitting
23 here today, can you think of any time at
24 which you ever taught students about the
25 economics of vaccine markets?

Page 99

1 T. McGuire - Highly Confidential
2     A. In any course I've ever taught,
3 and that's still what you mean?
4     Q. We can go through everything if
5 you like.
6     A. Well, you asked, so.
7     Q. I'm asking the question, so why
8 don't you answer it.
9     A. Okay. I taught health economics
10 at Harvard in a regular graduate course
11 several years ago. I think it was probably
12 on the reading list.
13     Q. Okay. What specifically was on
14 the reading list?
15     A. I probably put my own paper on
16 the reading list.
17     Q. Okay.
18     A. And I taught health economics at
19 BU for many, many years. And there, I
20 don't remember frankly.
21     Q. Okay. You are currently a
22 research associate at The National Bureau
23 of Economic Research; is that right?
24     A. That's correct, yes.
25     Q. And you've done that since 2012?

Page 100

1 T. McGuire - Highly Confidential
2     A. Sounds right.
3     Q. And has any of your research for
4 The National Bureau of Economic Research
5 pertained to the vaccine industry?
6     A. To understand what the NBER is,
7 if I could use the abbreviation --
8     Q. Sure.
9     A. -- it's an association of
10 economists that includes things other than
11 health. It's a kind of honor to be
12 included as a research associate. And then
13 it's voluntarily on the part of the
14 associates to have papers included as what
15 are called working papers.
16         And so what the NBER does is
17 provide a kind of early outlet for research
18 that might take quite a while to wind
19 through the journal and referee process.
20 It's kind of a self-administered thing. If
21 you are a member, you submit the paper,
22 they take it, they published it as an NBER
23 working paper.
24         I have done a number of these.
25 And at least one that I can think of was

Page 101

1 T. McGuire - Highly Confidential
2 about the pharmaceutical industry that has
3 application to drugs generally, and even to
4 vaccines.
5     Q. Do you remember the name of that
6 article?
7     A. It was a review with Ernie Berndt
8 and Joe Newhouse, and it's something
9 general like "The Economics of the
10 Pharmaceutical Industry." Something like
11 that.
12     Q. Okay. What are the most reliable
13 publications on vaccine economics in your
14 mind?
15     A. Well, with respect to what?
16     Q. With respect to vaccine
17 economics.
18     A. Vaccine economics are like health
19 economics. I mean, it's a little broad.
20 What is the question are you trying to
21 address in order to consult the literature?
22     Q. The general --
23     A. Just as an example, perhaps.
24     Q. Let's try the general operations
25 of vaccine markets. What would be the most

26 (Pages 98 - 101)

Appx20216

Page 102

1     T. McGuire - Highly Confidential
2 reliable publication in your view?
3     A.  The one that I -- that first
4 comes to mind is a particular paper, but
5 it's I think an example of the type of
6 outlet, is the paper by Fiona Scott Morton
7 and Margaret Kyle, which is in something
8 called the Handbook of Health Economics.
9        And these handbooks come out
10 around every ten years, and they're meant
11 to be resources for researchers and
12 graduate students.
13       And so they're very prominent
14 people.  Fiona Scott Morton and Margaret
15 Kyle are both well-recognized researchers
16 in pharmaceutical economics.  Their charge
17 is to review the literature, to make sense
18 of it, to identify questions that still
19 need answering.
20       So they're major enterprises for
21 people who are doing those reviews.  So
22 there is one of those in the Handbook of
23 Health Economics Volume 2 by Fiona and
24 Margaret.  And there is one in the Handbook
25 of Health Economics Volume 1 by William

Page 103

1     T. McGuire - Highly Confidential
2 Scheer, who is an older guy at the Harvard
3 Kennedy School, who is also a well-known
4 researcher on pharmaceutical economics
5 generally.
6        Now, the other kind of sources
7 that one would look to are the sources that
8 you would look to in general in health
9 economics.  Vaccine economics is a legit
10 set of questions within the broader field
11 of health economics.
12       There is not, as far as I know, a
13 journal called Vaccines, at least one that
14 economists write in and read frequently.
15 So the kind of mainstream journals in
16 published health economics like the Journal
17 of Health Economics, like a journal called
18 Health Economics would be places that I
19 would look.  And then there is edited
20 volumes, some of which are pretty good,
21 that review these things.
22       So there is a pretty wide range
23 of good sources I think.
24     Q.  What about the Berndt and
25 Denoncourt text that you cited in your

Page 104

1     T. McGuire - Highly Confidential
2 report, would that be something that you
3 would view as reliable?
4     A.  I know Ernie well, and I regard
5 him as a reliable -- maybe that's not the
6 right word, but a well-respected researcher
7 in this area, and it's something that I
8 consulted.
9        So, in general, I think it would
10 be a useful source, yes.
11     Q.  You said that you would regard
12 Dr. Berndt as a respected researcher in the
13 field of vaccine economics?
14     A.  Or in pharmacy generally, yeah,
15 and including vaccines.
16     Q.  Would you say the same thing
17 about Dr. Danzon?
18     A.  I'm not going to say anything bad
19 about anybody, unless I have to.  Both of
20 them I respect.  And, yes, I think she's a
21 good economist.
22     Q.  But you don't always agree with
23 her views is the -- is what I'm taking from
24 your testimony; is that fair?
25     A.  I wasn't implying anything

Page 105

1     T. McGuire - Highly Confidential
2 really, except I am a little bit
3 uncomfortable in talking about people.  I'd
4 much rather talk about issues or ideas.  I
5 don't like making personal comments.
6     Q.  Fair enough.  I was just trying
7 to latch onto the "well-respected
8 researcher" comment.
9     A.  There was no hidden message.
10     Q.  Do you have a view as to whether
11 Dr. Danzon's work is reliable with respect
12 to vaccine economics?
13     A.  I would, in order to make that
14 determination, in people -- I'm speaking
15 generally now -- economists and others who
16 I respect, I don't always agree with
17 everything they say.
18       So in spite of the regard I might
19 hold someone in, then it really is a
20 question of the particular thing you're
21 asking about.
22     Q.  Okay, fair enough.  Fair enough.
23       You've never worked in the
24 vaccine industry, correct?
25     A.  In terms of working for a

27 (Pages 102 - 105)

**Appx20217**

HIGHLY CONFIDENTIAL

Page 106

T. McGuire - Highly Confidential

1    manufacturer?
2    Q.  Correct.
3    A.  No, I've never worked in the
4    vaccine industry.
5    Q.  You've never worked for a company
6    that developed the vaccine; isn't that
7    right?
8    A.  That's correct.
9    Q.  And you've never worked at a
10   regulatory agency that has responsibility
11   for approving a vaccine; isn't that true?
12   A.  That's also correct.
13   Q.  And you've never been involved in
14   the submission of a BLA, correct?
15   A.  That's correct.
16   Q.  You have published two papers on
17   vaccines; is that correct?
18   A.  There is two papers that have
19   vaccines in the title.
20   Q.  Okay.  So there are two papers
21   that have vaccines in the title.  The one
22   is "Setting prices for New Vaccines (in
23   Advance)," and that was published in 2003;
24   is that right?

Page 107

T. McGuire - Highly Confidential

1    A.  That's correct.
2    Q.  And there is also -- was also an
3    article, a journal article, that was
4    written, "Overcoming Economic Barriers to
5    the Optimal Use of Vaccines," right?
6    A.  Those are the ones that I can
7    remember, yes.
8    Q.  And that was written in 2005?
9    A.  I'm not sure what the publication
10   is.  I don't remember.
11   Q.  Okay.
12   A.  It's on my CV.
13   Q.  Do you have any reason to think
14   it wasn't written in 2005?
15   A.  I don't remember the date.  It's
16   on my CV.  I would look at it just like
17   you're doing.
18   Q.  Your CV is in your report if you
19   want to look at it.
20   A.  Okay.  (Document review.)
21   Q.  It's on Page A-11.
22   A.  Okay.  There it is.  Okay.  It
23   was published in 2005.
24   Q.  Since 2005, have you written any

Page 108

T. McGuire - Highly Confidential

1    articles that specifically pertain to the
2    subject of vaccines?
3    A.  Well, I've written articles about
4    pharmaceuticals, as I'm sure you can tell
5    from my CV.  And vaccines are a drug, and
6    so there is some application.
7    Q.  In your mind, are there
8    differences between traditional
9    pharmaceutical, you know, small molecule
10   products and vaccines?
11   A.  Yes, there is differences.
12   Q.  Okay.  What are they?
13   A.  Well, maybe start with a
14   production side and then get to the demand
15   side.
16   On the production side, they
17   share a cost, which is normally referred to
18   in economics as a sunk cost, which has to
19   do with the basic research needed to
20   identify something that might be useful.
21   That process is a little
22   different in vaccines as it is in small
23   molecules.  It seems, from what I
24   understand, there to be on average a lower

Page 109

T. McGuire - Highly Confidential

1    cost per product in vaccines than there is
2    for the average small molecule drug in
3    terms of what the magnitude of what those
4    sunk costs are.
5    And then production also differs.
6    The vaccines are generally biologics, so
7    the production process is subject to
8    different regulations and is more difficult
9    to duplicate.
10   So with a typical small molecule
11   there's initially patent protection, which
12   is really necessary for a firm to maintain
13   an exclusive selling position in a market,
14   because it's not that difficult to make
15   atorvastatin.  And if it weren't for a
16   patent process, there would many other
17   competitors for atorvastatin.
18   So the production process is
19   different.  The barriers to entry, if I can
20   call them that, on the small molecule side,
21   patents are quite significant.  But they're
22   not as important on the biologic side.
23   Even without a patent, there can
24   be more of an effort needed on the part of

28 (Pages 106 - 109)

Appx20218

Page 110

1     T. McGuire - Highly Confidential
2 a potential competitor to be able to
3 replicate even a close substitute for a
4 vaccine.
5          On the -- I'm going to get it the
6 consumers in a minute.
7          And on the selling side -- let
8 me, I'll do consumers. For consumers, the
9 critical thing about vaccines is they are
10 often required. And it's a preventive.
11         So it's normally pills, if you
12 think of them, are designed to contend with
13 an illness that some people have and some
14 people don't have. Whereas, a vaccine is
15 meant to be given to healthy individuals,
16 and ideally given to nearly the full
17 population to not only protect the person
18 but to protect the whole population.
19         So that has to do with the nature
20 of demand, which is much less -- well,
21 demand is more kind of fixed because of
22 that. Each person should have one. And it
23 also affects the benefits of administration
24 of a vaccine versus a pill.
25         A pill typically helps the

Page 111

1     T. McGuire - Highly Confidential
2 person. Whereas, a vaccine not only helps
3 the person but it helps the herd by
4 providing some kind of herd immunity, which
5 in economics goes by the word
6 externalities.
7          And so these externalities are a
8 critical thing about vaccines that help
9 explain why the financing for them is
10 different, and why the price to consumers
11 is generally extremely low in order to not
12 just protect a person but to also help with
13 this herd immunity thing. And why there is
14 an extra reason for government intervention
15 in this market that doesn't exist in the
16 pill market that motivates the Vaccine for
17 Children Program. Whereas, you know,
18 relatively large sections of the population
19 were not getting vaccinated before the VFC,
20 and that's not a good thing, not only for
21 those kids but for other kids as well.
22    Q. That's helpful. I think -- I'm
23 sorry.
24         MR. KODROFF: Please.
25    Q. Were you finished?

Page 112

1     T. McGuire - Highly Confidential
2    A. I'll stop there.
3         MR. KODROFF: That's fine.
4    Q. So we started at the top of
5 today's deposition, and you told me that
6 you had given a deposition before, as
7 recently as earlier this year, correct?
8    A. I did say that. And, you know,
9 flipping through here I saw Solodyn was in
10 the end of 2017. So it may have seemed
11 like yesterday, but it was actually a few
12 months in the past.
13    Q. How many total cases have you
14 given deposition testimony in?
15    A. It is listed here for the past so
16 many years, but I won't consult that unless
17 you want me to. And, otherwise, I'd be
18 guessing. And I would guess --
19    Q. So since 2012?
20         MR. KODROFF: Objection. Let
21     him -- let him answer the question.
22    A. I would guess eight to ten, but
23 I'm really...
24    Q. And has that always been as an
25 expert witness?

Page 113

1     T. McGuire - Highly Confidential
2    A. Yes.
3    Q. Have you ever given trial
4 testimony in a case?
5    A. I have.
6    Q. How many times?
7    A. Three times.
8    Q. When was the most recent trial
9 you testified in?
10    A. Solodyn.
11    Q. Have you ever testified -- or let
12 me back up.
13         Have you ever submitted a report
14 other than this one on class certification?
15    A. I did some time ago. It's not in
16 the recent period that's listed on there.
17    Q. Okay. So it was prior to 2012?
18    A. Yes.
19    Q. Do you remember what case that
20 was in?
21    A. I just remember it as the name of
22 the company involved, which was Quest.
23    Q. Was that an antitrust case, do
24 you know?
25    A. I think so.

29 (Pages 110 - 113)

Page 114

1    T. McGuire - Highly Confidential
2    Q. Have you ever submitted a report
3 or provided testimony in a litigation
4 involving vaccines?
5        MR. KODROFF: Other than this
6 one.
7    Q. Other than this one.
8    A. No, I don't think so.
9    Q. Have you ever submitted a report
10 on behalf of a defendant in a case?
11    A. Oh, gosh, let me think.
12 Defendant. There was a case in which I was
13 an expert witness for a large drug company,
14 which shall remain unnamed, in which I was
15 just about to push the button, just about
16 to push the send button on my report, and
17 it settled.
18        So in simple answer to your
19 question, not that I can think of, but I
20 have worked as an expert for a defendant.
21    Q. Okay. And that's one time that
22 you can remember?
23    A. Oh, wait. Wait. There have been
24 several other times, including through
25 Analysis Group. It's all coming back to me

Page 115

1    T. McGuire - Highly Confidential
2 now.
3    Q. So how many times can you recall
4 that you've actually submitted a report or
5 testified on behalf of a defendant?
6    A. Well, through Analysis Group,
7 there was three that I can recall.
8    Q. And what are the names of those
9 cases?
10    A. I think the name is the managed
11 care litigation, which was a class action
12 against my client, and I worked for the
13 class of insurers. And for one insurer, it
14 was PacifiCare, it changed its name. But
15 it was a large California-based insurer at
16 the time.
17    Q. Okay.
18    A. And there were two cases that
19 were through Analysis Group that were kind
20 of sons and daughters of those, and kind of
21 smaller cases in a particular -- I guess,
22 it was also a class case I believe against
23 insurers and localities.
24    Q. And just to clarify, you
25 testified that you worked on behalf of the

Page 116

1    T. McGuire - Highly Confidential
2 class.
3    A. Not in these cases. I worked for
4 the defense. It was a class action. I
5 submitted reports and was deposed in the
6 managed care litigation. I submitted
7 reports, I don't remember whether I was --
8 when the settlement took place in the other
9 ones.
10    Q. Have any of your opinions offered
11 in litigation ever been excluded?
12    A. There is something that comes to
13 mind, but you may be asking a particular
14 legal question. By "excluded," what do you
15 mean?
16    Q. Have you been prohibited from
17 testifying by a court or has your opinion
18 been found unreliable by any court?
19    A. In Solodyn and in Nexium, which
20 I'll tell you about, there was an analysis
21 I did of stock price changes as a result of
22 a patent settlement.
23        And in the case of Solodyn, I
24 proposed uses for two different things:
25 One was to provide evidence on the

Page 117

1    T. McGuire - Highly Confidential
2 existence of anticompetitive effects. I
3 can explain it if that's important. And
4 that was admitted. I was allowed to
5 testify about that, which I was very happy
6 about.
7        And the other use I made of it in
8 my report was to estimate a counterfactual
9 date of what, once the parties would have
10 agreed to, had they not -- if had there not
11 been a reverse payment. And that part of
12 my analysis, the Judge decided I would not
13 be able to testify about.
14        In the Nexium case, was the first
15 time that this has been done as far as I
16 know. And Tom was the first one to use a
17 stock price study to shed light on the
18 anticompetitive effects and counterfactual
19 outcomes in a what's called reverse payment
20 cases.
21        So there Judge Young -- and this
22 has to do with the way the case went, and
23 I'm not going to be able to tell you what
24 the reasons were. But the case was going
25 over here, and Judge Young decided that

30 (Pages 114 - 117)

Appx20220

Page 118

1    T. McGuire - Highly Confidential
2  this was not going to be necessary for the
3  jury to hear.  So I didn't report that
4  analysis there.
5        Just parenthetically, it has been
6  accepted, that idea that was first proposed
7  by me in the Nexium case.  Einer Elhauge
8  used it, Scott Hemphill used it, and I got
9  to talk about it in Solodyn.
10       Although I think the answer to
11 your question is yes.  I overall find this
12 a professionally gratifying topic in my
13 career as an expert witness.
14   Q.  Okay.  Do you recall a case
15 called George versus Fresenius?
16   A.  There was two different Fresenius
17 cases that I was involved in, and that
18 probably was one of them.
19   Q.  Do you have a recollection of the
20 Court in its opinion characterizing your
21 opinion as unreliable?
22   A.  I actually don't have a
23 recollection of that.
24   Q.  Do you recall the Marshfield
25 Clinic case?

Page 119

1    T. McGuire - Highly Confidential
2   A.  I do.
3   Q.  And have you read the Seventh
4  Circuit's opinion in this case?
5   A.  I did.  This was some time ago,
6  but yes.
7   Q.  And you're aware that Judge
8  Posner found your opinion a little hard to
9  take seriously?
10   A.  I don't remember his exact words,
11 and maybe you're quoting his exact words,
12 but I know he preferred not to -- he went
13 in a different direction, shall we say.
14   Q.  When were you retained for this
15 matter?
16   A.  Some years ago.  It's been about
17 three years that I've worked on this.
18   Q.  Okay.  So backing up from today,
19 sometime in 2015?
20   A.  My first record of spending time
21 was June 2015.
22   Q.  And prior to this case, have you
23 ever worked with any of the counsel for the
24 Plaintiffs or the Relaters?
25   A.  I don't think so.

Page 120

1    T. McGuire - Highly Confidential
2   Q.  You're being compensated for your
3  time in this case at a rate of $750 an
4  hour; is that correct?
5   A.  That's correct.
6   Q.  Prior to being engaged by the
7  Plaintiffs and Relaters roughly three years
8  ago, had you heard about this litigation?
9   A.  No.
10   Q.  Okay.  How many hours roughly
11 have you spent on this case since you were
12 retained?
13   A.  My -- this is a guess.  I haven't
14 gone back to look at this.  My guess would
15 be 150 to 200 hours.
16   Q.  Did anyone assist you in the
17 preparation of your report?
18   A.  Yes.  I work with a litigation
19 support company called Greylock McKinnon
20 Associates.
21   Q.  I'm sorry, could you repeat?
22   A.  Greylock McKinnon Associates.
23 It's a Boston-based litigation support
24 company.
25   Q.  And did anyone from Greylock

Page 121

1    T. McGuire - Highly Confidential
2  McKinnon have a role in actually drafting
3  your report?
4   A.  Not the writing part or the
5  opinion part, but they helped me in various
6  ways.
7   Q.  What ways specifically?
8   A.  Finding stuff I'd say is the
9  biggest way, conducting data analysis, or
10 sometimes preparing -- well, not sometimes,
11 but preparing graphics and tables, which
12 isn't my forte.
13   Q.  In terms of the actual writing,
14 this report was written by you only?
15   A.  Yes, that's correct.
16   Q.  Were any parts of the report you
17 authored in this case taken from reports
18 that you've authored in other cases?
19   A.  You mean as in cut and paste?
20   Q.  Yes.
21   A.  I don't think so.  No.  Maybe my
22 qualifications, that probably they changed
23 slowly.  But this is different than other
24 things.
25   Q.  This is different from the

31 (Pages 118 - 121)

Page 122

1     T. McGuire - Highly Confidential
2 pay-for-delay cases, what you're saying?
3     A.  Yes, which I've done more of
4 those.
5     Q.  So Appendix B lists the list of
6 materials you considered in connection with
7 your report, correct?
8     A.  Yes.
9     Q.  Did you personally review all the
10 materials on the list of materials at
11 Appendix B?
12     A.  I looked at a ton of stuff.
13 I'm -- it seems like I did, yeah.  I can't
14 go down item by item, but I believe I
15 looked at most everything here.  I looked
16 at a lot of stuff.
17     Q.  Okay.
18     A.  Over the years.
19     Q.  There are three deposition
20 transcripts that are listed in Appendix B
21 to your report, and those are the
22 deposition transcripts of April Cohen,
23 Jorge Troncoso and Michele Taylor.
24     A.  Yeah, I'm there.  I see that.
25     Q.  Okay.  How were those three

Page 123

1     T. McGuire - Highly Confidential
2 depositions selected?
3     A.  Well, just generally the way the
4 documents would be selected, this refers
5 not to just depositions, but to the
6 literature and to the other documents.
7 Some I would know.  Say, the literature I
8 have a pretty good head start on what
9 things I would look at.  But the other
10 things are in response I would not do this
11 to the lawyers directly, but I would -- my
12 assistant at GMA, I would say, Keith, I
13 would like documents related to cost or
14 related to pricing or a deposition related
15 to those things.  And then he would help
16 select them.
17     Q.  So how it worked would be that
18 you would ask Keith, and that was the
19 person at Greylock who assisted you to
20 reach out to counsel for documents or items
21 on a particular topic?
22     A.  I think there was -- my
23 understanding of this is there's a kind of
24 document warehouse, whatever, that can be
25 searched.  And Keith did this directly.

Page 124

1     T. McGuire - Highly Confidential
2 You know, I looked for something on this,
3 he would try to find it.
4     There could have been some
5 attorney help here and there, but my --
6     Q.  So these were at -- I'm sorry.
7 Go ahead.
8     A.  My expectation was that Keith
9 would find anything pertinent to the kind
10 of analysis I was doing.
11     Q.  And so you relied on Keith to
12 track down information that was pertinent
13 for purposes of your analysis in this case?
14     A.  He was a big help, yes.
15     Q.  What's Keith's last name?
16     A.  Drake, D-r-a-k-e.
17     Q.  Were there any documents or
18 materials that you were, for whatever
19 reason, not permitted to review that you
20 would have wanted to review in putting
21 forth your opinions in this case?
22     A.  There was no barriers to me in
23 terms of, as far as I know, of the
24 available documents to what I was able to
25 review.

Page 125

1     T. McGuire - Highly Confidential
2     Q.  Okay.  And so the -- as far as
3 you're aware, the full discovery record in
4 this case was made available to you in
5 connection with your report?
6     A.  As far as I'm aware, that's
7 correct.
8     Q.  In connection with your report,
9 did you review the CDC and ACIP statements
10 about the safety and efficacy of the MMR
11 vaccine?
12     A.  I would have to take a look.
13     Q.  Well, let me ask you this.  Was
14 there anything that you reviewed in
15 connection with this report that is not
16 listed in Appendix B?
17     A.  Oh, gosh.  I don't -- you know, I
18 don't remember what all these things are.
19 I'm a little bit at your mercy at this
20 question.  So I don't know of anything.
21     Q.  Okay, that's fair.
22     In between submitting this
23 report, or I guess finalizing this report
24 is the best way to say it, and today, have
25 you reviewed any additional materials that

32 (Pages 122 - 125)

Appx20222

Page 126

```
 1      T. McGuire - Highly Confidential
 2  are not listed in this Appendix B?
 3      A.  Yes, I have.  And, primarily, the
 4  Defendant expert reports.
 5      Q.  All of them?
 6      A.  No.  There is probably more, but
 7  I reviewed three.
 8      Q.  Okay.  And which three were they?
 9      A.  They were Cremieux, Freed and
10  Rao.
11      Q.  What did you do to prepare for
12  this deposition today?
13      A.  Well, I was very interested on
14  what the three opposing experts would have
15  to say, so I read their reports.  And I'm
16  in the process of formulating what I think
17  about them.  So I have some thoughts, but
18  it's, obviously, incomplete.
19      And then I went back to my report
20  and just made sure I read it carefully and
21  what I said and what my assignment was,
22  refreshed myself on some of the documents
23  to make sure I'm as prepared as possible
24  for what questions you might have today.
25      Q.  And other than the three expert
```

Page 127

```
 1      T. McGuire - Highly Confidential
 2  reports that you described, Pierre
 3  Cremieux, Mohan Rao and Gary Freed, what
 4  other documents did you look at?
 5      A.  Nothing comes to mind.  Now, I
 6  may be forgetting something, but nothing
 7  comes to mind.
 8      Q.  Did you meet with counsel for
 9  Plaintiffs or Relaters at all in connection
10  with your preparation for this deposition?
11      A.  Yes.
12      Q.  And when did you do that?
13      A.  I first met counsel yesterday,
14  and we had maybe two phone conversations
15  prior to that about -- primarily about the
16  deposition.
17      Q.  If we were to total up the
18  telephone conversations and the meeting you
19  had yesterday, how long do you think you
20  met with counsel in connection with your
21  preparation?
22      A.  I would say maybe four, four and
23  a half hours.
24      Q.  Did you take any notes while you
25  were preparing?
```

Page 128

```
 1      T. McGuire - Highly Confidential
 2      A.  I did.
 3      Q.  Did you bring them with you
 4  today?
 5      A.  I did not.
 6      Q.  Where are they?
 7      A.  At home.
 8      Q.  And when did you take those
 9  notes?
10      A.  I think I took some during the
11  phone conversations, and I know I took some
12  yesterday.
13      Q.  You said that you are in the
14  process of formulating your views about the
15  Defendant's expert reports, but you haven't
16  finished; is that right?
17      A.  That's correct.
18      Q.  When do you intend to finish
19  formulating those views?
20      A.  I really haven't settled on a
21  date.  It really depends on what is
22  expected to me going forward in terms of
23  any other reports or other work I may do in
24  this case.  It's not clear to me what or
25  when I will do things.  So I can't -- I
```

Page 129

```
 1      T. McGuire - Highly Confidential
 2  don't know.
 3      Q.  Do you expect to submit another
 4  report in this case?
 5      A.  I haven't been asked, so I -- I
 6  just try to play my part here, and I
 7  haven't been asked to do that.
 8      Q.  Okay.  I'd like to turn, if you
 9  would, to Paragraph 3 of your report.
10      You're ahead of me I see.
11      A.  I'm there.
12      Q.  Paragraph 3 sets forth a summary
13  of your opinions in this case, does it not?
14      A.  That's correct.  Yes.
15      Q.  And the opinion you offer in
16  respect -- or in bullet one of Paragraph 3
17  is that "Merck had market power with
18  respect to the pricing of the Mumps
19  Vaccine"; is that correct?
20      A.  That's correct.
21      Q.  And does that conclusion apply to
22  MMR II, the product?
23      A.  Yes.
24      Q.  And ProQuad?
25      A.  Yes.
```

33 (Pages 126 - 129)

Page 130

1    T. McGuire - Highly Confidential
2    Q.  No other products, correct?
3    A.  "No other."  I was only concerned
4 with this part of the vaccine market.
5    Q.  That's not a trick question.
6    A.  Pardon me?
7    Q.  It's not a trick question.  I was
8 just confirming that it's no other products
9 besides those two.
10    A.  No, those are the two that I
11 opine about.
12    Q.  And are you offering this opinion
13 that Merck has market power with respect to
14 mumps vaccine, are you offering that
15 opinion with respect to the public and
16 private sector?
17    A.  Well, yes.  In a word.
18    Q.  And your conclusion about Merck's
19 market power is based in part on your
20 Lerner Index, right?
21    A.  In part, yes.
22    Q.  Besides the Lerner Index, what
23 else do you base your opinion about the
24 extent to which Merck had market power --
25 sorry.

Page 131

1    T. McGuire - Highly Confidential
2    Other than the Lerner Index, what
3 is the basis for your conclusion that Merck
4 had market power with respect to the
5 pricing of mumps vaccine?
6    A.  It was the only seller.
7    Q.  So those are the only two things?
8    A.  Well, I started with what is
9 sometimes called indirect evidence, which
10 says what is the market, what share does a
11 firm have in that market.  The market is
12 the Merck's mumps -- the market is mumps
13 vaccines.  Merck is the only seller.  So
14 that's strong evidence.
15    Then I also investigated what's
16 called direct evidence, sometimes that has
17 to do with their practice of pricing.  And
18 that's where the Lerner Index comes in, and
19 they are pricing much higher than marginal
20 cost, which is the kind of evidence that
21 fits into the indirect categories.
22    Q.  So let's talk about your Lerner
23 Index for a second.  You use list prices to
24 conduct your Lerner Index analysis,
25 correct?

Page 132

1    T. McGuire - Highly Confidential
2    A.  I do.  Do you want me to turn to
3 something in particular?
4    Q.  No.
5    A.  Okay.  Yes.
6    Q.  And you used average cost data
7 from a publication from 1995 to conduct
8 your Lerner Index, correct?
9    A.  Well, there was more to it than
10 that.  It wasn't just a single publication
11 that indicated to me what the range of
12 costs were.  That was maybe the one I used
13 to make the particular numerical
14 calculation, but the support for that comes
15 from other documents as well.
16    Q.  Okay.  And are those documents
17 cited in your report?
18    A.  Yes.
19    Q.  Did you actually use Merck cost
20 data in conducting your Lerner Index
21 analysis?
22    A.  I used the documents cited in my
23 report, which talk about Merck's cost data.
24    Q.  And so the figure that you
25 conducted, or that you used, in performing

Page 133

1    T. McGuire - Highly Confidential
2 your Lerner Index with respect to cost is
3 from Merck documents; is that your
4 testimony?
5    A.  Some of it is from Merck
6 documents; some of it is from other
7 sources.
8    Q.  So it's an amalgamation of Merck
9 documents and other sources; is that
10 testimony?
11    A.  Well, it's not -- I wouldn't call
12 it an amalgamation.  It's a synthesis of
13 both internal company and external
14 documents.
15    Q.  So it's not exclusively, then,
16 the 1995 publication?
17    A.  Well, I cite a number of things
18 regarding what the level of costs are.
19    Q.  In concluding that Merck had
20 market power, did you consider any external
21 constraints on Merck's prices?
22    A.  Can you explain what you mean by
23 "external constraints"?
24    Q.  Did you consider that possible
25 entry might constrain Merck's ability to

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1      T. McGuire - Highly Confidential
2 raise prices?
3      A. It's the -- the prices you
4 observe, say take the Lerner Index, which
5 identifies a price very high in relation to
6 marginal cost.
7          The economic analysis of that,
8 it's a profit maximizing price. And that
9 calculus of profit maximization depends on
10 demand elasticity, which is the thing that
11 the Lerner Index emphasizes. And I can
12 explain that more, if you would like me to.
13         And, just generally, it's a
14 reflection of the firm's economic position.
15 So they have maximized their profits, and
16 that's the price they've chosen to do that
17 in light of whatever factors on the demand
18 or the alternative supply side is -- are
19 influencing our decision.
20         So it's kind of built in. The
21 consideration for -- the example
22 consideration you just gave me, which other
23 considerations you could give me as an
24 example, they're kind of built in to the
25 profit maximization of the firm. So in

Page 135

1      T. McGuire - Highly Confidential
2 that sense, yes.
3      Q. Okay. So it's your testimony
4 that the Lerner Index, sort of by
5 definition of the model, would build in
6 constraints on Merck's pricing such as
7 potential competitive entry; is that right?
8      A. Yeah. By "profit maximization,"
9 an economist means the decisionmaker is
10 taking into account the factors that they
11 see relevant on the demand and the cost
12 side, and then this is the outcome of that.
13         So the interpretation of the
14 profit maximizing price embeds in it the
15 assumption that the decisionmaker is being
16 rational and taking into account the degree
17 to which the prices I choose might affect
18 decisions of my rivals, including regarding
19 entry.
20      Q. What about public relations
21 concerns, is the same true? So, in other
22 words, the profit maximization component of
23 the Lerner Index that you just described,
24 does that also assume that the firm takes
25 into account public relations

Page 136

1      T. McGuire - Highly Confidential
2 considerations in its pricing decisions?
3      A. Well, first of all, public
4 relations considerations is the luxury of a
5 monopolist. So the degree to which a firm
6 decides, well, maybe I shouldn't take quite
7 such high a price because of public
8 relations is an indication itself that this
9 firm has pricing discretion and is making
10 profits.
11      Q. So is it your --
12         MR. KODROFF: Objection. Is he
13 done answering?
14      A. Sorry. I'm close to being done.
15         And so, yes, in direct response
16 to your question, this might be a factor
17 that a rational company would take into
18 account. It might think if we are too
19 aggressive in our pricing, it could be that
20 regulators might be irritated at us and
21 make our life more difficult. It's a kind
22 of an economic consideration that would be
23 reflected in profit maximization.
24      Q. Is it your testimony that only
25 monopolists take into account public

Page 137

1      T. McGuire - Highly Confidential
2 relations concerns when setting prices?
3      A. Firms with no market power don't
4 set prices. They have the price at -- the
5 price the market forces them to do. Profit
6 maximization is the only thing they can do.
7      Q. Okay. So it's your testimony
8 that only firms with monopoly power have
9 the discretion to set prices?
10         MR. KODROFF: Objection.
11 Misstates what he testified to.
12      A. Well, that's -- well, that's
13 you're just repeating a definition, and
14 it's not really what I just said in any
15 form.
16      Q. Okay. I'm just -- how was I
17 wrong?
18      A. The -- I'll just repeat my
19 statement earlier, which was that a firm
20 that's in a competitive market is what's
21 called a price taker. And that means the
22 firm has the price given to it. It can't
23 decide anything about price.
24         Once a decision about price can
25 be made, in other words, once a firm has

35 (Pages 134 - 137)

Appx20225

HIGHLY CONFIDENTIAL

Page 138

T. McGuire - Highly Confidential

1 market power to be able to decide about
2 price, then profits will almost certainly
3 be part of that. But if there's something
4 else, that I don't want to look bad in my
5 community, for example, and even though I'm
6 the only restaurant on Main Street and I
7 could be charging, you know, $7 for
8 scrambled eggs, I just decide not to do
9 that because I want to be a good citizen.
10     And those things I'm sure happen.
11 But it's a sign that the firm has
12 discretion about what the prices are.
13     Q. You testified earlier that the
14 Lerner Index in this particular alleged
15 market were, quote -- that that was, quote,
16 very high.
17     A. Yes.
18     Q. And you also testified, right,
19 that you used list prices, correct, for
20 doing a Lerner Index?
21     A. Yes.
22     Q. But list prices don't necessarily
23 reflect discounts; isn't that true?
24     A. Not necessarily.

Page 139

T. McGuire - Highly Confidential

1     Q. And if the -- if you used net
2 prices, i.e., those prices that reflected
3 discounts, isn't it true that the Lerner
4 Index calculation would be different?
5     A. Well, there's a -- I mean,
6 there's a -- you're correct in the math,
7 which is to say if you look at the Lerner
8 Index formula P minus C over C, that if you
9 move the P down, the Lerner Index is going
10 to fall.
11     So your math is correct, but
12 it's -- the Lerner Index is so high and
13 it's -- you can even do a Lerner Index in
14 relation to the public prices, which if you
15 make -- and I think either one of your
16 experts did this somewhere -- if you figure
17 a markup over the public price, and say
18 they wouldn't sell to the public price
19 unless they were at least covering their
20 cost, so there must be at least an upper
21 bound of cost, then you're still going to
22 get a very, very high Lerner indices.
23     Q. Did you conduct a Lerner Index
24 analysis with respect to actual sale

Page 140

T. McGuire - Highly Confidential

1 prices?
2     A. You know, I don't remember if I
3 did that in that part of the report. But
4 if I did, it's there. If I didn't, I
5 didn't.
6     Q. Do you agree with the statement
7 that "Merck has been able to maintain a
8 price premium for its vaccine because of
9 superior quality of its strain"?
10     A. This is something that I refer to
11 in my report, and this is a paper by -- no,
12 I think it's a report -- well, I do refer
13 to it in my report. And Grabowski is
14 involved in there somehow. It's either his
15 paper, or someone is reporting on
16 Grabowski's paper. I can't remember the
17 details about that. And that was a
18 perception, I think, the way I cast it.
19     So if competitors believe that my
20 product is very, very effective, then it
21 will set a standard that they might have to
22 meet.
23     So this case is about whether or
24 not that standard is accurate or not.

Page 141

T. McGuire - Highly Confidential

1     Q. Okay. So would you agree with me
2 that "Merck has been able to maintain a
3 price premium for its vaccine against MMR
4 because of the superior quality of its
5 strain"?
6     MR. KODROFF: Objection. Asked
7 and answered.
8     A. Price premium. "Premium" refers
9 to something like extra something. But
10 that's why I'm a little bit not clear what
11 you mean by "premium" in this case.
12     Q. If I told you that you wrote
13 these words in the article "Setting Prices
14 for New Vaccines (in Advance)," would you
15 have any reason to disagree with me?
16     A. I'm sure you will quote them
17 correctly. I trust you to quote them
18 correctly.
19     This was written, I don't know, a
20 while ago. Before any of this stuff came
21 to light.
22     Q. So when you say "any of this
23 stuff," what do you mean?
24     A. I mean this case.

36 (Pages 138 - 141)

Appx20226

Page 142

1      T. McGuire - Highly Confidential
2      Q.  And are you offering an opinion
3  as to whether the allegations in this case
4  are accurate?
5      A.  No.  I'm -- well, I'm offering
6  the opinion that at the time I wrote that
7  paper, there was a perception that Merck
8  had a superior product.  It may have been
9  not fully accurate.
10      Q.  And what is your basis for the
11  belief sitting here today that that
12  perception may not have been fully
13  accurate?
14      A.  Well, we are sitting here today,
15  so there are certainly reason to believe
16  that it may not be fully accurate.
17      Q.  And your reason to believe is
18  because the Plaintiffs and Relaters have
19  filed a complaint in this case?
20      A.  Well, and I was instructed in my
21  report to take that as a basis for my work.
22  But I read this material and I see Kesler's
23  report, and I say:  Well, this makes sense
24  to me, maybe there is an issue here.
25      Q.  But you're not offering an

Page 143

1      T. McGuire - Highly Confidential
2  opinion sitting here today that there is a
3  reason to believe that Merck's product is
4  inferior, are you?
5          MR. KODROFF:  Objection.
6      Inferior to what?  Vague.
7      Q.  You can answer, if you
8  understand.
9      A.  Well, I would ask you, inferior
10  to what?
11      Q.  That you're not offering an
12  opinion sitting here today that Merck's
13  mumps vaccine has zero value.  Let's try
14  that.
15      A.  Certainly not.
16      Q.  And you're not offering an
17  opinion as to the quality of Merck's mumps
18  vaccine, are you?
19      A.  That's outside my bailiwick.
20      Q.  Okay.  If you could turn to the
21  second bullet point in your report.  And it
22  says, Opinion 2, "Direct purchasers paid
23  more for Merck's Mumps Vaccine products
24  than they would have had Merck not made the
25  alleged misrepresentations and omissions

Page 144

1      T. McGuire - Highly Confidential
2  related to its Mumps Vaccine and the market
3  was served by competition instead of a
4  monopoly seller"; is that right?
5      A.  That's right.
6      Q.  And to get to this opinion,
7  you're assuming that certain allegations
8  made by Plaintiffs and Relaters are true,
9  correct?
10      A.  That's correct.
11      Q.  And I think you testified earlier
12  that you didn't do any analysis or
13  investigation to verify whether or not
14  those are true, correct?
15      A.  I didn't do any independent
16  investigation of that.
17      Q.  Okay.  Do you know whether --
18  well, let me back up.  Do you know what
19  ACIP is?
20      A.  Yes.
21      Q.  What is it?
22      A.  It's a committee that advises the
23  CDC about vaccines.  It's something like
24  the Advisor Committee on Immunization
25  Practices.  Something like that.

Page 145

1      T. McGuire - Highly Confidential
2      Q.  Do you know whether ACIP or CDC
3  relies on Merck's representations regarding
4  the efficacy of a vaccine when determining
5  whether to include it on the pediatric
6  dosing schedule?
7      A.  Can I say I would hope so?  I'm
8  not really sure about what their
9  determination practice is.
10      Q.  Okay.  So you have no opinion on
11  whether ACIP or CDC relies on the
12  representations of Merck when making
13  decisions with respect to the dosing
14  schedule?
15      A.  I'm not an expert in the FDA
16  process -- I'm sorry -- CDC process.
17      Q.  So it follows that you don't know
18  whether the CDC relies on Merck's
19  representations when it purchases the
20  vaccine, right?
21      A.  I'm not an expert on the FDC
22  [sic] decision-making process -- I'm sorry,
23  CDC.  I keep saying FDA.
24      Q.  In preparing your report, have
25  you considered any of the statements that

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1        T. McGuire - Highly Confidential
2    the CDC has made with respect to the safety
3    or efficacy of Merck's mumps vaccine?
4        A.  Oh, I don't remember all the
5    details about what I may have looked at.
6    I'm sorry.
7        Q.  Sitting here today, you don't
8    recall having reviewed the CDC statements
9    pertaining to the safety and efficacy of
10   the Merck mumps --
11       A.  That's correct.  I don't recall
12   whether I did or not.
13       Q.  It would be included in your
14   Appendix B if you did?
15       A.  Yes, it would.
16       Q.  Are you aware that since 1967
17   there has been a 99 percent reduction in
18   mumps?
19       A.  I am aware of a dramatic
20   reduction.  I think some of Freed's numbers
21   were a little funny.  But, yes, there has
22   been a big reduction.
23       Q.  Now, you assume that the alleged
24   misrepresentations and omissions that Merck
25   supposedly made with respect to its mumps

Page 147

1        T. McGuire - Highly Confidential
2    vaccine created artificial barriers to
3    entry, correct?
4        A.  That's correct.
5        Q.  And what artificial barriers to
6    entry are you referring to?
7        A.  I'm referring to barriers that
8    arise because the standard of efficacy
9    would be higher than it actually is --
10   actually should be.
11       Q.  The standard for efficacy that
12   was identified by the FDA; is that what you
13   mean?
14       A.  I mean the standard of efficacy
15   that was I guess contained on the label
16   that a potential competitor would say:
17   This is the standard, then that's easy.
18   The standard is higher, then that's harder.
19       Q.  Okay.  So what you're saying is
20   that the -- it erected an artificial
21   barrier to entry with respect to potential
22   rivals' perception of the efficacy of the
23   vaccine?
24       MR. KODROFF:  Objection.
25       Misstates what he has testified to.

Page 148

1        T. McGuire - Highly Confidential
2        A.  Well, maybe I should be clear, in
3    case there is any ambiguity about this.
4        Just, very generally, to achieve
5    a certain standard, it comes at a cost.
6    Something like purity.  And if a standard
7    is higher, then it costs more.
8        So my statement is only that a
9    higher standard, if the higher standard is
10   due to some misrepresentation, which I was
11   asked to assume, would mean that any
12   entrant would face a higher cost to meet
13   that standard than a lower cost.
14       Q.  And you were asked to assume that
15   misrepresentations resulted in a higher
16   standard in this case, right?
17       A.  Well, I was asked to assume the
18   misrepresentations occurred.
19       Q.  And that they also generated a
20   higher standard, right?
21       A.  Yes.  Yes.
22       Q.  And that's not something that you
23   did any independent analysis of, correct?
24       A.  Well, I'm -- as I answered a few
25   minutes ago, I'm giving you a very basic

Page 149

1        T. McGuire - Highly Confidential
2    economic interpretation of what would be
3    going on; that lower standard, low cost;
4    higher standard, high cost.  So it just
5    makes perfect sense to me that a false
6    standard would be associated with higher
7    costs of entry.
8        Q.  Other than -- did you do any
9    analysis of whether this, the alleged
10   misrepresentations in this case increased
11   the actual costs to GSK of entering the
12   market?
13       A.  Well, this -- I can speak from
14   general economic principals.  And I think
15   from a general economic principal
16   standpoint, it's clear that a higher
17   standard should lead to higher cost.
18       Someone with more detailed
19   familiarity with GSK, Coppman hopefully,
20   will be able to fill in on more about the
21   specifics of what they would had to have
22   done differently in order to meet different
23   standards.
24       Q.  By how much did the alleged
25   misrepresentations made by Merck increase

38 (Pages 146 - 149)

Appx20228

HIGHLY CONFIDENTIAL

Page 150

1    T. McGuire - Highly Confidential
2 the cost to GSK?
3    A.  See, that's the quantitative
4 part.  What I would -- what I can say as an
5 economist is there is a directional effect.
6 That, yes, higher standards means higher
7 cost.  How much higher cost is more in the
8 realm of a different kind of expert.
9    Q.  Okay.  Something you don't know.
10    A.  Something that I don't -- I don't
11 know the quantitative.  I'm very
12 comfortable with the qualitative, if you
13 understand what I mean, the directional
14 effect.  But the magnitude of them, I don't
15 have an independent estimate.
16    Q.  When you were asked to assume
17 that the alleged misrepresentations and
18 omissions created artificial barriers to
19 entry, did you also consider that there are
20 natural barriers to entry in a vaccine
21 market?
22    A.  Well, this is one of those
23 incremental things that, of course,
24 there's -- you just don't walk into a
25 vaccine market and start selling a vaccine.

Page 151

1    T. McGuire - Highly Confidential
2 It takes some effort.
3    So my economic comment on this
4 has to do with the increase in those
5 barriers as a result of an artificially
6 high standard.
7    Q.  So we can agree, right, that it
8 takes tens or even hundreds of millions of
9 dollars to launch a vaccine?
10    A.  From scratch, if you want to --
11 if that's what you mean.
12    Q.  Yes.
13    A.  So ground zero, those are the
14 kinds of numbers, yes.
15    Q.  And that's a substantial barrier
16 to entry in the vaccine market, correct?
17    MR. KODROFF:  Objection to form.
18    A.  Well, different people regard
19 these kind of subcosts differently as a
20 barrier to entry.  So I think if we can
21 avoid the name, if you're okay with that,
22 that the presence of the need to undertake
23 upfront investments is something that would
24 be required in order to enter.  I agree
25 with that.  And the higher those costs are,

Page 152

1    T. McGuire - Highly Confidential
2 the more difficult it is to enter.
3    Q.  Okay.  So when you said that your
4 analysis takes -- that this is an -- I
5 think you said that it was incremental,
6 right?
7    A.  Yes.
8    Q.  So what do you mean by that?
9    A.  I mean the statements that I've
10 been making in the last few minutes as
11 we've talked about this are that a higher
12 standard would require higher cost.  And so
13 that's what I mean by "increment."  If you
14 increment the standard, you have to
15 increment the cost.  So it was just kind of
16 a change, if that's clear.
17    Q.  Okay.  Does your analysis of
18 common economic impact and damages in this
19 case disaggregate the effects of the
20 increased costs to GSK of entering versus
21 the existing challenges to vaccine entry?
22    MR. KODROFF:  Objection to form.
23    Vague.
24    A.  I do think that's very -- I'm not
25 sure what to make of that question.

Page 153

1    T. McGuire - Highly Confidential
2    Q.  So I'm just trying to get at do
3 you value -- does your impact and damages
4 calculate -- analysis calculate the
5 incremental barrier to entry that was
6 allegedly caused by Merck's conduct?
7    A.  I pick up the story after that
8 takes place, which is to say my analysis
9 about how the world would have been
10 different had there be two instead of one.
11    You're going one step back to
12 say, what was the quantity of the change in
13 cost due to the alleged misrepresentations.
14 I did not calculate that.
15    Q.  And are you aware of any expert
16 in this case that has done that
17 calculation?
18    A.  I believe that's what
19 Mr. Coppman's report is about, how the
20 effect of the misrepresentation, how that
21 would have changed the calculus from the
22 standpoint of GSK, about whether they're
23 going to be entering or not.
24    Q.  But he doesn't do any
25 quantitative analysis, does he?

39 (Pages 150 - 153)

Appx20229

Page 154

1    T. McGuire - Highly Confidential
2    A.  Well, I think it's quantitative
3 analyses.  He comes up with numbers and
4 dates, so that qualifies to me.
5    Q.  Okay.  But he doesn't say, okay,
6 here is how much the increased cost of
7 entry to GSK had price effects?
8        MR. KODROFF:  Objection.  Vague.
9    A.  These are two separate reports,
10 and I don't think he did the price effects
11 and I didn't do the incremental costs.  But
12 I'm just trying to answer your question.
13    Q.  No, that's my understanding as
14 well.  I just want to try and see if we're
15 on the same page.  And we are.
16    A.  It's a good thing.
17    Q.  You also talk in this bullet two
18 about competitors being discouraged from
19 entering the U.S. market, and you talk
20 about it in the plural.
21    A.  Yes.
22    Q.  Who, other than GSK -- let me ask
23 you this.  Do you have an opinion as to any
24 other competitors besides GSK having been
25 discouraged by this alleged behavior?

Page 155

1    T. McGuire - Highly Confidential
2    A.  I can't identify any others than
3 GSK, but there could well be.  I didn't
4 mean to write my report about GSK.  I meant
5 to write it about competitors allowing for
6 the possibility there might have been
7 others.
8    Q.  But you're not aware of any
9 sitting here today other than GSK?
10    A.  No, I can't name any names.
11    Q.  And the discouragement that was
12 taking place, is that the increase in costs
13 that we were talking about?
14    A.  Yes.
15    Q.  Would you agree with me that
16 because of the low prices of vaccines
17 relative to pharmaceuticals, "Potential
18 vaccine manufacturers choose to allocate
19 development resources between regular drugs
20 (whose prices are essentially set by the
21 manufacturer with very high markups) and
22 vaccines (for which a very powerful public
23 buyer negotiates discounts)"?
24        MR. KODROFF:  Objection.  Vague
25    and compound.

Page 156

1    T. McGuire - Highly Confidential
2    A.  That makes a lot of sense.
3    Q.  So you would agree with that?
4    A.  I think I wrote that.
5    Q.  I think you did.
6        So what you're saying there is
7 that it's possible that because of the low
8 prices of vaccines relative to
9 pharmaceuticals, that potential entrants
10 could choose to allocate their internal
11 resources differently, away from vaccines,
12 right?
13    A.  Well, there is a -- I'm going to
14 get around to saying yes, but I just want
15 to put it in a little more general context,
16 which is this decision about what to pursue
17 with respect to investments of a
18 pharmaceutical company, as well as really
19 any R&D type operation, depends on what
20 they forecast the market will look like at
21 the time they develop a product; how many
22 people will buy it, what the cost of
23 production is, what price can we get.
24        So, generally, that's the kind of
25 accepted way that economists think about

Page 157

1    T. McGuire - Highly Confidential
2 these kind of investments, is to look ahead
3 to how the market functions.  And I decide
4 on the basis of likely profits where I
5 invest what funds I have for research.
6    Q.  Okay.
7    A.  That's a long way of saying that
8 I think that's a pretty reasonable
9 statement.
10    Q.  So let's say we had GSK, and on
11 the one hand there was -- its
12 decision-making was affected by this
13 purported increase in costs, but it was
14 also affected by research allocation within
15 the firm, does your model do anything to
16 break out the damages attributable to each
17 of those components of the decision-making
18 by GSK?
19    A.  I think, again, I pick up the
20 story post that.
21    Q.  Okay.
22    A.  That it's economically reasonable
23 to me to think if the investment prospects
24 of just imagine there being two things, an
25 MMR vaccine and something else.  If the

Page 158

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2  investment prospects of this get better,
3  say, because costs are now lower than I
4  thought they were, then that will cause a
5  reallocation of some of my funds to -- from
6  alternative one to alternative two.  So
7  that makes perfect economic sense to me.
8       But then that Coppman is
9  interpreting all of that and giving to me
10 dates when that internal process would have
11 led to different things than it led to
12 today, and that's where I pick up the
13 story.
14    Q.  Okay.  So an opinion -- in bullet
15 three of your report, you say, "All Class
16 members suffered a common economic impact
17 as the result of Merck's alleged
18 misrepresentations in the form of paying
19 higher prices for mumps vaccine."
20    MR. KODROFF:  Is that three or
21    two?
22    MR. FEE:  Oh, I'm sorry.
23    MR. KODROFF:  Just for the
24    record.
25    MR. FEE:  It's Paragraph 3, 2,

Page 159

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2  the second bullet.
3    MR. KODROFF:  Oh, okay.
4    A.  I see it.
5    Q.  And when you say -- and we'll
6  talk about this a little bit later -- but
7  when you say "common economic impact,"
8  you're referring to overcharges; is that
9  right?
10    A.  Yes.
11    Q.  In opinion number 4, and I'm just
12 using the bullets here, Paragraph 3, fourth
13 bullet, you testified -- or you say, "In
14 the presence of a competitor, making the
15 market for MMR vaccines a duopoly instead
16 of a monopoly, Merck's prices would have
17 been lower and its sales volume reduced,"
18 correct?
19    A.  Yes.
20    Q.  So it's your opinion that Merck's
21 prices would have been lower and members of
22 the putative class would have purchased
23 fewer doses; is that right?
24    A.  From Merck.
25    Q.  From Merck.

Page 160

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2       And that would be true in the
3  but-for world, right?
4    A.  Yes.
5    Q.  And so it's your opinion that the
6  new market entrant here, GSK, would have
7  captured some of the sales, at least, of
8  MMR to members of the putative class,
9  right?
10    A.  That's correct.
11    Q.  And in conducting your damages
12 and impact analysis, you kept the number of
13 doses constant in the but-for world, right?
14    A.  Yes.  This is the quantity part I
15 referred to at different times to say that
16 that was fixed.  And then the change in
17 price is how you sum up the damages.
18    Q.  Okay.  So notwithstanding that
19 you believe that Merck would have lost
20 volume in the but-for world, you keep the
21 volume of Merck sales constant, right?
22    A.  No.  I keep the volume of
23 purchases of vaccines constant.
24    Q.  And you attribute damages --
25    A.  In total.  In total in the

Page 161

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2  market.
3    Q.  And you attribute damages to all
4  of those purchases in the but-for world,
5  right?
6    A.  That's right.
7       THE WITNESS:  Could I ask for a
8    break?  Would that be all right?
9    MR. FEE:  Sure.
10    MR. KODROFF:  While we're here --
11 could we go off the record.
12    VIDEO TECHNICIAN:  It is
13 p m., we're going off the record.
14    (Proceedings recessed at
15 12:26 p.m., and reconvened at
16 p m.)
17    VIDEO TECHNICIAN:  It is 12:38,
18 and we're back on the record on media
19 number three.
20 BY MR. FEE:
21    Q.  Welcome back, Dr. Coppman.
22    A.  Thank you.
23    Q.  Dr. McGuire.  Apologies, we were
24 talking about Dr. Coppman.
25       Going back to your report in

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1    T. McGuire - Highly Confidential
2  Paragraph 3, the fourth bullet, you say,
3  "Private purchasers would have paid lower
4  prices for MMR vaccines."
5        And I take it that's in the
6  but-for world, correct?
7    A. Yes.
8    Q. Does that opinion assume that GSK
9  would have entered the market at a price
10  that is lower than Merck's price?
11    A. Not necessarily.
12    Q. Does it assume that GSK would
13  have entered at a price that is at parity
14  or lower?
15    A. Well, it -- that's closer. The
16  affect of the price decrement as a result
17  of entry is marketwide.
18    Q. Well, let's try this. So what if
19  in the but-for world GSK entered with a
20  vaccine that was non-inferior and also had
21  demonstrated less stinging at the injection
22  point, as you describe in Paragraph 87 of
23  your report.
24    A. Okay.
25    Q. Is it possible under those

Page 163

1    T. McGuire - Highly Confidential
2  circumstances that GSK could have entered
3  at a premium to Merck's vaccine?
4    A. Well, I'm, of course, not sure.
5  If the product is superior in some way,
6  which I think the hypothetical you're
7  asking me to think about is the only
8  difference between the vaccines is that the
9  GSK product has some favorable aspects?
10    Q. Yes.
11    A. There might be a differential
12  price that GSK would enter at.
13    Q. At --
14    A. Excuse me, just one follow-on.
15  It doesn't interfere with my calculations
16  if that were true.
17    Q. So tell me why that is.
18    A. The way I think about this, and I
19  think the way basic economics does, is we
20  have my demand curve and we have a fixed
21  quantity of purchase, then the -- if there
22  is no change in product quality, the lower
23  price times the quantity is a measure of
24  the damages that consumers are buying.
25        And you're changing the situation

Page 164

1    T. McGuire - Highly Confidential
2  a little bit. You're telling me that
3  there's a different product that comes into
4  the market that has a little bit more
5  benefit, which is the way an economist
6  would interpret your question, a little bit
7  more benefit than something else, and the
8  price might be a little bit higher. And I
9  sort of understand what your hypothetical
10  is.
11        But it doesn't mean that delta is
12  any different. It's either the demand
13  curve goes up a little bit and you're
14  saying the price goes maybe not quite so
15  far down, but the calculation still goes
16  through.
17    Q. Do you have a view -- let's say
18  in my hypothetical GSK came in at a
19  premium, would in your mind Merck be
20  incentivized to reduce its price in the
21  hypothetical?
22    A. Well, generally, competition is
23  liked by consumers and not liked by other
24  sellers.
25        So, again, I find it a --

Page 165

1    T. McGuire - Highly Confidential
2  sorry -- an incomplete hypothetical to tell
3  me that if they came in at a higher price,
4  but what about the product quality? Are we
5  back in previous, or are we, whatever, in
6  some different world?
7    Q. We're in the world in which GSK
8  has a non-inferior product, but it
9  demonstrated less stinging at the injection
10  point?
11    A. Okay. So you've got a slightly
12  better product.
13    Q. Yes.
14    A. And then there is entry, and so
15  that GSK is pricing a little bit higher
16  possibly to reflect its superior product.
17  That's the world you're asking me to talk
18  about?
19    Q. Correct.
20    A. I think it really isn't different
21  than the world that I analyzed; that a
22  little bit more benefit, a little bit
23  higher price, they cancel out.
24    Q. Okay.
25    A. So whatever competitive forces

42 (Pages 162 - 165)

Appx20232

Page 166

1     T. McGuire - Highly Confidential
2  would have been in play, they'd still be in
3  play.
4       Q.  So it's your testimony that
5  members of the putative class in this case
6  would still have been harmed uniformly if
7  GSK came in at a price premium?
8       A.  The economic force that I study,
9  which is the addition of a competitor into
10  a market for a highly substitutable
11  product, is going to lower the price that
12  people pay.
13       So that's still -- it's very
14  straightforward economics.
15       Q.  Even if the new entrant comes in
16  at a premium?  That's your testimony?
17       A.  Yes.  That is my testimony.
18       Q.  Did you --
19       A.  For the reasons I gave earlier --
20  rather than just having that free floating
21  there.  For the reasons I gave earlier,
22  that the, you know, somewhat higher value
23  would translate into a different demand
24  curve.  Meaning, that even with a premium,
25  the measure of damages to consumers would

Page 167

1     T. McGuire - Highly Confidential
2  be the same.
3       Q.  Did you -- let me ask it this
4  way.  You did not model a GSK but-for price
5  in connection with your analysis; isn't
6  that correct?
7       A.  It was no specific GSK price.
8  This was the market price would change.
9       Q.  So in opinion number six, I'm
10  going to use that.  This is the fifth
11  bullet in Paragraph 3 of your report, you
12  calculate damages on behalf of private
13  Plaintiffs or members of the class for MMR
14  using several, or at least -- I'm sorry --
15  using two entry dates, right?
16       A.  You're at the first bullet on
17  Page 3?
18       Q.  Yes.
19       A.  Okay.  Yes.
20       Q.  And we'll get to this -- some
21  detail on this a little bit later.  But
22  part of this analysis, you looked at other
23  yardsticks, correct?
24       A.  That's correct.
25       Q.  And those were for Hep A, Hep B

Page 168

1     T. McGuire - Highly Confidential
2  and rotavirus?
3       A.  That's correct.
4       Q.  And the two entry dates that you
5  note in this particular subparagraph, which
6  are March 2009 and January 2014, those were
7  provided to you by counsel, correct?
8       A.  That's correct.
9       Q.  And it's your understanding that
10  those two but-for entry dates came from the
11  report of Dr. or Mr. Coppman?
12       A.  Yes, that's correct.
13       Q.  And did you do any independent
14  analysis to determine whether those but-for
15  entry dates were reasonable?
16       A.  As I said a few minutes ago, it's
17  reasonable to me that there would have been
18  a higher likelihood of entry if the cost of
19  entry were lower.  That was the extent of
20  my economic analysis, if that fits into
21  that.
22       Q.  Okay.
23       A.  The actual dates were Coppman's.
24       Q.  Okay.  In your analysis of impact
25  and damages, by definition, requires entry

Page 169

1     T. McGuire - Highly Confidential
2  dates, right?
3       A.  I think so, yeah.
4       Q.  So if, let's say, for whatever
5  reason, the Court were to say: Dr. Coppman,
6  we think those entry dates that you put
7  forward are not reliable.
8       Are you with me so far?
9       A.  Yes.
10       Q.  Would you still be able to run
11  your analysis of impact of damages?
12       A.  Yes.  And, in particular, at the
13  time I developed my report and my approach
14  to this, I didn't know what the dates were
15  going to be.  So my model was set up to be
16  able to analyze entry at different dates.
17       So if for some reason these dates
18  aren't the ones that I'm instructed to
19  model, I can pretty readily use other
20  dates.
21       Q.  Understood.  But let's say there
22  were no dates for you to rely on.
23       A.  No dates.
24       Q.  There is nothing.  There is an
25  absence of dates.  You couldn't run your

43 (Pages 166 - 169)

Appx20233

HIGHLY CONFIDENTIAL

Page 170

1    T. McGuire - Highly Confidential
2 model, right?
3    A. It's not that I couldn't run my
4 model. It's I need dates. So unless you
5 tell me a date, I'm just kind of waiting
6 there.
7    Q. Right. Sure.
8        And you also calculate damages
9 based on those two dates using the sales
10 for ProQuad as well, right?
11    A. Yes.
12    Q. And in connection with that
13 analysis, you were instructed to assume
14 that if Merck had not made the alleged
15 misrepresentations and omissions related to
16 its mumps vaccine, ProQuad would never have
17 been approved by the FDA, right?
18    A. Yes, that's correct.
19    Q. So you're not offering the
20 opinion that in the but-for world with
21 respect to ProQuad, GSK would have launched
22 a quadrivalent vaccine, correct?
23    A. I don't believe so.
24    Q. And your model assumes that Merck
25 would have just sold more VARIVAX, right,

Page 171

1    T. McGuire - Highly Confidential
2 the standalone varicella vaccine?
3    A. Yes.
4    Q. Why is your opinion different for
5 ProQuad than it is for MMR?
6    A. I'm sorry. What do you mean by
7 that question?
8    Q. Why are the assumptions
9 different, to the extent you know?
10    A. The instructions I received were
11 different --
12    Q. Do you know why --
13    A. -- from counsel.
14    Q. Do you know why that is?
15    A. Do I know why? I think it's on
16 the basis of the legal consideration about
17 what they thought they could prove.
18    Q. Okay. But other than that, you
19 have no knowledge of why the instruction
20 was different?
21    A. No, I don't.
22    Q. Did you do any analysis or
23 independent investigation to ascertain
24 whether the assumption that the FDA would
25 not have approved ProQuad was reasonable?

Page 172

1    T. McGuire - Highly Confidential
2    A. I see the perspective that
3 something isn't as good as it's made out to
4 be might affect their approval, but I
5 didn't do any independent analysis of it.
6    Q. And you're not a regulatory
7 expert, are you?
8    A. No, I'm not.
9    Q. So going back -- I think you say
10 in the seventh bullet of this Paragraph 3,
11 and that would be the second from the
12 bottom. And it begins, "My methodology
13 equips me, if required by the Court, to
14 estimate damages to private purchasers in
15 circumstances in which the entry [date] of
16 a competitor for Merck takes the form of a
17 probability of entry in one or more years."
18    A. Yes.
19    Q. Does that capture what you
20 previously described as, you know, your
21 model being scalable such that if there
22 were a different entry date, you could
23 still do the calculations?
24    A. Yes, that's what I was getting at
25 when I answered that earlier question.

Page 173

1    T. McGuire - Highly Confidential
2    Q. What if -- if you were provided
3 with a but-for entry date of April of 2018,
4 would class members who did not purchase
5 between April 2018 to today be damaged
6 using your model?
7        MR. KODROFF: Objection. Calls
8    for a legal conclusion. Or,
9    objection, vague as to what you mean
10    by "damages."
11    A. So, well, I'm set up through
12 2017. So my first comment is 2018 is
13 outside the range I considered, so I
14 probably would have to modify the model to
15 incorporate a but-for world that begins in
16 April of 2018.
17    Q. Okay.
18    A. So I put that qualification on.
19        And then, I'm sorry, if you could
20 then follow up with what you were asking?
21    Q. Sure. So what was the last date
22 that you calculated damages by?
23    A. I only calculated to. I mean
24 through. I mean the damages through 2017.
25    Q. So let's say that you had an

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 174

1    T. McGuire - Highly Confidential
2 entry date of December 31, 2017.
3    A. All right.
4    Q. And would the class members who
5 did not purchase between December 31, 2017,
6 and today still be damaged using your
7 model?
8       MR. KODROFF: Objection to form.
9    A. Did the entry occur in the
10 morning or the evening?
11    Q. Does it matter?
12    A. Well, yeah. Tell me.
13    Q. The morning.
14    A. The morning, all right. So there
15 is class members who are buying New Year's
16 Eve are paying for the vaccine, and there
17 would be an impact of that on prices. So I
18 believe so, yeah, unless I'm missing
19 something in the question.
20    Q. How about the people who
21 purchased entirely before that time?
22       MR. KODROFF: Objection. Vague.
23    Q. Let me just ask it a simpler way.
24    A. I'm a little bit -- I'm not sure
25 I'm following what you're trying to get at

Page 175

1    T. McGuire - Highly Confidential
2 here.
3    Q. If class member -- if there is a
4 class member, a physician, who stopped
5 purchasing MMR vaccine on December 29,
6 2017, and you have a but-for entry date of
7 December 31, 2017, would that class member
8 be damaged under your analysis?
9    A. My analysis --
10       MR. KODROFF: Objection. Vague.
11       You can answer.
12    A. I would, by applying my model to
13 that one day in which there would be lower
14 prices, ideally I would take the quantities
15 on that day, purchased on that day, and
16 apply the damage methodology to those
17 quantities on that day. That would be
18 damages.
19       If sort of a data point doesn't
20 enter into those purchases on that day,
21 then that wouldn't be part of that
22 calculation.
23    Q. So the hypothetical I just
24 posited was this individual physician
25 stopped purchasing entirely before the

Page 176

1    T. McGuire - Highly Confidential
2 but-for entry day, the day before the
3 but-for entry day, would that individual
4 physician still be damaged using your
5 model?
6       MR. KODROFF: Objection. Vague.
7    A. That physician's quantities
8 wouldn't be in that calculation.
9    Q. But he would still be a member of
10 the class as it's defined; isn't that
11 right?
12    A. I'm -- yeah, or to the class.
13 That's something --
14    Q. Okay. But that physician would
15 not be damaged, but that physician would
16 still be part of the putative class as its
17 currently defined; isn't that correct?
18    A. Well, yes, the class had a broad
19 definition in terms of time, and then entry
20 occurs within a period that is later than
21 the beginning of the class period. So the
22 damages are tied to quantities, and I think
23 what we've been talking about follows from
24 there.
25    Q. Right. So I guess what I'm

Page 177

1    T. McGuire - Highly Confidential
2 trying to say is that particular doctor
3 would not have been harmed, but would have
4 been -- strike that -- would not have been
5 overcharged, but would still be a member of
6 the putative class as it's currently
7 defined; isn't that correct?
8    A. I hope I'm not missing something
9 here, but the calculation of total damages
10 is driven by the price times the quantity
11 in that period, in that range of days,
12 which in this case you're making it into a
13 day of quantities, and that's where -- and
14 if that quantity isn't associated with, you
15 know, some member, then there's no damages
16 that go along with that.
17    Q. Okay. In opinion number eight,
18 and I'm using this is the eighth bullet in
19 Paragraph 3 of your report, the bottom of
20 Page 3. Do you see where I am?
21    A. Yes.
22    Q. You calculate the sum of payments
23 made to Merck for MMR II and ProQuad under
24 CDC contracts from 2004 to 2017, right?
25    A. Right.

45 (Pages 174 - 177)

Page 178

1     T. McGuire - Highly Confidential
2     Q.  And then in the bullet below
3 that, you calculate penalties for that same
4 time period, is that right, under the False
5 Claims Act?
6     A.  That's correct.
7     Q.  For those last two sets of
8 calculations, you performed those based on
9 the instructions of Relater's counsel; is
10 that right?
11     A.  Yes.
12     Q.  And you said in your report that
13 you're not opining on their damages
14 theories or conducting any types of damages
15 analysis; is that correct?
16     A.  If I said it in my report, yes.
17     Q.  All right.  Well, let's look at
18 it.  In footnote 1 of your report, Page 1,
19 you say in the last sentence, "For
20 Relaters, I simply performed calculations
21 at their direction and am not opining on
22 their damages theories or conducting any
23 type of damages analysis"; is that correct?
24     A.  Yes, that's correct.
25     Q.  So you didn't do any independent

Page 179

1     T. McGuire - Highly Confidential
2 analysis to determine whether the
3 assumptions that you were provided by
4 Relater's counsel were reasonable; is that
5 true?
6     MR. KODROFF:  Objection.  Asked
7     and answered.
8     A.  I interpreted my assignment for
9 the Relaters as being kind of math:  Here
10 are the counts of things, and here is the,
11 you know, the payments or the penalties
12 associated with them, and I added them up
13 as instructed.
14     Q.  Okay.  So is it correct to say
15 that for the FCA portion of this, False
16 Claims Act portion of this, you simply
17 performed the arithmetic; is that right?
18     A.  It was a simple calculation.
19     Q.  You did the math, right?
20     A.  I did the math.  Excel did the
21 math.
22     MR. FEE:  This would probably be
23     a good time for a break.
24     VIDEO TECHNICIAN:  It is
25     p.m.  We are going off the record.

Page 180

1     T. McGuire - Highly Confidential
2     (Proceedings recessed at
3     1:02 p.m. for the lunch break.)

Page 181

1     T. McGuire - Highly Confidential
2     A F T E R N O O N   S E S S I O N
3     VIDEO TECHNICIAN:  It is
4     2 o'clock p m.  We are back on the
5     record on media number three.
6 BY MR. FEE:
7     Q.  Welcome back, Dr. McGuire.
8     A.  Thank you.
9     Q.  Have you ever reviewed Merck's
10 label for MMR II?
11     A.  I think I've seen it.  But I
12 review, I looked at it.
13     Q.  You have looked at it?
14     A.  I think so, yeah.
15     Q.  How about the label for ProQuad?
16     A.  I think so.
17     Q.  And do you know whether the label
18 for MMR II reports an efficacy number?
19     A.  I can't recall.
20     Q.  And the same question for
21 ProQuad.
22     A.  Same answer.
23     Q.  You offer the opinion in your
24 report that pricing in vaccine markets with
25 two or more competitors can be

46 (Pages 178 - 181)

Appx20236

Page 182

1      T. McGuire - Highly Confidential
2  characterized as Bertrand competition,
3  right?
4      A.  Not exactly, no.
5      Q.  You don't say that?
6      A.  What I'd like to do is go to what
7  I said, if you don't mind.  It's very
8  brief.
9      Q.  Okay.
10     A.  Paragraph 60 to 62 is where I
11  discuss this.
12     Q.  Okay.
13     A.  I discuss some background in the
14  literature Paragraph 60 and 61, and then my
15  view is Paragraph 62.
16     Q.  Let me ask you this question.  Is
17  your view that in the but-for world in this
18  case, there would have been competition
19  that could be characterized as conforming
20  to the Bertrand model?
21     A.  I really interpreted the -- of
22  the implications of a model in economics,
23  the way economists generally interpret
24  them, which is the model itself provides
25  insights.  And then that insight helps you

Page 183

1      T. McGuire - Highly Confidential
2  understand the process you're attempting to
3  study.
4      So the Bertrand model is
5  something that provides insights.  But as
6  you see here, this is what I take away from
7  that.
8      Q.  So it's not -- your opinion is
9  that the Bertrand model provides a tool for
10  understanding what would have happened in
11  the but-for world in this case, but it is
12  not the case that competition would have
13  conformed exactly to the Bertrand model?
14     A.  That's pretty good in terms of a
15  statement of my view.  Not so much a tool
16  as really an insight into the nature of
17  competition between two sellers of closely
18  related products.
19     Q.  And would you agree with me that
20  the Bertrand model is defined as an
21  "Oligopoly model in which firms produce a
22  homogeneous good, each firm treats the
23  price of its competitors as fixed, and all
24  firms decide simultaneously what price to
25  charge."

Page 184

1      T. McGuire - Highly Confidential
2      A.  I disagree with that.  You're
3  probably reading from some textbook
4  definition of the Bertrand model, but there
5  is alternative ways to think about it and
6  describe it.
7      The Bertrand model, as I
8  understand it, can apply to different
9  numbers of sellers.  It could be two, which
10  is a duopoly, or an oligopoly, as in your
11  example, or even a very large number of
12  sellers.  And if a seller behaves Bertrand,
13  which would be the shorthand for this is
14  what you're talking about here, the seller
15  takes the other's prices as given.
16     And that was the kind of
17  background discussion I was engaging in
18  here, and that's what I mean by Bertrand
19  model.  I've written about the Bertrand
20  model in the drug area, and that's the --
21  the way I developed the model.
22     Q.  So I just read a definition to
23  you.  And you said that you didn't agree
24  with that definition; is that right?
25     A.  I gave you my definition, which

Page 185

1      T. McGuire - Highly Confidential
2  the part of your definition which was a key
3  to it is that a seller regards the other
4  competitors' prices as given.  That's what
5  defines a Bertrand model.  It doesn't have
6  to be an oligopoly.  So it's a bit more
7  broad than the quote you read.
8      Q.  Would it change your view if I
9  told you that the quote that I read was
10  from the Pindyck text that you cited in
11  your report?
12     A.  No.  It the would not change my
13  view.
14     Q.  All right.  So, in your view, the
15  only criteria for Bertrand competition is
16  taking prices as fixed; is that right?
17     A.  Well, not the only criteria.
18  That's kind of the defining criteria of a
19  Bertrand model.
20     Q.  Are there other criterion?
21  Criteria, I should say.
22     A.  Well, there needs to be sort of
23  the typical things in an economic model of
24  seller behavior.  The demand conditions are
25  taken as given.  The degree of

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

T. McGuire - Highly Confidential

1 substitutability among the products is
2 something that could vary in the
3 application of Bertrand.
4 Normally the objective of firms
5 is profit maximization in the Bertrand
6 model that probably could be generalized.
7 Q. So -- I'm sorry.
8 A. That's all I have to say about
9 that.
10 Q. Okay. So is it a necessary
11 criteria for the Bertrand model to apply
12 that the products being sold by the
13 competitors are homogeneous?
14 A. No, it's not.
15 Q. Is the idea that this market
16 would at least -- would behave Bertrand in
17 some ways necessary to your opinions on
18 common impact and damages?
19 A. The necessary part for me is that
20 there would be price competition. So when
21 there are two rather than one, there is
22 competition between the two and it leads to
23 a lower equilibrium price. That's really
24 all that's carried forward from the -- from

Page 187

1 T. McGuire - Highly Confidential
2 this part of my report.
3 Q. Do you have an understanding of
4 whether Merck's MMR product and GSK's
5 PRIORIX product would be differentiated in
6 any way in the but-for world?
7 MR. KODROFF: Objection. Vague.
8 A. I'm not sure how to answer.
9 PRIORIX was not introduced in the
10 United States. So in a but-for world, it's
11 an assumption one would make.
12 Q. In your but-for world, what
13 assumption do you make with respect to
14 GSK's differentiation, or lack thereof, of
15 PRIORIX?
16 A. I would say that my analysis was
17 based on the idea that they were close
18 substitutes.
19 Q. If they weren't close
20 substitutes, let's say they were the two
21 products, PRIORIX and MMR II, were not
22 homogeneous, would that lead to different
23 effects on price in the but-for world?
24 A. The setup you really gave me two
25 branches there; "not homogeneous" is not

Page 188

1 T. McGuire - Highly Confidential
2 the same as "not close substitutes." You
3 could be close substitutes but not
4 homogeneous.
5 But to answer your question about
6 the nature of price effects in this realm
7 in which there is substitutability,
8 generally the effect in a Bertrand model is
9 downward pressure on prices, even without
10 homogeneity.
11 Q. So, then, the key is
12 substitutability, not necessarily
13 homogeneity, right?
14 So, in other words, if the
15 products aren't regarded as close
16 substitutes by the potential purchasers,
17 then there is not going to be downward
18 price pressure, right?
19 A. In the extreme, if they were
20 different markets, then that would be an
21 example of they're not substitutes at all.
22 Then the pricing over here doesn't affect
23 the pricing over here.
24 Q. So let's take a vaccine where the
25 products are close substitutes but not

Page 189

1 T. McGuire - Highly Confidential
2 homogeneous products.
3 A. All right.
4 Q. Would that lead to different
5 effects on prices in the but-for world for
6 different purchasers?
7 A. For different purchasers. Well,
8 the effect of competition would be the same
9 if they're close substitutes, which is to
10 say there would be downward pressure on
11 price. And I don't see any distinction
12 between the what we call perfect
13 substitutability and close substitutability
14 in terms of the impact on different buyers.
15 Q. So Bertrand competition, I think
16 you said that it's not the only
17 characteristic but maybe it's the defining
18 characteristic, is that firms take prices
19 as given; is that correct?
20 A. Take prices of their competitors
21 as given.
22 Q. Do competitors in a market that's
23 characterized by Bertrand competition also
24 move in lockstep; is that correct?
25 MR. KODROFF: Objection. Vague.

48 (Pages 186 - 189)

Appx20238

HIGHLY CONFIDENTIAL

Page 190

1     T. McGuire - Highly Confidential
2     A.  I mean, not necessarily.  I mean,
3  if I'm taking your price as given, I'd have
4  to see your price.  And then I'd react to
5  it, so.
6     Q.  You agree with me that physician
7  buying groups will negotiate prices on
8  behalf of their members, right?
9     A.  They represent the interest of
10  their members.  And lower prices are,
11  obviously, in the interest of the members.
12     Q.  And would a new entrant in this
13  particular market have any insight into the
14  contract prices that are charged to a
15  particular purchaser when they're entering?
16        MR. KODROFF:  Object.  You said
17     "this particular market."  I just
18     wasn't sure which market we're
19     talking about.
20     Q.  I'm sorry.  The alleged market
21  for mumps vaccine.
22     A.  And would an entrant have insight
23  into?
24     Q.  Would they know the prices that
25  have been negotiated by the physician

Page 191

1     T. McGuire - Highly Confidential
2  buying groups?
3     A.  Well, not automatically, but one
4  might discover them.
5     Q.  But they wouldn't know them in
6  advance, right?
7        MR. KODROFF:  Objection.  In
8     advance of what?
9        MR. FEE:  Of entry.
10        MR. KODROFF:  Thank you.
11     A.  They might.
12     Q.  But it's -- so do you have an
13  understanding of whether vaccine prices are
14  confidential?
15     A.  There is some confidentiality
16  associated with vaccine prices.  They're
17  not widely known.
18     Q.  So inasmuch as net prices for
19  vaccines are not widely known, is it true,
20  then, that a new entrant wouldn't
21  necessarily take those prices as given in
22  setting its own prices?
23     A.  So I understand your question as
24  questioning the Bertrand assumption --
25     Q.  I'm just asking --

Page 192

1     T. McGuire - Highly Confidential
2     A.  -- in taking prices given, or is
3  this about information?  I'm not sure what
4  you're asking.
5     Q.  Well, so new entrants -- so let's
6  take GSK in this example.  Would, to your
7  mind, would GSK have -- know what Merck's
8  net prices are to various of its customers
9  when setting its prices?
10     A.  They might.
11     Q.  And they also probably wouldn't,
12  right, because you said they are not widely
13  known; isn't that true?
14     A.  It doesn't mean if you send a
15  sales rep somewhere you're not going to
16  find out something.
17     Q.  And so your testimony is that you
18  believe that physicians would breach their
19  confidentiality obligations to the
20  supplier?
21        MR. KODROFF:  No, objection.
22     That's not what he testified to.
23     A.  That's not what I said.
24     Q.  Okay.  So your testimony is that
25  sales reps may collect this information on

Page 193

1     T. McGuire - Highly Confidential
2  behalf of the potential new entrant and
3  provide it back to the supplier?  Is
4  that --
5     A.  That's not what I said, either.
6     Q.  Okay.  Maybe you could just --
7     A.  I -- I don't know --
8     Q.  Let me try to rephrase it.
9     A.  We could take another look at it.
10     Q.  No, that's fine.
11        Are prices transparent, net
12  prices, transparent in vaccine markets to
13  your knowledge?
14     A.  That depends on to whom.
15  Obviously, they're known to the buyer and
16  the seller.
17     Q.  Two would-be competitors.
18     A.  "Transparent" would be too strong
19  a word to describe them.  So by that, I
20  mean perfectly clear.  You know, probably
21  not zero information, but not complete
22  information.
23     Q.  So if there is not complete
24  information about the incumbent's prices,
25  is it correct to say, then, that it's

49 (Pages 190 - 193)

Appx20239

HIGHLY CONFIDENTIAL

1    T. McGuire - Highly Confidential
2  impossible for a new entrant to take
3  that -- the incumbent's price as given?
4    A.  No.  I'm not sure why you would
5  say that.
6    Q.  Well, if they don't know the
7  prices, how can they take them as given?
8    A.  I -- you can assume that the
9  entrant would just say whatever they're
10 doing, they're going to continue to do, and
11 I'm going to assume no reaction to my price
12 offerings.  That's the Bertrand.
13    I don't necessarily need to know
14 exactly what those prices are to believe
15 that my rival will not react to what I do.
16    Q.  So it's your testimony that you
17 don't actually have to know what the
18 incumbent's prices are to make a
19 determination as to how the incumbent would
20 react upon entry?
21    A.  So this is a different question.
22 I didn't testify to that.  I think it needs
23 a fresh question, actually.
24    Q.  Okay.  Let's make it a fresh
25 question.

1    T. McGuire - Highly Confidential
2    A.  That wasn't my testimony.
3    Q.  What was your testimony?
4    A.  I'm not trying to play games, but
5  you asked me a different question than I
6  answered.  And you asked me, was it was my
7  testimony.  I said, no, it was not my
8  testimony.  What was my testimony?
9    Q.  I don't want to --
10    A.  It had to do with a previous
11 question.  We're going around in circles.
12    Q.  Indeed, we are.
13    Does a new entrant actually have
14 to know what the incumbent's prices are to
15 make a determination about how the
16 incumbent would react upon new entry?
17    A.  Well, this is a more general
18 question than in a particular model.  So
19 previously we just discussed Bertrand, and
20 there is nothing contradictory to a
21 Bertrand view of the world if the entrant
22 does not know for sure what the incumbent's
23 prices are.
24    The question I was just asked
25 didn't refer to a particular model.  You're

1    T. McGuire - Highly Confidential
2  asking more generally about competition in
3  the world.
4    Q.  Yeah.
5    A.  And in that case, I would imagine
6  an entrant would have to give thought to
7  the issue of what is going to happen after
8  I enter at certain prices, what will my
9  rival do.
10    Q.  And one component of giving
11 thought to that would require knowing what
12 the incumbent's actual prices are, isn't
13 it?
14    A.  Not necessarily, no.  I'm not
15 sure why you say that.
16    Q.  Is it your opinion that in the
17 but-for world as a result of -- well, let
18 me just -- let's separate this from
19 Bertrand.
20    A.  Okay.
21    Q.  Is it your opinion that in the
22 alleged market for mumps vaccine that
23 prices would have been down to marginal
24 cost in the but-for world?
25    A.  No, that's not my testimony.

1    T. McGuire - Highly Confidential
2    Q.  Is it your opinion?
3    A.  No, it's not my opinion.
4    Q.  So you're not offering the
5  opinion in this litigation that in the
6  but-for world prices would have been down
7  to marginal cost?
8    A.  That's correct.
9    Q.  Let's say that -- well, let me
10 ask you this.  Is it your opinion that in
11 the but-for world prices would have been
12 down to close to marginal cost?
13    A.  My understanding of what marginal
14 cost is in this time period was $6-ish.
15 And my but-for prices, I don't consider
16 them to be close to $6.  So I would say,
17 basically, no is the answer to that
18 question.
19    Q.  You identify three yardsticks as
20 part of your analysis in this case; is that
21 right?
22    A.  That's correct.
23    Q.  And I think we identified them
24 already, but just for the sake of
25 continuity, those are hepatitis A,

HIGHLY CONFIDENTIAL

Page 198

1     T. McGuire - Highly Confidential
2 hepatitis B and the rotavirus, right?
3     A. Yes.
4     Q. What was the purpose of
5 identifying those yardsticks?
6     A. To help me see what would help in
7 a but-for world in which there was a
8 duopoly instead of a monopoly.
9     Q. So you used those yardsticks as a
10 tool to try and understand what the but-for
11 world would look like in this case; is that
12 a fair statement?
13     A. That's a fair statement.
14     Q. And is it correct that you
15 selected hepatitis B, hepatitis A and
16 rotavirus because they are examples of
17 where Merck and GSK competed and they were
18 similar sales levels, right? Those were
19 the two criteria you used?
20     A. Yes. I looked at the options,
21 and Table 2 has them in a childhood
22 vaccine. And there were three that
23 satisfied that criteria.
24     Q. Okay. So just to be clear, it
25 was markets in which Merck and GSK

Page 199

1     T. McGuire - Highly Confidential
2 competed?
3     A. As duopolists.
4     Q. Only Merck and GSK competed,
5 right?
6     A. Yes.
7     Q. Similar sales levels, correct?
8     A. Broadly similar sales levels.
9     Q. And childhood diseases?
10     A. Childhood.
11     Q. You did not consider as any
12 potential yardsticks circumstances where
13 GSK launched a vaccine against an incumbent
14 other than Merck, correct?
15     A. Well, I considered many different
16 yardsticks. I think this part of my job
17 was to say: Here are -- here is the
18 experience of various vaccine markets, what
19 would be good yardsticks. And then so I
20 considered it, but I chose the ones -- the
21 three that you mentioned.
22     Q. How many did you consider -- how
23 many markets did you consider and reject
24 because they didn't meet the criteria?
25     A. Oh, I don't know. Table 2 has I

Page 200

1     T. McGuire - Highly Confidential
2 think the childhood vaccine. So I pretty
3 much narrowed it to childhood pretty
4 quickly, and then looked at market
5 structure within that, and then settled on
6 the three.
7     Q. Okay.
8     A. So I'm not sure what the count of
9 the adults, if you want to consider them
10 rejected. The count of others was -- I
11 would have to go through and figure that
12 out.
13     Q. But just to be clear, you haven't
14 considered -- you decided not to use as
15 yardsticks in connection with your report
16 examples where Merck was not the incumbent,
17 right?
18     A. Well, any of the others, I
19 considered all of them, but did not choose.
20 So, in that sense, rejected other markets.
21 All the other markets.
22     Q. Okay. In this particular
23 instance, the Merck mumps vaccine has been
24 on the market for close to 40 years. Do
25 you agree with that?

Page 201

1     T. McGuire - Highly Confidential
2     A. Yes.
3     Q. Did any of the yardsticks you
4 consider have a period in which -- have a
5 similar time period in which Merck was the
6 incumbent for more than a decade?
7     A. I don't think the difference
8 between the two is that magnitude; that is,
9 between the -- in the yardstick markets.
10     It's Merck and GSK. Some of them
11 have been around longer than others. But I
12 think the difference is never so
13 great. But that's in table, whatever it
14 is, Table 2.
15     Q. And you didn't think that that
16 was significant in your selection of the
17 yardsticks to use?
18     A. Well, the yardstick is kind of a
19 holistic decision, in that you look at the
20 alternatives, you pick the ones that you
21 think are the best, and then you go
22 forward. All of those things were things I
23 considered.
24     Q. Do you think that the length of
25 time that an incumbent is on the market

51 (Pages 198 - 201)

Page 202

T. McGuire - Highly Confidential

1  without competition affects the way it may
2  behave in a but-for world when it has
3  competition?
4     A. It would be very speculative.
5  These markets of sort of annual. There is
6  a new bunch of kids. There is a given
7  technology. I don't see why a long time
8  would necessarily be a big factor. But
9  maybe you have some ideas about that.
10    Q. Do you have an understanding of
11 what a -- I'm sure you do. But do you know
12 what a first mover advantage is?
13    A. I do.
14    Q. Do you think that in the scenario
15 in which a vaccine is on the market for,
16 say, 40 years, do you think that in that
17 context it may enjoy a first mover
18 advantage?
19    A. That would also be speculative.
20 I mean, the first mover advantage is a
21 model in industrial organizations that
22 applies sometimes and not in others.
23    Q. Do you think it applies in this
24 case?

Page 203

T. McGuire - Highly Confidential

1     A. I'm not sure. I'd have to think
2  about it.
3     Q. You've never looked at that
4  previously?
5     A. I don't think I considered the
6  first mover perspective.
7     Q. And you don't have an opinion on
8  that sitting here today, correct?
9     A. Well, beyond the fact that it's
10 definitional. If you tell me first mover
11 advantage, you say did you consider the
12 first mover advantage, you were kind of
13 assuming the conclusion that the first
14 mover has an advantage.
15       So the way to look at it is not
16 to say let me model a first mover
17 advantage. Let me consider the role of
18 incumbency and entrant with respect to
19 market outcomes. And I certainly was, you
20 know, interested in that.
21    Q. With respect to this particular
22 case, did you consider whether Merck's
23 MMR II product enjoyed a first mover
24 advantage?

Page 204

T. McGuire - Highly Confidential

1     A. Well, I don't have any
2  elaboration, other than what I just said;
3  that the situation of the incumbent and the
4  entrant are relevant. I didn't use the
5  word "first mover" in my report, but I
6  wouldn't want to assume that it's a first
7  mover advantage. That seems like the wrong
8  thing to do.
9     Q. You didn't make an assumption as
10 to the existence of a first mover advantage
11 one way or the other in this case; is that
12 correct?
13    A. That's correct.
14    Q. Is it the case with all of your
15 yardsticks that GSK entered at a price
16 below Merck's?
17    A. You know, I'd have to go back to
18 the data and take a look. I'm not sure.
19    Q. Let's look at Attachment C.5 to
20 your report, please.
21    A. (Witness complies.)
22    Q. So in C.5 you identify the CDC
23 list price and the private price for
24 Merck's RotaTeq, correct?

Page 205

T. McGuire - Highly Confidential

1     A. Yes, that's correct.
2     Q. And do you know whether GSK's
3  entry price was higher or lower than those
4  prices listed?
5     A. Well, you have to be careful when
6  you compare these prices, because one is
7  two-dose and one is three-dose, and I
8  forget which is which. But my recollection
9  of the relative prices is if you correct
10 for the number of doses, they're pretty
11 similar.
12       Are you asking about the -- what,
13 is it a per-dose price you're asking or
14 about the per --
15    Q. Well, let me ask you --
16    A. Excuse me.
17       -- or the -- excuse me -- or for
18 the course of administration?
19    Q. I'm asking about a per-dose
20 pricing. Well, let me ask you this. What
21 do these prices reflect an in Attachment
22 C.5? Is that a per-dose price?
23    A. I would have to go back and
24 check. I'm not sure if whether it's the

Page 206

1      T. McGuire - Highly Confidential
2  one-dose or two-dose.
3      Q.  Okay.
4      A.  I think Merck is the three-dose
5  and GSK is the two-dose.  GSK's price is
6  higher.  Of course, you wouldn't expect
7  them to be the same.  But the price for the
8  protection, which depends on how many doses
9  are required, I think are pretty close in
10  the data that I looked at.
11      But, I mean, if you ask are they
12  exactly the same, I'd really have to go
13  back and refresh myself.
14      Q.  Okay.  So in the rotavirus
15  example, you were comparing two vaccines
16  with different dosages, right?
17      A.  Different number of doses to
18  complete the -- I'm not sure what the
19  technical term is -- the course of
20  treatment with respect to the -- in
21  protection against the rota.
22      Q.  Which, in your view, Merck
23  vaccine being -- Merck's RotaTeq being
24  two-dose and GSK's ROTARIX being
25  three-dose?

Page 207

1      T. McGuire - Highly Confidential
2      A.  I believe it's the other way
3  around.
4      Q.  It's Merck's RotaTeq being
5  three-dose and GSK's ROTARIX being
6  two-dose?
7      A.  I know it's one way or the other,
8  and I think that's correct.  I may have to
9  check my facts, though.
10      Q.  We can at least agree that they
11  are different dosages to complete the
12  treatment regimen, right?
13      A.  That's correct.
14      Q.  In your but-for world in this
15  case, would PRIORIX be the same number of
16  doses as MMR per the schedule?
17      A.  I believe so.
18      Q.  And you didn't account for the
19  fact that the dosing schedule is different
20  in the rotavirus example than it is in the
21  MMR PRIORIX example when choosing this as a
22  yardstick, right?
23      A.  Well, it was one of the things I
24  considered.  I thought it still a
25  noteworthy yardstick, even if it's three

Page 208

1      T. McGuire - Highly Confidential
2  and two.  Same illness --
3      Q.  You didn't --
4      A.  Excuse me.
5      Same illness; same companies.
6      Q.  You didn't consider that as
7  disqualifying?
8      A.  I didn't consider it as being
9  disqualifying, that's correct.
10      Q.  In the hepatitis examples, those
11  -- entry by GSK in Hep A and Hep B examples
12  took place in the '80s for hepatitis B,
13  right?
14      A.  They've been around longer.
15  Something like that is correct.  I'd have
16  to go back to verify, but I'm sure you have
17  it correct.
18      Q.  And the '90s for Hep A, right?
19      A.  I'm sure you have it correct.
20      Q.  And in the but-for -- sort of the
21  but-for construct that you have here, you
22  have entry well into the 2000s, right?
23      A.  Yes.
24      Q.  And do you have a view on whether
25  vaccine markets have changed between, say,

Page 209

1      T. McGuire - Highly Confidential
2  1980 and 2007?
3      A.  Well, a lot of the fundamental
4  economics hasn't changed.  Demand is still
5  highly influenced by mandates.  For most,
6  buyers' prices are low.  For many products,
7  the products are exactly the same as they
8  were.  So there is enough similarity from
9  my standpoint to think that they're good
10  yardsticks.
11      Q.  So just to summarize, you
12  didn't -- to go back to the language that
13  we previously I think agreed to, which was
14  disqualifying.  You didn't view the fact
15  that the entry dates for Hep A and Hep B
16  were in the '80s and '90s, and the but-for
17  entry dates here being at the earliest 2007
18  as being disqualifying?
19      A.  That's correct.
20      Q.  You identified a handful of
21  things from the standpoint of economics
22  that you perceived as being basically the
23  same between 1980 and 2007.  Are there
24  things that are different from an economic
25  standpoint with respect to vaccine markets

53 (Pages 206 - 209)

Appx20243

Page 210

1     T. McGuire - Highly Confidential
2  that have changed over the course of that
3  time?
4     A.  Well, I'm sure there have been
5  changes.  Insurance coverage has changed.
6  With the ACA, I believe that vaccines are
7  automatically included at zero price to the
8  consumer.  You know, the mixture of
9  mandated vaccines has changed some.  So
10 there have been changes.
11    Q.  If you could turn to
12 Paragraph 106 of your report, please.  In
13 the bottom part of that paragraph you say,
14 "If GSK improved its portfolio by receiving
15 approval of its MMR vaccine, it might put
16 additional pressure on Merck to reduce the
17 price of not just MMR, but other vaccines
18 in its portfolio.  For example, Merck might
19 increase discounts provided for purchasing
20 its bundle of vaccines.  To be
21 conservative, I have not included this type
22 of price competition in my calculations."
23       Did I read that right?
24    A.  Yes.
25    Q.  So you would agree with me, based

Page 211

1     T. McGuire - Highly Confidential
2  on this, that one way for Merck to compete
3  in the but-for world would be to adjust its
4  contract discounts, right?
5     A.  Yeah, Merck might respond to
6  competition by directly change its price
7  for the new product, or possibly, as I
8  indicate here, changing prices for other
9  products.
10    Q.  So it could be that Merck could
11 keep its price of MMR II constant but
12 revise the price of another product in the
13 bundle in the face of competition by GSK,
14 right?
15    A.  Well, something like that is
16 possible.  It seems not very likely, but
17 it's -- you could convey the price savings
18 to a buyer in different ways.  But if there
19 is something you need to match, especially
20 if they're buying more than one thing, you
21 can match it in different combinations of
22 price discounts.
23    Q.  Okay.  And are you -- you're
24 aware of the testimony by Michele Taylor in
25 this case that that's, in fact, how Merck

Page 212

1     T. McGuire - Highly Confidential
2  treats prices, right, on a portfolio basis?
3     A.  I am aware of the business
4  perspective of portfolios; that they want
5  to have as many sort of other family of
6  products purchased as possible.
7     Q.  The phenomenon that we talked
8  about a few minutes ago, a few seconds ago,
9  which is that Merck may have adjusted other
10 prices in its portfolio in the face of
11 entry by GSK, that's not something that you
12 considered in doing your analysis of impact
13 and damages, right?
14    A.  Well, I considered it right here.
15 The sentence, as you just read, it's
16 possible.  I considered it, but I sought to
17 be conservative and not add an additional
18 savings to buyers that would -- might
19 follow from this portfolio-based
20 competition.
21    Q.  So you considered it, but you
22 decided not to incorporate it into your
23 model, correct?
24    A.  I considered it, and I didn't
25 incorporate it into the actual computation

Page 213

1     T. McGuire - Highly Confidential
2  of the damages.  And I did so, and I say
3  here.  It says I did it in order to be
4  conservative.
5     Q.  Why do you say it would be
6  conservative?
7     A.  If anything, this kind of
8  competition would be even better for
9  buyers; make life even better for buyers.
10    Q.  Let's say that in the but-for
11 world Merck upon entry by GSK decided to
12 keep its price for the MMR vaccine constant
13 and discount other products across the
14 portfolio, would that require individual
15 analysis as to the purchasing mix of a
16 particular physician to determine whether
17 there was impact?
18    A.  I feel like you're kind of asking
19 me a legal question here.  "Require
20 individual analysis," maybe you could
21 explain what you mean by that.
22    Q.  If you want to determine whether
23 impact was -- existed, would you want to
24 analyze the particular product mix of that
25 physician to determine if impact exists?

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1     T. McGuire - Highly Confidential
2     A.  Okay.  I recognize the
3  possibility that you're asking me to answer
4  about, and it is a possibility.  But what I
5  do is look at data; that one needn't
6  speculate on all the possible, you know,
7  strategies that a company might do.
8         What is the added discount?  The
9  data tell me that.  What is the difference
10  in path of the price?  The data tell me
11  that, too.
12         So -- especially in the face of
13  situations in which there are, you know,
14  one can conceive of different possibilities
15  that could introduce the need for
16  individualized analysis.  That's where data
17  is really helpful.
18     Q.  Okay.  So there are very -- you
19  just told me that one could conceive of
20  various different possibilities that could
21  introduce the need for individualized
22  analysis, correct?
23     A.  Yes.
24     Q.  You did not consider any of those
25  possibilities -- you didn't incorporate any

Page 215

1     T. McGuire - Highly Confidential
2  of those possibilities in your model; is
3  that right?
4     A.  No, that's not right.  This is a
5  version of what we talked about a bit this
6  morning.  The methods are this marginal
7  approach in which I'm considering the
8  impact of a particular thing.  And the
9  particular thing is more competition on
10  buyers.  That is basic economics that more
11  competition benefits buyers.
12         Then the consideration of the
13  individual situations is driven by the data
14  in which I have information on purchases of
15  different classes of trade, or even by
16  individual transactions.  And the summation
17  of the damages reflects all the, you know,
18  in aggregate those individual situations.
19     Q.  And all the prices in the data,
20  right, all of the prices to the various
21  different class members, are different;
22  isn't that true?
23         MR. KODROFF:  You can answer.
24  I'm not going to object.
25         THE WITNESS:  I thought you were

Page 216

1     T. McGuire - Highly Confidential
2  going to object.
3     A.  Well, if there is differences.
4  They're not all different, but there is
5  differences.
6     Q.  And isn't the but-for world kind
7  of by definition a speculative exercise?
8     A.  It's, obviously, the but-for
9  world didn't happen.  So it requires
10  expertise to make a determination of what
11  it would look like.  And that involves
12  speculation.
13         I don't like that word in this
14  context.  I would say it requires economic
15  analysis and data and putting those things
16  together to come up with a forecast of what
17  the but-for world would look like.
18     Q.  And so based on your economic
19  analysis and the existing data in this
20  case, you concluded that it was not
21  necessary to model out the possibility that
22  there would be portfolio-based discounts in
23  the face of competition by GSK, right?
24     A.  I am going to agree with you, and
25  for the reasons that I wanted to be

Page 217

1     T. McGuire - Highly Confidential
2  conservative, which is to say I wanted to
3  conclude that my damages measure, if that
4  perspective or that force were taken into
5  play -- into consideration, would be
6  higher.
7     Q.  Do you have any information from
8  evidence in the record in this case to
9  suggest that if GSK entered, that Merck
10  would not have engaged in discounting on
11  other products in the portfolio?
12         MR. KODROFF:  Object to form.
13     Q.  Keeping its MMR price constant.
14         MR. KODROFF:  Same objection.
15     A.  There's about three negatives in
16  there, but let me try to answer anyway, and
17  tell me if I didn't get the point.
18         My reading of the documents is
19  that Merck's likely response reflects
20  higher discounts on the MMR product.  I
21  didn't see anything in the documents that
22  indicated that in the presence of
23  competition, they would leave that price
24  alone and change other prices in the
25  portfolio.

55 (Pages 214 - 217)

Appx20245

Page 218

1     T. McGuire - Highly Confidential
2     Q. If that were to be the case, then
3 you would agree with me that you would want
4 to do an individualized analysis of the
5 purchases of each class member with respect
6 to each of the vaccines in the portfolio,
7 right?
8         MR. KODROFF: Object to form.
9     "If that were," what are you
10     referring to?
11     Q. If in the but-for world Merck
12 would have kept the MMR price constant and
13 discounted one or more of the other
14 vaccines in the portfolio, it would require
15 individualized analysis of the mix of
16 vaccines being purchased by that class
17 member to determine whether there was
18 impact and damages, correct?
19     A. Well, my instinct would be to
20 continue to do what I did in this report,
21 which is to say if there were no price
22 change forecast on the MMR product alone,
23 which is I think the hypothetical you're
24 asking me to talk about, then my
25 methodology would say no damages. That's

Page 219

1     T. McGuire - Highly Confidential
2 conservative still.
3         If there were portfolio-based
4 discounts, that zero would be a minimum.
5 It might not be very helpful to the
6 Plaintiffs, but I think my methodology
7 remains sound.
8     Q. So you wouldn't want to look at
9 whether an individual physician purchased
10 the vaccine on which the discount was being
11 provided?
12     A. This is the non-MMR vaccine
13 you're talking about?
14     Q. Yes.
15     A. I see your question. But I think
16 from the standpoint of an economist, the
17 natural thing is to look at the market
18 we're talking about, maybe there is or
19 maybe there isn't a price change, measure
20 that.
21         Then the other part is you may
22 know where it's going and that there is
23 going to be some damages with respect to
24 that. But I'm certainly comfortable here
25 in being -- having a concrete number and

Page 220

1     T. McGuire - Highly Confidential
2 having it be conservative. This other
3 world I think would have been a harder
4 analysis.
5     Q. An individualized analysis,
6 right?
7     A. I don't know what exactly I would
8 have done, but looking, you know, where the
9 markets point you, which in this case where
10 there is more competition, is a natural
11 thing to do and where I, you know, first
12 looked at damages.
13     Q. Does the model reflected in your
14 report demonstrate antitrust impact through
15 evidence common to all class members?
16         MR. KODROFF: Object to form.
17     Calls for a legal conclusion.
18     A. I'm sorry. Can you repeat the
19 question?
20     Q. Does the model in your opinion
21 demonstrate antitrust impact through
22 evidence common to all class members?
23         MR. KODROFF: Same objection.
24     A. It's certainly phrased as a legal
25 question. I could repeat what I did, which

Page 221

1     T. McGuire - Highly Confidential
2 may not -- may not be answering what you're
3 intending to be asking. But there is a
4 common impact of competition on prices for
5 buyers. I took into account the importance
6 of the buyers measured as the quantity,
7 and --
8     Q. Does -- I'm sorry.
9     A. Sorry.
10     Q. No, I'm sorry.
11     A. -- and measured aggregate
12 damages.
13     Q. Does your model show that each
14 and every class member was impacted by
15 Merck's alleged conduct?
16         MR. KODROFF: Objection to form.
17         THE WITNESS: Objection? Sorry?
18         MR. KODROFF: I said objection to
19     form. I'm trying to stay quiet.
20         THE WITNESS: To form. I have to
21     hear it, though.
22     A. Well, the class was defined at
23 the time probably -- certainly previous to
24 my report being written. And the class
25 period began in 1999.

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

T. McGuire - Highly Confidential

My understanding is that with an earliest date of 2009 entry, that as in the example that we talked about before lunch of an entry date after, some class members stopped buying, that they would not have been affected by the introduction of competition.

So my understanding is that there would be some of these class members, but I'm probably venturing outside of my area of expertise when I start talking about class, the legalities of class, who were not harmed.

Q. So as the class is currently defined, you would agree with me that there are uninjured class members included in it?

A. My understanding is that there are members of the class as currently defined who didn't purchase after 2009. And if that my understanding is correct, then they wouldn't have been injured by the absence of entry in 2009.

Q. Do you know how many of those there were?

Page 223

T. McGuire - Highly Confidential

A. No, I don't.

Q. So taking those folks out, after 2009, does your model show that every class member that purchased Merck mumps vaccine after 2009 was impacted by the alleged conduct of Merck?

A. Well, those class members who didn't purchase weren't in my model at all, so there is no change I would need to make. They weren't in the empirical part of my analysis.

Q. Right. So I'm just taking your 2009 and later.

A. Yeah, I understand.

Q. And it's your testimony that every one of those class members was impacted by Merck's alleged conduct in this case?

A. Those -- now you're talking about not the class as it was defined originally, but you're talking about the people who bought after 2009? Would that be accurate?

Q. Correct.

A. And you're asking me would those

Page 224

T. McGuire - Highly Confidential

people have been injured by absence of competition?

Q. Does your model show that all of them were impacted?

A. Yes.

Q. And were all of them impacted in a uniform way based on your model?

A. Well --

MR. KODROFF:  Object to form.

A. -- they would all enjoy the same price reduction.

Q. So is it your testimony that you can calculate impact and damages in this case without individualized inquiry?

MR. KODROFF:  Objection to form.

A. I was able to calculate aggregate damages in this matter in the way that I did. The degree of individual -- sorry -- individuality is reflected in the data in terms of how many -- what the quantity of purchase of different buyers was.

Q. But what you're saying to me is that you only calculated aggregate damages, right?

Page 225

T. McGuire - Highly Confidential

A. Well, that's what I understood was my assignment.

Q. Okay.  You didn't calculate damages for each individual class member; is that correct?

A. Well, for each individual buyer in the data, you know, I didn't report all of those things, but it's there in the data, and it just got summed up, and I reported the number.

Q. Okay.  So your testimony is that you calculated damages for each of the individuals in the class post 2009, and your model shows that each one of them was overcharged?

A. What I -- literally what I did was to take each transaction, and on each transaction imposed the but-for price.  And it could be easy to sum it up for person or for buyer to be able to compute what the individual or what the impact was on that particular buyer, but that wasn't my main interest.  I was interested in the total, not in the -- in each individual.

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

1    T. McGuire - Highly Confidential
2    Q.  And in all events, you didn't do
3  that specific calculation for each
4  individual class member.  You just
5  calculated the aggregate?
6        MR. KODROFF:  Objection to form.
7    I don't think that's what he
8    testified to.
9        THE WITNESS:  And what?  I'm not
10    hearing you.
11        MR. KODROFF:  I don't think
12    that's what he testified to.
13        Wow, the witness telling the
14        lawyer to be louder.
15    A.  I would disagree with you.  As I
16  explained it a few minutes ago, first to
17  get to total, you have to do it transaction
18  by transaction, which is similar to doing
19  it person by person, buyer by buyer.
20    Q.  So let's talks about how you
21  actually went about doing this.  In
22  Paragraph 81 of your report, you -- and I'm
23  summarizing here -- you multiplied the
24  change in the price between the actual and
25  but-for worlds, right, by the volume of

Page 227

1    T. McGuire - Highly Confidential
2  purchases over time; is that right?
3    A.  Basically, yes.
4    Q.  And you say in Paragraph 82 that
5  "The change in price over time is an
6  average increment in price to private
7  purchasers due to Merck's alleged
8  misrepresentations or omissions"; is that
9  correct?
10    A.  I'm sorry.  Paragraph 82, yes.
11    Q.  So in order to come up with your
12  price in the actual world, you used an
13  average discount; is that correct?
14    A.  I looked at the change in the
15  discount.  So it's a -- it's a delta P.  So
16  the delta P is what is the impact of
17  competition.
18    Q.  Yeah, so I'm just asking in the
19  actual world in order to come up with --
20    A.  Oh, the actual world.  I'm sorry,
21  I misunderstood.
22    Q.  -- with a discount, you used an
23  average.  You took the average of the
24  discounts for all class members on a
25  particular day and used the average, right?

Page 228

1    T. McGuire - Highly Confidential
2    A.  I'm just thinking about how the
3  calculations worked.  I don't think I
4  needed to do that.  What I needed from the
5  actual world is the Qs, as in the simple
6  formula shows.
7    Q.  Okay.  And --
8    A.  And I need the deltas.  I didn't
9  need the pre in the actual world discounts.
10  I may be missing what you're asking, but
11  that's my...
12    Q.  So there are various different
13  prices across class members over time in
14  the actual world, right?
15    A.  Yes.
16    Q.  And isn't it correct that to get
17  an actual price that you model in the
18  actual world, you took the average of those
19  discounts?
20    A.  Unless I'm misunderstanding, what
21  I did was apply this very simple formula
22  that is driven from the deltas, not the
23  base, of the discounts.
24    Q.  I understand that.
25    A.  So I may be missing the point of

Page 229

1    T. McGuire - Highly Confidential
2  your question.  So, I'm sorry.
3    Q.  So why don't we go to D.3 in your
4  report.  D.3.a.  I'm sorry.
5        So if you look at column 3 -- I'm
6  sorry.  It's actually -- yes, it's column
7  3, which is labeled "Discount" in the
8  actual world.
9    A.  Okay, I see.
10    Q.  There are various percentages
11  there; is that correct?
12    A.  That would be right, yes.
13    Q.  And how did you arrive at those
14  percentages?
15    A.  They were a weighted average of
16  the discounts weighted by quantities during
17  that time period.
18    Q.  Okay.  So does this -- we agree,
19  then, to get to the actual world discount,
20  you created a weighted average because the
21  discounts were all different for various
22  different class members, right?
23    A.  Okay.  Now I think I'm better
24  understanding your question.
25        I did do that.  And as I

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

1    T. McGuire - Highly Confidential
2 explained in my report, it's exactly
3 equivalent to doing it, not at the average
4 level, but person by person. So I'm not
5 sure where that leaves us, but please
6 proceed.
7    Q. So as I understand an average,
8 there are values of the average, and values
9 below the average. Do you agree with that?
10    A. Yes. So far we are on the same
11 page.
12    Q. I knew we could agree on that.
13    And so how is it the case that
14 the average works out to be the same as
15 each individual discount?
16    A. There's actually a footnote in my
17 report that explains this. We could refer
18 back to it. But as long as the quantity
19 weights are constant, then you get exactly
20 the same summation of damages as if you do
21 it individual delta P by individual delta
22 P, or the average.
23    That's what kind of led me astray
24 there in our first exchange, which I think
25 I was misunderstanding. That it was not

1    T. McGuire - Highly Confidential
2 necessary to do this. But you can do this
3 one way or the other.
4    Q. You get the exact same total
5 damages, right?
6    A. Right.
7    Q. But as to each individual
8 purchaser, you don't get the exact same
9 damages, right?
10    MR. KODROFF: Objection. Vague.
11    A. Well, no, I think we're not on
12 the same page about that. It's more of a
13 mathematical statement to say that you can
14 get the total damages either by taking the
15 average discount and multiplying that by
16 the quantity, or allowing the delta P to
17 vary buyer by buyer and weight that delta P
18 by the quantity weight of that buyer. And
19 it turns out to be exactly the same number.
20    Q. In the aggregate?
21    A. Yes.
22    Q. If you would look at Paragraph 82
23 of your report again.
24    A. Uh-huh.
25    Q. So that's where I think you --

1    T. McGuire - Highly Confidential
2    A. That's what I'm taking about,
3 yeah.
4    Q. And you say, "An average yields
5 an accurate estimate of total aggregate
6 damages even if the level of prices differs
7 among members of a class (e.g., if larger
8 buyers were to receive higher discounts off
9 list price)," right?
10    A. Right.
11    Q. And so if two sets of customers
12 face different prices in the but-for world,
13 your damages model would still accurately
14 calculate overcharges?
15    MR. KODROFF: Objection. Vague.
16    A. I don't see why not, based on
17 what you just asked.
18    Q. And if for one set of customers
19 the price in the but-for world increased
20 and for another set of customers the price
21 in the but-for world differed, your model
22 would still accurately calculate damages?
23    A. If the -- this is a hypothetical
24 where competition increases prices, but let
25 me accept that part of your question and

1    T. McGuire - Highly Confidential
2 just answer it mathematically, which is to
3 say that if in the but-for world prices
4 went up, if you count -- if you think of
5 those as negative damages, then the answer
6 is yes.
7    Q. Would it still -- would those --
8 so they would -- the damages would be
9 negative in that particular situation?
10    A. In your hypothetical --
11    Q. Right.
12    A. -- of a buyer who for some reason
13 is harmed by competition and pays a higher
14 price, if those are part -- if aggregate
15 damages are the sum of damages minus any
16 benefits, if that's what you are asking me
17 to calculate, then my model still works,
18 yeah.
19    Q. It would work, but it would show
20 negative damages for that particular class
21 member, right?
22    A. Well, yeah. The damages -- this
23 formula still applies. The delta P takes a
24 different sign, but the analysis would
25 still be correct.

59 (Pages 230 - 233)

Page 234

1    T. McGuire - Highly Confidential
2    Q. I'm not -- so but the answer is
3 it would show negative damages in that
4 hypothetical, using the correct application
5 of your model.
6    A. Well, I don't see where we
7 differ, actually. But this is the model.
8 It's extremely simple. And if you just
9 apply the model, if the delta P takes a
10 different sign, you get a different sign on
11 the damages. But I'm not sure what else
12 you're --
13    Q. And the different sign, is it a
14 positive versus a negative?
15    A. It may be a positive versus a
16 negative.
17    Q. Okay.
18    MR. FEE: Do you mind if we take
19 a quick break?
20    MR. KODROFF: Sure.
21    VIDEO TECHNICIAN: It is
22 p.m. We are going off the record.
23    (Proceedings recessed at
24 3:11 p.m., and reconvened at
25 p.m.)

Page 235

1    T. McGuire - Highly Confidential
2    VIDEO TECHNICIAN: It is
3    p.m. We are back on the record on
4    media number four.
5 BY MR. FEE:
6    Q. Welcome back, Doctor.
7    A. Thank you.
8    Q. If you could turn back to
9 attachment D.3.a in your report.
10    A. Okay.
11    Q. And I'd like you to look -- are
12 you there?
13    A. Yes.
14    Q. I'd like you to look at column
15 number 7, and I believe that represents the
16 counterfactual discount; is that right?
17    A. Yes.
18    Q. Am I correct in saying that the
19 counterfactual discounts reflected in that
20 column are a product of the weighted
21 average of the discounts in the actual
22 world plus 2 percent?
23    A. I was -- I'm a little slow,
24 sorry. The 2 percent is the initial, and
25 then the discount depends over time on the

Page 236

1    T. McGuire - Highly Confidential
2 path of the yardsticks.
3    Q. Okay. So you take the discount,
4 the weighted average that is reflected in
5 column 3, that's sort of one input into it?
6    A. Well, yes. 2 and 3 yield the net
7 price on 4.
8    Q. Right. I guess what I'm trying
9 to get at is Column 7 is a combination of
10 three things: It's the weighted average of
11 the discounts that are reflected in column
12 3 plus 2 percent plus something -- the
13 output from your yardstick analysis?
14    A. Generally, yes.
15    Q. So at least one component of that
16 but-for discount is the weighted average
17 reflected in column 3?
18    A. Okay. I'll go with you so far.
19    Q. I just want to make sure that --
20 I'm just trying to confirm that, basically,
21 the weighted average discount from the
22 actual world is carried over in --
23    A. It will be additional discounts
24 in the but-for world.
25    Q. Understood. But that's the

Page 237

1    T. McGuire - Highly Confidential
2 baseline.
3    A. That's -- yes.
4    Q. And the baseline is the weighted
5 average?
6    A. Yes.
7    Q. Are you familiar with literature,
8 economic literature, positing that in the
9 face of competition an incumbent may
10 increase its prices?
11    A. Well, there is a literature in
12 the pharmaceutical area, if I can just say
13 drugs, the non-vaccine drugs, that studies
14 that, yes.
15    Q. You're aware of that?
16    A. I'm aware of that literature.
17    Q. Okay. Does that literature
18 include empirical studies in which that
19 phenomenon has actually happened?
20    A. The empirical studies that I'm
21 aware of in that literature have to do with
22 brand/generic competition. And upon
23 generic entry, it doesn't always happen,
24 and my impression is it happens less now
25 than it used to. In some cases the price

Page 238

1     T. McGuire - Highly Confidential
2 for the brand went up after a generic
3 appeared.
4     Q.  So in the context of
5 pharmaceutical products where an AB-rated
6 generic came onto the market, the price of
7 the incumbent, the brand, increased?
8     A.  It may have increased, yes.
9     Q.  That's the --
10     A.  That's the nature of that
11 literature.  It sometimes happens.
12     Q.  Are you aware of any specific
13 pharmaceutical product in which that
14 phenomenon took place?  And by that, I mean
15 where upon the entry of a generic, the
16 brand price increased.
17     A.  I can't think of any.  I know
18 there have been academic papers that
19 document this, but I can't name the
20 products.
21     Q.  Does your -- let's look at -- let
22 me ask you this.  You cite an article by
23 Dr. Freed in your report, correct?
24     A.  I do.
25     Q.  And that's at Paragraph 56 of

Page 239

1     T. McGuire - Highly Confidential
2 your report?
3     A.  Oh, Paragraph 56.  Okay, I'm
4 there.
5     Q.  I'm not there quite yet.
6     A.  Take your time.
7     Q.  And so have you read that
8 article?
9     A.  Yes, I have.
10     Q.  And what's your understanding of
11 the conclusions drawn by Dr. Freed in that
12 article?
13     A.  The purpose of Gary's
14 investigation was to collect data from
15 physicians on actual prices paid for
16 vaccines that, as we said earlier, is hard
17 to come by.  And according to Dr. Freed,
18 and I'd have no reason to doubt him, it's
19 the only, or one of the few, studies in the
20 academic literature that provides that kind
21 of information.
22         So his purpose was to collect
23 that data and sort of show us what the data
24 is.  And he, if you read his abstract, if I
25 remember it correctly, he talks about

Page 240

1     T. McGuire - Highly Confidential
2 different descriptions, the statistical
3 descriptions, of his findings which have to
4 do with what he calls variations and with
5 the averages or mean.
6     Q.  And is it your understanding that
7 he concluded in that article that there was
8 a high degree of a variation in vaccine
9 prices charged to private physicians
10 generally?  That was the underlying thesis?
11     A.  Well, that was his conclusion.  I
12 would like to point out the weakness of
13 that -- of the statistics behind that
14 conclusion.  And what I mean by that is we
15 understand what a mean is.  I think we
16 already actually covered that earlier
17 today.
18     Q.  We did.
19     A.  And there is something also
20 called variance, which is the difference
21 between observations and the mean, which is
22 the typical way to describe variation in
23 distribution.  He doesn't do that.  But
24 Dr. Freed does, is tell us the mean of a
25 distribution, for example, a price of a

Page 241

1     T. McGuire - Highly Confidential
2 certain vaccine.  And then he tells us the
3 minimum and the maximum of that
4 distribution.
5         So if you imagine a bell curve in
6 which the distribution of the prices are,
7 say, just imagine something like normally
8 distributed, he tells us what that middle
9 point is, and then he tells us the very,
10 very far endpoints on each side, which is
11 not variation.  It's statistics on that
12 distribution that are extremely volatile.
13         The extreme values in a
14 distribution are very sensitive to, say,
15 sample size and are not, in my view, the
16 best way to convey the presence of
17 variation in a distribution.
18         One final comment on his methods,
19 there's not a single significance anywhere
20 in his study, if I remember it correctly.
21 The mean of his distribution, because he's
22 sampling, you know, 20, 30 practices each
23 time, is a reasonably reliable statistic.
24 Whereas, the extreme values are, I would
25 say, unreliable statistics.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

1    T. McGuire - Highly Confidential
2    Q. I appreciate that.
3        But Dr. Freed's conclusion is
4    that there is a high degree of variation
5    across prices paid for vaccines, and that's
6    true whether there is -- whether the
7    particular vaccine is sole source or dual
8    source or multi-source, right?
9        MR. KODROFF:  Object to form.
10    Q. That's what he concluded.
11    A. That was along the lines of what
12    he concluded.  And I wanted to point out by
13    my previous long answer that what he
14    literally reports is the mean and the
15    max -- the minimum and the maximum to
16    support that statement, and those are very
17    unreliable statistics.
18    Q. Okay.  So it's --
19    A. And it's not variation.
20    Q. So in your report at
21    Paragraph 85 --
22    A. (Coughs)  Sorry.
23        MR. KODROFF:  Are you okay?
24        THE WITNESS:  I'm not okay, but
25    let's keep going.

Page 243

1    T. McGuire - Highly Confidential
2    Q. -- you cite Dr. Freed's report,
3    correct?
4    A. I do.  Yes.
5    Q. And you were citing his article
6    in your report --
7    A. Excuse me.  I don't think it's
8    Paragraph 85.  I think you're somewhere
9    else.
10    Q. Footnote 85.
11    A. Oh, footnote 85.  Sorry.
12    Q. Paragraph 56.
13    A. Okay.  Yes, I'm with you.
14    Q. So you're citing Dr. Freed's
15    article, notwithstanding that sitting here
16    today you said that his statistics are
17    unreliable?
18    A. Well, I didn't say that exactly.
19    I said the min and max are unreliable.  The
20    mean in this case is a reasonably reliable
21    statistic.
22    Q. So you disagree with Dr. Freed's
23    conclusions that vaccine markets display
24    variation in pricing?
25    A. Well, Dr. Freed in his article

Page 244

1    T. McGuire - Highly Confidential
2    was just telling us what he found.  He did
3    the survey, and I assume it was done well.
4    This is the highest and this is the -- or
5    this is the lowest and this is the highest
6    value.  That's what he told us.
7        And I don't disagree with that.
8    I'm only pointing out that those particular
9    statistics from a distribution are not
10    variation, and they are themselves volatile
11    and unreliable, especially in small
12    samples.
13    Q. So I'm just trying to -- I feel
14    like we're having a disconnect.  But do
15    you -- are we saying the same thing?  In
16    other words, do you disagree with the
17    conclusion of Dr. Freed that vaccine
18    markets exhibit variation?
19    A. Well, one wouldn't have had to do
20    a survey to say that.  And I don't disagree
21    that this is the minimum, this is the
22    maximum, and those things are different.
23        My comments on this are that
24    those particular values that he identifies
25    are very unreliable, because of the

Page 245

1    T. McGuire - Highly Confidential
2    properties of extreme values in small
3    distributions.
4    Q. Okay.  So is it correct to say
5    that you disagree that with the
6    significance of the particular values
7    described in his report, or in his article,
8    but you don't necessarily disagree with the
9    principle that vaccine markets exhibit
10    variation -- price variation?
11    A. The principle, as you call it,
12    that they exhibit price variation, we've
13    already established that.  That is to say,
14    there are different prices for different
15    buyers.  In other words, there is
16    variation.  So I don't disagree with that.
17        What I disagree with is the
18    implication that I think you're trying to
19    draw that these extreme values are good
20    indicators of the nature of that variation.
21    Q. Okay.
22    A. I'm not arguing with Dr. Freed,
23    but that's what I disagree with.
24    Q. Okay, fair enough.
25    A. Whoever says it.

62 (Pages 242 - 245)

Page 246

1    T. McGuire - Highly Confidential
2    Q.  Okay.  So we do agree that
3  vaccine markets exhibit variation in price.
4  The significance of that may be up for
5  debate.  But is that true with respect to
6  both single-source vaccines and dual or
7  multi-source vaccines?
8    A.  Which is to say, are there price
9  differences between different buyers for
10  dual source as well as single-source
11  vaccines?  I think the answer is yes.
12    Q.  You say in Paragraph 83 of your
13  report -- and I was slow to get there, so
14  please let me catch up -- that "Merck's
15  alleged misrepresentations and omissions
16  concerning its Mumps Vaccine elevated the
17  price and harmed private purchasers in two
18  main ways."
19        We're good?
20    A.  (Nods.)
21    Q.  One way is that Merck
22  misrepresented allegedly its ability to
23  protect against the vaccine -- or I'm
24  sorry -- protect against disease which
25  caused buyers to put a higher value on the

Page 247

1    T. McGuire - Highly Confidential
2  vaccine than they would have if they knew
3  the truth, right?
4    A.  That is one of the ways that I'm
5  referring to here.
6    Q.  Yeah.
7    A.  That, yes, if the allegations are
8  true, then buyers would have been misled
9  about the efficacy of the vaccine.
10    Q.  Okay.  And the other component is
11  this barrier to entry idea that we've been
12  talking about basically all day, right?
13    A.  That's correct, yes.
14    Q.  Okay.  So one is an alleged
15  inflation of the value of the vaccine based
16  on -- it's a fraud-based kind of harm,
17  right?
18        MR. KODROFF:  Objection to the
19        form.  "Fraud" is a legal term.
20    A.  Yeah, I can explain it without
21  relying on the word "fraud."  Consumers
22  make choices in their interest, if they
23  understand the nature of the product that
24  they buy.  And if they're misled about the,
25  you know, what a product can do for them,

Page 248

1    T. McGuire - Highly Confidential
2  they're not going to make decisions in
3  their own best interest.
4        So that's the nature of the other
5  harm, which we haven't talked about until
6  now, in addition to the price effect.
7    Q.  Sure, okay.  Just to try and see
8  if we're saying the same thing, the alleged
9  misrepresentations would have inflated the
10  value of the vaccine to consumers; is that
11  fair?
12    A.  Yeah, that's a reasonable
13  summary; that people think something does
14  more than it does, that's kind of inflating
15  the value.
16    Q.  Okay.  And in the prices that
17  were charged by Merck in the actual world,
18  they would have incorporated that inflated
19  value, right?
20    A.  They -- prices in the actual
21  world would reflect the demand conditions
22  that Merck faced.
23        Next question?
24    Q.  So I'm not sure how that's
25  different than what I just said.  Because

Page 249

1    T. McGuire - Highly Confidential
2  what I'm asking you is, is you said in one
3  respect the price of the product was
4  overstated because the value of the vaccine
5  was inflated, correct?
6    A.  I didn't say the price.  I said
7  the demand.  And the thing I'm getting at
8  is demand elasticity is the key to monopoly
9  pricing, which is a responsiveness concept
10  as opposed to a level of demand concept.
11    Q.  So it's not your testimony, then,
12  that the price of the vaccine was inflated
13  because consumers overvalued it?
14        MR. KODROFF:  Objection.  The
15        actual or but-for?
16        MR. FEE:  Actual.
17        MR. KODROFF:  Thank you.
18    A.  Yeah, that wasn't what I was
19  getting at for this point.  It was that
20  there was an additional harm to consumers
21  because they were misled and they did
22  things that were based on, if the
23  allegations are true, an incorrect
24  appreciation of the economic value of the
25  thing that they're buying.  And that's a

63 (Pages 246 - 249)

Page 250

T. McGuire - Highly Confidential

1     pretty general statement. It doesn't have
2     anything to do with prices too high or
3     prices too low. It's just people making
4     mistakes.
5        So there is something there in
6     terms of a quantum of harm due to that --
7     to the alleged misrepresentation and the
8     altered choices of consumers.
9     Q. Okay. And that --
10    A. I'm sorry, just one more thing.
11       I thought about this, how do I
12    measure this. I was pretty interested in
13    doing this. But, ultimately, as you see, I
14    just left it as one of those things that I
15    have to say my measures are conservative
16    because I didn't quantify that.
17    Q. Right. Understood. And but that
18    quantum, right, that quantum of harm, would
19    be included in Merck's actual price, right?
20    A. No, that's not correct.
21    Q. Why not?
22    A. It's really different things.
23    Think of just a price that you're not
24    talking about a change as higher or lower,

Page 251

T. McGuire - Highly Confidential

1     but then a product that people are confused
2     about, whether they want it or not. And
3     some people are going to make the mistake
4     and buy it if they think it's great but it
5     turns out not to be great, and some other
6     people will have a different kind of
7     regret. They might, you know, think it's
8     not so great and don't understand and not
9     buy it when they should buy it.
10       So they're really quite different
11    sources of harm.
12    Q. Okay. So there are two different
13    sources of harm. But wouldn't that
14    mistake, this phenomenon that we're talking
15    about, be incorporated in the price Merck
16    charges, right, in the actual world,
17    because it's part of demand?
18       MR. KODROFF: Objection to form.
19       THE WITNESS: Objection?
20       MR. KODROFF: To form.
21    A. It is part of demand. I need to
22    recall the point I made a few minutes ago,
23    that if you ask what is the characteristic
24    of demand that determines what a monopolist

Page 252

T. McGuire - Highly Confidential

1     would charge, it's the price of elasticity
2     of demand, which has to do with the
3     percentage change in quantity with respect
4     to a percentage change in price. And
5     that's not a statement about the level.
6        So even if some people now have
7     an elevated value, as we've been talking
8     about, and their demand is higher in some
9     sense, it doesn't imply that the elasticity
10    of demand has gotten less in the market
11    and, therefore, the monopolist would have
12    charged more.
13    Q. Okay. But is it your opinion
14    that the price elasticity concept that you
15    described would have been, that phenomenon
16    is taken into account when Merck sets its
17    prices?
18       MR. KODROFF: I'm going to object
19    to form.
20    A. So we're out of the world in
21    which there is misappreciation of demand,
22    or are we still there?
23    Q. We're still in that world. I'm
24    just trying to understand how it is that --

Page 253

T. McGuire - Highly Confidential

1     you said that this sort of inflation in
2     value concept affects elasticity of demand;
3     is that right?
4     A. I said elasticity is the driving
5     thing you're pricing, and this concept
6     we've been talking about is distinct from
7     elasticity. So that's why the connection
8     that I think you've been trying to ask me
9     about is one that's not necessarily there.
10    Q. So it's not necessarily the case
11    that if, in fact, it were true, that
12    Merck's mumps vaccine did not perform as
13    well as represented, that that price
14    inflation would be included in the actual
15    world price?
16       MR. KODROFF: Object to form.
17    Assumes facts not in evidence, or
18    even presented in your hypothetical.
19    But, by all means, answer.
20       MR. FEE: It definitely assumes
21    facts not in evidence.
22       MR. KODROFF: Well, you're right.
23    I think -- it's your hypothetical, I
24    agree. So, I didn't mean. Thank

64 (Pages 250 - 253)

Appx20254

Page 254

1     T. McGuire - Highly Confidential
2 you.
3     A.  It was a short question.  Do you
4 mind doing it again?
5     Q.  So if it were, in fact, true that
6 Merck's mumps vaccine did not perform as
7 well as stated in the label and that
8 phenomenon caused consumers to overvalue
9 the product, it's not necessarily the case
10 that that overvaluation would be included
11 in the actual price that Merck charged?
12     A.  That's along -- that's what I
13 think I've been saying, if I understand
14 your question correctly; that, yes, price
15 is driven by elasticity.  It's a different
16 statement than level.  So it certainly
17 wouldn't be.
18         I can give you an example.  Maybe
19 this will help clarify it.
20     Q.  Okay.  That would be helpful.
21     A.  Imagine a demand curve and there
22 is a cost curve, maybe even make that
23 constant, and you can visualize a markup
24 that a monopolist would make if they were
25 the only seller in which the price is above

Page 255

1     T. McGuire - Highly Confidential
2 marginal cost, and that's a profit
3 maximizing decision.  Let's just suppose
4 that's the case.  The calculation around
5 profit maximization depends on what's
6 happening around that point.
7         So if I reduce price a little
8 bit, I get more demand, but is that
9 profitable or not.  That's what a
10 monopolist would consider, and moving price
11 the other way.  That's a local condition.
12 It depends only on the slope of that demand
13 right around that price.  And so but there
14 is a whole other massive parts of the
15 demand curve that are way up here or way
16 down there.
17         And what happens is in this
18 valuation that, okay, these guys over here
19 who are optimistic anyway were too
20 optimistic, and now their part of the
21 demand comes down a little bit.  It doesn't
22 affect at all the local region in which the
23 monopolist -- in which the profit
24 maximization calculation takes place.  So
25 that's an example.

Page 256

1     T. McGuire - Highly Confidential
2         I can make examples any way you
3 want.  But the point is there is no
4 necessary connection between that damage
5 number one, misappreciation and pricing.
6     Q.  So in terms of the
7 misappreciation, as you described it, that
8 does not have a price effect?
9     A.  Now, see, that's not what I said.
10 I only said there is no necessary
11 connection between the misappreciation and
12 higher or lower prices.
13         It is changing demand, and it --
14 you have to know a lot more about what's
15 going on, who's changing, how that's
16 affecting elasticity, all those things that
17 probably wouldn't be that productive to
18 talk about.
19     Q.  But it could have a price effect;
20 is that what you're saying?
21     A.  It could have a price effect
22 either way.
23     Q.  It could have a price effect
24 either way.
25     A.  Yeah.

Page 257

1     T. McGuire - Highly Confidential
2     Q.  So does your model do anything to
3 account for the possibility that there
4 might be a price effect as a result of this
5 misappreciation?
6     A.  In one respect, yes.  I note it.
7 I think it's a reasonable economic point to
8 make.  My model is conservative because I
9 don't quantify.
10         In the other part of my analysis
11 where we're talking about the other form of
12 damages and the price effect, demand is
13 really in the background in that, because
14 quantities are fixed.  And that makes sense
15 as an economist to do that.
16         And with these fixed quantities,
17 the focus isn't on how quantity demand
18 would change.  It's saying here is what
19 they did, here is what they paid, here is
20 what they would have paid in a but-for
21 world.  That's what I computed.  So, I
22 don't know, that's my comments on your
23 question.
24     Q.  I guess the real basic question
25 here is, am I correct that your model does

Page 258

T. McGuire - Highly Confidential

1  not do anything to pull out any price
2  effects that may have existed as a result
3  of this misappreciation phenomenon that
4  we've just been talking about?
5     A. Well, my price effects are, as
6  you know, driven by the economic
7  perspective that competition lowers prices.
8  How much they lower prices, that's what the
9  data are for.
10    Q. No, but that's not my question.
11  My question is: Do you do anything in your
12  model to pull out any price effects that
13  could have existed as a result of this
14  misappropriation phenomenon?
15    A. What I do about this is only
16  right here, which is another way to -- I
17  think a way to answer your question. I
18  think it's a real form of potential damage.
19  I consider is there something I can do to
20  quantify this. I didn't see anything. So
21  it's easy to do. So I didn't, but I wanted
22  to keep track of it as another form of
23  damage.
24    Q. Okay. So the answer, then, to my

Page 259

T. McGuire - Highly Confidential

1  question is that, no, your model does not
2  pull out those potential price effects?
3     MR. KODROFF: Objection to form.
4     That misstates what he's testified
5     to.
6     A. These form of price effects would
7  work through the behavior of quantity
8  demanded. And in my damage analysis,
9  quantity is fixed. So that's what I meant
10  by demand is in the background, including
11  this factor, is in the background.
12    Q. So it doesn't separate out --
13  your model doesn't separate out any damages
14  or harm that, in an empirical way, that
15  might have resulted from the price effects
16  associated with the misappreciation; is
17  that correct?
18    MR. KODROFF: I'm going to object
19    to form. When you use "damage" and
20    "harm" sort of interchangeable, and I
21    don't think the two of you were doing
22    that earlier.
23    MR. FEE: That's a fair -- that's
24    a good objection. Let me rephrase.

Page 260

T. McGuire - Highly Confidential

1     MR. KODROFF: Okay.
2     Q. So your model doesn't separate
3  out any harm -- doesn't separate out in an
4  empirical way any harm that might have
5  resulted from the price effects associated
6  with this misappreciation phenomenon that
7  we've been discussing; is that correct?
8     A. With the proviso that this isn't
9  a price effect. This problem, or source of
10  harm, is not -- doesn't work through
11  prices. It works through mistakes that
12  people are making.
13    Q. Did you --
14    A. They might be making if they're
15  misled about the quality of a product.
16    Q. Did we not five minutes ago
17  discuss that this misappreciation
18  phenomenon could have price effects. We
19  talked about that, right? And you
20  testified that it could.
21    A. If demand has changed, it's
22  conceivable that there would be differences
23  in profit maximizing price.
24    Q. So this phenomenon could have

Page 261

T. McGuire - Highly Confidential

1  price effects, correct?
2     A. Well, I think what we just said,
3  if this is changing demand, it could have
4  implications for the profit maximizing
5  prices.
6     Q. Okay. And your model doesn't do
7  anything to separate out those possible
8  price effects, right? Because you couldn't
9  do it.
10    A. Well, given the framework of
11  fixed quantities, it's not called for.
12    Now, there is a source of harm
13  here that doesn't have anything to do with
14  changes in quantities. It has to do with
15  people making mistakes. So, I don't
16  know --
17    Q. I agree with you. I think we're
18  saying the same thing.
19    Your model does not account for
20  this particular harm that is associated
21  with the alleged misappreciation of the
22  value of the vaccine, correct?
23    A. I agree with that.
24    Q. Okay.

66 (Pages 258 - 261)

Page 262

1    T. McGuire - Highly Confidential
2        A.  And let the record show that
3    that's the one that I agreed with.
4        Q.  Okay.  Let's turn to Paragraph
5    104 of your report.  And we're going to
6    talk a little bit about ProQuad.
7        A.  (Witness complies.)
8        Q.  So in Paragraph 104 of your
9    report, you indicate that you calculate
10   overcharge from ProQuad sales assuming
11   ProQuad would not have been approved by the
12   FDA, correct?
13       A.  Yes, that's correct.
14       Q.  And that was based on something
15   that counsel instructed you to do?
16       A.  Yes.
17       Q.  You weren't instructed to assume
18   that GSK was going to enter with a
19   competing quadrivalent vaccine?
20       A.  I don't believe so.
21       Q.  And so in this scenario, you're
22   assuming that there is -- there are fewer
23   products on the market in the but-for
24   world?
25       A.  In the but-for world, ProQuad is

Page 263

1    T. McGuire - Highly Confidential
2    gone.  And so there would be one less.
3        Q.  As an economist, is it your view
4    that as a general proposition having more
5    products on the market is better for
6    competition?
7        A.  It's not always true.  The point
8    is of more products is people can make more
9    choices and can better match something to
10   their preferences.
11       If those choices are, you know,
12   directed in some other way, a product might
13   be introduced in a market that would, you
14   know, lead to harm.
15       Q.  So is it your opinion in this
16   case that the introduction of ProQuad into
17   this market, or the fact of ProQuad being
18   on the market was actually harmful to
19   consumers?
20       A.  Well, in the sense that I
21   calculated, which was a price-driven
22   calculation, as I was asked to do.  That
23   had consumers instead bought the separate
24   vaccines, they would have paid less.
25       Q.  In what circumstances would the

Page 264

1    T. McGuire - Highly Confidential
2    existence of more products rather than less
3    be harmful?
4        A.  Okay.  There's a number of these.
5    One would be just a standard monopolistic
6    competition.  Are you familiar with a
7    monopolistic competition?  Let me --
8        Q.  Why don't you explain it.
9        A.  -- explain it for the record
10   briefly, that it's one of the basic forms
11   of market structure in which there is an
12   element of monopoly.  So each firm faces a
13   downward sloping demand curve, but there is
14   also competition in which there is free
15   entry.
16       So you might think of something
17   like restaurants would be a good example of
18   monopolistic competition.  The key thing
19   that makes it monopolistic competition is
20   the presence of a fixed cost.  So the
21   market equilibrium looks like -- pardon me
22   for to be jargoning here.  But where the
23   demand curve is tangent to the average cost
24   curve.  So the firm is making zero profits,
25   but there is a downward sloping demand.

Page 265

1    T. McGuire - Highly Confidential
2        Now, what can happen in terms of
3    too much choice is there is no guarantee in
4    a competitive market that you get the right
5    number of entrants in monopolistic
6    competition.  It could be too many
7    entrants, or it could be too few.
8        So that's just an example of a
9    very well-known and accepted form of market
10   structure in which your basic, you know,
11   question is not true.
12       It's also not true in a lot of
13   R&D driven or related markets in which
14   there is something called me too
15   competition.  You know, very quickly what I
16   mean by that is imagine an invention that,
17   we can think of a drug say, that is very
18   helpful against some illness, and a firm
19   has a patent on that drug and is making
20   profits, very good profits on the basis of
21   that.  An alternative firm might say that's
22   really a good market for me to be in, let
23   me pursue an alternative technology that
24   will do exactly the same thing.  And those
25   investments on the part of that firm don't

67 (Pages 262 - 265)

Appx20257

HIGHLY CONFIDENTIAL

Page 266

T. McGuire - Highly Confidential
1 lead to any improvement in the technology
2 of treatment, but they consume social
3 resources in the investment.
4       There is another class of
5 instances in which more choice is -- it has
6 the opposite effect of improving consumers
7 in a whole range of areas in health
8 economics. One of those that I studied is
9 the market for health insurance in which
10 it's a pretty complicated product. And, as
11 employees, what we're used to is having
12 like one or two choices, and we can make
13 those choices pretty well.
14       But when you get in Medicare and
15 if you're a Medicare beneficiary, you have
16 this, you know, range of stuff. You have,
17 you know, 20, 30 Medicare Advantage plans,
18 you have Part D, you have supplemental, do
19 I want all of this, or do I stay in
20 traditional Medicare. And there is
21 empirical literature that demonstrates that
22 as choices proliferate, the matches between
23 people's preferences and their choices can
24 degrade.

*(Note: line numbers 1–25 as printed)*

Page 267

1       T. McGuire - Highly Confidential
2       So those are just three sets of
3 examples, but I'll stop there and see if
4 you want to ask questions.
5       Q. Are any of those examples that
6 you just described analogous to the market
7 for ProQuad?
8       A. Well, the first example I gave,
9 really the -- no, not the first example.
10 But the second example was a drug example.
11       Q. Can I ask you about the second
12 example?
13       A. Yes, sure.
14       Q. Is that akin to the product top
15 situation?
16       A. No. Product top is something
17 different. That's a kind of fourth example
18 that is probably a little closer to this,
19 actually.
20       Q. Okay. So --
21       A. Do you want to talk about product
22 tops?
23       Q. I do.
24       A. Okay.
25       Q. In the context of a product top,

Page 268

1       T. McGuire - Highly Confidential
2 right, there is an introduction of new
3 competition, right? Or a new product, I
4 should say.
5       A. Yeah, it's not competition in the
6 sense of a different firm. It's, I'd say,
7 a reformulation, or a line extension, or a
8 combination product. GEN (phonetics) is
9 part of the class called line extensions
10 which are the kind of subject of the
11 product top kind of analysis.
12       Q. But the evil associated, such as
13 it is with a product top, is that that
14 output is reduced; isn't that right?
15       MR. KODROFF: Object to form.
16       A. I wouldn't say that. The evil
17 associated with product top in the
18 literature, as I understand it, is that a
19 brand company facing competition in the
20 form of loss of patent exclusivity is
21 generally the nature of particular product
22 tops, has an incentive to create a line
23 extension and move patients to the line
24 extension, and to maintain high prices for
25 a longer period of time.

Page 269

1       T. McGuire - Highly Confidential
2       The harm comes by suppressing
3 potential competition at the time of patent
4 expiry.
5       Q. Right. So precluding entry by a
6 generic, for example, right?
7       A. Yeah. Generally, yeah. That's
8 right.
9       Q. And that reduces output; isn't
10 that true? Because the generic is not on
11 the market.
12       A. No, it doesn't necessarily reduce
13 the quantity of output in a molecule. It
14 makes consumers pay higher prices.
15       Q. They pay higher prices -- strike
16 that.
17       Do those in the product top
18 scenario, are consumers prevented from
19 making the choice about what product is
20 best for them?
21       MR. KODROFF: Objection to form.
22       A. There is hard switches and there
23 is soft switches in the product top realm.
24 The hard switch version of this in which a
25 product is pulled from the market at the

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL

Page 270

1    T. McGuire - Highly Confidential
2 time that another one is introduced, in
3 that case the answer is pretty clearly yes,
4 because some consumers who would have
5 preferred the original formulation can't
6 make that choice any longer.
7        In the soft switch version in
8 which the original product remains on the
9 market, it has been observed that part of
10 the strategy of the brand introducing the
11 new formulation is to raise the price of
12 the original formulation as part of the
13 strategy to move people over to the new
14 product.
15       And while that literally doesn't
16 prevent someone from buying, it does
17 inhibit them from buying as part of the
18 product top strategy.
19    Q.  In respect of the ProQuad
20 situation, would you agree with me that
21 having ProQuad on the market would give
22 consumer -- or physicians a broader variety
23 of products from which to choose?
24    A.  Well, addition of a product kind
25 of does that by definition.  But I think

Page 271

1    T. McGuire - Highly Confidential
2 this product top analogy is actually a
3 pretty good one in terms of how to
4 understand this economically.  And so if
5 you would like to continue to talk about
6 that, I think it applies here.
7    Q.  Okay.  But in the product, in
8 this particular situation, there is no --
9 there is no hard switch analogy, right?
10    A.  I don't think there is a hard
11 switch.
12    Q.  There is no soft switch analogy,
13 either, right?  Because there is no state
14 substitution laws, or things like that,
15 that is what gives rise to the soft switch
16 in the product distribution --
17    A.  No, that -- the state
18 substitution laws are important in the
19 typical brand generic, but it's not the
20 only motivation for a product top.  There
21 could be motivation if I just -- this new
22 product may make it more difficult for my
23 competitors, so I want to move consumers
24 over there.  That could still be the case.
25    Q.  We can at least agree that a

Page 272

1    T. McGuire - Highly Confidential
2 combination vaccine like ProQuad results in
3 fewer injections for patients, right?
4    A.  My understanding is that's
5 correct.
6    Q.  In terms of your methodology for
7 conducting your analysis of damages with
8 respect to ProQuad, part of it incorporates
9 the but-for prices of the MMR vaccine,
10 right?
11    A.  Yes.
12    Q.  And then you use averages of
13 actual world discounts for ProQuad, right?
14    A.  Yes.
15    Q.  In conducting your analysis, do
16 you account for the notion that Merck would
17 have behaved differently with respect to
18 the varicella component and the MMR
19 component in the but-for world than it did
20 in the actual world?
21       MR. KODROFF:  Object to form.
22 Differently in price?  Was that the
23 question?
24       MR. FEE:  With respect to price.
25       MR. KODROFF:  Thank you.

Page 273

1    T. McGuire - Highly Confidential
2    A.  Let me think a second.
3        I spelled out in this paragraph
4 what I assume was going on in the but-for
5 world.  By I guess -- so if you can maybe
6 zero in on the thing that...
7    Q.  So let me ask it this way.  In
8 the but-for world that you modeled with
9 respect to ProQuad, Merck would still be
10 sole source for VARIVAX; isn't that true?
11    A.  Yes.
12    Q.  But then it would be facing
13 competition from PRIORIX, right?
14    A.  Yes.
15    Q.  So isn't one possible outcome
16 there that Merck would choose to respond to
17 the competition from GSK on MMR by
18 increasing the price of VARIVAX, where it's
19 sole source?
20    A.  In kind of a straightforward
21 economic model of a multi-product
22 monopolist, I'm selling over here, I'm
23 selling over here.  I make what is profit
24 maximizing to those two different product
25 lines is whatever it is.  Unless there is

69 (Pages 270 - 273)

Appx20259

HIGHLY CONFIDENTIAL

Page 274

1    T. McGuire - Highly Confidential
2 some connection between those two markets,
3 either on the cost side or the demand side,
4 then my decision about what's profit
5 maximizing here is not affected by what's
6 going on over here.
7        What is the nature of the
8 connection that might exist that would
9 serve to create the kind of effect you're
10 asking about? It's not going to be on the
11 cost side. The cost of production of these
12 things are not reasonably thought of to be
13 affected by one another.
14        Demand for vaccines is pretty
15 much every kid gets it, or whatever. It's
16 probably primarily driven by vaccine-
17 specific factors.
18        Might there then be some other
19 way that these markets could be connected?
20 It's nothing immediately comes to mind why
21 you might see -- why my original price for
22 VARIVAX, if that was profit maximizing, why
23 now some other price is profit maximizing.
24    Q. They are all part of a pediatric
25 portfolio, correct?

Page 275

1    T. McGuire - Highly Confidential
2    A. Well, the portfolio, yeah. We've
3 talked about that.
4    Q. Right. So -- and at least, for
5 some reason, these were connected. In the
6 actual world these were sold together as a
7 single product; isn't that right?
8    A. Well, I don't know if they would
9 be sold together as a single product. I
10 don't think --
11    Q. That's what ProQuad is; isn't
12 that right?
13    A. Oh, ProQuad, yes. I'm sorry.
14 ProQuad would be a single product, yes.
15 Right.
16    Q. So there is a minimum, that
17 connection. In the actual world, there is
18 a connection between these four antigens?
19    A. Yes. But you were asking about
20 the but-for world I thought.
21    Q. Right. And so I'm saying in the
22 actual world -- the but-for world is
23 informed by the actual world; isn't that
24 true?
25    A. As a general matter, yes.

Page 276

1    T. McGuire - Highly Confidential
2    Q. At least one possibility would be
3 that in the but-for world where Merck is
4 facing -- in the but-for world with respect
5 to ProQuad where Merck is facing
6 competition from PRIORIX, they could
7 account for that by keeping the price of
8 MMR II the same and raising the price of
9 VARIVAX, correct?
10    A. Well, this is a version of the
11 portfolio discussion we had earlier. I
12 don't see that it's any different than
13 that.
14        And as we said there, that the
15 primary effect of a competition is going to
16 be in the market in which competition takes
17 place. The presence of portfolio discounts
18 makes it possible that these things would
19 happen, but I just don't see a strong
20 reason to think that would be the case.
21    Q. Okay. And what is your basis for
22 suggesting that you don't think that that
23 would be the case in the but-for world with
24 respect to ProQuad?
25    A. I laid this out in the discussion

Page 277

1    T. McGuire - Highly Confidential
2 of a multi-product monopoly. And what
3 would be the connections you would look to
4 as an economist to lead you to think that
5 what's going on in market A is going to
6 affect the profit maximization of B.
7        I don't think cost is reasonable.
8 I think demand conditions in market B, if
9 we think about it, VARIVAX would not be
10 very much affected by what's going on over
11 here.
12        So I don't see a strong reason to
13 think there would be a change in the profit
14 maximizing behavior with respect to
15 VARIVAX.
16    Q. Are you familiar with the
17 testimony in this case that says that Merck
18 engages in pricing at the portfolio level?
19    A. I am, yes.
20    Q. And that viewpoint that's been
21 expressed to Merck in the record in this
22 case does not change your view?
23    A. No, it doesn't. There could be
24 portfolio pricing and my statement could
25 still be correct.

Page 278

T. McGuire - Highly Confidential

1     Q. And your statement is that you
3  don't see any reason why Merck would
4  discount VARIVAX in the ProQuad but-for
5  world to account for competition between
6  MMR II and PRIORIX?
7     A. I think -- I don't know. I just
8  don't see a strong reason to think that
9  would be the case.
10    Q. Other than the testimony in the
11  case?
12    A. Well, I'm not sure what testimony
13  you're talking about. I realize there is a
14  portfolio.
15    Q. So how do you reconcile, then,
16  the evidence that Merck prices on a
17  portfolio basis with your statement that
18  it's not likely that Merck would in the
19  but-for world adjust the price of one
20  component of the portfolio that is not the
21  vaccine that's facing new entry?
22    A. This is a version of the levels
23  versus change discussion we've had in a
24  couple of different context. The portfolio
25  discounting is -- or portfolio pricing,

Page 279

T. McGuire - Highly Confidential

1
2  shall we say, is something that makes
3  business sense for a company like Merck.
4     The question I'm answering in my
5  report is how do the prices change if
6  competition changes. So whatever economic
7  forces there are that lead to the presence
8  of portfolio pricing, those are, like in
9  ceteris paribus, they're still there.
10    But now there is something new.
11  The new thing is that there is competitive
12  pressure and a particular vaccine market.
13  What do I think as an economist will be the
14  kind of the first order effect of that? It
15  will be the price in that market.
16    You asked me: Well, because
17  there is this portfolio pricing, doesn't
18  that make it possible that something might
19  happen over here? I haven't denied that
20  possibility. I've only said I don't see a
21  strong reason to think that would be the
22  case.
23    Q. Okay. So I think we're saying
24  the same thing, which is it's possible you
25  don't believe it to be likely that Merck

Page 280

T. McGuire - Highly Confidential

1
2  would have in the but-for world adjusted
3  the price of VARIVAX to account for the
4  competition between MMR II and PRIORIX?
5     A. It's possible. It doesn't accord
6  with the basic economics of the situation
7  to think that there would be the major
8  effect over there in the other market.
9     MR. KODROFF: Can we take a
10  break? In the afternoon, I try to
11  take a shorter --
12    MR. FEE: Sure. That's perfectly
13  fine.
14    MR. KODROFF: Thank you.
15    VIDEO TECHNICIAN: It is
16  p.m. We are off the record.
17    (Proceedings recessed at
18  4:28 p.m., and reconvened at
19  p.m.)
20    VIDEO TECHNICIAN: It is
21  p.m., and we are back on the record.
22  BY MR. FEE:
23    Q. Welcome back.
24    A. Thank you.
25    Q. You cite the Berndt and

Page 281

T. McGuire - Highly Confidential

1
2  Denoncourt text several times in your
3  report; is that right?
4     A. Yes.
5     Q. And in that text, the authors
6  say, "Recall that while combination
7  vaccines offer advantages of fewer
8  injections making them more practical and
9  desirable for patients as well as
10  providers, the fewer injections translate
11  into reduced administration revenue for
12  providers making them less profitable."
13    Do you agree with that?
14    A. I'm sorry. Are you reading from
15  my report?
16    Q. No, I'm reading --
17    A. Or the text. It wasn't cited in
18  my report.
19    Q. The text that was cited in your
20  report.
21    A. A section of the book that was
22  not cited in the report.
23    Q. Correct. Yes.
24    A. Of course, it depends on the form
25  of reimbursement for a provider. But if

71 (Pages 278 - 281)

Appx20261

HIGHLY CONFIDENTIAL

Page 282

T. McGuire - Highly Confidential
1 the provider is paid on a fee basis, and
2 that fee is the same for administration of
3 a, you know, one vaccine to the other,
4 then -- and there is fewer of those things,
5 then the revenue would be lower if there
6 were one instead of two, if I'm...
7    Q.  Right.  I think we agree on that.
8    A.  Okay.  And was it revenue or
9 profit used in the statement?
10    Q.  Profit.
11    A.  Profit.  Oh, profit.  Not
12 necessarily.
13    Q.  Because that would actually
14 depend on the variations in reimbursement,
15 right?
16    A.  Yeah.  There cost comes into the
17 picture, not just revenue.  And the effect
18 could go either way.
19    Q.  It would be different for
20 different members of the class in this
21 particular case?
22    A.  It would differ mainly according
23 to the nature of the reimbursement you're
24 talking about, which could differ between

*(lines 1-25 above correspond to Page 282)*

Page 283

T. McGuire - Highly Confidential
1 different providers.
2    Q.  But it's possible, though, that
3 in the but-for world for ProQuad, certain
4 class members could be more profitable on
5 the administration of the vaccine because
6 there are more injections, right?
7    A.  There are more injections, and I
8 think it's kind of an implication of what
9 we just said a minute ago; that if the
10 revenue is per injection and the fee is the
11 same, then revenue will go up.  Cost will
12 also go up, because I have to do something
13 twice rather than once.  And profits could
14 go up or down.
15    Q.  Okay.  And, of course, I think we
16 discussed whether profits would go up or
17 down is largely related to reimbursement,
18 correct?
19    A.  That's, I mean, it's like profits
20 depend on revenues and cost, so I wouldn't
21 want to say revenues is more important than
22 cost.
23        And just one more little comment;
24 that we discussed profitability earlier

Page 284

T. McGuire - Highly Confidential
1 around just administration of a single
2 vaccine when we were comparing revenue and
3 cost.  And I think we referred to that as
4 the narrow profit or something.  We had a
5 word for it.
6    Q.  Delta I think we used.
7    A.  No.  It was -- we had a word for
8 the profit and losses related to the
9 administration of the vaccine.  But these
10 things affect the nature of the services
11 that a pediatrician offers.  And the
12 overall profitability of those things
13 depends, too.
14    Q.  Those particular factors that
15 might affect the profitability of
16 physicians in the but-for world where
17 they're doing more administration wouldn't
18 necessarily be relevant to wholesalers,
19 right?  Because they don't get reimbursed;
20 is that fair?
21    A.  You mean administration of the
22 vaccine?  That kind of administration?
23    Q.  Correct.
24    A.  Well, these are -- I wouldn't

Page 285

T. McGuire - Highly Confidential
1 want to make the blanket statement that
2 they're not important.  They're, obviously,
3 more important to the physician firm that's
4 making the revenue and the cost.  But these
5 things have implications for the
6 wholesalers.
7    Q.  So differences in reimbursement
8 have implications for wholesalers as well?
9    A.  Yeah, sure.
10    Q.  Okay.  And so tell me how a
11 difference in reimbursement might impact a
12 wholesaler's decision in the but-for world?
13    A.  I would take the word "decision"
14 out of your question, if you don't mind,
15 how it would affect the wholesaler in the
16 but-for world.  And reimbursement affects
17 physician activity and what vaccines they
18 choose, and how many they choose to
19 administer, whether they administer
20 vaccines, whether I buy through a buying
21 group or whether I buy independently.  And
22 all of those things impact wholesalers.
23    Q.  And that is because physicians
24 are -- the customer is the wholesaler,

72 (Pages 282 - 285)

Appx20262

Page 286

1    T. McGuire - Highly Confidential
2 right?
3    A.  That's what I'm saying, is the
4 customer is the wholesaler, yes.
5    Q.  And --
6    A.  We used the word "derived demand"
7 earlier.  That was your word, which is a
8 good word.
9    Q.  Okay.  But just in terms of the
10 pure profitability calculation, there is no
11 similar impact between -- on wholesalers
12 along the lines of what we were just
13 talking with respect to physicians; namely,
14 that physicians could be more profitable in
15 the event of multiple sticks versus only
16 one?
17    MR. KODROFF:  Objection.  Vague.
18    A.  Well, you know, profits is a more
19 complex concept than just payments.  How
20 much do buyers pay more as a result of
21 price changes.  We talked about that.
22 That's a pretty straightforward
23 calculation.
24    Once we delve into profits, then
25 it becomes more complicated, and the

Page 287

1    T. McGuire - Highly Confidential
2 impacts on different physicians, depending
3 on their payor mix, we talked about that,
4 and on their place in the supply chain,
5 which wholesalers are a different place in
6 the supply chain.  And profits, you know,
7 is a more complex analysis.
8    Q.  Okay.  But you would agree with
9 me that it doesn't directly depend on
10 reimbursement, because they don't actually
11 receive reimbursement, right?  Wholesalers
12 do not.
13    A.  I think I explained how that
14 depends on reimbursement.  So it's not that
15 that is a component of their revenue, but
16 it affects the people who are their
17 customers.  And that impacts them.
18    Q.  It doesn't directly impact their
19 bottom line; isn't that true?
20    MR. KODROFF:  Objection.  Asked
21 and answered.
22    A.  I don't know how else to say it
23 again.  It's -- it's --
24    Q.  Do wholesalers receive
25 reimbursement from insurance companies or

Page 288

1    T. McGuire - Highly Confidential
2 other managed care organizations?
3    A.  No, they don't.  But that's not
4 the same as it doesn't affect them.
5    Q.  Are they directly affected?
6    MR. KODROFF:  Objection.  Vague.
7    A.  The channel by which they are
8 affected comes through physicians.  And if
9 you want to call that indirect, you can
10 label it that.  That's how I meant my
11 answer to represent.
12    Q.  Because the demand is derived,
13 right?
14    A.  Because the demand is derived
15 from another decisionmaker.
16    Q.  Okay.  I'd like to talk now about
17 the calculations you did with respect to
18 the claims made by Relaters in this case.
19    A.  Okay.
20    Q.  You note in Paragraph 45 of your
21 report that "the current approach, under
22 which state and local recipients of federal
23 funds for purchasing vaccine" -- "for
24 purchasing vaccines can choose which of the
25 approved vaccine manufacturers to use,"

Page 289

1    T. McGuire - Highly Confidential
2 right?
3    A.  Yes.
4    Q.  Is it your understanding that CDC
5 has to contract with all licensed
6 manufacturers?
7    A.  I'm not sure.
8    Q.  You don't know one way or the
9 other?
10    A.  I'm not sure.
11    Q.  We're saying the same thing,
12 right?  You don't know one way or the
13 other?  You're not sure?
14    A.  I'm not sure.  I don't know how
15 they differ.
16    Q.  Me neither.
17    Have you reviewed any of the CDC
18 contracts with Merck as part of your
19 analysis of -- or your calculations with
20 respect to False Claims Act damages?
21    A.  I'm sorry, I'm not sure about
22 that either.
23    Q.  If you did, would they be
24 reflected in the appendix to your report
25 that lists your materials reviewed?

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL

Page 290

1    T. McGuire - Highly Confidential
2    A.  Yes, they would.
3    Q.  Since this lawsuit has been
4 filed, do you know whether CDC has changed
5 the amount of MMR II it purchases each
6 year?
7    A.  There is -- I think my data go up
8 through 2015.  Since this lawsuit was
9 filed, which, I'm sorry, I'm not sure what
10 date you would ask me --
11    Q.  2012.
12    A.  2012.  I think the public
13 quantities have changed, yeah.
14    Q.  With respect to private
15 purchasers, you assume that the earliest
16 GSK could have entered the market was 2009,
17 right?
18    A.  Based on Coppman's report, right.
19 Yes.
20    Q.  Is it your view, similarly, that
21 the CDC would have paid less for Merck's
22 mumps vaccine after 2009?
23    A.  I considered that as part of my
24 assignment here.  And, you know, they're at
25 the cap.  So they might have remained at

Page 291

1    T. McGuire - Highly Confidential
2 the cap after GSK entry.  So I didn't
3 quantify any effect of that.  Certainly
4 there would be, if anything, a downward
5 kind of valence to prices, but I didn't see
6 it as -- I didn't see a way to quantify it.
7    Q.  Just to back up a second -- well,
8 let's just finish this out.
9    You calculated False Claims Act
10 damages beginning in 2004; is that correct?
11    A.  Yes.
12    Q.  Okay.  Where did you come up with
13 2004?
14    A.  That was an instruction from
15 counsel.
16    Q.  Okay.  Do you have any opinion on
17 the comparisons between MMR II and PRIORIX
18 on efficacy?
19    A.  No, I don't.
20    Q.  Same question with safety.
21    A.  No, I don't.
22    Q.  Same question with respect to
23 effectiveness.
24    A.  Same answer.
25    Q.  Have you reviewed in connection

Page 292

1    T. McGuire - Highly Confidential
2 with your damages calculation for the False
3 Claims Act case any head-to-head study data
4 as to the mumps component of Merck's
5 vaccine and GSK's vaccine?
6    A.  No, I don't believe I have.
7    Q.  If you had, it would be included
8 in the appendix to your report, correct?
9    A.  Yes, it would.
10    Q.  In performing your calculations
11 of CDC's actual damages, you assumed that
12 Merck's mumps vaccine has no value, right?
13    A.  No, I didn't make that assumption
14 at all.
15    Q.  So how do you -- let's actually
16 talk about what you did in Paragraph 109.
17    So is it correct that to isolate
18 the value of the mumps vaccine for MMR, you
19 take the past prices for the monovalent
20 vaccine?
21    A.  The most recent ones that I had,
22 yeah.
23    Q.  And then you divide that by the
24 MMR -- and divide the price of MMR II in
25 2004 by the monovalent prices?

Page 293

1    T. McGuire - Highly Confidential
2    A.  In proportion to the monovalent
3 prices, yes.
4    Q.  Right, okay.  And for ProQuad,
5 you calculated the cost of mumps vaccine by
6 taking the price of MMR and dividing it by
7 the combined price of MMR and VARIVAX,
8 right?
9    A.  It's the similar idea of doing
10 the proportion of the total attributable to
11 mumps.
12    Q.  Okay.  And you then go ahead and
13 total that up for each year, from 2004 to
14 2007, right?
15    A.  Yes.
16    Q.  Okay.  And you arrive at --
17    MR. KODROFF:  '17.
18    Q.  I'm sorry.  2017.
19    And you come up with 560 million
20 some odd dollars, right?
21    A.  Yes.
22    Q.  So your calculations assume that
23 the CDC should receive all of the amounts
24 that it paid for Merck's mumps vaccine
25 back, right?

74 (Pages 290 - 293)

Page 294

T. McGuire - Highly Confidential
1     T. McGuire - Highly Confidential
2     A. I'm just doing as I was
3 instructed here by counsel; to total up
4 what the CDC paid Merck for these products.
5 There is no real, any other assumptions
6 behind that. It's just doing the math, as
7 we said earlier.
8     Q. Okay. So you didn't try to do an
9 analysis of how much less value the
10 government received as a result of a
11 product that's quality was allegedly
12 overstated, right?
13     A. That's correct. I didn't study
14 value. Only payments.
15     Q. And we agree, right, that Merck's
16 mumps vaccine does have value?
17     A. Yeah, we said that earlier. I
18 wouldn't deny that.
19     Q. And we agree that it reduced --
20 the Merck's mumps vaccine has reduced
21 occurrences of mumps substantially over the
22 course of its existence since the late
23 '60s, right?
24     A. I also agree with that, yes.
25     Q. And you don't do any analysis to

Page 295

1     T. McGuire - Highly Confidential
2 determine the difference between what the
3 government was promised and what the
4 government actually received in terms of
5 the MMR vaccine, right?
6     A. That's true. I didn't study
7 promises. Only what they paid.
8     Q. And so but you didn't try to do
9 the math that would incorporate, or that
10 would assess the question -- strike that.
11     You didn't do an analysis to
12 assess the question of the difference
13 between what Merck allegedly said it was
14 providing to the government and what it
15 actually received in terms of damages; is
16 that right?
17     A. That's correct. I simply totaled
18 up payments by the government.
19     Q. Did you review any of the
20 invoices from Merck to the CDC?
21     A. I believe they were included in
22 the data that I had, yes.
23     Q. And in the transaction data, how
24 did you identify the invoices?
25     A. The -- how did I identify whether

Page 296

1     T. McGuire - Highly Confidential
2 they were CDC or something else?
3     Q. Well, let me ask you --
4     A. Or what are you asking?
5     Q. Let me ask you this. You define
6 an invoice as a single observation in the
7 transaction data; is that right?
8     A. Point me here. I understand that
9 this was an issue. Where are you looking
10 at when you say where I defined it?
11     Q. I'm just asking you.
12     A. I understood my assignment to be
13 a claim or invoice. So I was looking for a
14 claim or invoice in the transactions data.
15     Q. So based on -- each entry in the
16 transaction data you equated with either a
17 claim or an invoice?
18     A. That's correct, yes. That's what
19 I -- my count was based on a line that it
20 would be a claim or an invoice - and/or an
21 invoice.
22     Q. And you didn't use the Merck
23 invoice data field to identify invoices in
24 the transaction data, right?
25     A. I -- this part of my work was a

Page 297

1     T. McGuire - Highly Confidential
2 count, and I counted each line equally,
3 which I think answers your question. If
4 there was more than one invoice number that
5 was common to different lines, I counted
6 them twice.
7     Q. Is this something that your
8 colleague at Greylock actually did this?
9     A. "Actually did," meaning what?
10     Q. Meaning, actually ran the
11 calculations.
12     A. Yes. Keith would have created
13 programs that did these calculations.
14     Q. And did you do anything to
15 confirm that you're counting -- that each
16 invoice value represented in the data was
17 unique?
18     A. Well, as I explained, I wasn't at
19 the time I did this thinking I need to
20 count only invoices. My assignment was to
21 count claims or invoices.
22     Q. What's the difference in your
23 mind? I'm sorry, were you finished?
24     A. No. Just briefly, I've worked
25 with claims datasets many, many times and

75 (Pages 294 - 297)

Page 298

T. McGuire - Highly Confidential

1  they come in lines. And my approach was
2  just based on my experience in dealing with
3  these kind of datasets, this is how many
4  claims there are, and this is then the
5  multiplication of the minimum and the
6  maximum.
7
8     Q. Okay. And so --
9     A. If there is other legal
10 instructions out there, then I could do it
11 differently or someone else could do it
12 differently.
13    Q. But to answer my question, you
14 didn't do anything to confirm that there
15 wasn't any duplication within the claims
16 that you counted?
17    A. Duplication of invoices?
18    Q. Yes.
19    A. I didn't confirm that, because I
20 was looking for claims or invoices. And so
21 I --
22    Q. Did you do anything -- within the
23 universe of claims or invoices, did you do
24 anything to confirm that there was no
25 duplication?

Page 299

T. McGuire - Highly Confidential

1     A. I didn't do that, no.
2     Q. Do you understand that by just
3  looking at the CDC payments and not the
4  actual value of the vaccines that your
5  implication of that is that the vaccine
6  product that the government received is
7  worthless?
8     MR. KODROFF: Objection.
9     MS. KOURY: Objection.
10    MR. KODROFF: Vague.
11    MS. KOURY: Calls for a legal
12    conclusion.
13    A. Well, it certainly contradicts
14 economic -- an economic perspective. If
15 I'm asked to total payments for something,
16 I can do that. It doesn't -- it's like a
17 non sequitur to then say that the thing
18 itself is worthless.
19    Q. So by suggesting that the
20 government should receive all of the money
21 it paid to Merck for the mumps component of
22 the vaccine, which is what your
23 calculations imply, you're not saying that
24 the vaccine is worthless?

Page 300

T. McGuire - Highly Confidential

1     A. I am not implying anything by the
2  calculation. I'm just doing the
3  calculations. The implications will be
4  played out.
5     Q. And did you when counsel asked
6  you to perform these calculations, did you
7  ask any questions about how FCA damages are
8  appropriately calculated?
9     A. I was given pretty
10 straightforward instructions. And, no, I
11 don't think I questioned the legal basis
12 for my instructions.
13    Q. If you were to set out and to
14 calculate damages independent of counsel's
15 instruction in this case, would you do it
16 differently?
17    MR. KODROFF: Objection to form.
18    If also calls for a legal conclusion.
19    A. Define "damages" for me in the
20 way that an economist would understand it.
21    Q. How do you define "damages" in
22 your report to the FCA?
23    A. I don't define damages. I just
24 do a count of payments.

Page 301

T. McGuire - Highly Confidential

1     Q. Okay. What is your view of what
2  "damages" mean?
3     A. As an economist, apart from any
4  legal particular context, it involves
5  benefits and cost. And a agent, say, say
6  a consumer is getting a net benefit of
7  benefits minus cost, and that consumer or
8  agent would be damaged on the metric of
9  that net benefit. That's how I would
10 define "damages" in a general sense of
11 economics.
12    Q. So you would define "damages" as
13 a net benefit between what was actually
14 paid and what would have been paid in the
15 alternative world?
16    A. Well, no, I didn't say that. I
17 talked about benefits and cost. It was a
18 very general description of what you mean
19 by "damages" -- what I mean by "damages."
20    Q. Well, let's say you were trying
21 to calculate damages for FCA claims as an
22 economist, would you do it this way?
23    MR. KODROFF: Objection to form.
24    The law and the damages are what they

76 (Pages 298 - 301)

Page 302

1    T. McGuire - Highly Confidential
2    are.  Asking him what his -- how he
3    would do it different from the law is
4    kind of irrelevant.
5        MR. FEE:  You can answer the
6    question.
7        And stop the speaking objections.
8        MR. KODROFF:  Come on.
9    A.  It's not the kind of thing I
10   would think about doing.  If there is a
11   legal context in which some calculation
12   needs to be made like what is a false claim
13   - what is a false claim?  What do I know
14   about what is a false claim?  I have a very
15   general understanding about what is a false
16   claim.
17       But I wouldn't want to base my
18   analysis on my understanding of what a
19   false claim is, I would like someone to
20   tell me what a false claim is and tell me
21   what to do with respect to calculating
22   damages.  So I would kind of shy away from
23   that question.
24   Q.  So as an economist, do you think
25   it makes sense to not factor in the value

Page 303

1    T. McGuire - Highly Confidential
2    received by the government for the mumps
3    vaccine in calculating damages in this
4    case?
5        MR. KODROFF:  Objection.  Calls
6    for a legal conclusion.
7    A.  It "makes sense."  You really
8    have to ask a question that I can answer as
9    an economist.
10   Q.  I did.  Answer the question.
11   A.  "Makes sense"?
12   Q.  Does it makes sense to you --
13   A.  Is efficient?  Is fair?  What
14   exactly do you mean by "makes sense"?
15   Q.  As an economist, is it
16   appropriate not to factor in the value
17   received by the government for the mumps
18   vaccine in calculating damages in this
19   case?
20       MR. KODROFF:  Same objection.
21   Calls for a legal conclusion.
22   A.  This is a legal proceeding.  What
23   is appropriate in a legal proceeding is
24   different than just the efficiency cost and
25   benefits that are my world.

Page 304

1    T. McGuire - Highly Confidential
2    Q.  As an economist?
3    A.  As an economist.  So for me, cost
4    and benefits are what I study.  What is
5    appropriate in a particular legal context
6    is in my very general understanding is not
7    a matter of always cost and benefits.  It's
8    a matter of how we want to run society, and
9    I'm not really qualified to make a
10   determination of what's appropriate and
11   what's not appropriate.
12   Q.  So would you agree with me that
13   actual damages are equal to the difference
14   between the market value of the product the
15   government received and what it paid?
16       MR. KODROFF:  Objection.  Are we
17   talking damages under the FCA?
18       MR. FEE:  Yes.
19       MR. KODROFF:  So it calls for a
20   legal conclusion.  Thank you.
21   A.  My position in this is not to
22   determine what the legal definition of
23   "damages" are under the FCA.  I don't know
24   how to do that.  I just don't know how to
25   do it.  So I don't have a position on that.

Page 305

1    T. McGuire - Highly Confidential
2    And I depend on counsel in this case to
3    instruct me what it is I need to compute in
4    order -- and I'm a role player.  I'm not
5    sure where this fits into the overall
6    picture.  But I was asked to do something,
7    a simple calculation based on data, which I
8    hope feeds in in some productive way.
9        I didn't seek to divine it on my
10   own.  I don't think I can.
11   Q.  You testified earlier today that
12   you had begun to formulate your views about
13   the expert opinions that -- the three
14   expert opinions that you had read that had
15   been offered by Merck in this case; is that
16   right?
17   A.  That's correct.
18   Q.  What views with respect to the
19   expert opinion of Dr. Cremieux have you
20   formulated this for?
21   A.  We don't want to go through his
22   report.  I'm happy if you want me to give a
23   comprehensive answer to start at the
24   beginning and tell you what I think piece
25   by piece.

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL

Page 306

1    T. McGuire - Highly Confidential
2    Q.  Sure.
3    A.  Do you have a copy his report
4  that you can give me?
5        If you have more targeted
6  questions, I'll do the best I can.
7    Q.  Are there specific things that
8  you disagree with in the expert opinion
9  that has been offered by Dr. Cremieux based
10  on your preliminary thinking?
11    A.  Yeah.  There is a number of them.
12  And if you want them all, we need to start
13  at the beginning.  If you want something in
14  particular, I'm happy to try to answer it.
15    Q.  Okay.  What things do you
16  disagree with?
17    A.  If you want me to go through it,
18  I'm happy to go through it.  But if you ask
19  me what are the things I disagree with, I
20  interpret that question as asking me what
21  are all the things I disagree with.  And to
22  do that, I'd like to look at the report and
23  go through it and I could start telling you
24  paragraph by paragraph.
25    Q.  You can't tell me anything

Page 307

1    T. McGuire - Highly Confidential
2  without looking at his report?
3    A.  I didn't say that.
4    Q.  Okay.  Well, why don't you tell
5  me what you can tell me.
6    A.  Okay.  I thought there are
7  some -- this isn't going to be very
8  systematic, so just as they come to my
9  mind.
10        I thought there were some
11  misapplication of concepts from brand
12  generic competition that got included in
13  the report that I think weren't
14  particularly germane to vaccines.
15    Q.  What specific concepts?
16    A.  The concept of brand loyalists,
17  for example, and the concept of
18  differentiation I thought was overdone in
19  the context of the vaccine we're talking
20  about today.
21        I thought the kind of
22  theoretical -- I have sort of a minor and a
23  more major theoretical criticism.  The more
24  minor theoretical criticism is the
25  discussion around the possibility that

Page 308

1    T. McGuire - Highly Confidential
2  competition can raise prices.  I'm sure you
3  know in his report.  He talks -- he
4  references a paper by Michael Reardon and
5  someone else, I don't remember the second
6  author, is published in something called
7  the RAND Journal; and it's a particular
8  model of consumers in which the theoretical
9  possibilities exist.  And I don't think
10  that's a very good match to what we've been
11  talking about here today.  That's the more
12  minor objection.
13        The more major objection about
14  his theoretical framework is the kind of
15  denial -- this is -- these are my words, so
16  just, you know, hear them from that
17  respect.
18        What I interpreted his denial of
19  very basic economic methodology regarding
20  how to understand how markets work; that
21  there are things like demand curves and
22  supply curves that we, economists, use as
23  our everyday bread and butter in which
24  there are individuals, sure.  There are
25  individual consumers behind the demand

Page 309

1    T. McGuire - Highly Confidential
2  curve, there is individual firms behind a
3  supply curve.  And there are differences
4  between those people; some of them are --
5  have different preferences.  But, you know,
6  all of these things, some of those things
7  we talked about today.
8        But the logic that says, yes,
9  there are -- there is heterogeneity in the
10  world.  Yes, some consumers are different;
11  yes, some firms are different.
12        Two, the implication that you
13  can't do market level analysis, I think I
14  just don't accept.  So I may be putting
15  words into Cremieux's mouth, and I'm sure
16  he'll have his own perspective on this, but
17  I thought that was also a -- so it didn't
18  show an appreciation on the way economics
19  is done.
20        So those are my more conceptual
21  that I can think of at this point.
22        And then empirically, the -- let
23  me start from the back in the Relaters'
24  case.  The kind of the redefinition of the
25  elements on which a penalty would be

78 (Pages 306 - 309)

Appx20268

Page 310

1    T. McGuire - Highly Confidential
2 assessed from either a claim or an invoice,
3 which I can understand the issues we talked
4 about a few minutes ago about is it a
5 claim, is it an invoice, that someone
6 outside of my expertise would be able to
7 determine that.
8        The part of his report that
9 changed it radically into some
10 dosage-related thing, I didn't know where
11 that was coming from. I didn't see any
12 economic basis for that. I really don't
13 know where that was coming from. So that
14 just kind of left me out in the limbs, like
15 why would this economist do this. So I
16 didn't get that. And things you don't get,
17 you wonder, like, why is this person saying
18 this in this report.
19        Kind of then going, still going
20 from the back, the, you know, the
21 difference between what Cremieux did and
22 what I did, in part was driven by the way
23 he did what he called the yardstick
24 analysis, which is something similar to
25 what I have done. He chose his own methods

Page 311

1    T. McGuire - Highly Confidential
2 for doing the yardstick analysis that were
3 different than mine, and, by the way, were
4 different from Rao's. So none of the three
5 of us actually had the same, had an overlap
6 even, in the yardsticks we considered.
7        And so in Cremieux's case, as I
8 understand his report, was working on the
9 basis of two different approaches to the
10 yardsticks. One of them I'm not even sure
11 I would call the yardstick, although he
12 does. It's the -- working on the basis of
13 the planning documents from Merck which
14 indicate a first-year decline in --
15 sorry -- first-year increase in the
16 discount rate, and then subsequent to that
17 no change in the discount rate.
18        And on the basis of that
19 assumption about what would happen, you can
20 do calculations about what the overcharges
21 would have been to consumers. He did that.
22        And then he used a particular
23 vaccine as an alternative yardstick, which
24 was a polio vaccine, that was not Merck, or
25 that I thought was not as good a comparator

Page 312

1    T. McGuire - Highly Confidential
2 as the ones I chose. The companies weren't
3 the same. And my understanding of the
4 polio vaccine is that there are pretty
5 substantial differences between the first
6 that was introduced and the second that was
7 introduced that covered more illnesses. So
8 that second entry isn't just kind of the
9 same thing coming in. It's really
10 something quite different coming in. So I
11 thought that would be a less effective
12 comparator than the ones I had chose.
13        So I didn't -- I thought his
14 yardstick approach was -- I think the
15 document thing is pretty chancy. There is
16 lots of documents. And why this one as
17 opposed to other documents one could have
18 chosen as yardsticks. So that didn't sit
19 well with me. And then the polio yardstick
20 I thought wasn't a strong comparator.
21        So I'll just -- let me take a
22 break, I mean not a break break, but take a
23 breath. And if something else comes to me,
24 I'll add it.
25    Q. Okay. So I want to focus on, I

Page 313

1    T. McGuire - Highly Confidential
2 think, the minor theoretical point that you
3 took issue with in Dr. Cremieux's report,
4 which was that they're -- you were talking
5 about the Reardon article and the RAND
6 Journal, which you said I have imported
7 concepts from brand/generic competition
8 inappropriately in vaccines; is that
9 correct?
10    A. There were two statements there.
11 I wasn't equating the appropriation of
12 brand/generic into the RAND article. I was
13 saying I thought there was too strong an
14 appropriation of the perspectives from
15 brand/generic into the vaccine, and I
16 thought that article was not that relevant
17 to the case here.
18    Q. And what are the reasons that you
19 don't think that that article is -- or the
20 concepts in that article aren't applicable
21 to vaccine markets?
22    A. Well, I think the buyers we're
23 talking about here are for-profit firms and
24 it's just a difference. Transaction
25 between for-profit firms and how it might

79 (Pages 310 - 313)

Page 314

1    T. McGuire - Highly Confidential
2  work with consumers.
3    Q.  Are you aware of physician-
4  administered drugs that exist, right?
5    A.  Yes.  Including vaccines.
6    Q.  Right.  But so you're aware of
7  drugs that are non-vaccine drugs, so small
8  molecule drugs that are not bought directly
9  by consumers.  They're purchased by
10  physicians, right?
11    A.  Small molecule drugs?
12    Q.  Let me back that up.  So biologic
13  products.
14    A.  "Biologic products."  Yes, I'm
15  aware of that.
16    Q.  And there can be the
17  brand/generic type interplay in those
18  markets, right?
19    A.  Well, the -- for biologics, there
20  can be competition.  There can be entry by
21  the non-originator firm, but it's not the
22  same simple generic AB-rated that happens
23  in a small molecule case.  But I'm not sure
24  where you're going with this.
25    Q.  So let's take this:  Are there --

Page 315

1    T. McGuire - Highly Confidential
2  does that brand/generic scenario that is a
3  result of the Hatch-Waxman situation --
4    A.  Yes.
5    Q.  -- does that only apply to drugs
6  that are bought by consumers?
7    A.  Hatch-Waxman.  AB-rated.  Just
8  AB-rated state substitution laws, they
9  happen at pharmacies where consumers are
10  the ones that are doing the buying.  So
11  maybe you can point to some exception to
12  that, but I don't see it.
13    Q.  Okay.  So you're not aware of any
14  scenario where there is this brand/generic
15  dynamic where it's a physician-administered
16  drug?
17    A.  Well, this is a different
18  question.  The physician-administered drugs
19  are not the small molecules that are
20  purchased by consumers at pharmacies.
21       I'm generally aware of the
22  biologics and the competition.  I'm not
23  sure what you're trying to get at.
24    Q.  Well, I guess what I'm trying to
25  get at is you said you didn't think that

Page 316

1    T. McGuire - Highly Confidential
2  the literature, the RAND Journal
3  literature, was applicable to vaccine
4  markets because that literature pertained
5  to products that were purchased by
6  consumers instead of physicians.
7    A.  Yes.
8    Q.  And what I'm asking you is, are
9  you aware of any non-vaccine products that
10  are purchased by physicians.
11    A.  Yeah, Part B drugs are
12  purchased by -- in Medicare they're
13  purchased by physicians.  They're
14  reimbursed under Part B.
15    Q.  Why don't we talk a little bit
16  about the Rao report.
17    A.  Okay.
18    Q.  Well, you know what, why don't we
19  take a break, because we've got five
20  minutes on the tape.  And rather than take
21  a break then, we'll take a break now.
22       VIDEO TECHNICIAN:  It is
23  p m.  We're going off the record.
24
25

Page 317

1    T. McGuire - Highly Confidential
2       (Proceedings recessed at
3   5:28 p.m., and reconvened at
4   p m.)
5       VIDEO TECHNICIAN:  It is
6   p m., and we're back on the record.
7  BY MR. FEE:
8    Q.  Okay.  Welcome back, Dr. McGuire.
9    A.  Thank you.
10    Q.  Let's shift gears to Dr. Rao's
11  report.  Sitting here today, what issues or
12  criticisms do you have for Dr. Rao's
13  opinion?
14    A.  I haven't spent as much time with
15  Rao as I have with Cremieux, so I'm really
16  not prepared to give a reaction to Rao.
17    Q.  Okay.  Let me ask you the same
18  question with respect to Dr. Freed's
19  report.  What criticisms do you have with
20  respect to Dr. Freed's opinions?  Setting
21  aside what we've already talked about today
22  with respect to his article.
23    A.  Okay.  So I have talked some
24  about the inferences he makes from his
25  data.  He also talks about economics.  He

80 (Pages 314 - 317)

Appx20270

Page 318

1    T. McGuire - Highly Confidential
2 talks about how it's -- I think he may use
3 the word impossible to model pricing
4 because there is so much variation, and I
5 disagree with that.
6        He also makes a comment about my
7 duopoly model. They thought it wasn't an
8 appropriate duopoly model, and I also
9 disagree with that.
10        And that's all that comes to
11 mind. So I, of course, reserve the right,
12 and all that, to say more later if need be.
13    Q. When do you plan to say more?
14    A. I don't have any current plans.
15 But if need be, I'm prepared to.
16    Q. Okay. And I think you testified
17 today that you've not been asked to provide
18 a supplemental report in this case,
19 correct?
20    A. That's correct, yes.
21    Q. Do you know one way or the other
22 whether you are allowed to do that by the
23 Court in this case?
24    A. I actually don't know.
25    Q. With respect to the FCA

Page 319

1    T. McGuire - Highly Confidential
2 calculations that we were talking about a
3 little bit earlier, did you do anything
4 that someone like me that's not a Ph.D.
5 economist couldn't do without an Excel
6 program?
7        MR. KODROFF: Objection. Vague.
8    A. "Couldn't do without." So, in
9 other words, someone like you could do with
10 an Excel program.
11    Q. Could I do the same thing as you
12 did?
13    A. I'm just trying to get the double
14 negative out of there.
15    Q. Okay.
16    A. I think you could, if you had the
17 data and you were told to count this,
18 chances are you'd probably do well.
19    Q. So it doesn't take any
20 specialized economic analysis to do what
21 you did, right?
22    A. It wasn't the most challenging
23 part of my assignment. I regarded it as a
24 very straightforward count, and I was given
25 things to multiply the count towards, and

Page 320

1    T. McGuire - Highly Confidential
2 there was the number.
3    Q. And you didn't apply any economic
4 principles to get to that number, correct?
5 It was arithmetic only?
6    A. Yeah, there was no particular
7 economic principles associated with
8 assigning the price, or the dollar values,
9 to those things.
10        MR. FEE: Why don't we take like
11 three, and I may be done.
12        MR. KODROFF: Okay. Thank you.
13        MR. FEE: Maybe less.
14        MR. KODROFF: Four is it. That's
15 as far as I will go.
16        VIDEO TECHNICIAN: It is
17 p m. We're going off the record.
18        (Proceedings recessed at
19 5:41 p.m., and reconvened at
20 p m.)
21        VIDEO TECHNICIAN: It is
22 p m. We are back on the record.
23 BY MR. FEE:
24    Q. Dr. McGuire, other than the
25 opinions reflected in your report and the

Page 321

1    T. McGuire - Highly Confidential
2 opinions that you expressed during this
3 deposition today, are there any opinions
4 that you would like to offer in this case
5 at present?
6    A. None that I can think of, no.
7        MR. FEE: I have no further
8 questions for Dr. McGuire at this
9 time. Before we go off the record, I
10 on behalf of Merck would designate
11 the transcript of this deposition as
12 Highly Confidential under the
13 protective order.
14        MR. KODROFF: No argument.
15 Thank you. Off the record.
16        VIDEO TECHNICIAN: It is
17 p m. We're going off the record on
18 media number five. End of this
19 deposition.
20        (Time noted: 5:45 p m.)
21
22
23
24
25

81 (Pages 318 - 321)

Appx20271

HIGHLY CONFIDENTIAL

1
2 -----------------I N D E X-----------------
3 WITNESS          EXAMINATION BY  PAGE
4 THOMAS McGuire, Ph.D.  MR. FEE        8
5
6
7 -----------------EXHIBITS-----------------
8 McGUIRE EXHIBIT                 PAGE
9 Exhibit 1
10 Document entitled "Expert Report
11 of Thomas G. McGuire, Ph.D."......... 29
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2          C E R T I F I C A T E
3
4 COMMONWEALTH OF MASSACHUSETTS
5 SUFFOLK, SS.
6      I, MaryJo O'Connor, a Notary Public
7 in and for the Commonwealth of
8 Massachusetts, do hereby certify:
9      That THOMAS McGUIRE, Ph.D., the
10 witness whose testimony is hereinbefore set
11 forth, was duly sworn by me and that such
12 testimony is a true and accurate record of
13 my stenotype notes taken in the foregoing
14 matter to the best of my knowledge, skill
15 and ability.
16      IN WITNESS WHEREOF, I have hereunto
17 set my hand and Notarial Seal this 11th day
18 of July 2018.
19
20
21
         MARYJO O'CONNOR, RMR/CSR
22       Notary Public
23
   My Commission expires:
24 September 28, 2018
25

1   USA Ex Rel. v. Merck & Co Inc.
2      Thomas McGuire, Ph.D.
3   INSTRUCTIONS TO THE WITNESS
4      Please read your deposition over
5 carefully and make any necessary corrections.
6 You should state the reason in the
7 appropriate space on the errata sheet for any
8 corrections that are made.
9      After doing so, please sign the errata
10 sheet and date it.
11      You are signing same subject to the
12 changes you have noted on the errata sheet,
13 which will be attached to your deposition.
14      It is imperative that you return the
15 original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you.  If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24
25  2949248

1   USA Ex Rel. v. Merck & Co Inc.
2      Thomas McGuire, Ph.D.
3      E R R A T A
4      - - - - -
5 PAGE   LINE   CHANGE
6 ___ ___ ___ _____
7 Reason:_____
8 ___ ___ ___ _____
9 Reason:_____
10 ___ ___ ___ _____
11 Reason:_____
12 ___ ___ ___ _____
13 Reason:_____
14 ___ ___ ___ _____
15 Reason:_____
16 ___ ___ ___ _____
17 Reason:_____
18 ___ ___ ___ _____
19 Reason:_____
20 ___ ___ ___ _____
21 Reason:_____
22 ___ ___ ___ _____
23 Reason:_____
24 ___ ___ ___ _____
25  2949248

82 (Pages 322 - 325)

Appx20272

HIGHLY CONFIDENTIAL

Page 326

1    USA Ex Rel. v. Merck & Co Inc.
2        Thomas McGuire, Ph.D.
3      ACKNOWLEDGMENT OF DEPONENT
4      I, _____, do
5  hereby certify that I have read the foregoing
6  pages and that the same is a correct
7  transcription of the answers given by
8  me to the questions therein propounded,
9  except for the corrections or changes in form
10 or substance, if any, noted in the attached
11 Errata Sheet.
12
13 _____      _____
14 DATE            SIGNATURE
15
16
17
18
19
20
21
22
23
24
25 2949248

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx20273

11/26/2019
Declaration of G. Reilly
EXHIBIT 443



United States, Department of
Health & Human Services

Print 🖨  Download Reader 📄

NVPO | NVAC | HHS Reports | The National Vaccine Plan | Meetings

- Home
- Charter
- Roster
- Subcommittees
- Working Groups
- Previous Meetings
- Resolutions
- Reports
- Polio Containment
- NVPO Home
- Contact Us

# The National Vaccine Advisory Committee (NVAC)

**The National Vaccine Program**
**2008 State of the Program Report**
**February 2009**

**The National Vaccine Advisory Committee**

**Executive Summary:**

This report by the National Vaccine Advisory Committee (NVAC) describes the state of the National Vaccine Program (NVP) and recommends key steps for the NVP to address, on the 22nd anniversary of its establishment, to better achieve the promise of its broad statutory charge (see Appendix I).

The NVP was created as part of the National Childhood Vaccine Injury Act of 1986 (P.L. 99-660), which directs it to "coordinate and provide direction" to all federal activities related to vaccines and immunization programs. The NVP is housed within the U.S. Department of Health and Human Services (HHS), and is directed by the Assistant Secretary for Health (ASH). The National Vaccine Program Office (NVPO) manages the NVP on behalf of the ASH. The NVAC advises and makes recommendations to the ASH regarding the work of the NVP and assures input from a broad range of stakeholders including, but not limited to, federal, state and local health agencies, vaccine manufacturers and distributers, health care providers, employers and insurers, and consumers. The federal agencies with liaison members on the NVAC include the Public Health Service agencies in HHS, as well as the Department of Defense (DoD), the US Agency for International Development (USAID) and the Veterans Administration (VA).

In many ways, the state of the national vaccine enterprise in 2008 is strong. The recent period has seen an unprecedented number of new vaccines licensed and recommended for routine use in children, adolescents and adults. Immunization coverage levels in children for the vaccines recommended for routine use before 2000 are at historic high levels and morbidity and mortality from the diseases they prevent are low. New vaccines are under development for the future.

However, vaccination efforts face a number of significant challenges that threaten both future progress and current accomplishments. Three of the most pressing challenges include difficulties in financing the delivery of new vaccines, the failure to realize the promise of immunization of adults, and parental concerns about vaccine safety which may limit access to the newer vaccines and may threaten coverage levels of older vaccines. Federal efforts have suffered from a lack of coordination and oversight of vaccine-related activities, highlighted most recently by the need for the Secretary of HHS to empanel a special interagency vaccine safety working group to better address this growing concern. In addition to specifically addressing each of these challenges and others outlined in this report, NVPO is undertaking the critical step of developing the first update of the National Vaccine Plan in over a decade. This Plan will provide the blueprint to achieve five key goals: developing new and improved vaccines; enhancing the safety of vaccines and vaccination practices; supporting informed vaccine decision-making by the public, providers, and policy-makers; ensuring a stable supply of recommended vaccines, and achieving better use of existing vaccines to prevent disease, disability and death in the United States; and increasing global prevention of death and disease through safe and effective vaccination.

To assure that the National Vaccine Program (NVP) can fully and effectively meet its statutory charge to coordinate and direct the US vaccine enterprise, the NVAC recommends that:

1. The NVP should be given the resources and effective organizational authority within HHS necessary to carry out its mission to coordinate and direct the vaccine-related efforts of the federal PHS agencies. Having the NVP report directly to the Secretary of HHS would achieve the needed organizational authority.
2. The National Vaccine Plan should specifically address how the NVP will improve its effectiveness.
3. The NVP should be evaluated regularly and its effectiveness reviewed as part of each revision of the National Vaccine Plan.
4. The NVPO should improve the effectiveness of the NVAC based on the recommendations of the pending NVAC evaluation report.

**Immunizations: A public health success story**

Immunizations are among the most successful public health interventions ever employed and are a major tool to prevent communicable diseases. The use of vaccines to prevent disease has expanded greatly, from seven routinely recommended vaccines for children and adolescents when the NVP was formed in 1986 in 16 in 2008 (Table 1). As shown in Table 2, vaccines targeting 10 communicable diseases (smallpox, diphtheria, measles, mumps, pertussis, paralytic polio, rubella and congenital rubella syndrome, tetanus, and *Haemophilus influenzae* type b invasive disease) have resulted in significant declines in disease morbidity from the pre-vaccine era. For vaccine-preventable diseases with more recently recommended vaccines, such as varicella (1), invasive pneumococcal disease (2) and hepatitis A (3), morbidity decreases though not as dramatic, have been seen. Preliminary data indicate similar decreases for rotavirus and meningococcal disease.

For each US birth cohort vaccinated with the 7 vaccines (diphtheria, tetanus and acellular pertussis (DTaP), tetanus and diphtheria (Td), *Haemophilus influenzae* type b (Hib), polio, measles, mumps and rubella (MMR), hepatitis B, and varicella) in the recommended childhood immunization schedule prior to 2000, it is estimated that 14 million cases of disease are prevented and 33,000 lives are saved over the lifespan of the birth cohort. These reductions in morbidity and mortality result in $9.9 billion savings in direct health care costs and $33.4 billion saving to society in indirect costs for each birth cohort. For every dollar spent to vaccinate children, there are savings of more than $5 in medical costs and more than $16 in societal costs (4).

Immunizations are unique among public health prevention methods in having the potential for a health benefit beyond the individual persons receiving them. This is due to the impact of "community immunity", the phenomenon where high levels of vaccination coverage in a population interrupt disease transmission and protect those who are unimmunized, who cannot be immunized because of immunosuppression, or those in whom immunization did not result in protective immunity. This principle makes it critical to maintain high vaccine coverage levels to achieve population-wide protection from disease. Immunizations may also protect populations other than those immunized if the vaccinated population serves as a primary reservoir or transmission source of infection. This has been seen with routine pneumococcal conjugate vaccination of young children resulting in decreased pneumococcal disease in older age groups specifically due to the pneumococcal serotypes contained in the vaccine (Figure 1)(5).

Vaccine coverage in the U.S. for routinely recommended childhood vaccines is currently at a record high level (Table 3), reflecting the combined efforts of physicians and allied health care providers, insurers and other payors, government, pharmaceutical manufacturers, and parents. State immunization requirements for school entrance are a very important tool for assuring high coverage levels of childhood vaccinations (6). Vaccine coverage levels for routinely recommended adolescent and adult vaccines are much lower. A comparison of these rates is shown in the Table 3.

There are currently 17 diseases against which very safe and effective vaccines are recommended for routine use in selected populations in the U.S. Since 2000, six new vaccines have been licensed and eight new national recommendations have been established for routine use of vaccines in children and adolescents. Two new vaccines have been routinely recommended for adults. This speaks to the vitality of new vaccine development and of the system of incorporating vaccines into the routine immunization schedule. In addition, vaccines are now being introduced that prevent not only acute diseases (e.g., rotavirus, meningococcal disease), but also chronic diseases (e.g., liver cirrhosis and cancer, cervical cancer), opening up new possibilities for disease prevention.

### Immunizations: New and continuing challenges

While there is much promising news regarding vaccinations in the United States, these successes require constant attention and vigilance to be maintained and to form the basis for future expansion.

Recent outbreaks of measles, mumps and pertussis have highlighted the need to maintain high vaccination coverage levels. In particular, localized groups who reject vaccination pose a challenge to achieving population-wide immunity needed to prevent disease through community immunity, also known as herd immunity. Outbreaks of measles in 2008 occurred in children whose parents had declined vaccination (7). Similarly, Minnesota recently reported a resurgence of invasive Hib disease with five cases, three of which were in children who had been purposefully not vaccinated; one child died. A shortage of Hib vaccine also may have contributed to lower coverage levels and decreased community immunity (8). Although vaccination coverage is high in the wider community, improvement is needed to assure community protection in the event of disease introduction.

The system of vaccine financing and delivery is threatened by the growing complexity and high cost of the vaccine schedule, as well as by the increasing number of uninsured and underinsured Americans.

While vaccines are a safe and effective way to prevent disease, their use is not totally risk-free. Vaccine safety has become a major concern among some parents. The occurrence of adverse events, even though the most severe are quite rare, draws attention in part because of the lack of awareness of the severity of the diseases the vaccines prevent. In addition, some parents may attribute adverse events to vaccines where there are little or no data to support those concerns.

Historically, the focus of immunization programs was childhood vaccination. However, the use of vaccines across the lifespan should be a key component of maintaining health in all phases of life. Recently, a number of vaccines have been approved and recommended for use in adolescent and adult populations. The uptake of these vaccines has not approached levels for childhood vaccines.

The NVAC has addressed these issues in some cases by forming working groups and in others by extended discussion at NVAC meetings. Status reports for these activities as well as the NVAC's 2008 annual assessment, called for in section 2105 of PHSA Title XXI, of the most important areas of government and non-government cooperation that should be considered in implementing sections 2102 and 2103 of the Act are summarized in Appendix 2.

### Roles and Status of the National Vaccine Program and National Vaccine Advisory Committee

The immunization enterprise is complex and involves the interaction of many governmental and non-governmental partners. For example, agencies such as the National Institutes of Health (NIH), Department of Defense (DoD), and the Department of Homeland Security (DHS) are involved in basic biomedical research and contribute to vaccine development in conjunction with private pharmaceutical manufacturers. The Food and Drug Administration (FDA) licenses vaccines and monitors vaccine production as well as safety and efficacy post licensure. Pharmaceutical companies manufacture vaccines and retain accountability for the supply of safe and effective vaccines. The Centers for Disease Control and Prevention (CDC) monitors vaccine-preventable disease morbidity, promulgates vaccination recommendations,

funds the purchase of vaccines through the Vaccines for Children program (VFC) and supports state and local health departments to carry out immunization programs. CDC also is responsible, along with FDA, in monitoring and researching vaccine safety. Non-governmental partners such as professional medical associations (e.g., AAP, AAFP, AMA) participate in the formulation of vaccine policy and educate their members and members of the public. Employers and health insurers determine insurance coverage for vaccinations. Parents ultimately decide if their children receive vaccines.

The NVP and its advisory committee, NVAC, are charged with the coordination and oversight of this complex system of developing, producing, delivering and monitoring the nation's vaccines, vaccination programs and vaccine-preventable diseases. This involves not only the coordination of the activities of federal agencies, but also facilitating the interaction of governmental and non-governmental organizations and the obtaining of stakeholder input. In addition, the NVP has the authority to make available supplemental funds as appropriated for the other federal agencies. In short, the NVP is the central coordinating body for vaccination programs and policy in the United States.

The broad statutory authority described for the NVP gives the Program a unique position to ensure that Americans have access to widely available, safe, and effective vaccines to reduce the burden of infectious diseases. However, these broad responsibilities require the authority and resources to ensure they are appropriately accomplished. There are several indications that the current authority and resources of the NVP are not sufficient and that it is not carrying out its full functions as envisioned in Title XXI. For example, the National Vaccine Plan called for in statute has not been updated in more than a decade; the effectiveness of the NVAC, and by extension the NVP, has never been evaluated; concerns of some parents about vaccine safety have progressed to a near-crisis level in some groups without a fully coordinated response from the medical and public health communities to date; public and private sector financing for vaccines and vaccine delivery have been the subject of multiple sets or recommendations over the past decade with little evidence of a response and mounting concerns that these issues will become a barrier to access to new vaccines; the ASH currently does not have authority over the PHS Agencies programs and budgets as was the case in the past. While an update of the National Vaccine Plan and an evaluation of the NVAC are now underway, it can be argued that these steps are long overdue and the effectiveness of the vaccine enterprise has been threatened by delay. Recently, the Secretary of HHS found it necessary to convene a separate interagency taskforce on vaccine safety to develop a coordinated federal response plan, not relying on the existing framework for coordination provided by the NVPO and the NVAC. A new set of vaccine finance recommendations have been issued by NVAC, but given past history, it is not clear that these recommendations, or others by the NVP, will be effectively implemented.

**Conclusions and Recommendations**

Over the course of its regular meetings in 2008, the NVAC revisited its charge and that of the NVP to assess the degree to which they have been met. Although a number of reports have been issued and a number of forward looking activities are underway, such as those detailed in Appendix 2, NVAC believes that optimal coordination of federal vaccine efforts has not been achieved. This is due to the complexity of the task, the lack of resources for the NVP, and to NVP's organizational placement within HHS which separates it from the line of authority to the primary Public Health Service agencies (e.g. CDC, FDA, NIH, CMS, HRSA) that are responsible for the main elements of the federal vaccine enterprise. NVAC concludes that effective coordination of federal vaccine efforts will not be fully realized until adequate resources are made available for coordination and organizational changes are made to assure the authority of the NVP can be fully exercised. This NVAC review of its and the NVP's charges and the arrival of a new federal administration, make this an opportune time to make needed changes.

To assure that the National Vaccine Program (NVP) can fully and effectively meet its statutory charge to coordinate and direct the US vaccine enterprise, the NVAC recommends that:

1.  The NVP should be given the resources and effective organizational authority within HHS necessary to carry out its mission to coordinate and direct the vaccine-related efforts of the federal PHS agencies. Having the NVP report to the Secretary of HHS would achieve the needed organizational authority.

2. The National Vaccine Plan should specifically address how the NVP will improve its effectiveness.
3. The NVP should be evaluated regularly and its effectiveness reviewed as part of each revision of the National Vaccine Plan.
4. The NVPO should improve the effectiveness of the NVAC based on the recommendations of the pending NVAC evaluation report.

Specific operational recommendations to help achieve better coordination of federal vaccine efforts should include, but not be limited to, the following:

1. On an ongoing and routine basis, vaccination-related initiatives, regulatory amendments, etc., under consideration by other Federal agencies or advisory committees, should be brought to the attention of the NVPO to ensure that appropriate oversight by the NVP and input by the NVAC can be given.
2. Acknowledging the broad reach of NVAC recommendations, many of which require legislative action to enact, the NVAC should work more closely with the NVP, to ensure that its recommendations are appropriately considered and addressed.
3. The fundamental role of the NVAC to assure inclusive, meaningful and ongoing input from a broad array of stakeholders, including the public, into the development of vaccine policy should be reinforced and more effective ways to achieve this input should be undertaken.

## References

1. Seward JF, Watson BM, Peterson CL, Mascola L, Pelosi JW, Zhang JX, et al. Varicella disease after introduction of varicella vaccine in the United States, 1995-2000. JAMA 2002;287:606-11.
2. Whitney CG, Farley MM, Halder J, Harrison LN, Bennett NM, Lynfield R, et al. Decline in invasive pneumococcal disease after the introduction of protein-polysaccharide conjugate vaccine. N Engl J Med. 2003;348:1737-46.
3. Wasley A, Samandari T, Bell BP. Incidence of Hepatitis A in the United States in the era of vaccination. JAMA. 2005;294:194-201.
4. Zhou F, Santoli J, Messonnier ML, Yusuf HR, Shefer A, Chu SY, et al. Economic Evaluation of the 7-Vaccine Routine Childhood Immunization Schedule in the United States, 2001. Arch Pediatr Adolesc Med. 2005;159:1136-1144.
5. McBean AM, Park Y-T, Caldwell D, Yu, Xinhua. Declining invasive pneumococcal disease in the US elderly. Vaccine. 2005;23:5641-5.
6. Orenstein WA, Hinman AR. The immunization system in the United States - the role of school immunization laws. Vaccine. 1999;17(Suppl 3):S19-24.
7. CDC. Update: Measles - United States, January-July 2008. MMWR 2008;57:893-896.
8. CDC. Invasive Haemophilus influenzae Type B Disease in Five Young Children - Minnesota, 2008. MMWR 2009;58:58-60.

## Tables and Figures

**Table 1.** Vaccines recommended for routine use in children and adolescents in the United States, 1986, 1998 and 2008.

**Infections preventable by recommended vaccines**

| 1986 | 1998 | 2008 |
|------|------|------|
| Diphtheria | Diphtheria | Diphtheria |
| Tetanus | Tetanus | Tetanus |
| Pertussis | Pertussis | Pertussis |
| Measles | Measles | Measles |
| Mumps | Mumps | Mumps |
| Rubella | Rubella | Rubella |
| Polio | Polio | Polio |
| Hepatitis B | Hepatitis B | Hepatitis B |
| | *Haemophilus influenzae* type b | *Haemophilus influenzae* type b |
| | Varicella | Varicella |
| | | *Streptococcus pneumoniae* |
| | | Rotavirus |
| | | Hepatitis A |
| | | *Neisseria meningitidis* |
| | | Human papillomavirus |
| | | Influenza |

Source: Advisory Committee on Immunization Practices. Recommended Immunization Schedule for Persons 0-6 Years-United States, 2008 and Recommended Immunization Schedule for Persons Aged 7-18 Years-United States 2008. Available at http://www.cdc.gov/vaccines/recs/schedules/child-schedule.htm#printable.

**Table 2.** Annual morbidity in the 20th century pre-vaccine era and morbidity in 2007 due to selected vaccine-preventable diseases, United States.

| Disease | Annual morbidity, pre-vaccine era | 2007 reported cases | Percent decrease |
|---------|-----------------------------------|---------------------|------------------|
| Smallpox | 29,005 | 0 | 100% |
| Diphtheria | 21,053 | 0 | 100% |
| Polio (paralytic) | 16,316 | 0 | 100% |
| Congenital Rubella Syndrome | 152 | 0 | 100% |
| Measles | 530,217 | 43 | >99% |
| Mumps | 162,344 | 800 | >99% |
| Rubella | 47,745 | 12 | >99% |
| *H. influenzae* type b | 20,000 | 202 | 99% |
| Pertussis | 200,752 | 10,454 | 95% |
| Tetanus | 580 | 28 | 95% |

Source: Adapted from Schuchat A. Current status of immunization in the United States. Presentation given at the 2008 annual meeting of the American Public Health Association, San Diego, CA, October 2008.

**Table 3.** Immunization coverage levels for routinely recommended childhood, adolescent and adult vaccines.

| Recommended group | Vaccine | Year | Vaccine Coverage |
|---|---|---|---|
| Children | Diphtheria, tetanus, pertussis (DTP) | 2006 | 85% |
| Children | Polio | 2006 | 93% |
| Children | Measles, mumps, rubella (MMR) | 2006 | 92% |
| Children | Haemophilus influenzae type b (Hib) | 2006 | 93% |
| Children | Hepatitis B | 2006 | 93% |
| Children | Varicella (chickenpox) | 2006 | 895 |
| Children | Combined series | 2006 | 77% |
| | (4+ DTP, 3+ polio, 1+ MMR, 3+ Hib) | | |
| Adolescents | Quadrivalent meningococcal conjugate (MCV4) | 2007 | 32% |
| Adolescents | Tetanus, diphtheria, acellular pertussis (Tdap) | 2007 | 30% |
| Adolescent females | Human papillomavirus (HPV) | 2007 | 25% |
| Adults | Influenza | 2007 | 69% |
| Adults | 23-valent pneumococcal polysaccharide (PPV23) | 2007 | 66% |
| Adults | Tetanus, diphtheria (Td) | 2007 | 44% |
| Adults | Herpes zoster (shingles) | 2007 | 2% |

Source for childhood vaccination rates: http://www.cdc.gov/nchs/fastats/immunize.htm

Source for adolescent and adult vaccination rates: Schuchat A. Current status of immunization in the United States. Presentation given at the 2008 annual meeting of the American Public Health Association, San Diego, CA, October 2008.

**Figure 1.** Effect of community immunity, also known as herd immunity, illustrated by decreases in pneumococcal disease in adults following vaccination of infants with pneumococcal conjugate vaccine.



**Appendix 1. Statutory charge to the National Vaccine Program and National Vaccine Advisory Committee**

The National Vaccine Program (NVP), National Vaccine Program Office (NVPO), and National Vaccine Advisory Committee (NVAC) were created in 1986 as part of the National Childhood Vaccine Injury Act of 1986. The relevant Federal statutes governing these entities are found in 42 USC 300aa-1 - 300aa-6, which correspond to Title XXI of the Public Health Service Act (P.L. 99-660), sections 2101-2106. Section 2104 was repealed as part of the Federal Reports Elimination Act of 1998 (P.L. 105-362).

**Roles and responsibilities of the NVP and the NVAC**

The Director of the NVP is the Assistant Secretary for Health, United States Department of Health and Human Services (DHHS). As outlined in Section 2102 of Title XXI of the Public Health Service Act, there are nine responsibilities assigned to the Director of the NVP:

- Vaccine research - coordinate and provide direction for research carried out in or through the National Institutes of Health (NIH), the Centers for Disease Control (CDC), the Office of Biologics Research and Review of the Food and Drug Administration (OBRR), the Department of Defense (DoD), and the Agency for International Development (AID) on means to introduce human immunity against naturally occurring infectious diseases and to prevent adverse reactions to vaccines.
- Vaccine development - coordinate and provide direction for activities carried out in or through the NIH, OBRR, DoD, and AID to develop the techniques needed to produce safe and effective vaccines.
- Safety and efficacy testing of vaccines - coordinate and provide direction for safety and efficacy testing of vaccines carried out in or through the NIH, CDC, OBRR, DoD and AID.
- Licensing of vaccine manufacturers and vaccines - coordinate and provide direction for the allocation of resources in the implementation of the licensing program under section 353.

- Production and procurement of vaccines - ensure that the governmental and non-governmental production and procurement of safe and effective vaccines by the Public Health Service, DoD, and AID meet the needs of the United States population and fulfill commitments of the United States to prevent human infectious diseases in other countries.
- Distribution and use of vaccines - coordinate and provide direction to the CDC and assistance to the States, localities, and health practitioners in the distribution and use of vaccines, including efforts to encourage public acceptance of immunizations and make health practitioners and the public aware of potential adverse reactions and contradictions to vaccines.
- Evaluating the need for, and the effectiveness, adverse effects of vaccines and immunization activities - coordinate and provide direction to the NIH, CDC, OBRR, the National Center for Health Statistics, the National Center for Health Services Research and Health Care Technology Assessment, and the Health Care Financing Administration in monitoring the need for and the effective and adverse effects of vaccines and immunization activities.
- Coordinating governmental and non-governmental activities - provide for the exchange of information between Federal agencies involved in the implementation of the Program and the non-governmental entities engaged in the development and production of vaccines and in vaccine research and encourage the investment of non-governmental resources complementary to the governmental funding activities under the Program.
- Funding of Federal agencies - shall make available to Federal agencies funds appropriated under section 2106 to supplement the funds otherwise available to such agencies for activities under the Plan.

The NVAC provides recommendations to the Director of the NVP within four defined responsibility areas. As outlined in Section 2105 of Title XXI of the Public Health Service Act, NVAC shall:

- study and recommend ways to encourage the availability of an adequate supply of safe and effective vaccination products in the States
- recommend research priorities and other measures the Director of the Program should take to enhance the safety and efficacy of vaccines
- advise the Director of the Program in the implementation of sections 2102 and 2103 of Title XXI of the Public Health Service Act
- identify annually for the Director of the Program the most important areas of government and non-government cooperation that should be considered in implementing sections 2102 and 2103 of Title XXI of the Public Health Service Act.

### Appendix 2. Recent NVPO/NVAC Activities

### I. NVAC 2008 assessment pursuant to Section 2105 of PHSA Title XXI, of the most important areas of government and non-government cooperation that should be considered in implementing sections 2102 and 2103 of the Act

Government and non-government cooperation is critical to the US vaccine enterprise. Maintaining robust and ongoing, multi-way communication is key to assuring that issues are identified and dealt with in a timely and comprehensive fashion. NVAC has traditionally served the role of assuring stakeholder input by the makeup of its membership and the content of its agenda. In 2008, the NVAC and the NVP undertook a number of steps to improve stakeholder input and communication.

**Appx20283**

In September 2008, the NVAC approved a series of vaccine finance recommendations that had been developed over the course of two years. During this period, wide-reaching stakeholder input was solicited, including representation by stakeholder groups on the Vaccine Finance Working Group. This effort was unprecedented. The Working Group included not only NVAC members from traditional stakeholder groups such as health care providers, vaccine manufacturers and health insurers, but also by consumers, state and local public health departments, employers, and state legislatures and Medicaid agencies. Through these efforts, consensus was reached by all parties on the content of the vaccine finance recommendations, which may ultimately aid in their implementation, as the key players have already come to an agreement. It is hoped that this model of governmental and non - governmental cooperation will serve as an example for future NVP endeavors.

A second major effort to improve stakeholder input as part of assuring governmental and non-governmental cooperation will take place in the upcoming year with regard to vaccine safety. A Vaccine Safety Working Group (VSWG) has been formed by NVP to review the CDC Immunization Safety Office Scientific Agenda, while engaging citizens and stakeholder groups to review the agenda. As part of this review process, three public engagement meetings are being held around the US as well as a two-day stakeholder engagement meeting. Additionally, a meeting of the VSWG to discuss the Scientific Agenda was open to the public.

In a similar way, the update of the National Vaccine Plan is being led by efforts from the NVPO and NVAC, with a series of public and stakeholder engagement sessions being hosted by the Institute of Medicine. The input gained from these meetings will be incorporated into the developing National Vaccine Plan, helping it to become a truly national plan, rather than a Federal plan.

Finally, outreach to manufacturers has also been a recent advance in governmental/non-governmental cooperation. As part of the vaccine finance recommendation development, vaccine manufacturers were included in the discussions. Additionally, the NVPO has been holding periodic meetings with vaccine manufacturers in an effort to dialogue with industry on various issues and to get a sense of what vaccines are currently under development.

## II. Update to the National Vaccine Plan

### Overview

The National Vaccine Plan was first published in 1994, with no subsequent updates. Given the increase in the number of vaccines newly available since 1994, and issues related to vaccination (e.g., vaccine financing, safety, and supply), a revised Plan is critical to sustaining the successes we have had in the use of vaccinations to prevent disease.

### Current Actions

The NVPO has submitted a first draft of the updated National Vaccine Plan to the Institute of Medicine (IOM) and has circulated it for comment. The NVAC is playing a key role in the process. Actions assigned to the NVAC for this process include providing comments on the draft HHS plan, providing comments to the IOM on their Review of Priorities in the National Vaccine Plan, coordinating and participating in public engagement sessions to identify relevant public input on the update of the National Vaccine Plan, and providing comments on the revised recommendations from the IOM.

The current draft of the National Vaccine Plan is at:
http://www.dhhs.gov/nvpo/vacc_plan/2008plan/draftvaccineplan.pdf

The IOM home page for their review of the National Vaccine Plan is at:
http://www.iom.edu/CMS/3793/51325.aspx

### Future Steps

Public engagement meetings to solicit input on the National Vaccine Plan are scheduled for early 2009, with an anticipated delivery of a final report with the revised recommendations

from the IOM scheduled to be delivered to the NVP by the end of 2009.

### III. Vaccine Finance Report: Assuring Vaccination of Children and Adolescents without Financial Barriers: Recommendations from the National Vaccine Advisory Committee (NVAC). September, 2008

#### Overview

Vaccines, like all other components of the health care system, are subject to issues related to access to, and payment for, health care services. Childhood vaccines are particularly impacted by these issues due to the mandates in place for up-to-date vaccination required for school entry. While there are programs in place to help provide access to vaccines, such as the Immunization Grant Program/Section 317 and the VFC Program, there are still limitations in providing all children with necessary immunizations.

#### Current Actions

To address these limitations, the NVAC convened a Vaccine Finance Working Group (VFWG). Over the course of two years, the VFWG developed a white paper entitled "Assuring vaccination of children and adolescents without financial barriers: Recommendations from the National Vaccine Advisory Committee" that contained a detailed overview of the issues we face when addressing the financing of vaccines, along with 24 recommendations that were voted on and approved at the September 2008 NVAC meeting. A key feature of these recommendations is the broad stakeholder input and consensus that was obtained during their creation, including input and consensus from the pharmaceutical industry, consumer advocates, health insurers and employers, health care providers, state public health agencies, state legislatures and Medicaid agencies and the National Vaccine Program.

The final report is posted at:
http://www.hhs.gov/nvpo/nvac/CAVFRecommendationsSept08.html

#### Future Steps

These recommendations have been sent to the ASH for approval and transmittal to the Secretary of HHS, with the intention that they be enacted through appropriate legislation to ensure that financial barriers to immunization are removed. An implementation plan for these recommendations will be developed by the NVAC.

### IV. Vaccine Safety

#### Overview

Vaccine safety is a topic that has received widespread attention both in the scientific community and the public at large. To address this large and complex issue, the NVAC organized a Vaccine Safety Working Group (VSWG). The first meeting of the VSWG was held in April 2008, and included presentations by the working group as well as invited speakers, and was also a forum for a wide range of public comment regarding vaccine safety issues.

#### Current Actions

The NVAC has been charged with reviewing the proposed scientific agenda for the CDC Immunization Safety Office (ISO). This document was generated in response to a 2005 IOM report that recommended organizing a five-year immunization safety research plan at ISO. Within the VSWG there are four sub-groups, each addressing specific components of the ISO Scientific Agenda. The VSWG, and its subgroups, are in the process of developing formal recommendations to the ISO, a draft of which is expected to be presented to the full NVAC at the February 2009 NVAC meeting. In addition to reviewing the ISO Scientific Agenda, the VSWG is working to review the current federal vaccine safety system and to develop a white paper describing the infrastructure necessary for this system to assess vaccine safety in a timely manner, reduce adverse events following immunization, and improve and maintain public confidence in vaccine safety.

The NVAC VSWG web site is: http://www.hhs.gov/nvpo/nvac/vaccinesafety.html

**Future Steps**

A draft of the NVAC recommendations regarding the ISO Scientific Agenda is expected to be completed and ready for review by the February 2009 NVAC meeting. Following review, it is hoped that the recommendations will be finalized and ready for voting by the full NVAC at the June 2009 NVAC meeting. An NVAC white paper describing the state of vaccine safety and efforts to address vaccine safety issues will be written.

## V. Report: Adolescent Immunization

**Overview**

Immunization of adolescents faces a unique series of challenges. New and evolving vaccines targeted for adolescents have recently been approved, and concerted efforts need to be made to encourage their uptake by adolescents. This is made more difficult because adolescents rarely have regularly scheduled medical appointments similar to "well child" visits for infants and toddlers.

**Current Actions**

Following a 2004 meeting entitled "Strengthening the Delivery of New Vaccines to Adolescents: A National Stakeholders Meeting", the NVAC convened an Adolescent Immunization Working Group. This working group developed a report on "The Promise and Challenge of Adolescent Immunization" and developed a series of recommendations addressing adolescent immunization that were approved by the full NVAC at the June 2008 meeting. This report and these recommendations have been published in the American Journal of Preventive Medicine.

The NVAC report on Adolescent Immunization is found at http://www.hhs.gov/nvpo/nvac/documents/AdolescentVaccinationRecommend.pdf

**Future Steps**

An implementation plan for the Adolescent Immunization Working Group recommendations is under development, and a first draft was presented at the September 2008 NVAC meeting.

## VI. Immunization Information Systems

**Overview**

The NVAC produced and approved the report "Development of Community- and State- Based Immunization Registries" in January 1999. The original scope of these registries was to serve as "confidential, computerized information systems that contain information about immunizations and children" (http://www.cdc.gov/vaccines/programs/iis/pubs/nvac.htm). In the intervening years, much progress has been made in developing, implementing and encouraging the use of Immunization Information Systems (IIS), the current preferred term for immunization registries. In addition to documenting the immunization history of children, IIS are also

being used to track immunizations delivered to adults, with the hope they will serve as a "cradle-to-grave" record of immunizations.

**Current Actions**

Reports tracing the progress of IIS development have been developed and approved by the NVAC. Most recently, a series of recommendations to encourage participation in IIS were

developed and approved by the NVAC at the September 2008 NVAC meeting.

**Future Steps**

An implementation plan for the recently approved recommendations will be developed to ensure prompt and complete follow-up to strengthen the use of IIS.

## VII. Adult Immunization

**Overview**

Recent advances in vaccine development, licensure, and usage recommendations for adults (e.g., vaccines for herpes zoster, influenza, invasive pneumococcal disease) highlight the need for focused disease-prevention efforts in adults.

**Current Actions**

The NVAC has formed an Adult Immunization Working Group to identify and make recommendations regarding adult immunization. This working group is currently examining all issues related to adult immunization to identify areas in which improvements need to be made. Its specific mission is "To assess public health adult immunization activities in HHS programs, identify gaps, and recommend improvements, particularly in program implementation, coordination, evaluation and collaboration across agencies, that will lead to improved vaccination uptake in adults in these programs."

**Future Steps**

The Adult Immunization Working Group will develop a white paper outlining the challenges and problems associated with adult immunization within HHS, and will develop recommendations to be approved by the NVAC.

## VIII. Vaccine Development and Supply

**Overview**

Vaccine innovation is challenging and the issues associated with bringing a vaccine to market, encouraging uptake of the vaccine, and ensuring appropriate payment for a vaccine are complex. A single approach to innovation of new vaccines may not work as there are distinctly different markets with different factors that influence the success of any particular vaccine.

Vaccine supply has been a critical issue as of late, with shortages observed with influenza, rabies, and hepatitis B vaccines, among others. These supply problems come about from a combination of issues, including a diminished number of vaccine manufacturers, occurrences of manufacturing-related issues (e.g., contamination), and unanticipated increases in demand for certain vaccines.

**Current Actions**

Two reports addressing vaccine development and supply have been produced and approved by the NVAC - "Strengthening the supply of routinely administered vaccines", (http://www.hhs.gov/nvpo/bulletins/nvac-vsr.pdf), which was approved in 2003, and "Dose optimization strategies for vaccines: The role of adjuvants and new technologies" (to be posted at http://www.hhs.gov/nvpo/nvac/reports.html) which was approved in 2008.

The drivers behind vaccine development are currently being examined to determine the best ways to encourage development of new vaccines and better versions of existing vaccines. NVPO staff sit on the CDC supply working group to inform HHS and NVAC on supply issues

and steps being taken to mitigate supply disruptions. The NVAC is also receiving information from the CDC regarding vaccine stockpile plans so that comment and recommendations regarding these plans can be made.

The National Vaccine Plan will address a wide range of issues related to vaccine innovation including balancing the risks of development with the rewards for innovation. There have also been on-going discussions between the NVPO and large and small vaccine and biotechnology companies involved in vaccine development regarding vaccine innovations and identifying the drivers of vaccine development. NVAC will be discussing approaches to addressing challenges in vaccine innovation for vaccines with limited markets.

**Future Steps**

The NVAC will continue to receive information from CDC regarding vaccine stockpile plans, and will encourage discussion and comment regarding these plans. Vaccine development is addressed in the draft National Vaccine Plan that the NVAC is reviewing, and continued comment will be provided on this topic.

Last revised: May 8, 2009

Appx20288

11/26/2019
Declaration of G. Reilly
EXHIBIT 444

**Centers for Disease Control and Prevention**

# MMWR

Morbidity and Mortality Weekly Report

Weekly / Vol. 62 / No. 36                                              September 13, 2013

# National, State, and Local Area Vaccination Coverage Among Children Aged 19–35 Months — United States, 2012

The National Immunization Survey (NIS) is a random-digit–dialed telephone survey used to monitor vaccination coverage among U.S. children aged 19–35 months. This report describes national, state, and selected local area vaccination coverage estimates for children born during January 2009–May 2011, based on results from the 2012 NIS. *Healthy People 2020*\* objectives set childhood vaccination targets of 90% for ≥1 doses of measles, mumps, and rubella vaccine (MMR); ≥3 doses of hepatitis B vaccine (HepB); ≥3 doses of poliovirus vaccine; ≥1 doses of varicella vaccine; ≥4 doses of diphtheria, tetanus, and pertussis vaccine (DTaP); ≥4 doses of pneumococcal conjugate vaccine (PCV); and the full series of *Haemophilus influenzae* type b vaccine (Hib). Vaccination coverage remained near or above the national *Healthy People 2020* target for ≥1 doses of MMR (90.8%), ≥3 doses of poliovirus vaccine (92.8%), ≥3 doses of HepB (89.7%), and ≥1 doses of varicella vaccine (90.2%). Coverage increased from 68.6% in 2011 to 71.6% in 2012 for the birth dose of HepB.[†] Coverage was below the *Healthy People 2020* target and either decreased or remained stable relative to 2011 for ≥4 doses of DTaP (82.5%), the full series of Hib (80.9%), and ≥4 doses of PCV (81.9%). Coverage also remained stable relative to 2011 and below the *Healthy People 2020* targets of 85% and 80%, respectively, for ≥2 doses of hepatitis A vaccine (HepA) (53.0%), and rotavirus vaccine (68.6%). The percentage of children who had not received any vaccinations remained <1.0%. Although disparities in coverage were not observed for most racial/ethnic groups, children living in families with incomes below the federal poverty level had lower coverage than children living in families at or above the poverty level for ≥4 doses of DTaP (by 6.5 percentage points), the full Hib series (by 7.6 percentage points), ≥4 doses of PCV (by 8.6

percentage points), ≥2 doses of HepA (by 6.0 percentage points), and rotavirus vaccine (by 9.5 percentage points). Maintaining high coverage levels is important to maintain the current low burden of vaccine-preventable diseases in the United States and prevent their resurgence (*1*).

NIS uses a quarterly, random-digit–dialed sample of telephone numbers to reach households with children aged 19–35 months in the 50 states and selected local areas and territories,[§]

---

\*Additional information available at http://healthypeople.gov/2020/topicsobjectives2020/objectiveslist.aspx?topicid=23. The *Healthy People 2020* targets for children aged 19–35 months are 90%, except for rotavirus vaccine (80%) and ≥2 doses of HepA (85%).

[†] The *Healthy People 2020* target for the birth dose (0–3 days) of HepB is 85%, measured by annual birth cohort. In the two most recent complete birth cohorts captured by NIS, coverage with the birth dose of HepB was 65.0% for children born in 2008 and 70.6% for children born in 2009.

[§] The eight local areas separately sampled for the 2012 NIS included six areas that receive federal Section 317 immunization funds and are included in the NIS sample every year (District of Columbia; Chicago, Illinois; New York, New York; Philadelphia County, Pennsylvania; Bexar County, Texas; and Houston, Texas) and two additional sampled areas (Dallas County, Texas, and El Paso County, Texas). The territory of the U.S. Virgin Islands (including St. Croix, St. Thomas, and St. John) was included in the 2012 NIS landline sample, but data from the U.S. Virgin Islands are excluded from national coverage estimates.

---

**INSIDE**

741 Measles — United States, January 1–August 24, 2013

744 Influenza Vaccination Practices of Physicians and Caregivers of Children with Neurologic and Neurodevelopmental Conditions — United States, 2011–12 Influenza Season

747 Comparison of Provisional with Final Notifiable Disease Case Counts — National Notifiable Diseases Surveillance System, 2009

752 Notes from the Field: Measles Outbreak Among Members of a Religious Community — Brooklyn, New York, March–June 2013

753 Notes from the Field: Measles Outbreak Associated with a Traveler Returning from India — North Carolina, April–May 2013

754 Announcements

755 QuickStats

**Continuing Education** examination available at http://www.cdc.gov/mmwr/cme/conted_info.html#weekly.



**U.S. Department of Health and Human Services**
Centers for Disease Control and Prevention

Morbidity and Mortality Weekly Report

followed by a mail survey sent to the children's vaccination providers to collect vaccination information. Data were weighted to represent the population of children aged 19–35 months, with adjustments for households with multiple telephone lines and mixed telephone use (landline and cellular), household nonresponse, and exclusion of households without telephone service.¶ Beginning in 2011, NIS changed from sampling only landline telephones to a dual-frame sampling scheme, with interviews conducted via landline or cellular telephone. The response rate** for the 2012 NIS was 64.7% for the landline telephone sample (including the U.S. Virgin Islands) and 30.6% for the cellular telephone sample. Providers returned vaccination records for 67.6% of the 12,727 children with completed household interviews from the landline sample and 63.9% of the 13,009 children with completed household interviews from the cellular telephone sample, for a total of 16,916 children with provider-reported vaccination records included in this report. Of this total, 8,313 (49%) were from the cellular telephone sample, of whom 5,281 were from households with only cellular telephone service. Because the number of Hib†† and rotavirus vaccine§§ doses required differs according to manufacturer, coverage estimates for these vaccines take into account the type of vaccine used. Logistic regression was used to examine differences among racial/ethnic groups, controlling for poverty status. Statistical analyses were conducted using t-tests based on weighted data and accounting for the complex survey design. A p-value of <0.05 was considered statistically significant.

In 2012, national vaccination coverage among children aged 19–35 months was 82.5% for ≥4 doses of DTaP, 92.8% for ≥3 doses of poliovirus vaccine, 90.8% for ≥1 doses of MMR, 89.7% for ≥3 doses of HepB, and 90.2% for ≥1 doses of varicella vaccine (Table 1). Although this represents a decline in coverage from 2011 of 1–2 percentage points for DTaP,

---

¶ A description of the statistical methodology of the NIS is available at http://www.cdc.gov/nchs/data/series/sr_02/sr02_138.pdf and ftp://ftp.cdc.gov/pub/health_statistics/nchs/dataset_documentation/nis/nispuf11_dug.pdf.

** The Council of American Survey Research Organization (CASRO) household response rate, calculated as the product of the resolution rate (percentage of the total telephone numbers called that were classified as nonworking, nonresidential, or residential), screening completion rate (percentage of known households that were successfully screened for the presence of age-eligible children), and the interview completion rate (percentage of households with one or more age-eligible children that completed the household survey). Additional information is at http://casro.org. The CASRO response rate is equivalent to the American Association for Public Opinion Research (AAPOR) type 3 response rate. Information about AAPOR response rates is available at http://www.aapor.org/am/template.cfm?section=standard_definitions1&template=/cm/contentdisplay.cfm&contentid=1814.

†† Coverage for the primary Hib series was based on receipt of ≥2 or ≥3 doses, depending on product type received. The PRP-OMB Hib products require a 2-dose primary series with doses at ages 2 months and 4 months. All other Hib products require a 3-dose primary series with doses at ages 2, 4, and 6 months. Coverage for the full series, which includes the primary series and a booster dose, was based on receipt of ≥3 or ≥4 doses, depending on product type received. All Hib products require a booster dose at age 12–15 months.

§§ Coverage for rotavirus vaccine was based on ≥2 or ≥3 doses, depending on product type received (≥2 doses for Rotarix [RV1], licensed in April 2008, and ≥3 doses for RotaTeq [RV5], licensed in February 2006).

The *MMWR* series of publications is published by the Center for Surveillance, Epidemiology, and Laboratory Services (proposed), Centers for Disease Control and Prevention (CDC), U.S. Department of Health and Human Services, Atlanta, GA 30333.

**Suggested citation:** Centers for Disease Control and Prevention. [Article title]. MMWR 2013;62:[inclusive page numbers].

**Centers for Disease Control and Prevention**
Thomas R. Frieden, MD, MPH, *Director*
Harold W. Jaffe, MD, MA, *Associate Director for Science*
Joanne Cono, MD, ScM, *Acting Director, Office of Science Quality*
Chesley L. Richards, MD, MPH, *Deputy Director, Office of Public Health Scientific Services (proposed)*
Pamela S. Diaz, MD, *Acting Director, Center for Surveillance, Epidemiology, and Laboratory Services (proposed)*

**MMWR Editorial and Production Staff**
Ronald L. Moolenaar, MD, MPH, *Editor,* MMWR *Series*

John S. Moran, MD, MPH, *Deputy Editor,* MMWR *Series*
Teresa F. Rutledge, *Managing Editor,* MMWR *Series*
Douglas W. Weatherwax, *Lead Technical Writer-Editor*
Donald G. Meadows, MA, Jude C. Rutledge, *Writer-Editors*
Martha F. Boyd, *Lead Visual Information Specialist*

Maureen A. Leahy, Julia C. Martinroe,
Stephen R. Spriggs, Terraye M. Starr
*Visual Information Specialists*
Quang M. Doan, MBA, Phyllis H. King
*Information Technology Specialists*

**MMWR Editorial Board**
William L. Roper, MD, MPH, Chapel Hill, NC, Chairman

Matthew L. Boulton, MD, MPH, Ann Arbor, MI
Virginia A. Caine, MD, Indianapolis, IN
Barbara A. Ellis, PhD, MS, Atlanta, GA
Jonathan E. Fielding, MD, MPH, MBA, Los Angeles, CA
David W. Fleming, MD, Seattle, WA
William E. Halperin, MD, DrPH, MPH, Newark, NJ
King K. Holmes, MD, PhD, Seattle, WA

Timothy F. Jones, MD, Nashville, TN
Rima F. Khabbaz, MD, Atlanta, GA
Dennis G. Maki, MD, Madison, WI
Patricia Quinlisk, MD, MPH, Des Moines, IA
Patrick L. Remington, MD, MPH, Madison, WI
William Schaffner, MD, Nashville, TN

Appx20291

TABLE 1. Estimated vaccination coverage among children aged 19–35 months, by selected vaccines and dosages — National Immunization Survey, United States, 2008–2012*

| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Vaccine and dosage | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) |
| DTaP | | | | | | | | | | |
| ≥3 doses | 96.2 | (±0.5) | 95.0 | (±0.6) | 95.0 | (±0.6) | 95.5 | (±0.5) | 94.3 | (±0.7)† |
| ≥4 doses | 84.6 | (±1.0) | 83.9 | (±1.0) | 84.4 | (±1.0) | 84.6 | (±1.0) | 82.5 | (±1.2)† |
| Poliovirus (≥3 doses) | 93.6 | (±0.6) | 92.8 | (±0.7) | 93.3 | (±0.7) | 93.9 | (±0.6) | 92.8 | (±0.7)† |
| MMR (≥1 doses) | 92.1 | (±0.7) | 90.0 | (±0.8) | 91.5 | (±0.7) | 91.6 | (±0.8) | 90.8 | (±0.8) |
| Hib§ | | | | | | | | | | |
| Primary series | N/A | | 92.1 | (±0.8) | 92.2 | (±0.8) | 94.2 | (±0.6) | 93.3 | (±0.7) |
| Full series | N/A | | 54.8 | (±1.4) | 66.8 | (±1.3) | 80.4 | (±1.1) | 80.9 | (±1.2) |
| HepB | | | | | | | | | | |
| ≥3 doses | 93.5 | (±0.7) | 92.4 | (±0.7) | 91.8 | (±0.7) | 91.1 | (±0.7) | 89.7 | (±0.9)† |
| 1 dose by 3 days (birth)¶ | 55.3 | (±1.3) | 60.8 | (±1.3) | 64.1 | (±1.3) | 68.6 | (±1.3) | 71.6 | (±1.4)† |
| Varicella (≥1 doses) | 90.7 | (±0.7) | 89.6 | (±0.8) | 90.4 | (±0.8) | 90.8 | (±0.7) | 90.2 | (±0.8) |
| PCV | | | | | | | | | | |
| ≥3 doses | 92.8 | (±0.6) | 92.6 | (±0.7) | 92.6 | (±0.8) | 93.6 | (±0.6) | 92.3 | (±0.8)† |
| ≥4 doses | 80.1 | (±1.1) | 80.4 | (±1.2) | 83.3 | (±1.0) | 84.4 | (±1.0) | 81.9 | (±1.1)† |
| HepA** | | | | | | | | | | |
| ≥1 doses | 70.5 | (±1.1) | 75.0 | (±1.1) | 78.3 | (±1.1) | 81.2 | (±1.0) | 81.5 | (±1.1) |
| ≥2 doses | 40.4 | (±1.2) | 46.6 | (±1.4) | 49.7 | (±1.4) | 52.2 | (±1.4) | 53.0 | (±1.5) |
| Rotavirus†† | N/A | | 43.9 | (±1.4) | 59.2 | (±1.4) | 67.3 | (±1.3) | 68.6 | (±1.4) |
| Combined series | | | | | | | | | | |
| 4:3:1:3*:3:1:4§§ | N/A | | 44.3 | (±1.4) | 56.6 | (±1.3) | 68.5 | (±1.3) | 68.4 | (±1.4) |
| Children who received no vaccinations | 0.6 | (±0.2) | 0.6 | (±0.1) | 0.7 | (±0.2) | 0.8 | (±0.2) | 0.8 | (±0.1) |

**Abbreviations:** CI = confidence interval; DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine (includes children who might have been vaccinated with diphtheria and tetanus toxoids and pertussis vaccine or diphtheria and tetanus toxoids vaccine); MMR = measles, mumps, and rubella vaccine; Hib = *Haemophilus influenzae* type b vaccine; N/A = not available (estimate not available if the unweighted sample size for the denominator was <30 or 95% CI half width / estimate >0.588 or 95% CI half width >10); HepB = hepatitis B vaccine; HepA = hepatitis A vaccine; PCV = pneumococcal conjugate vaccine.

* For 2008, includes children born during January 2005–June 2007; for 2009, children born during January 2006–July 2008; for 2010, children born during January 2007–July 2009; for 2011, children born during January 2008–May 2010; for 2012, children born during January 2009–May 2011.
† Statistically significant change in coverage compared with 2011 (p<0.05).
§ Hib primary series: receipt of ≥2 or ≥3 doses, depending on product received. Full series: receipt of ≥3 or ≥4 doses, depending on product received (primary series and booster dose). Hib coverage for primary or full series not available until 2009.
¶ HepB administered from birth through age 3 days.
** HepA coverage was not available before 2008.
†† Rotavirus vaccine includes ≥2 or ≥3 doses, depending on the product received (≥2 doses for Rotarix [RV1] or ≥3 doses for RotaTeq [RV5]). Estimates of rotavirus vaccine coverage not available before 2009.
§§ 4:3:1:3*:3:1:4 series, referred to as routine, includes ≥4 doses of DTaP, ≥3 doses of poliovirus vaccine, ≥1 doses of measles vaccine, full series of Hib (3 or 4 doses, depending on product), ≥3 doses of HepB, ≥1 doses of varicella vaccine, and ≥4 doses of PCV.

poliovirus, and HepB, coverage for these vaccines has remained high and stable for at least the past decade.¶¶ Coverage with ≥4 doses of PCV decreased from 84.4% in 2011 to 81.9% in 2012. Coverage with the birth dose of HepB increased from 68.6% in 2011 to 71.6% in 2012. Coverage with the full series of Hib, which steadily increased during 2009–2011 after a vaccine shortage that occurred from December 2007 to September 2009 (2), was similar in 2012 at 80.9% compared with 2011. Similarly, coverage with ≥2 doses of HepA and rotavirus vaccine remained similar to 2011 levels at 53.0% and 68.6% in 2012, respectively.

Coverage with the combined vaccine series (4:3:1:3*:3:1:4)*** was 68.4% in 2012, also similar to coverage in 2011.

Children in families with incomes below the federal poverty level††† had lower coverage than children in families at or above the poverty level for ≥3 and ≥4 doses of DTaP, primary and full series of Hib, ≥3 and ≥4 doses of PCV, ≥2 doses of HepA, rotavirus vaccine, and the combined vaccine series (Table 2).

¶¶ Information on coverage with individual vaccines since the inception of NIS in 1994 through 2012 is available at http://www.cdc.gov/vaccines/stats-surv/nis/figures/2012_map.htm.

*** The 4:3:1:3*:3:1:4 vaccine series includes ≥4 doses of DTaP/diphtheria and tetanus toxoids vaccine/diphtheria and tetanus toxoids and pertussis vaccine, ≥3 doses of poliovirus vaccine, ≥1 doses of measles vaccine, ≥3 or ≥4 doses of Hib (depending on product type of vaccine), ≥3 doses of HepB, ≥1 doses of varicella vaccine, and ≥4 doses of PCV.
††† Poverty level uses income and family size to categorize households into 1) at or above the poverty level and 2) below the poverty level. Poverty level was based on 2011 U.S. Census poverty thresholds, available at http://www.census.gov/hhes/www/poverty/data/threshld.

Appx20292

Morbidity and Mortality Weekly Report

TABLE 2. Estimated vaccination coverage among children aged 19–35 months, by selected vaccines and dosages, race/ethnicity,* and poverty level[†] — National Immunization Survey, United States, 2012[§]

| | Race/Ethnicity | | | | | | | | | | | | Poverty level | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White, non-Hispanic | | Black, non-Hispanic | | Hispanic | | American Indian/ Alaska Native | | Asian | | Multiracial, non-Hispanic | | At or above | | Below | |
| Vaccine and dosage | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) |
| **DTaP** | | | | | | | | | | | | | | | | |
| ≥3 doses | 94.8 | (±0.6) | 94.0 | (±1.6) | 93.5 | (±1.9) | 95.6 | (±5.3) | 96.1 | (±2.1) | 95.1 | (±2.0) | 95.0 | (±0.9) | 93.4 | (±1.3)** |
| ≥4 doses | 83.6 | (±1.5) | 79.6 | (±3.1)[¶] | 80.8 | (±2.9) | 88.2 | (±5.9) | 88.1 | (±4.3) | 85.6 | (±3.6) | 85.0 | (±1.4) | 78.5 | (±2.3)** |
| Poliovirus (≥3 doses) | 93.0 | (±0.9) | 92.9 | (±1.8) | 92.5 | (±1.8) | 95.2 | (±3.4) | 92.3 | (±3.6) | 93.3 | (±2.3) | 93.4 | (±0.9) | 91.8 | (±1.4) |
| MMR (≥1 doses) | 90.9 | (±1.0) | 90.9 | (±2.1) | 90.7 | (±2.3) | 92.0 | (±5.0) | 89.8 | (±5.2) | 92.3 | (±2.6) | 91.4 | (±1.0) | 89.9 | (±1.4) |
| **Hib[††]** | | | | | | | | | | | | | | | | |
| Primary series | 93.7 | (±0.9) | 91.1 | (±2.2) | 93.5 | (±1.7) | 94.5 | (±3.9) | 94.9 | (±2.2) | 94.0 | (±2.2) | 94.3 | (±0.8) | 91.9 | (±1.4)** |
| Full series | 82.2 | (±1.4) | 77.5 | (±3.3)[¶] | 79.5 | (±2.8) | 84.7 | (±7.1) | 86.1 | (±4.4) | 82.5 | (±3.9) | 84.0 | (±1.4) | 76.4 | (±2.2)** |
| **HepB** | | | | | | | | | | | | | | | | |
| ≥3 doses | 89.3 | (±1.1) | 89.7 | (±2.2) | 89.4 | (±2.1) | 94.0 | (±3.9)[¶] | 93.2 | (±2.7)[¶] | 92.2 | (±2.6) | 89.8 | (±1.1) | 89.4 | (±1.5) |
| 1 dose by 3 days (birth)[§§] | 69.2 | (±1.6) | 74.9 | (±3.6)[¶] | 73.9 | (±3.4)[¶] | NA | | 71.6 | (±6.6) | 75.9 | (±4.8)[¶] | 69.4 | (±1.7) | 75.8 | (±2.5)** |
| Varicella (≥1 doses) | 89.8 | (±1.0) | 90.4 | (±2.1) | 90.9 | (±2.1) | 92.5 | (±4.5) | 91.9 | (±3.2) | 90.9 | (±2.9) | 90.6 | (±1.0) | 89.7 | (±1.7) |
| **PCV** | | | | | | | | | | | | | | | | |
| ≥3 doses | 92.7 | (±1.0) | 91.2 | (±2.0) | 92.4 | (±1.8) | 94.0 | (±4.0) | 90.7 | (±3.3) | 94.0 | (±2.2) | 93.4 | (±0.9) | 90.7 | (±1.5)** |
| ≥4 doses | 83.5 | (±1.4) | 77.1 | (±3.5)[¶] | 82.1 | (±2.5) | NA | | 80.7 | (±5.1) | 84.1 | (±3.7) | 85.3 | (±1.2) | 76.7 | (±2.3)** |
| HepA (≥2 doses) | 52.6 | (±1.8) | 52.0 | (±3.9) | 54.4 | (±3.4) | NA | | 57.5 | (±7.7) | 49.4 | (±5.7) | 55.4 | (±1.8) | 49.4 | (±2.7)** |
| Rotavirus[¶¶] | 70.5 | (±1.6) | 60.4 | (±4.0)[¶] | 70.0 | (±3.1) | NA | | 69.9 | (±7.1) | 69.3 | (±5.4) | 72.5 | (±1.6) | 63.0 | (±2.5)** |
| **Combined series** | | | | | | | | | | | | | | | | |
| 4:3:1:3*:3:1:4*** | 69.3 | (±1.7) | 64.8 | (±3.8)[¶] | 67.8 | (±3.2) | NA | | 71.6 | (±6.6) | 71.5 | (±4.8) | 71.6 | (±1.6) | 63.4 | (±2.7)** |

**Abbreviations:** CI = confidence interval; DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine (includes children who might have been vaccinated with diphtheria and tetanus toxoids and pertussis vaccine or diphtheria and tetanus toxoids vaccine); Hib = *Haemophilus influenzae* type b vaccine; MMR = measles, mumps, and rubella vaccine; N/A = not available (estimate not available if the unweighted sample size for the denominator was <30 or 95% CI half width / estimate >0.588 or 95% CI half width >10); HepB = hepatitis B vaccine; HepA = hepatitis A vaccine; PCV = pneumococcal conjugate vaccine.

* Native Hawaiian or other Pacific Islanders not included because of small sample sizes.
[†] Poverty level was determined for all children. Children were classified as below poverty if their total family income was less than the poverty threshold specified for the applicable family size and number of children aged <18 years. All others were classified as at or above poverty. Poverty thresholds reflect yearly changes in the Consumer Price Index. Thresholds and guidelines available at http://www.census.gov/hhes/www/poverty.html.
[§] Children in the 2012 National Immunization Survey were born during January 2009–May 2011.
[¶] Estimates are statistically significant at p<0.05. Children identified as non-Hispanic white were the reference group.
** Estimates are statistically significant at p<0.05. Children living at or above poverty were the reference group.
[††] Hib primary series: receipt of ≥2 or ≥3 doses, depending on product received; full series: primary series and booster dose includes receipt of ≥3 or ≥4 doses, depending on product received.
[§§] HepB (≥1 doses) administered from birth through age 3 days.
[¶¶] Includes ≥2 or ≥3 doses, depending on product received (≥2 doses for Rotarix [RV1] or ≥3 doses for RotaTeq [RV5]).
*** 4:3:1:3:3:1:4 series includes ≥4 doses of DTaP, ≥3 doses of poliovirus vaccine, ≥1 doses of measles vaccine, full series of Hib (3 or 4 doses, depending on type), ≥3 doses of HepB, ≥1 doses of varicella vaccine, and ≥4 doses of PCV.

Children in families below the poverty level had higher HepB birth dose coverage than children living at or above the poverty level. No differences by poverty status were observed for poliovirus vaccine, MMR, ≥3 doses of HepB, or varicella vaccine.

Compared with white children,[§§§] black children had lower coverage for ≥4 doses of DTaP, the full series of Hib, ≥4 doses of PCV, rotavirus vaccine, and the combined 4:3:1:3*:3:1:4 series (Table 2). After adjustment for poverty status, black race was not associated with coverage with any of these vaccines except for rotavirus. American Indian/Alaska Native (AI/AN)

children and Asian children had higher coverage for ≥3 doses of HepB compared with white children. Black, Hispanic, and multiracial children had higher coverage for the birth dose of HepB compared with white children. With the exception of the difference in HepB birth dose coverage between Hispanic and white children, all of these associations with ≥3 doses of HepB and the birth dose of HepB remained statistically significant after adjustment for poverty status.

Vaccination coverage varied by state, with coverage for the combined vaccine series ranging from 59.5% in Alaska to 80.2% in Hawaii (Table 3). Fifteen states had point estimates of MMR coverage below the *Healthy People 2020* target of 90%, and only Connecticut, Delaware, and the District of Columbia had coverage ≥90% for ≥4 doses of DTaP. Variations in coverage were widest for the birth dose of HepB (ranging from 36.0%

[§§§] Child's race/ethnicity was reported by their parent or guardian. Children categorized in this report as white, black, Asian, American Indian/Alaska Native, or multiracial were identified as non-Hispanic by their parent or guardian. Children identified as multiracial had more than one race category selected. Persons identified as Hispanic might be of any race.

Appx20293

Morbidity and Mortality Weekly Report

TABLE 3. Estimated vaccination coverage among children aged 19–35 months, by selected individual vaccines and vaccination series* and state/local area — National Immunization Survey, United States, 2012[†]

| State/Area | MMR (≥1 doses) | | DTaP (≥4 doses) | | HepB (birth) | | HepA (≥2 doses) | | Rotavirus** | | Combined series* | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) |
| United States | 90.8 | (±0.8) | 82.5 | (±1.2)[§§] | 71.6 | (±1.4)[††] | 53.0 | (±1.5) | 68.6 | (±1.4) | 68.4 | (±1.4) |
| Alabama | 93.1 | (±3.5) | 84.8 | (±5.9) | 83.8 | (±4.9)[††] | 49.2 | (±7.4) | 66.0 | (±7.4)[§§] | 71.3 | (±6.8) |
| Alaska | 86.2 | (±5.1) | 79.4 | (±5.8) | 56.8 | (±6.9) | 50.1 | (±6.9) | 60.3 | (±6.8) | 59.5 | (±6.8) |
| Arizona | 88.3 | (±4.9) | 82.7 | (±5.8) | 83.0 | (±5.3)[††] | 55.2 | (±6.9) | 71.6 | (±6.7) | 67.5 | (±7.5) |
| Arkansas | 92.3 | (±4.0) | 79.8 | (±6.4) | 81.7 | (±6.5) | 40.1 | (±7.5) | 56.3 | (±8.0) | 66.4 | (±7.6) |
| California | 91.5 | (±4.3) | 81.6 | (±6.6) | 61.5 | (±7.5) | 54.6 | (±7.8) | 71.0 | (±6.8) | 66.8 | (±7.5) |
| Colorado | 91.5 | (±4.5) | 82.8 | (±6.7) | 64.0 | (±8.4) | 56.2 | (±8.6) | 73.5 | (±7.7) | 71.7 | (±7.9) |
| Connecticut | 94.8 | (±2.9) | 91.3 | (±3.8) | 75.7 | (±5.7) | 65.5 | (±6.3)[††] | 72.5 | (±6.4) | 77.1 | (±5.7) |
| Delaware | 94.4 | (±3.4) | 90.9 | (±4.3) | 72.3 | (±6.7) | 65.7 | (±7.1)[††] | 76.5 | (±6.5) | 72.6 | (±6.7) |
| District of Columbia | 93.0 | (±3.7) | 90.7 | (±4.0) | 78.2 | (±5.4) | 62.3 | (±6.6) | 54.2 | (±6.8) | 73.4 | (±6.2) |
| Florida | 91.0 | (±4.8) | 83.3 | (±6.5) | 62.6 | (±7.6) | 51.9 | (±8.1) | 66.0 | (±7.9) | 68.6 | (±7.5) |
| Georgia | 91.9 | (±4.2) | 86.7 | (±5.2) | 87.6 | (±5.1) | 65.9 | (±7.6) | 71.8 | (±7.2) | 74.7 | (±6.8) |
| Hawaii | 95.0 | (±2.7) | 87.9 | (±4.6) | 82.7 | (±5.2)[††] | 58.1 | (±7.1) | 70.6 | (±6.5)[††] | 80.2 | (±5.5) |
| Idaho | 93.3 | (±3.6) | 76.6 | (±6.7) | 70.1 | (±7.8) | 52.8 | (±8.6) | 68.2 | (±7.2) | 63.0 | (±8.2) |
| Illinois | 91.6 | (±2.7) | 85.3 | (±2.6) | 71.3 | (±5.0) | 48.2 | (±5.4) | 67.2 | (±5.2) | 68.5 | (±4.9) |
| City of Chicago | 86.8 | (±6.1) | 79.4 | (±7.6) | 70.3 | (±8.4) | 45.2 | (±8.7) | 69.5 | (±8.7) | 60.4 | (±8.8)[§§] |
| Rest of state | 93.2 | (±2.9) | 87.4 | (±4.1) | 71.7 | (±6.0) | 49.3 | (±6.6) | 66.4 | (±6.3) | 71.4 | (±5.8) |
| Indiana | 90.0 | (±4.5) | 76.8 | (±6.5) | 78.2 | (±6.0) | 48.0 | (±7.5) | 63.9 | (±7.4) | 61.4 | (±7.4) |
| Iowa | 93.3 | (±3.4)[††] | 88.2 | (±4.4) | 68.3 | (±7.5) | 59.3 | (±7.2)[††] | 70.2 | (±7.5) | 74.8 | (±6.3) |
| Kansas | 88.5 | (±4.6) | 79.0 | (±6.0)[§§] | 78.3 | (±5.4) | 58.5 | (±6.9) | 59.9 | (±7.0) | 65.0 | (±6.7) |
| Kentucky | 89.2 | (±4.4) | 83.0 | (±5.4) | 80.8 | (±5.6) | 48.4 | (±7.0) | 69.0 | (±6.4) | 68.2 | (±6.6) |
| Louisiana | 90.5 | (±4.0) | 77.8 | (±6.6) | 76.6 | (±6.8) | 46.9 | (±7.3) | 65.0 | (±7.4) | 68.5 | (±7.1) |
| Maine | 91.2 | (±4.2) | 87.9 | (±5.1) | 74.2 | (±5.8) | 52.5 | (±7.4)[††] | 64.7 | (±7.0) | 72.6 | (±6.6) |
| Maryland | 92.5 | (±4.8) | 83.2 | (±6.2) | 73.3 | (±6.6) | 53.1 | (±7.3) | 71.2 | (±6.9) | 67.1 | (±7.1) |
| Massachusetts | 93.7 | (±3.4) | 88.2 | (±4.5) | 74.0 | (±6.2) | 57.5 | (±6.9) | 82.4 | (±5.6) | 73.5 | (±6.2) |
| Michigan | 91.4 | (±4.4) | 81.5 | (±6.7) | 78.9 | (±6.1) | 40.9 | (±7.4)[§§] | 64.3 | (±7.4) | 70.5 | (±7.3) |
| Minnesota | 90.1 | (±5.6) | 84.2 | (±5.6) | 62.8 | (±7.4) | 55.4 | (±7.7) | 76.6 | (±6.4) | 66.2 | (±7.6) |
| Mississippi | 93.4 | (±4.3) | 83.6 | (±6.4) | 81.6 | (±6.5) | 39.7 | (±8.2) | 63.8 | (±8.0) | 77.5 | (±7.0) |
| Missouri | 92.7 | (±4.1) | 81.9 | (±7.0) | 78.7 | (±6.2) | 56.3 | (±7.9) | 69.3 | (±7.8) | 63.9 | (±8.0) |
| Montana | 91.5 | (±4.0) | 86.6 | (±4.4)[††] | 64.5 | (±6.8)[§§] | 50.5 | (±7.3) | 61.3 | (±7.4) | 66.5 | (±7.1) |
| Nebraska | 89.0 | (±4.4)[§§] | 84.5 | (±5.2)[§§] | 79.4 | (±5.8) | 60.6 | (±7.0) | 74.2 | (±6.2) | 72.6 | (±6.5) |
| Nevada | 89.8 | (±4.1) | 81.0 | (±5.5) | 70.5 | (±6.3) | 52.2 | (±7.0) | 62.7 | (±6.7) | 65.3 | (±6.6) |
| New Hampshire | 93.7 | (±3.4) | 88.7 | (±4.7) | 72.2 | (±6.6) | 57.0 | (±7.0) | 83.0 | (±5.8) | 80.1 | (±5.7)[††] |
| New Jersey | 94.8 | (±2.7) | 84.7 | (±5.1) | 52.6 | (±6.9) | 45.9 | (±6.9) | 68.0 | (±6.6)[††] | 71.5 | (±6.4) |
| New Mexico | 88.8 | (±4.4) | 87.0 | (±4.9) | 68.9 | (±7.0) | 51.9 | (±7.6) | 78.4 | (±5.8) | 71.6 | (±6.6) |
| New York | 90.2 | (±2.9) | 83.8 | (±3.5) | 61.5 | (±4.7)[††] | 45.9 | (±4.7) | 65.5 | (±4.5) | 63.7 | (±4.6) |
| City of New York | 90.3 | (±3.9) | 82.9 | (±5.3) | 60.5 | (±6.4)[††] | 44.4 | (±6.6) | 56.8 | (±6.8) | 62.8 | (±6.5) |
| Rest of state | 90.0 | (±4.2) | 84.6 | (±4.7) | 62.4 | (±6.8) | 47.5 | (±6.7) | 74.1 | (±5.9)[††] | 64.6 | (±6.5) |

See table footnotes on page 738.

in Vermont to 87.6% in Georgia), ≥2 doses of HepA (ranging from 32.3% in Wyoming to 65.9% in Georgia), and rotavirus vaccine (ranging from 54.2% in the District of Columbia to 83.0% in New Hampshire).

### Reported by

Carla L. Black, PhD, David Yankey, MS, Maureen Kolasa, MPH, Immunization Services Div, National Center for Immunization and Respiratory Diseases, CDC. *Corresponding contributor:* Carla L. Black, cblack2@cdc.gov, 404-639-8436.

### Editorial Note

The results of the 2012 NIS indicate that vaccination coverage among children aged 19–35 months continues to be near or above the *Healthy People 2020* target of 90% for MMR,

poliovirus vaccine, HepB, and varicella vaccine. Although coverage estimates for many vaccines had small but statistically significant decreases compared with 2011, estimates are not directly comparable between years because NIS methods were changed. The number of interviews conducted via cellular telephone increased in 2012, such that approximately half of the 2012 NIS unweighted sample came from the cellular telephone sampling frame, compared with 11% of the 2011 unweighted sample. In 2012, an estimated 45% of U.S. children aged <18 years lived in households with cellular telephones only (3). The proportion of children aged 19–35 months living in households with only cellular telephone service estimated from the weighted 2012 NIS sample was 52.7%. Thus, the NIS sample now more closely resembles the U.S. population with respect to telephone service, and these 2012 vaccination

Appx20294

Morbidity and Mortality Weekly Report

TABLE 3. (*Continued*) Estimated vaccination coverage among children aged 19–35 months, by selected individual vaccines and vaccination series* and state/local area — National Immunization Survey, United States, 2012[†]

| State/Area | MMR (≥1 doses) | | DTaP (≥4 doses) | | HepB (birth)[§] | | HepA (≥2 doses)[¶] | | Rotavirus** | | Combined series* | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) | % | (95% CI) |
| North Carolina | 89.0 | (±4.9) | 85.9 | (±5.4) | 78.2 | (±5.9) | 48.5 | (±7.3) | 68.0 | (±7.1) | 75.4 | (±6.5) |
| North Dakota | 90.6 | (±5.4) | 85.1 | (±6.2) | 82.3 | (±5.6) | 59.8 | (±7.5) | 75.4 | (±7.1) | 72.2 | (±7.2) |
| Ohio | 90.3 | (±4.9) | 83.3 | (±6.0) | 77.8 | (±6.2) | 53.8 | (±7.0) | 67.4 | (±7.5) | 66.8 | (±6.9) |
| Oklahoma | 90.0 | (±4.8) | 79.1 | (±6.0) | 67.4 | (±7.4) | 56.1 | (±7.4) | 56.4 | (±7.7) | 61.0 | (±7.6) |
| Oregon | 87.3 | (±4.7) | 81.2 | (±5.8) | 65.4 | (±6.6) | 57.6 | (±7.0) | 66.1 | (±6.7) | 66.7 | (±6.7) |
| Pennsylvania | 87.0 | (±4.6)[§§] | 80.1 | (±5.3) | 83.2 | (±4.3)[††] | 58.5 | (±6.1) | 72.5 | (±5.5) | 68.3 | (±5.9) |
| Philadelphia County | 92.6 | (±4.3) | 85.4 | (±5.7) | 78.1 | (±6.0) | 58.1 | (±7.6) | 68.0 | (±7.2) | 73.8 | (±7.1) |
| Rest of state | 85.9 | (±5.5)[§§] | 79.1 | (±6.2) | 84.2 | (±5.1)[††] | 58.6 | (±7.1) | 73.4 | (±6.4) | 67.2 | (±6.9) |
| Rhode Island | 94.3 | (±3.1) | 89.0 | (±4.9) | 68.3 | (±6.7) | 57.3 | (±6.9) | 79.8 | (±6.4) | 72.5 | (±6.5) |
| South Carolina | 93.2 | (±3.5) | 80.9 | (±6.0) | 78.4 | (±5.8)[††] | 48.5 | (±7.3) | 70.6 | (±6.7)[††] | 71.8 | (±6.7) |
| South Dakota | 93.3 | (±3.0) | 79.2 | (±5.5) | 76.6 | (±5.6) | 45.3 | (±6.8)[††] | 59.5 | (±7.0) | 63.6 | (±6.4) |
| Tennessee | 92.2 | (±4.0) | 82.0 | (±6.0) | 68.8 | (±7.0) | 55.4 | (±7.7) | 64.3 | (±7.6) | 73.1 | (±6.8) |
| Texas | 89.7 | (±2.4)[§§] | 77.4 | (±3.6)[§§] | 74.6 | (±3.7) | 57.4 | (±4.0) | 67.5 | (±3.9) | 64.8 | (±4.0)[§§] |
| Bexar County | 90.9 | (±4.0) | 77.5 | (±6.4) | 76.4 | (±6.4)[††] | 62.6 | (±7.6) | 67.5 | (±7.4) | 65.7 | (±7.5) |
| City of Houston | 92.2 | (±4.7) | 83.4 | (±6.8) | 84.3 | (±5.6) | 64.4 | (±8.4) | 79.7 | (±7.6)[††] | 70.9 | (±7.9) |
| Dallas County | 86.5 | (±5.6) | 78.8 | (±6.6) | 72.3 | (±7.0)[§§] | 56.8 | (±8.0) | 72.0 | (±7.2) | 69.8 | (±7.5) |
| El Paso County | 87.1 | (±4.7) | 76.5 | (±6.1) | 77.9 | (±5.6) | 57.4 | (±6.7) | 68.4 | (±6.7) | 62.3 | (±6.7) |
| Rest of state | 89.7 | (±3.3)[§§] | 76.2 | (±5.0) | 72.8 | (±5.2) | 55.7 | (±5.6) | 64.5 | (±5.4)[§§] | 62.9 | (±5.6)[§§] |
| Utah | 87.3 | (±5.5) | 80.5 | (±6.6) | 78.6 | (±6.3) | 57.1 | (±7.7) | 74.5 | (±6.8) | 73.0 | (±7.2) |
| Vermont | 91.7 | (±3.8) | 86.0 | (±5.0) | 36.0 | (±6.7)[††] | 37.4 | (±6.4) | 64.2 | (±6.6) | 63.2 | (±6.7) |
| Virginia | 94.3 | (±3.9) | 82.7 | (±6.6) | 71.4 | (±7.4) | 50.0 | (±8.3) | 71.9 | (±7.9) | 69.8 | (±7.7) |
| Washington | 84.8 | (±5.8) | 84.0 | (±5.5) | 73.2 | (±6.5) | 51.0 | (±7.4) | 68.6 | (±7.0) | 65.2 | (±7.2) |
| West Virginia | 84.6 | (±6.0) | 79.1 | (±6.8) | 74.4 | (±6.6)[††] | 54.9 | (±7.9) | 62.6 | (±7.8) | 60.8 | (±7.9) |
| Wisconsin | 89.3 | (±5.2) | 87.8 | (±5.3) | 72.2 | (±6.5) | 55.6 | (±7.4) | 67.4 | (±7.1) | 75.2 | (±6.5) |
| Wyoming | 91.2 | (±3.9) | 79.4 | (±6.0) | 64.8 | (±7.1) | 32.3 | (±6.8)[§§] | 69.1 | (±6.7)[††] | 67.2 | (±6.8) |
| U.S. Virgin Islands | 63.7 | (±7.4)[§§] | 55.6 | (±7.7) | 72.8 | (±7.0) | 12.0 | (±4.7) | 15.6 | (±5.7) | 41.5 | (±7.6) |

**Abbreviations:** CI = confidence interval; DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine (includes children who might have been vaccinated with diphtheria and tetanus toxoids and pertussis vaccine or diphtheria and tetanus toxoids vaccine); HepB = hepatitis B vaccine; HepA = hepatitis A vaccine; Hib = *Haemophilus influenzae* type b vaccine; MMR = measles, mumps, and rubella vaccine; PCV = pneumococcal conjugate vaccine.
* Includes ≥4 doses of DTaP, ≥3 doses of poliovirus vaccine, ≥1 doses of measles vaccine, full series of Hib (3 or 4 doses, depending on product), ≥3 doses of HepB, ≥1 doses of varicella vaccine, and ≥4 doses of PCV.
[†] Children in the 2012 National Immunization Survey were born during January 2009–May 2011.
[§] HepB administered from birth through age 3 days.
[¶] ≥2 doses HepA measured among children aged 19–35 months.
** ≥2 or ≥3 doses of rotavirus vaccine, depending on product received (≥2 doses for Rotarix [RV1] or ≥3 doses for RotaTeq [RV5]).
[††] Statistically significant increase in coverage compared with 2011 (p<0.05).
[§§] Statistically significant decrease in coverage compared with 2011 (p<0.05).

coverage estimates should be considered a baseline against which subsequent trends in coverage can be evaluated.

After a sustained increase from 2009 to 2011, likely attributable to recovery from a Hib vaccine shortage that occurred from December 2007 to June 2009 (*2*), coverage with the full series of Hib vaccine has reached levels in 2012 similar to those of DTaP and PCV, vaccines that also require a booster dose during the second year of life. Because the frequency of recommended well-child visits declines after age 12 months, fewer opportunities for catch-up doses with these vaccines exist when children fall behind schedule. CDC encourages the use of provider and system-based interventions aimed at encouraging adherence to well-child visits and facilitating delivery of vaccines at these visits. Examples include use of immunization information systems, provider assessment and feedback, provider reminders, standing orders, and provider education in conjunction with other interventions (*4*).

Coverage with HepA and rotavirus, the more recently recommended vaccines, also remained similar in 2012 compared with 2011, after several years of continued increase. Similar to Hib, DTaP, and PCV, the plateau in coverage for HepA might be attributable to fewer opportunities for catch-up doses, as the first dose of HepA is recommended during age 12–23 months. Children's vaccination status in NIS is determined up to age 19–35 months, so some children might have received their second dose, or might be due for their second dose, after the survey was conducted (the second dose is recommended 6–18 months after the first dose) (*5*). For rotavirus vaccine, the first dose should be given before age 14 weeks and 6 days because of insufficient evidence of safety in children aged >15 weeks, and the final dose should be given by age 8 months (*5*). These age restrictions might preclude infants from starting or completing the series. Health-care providers should make every

Appx20295

---

**What is already known on this topic?**

*Healthy People 2020* set childhood vaccination targets of 90% for ≥1 doses of measles, mumps, rubella vaccine (MMR); ≥3 doses of hepatitis B vaccine (HepB); ≥3 doses of poliovirus vaccine; ≥1 doses of varicella vaccine; ≥4 doses of diphtheria, tetanus, and pertussis vaccine; ≥4 doses of pneumococcal conjugate vaccine; and the full series of *Haemophilus influenzae* type b vaccine. The National Immunization Survey estimates coverage among U.S. children aged 19–35 months for these and other vaccines.

**What is added by this report?**

In 2012, childhood vaccination coverage remains near or above national target levels for ≥1 doses of MMR (90.8%), ≥3 doses of HepB (89.7%), ≥3 doses of poliovirus vaccine (92.8%), and ≥1 doses of varicella vaccine (90.2%); however, coverage varied by state and tended to be lower among children in families with incomes below the federal poverty level.

**What are the implications for public health practice?**

Sustaining current coverage levels and increasing coverage for those vaccines below national target levels is needed to maintain the low levels of vaccine-preventable diseases and prevent a resurgence of these diseases in the United States. Ensuring systems such as client reminder/recall and vaccination programs are in place in settings such as Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) clinics and child-care facilities can help support high vaccination coverage.

---

effort to start and complete administration of the rotavirus vaccine series on time.

Although few differences in coverage by racial/ethnic group were observed after adjustment for poverty status, differences in coverage by poverty level remained for many vaccines. The Vaccines For Children program¶¶¶ has been successful in removing differences in coverage between children living above and below the poverty level that once existed for vaccines such as MMR, polio, and HepB (6); however, coverage among children living below the poverty level still lags behind coverage of children living at or above the poverty level for newer vaccines (HepA and rotavirus) and vaccines that require 4 doses to complete the series.

Vaccination coverage continues to vary across states. Clusters of unvaccinated children leave communities vulnerable to outbreaks of disease. The continued occurrence of measles outbreaks among unvaccinated persons in the United States (7) underscores the importance of maintaining uniformly high coverage to prevent transmission of imported disease. Recent budget cuts to state and local health departments (8) as well as differences by state in factors such as population characteristics, immunization program activities, vaccination requirements

for child-care centers, and vaccine financing policies might contribute to variations in vaccination coverage.

The findings in this report are subject to at least four limitations. First, the proportion of the NIS sampled by cellular telephone in 2012 was about half compared with only 11% in 2011 and zero in earlier years. Living in a household with only cellular telephone service is associated with poverty and other demographic factors that might be related to vaccination status (3). Second, underestimates of vaccination coverage might have resulted from the exclusive use of provider-reported vaccination histories because completeness of these records is unknown. Third, bias resulting from nonresponse and exclusion of households without telephone service might persist after weighting adjustments, although estimated bias from these sources for the 2011 NIS was low for selected vaccines examined, ranging from 0.3 (for MMR) to 1.5 (for ≥4 DTaP) percentage points (9). The potential for nonresponse bias was increased in 2012 because of the lower response rate for the cellular telephone sample. However, a comparison of vaccination coverage estimates from the NIS from July 2011 through June 2012 with those from the National Health Interview Survey during the same period yielded similar results, both overall and for children living in cellular-only households, despite largely different response rates between the two surveys (Assessment Branch, Immunization Services Division, National Center for Immunization and Respiratory Diseases, and Survey Planning and Special Surveys Branch, Division of Health Interview Statistics, National Center for Health Statistics, CDC; unpublished data; 2013). Finally, although national coverage estimates are precise, estimates for state and local areas should be interpreted with caution because of smaller sample sizes and wider confidence intervals.

High vaccination coverage among preschool-aged children has resulted in historically low levels of most vaccine-preventable diseases in the United States (1). The results of the 2012 NIS indicate that vaccination coverage among young children remained relatively stable and the proportion of children who do not receive any vaccinations has remained low. Slight decreases in coverage for some vaccines relative to 2011 cannot be immediately explained but could be attributable to a change in NIS methods. The 2012 results should be considered a baseline against which future trends in coverage can be evaluated. Careful monitoring of coverage levels overall and in subpopulations (e.g., racial/ethnic and geographic) is important to ensure that all children remain adequately protected. Parents and health-care providers should work to sustain high coverage and improve coverage for the more recently recommended vaccines and those that require booster doses after age 12 months. In addition to health system–based

---

¶¶¶ Additional information about the Vaccines for Children program is available at http://www.cdc.gov/vaccines/programs/vfc/default.htm.

interventions previously described, national, state and local immunization programs should continue to partner with providers to implement the *Guide to Community Preventive Services*–recommended interventions aimed at increasing community demand for vaccination, such as client reminder/recall and client or family incentives. Enhanced access to health services also is recommended, through reduced out-of-pocket costs, home visits, and vaccination programs in child-care centers, schools, and Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) settings**** (*4*). Health insurance reforms of the Affordable Care Act require health plans to cover recommended immunizations without cost to the enrollee when administered by an in-network provider (*10*).[††††]

---

**** Additional information about WIC is available at http://www.fns.usda.gov/wic.

[††††] Enrollment in the new Health Insurance Marketplace begins October 1, 2013. The Health Insurance Marketplace will offer individuals and small businesses a streamlined process to compare health plans, get answers to questions, find out if they are eligible for tax credits for private insurance or health programs like the Children's Health Insurance Program (CHIP), and enroll in a health plan that meets their needs. Consumers can learn more about the Marketplace at http://www.healthcare.gov or the Spanish-language site http://www.cuidadodesalud.gov or by calling the 24-hour consumer call center at 1-800-318-2596. Hearing impaired callers using TTY/TDD technology can call 1-855-889-4325 for assistance.

## References

1. CDC. Vaccine-preventable diseases, immunizations, and MMWR—1961–2011. MMWR 2011;60(Suppl 4):49–57.
2. CDC. Updated recommendations for use of *Haemophilus influenzae* type b (Hib) vaccine: reinstatement of the booster dose at ages 12–15 months. MMWR 2009;58:673–4.
3. CDC. Wireless substitution: early release of estimates from the National Health Interview Survey, July–December 2012. Atlanta, GA: US Department of Health and Human Services, CDC; 2013. Available at http://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201306.pdf.
4. Community Preventive Services Task Force. Increasing appropriate vaccination: universally recommended vaccinations. In: The Guide to Community Preventive Services. Atlanta, GA: Community Preventive Services Task Force; 2013. Available at http://www.thecommunityguide.org/vaccines/index.html.
5. CDC. General recommendations on immunization: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2011;60(No. RR-2).
6. CDC. Vaccination coverage by race/ethnicity and poverty level among children aged 19–35 months, United States, 1996. MMWR 1997;46 963–8.
7. CDC. Measles—United States, 2011. MMWR 2012;61:253–7.
8. Association of State and Territorial Health Officials. Budget cuts continue to affect the health of Americans: update March 2012. Arlington, VA: Association of State and Territorial Health Officials; 2012. Available at http://www.astho.org/display/assetdisplay.aspx?id=6907.
9. Pineau V, Wolter K, Skalland B, et al. Modeling total survey error in the 2011 National Immunization Survey (NIS): pre-school children and teens. Paper presented at 2013 Joint Statistical Meetings, August 3–8, 2013; Montreal, Quebec, Canada.
10. Patient Protection and Affordable Care Act. Pub. L. No. 111-48,124 Stat. 119 (2010).

Appx20297

Morbidity and Mortality Weekly Report

# Measles — United States, January 1–August 24, 2013

Measles is a highly contagious, acute viral illness that can lead to complications and death. Although measles elimination (i.e., interruption of continuous transmission lasting ≥12 months) was declared in the United States in 2000 (*1*), importation of measles cases continues to occur. During 2001–2012, the median annual number of measles cases reported in the United States was 60 (range: 37–220), including 26 imported cases (range: 18–80). The median annual number of outbreaks reported to CDC was four (range: 2–16). Since elimination, the highest numbers of U.S. cases were reported in 2008 (140 cases) and 2011 (220) (Figure 1) (*2,3*). To update measles data, CDC evaluated cases reported by 16 states during January 1–August 24, 2013. A total of 159 cases of measles were reported during this period. Most cases were in persons who were unvaccinated (131 [82%]) or had unknown vaccination status (15 [9%]). Forty-two importations were reported, and 21 (50%) were importations from the World Health Organization (WHO) European Region. Eight outbreaks accounted for 77% of the cases reported in 2013, including the largest outbreak reported in the United States since 1996 (58 cases) (*4*). These outbreaks demonstrate that unvaccinated persons place themselves and their communities at risk for measles and that high vaccination coverage is important to prevent the spread of measles after importation.

Confirmed measles cases in the United States are reported by state and local health departments to CDC using a standard case definition.* A measles case is confirmed in a person with febrile rash illness and laboratory confirmation or a direct epidemiologic link to a confirmed case. Laboratory confirmation involves serologic detection of measles-specific immunoglobulin M, a significant increase in measles immunoglobulin G level, isolation of measles virus, or detection of measles virus by nucleic acid amplification in a clinical specimen (e.g., nasopharyngeal or oropharyngeal swab, nasal aspirate, throat wash, or urine). Cases are considered imported if exposure to measles virus occurred outside the United States 7–21 days before rash onset and rash occurred within 21 days of entry into the United States, with no known exposure to measles in the United States during that period. Import-associated cases include 1) imported cases, 2) cases that are linked epidemiologically to imported cases, and 3) cases for which an epidemiologic link has not been identified but the viral genotype detected suggests recent importation.† An outbreak of measles is defined as a chain of transmission with three or more confirmed cases.

During January 1–August 24, 2013, a total of 159 cases were reported to CDC from 16 states and New York City (Figure 2). Patients ranged in age from 0 days to 61 years; 18 (11%) were aged <12 months, 40 (25%) were aged 1–4 years, 58 (36%) were aged 5–19 years, and 43 (27%) were aged ≥20 years. Among the 159 cases, 17 (11%) persons required hospitalization, including four patients diagnosed with pneumonia. No deaths were reported.

Among the 159 cases, 157 (99%) were import-associated, and two had an unknown source. Forty-two (26%) importations (23 returning U.S residents and 19 visitors to the United States) from 18 countries were reported, and 21 (50%) of the importations were from the WHO European Region. Genotypes identified to date are D8 (47 cases), B3 (six), H1 (four), D9 (three), and D4 (two).

Most cases were in persons who were unvaccinated (131 [82%]) or had unknown vaccination status (15 [9%]). Thirteen (8%) of the patients had been vaccinated, of whom three had received 2 doses of measles, mumps, and rubella (MMR) vaccine. Among 140 U.S. residents who acquired measles, 117 (84%) were unvaccinated, and 11(8%) had unknown vaccination status. Of those who were unvaccinated, 92 (79%) had philosophical objections to vaccination, six (5%) had missed opportunities for vaccination, 15 (13%) occurred among infants aged <12 months who were not eligible for vaccination, and for four (3%) the reason for no vaccination was unknown (Figure 3). Among the 21 U.S resident patients who traveled abroad and were aged ≥6 months, 14 (67%) were unvaccinated, five (24%) had unknown vaccination status, and two had received 1 dose of MMR vaccine.

To date in 2013, eight outbreaks have accounted for 77% of the cases, and outbreaks have ranged from three to 58 cases. The largest outbreak occurred in New York City (*4*). None of these patients had documentation of vaccination at the time of exposure, including 12 (21%) who were aged <12 months. Of those who were eligible for vaccination, 31 (67%) had objected or had parental objection to vaccination because of religious or philosophical beliefs (*4*). The second largest outbreak, in North Carolina (23 cases, including a California resident), occurred mainly among persons not vaccinated because of personal belief exemptions (*5*). In an ongoing outbreak in Texas, 20 confirmed cases have been reported as of August 24 among members of a church community. Nineteen (95%) cases were in patients aged >12 months, and 17 (85%) of the patients were unvaccinated. The index patient was an adult with unknown measles vaccination history who traveled to Indonesia.

---

* Available at http://wwwn.cdc.gov/nndss/script/casedef.aspx?condyrid=908&datepub=1/1/2013%2012:00:00%20am.
† Additional information available at http://www.cdc.gov/vaccines/pubs/surv-manual/chpt07-measles.html.

Appx20298

Morbidity and Mortality Weekly Report

FIGURE 1. Number and percentage of measles cases that were directly imported and number of cases that were not directly imported* — United States, 2001–2013[†]



* Directly imported cases are those in patients who acquired measles outside the United States and brought their infection into the United States. Cases not directly imported include those that were acquired in the United States but linked to directly imported cases, imported virus, and cases with unknown sources.
[†] As of Aug 24, 2013.

FIGURE 2. Number of measles cases (N = 159), by state — United States, 2013*



* As of August 24, 2013.
[†] Includes New York City.

### Reported by

Gregory Wallace, MD, Susan Redd, Jennifer Rota, Paul Rota, PhD, William Bellini, PhD, Div of Viral Diseases, National Center for Immunization and Respiratory Diseases; Emmaculate Lebo, MBBS, EIS Officer, CDC. **Corresponding contributor:** Emmaculate Lebo, elebo@cdc.gov, 404-718-4522.

### Editorial Note

Measles elimination has been maintained in the United States since it was declared in 2000. However, an estimated 20 million cases of measles occur each year worldwide, and cases continue to be imported into the United States. The increase in measles cases in the United States in 2013 serves as a reminder that imported measles cases can result in large outbreaks, particularly if introduced into areas with pockets of unvaccinated persons.

During 2013, nearly two thirds of the cases came from three outbreaks. In these outbreaks, transmission occurred after introduction of measles into communities with pockets of persons unvaccinated because of philosophical or religious beliefs. This allowed for spread to occur, mainly in households and community gatherings, before public health interventions could be implemented. Despite progress in global measles control and elimination, measles importations are likely to continue posing risks of measles outbreaks in unvaccinated communities. Maintaining high MMR vaccination coverage is essential to prevent measles outbreaks and sustain measles elimination in the United States.

To date in 2013, 23 measles importations have been reported by U.S. residents, most of whom were aged ≥6 months and unvaccinated. The source of imported cases continues to be most often the WHO European Region, a popular destination for U.S. travelers and an area where measles continues to circulate. All persons aged ≥6 months without evidence of measles immunity who travel outside the United States should be vaccinated before travel with 1 dose of MMR vaccine for infants aged 6–11 months and 2 doses for persons aged ≥12 months, at least 28 days apart. Routine MMR vaccination is recommended for all children at age 12–15 months, with a second dose at age 4–6 years. Two doses of MMR vaccine are also recommended for health-care personnel and students attending post–high school educational institutions, unless they have other evidence of immunity. Other adults without evidence of measles immunity should receive 1 dose of MMR vaccine. Health-care providers should encourage timely vaccination of all eligible patients and should remind parents

Appx20299

Morbidity and Mortality Weekly Report

**FIGURE 3. U.S residents with measles who were unvaccinated (n = 117), by reasons for not receiving measles vaccine — United States, January 1–July 13, 2013**



* Includes persons who were unvaccinated because of their own or their parents' beliefs.
† Includes persons ineligible for measles vaccination, generally those aged <12 months.
§ Includes children aged 16 months–4 years who had not been vaccinated and international travelers aged ≥6 months who were unvaccinated but had no exemption.
¶ Includes persons who were known to be unvaccinated and the reason was unknown.

**What is already known on this topic?**

Measles elimination has been maintained in the United States since it was declared in 2000. However, an estimated 20 million cases of measles occur each year worldwide, with continued importation of cases into the United States.

**What is added by this report?**

During January 1–August 24, 2013, a total of 159 cases of measles were reported to CDC, of which 146 (92%) were in persons who were unvaccinated or had unknown vaccination status and 42 (26%) cases were imported. Nearly two thirds of the cases were reported from three outbreaks that occurred after introduction of measles into communities with pockets of philosophical or religious exemptions.

**What are the implications for public health practice?**

Importation of measles into communities with unvaccinated persons can lead to large outbreaks and threaten the elimination of measles in the United States. Maintenance of high coverage with 2 doses of measles, mumps, and rubella vaccine, early detection of cases, and rapid public health response to reports of measles are key factors that will lead to sustained elimination.

who plan to travel internationally with children of the increased risk for measles and the importance of vaccination (6).

Patients with measles often seek medical care; therefore, health-care providers should maintain a high awareness of measles and suspect measles in persons who have a febrile rash illness and clinically compatible symptoms and who have recently traveled abroad or have had contact with travelers. Providers should implement isolation precautions immediately, collect an appropriate laboratory specimen, and promptly report suspected measles case to their local health department (7). Early reporting and rapid control efforts by states and local public health agencies are essential to limit the spread of disease. Timely response plays an important role in limiting the size of outbreaks and preventing spread of measles, even in communities with large numbers of unvaccinated persons.

High MMR vaccine coverage in the United States (91% among children aged 19–35 months) limits the size of measles outbreaks; however, some states have coverage levels <90% (8). Additionally, unvaccinated children tend to cluster geographically and socially, increasing the risk for outbreaks (9). Increases in the proportion of persons declining vaccination for themselves or their children might lead to large-scale and sustained outbreaks, threatening the elimination of measles in the United States (10). Maintenance of high, 2-dose MMR

vaccine coverage, early detection of cases, and rapid public health response to a case are the key factors that will lead to sustained elimination, despite the continued importation of cases into the United States.

### References

1. Katz SL, Hinman AR. Summary and conclusions: measles elimination meeting, 16–17 March 2000. J Infect Dis 2004:189(Suppl 1):S43–7.
2. CDC. Summary of notifiable diseases—United States, 2008. MMWR 2010;57(54).
3. CDC. Summary of notifiable diseases—United States, 2011. MMWR 2013;60(53).
4. CDC. Notes from the field: measles outbreak among members of a religious community—Brooklyn, New York, March–June 2013. MMWR 2013;62:752–3.
5. CDC. Notes from the field: measles outbreak associated with a traveler returning from India—North Carolina. MMWR 2013;62:753.
6. CDC. Prevention of measles, rubella, congenital rubella syndrome, and mumps, 2013: summary recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2013;62(No. RR-4).
7. CDC. 2007 guideline for isolation precautions: preventing transmission of infectious agents in healthcare settings. Atlanta, GA: US Department of Health and Human Services, CDC; 2007. Available at http://www.cdc.gov/hicpac/2007ip/2007isolationprecautions.html.
8. CDC. National, state, and local area vaccination coverage among children aged 19–35 months— United States, 2012. MMWR 2013;62:733–40.
9. Smith PJ, Chu SY, Barker LE. Children who have received no vaccines: who are they and where do they live? Pediatrics 2004;114:187–95.
10. Omer SB, Salmon DA, Orenstein WA, deHart MP, Halsey N. Vaccine refusal, mandatory immunization, and the risks of vaccine-preventable diseases. N Engl J Med 2009;360:1981–8.

Appx20300

Morbidity and Mortality Weekly Report

# Influenza Vaccination Practices of Physicians and Caregivers of Children with Neurologic and Neurodevelopmental Conditions — United States, 2011–12 Influenza Season

Cognitive dysfunction, seizure disorders (epilepsy), and other neurologic disorders are conditions associated with a high risk for complications of influenza virus infection (1–3). This risk was observed during the 2009 influenza pandemic; among 336 pediatric deaths, 146 occurred in children with underlying neurologic disorders, most commonly intellectual disability (76%) and epilepsy (51%) (4). Because little is known about influenza-related knowledge and practices among the families and health-care providers of children with neurologic or neurodevelopmental (NND) conditions, CDC worked with Family Voices and the American Academy of Pediatrics to survey parents and physicians during the 2011–12 influenza season to assess these factors. Among 1,005 children with NND conditions, parents reported that 50% of children were vaccinated or had a vaccine appointment scheduled. Vaccination rates were low for children with intellectual disability (52%) and epilepsy (59%). Physician recognition of high-risk conditions was low for intellectual disability (46%) and epilepsy (52%). Efforts to improve physician awareness are essential because physicians are in a key position to educate parents of children with NND conditions about their increased risk for influenza complications and the importance of prevention through vaccination. Further research also is needed to identify barriers to influenza vaccination among families and health-care providers of these children.

CDC collaborated with Family Voices, a national advocacy group for children with special health-care needs, to recruit via listservs parents of children with chronic medical conditions. An online survey was distributed to members of the Family Voices listservs and administered from September 6 through October 24, 2011. Parents or other caregivers were asked about their knowledge, attitudes, and practices related to having their children vaccinated with seasonal influenza vaccine.

This report focuses on vaccination behavior during the 2011–12 influenza season. For purposes of this study, vaccination rates were calculated by dividing the number of children reported to have been vaccinated or for whom a vaccination appointment was scheduled by the number of children for whom a response was obtained. Only children aged ≥6 months with high-risk conditions as defined by the Advisory Committee on Immunization Practices (1) were included in the analysis.

CDC also collaborated with the American Academy of Pediatrics to recruit primary-care and specialty physicians who provide care for children at high risk for influenza complications,

specifically children with neurologic conditions. Physicians were recruited through American Academy of Pediatrics specialty listservs, including the Council on Children with Disabilities, the Committee on Practice and Ambulatory Medicine, and the Section on Neurology. An online survey was available from March 7 through May 15, 2011. This survey collected basic information regarding practice setting, specialty, and vaccination practices for various patient populations. Respondents also were asked which chronic medical conditions were associated with increased risk for severe illness from influenza.

Descriptive statistics were summarized as percentages. Between-group differences were assessed using chi-square testing. A p-value of <0.05 was considered to be statistically significant.

A total of 1,940 surveys were completed by parents of children with a high-risk condition. Seasonal influenza vaccination rates categorized by high-risk condition ranged from 41% for children with metabolic conditions to 78% for children with chronic lung disease (Figure). Among 1,005 parents of children with NND conditions, 50% reported their child had received or had an appointment scheduled to receive influenza vaccine at the time of survey completion.

Among all respondents, health-care providers were reported most frequently (75%) as the source of information about vaccines in general, and influenza vaccine specifically. Parents of vaccinated children were more likely (80% versus 64% [p<0.001]) to report using health-care providers as a source of information. Use of the Internet (24%) and family support or disability advocacy organizations (22%) were less frequently reported as sources of information and did not differ between families of vaccinated and unvaccinated children.

A total of 412 physicians participated in the online survey. Of those, 183 (44%) respondents identified themselves as primary-care providers. Among the remaining physicians, the predominant specialties were neurology (65), emergency medicine (56), critical care (28) and genetics/metabolism (24). A total of 393 physicians completed the question about high-risk conditions (Figure). Intellectual disability and hematologic disorders other than sickle cell disease were considered to be high-risk conditions by a minority of respondents. Further analyses were performed on a subset of physicians most likely to provide outpatient medical care to children with NND conditions: primary-care pediatricians, neurologists, geneticists, developmental pediatricians, and physiatrists. These physicians caring for children with NND conditions were more likely than other pediatricians to

**Appx20301**

Morbidity and Mortality Weekly Report

FIGURE. Influenza vaccination coverage among children at high risk for complications of influenza and physician recognition of high-risk conditions — United States, 2010–11 influenza season



% of physicians who recognized condition as high-risk
% of parents reporting their child was vaccinated or was scheduled to be vaccinated

What is already known on this topic?

Since 2005, the Advisory Committee on Immunization Practices has included cognitive dysfunction, spinal cord injuries, seizure disorders, and other neuromuscular disorders as high-risk conditions for complications associated with influenza virus infection. A review of pediatric influenza deaths during the 2009 H1N1 pandemic revealed that 146 (43%) of the 336 deaths occurred in children with an underlying neurologic condition.

What is added by this report?

Parents of children with neurologic or neurodevelopmental disorders and physicians caring for such children were surveyed by CDC during the 2011–12 influenza season. Parents responding to an online survey reported that 50% of 1,005 children with a neurologic disorder were vaccinated against influenza or had a vaccine appointment scheduled. Among the physicians, intellectual disability was recognized as a high-risk condition by 46% of respondents and epilepsy by 52%.

What are the implications for public health practice?

Vaccination coverage levels among children with neurologic conditions are comparable with those of healthy children, despite the fact that they are at increased risk for poor outcomes. Further research among families and health-care providers is needed to identify barriers to influenza immunization.

### Editorial Note

Annual influenza vaccination is recommended for all children aged 6 months–18 years. Although they are at greater risk for poor outcomes related to infection with influenza viruses, influenza vaccination of children with NND conditions was similar to that observed in the general pediatric population. The results of this survey are consistent with 2011–12 national seasonal influenza vaccination coverage estimates of 52% among children aged 6 months–17 years in the general population (5). In contrast, the *Healthy People 2020* goal (IID-12) is to increase the percentage of children who are vaccinated annually to 80% (6). Parents and caregivers reported that health-care providers were the most important source of information about vaccines. Intellectual disability and epilepsy were the two most common NND conditions among children who died during the 2009 influenza pandemic (2) but were two of the three conditions least likely to be recognized as high-risk by physicians.

The findings in this report are subject to at least four limitations. First, selection bias likely affected the results. Both the health-care provider and caregiver surveys were distributed via listserv services that require a subscription, which might have led to the exclusion of non–American Academy of Pediatrics member physicians who treat children at high risk for influenza complications. In addition, physicians especially interested in influenza prevention and treatment might be overrepresented in the sample. Similarly, the caregiver survey excludes parents

indicate cerebral palsy (79% versus 63%), epilepsy (57% versus 39%), spinal cord conditions (76% versus 60%), stroke (63% versus 41%), and other brain conditions (62% versus 44%) as high-risk conditions (p<0.05 for all comparisons). They were not more likely to rate intellectual disability as a high-risk condition.

### Reported by

Michael J. Smith, MD, Univ of Louisville School of Medicine, Louisville, Kentucky. Deborah McFalls, Jennifer Hendricks, Janice Watkins, Oak Ridge Associated Universities, Oak Ridge, Tennessee. Cynthia Moore, MD, Georgina Peacock, MD, Adina de Coteau, MPH, Div of Birth Defects and Developmental Disabilities, National Center on Birth Defects and Developmental Disabilities, CDC. **Corresponding contributor:** Georgina Peacock, ghn3@cdc.gov, 404-498-4347.

Appx20302

Morbidity and Mortality Weekly Report

and caregivers who are not on Family Voices listservs. Second, although it was not possible to calculate response rates because both surveys were distributed to multiple listservs, participation bias also likely affected the results. Third, the results of both surveys are based on self-report and might not reflect actual vaccination practices. Also, because this study assessed parental intent to vaccinate and parents were surveyed early in the influenza season, current vaccination and scheduled vaccination appointments were combined. However, parental intent to vaccinate a child might not have always resulted in vaccination. Finally, the physicians who participated in the health-care provider survey were not the same physicians who treated the patients in the parent survey. Therefore, their responses might not be representative of the experiences the caregivers had with their own health-care providers.

Despite these limitations, the results of these surveys demonstrate that children with NND conditions are no more likely to be vaccinated than healthy children, despite the fact that they are at increased risk for poor outcomes. Health-care providers remain the primary source of information regarding influenza vaccination. Increased outreach and communication efforts to both primary- and subspecialty-care providers might help reduce influenza-related morbidity and mortality among these children.

## Acknowledgments

Nora Wells, Family Voices, Inc., Lexington, Massachusetts. Laura Aird, MS, American Academy of Pediatrics, Elk Grove Village, Illinois. Kelli Martin, MPH, Richard Tardif, PhD, Oak Ridge Associated Universities, Oak Ridge, Tennessee. Pascale Wortley, MD, Div of HIV/AIDS Prevention, Surveillance, and Epidemiology, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention; Timothy Uyeki, MD, Erin Burns, Influenza Div, National Center for Immunization and Respiratory Diseases, CDC.

## References

1. CDC. Prevention and control of influenza: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2005;54(No. RR-8).
2. Keren R, Zaoutis TE, Bridges CB, et al. Neurological and neuromuscular disease as a risk factor for respiratory failure in children hospitalized with influenza infection. JAMA 2005;294:2188–94.
3. CDC. Severe influenza among children and young adults with neurologic and neurodevelopmental conditions—Ohio, 2011. MMWR 2012;60:1729–33.
4. Blanton L, Peacock G, Cox C, Jhung M, Finelli L, Moore C. Neurologic disorders among pediatric deaths associated with the 2009 pandemic influenza. Pediatrics 2012;130:390–6.
5. CDC. Flu vaccination coverage, United States, 2011–12 influenza season. Atlanta, GA: US Department of Health and Human Services, CDC; 2013. Available at http://www.cdc.gov/flu/professionals/vaccination/coverage_1112estimates.htm#age-group-children.
6. US Department of Health and Human Services. Healthy people 2020. Washington, DC: US Department of Health and Human Services; 2013. Available at http://www.healthypeople.gov/2020/topicsobjectives2020/objectiveslist.aspx?topicid=23.

Appx20303

Morbidity and Mortality Weekly Report

# Comparison of Provisional with Final Notifiable Disease Case Counts — National Notifiable Diseases Surveillance System, 2009

States report notifiable disease cases to CDC through the National Notifiable Diseases Surveillance System (NNDSS). This allows CDC to assist with public health action and monitor infectious diseases across jurisdictional boundaries nationwide. The *Morbidity and Mortality Weekly Report* (*MMWR*) is used to disseminate these data on infectious disease incidence. The extent to which the weekly notifiable conditions are overreported or underreported can affect public health understanding of changes in the burden, distribution, and trends in disease, which is essential for control of communicable diseases (*1*). NNDSS encourages state health departments to notify CDC of a case when initially reported. These cases are included in the weekly provisional counts. The status of reported cases can change after further investigation by the states, resulting in differences between provisional and final counts. Increased knowledge of these differences can help in guiding the use of information from NNDSS. To quantify the extent to which final counts differ from provisional counts of notifiable infectious disease in the United States, CDC analyzed 2009 NNDSS data for 67 conditions. The results of this analysis demonstrate that for five conditions, final case counts were lower than provisional counts, but for 59 conditions, final counts were higher than provisional counts. The median difference between final and provisional counts was 16.7%; differences were ≤20% for 39 diseases but >50% for 12. These differences occur for various diseases and in all states. Provisional case counts should be interpreted with caution and an understanding of the reporting process.

Reporting of cases of certain diseases is mandated at the state or local level, and states, the Council of State and Territorial Epidemiologists (CSTE), and CDC establish policies and procedures for submitting data from these jurisdictions to NNDSS. Not all notifiable diseases are reportable at the state level, and although disease reporting is mandated by legislation or regulation, state reporting to CDC is voluntary. States send reports of cases of nationally notifiable diseases to CDC on a weekly basis in one of several standard formats. Amended reports can be sent, as well as new reports. Cases are reported by week of notification to CDC. Cases reported each week to CDC and published in *MMWR* are deemed provisional. The NNDSS database is open throughout the year, allowing states to update their records as new information becomes available. Annually, CDC provides each state epidemiologist with a cutoff date (usually 6 months after the end of the reporting year) by which all records must be reconciled and no additional updates are accepted for that reporting period. After the database is closed, final case counts, prepared after the states have reconciled the year-to-date data with local reporting units, are approved by state epidemiologists as accurate reflections of final case counts for the year and are published in the *MMWR Summary of Notifiable Diseases — United States.* Data for 2009 were published in 2011 (*2*).

CDC's publication schedule allows states time to complete case investigation tasks. To examine the extent that provisional counts of infectious diseases differ from final counts, CDC compared the cumulative case counts published for week 52 of 2009 in the *MMWR* of January 8, 2010 to the case counts published in the NNDSS final data set for 2009 (cutoff date of June 2010) published in *MMWR* on August 20, 2010. To assess whether discrepancies between provisional and final counts were more common in specific states or regions, or everywhere, reporting was examined, by state, of four diverse diseases: one sexually transmitted disease (*Chlamydia trachomatis*, genital infection), one vaccine-preventable disease (pertussis), one foodborne disease (salmonellosis), and one vectorborne disease (Lyme disease). Data are not presented for tuberculosis and human immunodeficiency virus (HIV)/acquired immunodeficiency syndrome because these data are published quarterly rather than weekly in *MMWR*. Weekly reports of these conditions to the public health community are of limited value because of differences in reporting patterns for these diseases, and long-term variations in the number of cases are more important to public health practitioners than weekly variations (*3*).

Reported data for 67 notifiable diseases were reviewed. Final counts were lower than provisional counts for five diseases, the same as provisional counts for three, and higher for 59 (Table 1). The median difference between final and provisional counts was 16.7%; differences were ≤20% for 39 diseases but >50% for 12. Among diseases with ≥10 cases reported in 2009, final counts were lower than provisional counts for just four: invasive *Haemophilus influenzae* disease, ages <5 years, unknown serotype (final: 166, provisional: 218); acute hepatitis C (final: 782, provisional: 844); toxic-shock syndrome, other than streptococcal (final: 74, provisional: 76); and influenza-associated pediatric mortality (final: 358, provisional: 360). Final counts were higher than provisional counts for 51 diseases. The greatest percentage differences between provisional and final case counts were for arboviral disease, West Nile virus (neuro/nonneuro) (final: 720, provisional: 0); mumps (final: 1,991, provisional: 982); and Hansen disease (final: 103, provisional: 59).

Appx20304

Morbidity and Mortality Weekly Report

TABLE 1. Comparison of provisional and finalized notifiable diseases data — National Notifiable Diseases Surveillance System, 2009

| Disease | Final data | Provisional data | Absolute change | Change (%) |
|---|---|---|---|---|
| Anthrax | 1 | — | 1 | |
| Arboviral disease, California serogroup (neuro/nonneuro) | 55 | 41 | 14 | (34.1) |
| Arboviral disease, Eastern equine (neuro/nonneuro) | 4 | 4 | 0 | (0.0) |
| Arboviral disease, Powassan (neuro) | 6 | 1 | 5 | (500.0) |
| Arboviral disease, St. Louis encephalitis (neuro/nonneuro) | 12 | 10 | 2 | (20.0) |
| Arboviral disease, West Nile virus (neuro/nonneuro) | 720 | — | 720 | |
| Botulism, total | 118 | 92 | 26 | (28.3) |
| Brucellosis | 115 | 100 | 15 | (15.0) |
| Chancroid | 28 | 25 | 3 | (12.0) |
| *Chlamydia trachomatis*, genital infections | 1,244,180 | 1,100,230 | 143,950 | (13.1) |
| Cholera | 10 | 8 | 2 | (25.0) |
| Coccidioidomycosis | 12,926 | 12,729 | 197 | (1.5) |
| Cryptosporidiosis, total | 7,654 | 6,652 | 1,002 | (15.1) |
| Cyclosporiasis | 141 | 123 | 18 | (14.6) |
| Ehrlichiosis, *Ehrlichia chaffeen* | 944 | 801 | 143 | (17.9) |
| Ehrlichiosis, *Ehrlichia ewingii* | 7 | 6 | 1 | (16.6) |
| Ehrlichiosis, *Anaplasma phagocytophilum* | 1,161 | 690 | 471 | (68.3) |
| Ehrlichiosis, undetermined | 155 | 122 | 33 | (27.0) |
| Giardiasis | 19,399 | 17,548 | 1,851 | (10.6) |
| Gonorrhea | 301,174 | 260,530 | 40,644 | (15.6) |
| *Haemophilus influenzae*, invasive disease, all ages, both sexes | 3,022 | 2,896 | 126 | (4.4) |
| *Haemophilus influenzae*, invasive disease, ages <5 yrs, serotype b | 38 | 25 | 13 | (52.0) |
| *Haemophilus influenzae*, invasive disease, ages <5 yrs, nonserotype b | 245 | 203 | 42 | (20.7) |
| *Haemophilus influenzae*, invasive disease, ages <5 yrs, unknown serotype | 166 | 218 | −52 | (−23.9) |
| Hansen disease | 103 | 59 | 44 | (74.6) |
| Hantavirus pulmonary syndrome | 20 | 12 | 8 | (66.7) |
| Hemolytic uremic syndrome postdiarrheal | 242 | 210 | 32 | (15.2) |
| Hepatitis A, viral, acute | 1,987 | 1,849 | 138 | (7.5) |
| Hepatitis B, viral, acute | 3,405 | 3,020 | 385 | (12.7) |
| Hepatitis C, viral, acute | 782 | 844 | −62 | (−7.4) |
| Influenza-associated pediatric mortality | 358 | 360 | −2 | (−0.6) |
| Legionellosis | 3,522 | 3,145 | 377 | (12.0) |
| Listeriosis | 851 | 755 | 96 | (12.7) |
| Lyme disease, total | 38,468 | 29,780 | 8,688 | (29.2) |
| Malaria | 1,451 | 1,169 | 282 | (24.1) |
| Measles, total | 71 | 61 | 10 | (16.4) |
| Meningococcal disease, all serogroups | 980 | 887 | 93 | (10.5) |
| Mumps | 1,991 | 982 | 1,009 | (102.8) |
| Pertussis | 16,858 | 13,506 | 3,352 | (24.8) |
| Plague | 8 | 7 | 1 | (14.3) |
| Polio | 1 | — | 1 | |
| Psittacosis | 9 | 9 | 0 | (0.0) |
| Q fever, total | 113 | 95 | 18 | (19.0) |
| Rabies, animal | 5,343 | 3,581 | 1,762 | (49.2) |
| Rabies, human | 4 | 4 | 0 | (0.0) |
| Rocky Mountain spotted fever, total | 1,815 | 1,393 | 422 | (30.3) |
| Rubella | 3 | 4 | −1 | (−25.0) |
| Rubella, congenital syndrome | 2 | 1 | 1 | (100.0) |
| Salmonellosis | 49,192 | 44,468 | 4,724 | (10.6) |
| Shiga toxin-producing *Escherichia coli* (STEC) | 4,643 | 4,323 | 320 | (7.4) |
| Shigellosis | 15,931 | 14,581 | 1,350 | (9.3) |
| Streptococcal disease, invasive group A | 5,279 | 4,861 | 418 | (8.6) |
| Streptococcal toxic-shock syndrome | 161 | 125 | 36 | (28.8) |
| *Streptococcus pneumoniae*, invasive disease, drug resistant, all ages | 3,370 | 2,823 | 547 | (19.4) |
| *Streptococcus pneumoniae*, invasive disease, drug resistant, ages <5 yrs | 583 | 464 | 119 | (25.7) |
| *Streptococcus pneumoniae*, invasive disease, nondrug resistant, ages <5 yrs | 1,988 | 1,768 | 220 | (12.4) |
| Syphilis, congenital | 427 | 257 | 170 | (66.2) |
| Syphilis, primary and secondary | 13,997 | 12,833 | 1,164 | (9.1) |
| Tetanus | 18 | 14 | 4 | (28.6) |
| Toxic-shock syndrome (other than streptococcal) | 74 | 76 | −2 | (−2.6) |
| Trichinellosis | 13 | 12 | 1 | (8.3) |
| Tularemia | 93 | 79 | 14 | (17.7) |
| Typhoid fever | 397 | 324 | 73 | (22.5) |
| Vancomycin-intermediate *Staphylococcus aureus* (VISA) | 78 | 70 | 8 | (11.4) |
| Vancomycin-resistant *Staphylococcus aureus* (VRSA) | 1 | — | 1 | |
| Varicella (chickenpox morbidity) | 20,480 | 16,944 | 3,536 | (20.9) |
| Vibriosis | 789 | 593 | 196 | (33.1) |

Appx20305

Examining four diverse but commonly reported diseases in detail revealed no consistent association between state or region and the magnitude of the discrepancy between final and provisional counts (Table 2). For *Chlamydia trachomatis*, genital infections, the final case count was 13.1% higher than the provisional count nationally; it was <2% lower everywhere and ≥20% higher in six states. Two states, Arkansas and North Carolina, reported no cases provisionally, but reported final case counts of 14,354 and 41,045, respectively. For Lyme disease, the final case count was 29.2% higher than the provisional count nationally. Only 23 jurisdictions reported >100 cases, including 21 states, upstate New York, and New York City. Of these, four states reported a final count lower than their provisional count (range: 13.4%–29.2%) and eight jurisdictions reported final counts ≥20% higher. The greatest percentage differences between provisional and final case counts were in Connecticut (final: 4,156, provisional: none), Minnesota, (final: 1,543, provisional: 169), Texas (final: 276, provisional: 48), and New York City (final: 1,051, provisional: 262). For pertussis, the final case count was 24.8% higher than the provisional count nationally; it was <2% lower everywhere and ≥20% higher in 18 states and the District of Columbia (DC). Of the five states that reported >1,000 cases, the states with the greatest percentage differences between provisional and final counts were Minnesota (final: 1,121, provisional: 165) and Texas (final: 3,358, provisional: 2,437). For salmonellosis, the final case count was 10.6% higher than provisional count nationally. Six states reported a final count lower than their provisional count (range: 0.1%–2.9%) and nine states plus DC reported final counts ≥20% higher, the highest being DC (final: 100, provisional: 26), Louisiana (final: 1,180, provisional: 599), and Indiana (final: 629, provisional: 349).

**Reported by**

*Nelson Adekoya, DrPH, Div of Notifiable Diseases and Healthcare Information, Public Health Surveillance and Informatics Program Office; Henry Roberts, PhD, Div of Viral Hepatitis, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention, CDC.* **Corresponding contributor:** *Nelson Adekoya, nba7@cdc.gov, 404-498-6258.*

**Editorial Note**

The findings in this report corroborate previous observations that provisional NNDSS data should be interpreted with caution (*1,4,5*). The primary appeal of provisional counts is timeliness; in comparison, final counts are more complete and accurate. As additional information is collected during investigations, final case counts might be higher or lower than the provisional counts. Local and state health departments collect reportable surveillance data primarily to assist with disease

**What is already known on this topic?**

Provisional counts of notifiable diseases usually differ from final counts; they are most often lower.

**What is added by this report?**

In 2009, finalized case counts were higher than the provisional case counts for 59 of 67 notifiable diseases. The median difference between provisional and final counts was 16.7%; differences were ≤20% for 39 diseases but >50% for 12. These differences occur, to a greater or lesser extent, for a wide variety of diseases and in all states.

**What are the implications for public health practice?**

Notifiable disease data are subject to case reclassification leading to undernotification or overnotification. Provisional case counts should be interpreted with caution because of the reporting process. The primary appeal of provisional counts is timeliness; in comparison, final counts are more complete and accurate.

control and prevention efforts (i.e., to monitor local outbreaks of infectious diseases), to measure disease burden among high-risk populations, and to assess effectiveness of local interventions. At the national level, these data can be compared with baseline data to detect unusual disease occurrences. Final data sets are useful in monitoring national trends and for determining the effectiveness of national intervention efforts. In 2009, final case counts did not differ from end-of-year provisional counts by >20% for two thirds of the 67 notifiable diseases examined. Understanding how provisional counts relate to final counts is essential for interpreting provisional data (*6,7*).

Final counts might be higher than provisional counts for several possible reasons: 1) as amended records are sent by states during the notification process, cases might be reclassified among confirmed, probable, suspected, and not-a-case categories; 2) states vary in their practices regarding when they report cases with incomplete data or that are under investigation, leading to variable delays; 3) allocation of cases to a state can be delayed; 4) laboratory testing, case investigation, and data entry can be delayed as a result of temporary staff absences (e.g., leave, furlough, or turnover); 5) states sometimes delay sending some reports to CDC until the end of the year; and 6) internal CDC data processing problems can cause a discrepancy.

The findings in this report are subject to at least one limitation. It was impossible to determine when final counts were known to the state and local jurisdictions so that they could take public health action. This report focuses only on counts published in *MMWR*. The jurisdictions might have been aware of final case counts sooner, and only notification to CDC was delayed. Although this study examined 1 year of data, previous research using multiple years of data for hepatitis A and B concluded that provisional data generally tend to underrepresent the final data counts for those conditions (*1*). The addition of

*Morbidity and Mortality Weekly Report*

**TABLE 2. Comparison of provisional and final reported cases of notifiable diseases for selected conditions, by state and area — National Notifiable Diseases Surveillance System, United States, 2009**

| Area | Chlamydia | | | Lyme disease | | | Pertussis | | | Salmonellosis | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Final | Provisional | Change (%) | Final | Provisional | Change (%) | Final | Provisional | Change (%) | Final | Provisional | Change (%) |
| **United States** | 1,244,180 | 1,100,230 | (13.1) | 38,468 | 29,780 | (29.2) | 16,858 | 13,506 | (24.8) | 49,191 | 44,468 | (10.6) |
| **New England** | 40,776 | 39,850 | (2.3) | 12,440 | 6,314 | (97.0) | 626 | 592 | (5.7) | 2,174 | 2,110 | (3.0) |
| Connecticut | 12,127 | 11,532 | (5.2) | 4,156 | — | | 56 | 48 | (16.7) | 430 | 406 | (5.9) |
| Maine | 2,431 | 2,386 | (1.9) | 970 | 894 | (8.5) | 80 | 78 | (2.6) | 121 | 119 | (1.7) |
| Massachusetts | 19,315 | 19,538 | (−1.2) | 5,256 | 3,662 | (43.5) | 358 | 348 | (2.9) | 1,155 | 1,159 | (−0.4) |
| New Hampshire | 2,102 | 1,633 | (28.7) | 1,415 | 1,156 | (22.4) | 76 | 76 | (0.0) | 261 | 243 | (7.4) |
| Rhode Island | 3,615 | 3,614 | (0.0) | 235 | 212 | (10.9) | 45 | 31 | (45.2) | 144 | 122 | (18.0) |
| Vermont | 1,186 | 1,147 | (3.4) | 408 | 390 | (4.6) | 11 | 11 | (0.0) | 63 | 61 | (3.3) |
| **Mid-Atlantic** | 159,111 | 154,989 | (2.7) | 16,346 | 16,691 | (−2.1) | 1,222 | 1,101 | (11.0) | 5,514 | 5,001 | (10.3) |
| New Jersey | 23,974 | 21,181 | (13.2) | 4,973 | 4,163 | (19.5) | 244 | 158 | (54.4) | 1,132 | 802 | (41.2) |
| New York (Upstate) | 33,722 | 32,099 | (5.1) | 4,600 | 4,179 | (10.1) | 265 | 252 | (5.2) | 1,370 | 1,321 | (3.7) |
| New York City | 58,347 | 59,370 | (−1.7) | 1,051 | 262 | (301.2) | 98 | 92 | (6.5) | 1,253 | 1,171 | (7.0) |
| Pennsylvania | 43,068 | 42,339 | (1.7) | 5,722 | 8,087 | (−29.2) | 615 | 599 | (2.7) | 1,759 | 1,707 | (3.1) |
| **Eastern North Central** | 197,133 | 167,016 | (18.0) | 2,969 | 2,359 | (25.9) | 3,206 | 2,990 | (7.2) | 5,169 | 4,597 | (12.4) |
| Illinois | 60,542 | 48,929 | (23.7) | 136 | 126 | (7.9) | 648 | 570 | (13.7) | 1,484 | 1,294 | (14.7) |
| Indiana | 21,732 | 21,111 | (2.9) | 83 | 62 | (33.9) | 392 | 338 | (16.0) | 629 | 349 | (80.2) |
| Michigan | 45,714 | 44,873 | (1.9) | 103 | 99 | (4.0) | 900 | 854 | (5.4) | 960 | 911 | (5.4) |
| Ohio | 48,239 | 34,036 | (41.7) | 58 | 56 | (3.6) | 1,096 | 1,096 | (0.0) | 1,407 | 1,407 | (0.0) |
| Wisconsin | 20,906 | 18,067 | (15.7) | 2,589 | 2,016 | (28.4) | 170 | 132 | (28.8) | 689 | 636 | (8.3) |
| **Western North Central** | 70,396 | 66,205 | (6.3) | 1,693 | 303 | (458.8) | 2,840 | 1,678 | (69.3) | 2,679 | 2,472 | (8.4) |
| Iowa | 9,406 | 9,311 | (1.0) | 108 | 96 | (12.5) | 235 | 192 | (22.4) | 408 | 398 | (2.5) |
| Kansas | 10,510 | 9,798 | (7.3) | 18 | 14 | (28.6) | 240 | 146 | (64.4) | 398 | 269 | (48.0) |
| Minnesota | 14,197 | 12,222 | (16.2) | 1,543 | 169 | (813.0) | 1,121 | 165 | (579.4) | 575 | 572 | (0.5) |
| Missouri | 25,868 | 25,698 | (0.7) | 3 | 3 | (0.0) | 1,015 | 975 | (4.1) | 656 | 667 | (−1.7) |
| Nebraska | 5,443 | 5,262 | (3.4) | 5 | 20 | (−75.0) | 141 | 141 | (0.0) | 341 | 337 | (1.2) |
| North Dakota | 1,957 | 1,769 | (10.6) | 15 | — | | 30 | 29 | (3.5) | 103 | 73 | (41.1) |
| South Dakota | 3,015 | 2,145 | (40.6) | 1 | 1 | (0.0) | 58 | 30 | (93.3) | 198 | 156 | (26.9) |
| **South Atlantic** | 249,979 | 194,409 | (28.6) | 4,466 | 3,778 | (18.2) | 1,632 | 1,551 | (5.2) | 14,478 | 13,488 | (7.3) |
| Delaware | 4,718 | 4,718 | (0.0) | 984 | 952 | (3.4) | 13 | 13 | (0.0) | 142 | 137 | (3.7) |
| District of Columbia | 6,549 | 6,414 | (2.1) | 61 | 20 | (205.0) | 7 | 3 | (133.3) | 100 | 26 | (284.6) |
| Florida | 72,931 | 71,731 | (1.7) | 110 | 127 | (−13.4) | 497 | 500 | (−0.6) | 6,741 | 6,749 | (−0.1) |
| Georgia | 39,828 | 29,934 | (33.1) | 40 | 53 | (−24.5) | 223 | 194 | (15.0) | 2,362 | 2,365 | (−0.1) |
| Maryland | 23,747 | 22,138 | (7.3) | 2,024 | 1,775 | (14.0) | 148 | 134 | (10.5) | 803 | 784 | (2.4) |
| North Carolina | 41,045 | — | | 96 | 63 | (52.4) | 220 | 223 | (−1.4) | 1,810 | 1,053 | (71.9) |
| South Carolina | 26,654 | 25,014 | (6.7) | 42 | 39 | (7.7) | 262 | 252 | (4.0) | 1,195 | 1,153 | (3.6) |
| Virginia | 30,903 | 30,881 | (0.1) | 908 | 579 | (56.8) | 222 | 198 | (12.1) | 1,095 | 1,004 | (9.1) |
| West Virginia | 3,604 | 3,579 | (0.7) | 201 | 170 | (18.2) | 40 | 34 | (17.7) | 230 | 217 | (6.0) |
| **Eastern South Central** | 92,522 | 87,926 | (5.2) | 41 | 36 | (13.9) | 803 | 760 | (5.7) | 3,077 | 2,937 | (4.8) |
| Alabama | 25,929 | 22,833 | (13.6) | 3 | 3 | (0.0) | 305 | 285 | (7.0) | 932 | 850 | (9.7) |
| Kentucky | 13,293 | 13,166 | (1.0) | 1 | 1 | (0.0) | 226 | 219 | (3.2) | 453 | 451 | (0.4) |
| Mississippi | 23,589 | 22,146 | (6.5) | — | — | | 75 | 66 | (13.6) | 899 | 853 | (5.4) |
| Tennessee | 29,711 | 29,781 | (−0.2) | 37 | 32 | (15.6) | 197 | 190 | (3.7) | 793 | 783 | (1.3) |
| **Western South Central** | 162,915 | 136,836 | (19.1) | 278 | 48 | (479.2) | 3,993 | 2,882 | (38.6) | 6,411 | 4,751 | (34.9) |
| Arkansas | 14,354 | — | | — | — | | 369 | 278 | (32.7) | 615 | 607 | (1.3) |
| Louisiana | 27,628 | 25,308 | (9.2) | — | — | | 149 | 90 | (65.6) | 1,180 | 599 | (97.0) |
| Oklahoma | 15,023 | 12,959 | (15.9) | 2 | — | | 117 | 77 | (52.0) | 652 | 615 | (6.0) |
| Texas | 105,910 | 98,569 | (7.5) | 276 | 48 | (475.0) | 3,358 | 2,437 | (37.8) | 3,964 | 2,930 | (35.3) |
| **Mountain** | 80,476 | 73,912 | (8.9) | 57 | 44 | (30.0) | 1,019 | 890 | (14.5) | 3,028 | 2,812 | (7.7) |
| Arizona | 26,002 | 25,110 | (3.6) | 7 | 6 | (16.7) | 277 | 224 | (23.7) | 1,086 | 1,051 | (3.3) |
| Colorado | 19,998 | 16,362 | (22.2) | 1 | 1 | (0.0) | 231 | 233 | (−0.9) | 619 | 621 | (−0.3) |
| Idaho | 3,842 | 3,501 | (9.7) | 16 | 15 | (6.7) | 99 | 99 | (0.0) | 174 | 172 | (1.2) |
| Montana | 2,988 | 2,913 | (2.6) | 3 | 3 | (0.0) | 61 | 57 | (7.0) | 110 | 99 | (11.1) |
| Nevada | 10,045 | 9,743 | (3.1) | 13 | 5 | (160.0) | 24 | 9 | (166.7) | 252 | 173 | (45.7) |
| New Mexico | 9,493 | 8,947 | (6.1) | 5 | 5 | (0.0) | 85 | 66 | (28.8) | 369 | 325 | (13.5) |
| Utah | 6,145 | 5,466 | (12.4) | 9 | 7 | (28.6) | 220 | 181 | (21.6) | 321 | 283 | (13.4) |
| Wyoming | 1,963 | 1,870 | (5.0) | 3 | 2 | (50.0) | 22 | 21 | (4.8) | 97 | 88 | (10.2) |
| **Pacific** | 190,872 | 179,087 | (6.6) | 178 | 207 | (−14.0) | 1,517 | 1,062 | (42.8) | 6,662 | 6,300 | (5.8) |
| Alaska | 5,166 | 4,412 | (17.1) | 7 | 3 | (133.0) | 59 | 49 | (20.4) | 68 | 70 | (−2.9) |
| California | 146,796 | 139,689 | (5.1) | 117 | 154 | (−24.0) | 869 | 473 | (83.7) | 5,003 | 4,757 | (5.2) |
| Hawaii | 6,026 | 5,610 | (7.4) | —* | —* | | 46 | 29 | (58.6) | 338 | 297 | (13.8) |
| Oregon | 11,497 | 10,245 | (12.2) | 38 | 35 | (8.6) | 252 | 246 | (2.4) | 433 | 416 | (4.1) |
| Washington | 21,387 | 19,131 | (11.8) | 16 | 15 | (6.7) | 291 | 265 | (9.8) | 820 | 760 | (7.9) |

\* Not notifiable in Hawaii.

Appx20307

more years to the current research, which examined multiple notifiable conditions and documents substantial differences across states, regions, and numerous conditions, would not be expected to change the overall results.

Interpreting weekly incidence data is complex because of surveillance system limitations. Nonetheless, health practitioners have to respond to public health threats based on preliminary surveillance information. In 2006, CDC and CSTE reconsidered data presentation formats and included additional information (e.g., 5-year weekly average, previous 52 weeks median, and maximum number of cases) to aid interpreting these data (*3*). However, the findings in this report illustrate that major challenges still exist in presenting and interpreting provisional data and highlights the need to examine specific factors that can contribute to late reporting of cases (e.g., late case reporting by providers to health departments or late reporting of cases by health departments to CDC) (*4*). Although information technology has improved notifiable disease reporting (*8*), NNDSS data remain subject to reporting artifacts. Understanding specific reasons for the variation between the provisional and final case counts for each condition can improve the use of provisional data for disease surveillance and notification.

## Acknowledgments

Richard Hopkins, MD, Florida Dept of Health. John Davis-Cole, PhD, District of Columbia Dept of Health. Michael Landen, MD, New Mexico Dept of Health. Participating state health departments and reporting jurisdictions.

## References

1. Smallman-Raynor M, Cliff AD, Haggett P, Stroup DF, Williamson GD. Spatial and temporal patterns in final amendments to provisional disease counts. J Public Health Manag Pract 1999;5:68–83.
2. CDC. Summary of notifiable diseases—United States, 2009. MMWR 2011;58(53).
3. CDC. Notice to readers: changes in presentation of data from the National Notifiable Diseases Surveillance System. MMWR 2006;55:13–4.
4. Stroup DF, Williamson GD, Herndon JL, Karon JM. Detection of aberrations in the occurrence of notifiable diseases surveillance data. Stat Med 1989;8:323–9.
5. Stroup DF, Wharton M, Kafadar K, Dean AG. Evaluation of a method for detecting aberrations in public health surveillance system data. Am J Epidemiol 1993;137:373–80.
6. Birkhead G, Chorba TL, Root S, Klaucke DN, Gibbs NJ. Timeliness of national reporting of communicable diseases: the experience of the National Electronic Telecommunications System for Surveillance. Am J Public Health 1991;81:1313–5.
7. Boehmer TK, Patnaik JL, Burnite SJ, Ghosh TS, Gershman K, Vogt RL. Use of hospital discharge data to evaluate notifiable disease reporting to Colorado's Electronic Disease Reporting System. Public Health Rep 2011;126:100–6.
8. Silk BJ, Berkelman RL. A review of strategies for enhancing the completeness of notifiable disease reporting. J Public Health Manag Pract 2005;11:191–200.

Appx20308

Morbidity and Mortality Weekly Report

## Notes from the Field

### Measles Outbreak Among Members of a Religious Community — Brooklyn, New York, March–June 2013

On March 13, 2013, an intentionally unvaccinated adolescent aged 17 years returned to New York City from London, United Kingdom, while infectious with measles. This importation led to the largest outbreak of measles in the United States since 1996 (1).

Investigation of suspected cases included patient interviews, medical record reviews, and ascertainment of immunization records. Testing for measles immunoglobulin G (IgG) and immunoglobulin M (IgM) and testing for measles virus RNA by reverse-transcription polymerase chain reaction (RT-PCR) were performed, and measles genotype was determined. Cases were identified in residents of New York City and classified according to the Council of State and Territorial Epidemiologists clinical case definition (2). Exposed contacts were identified, and control measures were implemented.

A total of 58 cases* were identified, including six generations of measles infection in two neighborhoods of the borough of Brooklyn. All cases were in members of the orthodox Jewish community. No case was identified in a person who had documented measles vaccination at the time of exposure; 12 (21%) of the cases were in infants too young (aged <12 months) for routine immunization with measles, mumps, and rubella (MMR) vaccine.

The outbreak was first recognized in Brooklyn's Borough Park neighborhood, where the median age of 28 infected persons was 10 years (range: 0–32 years), and 79% of cases in persons aged ≥12 months were in three extended families whose members declined use of measles vaccine. The outbreak spread to the Williamsburg neighborhood, where the median age of 30 infected persons was 19 months (range: 0 months–32 years), and the primary reasons for lack of vaccination were refusal (nine, 30%) and delay (eight, 27%). Forty-eight (83%) of all cases were confirmed by positive measles IgM or RT-PCR result and 10 (17%) by epidemiologic linkage (2). Genotype D8 was identified in 17 cases, consistent with known current circulation of this genotype in the United Kingdom. No other genotype was identified among the cases.

In 31% of cases, no medical care for rash illness had been sought and, therefore, the cases had not been reported to the New York City Department of Health and Mental Hygiene (DOHMH) by a medical provider. In 9% of cases, patients saw a medical provider at the time of rash illness but were not reported when the diagnosis of measles was first considered. In 52% of cases, measles was likely acquired from a relative. Complications included pneumonia in one child; two pregnant women required hospitalization, including one who miscarried. The last case onset occurred on June 9, 2013.

Approximately 3,500 contacts were identified in health-care, school, and home settings. Control measures included administration of immune globulin or MMR vaccine post-exposure prophylaxis; home isolation; alerts to medical providers; active recall of children in medical practices who were not up-to-date with measles vaccine; notifications to families, schools and day care providers through letters, flyers, and advertisements in newspapers; immunization audits of schools; and meetings with religious leaders and elected officials. DOHMH recommended that obstetricians in affected communities test for measles immunity during pregnancy and vaccinate women without evidence of measles immunity postpartum. Because infants were affected, vaccination recommendations during the outbreak period were expanded to include MMR vaccine for all children aged 6–11 months in the affected communities, with the second dose of MMR vaccine administered early, as soon as 4 weeks after the first dose of MMR vaccine.

Measles elimination was declared in the United States in 2000. However, importations of measles continue to present risks for outbreaks in the United States. This outbreak was propagated by a few extended families whose members declined MMR vaccine and by children with delays in receiving MMR vaccine in densely populated neighborhoods (3). High vaccination coverage within the Brooklyn orthodox Jewish community likely limited the scope of the outbreak. The insular nature of the affected community and high population-level vaccination coverage outside this community likely prevented further spread of measles.

**Reported by**

*Robert J. Arciuolo, MPH, Tamara R. Brantley, MPH, Mekete M. Asfaw, Rachel R. Jablonski, Jie Fu, PhD, Francesca R. Giancotti, PhD, Jennifer B. Rosen, MD, New York City Dept of Health and Mental Hygiene. Jane R. Zucker, MD, Immunization Svcs Div, National Center for Immunization and Respiratory Diseases, CDC. **Corresponding contributor:** Robert J. Arciuolo, rarciuolo@health.nyc.gov, 347- 396-2473.*

**Acknowledgment**

Measles Virus Team, Measles, Mumps, Rubella, and Herpesvirus Laboratory Br, Div of Viral Diseases, National Center for Immunization and Respiratory Diseases, CDC.

---

* Includes 57 confirmed cases and one case in a newborn who was culture-positive and born to an infected mother but did not have documentation of clinical symptoms.

Appx20309

Morbidity and Mortality Weekly Report

## Notes from the Field

### References

1. CDC. Measles outbreak among school-aged children—Juneau, Alaska, 1996. MMWR 1996;45:777–80.
2. Council of State and Territorial Epidemiologists. Public health reporting and national notification for measles; 2012. Atlanta, GA: Council of State and Territorial Epidemiologists; 2012. Available at http://c.ymcdn.com/sites/www.cste.org/resource/resmgr/ps/12-id-07final.pdf.
3. New York City Department of Planning. Population: 2010 demographic maps. New York, NY: New York City Department of Planning; 2013. Available at http://www.nyc.gov/html/dcp/html/census/demo_maps_2010 shtml.

### Measles Outbreak Associated with a Traveler Returning from India — North Carolina, April–May 2013

On April 14, 2013, public health officials in North Carolina were notified of suspected measles infections in two unvaccinated members of a family. Measles was confirmed by laboratory testing at the State Laboratory of Public Health on April 16, 2013. Investigators learned that a third unvaccinated member of the household had developed fever and rash 11 days earlier, after returning to the United States from a 3-month visit to India, but measles had not been suspected until household contacts sought evaluation for similar symptoms.

During April and May, direct and indirect transmission from the returning traveler resulted in 22 identified cases of measles (including the two cases first reported), for a total of 23 cases overall. Most cases were among residents of a largely unvaccinated religious community in rural North Carolina. Eighteen (78%) of the 23 patients were unvaccinated, three (13%) had been fully vaccinated with 2 doses of measles vaccine, and two (9%) had unknown vaccination status. The 23 patients ranged in age from 1 to 59 years. Measles was confirmed by laboratory testing of specimens from 16 patients (70%). Specimens collected from eight cases were sent to the Vaccine Preventable Disease Reference Center at the Wisconsin State Laboratory of Hygiene for molecular characterization. Genotype D8, the most commonly identified measles genotype in India (*1*), was identified in the specimens from all eight cases.

This outbreak required extensive resources from both state and local public health agencies. Estimates provided by local health departments indicated that approximately 2,200 hours were spent on control efforts. Isolation orders were issued to 30 persons with suspected or confirmed measles infection.

Investigation of the contacts of these persons led to the identification of approximately 1,000 exposed persons from various settings, including health-care facilities, schools, and community events. Contacts without evidence of measles immunity were offered postexposure prophylaxis with measles vaccine or immune globulin as indicated (*2*). Written quarantine orders were issued to 72 (81%) of 89 susceptible contacts who did not receive measles vaccine within 72 hours of exposure, and oral quarantine orders were issued to the remaining 17 (19%).

Although measles is no longer endemic in the United States (*2*), importation of measles virus continues to occur. This outbreak consumed resources from state and local public health agencies for many weeks and resulted in restrictions on the movement, through isolation or quarantine measures, of approximately 115 persons in the community. Preventing future travel-associated outbreaks in North Carolina and the United States will require maintaining high rates of immunization (particularly among travelers to areas where measles is endemic), rapid identification of cases, and swift public health response.

#### Reported by

*Kristin Sullivan, MPH, Zack S. Moore, MD, North Carolina Div of Public Health. Aaron T. Fleischauer, PhD, Career Epidemiology Field Officer, CDC.* **Corresponding contributor:** *Aaron T. Fleischauer, afleischauer@cdc.gov, 919-715-6431.*

#### References

1. Rota PA, Brown K, Mankertz A, et al. Global distribution of measles genotypes and measles molecular epidemiology. J Infect Dis 2011;204 (Suppl 1):S514–23.
2. CDC. Prevention of measles, rubella, congenital rubella syndrome, and mumps, 2013: summary recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2013;62(No. RR-4).

Appx20310

Morbidity and Mortality Weekly Report

## *Announcements*

### National Child Passenger Safety Week — September 15–21, 2013

In the United States, motor vehicle–related injuries are a leading cause of death among children (*1*). In 2011, a total of 656 passenger vehicle occupants aged 0–12 years died as a result of a crash (*2*). During 1975–2011, child restraints saved an estimated 9,874 lives of children aged 0–4 years (*2*). Seating position also contributes to child passenger safety. To keep child passengers as safe as possible, drivers should properly restrain children aged <13 years in a back seat and follow the American Academy of Pediatrics' child passenger safety recommendations (*3*).

For 2013, National Child Passenger Safety Week is September 15–21. As part of the campaign, September 21 is designated as National Seat Check Saturday, when drivers with child passengers are encouraged to visit a child safety seat inspection station to have a certified technician inspect their car seat and give hands-on advice free of charge. Additional information and an inspection station locator are available from the National Highway Traffic Safety Administration at http://www.nhtsa.gov/Safety/CPS. Promotional materials (in English and Spanish) are available at http://www.trafficsafetymarketing.gov/cps.

#### References

1. CDC. Web-based Injury Statistics Query and Reporting System (WISQARS). Atlanta, GA: US Department of Health and Human Services, CDC; 2013. Available at http://www.cdc.gov/ncipc/wisqars.
2. National Highway Traffic Safety Administration. Traffic safety facts 2011 data—children. Washington, DC: US Department of Transportation, National Highway Traffic Safety Administration; 2013. Available at http://www-nrd.nhtsa.dot.gov/pubs/811767.pdf.
3. Durbin DR; Committee on Injury, Violence, and Poison Prevention. Child passenger safety. Pediatrics 2011;127:e1050–66.

### CDC's New Healthy Aging Data Portfolio

The CDC Healthy Aging Program has released a Healthy Aging Data Portfolio (available at http://nccd.cdc.gov/dph_aging/default.aspx) that focuses on the health and well-being of older persons in the United States. Two factors will significantly affect health and social systems in the United States: longer adult life spans and a dramatic increase in the number of older adults, primarily because of the aging of "baby boomers" (persons born during 1946–1964). The population of U.S. residents aged ≥65 years is expected to double during the next 25 years, to about 72 million persons.

The portfolio is a compilation of previously published reports that focus on adults aged 50–64 years or ≥65 years, depending on the nature of the report. The portfolio includes the newly released report, *The State of Aging and Health in America 2013*, which provides data on key indicators and strategies to improve the health and quality of life for adults aged ≥65 years. National, state, and local public health and aging services network professionals, researchers, health-care providers, journalists, decision makers, and others interested in the health of older adults can use the portfolio to examine national, state, and selected local area data, create custom reports, learn about related expert recommendations and *Healthy People 2020* objectives, and find links to informational resources. Additional information about CDC's work on healthy aging is available at http://www.cdc.gov/aging.

Appx20311

Morbidity and Mortality Weekly Report

## QuickStats

FROM THE NATIONAL CENTER FOR HEALTH STATISTICS

### Sleep Duration* Among Adults Aged ≥20 Years, by Race/Ethnicity — National Health and Nutrition Examination Survey, United States, 2007–2010



* Data on sleep duration come from the question, "How much sleep do you usually get at night on weekdays or workdays?" All estimates are age-adjusted to the 2000 projected U.S. standard population using the age groups 20–39, 40–59, and ≥60 years.
† 95% confidence interval.

During 2007–2010, 60.4% of U.S. adults aged ≥20 years slept 7–9 hours at night, 37.3% slept 6 hours or less, and 2.3% slept 10 hours or more. Non-Hispanic black adults were less likely to report sleeping 7–9 hours and more likely to report sleeping 6 hours or less than non-Hispanic white and Hispanic adults.

**Source:** CDC. National Health and Nutrition Examination Survey. Hyattsville, MD: US Department of Health and Human Services, CDC, National Center for Health Statistics; 2007–2010. Available at http://www.cdc.gov/nchs/nhanes.htm.

**Reported by:** Steven M. Frenk, PhD, sfrenk@cdc.gov, 301-458-4096; Yinong Chong, PhD.

Appx20312

Morbidity and Mortality Weekly Report

The *Morbidity and Mortality Weekly Report (MMWR)* Series is prepared by the Centers for Disease Control and Prevention (CDC) and is available free of charge in electronic format. To receive an electronic copy each week, visit *MMWR*'s free subscription page at *http://www.cdc.gov/mmwr/mmwrsubscribe.html*. Paper copy subscriptions are available through the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402; telephone 202-512-1800.

Data presented by the Notifiable Disease Data Team and 122 Cities Mortality Data Team in the weekly *MMWR* are provisional, based on weekly reports to CDC by state health departments. Address all inquiries about the *MMWR* Series, including material to be considered for publication, to Editor, *MMWR* Series, Mailstop E-90, CDC, 1600 Clifton Rd., N.E., Atlanta, GA 30333 or to *mmwrq@cdc.gov*.

All material in the *MMWR* Series is in the public domain and may be used and reprinted without permission; citation as to source, however, is appreciated.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of these sites. URL addresses listed in *MMWR* were current as of the date of publication.

U.S. Government Printing Office: 2013-623-030/01023 Region IV    ISSN: 0149-2195

**Appx20313**

11/26/2019
Declaration of G. Reilly
EXHIBIT 445

Downloaded from https://academic.oup.com/cid/article-abstract/38/10/1440/346900 by guest on 20 November 2019



VACCINES    INVITED ARTICLE

Bruce Gellin and John F. Modlin, Section Editors

# Financing Immunizations in the United States

**Alan R. Hinman,[1] Walter A. Orenstein,[2,a] and Lance Rodewald[2]**

[1]Task Force for Child Survival and Development and [2]National Immunization Program, Centers for Disease Control and Prevention, Atlanta, Georgia

**Children in the United States receive immunizations through both private and public sectors. The federal government has supported childhood immunization since 1963 through the Vaccination Assistance Act (Section 317 of the Public Health Service Act). Since 1994, the Vaccines for Children (VFC) program has provided additional support for childhood vaccines. In 2002, 41% of childhood vaccines were purchased through VFC, 11% through Section 317, 5% through state and/or local governments, and 43% through the private sector. The recent introduction of more-expensive vaccines, such as pneumococcal conjugate vaccine, has highlighted weaknesses in the current system. Adult immunization is primarily performed in the private sector. Until 1981, there was no federal support for adult immunization. Since 1981, Medicare has reimbursed the cost of pneumococcal vaccine for its beneficiaries; influenza vaccine was added in 1993. This paper summarizes the history of financing immunizations in the United States and discusses some current problems and proposed solutions.**

Immunization of children was one of the greatest public health achievements of the twentieth century [1, 2]. A recent analysis of 30 clinical preventive services ranked routine childhood immunization first, on the basis of the preventable burden of disease and the cost effectiveness of the intervention [3]. Also ranked highly was immunization of individuals ≥65 years of age with influenza vaccine (ranked number 4, tied with 6 others) and pneumococcal polysaccharide vaccine (ranked number 11, tied with 3 others).

The Institute of Medicine (IOM) noted that a successful immunization program requires financing of vaccines and of their delivery; surveillance of vaccine coverage, adverse events, and disease; and implementation of interventions that maximize vaccine impact—all of which rely on a base of adequate financing [4]. The introduction of new vaccines that cost more than "traditional" vaccines has highlighted weaknesses in the current mechanisms for financing immunizations and raised concerns about how newer vaccines can be paid for.

This article reviews the history and current situation of financing of vaccines and of their administration. Child and adult immunization will be dealt with separately. The article does not address financing of vaccine research and development. Manufacturers' willingness and ability to support research and development of new vaccines depends, at least in part, on return from sales of existing vaccines.

## CHILD IMMUNIZATION

Until the mid-1950s, child immunization was fairly simple—only smallpox and DTP (diphtheria and tetanus toxoids and pertussis [whole cell] vaccine) were administered to all children. Most children received immunizations from private practitioners, and their parents paid for the immunizations. The cost of the vaccines was minimal (<$1). Some children received free immunizations from local health departments, with costs borne by local/state taxes or coming from the Maternal and Child Health Block Grant [5].

The introduction of inactivated poliovirus vaccine (IPV) in 1955 stimulated major public interest in assuring that all children received the vaccine. Federal funds were appropriated in 1955 and 1956 to help states and local communities buy and administer IPV. In 1960, Congress made a one-time appropriation for a stockpile of oral polio vaccine (OPV) to be used in combating epidemics.

Incomplete and unequal coverage with vaccines led to the 1962 introduction of the Vaccination Assistance Act (Section 317 of the Public Health Service Act). In the message accompanying the Act to Congress, President John F. Kennedy said,

Received 15 December 2003; accepted 14 January 2004; electronically published 26 April 2004.

a Present affiliation: Emory University Vaccine Center, Atlanta, GA.

Reprints or correspondence: Dr. Alan R. Hinman, Task Force for Child Survival and Development, Centers for Disease Control and Prevention, 750 Commerce Dr., Ste. 400, Decatur, GA 30330 (ahinman@taskforce.org).

**Clinical Infectious Diseases   2004;38:1440–6**
This article is in the public domain, and no copyright is claimed.
1058-4838/2004/3810-0018

"There is no longer any reason why American children should suffer from polio, diphtheria, whooping cough, or tetanus…. I am asking the American people to join in a nationwide vaccination program to stamp out these four diseases."

The central thrust of this legislation was to provide grants to state and local health departments to support mass immunization campaigns, rather than to provide a continuing program of support for childhood immunizations. The first grants were made to state and local health departments in June 1963. Section 317 allowed the federal government to provide vaccines and personnel (public health advisors and epidemiologists) to health departments instead of cash (direct assistance). The Federal Government negotiated vaccine prices with manufacturers at significant savings, compared with private sector cost (because of volume of sales, limited number of distribution points, a no-return policy, etc.).

Section 317 has been continuously reauthorized since 1962 and has become a mainstay of public sector support for immunization in the United States. Vaccines purchased through the Section 317 program can be provided to anyone, including adults. The lack of eligibility criteria greatly simplifies the vaccine administration process and reduces the number of missed opportunities for immunization, particularly at health department clinics. Until 1992, Section 317 funds could be used for the purchase of vaccines and the support of surveillance, program management, public education, etc., but could not be used to support the actual administration of vaccine. Funding levels for Section 317 have varied markedly since the inception of the program. During the Childhood Immunization Initiative of the 1990s, vaccine funding available through Section 317 ranged from a high of ~$220M to a low of <$150M [4].

In addition to Section 317, several states made the commitment to "universal purchase," in which the states (using a combination of federal and state funding) purchase and distribute vaccines recommended for children to all immunization providers, both public and private. In December 2000, there were 15 universal purchase states [6].

In the 1970s–1980s, approximately one-half of US children received immunizations in the private sector and one-half received them in the public sector [7]. Those receiving immunizations in the private sector were, in general, from higher income families who paid for the immunizations out-of-pocket or were reimbursed by health insurance (~1 of every 2 employer-paid plans covered childhood immunization). Those receiving immunizations in the public sector received them at local health departments or community health centers and typically did not pay for them.

The cost of immunizations increased dramatically in the 1990s, primarily as a result of the introduction of new vaccines (e.g., acellular pertussis vaccine and varicella vaccine) and recommendations for more doses of existing vaccines (e.g.,

second dose of measles vaccine). Newer vaccines, produced by technologically more sophisticated procedures, are substantially more expensive than the "traditional" vaccines. Table 1 depicts the public and private sector prices of vaccines recommended for universal use in children in 1987 compared with 2003 (http://www.cdc.gov/nip/vfc). The immunization schedule has become more complex, although efforts have been made to keep immunizations on a schedule of birth, 2 months, 4 months, 6 months, 12–18 months, and 4–6 years (before school entry), to coincide with regularly scheduled well-child visits [8]. In consequence, children may receive as many as 5 injections at a single visit, a prospect that is daunting both to providers and parents. For example, a 2-month-old infant could receive diphtheria and tetanus toxoids and acellular pertussis (DTaP), IPV, hepatitis B, *Haemophilus influenzae* type b (Hib), and pneumococcal conjugate vaccines. Combination vaccines can help resolve this problem, although the fact that there are different formulations of combination vaccines adds to the necessity for accurate record-keeping and good vaccine management. These challenges increase the utility of immunization registries [9–11].

**Table 1.** **Changes in vaccine costs for childhood immunization in the United States, 1987 and 2003.**

| | Cost of vaccine, $ (cost per dose, $) | |
| --- | --- | --- |
| Year, vaccines | CDC price | Catalog price |
| 1987 | | |
| 4 OPV doses | 5.72 (1.43) | 34.68 (8.67) |
| 5 DTP doses | 15.05 (3.01) | 56.10 (11.22) |
| 1 MMR doses | 10.67 | 17.88 |
| 1 Hib dose | 2.17 | 6.68 |
| 1 Td dose | 0.09 | 0.65 |
| Total for 1987 | 33.70 | 115.99 |
| 2003[a] | | |
| 4 IPV doses | 39.84 (9.96) | 87.20 (21.80) |
| 5 DTaP doses | 63.75 (12.75) | 98.25–110.20 (19.65–22.04)[b] |
| 2 MMR doses | 31.98 (15.99) | 69.46 (34.73) |
| 3 Hib product doses | 29.31 (9.77) | 64.56 (21.52) |
| 4 Hib product doses | 29.96 (7.49) | 87.12 (21.78) |
| 3 Hepatitis B doses | 27.00 (9.00) | 72.60 (24.20) |
| 1 Td dose | 7.91 (7.91) | 7.91 (7.91) |
| 1 Varicella dose | 44.08 (44.08) | 58.11 (58.11) |
| 4 PCV7 doses | 193.00 (48.25) | 246.60 (61.65) |
| Total for 2003 | 436.87–437.52 | 704.69–739.20 |

**NOTE.** Prices as of 23 February 1987 and November 2003. CDC, Centers for Disease Control and Prevention; DTaP, diphtheria, tetanus, and acellular pertussis; DTP, diphtheria, tetanus, and pertussis (whole cell); Hib, *Haemophilus influenzae* type b; IPV, inactivated polio vaccine; MMR, measles, mumps, rubella; OPV, oral polio vaccine; PCV7, pneumococcal conjugate vaccine; Td, tetanus and diphtheria toxoids.

[a] There is an excise tax of $0.75 per dose per disease prevented (e.g., IPV = $0.75; DTaP = $2.25).

[b] Range when there is >1 manufacturer for a product.

Downloaded from https://academic.oup.com/cid/article-abstract/38/10/1440/346900 by guest on 20 November 2019

Appx20316

**Table 2.**  **Major government financing programs for childhood immunization.**

| Variable | Vaccines for Children program | Section 317 | State/local government |
|---|---|---|---|
| Type of program | Entitlement funded through Medicaid trust fund | Annual discretionary appropriations by Congress | Appropriations through state or local legislatures |
| Eligibility | Age <19 years and membership in ≥1 of the following categories: Medicaid-eligible; uninsured; Alaska native or American Indian; or underinsured at a federally qualified health center | No eligibility restrictions | Varies by state or local area |
| Financing of new vaccines and recommendations | Vote of ACIP and establishment of a federal contract; funds must be approved by the Office of Management and Budget and the Department of Health and Human Services | Funding must be sought from Congress | Funding must be sought from state legislatures |
| Proportion of childhood vaccine market purchased, % | 41 | 11 | 5 |

**NOTE.**    ACIP, Advisory Committee on Immunization Practices.

Downloaded from https://academic.oup.com/cid/article-abstract/38/10/1440/346900 by guest on 20 November 2019

One consequence of the increasing cost of vaccines during the 1980s and early 1990s was that many families were unable to pay and increasingly went to health departments for immunizations. Many private providers referred their lower-income patients to public facilities to receive immunizations [12–14]. Although this allowed the children to receive needed vaccines, it fragmented their care and led to missed opportunities to vaccinate [15].

Immunization levels in 5–6-year-old children in the United States have been ≥90% in every state since the early 1980s, in part as a result of laws in every state requiring immunization before entry to school. Levels in preschoolers were significantly lower, as shown by the measles resurgence during 1989–1991. This epidemic, which involved >55,000 cases and 123 deaths, was fueled by unimmunized preschool children, particularly in inner city areas of poverty [16]. In response to the epidemic, a strategic assessment was made of what would be required to assure that the nation's children completed the basic series of immunizations by their second birthday. Immunization Action Plans were developed by all states and 28 major metropolitan areas; all emphasized the need to increase the availability of immunization services. As a result, since 1992, Section 317 funds can be used to support the actual provision of immunization services [1].

To ensure that vulnerable children have access to vaccines, the Vaccines for Children (VFC) Act was passed in 1993 [17] The VFC Act provides an entitlement to free vaccines for children who are uninsured, on Medicaid, or who are American Indians/Alaska Natives. It also provides free vaccines at federally qualified health centers for children who have insurance that does not cover immunization (i.e., "underinsured" persons).

At the time, the VFC Act was a radical and sometimes controversial departure from the vaccine financing system for children that was in place before 1993 [18–20]. Currently, the VFC Act is the largest of the 3 major government vaccine financing

systems: VFC, Section 317, and state health department funding (table 2). Under the VFC Act, funding for new vaccines or new recommendations occurs through a vote of the CDC's Advisory Committee on Immunization Practices (ACIP). It is unusual that a federal advisory committee has the power and authority to add benefits to an entitlement program. After ACIP passes a VFC resolution for a vaccine, the federal government must establish a contract with the relevant manufacturer. Funding is approved by the Department of Health and Human Services and the Office of Management and Budget without the need for additional Congressional appropriations. In contrast, funds needed for children served by the Section 317 program must be sought from and approved by Congress annually.

Working through state and urban area immunization programs, the VFC program rapidly developed a large network of children's immunization providers. Within 3 years, VFC providers collectively vaccinated >75% of US children using a combination of VFC vaccine and vaccine purchased with private and other funds [21]. The VFC program has substantially changed patterns of childhood immunization in the United States by allowing the privatization of immunization delivery—away from health department clinics and toward private pediatricians and family physicians (medical home) [22–25].

The CDC estimates that, in 2002, the private sector purchased 43% of childhood vaccines used in the United States, the VFC program purchased 41%, Section 317 purchased 11%, and state/local governments purchased 5% (CDC, unpublished data). None of the major government programs reimburses providers for delivery of vaccines. Vaccine delivery charges by private pediatricians in the early 1990s averaged ~$15.00 per dose administered [26]. These costs must be borne by insurance plans (including Medicaid, State Child Health Insurance Program, and private insurance plans), borne by parents, or absorbed as a loss by the provider. A 2003 IOM study reported that 53% of children ≤5 years of age had private insurance

coverage for immunizations; 10% had private insurance with no immunization benefit; 10% had no health insurance; 18% had Medicaid coverage; and the remaining 9% had other coverage for immunizations [27]. Concern has been raised that failure to cover vaccine administration could result in shifting children from private providers to health department clinics [28]. Previous experience showed that low administration fee reimbursement rates [29, 30] and high out-of-pocket costs to parents resulted in referrals to health department clinics [31–33]. The Task Force for Community Preventive Services, an independent body reviewing the evidence base for preventive interventions, found strong evidence that reducing out-of-pocket costs improves vaccination coverage among children and adults [34].

The combination of additional funding for Section 317 and VFC has played an important role in enabling the United States to achieve its highest immunization levels ever among young children [35]. The National Immunization Survey assesses immunization among children aged 19–35 months and, for several years, has shown that coverage with most vaccines is ~90%, the goal established in Healthy People 2010 [36]. However, series-complete levels are lower and have remained relatively static over the past few years. Racial/ethnic and income disparities in immunization coverage levels in young children have markedly diminished at the national level, although local variations continue [37–39].

The Section 317 program has been subject to marked swings in appropriations with consequent impact on public sector delivery of immunizations. As an entitlement, the VFC program is not subject to fluctuations. A 2000 IOM study on immunization finance policies and practices recommended, among other things, increased federal funding through Section 317, increased funding of immunizations by the states, and conversion of the Section 317 program from a discretionary to a formula basis (to enhance predictability for state planning) [40].

## ADULT IMMUNIZATION

Unlike childhood immunization, for which there has been extensive public-private collaboration for 40 years, adult immunization has been left to the private sector until relatively recently. Vaccines currently recommended for universal use in adults are periodic tetanus-diphtheria boosters (all adults), influenza vaccine (persons aged ≥50 years), and pneumococcal vaccine (persons aged ≥65 years) [41, 42]. A number of vaccines, including hepatitis B, influenza, pneumococcal, and rabies vaccines, are recommended for those at increased risk of infection and/or complication as a result of medical condition, occupation, lifestyle, etc. [43, 44]. Regular preventive care visits comparable to "well-child" visits are not as ingrained in adult medicine as in pediatrics.

There is no adult counterpart to the VFC program. The adult model is one of fee for service, in which the provider purchases vaccines up front and is reimbursed after administering them. Medicare, which insures virtually all Americans aged ≥65 years, specifically excluded coverage for preventive services until 1981, when reimbursement was permitted for pneumococcal vaccine and a limited number of other preventive services. In 1993, reimbursement for influenza vaccine was authorized. Hepatitis B vaccination has long been a covered service for beneficiaries at increased risk of acquiring hepatitis B disease, primarily through Medicare's end-stage renal disease program.

Vaccination coverage levels for adults are substantially lower than the coverage rates among young children. The National Health Interview Survey (NHIS) is used to track vaccination coverage levels among adults. The 2002 NHIS shows that, among individuals aged ≥65 years, annual influenza vaccination coverage is 66% and pneumococcal coverage is 55% [45]. Nonetheless, annual influenza vaccination coverage levels are more than double the 30% level in 1988, before Medicare's coverage of influenza vaccination began. Medicare reimbursement for administration of influenza vaccine has been considered to be inadequate by many practitioners; it has recently been increased.

In contrast to childhood vaccination, there are marked racial/ethnic disparities in coverage among adults for each vaccine [46].

Insurance coverage for adults under the age of 65 years is not monitored systematically. The IOM estimates that only 24% of people 18–64 years of age have insurance coverage for vaccinations. This figure includes individuals for whom vaccination is not routinely recommended. The IOM also estimates that 25% of individuals in this age group are at risk from medical, occupational, or lifestyle exposure and do not have any health insurance with an immunization benefit [47].

## SHORTFALLS OF IMMUNIZATION FINANCING

Even with Section 317 and the VFC program, funding for new childhood vaccines is not necessarily assured. Introduction of pneumococcal conjugate vaccine (PCV7) in 2000 demonstrated weaknesses in the system. In February 2000, PCV7 was licensed by the US Food and Drug Administration. In October 2000, the ACIP recommended routine use of the vaccine for infants and toddlers [48]. This vaccine is the only vaccine recommended for routine use that is not cost-saving to society, although it is cost-effective (i.e., although net benefits are not greater than costs, the cost per additional year of life saved by immunization is reasonable when compared with other health interventions) [49]. The cost for the 4-dose series of PCV7 doubled the public sector cost of vaccines for children and increased the private sector catalog price by ~50%. Within 1

Downloaded from https://academic.oup.com/cid/article-abstract/38/10/1440/346900 by guest on 20 November 2019

Appx20318

Downloaded from https://academic.oup.com/cid/article-abstract/38/10/1440/346900 by guest on 20 November 2019

year after the ACIP recommendation, 99% of pediatricians and 68% of family physicians were recommending this vaccine to their patients [50].

Although funding for PCV7 was adequate for VFC-eligible children, Section 317 and state funding was not adequate to cover PCV7 for underinsured children in many states. As of 2003, a total of 19 states had adopted 2-tiered programs in health department clinics, whereby VFC-eligible children could receive PCV7 although other children could not (CDC, unpublished data). This marked the first time in ≥10 years when some children coming to health department clinics could not receive vaccines recommended by the ACIP, the American Academy of Pediatrics, and the American Academy of Family Physicians. Private physicians developed similar 2-tiered approaches in their offices [51]. Because of an inability to secure sufficient funding to provide PCV7 to all children, 5 universal purchase states adopted a selective universal purchase policy in which all recommended vaccines for children except PCV7 were provided to all immunization providers [6].

The problems with financing new, more costly, vaccines led the CDC to ask the IOM to review the entire vaccine financing system. The charge to IOM was to identify strategies for private- and public-sector financing of recommended vaccines and their administration to children, adolescents, and adults, to achieve national immunization goals. The IOM created a study committee with expertise in health economics, public health, private medicine, and public policy that heard testimony and commissioned original research papers on vaccine financing.

The IOM committee came to the following conclusions:

- Current public and private financing strategies for immunization have had substantial success, especially in improving immunization rates for young children. However, significant disparities remain in assuring access to recommended vaccines across geographic and demographic populations.
- Substantial increases can be expected to occur in public and private health expenditures as new vaccine products become available. Although these cost increases will be offset by the health and other social benefits associated with these advances in vaccine development, the growing costs of vaccines will be increasingly burdensome to all health sectors. Alternatives to current vaccine pricing and purchasing programs are required to sustain stable investment in the development of new vaccine products and attain their social benefits for all.
- Many young children, adolescents, and high-risk adults have no or limited insurance for recommended vaccines. Gaps and fragmentation in insurance benefits create barriers, both for vulnerable populations and for clinicians, that can contribute to lower immunization rates.
- Current government strategies for purchasing and assuring

access to recommended vaccines have not addressed the relationship between the financing of vaccine purchases and the stability of the US vaccine supply. Financial incentives are necessary to protect the existing supply of vaccine products, as well as to encourage the development of new vaccine products.
- The vaccine recommendation process does not adequately incorporate consideration of a vaccine's price and societal benefits.

The IOM Committee made the following recommendations:

- "Implementation of a new insurance mandate, combined with a government subsidy and voucher plan, for vaccines recommended by the Advisory Committee on Immunization Practices (ACIP)" [47, p. 185]

  The proposed plan consists of five core elements: (1) a vaccine coverage mandate that would apply to all private and public health plans (including Medicare, Medicaid, and the State Children's Health Insurance Program); (2) a new federal subsidy to cover mandated vaccine costs and administration fees; (3) a voucher system for uninsured populations; (4) a process to distinguish between vaccines that have strong and weak societal benefits; and (5) a process to calculate subsidy levels for different vaccines based on estimates of their societ[al] benefits.
- "Changes in the procedures and membership of ACIP so that its recommendations can associate vaccine coverage decisions with societal benefits and costs, including consideration of the impact of the price of a vaccine on recommendations for its use."

The new elements of the proposal include a government-subsidized mandate for all private insurance policies in which vaccines with societal benefit (i.e., herd immunity effects) would be covered by the federal government using a "value-based" estimate to set subsidy levels. The committee also recommended extensive consultations (with vaccine manufacturers, insurers, private and public providers, health departments, business groups, other federal agencies, and other key stakeholders) and deliberations to determine the implications and likely impact of implementing these dramatic changes.

The IOM recommendations provide significant advantages to the current vaccine financing system, including a guarantee of federal financing for vaccines with societal benefit that are recommended for people of all ages, a financing system that covers both the cost of the vaccine and the costs of administering the vaccine and conducting standard immunization practices [52–54], a seamless financing system for private providers, elimination of underinsurance, more rapid financing of new vaccines (because coverage does not depend on the negotiation

of a federal contract), and a predictable pricing system through calculation of the vaccine subsidies.

Preliminary reactions to the report focused on fears that the mandate on private insurance plans to cover vaccines would continue even if subsidies ceased; vaccine price fixing by the federal government, because it determines the subsidy value; costs to the federal government for the program; the need for private physicians to "front" the costs of vaccines for later reimbursement; weakening of the partnership between the public health sector and private physicians, because the public health sector would no longer be supplying vaccine; how societal benefit would be calculated; and whether the proposed system would provide sufficient incentives to attract new manufacturers and development of new vaccines. It is too early to predict the outcome of the deliberations or whether the recommendations will be implemented.

In 2003, before release of the IOM report, President Bush developed a budget proposal that would change the VFC program by (1) expanding underinsured children's access to VFC vaccine by allowing their entitlement to be delivered at health department clinics in addition to federally qualified health centers, (2) removing price caps for vaccines in federal contracts, and (3) developing stockpiles of all routinely recommended vaccines that are technically feasible to stockpile [55]. This proposal would eliminate the 2-tiered system in place in many health departments (but not in private physician offices). Removal of price caps would provide an incentive to manufacturers to continue investments in vaccines by making them more profitable. It would allow tetanus and diphtheria toxoids to be included in VFC (the price cap for diphtheria toxoids is currently so low that the federal government is unable to obtain a contract for the vaccine).

## DISCUSSION AND CONCLUSION

Immunization confers both individual and societal benefits. Most childhood vaccines are not only cost-effective, they are cost-saving. Consequently, it is in society's best interest to assure that immunizations are available and used by the highest possible proportion of the population. Out-of-pocket expense has been clearly identified as a barrier to receipt of immunizations. A variety of approaches has been undertaken to assure the availability of vaccines to all, including direct provision of vaccines by public agencies, provision of free vaccines to private providers, and reimbursement of immunization through Medicaid and Medicare. Most effort has been directed at childhood immunization, and success has been greater there than in adult immunization. A dramatic change in financing childhood vaccines and their administration has recently been proposed by an IOM committee. Whether the proposed changes will be implemented depends on advice from stakeholders in the nation's immunization system.

## References

1. Centers for Disease Control and Prevention. Ten great public health achievements—United States, 1900–1999. MMWR Morb Mortal Wkly Rep **1999**; 48:241–3.
2. Centers for Disease Control and Prevention. Impact of vaccines universally recommended for children—United States, 1900–1998. MMWR Morb Mortal Wkly Rep **1999**; 48:24–248.
3. Coffield AB, Maciosek MV, McGinnis JM, et al. Priorities among recommended clinical preventive services. Am J Prev Med **2001**; 21:1–9.
4. Institute of Medicine. Calling the shots: immunization finance policies and practices. Washington, DC: National Academy Press, **2000**.
5. Orenstein WA, Rodewald LE, Hinman AR. Immunization in the United States. In: Plotkin S, Orenstein WA, eds. Vaccines. 4th ed. Philadelphia: Elsevier, **2004**:1359–65.
6. Institute of Medicine. Calling the shots: immunization finance policies and practices. Washington, DC: National Academy Press, **2000**.
7. The National Vaccine Advisory Committee. The measles epidemic: the problems, barriers, and recommendations. JAMA **1991**; 266:1547–52.
8. Centers for Disease Control and Prevention. General recommendations on immunization: recommendations of the Advisory Committee on Immunization Practices (ACIP) and the American Academy of Family Physicians (AAFP). MMWR Morb Mortal Wkly Rep **2002**; 51(RR-2):1–35.
9. Hinman AR. What will it take to fully protect all American children with vaccines? Am J Dis Child **1991**; 145:559–62.
10. Centers for Disease Control and Prevention. Immunization registry progress—United States, 2002. MMWR Morb Mortal Wkly Rep **2002**; 51:760–2.
11. Centers for Disease Control and Prevention. Notice to readers: immunization registry standards of excellence in support of core immunization program strategies. MMWR Morb Mortal Wkly Rep **2003**; 52:921.
12. Schulte JM, Bown GR, Zetzman MR, et al. Changing immunization referral patterns among pediatricians and family practice physicians, Dallas County, Texas, 1988. Pediatrics **1991**; 87:204–7.
13. Ruch-Ross HS, O'Connor KG. Immunization referral practices of pediatricians in the United States. Pediatrics **1994**; 94:508–13.
14. Zimmerman RK, Medsger AR, Ricci EM, Raymund M, Mieczkowski TA, Grufferman S. Impact of free vaccine and insurance status on physician referral of children to public vaccine clinics. JAMA **1997**; 278:996–1000.
15. Santoli JM, Szilagyi PG, Rodewald LE. Barriers to immunization and missed opportunities. Pediatr Ann **1998**; 27:366–74.
16. Atkinson WL, Hadler SC, Redd SB, Orenstein WA. Measles surveillance—United States, 1991. MMWR CDC Surveill Summ **1992**; 41:1–12.
17. Robinson CA, Sepe SJ, Lin KF. The president's child immunization initiative—a summary of the problem and the response. Public Health Rep **1993**; 108:419–25.
18. United States General Accounting Office. Vaccines for children: reexamination of program goals and implementation needed to ensure vaccination. Report GAO/PEMID-95–22. Washington, DC: General Accounting Office, **1995**.
19. Saldarini RJ. Putting prevention research at risk: implementation of the Vaccines for Children programme. Vaccine **1994**; 12:1364–7.
20. Brown KS. R & D takes a hit. The Scientist **1996**; 10. Available at: http://www.the-scientist.com/yr1996/may/vaccine_960527.html.
21. Santoli JM, Rodewald LE, Maes EF, Battaglia MP, Coronado VG. Vaccines for Children program, United States, 1997. Pediatrics **1999**; 104:e15.
22. Zimmerman RK, Mieczkowski TA, Mainzer HM, et al. Effect of the

Downloaded from https://academic.oup.com/cid/article-abstract/38/10/1440/346900 by guest on 20 November 2019

Appx20320

Downloaded from https://academic.oup.com/cid/article-abstract/38/10/1440/346900 by guest on 20 November 2019

Vaccines for Children program on physician referral of children to public vaccine clinics: a pre-post comparison. Pediatrics 2001; 108: 297–304.

23. Zimmerman RK, Nowalk MP, Mieczkowski TA, Mainzer HM, Jewell IK, Raymund M. The vaccines for children program: policies, satisfaction, and vaccine delivery. Am J Prev Med 2001; 21:243–9.

24. Szilagyi PG, Humiston SG, Pollard Shone L, Kolasa MS, Rodewald LE. Decline in physician referrals to health department clinics for immunizations: the role of vaccine financing. Am J Prev Med 2000; 18: 318–24.

25. Fairbrother G, Friedman S, Hanson KL, Butts GC. Effect of the vaccines for children program on inner-city neighborhood physicians. Arch Pediatr Adolesc Med 1997; 151:1229–35.

26. Fleming G. Vaccine administration fee survey. Child Health Care 1995; 11:6.

27. Institute of Medicine. Financing vaccines in the 21st century: assuring access and availability. Washington, DC: National Academy Press, 2003.

28. Berman S. Do we need a structural engineer to redesign our vaccine infrastructure? Pediatrics 2003; 112:671–2.

29. Bordley WC, Freed GL, Garrett JM, Byrd CA, Meriwether R. Factors responsible for immunizations referrals to health departments in North Carolina. Pediatrics 1994; 94:376–80.

30. Wood DL, Halfon N. The impact of the vaccine for children's program on child immunization delivery: a policy analysis. Arch Pediatr Adolesc Med 1996; 150:577–81.

31. Lieu TA, Smith MD, Newacheck PW, Langthorn D, Venkatesh P, Herradora R. Health insurance and preventive care sources of children at public immunization clinics. Pediatrics 1994; 93:373–8.

32. Arnold PJ, Schlenker TL. The impact of health care financing on childhood immunization practices. Am J Dis Child 1992; 146:728–32.

33. Santoli JM, Barker LE, Lyons BH, et al. Health department clinics as pediatric immunization providers: a national survey. Am J Prev Med 2001; 30:266–71.

34. Centers for Disease Control and Prevention. Vaccine-preventable diseases: improving vaccination coverage in children, adolescents, and adults: a report on recommendations of the Task Force on Community Preventive Services. MMWR Morb Mortal Wkly Rep 1999; 48(RR-8): 1–15.

35. Centers for Disease Control and Prevention. Vaccination coverage among children entering school—United States, 2002–03 school year. MMWR Morb Mortal Wkly Rep 2003; 52:791–3.

36. Centers for Disease Control and Prevention. National, state, and urban area vaccination coverage levels among children aged 19–35 months—United States, 2002. MMWR Morb Mortal Wkly Rep 2003; 52:728–32.

37. Orenstein WA. Immunization and health disparity issues: implications for the United States. In: A report on reaching underserved ethnic and minority populations to improve pediatric immunization rates. Washington, DC: National Foundation for Infectious Diseases, 2002:7–9.

38. Rosenthal J, Raymond D, Morita J, et al. African-American children are at risk of a measles outbreak in an inner-city community of Chicago, 2000. Am J Prev Med 2002; 23:195–9.

39. Santoli JM, Setia S, Rodewald LE, O'Mara D, Gallo B, Brink E. Immunization pockets of need: science and practice. Am J Prev Med 2000; 19(3 Suppl):89–98.

40. Guyer B, Smith DR, Chalk R. Calling the shots: immunization finance policies and practices. Executive summary of the report of the Institute of Medicine. Am J Prev Med 2000; 19(3 Suppl):4–12.

41. Advisory Committee on Immunization Practices. Prevention and control of influenza. MMWR Morb Mortal Wkly Rep 2003; 52:1–36.

42. Advisory Committee on Immunization Practices. Prevention of pneumococcal disease: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Morb Mortal Wkly Rep 1997; 46(RR-08):1–24.

43. Centers for Disease Control and Prevention. Notice to readers: recommended adult immunization schedule—United States, 2002–2003. MMWR Morb Mortal Wkly Rep 2002; 51:904–8.

44. Poland GA, Shefer AM, McCauley M, et al. Standards for adult immunization practices. Am J Prev Med 2003; 25:144–50.

45. Ni H, Schiller J, Hao C, Cohen RA, Barnes P. Early release of selected estimates based on data from January–September 2003 National Health Interview Survey. National Center for Health Statistics. September 2003. Available at: http://www.cdc.gov/nchs/nhis.htm. Accessed on 19 April 2004.

46. Stein CR, Wortley PM, Singleton JA. Racial/ethnic disparities in influrnza and pneumococcal vaccination levels among persons aged ≥65 years—United States, 1989–2001. MMWR Morb Mortal Wkly Rep 2003; 958–62.

47. Institute of Medicine. Financing vaccines in the 21st century: assuring access and availability. Washington, DC: National Academy Press, 2003.

48. Centers for Disease Control and Prevention. Preventing pneumococcal disease among infants and young children: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Morb Mortal Wkly Rep 2000; 49(RR-9):2–38.

49. Lieu TA, Ray GT, Black SB, et al. Projected cost-effectiveness of pneumococcal conjugate vaccination of health infants and young children. JAMA 2000; 283:1460–8.

50. Davis MM, Ndiaye SM, Freed GL, Kim CS, Clark SJ. Influence of insurance status and vaccine cost on physician's administration of pneumococcal conjugate vaccine. Pediatrics 2003; 112:521–6.

51. Schaffer SJ, Szilagyi PG, Shone LP, et al. Physician perspectives regarding pneumococcal conjugate vaccine. Pediatrics 2002; 110:e68.

52. Glazner JE, Steiner JF, Haas KJ, Renfrew B, Deutchman M, Berman S. Is reimbursement for childhood immunizations adequate? Evidence from two rural areas in Colorado. Public Health Rep 2001; 116:219–25.

53. National Vaccine Advisory Committee. Standards for child and adolescent immunization practices. Pediatrics 2003; 112:958–63.

54. Poland GA, Shefer AM, McCauley M, et al. Standards for adult immunization practices. Am J Prev Med 2003; 25:144–50.

55. Department of Health and Human Services. President to propose improvements in childhood vaccine programs. 25 January 2003. Available at http://www.hhs.gov/news/press/2003pres//20030125.html. Accessed on 19 April 2004.

Appx20321

11/26/2019
Declaration of G. Reilly
EXHIBIT 446

**Appx20322**

**Board of Scientific Counselors**
**National Center for Health Statistics**

**Program Review**
**National Immunization Survey (NIS) and**
**State and Local Area Integrated Telephone Survey (SLAITS)**

**November 27-28, 2007**

# Background Materials:  NIS

### Table of Contents

1.  Origins of the NIS ……………………………………………………… Page 2
2.  Purpose of Vaccination Assessment ………………………………………… Page 3
3.  Stakeholders ………………………………………………………… Page 3
4.  Resources and Organization ………………………………………………… Page 4
5.  NIS Methods ………………………………………………………… Page 5
6.  Information Dissemination …………………………………………………... Page 7
7.  Challenges ………………………………………………………… Page 8
8.  Objectives of NCHS BSC Program Review …………………………………… Page 11

### Appendix

A.  Selected NIS-Related Bibliography  ………………………………………….Page 13
B.  NIS Response Rates ……………………………………………………..Page 17
C.  Trends in Prevalence of U.S. Households by Type of Telephone Service ……...Page 18
D.  Bibliography of Recent NIS Methods Research ………………………………...Page 19
E.  Potential Bias in Landline Samples ………………………………………..Page 21

1

## 1. Origins of the NIS

**Overview of the U.S. Immunization Program**

In 1962, the Vaccination Assistance Act established the Section 317 grant program to support state immunization programs[1]. In 1976 and 1977, there was a major resurgence of measles, with the majority of cases in school-aged children. This led to the 1977 Childhood Immunization Initiative, which focused on enactment of school immunization laws. After another major resurgence of measles in 1989-1991, the 1993 Childhood Immunization Initiative (CII) was undertaken, establishing the goal of increasing vaccination coverage levels among children aged 2 years to greater than 90% by 1996 for the most critical doses of each vaccine routinely recommended for children. The CII sought to improve delivery of vaccines to children, reduce the cost of vaccines, make vaccines more accessible, increase awareness of the importance of immunizations, improve the science of vaccine development, monitor immunization coverage and report outbreaks of disease. The Vaccines for Children (VFC) was established, an entitlement program providing vaccine free to children with Medicaid or no health insurance, to children receiving care at federally qualified health centers who have private insurance that does not cover cost of vaccination, and to American Indian and Alaskan Native children. The Omnibus Budget Reconciliation Act of 1993 (42 U.S.C. 1296s) conferred an operational role on the Advisory Committee on Immunization Practices (ACIP) to provide advice which will assist the Department and the Nation in reducing the incidence of vaccine preventable diseases and to increase the safe usage of vaccines and related biological products. The ACIP makes recommendations regarding the most appropriate application of antigens and related agents (e.g., vaccines, antisera, immune globulins) for effective vaccine preventable disease control in the civilian population and to establish a list of vaccines for administration to children eligible for the VFC program, along with schedules regarding the appropriate periodicity, dosage, and contraindications to pediatric vaccines.

Currently, there are 15 vaccines for 16 vaccine preventable diseases recommended for children and adolescents in the U.S. The Federal government spends approximately $3.4 billion per year on national and state immunization programs, including more than $2.5 billion through the VFC program to purchase vaccines to be given to children at risk of under-vaccination due to inability to pay. The current routine childhood immunization schedule results in substantial cost savings, estimated for an annual birth cohort at $9.9 billion in direct costs and $43.3 billion from a societal perspective.[2]

**Vaccine Coverage Assessment**

During 1957-1985, vaccination coverage in the U.S. was monitored based on parental recall by the U.S. Immunization Survey, a component of the Current Population Survey.[3] This was dropped after 1985 because of concerns about the validity of parental report of childhood vaccinations and budget cuts. The Centers for Disease Control and Prevention (CDC) supported retrospective school surveys during 1985-1991. The 1993 CII resulted in funding for the National Immunization Survey (NIS), a two phase survey consisting of a random-digit-dialed survey of households, and a mailed survey to providers identified during the household telephone interview. The NIS has been conducted annually since 1994, providing estimates of vaccination coverage for children aged 19-35 months for each state and selected local areas. During 1994-1999, the National Health Interview Survey (NHIS) also included questions on vaccinations for children with a provider record check (NIPRCS). This provided national provider-reported data used in the NIS weighting adjustments for households without telephones. NIPRCS was discontinued to allow funding of pilot projects to assess adolescent vaccination coverage and other projects, and because NIS began to use a weighting adjustment for phoneless households based on NIS respondents with interruptions in their landline telephone service.

---

[1] Orenstein WA. The role of measles elimination in development of a National Immunization Program. The Pediatrics Infectious Disease Journal 2006;25:1093-1101.

[2] Zhou F, Santoli J, Messonier ML, et al. Economic evaluation of the 7-vaccine routine childhood immunization schedule in the United States, 2001. Arch Pediatr Adolesc Med 2005;159:1136-1144.

[3] Simpson DM, Ezzati-Rice TM, Zell ER. Forty years and four surveys: how does our measuring measure up? AJPM 2001;20:6-14.

2

The current budget for vaccination assessment is approximately $22 million, less than 1% of the federal investment in immunization programs. These funds are used for vaccination assessment for vaccines recommended by the ACIP in children, adolescents and adults. The NIS provides assessment of vaccinations during the first two years of life, and during adolescence. Adult vaccination coverage is assessed by vaccination questions added to the Behavioral Risk Factor Surveillance System (BRFSS) and the NHIS, and by periodic adult vaccination surveys to provide more timely information on new vaccines and more detailed knowledge and attitude questions on old and new vaccines.

## 2. Purpose of Vaccination Assessment

Aligned with the 1993 CII are the Healthy People 2000 and 2010 vaccine coverage objectives, which have served as a foundation for surveillance, research, improving vaccine delivery systems, and establishing effective community partnerships. Continuous monitoring is necessary to ensure that each annual birth cohort of over four million children is fully vaccinated per ACIP recommendations by their 2nd birthday. Monitoring is also needed for adolescents. Recently, three vaccines were routinely recommended at ages 11-12 years, including human papillomavirus (HPV) vaccine, meningococcal vaccine, and Tdap, a tetanus booster including antigens to protect against pertussis.

The overarching goal of CDC vaccination assessment is to facilitate program improvement and behavior change leading to increased vaccination levels, thus reducing the health and societal impact of vaccine preventable diseases.

Specific objectives:
- accountability to maximize value of public funds spend on immunization
- evaluate effectiveness of immunization grant programs over time
- help with allocation of VFC program resources
- monitor progress toward national *Healthy People* objectives
- build and maintain support for national and state immunization programs
- identify subgroups at higher risk of vaccine preventable diseases
- identify facilitators for and barriers to vaccination, to improve interventions
- evaluate implementation of ACIP recommendations
- assess differential impact of vaccine shortages
- evaluate uptake of new vaccines
- assist in evaluating health and societal impact of vaccination
  - proxy for immunity
  - ecologic analysis of disease trends
  - vaccine effectiveness studies
  - estimation of morbidity and mortality prevented by vaccination
  - vaccine safety studies
  - cost effectiveness studies
- emergency preparedness (e.g., monitoring influenza vaccination during a pandemic).

## 3. Stakeholders

One of the main purposes of vaccination assessment is accountability, the responsibility of the federal government to maximize value of public funds spent on immunization. In addition, the data should help CDC, the states and other grantee programs take actions to improve coverage levels in accordance with vaccine recommendations. The information should be used to target programmatic interventions to those areas most in need, to measure improvements based on those interventions, and help immunization programs build support at the state level for improving performance and reward areas that have invested in their immunization efforts.

3

Key federal stakeholders in the NIS include various organizations within the CDC with responsibility related to vaccine preventable diseases, Department of Health and Human Services, Centers for Medicare and Medicaid Services (CMS), Health Resources and Services Administration (WIC programs, federally qualified health centers), Office of Management and Budget (OMB) (Section 317 and VFC appropriations), and Congress. Key state and local stakeholders include the state and local immunization programs, and affiliated organizations such as the Association of Immunization Managers (AIM), Association of State and Territorial Health Officers (ASTHO), Council of State and Territorial Epidemiologists (CSTE), and the National Association of City and County Health Officers (NACCHO). CDC also partners with provider, health insurer and community organizations interested in immunization programs.

## 4. Resources and Organization

Funding for the NIS is obtained through the Public Health Service Evaluation Transfer Fund (Section 241 of the Public Health Service Act), the VFC program, and CDC National Center for Immunization and Respiratory Diseases (NCIRD) program funds.

Vaccination assessment resources for fiscal year 2007 totaled $23.3m and included:
- $12.8m PHS Evaluation
- $7.7m Vaccines for Children Program for NIS
- $1.4m Section 317 grant funding
  - NIS oversampling in areas chosen by state
- $ 0.9m NCIRD, Immunization Services Division (ISD) research funds
- $ 0.6m federal appropriations for influenza pandemic planning

Fiscal year 2007 funds were expended as follows:
- $20.5m NIS contract (NORC)
  - $12.2m core NIS
  - $ 2.2m NIS-Teen
  - $ 2.7m modules (Adult, SES, Concerns)
  - $ 1.5m operational/methods research
  - $ 1.4m NIS oversampling in selected areas
  - $ 0.6m influenza pandemic survey module
- $ 1.1m Inter Agency Agreements with NCHS
  - Support of NHIS immunization questions
  - NCHS staff support of NIS (~1.5 fte)
- $ 1.7m other assessment activities

The NIS is conducted under contract with the National Opinion Research Center (NORC) at the University of Chicago. NCIRD and NCHS oversee the technical and administrative aspects of the project. NORC assists with the design and operations, data collection and processing, file production, and qualitative assessments. The Assessment Branch, ISD/NCIRD, is responsible for managing the NIS and other vaccination assessment activities. The Branch has 17 full time staff, including 14 civil service positions, one Commissioned Corps medical officer, and three contractors. Most staff are epidemiologists, statisticians or health scientists. Approximately 9 of 17 full-time-equivalents are devoted to the NIS; remaining staff are responsible for adult vaccination assessment, technical assistance to state and local immunization programs in assessing vaccination in schools, child care facilities and other settings, and collaborating in face-to-face immunization surveys in U.S.-affiliated jurisdictions. NCHS staff serve as co-project officer for the NORC contract, responsible for the SLAITS component. NCHS staff also manage submissions to the NCHS IRB for the annual NIS renewal and protocol amendments, provide advice and recommendations on management of the NORC contract and NIS operations, participate in methods research, and handle public use file development and testing.

4

### 5. NIS Methods

The NIS will be described in terms of key attributes for designing a vaccination coverage assessment system, including the target population, sampling method, vaccines assessed, auxiliary data collected, geographic specificity, periodicity of data collection and reporting, timeliness, comparability across areas and over time, representativeness, and accuracy.  The statistical methods of the NIS have been described in detail.[4]

**Target population**

The core NIS targets non-institutionalized children aged 19-35 months at the time of the telephone interview.  Since the NIS is conducted based on quarterly samples, a calendar year of data includes children born over three annual birth cohorts (e.g., 2006 data included children born January 2003-June 2005).  Approximately 4% of households in the U.S. have an eligible child aged 19-35 months, and this varies greatly by area.  Thus the NIS screens a substantial number of households in order to identify those with young children.

In the 4th quarters of 2006 and 2007, a national sample of adolescents aged 13-17 was included (NIS-Teen).  The NIS-Teen will be expanded in 2008 to a calendar year of data collection to allow estimates for 56 areas (states and six urban areas receiving Section 317 grant funding).

**Sampling method**

The NIS (and NIS-Teen) are conducted as stratified, two phase surveys, with the first phase a list-assisted, random-digit-dialing survey to identify households with age-eligible children.  The second phase is a mailed survey to providers identified during the telephone interview to collect provider-reported vaccination histories.  A critical objective for the telephone interview is to obtain information about providers who have vaccinated the children, and consent from the parent or guardian to contact the provider(s).

**Vaccines assessed**

All ACIP recommended vaccines that children should have received by 19 months of age are included in the core NIS.  The NIS-Teen collects information about vaccines routinely recommended by ACIP at 11-12 years of age, including to "catch-up" with vaccinations missed during earlier childhood.

**Auxiliary data collected**

During the household interview with a parent or guardian most knowledgeable about the eligible child, questions asked include:  race/ethnicity of mother and child; mother's age, education and marital status; family income; health insurance status; WIC participation; availability of a shot card; breastfeeding; and number of persons in the family.  The provider survey form includes questions about the number of physicians at the practice, type of facility, whether the provider participates in the VFC program, and whether the provider obtained information for the child, or provides vaccination data for the child to an Immunization Information System (IIS) or registry.

To collect additional information relevant to the immunization program, supplemental modules are periodically added to the end of the core NIS survey for a subsample of NIS respondents.  Past modules have included: Insurance Status (2001-02; part of core NIS starting 2006); Day Care and Breast Feeding (2001-02; breastfeeding part of core NIS starting 2003); Attitudes and Beliefs (2001-02); Vaccine Safety (2003-04); Vaccine Shortage (2003-04); and Childhood Influenza (2004).  A Socioeconomic Status (SES) module is planned for the first half of 2008 to assess barriers to immunization, and factors associated with racial/ethnic and income-related coverage disparities.  Selected key questions from this module may be considered for the NIS core.  A Parental Concerns module is planned for the last half of 2008, to provide an early warning system for parental concerns about vaccination.  It will include questions on parental attitudes about safety and effectiveness of vaccination, quality of

---

[4] Smith PJ, Hoaglin DC, Battaglia MP, et al. Statistical methodology of the National Immunization Survey, 1994-2002. National Center for Health Statistics. Vital Health Stat 2(138). 2005.

interactions with providers about vaccination, and parental delay or refusal of vaccines, including which vaccines were delayed or refused, and why.

**Geographic specificity**

The NIS provides precise national estimates of vaccine coverage, and estimates at state and selected local areas with reasonable precision (e.g., 95% confidence halfwidths of ± 4-7%). The NIS was conducted as independent surveys in 78 areas from 1994-2004, including the 50 states, the six urban areas receiving Section 317 grant funding (Bexar County, TX; Chicago, IL; District of Columbia; Houston, TX; New York City, NY; Philadelphia County, PA) and 22 other urban areas. During 2005 and 2006, CDC worked with NACCHO to identify ~5 new areas during each of those years to oversample, while an equivalent number of the original non-grantee urban areas were not oversampled to balance cost. Starting in 2007, the NIS conducts independent surveys in the 50 states, the six urban area grantees, and other city or county areas selected by states and funded using states' Section 317 grant funds (average cost ~$200,000 per area oversampled). Eight areas were chosen by states for NIS oversampling in 2007. The shift from NIS overampling in the 22 non-grantee areas allowed funding of the NIS-Teen survey and other methods research, and provides states with flexibility in choice of selected areas to be oversampled.

**Periodicity of data collection and reporting**

The NIS is conducted continuously based on quarterly samples. Analytic data sets are delivered to CDC by NORC twice a year: in December, based on data from the last half of the prior year combined with data from the 1st half of the current year, and in June based on data from the prior calendar year. December data are reported online in standard tables. Data dissemination focuses on the calendar year data reported each June, which includes MMWR articles, online standard tables, a public use file, and articles for peer-reviewed scientific journals.

**Timeliness (vaccination to data availability)**

Timeliness is a key attribute affecting usefulness of the survey data for evaluating program success. Here, we define timeliness as the average number of months from *vaccination* to availability of calendar year data. The earliest possible vaccination is a dose of hepatitis B vaccine given within 12 hours of birth. Timeliness for the hepatitis B birth dose is 38 months (25-52 months). Components of delay include age when surveyed (e.g., 19 months in December or 34 months in January), and the six month lag from end of calendar year data collection until data delivery. Timeliness for other vaccines are: 32 months for 3rd dose of Rotavirus vaccine (range 19-46m); 26 months for MMR and varicella vaccines (range 13-40m); 19 months for 4th dose of DTaP (range 6-33m); and 17 months from end of the influenza vaccination period (January) for influenzas vaccine.

**Comparability across areas and over time**

With accountability as one of the key purposes of the NIS, having comparable estimates across states and local areas sampled, and within areas over time, is crucial. The NIS accomplishes this by using the same contractor and methods in all sampling areas. Sample sizes are chosen to achieve an effective sample size of 180 children with adequate provider data per area.

**Representativeness**

A key attribute of any survey is representativeness – is there minimal bias in estimates as compared to the true results for the target population? The NIS strives to minimize potential bias by maximizing response rates and weighting adjustments. Response rates are maximized through maintenance of a highly trained and monitored interviewer work force, mailing of advance letters if an address can be matched to a sampled telephone number, multiple call-back attempts to gain cooperation, keeping the length of the survey as short as possible (average 20 minutes), maintenance of a toll-free number and website to facilitate participation, carefully scripted answering machine and voice mail messages, and the offering of $15 as a token of appreciation for selected respondents (e.g., those who acknowledge young children in the household, but have not given birth date needed to determine eligibility, have started but not completed the interview, or completed the interview but have not given consent to

6

contact their child's vaccination providers).  The household questionnaire is available in a Spanish version of the CATI system for administration by bilingual staff interviewers (9% of 2005 interviews), and use of Language Line Services (187 interviews, or 0.67% of all interviews in 2005).  Cooperation from providers is facilitated with multiple mailings and telephone follow-up with providers who have not responded to the mail portion of the survey.

Data are weighted to account for the initial probability of selection of a household, households with multiple telephone numbers, unit non-response, households without landline telephones (using NIS respondents with interruption in telephone service during the previous 12 months to represent households with landlines), and to match population control totals by mother's education, and child's race/ethnicity, gender and age.  Information collected during the telephone interview for children for whom adequate provider data is not collected (parent did not give consent to contact providers, provider did not respond, or provider response deemed inadequate) is used in the weighting adjustment (to estimate response propensities and formation of weighting classes).  Residual bias may remain after weighting adjustments.

**Accuracy**

Because parental report of childhood vaccination was determined in multiple studies to be unreliable, the NIS initial design incorporated collection of vaccination histories from providers.  All NIS estimates are based on children with adequate provider data reported.  Provider data may not always be complete, particularly if the child had more than one provider and not all of those providers are identified by the parent or respond to the survey if identified.

**6.  Information Dissemination**

NIS findings are disseminated through:
- annual MMWR articles, including pre-publication briefings with selected grantees
- detailed tables posted online twice yearly ( http://www.cdc.gov/vaccines/stats-surv/imz-coverage.htm#nis )
  - Q3-4 2005 + Q1-2 2006 data ~ Jan. 2007
  - Q1-4 2006 data ~ summer 2007
- public use file available annually ( http://www.cdc.gov/nis/reports.htm )
- in-house analysis
  - 13 NIS papers published in 2006
- ad hoc requests from states, CDC, other
- inclusion in *Healthy People 2010* reports, reports to Congress and OMB, Agency for Healthcare Research and Quality racial disparities report, and America's Children report.

NIS results generate press interest every year and are widely cited by other organizations in publications and on websites.  An online data query system will be developed via the Census Data Ferret program to facilitate access to cross-tabulations, mapping and trend graphs.

NIS data have been used in a variety of ways, including:
- monitoring state immunization program improvements
- management of the Vaccines for Children (VFC) entitlement program (health insurance)
- monitoring *Healthy People 2010* objectives
- uptake of new vaccines
- factors associated with coverage
- racial/ethnic and socioeconomic disparities
- parental vaccine safety concerns
- quality performance measures
  - timeliness, age-appropriate & validly-spaced doses
- use of combination vaccines
- county-level coverage estimation

7

- coverage trends by birth cohort
- cost-effectiveness analysis
- vaccine-effectiveness studies

Appendix A includes a selected bibliography of recent NIS-related articles.

## 7. Challenges

Two major challenges currently facing the NIS and SLAITS are declining response rates and increasing non-coverage of the sample frame as households drop their landline telephone service and rely solely on cell phones. These challenges are not unique to the NIS and are shared by other telephone surveys in the public (e.g., BRFSS) and private survey sectors. Both of these challenges can potentially increase the cost of the survey. Lower response rates mean a larger sample of initial phone numbers must be drawn and worked through. In 2005, 4,465,261 telephone numbers were sampled in order to identify 1,085,040 households, successfully screen 1,006,435 households, identify 31,909 eligible households, complete interviews for 27,627 children, and yield a final sample of 17,448 children with adequate provider data. Increasing non-coverage of the sample frame will require supplemental sample frames to evaluate potential non-representativeness. Eventually, sample frames that include non-landline households will be needed to supplement or replace the landline sample frame.

### Response Rates

NIS response rates are reported separately for the two survey phases. The final CASRO household response rate is the product of the resolution rate (proportion of telephone numbers resolved as either a household or non-household), screener rate (proportion of telephone numbers resolved as a household that are successfully screened for presence of an age-eligible child), and the interview rate (proportion of households with age-eligible children identified that complete the interview). The Household Rates figure in Appendix B shows the trend in these rates since the beginning of the NIS in 1994. Rates have generally declined from 1994 to 2006, the most recent year with finalized response rate data: from 94.6% to 83.3% for the resolution rate, from 96.2% to 90.5% for the screener rate, from 95.4% to 85.6% for the interview rate, and from 86.8% 64.5% for the CASRO overall household response rate. In addition the eligibility rate among screened households has declined from 4.1% in 1994 to 3.3% in 2006. The actual percent of households with 19-35 month old children has been estimated at 4-5% based on the Current Population Survey. It is suspected that some NIS respondents opt out of the survey during the screening by failing to identify they have age-eligible children. The resolution and screening rates may also be lower for eligible households than ineligible households. It is also possible that some of the decline in observed eligibility rate among screened households results from an actual decline in prevalence of households with 19-35 month old children, particularly among households with landline telephones.

The Child Rates figure in Appendix B shows the trends in response rates related to the provider phase of the survey. The consent rate (proportion of children with completed household interviews for whom consent is given to contact the providers) remained relatively stable at 84.0-87.6% during 1995-2004, but declined during the first two years of the NIS under the new contractor, NORC (78.5% in 2005, 81.0% in 2006). The unconditional adequacy rate (proportion of children with completed interview for whom adequate provider data is obtained) has remained relatively stable in recent years, ranging from 65-70%. Provider response to the survey has been good over the years, with a mail return rate of 86% or higher since 1998. In 2006, the provider return rate was 94.4%, the highest rate since 2000.

### Coverage of Target Population

Based on data from the NHIS (see Appendix C), the percentage of children aged <18 years living in households with only wireless service increased from 2.9% in the 1st half of 2003 to 11.6% in the last half of 2006. The percentage of children living in households with no phone service has remained relatively stable (2.3% in the last half of 2006). Based on data from the 2005 NHIS, a larger proportion of children aged 1-3 years (similar to NIS-eligible age) lived in wireless only or phoneless households: wireless only 9.7% for 1-3 year olds vs. 5.8-7.6% for

8

all children; phoneless 3.4% for 1-3 year olds vs. 1.5-1.8% for all children (Khare et al., JSM 2006). The proportion of children aged 1-3 years in households with landlines was lower than the national average (87%) in some subpopulations, including Hispanics (83%), non-Hispanic blacks (82%), no private insurance (78%), living below the poverty threshold (75%), and living in a household with only two persons (e.g., one parent and child) (65%).

To assess potential bias due to non-coverage, NHIS respondents can be compared by telephone status. Based on the 2005 NHIS, there is little evidence of bias due to non-coverage of non-landline households (Khare et al., JSM 2006). However, this conclusion is based on proxy measures such as parental reported receipt of influenza vaccination, number of reported provider visits in the past 12 months, and vaccination status predicted from sociodemographic variables, and does not provide a direct comparison of provider-reported vaccination status among children in landline vs. wireless only and phoneless households. Further monitoring of potential bias due to non-coverage of non-landline households is needed using more recent NHIS data, expanding to assess the NIS-Teen, and evaluating the degree to which current non-coverage adjustments based on NIS respondents with landline interruptions adequately adjust for the non-coverage. Further research is also needed to benchmark NIS indicators such as type of health insurance, poverty level, household size, and parental report of influenza vaccination to other surveys (e.g., NHIS) to assess combined effects of non-response and non-coverage. Incorporating income level into weighting adjustments should also be explored.

### Methods Research

The NIS has a rich history of methods research. Projects initiated during the past two years and potential future projects are listed below, organized by topic area. A bibliography of recent methods-related research conducted in collaboration with NORC, NCHS and NCIRD is presented in Appendix D.

Bias from non-coverage of the sample frame and non-response
- NHIS analysis of potential bias from non-coverage of non-landline households
- Impact of incentives on representativeness
- Impact of refusal conversion on representativeness
- Ecologic analysis of nonresponse bias resulting from non-resolution of telephone interviews, eligibility screener nonresponse, and interview nonresponse
- Use of Immunization Information Systems (IIS) as a dual sample frame (currently underway in two states)
  - Independent samples of children from each of two IIS will be selected and the usual NIS interview and provider record check conducted. Sampled children from the IIS who live in a wireless only or phoneless household will also be included. Nonresponse bias can be assessed using vaccination histories in the IIS for children.
- Development of a simulation model to simultaneously assess multiple sources of bias at each survey stage

More cost-efficient landline sample frame
- Impact of moving to 2+ or greater phone bank sampling
- Oversampling of listed telephone numbers
- Use of age-targeted phone list sample frames
- Use of Immunization Information Systems (IIS) as a dual sample frame
  - IIS can easily identify age-eligible children, so use of an IIS frame may reduce the amount of landline sample needed.

Alternative sample frames that include non-landline populations
- Use of IIS as a sample frame (this project will provide an initial assessment of the feasibility of supplementing or replacing landline sample frames with IIS sample frames).
- Cell phone sample frames (several cycles of research by NORC have been conducted to pilot an abbreviated NIS interview with eligible households; preliminary findings indicate lower resolution and screener rates for cell phone samples, resulting in much higher costs than landline samples).

9

- o Further research is being considered for 2008 to obtain a national sample of children in wireless only households to evaluate potential non-coverage bias, and to further investigate the best approaches to maximizing response rates.
- NHIS sample frame (includes children in wireless only and phoneless households, so follow-back to providers to obtain vaccination histories would allow national estimation of bias in NIS)
- Potential future evaluations:
  - o American Community Survey
  - o BRFSS (when it incorporates an address-based sampling frame)
  - o NIS-specific address-based sampling frame
  - o Use of school-based sampling frame for NIS-Teen

Improving Response Rates and Survey Efficiency
- Questionnaire changes to improve interview completion and provider consent rates
- Restructuring the advance letter to improve resolution, screener, interview completion and consent rates
- Cost-benefit analysis of various calling rules to increase efficiency and response rates
- Experimentation with alternative methods to break down the answering machine barrier
- Experimenting with a shorter interview
- Experimenting with caller ID to improve cooperation
- Improving quality on interviewer monitoring
- Pre-screening telephone numbers to identify nonresidential lines
- Optimizing day and time of first dials
- Best follow-up protocols for provider non-respondents
- Potential future research:
  - o Further experiments with incentives (e.g., delay full payment, increasing incentive amount, sending a deactivated bank card in lieu of cash, expansion of incentives to additional respondent groups.
  - o Expand approaches used to contact respondents and complete screeners and interviews (e.g., mailing questionnaires, web response options)
  - o "Bank" children too young to be eligible at time of screening for future follow-up when they reach 19-35 months (could also collect provider data for younger children for more timely assessment of vaccines recommended during the first 6 months of life, e.g. hepatitis B birth dose, rotavirus vaccine).
  - o Changes to the screener and household questionnaire
  - o Respondent customization, e.g., mention respondent's state in advance letter, customized refusal conversion letter)

Improving Weighting Adjustments
- More stable estimates of the area-specific proportion of NIS children in landline households
- Post-Katrina New Orleans weighting adjustments
- Calibration of sample using data on income to compensate for drift over time in sample to more affluent respondents due to non-coverage and nonresponse

Improving Accuracy of Data
- Redesign of the provider survey form to limit errors in recording of hepatitis B birth dose
- Matching of NIS sample to 12 state/local IIS to compare vaccination histories (will help determine if IIS vaccination histories are sufficiently complete, and evaluate completeness of hepatitis B birth dose reporting by NIS providers)

**Future Design of the NIS**

The NIS is at a critical juncture given the increasing proportion of young children in wireless only households. The potential bias in the landline sample resulting from non-coverage of non-landline households can be determined as a function of the difference in vaccine coverage estimates between children in landline vs. non-landline households, and the proportion of children in non-landline households. This relationship is shown graphically in Appendix E.

10

For example, if vaccination coverage were 6 percentage points higher in landline vs. non-landline populations, and 15% of children live in non-landline households, bias due to non-coverage would be 1%.   A first step is to evaluate where we are on the x-axis of this figure, i.e., we need to estimate the vaccination coverage in a representative sample of children in non-landline households.  For example, this could be obtained by reinstating the NHIS NIPRCS.  It will be expensive to collect this information from cell phone samples, and lower response rates may adversely affect representativeness.  Over time, it will be necessary to supplement or replace the landline frame with another frame that includes non-landline households.  For example, a tri-frame design could be used, with landline, cell phone, and address-based frames combined.  Alternative frames include Immunization Information Systems (IIS) which in most states are populated by birth records, piggybacking on future BRFSS address-based frame, piggybacking on the American Community Survey, using a school-based sampling frame (for adolescents), and provider-based sampling frames.  The challenge is to develop short and long term strategies for evaluating and choosing among these various options, while maintaining a credible survey that will provide the information needed to monitor the U.S. Immunization Program.

## 8. Objectives of NCHS BSC Program Review

**Strategic Planning Efforts**

Strategic planning for vaccination assessment is a high priority for the National Center for Immunization and Respiratory Diseases (NCIRD). The outcome of internal and external reviews will ultimately lead to vaccination assessment data that prompt our national and state programs to continue effective actions. We have paid especially close attention in our assessment program to those vaccines that the ACIP votes to place in the VFC program for eligible children and adolescents for routine vaccination. In addition, ACIP makes recommendations for other vaccines, other age groups, sub-populations—such as medically high-risk persons, and specific venues—such as health care settings. Yet, all the ACIP recommendations are not currently coupled with strong assessment strategies to measure vaccination coverage or disease impact.  Due to the breadth of the vaccination enterprise and limited resources for assessment, we must prioritize our work.  Vaccinating young children and assessing coverage among 2-year-olds is the bedrock of our program.  If we want similarly strong vaccination programs for adolescents and adults, then we must carefully plan the best ways to measure coverage in those populations.  To this end, an external panel was convened in April 2007 to provide recommendations for prioritization of vaccination assessment and address the question, "What should we be assessing?"  Coupled with this external review was a series of meetings of stakeholders within the CDC.  Among the recommendations from these external and internal deliberations were several high-priority activities related to the NIS:

- Maintain the annual NIS in 56 grantee areas with provider record check
- Need grantee-specific coverage estimates for adolescents
- Continue NIS methods research
- Develop short and long term strategic plan for the role of IIS in coverage assessment.

The final report from the external panel will be circulated widely to stakeholders and further comment solicited. Another brief review was conducted in October 2007 by the NCIRD subcommittee of the Coordinating Center for Infectious Diseases Board of Scientific Counselors.  Recommendations included:

- Quickly expand NIS to survey infants (ages <12 months) and adolescents for state-level estimates
- Develop a mechanism to better assess immunization coverage among adults
- Develop IIS to (1) serve as a sampling frame for current NIS approaches and (2) to provide coverage data themselves
- Encourage links to electronic medical records (EMRs) to capture existing medical data and maximize the utility of IIS

11

**Appx20333**

**Proposed Questions for the NCHS BSC Review Panel**

Prior reviews and planning have focused on the breadth of vaccination assessment activities across the lifespan. Strategic decisions are needed within the next year to set the direction of the NIS, the cornerstone of our assessment system.  The current contract with NORC is in its third year, with two optional years; a new contract must be in place by fall 2009, so the scope of work must be developed by fall 2008.  This scope of work must outline the specific sampling frames to be used, or offer a menu of possible frames.  Feedback from the NCHS BSC review panel on the following questions would be useful in guiding next steps:

- ***What could be done to improve the validity and efficiency of the NIS?***
- ***How should we deal with increasing prevalence of households with only cell phones?***
- ***What alternative sampling designs should be considered?***
- ***What steps and processes should be undertaken to aid decisions about the future direction of the NIS sampling design?***

12

### Appendix A:  Selected NIS-Related Bibliography

**2007 research articles**

1.  Allred NJ, Wooten KG, Kong Y.  The association of health insurance and continuous primary care in the medical home on vaccination coverage for 19-35 month old children.  Pediatrics 2007;119(supplement 1):S4-11.

2.  Chaves SS, Santibanez TA, Gargiullo P, Guris D.  Chickenpox exposure and herpes zoster disease incidence in older adults in the U.S.  Public Health Reports 2007;122(2):155-9.

3.  Davila JC, Wang W, Gustafson KW, Smith PJ.  The San Diego Immunization Survey:  a model for local vaccination coverage assessment.  Public Health Reports (in press).

4.  Groom AV, Washington ML, Smith PJ, Bryan RT.  Under-immunization of American Indian and Alaska Native children.  Pediatrics (in press).

5.  Groom HC, Kolasa M, Wooten K, Ching P, Shefer A.  Childhood immunization coverage by provider type.  JPHMP 2007;13:584-589.

6.  Gust DA, Darling N, Kennedy A, Schwartz B.  Parents with concerns about vaccines:  which vaccines and reasons why.  (submitted)

7.  Jain N, Smith P.  Disparities in health care utilization patterns among U.S. adults, National Survey of Children's Health, 2004 (in clearance)

8.  Khare M, Chowdhury S, Wolter K, Singleton JA.  An assessment of bias due to noncoverage of wireless only households in RDD surveys.  2007 JSM Proceedings.

9.  Klabunde CN, Meissner HI, Wooten KG, Breen N, Singleton JA.  A national comparison of colorectal cancer screening and immunization status in older americans.  AJPM 2007;33(1):1-8.

10.  Kolasa M, Luman E.  Missed opportunities for simultaneous vaccination as a factor in racial disparities (analysis in progress)

11.  Luman ET, Sablan M, Anaya G, Stokley S, McCauley MM, Shaw KM, Salazar A, Balajadia R, Chaine JP, Duncan R.  Vaccination coverage in the Commonwealth of the Northern Mariana Islands, 2005.  JPHMP 2007;13:595-604.

12.  Luman ET, Shaw KM, Stokley S.  Are U.S. children in compliance with vaccination recommendations? (submitted)

13.  Luman E, Sablan M, Stokley S, McCauley M, Shaw K. The Impact of Methodological "Shortcuts" in Conducting Public Health Surveys (in clearance).

14.  Luman E et al.  Falling behind and catching up – vaccination status at milestone ages throughout early childhood (cleared, under revision).

15.  Luman E et al.  Resiliency of vaccination coverage in the United States (analysis in progress).

16.  McMorrow M, Luman E.  Provider specialty and vaccination coverage (analysis in progress).

17.  Nuorti JP, Martin SW, Smith PJ, Moran JS, Schwartz B.  Uptake of 7-valent pneumococcal conjugate vaccine among children in the United States.  Pediatrics (in press).

18.  O'Connor KS, Bramlett MD.  Vaccination coverage by special health care needs status in young children.  Pediatrics 2007 (in press).

19.  Salmon DA, Smith PJ, Pan KY, Navar AM, Omer SA, Halsey NA.  Disparities in preschool immunization coverage associated with maternal age:  United States, 2001-2003.  AJPM (in clearance)

13

20. Santibanez TA, Shaw KM, Euler GL, Singleton JA.  Validity of parent-reported influenza vaccination status of children aged 19-35 months.  AJPM (submitted).

21. Santibanez TA et al.  Influenza vaccination of adults 50-64 years, NAIS 2004 (in preparation).

22. Shaw KM, Santibanez TA, Chu SY.  Asian and Pacific Islander childhood vaccination coverage:  National Immunization Survey, 2002-2004 (submitted)

23. Shimabukuro T, Luman E, Schieber R, Winston C.  Potential for improving age-appropriate vaccination coverage by maximizing the 18-month well-child visit.  JPHMP 2007;13:572-577.

24. Shefer A, Santoli J, Singleton JA.  Measuring vaccination coverage – where are we now and where are we going? (editorial). JPHMP 2007;13:541-543.

25. Skalland B, Xu C, Wooten K.  Optimizing the day and time of the first dial in random-digit-dial telephone surveys.  AAPOR 2007, ASA Proceedings.

26. Skalland B, Montgomery R.  An analysis of nonresponse bias resulting from non-resolution of telephone numbers, eligibility screener nonresponse, and interview nonresponse for the National Immunization Survey.  JSM 2007, ASA Proceedings.

27. Smith PJ, Singleton JA.  Vaccination coverage for 207 selected counties:  results from the 2003-04 National Immunization Survey.   Public Health Reports (in press).

28. Smith PJ, Nuorti P, Singleton JA, Zhao Z, Wolter KM.  The effect of vaccine shortages on timeliness of pneumococcal conjugate vaccination:  results from the 2001-05 National Immunization Survey.  Pediatrics 2007;120:1165-1173.

29. Stanwyck C, Davila J, Lake L, Koshak M.  Assessment of kindergarten immunization rates in Colorado:  school self-reports vs. health department audits – 2004-05.  Public Health Reports 2007;122(4).

30. Wooten KG, Luman ET, Barker LE.  Socioeconomic factors and persistent racial disparities in vaccination coverage.  American Journal of Health Behavior 2007; 31:434-445.

31. Zhao Z.  Ranking childhood vaccination coverage curves with the National Immunization Survey (NIS).  2007 JSM Proceedings.

**2007 MMWR Weekly**

1. Brim SN, Rudd RA, Funk RH, Callahan DB, Euler GL.  Influenza vaccination coverage among children with asthma – United States, 2004-05 influenza season (September 2004-February 2005).  MMWR 2007;56(9):193-6.

2. Fischer G, Williams I, Wasley A, Darling N, Singleton JA.  Hepatitis A Vaccination Coverage Among Children Aged 24-35 Months—United States, 2004-2005. MMWR 2007;56:678-681.

3. Stanwyck C, Jain N.  Vaccination coverage among children in Kindergarten – United States, 2006-07 school year.  MMWR 2007;56:819-821.

4. Wooten KG, Darling N, Singleton JA, Shefer A.  National, state, and local area vaccination coverage among children aged 19-35 months – United States, 2006.  MMWR 2007;56:880-5.

5. Jain N, Stokely S.  National vaccination coverage among adolescents aged 13-17 years – United States, 2006.  MMWR 2007;56:885-8.

6. Santibanez TA, Santoli JM, Mootrey G, Euler GL, Fiore A.  Influenza vaccination coverage among children aged 6-23 months – United States, 2005-06 influenza season.  MMWR 2007;56:959-963.

**2006 peer-reviewed immunization research articles**

1. Amon JJ, Darling N, Fiore AE, Bell BP, Barker LE.  Factors associated with hepatitis a vaccination among children 24 to 35 months of age: United States, 2003.  Pediatrics 2006;117(1):30-3.

14

2.  Barker LE, Chu SY, Li Qian, Shaw KM, Santoli JM.  Disparities in immunization coverage between non-Hispanic white and non-Hispanic black children, United States, 1996-2003.  JNMA 2006l98(2):130-5.

3.  Bloom S, Smith P, Stanwyck C, Stokley S. Has the United States population been adequately vaccinated to achieve rubella elimination? Clin Infect Dis. 2006;43(Suppl 3): S141-S145.

4.  Gust DA, Campbell S, Kennedy A, Shui I, Barker L, Schwartz B. Parental concerns and medical-seeking behavior after immunization. Am J Prev Med. 2006;31:32-5.

5.  Khare M, Piccinino L, Barker LE, Linkins RW. Assessment of immunization registry databases as supplemental sources of data to improve ascertainment of vaccination coverage estimates in the National Immunization Survey. Arch Pediatr Adolesc Med. 2006;160:838-42.

6.  Luman ET, Ching PLYH, Jumaan AO, Seward JF.  Uptake of varicella vaccination among young children in the United States:  a success story in eliminating racial and ethnic disparities.  Pediatrics 2006;117:999-1008.

7.  Salmon DA, Smith PJ, Navar AM, Pan KY, Omer SB, Singleton JA, Halsey NA. Measuring immunization coverage among pre-school children:  past, present and future opportunities. Epidemiologic Reviews 2006;28:27-40.

8.  Santibanez TA, Santoli JM, Barker LE.  Differential effects of the DTaP and MMR vaccine shortages on timeliness of childhood vaccination coverage.  American Journal of Public Health 2006;96(4):691-6.

9.  Santibanez T, Santoli J, Euler G, Bridges CB. Influenza vaccination of children aged 6-23 months: the 2002-2003 and 2003-2004 influenza seasons. Pediatrics. 2006;118:1167-75.

10. Smith PJ, Kennedy AM, Wooten K, Gust DA, Pickering LK. Association between health care providers' influence on parents who have concerns about vaccine safety and vaccination coverage. Pediatrics. 2006;118:e1287-e92.

11. Smith PJ, Stevenson J, Chu SY. Associations between childhood vaccination coverage, insurance type, and breaks in health insurance coverage. Pediatrics. 2006;117:1972-8.

12. Smith PJ, Zhao Z, Wolter KM, Singleton JA, JP Nuorti. Age-period-cohort analyses of public health data collected from independent serial cross-sectional complex probability sample surveys. 2006 *Proceedings of the Section on Survey Research Method*s, Alexandria, VA: American Statistical Association.

13. Stokley S, Shaw KM, Barker L, Santoli JM, Shefer A.  Impact of state vaccine financing policy on uptake of heptavalent pneumococcal conjugate vaccine. Am J Public Health. 2006;96:1308-13

**2006 MMWR Weekly**

1.  Darling N, Singleton JA, Santoli J.  National, state, and urban area vaccination coverage among children aged 19-35 months --- United States, 2005.  MMWR 2006:55:988-93.

2.  L Grummer-Strawn, PhD, KS Scanlon, PhD, N Darling, MPH, EJ Conrey, PhD. CDC. Racial and socioeconomic disparities in breastfeeding --- United States, 2004. MMWR/Mar 31, 2006;55(12):335-9.

3.  Santibanez TA, Singleton JA, Santoli J, Euler G, Bridges CB. Childhood influenza vaccination coverage --- United States, 2003--04 influenza season.  MMWR 2006;55(04):100-3.

4.  Santibanez TA, Singleton JA, Shaw KM, Santoli JM, Euler GL, Bridges CB.  Childhood influenza vaccination coverage -- United States, 2004-05 influenza season.  MMWR 2006;55:1061-5.

5.  Stanwyck C, Davila J, Lyons B, Knighton C. Vaccination coverage among children entering school --- United States, 2005-06 school year.  MMWR 2006;55:1124-6.

**2005 peer-reviewed immunization research articles**:

1.  Allred NJ, Shaw KM, Santibanez TA, Rickert DL, Santoli JM.  Parental vaccine safety concerns: results from the National Immunization Survey, 2001-2002.  American Journal of Preventive Medicine 2005;28(2):221-4.

15

2.   Barker LE, McCauley MM, Li Q.  Increasing the precision of estimates of immunization coverage among 19- to 35-month-old children in the United States.  Journal of Data Science 2005;3(1):35-45.

3.   Barker LE, Smith PJ, Gerzoff RB, Luman ET, McCauley MM, Strine TW.  Ranking states' immunization coverage: an example from the National Immunization Survey.  Statistics in Medicine 2005;24(4):605-13.

4.   Cadwell BL, Smith  PJ, Baughman A. (2005). Methods for capture-recapture analysis when cases may not be identified uniquely. *Statistics in Medicine.*  2005;24:2041-2051.

5.   Darling N, Barker LE, Shefer A, Chu SY.  Immunization coverage in 19-35 month old children of Hispanic Ancestry, United States.  American Journal of Preventive Medicine 2005;29(5):421-7.

6.   Davis MM, Gaglia MA.  Associations of daycare and school entry vaccination requirements with varicella immunization rates. Vaccine. 2005 Apr 27;23(23):3053-60.

7.   Dougherty D, Meikle SF, Owens P, Kelley E, Moy E. Children's Health Care in the First National Healthcare Quality Report and National Healthcare Disparities Report. Med Care. 2005 Mar;43(3 Suppl):I58-63.

8.   Gust DA, Kennedy A, Shui I, Smith PJ, Nowak G, Pickering L. Parents' attitudes toward immunizations and healthcare providers. *Am J Prev Med. 2005;29(2):105-112.*

9.   Joyce T, Racine A. CHIP shots: association between the State Children's Health Insurance Programs and immunization rates. Pediatrics. 2005 May;115(5):e526-34.

6.   Li R, Darling N, Maurice E, Barker L, Grummer-Strawn LM.  Breastfeeding rates in the United States by characteristics of the child, mother, or family: the 2002 National Immunization Survey.  Pediatrics 2005;115(1):e31-7.

7.   Luman ET, Barker LE, Shaw KM, McCauley MM, Buehler JW, Pickering LK.  Timeliness of childhood vaccinations in the United States: days undervaccinated and number of vaccines delayed.  The Journal of the American Medical Association 2005;293(10):1204-11.

8.   Luman ET, Barker LE, McCauley MM, Drews-Botsch C.  Timeliness of childhood immunizations: a state-specific analysis.  American Journal of Public Health 2005;95(8):1367-74.

9.   Santibanez TA, Barker LE, Shaw KM.  Measurement of vaccination coverage at age 24 and 19-35 months: a case study of multiple imputation in public health.  Population Health Metrics 2005;3:6.

10.  Shaw KM, Barker LE.  How do caregivers know when to take their child for immunizations?  BMC Pediatrics 2005;5(1):44.

11.  Singleton JA, Santibanez TA, Wortley PM.  Influenza and pneumococcal vaccination of adults aged ≥ 65: racial/ethnic differences.  American Journal of Preventive Medicine 2005;29(5):412-20.

12.  Smith PJ, Santoli JM, Chu SY, Ochoa DQ, Rodewald LE.  The association between having a medical home and vaccination coverage among children eligible for the Vaccines For Children (VFC) Program.  Pediatrics 2005;116(1):1-10.

13.  Smith PJ, Hoaglin DC, Battaglia MP, Khare M, Barker LE.  Statistical methodology of the National Immunization Survey: 1994-2002.  Vital Health Statistics Series 2 2005;(138):1-55.

**2005 MMWR Weekly**

1.   CDC. Hepatitis A Vaccination Coverage Among Children Aged 24-35 Months — United States, 2003.  MMWR 2005;54(06):141-4.

2.   CDC. National, State, and Urban Area Vaccination Coverage Among Children Aged 19--35 Months - United States, 2004. MMWR 2005;54(29):717-21.

16

## Appendix B:  NIS Response Rates
Note 2007 response rates are not complete



**Household Rates**
(data through 9/16/2007)



**Child Rates**
(data through 9/16/2007)

Appendix C:  Trends in Prevalence of U.S. Households by Type of Telephone Service

Wireless Substitution: Early release of estimates based on data from the NHIS, July-December 2006 (Blumberg et al., NCHS Health E-Stat 2007)



**Appx20340**

## Appendix D:  Bibliography of Recent NIS Methods Research

Amaya, Ashley, Martin Barron, and Philip Smith. 2007. "Investigating whether a shorter interview is a better interview for the National Immunization Survey." Presented at the Annual Conference of the American Association for Public Opinion Research, Anaheim, CA.

Barron, Martin, Karen Wooten, James Chesire, Keeshawna Brooks. 2006. "Advance letter readability and survey cooperation." Presented at the Annual Conference of the American Association for Public Opinion Research, Montreal, Canada.

Barron, Martin and Meena Khare. 2006. "Calling patterns for a large national random digit dial health survey." Presented at the 2nd International Conference on Telephone Survey Methodology, Miami, FL.

Barron, Martin and Karen Wooten. 2007. "The Impact of refusal conversion on survey response and error." Presented at Joint Statistical Meeting, Salt Lake City, UT.

Barron, Martin, Angela DeBello, and Meena Khare. 2007. "Manipulating caller ID for higher survey response in RDD surveys." Presented at the Annual Conference of the American Association for Public Opinion Research, Anaheim, CA.

Eckman, Stephanie and Philip Smith. 2006. "Magnitude and effects of number portability in a national RDD survey." Presented at the 2nd International Conference on Telephone Survey Methodology, Miami, FL.

Howes, Cindy, Martin Barron, and James Singleton. 2007. "Increasing the cooperation rate through the advance letter." Presented at the Annual Conference of the American Association for Public Opinion Research, Anaheim, CA.

Howes, Cindy, Patrick Cagney, and Gary Euler. 2007. "Take me off your list:  Who are these non-responders." Presented at the Annual Conference of the American Association for Public Opinion Research, Anaheim, CA.

Khare, Meena, Sadeq Chowdhury, Kirk Wolter, Karen Wooten, and Stephen J. Blumberg. 2006. "An Evaluation of methods to compensate for noncoverage of phoneless households using information on interruptions in telephone service and presence of wireless phones." Presented at the Joint Statistical Meetings, Seattle, WA.

Khare, Meena, Sadeq Chowdhury, Kirk Wolter, and James A. Singleton. 2007. "An assessment of methods to compensate for growing noncoverage of wireless-only households in the National Immunization Survey (NIS). Presented at the Annual Meeting of the American Association for Public Opinion Research, Anaheim, CA.

Jessoe, Rebecca and Patrick Cagney. 2006. "The last monitor told me to do it that way: Improving quality on interviewer monitoring." Presented at the International Field Directors & Technologies Conference, Montreal, Canada.

Montgomery, Margrethe, Martin Barron, Martin Barron, Keeshawna Brooks, Ben Skalland, and James Singleton. 2007. "The impact of incentives on representativeness in the National Immunization Survey." Presented at the Annual Meeting of the American Association for Public Opinion Research, Anaheim, CA.

Montgomery, Robert and Meena Khare. 2007. "'Do you know what day this is?' Special events and RDD response rates." Presented at the Annual Meeting of the American Association for Public Opinion Research, Anaheim, CA.

Murphy, Whitney, Martin Barron, Kirk Wolter, Karen Wooten, and Meena Khare. 2007. "How do you hide a house? Factors associated with the declining working residential number rate." Presented at the Annual Meeting of the American Association for Public Opinion Research, Anaheim, CA.

Pedlow, Steven and Zu Zhao. 2007. "Post-Katrina New Orleans adjustment to control totals for the National Immunization Survey." Presented at the Joint Statistical Meetings, Salt Lake City, UT.

Upchurch, Heidi, Marcie Cynamon, and Larry Wilkinson. 2006. "Prescreening telephone numbers to identify nonresidential lines." Presented at the 2nd International Conference on Telephone Survey Methodology, Miami, FL.

Singleton, James, Kirk Wolter, and Philip Smith. 2007. "A simulation model as the framework for quantifying systematic error in a health survey." Presented at the 9th Conference on Health Survey Research Methods, PeachTree, GA.

19

Singleton, James and Sara Zuckerbraun. 2007. "Provider response rates in the National Immunization Survey (NIS) 2005 and 2006." Presented at the National Immunization Conference, Kansas City, Missouri.

Skalland, Benjamin, Kirk Wolter, Hee-Choon Shin, and Stephen Blumberg. 2006. "A nonresponse bias analysis to inform the use of incentives in multistage telephone surveys." Presented at the Joint Statistical Meetings, Seattle, WA.

Skalland, Benjamin, Robert Montgomery, and Philip Smith. 2007. "An analysis of nonresponse bias resulting from non-resolution of telephone numbers, eligibility screener nonresponse, and interview nonresponse for the National Immunization Survey." Presented at the Joint Statistical Meeting, Salt Lake City, UT.

Skalland, Benjamin, Chao Xu, and Karen Wooten. 2007. "Optimizing the day and time of the first dial in random-digit-dial telephone surveys." Presented at the Annual Meeting of the American Association for Public Opinion Research, Anaheim, CA.

Smith, Philip, Kirk Wolter, and James Singleton. 2006. "Methods for birth cohort analysis for the National Immunization Survey."  Proceedings of the Survey Research Methods Section, American Statistical Association, Alexandria, VA.

Smith, Philip, P. Nuorti, Kirk Wolter, and James Singleton. 2006. "Effects of the PCV7 shortages on timeliness of childhood vaccination coverage. Presented at the American Academy of Pediatrics. Elk Grove, IL.

Welch, Bess. 2006. "Impact of placement of time estimate information on screener and interview completion rates." Presented at International Field Directors and Technologies Conference, Montreal, Canada.

Wolter, Kirk. 2006. "Update on the National Immunization Survey." Presented at the National Immunization Conference, Centers for Disease Control and Prevention, Atlanta, GA.

Wolter, Kirk and James Singleton. 2006. "Impact of gulf hurricanes on the National Immunization Survey." Proceedings of the Survey Research Methods Section, American Statistical Association, Alexandria, VA.

Zuckerbraun, Sara, Gary Euler, and Julie Pace. 2007. "Surveys to medical providers: What is the best follow-up protocol for non respondents? A data analysis of experiments, and discussion." Presented at the Annual Meeting of the American Association for Public Opinion Research, Anaheim, CA.

20

Appendix E:  Potential Bias in Landline Samples



11/26/2019
Declaration of G. Reilly
EXHIBIT 447

 Centers for Disease Control and Prevention

## Vaccines for Children Program (VFC)

# About VFC

## The VFC Program: At a Glance

The Vaccines for Children (VFC) Program helps provide vaccines to children whose parents or guardians may not be able to afford them. This helps ensure that all children have a better chance of getting their recommended vaccinations on schedule. Vaccines available through the VFC Program are those recommended by the Advisory Committee on Immunization Practices (ACIP). These vaccines protect babies, young children, and adolescents from 16 diseases.

Funding for the VFC program is approved by the Office of Management and Budget (OMB) and allocated through the Centers for Medicare & Medicaid Services (CMS) to the Centers for Disease Control and Prevention (CDC). CDC buys vaccines at a discount and distributes them to grantees—i.e., state health departments and certain local and territorial public health agencies—which in turn distribute them at no charge to those private physicians' offices and public health clinics registered as VFC providers.

## Roles of Those Involved

This site serves 3 main audiences:

1. The parent or guardian of the child needing vaccines provided by the VFC who needs to know what the VFC offers them, how to find vaccines provided, and who to contact for answers to questions.
2. The provider, whether currently enrolled or wants to know the incentives for joining the VFC program, what's involved, how to order vaccines, and how costs and fees are handled.
3. The awardee, with the largest role, that performs the paperwork; distributes vaccines; complies with changing state and federal regulations; manages the program; recruits and enrolls providers in the program; evaluates performance; controls, identifies, and differentiates fraud from abuse; provides quality assurance and improvement, conducts provider site visits; completes surveys; returns, replaces, or files credits for vaccines, etc.

## Determining Eligibility

A child is eligible for the VFC Program if he or she is younger than 19 years of age and is one of the following:

- Medicaid-eligible
- Uninsured
- Underinsured [1]
- American Indian or Alaska Native

Children whose health insurance covers the cost of vaccinations are not eligible for VFC vaccines, even when a claim for the cost of the vaccine and its administration would be denied for payment by the insurance carrier because the plan's deductible had not been met.

---

### Footnotes

1. Underinsured means the child has health insurance, but it
   - Doesn't cover vaccines, or
   - Doesn't cover certain vaccines, or
   - Covers vaccines but has a fixed dollar limit or cap for vaccines. Once that fixed dollar amount is reached, a child is then eligible.

**Appx20345**   1/2

Underinsured children are eligible to receive vaccines only at Federally Qualified Health Centers (FQHC) or Rural Health Clinics (RHC). An FQHC is a type of provider that meets certain criteria under Medicare and Medicaid programs. To locate an FQHC or RHC, contact the state VFC coordinator. For additional details, consult the "Which Children are Eligible" section.

# What are the Costs or Fees?

There is no charge for any vaccines given by a VFC provider to eligible children. But there can be some other costs with a vaccination:

- Doctors can charge a set (or standard) fee to administer each shot. But if the family can't afford the fee per shot, the fee must be excused. A VFC-eligible child cannot be refused a vaccination due to the parent's or guardian's inability to pay for shot administration.
- There can be a fee for the office visit.
- There can be fees for non-vaccine services, like an eye exam or blood test.

# Locating a VFC Provider

Nationwide, there are over 44,000 doctors (nearly 40,000 sites) doctors enrolled in the VFC Program. Each state's VFC Coordinator can provide a list of doctors enrolled in the VFC Program. Other places that provide vaccinations are

- Public Health Clinic
- Federally Qualified Health Center (FQHC)
- Rural Health Clinic (RHC)

# History of the Vaccines for Children Program

In 1989 – 1991, a measles epidemic in the United States resulted in tens of thousands of cases of measles and hundreds of deaths. Upon investigation, CDC found that more than half of the children who had measles had not been immunized, even though many of them had seen a health care provider.

In partial response to that epidemic, Congress passed the Omnibus Budget Reconciliation Act (OBRA) on August 10, 1993, creating the Vaccines for Children (VFC) Program. VFC became operational October 1, 1994. Known as section 1928 of the Social Security Act, the Vaccines for Children program is an entitlement program (a right granted by law) for eligible children, age 18 and younger.

---

## Related Pages

For Parents: VFC Questions and Answers

For Providers: VFC Questions and Answers

State VFC Web Sites

Recommended Immunization Schedules (ACIP)

Vaccine Supply Policy

VFC Program Distribution of Pediatric Vaccines

---

Page last reviewed: February 18, 2016

11/26/2019
Declaration of G. Reilly
EXHIBIT 448

Westlaw.

59 FR 50235-01, 1994 WL 530057 (F.R.)

Page 1

NOTICES

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Health Care Financing Administration

[MB-84-NC]

**RIN 0938-AG77**

Medicaid Program; Charges for Vaccine Administration Under the Vaccines for Children (VFC) Program

Monday, October 3, 1994

*50235 AGENCY: Health Care Financing Administration (HCFA), HHS.

ACTION: Notice with comment period.

SUMMARY: This notice with comment period lists, by State, the interim regional maximum charges that providers may impose for the administration of pediatric vaccines to Federally vaccine-eligible children under the Pediatric Immunization Distribution Program, more commonly known as the Vaccines for Children (VFC) program. This notice also specifies the methodology that HCFA used to establish the maximum administration charges.

In addition, the notice provides States that purchase vaccines for all children the option to use these maximum charges or devise their own, and clarifies that State Medicaid agencies may establish lower fees than these maximums if they can provide assurances of access to immunizations for Medicaid eligible children to the same extent as the general population.

The publication of these administration charges is essential to implementation of the VFC program, which is mandated by law to become operational on October 1, 1994. We intend that this list be used on an interim basis until we issue a separate Federal Register document that will finalize these maximum regional charges and respond to any relevant public comments.

EFFECTIVE DATE: October 1, 1994.

FOR FURTHER INFORMATION CONTACT: Marge Sciulli, (410) 966-0691.

SUPPLEMENTARY INFORMATION:

I. Background

The Omnibus Budget Reconciliation Act of 1993 (OBRA '93), Public Law 103-66, created the Pediatric Vaccine Distribution Program (more commonly known and hereafter referred to as the Vaccines for Children (VFC) Program), which takes effect on October 1, 1994. Section 13631 of OBRA '93 added section 1902(a)(62) to the Social Security Act (the Act) to require that States provide for a program for the purchase and distribution of pediatric vaccines to program-registered providers for the immunization of vaccine eligible children in accordance with section 1928 of the Act. Section 13631 redesignated the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

existing section 1928 as section 1931 and inserted a new section 1928. The new section 1928 requires each State to establish a VFC Program (which may be administered by the State department of health) under which certain specified groups of children are entitled to receive qualified pediatric immunizations without charge for the cost of the vaccine.

Federally purchased vaccines under the VFC Program will be made available to children who are 18 years of age or younger and—

- Who are eligible for Medicaid;

- Who are not insured under any form of health insurance;

- Who are not insured with respect to the vaccine and who are administered pediatric vaccines by a federally qualified health center (FQHC) or in a rural health clinic; or

- Who are Indians, as defined in section 4 of the Indian Health Care Improvement Act.

Under the VFC program, vaccines must be administered by program-registered providers. Section 1928(c) defines a program-registered provider as any health care provider that—

- Is licensed or authorized to administer pediatric vaccines under the law of the State in which the administration occurs without regard to whether or not the provider is a Medicaid-participating provider;

- Submits to the State an executed provider agreement in the form and manner specified by the Secretary; and

- Has not been found by the Secretary or the State to have violated a provider agreement or other requirements that may apply that are established by the Secretary or the State.

Providers may participate in the VFC program without participating in Medicaid if they are qualified to administer vaccines under applicable State law. However, such providers will *50236 not be reimbursed by Medicaid for their services in administering the vaccine.

Under the VFC Program, a provider may impose a fee for the administration of a qualified pediatric vaccine as long as the fee, in the case of a Federally vaccine-eligible child, does not exceed the cost of such administration (as determined by the Secretary based on actual regional costs for such administration). However, a provider may not deny administration of a qualified pediatric vaccine to a vaccine-eligible child due to the inability of the child's parents or legal guardian to pay the administration fee.

II. Provisions of This Notice With Comment Period

*A. General Statement*

This notice announces interim regional maximum charges. These represent the maximum amount that a provider in a State may charge for the administration of qualified pediatric vaccines to Federally vaccine-eligible children under the VFC Program. It also specifies the methodology that HCFA used to establish these regional maximum charges. We are interpreting "regional" as specified in the statute to be the "State", as discussed in section II.B.2. of this notice. In addition, this notice gives Universal Purchase States (that is, where the vaccines are purchased by the State for all children in the State) the right to develop administration charges that differ from those established by HCFA, provided they are reasonable. Therefore, Universal Purchase States are provided the flexibility to accept the maximum charges established by the Secretary or to develop their own maximum charges. In either case, the statute gives State Medicaid agencies the option to establish and apply vac-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

cine administration fees that are lower than the specified maximum charges if they provide assurances that Medicaid children have access to immunizations to the same extent as the general population. Section 1902(a)(30)(A) of the Act, as amplified by section 1926, requires States to pay enough for obstetrical and pediatric services (which include immunization services) so that those services are available to the "Medicaid population" to the same extent that are available to the general population in the geographic area. These assurances must be submitted to HCFA as part of the appropriate State plan amendment to impose the fees. This notice specifies guidelines for States to use in setting lower administration fees.

The administration charge cap applies to all VFC Program-registered providers that administer the vaccine to a Federally vaccine-eligible child. It does not apply to children receiving free vaccines under State purchase programs or any other arrangement.

In accordance with the statute, physicians participating in the VFC Program can charge non-Medicaid eligible children the maximum administration charge (if that charge reflects the provider's cost of administration) regardless of whether the State has established a lower administration fee under the Medicaid program. However, there would be no Federal Medicaid matching funds available for such administration. Although the cost of the vaccines for the VFC Program is funded under Title XIX of the Act, Medicaid will not pay for the administration of vaccines provided to children under the VFC Program who are not eligible for Medicaid. A provider may only bill Medicaid for the administration of a vaccine if the child is Medicaid eligible.

Because the VFC program is mandated by law to become operational on October 1, 1994, we are announcing these regional maximum administration charges and guidelines for documenting access on an interim basis, subject to comment and revision. We will issue a final Federal Register document setting forth the applicable requirements and responding to public comments on the provisions of this notice that we receive on a timely basis.

*B. Methodology Used to Establish Administration Charges*

We used the following methodology to establish the regional maximum charges for administration of qualified pediatric vaccines set forth under section II.C. of this notice.

1. Basis for Using Charge Data versus Cost Data

As noted above, the statute provides that these maximum charges are to be based in the actual costs of vaccine administration, as determined by the Secretary. This provision posed a serious implementation problem for HCFA because of the unavailability of usable actual cost data on a nationwide basis and the urgency of promulgating maximum fees before the VFC program begins operation. We searched thoroughly for appropriate data on the costs of vaccine administration. We also consulted with several organizations and with individuals with knowledge and expertise in issues regarding physician payment, including the Physician Payment Review Commission (PPRC). We were informed that there are no data readily available on physicians' actual costs that would provide a valid basis for setting these maximum charges on a nationwide scale. It also was apparent to us that it would not be possible to generate such data via field research within the time available to implement the VFC program on October 1, 1994. A proper analysis would require detailed, expensive, and time-consuming collection and evaluation of data on each element of both direct and indirect costs, including equipment, supplies and labor, as well as an appropriate verification and allocation of "overhead" costs.

On the basis of this information, we concluded that we should explore setting the maximum charges based on data regarding actual charges for the administration of vaccines in physicians' offices. This, too, posed a problem. We consulted with insurance companies, physicians' groups, trade associations, the PPRC, and other knowledgeable experts. Again, we concluded that accurate, consistent data on charges were not readily available. There are a number of concerns about the data that are available, including inconsistencies in the coding of procedures and the fact that most payers do not differentiate, or pay separately for, the cost of the vaccine and its administration. In light of these problems, we were unable to construct a reliable data base by integrating data from existing information sources.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

We concluded that it would be necessary to generate a data base specifically for this purpose. For the reasons stated above, it was not feasible to generate a data base using actual costs, but it was feasible to do one based on charges. In the absence of valid studies to the contrary, we think that, for this particular service, charge data is a reasonable proxy for setting these maximum fees until we are able to obtain cost data. Our conclusion is reinforced by the provision of the statute requiring physicians to agree not to refuse to vaccinate a child because of the family's inability to pay the administration fee and by the knowledge that many physicians currently either do not bill indigent patients their full charge or accept less than full payment from them.

Given the statutory requirements that the administration fees not exceed the costs of administration, we recognize the importance of utilizing cost data in developing the regional maximum charges. We also realize that the use of charge data in developing the maximum charges may result in maximum charges that are too high. While it appears that *50237 there are no useable cost data readily available, our goal is to obtain information that can be used in setting maximum charges in the future. We will be conducting a study to accumulate accurate cost data, and will revise the maximum charges based on cost as soon as possible.

The fiscal year 1995 Department of Health and Human Services appropriations bill specifically addresses the use of charge versus cost data. (140 Cong. Rec. H9306, Sept. 20, 1994) The Secretary is directed to compute the actual cost of administering vaccines and to revise the fees in accordance with the requirements of the law. Because the appropriations bill also states that this directive is not intended to delay the start-up of the VFC program, we will utilize the interim maximum charges. However, as stated above, we will conduct a study with the goal of obtaining accurate cost data and will issue revised maximum charge amounts as soon as possible.

2. Charge Data Methodology

To obtain a data base of physician charges, we contracted with the American Academy of Pediatrics (AAP) to purchase data on the normal fee charged by its members for administering the vaccines to be covered by this program. (We note that AAP did not believe it could obtain cost data by directly surveying its membership.) The AAP had gathered these data from a national, sample survey of its members. The sample was large enough (approximately 1,114 responses) to give us confidence in the national average, but not large enough in each State to allow us to set state-by-state maximum charges without further adjustment. The preliminary results of the survey indicated that the overall average administration charge was $14.48. The final national average administration charge we obtained from the AAP was $15.09.

In order to adjust this national average for regional variations, we concluded that the most reliable means available was the Geographic Practice Cost Indices (GPCIs) established for the Medicare physician fee schedule.

The GPCI is an index developed by a joint effort of the Urban Institute (UI) and the Center for Health Economics Research (CHER) to measure the differences in resource cost among localities compared to the national average in the three components of the relative value units—physician work, practice expenses, excluding malpractice, and malpractice. These three components are weighted 54.2 percent, 40.2 percent, and 5.6 percent, respectively. The resource inputs and their weights were obtained from the American Medical Association's (AMA) Socioeconomic Characteristics of Medical Practice. The weights for the current GPCIs are from the AMA's 1989 Socioeconomic Monitoring System (SMS) Survey.

If there is more than one GPCI for a State, we used the GPCI with the highest values to derive the maximum charge in order to assure that the administration charge for providers in high cost areas would fall within our established maximum.

The GPCIs are grouped by State and substate areas. For purposes of developing the regional maximum charges, we interpreted the term "regional" used in the statute to mean "State" because of the specific grouping of the data using the GPCIs. While the GPCI is grouped by State and substate areas, we decided to use the State grouping only. The geographic area of a State is clearly identifiable by boundary lines recognized nationwide, as opposed to a substate area. In other words, substate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

areas do not necessarily represent counties, which would be an easily identifiable geographic area. Therefore, we believe using substate geographic areas would be confusing to both States and providers.

We derived the amounts specified in the chart under section II.C. of this notice as the maximum charges that may be charged for the administration of qualified pediatric vaccines for each State on the basis of the following formula: National charge data total weighted GPCI = maximum charge.

Following is an example of application of the formula for Hawaii:

Average national administration

charge = $15.09

Work expense = 1.003

Practice expense = 1.094

Malpractice expense = 1.025

Using Medicare weights to weigh components of—

Work expense = 54.2 percent

Practice expense = 40.2 percent

Malpractice expense = 5.6 percent

| Calculation: | | |
|---|---|---|
| Work expense | 1.003 54.2 percent = | .5436 |
| Practice expense | 1.094 40.2 percent = | .4398 |
| Malpractice expense | 1.025 5.6 percent = | .0574 |
| | | 1.0408 |

Hawaii's maximum charge for administration of the vaccine is:

$15.09 1.0408 = $15.71

Given the circumstances discussed in the beginning of section II.B. of this notice, the maximum charge will be based on charge data and will be applicable until we are able to obtain cost data. Our goal is to obtain information that can be used in setting maximum charges in the future. We will revise the regional maximum charges as we determine it is necessary, or in response to public comments.

*C. Maximum Regional Charges for Vaccine Administration by State*

Based on the methodology described, the maximum administration charges are as follows:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

| State | Regional maximum charge |
|---|---|
| Alabama | $14.26 |
| Alaska[FN1] | 17.54 |
| Arizona | 15.43 |
| Arkansas | 13.30 |
| California | 17.55 |
| Colorado | 14.74 |
| Connecticut[FN1] | 16.56 |
| Delaware | 15.13 |
| District of Columbia | 16.55 |
| Florida | 16.06 |
| Georgia | 14.81 |
| Hawaii | 15.71 |
| Idaho[FN1] | 14.34 |
| Illinois | 16.79 |
| Indiana | 14.47 |
| Iowa | 14.58 |
| Kansas | 14.80 |
| Kentucky | 14.17 |
| Louisiana | 15.22 |
| Maine[FN1] | 14.37 |
| Maryland | 15.49 |
| Massachusetts[FN1] | 15.78 |
| Michigan | 16.75 |
| Minnesota | 14.69 |
| Mississippi | 13.92 |
| Missouri | 15.07 |
| Montana | 14.13 |
| Nebraska | 13.58 |
| Nevada | 16.13 |
| New Hampshire[FN1] | 14.51 |
| New Jersey | 16.34 |
| New Mexico | 14.28 |
| New York | 17.85 |
| North Carolina[FN1] | 13.71 |
| North Dakota | 13.90 |
| Ohio | 14.67 |
| Oklahoma | 13.89 |
| Oregon | 15.19 |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| Pennsylvania | 15.76 |
| Puerto Rico | 12.24 |
| Rhode Island[FN1] | 14.93 |
| South Carolina | 13.62 |
| South Dakota[FN1] | 13.56 |
| Tennessee | 13.70 |
| Texas | 14.85 |
| Utah | 14.52 |
| Vermont[FN1] | 13.86 |
| Virginia | 14.71 |
| Virgin Islands | 15.09 |
| Washington[FN1] | 15.60 |
| West Virginia | 14.49 |
| Wisconsin | 15.02 |
| Wyoming[FN1] | 14.31 |

FN1 According to available information, these are Universal Purchase States. The Universal Purchase States may accept the maximum charges listed or develop their own maximum fees, as indicated under section II.D. of this notice.

*50238 D. Maximum Charges for Administration of Vaccines in Universal Purchase States*

States that have programs under which the State purchases vaccines for all children in the State (Universal Purchase States) have the flexibility to accept the maximum charges developed by HCFA or to develop their own maximum charges. We believe it is necessary that Universal Purchase States are provided sufficient flexibility in developing charges in order to ensure that there is equal access to immunizations for all children. In these States, we believe the State may wish to set one overall charge cap in order to encourage adequate provider participation. Furthermore, it is our understanding that providers should experience no cost differences between VFC program eligible children and all other children inasmuch as the provider never incurs the cost of the vaccine.

While Universal Purchase States have the flexibility to develop their own caps, they must develop these by utilizing a reasonable methodology based upon the requirements of section 1928(c)(2)(C)(ii) of the Act. The amount of the cap is not required to be set in State law. However, the authority to set an amount must be based in State law.

*E. Optional Lower Medicaid Administration Fees*

State Medicaid agencies are not obligated to set the Medicaid payment for vaccine administration at the level of the maximum charges set forth in this notice. Section 1928(c)(2)(C)(ii) of the Act allows them to set their payment at a lower level, according to their own judgment. State Medicaid agencies typically set payment rates taking into consideration a variety of factors, including the need to assure adequate participation by providers. Since the maximum charges in this notice are based on the normal charges billed by physicians, rather than on the amounts actually collected by physicians from insurers or patients, State Medicaid agencies may determine that a lower payment level is appropriate.

If the State Medicaid agency elects to pay a lower fee, it must provide assurances to HCFA, as described below, that Medicaid-eligible children will have access to vaccines. In addition, a State Medicaid agency may elect to apply the regional maximum charges in selected areas of the State and a lower fee in other areas. Any lower fees that a State Medicaid agency

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

elects to apply must be justified using the guidelines specified in section II.F. of this notice.

In the case of Universal Purchase States that elect to develop their own maximum charges, State Medicaid agencies have the flexibility to pay the maximum charge or to pay a lower fee subject to the same provisions discussed above.

*F. Documentation Guidelines for Optional Lower Medicaid Administration Fees*

1. Pediatric Services Defined

As defined in section 1926(a)(4)(B) of the Act, the term "pediatric services" means "services covered under the State plan provided by a pediatrician, family practitioner, or certified pediatric nurse practitioner to children under 18 years of age and does not include inpatient or outpatient hospital services or other institutional services."

2. Immunization Rate

In applying any of the guidelines under section II.F.3. of this notice, we believe it is necessary to identify what children would be considered immunized. In order to be counted toward the immunization rate goals discussed, a child must have received, within the year period of measure for access, all immunizations required for his or her particular age, including those immunizations under a revised schedule because of those missed from a previous year.

3. Data Requirements

If the State elects to pay an administration fee lower than the maximum charge set forth in section II.C. of this notice, it must provide, via the obstetrical/pediatric State plan amendment submittal, data that document that the lower or varying fees meet the statutory requirements of sections 1902(a)(30)(A) and 1926 of the Act and the implementing regulatory requirements of 42 CFR 447.204.Section 447.204 of the regulations specify that a Medicaid agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population.

The State may use one or more of the following guidelines to document that the statutory and regulatory requirements are met:

a. Comparison of Ratios

Under this guideline, the State would submit a comparison between the following ratios:

(i) The ratio of the number of children in the general population immunized to the number of children in the general population; and

(ii) The ratio of the number of Medicaid children immunized to the number of Medicaid children.

In order for a State to use this guideline as an equal access assurance, the ratio of Medicaid children immunized to the number of Medicaid children would have to be equal to or greater than the ratio of the general population immunized to the number of children in the general population.

b. Comparison to Private Insurance

Another alternative is for the State to do a comparison of the Medicaid fees for administration of pediatric vaccines to the administration fees paid by a major insurance company.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In order for the State to use this guideline as an equal access assurance, the Medicaid rates for the administration of pediatric vaccines would have to be set at a rate equal to or greater than the private insurance company's rates up to the established State maximum fee.

c. Practitioner Participation

The State also may compare:

(i) The number of Medicaid pediatric practitioners (which includes practitioners listed in section 1926(a)(4)(B) of the Act) who are Medicaid program- registered providers *50239 and who have submitted pediatric immunization claims; and

(ii) The total number of pediatric practitioners providing immunizations to children.

The program registered providers must have at least one Medicaid pediatric immunization claim per month or an average of 12 such claims during the year. The State would need 50 percent participation to show equal access through use of this guideline.

d. Other

States have the flexibility to devise alternative measures of equal access to immunizations. HCFA will evaluate these other methods by which States can choose to demonstrate equal access.

*G. Submittal of State Plan Amendments*

A State Medicaid agency must specify the reimbursement for the administration of pediatric vaccines (and, if applicable, submit documentation of equal access) as part of its obstetrical/pediatric payment rate State Medicaid plan amendment submittal that are due by April 1 of each year, beginning April 1, 1995 (and which are effective July 1, 1995). If the State Medicaid agency elects to pay the maximum regional amount statewide (including that established by the State in Universal Purchase States), it need only specify this in its State plan amendment submittal (no additional documentation will be needed). However, if the State Medicaid agency elects to vary the vaccine administration fee by geographic areas within the State, the State must list the administration fee for each area, and specify the methodology, and provide the data and methodology it used to demonstrate equal access to the vaccines for each geographic area where the maximum charges are not applied. This documentation requirement is consistent with the requirements currently imposed for submittal of State Medicaid plan amendments for obstetrical and pediatric payment rates under sections 1902(a)(30)(A) and 1926 of the Act. We also believe that documenting access to immunizations by each geographic area provides a more accurate picture of access and areas where access is problematic.

The State plan amendment must be submitted by December 31, 1994 and be effective on October 1, 1994. For the interim period of October 1, 1994 through March 31, 1995, States may claim Federal matching funds for the costs of administration of vaccines to Medicaid-eligible children using the maximum charges or the lower fees established on the basis of the guidance provided in this notice. For this interim State plan amendment, the State will not be required to submit the data to document access to immunizations but will be required to list the methodology by which Medicaid beneficiary access to immunizations is assured. Beginning April 1, 1995, documentation of equal access to immunizations will be required to be included as part of the yearly Obstetrical/Pediatric State plan amendment submittal in accordance with section 1926 of the Act.

III. Impact Statement

For notices such as this, we generally prepare a flexibility analysis that is consistent with the Regulatory Flexibility Act

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(RFA) (5 U.S.C. 601 through 612), unless the Secretary certifies that a notice will not have a significant economic impact on a substantial number of small entities. For purposes of a RFA, States and individuals are not considered small entities. However, providers are considered small entities.

In addition, section 1102(b) of the Act requires the Secretary to prepare a regulatory impact analysis for any notice of proposed rulemaking that may have a significant impact on the operation of a substantial number of small rural hospitals. Such an analysis must conform to the provisions of section 604 of the RFA. For purposes of section 1102(b) of the Act, we define a small rural hospital as a hospital that is located outside of a Metropolitan Statistical Area and has fewer than 50 beds.

This notice with comment period implements a provision of section 1928 of the Act. Specifically, this notice with comment period announces interim regional maximum charges that providers may impose for administering pediatric vaccines to Federally vaccine-eligible children under the VFC Program. Section 1928 of the Act directs the Secretary to establish regional maximum fees. As discussed in section II. B of this notice, HCFA contracted with the American Academy of Pediatrics to conduct a survey to obtain national charge data for the administration of pediatric vaccines. HCFA used this data to develop a national charge amount and then adjusted this amount to take into account regional variations to establish a charge for each State. The GPCIs established for the Medicare physician fee schedule were used to make this adjustment. Universal Purchase States have the flexibility to accept the maximum charges developed by HCFA or to develop their own maximum charges. HCFA is also permitting State Medicaid agencies to develop a lower administration fee than the maximum charge if they can demonstrate equal access for children to the vaccines.

The impact of implementing the provision of section 1928(c)(2)(C)(ii) of the Act is discussed further below. We do not believe that this provision will have a significant effect on a substantial number of small entities.

To the extent that a legislative provision being implemented by a notice such as this may have a significant effect on recipients or providers or may be viewed as controversial, we believe that we should address any potential concerns. In this instance, it is difficult to predict what the fiscal impact of this notice will be. There are several unknown factors. Among them are the number of program-eligible providers who will elect to administer the vaccines. In addition, State Medicaid agencies are not required to pay the maximum charges. State Medicaid agencies may establish and apply lower vaccine administration fees if they document that Medicaid children have access to immunizations to the same extent as the general population. Given the availability of free vaccines and the fact that State payments for all pediatric and obstetrical services, including, presumably, vaccine administration, have for some time been subject to access demonstration requirements under 42 CFR 447.204 and sections 1902(a)(30)(A) and 1926 of the Act, we believe that a large proportion of States will be able to demonstrate equal access for Medicaid-eligible children at rates lower than the maximum charges. In addition, should a State Medicaid agency not be able to demonstrate equal access at its current rates, the State Medicaid agency would only have to increase its rates to where there would be equal access. The publication of the maximum charge schedule will certainly create pressure in States with vaccine administration fees for Medicaid-eligible children lower than the maximums to raise those fees. However, to the extent that these States can provide the required assurances, they will not need to raise their fees. (Currently, it appears that most States pay for vaccine administration under Medicaid at rates well below the proposed maximum. This is allowable under the statute.)

Hence, the magnitude of any increase in Medicaid outlays is difficult to ascertain. Because of the pre-existing equal access demonstration requirements, we find it hard to estimate how much of any increase in charges would be attributable to the *50240 specific guidelines of this notice and how much would occur without publication of the notice. We invite public comment on the impact of both the equal access assurances and anticipated fee increases.

We are providing a voluntary regulatory flexibility analysis because of the large number of children and providers who may be affected. Normally, a regulatory flexibility analysis requires the agency to discuss various alternatives to the provisions in a notice. As discussed above, however, HCFA is implementing the provisions of section 1928(c)(2)(C)(ii) of the Act. The focus of this legislation is upon expanding the number of children who are eligible to receive free pediatric vaccines. We have provided State Medicaid agencies with an option of using a lower fee than the maximum charges set forth in this notice or using a charge established by a Universal Purchase State at their option if they can demonstrate equal access of children to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the pediatric vaccines. Because indicated Congressional intent was to expand the coverage for vaccines, we believe that permitting State Medicaid agencies to use a lower fee where they can demonstrate equal access of children to the pediatric vaccines is consistent with the statute. In addition, we note that this option, if utilized by State Medicaid agencies, will cost Federal and State governments less money than if the State Medicaid agencies were using the maximum regional charges as set forth in this notice, while simultaneously achieving Congress' goal.

A brief summary of the impact of the provisions of this notice with comment period upon various groups is provided below.

*1. Providers*

Each program-registered provider who administers a qualified pediatric vaccine is entitled to receive the vaccine without charge either for the vaccine or its delivery to the provider. This notice specifically establishes maximum regional charges for providers to administer the vaccines. As a result of these maximum regional charges, we believe that the number of providers who may be willing to administer the vaccines would be maintained or increased. In addition to a potential increase in the number of providers who may be willing to administer these vaccines, there may be an increase in the number of patients that they treat since section 1928 of the Act expands the number of children who are eligible to receive the vaccine without charge.

*2. Children*

The greatest benefit of this provision is that it expands the number of children who are eligible to receive pediatric vaccines without charge for the vaccines. We believe that there will be an increase in the number of children receiving pediatric vaccines. As the number of children who are vaccinated increases, we believe that savings will accrue as a result of a decline in the number of children who will require treatment for vaccine-preventable illnesses.

*3. States*

States may also benefit under various provisions of the VFC Program. Specifically, this program will provide free vaccines and free delivery to States thus saving States monies that would otherwise be spent on purchase and delivery of vaccines. Where they can demonstrate equal access, State Medicaid agencies are given the option of using the regional charge as specified in this notice or a lower fee. States could experience an increase in the number of children who are receiving the vaccines, thus achieving Congress' goal though increasing their pediatric immunization costs. As discussed above, fewer children may be treated for vaccine-preventable illnesses which may provide a savings to the States.

We are not preparing a rural impact statement since we have determined, and the Secretary has certified, that this notice with comment period will not have a significant impact on the operations of a substantial number of small rural hospitals.

In accordance with the provisions of Executive Order 12866, this notice was reviewed by the Office of Management and Budget.

(Catalog of Federal Domestic Assistance Program No. 93.778, Medical Assistance Program)

Dated: September 2, 1994.

Bruce C. Vladeck,

Administrator, Health Care Financing Administration.

Dated: September 23, 1994

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Donna E. Shalala,

Secretary.

[FR Doc. 94-24433 Filed 9-30-94; 8:45 am]

BILLING CODE 4120-01-P

59 FR 50235-01, 1994 WL 530057 (F.R.)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

11/26/2019
Declaration of G. Reilly
EXHIBIT 449

Page 1

1          UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   UNITED STATES OF AMERICA      CIVIL ACTION
    ex rel, STEPHEN A. KRAHLING  NO. 2:12-04374 (CDJ)
5   and JOAN A. WLOCHOWSKI,
                 Plaintiffs,
6

7          V.

    MERCK & CO., INC.,
8                Defendant.
    _____
9   IN RE:  MERCK MUMPS VACCINE  MASTER FILE NO.
    ANTITRUST LITIGATION         2:12-cv-03555(CDJ)
10

    THIS DOCUMENT RELATES TO:
11  ALL ACTIONS

12  _____

13            TUESDAY, MAY 9, 2017

14

15          Videotaped deposition of MICHELE TAYLOR,

16  held in the offices of Spector Roseman Kodroff &

17  Willis, PC, 1818 Market Street, Suite 2500,

18  Philadelphia, Pennsylvania, commencing at 9:45

19  a.m., on the above date, before Deborah L.

20  Williams, a Certified LiveNote Reporter and a

21  Notary Public in the Commonwealth of Pennsylvania.

22

23

24

25

Page 2

```
 1  A P P E A R A N C E S :
 2     ROBINS KAPLAN, LLP
          BY: EAMON O'KELLY, ESQUIRE
 3           eokelly@robinskaplan.com
          BY: MICHELLE C ZOLNOSKI, ESQUIRE
 4           mzolnoski@robinskaplan.com
          399 Park Avenue, Suite 3600
 5        New York, New York 10022
          (212) 980-7400
 6        Co-counsel for Private Plaintiffs
 7
 8     SPECTOR ROSEMAN KODROFF & WILLIS, PC
          BY: DIANA J ZINSER, ESQUIRE
 9           dzinser@srkw-law.com
          1818 Market Street, Suite 2500
10        Philadelphia, Pennsylvania 19103
          (215) 496-0300
11        Co-counsel for Private Plaintiffs
12
13     CONSTANTINE CANNON, LLP
          BY: MARLENE KOURY, ESQUIRE
14           mkoury@constantinecannon.com
          335 Madison Avenue
15        New York, New York 10017
          (212) 350-2700
16        Counsel for Relators
17
18     MORGAN, LEWIS & BOCKIUS, LLP
          BY: LISA C DYKSTRA, ESQUIRE
19           lisa.dykstra@morganlewis.com
          BY: ZACHARY M JOHNS, ESQUIRE
20           zachary.johns@morganlewis.com
          1701 Market Street
21        Philadelphia, Pennsylvania 19103
          (215) 963-5000
22        Counsel for Merck
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S :  (Continued)
 2     VENABLE, LLP
          BY: CHRISTINA L. GAARDER, ESQUIRE
 3           clgaarder@venable.com
          750 East Pratt Street, Suite 900
 4        Baltimore, Maryland 21202
          (410) 244-7638
 5        Counsel for Merck
 6
 7  ALSO PRESENT:
 8     Timothy K. Howard - Merck in-house counsel
       Phillip Leaf - Videotape technician
 9
10
11
                    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              - - -
 2            I N D E X
 3  WITNESS                    PAGE NO.
 4  MICHELE TAYLOR
 5    By Mr. O'Kelly.....................10, 241, 251
 6    By Ms. Koury.....................189
 7    By Mr. Johns.....................246
 8
 9
10
11          E X H I B I T S
12  NO.        DESCRIPTION        PAGE MARKED
13
14  Exh. 1  Notice of Rule 30(B)(6)
             Deposition.......................15
15
     Exh. 2  E-mail string and attachment,
16           Bates stamps MRK-CHA00440895
             through 440906...................56
17
     Exh. 3  E-mail string, Bates stamps
18           MRK-CHA01156694 through
             1156696...........................69
19
     Exh. 4  Proof Certificate,
20           MRK-CHA00014375 and 14376.........74
21  Exh. 5  E-mail string, Bates stamps
             MRK-CHA00072356 through 72364.....79
22
     Exh. 6  E-mail dated 10-29-14 and
23           attachment, Bates stamps
             MRK-CHA00272884 through
24           272886...........................86
25
```

Page 5

```
 1              - - -
 2          E X H I B I T S  (Continued)
 3  NO        DESCRIPTION        PAGE MARKED
 4
 5  Exh 7  E-mail string, Bates stamps
            MRK-CHA01147290 through
 6          1147301             89
 7  Exh 8  E-mail string, Bates stamps
            MRK-CHA01157658 through
 8          1157676             102
 9  Exh 9  Merck Pricing Approval
            Procedure - V2, Bates stamps
10          MRK-CHA01173899 through
            1173906             106
11
     Exh 10  E-mail dated 8-19-11 and
12           attachment, Bates stamps
             MRK-CHA00077200 through
13           77204               110
14  Exh 11  E-mail string and attachment
             Bates stamps MRK-CHA00267729
15           through 267757      112
16  Exh 12  E-mail string and attachment
             Bates stamps MRK-CHA01224684
17           through 1224690     125
18  Exh 13  E-mail dated 5-25-06 and
             attachment, Bates stamps
19           MRK-CHA00356494 through
             356535              127
20
     Exh 14  Vaccine Pricing Governance for
21           US, 11-12-13, Bates stamps
             MRK-CHA00461452 through
22           461468              141
23  Exh 15  Overview of Vaccine
             Contracting/Pricing for Private
24           Sector Physician Clinics, Bates
             stamps MRK-CHA01176531 through
25           1176573             153
```

2 (Pages 2 - 5)

Page 6

```
1              - - -
2         E X H I B I T S   (Continued)
3 NO.        DESCRIPTION        PAGE MARKED
4
5 Exh. 16  Distribution Agreement, Bates
            stamps MRK-CHA01035600 through
6           1035616...........................163
7 Exh. 17  Distribution Agreement, Bates
            stamps MRK-CHA00931264 through
8           931280...........................170
9 Exh. 18  Agreement, Bates stamps
            MRK-CHA01222724 through
10          1222781...........................171
11 Exh. 19  Agreement, Bates stamps
            MRK-CHA00868307 through
12          868321...........................174
13 Exh. 20  Agreement, Bates stamps
            MRK-CHA00902142 through
14          902146...........................176
15 Exh. 21  Printout...........................181
16 Exh. 22  Transaction data...................182
17 Exh. 23  Transaction data...................185
18 Exh. 24  Contract, Bates stamps
            MRK-CHA01371817 through 1371840....201
19
    Exh. 25  E-mail string and attachment
20          Bates stamps MRK-CHA00072713
            through 72735.....................212
21
    Exh. 26  Contract, Bates stamps
22          MRK-CHA01652529 through 1652555....229
23 Exh. 27  E-mail string and attachment
            Bates stamps MRK-CHA00071456
24          through 71502.....................241
25
```

Page 8

```
1        DEPOSITION SUPPORT INDEX
2 DIRECTION TO WITNESS NOT TO ANSWER
    PAGE    LINE
3 (None)
4
5 REQUEST FOR PRODUCTION OF DOCUMENTS
    PAGE    LINE
6 (None)
7
8 STIPULATIONS
    PAGE    LINE
9 (None)
10
11 QUESTIONS MARKED
    PAGE    LINE
12 (None)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1              - - -
2         E X H I B I T S   (Continued)
3 NO.        DESCRIPTION        PAGE MARKED
4
5 Exh. 28  E-mail dated 5-24-11 and
            attachment, Bates stamps
6           MRK-CHA00967264 through
            967276.............................241
7
8              - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
1         VIDEOTAPE TECHNICIAN:  We are now on the
2  record.  My name is Phillip Leaf representing
3  Veritext.  The date today is May 9, 2017, and
4  the time is approximately 9:45 a.m.
5         This deposition is being held at Spector
6  Roseman located 1818 Market Street, Suite 2500,
7  Philadelphia, Pennsylvania.  The caption of this
8  case is United States of America, et al., versus
9  Merck, et al.  This case is being held in the
10 United States District Court for the Eastern
11 District of Pennsylvania, case number
12 2:10-04374.  The name of the witness is Michele
13 Taylor.
14        At this time will the attorneys present
15 in the room identify themselves and the parties
16 they represent.
17        MR. O'KELLY:  Eamon O'Kelly from Robins
18 Kaplan representing the class action plaintiffs.
19        MS. ZOLNOSKI:  Michelle Zolnoski from
20 Robins Kaplan on behalf of the private
21 plaintiffs.
22        MS. KOURY:  Marlene Koury, Constantine
23 Cannon, representing relators.
24        MS. ZINSER:  Diana Zinser, Spector
25 Roseman Kodroff & Willis, for private
```

3 (Pages 6 - 9)

Appx20363

Page 10

1  plaintiffs.
2       MS. DYKSTRA: Lisa Dykstra, Morgan
3  Lewis, for Merck.
4       MR. JOHNS: Zach Johns, Morgan Lewis,
5  for Merck.
6       MS. GAARDER: Christina Gaarder,
7  Venable, LLP, for Merck.
8       MR. HOWARD: Timothy Howard, in-house
9  counsel for Merck.
10      VIDEOTAPE TECHNICIAN: Our court
11  reporter, Debbey Williams, representing Veritext
12  will swear in the witness and we can proceed.
13            - - -
14      MICHELE TAYLOR, after having been duly
15  sworn, was examined and testified as follows:
16            - - -
17      EXAMINATION
18            - - -
19  BY MR. O'KELLY:
20   Q.   Good morning, Ms. Taylor. Would you
21  just please state and spell your full name for the
22  record.
23   A.   Michele, M-I-C-H-E-L-E, Taylor,
24  T-A-Y-L-O-R.
25   Q.   Thank you. Have you ever had your

Page 11

1  deposition taken before?
2   A.   No, I have not.
3   Q.   Well, I'll describe to you in general
4  terms what's going to happen today. I'm going
5  to -- well, Ms. Koury and I are going to be taking
6  your deposition. I'm going to be mainly addressing
7  the suit by the private plaintiffs against Merck,
8  and Ms. Koury is going to be -- she represents the
9  relators and -- so I'll be on first, and then Ms.
10  Koury will come on, and then it's possible that
11  Merck's lawyers will have some questions for you
12  later in the day.
13      I'm going to be asking you a series of
14  questions about prices, catalog prices, contract
15  prices, discount and rebate programs that Merck has
16  amongst vaccines, reporting of those prices,
17  contract and catalog prices, and the data systems
18  in which pricing data is maintained and how that
19  data works. That's sort of the overview.
20      The way that I typically will address
21  those topics, I will start with each subject by
22  asking you some fairly broad, general questions
23  about the pricing, for example, catalog pricing,
24  and then I will have some more
25  specifically-focussed questions. I will also show

Page 12

1  you some documents that relate to pricing, and we
2  will discuss what's in the documents. That's sort
3  of the overview of what's going to happen today.
4       Now, do you understand that the
5  testimony here is in connection with two
6  coordinated lawsuits against Merck, one by my
7  clients, the private plaintiffs and one brought on
8  behalf of the relators?
9   A.   Yes, I do.
10   Q.   And have you read the Complaints that
11  were filed in this lawsuit?
12   A.   No, I have not read them.
13   Q.   Do you have a general understanding of
14  what the claims by the private plaintiffs are in
15  this lawsuit?
16   A.   I do.
17   Q.   Would you state for the record what your
18  understanding is?
19   A.   For the private side, that there is
20  challenges based on the fact that GSK has a
21  competitive product that may or may not make it to
22  market. Merck has a general understanding of the
23  that there's some debate as to whether or not --
24  how Merck has dealt with potency issues, that it
25  could have jeopardized in some way GSK's ability to

Page 13

1  bring the product to market.
2   Q.   And do you understand that the part of
3  the Complaint by the private plaintiffs is that
4  they paid too much for Merck's vaccines -- Merck's
5  mumps vaccines -- they paid higher prices than they
6  would have had there been a competitive market?
7   A.   Yes.
8   Q.   And today I need you to answer all of
9  your questions to the best of your ability. You do
10  understand you're expected to answer each question
11  truthfully?
12   A.   Yes.
13   Q.   And is there any reason why you couldn't
14  give complete and truthful testimony here today,
15  for example, if you were on some kind of medication
16  that impaired your ability to answer?
17   A.   No.
18   Q.   If you don't understand any of my
19  questions, don't guess at what I'm saying. Say you
20  don't understand the question, or could you
21  rephrase the question. I'll try and rephrase it,
22  because neither our side nor Merck's lawyers wants
23  questions to be answered if they're not clear and
24  if you don't understand them.
25   A.   Absolutely.

4 (Pages 10 - 13)

Appx20364

Page 14

1    Q.    The court reporter needs to make a clear
2  record of what goes on today.  So even if you
3  anticipate how my question is going to end, wait
4  until I finish before you start answering, because
5  she can't capture if we're both speaking at the
6  same time.
7        Also, if there are questions for which
8  the answer is a yes or a no, we need you to say
9  "yes" or "no" because, again, she can't get nods of
10  the head or "uh-huhs" and so forth.
11        And finally, it's a long day, seven
12  hours of deposition time and that can be pretty
13  tiring.  So it's important that you feel free to
14  take a break whenever you need one.  So don't
15  hesitate to ask for a break whenever you need one.
16    A.    Will do.
17    Q.    The only qualifier in that is that if
18  there's a question pending, I need you to answer
19  the question before we take the break.  Otherwise,
20  you control when the breaks happen.
21    A.    Very good.
22        THE REPORTER:  Can we go off the record
23  for one second?
24        MR. O'KELLY:  Of course.
25        VIDEOTAPE TECHNICIAN:  The time is now

Page 15

1  9:51.  We're going off the video record.
2              - - -
3        (Whereupon, there was an off-the-record
4  discussion.)
5              - - -
6        VIDEOTAPE TECHNICIAN:  The time is now
7  9:52.  We're on the video record.
8        MR. O'KELLY:  Mark this as Exhibit 1,
9  please.
10              - - -
11        (Whereupon, the document was marked, for
12  identification purposes, as Plaintiffs' Exhibit
13  Taylor-1.)
14              - - -
15  BY MR. O'KELLY:
16    Q.    The court reporter has handed you what
17  we've marked as Exhibit 1, and that's the Rule
18  30(B)(6) Notice that was served on Merck.
19        Do you understand that you're here today
20  as a corporate witness, you're testifying on behalf
21  of Merck as opposed to in your personal capacity?
22    A.    Yes, I do.
23    Q.    And the subject matters of the
24  deposition are set forth on pages 3 through 5 of
25  the document I've just handed to you.

Page 16

1        Have you had an opportunity to review
2  the subject matters you're going to be testifying
3  about today?
4    A.    Yes, I have.
5    Q.    And are you able to testify with respect
6  to all of those subject matters?
7    A.    Yes.
8    Q.    Thank you.  Ms. Taylor, did you do
9  anything to prepare for your deposition today?
10    A.    Yes, I did.
11    Q.    And can you describe in general terms
12  what you did to prepare?
13    A.    Spent a significant amount of time with
14  the folks in the room here today reviewing the
15  questions, the issues.
16        MS. DYKSTRA:  I'll instruct you not to
17  get into our discussions itself, just how much
18  time we spent, who you met with and the like.
19        THE WITNESS:  Will do.
20        I don't know, six or eight different
21  meetings, something like that, anywhere from a
22  few hours to full day, and met with a variety of
23  different subject matter experts within Merck to
24  make sure that I had the appropriate information
25  to address these issues including individuals

Page 17

1  from manufacturing or our management center,
2  customer contract management, regulatory
3  affairs, a few different other areas.
4  BY MR. O'KELLY:
5    Q.    Okay.  And just to be clear, when you
6  say you met with subject matter experts within
7  Merck, you're talking about Merck employees?
8    A.    Yes.
9    Q.    So these were employees that you spoke
10  with about --
11    A.    Topics relevant to the issues in this
12  document.
13    Q.    And did you review any documents in
14  preparing for the deposition today?
15    A.    Yes, I did.
16    Q.    Can you describe what types of documents
17  you reviewed?
18        MS. DYKSTRA:  Objection.  Work product.
19  She can answer if something refreshed her
20  recollection.
21  BY MR. O'KELLY:
22    Q.    You can answer.
23    A.    CDC contracts, standard operating
24  procedures, different reports with sales
25  information type of thing.

5 (Pages 14 - 17)

Page 18

1    Q.    Okay, thank you.  And did you bring any
2  notes with you today?
3    A.    I do not have any.
4    Q.    So let's just sort of go back a little
5  bit from the subjects, and I'm going to ask you
6  some general questions first.
7          Did you attend college?
8    A.    Yes, I did.
9    Q.    And where did you go to college?
10    A.    I went to undergraduate at University of
11  California - Long Beach.
12    Q.    And what degree did you take there?
13    A.    Chemistry.
14    Q.    And did you have any graduate education?
15    A.    Yes, MBA from University of Fullerton in
16  California.
17    Q.    And are you currently employed?
18    A.    Yes, I am.
19    Q.    And who's your employer?
20    A.    Merck.
21    Q.    And what's your position at Merck?
22    A.    I'm director of national customer
23  operations.
24    Q.    And how long have you been employed by
25  Merck?

Page 19

1    A.    20 years last month.
2    Q.    And in your entire 20 years at Merck,
3  have you always been director of national customer
4  operations?
5    A.    No, I have not.
6    Q.    Would you run us briefly through the
7  various jobs you've held at Merck in the 20 years?
8    A.    Sure.  I started out in sales as a
9  district manager for a couple years and then came
10  into corporate headquarters in Pennsylvania leading
11  a communications team, supporting our sales force
12  and marketing teams, and then moved to a role in
13  marketing, and in 2005 went over to the vaccine
14  division where I have been in various related roles
15  starting with national sales, moving then -- and
16  this was all US based -- and then moving to our
17  headquarters strategy contract and distribution for
18  the same private sector type customers, and then
19  eventually added in the public sector side, CDC and
20  VA, so at this point to have private and public
21  sector national account sales as well as
22  responsibility for our US contracting and
23  distribution strategy.
24    Q.    And that last description, does that
25  describe your duties today?

Page 20

1    A.    Yes.
2    Q.    The position you currently have, the
3  director of national customer operations, is that a
4  position that was newly created when you took it
5  on, or was there somebody in that position before
6  you?
7    A.    There were individuals.  Like many other
8  things at Merck, there are multiple jobs that have
9  been consolidated into one to create this position.
10    Q.    And who was your immediate predecessor
11  in -- if it's possible to describe?
12    A.    On the public sector side of the
13  business would be Eric Skjeveland.  On the private
14  sector side of the business would have been Dora
15  Dibola.
16    Q.    I think you need to spell that one for
17  the court reporter, if you can?
18    A.    D-I-B-O-L-A, I think, something like
19  that.  It's been a long time since I've written her
20  name.  She is still a Merck employee.
21    Q.    Now, in your role at Merck, have you
22  been responsible for developing pricing strategies?
23    A.    Contracting strategies.  The pricing --
24  the actual catalog pricing is established by a
25  different group.

Page 21

1    Q.    Are you in a position to discuss the
2  strategies by that different group --
3    A.    Yes, I am.  I'm involved in it, but it
4  is not my area of responsibility.
5    Q.    As we said before, if you can wait until
6  I've got the question out, even though it's obvious
7  what the question is going to be, just so that she
8  can write them both down.
9    A.    Yes, will do.
10    Q.    Thank you.
11          Now, let's start with the catalog
12  pricing.  Could you describe what the term catalog
13  price means insofar as it's used by Merck?
14    A.    Yes, it is the published price that is
15  available to all purchasers independent of any
16  contract or special discounts, fees, et cetera.
17    Q.    Now, when you say it's the published
18  price, where is it published?
19    A.    There's a catalog that is available on
20  Merck.com or through our economic affairs group.
21    Q.    And when you said it's available to all
22  customers regardless of contracts, et cetera, does
23  that mean that they have access to the information
24  or that they have access to the prices?
25    A.    They have access to the prices assuming

6 (Pages 18 - 21)

Appx20366

Page 22

1  that it's an eligible class of trade that can
2  purchase directly from Merck.
3      Q.   Now, would you explain what you mean by
4  an eligible class of trade that can purchase
5  directly from Merck?
6      A.   Sure.  So wholesalers and distributors
7  are a class of trade that can purchase directly
8  from Merck.  Physician clinics can purchase
9  directly from Merck.  Hospital acute care
10  facilities, for example, are not an eligible class
11  of trade.
12      Q.   They're not an eligible --
13      A.   No, for vaccines, for the mumps vaccine.
14      Q.   Sure, all of our questions today, unless
15  I specifically say otherwise, I think, if we can
16  just accept it's all to do with vaccines.
17      A.   Very good.
18      Q.   So we won't have to have these
19  qualifiers.
20          Now, when you say that hospital acute
21  care facilities are not an eligible class of trade,
22  how do those entities purchase Merck vaccines?
23      A.   They purchase through wholesalers.
24      Q.   And other than wholesalers, distributors
25  and physician clinics, can you list for me the

Page 23

1  other classes of trade that are eligible to
2  purchase directly?
3      A.   The CDC purchases directly from Merck.
4  For vaccines, I believe that is it.
5      Q.   So just three?
6      A.   For mumps vaccine.
7      Q.   And when we talked about the catalog
8  price, is this -- is it fair to say that's what we
9  generically call a list price?
10      A.   Yes.
11      Q.   Are you familiar with the term wholesale
12  acquisition cost or WAC?
13      A.   Yes, I am.
14      Q.   Is that also a list price?
15      A.   Yes, it is.
16      Q.   And does Merck use the term WAC or
17  wholesale acquisition cost?
18      A.   Yes, we do, not -- only to the extent
19  that our customers use it.  We usually refer to it
20  as catalog price.
21      Q.   But it's -- at least when used by
22  customers, you understand it to be synonymous with
23  Merck's catalog price?
24      A.   Yes.
25      Q.   What about the term average wholesale

Page 24

1  price or AWP, does Merck use that term with respect
2  to vaccines?
3      A.   Yes, again, to the extent that our
4  customers use that terminology.
5      Q.   And, again, you understand that with
6  respect to vaccines as used by customers, that's
7  synonymous with catalog price?
8      A.   So the wholesale acquisition price is
9  different than the average wholesale price.
10  Average wholesale price is what the -- I sometimes
11  get the two backwards.  One is what they pay when
12  they purchase from Merck.  The other is what they
13  sell it for when they sell it to the end user.
14      Q.   And by the "they" in that sentence, you
15  mean --
16      A.   The whole --
17      Q.   -- wholesalers?
18      A.   Wholesaler, yes.
19      Q.   I've consistently gotten confused
20  between those two myself.
21          Now, do any of the -- I'm going to leave
22  the CDC out because Ms. Koury is going to be
23  dealing with that later.
24          But the three classes of private classes
25  of trade -- private classes of trade, you listed

Page 25

1  wholesaler/distributors and physician clinics, and
2  what was the third one?
3      A.   It was the CDC was the third.
4      Q.   Oh, okay.  So the two classes, private
5  classes of trade that you listed, do any entities
6  within those classes purchase at the catalog price?
7      MS. DYKSTRA:  Just to be clear, I think
8  she's referring to wholesalers and distributors
9  and physician clinics as three.  I think that's
10  where we have the confusion.
11      MR. O'KELLY:  Let's go back and clarify.
12  BY MR. O'KELLY:
13      Q.   Are wholesalers and distributors one
14  class of trade, or do you make a distinction?
15      A.   One class of trade.
16      Q.   And the physician clinics are the second
17  class of trade.
18      A.   Second class of trade, yes.
19      Q.   And then the only other class of trade
20  is the CDC.
21      A.   Yeah, I should add staff model HMOs.
22  There's only one in the country that purchases
23  vaccines from us, but they are an eligible class of
24  trade.
25      Q.   And that one staff model HMO is Kaiser,

7 (Pages 22 - 25)

Appx20367

Page 26

1 right?
2    A.   Yes.
3    Q.   So of the three private classes of
4 trade, do any entities within any of those classes
5 purchase vaccines from Merck at the catalog price?
6    A.   Yes, they do.
7    Q.   Do you have a sense as to -- let's take
8 the three of them one by one.
9         Well, I guess Kaiser we can deal with
10 easily.  Does Kaiser purchase at the catalog price?
11   A.   No, they do not.
12   Q.   Do -- what percentage, if you know, of
13 wholesalers and distributors purchase at the
14 catalog price?
15   A.   I would say a hundred percent.  Well, I
16 would say 99 percent.
17   Q.   Okay.  And then of the physician
18 clinics?
19   A.   Actually, because we are talking about
20 mumps vaccine --
21   Q.   Mumps vaccine only.
22   A.   -- a hundred percent.
23   Q.   A hundred percent of the wholesalers and
24 distributors purchase at the catalog price?
25   A.   Yes.

Page 27

1    Q.   And what about the physicians' clinics?
2    A.   Probably 20 percent may purchase at the
3 catalog price.
4    Q.   Now, is it fair to say that when Merck
5 prices its vaccine products, that the starting
6 point for any subsequent changes to price is the
7 catalog price?
8    A.   Yes.
9    Q.   So you start by setting the catalog
10 price, and then if adjustments are needed through
11 contracting or through discount programs, those
12 adjustments are made to the catalog price for a
13 particular class of customers.
14   A.   Yes, for most vaccines.  That would
15 apply to MMR II, but there are other vaccines where
16 we start with the base price.
17   Q.   Okay.  Just so we understand any
18 documents that are in the record, can you explain
19 to us what the base price is?
20   A.   For products where the catalog price is
21 not a competitive price, it's not relevant in the
22 marketplace, we establish a contract base price
23 that is more similar to what the price is in the
24 marketplace, and then the discounts are off of that
25 base price.

Page 28

1    Q.   And is that base price published in the
2 same way that a catalog price is?
3    A.   No, it is not.
4    Q.   So if an entity was purchasing pursuant
5 to a contract that originated -- the pricing
6 originated with the base price, how would that
7 customer know what the base price is?
8    A.   If the customer is enrolled in a
9 contract, they would have access to those base
10 prices.
11   Q.   It's just not generally published.
12   A.   Exactly.  It's confidential information.
13   Q.   Okay.  Now, when Merck -- and, again,
14 let's confine this to the vaccines, to the mumps
15 vaccines.  When Merck is deciding what the catalog
16 price is going to be, what's the goal in setting
17 the prices or goals, plural, if there are plural
18 goals?
19   A.   Clarifying question, are you referring
20 to when Merck establishes the catalog price for a
21 product at entry, at launch, or is this just in
22 general about, say, price increases that we take
23 annually on our catalog price?
24   Q.   Very good question.  Let's look at it
25 this way just again for the record:  Does Merck

Page 29

1 periodically change the catalog price for mumps
2 vaccines?
3    A.   Yes, we do.
4    Q.   And how often does Merck typically
5 change those prices?
6    A.   Typically, it's annual, once a year.
7    Q.   And when Merck -- and it's for a year
8 looking forward.  You are deciding the price for
9 next year at a point this year.
10   A.   (Witness nodded.)
11   Q.   By the way, typically, what period in
12 the year or what month in the year does Merck set
13 the prices for the year going forward?
14   A.   It's generally in the second half of the
15 year.  In the past it's been in the fourth quarter,
16 but more recently is in the third quarter.
17   Q.   Okay.  So when Merck is establishing a
18 catalog price for the mumps vaccines for the year
19 going forward from the third to fourth quarter,
20 what's its objective in setting those prices?
21   A.   There's a lot that goes into the catalog
22 prices.  Some -- some inputs are very specific to
23 that vaccine, and some are more general across the
24 business.  So factors that are going to be more
25 relevant to the vaccine, for example, is the health

8 (Pages 26 - 29)

Appx20368

Page 30

1 economic information.
2    Q.   I'm sorry, I didn't --
3    A.   Health economic information, so the
4 value of the vaccine, cost relative to disease
5 prevented.  Some vaccines have a very low price
6 relative to their actual economic value, so
7 presumably those products have a little bit more
8 room for a price increase as opposed to those that
9 are approaching the top of their economic value.
10        We also look at what our historical
11 price increases have been so that we are relatively
12 consistent.
13        We look at access to our vaccines.  We
14 want to ensure that we don't price them in a way
15 that impedes access.
16        We look at revenue objectives so that
17 these price increases can help to improve
18 population vaccine coverage by being able to, you
19 know, do more around communications to consumers
20 about vaccines.  Price increases help to support
21 vaccine research perhaps for that vaccine or for
22 other vaccines, as well as the objective to
23 generate revenues from the price increases to
24 support manufacturing capabilities, upgrades to
25 manufacturing facilities, that type of thing.

Page 31

1    Q.   Okay.  I'm going to go back and ask some
2 questions about all of those.
3    A.   Sure.
4    Q.   Would you agree that as a very general
5 proposition that the goal of setting the catalog
6 prices is to maximize profitability for Merck
7 shareholders?
8        MS. DYKSTRA:  Objection.
9        You can answer, if you can answer that
10 question.
11        THE WITNESS:  I -- it is only one of the
12 objectives.  If that were the only objective,
13 price increases would probably be a lot higher.
14 But based on all the other things I described,
15 such as ensuring that we have good market
16 access, that we are relatively consistent with
17 what we're doing, we also don't want to create
18 to the access bucket negative financial
19 implications for providers by taking too high of
20 a price increase.
21 BY MR. O'KELLY:
22    Q.   But you do agree that maximizing value
23 for the shareholders is one of the objectives for
24 setting the price?
25    A.   I would say optimizing.

Page 32

1    Q.   Optimizing, okay.  And what's the
2 distinction you're drawing between optimizing and
3 maximizing?
4    A.   Well, I believe optimizing takes more of
5 a long-term wholistic view as opposed to just that
6 vaccine for that year.
7    Q.   And let's go back and talk about some of
8 the factors that you described to me.  Actually,
9 let me take it a different way.
10        You said a few minutes ago that where
11 there are not other constraints that you could
12 charge a lot more for the vaccine, correct?
13        MS. DYKSTRA:  Objection.
14 BY MR. O'KELLY:
15    Q.   Isn't it true that if you raise price
16 too much that some customers would be unable to
17 purchase the vaccine at the higher price?
18        MS. DYKSTRA:  Objection.  Speculation.
19        You can answer if you -- any time I
20 object and I don't instruct you not to answer,
21 you can answer if you're capable.
22        THE WITNESS:  Okay, very good.
23        It depends on the customer.  If -- if
24 it's a customer that has, you know, fixed
25 funding, then, yes, definitely could impact

Page 33

1 access.  If it is a customer whose reimbursement
2 is subsequently going to be increased, say, from
3 commercial payers, then it likely will not have
4 that impact.
5 BY MR. O'KELLY:
6    Q.   And do you know what happens when the
7 price is raised to a point where some customers are
8 unable to purchase the vaccine at that higher
9 price?  The question is, do you know -- do those
10 customers then forego vaccination or --
11    A.   I've never --
12        MS. DYKSTRA:  Objection.  Calls for
13 speculation.
14        You can answer.
15        THE WITNESS:  I've never seen that
16 happen.  I don't know.  I've not -- we've not
17 broached that -- you know, that end of the
18 spectrum.  We keep our price increases fairly
19 small, single digit.  So we've not encountered
20 that issue.
21 BY MR. O'KELLY:
22    Q.   But you do agree that there -- that if
23 Merck were to raise its prices too much that there
24 would be some customers who wouldn't be able to
25 purchase at a higher price.

9 (Pages 30 - 33)

Appx20369

Page 34

1         MS. DYKSTRA:  Objection.
2         THE WITNESS:  It may be that they choose
3    not to.  I don't know.
4    BY MR. O'KELLY:
5         Q.    And would you agree at the opposite end
6    that if Merck priced the vaccine too cheaply that
7    it would be leaving potential revenue on the table?
8         A.    Agreed.
9         Q.    So would you then -- strike that.
10         Is it fair to say that when Merck is
11   deciding on the catalog prices for its vaccines
12   that a factor it takes into account is to balance
13   the price to optimize its revenues so that it's not
14   so low as to be leaving money on the table but not
15   so high as to be potentially driving off some
16   customers?
17        A.    Yes, I think that's fair, but also
18   taking into consideration all of the other
19   objectives for investments that need to be made.
20        Q.    Now, let's go back over the factors that
21   you listed a little earlier.  You talked about the
22   health economic information.  And as I understand
23   it, you were describing a balance between the costs
24   of producing the vaccine versus the economic
25   benefit of the disease prevented.

Page 35

1         Am I characterizing that correctly?
2         A.    I would say instead of the cost of
3    producing the vaccine, it would be the cost to
4    purchase the vaccine relative to the disease -- the
5    cost of treating the disease that it prevents.
6         Q.    So when we say "cost" here, we're
7    describing the price that the ultimate purchaser
8    pays for the vaccine versus the economic benefits
9    of avoiding the disease that would have occurred
10   but for the vaccine.
11        A.    Yes.
12        Q.    And how does Merck -- can you describe
13   to us how Merck goes through that process
14   specifically with respect to the mumps vaccines?
15        A.    Yeah, there is -- our outcomes group
16   does a lot of analysis -- mostly for new products,
17   as they're in development and bringing them to
18   market, will do a lot of analysis to determine what
19   the cost is to treat the disease so that we can
20   then compare that generally drives the price at
21   which we bring the product to market.  But,
22   ultimately, it is the CDC that is -- they do their
23   own analysis, the same type of analysis, and that
24   is largely what is driving the health economic.
25        Q.    Now, you said that this outcomes group

Page 36

1    does this evaluation when there are new products
2    coming to market.  The MMR vaccine has been on the
3    market for quite some time; isn't that true?
4         A.    Yes.
5         Q.    Does the outcomes group do a similar
6    evaluation with respect to, you know, a product
7    like the MMR II -- in fact, to the MMR II which is
8    not a new product?
9         A.    Yes, they do from time to time.  I don't
10   think it's updated too terribly often, but there is
11   occasion when they go back and look at existing
12   data.
13        Q.    When you say the outcomes group doesn't
14   do this too often, do you have a sense as to how
15   often they do it specifically with respect to the
16   mumps vaccines?
17        A.    I would say, if I had to guess --
18        MS. DYKSTRA:  Objection.  You don't --
19   you shouldn't guess.
20   BY MR. O'KELLY:
21        Q.    Don't guess.  Neither of us wants you to
22   guess.
23        A.    I think they go many years without doing
24   it, unless there's a specific question that needs
25   to be answered.

Page 37

1         Q.    And, again, I'm not asking you to guess,
2    but do you know when was the last time that they
3    did it?
4         A.    I believe that they did it last year,
5    but I don't know if it was based on new analysis.
6    There was new data that was generated, but I don't
7    know if it was generated from studies or inputs
8    that were old or whether it -- for example, if they
9    went out and got new data as to what it cost to
10   treat mumps.  I don't know.
11        Q.    Do you know what -- I presume that this
12   outcomes group produced some written work product
13   that describes this analysis and their conclusions?
14        A.    Yes.
15        Q.    Do you know what that -- may I call it a
16   report -- what that report was called?
17        A.    I do not know.
18        Q.    Who within Merck would know that?
19        A.    Somebody in our economic affairs group.
20        Q.    And do you know if that document was
21   produced to us in this lawsuit?
22        A.    I do not know.
23        Q.    And do you know why that evaluation of
24   the MMR II vaccine was done last year by the
25   outcomes group?

10 (Pages 34 - 37)

Page 38

1    A.   Yes, it was -- it was done to support an
2  evaluation of our overall strategy for taking price
3  increases.  It was not specific to the mumps
4  vaccine.
5    Q.   Now, another factor that you said was
6  taken into account when deciding on the catalog
7  prices was a look at historical price increases.
8        Could you describe what you meant by
9  that?
10    A.   Just looking back over the last five
11  years to see, you know, what has our trend been.
12    Q.   And how does that affect the price for
13  the year going forward for which you are now
14  establishing the price?
15    A.   Just to the extent that we want -- we
16  want to be relatively consistent -- not exactly
17  consistent, but relatively consistent so that we
18  don't cause unintended, you know, economic --
19  negative economic issues for purchasers.
20        So, for example, if payers had not
21  anticipated this type of price increase, their
22  budgets may not have included it, so it could
23  create some challenges for them.  Because we don't
24  publish our price increases years in advance, we
25  assume that payers are looking at our historical

Page 39

1  price increases to determine how much they should
2  budget for in the future.  So that's just one
3  example of why we would want to be mindful of what
4  our historical price increases have been.
5    Q.   So if you had been running at a steady 4
6  percent increase for the previous five years, you
7  would have to think hard as to whether you should
8  increase it, say, by 9 percent for the coming year;
9  is that correct?
10    A.   Yes, unless there was a very unique
11  situation that was specific to that product, that
12  is how we would look at it.
13    Q.   And do you recall any such unique
14  situations arising with respect to either the MMR
15  II or the ProQuad vaccine?
16    A.   No, I do not.
17    Q.   Then another factor you mentioned was
18  access.  You said that in setting prices, you don't
19  want to impede access.
20        Could you describe for us what you meant
21  by that?
22    A.   If the price -- as I mentioned before,
23  if the price of vaccines was too high, there may be
24  organizations that don't have the funding for it.
25  There also could be situations where if it's --

Page 40

1  becomes too expensive for practices to inventory
2  the product that they may choose to get out of the
3  vaccination business, which would probably not be
4  good for patients if there's fewer vaccinators.
5    Q.   And what do you mean by that it might
6  become too expensive for them to inventory the
7  product?
8    A.   If -- because there is cash outlay for
9  providers because they purchase the product, they
10  take it in inventory, and until they vaccinate and
11  submit for a claim for reimbursement, they're
12  out -- they're out of the cash during that time.
13    Q.   So an increase -- an excessive increase
14  in price would raise the customer's inventory
15  price -- inventory cost -- excuse me --
16    A.   Exactly.
17    Q.   -- to the point where it might become
18  unfeasible for them to purchase the vaccine?
19    A.   Yes, theoretically that is a concern.
20    Q.   Then you talked about revenue objectives
21  to improve coverage.
22        Could you describe what you meant by
23  that?
24    A.   Investments in different programs that
25  help to improve provider and consumer appreciation

Page 41

1  for the benefits of vaccines so that we have more
2  people vaccinated.
3    Q.   You mean like public education?
4    A.   Yes.
5    Q.   Countering anti-vaccine?  I'm trying to
6  find a neutral word for propaganda.
7    A.   It could just be disease awareness,
8  direct consumer communications about the importance
9  of various diseases.  It could be independent of
10  anti-vaccinators.
11    Q.   And do you know what proportion of
12  Merck's revenues from the mumps vaccines goes into
13  that type of effort?
14        MS. DYKSTRA:  Objection.
15        THE WITNESS:  No, I don't.
16  BY MR. O'KELLY:
17    Q.   You also talked that one of the
18  objectives in determining the pricing was to
19  generate revenues that would support vaccine
20  research.
21        How much does Merck spend on vaccine
22  research pertaining to the MMR II and ProQuad
23  vaccines?
24        MS. DYKSTRA:  Objection.
25        THE WITNESS:  I do not know.

11 (Pages 38 - 41)

Page 42

1  BY MR. O'KELLY:
2      Q.   When this factor is being taken into
3  account in determining the catalog prices for the
4  MMR II and ProQuad vaccines, how is it factored in?
5  Let me maybe rephrase the question in a way that
6  may be more comprehensible.
7          There's a group of people at Merck, I
8  assume, determining what the catalog price for
9  these two vaccines is going to be for next year,
10  right?
11     A.   Yes.
12     Q.   And you said that one of the factors
13  that that group takes into account is whether it
14  will be feasible to generate revenues to support
15  vaccine research arising out of this price
16  increase.
17          How do they determine -- do they say,
18  "Gee, we'll raise it a quarter percent or half
19  percent to generate revenues for vaccine research"?
20  How is that factor --
21     A.   It is nothing that precise.  It is just
22  a general objective around operating expense.  And,
23  you know, looking at the business as a whole, that
24  the more revenues we generate, the more opportunity
25  we have to reinvest in research.  But it is not

Page 43

1  vaccine specific, nor is it a specific mathematical
2  objective that's attached to our annual price
3  increases.  It's much broader.
4      Q.   And then when you said that there was
5  also the objective of generating revenues to
6  support manufacturing facilities, is that the same
7  consideration?
8      A.   Yes.
9      Q.   So it's -- the purpose is to generate
10  revenues to generally support Merck's ongoing
11  activities, including research and manufacturing?
12     A.   Yes.
13     Q.   Thank you.  Now, when Merck is
14  evaluating pricing -- catalog price increases, does
15  it take into account the cost of producing the MMR
16  II and ProQuad vaccines?
17     A.   Not that I'm aware of because -- I mean,
18  obviously, when a product is brought to market,
19  certainly, but once it's established in the
20  marketplace, I don't know that that is directly
21  impacting -- or directly driving our price
22  increase.  It's more of a calculation that's done
23  afterwards.  It's just a fact.
24     Q.   With respect to the mumps vaccines, do
25  you have an understanding of what percentage of the

Page 44

1  catalog price reflects the cost of producing --
2  producing and selling the vaccine?
3          MS. DYKSTRA:  Objection.
4          THE WITNESS:  No, I do not.
5  BY MR. O'KELLY:
6      Q.   Now, these vaccines or at least the MMR
7  vaccine and the general strain have been on the
8  market for quite a long time.
9      A.   Yes.
10     Q.   So are there any ongoing research costs
11  associated with the MMR II and ProQuad vaccines?
12         MS. DYKSTRA:  Objection.  To the extent
13     that this does not relate to the catalog price
14     or something identified in your 30(B)(6), she
15     can answer in her personal capacity.
16         MR. O'KELLY:  Yeah, what I'm trying to
17     understand is to what extent, if at all, the
18     cost of producing and selling the product goes
19     into the pricing position.
20         MS. DYKSTRA:  I think she answered that
21     question.
22         MR. O'KELLY:  Okay.
23  BY MR. O'KELLY:
24     Q.   In your personal capacity, speaking from
25  your own personal knowledge, rather than as a Merck

Page 45

1  representative, do you have an understanding as to
2  what percentage of the catalog price reflects the
3  cost of producing and selling the MMR II and
4  ProQuad vaccines?
5      A.   I do not.
6      Q.   Do you know if the cost of producing
7  these two vaccines is the same irrespective of
8  whether the product is ultimately sold to the CDC
9  or to private purchasers?
10     A.   I do not believe there's any difference
11  in the manufacturing cost.
12     Q.   Thank you.
13         Do you take into account benchmarks like
14  the CPI when determining what prices to set for the
15  catalog price for the MMR II and ProQuad vaccines?
16     A.   Not on the private sector side of the
17  business.
18     Q.   Do you take into account when pricing
19  vaccines the existence of competitors in the
20  marketplace?
21     A.   Yes, we do.
22     Q.   And how does that factor play out in
23  determining the price -- the contract price that
24  you're going to charge for the forthcoming year for
25  vaccines?

12 (Pages 42 - 45)

Appx20372

Page 46

1     MS. DYKSTRA:  Objection.  Are you
2  limiting your question to the mumps vaccine or
3  more broadly?
4     MR. O'KELLY:  It was a more broad
5  foundational question so I can ask her about the
6  mumps vaccine, if that's all right.
7     MS. DYKSTRA:  Yes.
8     THE WITNESS:  Because on the private
9  sector side of the business we sell our vaccines
10  in portfolio agreements where the vaccines are
11  generally bundled together, that we tend to not
12  look at a product-versus-product price but,
13  rather, portfolio-versus-portfolio.
14  BY MR. O'KELLY:
15     Q.  Okay.  And can you describe how that
16  would play out specifically when establishing the
17  prices for the mumps vaccines?
18     A.  So as we look at all the products that a
19  provider would need to buy from Merck, including
20  the mumps vaccine, it would be included in that
21  cost, and then we would compare that to them
22  purchasing all the products they needed for
23  vaccinating a child, including those sole-source
24  products that they would have to buy from Merck,
25  but then assuming that they bought the competitive

Page 47

1  products from a different manufacturer, what would
2  the total cost be, and it's that cost for the full
3  portfolio that we're looking at.  Obviously each
4  product in the portfolio is impacting that bottom
5  line, but it's really the bottom line that we're
6  looking at.
7     Q.  And when you use the term "sole-source
8  product" in that answer, you're referring to
9  products like the MMR II and ProQuad for which
10  there is not currently a competing product
11  available in the United States?
12     A.  Yes, I am.
13     Q.  And when Merck is establishing the
14  contract price for the mumps vaccines, does it take
15  into account the fact that there is not currently a
16  competing product for either of those products?
17     A.  Only to the extent that it -- you know
18  the total portfolio value, we want it to be
19  relatively similar to other portfolios in the
20  marketplace.
21     Q.  And that applies even at the contract --
22  excuse me -- the catalog price level as opposed to
23  the contract price level.
24     A.  No, I'm sorry if I misunderstood your
25  question.  That would not impact the catalog price.

Page 48

1     Q.  Okay.  So let's take a step back then
2  and go over that again because I don't want there
3  to be any confusion.
4       So when Merck is establishing the
5  catalog price for vaccines, does it -- generally,
6  does it take into account the existence of
7  competing products for those vaccines?
8     A.  When we're setting the catalog price?
9  To some extent -- to the extent that it would
10  impact the full portfolio.
11     Q.  Even at the level of setting the catalog
12  price?
13     A.  Well, at taking the annual price
14  increases.
15     Q.  Taking the annual price increases?
16     A.  Yes.
17     Q.  So you look at the impact of competition
18  for some of the products in the portfolio of having
19  competition for those specific products.
20     A.  It is -- so for products where we have
21  competition, as we're deciding whether or not we'll
22  take a price increase, it is -- it's hard to answer
23  that because it is really to the extent that it
24  impacts the portfolio total.  But obviously on the
25  other -- when you're comparing it to other

Page 49

1  manufacturers' portfolios, because the same product
2  is in each portfolio, it can have an impact there.
3     Q.  But do you take the existence of
4  portfolio into account when you're setting the
5  catalog prices for the individual products?
6     A.  To some extent.  It's a secondary
7  consideration.
8     Q.  And then with respect to the MMR II and
9  ProQuad vaccines specifically, what impact, if any,
10  does the fact that they are sole-source products
11  have on determining the catalog price?
12     A.  It does not, not significantly.  It's
13  treated the same.  As I described before, all the
14  various factors that we consider, and those would
15  be applied to both sole-source and multi-source
16  vaccines.
17     Q.  So let me just again, before we leave
18  this, be sure that I understand your testimony.  Am
19  I correct that it's your testimony that the
20  existence or nonexistence of competing products for
21  the MMR II and ProQuad vaccines doesn't impact the
22  process of establishing catalog prices for those
23  products?
24     A.  No, it would not be -- it would be --
25  that's difficult to answer the question because

13 (Pages 46 - 49)

Page 50

1 there is not a competitor. It is -- can you
2 rephrase the question again? I just want to make
3 sure that I --
4        MR. O'KELLY: Can you read it back? I'm
5    not sure if I can rephrase it.
6              - - -
7        (Whereupon, the pertinent portion of
8    the record was read.)
9              - - -
10       MS. DYKSTRA: Objection to form.
11       THE WITNESS: I would say no.
12       MR. O'KELLY: And I understand the
13   objection to form.
14 BY MR. O'KELLY:
15    Q.   So you're saying, no, that I'm not
16 correct?
17    A.   Yes.
18    Q.   It was a badly-phrased question, which
19 is why Ms. Dykstra's objection.
20       So I'm not correct that the existence or
21 nonexistence of competing products doesn't play
22 into Merck's catalog pricing process.
23       MS. DYKSTRA: Objection to form. I
24   think there's just maybe one too many negatives
25   in that.

Page 51

1        MR. O'KELLY: I'm trying to get a wrap
2    on what her testimony is. Let's try again.
3 BY MR. O'KELLY:
4    Q.   The two mumps vaccine products do not
5 have -- they're sole-source products that do not
6 have a competitor in the marketplace.
7        Does the fact that they don't have a
8 competitor in the marketplace affect the pricing --
9 the catalog pricing decisions for those products?
10    A.   As it relates to the individual
11 products, no, it does not impact it. As it would
12 impact the portfolio, it could.
13    Q.   Okay, we'll come back to that.
14    A.   It's complicated.
15    Q.   Now, when the catalog prices are being
16 set, does Merck take into account customer
17 reactions to the price increase?
18    A.   Yes, we do.
19    Q.   And can you describe how that plays into
20 the process?
21    A.   We collect feedback that is provided to
22 us reactively through our sales force, and that
23 information is considered. It is shared with
24 decision-makers, and we do what we can to avoid
25 those negative reactions. It also drives the

Page 52

1 communications that we provide to our sales force
2 when we are taking pricing actions so that we can
3 help them manage questions and comments,
4 frustrations from customers.
5    Q.   And when you talk about negative
6 reactions, can you say for the record what that
7 means?
8    A.   No one likes price increases. So
9 there's generally just an emotional reaction to a
10 price increase, even if it's a 2 or 3 percent price
11 increase.
12    Q.   Has Merck ever reversed a decision to
13 increase the price of a vaccine in response to
14 negative reactions from the marketplace?
15    A.   Are you referring to a situation where
16 we had already announced a price increase? No, I'm
17 not aware of us doing that.
18    Q.   So when there's negative reaction to an
19 announced price increase, you mentioned that there
20 was communications by Merck with the customers.
21 Could you describe, generally, what the nature of
22 such communications is in a circumstance where
23 there's a negative reaction from the customers?
24    A.   We provide our sales force with talking
25 points that help them describe why Merck takes

Page 53

1 price increases. It helps address misconceptions
2 about price increases.
3        For example, providers are getting hit
4 with price increases from many vaccine
5 manufacturers, and so they might feel like they're
6 being hit with multiple price increases every year,
7 and they're not recognizing that isn't Merck. It's
8 other manufacturers as well.
9        So providing them with talking points to
10 reminder providers that, generally speaking, we
11 don't take pricing actions more than once a year
12 for each of our vaccines. And in addition, talking
13 points to help them communicate the solutions that
14 Merck puts in the marketplace to help address some
15 of the temporary financial impacts of price
16 increases.
17    Q.   What do you mean by "the temporary
18 financial impacts"?
19    A.   When we take a price increase,
20 it general -- we -- any manufacturer takes a price
21 increase, it will take managed care a number of
22 months to get the information into their systems
23 and get their reimbursement updated. In the
24 meantime, the provider is paying the higher price
25 but getting the lower -- but the old reimbursement.

14 (Pages 50 - 53)

Appx20374

1        So, for example, in our contracts we
2  allow customers to purchase -- once we announce
3  a price, we allow them to purchase at the old price
4  for 90 days while everyone waits for managed care
5  to catch up. Hopefully that keeps them from going
6  under water.
7      Q.  Thank you.
8        THE WITNESS:  Would this be a good time
9  for a break?
10       MS. DYKSTRA:  Yup. We've been going for
11  an hour. Is that good with you?
12       MR. O'KELLY:  That's perfectly fine with
13  me.
14       VIDEOTAPE TECHNICIAN:  The time is
15  10:50. We are going off the video record.
16           - - -
17       (Whereupon, a recess was held.)
18           - - -
19       VIDEOTAPE TECHNICIAN:  The time is now
20  11:01. Back on the video record.
21       MS. DYKSTRA:  Ms. Taylor wanted to
22  clarify one answer to a question, if that's
23  appropriate right now.
24       MR. O'KELLY:  Of course.
25       THE WITNESS:  The question regarding do

1  we -- does whether or not we have competition
2  for a product impact the catalog price increase.
3  I feel like I haven't done a really good job of
4  answering that.
5        As I said, it is taken into
6  consideration when we look at the total
7  portfolio impact. However, for that particular
8  product, it may not necessarily impact it.
9        For example, with RotaTeq, we do have a
10  competitor in the marketplace, but, yet, we
11  still take price increases.
12       Likewise, MMR II, we don't have a
13  competitor in the marketplace, and we also take
14  price increases, but we're not taking unusually
15  high price increases because of all the other
16  factors that we talked about.
17       So, in the end, it isn't -- it isn't
18  really changing the price increase that much,
19  but it is considered when we do it.
20 BY MR. O'KELLY:
21     Q.  You used the expression there "unusually
22  high price increases"?
23     A.  Yes.
24     Q.  What do you mean by unusually high price
25  increases?

1      A.  It's double digit. 15 percent as
2  opposed to 5 percent.
3      Q.  Do you have any vaccine products where
4  you take annual increases of 15 percent?
5      A.  We have. Several years ago with
6  Pneumovax-23, a couple times we did take a
7  15 percent price increase.
8      Q.  What would you regard as not being an
9  unusually high price increase?
10     A.  5 percent.
11     Q.  So 5 percent is not unusually high, and
12  15 percent is unusually high.
13     A.  Yes.
14     Q.  What about 10 percent?
15     A.  That would be on the upper end.
16     Q.  Okay, thank you.
17           - - -
18       (Whereupon, the document was marked, for
19  identification purposes, as Plaintiffs' Exhibit
20  Taylor-2.)
21           - - -
22 BY MR. O'KELLY:
23     Q.  I've asked the court reporter to mark as
24  Exhibit Number 2 a document that's Bates numbered
25  MRK-CHA00440895. See that number down at the

1  bottom, Ms. Taylor? And with some of these
2  documents, if I need to refer to a specific page, I
3  use the last four digits of the Bates number.
4      A.  Okay.
5      Q.  Sometimes if a document has internal
6  page numbering, like 1 through 15 or something, it
7  might be easier to use those. But if I say, "Look
8  at Bates number 1234," that's what I'm referring
9  to.
10       Do you recognize this document?
11     A.  Yes, I do.
12     Q.  And could you describe for the record
13  what it is?
14     A.  I don't -- I should clarify, I don't
15  recognize this specific one from 2012, but it
16  appears to be a slide presentation that was
17  developed to review our annual price increase
18  recommendations.
19     Q.  And can you tell us what the term --
20  what the term "catalog pricing action" means? I
21  see it in a lot of documents.
22     A.  That would refer to our annual price
23  increase on the catalog or list price.
24     Q.  Now, is it possible that a pricing
25  action in a particular year might result in no

15 (Pages 54 - 57)

1 price increase for a particular product for that
2 year?
3     A.    Generally, if we're referring to a
4 pricing action, it's because we are taking price.
5 If we're not taking price, there would be no price
6 action.
7     Q.    And when you say "taking price," you
8 mean increasing the price?
9     A.    Yes.
10     Q.    Thank you.  And the first page of this
11 document is a cover e-mail from Todd Nichols to
12 Julie Gerberding.  And it says, "Julie, per our
13 conversation last week, Jim and I met with the
14 pricing team to look at various options for the
15 proposed pricing actions for the Ped Portfolio."
16 There's a redacted piece.  It says, "Attached is a
17 background deck that is consistent with the
18 proposal for a 4% price increase.  The pricing
19 document will follow for your approval within the
20 next couple of days."
21         First of all, do you know who these
22 individuals are?
23     A.    Yes, I do.
24     Q.    And for the record, can you tell us who
25 they are?

1     A.    Todd Nichols led our US operations team
2 at this time.  Julie Gerberding was the president
3 of Merck Vaccines at the time.  Jim Hall was the
4 head of finance.  And Jacques Cholat was the head
5 of global marketing.  Steve Egge was the head of US
6 marketing.  And Tammy Sprague was the lead on
7 economic affairs or our global pricing team.
8     Q.    And what's the purpose of Mr. Nichols --
9 well, first of all, do you understand -- who do you
10 understand typically prepares these types of
11 PowerPoints?
12     A.    Generally would be a collaborative
13 effort between finance, economic affairs and US
14 commercial operations.
15     Q.    And do you understand what's the purpose
16 of Mr. Nichols sending this PowerPoint to Ms.
17 Gerberding?
18     A.    Let me flip through it quickly just to
19 make sure I'm not making any incorrect assumptions
20 by looking at just the cover memo.
21         It looks like it was just an advanced
22 notice to Julie Gerberding that she would be
23 receiving a document to approve these price
24 increases, and Todd is letting her know that this
25 is the team's recommendation, so asking for her

1 agreement to approve these pricing increases.
2     Q.    And for the record, these price
3 increases are a 4 percent increase on the products
4 that are covered in this PowerPoint, which include
5 the MMR II and the ProQuad vaccines.
6     A.    Yes.
7     Q.    The redactions you see are -- they're
8 related to other products that are not the subject
9 of the lawsuit.
10         Now, on the page that's numbered 2 of
11 the PowerPoint that's Bates numbered 0897, it's
12 headed "Pediatric Catalog Pricing Action
13 Recommendation," and it's got, "4% Price Increase
14 effective September 25, 2012."  Underneath that
15 there's a gray box that says, "These price
16 adjustments will impact private sector contracts
17 30-60 days following the pricing action, and will
18 have an impact on FSS pricing as of January 2013,
19 and will be considered during the CDC contract
20 negotiation in April 2013."
21         Could you describe for the record what
22 the meaning of that language in that box is?
23     A.    The reference to the impact to private
24 sector contracts 30 to 60 days following a pricing
25 action means that for some -- I referenced before

1 the 90 days that we currently allow customer --
2 contracted customers to purchase at the old price.
3 Back in 2012, some customers had 30 days in their
4 contract to purchase at the old price, and some
5 customers had 60 days to purchase at the old price,
6 and so, therefore, the 30 to 60 days following the
7 announcement of the price increase before customers
8 are actually impacted.
9     Q.    And let me just stop you there for a
10 moment.  How would one identify -- are there
11 documents from Merck that would allow us to
12 identify which customers were subject to the 30-day
13 or 60-day grace period, if you will, before the
14 price rise takes effect?
15     A.    Yes, they're always written in the
16 contract terms associated with that contract.
17     Q.    Now, with respect to the distributors
18 and wholesalers, if I recall correctly, you
19 testified earlier that they don't have contract
20 pricing for the MMR II or ProQuad.
21     A.    Yes.
22     Q.    So does that mean that with respect to
23 that class of trade that these price increases
24 would take effect as soon as the pricing action --
25     A.    Yes.

16 (Pages 58 - 61)

Appx20376

Page 62

1       THE REPORTER:  Hold on.  "As soon as
2   the" what?
3   BY MR. O'KELLY:
4       Q.   The pricing action went into effect?
5       A.   Yes.
6       Q.   And then with respect to Kaiser and to
7   the physician practice groups, it would be -- one
8   would need to go to the individual contract for
9   each of those to determine when the new prices
10   kicked in.
11       A.   Yes, that's true.
12       The impact to the federal supply
13   schedule as of January 2013, is just a formulaic
14   calculation that our government pricing does to
15   determine what the impact -- future impact to the
16   federal supply schedule is.
17       And then consideration will be given
18   during the CDC contract negotiations in April 2013,
19   when we develop our recommendations for the
20   upcoming CDC contract, we generally look to see
21   what our price increases -- what we -- what price
22   increases we took in the private sector the time
23   period before that.
24       Q.   Okay, thank you.
25       Then if we look at the next page, it's

Page 63

1   headed, "2012 Profit Plan and May Forecast
2   Assumptions."
3       In general, what is this page or this
4   slide communicating?
5       A.   The profit plan is our annual planning
6   process, and then they update throughout the year
7   the forecast based on what's actually happening.
8   So based on data through May, they had updated the
9   forecast.
10       Q.   So what does the zero percent with
11   respect to MMR II and ProQuad in that first column
12   reference?
13       A.   I'm not sure.  I assume it's the price
14   increase, but I don't know -- it doesn't make sense
15   because the forecast piece I don't understand.
16       Q.   Does it perhaps relate to revenues?
17       A.   Potentially.
18       Q.   And then underneath there's a grayed
19   box, and the part that's not redacted says, "Profit
20   Plan assumed competition for MMR II in 2012 (now
21   expected much later)."
22       Do you understand what that refers to?
23       A.   I assume that when they were developing
24   the 2012 profit plan in 2011 that there was an
25   assumption that we would potentially have

Page 64

1   competition from MMR II in the marketplace the
2   following year, but that assumption changed in
3   2012.
4       Q.   And what was the significant of that
5   assumption, the assumption that there would be
6   competition for the MMR II?
7       A.   I -- as I look at this more closely, I
8   believe these probably were financials and not
9   price increases.  So it's probably to the extent
10   that we had assumed a small loss in market share.
11   From these numbers, it looks like it probably would
12   have been towards the end of 2012.  So without
13   competition coming that year that they don't
14   expect, you know, to lose the market share.
15       Q.   Now, when Merck faces a loss in market
16   share during -- excuse me -- owing to a competitor
17   coming onto the marketplace, does that affect
18   Merck's pricing decisions in subsequent years?
19       A.   I'm sorry, can you ask the question
20   again?
21       Q.   When Merck experiences a drop in market
22   share because of a competitor coming onto the
23   market, does that affect Merck's pricing decisions
24   with respect to that product in future years?
25       MS. DYKSTRA:  Objection.  I'm going to

Page 65

1   permit her to answer in her personal capacity
2   because the entire 30(B)(6) is limited to the
3   mumps vaccine, and since that situation hasn't
4   happened, you can ask the question, but she can
5   answer in her personal capacity.
6       MR. O'KELLY:  Okay.
7       THE WITNESS:  To the -- very much in
8   line with the answer that I provided before with
9   regards to how having competition in the
10   marketplace does or does not impact our
11   decisions around pricing may have more of an
12   impact on the discount that we would provide,
13   potentially, but it may not even be on that
14   product, but probably would -- would not be
15   impacted by the actual market share.
16   BY MR. O'KELLY:
17       Q.   So, again, just to be clear, if I
18   understand you, you're testifying that a loss of
19   market share due to competition entering the market
20   doesn't lead to a reduction in prices to try to
21   preserve market share.
22       A.   It's not so much the loss of market
23   share, but that we have a competitor.  So when we
24   do our portfolio analysis, because there is an
25   option, it changes the calculation.

17 (Pages 62 - 65)

Appx20377

Page 66

1    Q.   Now, on the next page, page 4 of the
2  PowerPoint, it says, "Other Pricing Evaluated," and
3  there's two bullet points, "5%" and "6%."
4        The third bullet says, "Incremental
5  Revenue versus the 4% pricing action did not
6  justify the action in light of other
7  considerations."
8        Do you know what that means?
9    A.   I can -- I believe I -- considering,
10 based on the other information in this document,
11 that at this point we did not believe there was
12 competition, I'm assuming the other considerations
13 they're referring to are many things we've already
14 talked about such as access, the perception in the
15 marketplace, negative impact to purchasers, et
16 cetera.
17    Q.   And then on the next page there's a
18 slide headed, "2012 Financial Upside vs May
19 Forecast at 4, 5 and 6% Pricing Action," and then
20 there's a chart underneath that.
21        In general terms, do you know what this
22 slide is communicating?
23    A.   I believe it is simply taking the
24 forecasted volume and applying a 4 percent, a 5
25 percent and a 6 percent price increase to determine

Page 67

1  what the impact is to revenue for those various
2  price increases.
3    Q.   And then if we can skip ahead to slide
4  7, and this slide is headed, "Other Considerations
5  for Level of Price Increase," and then there's a
6  series of bullet points.  The first one is, "CPI*
7  1.7%, Medical CPI* 4%, Mean of Pharma Pricing
8  Actions Year to Date 10%," and several others.
9        Do you have an understanding as to what
10 this slide is generally trying to communicate?
11    A.   Yeah, I believe we are just trying to
12 compare what our 4% price increase looks like
13 compared to other factors that individuals in the
14 medical community might be anchoring to.
15    Q.   And then there's one bullet there that
16 says, "Historical Pediatrician Customer Reaction at
17 5.5% to 6% Pricing Action Level on Pediatric
18 Vaccines, Strong Customer Dissatisfaction."
19        Again, can you unpack for us what that
20 bullet is trying to communicate?
21    A.   Yeah, similar to what we discussed
22 before and according to this document at the time,
23 we only had a -- for the majority of our customers
24 a 30-day price discount.  So, you know, anything
25 above 4 or 5 percent, a provider is probably

Page 68

1  feeling that there was a negative financial impact
2  to them.
3    Q.   So does this mean that with respect to
4  vaccines that Merck would be reluctant to increase
5  prices above 5-1/2 or 6 percent because of negative
6  customer reaction?
7    A.   Yes.
8    Q.   If you can skip forward, please, to
9  slide number 9, and it says, "Considerations for
10 Timing, and there's the -- the third bullet point
11 here says, "ProQuad re-launch October 1 - Pricing
12 timed with MMR II."
13        Do you have an understanding as to what
14 that bullet point means?
15    A.   I assume that we're just reminding folks
16 that ProQuad will be relaunching in October, which
17 would be around the time of these price increases,
18 and that they want to time the price increase of
19 ProQuad with the price increase for MMR II.
20    Q.   So ProQuad had been off the market for
21 some time before 2012?
22    A.   Yes.  I don't remember the details.  I'd
23 have to look back specifically as to where -- when
24 we say "re-launch" here, it may have actually been
25 in the marketplace, but it may have been more of a

Page 69

1  promotional relaunch.  I don't know if it was
2  actually physically bringing product back to
3  market.
4        MR. O'KELLY:  Okay.  So let's set that
5  one aside.
6             - - -
7        (Whereupon, the document was marked, for
8  identification purposes, as Plaintiffs' Exhibit
9  Taylor-3.)
10            - - -
11 BY MR. O'KELLY:
12    Q.   The court reporter has marked as Exhibit
13 Number 3 a document that's Bates numbered
14 MRK-CHA01156694 through 56696.
15        Ms. Taylor, do you recognize this
16 document?
17    A.   I don't specifically recognize it, but
18 it looks pretty standard.
19    Q.   Do you understand generally what it's
20 communicating?
21    A.   It looks like it's circulation of a
22 pricing document to approve recommended catalog
23 price actions.
24    Q.   And then in this case for MMR, the
25 proposed catalog transaction is 5 percent increase,

18 (Pages 66 - 69)

1 and for ProQuad it's 7 percent increase.
2    A.   Yes.
3    Q.   Now, when we looked at the last
4 document, you expressed the view that because of
5 strong customer dissatisfaction that Merck would be
6 reluctant to raise prices by more than 5-1/2 or 6
7 percent.
8        Do you have an understanding as to why
9 the recommendation here was for a price increase
10 for ProQuad for 7 percent?
11    A.   Generally speaking, over this time
12 period we trended a little bit higher for our price
13 increases versus prior years.  It wasn't specific
14 to MMR II and ProQuad.  It was pretty much across
15 the portfolio.  Just a different leadership,
16 different perspective at the time.
17    Q.   And the period you're referring to here
18 is 2015?
19    A.   Yes.
20    Q.   And does this continue in 2016?
21    A.   Yes.
22    Q.   Does it continue in 2017?
23    A.   No.
24    Q.   What has changed?
25    A.   Really, customer feedback.  So for many

1 years we were pretty much 4 percent, and then we
2 experimented with some -- a little bit higher price
3 increases, got some negative feedback, and now are
4 course correcting a bit.
5    Q.   So by "negative feedback," does that
6 mean your last market share with some products?
7    A.   Not necessarily, no.  It is more of just
8 a customer frustration.
9    Q.   And that caused you to scale back the
10 rate of increase in 2017 relative to '15 and '16.
11    A.   Yes.
12    Q.   Now, on the second page of this
13 document -- this is in the e-mail from Emily
14 Gallagher to a group of people.  And you're one of
15 the people CC'd on this.
16    A.   Yes.
17    Q.   We won't go into who all these people
18 are.  But who is Emily Gallagher?
19    A.   She is the -- was at the time our point
20 person in economic affairs who was responsible for
21 preparing pricing documents for vaccines.
22    Q.   And in the -- sort of towards the middle
23 of the second page, just above the second
24 redaction, there is a statement that says, Based on
25 the initially planned price action date of October

1 29th, relative to the August 2015 Forecast, this
2 pricing action is expected to increase net revenue
3 by approximately 2 million in 2015 and increase net
4 revenue by approximately 41.8 million in 2016.
5        Is that referring to the decision to
6 move away from the previous 4 percent per annum
7 price increases to a 7 percent increase in this
8 period, 2015?
9    A.   Probably, but I think there's a lot of
10 redacted information here, and so that expected 2
11 million revenue impact on 2015 and 41.8 million in
12 '16 was across the entire portfolio.
13    Q.   And the entire portfolio being
14 vaccines --
15    A.   Yes.
16    Q.   -- or pediatric vaccines?
17    A.   Entire vaccine portfolios.  So could
18 include Gardasil and Pneumovax-23, et cetera.
19 Probably more related to Gardasil, but without
20 seeing those numbers, I don't know, but I know that
21 sentence would have been generalized across all the
22 price increases.
23    Q.   Just excuse me for a moment.  Could I
24 ask you to turn back to the first page of this
25 document?  This is an e-mail from Andrea Kaum to

1 Emily Gallagher, and it's confidential, and it
2 says, "Emily, thanks for your patience with us.
3 Jacques, Colleen and I just met for another
4 assessment of our opportunities in pricing given
5 the environmental factors we are facing and we came
6 to the conclusions we might have been too
7 aggressive in some areas."
8        Who is Andrea Kaum?
9    A.   She's the head of finance for vaccines.
10    Q.   And do you understand what she's
11 communicating here to Emily Gallagher?
12    A.   Yeah, my assumption is that they had
13 looked at a variety of different price increases,
14 generally increasing them versus plan, and that
15 potentially what they had recommended as they
16 revisited what had been put in the plan for the
17 prior year, that perhaps they had been too
18 aggressive.  So they went back and re-re-visited
19 and brought them back down a little bit.
20    Q.   So it's your understanding, then, that
21 the original proposal was to increase at a rate
22 that was higher than 7 percent?
23    A.   Versus what's in this document.
24    Q.   Let's just stick with --
25    A.   Yes.

19 (Pages 70 - 73)

**Appx20379**

1    Q.    -- products for MMR is 5 percent and
2 ProQuad is 7 percent.
3    A.    I don't know that from this document.
4    Q.    Do you understand what's meant by the
5 phrase "environmental factors we are facing"?
6    A.    This is 2015. So I'm assuming it just
7 is the medical community and concerns for
8 healthcare costs rising.
9    Q.    And by "too aggressive," what's your
10 understanding of what that phrase means in this
11 context?
12    A.    Price increases that we believe would
13 elicit a negative response, a more negative
14 response from customers than we're prepared to deal
15 with.
16    Q.    And so those original proposed prices
17 would have been higher than the prices discussed in
18 this document?
19    A.    I assume, but I don't know for which
20 products. It may or may not have been MMR and
21 ProQuad.
22              - - -
23        (Whereupon, the document was marked, for
24    identification purposes, as Plaintiffs' Exhibit
25    Taylor-4.)

1              - - -
2 BY MR. O'KELLY:
3    Q.    The court reporter has marked as
4 Exhibit 4 MRK-CHA00014375 to 376.
5        Do you recognize this document?
6    A.    It's generally a document we use to put
7 a customer communication through our approval
8 process.
9    Q.    So communications to customers have to
10 be approved?
11        MS. DYKSTRA:  Objection.
12        MR. O'KELLY:  Let me ask a different
13    question then.
14 BY MR. O'KELLY:
15    Q.    What do you mean put a customer
16 communication through your approval process?
17    A.    A letter, for example, to providers
18 would need to go through our approval process.
19    Q.    And who needs to approve letters like
20 this before they go to customers?
21    A.    They would be approved by our commercial
22 attorneys, potentially the medical/legal board, as
23 well as editors, et cetera.
24    Q.    Okay. So on this first page, is this
25 page the page that's requesting approval for the

1 communication that's on the second page?
2    A.    It is. It's just to request -- it's not
3 to request approval for the price increase. It's
4 just for this actual document:  Is everything
5 spelled correctly, is it factual, et cetera.
6    Q.    And the word "Zinc" on the top right, do
7 you know what that refers to?
8    A.    It's just our internal computer system,
9 if you will, that houses all of our documents that
10 are being reviewed and approved.
11    Q.    Okay, thanks.
12        Now, the -- then the document that's
13 being approved, is this or was this a communication
14 to all of your direct purchaser customers?
15        MS. DYKSTRA:  You mean the second page
16    of the document?
17        MR. O'KELLY:  Second page.
18        THE WITNESS:  It looks like it is a
19    letter announcing the price increase for ProQuad
20    of the new price, but my assumption is that this
21    was a letter to wholesalers as opposed to
22    physicians.
23 BY MR. O'KELLY:
24    Q.    And the heading on top, "Product
25 Availability Notification," do you have any

1 understanding of what that means?
2    A.    So this must have been when ProQuad was
3 being reintroduced into the market.
4    Q.    So this is announcing the reintroduction
5 of ProQuad and the catalog price?
6    A.    Yes.
7    Q.    And in this case the catalog price for a
8 package containing ten single-dose 0.5mL vials of
9 diluent is $1,361,68.
10    A.    Yes.
11    Q.    And then there's a footnote to the
12 catalog price, and it says, "The Merck Catalog
13 Price listed is for convenience only; Merck retains
14 the right, in its sole discretion, to increase or
15 otherwise change the Catalog Price at any time."
16    A.    Yes.
17    Q.    You described earlier how Merck
18 typically sets the catalog prices for a year at a
19 time.
20        Are you aware of any situations with
21 respect to the mumps vaccines where it made changes
22 to the price outside of that normal one-year cycle?
23    A.    Well, first, just to clarify, we don't
24 commit to setting price for a year, if that's what
25 you said. We historically limit our pricing

20 (Pages 74 - 77)

Page 78

1 actions to once a year per product, but it could be
2 at any time, and it could be more frequently than
3 that, but generally is not.
4      I think this footnote is just simply
5 stating that Merck reserves the right to change the
6 price at any time.
7    Q.   Okay.  But again --
8    A.   Which is pretty standard.
9    Q.   Are you aware of any circumstances under
10 which Merck having internally set a price, a
11 catalog price for a year for MMR II or ProQuad
12 subsequently changed that contract price within
13 that year?
14    A.   So just to make sure I understand the
15 question, are you asking if I know of a situation
16 for mumps vaccine if we increased the catalog price
17 more than twice in a year or in a 12-month time
18 period?
19    Q.   I'll take that.
20    A.   No, I am not aware of a time.
21    Q.   Thank you.  By the way with Zinc, is
22 this -- is this how all of Merck's information is
23 housed, or does it only relate to documents as
24 opposed to, say, transactional data?
25         MS. DYKSTRA:  Objection.  To the extent

Page 79

1 you know in your personal capacity, you can
2 answer that question.
3         THE WITNESS:  I believe it's just what
4 is deemed to be promotional information.  So,
5 no, it would not be a repository for data.
6 BY MR. O'KELLY:
7    Q.   Including pricing data.
8    A.   Exactly, just the letters themselves.
9         MR. O'KELLY:  Okay.
10             - - -
11      (Whereupon, the document was marked, for
12 identification purposes, as Plaintiffs' Exhibit
13 Taylor-5.)
14             - - -
15 BY MR. O'KELLY:
16    Q.   We've marked as Exhibit Number 5 a
17 document Bates numbered MRK-CHA00072356 through
18 2884.  Hold on.  Those numbers are not sequential.
19 Excuse me, the last document is 2364.
20    A.   I'm sorry.
21    Q.   I'm sorry, I picked up two documents
22 together, so I gave the court reporter the wrong
23 Bates number.
24    A.   Okay.
25    Q.   Do you recognize this document?

Page 80

1    A.   No, I don't, but I will look through it.
2         (Witness reviewing document.)
3         Okay.
4    Q.   This document, as I read it, it mostly
5 refers to CDC pricing or CDC negotiations?
6    A.   Yes.
7    Q.   So I won't be asking you about most of
8 that because that's Ms. Koury's area.
9      There's just a couple of items in here
10 that possibly relate to private pricing.  If you
11 wouldn't mind turning first to page number -- Bates
12 number 2362, and this is an e-mail from Eric --
13    A.   Skjeveland.
14    Q.   Thank you -- dated March 4, 2014, to
15 Todd Nichols.  In the e-mail towards the bottom of
16 the first paragraph, he says, "The CDC is taking a
17 couple of new approaches this year in an attempt to
18 rein in vaccine costs and to ensure the government
19 is getting a fair and reasonable price."
20      And then in the next paragraph it says
21 it requires -- CRC "requires manufacturers to
22 provide commercial pricing information to help the
23 government make a determination that the contract
24 prices we are offering are fair and reasonable."
25      Skipping down to towards the bottom of

Page 81

1 the next page, he writes, "One additional point and
2 possible risk is the uncertainty of how other
3 manufacturers will respond to CDC's new approach.
4 If our competitors reduce their prices in a
5 meaningful way, we may be compelled to do the same.
6 GSK and Rotarix present the greatest financial
7 risk."
8      Can you tell me what your understanding
9 of that statement is?
10    A.   Of this last one?
11    Q.   This last one, yes.
12    A.   Here?
13    Q.   Uh-huh.
14    A.   Probably a combination of a couple
15 things.
16      One is just the impact on negotiations.
17 So our belief that if our competitors are being
18 more responsive to the CDC, whether they're
19 products we compete with or not, but just other
20 vaccine manufacturers are being more responsive
21 than Merck is, that it would be harder for us to
22 maintain the pricing increases that we put forward.
23      And secondarily, that in cases like
24 RotaTeq versus Rotarix, if there is a much greater
25 delta between the two products, that there is the

21 (Pages 78 - 81)

Appx20381

Page 82

1 potential that it could put market share at risk.
2    Q.    Okay.  And when you say being more
3 responsive to the CDC, you testified that if other
4 competitors are being more responsive, by more
5 responsive you mean if they reduce their prices in
6 response to a request by the CDC --
7    A.    Yes.
8    Q.    -- then Merck may do the same?
9    A.    We may be forced.  It may be more
10 difficult for us not to do the same.
11    Q.    No, but my question is, in dealing with
12 private customers, if competitors reduced their
13 prices by being more responsive to the private
14 purchasers, would Merck do the same?
15    A.    To the extent that we need to to
16 maintain similar value across the portfolio, yes.
17    Q.    Thank you.
18        Now, if we can skip back to the page
19 before this e-mail, that's page Bates number 2361,
20 and there's -- underneath the redacted block,
21 there's a sentence at the very bottom, "Preferred
22 Status:  Defined as Performance unless vaccine is
23 sole-source (RL) Kaiser for VVX."  It's on the very
24 bottom of that page?
25    A.    Yes, what is the question?

Page 83

1    Q.    Do you understand what that means?
2    A.    That if -- that in the Kaiser contract
3 preferred status refers to a product in a
4 competitive situation that has preferential
5 formulary status, but in the case of a sole-source
6 product that wouldn't apply, the terminology
7 wouldn't apply.
8    Q.    Do the MMR II and ProQuad vaccines have
9 preferred status with Kaiser?
10        MS. DYKSTRA:  Objection.
11        THE WITNESS:  I'd have to look at the
12    contract to be sure, but I don't believe so,
13    because the term doesn't make sense in a
14    sole-source situation, but I'm -- I'm not -- I
15    don't have responsibility for that contract, so
16    I'm not a hundred percent sure.
17 BY MR. O'KELLY:
18    Q.    And does preferred status affect the
19 price that Merck charges to Kaiser?
20        MS. DYKSTRA:  Objection.
21        THE WITNESS:  Generally speaking.
22 BY MR. O'KELLY:
23    Q.    If you just flip back two pages to page
24 2359, and there's some numbers there that refer to
25 ProQuad.  Do you understand what those numbers are

Page 84

1 communicating?
2    A.    It's very strange.  I assume that what
3 is --
4        MS. DYKSTRA:  Objection.  I want to make
5    sure you don't speculate or guess.  If you know
6    what they mean, you can testify to that.
7        THE WITNESS:  Based on one of the other
8    pages, I believe it is showing the comparison
9    between private price, CDC price and Kaiser
10    price.
11 BY MR. O'KELLY:
12    Q.    And by "private price," do you mean
13 catalog price?
14    A.    Probably private price in contracts
15 where there is a performance requirement -- well,
16 where there is not a performance requirement,
17 because that is the information that the CDC
18 requested.
19    Q.    My colleague has pointed out possibly
20 helpful information in the two pages before that.
21 There's a key or an index, I believe, to these two
22 sets of numbers.  So we've got, "Product Name" --
23    A.    Okay, yup.
24    Q.    "NDC, Image, Catalog Current Price Per
25 Dose, CDC 2014 Best and Final Offer Price Per Dose,

Page 85

1 Lowest Commercial Non-Performance Price Per Dose,
2 CDC Discount, Comments."
3    A.    Yes.
4    Q.    With that information, maybe we can now
5 decipher these two -- two sets of numbers.
6    A.    Yup.
7    Q.    Let's go with the MMR II, as it's closer
8 at hand now.
9        MS. DYKSTRA:  Objection.
10        You can answer in your personal
11    capacity.
12        THE WITNESS:  So it's the MMR II catalog
13    price.
14 BY MR. O'KELLY:
15    Q.    That's $53 --
16    A.    Yup.
17    Q.    -- and 89 cents?
18    A.    CDC price at $17.79, and then the lowest
19 non-performance private sector contract price at
20 48.50.
21    Q.    And that's for Kaiser.
22    A.    I assume, given the footnote here.
23    Q.    And then with respect to ProQuad on the
24 next page, it's the same sequence?
25    A.    Yes.

22 (Pages 82 - 85)

Appx20382

| Page 86 |
|---|
| 1  Q.   We'll come back to Kaiser a little |
| 2  later.  I didn't understand what these meant, and |
| 3  now we've puzzled it out. |
| 4          - - - |
| 5          (Whereupon, the document was marked, for |
| 6  identification purposes, as Plaintiffs' Exhibit |
| 7  Taylor-6.) |
| 8          - - - |
| 9          MR. O'KELLY:  The reporter has marked as |
| 10  Exhibit Number 6 MRK-CHA00272884. |
| 11  BY MR. O'KELLY: |
| 12  Q.   Do you recognize that document? |
| 13  A.   Yes, it's a standard communication, |
| 14  internal communication regarding price increases. |
| 15  Q.   And the second page of the document |
| 16  that's Bates 2885, that's a "Dear Customer" letter? |
| 17  A.   Yes. |
| 18  Q.   And what I want to ask you about is, |
| 19  there are two bold paragraphs underneath the |
| 20  pricing information, and the second one says, "All |
| 21  chargebacks with a wholesaler invoice date of |
| 22  October 29, 2014 or earlier, will be processed at |
| 23  the October 29, 2014 catalog price." |
| 24          Can you explain the meaning of the term |
| 25  chargebacks as it's used here? |

| Page 87 |
|---|
| 1  A.   Yes.  A chargeback, so the wholesalers |
| 2  are purchasing at catalog price, but for a |
| 3  contracted customer that has a contract with Merck |
| 4  where they purchase via an on-invoice discount as |
| 5  opposed to a rebate, when they purchase from the |
| 6  wholesaler, the wholesaler is actually selling it |
| 7  to them at the discounted price and -- so the |
| 8  wholesaler submits a chargeback to Merck so that we |
| 9  can pay them the difference between the catalog |
| 10  price that they purchased it at and the discounted |
| 11  price that they sold it at. |
| 12  Q.   Okay.  So let's -- let's unpack that a |
| 13  little bit just so the record will be clear. |
| 14          So a direct purchaser, a wholesaler |
| 15  purchases the vaccine product from Merck at the |
| 16  catalog price. |
| 17  A.   Yes. |
| 18  Q.   And Merck has entered into a contract |
| 19  with an indirect purchaser so that that indirect |
| 20  purchaser can purchase at a price that's lower than |
| 21  the catalog price; is that correct? |
| 22  A.   Yes. |
| 23  Q.   And the wholesaler agrees to honor |
| 24  Merck's contract with the indirect purchaser, who |
| 25  is the wholesaler's customer. |

| Page 88 |
|---|
| 1  A.   Yes. |
| 2  Q.   And -- so, therefore, let's take an |
| 3  example.  If the contract -- excuse me -- the |
| 4  catalog price was a hundred dollars and the |
| 5  indirect purchaser contract price was $90, so Merck |
| 6  would initially sell the product at a hundred |
| 7  dollars to the wholesaler, right? |
| 8  A.   Yes. |
| 9  Q.   And the wholesaler would sell at $90 |
| 10  plus the wholesaler's own fee -- |
| 11  A.   Yes. |
| 12  Q.   -- to the indirect purchaser.  Then the |
| 13  wholesaler would charge back the difference in the |
| 14  $10 to Merck, and Merck would reimburse -- well, |
| 15  actually, if you'd tell me the last step. |
| 16  A.   Yes, that is correct.  So once the |
| 17  chargeback is submitted from the wholesaler to |
| 18  Merck, then Merck pays the wholesaler that $10 to |
| 19  make them whole. |
| 20  Q.   Okay.  And we've captured the essence of |
| 21  chargebacks there? |
| 22  A.   Yes. |
| 23          MS. DYKSTRA:  Let us know when it's a |
| 24  good time to take a quick break. |
| 25          MR. O'KELLY:  Sure. |

| Page 89 |
|---|
| 1          MS. DYKSTRA:  We'll take a break and |
| 2  then come back a little longer and then break |
| 3  for lunch? |
| 4          MR. O'KELLY:  That's fine. |
| 5          VIDEOTAPE TECHNICIAN:  The time is |
| 6  11:59.  We're going off the video record. |
| 7          - - - |
| 8          (Whereupon, a recess was held.) |
| 9          - - - |
| 10          (Whereupon, the document was marked, for |
| 11  identification purposes, as Plaintiffs' Exhibit |
| 12  Taylor-7.) |
| 13          - - - |
| 14          VIDEOTAPE TECHNICIAN:  The time is now |
| 15  12:15.  This begins disc three. |
| 16  BY MR. O'KELLY: |
| 17  Q.   Welcome back, Ms. Taylor.  We've marked |
| 18  as Exhibit Number 7 a document Bates numbered |
| 19  MRK-CHA01147290 through 7301, and this is a series |
| 20  of e-mails from October 2014. |
| 21          Do you recognize these documents? |
| 22          MS. DYKSTRA:  I'll instruct the witness |
| 23  to make sure you read through the full document |
| 24  to make sure you're comfortable. |
| 25          MR. O'KELLY:  Thank you. |

23 (Pages 86 - 89)

Appx20383

Page 90

1       THE WITNESS:  (Witness reviewing
2   document.)
3       Okay.
4   BY MR. O'KELLY:
5       Q.   So you've had an opportunity to study
6   this document.
7       A.   (Witness nodded.)
8       Q.   And do you recognize this succession of
9   e-mails?
10      A.   Yes, the latter part of it where I was
11  involved, and then obviously it took on a life of
12  its own --
13      Q.   All right.  So let's --
14      A.   -- without me on it.
15      Q.   Let's turn to the page numbered 7298.
16  At the very bottom of the page there's an e-mail
17  from Bradley Thompson on October 8, 2014, at
18  8:37 a.m., and it's addressed to several people,
19  including you, and the subject says, "RE:  Rota
20  Discount."  And it reads, "To All,
21      "First of all, I want to thank you all
22  for the 'lively' discussion yesterday.  I
23  appreciate the ideas and perspectives as we try to
24  tackle this challenging situation."
25      Do you have an understanding what he

Page 91

1   means by the -- well, first of all, let's start by,
2   who is Bradley Thompson?
3       A.   He is the global marketing leader for
4   pediatric vaccines, including RotaTeq.
5       Q.   When he just mentions a challenging
6   situation, do you know what he's referring to
7   there?
8       MS. DYKSTRA:  Objection.
9       You can answer in your personal
10  capacity.
11      THE WITNESS:  Based on the content of
12  this e-mail, I'm assuming he's referring to
13  differences of opinion on what the price
14  increase should be.
15  BY MR. O'KELLY:
16      Q.   And what are those differences of
17  opinion?  Do you recall?
18      A.   That some -- I don't recall the
19  conversation, but based on the e-mail, stick with
20  the planned price increase or increase it.
21      Q.   And the planned price increase, I
22  believe you testified earlier, this time was 4
23  percent.
24      A.   Yes.
25      Q.   And then a line or two later he says,

Page 92

1   "Bottom line, as a division, we are missing on our
2   August 2014 forecast, so there are bigger concerns
3   right now than projected negative growth in the
4   Pediatric Franchise for 2015."
5       Do you have a recollection as to what he
6   meant by "we are missing on our August 2014
7   forecast"?
8       A.   Just that sales revenue was lower than
9   what was projected, but I don't know for which
10  products.
11      Q.   And then towards the bottom of his
12  e-mail, about four lines from the end of the text,
13  it says, "I will float the idea of 6-7% price
14  increase on MMR/VV/PQ and explain our concerns
15  regarding a RotaTeq price increase at this time."
16      So MMR in this context is the MMR II
17  vaccine, right?
18      A.   Yes.
19      Q.   And when he says "PQ," that's the
20  ProQuad vaccine?
21      A.   Yes.
22      Q.   And "VV" is not one of the two mumps
23  vaccines?
24      A.   Right, that would be Varivax.
25      Q.   And so he's communicating to the group,

Page 93

1   including you, that he will float the idea of
2   increasing the price on MMR II and ProQuad to -- by
3   6 percent or 7 percent as opposed to the planned 4
4   percent, correct?
5       A.   Yes.
6       Q.   Then Emily Gallagher, who was one of the
7   recipients of this e-mail, responded to Mr.
8   Thompson and she writes, "Regarding the proposal to
9   increase MMRV products this October 30th from 5% to
10  6-7%, the action items and impact to GVUSPP is
11  outlined below."
12      Do you have an understanding as to what
13  she meant by that?
14      A.   I mean, she's just pointing out the
15  revenue impact in going from a planned 5 percent to
16  the proposed 7 or 7 percent.
17      Q.   And --
18      A.   GV is probably Global Vaccines' US
19  profit plan.
20      Q.   And then she says, "This does not
21  capture impact to other teams (such as CCM & US
22  National Customer Ops & Partnerships."
23      Do you understand what she meant by
24  that?
25      A.   Just it's -- that there could be an

24 (Pages 90 - 93)

Page 94

1  impact to capacity resource constraints because
2  teams have already started to prepare letters and
3  communications loading contract information based
4  on 5 percent, and that it would mean some
5  significant rework to change it to 6 or 7 percent.
6      Q.   And then on the next physical page --
7  but it's the continuation of her e-mail -- there
8  are four bullet points.
9         And could you describe, generally, what
10  they refer to?
11     A.   So she's listing all the steps involved,
12  that the wheels have already been put in motion.
13         Managed care pre-notification letters,
14  Per our signed confidentiality agreements, these
15  are mailed 30 days prior.  We would need to draft
16  and send revised letters.
17         So these letters had already been sent
18  out to managed care organizations about the price
19  increase.
20         Frequently asked questions, and managed
21  care organization, healthcare provider, and
22  Medicaid letters, These are already under PRT
23  review in Zinc -- so they're already under
24  commercial legal review in our approval system -- I
25  waiting to receive confirmation on an updated

Page 95

1  timing to support changes, but I think as long as
2  we have revised by next Wednesday, the 15th, we
3  would be okay.  So those letters hadn't been sent
4  out, but they were in the approval process.
5         Bulletin to the field, that's our field
6  sales communications.  This is still being drafted.
7  Same timeline as above, as long as we have
8  finalized by next Wednesday, so could still be
9  changed.
10         Pricing document, this would need to be
11  amended.  So the pricing document had already been
12  circulated and approved.  The approval timeline
13  would need to be shortened from eight days.
14         So normally we would give at least eight
15  days for the circulation of the pricing document,
16  but she's saying it would have to be expedited,
17  which puts additional pressure on the system.
18  Approvers would need to be made aware prior to the
19  urgency of response -- approvers would be Julie
20  Gerberding, who was president of Merck Vaccines at
21  the time; Jim Hall, head of finance; and Isabel
22  Duffy commercial legal -- and the date by which
23  they would need approval in order to execute this
24  change for an effective October 30th date.
25     Q.   Thank you.  Now, if I can ask you to

Page 96

1  turn back to page 7296, and this is an e-mail from
2  you to the individuals who were involved in the
3  e-mail conversation to this point.  And it says,
4  "Thanks Brad and Emily for the follow up.
5         "1.  We have established a business
6  practice to keep the negative impact (to customers)
7  of pricing actions to a minimum.  This includes
8  ensuring that all ped actions are taken at the same
9  time and no more than one each year.  Customers
10  will be very upset when they see we took price on
11  Gardasil and MMRV in 4Q and turn around and take
12  price on RotaTeq in 1Q."
13         Could you explain what you were
14  communicating to the group in this e-mail?
15     MS. DYKSTRA:  Objection.  Outside the
16  scope.
17         You can answer in your personal
18  capacity.
19     THE WITNESS:  It looks like we were
20  suggesting that we would take an MMRV and
21  ProQuad price increase in the fourth quarter,
22  like we normally do, and then in the following
23  1Q we would take a price increase for RotaTeq,
24  which went counter to our business practice of
25  limiting the number of pricing events in a year,

Page 97

1  because each time we do that, providers have to
2  go through a lot of gymnastics to renegotiate
3  their contracts with managed care plans, update
4  their pricing systems, et cetera.
5  BY MR. O'KELLY:
6     Q.   And when you refer to "MMRV," what does
7  that refer to?
8     A.   It's an internal shorthand for measles,
9  mumps, rubella vaccine and Varicella vaccine and
10  ProQuad.  So just lumping them all together.
11     Q.   So it's the products that are at issue
12  in this lawsuit.
13     A.   Except for the Varivax.  It could
14  include the Varivax as well.
15     Q.   And the -- your objection to this
16  proposed price increase here is not to the 7
17  percent amount of the increase, it's to the fact
18  that it's a disruption to the process of keeping
19  price increases to no more than one per year?
20     MS. DYKSTRA:  Objection.
21  Mischaracterizes her testimony.
22  BY MR. O'KELLY:
23     Q.   Is that correct?
24     A.   Yes, and the negative impact to
25  providers.

25 (Pages 94 - 97)

1    Q.    Thank you.
2        And then there's a response to your
3  e-mail from 1:21 p.m. on the same day by Jorge L.
4  Troncoso.  And he writes, "Thanks Michelle for
5  highlighting these risks and I agree 100% that they
6  need to be considered in our decision; however, I
7  also believe that it is more important at this time
8  to try to capture greater value out of our
9  products, while recognizing that customers will
10  likely object to ANY" -- in all caps --
11  "price increase, regardless of its magnitude,
12  timing and/or frequency."
13        Who is Jorge Troncoso?
14    A.    He is -- he leads our pricing group for
15  vaccines globally.
16    Q.    And what did you understand he was
17  communicating there in response to your e-mail?
18    A.    That while we need to consider a
19  customer's reaction, it is impossible to completely
20  avoid customer frustration, and that, in his
21  opinion, it was important to look for opportunities
22  to increase prices where we can.  He's obviously
23  not talking about all the other things that we have
24  to consider when we do that.
25    Q.    So when he talks about trying to capture

1  greater value out of our products, he's talking
2  about increasing prices more than the planned 4
3  percent?
4    A.    Yes.
5    Q.    And these other factors that you had
6  described earlier, if I understand it correctly,
7  he's placing less value on those, such as customer
8  reaction?
9    A.    Yes.
10    Q.    And then you responded to Mr. Troncoso,
11  "Last time I checked, we place great value on our
12  customer's perspective.  Your statement below is
13  concerning to me, and I hope this is not
14  representative of Merck's pricing practices or our
15  prioritization of customer experience."
16        What were you communicating to
17  Mr. Troncoso in this e-mail?
18        MS. DYKSTRA:  Objection.  Outside the
19  scope.
20        You can answer in your personal
21  experience.
22        THE WITNESS:  We had a difference of
23  opinion in the weight of customer experience in
24  the process of deciding on a price increase.
25  BY MR. O'KELLY:

1    Q.    If we can skip forward to page 7292, I
2  think you've left the conversation at this point.
3  There's an e-mail from Sean McElligott in which he
4  writes, "Let it go, if she doesn't recognize that
5  the 'strategy' that Tammy and Patrick came up with
6  is to not make waves and is costing the business
7  $500 million a year she won't get it now.  The
8  other fact is that going from 5% to 7% isn't going
9  to make a lot more waves but will make us more
10  money.
11        Who is Mr. McElligott?
12    A.    I do not know Sean.  I have not seen the
13  name before.
14    Q.    And he's talking about a price increase
15  going from 5 percent to 7 percent is not going to
16  make a lot more waves.
17        Do you understand what he means by that?
18        MS. DYKSTRA:  Objection.  Outside the
19  scope.
20        You can answer in your personal
21  capacity.
22        THE WITNESS:  I assume he's referring to
23  the conversation about customer experience, that
24  if they will be upset with 5 percent, they'll be
25  upset with 7 percent, too.

1  BY MR. O'KELLY:
2    Q.    And do you have any understanding as to
3  what -- do you know who the Tammy is that he's
4  referring to?
5    A.    Yes, Tammy Sprague.
6    Q.    Okay, we met her earlier.
7        And Patrick?
8    A.    I assume that's Patrick Davish, who
9  leads global pricing for Merck.
10    Q.    And the strategy that he's referring to,
11  do you have an understanding as to what that means?
12  Is it related to pricing?
13        MS. DYKSTRA:  Same objection.
14        THE WITNESS:  Yeah, I believe it is, our
15  vaccine pricing.
16  BY MR. O'KELLY:
17    Q.    And that's the policy of taking
18  increases of 4 percent a year?
19    A.    Presumably.  There's not a lot of
20  information here.
21    Q.    Who is Barry Wenick?
22    A.    Barry is also in global pricing.  I
23  believe he is responsible for ex-US vaccine
24  pricing.
25    Q.    And he writes in response to

26 (Pages 98 - 101)

1 Mr. McElligott's e-mail and cc's Mr. Troncoso,
2 "Agree with Sean. Don't reply tonight. However, I
3 don't like what she is saying to you."
4        Is the "she" he's referring to you?
5        MS. DYKSTRA: Same objection.
6        You can answer.
7        THE WITNESS: I assume.
8 BY MR. O'KELLY:
9    Q.   And do you understand what he's
10 referring to there?
11    A.   My request that we more carefully take
12 into consideration impact to our customers.
13        MS. DYKSTRA: Michele, I'll just caution
14    you that to the extent that you're just
15    assuming in reading from --
16        THE REPORTER: Excuse me, can you please
17    speak louder?
18        MS. DYKSTRA: I'm sorry. You should be
19    careful about assuming what are in other
20    people's minds unless you have information
21    outside of this e-mail string.
22        THE WITNESS: Okay.
23        MR. O'KELLY: Let's move on.
24          - - -
25        (Whereupon, the document was marked, for

1    identification purposes, as Plaintiffs' Exhibit
2    Taylor-8.)
3          - - -
4 BY MR. O'KELLY:
5    Q.   We've marked as Exhibit Number 8
6 MRK-CHA-01157658 through 7301 [sic]. Take a moment
7 to familiarize yourself with that document, please.
8    A.   (Witness reviewing document.)
9        Okay.
10    Q.   This document is series of e-mails from
11 September 2015. Is it fair to characterize it as
12 discussing a proposed price increase from the year
13 2015 forward?
14    A.   Yes.
15        MS. DYKSTRA: I'm going to just object.
16    I'm going to let Ms. Taylor answer in her
17    personal capacity. I think we've gone far
18    afield from the policies, practices and
19    procedures of setting prices to questions around
20    specific prices and specific pricing actions and
21    specific customers. So she can answer in her
22    personal capacity.
23        MR. O'KELLY: Okay.
24 BY MR. O'KELLY:
25    Q.   So if we look back to page -- the page

1 that's Bates numbered 7671.
2    A.   Yes.
3    Q.   And could you describe what these
4 numbers on 7671 communicate?
5    A.   I'm in the wrong place. I think this is
6 like the other document where this must be a column
7 missing somewhere. I'm looking for it, but I don't
8 necessarily see it.
9    Q.   If you look back to 7663 and 7664.
10    A.   Oh, okay.
11    Q.   So am I correct in reading the
12 information on 7671 as stating that there's a
13 proposed increase of 9 percent for the year
14 beginning October 2015 for MMR II?
15    A.   That's what it would appear.
16    Q.   And that's coming after an increase the
17 previous October, October 2014, of 7 percent.
18    A.   Yes.
19    Q.   And that's the price increase that was
20 discussed in the previous set of e-mails that we
21 just looked at.
22    A.   Yes.
23    Q.   And then if you look at page 7666, it's
24 discussing price increases for ProQuad. And again,
25 it's got a proposed increase for 2015,

1 October 2015, of 9 percent following a 7 percent
2 increase in October 2014; is that correct?
3    A.   Yes.
4    Q.   And then -- and these price increases
5 relate to catalog prices, correct?
6    A.   Yes.
7    Q.   Now, if you can come back to page 7660,
8 there's an e-mail from Patrick Davish to Jorge
9 Troncoso. And if we go down four lines, he says,
10 "I can only say that on balance, 9% on a product
11 less than a year after launch is something as an
12 organization we would have look closely at. I know
13 you say that senior management is well aware and
14 prepared, but when angry customers (including Penn
15 some years ago) come calling, they quickly seem to
16 reconsider their resolve. Anyway, reasonable minds
17 can differ."
18        So do you understand what Mr. Davish is
19 communicating with respect to this proposed 9
20 percent price increase?
21        MS. DYKSTRA: Objection. Outside the
22    scope.
23        Again, you can answer this whole line of
24    questions in your personal capacity and to the
25    extent that you have knowledge of what he's

27 (Pages 102 - 105)

Appx20387

Page 106

1  saying other than what's directly on this
2  document.
3      THE WITNESS:  I don't believe this has
4  anything to do with MMR or ProQuad.  It's
5  referring to --
6      THE REPORTER:  Excuse me?
7      THE WITNESS:  That paragraph is not
8  related to MMR or ProQuad.  It's related to
9  Gardasil 9.
10 BY MR. O'KELLY:
11     Q.   In this document there -- it is
12 reflected that there was a proposal to increase
13 ProQuad and --
14     A.   Yes.
15     THE REPORTER:  "Proposal to increase"?
16     MR. O'KELLY:  MMR II and ProQuad by 9
17 percent beginning in October 2015.
18                  - - -
19     (Whereupon, the document was marked, for
20 identification purposes, as Plaintiffs' Exhibit
21 Taylor-9.)
22                  - - -
23 BY MR. O'KELLY:
24     Q.   Let's return to procedures.
25     A.   Okay.

Page 107

1      Q.   And we've marked as Exhibit 9
2  MRK-CHA01173899 through 3906.
3      Do you recognize this document?
4      A.   I have not seen it before, but it looks
5  like a standard procedure that our economic affairs
6  group would use to implement price increases.
7      Q.   Okay.  So I've got a number of specific
8  questions that I think are not necessarily specific
9  to this document, but to this type of document.
10     A.   Okay.
11     Q.   So let's just start on the second page.
12 And just for the record, it defines the scope of
13 the Merck pricing approval procedure.  "The purpose
14 of this document is to define the decision rights
15 and approval process required for establishing
16 global pricing and reimbursement strategy and net
17 prices and tender prices for Merck products
18 worldwide."
19     Does that include the United States?
20     A.   I believe it would.
21     Q.   And then there's a series of definitions
22 under B, and it says, "Pricing guidance is created
23 for Strategic products" -- and that's a defined
24 term itself -- "and initial launch pricing guidance
25 is approved by the President and CEO."

Page 108

1      Do you understand what's meant by
2  strategic product?
3      MS. DYKSTRA:  Can I object for one
4  moment --
5      MR. O'KELLY:  Of course.
6      MS. DYKSTRA:  -- just to make sure Ms.
7  Taylor understands if this is a document that
8  relates to pharmaceutical or vaccine pricing.  I
9  just want to clarify I'm not entirely sure it
10 does.
11     THE WITNESS:  Yes, very broad, as well
12 as ex-US tender.  So it's very very broad.
13 BY MR. O'KELLY:
14     Q.   But my questions are fairly few and I
15 hope fairly focussed.
16     A.   Okay.
17     Q.   So the question that's open is, do you
18 understand in the context of the pricing approval
19 procedure what strategic products -- what that term
20 means?
21     A.   This one has a definition here.  This is
22 a product that is either launching (or establishing
23 new indications) across markets globally or is an
24 otherwise strategically important product.  The
25 launch phase usually spans two to three years.

Page 109

1  Strategically important products may fall outside
2  of launch definition, but requires more centralized
3  management due to global or strategic issues or
4  initiatives.
5      Outside of the definition here, I can't
6  add anything.
7      Q.   It's not a term that you encounter --
8      A.   No.
9      Q.   -- in the normal course?
10     A.   No.
11     Q.   On page 3905 -- that's page 7 of the
12 document -- it lists a number of products, several
13 products that are defined as strategic products,
14 and they include ProQuad and MMR II.
15     Do you have any sense from a pricing
16 perspective what the significance is of having
17 defined ProQuad and MMR II as strategic products?
18     A.   No, I do not, other than this is a
19 global document, so it could be in other countries.
20     Q.   When you at Merck in the US are going
21 through this annual process of evaluating and
22 recommending and ultimately approving pricing
23 actions, is this the process you follow or do you
24 follow a somewhat different process?
25     A.   Well, the economic affairs teams may

28 (Pages 106 - 109)

Page 110

1  follow this process, but they're working with the
2  marketing teams to establish those prices.  I am
3  not involved in the processes here.
4       MR. O'KELLY:  Okay, let's move on.
5            - - -
6       (Whereupon, the document was marked, for
7   identification purposes, as Plaintiffs' Exhibit
8   Taylor-10.)
9            - - -
10 BY MR. O'KELLY:
11     Q.   We've marked as Exhibit 10
12 MRK-CHA00077200 to 204.
13     A.   (Witness reviewing document.)
14          Okay.
15     Q.   Can you just describe for the record
16 what this document is?
17     A.   It's a typical e-mail to circulate
18 approval for a pricing document to take a pricing
19 action.
20     Q.   And in this case the document is dated
21 August 19, 2011, and it's requesting approval for a
22 4 percent increase for MMR II and ProQuad effective
23 October 2011.
24     A.   Yes.
25     Q.   And it notes that in October 2010, there

Page 111

1  was also a 4 percent increase --
2       A.   Yes.
3       Q.   -- taken on those two products.
4            Now, my questions are quite -- quite
5  narrow in this document.  On the second page
6  there's Roman IV that says, "Impact on Average
7  Sales Price (ASP)."
8            Can you tell us what average sales price
9  is?
10      A.   It is a formulaic number that Medicare
11 and Medicaid use, some managed care organizations
12 use it, where they simply take our catalog price
13 and add an assumed 6 percent so that becomes the
14 average selling price, but it's not a Merck -- it's
15 not a Merck number.  It's an industry standard.
16      Q.   Then under Roman V, it's
17 "Implementation."  About three lines down it says,
18 "SAP and the catalog pricing master file within
19 CCAS will be updated to reflect the increases."
20           Do you have any idea what SAP and CCAS
21 are?
22      A.   Yeah, those are just -- SAP is the
23 internal system that we use for putting prices into
24 our system collecting data throughout the
25 organization.  It is just a data processing system.

Page 112

1  CCAS is specific to implementing contracts.  So
2  these are just systems, internal Merck systems.
3       Q.   They're internal Merck systems, and
4  they're on some kind of big servers --
5       A.   Exactly.
6       Q.   -- somewhere?
7       A.   Yes.
8       Q.   Roman VII, the next page, says, "Systems
9  Impact."  And it says, "No Merck system changes are
10 required for this price action."
11           Do you understand what that means in
12 this context?
13      A.   That there's no new processes or other
14 re -- or resources that would be consumed to
15 implement this other than the usual.
16      MR. O'KELLY:  Okay, thanks.  That's all
17 I have on that document.
18            - - -
19      (Whereupon, the document was marked, for
20  identification purposes, as Plaintiffs' Exhibit
21  Taylor-11.)
22            - - -
23      THE WITNESS:  (Witness reviewing
24  document.)
25      MR. O'KELLY:  Let's just go off the

Page 113

1  record for a moment.
2       VIDEOTAPE TECHNICIAN:  The time is 1:04.
3   Going off the record.
4            - - -
5       (Whereupon, there was an off-the-record
6   discussion.)
7            - - -
8       VIDEOTAPE TECHNICIAN:  The time is now
9   1:05.  We're back on the video record.
10 BY MR. O'KELLY:
11      Q.   My questions with respect to this
12 document are going to be -- I'm going to ask you
13 for a general description of what the process
14 described in this document is and whether it's
15 currently in force.  Then I'm going to have some
16 questions regarding definitions on page 7735, 7737,
17 7742, and I think that's -- oh, and 7749.  I think
18 that's going to be the extent of my questioning on
19 this document.
20      A.   Okay.
21      Q.   All right.  So let's start with the
22 opening question:  Can you describe what this
23 document is?
24      A.   Yeah, this is a document -- a document
25 that simply articulates what the process is for

29 (Pages 110 - 113)

Appx20389

Page 114

1 approving and executing pricing strategies. So
2 it's very process oriented, who has decision
3 rights, who has to approve, what their grants of
4 authority is, that type of thing.
5    Q.   And this document is dated
6 December 2011. Is the process that it describes
7 fundamentally the same process that is in force
8 today?
9        MS. DYKSTRA:  To that question I'll
10   instruct you, Michele, if you need to review
11   more of the document, you should do so. And if
12   we have to read the whole thing, we can go off
13   the record, if necessary.
14       THE WITNESS:  Yeah, I don't know without
15   reading the whole thing if it's changed
16   materially. Fair to say we continue to have
17   processes to formally ensure we're doing this in
18   an organized manner.
19 BY MR. O'KELLY:
20   Q.   Okay. Let's look at page 7735, and it's
21 titled, "The Role of Pricing Governance at Merck."
22 It says, "Pricing governance refers to the set of
23 rules and processes that determine the decision
24 rights, review and approval process and associated
25 matters (including delegations) required to set or

Page 115

1 adjust all prices for Merck products, including"
2 and then there are three bullets.
3       The first bullet refers to "the list (or
4 catalog, WAC or Gross list) price, including new
5 dosages, strengths or line extensions."
6       The second bullet says, "the net or
7 contracted price, including pricing concessions of
8 any kind or free or nominally priced products."
9       And then the third bullet is, "any other
10 contractual arrangement that may affect the price
11 of a Merck product ultimately realized by Merck or
12 any of its subsidiaries, including chargebacks and
13 any terms and conditions of sale that effectively
14 adjust price (e.g., prompt payment, admin fees,
15 distributor fees, PDPs)."
16       Do you think that that generally
17 describes the pricing governance process at Merck
18 today?
19   A.   What would be included in the governance
20 process, yes.
21   Q.   Now, let's take the -- take the three
22 bullets one by one. We've already discussed that
23 list price, catalog price and WAC are synonyms for
24 what Merck typically calls the catalog price.
25   A.   Yes.

Page 116

1    Q.   Is gross price another synonym for
2 catalog price?
3    A.   Normally we don't use catalog list. I
4 think list is the important part there as opposed
5 to gross.
6    Q.   And then the next one talks about the
7 net or contracted price, including pricing
8 concessions of any kind.
9        Does this refer to purchases by direct
10 purchasers, or does it also include net prices paid
11 by indirect purchasers through the chargeback
12 system that we discussed earlier?
13   A.   I believe it's referring to prices paid
14 by the healthcare providers or the payer in a
15 country where they're purchasing the product. So
16 if there's a contract in place with a government or
17 with a provider organization, that it would include
18 those price -- those discount programs.
19   Q.   Now, at the very beginning of the
20 deposition, we discussed the three -- leading up to
21 CDC, the three classes of trade, and there were the
22 physician practice groups, many of whom have
23 contracted pricing with Merck.
24   A.   Uh-huh.
25   Q.   And are they included in the entities

Page 117

1 with a net or contracted price in this bullet?
2    A.   I believe it would be included there.
3    Q.   And when it talks about pricing
4 concessions, is that simply an agreed discount?
5    A.   It's not a term we use in the US. This
6 is a global document. So I suspect that is a term
7 that's probably used in developing tenders in other
8 countries, but generally not a term we use in US
9 pricing.
10   Q.   So this is not customized to the US
11 pricing process.
12   A.   No.
13   Q.   Now, if you take a look at page 7742,
14 this slide is headed "Global Vaccine and US
15 Pricing, Access & Reimbursement Mission Statement."
16 Why don't you take a moment to study that. I have
17 a few questions on that.
18   A.   (Witness reviewing document.)
19       Okay.
20   Q.   When it talks about a mission statement,
21 do you have an understanding of whose mission
22 statement it's referring to? In other words, is
23 this Merck's mission statement or a pricing group
24 within Merck?
25       MS. DYKSTRA:  Objection to form.

30 (Pages 114 - 117)

Page 118

1    You can answer.
2       THE WITNESS: I'm not sure.
3 BY MR. O'KELLY:
4    Q.   Then it describes a component of the
5 mission statement, the first bullet, first big
6 bullet, "To maximize the net revenue contribution
7 of all in-line products in the US and vaccines
8 globally, particularly through," and then it lists
9 three sub bullets.
10    What are in-line products in this
11 context?
12    A.   In-line would be products that are not
13 growth products or are not key products.
14    Q.   So it wouldn't include MMR II and
15 ProQuad?
16    A.   It would.
17    Q.   They're in-line products?
18    A.   We generally refer to those as in-line
19 products. They're products that we don't put a lot
20 of promotional effort behind. They don't have new
21 indications. They don't -- you know, very high
22 vaccination rates. So not a lot of promotional
23 effort goes into them --
24    Q.   And then it describes --
25    A.   -- at least in the US.

Page 119

1    Q.   Okay. The maximizing of the net revenue
2 contributions of those products through, first
3 bullet, "Using pricing and reimbursement expertise
4 to develop optimal lifecycle pricing and
5 reimbursement strategies."
6    Do you know what that means?
7    A.   Yeah, there are, as it relates to the
8 US, products that will have new indications or may
9 have competitive entrance, may have new images, you
10 know, over the five- to ten-year horizon, and
11 recognizing that we may want to make adjustments to
12 our pricing and reimbursement strategies to
13 optimize those events.
14    Q.   And then the next bullet says, "Reducing
15 price erosion through careful stewardship of price
16 governance."
17    Again, with respect to the in-line
18 products, your understanding as to what that bullet
19 point means here?
20    A.   My interpretation is that we want to not
21 jump to increase our discounts, that we have to
22 wait and see what happens in the marketplace.
23    Q.   And then finally it says, "Developing
24 and implementing WAC (or catalog) pricing
25 strategies in the US."

Page 120

1    Am I correct that that's what we've been
2 discussing for the past several hours?
3    A.   Yes, I believe so.
4       MR. O'KELLY: Thank you. I think that's
5 all I have on this document.
6       MS. DYKSTRA: Do you want to let us know
7 when it's a good time for a lunch break? Is
8 that now?
9       MR. O'KELLY: It's later than I thought.
10       MS. DYKSTRA: We've been going for
11 another hour.
12       MR. O'KELLY: I've basically got a bunch
13 of documents like this one with relatively,
14 hopefully, narrowly-focused questions on each of
15 these big documents. But this is as good a time
16 to break as any.
17       MS. DYKSTRA: Okay, let's do that then.
18       VIDEOTAPE TECHNICIAN: The time is now
19 1:17. We're going off the video record.
20       - - -
21       (Whereupon, a recess was held.)
22       - - -
23       VIDEOTAPE TECHNICIAN: The time is now
24 2:12. This begins disc four.
25 BY MR. O'KELLY:

Page 121

1    Q.   Good afternoon. I think it would help
2 speed things along if we discussed, in general
3 terms, what we've seen in some of the previous
4 documents. I want to summarize the process for
5 bringing a price action from concept to approval.
6    A.   Okay.
7    Q.   So can you describe for us, with respect
8 to the mumps vaccines, where does the
9 recommendation for a specific price action
10 originate annually, in what departments?
11    A.   It generally starts with the marketing
12 teams. As they're developing their long-range
13 plan, their five-year plan, they will look out five
14 years, and based on certain anticipated market
15 events, they will build in price increases
16 throughout those five years, albeit they're, you
17 know, a guess.
18    And then, in addition to the five-year
19 plan, every year they do a one-year plan. So about
20 halfway through the year they'll be planning for
21 the next year, which is the first year of that
22 five-year plan. And that's when they'll maybe make
23 more adjustments because now it's more near term,
24 they have more information about where they're
25 headed, what their resources are going to be, what

31 (Pages 118 - 121)

Appx20391

Page 122

1 the economic climate is, et cetera.
2        And the marketing teams will then work
3 with their finance point, and with our economic
4 affairs or US global pricing team, between the
5 three of them, will convene on what would be an
6 appropriate price increase to put into the one-year
7 plan, so for the up coming year. So they will
8 build that into the plan, and that's approved in
9 the latter part of the calendar year.
10        And then they come into the beginning of
11 the next year and, generally, because we don't take
12 our price increases until later in the year, there
13 may be some additional debate, even though they've
14 already built it into the plan. Maybe there's
15 changes in market events. Strategy may have
16 changed. I think you read in some documents where
17 maybe their revenue is not what they thought it was
18 going to be. So, you know, maybe if they took a 1
19 percent price increase more they could make up some
20 of that revenue.
21        So all those things start to come in,
22 and they may or may not make some adjustments to
23 that one-year plan.
24    Q.   You said after the three groups get
25 together and make the recommendation it's approved.

Page 123

1        Who approves it?
2    A.   It's not approved. After they make a
3 recommendation, they put it into the plan, and then
4 the -- the pricing action itself isn't approved.
5 What is agreed to by senior leadership is the plan,
6 but it includes many things. It includes their
7 assumptions for what sales are going to be for the
8 next year. It includes assumptions for expenses,
9 like selling expenses, promotion, et cetera. So
10 it's just part of a big group of operating expenses
11 and revenue projections for the next year.
12        Once they get into the next year, a
13 couple months before we actually implement the
14 price increase is when the official approval
15 takes place, and that's where you see the
16 pricing documents that are circulated via e-mail
17 for approval.
18    Q.   And If I could just stop you there
19 again. Those pricing documents that are circulated
20 at that point, which we've seen in August and
21 September for these products --
22    A.   Yes.
23    Q.   -- who initiates the circulation?
24    A.   So it is the economic affairs team,
25 Jorge Troncoso, Emily Gallagher, those individuals

Page 124

1 who you've seen on some of the documents who
2 initiate it. Although, frankly, they are not
3 decision-makers. The recommendation is really
4 driven primarily by the marketing teams and
5 approved by the division's leadership, but it needs
6 to be agreed to by the head of economic affairs.
7 My team will weigh in as to what the price
8 increases do to our portfolio competitiveness in
9 the marketplace, customer feedback, you know, other
10 types of things that we have to take into
11 consideration when we go to implement it.
12    Q.   And then who, ultimately, approves the
13 pricing action?
14    A.   It is the leadership within Merck
15 Vaccines division.
16    Q.   And is that a group of three people or
17 five people, or does it vary?
18    A.   Well, it would be our president of Merck
19 Vaccines at the time; Julie Gerberding, who you saw
20 in some communications, and now Mike Nally would be
21 the ultimate approver.
22    Q.   And has that been essentially the
23 process in the years that you've been at Merck?
24    A.   Yes.
25    Q.   It hasn't materially changed?

Page 125

1    A.   No, it has not.
2        MR. O'KELLY: I'm going to show you a
3 document, and I have some very limited
4 questions.
5            - - -
6        (Whereupon, the document was marked, for
7 identification purposes, as Plaintiffs' Exhibit
8 Taylor-12.)
9            - - -
10 BY MR. O'KELLY:
11    Q.   We've marked as Exhibit 12 a document
12 Bates numbered MRK-CHA01224864 through 4690, and my
13 questions on this document are going to relate to
14 the pages 4686 and 4687.
15    A.   (Witness reviewing document.)
16        Okay.
17    Q.   Do you recognize this document or this
18 type of document?
19    A.   Yes.
20    Q.   And can you just describe for the record
21 what it is?
22    A.   Just an internal notification to
23 appropriate teams, namely those who have to
24 actually implement the pricing action to make them
25 aware that it's coming.

32 (Pages 122 - 125)

Page 126

1    Q.    And this particular document is from
2  June 2004; is that correct?
3    A.    Yes.
4    Q.    And then there's what look like columns
5  from an Excell sheet that start on 4685 and
6  contains pricing information relating to MMR II and
7  Mumpsvax.  My question is to do with the columns in
8  the spreadsheet that run onto pages 4686 and 4687.
9        First of all, just for the record, it
10  anticipates a price increase that year of
11  3.5 percent.  That's in the second column.
12        My questions are, if you go to column N,
13  like in Nancy, it says, "Direct cost with FET."
14        Do you know what that refers to?
15    A.    FET is Federal Excise Tax on certain
16  vaccines, 75 cents per antigen I think in most
17  cases.  And so I assume when they say direct cost,
18  they mean that's the price that a provider would
19  pay if they purchased direct plus the FET.
20    Q.    And then in the next column it says,
21  "Calculated AWP inc.," which I assume means
22  including -- "FET as needed."
23    A.    Uh-huh.
24    Q.    Do you know what that means?
25    A.    It's formulaic.  Again, it's not a --

Page 127

1  it's an average wholesale price.  It's -- I think
2  they add 6 percent to it.  It's an industry
3  standard.  Or 5 percent is as an industry standard
4  that is used as average wholesale price.
5    Q.    Then the next one is "FDB AWP (package
6  level)."
7        Do you know what that means?
8    A.    I do not know what FDB is.
9    Q.    And then finally on the next page,
10  there's a column that says, "Redbook AWP."
11    A.    Redbook is one of the pricing services
12  that we get that communicates manufacturers' price
13  increases.
14    Q.    Now, this document is from, I think,
15  2004.  Do you know if these terms are still in
16  regular use at Merck for pricing?
17    A.    For the most part, yes.  Yup.
18        - - -
19        (Whereupon, the document was marked, for
20  identification purposes, as Plaintiffs' Exhibit
21  Taylor-13.)
22        - - -
23  BY MR. O'KELLY:
24    Q.    Ready?
25    A.    Yup.

Page 128

1    Q.    We've marked as Exhibit Number 13
2  MRK-CHA00356494 through 6535.
3        Do you recognize this document?
4    A.    I'm not familiar with the document, but
5  it's -- generally what it is, yes, it is the
6  five-year plan.
7    Q.    And it says -- the PowerPoint is titled,
8  "Preliminary 2006 MVD LROP May 25, 2006."
9        Can you tell us what LROP means?
10    A.    Long-range operating plan.  It's a
11  five-year view.
12    Q.    And in general terms, the purpose of a
13  long-range operating plan is what?
14    A.    To anticipate in, one, investments, but
15  also to inform the organization on revenue
16  projections.
17    Q.    And by "investments," what do you mean?
18    A.    If we're going to launch a new product,
19  maybe we need to increase our number of sales reps.
20    Q.    Okay.  Would you mind turning to the
21  page that's number 6 of the PowerPoint?  6500 is
22  the Bates number.
23    A.    Okay.
24    Q.    Now, here we have a slide that reads,
25  "Changes to Key Sales Assumptions 2006 LROP vs.

Page 129

1  2005 LROP."  And under 2005 LROP under pricing,
2  there's a notation, "ProQuad premium 10% 2006-2009,
3  9% in 2010 and 7% in 2011.  Price reductions of 8%,
4  5% and 4% in 2012, 2013 and 2014, respectively."
5        Do you know what that means?
6        MS. DYKSTRA:  Objection.
7        THE WITNESS:  The premium that they're
8  referring to I believe is the premium between
9  ProQuad, and it's the pricing between ProQuad
10  and its individual components, so MMR and
11  Varivax.
12  BY MR. O'KELLY:
13    Q.    So there's a premium for purchasing the
14  MMR plus the Varicella in a single component.
15    A.    When they launch the product, yup.  And
16  price reduction, I'm assuming, is an increase to
17  contracted discounts.
18    Q.    Okay, try me again there.
19    A.    I believe the price reductions they're
20  referring to are discounts, contract discounts,
21  that they were assuming over time that -- I don't
22  know if those are incremental or if they literally
23  were going from 8 to 5 to 4.
24    Q.    So -- and when you talk about "price
25  reductions," are we talking about catalog price or

33 (Pages 126 - 129)

Appx20393

Page 130

1 contract price?
2    A.   I'm sure it's contract price.
3    Q.   And then in the 2006 LROP it reads,
4 "ProQuad premium 3% in 2006 and 0% from 2007 until
5 competition enters the market in 2012.  Price
6 reductions of 10%, 5% and 4% in 2012, 2013 and
7 2014, respectively."
8        Do you know what competition entering
9 the market in 2012 is being referenced there?
10    A.   There were various times over many years
11 that the organization had projected that a
12 competitor for MMR II is coming to the market.  So
13 I assume that's what they're referring to, but I
14 don't remember the exact years because there were
15 multiple times that it was anticipated and planned
16 for.
17    Q.   So these price reductions in 2012, '13
18 and '14, do you believe that they're referring to
19 MMR II or to ProQuad?
20        MS. DYKSTRA:  Objection.
21        THE WITNESS:  Don't know.
22 BY MR. O'KELLY:
23    Q.   Let's skip forward to page 11.  This is
24 a slide headed, "Domestic Gross Catalog Price
25 Increases 2007-2015."

Page 131

1        Is there a distinction between gross
2 catalog price and catalog price?
3    A.   Not that I'm aware of.
4    Q.   So this is referring to catalog prices?
5    A.   Yes, I believe so.
6    Q.   And it's forecasting for ProQuad price
7 increases in 2007 of 3.3 percent, 2008 of
8 6.5 percent, 2009 6.5 percent, 2010 6.5 percent,
9 and 2011 6.5 percent, and then in 2012 a decrease
10 of 10 percent; is that correct?
11    A.   That's what it says here.
12    Q.   In 2013 a decrease of 5 percent, 2014 a
13 decrease of 4 percent, and then zero percent change
14 in 2015.
15    A.   And it may be here that they're using
16 gross catalog sales as the impact of contracting,
17 because I'm not aware of us ever planning to
18 decrease the catalog price of a product.
19    Q.   And this 2012 point where it switches
20 from an increase to a decrease is where the earlier
21 slide noted the competition was anticipated.
22    A.   Yes.
23    Q.   Then the next line has the MMR II
24 vaccine, and the corresponding numbers are for 2007
25 an increase of 6.5 percent, 2008 an increase of

Page 132

1 6.5 percent, 2009 an increase of 6.5 percent, the
2 same in 2010 and 2011, and then in 2012 an increase
3 of 4.5 percent, and similarly 4.5 percent increase
4 in '13, '14 and '15.
5    A.   It looks pretty standard.
6    Q.   But it was increasing -- at least it was
7 proposed to increase at a rate of 6.5 percent until
8 2012, and then there was the point when competition
9 was anticipated at --
10    A.   Uh-huh.  Uh-uh.
11    Q.   -- which the rate increase declined.
12 Now, that's not what actually happened in those
13 other years.  The catalog prices of those products
14 did not decrease.
15        MS. DYKSTRA:  Objection.
16        THE WITNESS:  Correct.  Again, I'm just
17    not sure what they mean by gross catalog.  I
18    would be surprised if we were planning to take
19    the catalog price down.  I have not seen that
20    before, so I don't know for sure what gross
21    catalog means.
22 BY MR. O'KELLY:
23    Q.   Do you know who at Merck would be able
24 to explain this document to us?
25    A.   Well, I believe these are finance --

Page 133

1 this document was generated by finance.  So someone
2 in Merck Vaccines' finance.
3    Q.   One last question on this document.
4 Page 17, this shows some financial figures for --
5 looking forward from 2006 and 2005.
6        Do you know if these numbers relate to
7 the MMR and ProQuad vaccines or to a range of
8 products more broadly?
9    A.   I do not know, but it looks to be that
10 they're global numbers, not US, because of the
11 SP-MSD.
12    Q.   Let's switch gears again.  Let's talk
13 about contract pricing.
14        Can you describe, in general terms, the
15 process by which contract prices are negotiated and
16 agreed with direct purchasers?
17    A.   Direct provider --
18    Q.   No, direct purchasers.
19    A.   -- or wholesalers --
20    Q.   We discussed this morning there were
21 four classes of trade that purchased directly, CDC,
22 Kaiser, wholesaler/distributors, and physician
23 practice groups.
24    A.   Yes.
25    Q.   So with respect to Kaiser, the

34 (Pages 130 - 133)

1  wholesalers and the physician practice groups, the
2  process by which contracts are negotiated and
3  agreed with specifically the pricing component of
4  the contracts with those customers.
5      A.   Okay.
6          MS. DYKSTRA:  Objection.  Form.
7          THE WITNESS:  With wholesalers and
8  distributors there really is not a negotiation.
9  There is a distribution fee, a contract that we
10  have in place that pays a set fee across all of
11  our vaccines.  So that is a contract that's
12  updated that -- you know, maybe once every five
13  years or something like that, depending on if
14  strategy changes.  So that is only negotiated at
15  the time that that contract would change, but it
16  is across -- in the case of the wholesalers is
17  across all of Merck products, the same fee is
18  paid regardless of if it's a vaccine or a tablet
19  or what have you.  So there is really nothing,
20  no vaccine negotiation that goes on there.
21  With --
22  BY MR. O'KELLY:
23      Q.   Let's just stop there for a second.
24  When you say a fee is paid, is that based on a
25  percentage or based on a flat dollar amount per

1  unit?
2      A.   Percent based on the cost of the
3  product.
4      Q.   But costs --
5      A.   Or price, the catalog price.
6      Q.   The catalog prices.
7      A.   Yes.
8      Q.   So the wholesaler gets a reduction in
9  catalog price by a flat percentage.
10         MS. DYKSTRA:  Objection.
11  BY MR. O'KELLY:
12      Q.   Am I understanding correctly?
13      A.   Yeah, it is -- I believe they pay
14  catalog when they purchase it, but that we pay them
15  a rebate if they meet certain performance
16  requirements in their contracts, like service
17  levels, inventory levels, days of supply, that type
18  of thing, and there's a lot of data they have to
19  give us.  And if they do all those things, then we
20  would pay them, for example, 1 percent of --
21  multiplied by their purchases.
22         MS. DYKSTRA:  And I'm just going to
23  object to the extent that she's testifying
24  around wholesaler fees that it's outside the
25  scope, but she can answer in her personal

1  capacity.
2  BY MR. O'KELLY:
3      Q.   That's a very good question.  I mean,
4  I'm not an economist.
5          But are the fees considered a discount
6  or rebate?  I'm just wondering if -- for example,
7  if it was 2 percent and if a wholesaler purchased a
8  product for a hundred bucks and then they got the 2
9  percent money paid back to them, would the price be
10  the hundred dollars or the $98?
11      A.   I can't testify to that.
12         MS. DYKSTRA:  I think that would
13  probably be regulated by all sorts of
14  Medicare/Medicaid and life provisions.
15         MR. O'KELLY:  I still think it's
16  information we need for purposes of determining
17  the economic price.
18         MS. DYKSTRA:  Well, she can answer in
19  her personal capacity if she knows.
20         MR. O'KELLY:  Fair enough.
21         THE WITNESS:  I don't think that that
22  fee is impacting the end-user price, though.
23  That is mostly all done through chargeback.
24  BY MR. O'KELLY:
25      Q.   Okay.  That's -- that's getting onto a

1  level that we don't have to go in this lawsuit.
2          All right.  So that's the wholesalers.
3      A.   Yes.
4      Q.   Let's take Kaiser because it's one of a
5  kind.
6      A.   Yup.
7      Q.   And why is Kaiser one of a kind?
8      A.   Because there are just really not any
9  other organizations that operate like Kaiser, in
10  that they -- that they are their own payer.  So
11  they are the provider and the payer in one versus
12  in the rest of the market the managed care
13  organizations are the payer and the physician
14  clinic, integrated delivery system, et cetera, are
15  the provider.  So two separate organizations.  And
16  we don't contract with managed care in that case,
17  but because Kaiser is also the provider -- they
18  purchase the product -- we do contract with them at
19  their request.  If there were any like customers
20  that wanted to engage in a contract with us, we
21  would consider that.
22      Q.   And how does Merck agree on prices for
23  products purchased by Kaiser?
24      A.   It is a product-by-product negotiation.
25  I think their contracts are probably two and three

1 years in length. But it is a pretty standard
2 contract negotiation that goes product by product.
3    Q.   So each individual product out of how
4 many thousands, how many hundred?
5    A.   13 vaccines, but I don't know about the
6 rest of Merck.
7    Q.   Let's stay with vaccines. And each of
8 those is agreed separately --
9    A.   Yes.
10    Q.   -- on a product-by-product basis --
11    A.   Yes. They may be --
12    Q.   -- with Kaiser?
13    A.   -- grouped into more -- into one
14 contract, so all pediatric vaccines might be in one
15 contract, but they are -- each product is
16 negotiated separately, the price of the product.
17    Q.   Let's take a step back for a moment.
18 Let's talk about the wholesalers for one more
19 point.
20       What does Merck regard as being the
21 price that the wholesaler pays for the product?
22 The catalog price, or the catalog price minus the
23 fee that you described?
24    A.   I believe it is the catalog price.
25    Q.   Thank you.

1       Then let's go to the physician groups.
2    A.   Okay.
3    Q.   How are the prices negotiated and agreed
4 with the physician groups?
5    A.   Physician groups or physicians, clinics,
6 integrated delivery systems, medical groups
7 participate in a pricing program so they are not
8 individually negotiated contracts.
9       So we have a variety of different
10 pricing programs that exist in the marketplace
11 recognizing that one size does not fit all. There
12 are different business models that we're trying to
13 address. We don't want to try and address an
14 infinite number of business models because we could
15 never pull that off. But we also want to try and
16 offer pricing within the business model that best
17 meets the needs of that particular organization.
18 So we have a variety. Over the years it's been as
19 little as three, as many as maybe five or six
20 different options in the marketplace to pick from.
21       And a medical group, for example, will
22 sign up for one of those programs. There are
23 usually performance requirements that are usually
24 market-share based. They could be volume, but
25 usually market share. And they're usually bundled

1 with multiple vaccines together.
2    Q.   Now, the negotiations with respect to --
3 take one of these provider organizations. Does the
4 provider organization negotiate directly with
5 Merck, and Merck says, "You fit the requirements
6 for type number three out of five possible pricing
7 programs that are available," or do they come in
8 some form of a group to negotiate with you?
9    A.   Both. There are providers who join
10 buy-in groups, and then we contract with the buy-in
11 group, and that's where -- if any negotiation is
12 taking place, that's where it would be. But then
13 we also have pricing programs that are not part of
14 a buy-in group that physicians can sign up for.
15    Q.   Now, to determine the prices that one of
16 these physician groups pays for Merck's vaccine
17 products, are there contracts or other documents
18 that reflect what the agreed pricing is?
19    A.   Yes, absolutely.
20    Q.   We're going to look at a handful of
21 contracts, which I think are just exemplars, in a
22 few minutes. First I want to show you a few other
23 documents which I think describe part of the
24 process we've just been describing, and then we'll
25 talk through those.

1    A.   Okay.
2          - - -
3       (Whereupon, the document was marked, for
4    identification purposes, as Plaintiffs' Exhibit
5    Taylor-14.)
6          - - -
7 BY MR. O'KELLY:
8    Q.   So we've marked as Exhibit 14
9 MRK-CHA00461452 through 1468. Just let me know
10 when you've had a chance to look through it.
11    A.   (Witness reviewing document.)
12       Yup.
13    Q.   Do you recognize this document?
14    A.   I don't think it's one of mine, but I
15 recognize the information in it.
16    Q.   Okay. Do you have an understanding as
17 to what the purpose of this document was?
18    A.   I believe so. It looks like it is just
19 for determining roles and responsibilities, the
20 type of pricing that different individuals are
21 responsible for agreeing to in their contracts.
22    Q.   Okay. Would you mind turning to page 6
23 of the PowerPoint, "Contract Structure"?
24       Now, are these some of the -- the items
25 listed in the column on the left, are these some of

36 (Pages 138 - 141)

Appx20396

1 the pricing programs that you just described?
2    A.   Yes, they are.
3    Q.   Would you mind talking us through each
4 of them and explaining what they are in broad
5 terms?
6    A.   Sure.  Physician organizations are
7 basically GPOs for physicians.  They primarily
8 specialize in vaccines.  We contract with the
9 physician organization or buy-in group, if you
10 will, and then physician clinics sign up to
11 whichever physician organization they want to be a
12 member of, and that's how they get their pricing.
13 There is generally a market share requirement of
14 80 percent for all multi-source vaccines, and if
15 they achieve at the buy-in group level those market
16 share requirements, all of their members receive
17 discounts across our full portfolio.
18    Q.   Now, is this -- I mean, obviously --
19 well, I shouldn't say obviously.  I'm testifying
20 now.
21        The 80 percent requirement would not
22 apply to MMR II and --
23    A.   No, it would not.
24    Q.   -- ProQuad.
25        THE REPORTER:  Hold on.

1    A.   No, it would not.
2 BY MR. O'KELLY:
3    Q.   Because there is no other market --
4    A.   Agree.
5    Q.   -- participant.
6    A.   But MMR II is part of the bundle.  If
7 they achieve 80 percent market share on the
8 products for which there is competition, they would
9 receive discounts on MMR II.
10    Q.   That was my next question.  Thank you.
11        And the physicians that are members of
12 these buy-in groups, they purchase directly from
13 Merck?
14    A.   In the past, that was the only way that
15 this particular contract was available, but as of
16 the middle of 2016, that was opened up to indirect
17 purchase.  So they can be on the same contract or
18 buy-in group, but actually order their product
19 through physician distributors now.
20    Q.   We're going to talk about electronic
21 data later.  But would the data for 2016 onwards
22 reflect that -- would it differentiate between the
23 physician organizations that were direct purchasers
24 versus those that purchased indirectly through
25 wholesalers?

1    A.   Yes, it definitely would.
2    Q.   Thank you.
3    A.   Vaccine Brand Choice is another contract
4 that offers a little bit more flexibility.  The
5 bundles are broken up into different groups so that
6 providers can choose which bundles they want to
7 participate in, but same concept, 80 percent market
8 share.  You achieve the market share, you earn
9 discounts across a variety of products including
10 MMR II.  That contract is available through GPOs.
11 Your traditional GPO is Premier Innovation, et
12 cetera, but is also available for providers to
13 participate in independent of a buy-in group.  It
14 is available direct and indirectly.
15    Q.   And has it only been available
16 indirectly since 2016?
17    A.   No, this one has always been available
18 indirectly.
19    Q.   And then will the data distinguish
20 between direct purchasers --
21    A.   Yes.
22        THE REPORTER:  Hold on.  Just let him
23    ask his full question.  Can you please repeat
24    your question?
25 BY MR. O'KELLY:

1    Q.   Will the data distinguish between direct
2 and indirect purchasers?
3    A.   Yes, it will show up as direct sales or
4 chargeback sales.
5    Q.   Okay.
6    A.   VIC, or integrated delivery systems
7 contract, same concept as a Vaccine Brand Choice,
8 that is there a couple different groups.  What
9 distinguishes this contract is that some of the
10 measurements are a little bit different.  For
11 example, there's a volume requirement on Pneumovax
12 23.  There's also slightly better pricing on a
13 couple products, but it is only available -- we
14 only use it when we have a significant competitive
15 threat from a really large system, like Cleveland
16 Clinic or Mayo Clinic or something like that.
17    Q.   And if a member of this plan complies
18 with the requirements that are described here, will
19 they again get discounts across the board on their
20 vaccines, including the MMR II and the ProQuad?
21    A.   Yes, you are correct.
22    Q.   How many -- do you know how many
23 entities participate in this?
24    A.   Today, I believe it is 32.
25        The Vaccine Savings Plan is a program

37 (Pages 142 - 145)

Appx20397

1 that has been retired. It's similar to Vaccine
2 Brand Choice as well, required a certain number of
3 brands to be purchased, a market share requirement
4 for RotaTeq, and again you get discounts across all
5 products. It was only available direct from Merck,
6 but it was retired, I think, in 2014.
7     Q.    And how long was it in effect before it
8 was retired?
9     A.    In one form or another, probably since
10 early 2000s.
11    Q.    Okay. Physician distributor?
12    A.    Yeah, physician distributors, there
13 is -- it is mostly a contract that is service
14 oriented. We pay a fee for them to administer
15 chargebacks, represent pricing availability for our
16 products, that type of thing, make sure that they
17 have plenty of inventory on hand for service
18 levels, et cetera. And then there are some
19 optional market share requirements that are
20 available to them. The difference there is they're
21 not bundled in; they're optional type market share
22 requirements. So those programs are more
23 about paying for a service of distributing our
24 products.
25    Q.    So in this case, does Merck regard these

1 entities as purchasing at catalog price?
2     A.    Today, they do purchase at catalog.
3 Well, the majority of them do. There are prime
4 distributors that represent probably 90 percent of
5 our physician distributor sales, and they purchase
6 a catalog because we need them to do chargebacks.
7 And then we have some smaller-based distributors
8 who do not administer chargebacks, but we sell,
9 basically, Hep A and Hep B to them at a discount
10 off invoice because those products' catalog prices
11 really are not relevant in the marketplace.
12    Q.    But that wouldn't affect or doesn't
13 affect the MMR II and ProQuad.
14    A.    It does not.
15         340B is another portfolio contract that
16 is only available to organizations that are -- have
17 the 340B distinction according to the HRSA website.
18 So the disproportionate share provider hospitals
19 type of organizations that are treating the
20 underserved but they're privately-held companies.
21 And it's very similar to Vaccine Brand Choice with
22 just better pricing more similar to public sector
23 type of pricing.
24    Q.    And, again, to the extent that sales to
25 these entities are captured by your sales data,

1 will it be readily evident from the data what the
2 prices are --
3     A.    Yes.
4         THE REPORTER: "The prices are" what?
5 BY MR. O'KELLY:
6     Q.    The prices are at which the sales are
7 made to these entities?
8     A.    Yes, it's all on invoice discounts.
9     Q.    We both need to fix what we're doing. I
10 need to speak more slowly, and you need to let me
11 finish. Thank you. Otherwise, we'll be in
12 trouble.
13    A.    Yes, on invoice discounts, and that
14 contract is only available indirectly. So it would
15 be all through chargebacks.
16        Kaiser, we've already talked about
17 Kaiser.
18        PDP is the Pharmaceutical Distribution
19 Program. We talked about that, the fee that we pay
20 wholesalers to distribute our products and
21 administrator contracts.
22        FSS is the federal supply schedule.
23 It's just a formulaic calculation as to what that
24 price is, and we just administrator it.
25        And then CDC, which we'll talk about a

1 little bit later, the Vaccines for Children
2 Program.
3     Q.    And then on the right we have
4 "evolving"?
5     A.    New programs that were in the works at
6 the time, we had -- were just starting to contract
7 with retail pharmacy as they became more prominent
8 vaccinators in the marketplace and put a
9 volume-based program in place for them where it was
10 really Zostavax. It had nothing to do with MMR II.
11 Actually, MMR II is not even in the contract now
12 that I think about it, so we don't need to talk
13 about that.
14        And vaccine service providers really is
15 just the same as Vaccine Brand Choice but just a
16 different class of trade.
17        And city/county/state is they have
18 access to Vaccine Brand Choice as well and
19 potentially through the Minnesota Multistate GPO.
20    Q.    And do they purchase directly or
21 indirectly?
22    A.    They can do either one.
23    Q.    And will the data show whether it's --
24    A.    Yes, it will.
25        THE REPORTER: "Whether it's"?

38 (Pages 146 - 149)

Appx20398

Page 150

1 BY MR. O'KELLY:

2    Q.    Whether it's direct or chargeback?

3        Then if we look at pages 8, 9, 10, 11,

4 can you just describe in general what these pages

5 are communicating?

6    A.    On page 8, that is the Merck Vaccine

7 Savings Plan, the pricing program that I told you

8 we retired I think in 2014, and it's just simply

9 showing what the on-invoice discounted is for MMR

10 and ProQuad, depending on which tier the customer

11 falls into.  So if they -- if they order four

12 products in a given quarter, then they would earn 2

13 percent discount on MMR and ProQuad; likewise, tier

14 2-5 products and on up.

15        And then the last column says, "Brand

16 Choice."  So if -- in addition to buying four

17 brands or five brands or what have you in those

18 tiers, if they also achieve an 80 percent market

19 share requirement for Rotavirus vaccine, they would

20 get an additional 2 percent discounted.  So if they

21 were buying four products in a quarter, they would

22 get 2 percent for being in tier 1.  And if they

23 were also buying 80 percent market share on

24 RotaTeq, they would get another 2 percent for that.

25 So they would get 4 percent discount on MMR II and

Page 151

1 ProQuad.

2    Q.    Thank you.

3    A.    Vaccine Brand Choice on slide 9 shows

4 the two groups.  So they can choose to perform

5 their independent bundles.  They can choose to

6 perform in one or both or neither group.

7        And in group one, they have a market

8 share requirement for a multi-source product that

9 they have to achieve to earn those discounts on MMR

10 and ProQuad.

11        And then in the -- no impact on group

12 two because MMR and ProQuad are not in group two,

13 but it's a separate program, separate bundle.

14    Q.    And can you tell me -- one of the

15 columns says, "Base Discount."

16    A.    Yeah, 0.1 percent.  That's really a

17 tracking fee.  It technically is a discount, so we

18 call it a discount.  But when a customer purchases

19 indirectly, if they were on base, if they were not

20 achieving the performance requirement and were not

21 earning a discount, there would be no chargeback,

22 and then we wouldn't have the record of where that

23 sale went.  So by giving them a 0.1 percent

24 discount, we get to see the tracings.

25    Q.    Okay.

Page 152

1    A.    Slide 10, VIC is the program that we

2 only have 32 in the marketplace today.  Same type

3 of thing in group one, there is a performance

4 requirement, a market share and a multi-source

5 product.  If they achieve that, then they will earn

6 the discounts of up to 5 percent on MMR and

7 ProQuad.

8    Q.    What about slide 11?

9    A.    Yeah, I'm trying to figure out this --

10 it looks like it -- the first part is the group one

11 similar to the Vaccine Brand Choice, which is where

12 MMR is.  So if they achieve the discounts across

13 the -- or achieve the market share requirement for

14 that group, they would get 4 percent on MMR II.

15    Q.    Okay, thank you.

16        On page 13 there's a bullet that says,

17 "Currently, 95% of direct customers buy off a

18 contract."

19        Do you understand what that means?

20        Very simplistic, my understanding is

21 that a substantial part of the direct purchases

22 were made by the wholesalers and distributors and,

23 therefore, were not on a contract.

24    A.    No, this -- so this is referring to --

25 when we say "direct customers," we are -- these are

Page 153

1 providers.

2    Q.    Okay.

3    A.    So wholesalers and distributors aside.

4 So 95 percent of physicians that purchase direct

5 from Merck are participating in one of these

6 pricing programs.  5 percent are just purchasing at

7 catalog.

8        MR. O'KELLY:  Okay, that cleared up a

9 mystery.

10        This always happens later in the day,

11 things that you had planned to ask with

12 documents have fortunately already taken care of

13 themselves.  Skip forward.

14        THE WITNESS:  That's a good thing.

15        MR. O'KELLY:  It is a good thing.

16        - - -

17        (Whereupon, the document was marked, for

18 identification purposes, as Plaintiffs' Exhibit

19 Taylor-15.)

20        - - -

21 BY MR. O'KELLY:

22    Q.    We've marked as Exhibit 15 a document

23 that's Bates numbered MRK-CHA01176531 to 6573.

24 Just let me know when you've had a chance to --

25    A.    (Witness reviewing document.)

39 (Pages 150 - 153)

Page 154

1    Yup.
2    Q.    Could you describe in general terms what
3  this document describes?
4    A.    It is simply, and as the title says, an
5  overview of our approach to private sector
6  contracting with physician class of trade.
7    Q.    And this was in 2006.
8    A.    Yes.
9    Q.    So it, in many regards, deals with
10  information what's similar to what we saw on the
11  previous document?
12    A.    Yes.
13    Q.    For an earlier time period?
14    A.    Yes.
15    Q.    So what I just want to do is go through
16  it fairly quickly, hopefully, and try and determine
17  if there are -- if there are material differences
18  as far as those programs that were described here
19  that either changed materially or no longer
20  existed.
21    So, for example, on page 7, it names
22  several GPOs, and it says, "GPO Alternate Care
23  Contracts."
24    Do you know whether in this context this
25  is describing GPOs who represent entities that

Page 155

1  purchase directly from Merck or indirectly or both?
2    A.    Both.  So traditional GPOs, as they list
3  here, but this is specific to alternate care,
4  meaning nonacute.  So physician clinic.
5    Q.    And would the products that are covered
6  by GPO contracts with these traditional GPOs for
7  these nonacute clinics include MMR II and ProQuad?
8    A.    Yes, it would.  It was probably -- the
9  contract that was available to clinics through
10  these GPOs at the time was probably an earlier
11  version of Vaccine Brand Choice, but it wasn't --
12    THE REPORTER:  "But it" what?
13    THE WITNESS:  Was not called Vaccine
14  Brand Choice at the time.
15  BY MR. O'KELLY:
16    Q.    So if we look at page 9, do you
17  understand what that document is communicating?
18    A.    So, again, this were the nonacute care
19  class of trade that were purchasing on these GPO
20  contracts.  This was a base contract, meaning that
21  available through the GPO to the physician clinic,
22  but not with any performance requirements.  So for
23  MMR II and Varivax, base price is catalog, but that
24  was just the base program.
25    Q.    Could a practice group or provider group

Page 156

1  that participated in this program have availed
2  itself of some other discounts and rebates outside
3  of the program?
4    A.    Yes, it would.  So this is the -- these
5  are the base discounts that, just by being a member
6  of the GPO, they would have access to.  But then,
7  in addition, if they wanted to enroll in what was
8  Vaccine Brand Choice or what evolved into Vaccine
9  Brand Choice and they wanted to perform at those
10  market share levels, they would earn the
11  performance-based discounts.
12    Q.    Got it.  Thank you.
13    And then if we look at page 11.
14    A.    So this would be the performance-based
15  option that they would have in addition to the base
16  contract.
17    Q.    And the performance would -- it related
18  to purchasing minimum contracted quantities of
19  other products, and then they got a 2 percent
20  discount off catalog on the MMR II and ProQuad --
21    A.    Yes.
22    Q.    -- as a consequence of satisfying their
23  requirement.
24    A.    Yes.
25    Q.    And then let's look at page 13.  What do

Page 157

1  we have here?
2    A.    Same exact thing as the alternate care,
3  but this was for hospitals.  So for acute care base
4  pricing and no performance.  And in the case of MMR
5  II and ProQuad, the base price is catalog.
6    Q.    And then page 15.
7    A.    Same as before, but for the hospital, if
8  they are achieving the performance requirements,
9  they receive the 2 percent discount performance
10  requirement.  On other products, they receive the
11  benefit 2 percent on MMR and ProQuad.
12    Q.    Okay.  And then let's go to 17 and the
13  pages that follow it.  So what does page 17
14  introduce?
15    A.    This is the pricing program that had
16  been in place for many many years for physician
17  clinic that was available through direct purchase
18  only.
19    Q.    And is that program still in existence?
20    A.    This is the one that we retired in 2014.
21    Q.    Okay.  But it was in place for many
22  years before 2014.
23    A.    Yes.
24    Q.    And then on page 18?
25    A.    This is just laying out what the

40 (Pages 154 - 157)

Appx20400

Page 158

1 requirements were. It was if you buy multiple
2 brands, you achieved different levels of discount
3 across the entire portfolio.
4 Q. And then on page 19, does this describe
5 additional discounts on top of the ones described
6 in page 18?
7 A. Yes, this was a kicker. In other words,
8 on page 18, if you were buying five qualifying
9 products, you would get a 7 percent discount on MMR
10 and ProQuad. If, in addition to that, you bought
11 at least 300 doses in that time period, you would
12 get an extra 2 percent. So 9 percent on MMR and
13 ProQuad.
14 Q. That's 300 doses of any combination of
15 products in the package.
16 A. Yes. Yes, any -- any combination. And
17 then if you -- because you were purchasing direct,
18 if, in addition to that, you paid your bill within
19 30 days, you would receive another 2 percent. So
20 that would be 11 percent on MMR and ProQuad.
21 20 is just talking about different
22 resources the sales force had to communicate
23 these -- this program.
24 Q. On pages 26 and 27, there are two
25 slides, one of which lists "Authorized

Page 159

1 Distributors," and on the next page it's "Vaccine
2 Contracted Distributors."
3 Do you know what's the distinction
4 between authorized distributors and vaccine
5 contracted distributors?
6 A. It's difficult to read the individual
7 names here, but I believe at the time authorized
8 distributor is any wholesaler or distributor that
9 had signed an agreement with Merck, the Merck
10 authorized distribution agreement were included
11 there.
12 And then the vaccine contracted
13 distributors are a subset of those that also were
14 on the vaccine contract, which had additional
15 requirements and additional fees that they could
16 earn.
17 Q. Does Merck use IMS data when it's
18 setting contract prices?
19 A. Yes, we do.
20 Q. And could you describe for us how you
21 use IMS data?
22 A. We use the IMS data really just for
23 competitive product volume so that we can measure
24 market share. Most of our programs have market
25 share requirement for one or two or more products.

Page 160

1 So we use the IMS data to measure that market
2 share.
3 Q. Now, in the case of MMR II and ProQuad,
4 do you use IMS data in determining what the
5 contract pricing is going to be for those two
6 products?
7 A. Because discounts for MMR II and ProQuad
8 are dependent on achieving the market share
9 requirement for a different product, to that
10 extent, yes, it does impact the discount on MMR II
11 and ProQuad.
12 Q. IMS typically distinguishes between
13 different categories of purchasers of
14 pharmaceuticals and, I believe, vaccines.
15 Does Merck use those categories, the
16 IMS-created categories of different types of
17 classes of trade in making its own contracting
18 decisions?
19 A. Such as physician clinic, hospital, that
20 type of class of trade?
21 Q. Yes.
22 A. Yes.
23 Q. But do you use their definitions, or do
24 you create your own, I guess is the question I'm
25 trying to ask?

Page 161

1 A. In some cases we create our own, but for
2 the vast majority, it's the same. So there may be
3 a unique situation like, you know, vaccine service
4 provider. Is that a clinic, or is it some other --
5 we create our own class of trade for a vaccine
6 service provider, but I think IMS just calls it
7 physician clinic. But that's a very very small
8 piece. The overwhelming majority were using the
9 same class of trade as IMS.
10 Q. Do you personally work with IMS data?
11 A. I do not.
12 Q. So if I showed you a snapshot of a page
13 of IMS data, it's not something you're familiar
14 with?
15 A. No. We use the end result to measure
16 performance in our contracts.
17 MR. O'KELLY: Let's look at some
18 contracts.
19 MS. DYKSTRA: Is it okay to take a
20 break?
21 MR. O'KELLY: Sure.
22 VIDEOTAPE TECHNICIAN: The time is now
23 3:17. We're going off the video record.
24 - - -
25 (Whereupon, a recess was held.)

41 (Pages 158 - 161)

Appx20401

Page 162

1                    - - -
2         VIDEOTAPE TECHNICIAN: The time is now
3    3:31. This begins disc five.
4         MS. DYKSTRA: There's one quick
5    clarification in the testimony Michele wanted to
6    just touch on. It was on Taylor-15, page 11. I
7    just want to make sure she answered accurately.
8    This document, Taylor-15, page 11.
9         MR. O'KELLY: I'm just trying to find
10   it.
11        MS. DYKSTRA: Oh, I'm sorry.
12        MR. O'KELLY: Just give me a second.
13        MS. DYKSTRA: The last exhibit I think
14   we were using.
15        THE WITNESS: I think you had -- the
16   question was, if the discounts on ProQuad and
17   MMR were dependent on volume purchases, may have
18   been the question. But I just wanted to clarify
19   that that is a market share program. So the
20   discounts are dependent on market share for
21   other products.
22        MR. O'KELLY: Okay, thanks for
23   clarifying that.
24        THE WITNESS: Sure.
25        MR. O'KELLY: That's very helpful.

Page 163

1         I understand we have a little under
2    three hours left on the clock, and I could
3    easily eat up two hours of those, but the
4    relators will be very unhappy.
5         So what I'm going to do is, I'm going to
6    ask a very limited number of questions about
7    four or five contracts just as exemplars, as
8    we've just been discussing, and then I've got
9    some questions about the data, and I reckon we
10   should wrap that up in hopefully less than an
11   hour and at that point hand it over to the
12   relators.
13        And then if, by the time Ms. Koury is
14   finished, there's still some time left, then I
15   may come back to some of the other stuff that
16   I'm skipping.
17        MS. DYKSTRA: That sounds fine. I
18   think, depending on Ms. Koury's question, we may
19   have direct that comes into -- eats into that
20   timetable, so we'll let you know.
21        MR. O'KELLY: All right. So let's plow
22   on with the contracts.
23                   - - -
24        (Whereupon, the document was marked, for
25   identification purposes, as Plaintiffs' Exhibit

Page 164

1    Taylor-16.)
2                    - - -
3    BY MR. O'KELLY:
4         Q.   We've marked as Exhibit 16
5    MRK-CHA01035600 to 5616.
6              Can you identify this document for us?
7         A.   It is a distribution agreement between
8    Merck and Henry Schein from 2004 for vaccines.
9    Before my time, but I am familiar with the
10   organization and how we contracted with them at the
11   time.
12        Q.   And is this agreement typical of
13   distribution agreements that Merck had at the time?
14        A.   At the time --
15        MS. DYKSTRA: Objection. Did you have a
16   chance to look over this to just confirm?
17        THE WITNESS: I didn't. I'm familiar
18   with what the contract was back then.
19        MS. DYKSTRA: Sounds good.
20   BY MR. O'KELLY:
21        Q.   Now, if we'll just look at page 3, it
22   talks about reporting. And it says, "Merck hereby
23   gives notice to Schein that, except as set forth
24   below, discounts and rebates will be paid under
25   this Agreement only if Schein reports to IMS

Page 165

1    Health, Inc. ('IMS') all doses sold by Schein to
2    Physicians and Merck receives DDD data including
3    such information."
4              Do you know what DDD data is?
5         A.   It is -- it's an IMS data source. I
6    can't remember what it stands for, but it's an IMS
7    data source.
8         Q.   But the import of this provision is that
9    in order to qualify for discounts and rebates under
10   this agreement that Schein has to report on all
11   doses sold to physicians, has to make that report
12   to Merck in a timely fashion.
13        A.   It actually is saying that Henry Schein
14   agrees to give their data to IMS so that Merck
15   could get it through the DDD data feed from IMS.
16        Q.   And then there's a section B which says,
17   "Within 60 days following the close of each
18   calendar semi-annual period, Schein shall provide
19   for delivery to Merck reports, in a format
20   acceptable to Merck with categories as listed on
21   Schedule F, showing the number of units sold to
22   Physicians in such calendar semi-annual period for
23   each Merck Product and each competitive vaccine in
24   the therapeutic categories according to the full
25   NDC number of each."

42 (Pages 162 - 165)

Appx20402

Page 166

1    Do you know why there was a second
2 reporting requirement directly to Merck in addition
3 to the IMS reporting?
4    A.    Schedule F, I think that was a lot of
5 the competitive data.  Is this on page 17?  Is that
6 what we're calling -- I'm assuming I'm going in
7 order here, this being the Schedule F.
8        MS. DYKSTRA:  I think, for the record,
9 at the top of page 17 in the very top corner,
10 it's very small.
11        THE WITNESS:  I see it.  It's very
12 small, but it does say Schedule F, yes.
13        So this is competitive data so -- to
14 ensure that we could measure market share for
15 the customers that Henry Schein was servicing
16 because we may or may not be able to get that
17 from IMS.
18 BY MR. O'KELLY:
19    Q.    Okay.  Now, we discussed earlier that
20 distributors typically purchase at the catalog
21 price?
22    A.    Yes.
23    Q.    But this contract anticipates that if
24 certain performance metrics and reporting metrics
25 are satisfied, that Henry Schein will be able to

Page 167

1 avail itself of discounts and rebates; isn't that
2 correct?
3    A.    At the time that this contract was in
4 place, we did not have distributors administering
5 chargebacks for us.  So we could sell to them at a
6 discount.  We didn't have to worry about
7 reconciling the difference.
8    Q.    Was that a general procedure that
9 applied to distributors at that time?
10    A.    Yes.
11    Q.    In other words, they receive rebates and
12 discounts rather than processing pricing through a
13 chargeback system?
14    A.    Yes.
15    Q.    When did that change?  Do you know?
16    A.    Maybe 2010, 2008.
17    Q.    Do you know if the data for the pre-2010
18 or 2008 period will reflect the post-discount and
19 post-rebate pricing paid by the distributors?
20    A.    It will show what they purchased at, so
21 whether it was a non-invoice discount or whether it
22 was catalog.  And then it will also show from a
23 separate data feed if there were any additional
24 rebates that were paid after the fact or fees or
25 anything like that.  So they're two -- two

Page 168

1 different data sources that come together to
2 reflect that.
3    Q.    We're talking about fees again.  Earlier
4 you testified that Merck does not regard the fees
5 that are paid to distributors today as being a
6 component of price.
7        In this pre-2008 or 2010 period, were
8 those fees regarded as a component of price?
9    A.    I believe we look at wholesalers and
10 distributors even though they are the same class of
11 trade.  From Merck we look at them a little bit
12 differently.  And in the wholesaler agreement that
13 is more of a fee for service type arrangement, but
14 with physician distributors for vaccines, that
15 although we could potentially record those as a
16 fee, that to be more conservative we count them as
17 a discount.
18    Q.    Okay.  And then if we turn to Schedule
19 A.  That's 5610 in the Bates numbers.  Just for the
20 record, this shows that the MMR II vaccine was one
21 of the products that was the subject of this
22 contract.
23    A.    Yes.
24    Q.    And then on pages 5611 and 5612, if you
25 wouldn't mind taking us across the columns.  This

Page 169

1 is "Schedule B" -- it's headed "Discounted Prices."
2 And just explain what these different columns mean.
3    A.    The first column is showing what the
4 catalog price was at that time.
5        The next column is showing what the
6 price was after on-invoice discounts.  So in this
7 particular case, there was no on-invoice discount.
8        And the column after that is the same
9 thing, but without excised tax.  So one is with and
10 one is without, but distributors don't pay the
11 excise tax to us, to Merck.
12        And then the last is just showing if
13 there are any on-invoice discounts.  And as the
14 numbers show, there aren't.  It's zero.
15        The last two columns are showing what
16 the rebates are.  So an additional 1 percent
17 rebate, market share rebate.  And I don't know --
18 that must have been a bundle type thing.  I'd have
19 to look back through the contract.  I don't
20 remember that.
21        And the last column, an additional
22 potential rebate for market share.
23    Q.    And of these two columns, the first
24 rebate, the maximum rebate that Henry Schein could
25 have earned on the MMR II product was 1 percent.

43 (Pages 166 - 169)

Appx20403

Page 170

1    A.    Yes.
2    Q.    And in the second column, the maximum is
3 $0.40. Is that for a simple dose vial or --
4    A.    Yes, it's showing the dollars.  I'm
5 sorry.  The one column is the percent.  The other
6 one is the dollars, yes.
7    Q.    And then if we look at, I think it's the
8 extension of the table on page 13, do you
9 understand how that differs from the information in
10 the previous two columns?
11    A.    I think it's referring to the same
12 thing, probably just mentioned in two different
13 places in the contract.
14        MR. O'KELLY:  Okay.
15        - - -
16        (Whereupon, the document was marked, for
17    identification purposes, as Plaintiffs' Exhibit
18    Taylor-17.)
19        - - -
20 BY MR. O'KELLY:
21    Q.    Exhibit Number 17 is MRK-CHA00931264 to
22 1280.  Just let me know when you've had a chance to
23 look it over.
24    A.    (Witness reviewing document.)
25        Same type of agreement that was in place

Page 171

1 with Henry Schein for vaccines.
2    Q.    And this one is with Cardinal Health?
3    A.    Yeah, this was likely with the -- I'm
4 looking for the name on here.  Cardinal, the
5 wholesaler has a physician distributor arm, and
6 this was probably pertaining to specifically the
7 distributor arm.
8    Q.    So this isn't cardinal in its sort of
9 mainstream wholesaler capacity?
10    A.    No, I don't believe so.
11    Q.    And the reporting requirements we see
12 here under 6(a) and (b) are similar to the ones we
13 saw for Henry Schein?
14    A.    Yup.
15    Q.    And then this also -- one of the covered
16 products is MMR II.  I believe if we look at pages
17 1275 and 1276, the discounted pricing follows a
18 similar pattern to what we saw for Henry Schein?
19    A.    Yes, 1 percent.
20        - - -
21        (Whereupon, the document was marked, for
22    identification purposes, as Plaintiffs' Exhibit
23    Taylor-18.)
24        - - -
25        THE WITNESS:  (Witness reviewing

Page 172

1    document.)
2        This is a contract between Merck
3    Vaccines and the GPO Amerinet.
4 BY MR. O'KELLY:
5    Q.    I don't think I noted the Bates numbers
6 for the record, so let me do that.  MRK-CHA01222724
7 to 781, and it's Exhibit Number 18.  So this was a
8 GPO contract in 2004.
9        So the entities that were members of
10 Amerinet in 2004, does this contract describe the
11 prices that they would have paid including rebates
12 and discounts?
13    A.    I don't -- yes, on page 4, you can see
14 in the index third line from the bottom "Merck
15 vaccine commitment Program."  So that would have
16 been the performance-based pricing program that
17 physicians could participate in.  It also included
18 the base discounts, you can see in the lines up
19 above.
20    Q.    And if you take a look at page 11, which
21 is 2734 in Bates numbers.  If you can sort of read
22 through the redactions, can you describe to us what
23 that's communicating about the prices that Amerinet
24 numbers -- strike all that.
25        Can you describe the prices that

Page 173

1 Amerinet members paid for MMR II vaccine under this
2 contract?
3    A.    So the first sentence is indicating that
4 all members of Amerinet would receive the base
5 pricing, which in the case of MMR would be catalog.
6        And then the second or the note is
7 indicating that they could also participate in the
8 commitment program, the vaccine commitment program,
9 which would also give them discount -- access to
10 additional performance-based discounts.
11    Q.    Can you tell from the document what
12 these additional discounts were?
13    A.    2 percent.
14    Q.    And what did Amerinet's members have to
15 do to qualify for that 2 percent discount?
16    A.    I'm not sure.  Usually it was a market
17 share bundle.  But here it looks like page 45.  Any
18 Amerinet member enrolled in the program pursuant to
19 the agreement shall continue to be enrolled.  Okay.
20 "The discounts offered on Merck Vaccines under the
21 Vaccine Program are exclusive and may not be
22 combined" --
23        MS. DYKSTRA:  Just for the record,
24    you're reading on page Bates labeled 2768?
25        THE WITNESS:  Yes -- "may not be

Page 174

1 combined with any other Merck discounts or
2 rebates."
3      It looks like it may have -- a lot of
4 this is redacted.  So based on what's here, I
5 can't be sure.
6 BY MR. O'KELLY:
7    Q.   It's pretty hard to wade through the
8 redactions.
9    A.   But it was likely a market share bundle.
10    Q.   I've got another contract here -- I
11 won't mark it yet -- from Broadlane.
12      Is Broadlane a similar entity to
13 Amerinet?
14    A.   Yes, it is.  It's a GPO.
15          - - -
16      (Whereupon, the document was marked, for
17    identification purposes, as Plaintiffs' Exhibit
18    Taylor-19.)
19          - - -
20 BY MR. O'KELLY:
21    Q.   We've marked as Exhibit 19 the document
22 Bates numbered MRK-CHA00868307 to 8321.  When
23 you've had a chance to look through that, we can
24 talk about it.
25    A.   This is a contract between Merck

Page 175

1 Vaccines and a physician organization buy-in group,
2 so one of these GPO for vaccines.
3    Q.   And the members of this GPO, are they
4 direct purchasers or indirect purchasers?
5    A.   At the time they were direct purchasers
6 only, physician clinics.
7    Q.   And could you describe to us what
8 discounts were available to the members of Kelson
9 under this contract?
10      MS. DYKSTRA:  I'll just note for the
11    record that this is -- I'm not sure it's final,
12    because it's not signed, this contract.
13      But to the extent that you know, of
14    course you can answer.
15      THE WITNESS:  Market share measured at
16    the buy-in group level bundled across all Merck
17    vaccines.  So achieving market share, there were
18    different levels, I believe 80 and 90 percent.
19    If as all the members combined achieved the
20    market share for multiple products, they would
21    earn discounts across the entire portfolio
22    including MMR II.
23 BY MR. O'KELLY:
24    Q.   If you look at page 12 of this document,
25 it shows a market share of greater than or equal to

Page 176

1 90 percent.
2      So as long as the combined members of
3 the buy-in group met an overall market share on the
4 vaccines that were the subject of this contract,
5 then they got that discount on all the vaccines
6 purchased including the MMR II and ProQuad if it
7 was -- just MMR II.
8    A.   Exactly, yes, you are correct.
9      MR. O'KELLY:  And the last contract of
10    the day.  And I will point out before Ms.
11    Dykstra does that it's not signed, so it may not
12    be final, but I'm just marking it as an
13    illustration.
14          - - -
15      (Whereupon, the document was marked, for
16    identification purposes, as Plaintiffs' Exhibit
17    Taylor-20.)
18          - - -
19 BY MR. O'KELLY:
20    Q.   Do you recognize this type of contract?
21    A.   It's a contract between Merck Vaccines
22 and Kaiser.
23    Q.   And does it provide for an on-invoice
24 discount to Kaiser -- for MMR II?  Excuse me.  I'm
25 looking at 1.1.  It says, Merck shall make

Page 177

1 available to Kaiser an on-invoice discount of 15
2 percent on purchases of MMR II and its components.
3    A.   Yes, and it looks like it was volume
4 based.
5    Q.   So it provides this -- to qualify, Merck
6 "shall purchase 95% of its requirements for
7 measles, mumps and rubella vaccines and 95% of its
8 requirements for varicella vaccines from Merck
9 during each Contract Year."
10      And then it also provides that Kaiser
11 has to purchase a minimum of 225 doses -- excuse
12 me -- 225,000 doses of MMR II during the contract
13 year.
14      Have you had -- and this is -- is this
15 typical of the agreements that Merck Vaccines
16 enters into with Kaiser?
17      MS. DYKSTRA:  Objection.
18      THE WITNESS:  Our contracts are
19 different today.
20 BY MR. O'KELLY:
21    Q.   Do your contracts with Kaiser today
22 require it to meet either market share or minimum
23 purchase requirements or both?
24    A.   Generally, market share.
25    Q.   And to the extent that Kaiser gets

45 (Pages 174 - 177)

Page 178

1 discounts on its purchases of MMR II and ProQuad,
2 would that be reflected in the data, the electronic
3 data that Merck uses?
4     A.   Yes, they would be on-invoice discounts.
5     Q.   Now, we've been talking about discounts
6 of various types, and I've noted from the documents
7 I've looked at various terms describing discounts.
8 So if you wouldn't mind telling me the ones you're
9 familiar with.  We talked about a prompt pay
10 discount.
11        And have you seen the term "package
12 discount"?
13     A.   No, I do not know what package discount
14 is.
15     Q.   Have you come across the term "Pharmacy
16 Savings Plan"?
17     A.   Yes, I do know what that is.
18     Q.   Can you tell me what that means?
19     A.   It is simply a performance-based
20 contract for retail pharmacy for adult vaccines.
21 It does not include MMR II and ProQuad.
22     Q.   Okay.  Skip all this.  Save it for
23 later.
24        Transactional data, can you tell us
25 where is the data maintained, stored at Merck?

Page 179

1        MS. DYKSTRA:  And if I may, I'm going
2 to -- Michele has some notes she wants -- she
3 has to help enable her to answer this question.
4        MR. O'KELLY:  Of course.
5        MS. DYKSTRA:  And we'll provide you with
6 a copy of that as well.
7        THE WITNESS:  Thank you.
8        MR. O'KELLY:  Thanks.  Hopefully it will
9 make my questions easier, too.
10        MS. DYKSTRA:  There you go.  That's my
11 job.
12        THE WITNESS:  So the data sources have
13 changed over the years due to different systems
14 that have been upgraded at Merck.  So from
15 2000 -- or from 1998 to 2003, it was one set of
16 sources for the data, two different data sources
17 depending on the type of data.
18        The first data source is a combined
19 direct sales and chargeback sales that sit in
20 our DDS repository, and that repository
21 basically pulls in historical sales, again from
22 direct purchases and chargebacks.  Then in
23 addition to that there is a -- well, what feeds
24 into that is direct sales through our order
25 management center, order management system.  And

Page 180

1 then CCAS is the system that fed the chargeback
2 data into DDS.  So that's how the two sources
3 would get into DDS, the direct and chargeback
4 sales.
5        And then the secondary set of data for
6 that charge -- for that time period are anything
7 outside of the direct sales and the chargeback,
8 which would be in the Gencore system, which
9 would include things like rebate checks,
10 administration fees that we paid to GPOs and
11 buy-in groups, as well as any fees we paid to
12 wholesalers or distributors.  So that was for
13 1998 to 2003.
14        And then 2004 to 2015, we started using
15 our government pricing system.  Similar to DDS,
16 it's a repository that brings in historical
17 sales for both direct from our order management
18 system and now in this case using SAP, which we
19 had switched over to, for those direct sales as
20 well as still using CCAS for the chargebacks,
21 and then now using in 2004 to 2013 Gencore for
22 rebates, and then we switched over to RME in
23 2014 for the chargebacks and rebates.
24        MR. O'KELLY:  Thank you.  We're going to
25 mark this as an exhibit, whatever the next

Page 181

1 number is.
2              -  -  -
3        (Whereupon, the document was marked, for
4 identification purposes, as Plaintiffs' Exhibit
5 Taylor-21.)
6              -  -  -
7 BY MR. O'KELLY:
8     Q.   I'm now going to show you some printouts
9 we've taken, snapshots of pieces of the data
10 base -- the data that was produced to us.  I don't
11 know whether it's pre or post 2004, so we'll find
12 out in a moment.  And I'd like you just to identify
13 what the various columns across tell us.
14     A.   Okay.
15        MS. DYKSTRA:  Depending on the question
16 specifically, we may have an objection because
17 we did negotiate the scope of this topic in the
18 meet and confers.  But why don't you go ahead
19 and proceed, and we'll see what they are.
20        MR. O'KELLY:  Okay.  Basically -- on the
21 record, I'm just basically looking for
22 information that will help our experts to
23 decipher the data.
24        I've had these blown up so we can read
25 them.

46 (Pages 178 - 181)

1      THE WITNESS: Oh, good.
2      MS. DYKSTRA: I'll put on the record
3  that we had negotiated during the meet and
4  confers that we would produce a witness to
5  address the sources from which we pull the
6  transactional data, which I think is what you
7  have in front of you. I think we've already
8  identified those sources. I'll let Ms. Taylor
9  answer the questions to the best of her ability.
10  And if not, we'll have to talk about it probably
11  separately.
12      MR. O'KELLY: Okay, that's fair.
13          - - -
14      (Whereupon, the document was marked, for
15  identification purposes, as Plaintiffs' Exhibit
16  Taylor-22.)
17          - - -
18      THE WITNESS: (Witness reviewing
19  document.)
20      Okay.
21  BY MR. O'KELLY:
22      Q.  What we have here is a snapshot from the
23  electronic data. So, conceptually, this is all one
24  long page that stretches as far as the blue screen
25  over there.

1      So what I would just like to do is, if
2  you're able to, to identify what each of these
3  columns describes, please.
4      A.  Sure. First column is just indicating
5  what type of transaction this is, and everything on
6  this page is a chargeback sale.
7      The year --
8      Q.  Just let me stop you there. A
9  chargeback sale is a sale to a wholesaler that pays
10  the catalog price?
11      A.  This would be a -- once the sale is made
12  to the end user and it comes back in as a
13  chargeback is when it's being recorded. It does
14  eventually show who -- which wholesaler it went
15  through, but this is directly related to the end
16  purchaser. So it's a chargeback sale from -- the
17  next column is the year, followed by the quarter,
18  the month, month name.
19      Q.  And the names in this column on the
20  first page, physical page of the document are the
21  indirect purchaser customers who contracted for
22  discounted pricing which were purchased through the
23  wholesaler?
24      A.  Exactly, yes. Their identification,
25  their class of trade.

1      Q.  COT is class of trade?
2      A.  Yes. The next three columns are all
3  about their address. The rest of this page is all
4  blank because it's information that we would not
5  have on an indirect purchaser. Those columns are
6  generally used for direct purchasers.
7      Next page with the blue heading, the NDC
8  associated with the product, name of the product,
9  number of packages or doses per packages that are
10  associated with that NDC, the contract that they
11  were on, that purchaser was on, the list price or
12  the catalog price for the ten pack and then for the
13  per dose. The rest of those columns are not
14  applicable because they were indirect purchasers.
15      Q.  For direct purchasers, you would expect
16  to find value in those columns.
17      A.  Yes. Again, no credits, no prompt pay.
18  None of that applies. And then towards the end
19  it's which wholesaler.
20      Q.  Let me stop you there. How do you tell
21  which wholesaler from this data?
22      A.  That invoice number would be tracked
23  back to the wholesaler. It's a unique -- every
24  invoice would be associated with a purchase through
25  the wholesaler with a chargeback.

1      And then again the quantities, the list
2  price, the actual price paid, what was the net
3  discount. And all the purple columns again would
4  not apply to these customers. And the last columns
5  are the actual discounts that were part of a
6  transaction.
7      Q.  And what's a dose discount? Is that
8  just allocated to the single dose?
9      A.  Yes.
10      Q.  And then the package discount is on a
11  per-package basis?
12      A.  Yes.
13      Q.  It's self-explanatory?
14      A.  Yup.
15      MR. O'KELLY: Let's go off the record
16  for a moment.
17      VIDEOTAPE TECHNICIAN: The time is now
18  4:18. We're going off the video record.
19          - - -
20      (Whereupon, there was an off-the-record
21  discussion.)
22          - - -
23      (Whereupon, the document was marked, for
24  identification purposes, as Plaintiffs' Exhibit
25  Taylor-23.)

47 (Pages 182 - 185)

Page 186

1          - - -
2          VIDEOTAPE TECHNICIAN: The time is now
3     4:19. We're back on the video record.
4     BY MR. O'KELLY:
5          Q.    This is data we've taken from the Merck
6     database in so far as it relates to Chatom Primary
7     Care, which is one of the named plaintiffs in the
8     case, and the columns I believe should be identical
9     to the ones we had earlier.
10         I want to ask you about the first
11    column. In the transaction type, there are direct
12    sales, there were rebates. And I just want to know
13    if you can explain to us how the rebates are
14    accounted for separately from the direct sales, if
15    you know.
16         A.    Let me see what -- okay, Chatom Primary
17    Care. Let me see what the contract type was. Fair
18    Advantage Consortium.
19         Yeah, so you can see in the beginning
20    2000 -- the early years where it's all direct
21    sales, they were on the Merck Vaccine Savings Plan
22    or whatever it was called at the time. It was just
23    the individual pricing program that they purchased
24    direct from Merck. There was no buying group
25    involved.

Page 187

1          MS. DYKSTRA: And just for the record,
2     you're talking about page 4 of this exhibit with
3     the gray heading "Contract Description"?
4          THE WITNESS: Yes. So under "Contract
5     Description," in the beginning they were on the
6     Multiple Vaccine Program. There's no buy-in
7     group involved. That was just a program they
8     enrolled in, and they purchased direct from
9     Merck. So there was no chargeback involved.
10    There was no rebate involved. It was just
11    on-invoice discounts.
12         And then it looks like in 2009-ish, they
13    joined Fair Advantage Consortium, which is a
14    physician organization buy-in group, one of
15    those GPOs for vaccines for physician clinics.
16    And I'm not -- you know, it may have been --
17    Fair Advantage Consortium, I'm not -- I don't
18    remember this organization. It could be that
19    this is -- we had -- of the number of these
20    contracts with these buy-in groups we had, some
21    of them actually were medical groups as opposed
22    to a buy-in group. And so, we paid them a
23    rebate instead of an administration fee. We
24    normally would pay an administration fee to a
25    buy-in group, but for a medical group it was the

Page 188

1     same contract; we just paid them a rebate
2     instead. And so that may be what that is.
3     BY MR. O'KELLY:
4          Q.    And when you say a medical group as
5     opposed to a buy-in group, what's a medical group
6     in that context?
7          A.    Just an owned and operated facility.
8     You know, they may have many clinics that -- but
9     they're owned and operated by an organization.
10    They are not a buy-in group.
11         But we just used the same contract with
12    them, but we -- an admin fee is for a buy-in group.
13    We can't pay an admin fee to a medical group, so we
14    used the same contract and just paid a rebate
15    instead of the admin fee, and that may have been
16    what this was.
17         MR. O'KELLY: Okay, thanks. I'm going
18    to hand over the baton to Ms. Koury. Maybe I'll
19    be back.
20         MS. DYKSTRA: Let's take a quick
21    five-minute break.
22         VIDEOTAPE TECHNICIAN: The time is 4:23.
23    We're going off the video record.
24         - - -
25         (Whereupon, a recess was held.)

Page 189

1          - - -
2          VIDEOTAPE TECHNICIAN: The time is now
3     4:31. We're back on the record.
4          - - -
5          EXAMINATION
6          - - -
7     BY MS. KOURY:
8          Q.    Hello, Ms. Taylor. My name is Marlene
9     Koury. I represent the relators in this action.
10         I just want to ask you a couple of
11    follow-up questions from your testimony earlier
12    today. You said earlier that there was some sort
13    of CDC analysis on health economics.
14         Do you recall that testimony?
15         A.    We may have been referring to the, yes,
16    health economic analysis that CDC does when they
17    are determining whether or not they want to
18    recommend a vaccine on the ACIP schedule.
19         Q.    Okay. And was that analysis you're
20    referring to related in any way to the mumps
21    vaccine?
22         A.    No, just a general statement.
23         Q.    Do you know of any of CDC's analysis on
24    health economics that is related to the mumps
25    vaccine?

48 (Pages 186 - 189)

Page 190

1    A.   I do not because of how long ago it was.
2    Q.   Sure.  And also you testified earlier, I
3 believe, that the CDC is the only public entity
4 that purchases directly through Merck; is that
5 correct?
6    A.   I believe so.  I don't think any -- so
7 VA, you know, Department of Defense, they don't.
8 But it may be that some of the city/county/state
9 type of health departments who are purchasing
10 private product may purchase direct from Merck, and
11 we treat them as a -- as a clinic class of trade.
12    Q.   Okay.  So they -- they would not
13 purchase under the CDC's contracts with Merck.
14    A.   Correct.  For those -- for those doses,
15 they would be purchasing private -- off a private
16 contract or paying catalog.
17    Q.   Okay.  I just wanted to clear that up.
18         And if you could describe to me just the
19 process -- if you could summarize the process by
20 which an entity purchases the -- or orders the
21 vaccine under the CDC contract from Merck.
22         I can tell you what my understanding is,
23 but I'd prefer you do it, because I'm sure mine is
24 wrong.
25    A.   Sure.  And there is a -- it's slightly

Page 191

1 different for refrigerated and frozen.
2    Q.   Okay, just the mumps vaccine.
3    A.   Okay.  So for the mumps vaccine --
4    Q.   Yes.
5         THE REPORTER:  One at a time, please.
6         THE WITNESS:  For the mumps vaccine,
7 they will look to the products that are
8 available on the CDC contract, the brands and
9 the images of those products that are available
10 to them.  They will place their order through
11 the CDC's VTrckS system.
12         When the CDC receives that order, they
13 review those orders, and then those orders are
14 transmitted to the CDC's authorized distributor,
15 which is McKesson Specialty, and the product is
16 shipped directly from McKesson to the individual
17 provider.
18         CDC replenishes the McKesson inventory
19 by placing orders directly with Merck, and then
20 Merck ships the product to McKesson.
21 BY MS. KOURY:
22    Q.   So McKesson handles actually sending the
23 vaccine to the entities who are ordering.
24    A.   They do.
25         MS. DYKSTRA:  And just a clarification.

Page 192

1    We're talking about the MMR II --
2         THE WITNESS:  Yes.
3         MS. DYKSTRA:  -- not ProQuad.
4         THE WITNESS:  Yes, correct.
5 BY MS. KOURY:
6    Q.   Is there a name used in Merck for these
7 entities that order under the CDC contract?  Is
8 there a general way we can talk about them?
9 Authorized purchasers or --
10    A.   So the end -- the physician clinics?
11    Q.   The private purchasers who purchase
12 under the CDC contract.
13    A.   But they're pur -- they're ordering CDC
14 doses --
15    Q.   Yes.
16    A.   -- right?
17         We usually just refer to them as a VFC
18 provider.
19    Q.   Okay, that's fine.
20         And these VFC providers all purchase --
21 they don't actually pay for the vaccine; is that
22 correct?
23    A.   Correct.
24    Q.   The CDC pays for all of those doses.
25    A.   Correct.

Page 193

1    Q.   There's not a time when they would split
2 the cost or anything like that.
3    A.   No, there isn't.
4         MS. DYKSTRA:  Objection to form.
5         THE WITNESS:  Not that I'm aware of.
6         MS. DYKSTRA:  Let Ms. Koury just finish
7    her questions so we can make sure we get it all
8    on the record.
9 BY MS. KOURY:
10    Q.   I think that takes care of a number of
11 background questions, which is very helpful.  So
12 let me just look at my outline.
13         And can we -- can we talk about the
14 various contracts that exist between Merck and the
15 government for the purchase of Merck's mumps
16 vaccine?
17         So you mentioned the Vaccines for
18 Children contract.  Are there other contracts
19 between Merck and the government for the purchase
20 of the mumps vaccine?
21    A.   Yes, we have the adult CDC contract,
22 which MMR II is on that contract, the stockpile
23 contract that the VFC -- or that the CDC has with
24 Merck.  Then outside of the CDC, there's also the
25 Federal Supply Schedule and the entities who are

49 (Pages 190 - 193)

Page 194

1 eligible to purchase off of that schedule, so the
2 VA, Department of Defense, Indian Health and Coast
3 Guards, I believe it is.
4    Q.   Okay.  So most of my questions today
5 will deal with the Vaccines for Children contract
6 primarily.  I'll have some questions on the
7 stockpile contract.  We might touch upon the other
8 contracts today.
9         And can you tell me for the Vaccines for
10 Children contract, how often is that contract
11 negotiated?
12    A.   Annually.
13    Q.   Annually.  And what is generally
14 discussed during the negotiations to renew the
15 contract?
16       MS. DYKSTRA:  Objection to form.
17       You can answer.
18       THE WITNESS:  Mostly it is FAR clauses,
19 different terms of the contract related to how
20 we handle certain processes.
21       But, generally speaking, the pricing, we
22 really -- and there is -- by rare exception do
23 we actually have a conversation about the
24 pricing.  Usually that's done via the bid
25 process where, you know, they give us the RFP,

Page 195

1 we fill out the form, we e-mail it back, we wait
2 for a few weeks, they may come back with a
3 counter offer, some suggested different prices,
4 and then we'll submit our best and final, and
5 there may be a conversation depending on a
6 unique situation.
7 BY MS. KOURY:
8    Q.   Okay.  And as far as you know -- and you
9 can answer in your personal capacity -- do the
10 contract terms change substantially throughout the
11 years, or are they generally the same every year
12 that they're negotiated?
13    A.   There's a lot of terms in there.  I
14 would say the vast majority do not change.  But
15 every year there may be one new FAR clause or, you
16 know, one change that they've made to the -- to the
17 contract that we have to work through.
18    Q.   Okay.  And during the contract
19 negotiations between Merck and the CDC, did Merck
20 and the CDC discuss the shelf life of the vaccine?
21    A.   No, we generally have never needed to
22 talk about that.
23       MS. DYKSTRA:  Just for the record, when
24 you talk about vaccines, should we just assume
25 we're talking about MMR II --

Page 196

1       MS. KOURY:  Yes.
2       MS. DYKSTRA:  -- and ProQuad?
3       MS. KOURY:  Yes.
4 BY MS. KOURY:
5    Q.   And are there any internal deliberations
6 at Merck relating to the shelf life of the vaccine
7 in the context of selling the vaccine to the
8 government?
9       MS. DYKSTRA:  Objection to form.
10       THE WITNESS:  It's very straightforward
11 per the contract that we need to have at least
12 12-month shelf life on product that we ship to
13 them.
14 BY MS. KOURY:
15    Q.   Are there any internal deliberations at
16 Merck regarding whether Merck can meet the 12-month
17 shelf life required under the contract?
18       MS. DYKSTRA:  Objection to form.
19       THE WITNESS:  Generally not.  Most
20 products have at least a 24-month shelf life on
21 them, so not deemed to be something that's
22 difficult for us to do.
23 BY MS. KOURY:
24    Q.   Okay.  And can you tell me, if you know,
25 at what point after manufacture of the vaccine is

Page 197

1 shipped to the CDC --
2       MS. DYKSTRA:  Objection to form.
3       THE REPORTER:  Can you please repeat
4    your question?
5       MS. KOURY:  Sure.
6 BY MS. KOURY:
7    Q.   Can you tell me at what time after
8 manufacture of the vaccine it's actually shipped
9 out to I believe it's McKesson?
10       MS. DYKSTRA:  Object to form.
11       THE WITNESS:  I'm not sure I understand
12    the question.
13 BY MS. KOURY:
14    Q.   So my question is, you just said that
15 there's generally a 24-month shelf life on the
16 vaccine and that the contract requires a minimum of
17 12 months upon delivery; is that correct?
18    A.   Yes.
19    Q.   So my question is how Merck ensures that
20 there is 12 months remaining on the vaccine at the
21 time of delivery.
22    A.   It is -- it is in our SAP system that
23 when product is picked off the shelf to fill a CDC
24 order, it automatically looks at the lot number,
25 which has the expiry in it and will determine

50 (Pages 194 - 197)

Page 198

1 whether or not that lot can be sent to McKesson.
2    Q.   Okay.  So if the lot is -- you know, if
3 there's seven months remaining, it won't be shipped
4 out, for example.
5    A.   Exactly.
6    Q.   And during Merck's negotiations with the
7 CDC about the purchase of the mumps vaccine, do
8 Merck and the CDC discuss how well the vaccine
9 works?
10        MS. DYKSTRA:  Objection to form.
11        THE WITNESS:  No, we do not.
12 BY MS. KOURY:
13    Q.   Are there any internal deliberations at
14 Merck relating to how well the vaccine works in the
15 context of selling the vaccine to the government?
16        MS. DYKSTRA:  Objection to form.
17        THE WITNESS:  No.
18        MS. DYKSTRA:  Marlene, just to make sure
19    I'm understanding, we're talking about 24 months
20    shelf life and shipping to McKesson.  I think
21    that just relates to MMR II.  So --
22        MS. KOURY:  Yes.
23        MS. DYKSTRA:  -- we're limiting that
24    to --
25        (Cross-talk.)

Page 199

1        MS. KOURY:  Right.
2        MS. DYKSTRA:  Thank you.
3        MS. KOURY:  Sure.
4 BY MS. KOURY:
5    Q.   What is Merck's understanding, if any,
6 as to the factors the CDC considers when deciding
7 to purchase the mumps vaccine?
8        MS. DYKSTRA:  Objection to form.
9        THE WITNESS:  I'm sorry, can you repeat
10    that?
11 BY MS. KOURY:
12    Q.   What is Merck's understanding, if any,
13 as to the factors the CDC considers when deciding
14 to purchase the mumps vaccine?
15    A.   What are the factors they consider in
16 purchasing it?  And when you say "purchasing," do
17 you mean the decision to put it on the contract and
18 make it available to the FC providers, or do you
19 mean the actual process of placing an order?
20    Q.   I mean the decision to make it available
21 to the FC providers.
22    A.   Okay.  So that is a little bit outside
23 of the scope of my work.  That is all the stuff
24 that's done prior to the product ever being put on
25 contract.  I believe that is all part of the ACIP

Page 200

1 recommendation and whether or not through the HECON
2 data they believe that it should be a recommended
3 vaccine that's on the schedule.
4    Q.   Do you have any understanding of what
5 they consider -- strike that.
6        Do you have any understanding of the
7 factors they consider in putting it on the ACIP
8 schedule?
9        MS. DYKSTRA:  Objection.  Form.  And I
10    think it's outside the scope.
11        But you can answer to the extent you
12    know in your personal capacity.
13        THE WITNESS:  Yeah, I believe it is, you
14    know, disease versus the disease prevented, the
15    cost of that disease versus the cost of the
16    vaccine.  So whether or not they would make it
17    available as a required vaccine or as optional
18    use or something like that.
19 BY MS. KOURY:
20    Q.   Okay.  And during Merck's negotiations
21 with the CDC about the purchase of the mumps
22 vaccine, do Merck and the CDC discuss the
23 outbreaks?
24    A.   No.
25    Q.   Are there any internal deliberations at

Page 201

1 Merck relating to the outbreaks in the context of
2 selling the mumps vaccine to the government?
3        MS. DYKSTRA:  Objection.  Form.
4        THE WITNESS:  No.
5 BY MS. KOURY:
6    Q.   And during Merck's negotiations with the
7 government about purchasing the mumps vaccine, are
8 there any discussions regarding the safety of the
9 vaccine?
10        MS. DYKSTRA:  Objection.  Form.
11        THE WITNESS:  No.
12 BY MS. KOURY:
13    Q.   And are there any internal deliberations
14 at Merck relating to the safety of the vaccine in
15 the context of selling the vaccine to the
16 government?
17        MS. DYKSTRA:  Objection.  Form.
18        THE WITNESS:  No.
19        MS. KOURY:  I'm just going to introduce
20    a contract.  I'm a little low on copies, so I
21    apologize.
22             - - -
23        (Whereupon, the document was marked, for
24    identification purposes, as Plaintiffs' Exhibit
25    Taylor-24.)

51 (Pages 198 - 201)

Page 202

1              - - -
2 BY MS. KOURY:
3    Q.   The court reporter just handed you
4 Taylor Exhibit 24. It is a document bearing Bates
5 numbers MRK-KRA01371817 through MRK-KRA01371840.
6 Take a moment to look at this document, and let me
7 know if you recognize this.
8    A.   (Witness reviewing document.)
9         It's a standard VFC contract between
10 Merck and the CDC from 2008.
11    Q.   Can you please turn to page 1823, which
12 is page 4 of the contract?
13         So you see under C.1.1 "Shelf Life" --
14 we were just discussing this -- there's the
15 requirement that there's a minimum shelf life of
16 12 months remaining upon delivery.
17         Do you see that?
18    A.   I do see that.
19    Q.   And do you know why this term is
20 included in the contract?
21    A.   Yeah, I believe it is a logistical
22 requirement because we don't allow returns on the
23 contract, and the CDC -- even if we did, the CDC is
24 very sensitive about wasting any vaccine. So it
25 really just is the amount of time that they believe

Page 203

1 they need to get it into their warehouse, to get it
2 out to VFC providers, for VFC providers to actually
3 consume or utilize the products that they have, no
4 products coming back that sat on the shelf that,
5 you know, became expired because they weren't used
6 in time, and if the shelf life isn't long enough,
7 they don't have enough time to go through that
8 whole process.
9    Q.   Do you have any understanding as to how
10 long the vaccines are at McKesson before they're
11 shipped out, generally?
12         MS. DYKSTRA: Objection. Form.
13         THE WITNESS: No, I do not.
14 BY MS. KOURY:
15    Q.   And how does Merck -- actually, strike
16 that. You answered that already.
17         Has Merck ever failed to comply with the
18 12-month shelf life provision?
19    A.   I believe there have been times where we
20 have needed to contact the CDC to see whether or
21 not they would accept product that was something
22 less than the 12 months, but there is a standard
23 procedure for reaching out to them and gaining
24 their agreement. If they don't agree, then we
25 certainly don't send the product, but it would be

Page 204

1 in a situation where maybe there was a limited
2 volume.
3         And, actually, as I'm thinking about it,
4 I'm probably going beyond MMR II in this case
5 because I don't think we've had to do that with MMR
6 II. I'm thinking of other vaccines. Sorry about
7 that.
8    Q.   Have you ever had to do it with any
9 mumps-containing vaccines, including ProQuad?
10    A.   Not that I'm aware of. ProQuad,
11 different situation, yes.
12    Q.   Can you explain the situation with
13 ProQuad, please?
14    A.   Yeah, we, for a number of years, were
15 challenged to make enough of the product, and so
16 there were times when we would have to check in
17 with the CDC to see if, you know, they could accept
18 product that had shorter shelf life on it.
19    Q.   Okay. And what did the CDC do in that
20 situation?
21    A.   Generally speaking, they're -- you know,
22 they're -- they're willing to accept something that
23 was a little bit shorter, but if it's a problem
24 where it's going to create a lack of continuity for
25 their providers, then they will just choose not to

Page 205

1 take the product. And so there was a time at which
2 the product was actually removed from the market,
3 not just for the CDC, but for all providers,
4 because we just couldn't make enough of it.
5    Q.   And so then you would have sent, I'm
6 assuming, the MMR vaccine in place of ProQuad; is
7 that correct?
8         MS. DYKSTRA: Objection. Form.
9         THE WITNESS: Yes. Well, they would
10 have ordered MMR instead of it, yes.
11 BY MS. KOURY:
12    Q.   If you could please turn to page 1825,
13 page 6 of the contract. You see the section C.1.7
14 "Product Licensure," and under subsection "a"
15 there's a term that says "a current establishment
16 and product license."
17         Can you explain to me what that means?
18    A.   So this is the license for the
19 manufacturing facility where we're licensed to make
20 the product that is required to submit to the CDC
21 with the contract.
22    Q.   I'm sorry, what did you say was required
23 to submit to the CDC?
24    A.   The license for the facility that the
25 vaccines are manufactured.

52 (Pages 202 - 205)

Page 206

1    Q.   Okay.  And are there any requirements
2 under that product license relating to the
3 effectiveness of the vaccine?
4    A.   No.
5    Q.   Are there any requirements under the
6 product license related to the potency of the
7 vaccine?
8    A.   No.
9    Q.   Are there any requirements under that
10 product license relating to the safety of the
11 vaccine?
12    A.   No.
13    Q.   Can you give me an example of what
14 requirements would be under the product license?
15    A.   The license -- there should be a copy
16 attached to the contract -- really just states that
17 it is licensed.  So there aren't details in it.
18    Q.   Okay.  And then under section "b," "The
19 Current Good Manufacturing Practice Regulations,"
20 can you explain to me your understanding of what
21 those are?
22    A.   These are the standards by which Merck
23 manufactures all of our vaccines, and this part of
24 the contract is requiring that we have a standard
25 for manufacturing vaccines that we follow, and this

Page 207

1 states that we do have a standard for that, which
2 is our GMP.
3    Q.   Okay.  And under the Current Good -- can
4 I just call them the CGMP?
5        Under the CGMPs, are there provisions
6 related to potency --
7        MS. DYKSTRA:  Objection.
8 BY MS. KOURY:
9    Q.   -- ensuring the potency of the vaccine?
10        MS. DYKSTRA:  Objection.
11        MS. KOURY:  If she knows.
12        MS. DYKSTRA:  So we had a deposition on
13 CGMP specifications for the vaccine, a 30(B)(6)
14 on that topic.  So if your question is limited,
15 does she know if CGMP generally has requirements
16 around potency, she can answer that in her
17 personal capacity.
18        MS. KOURY:  That's fine.
19        THE WITNESS:  I believe CGMP is the
20 processes we use to follow the manufacturing of
21 the vaccines that of course are done according
22 to the specific requirements in the actual
23 license for the vaccine, the BLA.
24 BY MS. KOURY:
25    Q.   And how does Merck ensure that it

Page 208

1 complies with this term in the contract?
2    A.   Each of the vaccines and their specific
3 requirements within them are manufactured according
4 to these procedures, for example, documentation of
5 each of the steps along the way, again, according
6 to the BLA for each product.
7    Q.   Okay.  And that's also true, obviously,
8 for the MMR II vaccine under --
9    A.   Yes.
10    Q.   -- this contract, correct?
11        And under subsection "c" it states, if
12 at any time during the life of the contract, the
13 item listed under this contract fails to meet
14 CGMPRs, the contract may be terminated.
15        Do you see that?
16    A.   Yes, I do.
17    Q.   Has there ever been a time when the
18 contract was terminated or threatened to be
19 terminated for failing to follow the CGMPs?
20    A.   No.
21    Q.   If you could turn to page -- Bates page
22 ending 1828.  It's page 9 of the contract.  Under
23 "Invoice submission," part "b," subpart 8 it says,
24 "Expiration date of vaccine vials shipped."
25        Is there an expiration date on all of

Page 209

1 the vaccine vials shipped for MMR II?
2    A.   Yes.
3    Q.   And that expiration date is 24 months?
4        MS. DYKSTRA:  Objection.  Form.
5        THE WITNESS:  I believe it depends on
6 the actual lot.
7 BY MS. KOURY:
8    Q.   Okay.  Can you explain that a little
9 bit?
10    A.   I -- I'm not --
11        MS. DYKSTRA:  Objection.  Outside the
12 scope.
13        THE WITNESS:  It's beyond my scope, but
14 I believe it -- as it works its way through the
15 manufacturing process, each lot, depending on
16 how long it takes at each stage of that, could
17 have a slightly different shelf life.
18 BY MS. KOURY:
19    Q.   Okay.  And that would be represented on
20 the vaccine vial, correct?
21    A.   Yes.
22    Q.   What is Merck's understanding, if any,
23 as to whether the contract requires Merck to have a
24 certain efficacy rate for its vaccine?
25        MS. DYKSTRA:  Objection.  Form.

53 (Pages 206 - 209)

Page 210

1    THE WITNESS: The contract does not
2    include anything related to efficacy.
3    BY MS. KOURY:
4    Q.   What is Merck's understanding of whether
5    there is a requirement by the CDC contractual or
6    otherwise relating to the efficacy of the vaccine?
7        MS. DYKSTRA: Objection. Form.
8        THE WITNESS: So as per the contract,
9    there are no requirements for efficacy.
10   BY MS. KOURY:
11   Q.   What about outside of the contract?
12       MS. DYKSTRA: Objection. Form.
13       THE WITNESS: Other than what the CDC
14   reads in the label, I don't have any other
15   connection to that.
16   BY MS. KOURY:
17   Q.   What do you mean by "what the CDC reads
18   in the label"?
19   A.   Well, so, they have --
20       MS. DYKSTRA: Objection. Form. Don't
21   speculate as to what the CDC may or may not
22   consider unless you actually know.
23   BY MS. KOURY:
24   Q.   Do you know?
25   A.   No, only what's in the contract.

Page 211

1    Q.   So I just want to be clear. Is it your
2    testimony that the only information relevant to the
3    CDC in purchasing the mumps vaccine is what's
4    contained in the contract?
5        MS. DYKSTRA: Objection. Form.
6    Objection. Misstates her testimony.
7        THE WITNESS: In my interactions with
8    the CDC on the contract and acquisition of it,
9    it is not related to the potency.
10   BY MS. KOURY:
11   Q.   Or the efficacy?
12   A.   Or the efficacy.
13   Q.   Or the effectiveness?
14   A.   No.
15   Q.   What about the safety?
16   A.   No.
17   Q.   Does Merck have an understanding as to
18   whether the CDC expects the mumps vaccine sold
19   under the VFC contract to comply with its label
20   specifications?
21       MS. DYKSTRA: Objection. Form.
22       And to the extent that it's related to
23   the contract, you can answer.
24       I'll object again that the label
25   specifications were already identified and

Page 212

1    discussed by a former 30(B)(6).
2        So in your personal capacity, you may
3    answer the question.
4        THE WITNESS: I don't have discussions
5    with the CDC on that. It's not part of the
6    contract. So I can't speculate what their
7    assumptions are.
8    BY MS. KOURY:
9    Q.   Do you have any discussions with the CDC
10   outside of the contract in your personal capacity?
11   A.   Not about the efficacy or potency or
12   safety of the product.
13   Q.   And during contract negotiations, does
14   Merck make any representations to the CDC regarding
15   the efficacy of the vaccine?
16   A.   No.
17   Q.   And during contract negotiations, does
18   Merck make any representations to the CDC regarding
19   the safety of the vaccine?
20   A.   No.
21       MS. KOURY: I have another document.
22   You can put the contract aside.
23           - - -
24       (Whereupon, the document was marked, for
25   identification purposes, as Plaintiffs' Exhibit

Page 213

1    Taylor-25.)
2           - - -
3    BY MS. KOURY:
4    Q.   The court reporter handed you Taylor
5    Exhibit 25, Bates numbers MRK-CRA00072713 through
6    MRK-KRA00072735.
7        Do you recognize this document?
8        MS. DYKSTRA: You can take a couple
9    minutes to look at it, if you need, since you're
10   not copied on it.
11       MS. KOURY: Yeah, feel free.
12       THE WITNESS: (Witness reviewing
13   document.)
14       Okay.
15   BY MS. KOURY:
16   Q.   Do you understand, generally, what this
17   document is communicating?
18   A.   Yes.
19   Q.   Can you -- you see the subject line is
20   "Vaccine price issue." Can you describe to me what
21   the vaccine price issue was in or around March 3,
22   2015?
23   A.   So this was the year we were negotiating
24   the addition of Gardasil 9 to the contract -- 2015,
25   yes -- and in the process, there was some feedback

54 (Pages 210 - 213)

Page 214

1 from the CDC that they were not happy with our
2 price increases that we were proposing in the
3 initial bid response, and so the CDC had come back
4 and said they wanted to have a conversation with us
5 about those price increases, that they didn't want
6 to accept them. So it was an internal document
7 helping to frame up the issue, the pros, the cons,
8 et cetera, and what our options were to respond or
9 not respond.
10  Q. And this included the mumps vaccine, is
11 that right, these negotiations?
12  A. Yes.
13  Q. Can you tell me who Anne Schuchat is?
14  A. She was -- I don't remember her exact
15 title at the CDC, but basically the right-hand
16 person to Tom Frieden, the head of the CDC.
17  Q. And in the last sentence on the first
18 page there's a reference to structure volume
19 discounts. Can you explain what a structure volume
20 discount is? Actually, strike that.
21   Can you explain what a structure volume
22 discount is, if it has anything to do with the
23 mumps vaccine?
24  A. No.
25   MS. DYKSTRA: No, it does not have

Page 215

1 anything to do with it or, no, you can't explain
2 it?
3   THE WITNESS: No, their -- I don't think
4  this had anything to do with the mumps vaccine.
5 BY MS. KOURY:
6  Q. Okay. I'm on page Bates ending 2716.
7 Under "Situation," the fourth bullet point down,
8 can you tell me what's being communicated in that
9 fourth bullet point?
10  A. The one that starts with "CDC has" --
11  Q. Yes.
12  A. -- "of recent implemented two new
13 strategies, one expected to create price 'wars' for
14 multi-source vaccines and the second requiring
15 manufacturers to disclose commercial pricing."
16   I don't know about the price wars. I
17 don't know exactly what that is referring to. The
18 second is a -- was a FAR clause added -- it's
19 Merck's interpretation of the rationale for the FAR
20 clause that was added to the CDC contract requiring
21 manufacturers to disclose to them the private
22 sector discounted price for vaccines so that
23 presumably it would give them more information by
24 which to request lower prices.
25  Q. Okay. And does Merck now communicate to

Page 216

1 the CDC the private price of the MMR II vaccine?
2  A. We do.
3  Q. And MMR II vaccine is not a multi-source
4 vaccine; is that right?
5  A. No, it is not.
6  Q. And if you please turn to page Bates
7 ending 2720, "Talking Points - Vaccine Pricing
8 Rationale." If you want to read the page first or
9 I can ask the question, either way.
10  A. (Witness reviewing document.)
11   Okay.
12  Q. I want to focus on point 4, number 4,
13 "Striving to maintain the highest standards of
14 safety and product quality in all stages of vaccine
15 development and manufacturing."
16   Do you see that?
17  A. Yes.
18  Q. Can you explain how maintaining the
19 highest standards of safety and product quality
20 relate to vaccine pricing?
21  A. As we talked about earlier, there's so
22 many factors that go into a decision as to taking a
23 price increase, whether it's in the private sector,
24 whether it's with the CDC, and one of those is the
25 ongoing investment in things like research and

Page 217

1 development, but also in upgrading manufacturing
2 facilities, maybe even improving efficiencies for
3 our manufacturing processes to increase the number
4 of doses that we can manufacture, is what that's
5 referring to.
6  Q. Okay. And has Merck upgraded its
7 manufacturing with respect to the manufacture of
8 the MMR II vaccine?
9   MS. DYKSTRA: Objection. Form.
10   THE WITNESS: I don't know specifics
11  about MMR II.
12 BY MS. KOURY:
13  Q. Okay. What, if anything, does Merck
14 communicate to the CDC regarding safety and product
15 quality of the mumps vaccine when discussing
16 pricing?
17   MS. DYKSTRA: Objection. Form.
18   THE WITNESS: We generally don't.
19 BY MS. KOURY:
20  Q. Is there a reason why not?
21  A. Well, pricing is generally discussed
22 when a new product comes to market and we're
23 establishing the pricing and the CDC needs that
24 pricing so they can do their health economic
25 analysis to determine if the -- you know, if it's

55 (Pages 214 - 217)

Page 218

1  worth making a recommendation for everyone to get
2  it.  And other than that, the other time that we're
3  dealing with pricing is in the negotiations.  And
4  in the annual negotiation process, as we already
5  discussed, we don't discuss safety, efficacy, that
6  type of thing.  It is really only about pricing.
7      Q.   Okay.  And if you could turn to the next
8  page, please, Bates ending 2721.
9      A.   Okay.
10     Q.   These are, reading the heading, "Talking
11 Points - Specific to VFC Contract."  And under the
12 first bullet point, sub bullet 3, it says, "Pricing
13 of these vaccines is supported by the health
14 benefits to the VFC population."
15         What is your understanding as to what
16 this sentence means?
17     A.   I believe that is referring to the
18 health economic data, meaning that the price of the
19 vaccines relative to the cost of treating the
20 disease that it prevents, it has a positive econ
21 value.
22     Q.   And how do you -- recurrent outbreaks
23 fit into that analysis?
24         MS. DYKSTRA:  Objection.  Form.
25         THE WITNESS:  To the extent that those

Page 219

1  studies are done to understand that, I --
2  BY MS. KOURY:
3      Q.   I'm sorry, I don't understand your
4  answer.
5      A.   Well, if there are studies that are done
6  looking at the cost maybe to increase vaccinations
7  during an outbreak relative to treating the disease
8  in those individuals who are affected by the
9  outbreak, but I'm not familiar with those studies.
10 I don't think this bullet point was -- this was
11 much broader than that.  It really wasn't.  It was
12 more about just vaccinate or don't vaccinated type
13 of thing, very general.
14     Q.   Okay.  And if you could turn to the next
15 page, it's Bates ending 2722.  And, again, this
16 heading "Talking Points - Specific to VFC contract
17 (continued)," I want to focus on the second bullet
18 point which reads, "Merck is interested in working
19 with CDC to develop innovative pricing programs
20 that support public health goals, as well as CDC
21 and Merck business objectives."
22         Can you describe what the public health
23 goals are?
24         MS. DYKSTRA:  Objection.  Outside the
25 scope.

Page 220

1          But you can answer in your personal
2  capacity.
3          THE WITNESS:  Decrease preventable
4  diseases.
5  BY MS. KOURY:
6      Q.   And how is that related to pricing?
7          MS. DYKSTRA:  Same objection.
8          THE WITNESS:  Part of it is the process
9  by which they achieve it.  So they're -- you
10 know, if we're both working towards, for
11 example, increasing patient origination, that
12 allows us to both achieve our objectives.
13 BY MS. KOURY:
14     Q.   What do you mean by "patient
15 origination"?
16     A.   Parents bringing their children in to
17 get them vaccinated.
18     Q.   So vaccine uptakes, generally?
19     A.   Yes, consumer education, that type of
20 thing.
21     Q.   Okay.  In the sentence, what do Merck's
22 business objectives refer to?  What does that mean?
23         MS. DYKSTRA:  Same objection.
24         THE WITNESS:  It would be to increase
25 vaccination rates.

Page 221

1  BY MS. KOURY:
2      Q.   And what about the CDC's business
3  objective or the CDC's objectives?
4      A.   It would be the same thing.
5      Q.   And why did Merck and the CDC want to
6  increase vaccination rates?
7          MS. DYKSTRA:  Objection.  Same
8  objection.
9          You can answer in your personal
10 capacity.
11         THE WITNESS:  Both Merck and CDC want to
12 do what's right for public health.
13 BY MS. KOURY:
14     Q.   And why would that be right for public
15 health?
16         MS. DYKSTRA:  Objection.  Form.
17         THE WITNESS:  Because it's less
18 expensive to prevent the disease than it is to
19 treat it.  So it's good for the patient for
20 quality of life, et cetera, but it's also good
21 for health economics.
22 BY MS. KOURY:
23     Q.   Do you have an understanding as to the
24 CDC's eradication goals for the mumps disease?
25         MS. DYKSTRA:  Objection.  Outside the --

56 (Pages 218 - 221)

1      THE WITNESS: I do not.
2      MS. DYKSTRA: Objection. Outside the
3  scope.
4      You can answer in your personal
5  capacity.
6      THE WITNESS: I don't know.
7  BY MS. KOURY:
8    Q.   You have no understanding of their
9  eradication goals?
10      MS. DYKSTRA: Objection. Asked and
11  answered.
12      THE WITNESS: Specific to MMR, I do not.
13  BY MS. KOURY:
14    Q.   Specific to mumps.
15    A.   I don't.
16    Q.   So the next bullet point, there's a
17  reference to a quality-based contract.
18      Can you explain what a quality-based
19  contract is?
20    A.   I believe what we're referring to there
21  is a program that we have in place that offers
22  incremental rebates to -- and this is on the
23  private sector side of the business -- for having
24  protocols in place to identify unvaccinated
25  patients and get them vaccinated, and to look at

1  their vaccination rates to increase awareness that
2  their rates may not be as high as they think they
3  are.
4    Q.   Okay. And it says here Merck would be
5  interested in considering similar programs for the
6  VFC program; is that correct?
7    A.   Yes.
8    Q.   Did Merck consider similar programs for
9  the VFC program?
10      MS. DYKSTRA: Objection. Outside the
11  scope.
12      You can answer in your personal
13  capacity.
14      THE WITNESS: The -- we have a program
15  in place that's not for MMR, but we do have an
16  HPV program that we work with the CDC on that
17  provides some incremental discounts when they
18  increase utilization, so similar types of
19  programs where it's kind of a cost sharing
20  thing, we both want vaccination rates to go up,
21  which means your spending goes up, so we're
22  willing to help share in some of that cost.
23  BY MS. KOURY:
24    Q.   Okay. And is there movement at Merck to
25  have this program implemented for MMR II?

1      MS. DYKSTRA: Same objection.
2      THE WITNESS: No.
3  BY MS. KOURY:
4    Q.   Why not?
5    A.   Vaccination rates are very high for MMR
6  II. This is referring to an HPV program. We had
7  low rates.
8    Q.   Do you know what the vaccination rates
9  are for MMR II?
10      MS. DYKSTRA: Same objection.
11      THE WITNESS: I believe they're in the
12  90s.
13  BY MS. KOURY:
14    Q.   The next page, Bates ending 2723, it
15  says in first bullet, "Presently, the CDC has no
16  clear mechanism to regulate manufacturer's
17  pricing."
18      Do you see that?
19    A.   Yes.
20    Q.   Can you explain to me what that means?
21      MS. DYKSTRA: Same objection.
22      You can answer in your personal
23  capacity.
24      THE WITNESS: I'm not -- I'm not sure if
25  it's referring to private or public sector

1  pricing. It's not clear.
2  BY MS. KOURY:
3    Q.   It does say the CDC, so probably public,
4  right?
5    A.   It could, but it's a negotiated
6  contract. So if it's referring to CDC pricing,
7  it's a negotiation.
8    Q.   Is there a cap on how much Merck can
9  charge for the MMR II vaccine to the CDC?
10    A.   Thank you for reminding me. I keep
11  forgetting we're talking about MMR II. It's unique
12  in the contract. So this bullet point, if it is
13  public sector pricing or referring to VFC, then it
14  would not apply to the mumps vaccine because it is
15  under/over 93, and that is not a negotiated price.
16  It is a formulaic price that is driven based on CPI
17  that we have no control over.
18    Q.   Okay. What is a CPI cap?
19    A.   It is -- so we -- they take the current
20  price, and CDC tells us what their consumer price
21  index is that they're using. We apply that to the
22  current price, and that is the new price that we
23  put forward in the new contract.
24    Q.   Okay. You can put this document aside.
25      Let me move on to negotiations between

57 (Pages 222 - 225)

Appx20417

Page 226

1 Merck and the government on a potential or actual
2 third dose of the mumps vaccine. So has Merck
3 discussed with the government the possibility of
4 adding a third dose of the mumps vaccine to the
5 schedule?
6      MS. DYKSTRA: Objection. Form.
7      THE WITNESS: There are probably
8 scientific conversations that happen between our
9 medical affairs individuals in the context of
10 the science, but I'm not involved in those
11 discussions.
12 BY MS. KOURY:
13    Q.  So you're not aware of the content of
14 those discussions; is that right?
15    A.  To the extent that there's discussion
16 about the -- what they call their -- there is not a
17 formal recommendation that the CDC has but in --
18 they do have a document indicating that in times of
19 outbreak, that there is some rationale in using a
20 third dose, but it's not an official
21 recommendation.
22      So to the extent that there's a
23 scientist-to-scientist type of or
24 clinician-to-clinician conversation about that, I
25 believe those do happen.

Page 227

1    Q.  Okay. What about outside of outbreaks,
2 adding a -- the potential of adding a third dose to
3 the vaccination schedule?
4      MS. DYKSTRA: Objection. Form.
5      THE WITNESS: I am not familiar with
6 that.
7 BY MS. KOURY:
8    Q.  Do you know if Merck has proposed to the
9 CDC that it add a third dose to the vaccination
10 schedule?
11    A.  I do not believe so, but I'm not
12 involved in those conversations.
13    Q.  If there were a third dose of the
14 vaccine added to the schedule, would it be the MMR
15 II vaccine?
16      MS. DYKSTRA: Objection. Form. Calls
17 for speculation.
18      THE WITNESS: I don't know.
19 BY MS. KOURY:
20    Q.  Is the monovalent Mumpsvax still
21 available to purchase?
22    A.  No, it is not.
23    Q.  When did Merck remove the monovalent
24 from the market?
25      MS. DYKSTRA: Objection. Outside the

Page 228

1 scope.
2      You can answer in your personal
3 capacity.
4      THE WITNESS: I don't -- maybe ten years
5 ago.
6 BY MS. KOURY:
7    Q.  Do you know why Merck removed the
8 monovalent from the market?
9      MS. DYKSTRA: Same objection.
10      THE WITNESS: I believe it was because
11 there was little to no utilization of it.
12 BY MS. KOURY:
13    Q.  And why not?
14      MS. DYKSTRA: Same objection. Calls for
15 speculation.
16      THE WITNESS: The combination products
17 are preferred by the majority of physicians and
18 parents, fewer, you know, pain -- pain points
19 for the kids.
20 BY MS. KOURY:
21    Q.  Do you know if Merck has any plans to
22 put the monovalent back on the market?
23    A.  I am not aware of that.
24    Q.  If the CDC were to add a third dose to
25 the vaccination schedule, would Merck be able to

Page 229

1 produce enough mumps vaccine to meet the increase
2 in demand?
3      MS. DYKSTRA: Objection.
4      THE WITNESS: I don't know.
5      MS. DYKSTRA: Outside the scope, and
6 calls for speculation.
7      But you can answer in your personal
8 capacity.
9      THE WITNESS: All I can say is that that
10 is the type of thing that is planned for, that
11 there are long-range plans with manufacturing
12 when a market event is anticipated, but I'm not
13 aware of any of those conversations taking
14 place.
15      - - -
16      (Whereupon, the document was marked, for
17 identification purposes, as Plaintiffs' Exhibit
18 Taylor-26.)
19      - - -
20      THE WITNESS: (Witness reviewing
21 document.)
22 BY MS. KOURY:
23    Q.  The court reporter has handed you an
24 exhibit marked Taylor-26 and bearing Bates numbers
25 MRK-KRA01652529 and ending on 2555.

58 (Pages 226 - 229)

1        Do you recognize this document?
2    A.    Yes.
3    Q.    Can you tell me what it is?
4    A.    It is a contract between Merck and the
5 CDC for the 2011 VFC contract.
6    Q.    It's my understanding that this was a
7 stockpile contract.
8        MS. DYKSTRA:  Take a minute to look.
9        THE WITNESS:  Yeah, let me look more
10 closely.
11 BY MS. KOURY:
12    Q.    If you look at page 2532.
13    A.    There's so much redacted, it's hard
14 to --
15        MS. DYKSTRA:  You said page 2532?
16        MS. KOURY:  2532.
17 BY MS. KOURY:
18    Q.    The first sentence on that page says,
19 "This contract will cover storage and rotation
20 services for any vaccines that have been set aside
21 by the Contractor for Government stockpile
22 purposes."
23    A.    Yes.
24    Q.    What is the purpose of the stockpile
25 contract?

1    A.    To ensure that Merck and the CDC are in
2 agreement with respect to how we will manage their
3 inventory, what we will charge to manage the
4 inventory, how many doses we'll retain, what
5 percent of those doses are labeled, packaged, et
6 cetera.
7    Q.    And what is the purpose of having a
8 stockpile?
9        MS. DYKSTRA:  Objection.  Form.
10        THE WITNESS:  Generally for emergencies.
11 It could be -- I think where it's used most
12 often is when another manufacturer can't
13 manufacture the product so that they have a
14 fallback.
15 BY MS. KOURY:
16    Q.    And in the context of MMR II, what is
17 the purpose of having a stockpile?
18    A.    In the event that -- it could be that if
19 there's an outbreak, but it could be that Merck
20 runs into some manufacturing problems, and so
21 there's product available in case, you know,
22 there's a period of time where we're not able to
23 produce as much as we normally do.
24    Q.    And how does the CDC -- forgive me if
25 I'm not using the right term -- draw upon the

1 stockpile files to use?  What is the process that
2 the CDC would go through to use those files, to
3 request those files?
4    A.    There's a standard operating procedure
5 for how that works.  They would notify us of how
6 many doses they want to pull from the stockpile,
7 when they want to pull them, and then when they
8 anticipate replacing them.
9    Q.    Okay.  And has the CDC pulled doses from
10 the stockpile in the past ten years, to your
11 knowledge?
12    A.    For MMR II?
13    Q.    Yes.
14    A.    I don't believe so.  I think that --
15 there's been changes with respect to how many doses
16 they want to have in the stockpile, and sometimes
17 they'll swap, you know, volume of one for another
18 type thing.  So it's a lot of kind of moving
19 product -- or volume from one to another product.
20    Q.    Okay.  Is the CDC storing more doses
21 under the stockpile contract now than it did, say,
22 ten years ago?
23        MS. DYKSTRA:  Objection.  Form.
24        THE WITNESS:  I don't -- I don't know
25 that it's more or less, but I think their

1 strategy can sometimes change over time.
2        MS. DYKSTRA:  Your question was specific
3 to MMR II?
4        MS. KOURY:  It is.
5 BY MS. KOURY:
6    Q.    Can you give me an example of when the
7 CDC requested to have more doses held in a
8 stockpile?
9        MS. DYKSTRA:  For MMR II specifically?
10        MS. KOURY:  For MMR II.
11        THE WITNESS:  I don't know for MMR II.
12 BY MS. KOURY:
13    Q.    Do you know for ProQuad?
14    A.    No.
15    Q.    What about for Mumpsvax?
16    A.    No.
17    Q.    MMRV?
18    A.    No.
19    Q.    What happens to vaccines stored under
20 the stockpile contract that goes unused and
21 expires?
22        MS. DYKSTRA:  Objection.  Form.
23        THE WITNESS:  The goal is for it not to
24 expire.  There is a rotation schedule so that it
25 can be taken out of the stockpile, put into

59 (Pages 230 - 233)

Page 234

1  inventory to sell to the market with enough
2  expiry left on it.
3  BY MS. KOURY:
4      Q.  I was just going to ask, what is the,
5  generally speaking, expiration left on the vaccine
6  when it's rotated out?
7          MS. DYKSTRA: Objection. Form.
8          THE WITNESS: I don't know.
9  BY MS. KOURY:
10     Q.  Do you have a general understanding?
11     A.  No, but it's more than enough to sell it
12 and not risk returns.
13     Q.  Okay. Has the CDC ever returned a
14 vaccine to the -- to Merck?
15         MS. DYKSTRA: Objection.
16         THE WITNESS: The only product that we
17 have agreement for returns to is Zostavax.
18 Otherwise, the CDC contracts do not allow for
19 returns.
20 BY MS. KOURY:
21     Q.  And there's never been any exceptions to
22 that for MMR II; is that right?
23     A.  No, but -- they do return product, but
24 it's not for replacement or credit. So if they
25 have product that needs to be disposed of, they

Page 235

1  will send it to us, and then we also have to
2  process the federal excise tax for them.
3      Q.  Okay. In what situations does the CDC
4  return product that needs to be disposed of?
5      A.  If they have providers that didn't
6  consume it before it expired, they would return it
7  back through the -- through McKesson.
8      Q.  But they're not reimbursed for the
9  return, right?
10     A.  No, just for the federal excise tax.
11     Q.  Okay. If we could turn to page 2532. I
12 think we're already here. Under item 0001 it
13 says, quantity/unit 12 months.
14         Can you tell me what that means?
15     A.  I believe that's just referring to
16 annual quantity.
17     Q.  I don't want to testify for you, but are
18 you saying the 3 million plus doses in the supply
19 services section are how many are going to be
20 stored in 12 months under this contract?
21     A.  I'm not exactly sure.
22     Q.  Do you have an understanding of what --
23 what the contract says under supplies and services?
24     A.  Is that --
25     Q.  It's on the same page. It's right next

Page 236

1  to the box that says 12 months.
2      A.  So there is just referring to the number
3  of doses that would be in storage at any one time
4  and rotated.
5      Q.  Do you have an understanding of how that
6  relates to the 12 months?
7      A.  I don't know. I would be -- I'd be
8  speculating. I'd have to look at another part of
9  the contract to make sure I understand that.
10     Q.  If you could turn to page 2549, Bates
11 page 2549. And under the heading "Scope of Work,"
12 "e" says, "The CDC will make announced/scheduled
13 visits to the Contractor's facility for the purpose
14 of inspection and review of its inventory."
15         Do you see that?
16     A.  Yes, I do.
17     Q.  Can you explain what those -- what
18 happens during those visits?
19     A.  Yeah. The CDC comes and they -- they
20 own the product. So they do site inspections from
21 time to time to ensure that what we've said we're
22 going to do in the contract we've done. So if
23 there's a certain volume in the contract, which
24 there is, that we have that volume available, that
25 it has the right expiry on it, that a certain

Page 237

1  percent of it is packaged, labeled and ready to go.
2  Those are the type of things that they're looking
3  at.
4      Q.  Okay. And how often do they do these
5  inspections?
6      A.  I believe they have the right to audit
7  once a year.
8      Q.  Okay. Do you know if the CDC has ever
9  found Merck to be in breach of this contract on one
10 of their site inspections?
11     A.  Not in the time that I've been managing
12 the contract. I'm not aware of any.
13     Q.  Okay. And if you can turn to page 2551.
14 Under "Release of Stockpiled Vaccine, Placement of
15 Orders Against Stockpile," under section 2,
16 "Non-Emergency Reductions," point "a," there's a
17 provision here that says, "To ensure potency of
18 vaccine held in stockpiles and eliminate the
19 opportunity for wastage."
20         Can you just generally describe how
21 Merck ensures the potency of the vaccine held in
22 the stockpile?
23     A.  I believe this is just referring to
24 decisions around how much is in the stockpile and
25 how often we rotate it.

60 (Pages 234 - 237)

**Appx20420**

Page 238

1    Q.   But how does that relate to ensuring the
2  potency of a vaccine?
3    A.   Meaning that it is still sellable or
4  usable product, according to the label, in the
5  12-month expiry.  So when we ship the product to
6  them, even product outside of -- within the
7  stockpile, it needs to have the 12-month expiry on
8  it.
9    Q.   Does Merck do any separate potency
10 testing on the vaccines in the stockpile?
11   A.   I believe the stockpile product is
12 treated the same as any other product in inventory.
13   Q.   If you could turn to page 2553.  Under
14 section D, "Packaging, Packing and Marking
15 Requirements," the first sentence says, "All
16 vaccines shall be packaged and marked in standard
17 commercial manner."
18      Do you see that?
19   A.   Uh-huh.
20   Q.   What does that mean?
21   A.   I believe that all this is referring to
22 is that we're not -- that we're treating the
23 stockpile vaccine the same as we would any other
24 product in inventory with respect to how it's
25 labeled and packaged and stored.

Page 239

1      MS. KOURY:  I think that the disc is
2  about to run out.  So if you guys would like to
3  take a break.  We can also change the disc and
4  keep going.  It's up to you.
5      MS. DYKSTRA:  We can take a quick
6  bathroom break.
7      VIDEOTAPE TECHNICIAN:  The time is now
8  5:36.  We are going off the video record.
9         - - -
10     (Whereupon, a recess was held.)
11        - - -
12     VIDEOTAPE TECHNICIAN:  The time is now
13 5:47.  This begins disc six.
14     MS. KOURY:  I just have a couple more
15 questions for you.  First I want to thank you
16 for your testimony today.  You've been very
17 helpful in explaining everything, and it's cut
18 my outline down by a lot.  Thank you.
19     THE WITNESS:  Great.
20 BY MS. KOURY:
21   Q.   Would you agree that the CDC's goal in
22 purchasing the mumps vaccine is to prevent disease?
23     MS. DYKSTRA:  Objection.  Outside the
24 scope.
25     You can answer in your personal

Page 240

1  capacity.
2      THE WITNESS:  The term "purchasing,"
3  again I think their goal to make it a
4  recommended vaccine and to fund it is to reduce
5  disease.  The purchasing of it I think is more
6  of a logistical objective just to ensure that
7  product is available where it needs to be
8  available.
9  BY MS. KOURY:
10   Q.   Would you agree that as a general
11 proposition, the CDC expects the vaccine to comply
12 with the specifications on its label?
13     MS. DYKSTRA:  Objection.  Outside the
14 scope.
15     You can answer in your personal
16 capacity.
17     THE WITNESS:  I can't speculate.  You
18 know, again, the CDC is putting it on the ACIP
19 schedule because they believe it will reduce
20 disease.
21     MS. KOURY:  I have no further questions.
22     VIDEOTAPE TECHNICIAN:  The time is now
23 5:49.  Going off the video record.
24        - - -
25     (Whereupon, a recess was held.)

Page 241

1         - - -
2      (Whereupon, the documents were marked,
3  for identification purposes, as Plaintiffs'
4  Exhibits Taylor-27 and Taylor-28.)
5         - - -
6      VIDEOTAPE TECHNICIAN:  The time is now
7  5:52.  We're back on the video record.
8         - - -
9      EXAMINATION
10        - - -
11 BY MR. O'KELLY:
12   Q.   We're back for one more round, Ms.
13 Taylor.
14     I've asked the court reporter to mark as
15 Exhibit 27 a document Bates numbered
16 MRK-CHA00071456 through 1502.
17     And we've also marked as Exhibit 28 a
18 document Bates numbered MRK-CHA00967264 to 7276.
19     So do you recognize Exhibit Number 27?
20   A.   Yeah, it looks like it is the pediatric
21 marketing team's profit plan for 2011 and an update
22 to their five-year plan.
23   Q.   And you'll recall that earlier today we
24 had a document that appeared to state that the
25 prices of the MMR II and the ProQuad vaccine will

61 (Pages 238 - 241)

Page 242

1  increase over a number of years until approximately
2  2011 or '12 when -- and then there was going to be,
3  it appeared, a decrease in the price.
4      A.  Uh-huh.
5          MS. DYKSTRA:  Objection.  Go ahead.  I'm
6  sorry.
7  BY MR. O'KELLY:
8      Q.  I'm going to ask you to turn to page 20
9  of this document.  And this slide here appears to
10  relate to ProQuad specifically.  And if you look at
11  the second row from the bottom, "Discounts," and
12  then go into the column 2011 profit plan, it talks
13  about increasing discounts from 2 percent to
14  approximately 9 percent.
15      A.  Uh-huh.
16      Q.  Do you have an understanding as to what
17  that refers to?
18          MS. DYKSTRA:  Objection.  Outside the
19  scope.
20          You can answer.
21          THE WITNESS:  Yeah, so I believe they
22  were just acknowledging that if we have
23  competition in the marketplace that there may be
24  an expectation from our customers that we would
25  increase our discounts.  There is the assumption

Page 243

1  that our competitor will enter with additional
2  discounts.  And so we just want to be prepared
3  in our planning that if we have to -- again,
4  we're looking at the full portfolio.  We may or
5  may not have to make any adjustments, but that
6  if we do, we would have planned for it.
7  BY MR. O'KELLY:
8      Q.  And you would achieve this price
9  competition by increasing the discounts rather than
10  changing the catalog price.
11      A.  Yes, yes.
12      Q.  But from the perspective of the
13  purchaser, the effect was going to be the same as
14  if you had decreased the catalog price.
15          MS. DYKSTRA:  Objection.  Form.
16          THE WITNESS:  It's subtle, but I think
17  if we lowered the catalog price, it would
18  probably have more of an impact on their
19  reimbursement from managed care.  But that isn't
20  what drives what we're doing.  We just --
21  generally, it's easier, because it's a lot of
22  work to change the catalog price, but we can
23  very easily change discounts.  And there's a
24  perception, too, from providers that they're
25  getting more.  If we lowered the catalog and

Page 244

1  left their discount at 2 percent, they may not
2  feel like -- you know, there would still be 2
3  percent.  But, you know, the expectation is,
4  when you have a competitor come to market that
5  as manufacturer, you're going to recognize that
6  and provide some additional discounts.
7  BY MR. O'KELLY:
8      Q.  Okay.  And let's look at the next
9  exhibit, which is number 28, and that's from a year
10  later, I believe.  If we look at page number 5 of
11  the document, is it the case that this document is
12  also anticipating that if there's competition from
13  Priorix, that Merck may have to increase the
14  discount from 2 percent to approximately 9 percent?
15      A.  It looks like they have a different
16  assumption for 2012 to '15.  I think that 2011
17  column, they just left it there to show what they
18  had in the previous submission.
19      Q.  On the column to the left of that it
20  says, "Exit private sector discount approximately
21  7%."
22          Do you have an understanding as to what
23  that means?
24      A.  I'm sorry, I don't see where --
25      Q.  Sorry, under "Discounts," the first

Page 245

1  column.
2      A.  Yup, first column.
3      Q.  In the discounts row, the first column,
4  it says, "Exit private sector discount
5  approximately 7%."
6      A.  Yeah, but that column says "2010EA,"
7  right?  This was -- this document was from May of
8  2011.  So I think they may have just been showing
9  how their -- how things have changed over time.
10      Q.  Okay.
11      A.  I'm assuming that was what they at one
12  point had put as a placeholder.
13      Q.  Okay.  One final set of questions.  In
14  your experience in working in pricing with Merck,
15  have you taken the existence of outbreaks into
16  consideration when you've been establishing catalog
17  prices?
18      A.  Not that I'm aware of, no.  Catalog
19  price?  No, I'm not aware of that being done at
20  all.
21      Q.  Have you been aware of it in any way
22  affecting discounts?
23      A.  No, not at all.
24      Q.  Have you been -- are you aware if it's
25  ever had any impact on the price paid by customers

62 (Pages 242 - 245)

Page 246

1  at all?

2     A.   No, I'm not aware of it ever impacting

3  decisions around pricing.

4        MR. O'KELLY:  That's all I have.  Thank

5  you very much for your time.

6        MS. DYKSTRA:  I'm going to let -- Zach

7  has just a very short, brief couple of questions

8  on one document.

9             - - -

10            EXAMINATION

11            - - -

12  BY MR. JOHNS:

13     Q.   Ms. Taylor, in the documents we were

14  just looking at that are Taylor-27 and 28, the two

15  slides we were just looking at -- do you have those

16  in front of you?

17     A.   Yes, I do.

18     Q.   If you could go to in Taylor-27, it was

19  slide 20, and in Taylor-28 it was 5.

20     A.   Okay.

21     Q.   The second row from the bottom there

22  that's titled "Discounts," do you see that there on

23  both of these documents?

24     A.   Yes.

25     Q.   Does the information in there reflect,

Page 247

1  in fact, how Merck would have reacted in the event

2  of competitive entry?

3     A.   You know, as I was saying before, I

4  think it is really a placeholder.  You know,

5  because we're projecting out so far and there's so

6  much uncertainty with respect to competitive

7  entrance that the company takes a fairly

8  conservative approach.  In other words, we would

9  rather overpromise than underdeliver on revenues

10  and not knowing how the medical community will

11  react to a competitive entrant, I think, generally

12  speaking, finance and the marketing team assume

13  worst case with respect to what they have to do

14  from a pricing perspective.

15        The second thing is that we don't even

16  start looking at discounting, how would we go about

17  doing that, until a product is maybe within a year

18  of -- certainly something had been filed with the

19  FDA and we have a PDUFA date and now, you know,

20  we're planning, and then still may or may not make

21  it to market, but at least now we have a product

22  that's been filed with the FDA, and we'll start to

23  put the rigger around exactly what we would do with

24  the pricing.  So I think it's a fairly conservative

25  estimate.

Page 248

1        RotaTeq, for example, we went through

2  the same process when Rotarex was coming to market,

3  and to this date, you know, we still have a

4  significant premium over Rotarex in the

5  marketplace.

6     Q.   And when you say "placeholder" there,

7  what do you mean by -- when you use that word, what

8  do you mean by that?

9     A.   Just a way of getting the organization

10  to account for the fact that a competitive entrant

11  may require us to increase our discounts, and we

12  don't know what those discounts would be.

13     Q.   And for GSK or for competition on MMR II

14  or ProQuad, did you ever get to a point where Merck

15  was planning specific discounts?

16     A.   No, I -- in all the time I've been in

17  this job, we've never gotten close enough to where

18  we actually had to start preparing for it.  It's

19  really just always been in these long-range plans.

20     Q.   And how about for catalog price?  Have

21  you ever -- are you aware in your personal

22  capacity as to --

23     A.   No, no.

24     Q.   I'd like to go to a document that was

25  marked called Taylor-13.  It's probably in the

Page 249

1  middle of the stack there.  Could you turn to slide

2  6, please?

3     A.   Okay.

4     Q.   Under the "2006 LROP" heading, it notes

5  that competition enters the market in 2012.  Do you

6  see that?

7     A.   Yes.

8     Q.   And it notes that price reductions will

9  happen in 2012, 2013, 2014.  That's what the text

10  says, right?

11     A.   Uh-huh.

12     Q.   Does Merck usually finalize its pricing

13  and discount strategy six years in advance of

14  competition?

15     A.   No.

16     Q.   And why not?

17     A.   Because there's so much -- one is,

18  there's a lot of unpredictability.  And two is, it

19  will consume a lot of resources that will just end

20  up being changed later.  It's not productive.

21     Q.   So would you say that these are reliable

22  figures?

23        MR. O'KELLY:  Objection to the form.

24        THE WITNESS:  I've not seen a case where

25  we've had taken discounts like this for a

63 (Pages 246 - 249)

Page 250

1  competitive entrant.
2  BY MR. JOHNS:
3      Q.   And planned for them six years out?
4      A.   (Witness nodded.)
5      Q.   I'm sorry, could you -- I need a yes or
6  a no.  We can't take down head shakes on the --
7      A.   True, yes, we haven't -- we haven't
8  planned for them that far out, and we haven't had
9  to execute discounts to that extent, even when a
10  competitor does finally enter.
11      Q.   And could you turn to slide 11?  There
12  was some discussion earlier about how this could
13  reflect how Merck might react to ProQuad pricing.
14         Does Merck usually plan out, again, six
15  years in advance?
16         MR. O'KELLY:  Objection to the form
17    price changes.
18         MR. JOHNS:  Hold on.  Let me finish it.
19  BY MR. O'KELLY:
20      Q.   Does Merck usually plan out in advance
21  by six years its price increase strategy?
22      A.   Again, it's just a placeholder
23  recognizing that if we anticipate a market event,
24  the financials also should reflect that and give us
25  an opportunity to just anticipate it.  But we're

Page 251

1  not really doing anything to plan for it, meaning
2  we're not looking at how we would structure our
3  contracts or how that would impact other products
4  in the portfolio.
5         For example, in the case of a
6  competitive entrant for MMR, we might not even add
7  a discount to MMR.  It might be an additional
8  discount on a different product in the portfolio.
9  And that's not represented in these plans because
10  it's -- we don't know.
11         MR. JOHNS:  Thank you.  That's all the
12    questions I have.
13              -  -  -
14         EXAMINATION
15              -  -  -
16  BY MR. O'KELLY:
17      Q.   Let's just stick with this exhibit.
18  These -- what's the purpose of these long-range
19  operating plans, LROPs?
20      A.   The plan itself?
21      Q.   Uh-huh.
22      A.   So it is, one, to inform the
23  organization of what we expect our revenues to be,
24  and, two, so that we can anticipate what our
25  expenses might be to go along with those market

Page 252

1  events that are driving the revenue and the
2  expenses.
3      Q.   And what's the purpose of specifically
4  including in these long-range operating plans
5  potential or proposed price reductions seven years
6  out when you anticipated there may be competition
7  for the mumps products?
8      A.   It's to ensure that to the extent that
9  could potentially impact revenue, that we've
10  captured that and it's consistent with what we're
11  saying about the market event, the timing.
12      Q.   Now, you testified a few minutes ago
13  that in the case of MMR II and ProQuad that you
14  never actually had to specifically plan for the
15  either introduction of increased discounts or lower
16  catalog prices.
17      A.   Correct.
18         MR. JOHNS:  Objection.
19  BY MR. O'KELLY:
20      Q.   And the reason for that was because
21  there never was a competitor immediately in the
22  offing for either of those two products; is that
23  correct?
24         THE REPORTER:  "Immediately in the"
25    what?

Page 253

1         MR. O'KELLY:  In the offing.
2         THE WITNESS:  Correct.
3         MR. JOHNS:  Objection.
4         THE REPORTER:  "In the offing of" what?
5         MR. O'KELLY:  Sorry, we're all talking
6    at once.  What have you got?
7  BY MR. O'KELLY:
8      Q.   For the MMR II and ProQuad products.
9         MR. JOHNS:  Objection.
10         THE WITNESS:  Until a product is filed
11    with the FDA and there's a PDUFA date, it's all
12    speculation.
13  BY MR. O'KELLY:
14      Q.   Sure.  But in 2006 and as relators in
15  2010, you were making allowance for making
16  provision --
17      A.   Absolutely.
18         THE REPORTER:  Hold on.  "You were
19    making allowance for"?
20  BY MR. O'KELLY:
21      Q.   In 2006 and later in 2010, you were
22  making provision for the possibility that there
23  might be competitive entry in 2011 and '12?
24         MR. JOHNS:  Objection.  Misstates
25    testimony.

64 (Pages 250 - 253)

| Page 254 |
|---|
| 1    THE WITNESS: Yeah, so the difference |
| 2  between what they put in the long-range plan |
| 3  from a financial perspective -- and if we have a |
| 4  product we anticipate bringing to market as |
| 5  well, that would be reflected in the LROP as |
| 6  well, but that's different than activating the |
| 7  teams who actually have to figure out what the |
| 8  strategy would be and how you would actually do |
| 9  that. And that's the part we've not had to do. |
| 10 BY MR. O'KELLY: |
| 11   Q.  Sure. But in 2006, you were making |
| 12 plans for what might happen in 2012, if there was |
| 13 competitive entry. |
| 14   A.  We were not making plans. |
| 15   Q.  In the long-range operating plan, you |
| 16 were not making plans? |
| 17   A.  We were just recognizing the potential |
| 18 impact on revenue. And presumably they also had |
| 19 recognized the impact on expenses. For example, |
| 20 you know, would you have to increase your sales |
| 21 force because now you have a competitor you have to |
| 22 deal with? |
| 23   Q.  But the potential impact on revenue from |
| 24 the perspective of 2006 looking forward to 2012 -- |
| 25   A.  Yes. |

| Page 255 |
|---|
| 1    Q.  -- included the possibility of having to |
| 2  reduce the prices paid by customers for the MMR II |
| 3  and the ProQuad product. |
| 4    A.  Yes, it did. |
| 5    Q.  And the reason why you later didn't have |
| 6  to make specific plans to deal with a competitor |
| 7  was because it was never filed with the FDA. There |
| 8  was never a competitor about to enter. |
| 9    A.  That is true. |
| 10   MR. O'KELLY: Thank you. |
| 11   MS. KOURY: Nothing further. |
| 12   MR. JOHNS: Nothing further. |
| 13   VIDEOTAPE TECHNICIAN: The time is now |
| 14 6:14. This completes the deposition of Michele |
| 15 Taylor. |
| 16     - - - |
| 17  (Witness excused.) |
| 18     - - - |
| 19  (Deposition concluded at 6:14 p.m.) |
| 20     - - - |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 256 |
|---|
| 1    **C E R T I F I C A T E** |
| 2 |
| 3 |
|   I do hereby certify that I am a Notary |
| 4  Public in good standing, that the aforesaid |
|   testimony was taken before me, pursuant to notice, |
| 5  at the time and place indicated; that said deponent |
|   was by me duly sworn to tell the truth, the whole |
| 6  truth, and nothing but the truth; that the |
|   testimony of said deponent was correctly recorded |
| 7  in machine shorthand by me and thereafter |
|   transcribed under my supervision with |
| 8  computer-aided transcription; that the deposition |
|   is a true and correct record of the testimony given |
| 9  by the witness; and that I am neither of counsel |
|   nor kin to any party in said action, nor interested |
| 10 in the outcome thereof. |
| 11   WITNESS my hand and official seal this |
|   24th day of May, 2017. |
| 12 |
| 13 |
| 14 |
| 15     Deborah L. Williams, CCR, CLR |
|      Notary Public |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 257 |
|---|
| 1    INSTRUCTIONS TO WITNESS |
| 2 |
| 3    Please read your deposition over carefully |
| 4  and make any necessary corrections. You should |
| 5  state the reason in the appropriate space on the |
| 6  errata sheet for any corrections that are made. |
| 7    After doing so, please sign the errata |
| 8  sheet and date it. |
| 9    You are signing same subject to the |
| 10 changes you have noted on the errata sheet, which |
| 11 will be attached to your deposition. |
| 12   It is imperative that you return the |
| 13 original errata sheet to the deposing attorney |
| 14 within thirty (30) days of receipt of the |
| 15 deposition transcript by you. If you fail to do |
| 16 so, the deposition transcript may be deemed to be |
| 17 accurate and may be used in court. |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

65 (Pages 254 - 257)

Page 258

1     ACKNOWLEDGMENT OF DEPONENT

2

3          I have read the foregoing transcript of

4     my deposition and except for any corrections or

5     changes noted on the errata sheet, I hereby

6     subscribe to the transcript as an accurate record

7     of the statements made by me.

8

9     _____

10              MICHELE TAYLOR

11

12          SUBSCRIBED AND SWORN before and to me

13    this _____ day of _____, 20____.

14

15

16    _____

17              NOTARY PUBLIC

18

19

20    My Commission expires:

21

22

23

24

25

Page 259

1          E R R A T A  S H E E T

2     IN RE:  USA ex rel. vs. MERCK

3     DATE:  5/9/2017

4     PAGE   LINE          CORRECTION AND REASON

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23

24    _____ _____

25    (DATE)          MICHELE TAYLOR

66 (Pages 258 - 259)

Appx20426

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING AND JOAN A. WLOCHOWSKI, | Civil Action No. 10-4374 (CDJ) |
| *Plaintiffs*, | **FILED UNDER SEAL** |
| v. | **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |
| MERCK & CO., INC., | |
| *Defendant*. | |

**DEFENDANT'S RESPONSE TO RELATORS' ADDITIONAL
STATEMENT OF MATERIAL FACTS IN CONNECTION WITH
DEFENDANT'S FIRST AND FOURTH SUMMARY JUDGMENT MOTIONS**

Pursuant to the Court's Policies and Procedures for Civil Cases, Defendant Merck Sharp & Dohme Corporation, formerly known as Merck & Co., Inc. ("Merck"), submits this response to Relators' additional statement of material facts related to Merck's First and Fourth Motions for Summary Judgment.

## I.     MINIMUM MUMPS POTENCY SPECIFICATION ON MMR-II LABEL

1.     Disputed.  Multiple documents contemporaneous to the period between 1996 and 1998 evidence that Merck understood the potency specification of 4.3 $\log_{10}$ $TCID_{50}$ on the MMR-II label to refer to the potency at release, not expiry.[1]  Those same documents from 1996 to 1998 reflect that Merck conveyed to CBER its understanding that 4.3 $\log_{10}$ $TCID_{50}$ was the minimum release potency.[2]  Further, in connection with a 30(b)(6) deposition pertaining to Merck's release practices, Merck produced a witness to answer questions about the Company's release testing practices.  The witness provided an exhibit summarizing the Company's quality standards which state that 4.3 log was the minimum release potency for the mumps-component of MumpsVax, MM-Vax, and MMR for the time period "approx. 1998 to 10/3/99."[3]  Even CBER's communications reflect that the "minimum release potency" until February 2000 was understood to be 4.3.[4]

---

[1] *See, e.g.*, Merck's Ex. 152 at '5142 (February 26, 1996 email reflecting a discussion with CBER in which Merck indicated that while the label says 20,000, "historically we have provided the release specification" and CBER noting an interpretation that the labeled potency refers to the potency at expiry); Merck's Ex. 186 at '5508 (Merck's January 28, 1998 submission to CBER stating, "[c]urrently, the minimum release titer[] of . . . 20,000 . . . for the . . . mumps component[], . . . are specified"); *id*. at '5513 (background slides from December 16, 1997 meeting between Merck and CBER where slide 2 states: "Minimum release specifications →mumps:  20,000 (4.3 log) $TCID_{50}$/dose).

[2] *See* Merck's SUMF in Support of its Fourth Motion for Summary Judgment at ¶¶ 135, 153, 154.

[3] Merck's Ex. 201 at 2.

[4] For example, FDA's Warning Letter to Merck, dated February 9, 2001, requested an analysis of the range of potencies expected for product on the market where the assumed initial potency is the "minimum release potency specification that was in effect before February 2000."  Merck's Ex. 143 at '0669.  Merck responded, "if it is assumed that the initial potency is 4.3log TCI050/dose, **the minimum release mumps potency specification in effect prior to February 2000** . . ."  Merck's Ex. 177 at '7609 (Response to Warning Letter) (emphasis added).  Merck's response also reflected, in part, "As stated in our October 24, 2000 communication, we historically considered the M-M-R II labeled titers to reflect minimum release specifications."  *Id.* at '7608.

Only one document, Relators' Ex. 44, suggests that "in 1990, the mumps virus end-expiry potency for M-M-R™ II was established as 4.3." That document was prepared in 2011 by a Merck employee who testified that she was not involved in the original discussions with CBER about the vaccine's potency,[5] and that she has "no knowledge of 1990, I was not employed by the company" at that time."[6] The same employee testified that she prepared Relators' Ex. 44 after looking at regulatory filings and manufacturing SOPs,[7] but she also confirmed that she did not review certain documents, including documents that reflected "that discussions were held with CBER in 1998 and 1999 about the difference in interpretation of labeled mumps potency."[8] The same employee, testifying about Relators' Ex. 44, also testified as a 30(b)(6) witness that "in 1997, CBER clarified" that 4.3 log "should represent the end expiry titer for mumps in the US."[9] Relators also cite testimony from a separate and earlier 30(b)(6) deposition where the witness read or referred to the same portion of Relators' Ex. 44 that are disputed for the reasons stated above.[10]

---

[5] *See* Merck's Ex. 117 at 22:8-21 (30(b)(6) (testimony of Amy Keegan that she was "not directly involved in those discussions" and that her understanding was based only on reviewing Merck's filings with CBER).

[6] Relators' Ex. 361 at 82:11-20 (Deposition of Amy Keegan on April 27, 2017) (Q (in part): "When you drafted this document, was it your understanding that 4.3 was established as the end expiry in 1990"; A: "So I have no knowledge of 1990, I was not employed by the company. My interpretation of a CBER approval letter that I read stated minimum potency as 4.3. I interpreted that to mean mumps end expiry.").

[7] Relators' Ex. 361 at 87:21-88:2 ("As stated in the memo, I looked at regulatory filings and I looked at the manufacturing and standard operating procedure").

[8] Relators' Ex. 361 at 83:5-13 (Q: "At the time you drafted [the 2011 memo] did you know that discussions were held with CBER in 1998 and 1999 about the difference in interpretation of labeled mumps potency?"; A: "I did not consult that document in order to prepare this memo.").

[9] Merck's Ex. 330 at 19:13-22 (30(b)(6) testimony of Amy Keegan, answering a question about the basis for her answer that FDA suggested the 5.0 minimum release potency, that "in 1997, CBER clarified that the label potency of 4.3 log TCID50 per dose should represent the end expiry titer for mumps in the US" and that "Merck and CBER then engaged in additional discussions in late 1998 and early 1999 regarding increasing the release titer of Merck's mumps-containing vaccines.").

[10] Relators' Ex. 38 at 130:2-16 (Q: "Was there an end expiry potency in August 1999?" . . . A: "I have another document . . . so bear with me as I draw your attention to a letter to Annie Sturgess from Amy Keegan").

## II.      MUMPS OVERFILL

2.      It is undisputed that, on August 20, 1999, CBER directed Merck to increase the minimum release potency for its mumps-containing vaccines to 5.0 $\log_{10}$ $TCID_{50}$ per dose.[11] CBER's letter suggests Merck should formulate all lots filled on or after September 13, 1999 to contain at least 5.2 $\log_{10}$ $TCID_{50}$ and that all lots submitted for CBER release after November 8, 1999 would be subject to a requirement of having a minimum release potency of 5.0 $\log_{10}$ $TCID_{50}$.[12] On September 15, 1999, Merck submitted a Prior Approval Supplement to support the increased release potency of 5.0 $\log_{10}$ $TCID_{50}$ and CBER approved that supplement on February 11, 2000.[13]

It is undisputed that, prior to the changes described in the prior paragraph, Merck manufactured the mumps component of MMR-II with a target manufacturing potency of 4.9 $\log_{10,}$ which can also be expressed mathematically as 80,000.

It is undisputed that 5.2 $\log_{10}$ can also be expressed mathematically as 160,000 and that 5.0 $\log_{10,}$ can be expressed mathematically as 100,000.

Any suggestion that referring to the potency values using ordinary numbers, rather than log figures, supports inferences related to patient safety or that these changes were necessary because of concerns that the mumps vaccine did not confer appropriate protection is not supported by the materials Relators cite.

3.      Disputed.  The documents Relators cite do not support the proffered factual statement that "FDA viewed" the "Overfill" discussed in paragraph 2 as "temporary" or as an

---

[11] *See* Merck's SUMF in Support of its Fourth Motion for Summary Judgment at ¶ 135.
[12] Merck's Ex. 185 at MRK-KRA01624909 (CBER's August 20, 1999 letter).
[13] See Merck's SUMF in Support of its Fourth Motion for Summary Judgment at ¶¶ 165 & 166.

Appx20430

"interim" measure.[14]  Neither CBER's August 20, 1999 letter regarding the "overfill" nor the February 11, 2000 approval of Merck's supplement application reference the approved change as "temporary" or as "interim."[15]

4.    It is undisputed that, since the manufacturing changes proposed by CBER in August 1999 and approved in February 2000, Merck has manufactured MMR-II with a target manufacturing potency of 5.2 $\log_{10}$ $TCID_{50}$ with a mumps minimum release potency of 5.0 $\log_{10}$ $TCID_{50}$.

## III.    PROTOCOL 007

5.    The relationship between the efficacy of Merck's mumps vaccine and Protocol 007 is undisputed.

The efficacy of the vaccine, as that term is formally used, was demonstrated in pre-licensure studies in which vaccine was given to some study subjects and withheld from others.[16] As the FDA stated in 2004 in connection with the components of ProQuad, which includes mumps, "the efficacy of those products has already been established."[17]

---

[14] The only documents Relators' cite for this statement were authored by Merck employees.  *See* Relators' Ex. 48 (internal email string between Merck employees); Relators' Ex. 79 (internal email message from a Merck employee); Relators' Ex. 362 (internal memo from Merck employee); Relators' Ex. 363 (internal memo); Relators' Ex. 364 (Merck submission to CBER, not reflecting CBER's response).

[15] *See* Merck's Ex. 185 at MRK-KRA01624909-'10 (CBER's August 20, 1999 letter) and Merck's Ex. 187 at MRK-KRA01897091-'092 (CBER's February 11, 2000 letter approving Merck's supplement to the mumps vaccine licenses).

[16] Relators' Ex. 30 (Durbin Dep. Tr.) at 62:25-63:9; Relators' Ex. 115 (Emini Dep. Tr.) at 128:24-129:6, 130:21-131:3; Relators' Ex. 39 (Musey Dep. Tr.) at 81:2-22; Relators' Ex. 112 (November 17, 2004 Submission) at MRK-KRA00126970.  *See also* Merck's Ex. 86 (Hilleman, Maurice et al., Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation, New England Journal of Medicine, (1967) 267(5):252-258) at 252-253, 257; Merck's Ex. 199 (Weibel, Robert et al., Live, Attenuated Mumps Virus Vaccine 3. Clinical and Serologic Aspects in a Field Evaluation, New England Journal of Medicine, (1967) 267(5):245-251) at 245-46 (describing how the original efficacy trial for Merck's mumps vaccine was conducted and the results as "giving an overall protective efficacy rate of 97 per cent," and with 20 additional unconfirmed cases included, "the overall protection rate would be 95 per cent.").

[17] Relators' Ex. 112 (November 17, 2004 Submission) at MRK-KRA00126970.

Appx20431

Protocol 007 was designed to demonstrate comparability by immunological testing between a lower potency of the vaccine and the release potency of the vaccine.[18]   Unlike a true efficacy study, in which disease outcomes are compared, Protocol 007 involved use of assays that measured immune responses.  As Merck explained to the FDA when submitting the application to lower the labeled potency, which was supported by Protocol 007, "[n]o studies of efficacy of M-M-R[TM]II were performed in support of this application."[19]  Because the efficacy of the vaccine had been established, the control group was presumed efficacious and the assays used in Protocol 007 compared immune responses as a surrogate for efficacy.[20]   Neither assay measured efficacy or protection directly.[21]  As Merck explained to the FDA in its label change application, the PRN assay in Protocol 007 can be used as a surrogate for effectiveness.[22]

All of the material cited in support of Paragraph 5 is consistent with this role of efficacy, effectiveness and protection in Protocol and in that sense Paragraph 5 is undisputed.

Paragraph 5 is disputed and unsupported by any record evidence to the extent that it implies that Protocol 007 was intended to evaluate the efficacy, effectiveness or protection of the

---

[18] Relators' Ex. 105 (CSR) MRK-KRA00224982 at '021; Relators' Ex. 115 (Emini Dep. Tr.) at 69:23-70:7.

[19] Relators' Ex. 189 (January 29, 2004 Submission) MRK-KRA00000032 at '116.

[20] Relators' Ex. 6 (Burlington Dep. Tr.) at 236:1-237:7 ("And we know that the vaccine… [at] the release titer is an effective vaccine.  That's the assumption that's built into this trial."); *id.* at 283:24-284:9 ("vaccine used in the control group in these studies is related to that effective vaccine"); Relators' Ex. 115 (Emini Dep. Tr.) at 26:13-27:11 (testifying that the goal of Protocol 007 "was not to assess efficacy because the vaccine's effectiveness and efficacy had been defined many years previously in a former trial for efficacy" but rather "to study the immunogenicity of the vaccine using a specific set of assays as a measure of immunogenicity").

[21] Relators' Ex. 30 (Durbin Dep. Tr.) at 231:13-17 ("[T]he PRN, in and of itself, cannot predict efficacy.  It is an indirect indicator of efficacy.  It doesn't necessarily completely protect, particularly on an individual level."); *id.* 214:7 at (PRN is "an indirect marker of protection"); *id.* at 50:15-51:9 (while "efficacy [is] a direct measure of protection, the immunological assay is an indirect measure"); Relators' Ex. 115 (Emini Dep. Tr.) at 310:17-311:25 ("[The seroconversion rate as measured by the neutralization assay] is not an assessment of efficacy.  Rather what this is, is a measure of the ability of the vaccine at these three different tested potency levels to elicit a measurable immune response as measured by the assay.").

[22] Relators' Ex. 189 (January 29, 2004 Submission) at MRK-KRA00000032.  *See generally* Relators' Ex. 5 (Burlington Expert Report) at ¶¶ 38-44; Relators' Ex. 24 (Durbin Expert Report) at 6-9.

mumps component of MMRII in any other respect, such as, for example, providing a direct measure or percentage of efficacy.

6.      Disputed.

The material cited in Paragraph 6 does not support the first sentence of the paragraph.  Of the 19 exhibits cited in support of Paragraph 6, only two purport even to address the relationship between the 96% seroconversion rate on the MMR-II label and the vaccine's ability to protect against mumps.  One is a document sent to Merck by an outside marketing consultant, not authored by Merck.[23]  The second is one question and answer over counsel's objection, about a sentence in a PowerPoint presentation parts of which the witness had never seen, from a former Merck statistician.[24]

The material cited in Paragraph 6 does not support the second sentence of the paragraph. At most, some of the documents cited in Paragraph 6 show that Merck was considering proposing a label change to the FDA under various hypothetical scenarios, none of which ever came to pass; there is no statement in the documents of the FDA's view that a label change would be required, or even allowed.  Even the documents that describe Merck's consideration of proposing a label change under the various hypothetical scenarios do not refer to changing the label regarding "mumps protection," but instead involve the seroconversion rate on the label. There is no suggestion in any of the documents cited in Paragraph 6 or in any other documents of which Merck is aware of a change to the efficacy statement on the MMR II label that the controlled field trials on mumps vaccine "demonstrated a high degree of protective efficacy."

---

[23] The document is Relators' Ex. 379.  Relators do not cite to the cover email to which Relators Ex. 379 is attached. Merck has attached that cover email hereto as Merck's Ex. 331.  As shown, Relators' Ex. 379 was an attachment to an email received from an outside marketing consultant.

[24] In fact, the witness specifically testified that he had no recollection of being involved in discussions about that issue.  Relators' Ex. 380 (Schofield Dep. Tr.) at 224:21-225:4.  Notably, Relators do not cite to any testimony or documents from Merck medical doctors or other relevant company scientists.

Appx20433

The material cited in Paragraph 6 does not support the third sentence of the paragraph. At most, some of the documents cited in Paragraph 6 contain a speculative statement by the author that a change in the seroconversion rate could lower the bar for competition. There is no indication in any of the documents that this impacted any decision made by Merck or that any document author indicated that it would or should impact any decision to be made by Merck. In addition, Paragraph 6 cites to testimony from a GlaxoSmithKline ("GSK") Rule 30(b)(6) corporate designee, April Cohen. Ms. Cohen testified that ███████████████████████ ████████████████████████████████████████████████████,[25] ██████████████████████████████████████████████████████████ ████████████████████████████████████████.[26]

## IV.    MERCK'S POTENCY LOSS, STABILITY, AND SHELF-LIFE ANALYSES

7.    It is undisputed that, from approximately 2001 to 2004, Philip Bennett was a statistician for Merck with certain responsibilities for calculations related to the potency and stability of the mumps vaccine.[27] To the extent that this paragraph suggests that Mr. Bennett was "primarily" responsible for MMR-II potency and stability, that suggestion is not supported by Relators' citations and is contradicted by Mr. Bennetts's own deposition testimony.[28]

---

[25] Relators' Ex. 375 (Cohen Dep. Tr.) at 39:20-45:1, 165:21-168:12, 168:21-169:11.

[26] *Id.* at 151:6-152:12.

[27] Relators' Ex. 49 at 12:5-7, 12:10-14 ("In 2001, I was a statistician" who was, "within [his] department" "the person responsible for the live virus vaccines – measles, mumps and rubella.").

[28] *Compare*, for example, Relators' statement that Bennett "primarily" dealt with MMR-II potency and stability issues," with the full exchange at Bennett's deposition: (Q. "So up until 2004, you were the statistician who dealt with any potency and stability issues dealing with M-M-R?" A: "Myself primarily, also Tim Schofield and Jim Clair."). Relators' Ex. 49 at 18:1-6.

7

Any additional suggestion that Mr. Bennett was singularly "responsible" for the stability monitoring program is also not supported by Relators' citations and is also contradicted by Mr. Bennetts's deposition testimony.[29]  The remainder of paragraph 7 is undisputed.

8.     The first sentence of paragraph 8 is not supported by a citation to the record.[30]  It is undisputed that Phil Bennett testified that "the modeling he did was supposed to provide a 95 percent confidence level that the end expiry potency would be reached."[31]  Any suggestion that "modeling" was the only or best way to provide assurance regarding end expiry potency is not supported by the cited materials and is contradicted by other testimony from Mr. Bennett and others on this same topic.

During his deposition, for example, Mr. Bennett testified that the stability monitoring program that Merck uses and historically has used gives assurance that lots released to market comply with the potency specifications on the label.[32]  He further testified that lots tested on stability give comfort that other lots, not retained for stability testing, comply with the specifications.[33]  He also testified that the assurance that product will comply with specifications

---

[29] *Compare*, for example, Relators' statement that Bennett was "responsible" for Merck's stability monitoring process, with Bennett's deposition testimony that "Cindy Morrisey was in MMD as –responsible for the stability programs" and that Cindy Morrisey was "the person responsible for the stability studies."  Relators' Ex. 49 at 13:16-17, 214:9-16.

[30] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5 ("The Court will not consider any description of a fact that is not supported by citation to the record. Statements of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements, such as the title of or numbered reference to a document, the name of a deponent and the page(s) of the deponent's deposition, or the identity of an affidavit or declaration and the specific paragraph relied upon. Pinpoint citations are required.").

[31] Relators' Ex. 49 at 225:6-11.

[32] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want  95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots.  And it's that information that would provide the assurance of current production being above 4.3.").

[33] *Id.* at 220:6-10.

comes from this stability testing and from the manufacturing and production processes.[34]  As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[35] and "testing" of the "current [lots]," which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[36]  FDA's Warning Letter to Merck made the same point.  In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[37]

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements.  *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through

---

[34] *Id.* at 220:11-14.

[35] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want  95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A:  "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots.  And it's that information that would provide the assurance of current production being above 4.3.").

[36] *Id.* at 222:11-223:5, 223:7-224:1 (Q.  So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A:  "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material.  If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market."); *see also* Relators' Ex. 381 at '96072 (reflecting data used for the analysis from lots with a date of manufacture between "1/95" and "5/98," which consists only of historical lots from before the release potency was increased).

[37] Merck's Ex. 143 at '0669.

[the] stability program,"[38] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these memos are saying"[39]).

9.      It is undisputed that Relators' Ex. 381 consists of a document from Phil Bennett that is dated February 27, 2001.  The statement that Mr. Bennett performed a potency loss, stability, and shelf-life analysis incorporating potency measurements from samples of 20 lots of mumps vaccine is not supported by the materials Relators cite.[40]

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

10.      Relators' Ex. 381 is a document from Phil Bennett, dated February 27, 2001, that contains the language selectively quoted by Relators in paragraph 10.

Any suggestion that the statement in Exhibit 381 is an accurate reflection of whether lots manufactured at 5.0 complied with an end-expiry potency of 4.3 is disputed.  For example, during his deposition, Mr. Bennett testified about the analysis he performed in Exhibit 381 and testified that it was an "overestimate" of loss because "other data and datasets . . . show a lower [average shelf life] loss."[41]  When pushed to clarify, Mr. Bennett testified further that he thinks

---

[38] Relators' Ex. 416 at 160:22-161:8. (R. McKee Dep. Tr.); *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

[39] Relators' Ex. 394 at 317:7-319:12 (Gulati Dep. Tr.) (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No.  In my opinion, no.  It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

[40] Relators' Ex. 49 at 30:18-31:6 (In response to a question about whether the analysis in Exhibit 381 "was taken from 20 actual lots," Mr. Bennett testified "I don't know" and "I don't know that, but that is a way that it probably was done based on reading this.").

[41] Relators' Ex. 49 at 58:3-9 (Q:  "And why do you think this would be an overestimate?"; A: "Inasmuch as other data and datasets that I've seen show a lower [average shelf life] loss than this."); *id.* at 59:18-20 (Q: "And sitting here today, you think this was an overestimate?"; Q:  "Yes.").

the February 27, 2001 analysis overestimates loss based upon access to data from more observations "with a lower variability and a lower average."[42]

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

With respect to Relators' second sentence, it is undisputed that, as of 1999, the MMR-II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus"—equivalent to 4.3 log10 $TCID_{50}$.[43]  It is also undisputed that, after the FDA approved the change to the label in 2007, the M-M-R II label stated that "[e]ach 0.5 mL dose contains not less than … 12,500 $TCID_{50}$ of mumps virus"— equivalent to 4.1 log10 $TCID_{50}$.[44]  The remaining portions of the second sentence are disputed.

11.    Relators' Ex. 381 is a document from Phil Bennett, dated February 27, 2001, that reflects that the memo was addressed to Keith Chirgwin and Roberta McKee.

Disputed to the extent that the materials cited in support of this paragraph do not reflect or confirm the titles for Mr. Chirgwin or Dr. McKee.[45]  Also disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

12.    Relators' Ex. 86 is an email from Phil Bennett that contains the language selectively quoted by Relators in paragraph 12.

---

[42] *Id.* at 59:18-60:11.
[43] Merck's Ex. 166 (April 1999 Label), at 1.11.
[44] Merck's Ex. 167 (Current Label) at 1.
[45] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5 ("The Court will not consider any description of a fact that is not supported by citation to the record. Statements of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements, such as the title of or numbered reference to a document, the name of a deponent and the page(s) of the deponent's deposition, or the identity of an affidavit or declaration and the specific paragraph relied upon. Pinpoint citations are required.").

Appx20438

Disputed to the extent that, during his deposition, Mr. Bennett testified that he did not recognize Relators' Ex. 46, did not recall sending this email, did not specifically recall making the calculations in the document or any reason why he sent the email – other than in response to an earlier email in the same thread.[46]

Disputed further to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

13.     It is undisputed that Relators' Ex. 86 is an email from Phil Bennett that contains the language selectively quoted by Relators in paragraph 13.  Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Any suggestion that the statement in Exhibit 86 is an accurate calculation of the shelf life for MMR-II is disputed.  For example, during his deposition, Mr. Bennett was asked if he had reason to question the accuracy of the calculation in this document.  He testified:

> Accuracy in terms of correctly analyzing the data in hand, no – they . . . would be accurate.  Accurate in terms of characterizing our product, that would be limited to the fact that this is [] based upon a limited dataset and a specific analysis requested for it.[47]

Mr. Bennett also testified that he could not say that this was the most reliable calculation at the time.[48]

It is undisputed that the FDA-approved shelf life for MMR-II has always been 24 months.

---

[46] Relators' Ex. 49 at 156:21-22, 158:18-21, 159:13-19, 160:6-9.
[47] Relators' Ex. 49 at 160:10-18.
[48] Relators' Ex. 49 at 160:19-161:3 (Q:  Was this the most reliable calculation you came up with at the time with the data available to you?  A: "[i]t's impossible to say what's most reliable.  I mean, there are other datasets, other analyses, and to know which is – there is no correct one or best – to know best, I – you can't tell.").

Appx20439

14.     Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Relators' Ex. 86 lists the names of the 18 individuals in the "to" field of Mr. Bennett's email.  Mr. Bennett testified that he did not recall sending this email or any reason why he sent the email to these particular recipients – other than in response to an earlier email in the same thread.[49]  Therefore, any inference that Mr. Bennett was communicated to "upper management" for any particular reason is not supported by the record and is disputed.  It is undisputed that, during his deposition, Mr. Bennett stated that a number of people on the email string "were in upper management."[50]

15.     Disputed.  The materials cited in support of this paragraph do not itemize the number of lots discussed in the email in the same manner as in Relators' proffered factual statement about incorporating measurements from samples of "at least 12 lots."  Relators' Ex. 382 does not list or specify which lots were analyzed; it contains the language quoted in the supporting footnote that references "9 lots," but does not specify an analysis of "3 lots released at 5.0."  Also disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

16.     Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

---

[49] Relators' Ex. 49 at 156:21-22, 158:18-21, 159:13-19, 160:6-9.
[50] Relators' Ex. 49 at 159:8-11.

Appx20440

Relators' Ex. 382 is an email from Phil Bennett that contains the language selectively quoted by Relators in paragraph 16. Any suggestion that the statements in Exhibit 382 are an accurate calculation of the shelf life for MMR-II or the calculation of shelf-life loss is disputed. During his deposition, Mr. Bennett did not remember this email exchange[51] and did not specifically recall how he performed the calculations discussed in the email string.[52] He was asked if lots made after the increase to the minimum release potency had already lost .7 logs by the time of this email and testified "I wouldn't say that."[53]

The scatter plots included in the graphs in Relators' Ex. 382 reference potency measurements for lots filled from "12/86 -12/94," "1/95-5/99," and "8/99-6/00."[54] Any suggestion that the January 2002 email analysis is evidence that the mumps component of MMR-II, manufactured after the minimum release potency increased, failed to have an end-expiry potency at or before 24 months is disputed. For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ TCID$_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below 4.3 $\log_{10}$ TCID$_{50}$ (which would be considered "out of specification") for any lots at any interval through 24 months.[55] As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[56] and "testing" of the "current [lots],"

---

[51] Relators' Ex. 49 at 177:9-10.
[52] *Id.* at 180:15-17.
[53] *Id.* at 181:17-182:8.
[54] Relators' Ex. 49 at 183:5-184:2.
[55] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).
[56] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want 95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots. And it's that information that would provide the assurance of current production being above 4.3.").

Appx20441

which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[57] FDA's Warning Letter to Merck made the same point. In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[58]

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements. *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program,"[59] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these memos are saying"[60]).

It is further disputed that Mr. Bennett "affirmed" "13.6 months" as the calculated expiry period. As reflected in Relators' Exhibit 382, Cindy Morrisey sent a three paragraph email to Mr. Bennett to which he responded, in part, "You are correct." The email does not state that Mr.

---

[57] *Id.* at 222:11-223:5, 223:7-224:1 (Q. So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A: "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material. If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market."); *see also* Relators' Ex. 382 at '094849 (scatterplot chart indicates that it includes historic data (lots from "12/86-12/94" and "1/95-5/99")).

[58] Merck's Ex. 143 at '0669.

[59] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

[60] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No. In my opinion, no. It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

Bennett affirmed 13.6 as the calculated "expiry period," and he did not testify to that fact in his deposition.

17.     Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

It is undisputed that Relators' Ex. 382 lists the names of the individuals in the "to" field of Mr. Bennett's email.

18.     It is undisputed only that Relators' Ex. 73 includes an email from Phil Bennett that is dated September 5, 2002 that contains the language selectively quoted by Relators in paragraph 18. Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

19.     Disputed that the shelf life for the mumps component of MMR-II should have been 12 months based on the analysis in Relators' Ex. 73. Ex. 73 includes an email from Phil Bennett that is dated September 5, 2002 that contains the language selectively quoted by Relators in paragraph 19.

Any inference that the email analysis in Relators' Ex. 73 is evidence that the mumps component of MMR-II, manufactured after the minimum release potency increased, failed to have an end-expiry potency at or before 24 months or that it should have had a different shelf life than 24 months is disputed. For all testing on lots manufactured and released with a release potency at or above $5.0 \log_{10} TCID_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below $4.3 \log_{10} TCID_{50}$ (which would be considered "out of

specification") for any lots at any interval through 24 months.[61]  As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[62] and "testing" of the "current [lots]," which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[63]  FDA's Warning Letter to Merck made the same point.  In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[64]

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements.  *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program,"[65] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett

---

[61] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).

[62] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want  95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A:  "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots.  And it's that information that would provide the assurance of current production being above 4.3.").

[63] *Id.* at 222:11-223:5, 223:7-224:1 (Q.  So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A:  "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material.  If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market."); *see also* Relators' Ex. 73 at '62820 (reflecting data used for the analysis from "product filled 1995 to 2000," which includes historical lots from before the release potency was increased).

[64] Merck's Ex. 143 at '0669.

[65] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

"won't trigger a concern" because "none of the stability data is showing what these memos are saying"[66]).

Further disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

20.    Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

It is undisputed that Relators' Ex. 73 lists the names of the individuals in the "to" field of Mr. Bennett's email.

21.    Relators' Ex. 73 includes an email in response to Phil Bennett's September 5, 2002 email that contains the language selectively quoted by Relators in paragraph 21.

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Further disputed to the extent that this proffered fact is being offered to suggest that the mumps component of MMR-II should have had a 12 month shelf life.  For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ TCID$_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below 4.3 $\log_{10}$ TCID$_{50}$ (which would be considered "out of specification") or any lots at any interval through 24

---

[66] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No.  In my opinion, no.  It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

months.[67]  As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[68] and "testing" of the "current [lots]," which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[69]  FDA's Warning Letter to Merck made the same point.  In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[70]

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements.  *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program,"[71] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett

---

[67] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).

[68] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want  95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A:  "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots.  And it's that information that would provide the assurance of current production being above 4.3.").

[69] *Id.* at 222:11-223:5, 223:7-224:1 (Q.  So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A:  "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material.  If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market."); *see also* Relators' Ex. 73 at '62820 (reflecting data used for the analysis from "product filled 1995 to 2000," which includes historical lots from before the release potency was increased).

[70] Merck's Ex. 143 at '0669.

[71] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

"won't trigger a concern" because "none of the stability data is showing what these memos are saying"[72]).

Further, at her own deposition, Dr. Morsy was not asked about Relators' Ex. 73. She was asked about other documents similarly discussing an estimated 12 month shelf life for the mumps component of MMR-II and, in response, Dr. Morsy noted that the key language in many such communications is "estimate," which appears in Ex. 73.[73] Dr. Morsy further testified that "estimates is the keyword" and that not all stability projections are estimates; stability testing involves "actual numbers" and "based on these actual numbers, then you can say [what] the shelf life."[74] She directed Relators' counsel and the government to Merck Manufacturing[75] for the actual stability data which is highlighted in Merck's fourth motion for summary judgment.[76]

Finally, any suggestion that the language "we have much larger problem," selectively quoted from Relators' Ex. 73 has any meaning within the context of this litigation is disputed. Dr. Morsy was not asked about Relators' Ex. 73 and, therefore, there is no testimony from her to explain the meaning of the selectively quoted language.

22. Relators' Ex. 73 includes an email in response to Phil Bennett's September 5, 2002 email that contains the language selectively quoted by Relators in paragraph 22. When

---

[72] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No. In my opinion, no. It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

[73] Relators' Ex. 359 (M. Morsy Dep. Tr.) at 367:10-25 (Q: "[In this document], there is a statement that the estimated shelf life with a 4.3 log is less than 12 months, a potentially non-marketable shelf life. Do you see that?"; A: "It says there calculations under review and evaluation. So it's an estimate.").

[74] Relators' Ex. 359 (M. Morsy Dep. Tr.) at 368:10-368:19; 370:6-370:14.

[75] Relators' Ex. 359 (M. Morsy Dep. Tr.) at 370:22-371:11 (Q: "Just help me understand, who would have the actual data if you're saying the estimates aren't what [] mattered?" A: "Manufacturing . . . would have whatever actual data is available.").

[76] *See, e.g.*, Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).

Appx20447

asked about the email during a deposition, Cindy Morrisey did not remember the email,[77] although she did confirm that she did not agree with Relators' counsel that it or similar documents indicated that the product was "not effective."[78]

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Further disputed to the extent that this proffered fact is being offered to suggest that the mumps component of MMR-II did not maintain 4.3 $\log_{10}$ $TCID_{50}$ potency throughout its shelf life. For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ $TCID_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below 4.3 $\log_{10}$ $TCID_{50}$ (which would be considered "out of specification") or any lots at any interval through 24 months.[79] As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[80] and "testing" of the "current [lots]," which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[81] FDA's Warning Letter to

[77] Merck's Ex. 332 (C. Morrisey Dep. Tr.) at 178:10-24 (Q: "Doesn't this memo indicate that the product is not effective?; A: "No, it doesn't say that"; Q: "Really? If the product has less than the labeled potency, it's still effective? Is that your interpretation?" A: (over objection) "That would not be my interpretation. It's two sentences, and I think you're trying to draw a really, really broad conclusion from two sentences.").
[78] Merck's Ex. 332 (C. Morrisey Dep. Tr.) at 159:6-165:16.
[79] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).
[80] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want 95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots. And it's that information that would provide the assurance of current production being above 4.3.").
[81] *Id.* at 222:11-223:5, 223:7-224:1 (Q. So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring

Merck made the same point.  In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[82]

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements.  *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program,"[83] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these memos are saying"[84]).

23.    Undisputed that Relators' Ex. 385 is a memorandum from Phil Bennett, dated "January 28, 2004 (original)" and "February 9, 2004 (revised)."  Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

24.    Undisputed that Relators' Ex. 385 is a memorandum from Phil Bennett, dated "January 28, 2004 (original)" and "February 9, 2004 (revised)."  Disputed to the extent that the

---

program?"; A:  "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material.  If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market."); *see also* Relators' Ex. 73 at '62820 (reflecting data used for the analysis from "product filled 1995 to 2000," which includes historical lots from before the release potency was increased).
[82] Merck's Ex. 143 at '0669.
[83] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").
[84] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No.  In my opinion, no.  It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

Appx20449

phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Any suggestion that the statement in Relators' Ex. 385 evidences that the mumps component of the MMR-II vaccine did not contain 4.3 $\log_{10}$ TCID$_{50}$ potency at or before 24 months is disputed. For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ TCID$_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below 4.3 $\log_{10}$ TCID$_{50}$ (which would be considered "out of specification") or any lots at any interval through 24 months.[85] As made clear in FDA's February 9, 2001 Warning Letter to Merck, "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[86]

With respect to Relators' second sentence, it is undisputed that, from February 2004 to December 2007, the MMR-II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 TCID$_{50}$ of mumps virus"—equivalent to 4.3 $\log_{10}$ TCID$_{50}$.[87] The remaining portions of the second sentence are disputed.

25.     Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

It is undisputed that Relators' Ex. 385 identifies individuals in the "to" and "cc" fields.

26.     Undisputed that Relators' Ex. 386 is a memorandum from Phil Bennett, dated November 4, 2004 that contains the language selectively quoted by Relators in paragraph 26. During his deposition, Mr. Bennett could not recall the source of the lots used for the

---

[85] Merck's SUMF in Support of its Fourth Motion for Summary Judgment at ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).
[86] Merck's Ex. 143 at '0669.
[87] Merck's Ex. 166 (April 1999 Label) at 1.11.

calculations discussed in Relators' Ex. 386 and did not know how many lots were reflected in the analysis, which vaccines they were drawn from or the time period covered by the lots.[88]

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Disputed to the extent that this paragraph implies or suggests that the mumps component of the MMR-II vaccine did not contain 4.3 $\log_{10}$ TCID$_{50}$ at or before 24 months after being released with a minimum release potency at or above 5.0 $\log_{10}$ TCID$_{50}$. For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ TCID$_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below 4.3 $\log_{10}$ TCID$_{50}$ (which would be considered "out of specification") or any lots at any interval through 24 months.[89] As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[90] and "testing" of the "current [lots]," which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[91] FDA's Warning Letter to Merck made the same point. In

---

[88] Relators' Ex. 49 at 208:1-14.

[89] Merck's SUMF in support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).

[90] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want 95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots. And it's that information that would provide the assurance of current production being above 4.3.").

[91] *Id.* at 222:11-223:5, 223:7-224:1 (Q. So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A: "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material. If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market.").

it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[92]

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements.  *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program,"[93] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these memos are saying"[94]).

27.     Undisputed that Relators' Ex. 386 is a memorandum from Phil Bennett, dated November 4, 2004 that contains the language selectively quoted by Relators in paragraph 26. During his deposition, Mr. Bennett could not recall the source of the lots used for the calculations discussed in Relators' Ex. 386 and did not know how many lots were reflected in the analysis, which vaccines they were drawn from or the time period covered by the lots.[95]

---

[92] Merck's Ex. 143 at '0669.

[93] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

[94] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No.  In my opinion, no.  It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

[95] Relators' Ex. 49 at 208:1-14.

Appx20452

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Disputed to the extent this paragraph suggests that the mumps component of the MMR-II vaccine did not contain $4.3 \log_{10} TCID_{50}$ at or before 24 months after being released with a minimum release potency at or above $5.0 \log_{10} TCID_{50}$. For all testing on lots manufactured and released with a release potency at or above $5.0 \log_{10} TCID_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below $4.3 \log_{10} TCID_{50}$ (which would be considered "out of specification") or any lots at any interval through 24 months.[96]  As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[97] and "testing" of the "current [lots]," which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[98]  FDA's Warning Letter to Merck made the same point.  In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[99]

---

[96] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).

[97] Relators' Ex. 49 at 219:21-220:4; 226:10-25 (Q: So if I want  95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A:  "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots.  And it's that information that would provide the assurance of current production being above 4.3.").

[98] *Id.* at 222:11-223:5; 223:7-224:1 (Q.  So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A:  "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material.  If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market.").

[99] Merck's Ex. 143 at '0669.

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements. *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program,"[100] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these memos are saying"[101]).

28.     It is undisputed that, mathematically, $5.2 \log_{10}$ is the equivalent of 160,000, and that $5.0 \log_{10}$ is the equivalent of 100,000. It is further undisputed that, mathematically, 160,000 is 60,000 more than 100,000 and that 160,000 is 60% higher than 100,000.

None of the materials Relators cite for support of the factual statement in paragraph 28 calculate or discuss that the minimum release potency specification of $5.2 \log_{10}$ is 60% higher than the minimum release potency specification of $5.0 \log_{10}$. Any inference that the difference between $5.0 \log_{10}$ and $5.2 \log_{10}$ has clinical, regulatory or other significance is not supported by the materials Relators cite and is disputed.

---

[100] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

[101] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No. In my opinion, no. It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

Appx20454

29.    Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

It is undisputed that Relators' Ex. 386 identifies individuals in the "to" and "cc" fields.

30.    Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Paragraph 30 is also disputed because it mischaracterizes Mr. Bennett's testimony. While Mr. Bennett's testimony is selectively quoted in footnote 452, other testimony is omitted in which Mr. Bennett acknowledged there were ways to make the analysis more precise[102] and cautioned against an inference that the models were more accurate than the potency results of Merck's stability monitoring program.[103]

31.    Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

It is undisputed that footnote 453 reflects selective quotations from Mr. Bennett's deposition.

Disputed that Mr. Bennett's recollection regarding anyone challenging his calculations supports an inference that calculations he prepared evidence that the mumps component of

---

[102] *See, e.g.*, Relators' Ex. 49 at 48:12-50:13 (testifying that "given unlimited resources and time," having and analyzing additional lots would have made his analysis "more reliable.").

[103] *Id.* at 222:11-223:5, 223:7-224:1 (Q. So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A: "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material. If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market.").

28

**Appx20455**

MMR-II did not contain $4.3 \log_{10} \text{TCID}_{50}$ at or before 24 months after being released with a minimum release potency at or above $5.0 \log_{10} \text{TCID}_{50}$. For all testing on lots manufactured and released with a release potency at or above $5.0 \log_{10} \text{TCID}_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below $4.3 \log_{10} \text{TCID}_{50}$ (which would be considered "out of specification") or any lots at any interval through 24 months.[104] As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label.[105] *See also* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program,"[106] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these memos are saying"[107]).

---

[104] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).

[105] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want 95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots. And it's that information that would provide the assurance of current production being above 4.3.").

[106] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

[107] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No. In my opinion, no. It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

During his deposition, Mr. Bennett could not recall the source of the lots used for the calculations discussed in Relators' Ex. 386 and did not know how many lots were reflected in the analysis, which vaccines they were drawn from or the time period covered by the lots.[108]

32.    It is undisputed that Relators' Ex. 387 is an email string from December 4, 2012. It is further undisputed that Relators' Ex. 388 is an email string from December 5, 2012.

It is disputed that the December 2012 email string was conducted for the purposes of developing any potency specifications for MMR-II.  As Ms. Keegan testified when deposed about Relators' Ex. 388, the group was not working on potency specifications at all; instead, the group was working on acceptance criteria for performance qualification to transfer certain work to the then-new Merck manufacturing facility in Durham.[109]

Any inference that conversations had to happen "off-line" because they related to the potency specifications for the mumps component of MMR-II is also disputed.[110]

Also disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" in the first sentence is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

33.    Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" in the first sentence is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.  It is also disputed as to whether

---

[108] Relators' Ex. 49 at 208:1-14.

[109] Relators' Ex. 361 (A. Keegan Dep. Tr.) at 109:14-111:23 ("[R]eading the entirety of [Relators' Ex. 388], it is clear to me that this is to develop acceptance criteria for performance qualification of technical transfer of MMR II to the Durham facility"; "it is not the min-max range for the product;" and defining acceptance criteria as testing to demonstrate consistency of processing that happens in more than one site.).

[110] First, none of the cited materials does more than include the language Relators highlight in paragraph 32 about taking "this conversation off-line."  Second, when asked about this document, Ms. Keegan could only state that she did not specifically recall the email or write the email, so she did not know what the author meant.  Relators' Ex. 361 at 130:14-131:9 ("I don't specifically [remember receiving this email;" "I did not write this email;" and "I did not author this email.  I don't know what Kim meant.").

Appx20457

the cited documents and testimony were "in addition to" the Bennett analyses described in paragraphs 7 through 29 or whether they are merely communications about those analyses.

Relators also selectively quote from lengthy documents and do not include content that provides additional context for the portions of documents they cite.[111]

Finally, disputed as to Relators' suggestion that the Merck lacked assurance that the MMR-II vaccine, manufactured after the potency increase in 1999, did not meet the minimum mumps potency specification of 4.3 log at or before 24 months. For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ TCID$_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below 4.3 $\log_{10}$ TCID$_{50}$ (which would be considered "out of specification") for any lots at any interval through 24 months.[112] As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[113] and "testing" of the "current [lots]," which is reflective of "current production" is a

---

[111] For example, Relators cite some language from Relators' Ex. 83, but not the context for individuals at Merck questioned some of these analyses. *See* Relators' Ex. 83 at '9252 ("While Merck recognized … flaws [in the calculation of the minimum release potency], it felt that there was a high enough degree of uncertainty regarding current stability of MMR-II vaccine that it couldn't provide a reliable release specification at that time. At CBER's recommendation Merck designed a stability study with lots manufactured to the new mumps target and promised to set permanent release specifications with the data obtained from that study."). Additionally, the cited language in footnote 457 from Relators' Ex. 80 is misleading. The cited document states "[T]he probability of all of these ["worst case scenario"] extremes being realized on a single lot is very low. However there are no controls to ensure that they do not occur," not that there are "no controls" to ensure that MMR-II complied with having a potency of 4.3 through 24 months. Also, the language cited from Relators' Ex. 72 is misleading because the full statement is "Each time a lot tests below 4.3, MMD must file a [BPDR] to CBER detailing results of investigation and medical impact (estimate ~ 7% of lots)," and it does not state that a BPDR is required when *estimated* potency is below 4.3.
[112] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82). Finally, as an additional example, Relators' Ex. 390 is quoted for Merck's commitment to undertake a stability study with "lots manufactured to the new mumps target **and** [to] set permanent release specifications with the data obtained from that study." Relators' Ex. 390 at 5 (emphasis added).
[113] Relators' Ex. 49 at 219:21-220:4; 226:10-25 (Q: So if I want 95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots. And it's that information that would provide the assurance of current production being above 4.3.").

31

"more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[114]  FDA's Warning Letter to Merck made the same point.  In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[115]

As Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations between 1998 and 2004 testified, "no company" tests every lot of product to ensure it meets end expiry specifications.[116]  Instead, the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program . . . to confirm, in fact, that product throughout its expiry period was meeting specification."[117]  She further testified that:

> [Y]ou can't test every lot.  You don't test every lot.  No company or industry – it's not the industry standard, nor is it the regulatory expectation.  The way you have confidence is that you have an established manufacturing process that is executed according to that process.  Should there be any exception to that process that it would be evaluated and confirmed or even in those cases even monitored to check for something.  So it is the collective data, the collective experience of manufacturing and knowing how that performs which is then confirmed or denied, but confirmed through the stability testing.[118]

Dr. Gulati, an expert for Merck with experience designing and consulting regarding stability programs, also testified that the types of analyses discussed in paragraphs 7 through 29 should not have triggered concern at Merck that the vaccine was not meeting the label

---

[114] *Id.* at 222:11-223:5; 223:7-224:1 (Q.  So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A:  "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material.  If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market.").

[115] Merck's Ex. 143 at '0669.

[116] Relators' Ex. 416 (R. McKee Dep. Tr.) at 18:1-5; 21:25-22:12; 162:6-11.

[117] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8.

[118] Relators' Ex. 416 (R. McKee Dep. Tr.) at 163:12-25.

Appx20459

specifications because the data from the stability program continued to test at or above 4.3 at or before 24 months.[119]

Dr. Gulati testified further that when "realtime data is passing the specification," that's a "key point" because "CBER … evaluate[s] compliance based on label compliance -- based on realtime data, not based on the prediction models," like the ones discussed in paragraphs 7 through 29 and paragraph 33.[120]

34.    It is undisputed that Relators' Ex. 391 consists of excerpts from a June 30, 2004 Supplemental Biologics License Application (sBLA) for the purposes of substituting recombinant protein produce in yeast (rHA) for pooled human derived serum albumin (HSA) in the bulk manufacturing process for MMR-II.[121]    Relators' description of this sBLA in the first sentence is disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.  The sBLA consisted of dozens of volumes and hundreds of pages

---

[119] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No.  In my opinion, no.  It won't trigger a concern because we are in the process of building a model and we don't have any model finalized and approved yet.  And we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos.  It's not -- I mean, none of the stability data is showing what these memos are saying here.  I'm going to give you a few examples.  For example, in this, one of the memo you showed that end expiry is 4.1.  If you look at the -- all the realtime stability data, you're staying well above 4.3.  I mean, all of your lots which are put on stability as a part of study are annual stability, you are getting results above 4.3.  There is no [out of specification result].  The range log loss is .3 to .6.  So that is one piece of the whole analysis.  You did increase the titer.  You put the lots on stability.  And your stability lots are written in that specification, no OOS, 4.3 is from the data.  Your data is indicating that this is the right log loss and these are the right specification.  So that is one part of the -- what is going on.  Another part, I mean, I see that Merck is trying to do different analyses and trying to build a comprehensive statistical release model which can be used in future long term.  I mean, it could be their permanent model to determine the minimum release potency.  So those are two parallel efforts.  So, I mean this data -- I mean, this -- I mean, this will not raise a concern to me because your realtime data is annual report, annual stability report.  All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

[120] *Id.* at 319:15-320:17.

[121] Relators' Ex 391 at MRK-KRA00137854.

Appx20460

of information[122] including an entire module on stability from which the Relators selectively quoted the language in paragraph 34.

With respect to Relators' third sentence, it is undisputed that, as of 1999, the MMR-II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus"—equivalent to 4.3 $\log_{10} TCID_{50}$.[123] It is also undisputed that, after the FDA approved the change to the label in 2007, the M-M-R II label stated that "[e]ach 0.5 mL dose contains not less than … 12,500 $TCID_{50}$ of mumps virus"— equivalent to 4.1 $\log_{10} TCID_{50}$.[124] The remaining portions of the third sentence are disputed.

35. It is undisputed that Relators' Ex. 392 is a document titled "Regulatory Liaison FDA Conversation Record," dated May 2, 2005, and that this document contains the language selectively quoted in paragraph 35.

36. It is undisputed that Relators' Ex. 393 consists of excerpts from Merck's July 13, 2005 amendment to the June 30, 2004 Supplemental Biological Licensing Application and that the excerpt includes the language Relators selectively quote in paragraph 36.

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" in the first sentence is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

37. Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" in the first sentence is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

---

[122] *See, e.g.*, Merck's Ex. 333 at MRK-KRA00137827 (the comprehensive table of contents for the supplement, listing the fifteen volumes of clinical data and other information Merck submitted to FDA.)
[123] Merck's Ex. 166 (April 1999 Label) at 1.11.
[124] Merck's Ex. 167 (Current Label) at 1.

The cited materials also do not support Relators' proffered fact.[125]

38.     Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" in the first sentence is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Disputed that Relators have established that Merck included data beyond 24 months in the calculation of the slope (or loss rate) used in a calculation submitted to CBER with Merck's July 13, 2005 amended sBLA.[126]

It is further disputed that, to the extent data beyond 24 months was included in the calculation of slope (or loss rate), it biased "Merck's estimate of the rate" of potency loss.  Dr. Gulati testified that Dr. Stark's analysis of bias was premised on taking one slope across the entire 0 to 24 month time period and comparing it to one slope across the entire 0 to 30 month time period; she testified that this approach was inconsistent with Merck's methodology and understanding of potency loss at this time.[127]  At this time, Merck analyzed potency loss as bi-phasic – essentially, having one phase of higher loss from 0 to 6 months[128] and a second phase of linear (or constant) loss across the time period from 6 to 30 months.[129]  Where loss is constant

---

[125] While Relators selectively quote from Dr. Gulati's deposition, they omitted a reference to Dr. Gulati's testimony that she did not know what data was used for the purposes of calculating the slope (or loss rate) associated with Merck's July 13, 2005 submission.  Relators' Ex. 394 at 348:23-350:4; 353:16-22; 357:7-10 ("I don't know how he did it"); (Q: What tells us which 34 lots out of this were used?"; A: I don't know.  It doesn't tell me anything. . . .I cannot say for sure.  It could be, it could not be"); ("So I looked at it, but again, I mean, I did not confirm if this is the same table, what is being used here.").

[126] See Merck's response to paragraph 37.

[127] Relators' Ex. 394 at 349:5:21 (Dr. Stark is "using linear – he's using linear analysis from zero to 24 months, and . . . you have a plot, you have zero to 24 months.  He's going linear and the zero to 30 months . . .your slope will be different.")("I understand that he is considering [the entire period from 0 to 24 or 30 months] as a linear slope and it's different.  But Merck is doing it differently.").

[128] See, e.g., Relators' claim to this effect in paragraph 43.  See also Relators' Ex. 394 at 346:9-20 ("Q: Meaning it loses more at the beginning than at the end?"; A: "Yes.  Zero to six months is one phase and 6 to 30 months is second phase, it's linear."; Q: The slope is lesser in the second phase than it is in the first phase?"; A: "Yes, that is correct.  The slope is lesser in the second phase."

[129] Relators' Ex. 394 at 347:6-348:5; 348:10-21 ("So you're reading supplements from Merck. It appears that slope is biphasic. I mean, it's all over the supplements. Single phase is zero to six months, is linear from zero to six months, that's phase one. And then second phase is what they call the terminal slope, which is 6 to 30 months. So the way

from 6 to 30 months; the loss rate is constant whether you calculate the rate between 6 and 24 months or the rate between 6 and 30 months.[130]

39.     Relators' characterization that Merck "only" ever tested a certain number of lots annually is disputed.  As of June 1998, FDA's then-applicable draft guidance was that industry should initiate stability testing on an annual basis – one lot, per year.[131]  According to FDA, the purpose of this stability testing is "to provide evidence of how the quality of a [product] varies with time, under the influence of a variety of environmental factors such as temperature, humidity, and light."[132]  The results are used to evaluate and establish storage conditions and shelf life.[133]  WHO Guidance for evaluating the stability of vaccines, published in 2006, further confirms that stability studies are used to "monitor vaccine stability in the post licensure period," by placing "one or more lots" on long term stability studies.[134]

---

Merck is doing the analysis, they're calculating the slope, they're taking the data from 6 to 30 months with the consideration it's linear and they're calculating slope per month or per unit, or per unit, whatever it is. And then you took 30 months, 6 to 30 months of data, you calculate slope per month.  And then you multiply with 18 months because your total shelf life is 24.  So you get the 18-month log loss there. And then whatever is the log loss in 18 months, you add six months of first phase log loss, and that's how you calculate the total log loss); (Merck's supplements made clear that slope is calculated for phase one and then a "terminal phase slope from 6 to 30 months is calculated and then phase one is added);

[130] Relators' Ex. 394 at 344:13-345:12 ("If your log loss is linear, your slope, whether you use 24 months or 30 months of data is going to be constant.").

[131] *See, e.g.*, Merck's Ex. 334 (FDA Draft Guidance for Industry, Stability Testing of Drug Substances and Drug Products, June 1998) at 27.  When a product is initially approved or changed, shelf life and label storage instructions applicable to "*all* future batches" of the same product type are "based on testing a minimum of *three* batches of the drug product. *Id.* at 16.  Post-approval, annual batches of each "drug product, container and closure" are to be studied according to established stability protocols. *Id.* at 27, 76, 85 ("All changes should be accompanied by the standard stability commitment to conduct and/or complete long-term stability studies on the first 1 or 3 batches of the [product] and annual batches thereafter, in accordance with the approved stability protocol").  When FDA asked Merck to add additional lots to its annual stability testing, Merck committed to do so (see, e.g., Relators' Ex. 399) and then did so (see, e.g. Relators' Ex. 398, reflecting testing of three or four lots of MMR-II per year).

[132] Merck's Ex. 334 (FDA Draft Guidance for Industry, Stability Testing of Drug Substances and Drug Products) at 1.

[133] *See id.; see also* 21 CFR 211.137 (FDA's GMP regulations that "to assure that a drug product meet applicable standards of . . . strength . . . at the time of use, it shall bear an expiration date determined by **appropriate stability testing** described in 211.166") and 21 CFR 211.166 (GMP requires a "written testing program designed to assess the stability" where "the results . . . shall be used in determining . . . appropriate expiration dates").  These same GMP regulations demonstrate reliance on tests and test results like the ones Merck obtained, not modeling, to "determine an appropriate expiration date." 21 CFR 211.166.

[134] Merck Ex. 335 (WHO Guidelines on Stability Evaluation of Vaccines, October 2006) at 16, 19.

As Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations between 1998 and 2004 testified, "no company" tests every lot of product to ensure it meets end expiry specifications.[135]  Instead, the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through [the] stability program . . . to confirm, in fact, that product throughout its expiry period was meeting specification."[136]  She further testified that:

> [Y]ou can't test every lot.  You don't test every lot.  No company or industry – it's not the industry standard, nor is it the regulatory expectation.  The way you have confidence is that you have an established manufacturing process that is executed according to that process.  Should there be any exception to that process that it would be evaluated and confirmed or even in those cases even monitored to check for something.  So it is the collective data, the collective experience of manufacturing and knowing how that performs which is then confirmed or denied, but confirmed through the stability testing.[137]

Merck selects lots for testing in the stability program where they are representative of other marketed product and, as Merck's 30(b)(6) witness on manufacturing-related topics testified, lots are not "cherry picked" to be tested in the stability program.[138]  Instead, testing is planned and samples are selected by Merck's stability organization from across the manufactured lot.[139]

---

[135] Relators' Ex. 416 (R. McKee Dep. Tr.) at 18:1-5; 21:25-22:12; 162:6-11.

[136] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8.

[137] Relators' Ex. 416 (R. McKee Dep. Tr.) at 163:12-25.

[138] Relators' Ex. 38 at 113:16-117:18 (M. Stannard Dep. Tr.) (in response to a question about who decides which lots to sample, testifying that "The stability organization has an annual stability schedule that is communicated to the quality manufacturing organizations so we know the number of planned stability studies that were to occur.  So as part of the manufacturing schedule to make sure that we do comply and get in this case four, those will be planned so when you're manufacturing, you are picking a representative batch.  They should be just planned because they're supposed to be representative.  **They're no cherry picking if I can use that term**, to say I'm going to use this one.  It is  representative of any batch going on the market.") (emphasis added).

[139] Relators' Ex. 38 (M. Stannard Dep. Tr.) at 113:16-117:18 (testifying that "samples [are] taken across . . .lot[s]" that are tested; that samples are drawn at the "beginning, middle, [and] end"; and testifying in response to the question "How do you decide which lots you take samples from?," that "we typically -- we are obliged and take a lot that is representative of anything we're putting on the market.  So this would be typically a batch that is going on the market itself, manufactured in the same manner as others that are being put on the market as well.  We target one per quarter when we do these four per site.").

37

40.     Undisputed with the clarification that the transactional data for 2014 in Relators' Ex. 298 reflects 140 unique MMR-II lot numbers for 2014, not 142 as reflected in footnote 468 of Relators' (I) Responses to Merck's Statements of Undisputed Material Facts in Support of its First and Fourth summary Judgment Motions and (II) Their Corresponding Additional Statement of Material Facts.

41.     It is undisputed that Relators Ex. 49 contains the language selectively quoted in paragraph 41.

Disputed to the extent this quote is offered to suggest or infer that all lots should be tested for stability.  Mr. Bennett's full testimony was that all lots are not tested, but the lots tested can be understood to be representative of other lots not tested where the manufacturing process has not changed and Merck looks for lots that "do not conform" using stability monitoring programs.[140]

As Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations between 1998 and 2004 testified, "no company" tests every lot of product to ensure it meets end expiry specifications:[141]

> [Y]ou can't test every lot.  You don't test every lot.  No company or industry – it's not the industry standard, nor is it the regulatory expectation.  The way you have confidence is that you have an established manufacturing process that is executed according to that process.  Should there be any exception to that process that it would be evaluated and confirmed or even in those cases even monitored to check for something.   So it is the collective data, the collective experience of manufacturing and knowing how that performs which is then confirmed or denied, but confirmed through the stability testing.[142]

---

[140] Relators' Ex. 49 at 108:17-109:9 (Q: "[W]hat should Merck, if anything be doing to assure itself that the lots it retains . . . for the program are a representative sample of the lots that are not on the program?"; A: "The only way of doing that is through the enhanced stability monitoring program, looking for lots which don't conform . . . aside from just saying there is nothing in the production process of these lots which would make them different from the lots we have on study.").
[141] Relators' Ex. 416 (R. McKee Dep. Tr.) at 18:1-5; 21:25-22:12; 162:6-11.
[142] Relators' Ex. 416 (R. McKee Dep. Tr.) at 163:12-25.

Appx20465

As of June 1998, FDA's then-applicable draft guidance was that industry should initiate stability testing on an annual basis – one lot, per year.[143]  According to FDA, the purpose of this stability testing is "to provide evidence of how the quality of a [product] varies with time, under the influence of a variety of environmental factors such as temperature, humidity, and light."[144] The results are used to evaluate and establish storage conditions and shelf life.[145]  WHO Guidance for evaluating the stability of vaccines, published in 2006, further confirms that stability studies are used to "monitor vaccine stability in the post licensure period," by placing "one or more lots" on long term stability studies.[146]

42.     Disputed to the extent that "estimates" is not defined and the paragraph is misleading in the overall context of the materials Relators cite and Mr. Bennett's other testimony.

First, some of the cited testimony in footnote 470 consists of testimony about variability Mr. Bennett included in his calculations, and was not testimony about "all mumps potency measurements."[147]

---

[143] *See, e.g.*, Merck's Ex. 334 (FDA Draft Guidance for Industry, Stability Testing of Drug Substances and Drug Products, June 1998) at 27.  When a product is initially approved or changed, shelf-life and label storage instructions applicable to "*all* future batches" of the same product type are "based on testing a minimum of *three* batches of the drug product. *Id.* at 16.  Post-approval, annual batches of each "drug product, container and closure" are to be studied according to established stability protocols.  *Id.* at 27, 76, 85 ("All changes should be accompanied by the standard stability commitment to conduct and/or complete long-term stability studies on the first 1 or 3 batches of the [product] and annual batches thereafter, in accordance with the approved stability protocol").  When FDA asked Merck to add additional lots to its annual stability testing, Merck committed to do so (*see, e.g.*, Relators' Ex. 399) and then did so (*see, e.g.* Relators' Ex. 398, reflecting testing of three or four lots of MMR-II per year).

[144] Merck's Ex. 334 (FDA Draft Guidance for Industry, Stability Testing of Drug Substances and Drug Products) at 1.

[145] *See id.*; *see also* 21 CFR 211.137 (FDA's GMP regulations that "to assure that a drug product meet applicable standards of . . . strength . . . at the time of use, it shall bear an expiration date determined by **appropriate stability testing** described in 211.166") and 21 CFR 211.166 (GMP requires a "written testing program designed to assess the stability" where "the results . . . shall be used in determining . . . appropriate expiration dates").  These same GMP regulations demonstrate reliance on tests and test results like the ones Merck obtained, not modeling, to "determine an appropriate expiration date." 21 CFR 211.166.

[146] Merck's Ex. 335 (WHO Guidelines on Stability Evaluation of Vaccines, October 2006) at 16, 19.

[147] *See, e.g.*, Relators' Ex. 49 at 36:19-37:2 (discussing variability factored into the standard deviation, not potency measurements).

Appx20466

Second, Mr. Bennett's testimony is presented without important context. Mr. Bennett's testimony is excerpted in footnote 470. During his deposition, he compared the "true but unknown average potency" of an entire lot with hundreds of vials with the "known average potency" that arises from taking a sample of actual measurements across a particular lot.[148] While the "known average potency" of the entire lot is an "estimate" from this perspective, Mr. Bennett also testified that "the most reliable reasonable way" to calculate shelf life loss was to <u>test the potency of samples</u>,[149] which is what is done in Merck's stability program.[150]

Third, to the extent that paragraph 42 implies that estimates are not reliable, Mr. Bennett also testified that the results of that testing give assurance that lots released to market comply with the potency specifications on the label[151] and that "testing" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data"[152] discussed in paragraphs 7 through 29. FDA's Warning Letter to Merck made

---

[148] Relators' Ex. 49 at 38:1-18 (Q: "So what was the estimate that you're referring to?" A: "It's – the values are estimates; they aren't known, they aren't true in terms of a lot has a true but unknown average potency. So when I take a sample from that, I get an estimate of that true, but unknown average potency of the lot. So each of the measurements for release from these 20 lots is an estimate of the true, but unknown, average potency of those 20 lots, just as the potency at expiry would be an estimate of the true, but unknown average potency of that lot.").

[149] Relators' Ex. 49 at 31:8-21 ("Q. So if I have -- if I have a sample that has a release potency of five and I keep it for 24 months and do all the things you do to make sure that there's nothing funky going on, and the end expiry potency is four, and by end expiry, I'm talking 24 months, would the shelf life loss for that sample be one, five minus four equals one?"; A: "Yes."; Q: "And is there any other way that I could calculate shelf life loss for that actual sample?"; A: "A. I think that would be the most reliable reasonable way."

[150] *See* the annual stability reports cited in footnote 157, which reflect test results for lots of MMR-II at various time points and the ongoing assessment of potency from 0 months through 24 months. *See also* Relators' Ex. 49 at 111:13-17 ("They're not the actual potencies, they are <u>potency tests</u>. As I mentioned before, the potency test is three vials to get an estimate of the potency of the lot a release.").

[151] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want 95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots. And it's that information that would provide the assurance of current production being above 4.3.").

[152] *Id.* at 222:11-223:5, 223:7-224:1 (Q. So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A: "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material. If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market.").

the same point.  In it, FDA stated "[p]roducts must meet their specifications, not the historical

trend throughout the labeled expiry period."[153]  *See also* paragraph 33 *supra* (citing, among

other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile

Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens

. . . through execution of established manufacturing processes and monitoring of that data

through [the] stability program,"[154] and from Merck's expert Dr. Gulati that the modeling by

Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these

memos are saying"[155]).

43.      Disputed.  It is undisputed that Relators' Ex. 400, a 2010 Stability Annual

Review for MMR-II with rHA states that:

> In previous annual reviews, the slope evaluations for . . . mumps potency did not
> include data at Time Zero and 3 months due to the biphasic kinetics observed at
> accelerated storage conditions.  However, the biphasic kinetic approach will no
> longer be used so that atypical potency trends can be identified earlier in the
> study.[156]

For MMR-II, potency was tested at time zero and 3 month time points as part of Merck's

annual stability program before 2010 and as early as 1999 and the results were reported in

annual stability reports.[157]  The testing in Merck's stability program is conducted at these and

---

[153] Merck's Ex. 143 at '0669.

[154] Relators' Ex. 416 (R. McKee Dep. Tr.) at 160:22-161:8; *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

[155] Relators' Ex. 394 (Gulati Dep. Tr.) at 317:7-319:12 (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No.  In my opinion, no.  It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

[156] Relators' Ex. 400 at MRK-KRA01458201.

[157] *See, e.g.,* Merck's Ex. 336 at MRK-KRA01632673 (0 and 3 month results for Lot 0291 H in the 1999 annual stability report for MMR-II); Merck's Ex. 337 at MRK-KRA01633629 (0 and 3 month results for Lot 0500954 in the 2000 annual stability report for MMR-II); Merck's Ex. 338 at MRK-KRA01632817 (0 and 3 month results for Lot 1434K in the 2001 annual stability report for MMR-II); Merck's Ex. 339 at MRK-KRA01633598 (initial and 3 month results for Lot 1832K in the 2002 annual stability report for MMR-II); Merck's Ex. 340 at MRK-KRA01632945 (initial/0 and 3 month results for Lot 0636850 in the 2003 annual stability report for MMR-II);

other regular intervals to evaluate potential out-of-specification results and assess if the rate of loss is different than in prior lots of the vaccine.[158]

The materials cited by Relators do not define or explain the role of "slope evaluations" in the annual stability reports or the evaluation of potency in the annual stability program. Therefore, any inference or suggestion that using or not using Time Zero or 3 month data is meaningful to the accurate evaluation of potency results is not supported by the materials Relators cite.

## V.    OUTBREAKS

44.    Disputed.

Paragraph 44 is disputed because the source cited does not support the assertion in the paragraph that the information regarding the mumps cases reported in 2019 was as of November 24, 2019.

This Paragraph is misleading unless considered in the appropriate context.  During the years where it is claimed that there has been a resurgence of mumps cases, the percent reduction in the number of reported cases of mumps in the United States as compared to the pre-vaccine era annual estimate of 186,000 cases has been between 96% and 99.9%, with the reduction being 99% or greater in 8 of these years.[159]  In fact, the total cumulative number of mumps cases

---

Merck's Ex. 341 at MRK-KRA01632866 (initial/0 and 3 month results for Lot 0647679 in the 2004 annual stability report for MMR-II); Merck's Ex. 342 at MRK-KRA01633299 (initial/0 and 3 month results for Lot 0650345 in the 2005 annual stability report for MMR-II); Merck's Ex. 343 at MRK-KRA01632982 (initial/0 and 3 month results for Lot 0391 N in the stability data summary tables for the 2006 annual stability report for MMR-II); Merck's Ex. 344 at MRK-KRA01633728 (initial/0 and 3 month results for Lot 0644171TR in the stability data summary tables for the 2007 annual stability report for MMR-II).

[158] Merck's Ex. 91 at 9 ¶ 54 (discussing testing at regular intervals); *accord* the Annual Stability Reports cited in footnote 157 (reflecting testing at regular intervals during the entire 1999 to 2007 time period).  *See also* Merck's Ex. 91 at 10 ¶ 57 (discussing an analysis to whether current results "differ[] significantly" from historical lots); *id.* at 14 ("Merck conducts routine stability testing" "to monitor the product and compare it to the expectations for the product to verify that it meets specifications for potency.").

[159] *See* Merck's Ex. 280 (CDC, Mumps Outbreak-Related Questions and Answers for Patients, https://www.cdc.gov/mumps/outbreaks/outbreak-patient-qa.html) ("From year to year, the number of mumps cases can range from roughly a couple hundred to a couple thousand. In some years, there are more cases of mumps than

Appx20469

reported in the twenty years since 1999 is only 33,267 – significantly fewer than the 186,000 cases reported annually in the pre-vaccine era.[160] Using 2,618, the number of mumps cases identified in Paragraph 44 as having been reported in 2019, the percent reduction of mumps cases in 2019 as compared to the pre-vaccine era is 98.6%.

For further context, the number of cases of the vaccine-preventable diseases of pertussis (11,098 cases) and chickenpox (5,142 cases) as of October 12, 2019, is higher than the number of mumps cases as of that time (2,655 cases).[161]

---

usual because of outbreaks."); Merck's Ex. 99 (CDC, Mumps: For Healthcare Providers) ("Since the pre-vaccine era, there has been a more than 99% decrease in mumps cases in the United States. From year to year, the number of mumps cases can range from roughly a couple hundred to a couple thousand."); see also Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 100:5-9 ("Q. And when you say disease burden, are you just meaning the contracting of disease? A. So yes, and our reference point usually being a pre-vaccine era estimate of the disease burden."). In addition, Relators' Expert Dr. Shapiro testified that in the "prevaccine era, there were a couple hundred thousand cases" of mumps reported annually. He also testified that whether the number of mumps cases has gone up or gone down "depends [on] what your base line is" and that "it just depends [on] what your comparison is." He further testified that the number of mumps cases reported in 2006, the year where the greatest number of mumps cases were reported during what Relators' refer to as the "mumps resurgence," was a "blip" and that the number of mumps cases reported in 2016 (6,369) was "[c]learly … lower than 200,000" / "clearly lower" than the number of mumps cases reported in the prevaccine era. Relators' Ex. 8 (Shapiro Dep. Tr.) at 58:5-60:6.

[160] See Merck's Ex. 325 (2012 CDC Summary of Notifiable Diseases) at 105, 107; Relators' Ex. 238 (2013 CDC Summary of Notifiable Diseases) at 31; Relators' Ex. 239 (2014 CDC Summary of Notifiable Diseases) at 48; Relators' Ex. 240 (2015 CDC Summary of Notifiable Infectious Diseases and Conditions) at 53; Relators' Ex. 241 (2016 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables of Infectious Disease Data) at Table 2j; Relators' Ex. 242 (2017 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables of Infectious Disease Data) at Table 2j; Merck's Ex. 281 (2018 CDC Nationally Notifiable Infectious Diseases and Conditions, Table 2j (https://wonder.cdc.gov/nndss/static/2018/annual/2018-table2j.html); Merck's Ex. 326 (CDC Annual Summary 1977, MMWR (1978) 26(53): 1-77) at 2; Merck's Ex. 327 (CDC Annual Summary 1980, MMWR (1981) 29(54): 1-128) at 12.

[161] See Merck's Ex. 345 (CDC Nationally Notifiable Infectious Diseases and Conditions, United States: Weekly Tables, Table 1y (mumps), https://wonder.cdc.gov/nndss/static/2019/41/2019-41-table1y html); Merck's Ex. 346 (CDC Nationally Notifiable Infectious Diseases and Conditions, United States: Weekly Tables, Table 1z (pertussis), https://wonder.cdc.gov/nndss/static/2019/41/2019-41-table1z html); Merck's Ex. 347 (CDC Nationally Notifiable Infectious Diseases and Conditions, United States: Weekly Tables, Table 1kk (varicella), https://wonder.cdc.gov/nndss/static/2019/41/2019-41-table1kk.html).

Appx20470

## VI.    EFFECTIVENESS ESTIMATES

45.    It is undisputed that the CDC's determination that the median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88% is based on outbreak studies conducted by the CDC and others.[162]

Paragraph 45 mischaracterizes the record to the extent it uses "resurgence" to describe the number of mumps cases and outbreaks in the United States since 2006 because such use is misleading if not place in the appropriate context.  During the years that Paragraph 45 claims that there has been a resurgence of mumps, the percent reduction in the number of reported cases of mumps in the United States as compared to the pre-vaccine era annual estimate of 186,000 cases has been between 96% and 99.9%, with the reduction being 99% or greater in 8 of these years.[163]  In fact, the total cumulative number of mumps cases reported in the twenty years since 1999 is only 33,267 – significantly fewer than the 186,000 cases reported annually in the pre-vaccine era.[164]

Paragraph 45 is misleading and mischaracterizes the record to the extent it is intended to suggest that Merck's mumps vaccine is any less effective today than it was in 2006.  The focus on the low-end of the effectiveness range is inappropriate and is inconsistent with how the CDC estimates effectiveness rates, given that the low-end number is an individual study result and, as such, merely constitutes single data point.  Accordingly, the focus should be on the median effectiveness rate—the metric used by the CDC—which is based on the results of multiple

---

[162] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 131:18-19 (testifying that "the vaccine effectiveness has almost exclusively been measured in outbreak settings").
[163] *See* References cited in support of Paragraph 44 at Footnote 159.
[164] *See* References cited in support of Paragraph 44 at Footnote 160.

Appx20471

different studies.[165]  Not only has the median effectiveness rate as calculated by the CDC not

changed during this time,[166]  the effectiveness of Merck's mumps vaccine has remained constant

over time.[167]

Even if it were appropriate to focus on the low end of the range around the unchanged

88% 2-dose mumps effectiveness rate, the material cited in Paragraph 45 does not support the

assertion that it has "continually dropped."  The 66% figure for the low end of the range in 2012

is based on a single 2011 study that found a mumps effectiveness rate of 66%.[168]  The 31%

figure for the low end of the range in 2019, also based on a single paper, was from a study that

specifically calculated an effectiveness rate for vaccine recipients who received their second

dose of MMR II more than 13 years before the outbreak, a figure that was not calculated in

---

[165] When describing the effectiveness of the mumps vaccine the CDC reports its median effectiveness: "The median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%." Merck's Ex. 48 (*Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus-Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak*, MMWR, 2018:67(1):33-38) at 34; *see also* Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 57:11-20 (stating that the 88% median effectiveness rate for the mumps vaccine was based on "multiple different outbreaks"); *id.* at 30:18-31:12 (stating that the 88% effectiveness rate for the mumps vaccine "is a summary of multiple studies that have been conducted both in the United States and in other countries that have attempted to measure effectiveness").  The median is "the measure of central location that divides a set of data into two equal parts, above and below which lie an equal number of values."  Merck's Ex. 100 (CDC, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics (*Third Edition), Updated 2012), https://www.cdc.gov/csels/dsepd/ss1978/glossary.html) at Glossary-12; *id.* at 2-23, 2-54 (stating that the median "is not generally affected by one or two extreme values (outliers)" and that the "advantage of the median is that it is not affected by a few extremely high or low observations"); Relators' Ex. 22 (Atkinson Expert Report) at 8 (stating that "[m]edian values are often used in epidemiology when there is a wide range of values and the average ("mean") value does not accurately describe the distribution of values").

[166] *See, e.g.*, Relators' Ex. 402 at 1 (2019 CDC statement that the "mumps component of the MMR vaccine is about 88% (range: 31-95%) effective when a person gets two doses"); Relators' Ex. 403 at 1 (2012 CDC statement that "[t]wo doses of the mumps vaccine are 88% (range: 66-95%) effective at preventing the disease").

[167] *See* Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 129:9-11 (testifying that "[t]here has been no significant change in the estimate of [mumps] vaccine effectiveness for more than 10 years in general"—referring to the 10 year period ending in October 2017); Merck's Ex. 297 (Lewnard, Joseph and Grad, Yonatan, *Vaccine waning and mumps-re-emergence in the United States*, Science Translational Medicine, (2018) 10(433):1-10)at 6 (stating that the finding of the study is that mumps "vaccine effectiveness has not declined"); Relators' Ex. 247 (Grad Dep. Tr.) at 22:8-21, 25:11-26:4, 179:25-180:17 (testifying that there has not been a change in the effectiveness of the mumps vaccine over time); Relators' Ex. 22 (Attkinson Expert Report) at 8 (stating that "the overall effectiveness of the mumps vaccine has not changed over time).

[168] Merck's Ex. 348 (Deeks, Shelley et al., An assessment of mumps vaccine effectiveness by dose during an outbreak in Canada, Canadian Medical Association Journal, (2011) 183(9):1014-1020).

earlier studies.[169]   The effectiveness of the mumps vaccine among those who received their

second dose of MMR II less than 13 years before the outbreak was 89%--a finding of mumps

effectiveness that is fully in line with the CDC's constant recognition that 2 doses of MMR

vaccine is 88% effective in preventing mumps.[170]

## VII.   NO GOVERNMENT KNOWLEDGE

46.     Disputed.

Paragraph 46 is disputed as vague and ambiguous because "allegations" and "conduct" as

used in this Paragraph are imprecise, undefined, and subject to broad interpretation.

In addition, the material cited in Paragraph 46 does not support the assertions in this

paragraph.  Paragraph 46 relies upon Rule 30(b)(6) testimony from Mr. Sims and Dr. Pallansch,

CDC Rule 30(b)(6) designees, but the designations of Mr. Sims and Dr. Pallansch do not include

anything related specifically to "whether Relators' allegations are true or whether the conduct

Relators claim was improper occurred."[171]   Accordingly, the cited testimony was given by Mr.

Sims and Dr. Pallansch in their individual capacities with no showing that they would have

personal knowledge of the entirety of the CDC's knowledge regarding "whether Relators'

allegations are true or whether the conduct Relators claim was improper occurred."

Similarly, the material cited in Paragraph 46, even if admissible on this topic, does not

support the assertion that "the CDC *has no knowledge* of whether Relators' allegations are true

or whether the conduct Relators claim was improper occurred."  (Emphasis added.)  In the cited

testimony, Mr. Sims speaks mostly in the first person singular and does not address what others

---

[169] Merck's Ex. 294 (Cardemil, Cristina et al., Effectiveness of a Third Dose of MMR Vaccine for Mumps Outbreak Control, New England Journal of Medicine, (2017) 377(10):947-956) at 947.
[170] *Id.* at 951, 954.
[171] *See* Relators' Ex. 12 (September 26, 2017 Letter from Schuchat to Dykstra and Mahendranthan) at 2-5 (identifying the topics identified by Merck and Plaintiff's counsel about which Mr. Sims and Dr. Pallansch were permitted to testify on behalf of the CDC).

Appx20473

at the CDC may know.[172]  In addition, Paragraph 46 is misleading and mischaracterizes the record to the extent it does not include the testimony of Dr. Pallansch indicating that at "a minimum" at least one other person at the CDC, Dr. William Bellini, knew about the lawsuit as of "three to four years ago."[173]  Given that Dr. Pallansch's testimony does not address what was known by Dr. Bellini or by anyone at the CDC including those with whom Dr. Bellini may have discussed the litigation, the evidence cited in this Paragraph does not support the assertion that the "CDC had no knowledge of whether Relators' allegations are true or whether the conduct Relators claim was improper occurred."

Additionally, Paragraph 46 misconstrues Dr. Pallansch's testimony to the extent Relators assert that his testimony that he has "just a superficial understanding of the details of the allegations" and that the CDC has "made no determination" "one way or another as to the veracity of the allegations in the lawsuit" means that, or is the same as, "the CDC has no knowledge of whether Relators' allegations are true or whether the conduct Relators claim was improper occurred."  Dr. Pallansch's testimony falls far short of supporting these assertions as it, on its face, directly contradicts Relators' claim that "the CDC has no knowledge" of the identified topics.

Similarly, Paragraph 46 misconstrues Mr. Sims testimony to the extent Relators assert that his testimony that he is "not aware" of the CDC having concluded "one way or the other as to whether or not the allegations in [Relators'] lawsuit are true" and that he is not "not aware" of

---

[172] Relators' Ex. 249 (CDC 30(b)(6) Sims Dep. Tr.) at 87:21-89:7, 89:25-91:3, 197:7-11 (repeatedly using the phrase, "*I'm* not aware" when responding to questions regarding what the CDC knew about the Relators' allegations and the conduct they claim was improper) (emphasis added).

[173] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 16:9-17:20 (testifying that he believes that "Dr. Bellini was the one who initially informed [him] about this particular matter" three to four years ago and that he cannot say if others beside he and Dr. Bellini knew about the lawsuit prior to when he began to prepare for his deposition because he does "not know who Dr. Bellini may have talked with").

the CDC having "actual knowledge that Merck's mumps-containing vaccines are not fit for the intended purpose" or that they "are merchantable" means that or is the same as "the CDC has no knowledge of whether Relators' allegations are true or whether the conduct Relators claim was improper occurred." Mr. Sims' testimony falls far short of supporting the assertions that "the CDC has no knowledge" of the identified topics.

To the extent that "Relators' allegations" as used in Paragraph 46 are intended to include an allegation that Merck's mumps vaccine does not protect vaccinees from disease, then it is undisputed that the CDC believes that Relators' allegations are false. Although the evidence on this issue is vast, in short the CDC believes that Merck's mumps vaccine has a median effectiveness rate of 88%[174] and that it has effected a 99% reduction in the number of reported cases of mumps in the United States since the pre-vaccine era.[175]

47.    Disputed.

Paragraph 47 is disputed as vague and ambiguous because "problems," "issues" and "concerns" as used in this Paragraph and in the parentheticals in the footnotes cited in support of this Paragraph are imprecise, undefined, and subject to broad interpretation. It is further disputed that there was fraud committed in the conduct of Protocol 007 and in connection with "securing licenses" of Merck's mumps vaccines.

---

[174] *See, e.g.,* Merck's Ex. 48 (Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus-Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak, MMWR, 2018) at 34 (stating that "[t]he median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%"); Merck's Ex. 52 (CDC, Measles, Mumps, and Rubella (MMR) Vaccination: What Everyone Should Know, https://www.cdc.gov/vaccines/vpd/mmr/public/index.html) (stating that the "MMR vaccine is very effective at protecting people against measles, mumps, and rubella, and preventing the complications caused by these diseases" and that "[t]wo doses of MMR vaccine are … 88% effective against mumps").

[175] *See, e.g.*, Merck's Ex. 99 (CDC, Mumps for Healthcare Providers) ("Since the pre-vaccine era, there has been a more than 99% decrease in mumps cases in the United States. From year to year, the number of mumps cases can range from roughly a couple hundred to a couple thousand."); Merck's Ex. 81 (CDC, Mumps Vaccination, https://www.cdc.gov/mumps/vaccination.html) ("After the U.S. mumps vaccination program started in 1967, there has been a more than 99% decrease in mumps cases in the United States.").

Appx20475

In addition, the testimony of Dr. Pallansch cited in Paragraph 47 does not support the assertions contained in this paragraph to the extent it relates to compliance with mumps label specifications or with FDA licenses of mumps vaccines.  Paragraph 47 relies upon Rule 30(b)(6) testimony of Dr. Pallansch, a designee of the CDC, but the designation does not include anything related specifically to regulatory issues,[176] which is not surprising given that, as Dr. Pallansch explained, it is the FDA, not the CDC, that regulates vaccines.[177]  Specifically, the Rule 30(b)(6) designation does not include anything regarding compliance with mumps label specifications or with FDA mumps vaccine licenses.[178]  In addition, the Rule 30(b)(6) designation does not include the general topic of Merck's disclosures to the CDC.  Accordingly, the cited testimony of Dr. Pallansch regarding compliance with mumps label specifications and with FDA mumps vaccine licenses, and with Merck's disclosures to the CDC, was given in his individual capacity with no showing that he would have personal knowledge of all disclosures Merck had ever made to the CDC regarding these regulatory topics or comprehensive knowledge of Merck's disclosures to the CDC on any given topic.[179]

The testimony of Dr. Atkinson cited in Paragraph 47 also does not support the assertions contained in this paragraph because he was not testifying on behalf of the CDC.[180]

---

[176] *See* Relators' Ex. 12 (September 26, 2017 Letter from Schuchat to Dykstra and Mahendranthan) at 2-5 (identifying the topics identified by Merck and Plaintiff's counsel about which Dr. Pallansch was permitted to testify on behalf of the CDC).

[177] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 22:19-23:10 (describing the different roles between the FDA and the CDC, testifying that "we are a post-marketing assessment and evaluation, as opposed to a licensure issue," and answering "No, not that I'm aware," in response to the question of whether the CDC is a regulator of the manufacturers of vaccines).

[178] *See* Relators' Ex. 12 (September 26, 2017 Letter from Schuchat to Dykstra and Mahendranthan) at 2-5 (identifying the topics identified by Merck and Plaintiff's counsel about which Dr. Pallansch was permitted to testify on behalf of the CDC).

[179] In addition, although Paragraph 47 asserts that Dr. Pallansch testified he was not aware of Merck ever disclosing to the CDC any issues related to effectiveness, the cited testimony does not state that.

[180] *See, e.g.*, Relators' Ex. 245 (Atkinson Dep. Tr.) at 8:12-18 (Dr. Atkinson testifying that "… the opinions that I will provide today are mine.  I do not represent the opinions or official positions of either the Centers for Disease Control and Prevention, the Advisory Committee on Immunization Practices, the Department of Health and Human Services or the United States Public Health Service."); *id.* at 189:11-12 (Dr. Atkinson testifying that "I can't speak

In addition, Paragraph 47 mischaracterizes the record to the extent it is intended to suggest that there were "problems," "issues," or "concerns" with the efficacy, effectiveness, potency, shelf life, seroconversion, immunogenicity, or stability of Merck's mumps vaccine, issues with Merck's mumps vaccine relating to "not complying with label specifications, fraud in securing licenses, or clinical trial fraud," or cGMP violations associated with Merck's mumps vaccine.

Whatever meaning Paragraph 47 intends by "problems," "issues," and "concerns," it is undisputed that the CDC is the party best positioned to evaluate the effectiveness of Merck's mumps vaccine,[181] that the CDC has evaluated the effectiveness of Merck's mumps vaccine on many occasions,[182] that effectiveness is the single most important criterion to the CDC in its evaluation of vaccine performance,[183] that the CDC would not look to Merck for data about vaccine effectiveness because such studies are generally not performed by vaccine manufacturers

---

for what CDC knows or doesn't know" about the CDC's knowledge of any shelf life problems associated with Merck's mumps vaccine).

[181] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 33:17-24 ("Q. Fair to say that it's one of the CDC's jobs, if you will, to monitor vaccine effectiveness? A. That is one of the major things we do on the epidemiology side is to measure vaccine effectiveness for both old and new products. Q. Do you feel the CDC has the experience to perform that function? A. Absolutely."); *id.* at 36:6-13 ("Q. Would you say the CDC is the ultimate authority on the number of mumps cases in any given year? A. The CDC is the only entity that has a national system for determining the number of cases; therefore, by default, it is. Q. The ultimate authority? A. It is the source of the data."); Relators' Ex. 22 (Atkinson Expert Report) at 7, 8 (stating that the "CDC is best-positioned to monitor the effectiveness of vaccines, including mumps vaccines" and that based upon the type of activities the CDC conducts when evaluating mumps outbreaks and "as a result of the routine disease surveillance conducted by the CDC, the CDC is better positioned than the manufacturer to evaluate a vaccine's effectiveness").

[182] *See, e.g.*, Merck's Ex. 294 (Cardemil, Cristina et al., Effectiveness of a Third Dose of MMR Vaccine for Mumps Outbreak Control, New England Journal of Medicine, (2017) 377(10):947-956); Merck's Ex. 349 (Livingston, Kara et al., Mumps vaccine effectiveness and risk factors for disease in households during an outbreak in New York City, Vaccine, (2014) 32:369-74); Merck's Ex. 291 (Barskey, Albert et al., Mumps Outbreak in Orthodox Jewish Communities in the United States, New England Journal of Medicine, (2012) 367(18):1704-1713); Merck's Ex. 290 (Marin, Mona et al., Mumps vaccination coverage and vaccine effectiveness in a large outbreak among college students – Iowa, 2006, Vaccine, (2008) 26:3601-3607); Relator's Ex. 262 (Dayan, Gustavo and Rubin Steven, Mumps Outbreaks in Vaccinated Populations: Are Available Vaccines Effective Enough to Prevent Outbreaks, Vaccines, (2008) 47:1458-1467); Merck's Ex. 350 (Wharton, Melinda et al., A Large Outbreak of Mumps in the Postvaccine Era, Journal of Infectious Diseases, (1988) 158(6):1253-1260).

[183] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 100:25-101:16) (stating that vaccine effectiveness "is the key criteria that [the CDC] monitor[s]" and that vaccine effectiveness "certainly is evaluated routinely and is a key function of what we do here at the CDC"); *id.* at 33:3-5 (testifying that "[e]ffectiveness is [the CDC's] single-most important measure in terms of the impact that a vaccine has on disease in the population").

Appx20477

and are specifically the responsibility of the CDC,[184] and that CDC scientists have published extensively on issues related to mumps and Merck's mumps vaccine,[185] including specifically on the immunogenicity of Merck's mumps vaccine, which was the subject matter explored in Protocol 007.[186]

In addition, if Relators consider the seroconversion rates seen by Merck while the assay for use in Protocol 007 was being developed to be a "problem," "issue," or "concern," it is

---

[184] *See, e.g.*, Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 42:12-19 ("Q. Were these studies that have contributed to the CDC's understanding of mumps vaccine effectiveness performed by vaccine manufacturers? A. Vaccine effectiveness studies in general are not often conducted by the manufacturers. And they can be conducted by CDC, other state health departments, and with or without collaborations of academic collaborators, for example."); *id.* at 42:20-43:7 (testifying that he is not aware of Merck having any involvement with any CDC mumps vaccine effectiveness study); Relators' Ex. 146 (Kuter 30(b)(6) Dep. Tr.) at 152:2-22 (stating that the CDC, upon which Merck relies, "are the experts in terms of looking at vaccines and outbreaks and getting the associated effectiveness" and that "[i]ts not our role. CDC does that very effectively, much better than [Merck] would ever do"); *id.* at 63:1-63:5 (stating that the evaluation of vaccine "effectiveness is a role that's been given to state, local health departments as well as the CDC. [Merck does] not have that basic jurisdiction"); *id.* at 171:5-171:10 (stating that assessing vaccine effectiveness is "really extremely difficult for [Merck] to do. [Merck does not] have access to those populations. The CDC works with countries, states, locales that have outbreaks. And that's how [you] would … determine effectiveness"); Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 22:19-22:22 (stating that the role of the CDC is to "evaluate post-marketing how the vaccine is performing in the real world"); Relators' Ex. 22 (Atkinson Expert Report) at 10 (stating that the "mission statements of the NCIRD and the Division of Viral Diseases clearly describe the roles and responsibilities of this center and division of the CDC" and "expressly note that evaluations of vaccine effectiveness … are the responsibility of those at the CDC"); Relators' Ex. 22 (Atkinson Expert Report) at 15 (stating that "[o]utbreak investigations, among other things, allow for the collection of data that enables the CDC to make estimates of vaccine effectiveness and to otherwise evaluate how well a vaccine is working").

[185] *See, e.g.*, Relators' Ex. 22 (Atkinson Expert Report) at 12-14 (identifying CDC publications, peer-reviewed literature, and other authoritative publications authored by scientists at the CDC regarding mumps and mumps outbreaks).

[186] *See, e.g.*, Merck's Ex. 266 (Cortese et al., 2011); Merck's Ex. 351 (LeBaron, Charles et al., Persistence of Mumps Antibodies after 2 Doses of Measles-Mumps-Rubella Vaccine, Journal of Infectious Diseases, (2009) 199:552-560); Merck's Ex. 219 (Immunological Basis for Immunization Series, Module 16: Mumps (2010)) at 10 (stating that "seroconversion rates vary widely from 74% to 100% for vaccines containing the Jeryl Lynn strain"); Merck's Ex. 51 (Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013: Summary Recommendations of the [ACIP], MMWR, 2013) at 10 (stating that "[a]pproximately 94% of infants and children develop detectable mumps antibodies after vaccination with MMR vaccine (range: 89%-97%) (Table 1)").

undisputed that Merck disclosed to the CDC seroconversion rates at or below those rates,[187] and

that the CDC's own scientists have published on seroconversion rates in that range.[188]

48.      Disputed

Paragraph 48 is disputed as vague and ambiguous because "details" as used in this

Paragraph and in the parentheticals in the footnotes cited in support of this Paragraph is

imprecise, undefined, and subject to broad interpretation.  It is further disputed that there was

fraud or the falsifying of data committed in the conduct of Protocol 007.

The material cited in Paragraph 48 does not support the assertions contained in that

paragraph.  Paragraph 48 relies exclusively upon Rule 30(b)(6) testimony from Dr. Pallansch, a

CDC Rule 30(b)(6) designee, but the designation of Dr. Pallansch does not include anything

related specifically to Protocol 007 or to Merck's communications with the CDC about Protocol

007.[189]  Accordingly, the cited testimony was given in Dr. Pallansch's individual capacity with

no showing that he would have personal knowledge of all of the details surrounding Protocol

007.

The testimony of Dr. Pallansch cited in Paragraph 48, even if admissible on this topic,

does not support the assertion that "the CDC has no knowledge of the details surrounding

Protocol 007."  Dr. Pallansch testified that some of the CDC's most sophisticated mumps

scientists (including Dr. William Bellini) are aware of the allegations in this lawsuit,[190] which

---

[187] *See* Merck's Ex. 220 (February 25, 2010 Presentation) at Slide 11 (identifying results from a Merck study showing seroconversion rates for a Merck mumps vaccine as low as 53%); Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 90:15-19 (testifying that Merck's use of Slide 11 of its February 25, 2010 presentation during a meeting with the CDC amounted to Merck "notifying the CDC that it has seen seroconversion rates as low as 53 percent when using certain [mumps] virus strains in its assay").

[188] *See, e.g.*, Merck's Ex. 219 (Immunological Basis for Immunization Series, Module 16: Mumps (2010)) at 10 (stating that "seroconversion rates var widely from 74% to 100% for vaccines containing the Jeryl Lynn strain").

[189] *See* Relators' Ex. 12 (September 26, 2017 Letter from Schuchat to Dykstra and Mahendranthan) at 2-5 (identifying the topics identified by Merck and Plaintiff's counsel about which Dr. Pallansch was permitted to testify on behalf of the CDC).

[190] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 17:11-20.

Appx20479

include details about Relators' understanding of Protocol 007.  Moreover, Relators and/or their counsel met with the CDC about this case, which presumably also included a discussion of their understanding of Protocol 007.[191]

Additionally, Paragraph 48 is misleading and mischaracterizes the record because it fails to quote testimony of Dr. Pallansch that contradicts the assertion that the "CDC has no knowledge of the details surrounding Protocol 007."[192]

49.    Disputed.

The material cited in Paragraph 49 does not support the assertions contained in that paragraph.  Paragraph 49 relies upon Rule 30(b)(6) testimony from Dr. Pallansch, a CDC Rule 30(b)(6) designee, but the designation of Dr. Pallansch does not include anything related specifically to Protocol 007, or to the ELISA used in Protocol 007, or to Merck's communications with the CDC about those topics.[193]  Accordingly, the cited testimony was given in Dr. Pallansch's individual capacity with no showing that he would have personal knowledge of all disclosures Merck had ever made to the CDC on the topics of the cited testimony.  In fact, Dr. Pallansch specifically testified that the topic of this Paragraph was discussed at a presentation Merck made to the CDC, volunteered that he was not present at the

---

[191] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 11:15-17.

[192] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 15:3-8 (testifying that Protocol 007 "was a small clinical trial looking at the efficacy of the mumps component at some point back in the 1990s"); *id.* at 15:18-16:5) (testifying that "all I would know is there are general endpoints, and I don't know if they were explicitly stated in this context" and that "I know that the serologic endpoint was part of the clinical trial, and I do not know if it was a primary or a secondary endpoint"); *id.* at 121:25-122:6, 122:18-123:5 (stating that with respect to the results of Protocol 007 the CDC was aware of the information presented in Merck's February 25, 2010 Slide Deck (Merck's Ex. 242 (Immunogenicity of Mumps Containing Vaccines PowerPoint) MRK-KRA00091408) and testifying that the CDC "could have other details from this, because I know it was at least discussed from the point of view of the data that was related to the one-year time point, because that was of interest, as opposed to the six-week time point. So I know there was follow-up discussion about the one year, but I'm not so sure they were looking at it from a shelf-life perspective").

[193] *See* Relators' Ex. 12 (September 26, 2017 Letter from Schuchat to Dykstra and Mahendranthan) at 2-5 (identifying the topics identified by Merck and Plaintiff's counsel about which Dr. Pallansch was permitted to testify on behalf of the CDC).

meeting at which the presentation occurred, and provided no testimony to suggest he was informed of what was said.[194]

In addition, the material cited in Paragraph 49, even if admissible on this topic, does not support the assertion that "the CDC has no knowledge of the surrounding context of Merck's use of ELISA test in Protocol 007." In the cited testimony, Dr. Pallansch speaks mostly in the first person singular and does not address what others at the CDC may have known;[195] Dr. Pallansch does not say that either he or the CDC "has no knowledge" of anything; and Dr. Pallansch's testimony does not address the "surrounding context" of Merck's use of the ELISA, which context in fact is evident from the face of the relevant presentation slide.[196]

In addition, in extracting the words "I don't think we fully understand even to this day" from Dr. Pallansch's deposition testimony, Paragraph 49 appears to attempt to suggest that he was referring either to the context of Protocol 007 or to the basis of a change Merck made to the serostatus cutoff of the ELISA. The actual quotation was on a different topic. Moreover, the portion of the sentence omitted by Relators reads "but changing assays is not unusual."[197]

50.    Disputed. Although it is undisputed that the language from Dr. Pallansch's deposition transcript is quoted accurately, Paragraph 50 is nonetheless misleading and mischaracterizes the record because it fails to state that the quoted testimony of Dr. Pallansch regarding potency was limited given that it was provided in response to a question regarding the "possible causes for the resurgences of [mumps] outbreaks."

---

[194] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 120:6-10.

[195] *Id.* at 119:6-120:10 (stating, with respect to Merck's use of the ELISA in Protocol 007, that the CDC was aware of the information set forth Merck's February 25, 2010 presentation and testifying that although he wasn't at the February 25, 2010 meeting, Merck "may have verbally included other information" during the meeting); *id.* at 121:16-24 (testifying that "[t]here could have still been communication [outside of what's in Merck's February 25, 2010 presentation] within the work group context trying to explain some of this [the change of ELISA assay]).

[196] Merck's Ex. 242 (Immunogenicity of Mumps Containing Vaccines PowerPoint) at MRK-KRA00091408, Slide 9.

[197] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 121:2-3.

Paragraph 50 further mischaracterizes the record to the extent Relators' cite to testimony provided by Dr. Pallansch where he states in response to a question about whether a "change of potency could ... be relevant to how effective the vaccine is" that "if you cut the amount of vaccine – amount of virus in the vaccine, that could easily make a lower response" but they fail to cite to his testimony that "it's all hypothetical.  It's just a generic property of vaccines, because when they're licensed, that's one of the things that's required that the companies produce generically related to vaccine is potency."  Nor do they cite his testimony that the CDC does not take into consideration which vaccines "have the lowest potency that is sufficient to provide an effective response … because the vaccine that we're having a discussion around is already a licensed product at a certain potency, so it's not a factor that comes into consideration."[198]

In addition, although it is undisputed that the language from Dr. Pallansch's deposition transcript is quoted accurately,  by failing to include the following testimony in Paragraph 50, Dr. Pallansch's testimony lacks context and is, therefore, misleading: "Q.  Suppose there were changes made to potency. A. Again we'd want to know what clinical data was, you know, looked at in terms of a change in potency, and what was FDA's reaction to that."[199]

Paragraph 50 is also misleading and mischaracterizes the record because the materials cited in this Paragraph do not support the assertion that "CDC is not looking into any MMR-II manufacturing changes because Merck has not disclosed any changes."  Dr. Pallansch merely

---

[198] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 156:13-157:15.   In addition, Merck has never decreased the potency of the mumps component of the MMR vaccine – it has only increased it.  With respect to an increase in potency, Dr. Pallansch testified as follows: "Q. What about increasing potency, what impact could that potentially have on effectiveness?  A. Usually it has the effect of better response, at least immunogenicity of the data is quite solid; but in the context often it is a question of does this increase the safety issue rather than a immunogenicity or efficacy issue." Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 156:24-157:5.
[199] Relators' Ex. 7 (CDC 30(b)(6) Pallansch Dep. Tr.) at 148:17-21.

Appx20482

testified that he was "not aware of any such disclosure" by Merck not that Merck has not made such a disclosure.[200]

Additionally, Paragraph 50 is misleading and mischaracterizes the record to the extent it is intended to suggest that all manufacturing changes would be equally relevant to the CDC because Dr. Pallansch could not identify in "what way [manufacturing changes] would have been relevant to ACIP's determinations" and testified that "[i]t would depend upon the nature of the change, so I don't know.  There's not a general answer to that."[201]

---

[200] *Id.* at 142:10-13.
[201] *Id.* at 148:11-16.

Appx20483

DATED:  December 20, 2019                    Respectfully submitted,

                                                    */s/ Lisa C. Dykstra*

Eric W. Sitarchuk
Lisa C. Dykstra
R. Brendan Fee
Margaret E. Rodgers Schmidt
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Telephone:  215-963-5000
eric.sitarchuk@morganlewis.com
lisa.dykstra@morganlewis.com
brendan.fee@morganlewis.com
margaret.rodgers-schmidt@morganlewis.com

Dino S. Sangiamo
Sally W. Bryan
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD  21202
Telephone:  410-244-7400
DSSangiamo@Venable.com
SRBryan@Venable.com

Neal K. Katyal
Jessica Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC  20004
Telephone:  202-637-5600
neal.katyal@hoganlovells.com
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant*
*Merck Sharpe & Dohme, Corp.*
*(f/k/a Merck & Co. Inc.)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2019, a true and correct copy of the foregoing

under seal filing was served upon the following counsel of record via electronic mail:

Gordon Schnell
Robert L. Begleiter
Dan Vitelli
Marlene Koury
Hamsa Mahendranathan
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
Telephone: (212) 350-2700
gschnell@constantinecannon.com
rbegleiter@constantinecannon.com
dvitelli@constantinecannon.com
mkoury@constantinecannon.com
hmahendranathan@constantinecannon.com

Jeffrey F. Keller
Kathleen R. Scanlan
KELLER GROVER LLP
1965 Market Street
San Francisco, CA 94103
Telephone: (415) 543-1305
jfkeller@kellergrover.com
kscanlan@kellergrover.com

***Counsel for Relators***

Gerald B. Sullivan
Joel M. Sweet
Office of the U.S. Attorney for the
  Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
gerald.sullivan@usdoj.gov
joel.sweet@usdoj.gov

Holly H. Snow
United States Department of Justice
601 D Street NW, Suite 9909
Washington, DC 20004
holly.h.snow@usdoj.gov

***Counsel for the United States***

Dated: December 20, 2019

    _/s/ Lisa C. Dykstra_____
        Lisa C. Dykstra

    *Counsel for Defendant*
    *Merck Sharpe & Dohme, Corp.*
    *(f/k/a Merck & Co. Inc.)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING AND JOAN A. WLOCHOWSKI, <br><br> *Plaintiffs*, <br><br> v. <br><br> MERCK & CO., INC., <br><br> *Defendant*. | Civil Action No. 10-4374 (CDJ) <br><br> **FILED UNDER SEAL** <br><br> **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

**DEFENDANT'S RESPONSE TO RELATORS' ADDITIONAL
STATEMENT OF MATERIAL FACTS IN CONNECTION WITH
DEFENDANT'S FIRST AND FOURTH SUMMARY JUDGMENT MOTIONS**

Pursuant to the Court's Policies and Procedures for Civil Cases, Defendant Merck Sharp & Dohme Corporation, formerly known as Merck & Co., Inc. ("Merck"), submits this response to Relators' additional statement of material facts related to Merck's First and Fourth Motions for Summary Judgment.

## I.    MINIMUM MUMPS POTENCY SPECIFICATION ON MMR-II LABEL

1.    Disputed.  Multiple documents contemporaneous to the period between 1996 and 1998 evidence that Merck understood the potency specification of 4.3 $\log_{10}$ TCID$_{50}$ on the MMR-II label to refer to the potency at release, not expiry.[1]  Those same documents from 1996 to 1998 reflect that Merck conveyed to CBER its understanding that 4.3 $\log_{10}$ TCID$_{50}$ was the minimum release potency.[2]  Further, in connection with a 30(b)(6) deposition pertaining to Merck's release practices, Merck produced a witness to answer questions about the Company's release testing practices.  The witness provided an exhibit summarizing the Company's quality standards which state that 4.3 log was the minimum release potency for the mumps-component of MumpsVax, MM-Vax, and MMR for the time period "approx. 1998 to 10/3/99."[3]  Even CBER's communications reflect that the "minimum release potency" until February 2000 was understood to be 4.3.[4]

---

[1] *See, e.g.*, Merck's Ex. 152 at '5142 (February 26, 1996 email reflecting a discussion with CBER in which Merck indicated that while the label says 20,000, "historically we have provided the release specification" and CBER noting an interpretation that the labeled potency refers to the potency at expiry); Merck's Ex. 186 at '5508 (Merck's January 28, 1998 submission to CBER stating, "[c]urrently, the minimum release titer[] of . . . 20,000 . . . for the . . . mumps component[], . . . are specified"); *id*. at '5513 (background slides from December 16, 1997 meeting between Merck and CBER where slide 2 states: "Minimum release specifications →mumps:  20,000 (4.3 log) TCID$_{50}$/dose).
[2] *See* Merck's SUMF in Support of its Fourth Motion for Summary Judgment at ¶¶ 135, 153, 154.
[3] Merck's Ex. 201 at 2.
[4] For example, FDA's Warning Letter to Merck, dated February 9, 2001, requested an analysis of the range of potencies expected for product on the market where the assumed initial potency is the "minimum release potency specification that was in effect before February 2000."  Merck's Ex. 143 at '0669.  Merck responded, "if it is assumed that the initial potency is 4.3log TCI050/dose, **the minimum release mumps potency specification in effect prior to February 2000** . . ."  Merck's Ex. 177 at '7609 (Response to Warning Letter) (emphasis added).  Merck's response also reflected, in part, "As stated in our October 24, 2000 communication, we historically considered the M-M-R II labeled titers to reflect minimum release specifications."  *Id.* at '7608.

Only one document, Relators' Ex. 44, suggests that "in 1990, the mumps virus end-expiry potency for M-M-R™ II was established as 4.3." That document was prepared in 2011 by a Merck employee who testified that she was not involved in the original discussions with CBER about the vaccine's potency,[5] and that she has "no knowledge of 1990, I was not employed by the company" at that time."[6] The same employee testified that she prepared Relators' Ex. 44 after looking at regulatory filings and manufacturing SOPs,[7] but she also confirmed that she did not review certain documents, including documents that reflected "that discussions were held with CBER in 1998 and 1999 about the difference in interpretation of labeled mumps potency."[8] The same employee, testifying about Relators' Ex. 44, also testified as a 30(b)(6) witness that "in 1997, CBER clarified" that 4.3 log "should represent the end expiry titer for mumps in the US."[9] Relators also cite testimony from a separate and earlier 30(b)(6) deposition where the witness read or referred to the same portion of Relators' Ex. 44 that are disputed for the reasons stated above.[10]

---

[5] *See* Merck's Ex. 117 at 22:8-21 (30(b)(6) (testimony of Amy Keegan that she was "not directly involved in those discussions" and that her understanding was based only on reviewing Merck's filings with CBER).

[6] Relators' Ex. 361 at 82:11-20 (Deposition of Amy Keegan on April 27, 2017) (Q (in part): "When you drafted this document, was it your understanding that 4.3 was established as the end expiry in 1990"; A: "So I have no knowledge of 1990, I was not employed by the company. My interpretation of a CBER approval letter that I read stated minimum potency as 4.3. I interpreted that to mean mumps end expiry.").

[7] Relators' Ex. 361 at 87:21-88:2 ("As stated in the memo, I looked at regulatory filings and I looked at the manufacturing and standard operating procedure").

[8] Relators' Ex. 361 at 83:5-13 (Q: "At the time you drafted [the 2011 memo] did you know that discussions were held with CBER in 1998 and 1999 about the difference in interpretation of labeled mumps potency?"; A: "I did not consult that document in order to prepare this memo.").

[9] Merck's Ex. 330 at 19:13-22 (30(b)(6) testimony of Amy Keegan, answering a question about the basis for her answer that FDA suggested the 5.0 minimum release potency, that "in 1997, CBER clarified that the label potency of 4.3 log TCID50 per dose should represent the end expiry titer for mumps in the US" and that "Merck and CBER then engaged in additional discussions in late 1998 and early 1999 regarding increasing the release titer of Merck's mumps-containing vaccines.").

[10] Relators' Ex. 38 at 130:2-16 (Q: "Was there an end expiry potency in August 1999?" . . . A: "I have another document . . . so bear with me as I draw your attention to a letter to Annie Sturgess from Amy Keegan").

Appx20488

## II.    MUMPS OVERFILL

2.        It is undisputed that, on August 20, 1999, CBER directed Merck to increase the

minimum release potency for its mumps-containing vaccines to 5.0 $\log_{10}$ $TCID_{50}$ per dose.[11]

CBER's letter suggests Merck should formulate all lots filled on or after September 13, 1999 to

contain at least 5.2 $\log_{10}$ $TCID_{50}$ and that all lots submitted for CBER release after November 8,

1999 would be subject to a requirement of having a minimum release potency of 5.0 $\log_{10}$

$TCID_{50}$.[12] On September 15, 1999, Merck submitted a Prior Approval Supplement to support the

increased release potency of 5.0 $\log_{10}$ $TCID_{50}$ and CBER approved that supplement on February

11, 2000.[13]

It is undisputed that, prior to the changes described in the prior paragraph, Merck

manufactured the mumps component of MMR-II with a target manufacturing potency of 4.9

$\log_{10}$, which can also be expressed mathematically as 80,000.

It is undisputed that 5.2 $\log_{10}$ can also be expressed mathematically as 160,000 and that

5.0 $\log_{10}$, can be expressed mathematically as 100,000.

Any suggestion that referring to the potency values using ordinary numbers, rather than

log figures, supports inferences related to patient safety or that these changes were necessary

because of concerns that the mumps vaccine did not confer appropriate protection is not

supported by the materials Relators cite.

3.        Disputed.  The documents Relators cite do not support the proffered factual

statement that "FDA viewed" the "Overfill" discussed in paragraph 2 as "temporary" or as an

---

[11] *See* Merck's SUMF in Support of its Fourth Motion for Summary Judgment at ¶ 135.
[12] Merck's Ex. 185 at MRK-KRA01624909 (CBER's August 20, 1999 letter).
[13] See Merck's SUMF in Support of its Fourth Motion for Summary Judgment at ¶¶ 165 & 166.

Appx20489

"interim" measure.[14]  Neither CBER's August 20, 1999 letter regarding the "overfill" nor the February 11, 2000 approval of Merck's supplement application reference the approved change as "temporary" or as "interim."[15]

4.      It is undisputed that, since the manufacturing changes proposed by CBER in August 1999 and approved in February 2000, Merck has manufactured MMR-II with a target manufacturing potency of $5.2 \log_{10} TCID_{50}$ with a mumps minimum release potency of $5.0 \log_{10} TCID_{50.}$

## III.    PROTOCOL 007

5.      The relationship between the efficacy of Merck's mumps vaccine and Protocol 007 is undisputed.

The efficacy of the vaccine, as that term is formally used, was demonstrated in pre-licensure studies in which vaccine was given to some study subjects and withheld from others.[16] As the FDA stated in 2004 in connection with the components of ProQuad, which includes mumps, "the efficacy of those products has already been established."[17]

---

[14] The only documents Relators' cite for this statement were authored by Merck employees.  *See* Relators' Ex. 48 (internal email string between Merck employees); Relators' Ex. 79 (internal email message from a Merck employee); Relators' Ex. 362 (internal memo from Merck employee); Relators' Ex. 363 (internal memo); Relators' Ex. 364 (Merck submission to CBER, not reflecting CBER's response).

[15] *See* Merck's Ex. 185 at MRK-KRA01624909-'10 (CBER's August 20, 1999 letter) and Merck's Ex. 187 at MRK-KRA01897091-'092 (CBER's February 11, 2000 letter approving Merck's supplement to the mumps vaccine licenses).

[16] Relators' Ex. 30 (Durbin Dep. Tr.) at 62:25-63:9; Relators' Ex. 115 (Emini Dep. Tr.) at 128:24-129:6, 130:21-131:3; Relators' Ex. 39 (Musey Dep. Tr.) at 81:2-22; Relators' Ex. 112 (November 17, 2004 Submission) at MRK-KRA00126970.  *See also* Merck's Ex. 86 (Hilleman, Maurice et al., Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation, New England Journal of Medicine, (1967) 267(5):252-258) at 252-253, 257; Merck's Ex. 199 (Weibel, Robert et al., Live, Attenuated Mumps Virus Vaccine 3. Clinical and Serologic Aspects in a Field Evaluation, New England Journal of Medicine, (1967) 267(5):245-251) at 245-46 (describing how the original efficacy trial for Merck's mumps vaccine was conducted and the results as "giving an overall protective efficacy rate of 97 per cent," and with 20 additional unconfirmed cases included, "the overall protection rate would be 95 per cent.").

[17] Relators' Ex. 112 (November 17, 2004 Submission) at MRK-KRA00126970.

Appx20490

Protocol 007 was designed to demonstrate comparability by immunological testing between a lower potency of the vaccine and the release potency of the vaccine.[18]   Unlike a true efficacy study, in which disease outcomes are compared, Protocol 007 involved use of assays that measured immune responses.  As Merck explained to the FDA when submitting the application to lower the labeled potency, which was supported by Protocol 007, "[n]o studies of efficacy of M-M-R^TM II were performed in support of this application."[19]  Because the efficacy of the vaccine had been established, the control group was presumed efficacious and the assays used in Protocol 007 compared immune responses as a surrogate for efficacy.[20]   Neither assay measured efficacy or protection directly.[21]  As Merck explained to the FDA in its label change application, the PRN assay in Protocol 007 can be used as a surrogate for effectiveness.[22]

All of the material cited in support of Paragraph 5 is consistent with this role of efficacy, effectiveness and protection in Protocol and in that sense Paragraph 5 is undisputed.

Paragraph 5 is disputed and unsupported by any record evidence to the extent that it implies that Protocol 007 was intended to evaluate the efficacy, effectiveness or protection of the

---

[18] Relators' Ex. 105 (CSR) MRK-KRA00224982 at '021; Relators' Ex. 115 (Emini Dep. Tr.) at 69:23-70:7.

[19] Relators' Ex. 189 (January 29, 2004 Submission) MRK-KRA00000032 at '116.

[20] Relators' Ex. 6 (Burlington Dep. Tr.) at 236:17-237:7 ("And we know that the vaccine… [at] the release titer is an effective vaccine.  That's the assumption that's built into this trial."); *id.* at 283:24-284:9 ("vaccine used in the control group in these studies is related to that effective vaccine"); Relators' Ex. 115 (Emini Dep. Tr.) at 26:13-27:11 (testifying that the goal of Protocol 007 "was not to assess efficacy because the vaccine's effectiveness and efficacy had been defined many years previously in a former trial for efficacy" but rather "to study the immunogenicity of the vaccine using a specific set of assays as a measure of immunogenicity").

[21] Relators' Ex. 30 (Durbin Dep. Tr.) at 231:13-17 ("[T]he PRN, in and of itself, cannot predict efficacy.  It is an indirect indicator of efficacy.  It doesn't necessarily completely protect, particularly on an individual level."); *id.* 214:7 at (PRN is "an indirect marker of protection"); *id.* at 50:15-51:9 (while "efficacy [is] a direct measure of protection, the immunological assay is an indirect measure"); Relators' Ex. 115 (Emini Dep. Tr.) at 310:17-311:25 ("[The seroconversion rate as measured by the neutralization assay] is not an assessment of efficacy.  Rather what this is, is a measure of the ability of the vaccine at these three different tested potency levels to elicit a measurable immune response as measured by the assay.").

[22] Relators' Ex. 189 (January 29, 2004 Submission) at MRK-KRA00000032.  *See generally* Relators' Ex. 5 (Burlington Expert Report) at ¶¶ 38-44; Relators' Ex. 24 (Durbin Expert Report) at 6-9.

Appx20491

mumps component of MMRII in any other respect, such as, for example, providing a direct measure or percentage of efficacy.

6.    Disputed.

The material cited in Paragraph 6 does not support the first sentence of the paragraph.  Of the 19 exhibits cited in support of Paragraph 6, only two purport even to address the relationship between the 96% seroconversion rate on the MMR-II label and the vaccine's ability to protect against mumps.  One is a document sent to Merck by an outside marketing consultant, not authored by Merck.[23]  The second is one question and answer over counsel's objection, about a sentence in a PowerPoint presentation parts of which the witness had never seen, from a former Merck statistician.[24]

The material cited in Paragraph 6 does not support the second sentence of the paragraph.  At most, some of the documents cited in Paragraph 6 show that Merck was considering proposing a label change to the FDA under various hypothetical scenarios, none of which ever came to pass; there is no statement in the documents of the FDA's view that a label change would be required, or even allowed.  Even the documents that describe Merck's consideration of proposing a label change under the various hypothetical scenarios do not refer to changing the label regarding "mumps protection," but instead involve the seroconversion rate on the label.  There is no suggestion in any of the documents cited in Paragraph 6 or in any other documents of which Merck is aware of a change to the efficacy statement on the MMR II label that the controlled field trials on mumps vaccine "demonstrated a high degree of protective efficacy."

---

[23] The document is Relators' Ex. 379.  Relators do not cite to the cover email to which Relators Ex. 379 is attached.  Merck has attached that cover email hereto as Merck's Ex. 331.  As shown, Relators' Ex. 379 was an attachment to an email received from an outside marketing consultant.

[24] In fact, the witness specifically testified that he had no recollection of being involved in discussions about that issue.  Relators' Ex. 380 (Schofield Dep. Tr.) at 224:21-225:4.  Notably, Relators do not cite to any testimony or documents from Merck medical doctors or other relevant company scientists.

6

The material cited in Paragraph 6 does not support the third sentence of the paragraph. At most, some of the documents cited in Paragraph 6 contain a speculative statement by the author that a change in the seroconversion rate could lower the bar for competition. There is no indication in any of the documents that this impacted any decision made by Merck or that any document author indicated that it would or should impact any decision to be made by Merck. In addition, Paragraph 6 cites to testimony from a GlaxoSmithKline ("GSK") Rule 30(b)(6) corporate designee, April Cohen. Ms. Cohen testified that ███████████████████████████

████████████████████████████████████████████████████████████[25]

███████████████████████████████████████████████████████

██████████████████████████████████████████.[26]

## IV.    MERCK'S POTENCY LOSS, STABILITY, AND SHELF-LIFE ANALYSES

7.     It is undisputed that, from approximately 2001 to 2004, Philip Bennett was a statistician for Merck with certain responsibilities for calculations related to the potency and stability of the mumps vaccine.[27] To the extent that this paragraph suggests that Mr. Bennett was "primarily" responsible for MMR-II potency and stability, that suggestion is not supported by Relators' citations and is contradicted by Mr. Bennetts's own deposition testimony.[28]

---

[25] Relators' Ex. 375 (Cohen Dep. Tr.) at 39:20-45:1, 165:21-168:12, 168:21-169:11.
[26] *Id.* at 151:6-152:12.
[27] Relators' Ex. 49 at 12:5-7, 12:10-14 ("In 2001, I was a statistician" who was, "within [his] department" "the person responsible for the live virus vaccines – measles, mumps and rubella.").
[28] *Compare*, for example, Relators' statement that Bennett "primarily" dealt with MMR-II potency and stability issues," with the full exchange at Bennett's deposition: (Q. "So up until 2004, you were the statistician who dealt with any potency and stability issues dealing with M-M-R?" A: "Myself primarily, also Tim Schofield and Jim Clair."). Relators' Ex. 49 at 18:1-6.

Any additional suggestion that Mr. Bennett was singularly "responsible" for the stability monitoring program is also not supported by Relators' citations and is also contradicted by Mr. Bennetts's deposition testimony.[29]  The remainder of paragraph 7 is undisputed.

8.    The first sentence of paragraph 8 is not supported by a citation to the record.[30]  It is undisputed that Phil Bennett testified that "the modeling he did was supposed to provide a 95 percent confidence level that the end expiry potency would be reached."[31]  Any suggestion that "modeling" was the only or best way to provide assurance regarding end expiry potency is not supported by the cited materials and is contradicted by other testimony from Mr. Bennett and others on this same topic.

During his deposition, for example, Mr. Bennett testified that the stability monitoring program that Merck uses and historically has used gives assurance that lots released to market comply with the potency specifications on the label.[32]  He further testified that lots tested on stability give comfort that other lots, not retained for stability testing, comply with the specifications.[33]  He also testified that the assurance that product will comply with specifications

---

[29] *Compare*, for example, Relators' statement that Bennett was "responsible" for Merck's stability monitoring process, with Bennett's deposition testimony that "Cindy Morrisey was in MMD as –responsible for the stability programs" and that Cindy Morrisey was "the person responsible for the stability studies."  Relators' Ex. 49 at 13:16-17, 214:9-16.

[30] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5 ("The Court will not consider any description of a fact that is not supported by citation to the record. Statements of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements, such as the title of or numbered reference to a document, the name of a deponent and the page(s) of the deponent's deposition, or the identity of an affidavit or declaration and the specific paragraph relied upon. Pinpoint citations are required.").

[31] Relators' Ex. 49 at 225:6-11.

[32] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want  95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots.  And it's that information that would provide the assurance of current production being above 4.3.").

[33] *Id.* at 220:6-10.

comes from this stability testing and from the manufacturing and production processes.[34] As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[35] and "testing" of the "current [lots]," which is reflective of "current production" is a "more reliable measure of assuring . . . that the lots are compliant with the potency specifications" than the "modeling from historic data."[36] FDA's Warning Letter to Merck made the same point. In it, FDA stated "[p]roducts must meet their specifications, not the historical trend throughout the labeled expiry period."[37]

As discussed more fully in Merck's Response to paragraph 33 (below), other Merck employees and experts similarly testified that stability testing provides assurance that lots comply with end-expiry potency requirements. *See* paragraph 33 *infra* (citing, among other things, deposition testimony from Dr. Roberta McKee, Merck's VP of Vaccine and Sterile Quality Operations, that the "assurance" that lots comply with the end expiry potency "happens . . . through execution of established manufacturing processes and monitoring of that data through

---

[34] *Id.* at 220:11-14.

[35] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want 95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A: "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots. And it's that information that would provide the assurance of current production being above 4.3.").

[36] *Id.* at 222:11-223:5, 223:7-224:1 (Q. So let's take a point in time when you were doing the modeling, say in 2004. . . At that point in time, which was, if either, a more reliable indicator as to whether or not a particular lot was going to comply with the potency specifications; the modeling that you were doing or the [] stability monitoring program?"; A: "Again, I would say the [] stability monitoring" . . . "because that's an indication of the present material. If, indeed, there had been any change in stability over time, . . . the current material on test would be reflective of the current material being released to the market."); *see also* Relators' Ex. 381 at '96072 (reflecting data used for the analysis from lots with a date of manufacture between "1/95" and "5/98," which consists only of historical lots from before the release potency was increased).

[37] Merck's Ex. 143 at '0669.

[the] stability program,"[38] and from Merck's expert Dr. Gulati that the modeling by Mr. Bennett "won't trigger a concern" because "none of the stability data is showing what these memos are saying"[39]).

9.    It is undisputed that Relators' Ex. 381 consists of a document from Phil Bennett that is dated February 27, 2001.  The statement that Mr. Bennett performed a potency loss, stability, and shelf-life analysis incorporating potency measurements from samples of 20 lots of mumps vaccine is not supported by the materials Relators cite.[40]

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

10.    Relators' Ex. 381 is a document from Phil Bennett, dated February 27, 2001, that contains the language selectively quoted by Relators in paragraph 10.

Any suggestion that the statement in Exhibit 381 is an accurate reflection of whether lots manufactured at 5.0 complied with an end-expiry potency of 4.3 is disputed.  For example, during his deposition, Mr. Bennett testified about the analysis he performed in Exhibit 381 and testified that it was an "overestimate" of loss because "other data and datasets . . . show a lower [average shelf life] loss."[41]  When pushed to clarify, Mr. Bennett testified further that he thinks

---

[38] Relators' Ex. 416 at 160:22-161:8. (R. McKee Dep. Tr.); *see also id.* at 163:12-25 (testifying that assurance arises form "the collective data, the collective experience of manufacturing," which is then "confirmed through the stability testing").

[39] Relators' Ex. 394 at 317:7-319:12 (Gulati Dep. Tr.) (Q: So absent knowing anything in that background, shouldn't this memo have triggered concern at Merck that it wasn't meeting the label specifications?"; A: "No.  In my opinion, no.  It won't trigger a concern because . . . we have this realtime stability data which is all in the specification which is not showing the concern which are shown in these memos . . . All realtime data is passing the spec, there's no issue there with the process with the overfill lots.").

[40] Relators' Ex. 49 at 30:18-31:6 (In response to a question about whether the analysis in Exhibit 381 "was taken from 20 actual lots," Mr. Bennett testified "I don't know" and "I don't know that, but that is a way that it probably was done based on reading this.").

[41] Relators' Ex. 49 at 58:3-9 (Q:  "And why do you think this would be an overestimate?"; A: "Inasmuch as other data and datasets that I've seen show a lower [average shelf life] loss than this."); *id.* at 59:18-20 (Q: "And sitting here today, you think this was an overestimate?"; Q:  "Yes.").

the February 27, 2001 analysis overestimates loss based upon access to data from more observations "with a lower variability and a lower average."[42]

Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

With respect to Relators' second sentence, it is undisputed that, as of 1999, the MMR-II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus"—equivalent to 4.3 log10 $TCID_{50}$.[43]  It is also undisputed that, after the FDA approved the change to the label in 2007, the M-M-R II label stated that "[e]ach 0.5 mL dose contains not less than … 12,500 $TCID_{50}$ of mumps virus"— equivalent to 4.1 log10 $TCID_{50}$.[44]  The remaining portions of the second sentence are disputed.

11.    Relators' Ex. 381 is a document from Phil Bennett, dated February 27, 2001, that reflects that the memo was addressed to Keith Chirgwin and Roberta McKee.

Disputed to the extent that the materials cited in support of this paragraph do not reflect or confirm the titles for Mr. Chirgwin or Dr. McKee.[45]  Also disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

12.    Relators' Ex. 86 is an email from Phil Bennett that contains the language selectively quoted by Relators in paragraph 12.

---

[42] *Id.* at 59:18-60:11.
[43] Merck's Ex. 166 (April 1999 Label), at 1.11.
[44] Merck's Ex. 167 (Current Label) at 1.
[45] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5 ("The Court will not consider any description of a fact that is not supported by citation to the record. Statements of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements, such as the title of or numbered reference to a document, the name of a deponent and the page(s) of the deponent's deposition, or the identity of an affidavit or declaration and the specific paragraph relied upon. Pinpoint citations are required.").

Appx20497

Disputed to the extent that, during his deposition, Mr. Bennett testified that he did not recognize Relators' Ex. 46, did not recall sending this email, did not specifically recall making the calculations in the document or any reason why he sent the email – other than in response to an earlier email in the same thread.[46]

Disputed further to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

13.     It is undisputed that Relators' Ex. 86 is an email from Phil Bennett that contains the language selectively quoted by Relators in paragraph 13. Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Any suggestion that the statement in Exhibit 86 is an accurate calculation of the shelf life for MMR-II is disputed. For example, during his deposition, Mr. Bennett was asked if he had reason to question the accuracy of the calculation in this document. He testified:

> Accuracy in terms of correctly analyzing the data in hand, no – they . . . would be accurate. Accurate in terms of characterizing our product, that would be limited to the fact that this is [] based upon a limited dataset and a specific analysis requested for it.[47]

Mr. Bennett also testified that he could not say that this was the most reliable calculation at the time.[48]

It is undisputed that the FDA-approved shelf life for MMR-II has always been 24 months.

---

[46] Relators' Ex. 49 at 156:21-22, 158:18-21, 159:13-19, 160:6-9.
[47] Relators' Ex. 49 at 160:10-18.
[48] Relators' Ex. 49 at 160:19-161:3 (Q: Was this the most reliable calculation you came up with at the time with the data available to you? A: "[i]t's impossible to say what's most reliable. I mean, there are other datasets, other analyses, and to know which is – there is no correct one or best – to know best, I – you can't tell.").

Appx20498

14.    Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

Relators' Ex. 86 lists the names of the 18 individuals in the "to" field of Mr. Bennett's email.  Mr. Bennett testified that he did not recall sending this email or any reason why he sent the email to these particular recipients – other than in response to an earlier email in the same thread.[49]  Therefore, any inference that Mr. Bennett was communicated to "upper management" for any particular reason is not supported by the record and is disputed.  It is undisputed that, during his deposition, Mr. Bennett stated that a number of people on the email string "were in upper management."[50]

15.    Disputed.  The materials cited in support of this paragraph do not itemize the number of lots discussed in the email in the same manner as in Relators' proffered factual statement about incorporating measurements from samples of "at least 12 lots."  Relators' Ex. 382 does not list or specify which lots were analyzed; it contains the language quoted in the supporting footnote that references "9 lots," but does not specify an analysis of "3 lots released at 5.0."  Also disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

16.    Disputed to the extent that the phrase "potency loss, stability and shelf-life analysis" is not a defined term and the meaning of it is not clear from the paragraph or the materials cited in support of this paragraph.

---

[49] Relators' Ex. 49 at 156:21-22, 158:18-21, 159:13-19, 160:6-9.
[50] Relators' Ex. 49 at 159:8-11.

Relators' Ex. 382 is an email from Phil Bennett that contains the language selectively quoted by Relators in paragraph 16.  Any suggestion that the statements in Exhibit 382 are an accurate calculation of the shelf life for MMR-II or the calculation of shelf-life loss is disputed.  During his deposition, Mr. Bennett did not remember this email exchange[51] and did not specifically recall how he performed the calculations discussed in the email string.[52]  He was asked if lots made after the increase to the minimum release potency had already lost .7 logs by the time of this email and testified "I wouldn't say that."[53]

The scatter plots included in the graphs in Relators' Ex. 382 reference potency measurements for lots filled from "12/86 -12/94," "1/95-5/99," and "8/99-6/00."[54]  Any suggestion that the January 2002 email analysis is evidence that the mumps component of MMR-II, manufactured after the minimum release potency increased, failed to have an end-expiry potency at or before 24 months is disputed.  For all testing on lots manufactured and released with a release potency at or above $5.0 \log_{10} TCID_{50}$, the potency testing conducted in Merck's stability program did not reveal any results below $4.3 \log_{10} TCID_{50}$ (which would be considered "out of specification") for any lots at any interval through 24 months.[55]  As Mr. Bennett testified, these results from Merck's stability monitoring program give assurance that lots released to market comply with the potency specifications on the label[56] and "testing" of the "current [lots],"

---

[51] Relators' Ex. 49 at 177:9-10.
[52] Id. at 180:15-17.
[53] Id. at 181:17-182:8.
[54] Relators' Ex. 49 at 183:5-184:2.
[55] Merck's SUMF in Support of its Fourth Motion for Summary Judgment ¶ 189 (citing Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82).
[56] Relators' Ex. 49 at 219:21-220:4, 226:10-25 (Q: So if I want  95 percent confidence level that the M-M-R vaccine that Merck is manufacturing meet the end expiry potency for mumps, am I better suited to use the type of modeling that you conducted or the stability monitoring program? . . . A:  "My interpretation of your words "the stability monitoring program," perhaps I'm mistaken, but to me, that refers to the current stability program and the number of lots and the number of intervals and the compilation of data from . . . those lots.  And it's that information that would provide the assurance of current production being above 4.3.").